**No. 2:21-CV-0062-Z-BR**

**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**AMARILLO DIVISION**

---

**JOSHUA DAVID STOCKER,**

**PETITIONER**

**v.**

**BRIAN COLLIER, DIRECTOR, TDCJ,**

**RESPONDENT**

---

# APPENDICES TO BRIEF IN SUPPORT OF PETITION FOR WRIT OF HABEAS CORPUS

---

SUBMITTED BY:

JAMES EDD WOOLDRIDGE
Attorney & Counselor at Law
SBN 24010492
First Bank Southwest Building
600 S. Tyler Street
Suite 1704
Amarillo, Texas 79101
Tel: (806) 418 8575
Fax: (806) 418 8576
j.e.wooldridge@att.net

# TABLE OF CONTENTS


**TABLE OF CONTENTS** 2

**APPENDIX A** 5
COURTS'S EXHIBITS - STATE'S EXHIBIT 263

**APPENDIX B** 8
CO-DEFENDANT'S SUPPORTING AFFIDAVIT

**APPENDIX C** 13
ATTORNEY'S SUPPORTING AFFIDAVIT

**APPENDIX D** 16
REPORTER'S RECORD EXCERPT, VOLUME 10, STATE V. STOCKER, 15,307-A

**APPENDIX E** 18
REPORTER'S RECORD EXCERPT, VOLUME 10, STATE V. STOCKER, 15,307-A

**APPENDIX F** 25
REPORTER'S RECORD EXCERPT, VOLUME 10, STATE V. STOCKER, 15,307-A

**APPENDIX G** 39
REPORTER'S RECORD EXCERPT, VOLUME 10, STATE V. STOCKER, 15,307-A

**APPENDIX H** 45
USE IMMUNITY AGREEMENT (PATRICK)

**APPENDIX I** 47
LEDBETTER MEMO

**APPENDIX J** 49
REGISTER OF ACTIONS, 18,834-A

**APPENDIX K** 52
REPORTER'S RECORD EXCERPTS, VOLUME 11, STATE V. STOCKER, 15,307-A

**APPENDIX L** **66**
Use Immunity Agreement (Garcia)

**APPENDIX M** **68**
Use Immunity Agreement (Patrick), Defense Exhibit 14, 17,288-A

**APPENDIX N** **70**
Letter, Farren to Robnett, 7-19-2004

**APPENDIX O** **72**
Findings of Fact & Conclusions of Law, W-15,307-A-1

**APPENDIX P** **76**
Cates note to Farren, found in 15,307-A

**APPENDIX Q** **80**
Register of Actions, State v. Kimberlin, 15,308-A

**APPENDIX R** **85**
Register of Actions, State v. Kimberlin, 17,288-A

**APPENDIX S** **88**
TDCJ Offender Information, Kimberlin

**APPENDIX T** **90**
Kimberlin Booking Photograph

**APPENDIX U** **96**
Kimberlin (Craig) Facebook Screenshot

**APPENDIX V** **99**
Kimberlin (Codi) Facebook Screenshot

**APPENDIX W** **102**
Kimberlin (Jessica) Facebook Screenshot

**APPENDIX X** **107**
Kimberlin Pro Se Motion for Conference Call, 17,275-A

**APPENDIX Y** **117**
AFFIDAVIT - JEREMY MARC GREEN

**APPENDIX Z** **122**
WIRETAP EXCERPT

**CERTIFICATE OF COMPLIANCE** **127**

# APPENDIX A

07

15307A - Randall 47th

State v Stocker -

Courts Exhibits - Refered to in Court Reporters' Record

FILED
Jo Carter
District Clerk
Randall County, Texas

JUL 22 2005

STATE'S EXHIBIT 243

# USE IMMUNITY AGREEMENT

By my signature below I, Guin Garcia acknowledge and affirm that I have entered into a use immunity agreement with the Randall County Criminal District Attorney's Office. I understand that I have both a 5th and 6th Amendment right under the United States Constitution to have an attorney present to advise me during any interrogation by law enforcement authorities. I understand this agreement provides that if I give truthful, accurate, and complete information about The Dustin Pool Homicide Investigation to Sgt. Mark Brown that said information will not be used against me in any prosecution. I also understand that if I provide information that is not truthful, accurate, and complete that this agreement is void and that the promised immunity if forfeited.

Date: 9-8-03

x [signature]
Declarant

[signature]
Randall County Criminal District Attorney's Office

Mark K. Brown
Witness

Witness

# APPENDIX B

NO. W-15,307-A-1

| | | |
|---|---|---|
| **EX PARTE** | § | **IN THE DISTRICT COURT** |
| | § | |
| | § | **47TH JUDICIAL DISTRICT** |
| | § | |
| **JOSHUA DAVID STOCKER** | § | **RANDALL COUNTY, TEXAS** |

**CO-DEFENDANT'S SUPPORTING AFFIDAVIT**

**TO THE HONORABLE JUDGE OF SAID COURT:**

Tori Brooke Patrick appeared in person before me today and stated under oath:

"My name is Tori Brooke Patrick. My date of birth is February 21ST, 1979. I am thirty-eight years of age, and I am fully competent to make this affidavit. The facts stated in this affidavit are within my personal knowledge and are true and correct.

I am the person named as the accused in the indictment charging Kidnapping, a Third Degree Felony, against Tori Brooke Patrick in Cause No. 18,834-A in the 47TH Judicial District Court in and for Randall County, Texas, and in the indictment, now dismissed, charging Capital Murder in Cause No. 15,310-A in the 47TH Judicial District Court in and for Randall County, Texas. The facts giving rise to the charges against me in both aforesaid matters were the same as giving rise to the charge against co-defendant Joshua David Stocker in the present matter.

On the original charge of Capital Murder in Cause No. 15,310-A, I was arrested June 24TH, 2003. I was subsequently released on bond on June 28TH, 2003. I changed residence by a move to Midland, Texas on July 3D, 2003. I remained a resident of Midland until sometime around January, 2005. At no point during or after the investigation and trial of my co-defendants was I ever notified that I had been the subject of any wiretapping operation. I was only notified that I had been the subject of wiretaps after the inadvertent discovery of a note wherein it was revealed that Farren and crew had been listening to me but that Jeremy Fowler opined that I honestly did not believe they were listening to me. The note was a post-it "sticky" and

accompanied another note with investigator Bobbie Ledbetter's heading whereupon I had given my second address in Midland, and would have been dated , well after I had left the confines of the Randall County Jail. During that period I was a cooperating witness in the preparatory lead-up to Joshua Stocker's Capital Murder trial.

During the time I was in Midland I made frequent return trips to Canyon and Amarillo in order for the Randall County *Criminal* District Attorney, James Farren, in conspiracy with his Assistant District Attorney, Jeremy Fowler, to structure my testimony in accordance with their desires as to how it should be seen most favorably for the storyline with which they intended to run. During the period of my incarceration in June, 2003, I was in fact informed by James Farren upon our first meeting that if I did not get on board with his storyline, that I would be prosecuted for Capital Murder and further that his office had a 96 percent conviction rate.

Immediately prior to the dismissal of the Capital Murder charge, I entered into a plea agreement on the Kidnapping charge wherein I received Deferred Adjudication for a period of ten (10) years. The Complaint and Information charging Kidnapping was filed, and Attorney James E. Wooldridge appointed for my defense, the day previous, March 29TH, 2007. The plea agreement into which I entered had been brokered between myself and the Randall County Criminal District Attorney, James Farren, over two and a half years previously, shortly after I gave a statement on July , 2004 regarding matters in the Dustin Pool murder cases. No attorney on my behalf participated in the agreement even though, at the time of brokerage and the following two and a half years, I was represented continuously by Mr. Robnett; the agreement was purely between myself and James Farren. The agreement, as of July, 2004, was that in return for testimony structured to James Farren's satisfaction, I would receive ten (10) years deferred adjudication probation on a charge of Kidnapping, a third degree felony. If I did not cooperate or my testimony was not to James Farren's satisfaction, Mr. Farren would prosecute me for Capital Murder, that I would not get defense counsel, a jury trial, nor a bench trial because I had waived such by signing the Use Immunity Agreement.

The agreement was brokered shortly after the meeting wherein I provided the statement dated July 22ND, 2004. Mr. Robnett was present at that meeting. However, immediately

afterwards, James Farren contacted me and arranged for to come to his office, whereupon he told me to get rid of my attorney, Mr. Robnett, because he did not like him and I would get a much better deal from Farren without Mr. Robnett. The agreement as aforementioned was then brokered without counsel on my behalf, by myself.

Subsequently I provided testimony in the trials of Joshua Stocker, Frank Chacon, and Michael Stocker. I testified as instructed by James Farren and Jeremy Fowler. Specifically, I was instructed to testify that neither the actual agreement (as to 10 years deferred on Kidnapping) nor the Use Immunity Agreement entered into on June 28TH, 2003 existed. I was also instructed to say falsely that an agreement to testify existed between myself, James Farren, and my attorney. Prior to the Joshua Stocker trial, my testimony in such regard was rehearsed in James Farren's office by James Farren and Jeremy Fowler approximately 20 to 30 times to provide such testimony exactly as James Farren wanted it delivered according to his 'script.' I was also instructed to omit certain information, such as that I was instructed by Detective Mark Brown and attorney Laura Hamilton to leave Amarillo for Dallas for my safety, so that it appeared my departure for Dallas was purely at the behest of Craig Kimberlin; that Joshua Stocker wanted me to get Dustin Pool to my apartment so that he could be confronted and that they were supposed to go out in the yard and fight; that my last call to Dustin Pool went unanswered except for voicemail, and that in my last voicemail for Dustin Pool I instructed him to NOT come over, as I had developed a bad feeling; and that I knew Dustin Pool carried a gun, which was never officially recovered, and that upon discovering Joshua and Michael Stocker in my apartment that Dustin Pool attempted to pull the gun and it was taken away from him; and that Dustin Pool was a snitch and carried a phone issued to him by the police, also never officially recovered; or that the fireplace poker I took out of the apartment, alleged to have been used to strike Dustin Pool, had no blood or damage. I was also instructed by James Farren and Jeremy Fowler to testify falsely during the trial (2007) of co-defendant Frank Chacon that I had not understood the question as to the Use Immunity Agreement in previous testimony, and to testify identically during the trial (February, 2009) of co-defendant Michael Stocker.

During the Joshua Stocker trial, Joshua Stocker's attorney, Mike Watkins, raised the issue

about the Use Immunity Agreement, whereupon James Farren informed the court that the agreements did not exist and suborned perjured testimony from Bobbi Ledbetter that the agreements did not exist. Shortly thereafter, I questioned James Farren in his office about the possible consequences if the Use Immunity Agreement were to be discovered. James Farren assured me that would never happen as "Gil (Farren) and Bobbi took care of it."

Even though Mr. Robnett remained my attorney until the Capital Murder charge was dismissed, I ceased to have any interaction with him as a direct result of James Farren directing me to "get rid of him" following the July 22ND, 2004 meeting. I did so, and complied with James Farren's directions as result of fear and duress induced by his threats to prosecute me for Capital Murder if I did not. As I now understand that the facts of this case would support neither Capital Murder or Kidnapping against me, I should never have been placed in the position of having to choose between the lesser of two evils. I was in such position because of the coercion inflicted by James Farren. Had he not threatened and persuaded me to abandon counsel, I would not have entered the plea agreement recorded in this matter. While said agreement does in fact contain my signature in the relevant places, at the time I signed I did so involuntarily as my state of mind in so doing was predicated upon fear for the rest of my life resulting from James Farren's deliberate misrepresentation to me that the testimonial facts and legal defenses available to me would have exonerated me from legal liability, and his measured steps to separate me from counsel who would have advised me appropriately such that I would never have entered into the agreement, and certainly would never have testified falsely as James Farren coerced me to do."

Tori Brooke Patrick

Tori Brooke Patrick

SUBSCRIBED AND SWORN under oath before me on this, the 5TH day of January, 2018.

LINDA J. WHIPPLE
NOTARY PUBLIC
STATE OF TEXAS
ID# 4839722
EXPIRES 3-10-2020

Linda J. Whipple

Notary Public, State of Texas

# APPENDIX C

**NO. 18,834-A**

| | | |
|---|---|---|
| **STATE OF TEXAS** | § | **IN THE DISTRICT COURT** |
| | § | |
| **V.** | § | **47TH JUDICIAL DISTRICT** |
| | § | |
| **TORI BROOKE PATRICK** | § | **RANDALL COUNTY** |

## ATTORNEY'S SUPPORTING AFFIDAVIT

**TO THE HONORABLE JUDGE OF SAID COURT:**

Jeffrey Todd Robnett appeared in person before me today and stated under oath:

"My name is Jeffrey Todd Robnett. I am fifty-four years of age, and I am fully competent to make this affidavit. The facts stated in this affidavit are within my personal knowledge and are true and correct to the best of my recollection.

I am an attorney licensed to practice in the State of Texas, State Bar Number 17118450. I am a graduate of Texas Tech University School of Law and have been licensed since May 5TH, 1989. My primary practice location is Midland , Texas and my contact information is as follows:

Law Offices of Jeff Robnett
PO Box 1583
Midland, TX 79702-1583
432 682 6140

I am the attorney who last represented Tori Brooke Patrick in Cause No. 15,310-A in the 47TH Judicial District Court in and for Randall County, Texas, in which she was charged with Capital Murder relating to the homicide of Dustin Pool. I substituted into the matter July 15TH, 2004, replacing Don Schofield, and remained as counsel of record until the charge was dismissed on March 30TH, 2007.

Shortly after I was retained by Ms. Patrick, I flew with her from Midland to Amarillo, on July 22ND, 2004, via a personal aircraft and met with the Randall County Criminal District Attorney, James Farren at his office. During the course of the meeting, I discussed resolution of Ms. Patrick's case with James Farren. I do not believe Ms. Patrick was present during the discussion. The oral agreement between Farren and myself was to have been that, in return for Ms. Patrick's cooperation in the prosecution of the co-defendant's, the Capital Murder charge against her would be dismissed. Immediately subsequent, Ms. Patrick executed a sworn statement that clarified earlier statements she had given before my involvement, as requested by James Farren.

That essentially concluded my involvement in her case. I do not recall having received any further communication on the matter from James Farren or his office, and heard nothing more about it until I learned, well after the dismissal date, that the case had actually been dismissed. I was never informed that my client, Ms. Patrick, was needed for further interview or involvement in developing details of the case, and subsequent to the July 22ND, 2004 meeting, permission to speak with Ms. Patrick was never sought from me by any person from the Randall County Criminal District Attorney's Office. I was further completely unaware that Ms. Patrick had been subpoenaed for testimony in any trials, or that she was in fact testifying in the trials of co-defendants on matters that related to her own charge without me being present to assist and advise her. I was also completely unaware that she entered into a plea deal with James Farren wherein she pled to the offense of Kidnapping in return for dismissal of the Capital Murder charge on which I represented her. I was, in fact, completely unaware that Ms. Patrick entered such a deal until I was informed by her current counsel, James E. Wooldridge, when he contacted me earlier this year. I was in no way involved in the agreement Ms. Patrick ultimately entered, and did not at any time give James Farren permission to speak with my client, or broker any deal, without my involvement."

[signature]

Jeffrey Todd Robnett

SUBSCRIBED AND SWORN under oath before me on this, the 19 TH day of May, 2016.

DEE PRINTZ
Notary Public, State of Texas
My Commission Expires
March 27, 2019

[signature]

Notary Public, State of Texas

# APPENDIX D

0 14 THE COURT: That seems likely. You may step
40:07 down, Detective. Thank you.

0:40:09 THE WITNESS: Thank you, Judge.

0:40:22 MR. FOWLER: Your Honor, we call Tori
0:40:24 Patrick.

0:40:45 THE COURT: Ms. Patrick, would you raise
0:40:47 your right hand.

0:40:48 (Witness sworn.)

0:40:55 THE COURT: All right. It will be all
0:40:57 right, just sit right down there.

0:41:02 MR. FARREN: May I approach, Your Honor?
0:41:09 We're are going to need these.

0: 1 THE COURT: All right. Thank you.

<u>TORI PATRICK,</u>

having been first duly sworn, testified as follows:

<u>DIRECT EXAMINATION</u>

0:41:18 <u>BY MR. FOWLER</u>

0:41:18 Q. Would you please state your full name.
0:41:25 A. Tori Brook Keeler (phonetic) Patrick.
0:41:28 Q. Ma'am, how old are you?
0:41:29 A. Twenty-six.
0:41:30 Q. Where do you work?
0:41:31 A. At Tejas Broadcast.
0:41:34 Q. What -- are you married?
0: 5 A. Divorced.

Q. Do you have any children?

A. One.

Q. How old is your child?

A. Four years old.

Q. And that's a son?

A. Yes.

Q. And what's your son's name?

A. Kadden Dean Patrick (phonetic).

Q. Ms. Patrick, do you understand that you are charged with capital murder --

A. Yes, sir.

Q. -- as a result of this case?

A. Yes, sir.

Q. And you and your attorney have reached an agreement with Mr. Farren in our office, for you to testify in this case. Is that right?

A. Yes, sir.

Q. What is your understanding of the agreement that you have with Mr. Farren, and our office?

A. That I'm -- I don't understand what you mean.

Q. Well, what -- what is your understanding of the agreement that has been reached between you and your attorney, and Mr. Farren and our office? What is your deal, or do you have a deal?

A. I don't have anything promised from y'all. All

know is that if I testify it may be a little bit better. I'm testifying anyway, because I can't sleep with this on my mind.

Q. Okay. Tori, and if you could, maybe speak a little bit closer to the microphone. You have a soft voice there.

A. I'm sorry.

Q. So as a -- part of the agreement you've reached is that there really is no agreement --

A. I have no agreement whatsoever.

Q. Okay.

A. I have nothing.

Q. And as a part of the agreement, you have to tell the truth. Is that correct?

A. Well, yes, sir.

Q. And do you know Josh Stocker?

A. Yes, sir.

Q. Do you see him here in this courtroom?

A. Yes, sir.

Q. Can you point him out for us?

A. (Witness pointing).

Q. Can you describe an article of clothing he's wearing?

A. Yes. He's wearing a blue tie.

Q. Is he also wearing a --

# APPENDIX E

3:'3 MR. FOWLER: I pass the witness, Your Honc

CROSS EXAMINATION

BY MR. WATKINS:

3:41:46 Q. Hi, Ms. Patrick. My name is Mike Watkins.

3:41:50 A. Hi.

3:41:51 Q. How are you today? A little nervous?

3:41:53 A. Yes.

3:41:55 Q. Okay. I have some questions, based on your testimony and your statements. Let's start out: Mr. Fowler started out with you talking about what agreement you have for your testimony today.

3:42:11 A. I don't have an agreement for any testimony.

3: 3 Q. Okay. Now, do you remember a day back in June 2003, when you were in jail and you were represented by Jamie Watson, when Mr. Farren and Ms. Ledbetter came out and talked to you?

3:42:33 A. Yes.

3:42:34 Q. Okay. And on that day did you sign an immunity agreement with Mr. Farren?

3:42:39 A. No. I never have seen an immunity agreement.

3:42:41 Q. You've never seen one?

3:42:43 A. No. I've never been given anything like that.

3:42:46 Q. Okay. In talking with the DA, did they agree to recommend a reduction of your bond for your testimony?

3: 1 A. They --

3 14 Q. Wasn't your bond originally set at --
:07 A. Right. I don't know why it was. I mean, I
3:43:10 don't -- I don't know the reasons why.
3:43:11 Q. Just out of nowhere --
3:43:13 A. Well, I don't know anything about the law. I've
3:43:17 never been in trouble. You know? I don't know.
Q. Okay. All right.
3:43:20 A. I knew what I was charged with. I didn't feel
3:43:22 like --
3:43:23 Q. Let me -- let me slow you down, and let's ask
3:43:25 questions and answers, so we don't lose the court reporter
3:43:28 or the jury. Okay?
3 '0 Your original bond was pretty high. Is that
correct?
3:43:32 A. Yes, sir.
3:43:33 Q. What was it?
3:43:33 A. $1,000,000.00.
3:43:35 Q. And you're currently out on bond right now?
A. Yes, sir.
3:43:38 Q. How much?
3:43:40 A. I think $10,000.00.
3:43:41 Q. $10,000.00? That's quite a difference, isn't it?
3:43:46 A. Yes, sir.
3:43:47 Q. And you've been out on bond for how long?
3 '3 A. About a year and a half. I don't know.

3:5 Q. Okay. And during your first couple of statements you were represented by an attorney, Jamie Watson. Is that correct?

3:44:08 A. Yes, sir.

3:44:09 Q. Now, she's not your attorney any longer?

3:44:11 A. No, sir.

3:44:12 Q. She actually works for the Randall County DA's office now?

3:44:15 A. Yes, sir.

3:44:16 Q. Okay. Who's your attorney now?

3:44:18 A. Jeff Robinette (phonetic).

3:44:20 Q. Okay. And is he here today?

3:2 A. He doesn't live in town.

:24 Q. Okay. So he's not in the courtroom?

3:44:26 A. No, sir.

3:44:30 Q. Okay. Now, you say that there's not an agreement, but you understand that you still stand charged with capital murder?

3:44:36 A. Yes, sir.

3:44:36 Q. And that there's been some discussion about if you give truthful testimony that that will be taken into consideration when your case is taken care of?

3:44:48 A. Yes, sir.

3:44:49 Q. Okay. Just no one's ever mentioned an exact time?

A. No, sir.

Q. Okay. Now, you're not hoping for a life sentence, are you?

A. No, sir.

Q. You're kind of hoping for probation, or a lesser sentence, or something like that, aren't you?

A. Well, whatever one would hope for over prison.

Q. Okay. Or maybe that goes away?

A. Well, yeah, I wish that, but. . .

Q. Okay. But you just don't know?

A. Right.

Q. Now, has -- your case, it's pending at what we call complaint. Is that correct?

A. What does that mean?

Q. Well, has it -- has it ever been indicted?

A. No.

Q. You don't -- you know those terms?

A. Not really.

Q. Okay. That's fine. All right. You said that you second met Josh Stocker. You knew him as a kid, when y'all were all kids. Right?

A. Yes.

Q. And the second time you run into him is whenever you want to sell a stereo?

A. Yes.

# APPENDIX F

THE COURT: Yeah. Come on up.

(At the bench, before the Court only:)

MR. WATKINS: Your Honor, I -- the State is required to provide Brady material to us. There is a memo or a part of an incident report in what the State has provided to us, indicating that there is use of an immunity agreement signed by Mr. Farren, and Ms. Patrick. It never has been provided to us. At this point, we're kind of left with a situation of calling Ms. Ledbetter, who made the memo --

MR. FARREN: Can I see that?

THE COURT: May have to. Let's -- let's take the jury out and let's look into it.

(In open court:)

THE COURT: Ladies and gentlemen, we're going to take a break here. If y'all would be back in the jury room at a quarter until 3:00. Thank you.

(Jury retired from the courtroom.)

THE COURT: Well, I for one, could use about a ten-minute break here. Uh -- let's be back in here, and Markus, if you'd keep the Defendant here, and keep this witness on the witness stand, let's be back here at 2:40.

(Both sides, the Defendant present, in open (court:

THE COURT: Be seated. Let me see that,

please. Let me read it first.

MR. FARREN: Yes, sir.

THE COURT: And, in fact, with the Court's permission, I'd like to put Ms. Ledbetter on the stand, outside of the presence of the jury. I think we can clear this up.

Okay. Let me look at it.

(Pause.)

THE COURT: Okay.

MR. FARREN: For the record, Your Honor, this issue has come up during our preparation for this trial. We believe there was discussion about an immunity agreement with Ms. Watson, when she represented her at that time. We believe Bobby Ledbetter knew that there was this discussion, and had assumed that an agreement had been drawn up and signed.

I do not recall ever actually drafting the agreement and having it signed. I believe this witness is testifying truthfully when she says there was no agreement signed. I think she will respond to questions, do you remember talking about such an agreement, but we don't believe the agreement actually exists anywhere in writing to produce. We can't find it, her attorney can't find it. The only other possible trace on it is on Ms. Farren's computer at that Sheriff's Department, because that's

where Ms. Ledbetter met with her. Ms. Farren is currently checking to see that if in her files there's a copy, but an unsigned one.

We think that's what occurred, and we have no problem with Defense counsel asking her about that. We don't mind putting Ms. Ledbetter on the stand, out of the presence of the jury to clarify that.

THE COURT: I would like to do that. Would you produce Ms. Ledbetter. And would you step down for a minute.

MS. McELROY: Can we enter it into the Court's --

THE COURT: Raise your right hand.

(Witness sworn.)

THE COURT: Sit right there, Ms. Ledbetter.

THE BAILIFF: Do you want Ms. Patrick in here, Judge?

THE COURT: That will be just fine. Just -- because we're not going to take very long.

You let me do it.

MR. FARREN: Yes, sir.

<u>BOBBIE LEDBETTER,</u>

having been first duly sworn, testified as follows:

<u>DIRECT EXAMINATION</u>

THE COURT: Ms. Ledbetter, have you seen

this document that I am going to term as Court's 3?

THE WITNESS: I glanced over it, but I didn't get to read it.

THE COURT: Okay. Why don't you read it.

Is this something she prepared for just notes or something --

(Off-the-record discussion with the Court (and Mr. Farren.)

THE WITNESS: Okay.

THE COURT: So you've read it?

THE WITNESS: Yes, sir.

THE COURT: Is that a note that you prepared for yourself or for internal use?

THE WITNESS: Yes, sir.

THE COURT: All right. It makes reference to a written or a signed use of immunity agreement.

THE WITNESS: Yes, sir.

THE COURT: To your knowledge, is there in existence anywhere a signed use of immunity agreement by Tori Patrick?

THE WITNESS: Not to my knowledge.

THE COURT: Pass the witness to Mr. Watkins first, I guess. Do you have some questions for her?

MR. WATKINS: Your Honor, I don't have any questions of Ms. Ledbetter, with that testimony --

THE COURT: Okay.

MR. WATKINS: -- I don't, no.

THE COURT: I'm building a record here. Anybody else you want to talk to her from the DA's office about this purported use of immunity agreement?

MR. WATKINS: Let me ask her a couple of questions.

CROSS EXAMINATION

BY MR. WATKINS:

Q. Ms. Ledbetter, is this an incident report that you typed up and submitted?

A. I don't -- I don't call them incident reports. I mean, I do supplements sometimes or I'll make notes of interviews, or things that I'm present for.

Q. Okay. Do you see the -- at the top it says, (reading) IR number 0323750?

A. Yes, sir.

Q. Is that the -- does "IR" stand for incident report?

A. Yes, it does.

Q. And does that refer to the Special Crimes or the Amarillo Police Department incident report number that deals with the death of Dustin Pool?

A. I don't know that for certain now, but by seeing it on top of that report, I would -- I would assume so. I

4 1 will double check.

,9:16 Q. If I show you the incident report that's been provided to us, would -- would that help you --

4:39:24 MR. FARREN: Here you go, Mike.

4:39:26 A. Yes, it would help me.

4:39:29 MR. WATKINS: I'll bring it all back to you just like this.

4:39:33 Q. (BY MR. WATKINS) This is from your employer, Mr. Farren, the incident report in this case. Does this appear to a supplement to this incident report?

4:39:45 A. Yes, sir.

4:39:46 Q. Do you prepare these kind of incident reports to identify them, to remind you what happened during your part of the investigation of a case?

4:39:56 A. Yes, sometimes I do.

4:39:57 Q. And when you prepare them, do you try to be as accurate and truthful as you can be?

4:40:02 A. Yes, sir, I do.

4:40:03 Q. Okay. And does this one, in fact, say that Ms. Patrick agreed that she wanted to speak with Mr. Farren and she signed the use immunity agreement?

4:40:13 A. Yes, it does.

4:40:14 Q. Okay. Do you know if there is a use immunity agreement anywhere?

4: 0 A. I have not been able to locate one, no, sir.

Q. Do you remember speaking --

THE COURT: No -- no more sugar.

Q. (BY MR. WATKINS) Do you remember speaking with Ms. Patrick on June 28th of 2003?

A. Yes, sir, I do.

Q. Okay. And you met at the sheriff's office in jail --

A. Yes, sir.

Q. -- with her and with her attorney?

A. Yes, sir.

Q. You have independent memory of those -- of that visit or is it this incident report?

A. No, I remember being there that day.

Q. Okay. Do you have independent memory of not filling out the use of immunity agreement and having even sign?

A. I don't. I remember discussing that. I don't remember anything actually being signed but we discussed that whichever one that was willing to talk to us.

Q. Okay. You don't remember one way or the other?

A. I don't -- I know -- I remember talking about it because I remember leaving the room, so that Ms. Patrick could visit with her attorney out of my and Mr. Farren's presence.

Q. Okay.

MR. WATKINS: Pass the witness.

MR. FARREN: Just a couple of quick questions, Your Honor.

CROSS EXAMINATION

BY MR. FARREN:

Q. When you drafted this document in which we've made reference, and I -- I think perhaps we should mark it at least for some sort of exhibit outside -- outside of the trial record for appellate purposes -- but when you drafted this, because of a practice that we often exercise where we do use a documented use immunity, did you assume that one -- because we'd talked about it, that one had been signed?

A. That -- that could very well be.

Q. But you don't -- you don't remember specifically seeing her sign such a document?

A. No, I -- I don't.

Q. And you -- you know that Ms. Watson, her attorney at the time, has searched her files and cannot find such a document?

A. Yes, sir. I've talked to Ms. Watson.

Q. And you know that we cannot locate such a document anywhere in our office?

A. Yes, sir, I know that, too.

MR. FARREN: That's all I have.

THE COURT: All right. You can step down, Ms. Ledbetter. Leave Court's 3 right there.

MR. FARREN: I didn't realize you'd already marked it.

THE COURT: Yes, sir. For the same reason you wanted it marked, some way to identify it. It will be here for the people to use.

MR. WATKINS: Okay. And it's going into the records --

THE COURT: Right. I asked Ms. Watson be brought in. I want to ask her --

MR. FARREN: She's on vacation, Your Honor.

THE COURT: Oh, she is?

MR. FARREN: Yeah. Now, we can try to get her --

THE COURT: She's not here?

MR. FARREN: No, but I think --

THE COURT: That's pretty handy. And I'm sure her answers are going to be the same, and I -- at such time you can conveniently have her come -- don't cut any vacation short. Don't do any of that.

MR. FARREN: She will return before this trial is over.

THE COURT: Okay. Then we'll just -- we'll just continue this little -- this little record. But I'm

4 3 satisfied there's not any kind of Brady violations here
.3:17 Can we continue with this witness?

4:43:20 MR. WATKINS: Certainly. Certainly.

4:43:21 THE COURT: All right. Bring this jury back
4:43:23 in.

4:43:52 (Jury seated.)

4:43:53 THE COURT: Thank you, ladies and gentlemen.
4:43:55 Everyone be seated.

4:43:56 MR. WATKINS: Is it still my witness?

4:43:58 THE COURT: Yes, it is your witness. I
4:44:00 think you were about finished though.

4:44:03 MR. WATKINS: I think I am.

(Witness Tori Patrick resumes stand.)

<u>RECROSS EXAMINATION (CONTINUED)</u>

<u>BY MR. WATKINS:</u>

4:44:04 Q. Ms. Patrick, a couple of more quick questions. I
4:44:07 promise. I asked you about a use of immunity -- or about
4:44:11 an immunity agreement earlier. Do you remember that?

4:44:13 A. Yes, sir.

4:44:14 Q. And you don't remember signing anything.
Correct?

4:44:16 A. Yes, sir.

4:44:17 Q. Do you remember talking with the DA's office
4:44:19 about them not using your testimony against you?

4: 2 A. Yeah. We've -- we've talked about it.

Q. Okay. And that's the general understanding, is that whatever you tell them won't be used against you?

A. Yes.

Q. Okay. How many times have you talked with the DA's office all together?

A. Maybe -- maybe just three times.

Q. Okay. Now, there's the statement on June -- or July 22nd. Correct?

A. Yes, sir.

Q. Okay. And the statement on July 3rd?

A. Do what now?

Q. Said you gave a statement to Investigator Ledbetter, to Bobbie Ledbetter --

A. Yes.

Q. -- on July 3rd. Is that correct?

A. Yes. Yes.

Q. Okay. And then you gave one to Ms. Ledbetter -- Ms. Ledbetter on June 28th?

A. June 28th is when I was in jail. Yes, that was that statement. I'm not aware of July 3rd. Is it not the same thing?

Q. Well, the June 28th --

A. I don't understand.

Q. -- 28th appears to be --

MR. FOWLER: Judge, if I may interrupt

Mr. Watkins. I think they're the same statement. That

THE WITNESS: There was like --

MR. FOWLER: -- that later statement didn't have the waiver of rights on it, and when Ms. Ledbetter noticed that it didn't have the waiver, she prepared a new one and put the waiver back on.

THE COURT: Verbatim, the same?

MR. FOWLER: Yes.

Q. (BY MR. WATKINS) Okay. So on July 3rd, you signed -- you resigned a statement?

A. The same one from the 28th.

Q. The same one from the 28th?

A. Yes.

Q. Okay. But that was another -- you had contact with the DA's office on July 3rd and June 28th?

A. Yes. Just to sign the same statement, yes.

Q. Okay. And then you had contact with Mark Brown back on 3/26?

A. Yes.

Q. March 26th?

A. Yes.

Q. Okay. Did you have contact with the DA's office in preparing for trial? As they were preparing their case and putting their witnesses together, did you come in and talk to them?

A. Briefly. I talked to Farren for maybe three minutes.

Q. Okay.

A. Seriously.

Q. Did you talk to anyone else?

A. No.

Q. Okay. Ever talk to anyone on the phone?

A. I've called to see if -- what about court time and stuff. Other than that, no.

MR. WATKINS: Pass the witness.

MR. FOWLER: No further questions, Judge.

THE COURT: You may step down, ma'am. Thank you. Call your next witness.

MR. FARREN: State calls Michael Elliston, Your Honor.

THE COURT: Okay. Come around here, Mr. Elliston. Raise your right hand, please.

(Witness sworn.)

THE COURT: Thank you, sir. Sit right there.

Go head.

MICHAEL WAYNE ELLISTON,

having been first duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. FARREN:

# APPENDIX G

meeting --

MR. KELLY: Objection; nonresponsive.

A. Because the other ones were just --

Q. (By Mr. Farren) Did you get to talk to anyone else -- did you have to talk to someone else first before you were allowed to talk to Mr. Kimberlin?

A. When I was --

Q. Just -- just yes or no.

A. Yes.

Q. Okay. Thank you. Now, you indicated a moment ago, this was the last meeting. What do you mean by the last meeting?

A. Well, I mean, we had a few meetings at Wal-Mart. I don't know when -- when exactly every meeting was. But I know the last one happened after I got back from Dallas at Slim's Pool Hall.

Q. Okay. Did Mr. Kimberlin ever visit with you about what you were to do if the police talked to you?

A. Yeah. I mean, he visited with me. He didn't want me to talk to the police about anything. He had got me an attorney at one point.

Q. Okay. So he didn't want you to talk to the police and he provided you with an attorney?

A. Yes.

Q. Okay. And did you -- did you follow those

instructions at first?

A. At first.

Q. Okay. Eventually, did that change?

A. Yes. That -- that attorney was not someone I wanted.

Q. All right. So eventually you talked with the police?

A. Eventually. It was, like, way down the line.

Q. Did you give a statement to the police?

A. Yes.

Q. Did you tell them the truth at first?

A. No.

Q. What did you tell them at first?

A. Are you referring to the meeting with Mark Brown or after that?

Q. Uh-huh. Yes, ma'am.

A. Some made-up story. I don't even remember what I said now. It's been a long time. But it was a made-up story between me, and Josh, and Guin, that Craig wanted us to use.

Q. Okay. Later, did you talk with Mark Brown again?

A. I just talked to him once.

Q. Okay.

A. I think I just talked to him once.

Q. Did you ever tell Mark Brown the truth?
A. No.
Q. Okay. Did you eventually tell the truth?
A. Yes.
Q. To whom?
A. To you.
Q. Well --
A. Well --
Q. -- to me or to an investigator in my office?
A. An investigator in your office.
Q. Do you know a lady named Bobbie Ledbetter?
A. Yes.
Q. All right. And you visited Ms. Ledbetter?
A. Yes.
Q. And provided a written statement?
A. Yes.
Q. And did you tell the truth in that statement?
A. Yes.
Q. Just briefly, Ms. Patrick, did you -- did you sign a Use Immunity Agreement?
A. Yes, I did.
Q. Okay. Do you recall testifying in the Josh Stocker trial?
A. Yes, I do.
Q. Okay. Do you remember being asked about a Use

Immunity Agreement in that trial?

A. They asked me, apparently, about that, but I thought they had asked about something altogether different.

Q. You denied signing a Use Immunity Agreement in that trial, didn't you?

A. Yes.

Q. What did you think they were talking about?

A. I thought they were talking about, like, a set deal, like --

Q. A plea agreement?

A. That they -- yes, because they never said Use Immunity Agreement that I could --

Q. So you thought they were asking about a plea agreement?

A. Yes.

Q. And when you said, no, you -- you weren't talking about the Use Immunity Agreement?

A. No.

Q. Okay.

MR. FARREN: Pass the witness.

CROSS-EXAMINATION

BY MR. KELLY:

Q. Ms. Patrick, I'm Bill Kelly, and I represent Frank. While we're on the Use Immunity Agreement, were

you charged in this case?

A. Yes, sir.

Q. With what?

A. Capital murder.

Q. And I believe that you were charged by complaint, but you haven't been indicted yet; is that right?

A. That's true.

Q. So that's still hanging over your head?

A. Yes, sir.

Q. This Use Immunity Agreement that you signed, I think that not only at the last trial you didn't understand it, but everybody in the trial denied it; isn't that correct? Mr. Farren's office. Do you remember that?

A. Yes.

MR. FARREN: Well, I am going to object to him asking her to speculate about what other people understood.

THE COURT: Sustained.

MR. KELLY: I think that came out in the testimony.

MR. FARREN: I am going to object to sidebar comments, Your Honor.

THE COURT: Sustained. Mr. Kelly, please

# APPENDIX H

12/13/05 TUE 10:41 FAX 806 374 2620

LAW OFFICES


JAMES A. FARREN
CRIMINAL DISTRICT ATTORNEY
RANDALL COUNTY, TEXAS

Randall County Courthouse
501 16th Street
Canyon, Texas 79015

Ph: (806) 468-5570
Fax: (806) 468-5566


## USE IMMUNITY AGREEMENT

By my signature below I, Tori Brooke Patrick, acknowledge and affirm that I have entered into a use immunity agreement with the Randall County Criminal District Attorney's Office. I understand that I have both a 5th Amendment right and a 6th Amendment right under the United States Constitution to have an attorney present to advise me during any interrogation by law enforcement authorities. I hereby confirm that I initiated this meeting and discussion and I have chosen to waive the aforementioned 5th and 6th Amendment rights. I understand that this agreement provides that if I give truthful and accurate information about the death of Dustin Pool to Bobbi Ledbetter of the Randall County Criminal District Attorney's Office that information will not be used against me in any prosecution. I also understand that if I provide information that is not truthful or accurate that this agreement is void and that the promised immunity is forfeited.

Date: June 28, 2003

Tori Brooke Patrick
Tori Brooke Patrick

James A. Farren
James A. Farren
Criminal District Attorney
Randall County, Texas

Bobbie Ledbetter
Witness – Bobbie Ledbetter

Gil Farren
Witness – Gil Farren

Jami K. Watson
Jami K. Watson

# APPENDIX I

IR # 03-23750

On June 28, 2003 I accompanied Randall County District Attorney James A. Farren to the Randall County Sheriff's Office and Jail to meet with Randall County inmate Tori Patrick. [redacted] The meeting started at approximately 10:00 a.m. and began with Mr. Farren explaining a Use Immunity Agreement to Ms. Patrick. After consulting with her attorney, Ms. Patrick agreed that she wanted to speak with Mr. Farren and she signed the use immunity agreement. Ms. Patrick gave Mr. Farren a detailed account of what happened in an incident involving the kidnapping and eventual murder of Dustin Pool and agreed to signing a written statement concerning the incident. We began the type written statement at 1:17 p.m. The Miranda warning was attached to the top of each page of the statement. Ms. Patrick conveyed the incident to me and I typed as she spoke. Ms. Watson was present the entire time. At times, Ms. Watson would request to speak with her client and I would step out of the room. The statement was completed and signed at approximately 6:45 p.m. While reviewing the statement I encountered typographical errors and I contacted Ms. Watson to see if Ms. Patrick would agree to meet again to go over the revisions and sign a new corrected statement. Ms. Watson and Ms. Patrick agreed and the corrected statement was reviewed and signed at the Randall County District Attorney's Office on July 3, 2003 at approximately 11 a.m. The original statement was given to Sgt. Mark Brown at the Amarillo Police Department on the afternoon of July 3.

No copy of Use Immunity Agreement.

$10,000 Bond Judy

Threaten CPS action if you didn't help?

Bobby Ledbetter

# APPENDIX J

# REGISTER OF ACTIONS
## CASE NO. 18834A

**STATE OF TEXAS Vs. TORI BROOKE PATRICK** § § § § § §

Case Type: **Adult Felony**
Date Filed: **03/29/2007**
Location: **47th District Court**

### RELATED CASE INFORMATION

**Related Cases**
18834A (Other)

### PARTY INFORMATION

| | | | Attorneys |
|---|---|---|---|
| **Defendant** | PATRICK, TORI BROOKE<br>Amarillo, TX 79110<br>SID: TX07123894<br>Other Agency Numbers<br>RCSO Other-see notes | Female White<br>DOB: 02/21/1979<br>5' 5", 98 lbs | |
| **State** | **STATE OF TEXAS**<br>CANYON, TX 79015 | Other | **JAMES A. FARREN**<br>806-468-5570(W) |

### CHARGE INFORMATION

| Charges: PATRICK, TORI BROOKE | Statute | Level | Date |
|---|---|---|---|
| 1. KIDNAPPING | 20.03(a) PC | Third Degree Felony | 03/09/2003 |

### EVENTS & ORDERS OF THE COURT

**DISPOSITIONS**

04/02/2007 **Disposition** (Judicial Officer: Miner, Hal)
1. KIDNAPPING
Deferred

04/02/2007 **Plea** (Judicial Officer: Miner, Hal)
1. KIDNAPPING
Guilty

04/02/2007 **Sentence** (Judicial Officer: Miner, Hal)
1. KIDNAPPING
CSCD 10 Years , 0 Months , 0 Days with Community Service of 0 Hours

**OTHER EVENTS AND HEARINGS**

03/29/2007 **Complaint Filed** (Judicial Officer: Miner, Hal )
*Event Code: CPF*
03/29/2007 **Information (OCA)**
03/30/2007 **DOCKET SHEET** (Judicial Officer: Miner, Hal )
*Event Code: DSH*
03/30/2007 **Trial Court's Certification of Defendant's Right to Appeal** (Judicial Officer: Miner, Hal )
*Event Code: TCC*
03/30/2007 **DEFENDANT'S WAIVER OF APPEAL AFTER SENTENCE** (Judicial Officer: Miner, Hal )
*Event Code: DWAP*
03/30/2007 **Affidavit by Attorney for Plaintiff for Posting** (Judicial Officer: Miner, Hal )
*Event Code: AAP*
03/30/2007 **FELONY PLEA MEMORANDUM** (Judicial Officer: Miner, Hal )
*Event Code: FPM*
03/30/2007 **Order To Pay Attorney Fee** (Judicial Officer: Miner, Hal )
*Event Code: OPAF Memo: $400.00/JAMES WOOLDRIDGE*
04/05/2007 **Order Deferring Adjudication & Placing on Community Supervis** (Judicial Officer: Miner, Hal )
*Event Code: DEF Memo: 10 YRS; $2000.00 FINE VOL: I;S*
Vol./Book I;S

| | |
|---|---|
| 05/13/2009 | **Motion**<br>*Event Code: MOT Memo: FOR PERMISSION TO TRAVEL* |
| 01/25/2016 | **MOTION TO PROCEED - UNADJUDICATED PROBATION - (OCA)** |
| 01/25/2016 | **PROPOSED ORDER** |
| 01/25/2016 | **REPORT PROBATION VIOLATION** |
| 01/25/2016 | **NOTICE OF COMPLIANCE WITH C.C.P. ART. 39.14** |
| 01/25/2016 | **ORDER TO ISSUE ALIAS CAPIAS** |
| 01/25/2016 | **ISS CAPIAS/PRECEPT** |
| 01/29/2016 | **Bond**<br>*BUDGET BAIL BONDS $10,000* |
| 02/09/2016 | **FIL CAPIAS/PREC**<br>*SERVED $50* |

## Financial Information

| | | | | |
|---|---|---|---|---|
| | **Defendant** PATRICK, TORI BROOKE | | | |
| | Total Financial Assessment | | | 2,873.00 |
| | Total Payments and Credits | | | 2,873.00 |
| | **Balance Due as of 02/17/2016** | | | **0.00** |
| 03/30/2007 | Transaction Assessment | | | 2,223.00 |
| 04/26/2007 | Payment | Receipt # 30986 | PATRICK, TORI BROOKE | (150.00) |
| 05/25/2007 | Payment | Receipt # 31366 | PATRICK, TORI BROOKE | (150.00) |
| 06/21/2007 | Payment | Receipt # 31712 | PATRICK, TORI BROOKE | (150.00) |
| 07/24/2007 | Payment | Receipt # 32139 | PATRICK, TORI BROOKE | (150.00) |
| 08/21/2007 | Payment | Receipt # 32542 | PATRICK, TORI BROOKE | (150.00) |
| 09/21/2007 | Payment | Receipt # 32959 | PATRICK, TORI BROOKE | (150.00) |
| 10/23/2007 | Payment | Receipt # 33364 | PATRICK, TORI BROOKE | (150.00) |
| 11/21/2007 | Payment | Receipt # 33720 | PATRICK, TORI BROOKE | (150.00) |
| 12/21/2007 | Payment | Receipt # 34098 | PATRICK, TORI BROOKE | (150.00) |
| 01/22/2008 | Payment | Receipt # 34453 | PATRICK, TORI BROOKE | (150.00) |
| 02/27/2008 | Payment | Receipt # 34893 | PATRICK, TORI BROOKE | (150.00) |
| 03/20/2008 | Payment | Receipt # 35165 | PATRICK, TORI BROOKE | (573.00) |
| 10/14/2011 | Transaction Assessment | | | 50.00 |
| 10/18/2011 | Transaction Assessment | | | 600.00 |
| 07/23/2012 | Payment | Receipt # 76659 | PATRICK, TORI BROOKE | (200.00) |
| 10/03/2012 | Payment | Receipt # 79286 | PATRICK, TORI BROOKE | (100.00) |
| 11/02/2012 | Payment | Receipt # 80477 | PATRICK, TORI BROOKE | (120.00) |
| 11/30/2012 | Payment | Receipt # 81637 | PATRICK, TORI BROOKE | (120.00) |
| 12/27/2012 | Payment | Receipt # 2012-148752 | PATRICK, TORI BROOKE | (110.00) |

# APPENDIX K

REPORTER'S RECORD

VOLUME 11 OF 22 VOLUMES

TRIAL COURT CAUSE NO. 15,307-A

| | | |
|---|---|---|
| THE STATE OF TEXAS | ) | IN THE DISTRICT COURT |
| VS. | ) | POTTER COUNTY, TEXAS |
| JOSHUA DAVID STOCKER | ) | 47TH JUDICIAL DISTRICT |

*********************

STATEMENT OF FACTS

*********************

COPY

On the 15th day of July, 2005, the following proceedings came on to be heard in the above-entitled and numbered cause before the Honorable Hal Miner, presiding, held in Potter County, Texas:

Proceedings reported by Stenographic Method.

FILED
20.10.2005 13:32
JO CARTER, DISTRICT CLERK
RANDALL COUNTY, TEXAS
________, DEPUTY

that.

MS. McELROY: Yes, sir.

THE COURT: Objection overruled.

Q. (BY MR. FOWLER) Ms. Garcia, you may answer the question.

A. He was upset.

Q. Now, after these events unfolded, was Josh Stocker hard to get ahold of?

A. Yes.

Q. Would you try calling his cell phone?

A. Yes.

Q. Would you get any responses?

A. No.

Q. Approximately for how long was the Defendant hard to get ahold of after these events?

A. I talked to him one time after all of that happened, and never talked to him again.

Q. Now, ma'am, I believe you gave a statement to Mark Brown of the police department in September of 2003?

A. Yes, sir.

Q. And Mark Brown, in fact, told us that you, too, were hard to get ahold of right after these events. Is that correct?

A. Probably, yes.

Q. And now -- and to let the jury know a little bit about your background, you -- at the time this happened, you were on felony probation for drug offenses. Is that right?

A. Yes, I was.

Q. And your probation was pending out of Judge Board's court, I believe. Is that right?

A. Yes.

Q. And you hired an attorney for that. Right?

A. Yes, sir.

Q. And you have been charged with aggravated kidnapping and tampering with evidence. Is that right?

A. Yes, sir.

Q. And you have an attorney for those charges, as well?

A. Yes, sir.

Q. What is the understanding of any agreement that you have worked out with Mr. Farren and our office?

A. I don't have an agreement. Any punishment I get is going to be based on me telling the truth and my knowledge, and even my guilty part in what happened.

Q. And what happens if you don't tell the truth?

A. I don't know. I'm sure I will go to prison for a long time.

Q. And when I asked you when you first took the

stand where you were staying, and you told us you were at the Randall County Jail?

A. Yes, sir.

Q. Can you tell us why you're at the Randall County Jail?

A. Failure to report uh -- the way I'm supposed to, the times I'm supposed to.

Q. So you have been all of this time reporting to a probation officer. Is that right?

A. Yes, sir.

Q. And you had some problems with your probation. Right?

A. Yes.

Q. And, in fact, I believe you also had a dirty drug test?

A. Yes.

Q. And you were supposed do go to out-patient rehab and you didn't go. Right?

A. I went.

Q. Okay.

A. I -- the last day I did not go. I was sick. Yes, I did not go.

Q. And so the bond that you were let out on was increased, and this new charge was filed, and you ended up in the Randall County Jail because you weren't

behoving, basically?

A. Right. Yes.

MR. FOWLER: Your Honor, may I approach the witness?

THE COURT: Yes.

Q. (BY MR. FOWLER) I want to show you what has been admitted into evidence as State's 69. Is that the Dustin Pool that you knew?

A. Yes.

MR. FOWLER: Your Honor, I pass the witness.

THE COURT: Ms. McElroy.

CROSS EXAMINATION

BY MS. McELROY:

Q. Ms. Garcia, I believe that you testified -- well, first let me back up and ask you this: Is Daniel Jaquez (phonetic) your cell phone -- or did you ever use a cell phone by this person?

A. Daniel who?

Q. Jaquez.

A. Not that I'm aware of.

Q. Were you ever -- did you have a cell phone?

A. When?

Q. During this period of time, March of 2003.

A. Yes.

Q. What phone number was that?
A. I don't know. It was -- I don't know the phone number, but it was under Tori's name.
Q. I'm sorry.
A. It was under Tori's name.
Q. It was under Tori's name? Do you remember who provided the service?
A. Sprint, I believe.
Q. Did you ever use or have the cell phone number with the number 336-5072?
A. No, I don't believe so.
Q. Did you ever use anyone else's cell phone?
A. Not that I can remember.
Q. Did you ever use Chad Spanel or Morgan Sprool's phone?
A. Oh, Morgan got one in his name whenever Tori had it turned off.
Q. Okay. Do you remember what that number was?
A. It was a long time ago. I don't.
Q. Okay. All right. Do you have any memory of using a phone with the numbers 584-9000?
A. No.
Q. That was Morgan's phone. Do you remember using that phone?
A. I don't remember the numbers. He had one and

he had another one --

Q. There were two phones?

A. Yes.

Q. Okay. And was it a frequent occurrence for y'all to kind of trade phones around?

A. No.

Q. Well, didn't you just tell me that you would use other people's phones?

A. No, I used his -- that phone. He got it for me in the name -- whenever Tori had mine turned off, the one that was in her name.

Q. Okay. But you didn't run around with a cell phone in your name, Guinn Garcia?

A. No.

Q. Okay. So you would use someone else's cell phone?

A. Yes, I did.

Q. Okay. Ms. Garcia, you testified earlier that you had a live-in relationship with Ray Placensio?

A. Yes.

Q. Do you remember how long you had been with him?

A. Probably -- like I said earlier, I was with him probably half a year before he went to prison, and then when he got out, probably a year, year and a half.

Q. Okay. And do you remember giving testimony in a court case entitled, the State of Texas versus Ricky Gallegos?

A. Yes, I do.

Q. Do you remember testifying for the State in that matter?

A. Yes.

Q. Can you tell me, briefly, why you were testifying for the State then?

A. Uh -- I pretty much just told them what I knew. There was a meeting held at my house. And --

Q. Well, you were involved with Ray. Correct?

A. Yeah.

Q. Okay. And Ray was a member of the Texas Syndicate. Is that right?

A. I believe so.

Q. Okay. And during that time, he was holding meetings?

A. Yes.

Q. Okay. And at one of those meetings, can you tell me, do you know who Bobby O'Connis is?

A. I was not allowed to be there present during the meetings.

Q. I understand. Do you know who Bobby O'Connis is?

A. Yes, I do.

Q. Do you know Mr. Valdez (phonetic)?

A. I met him, yes.

Q. Do you know Lupe Rodriguez (phonetic)?

A. Yes, I do.

Q. So you knew all of these people?

A. Yes.

Q. Can you tell me if you know how many people were charged in this particular case?

A. I don't know.

Q. Did you know Ricky Ricardo Gallegos (phonetic)?

A. Yes.

Q. How did you know him?

MR. FARREN: Your Honor, if I may -- and this is not an objection or anything. I realize it's his (sic) witness. I was wondering if we can all stipulate that Mr. Gallegos was a co-defendant in the Pracioto murder with Mr. Placensio, so that the jury has some context of what this is all about.

MS. McELROY: That's fine, Your Honor.

MR. FARREN: So these are from the transcript of the Gallegos murder trial, who is the co-defendant to Placensio in the Pracioto murder.

THE COURT: All right. Mr. Farren, since

we've raised it, let's clear it up for the jury a little bit. Go into a little more detail.

MR. FARREN: And we'll provide a written summary to the Court, so we can both sign it.

THE COURT: All right. Okay. That's good.

MR. FARREN: It is my understanding that these questions are from the transcript of the Ricky Gallegos trial, and that Ricky Gallegos is a co-defendant or was a co-defendant to Mr. Ray Placensio. Both of them, and I think some others charged in the homicide of Pracioto in Potter County in Amarillo.

THE COURT: All right. I hope that clears it up for them. I worry about them getting bits and pieces of this and not understanding the context.

MR. FARREN: Yes, Your Honor.

THE COURT: You and I know, because a part of it is in my court up there. Anyway -- all right.

Q. (BY MS. McELROY) You testified, did you not?

A. Yes, I did.

Q. In this event? And you testified in Mr. Gallegos' trial. Do you anticipate testifying against Ray Placensio?

A. Probably.

Q. His trial hasn't been yet held. Is that correct?

A. I'm -- not to the best of my knowledge.

Q. Well, you haven't been called to court or anything?

A. No.

Q. Was Ray the head of the "TS" at that time?

A. No, not to the best of my knowledge. It was -- they were trying to decide who was going to be the head. As far as I knew, it was Bobby and a guy named K.O. before that.

Q. Okay. Now, did the Texas Syndicate, they were dealing drugs?

A. Yeah.

Q. Okay. And so you were working for them?

A. No.

Q. No. Where were you getting your drugs from?

A. Dustin Pool.

Q. Okay. So it's your testimony that the Texas Syndicate was taking over Dustin Pool's drugs?

A. No. Dustin asked them to kind of come in and help him, as far as having someone to back him, like collecting and stuff like that.

Q. Okay. But I think your testimony earlier on direct was that the "TS" were wanting people to pay tax

in order to sell dope?

A. Yeah, Ray always said that.

Q. Right. Well, Dustin Pool was an independent drug dealer at that time, was he not?

A. Yes.

Q. All right. So would it be logical that then they would expect him to pay that tax, also?

A. Well, when they --

MR. FOWLER: Your Honor, I'd object to speculation.

THE COURT: Sustained.

Q. (BY MS. McELROY) For your testimony, were you given any immunity agreement in Potter County?

A. (Witness shakes head side to side.)

Q. You -- did you have any sort of -- did you have any sort of deal with the Prosecutor in Potter County in order to have your testimony?

A. (Witness shakes head side to side.)

Q. I'm sorry?

A. A deal? No.

Q. You were just a bystander?

A. A bystander?

Q. Yes. You -- you weren't charged in this offense?

A. No.

Q. Okay. So you were subpoenaed to testify about it. Right?

A. Yes.

Q. Do you know when this murder took place?

A. Specific dates, no, I don't.

Q. Well, if I were to tell you that it was February 24th, would that sound about right?

A. I don't know a specific date. I mean, I don't --

Q. All right. I'm going to ask you if Ray (sic) -- February 27th of 2003 sounds accurate to you?

A. I don't know.

Q. Okay. Do you know whether or not Mr. Pracioto (sic), in concert with these other people, ended up murdering Jesse Pracioto?

A. You mean Placensio? Or Pracioto?

Q. Yes. I'm sorry. Did Ray Placensio, and Bobby O'Connis, and Mr. Valdez, and Ricky Ricardo Gallegos, and Vincente Flores, did they go in on February 27th and stab Jesse Pracioto to death?

A. I do not know.

Q. And you testified at this trial?

A. I testified to him telling me that he showed his heart when I asked him about it.

Q. Okay. And that was the sole purpose of your

# APPENDIX L

USE IMMUNITY AGREEMENT

By my signature below I, Guin Garcia acknowledge and affirm that I have entered into a use immunity agreement with the Randall County Criminal District Attorney's Office. I understand that I have both a 5th and 6th Amendment right under the United States Constitution to have an attorney present to advise me during any interrogation by law enforcement authorities. I understand this agreement provides that if I give truthful, accurate, and complete information about The Dustin Paol Homicide Investigation to Sgt. Mark Brown that said information will not be used against me in any prosecution. I also understand that if I provide information that is not truthful, accurate, and complete that this agreement is void and that the promised immunity if forfeited.

Date: 9-8-03

x [signature]
Declarant

[signature]
Randall County Criminal District Attorney's Office

[signature] Mark K. Brown
Witness

Witness

# APPENDIX M

JAMES A. FARREN
CRIMINAL DISTRICT ATTORNEY
RANDALL COUNTY, TEXAS

Randall County Courthouse
501 16th Street
Canyon, Texas 79015

Ph: (806) 468-5570
Fax: (806) 468-5566

# USE IMMUNITY AGREEMENT

By my signature below I, Tori Brooke Patrick, acknowledge and affirm that I have entered into a use immunity agreement with the Randall County Criminal District Attorney's Office. I understand that I have both a 5th Amendment right and a 6th Amendment right under the United States Constitution to have an attorney present to advise me during any interrogation by law enforcement authorities. I hereby confirm that I initiated this meeting and discussion and I have chosen to waive the aforementioned 5th and 6th Amendment rights. I understand that this agreement provides that if I give truthful and accurate information about the death of Dustin Pool to Bobbi Ledbetter of the Randall County Criminal District Attorney's Office that information will not be used against me in any prosecution. I also understand that if I provide information that is not truthful or accurate that this agreement is void and that the promised immunity is forfeited.

Date: June 28, 2003

Tori Brooke Patrick
Tori Brooke Patrick

James A. Farren
James A. Farren
Criminal District Attorney
Randall County, Texas

Bobbie Ledbetter
Witness – Bobbie Ledbetter

Gil Farren
Witness – Gil Farren

Jami Watson
JAmi K. Watson

~~DEPOSITION~~
EXHIBIT
Defense 14
PENGAD 800-631-6989

# APPENDIX N

JAMES A. FARREN
CRIMINAL DISTRICT ATTORNEY
RANDALL COUNTY, TEXAS

Randall County Courthouse
501 16th Street
Canyon, Texas 79015

Ph: (806) 468-5570
Fax: (806) 468-5566

July 19, 2004

Jeff Robnett
Attorney at Law
P.O. Box 1583
Midland, Texas 79702

Re: Tori Patrick

Dear Mr. Robnett:

I write in response to our recent conversation concerning Tori Patrick. We have entered an agreement with Patrick and her former attorney Jamie Watson that provided for dismissal of the pending capital murder charge to be replaced with a charge of aggravated kidnaping. Patrick agreed to plead guilty to aggravated kidnaping and to testify truthfully at the trial of any other defendant charged with any crime in connection with the death of Dustin Pool. We have never specified a sentence and the State would prefer to avoid delineating a specific sentence until the trials of the other defendants have been completed.

We do have some concerns about the completeness of Patrick's earlier written statement and would like to meet with her in the near future to clear up some ambiguities. We look forward to meeting with you and your client in the near future. Please contact me if I can provide further information.

James A. Farren
Criminal District Attorney
Randall County, Texas

# APPENDIX O

Texas Court of Criminal Appeals No. **WR-88,099-01**

**NO. W-15,307-A-1**

| | | |
|---|---|---|
| EX PARTE | § | IN THE 47TH DISTRICT COURT |
| | § | |
| | § | |
| JOSHUA DAVID STOCKER | § | IN AND FOR |
| | § | |
| | § | |
| TDCJ ID # 01811349 | § | RANDALL COUNTY, TEXAS |

***FINDINGS OF FACT AND CONCLUSIONS OF LAW***

***BACKGROUND OF CASE***

Applicant was a participant in a methamphetamine distribution ring allegedly headed by Craig Kimberlin. The deceased, Dustin Pool, was the head of a rival methamphetamine distribution organization. Applicant and several associates were involved in the kidnapping, torturing and beating of Mr. Pool. The beating and torturing was extremely brutal, the participants acting in "shifts" because they were getting tired. During the process Mr. Pool was stripped and bound to a chair and even had a pair of vice grips applied to his genitals. A decision was made to move him to a different location, and a sock was placed in his mouth and his head wrapped with duct tape. Mr. Pool died and his body was later thrown into an abandoned grain elevator in Randall County and covered in concrete. His body was recovered about three months later. Applicant was later indicted tried and convicted of capital murder, and sentenced to life imprisonment. His trial was conducted from July 11-21, 2005.



FILED
August 9, 2019 2:16 PM
JOEL FORBIS DISTRICT CLERK
RANDALL COUNTY, TEXAS
by MG_______________Deputy

Applicant is indigent, but represented pro bono by attorney James Edd Wooldrige.

## ***Findings of Fact***

1. The State had entered into Use Immunity Agreements with several of the persons also accused of capital murder in this incident, one of whom was Tori Patrick.

2. Tori Patrick's testimony was important to paint the background for the events leading up to Mr. Pool's kidnapping.

3. Ms. Patrick's testimony included details of her being approached by Applicant and one Guinn Garcia to lure Mr. Pool to her Potter County apartment. She did so, and it was at her apartment that Applicant and his brother attacked Mr. Pool and kidnapped him.

4. Ms. Patrick's use immunity agreement was signed July 3, 2003, more than two years prior to Applicant's trial. The use-immunity agreement was also signed by the Criminal District Attorney, James Farren, his investigator Bobbie Ledbetter (Bruhn), his wife, Gil Farren who was a witness, and by Ms. Patrick's then-appointed counsel Jamie Watson (who later became employed as an Assistant CDA).

5. At the outset of Applicant's trial, Mr. Farren denied the existence of any such agreement.

6. In a bench conference occurring the next day, he acknowledged the

possibility that one might exist, producing an unsigned copy, but said that it was never signed.

7. When Ms. Patrick testified she had no agreement with the State there was no attempt by the state to correct the false and misleading testimony.

8. Ms. Patrick's signed use-immunity agreement was found eight months to a year after Applicant's trial by Assistant CDA Jeremy Fowler in a co-defendants file. (before Mr. Kimberlin's trial date)

9. The state presented Investigator Ledbetter, who testified to the Judge she has no memory of Ms. Patrick's agreement having been signed.

10. Investigator Ledbetter's (Bruhn) supplemented incident report states that the use immunity agreement referenced in finding fact number 4 was given to Detective Mark Brown.

11. The state made no effort to correct Investigator Bruhn's misleading testimony about her memory of any agreement made with Ms. Patrick.

12. The Criminal District Attorney had earlier made a letter agreement with Ms. Patrick's retained counsel Jeff Robinette that she would be allowed to plead to Aggravated Kidnapping. The Criminal District Attorney says that letter agreement was later rescinded because Ms. Patrick was vacillating.

## ***CONCLUSIONS OF LAW***

1. Tori Patrick was an important witness in establishing the plot to kidnap, and the eventual kidnapping of the deceased

2. Applicant has suffered a Brady violation not only by an untimely disclosure of Ms. Patrick's use-immunity agreement but by the state's denial of the existence of the same and the failure to correct misleading testimony regarding the same during his trial.

3. It is likely that a jury might have reached a different conclusion had they been informed of such agreement. It is here noted that the subsequent capital murder trials of Michael Stocker (Applicant's brother) and Frank Chacon, both resulted in convictions of a lesser included offense.

Signed this 9th day of August, 2019.

Signed: 8/9/2019 02:05 PM

Respectfully submitted,

Senior District Judge

Sr. District Judge, Presiding
By assignment

# APPENDIX P

1341/2

* I don't know if you want
to use anything from the
phone calls. Tori honestly
elieves we aren't listening
o her -- might be better to
t her think that.

~~2215~~ 110

Jori Patrick

2317 N. County R

Midland

79706

432-686-9168

-GM- Acutel

04 ~~35177~~

# APPENDIX Q

# REGISTER OF ACTIONS

## CASE NO. 15308A

The State of Texas vs STEPHEN CRAIG KIMBERLIN

§ § § § §

Case Type: **Adult Felony**
Date Filed: **08/06/2003**
Location: **47th District Court**

### PARTY INFORMATION

**Defendant** KIMBERLIN, STEPHEN CRAIG
SID: TX04093855
Other Agency Numbers
0000000000 Other-see notes, APD 03-73750 Other-see notes, APD IR #03-58841 Other-see notes

Male White
DOB: 06/27/1968
6' 1", 225 lbs

**Attorneys**
**PAUL HERRMANN**
*Retained*
806-342-4242(W)

SELDEN B. HALE
*Retained*
806-372-5711(W)

**State** STATE OF TEXAS
CANYON, TX 79015

Other

**JAMES A. FARREN**
806-468-5570(W)

### CHARGE INFORMATION

| Charges: KIMBERLIN, STEPHEN CRAIG | Statute | Level | Date |
|---|---|---|---|
| 1. CAPITAL MURDER OF A PEACE OFFICER OR FIREMAN | 19.03 (a)(1) | Capital Felony | 03/09/2003 |

### EVENTS & ORDERS OF THE COURT

**DISPOSITIONS**

08/01/2005 **Disposition** (Judicial Officer: Miner, Hal)
1. CAPITAL MURDER OF A PEACE OFFICER OR FIREMAN
Dismissed

**OTHER EVENTS AND HEARINGS**

06/23/2003 **Complaint Filed** (Judicial Officer: Miner, Hal )
*Event Code: CPF Memo: CAPITAL MURDER 19.03 VOL: I;S*
Vol./Book I;S

06/23/2003 **ISS WARRANT** (Judicial Officer: Miner, Hal )
*Event Code: IW VOL: I;S*
Vol./Book I;S

06/25/2003 **MAGISTRATE'S WARNING** (Judicial Officer: Miner, Hal )
*Event Code: MW*

06/26/2003 **FIL WARRANT** (Judicial Officer: Miner, Hal )
*Event Code: FW Memo: 6-23-2003 VOL: I;S*
Vol./Book I;S

08/06/2003 **Indictment - (OCA)** (Judicial Officer: Miner, Hal )
*Event Code: IND*

08/06/2003 **ISS CAPIAS/PRECEPT** (Judicial Officer: Miner, Hal )
*Event Code: IC*

08/12/2003 **MAGISTRATE'S WARNING** (Judicial Officer: Miner, Hal )
*Event Code: MW*

08/14/2003 **MAGISTRATE'S WARNING** (Judicial Officer: Miner, Hal )
*Event Code: MW VOL: I;S*
Vol./Book I;S

08/18/2003 **FIL CAPIAS/PREC** (Judicial Officer: Miner, Hal )
*Event Code: FC Memo: 8-8-03 VOL: I;S*
Vol./Book I;S

08/18/2003 **Defendant's Pre-Trial Motion** (Judicial Officer: Miner, Hal )
*Event Code: DPTM Memo: DEF'S REQ/EVIDENCE; DEF'S MOT REQUEST NOT OF PROSEC INTENT TO USE CERT COPIES; MOT/DISCLOSURE OF IMPEACHING INFO; MOT/LIMIT JURY ARGUMENT OF STATE; MOT/PRODUCTION & INSPECTN OF EVIDENCE/EXCULP EVID; MOT/PROD OF INFO CONCERN STATE'S WITNESSES; DEF'S MOT IN LIMINE #1; DEF'S MOT IN LIMINE #2; MOT/LIMINE REGARDING APP FOR PROB; MOT/DISCOVERY OF EXPERTS; MOT/DISCOVOF PRIOR JURY SERV; MOT/DISCOVERY, PRODUCTION & INSP OF EVIDENCE; MOT/REQ STATE TO REVEAL ANY AGREEMENT W/ANY WITNESS. VOL: I;S*

| | |
|---|---|
| | Vol./Book I;S |
| 09/03/2003 | **COURT APPT ATTY**<br>*Event Code: CAP Memo: HERRMANN/S.HALE VOL: I;S*<br>Vol./Book I;S |
| 10/02/2003 | **Motion**<br>*Event Code: MOT Memo: APPT OF INVESTIGATOR; SEALED VOL: I;S*<br>Vol./Book I;S |
| 10/02/2003 | **ORDER**<br>*Event Code: ORD Memo: APPT OF INVESTIGATOR; SEALED VOL: I;S*<br>Vol./Book I;S |
| 10/28/2003 | **SEARCH WARRANT** (Judicial Officer: Miner, Hal )<br>*Event Code: SW* |
| 05/05/2004 | **Order To Pay Attorney Fee** (Judicial Officer: Miner, Hal )<br>*Event Code: OPAF Memo: INVESTIGA--$574.50 - PAT CHAMBERS VOL: I;S*<br>Vol./Book I;S |
| 06/15/2004 | **Order To Pay Attorney Fee** (Judicial Officer: Miner, Hal )<br>*Event Code: OPAF Memo: S.HALE $2890.00 VOL: I;S*<br>Vol./Book I;S |
| 07/15/2004 | **Order To Pay Attorney Fee** (Judicial Officer: Miner, Hal )<br>*Event Code: OPAF Memo: INVSTG; STEINHILPER $6725.00 VOL: I;S*<br>Vol./Book I;S |
| 08/27/2004 | **Notice** (Judicial Officer: Miner, Hal )<br>*Event Code: N Memo: NOTICE OF DEATH PENALTY INTENT VOL: I;S*<br>Vol./Book I;S |
| 01/31/2005 | **Order To Pay Attorney Fee** (Judicial Officer: Miner, Hal )<br>*Event Code: OPAF Memo: $2525.00/SELDEN HALE* |
| 03/18/2005 | **Defendant's Pre-Trial Motion** (Judicial Officer: Miner, Hal )<br>*Event Code: DPTM Memo: MOT ELECT JURY TO ASSESS PUNISHMENT* |
| 03/22/2005 | **Defendant's Pre-Trial Motion** (Judicial Officer: Miner, Hal )<br>*Event Code: DPTM Memo: 4 MOTIONS* |
| 03/23/2005 | **Defendant's Pre-Trial Motion** (Judicial Officer: Miner, Hal )<br>*Event Code: DPTM Memo: ORD ON DEF MOT APPT MITIGATION SPEC.; SEALED BY ORDER* |
| 03/28/2005 | **STATE APPLICATION** (Judicial Officer: Miner, Hal )<br>*Event Code: SA Memo: SEE IMAGING* |
| 03/29/2005 | **Defendant's Pre-Trial Motion** (Judicial Officer: Miner, Hal )<br>*Event Code: DPTM Memo: INDIVIDUAL VOIR DIRE & MOT TO DISCOVER* |
| 03/29/2005 | **ORDER OR NOTICE OF HEARING** (Judicial Officer: Miner, Hal )<br>*Event Code: OH Memo: 4-14-05* |
| 03/30/2005 | **Defendant's Pre-Trial Motion** (Judicial Officer: Miner, Hal )<br>*Event Code: DPTM Memo: MOT/LIST EXHIBITS & MOT/DISCOVERY OF IMMUNITY TO POTENTIAL WITNESSES* |
| 03/30/2005 | **Subpoena Served** (Judicial Officer: Miner, Hal )<br>*Event Code: SUBPS Memo: SEE IMAGING* |
| 04/01/2005 | **Subpoena Returned Unserved** (Judicial Officer: Miner, Hal )<br>*Event Code: SUBPU Memo: CONTINUED* |
| 04/04/2005 | **STATE APPLICATION** (Judicial Officer: Miner, Hal )<br>*Event Code: SA Memo: NO. 15308A, 15307A, 15305A* |
| 04/06/2005 | **Motion**<br>*Event Code: MOT Memo: WRIT H/CORPUS AD PROSEQUENDUM* |
| 04/06/2005 | **ORDER**<br>*Event Code: ORD Memo: WRIT H/CORPUS AD PROSEQUENDUM* |
| 04/14/2005 | **STATE'S MOTIONS** (Judicial Officer: Miner, Hal )<br>*Event Code: SM Memo: DISCOVERY OF DEF. EXPERTS* |
| 04/18/2005 | **STATE APPLICATION** (Judicial Officer: Miner, Hal )<br>*Event Code: SA Memo: SEE IMAGE* |
| 04/22/2005 | **MEMO TO THE JUDGE-JUV** (Judicial Officer: Miner, Hal )<br>*Event Code: MEMO Memo: FROM SELDEN HALE - MEDICAL STATEMENT* |
| 05/05/2005 | **ORDER OR NOTICE OF HEARING** (Judicial Officer: Miner, Hal )<br>*Event Code: OH Memo: 8-8-05* |
| 05/10/2005 | **STATE APPLICATION** (Judicial Officer: Miner, Hal )<br>*Event Code: SA Memo: ERFAIN RAMOS, WARD GREGORY, ERIN FOSTER* |
| 05/11/2005 | **Subpoena Served** (Judicial Officer: Miner, Hal )<br>*Event Code: SUBPS Memo: RONNIE POPE & JERROD HAWBAKER* |
| 05/12/2005 | **ORDER**<br>*Event Code: ORD Memo: ASSIGNMENT; JUDGE GLEASON* |
| 05/12/2005 | **FILED** (Judicial Officer: Miner, Hal )<br>*Event Code: F Memo: ASSIGNMENT OF JUDGE DAVID GLEASON* |
| 05/13/2005 | **Defendant's Pre-Trial Motion** (Judicial Officer: Miner, Hal )<br>*Event Code: DPTM Memo: MOT/PRODUCTION OF JURY QUESTIONNAIRES; MOT/DISCLOSURE OF EVIDENCE OR PRIOR CONVICTIONS; MOT/CONCERNING EXTRANEOUS ACTS; WRITTEN ORJECTIONS; & MOT/RECESS* |
| 05/13/2005 | **STATE APPLICATION** (Judicial Officer: Miner, Hal )<br>*Event Code: SA Memo: SEE IMAGING* |
| 05/24/2005 | **Subpoena Served** (Judicial Officer: Miner, Hal )<br>*Event Code: SUBPS Memo: WAREHOUSE SOL.* |
| 05/25/2005 | **NOTICE/AFFIDAVIT BUSINESS RECORD** (Judicial Officer: Miner, Hal )<br>*Event Code: NABR Memo: J.PRESNALL; S.JONES; T.BLEVINS; B.FOSTER; CHRIS JONSE* |

| | |
|---|---|
| 06/03/2005 | **LETTER** (Judicial Officer: Miner, Hal )<br>*Event Code: LETTER Memo: TO ATTYS FROM JUDGE GLEASON - OFFICE CONFERENCE - 6/14/05 @ 10:00 IN CANYON* |
| 06/08/2005 | **Defendant's Pre-Trial Motion** (Judicial Officer: Miner, Hal )<br>*Event Code: DPTM Memo: MOT/DISCLOSUREOF ALL EVIDENCE FAVORABLE TO THE DEF. UNDER BRADY V. MARYLAND* |
| 06/15/2005 | **Defendant's Pre-Trial Motion** (Judicial Officer: Miner, Hal )<br>*Event Code: DPTM Memo: MOT/EXCULPATORY EVIDENCE & MOT/DISCOVERY* |
| 06/15/2005 | **STATE APPLICATION** (Judicial Officer: Miner, Hal )<br>*Event Code: SA Memo: JEFF STOCKE* |
| 06/23/2005 | **NOTICE/AFFIDAVIT BUSINESS RECORD** (Judicial Officer: Miner, Hal )<br>*Event Code: NABR Memo: QUALITY INN* |
| 06/27/2005 | **Subpoena Served** (Judicial Officer: Miner, Hal )<br>*Event Code: SUBPS Memo: JERROD HAWBAKER* |
| 06/29/2005 | **STATE APPLICATION** (Judicial Officer: Miner, Hal )<br>*Event Code: SA Memo: OFF. RODEN, APD* |
| 07/12/2005 | **Subpoena Served** (Judicial Officer: Miner, Hal )<br>*Event Code: SUBPS Memo: OFF RODEN* |
| 07/15/2005 | **STATE APPLICATION** (Judicial Officer: Miner, Hal )<br>*Event Code: SA Memo: DAVID COCHET* |
| 07/15/2005 | **STATE APPLICATION** (Judicial Officer: Miner, Hal )<br>*Event Code: SA Memo: SEE IMAGING* |
| 07/20/2005 | **Subpoena Served** (Judicial Officer: Miner, Hal )<br>*Event Code: SUBPS Memo: BRANDON COTTON* |
| 08/02/2005 | **DOCKET SHEET** (Judicial Officer: Miner, Hal )<br>*Event Code: DSH* |
| 08/02/2005 | **MOTION & ORDER TO DISMISS** (Judicial Officer: Miner, Hal )<br>*Event Code: MODISM Memo: REINDICTED AS 17288A* |
| 08/17/2005 | **ORDER OR NOTICE OF HEARING** (Judicial Officer: Miner, Hal )<br>*Event Code: OH Memo: JURY TRIAL 1-9-06* |
| 01/03/2006 | **DEFENSE APPLICATION FOR SUBPOENA** (Judicial Officer: Miner, Hal )<br>*Event Code: DAS Memo: CUSTODIAN OF RECORDS - RANDALL CO DETENTION CENTER & CUSTODIAN OF RECORDS - CAL FARLEY'S BOY'S RANCH* |
| 01/10/2006 | **Subpoena Served** (Judicial Officer: Miner, Hal )<br>*Event Code: SUBPS Memo: SEE IMAGING* |

# APPENDIX R

# Register of Actions

## Case No. 17288A

The State of Texas vs STEPHEN CRAIG KIMBERLIN

Case Type: **Adult Felony**
Date Filed: **07/27/2005**
Location: **47th District Court**

## Party Information

| | | | Attorneys |
|---|---|---|---|
| Defendant | KIMBERLIN, STEPHEN CRAIG<br>SID: TX04093855<br>Other Agency Numbers<br>0000000000 Other-see notes, APD 03-73750 Other-see notes, APD IR #03-58841 Other-see notes | Male White<br>DOB: 06/27/1968<br>6' 1", 225 lbs | **PAUL HERRMANN**<br>*Court Appointed*<br>806-342-4242(W)<br><br>SELDEN B. HALE<br>*Retained*<br>806-372-5711(W) |
| State | **STATE OF TEXAS**<br>CANYON, TX 79015 | Other | **JAMES A. FARREN**<br>806-468-5570(W) |

## Charge Information

| Charges: KIMBERLIN, STEPHEN CRAIG | Statute | Level | Date |
|---|---|---|---|
| 1. MURDER | 19.02(b)(1) | First Degree Felony | 03/09/2003 |

## Events & Orders of the Court

### DISPOSITIONS

01/05/2006 **Disposition** (Judicial Officer: Miner, Hal)
1. MURDER
Convicted

01/05/2006 **Plea** (Judicial Officer: Miner, Hal)
1. MURDER
Guilty

01/05/2006 **Adult Sentence - Local Jail - (OCA)** (Judicial Officer: Miner, Hal)
1. MURDER
Confinement to Commence 01/05/2006
45 Years , Texas Department of Corrections, Texas Department of Criminal Justice

### OTHER EVENTS AND HEARINGS

07/27/2005 **Indictment - (OCA)** (Judicial Officer: Miner, Hal )
*Event Code: IND*

07/27/2005 **ISS CAPIAS/PRECEPT** (Judicial Officer: Miner, Hal )
*Event Code: IC*

08/03/2005 **FIL CAPIAS/PREC** (Judicial Officer: Miner, Hal )
*Event Code: FC*

08/08/2005 **STATE APPLICATION** (Judicial Officer: Miner, Hal )
*Event Code: SA Memo: SEE IMAGE*

08/15/2005 **STATE APPLICATION** (Judicial Officer: Miner, Hal )
*Event Code: SA Memo: BRANDON COTTON*

08/17/2005 **Subpoena Served** (Judicial Officer: Miner, Hal )
*Event Code: SUBPS Memo: BRANDON COTTON*

08/25/2005 **Subpoena Served** (Judicial Officer: Miner, Hal )
*Event Code: SUBPS Memo: BONNIE POPE*

08/29/2005 **STATE APPLICATION** (Judicial Officer: Miner, Hal )
*Event Code: SA Memo: PAUL MAES*

09/07/2005 **STATE APPLICATION** (Judicial Officer: Miner, Hal )
*Event Code: SA Memo: SHANNON BURNEY*

09/16/2005 **STATE APPLICATION** (Judicial Officer: Miner, Hal )
*Event Code: SA Memo: MYER, SPANEL*

| | |
|---|---|
| 09/21/2005 | **Subpoena Served** (Judicial Officer: Miner, Hal )<br>*Event Code: SUBPS Memo: GUIN GARCIA & RONNIE POPE* |
| 09/27/2005 | **STATE APPLICATION** (Judicial Officer: Miner, Hal )<br>*Event Code: SA Memo: CHRIS EASON* |
| 09/28/2005 | **STATE APPLICATION** (Judicial Officer: Miner, Hal )<br>*Event Code: SA Memo: JAMIE KELLERMAN* |
| 09/28/2005 | **STATE APPLICATION** (Judicial Officer: Miner, Hal )<br>*Event Code: SA Memo: TORI PATRICK* |
| 10/05/2005 | **STATE APPLICATION** (Judicial Officer: Miner, Hal )<br>*Event Code: SA Memo: KRISTI BRESHEARS & MIKE CRANDELL* |
| 10/10/2005 | **Defendant's Pre-Trial Motion** (Judicial Officer: Miner, Hal )<br>*Event Code: DPTM Memo: MOT/LIMINE TO EXCLUDE PSYCHIATRIC OR PSYCHOLOGICAL TESTIMONY* |
| 10/13/2005 | **STATE APPLICATION** (Judicial Officer: Miner, Hal )<br>*Event Code: SA Memo: LOWES HOME IMPROVEMENT CUSTODIAN OF RECORDS* |
| 10/19/2005 | **Subpoena Served** (Judicial Officer: Miner, Hal )<br>*Event Code: SUBPS Memo: JEFF RODDEN* |
| 10/19/2005 | **MEMO TO THE JUDGE-JUV** (Judicial Officer: Miner, Hal )<br>*Event Code: MEMO Memo: FROM S HALE CONCERNING DEF. TRIAL TRANSCRIPT* |
| 10/19/2005 | **ORDER OR NOTICE OF HEARING** (Judicial Officer: Miner, Hal )<br>*Event Code: OH Memo: 11/7/05, 12/12/05, 12/13/05* |
| 10/19/2005 | **LETTER** (Judicial Officer: Miner, Hal )<br>*Event Code: LETTER Memo: FROM JUGDE MINER TO COUNSEL* |
| 10/19/2005 | **MEMO TO THE JUDGE-JUV** (Judicial Officer: Miner, Hal )<br>*Event Code: MEMO Memo: FROM S.HALE* |
| 10/24/2005 | **STATE APPLICATION** (Judicial Officer: Miner, Hal )<br>*Event Code: SA Memo: CURTIS SINCLAIR, CINCLAIR COMMUNICATIONS CUSTODIAN OF RECORDS* |
| 10/24/2005 | **STATE APPLICATION** (Judicial Officer: Miner, Hal )<br>*Event Code: SA Memo: CUSTODIAN OF RECORDS, SW BELL TELEPHONE* |
| 10/24/2005 | **STATE APPLICATION** (Judicial Officer: Miner, Hal )<br>*Event Code: SA Memo: MELANIE HALL, SPRINT PCS, SUBPOENA COMPLIANCE* |
| 10/24/2005 | **STATE APPLICATION** (Judicial Officer: Miner, Hal )<br>*Event Code: SA Memo: DAN METSLER, CINGULAR WIRELESS* |
| 10/28/2005 | **STATE APPLICATION** (Judicial Officer: Miner, Hal )<br>*Event Code: SA Memo: DAN MATSLER, MELANIE HALL, CUST WESTERN WIRELESS,* |
| 11/01/2005 | **Defendant's Pre-Trial Motion** (Judicial Officer: Miner, Hal )<br>*Event Code: DPTM Memo: MOT/APPOINTMENT OF AN INVESTIGATOR* |
| 11/01/2005 | **ORDER**<br>*Event Code: ORD Memo: GRANTING APPOINTMENT OF INVESTIGATOR* |
| 11/07/2005 | **MEMO TO THE JUDGE-JUV** (Judicial Officer: Miner, Hal )<br>*Event Code: MEMO Memo: FROM SELDEN HALE - NO LONGER NEED HEARING 11-7-05* |
| 11/14/2005 | **Motion**<br>*Event Code: MOT Memo: DEF. MOT TO TRANSFER FILED MOTIONS* |
| 11/14/2005 | **Subpoena Served** (Judicial Officer: Miner, Hal )<br>*Event Code: SUBPS Memo: SEE IMAGING* |
| 11/14/2005 | **ORDER**<br>*Event Code: ORD Memo: GRANTING MOTION TO TRANSFER DEF. PRE TRIAL MOTIONS* |
| 11/15/2005 | **Order To Pay Attorney Fee** (Judicial Officer: Miner, Hal )<br>*Event Code: OPAF Memo: HALE; $7086.00* |
| 11/22/2005 | **Motion**<br>*Event Code: MOT Memo: MOT WRIT H/C TESTIFICANDUM; TOMMY TUCKER, JOSHUA STOCKER, MIGHUEL GONZALES, DESTRY KEELING, JOSHUA CRAIG BLEDSOE* |
| 11/22/2005 | **ORDER**<br>*Event Code: ORD Memo: WRIT H/C AD TESTIFICANDUM; TUCKER, STOCKER, GONZALES, KEELING, BLEDSOE* |
| 11/22/2005 | **APPLICATION FOR WRIT OF HABEAS CORPUS**<br>*Event Code: WRIT Memo: WRIT H/C AD TESTIFICANDUM; TUCKER, STOCKER, GONZALES, KEELING, BLEDSOE* |
| 11/30/2005 | **Defendant's Pre-Trial Motion** (Judicial Officer: Miner, Hal )<br>*Event Code: DPTM Memo: MOT/RECUSE DA* |
| 11/30/2005 | **APPLICATION FOR WRIT OF HABEAS CORPUS**<br>*Event Code: WRIT Memo: AD TESTIFICANDUM; JOSHUA BLEDSOE* |
| 12/01/2005 | **Defendant's Pre-Trial Motion** (Judicial Officer: Miner, Hal )<br>*Event Code: DPTM Memo: MOT/CHANGE OF VENUE* |
| 12/01/2005 | **STATE APPLICATION** (Judicial Officer: Miner, Hal )<br>*Event Code: SA Memo: TIM ATCHLEY* |
| 12/01/2005 | **Defendant's Pre-Trial Motion** (Judicial Officer: Miner, Hal )<br>*Event Code: DPTM Memo: MOT/SUPPRESS EVIDENCE; MOT/DISMISS; MOT/SUPPRESS; MOT/DISCOVERY* |
| 12/02/2005 | **STATE'S MOTIONS** (Judicial Officer: Miner, Hal )<br>*Event Code: SM Memo: TRIAL BRIEF IN SUPPORT OF ADMISSION OF MARITAL COMMUNICATIONS, TRIAL BRIEF IN SUPPORT OF ADMISSION OF COCONSPIRATION STATEMENTS, TRAIL BRIEF IN SUPPORT OF VENUE, MOT/DISCOVER DEF. EXPERTS, MOT/LIMINE - COMMITMENT QUESTIONS, MOT/LIMINE - PRETRAIL NEGOTIATIONS, MOT/LIMINE-HEARSAY, MOT/LIMINE-UNFILED CHARGES, TRIAL BRIEF IN SUPPORT OF ADMISION OF EXTRANEOUS OFFENSES* |
| 12/02/2005 | **Notice** (Judicial Officer: Miner, Hal )<br>*Event Code: N Memo: EXPERT WITNESSES FOR THE STATE* |
| 12/02/2005 | **TEXAS RULES OF CRIMINAL EVIDENCE** (Judicial Officer: Miner, Hal )<br>*Event Code: TRE Memo: STATE - RULE 404(b) & 609(f)* |
| 12/02/2005 | **DEFENSE APPLICATION FOR SUBPOENA** (Judicial Officer: Miner, Hal ) |

| | |
|---|---|
| | *Event Code: DAS Memo: NYLYNN NICHOLS, DUSTY GREEN, KARI KING, BARRY KING* |
| 12/02/2005 | **LETTER** (Judicial Officer: Miner, Hal )<br>*Event Code: LETTER Memo: FROM DA TO SELDEN HALE - REQ/NAME & ADDRESSES OF EXPERTS* |
| 12/02/2005 | **LETTER** (Judicial Officer: Miner, Hal )<br>*Event Code: LETTER Memo: FROM DA TO PAUL HERRMANN - REQ NAME & ADDRESS OF EXPERTS* |
| 12/05/2005 | **Motion**<br>*Event Code: MOT Memo: TO UNSEAL RECORDS IN 15307-A* |
| 12/05/2005 | **Motion**<br>*Event Code: MOT Memo: REQUIRE DISCLOSURE OF ALL INFORMERS RELIED UPON AND FOR PRODUCTION OF SAID INFORMERS IN OPEN COURT* |
| 12/06/2005 | **FILED** (Judicial Officer: Miner, Hal )<br>*Event Code: F Memo: AFFIDAVIT'S OF REDDEN, BROWN, JAKLEWICZ* |
| 12/06/2005 | **STATE'S MOTIONS** (Judicial Officer: Miner, Hal )<br>*Event Code: SM Memo: REPLY TO DEFENDANT'S MOTION TO CHANGE VENUE* |
| 12/06/2005 | **Subpoena Served** (Judicial Officer: Miner, Hal )<br>*Event Code: SUBPS Memo: KING, KING, MILLER,GREEN* |
| 12/06/2005 | **STATE'S MOTIONS** (Judicial Officer: Miner, Hal )<br>*Event Code: SM Memo: TO RECUSE COUNSEL FOR DEFENDANT* |
| 12/07/2005 | **STATE'S MOTIONS** (Judicial Officer: Miner, Hal )<br>*Event Code: SM Memo: TRANSFER FILED MOTIONS* |
| 12/12/2005 | **RANDALL CO SO TRANSPORT - CRI**<br>*Event Code: TRANSPORT Memo: MIGUEL GONZALES - $260.94* |
| 12/12/2005 | **RANDALL CO SO TRANSPORT - CRI**<br>*Event Code: TRANSPORT Memo: JOSHUA STOCKER - $1504.48* |
| 12/13/2005 | **STATE APPLICATION** (Judicial Officer: Miner, Hal )<br>*Event Code: SA Memo: PALLARD, KATHY JONES* |
| 12/13/2005 | **Subpoena Served** (Judicial Officer: Miner, Hal )<br>*Event Code: SUBPS Memo: SEE IMAGING* |
| 12/13/2005 | **Defendant's Pre-Trial Motion** (Judicial Officer: Miner, Hal )<br>*Event Code: DPTM Memo: MOT/REQ/DISCLOSURE/INFORMERS* |
| 12/13/2005 | **Subpoena Served** (Judicial Officer: Miner, Hal )<br>*Event Code: SUBPS Memo: PAM POLLARD, KATHY JONES, SGT BROWN, LT TRUPE, B REDDEN, J WATSON, B LEDBETTER* |
| 12/14/2005 | **Notice** (Judicial Officer: Miner, Hal )<br>*Event Code: N Memo: TO S HALE FROM DA'S OFFICE WITH LISTING OF EVIDENCE* |
| 12/14/2005 | **Notice** (Judicial Officer: Miner, Hal )<br>*Event Code: N Memo: TO P HERRMANN FROM DA'S OFFICE - LIST OF EVIDNECE* |
| 12/14/2005 | **RANDALL CO SO TRANSPORT - CRI**<br>*Event Code: TRANSPORT Memo: 237.44* |
| 12/15/2005 | **LETTER** (Judicial Officer: Miner, Hal )<br>*Event Code: LETTER Memo: TO ATTYS FROM JUDGE MINER - HEARING IN AMARILLON 12-17-05* |
| 12/16/2005 | **DEFENSE APPLICATION FOR SUBPOENA** (Judicial Officer: Miner, Hal )<br>*Event Code: DAS Memo: BILL REDDEN* |
| 12/16/2005 | **Defendant's Pre-Trial Motion** (Judicial Officer: Miner, Hal )<br>*Event Code: DPTM Memo: MOT/"GAG" ORDER* |
| 12/16/2005 | **Trial Document** (Judicial Officer: Miner, Hal )<br>*Event Code: TRIAL Memo: STATES TRIAL BRIEF* |
| 12/20/2005 | **RANDALL CO SO TRANSPORT - CRI**<br>*Event Code: TRANSPORT Memo: BLEDSOE $669.23* |
| 12/20/2005 | **NOTICE/AFFIDAVIT BUSINESS RECORD** (Judicial Officer: Miner, Hal )<br>*Event Code: NABR Memo: STATES; CINGULAR WIRELESS, SINCLAIR COMM, MOTEL 6, LA QUINTA INN, QUALITY INN, WAREHOUSE SOLUTIONS, CIRCUIT CITY, SW BELL TEL, WESTERN WIRELESS, SPRINT PCS* |
| 12/21/2005 | **Notice** (Judicial Officer: Miner, Hal )<br>*Event Code: N Memo: EXPERT WITNESSES FOR THE DEFENDANT* |
| 12/21/2005 | **DEPUTY REPORTER STATEMENT** (Judicial Officer: Miner, Hal )<br>*Event Code: DRS* |
| 12/21/2005 | **PRE-TRIAL ORDERS** (Judicial Officer: Miner, Hal )<br>*Event Code: PTO* |
| 12/21/2005 | **STATE APPLICATION** (Judicial Officer: Miner, Hal )<br>*Event Code: SA Memo: KATHY JONES, CPS* |
| 12/22/2005 | **Notice** (Judicial Officer: Miner, Hal )<br>*Event Code: N Memo: AMENDED NOTICE OF EXPERT WITNESS/DEFENDANT* |
| 12/29/2005 | **Subpoena Served** (Judicial Officer: Miner, Hal )<br>*Event Code: SUBPS Memo: KATHY JONES* |
| 12/30/2005 | **DEFENSE APPLICATION FOR SUBPOENA** (Judicial Officer: Miner, Hal )<br>*Event Code: DAS Memo: VICKIE LAMBERSON, JAY EUBANKS* |
| 12/30/2005 | **Subpoena Served** (Judicial Officer: Miner, Hal )<br>*Event Code: SUBPS Memo: JAY EUBANKS, VICKIE LAMBERSON* |
| 01/04/2006 | **NOTICE/AFFIDAVIT BUSINESS RECORD** (Judicial Officer: Miner, Hal )<br>*Event Code: NABR Memo: PERSONNEL DIRECTOR RANDALL CO JUV PROB., REGISTRARS OFFICE WTAM* |
| 01/05/2006 | **DOCKET SHEET** (Judicial Officer: Miner, Hal )<br>*Event Code: DSH* |
| 01/05/2006 | **Trial Court's Certification of Defendant's Right to Appeal** (Judicial Officer: Miner, Hal )<br>*Event Code: TCC* |
| 01/05/2006 | **DEFENDANT'S WAIVER OF APPEAL AFTER SENTENCE** (Judicial Officer: Miner, Hal )<br>*Event Code: DWAP* |

| | |
|---|---|
| 01/05/2006 | **FELONY PLEA MEMORANDUM** (Judicial Officer: Miner, Hal ) *Event Code: FPM* |
| 01/05/2006 | **Judgment of Conviction** (Judicial Officer: Miner, Hal ) *Event Code: JCON Memo: 45 YRS TDC VOL: I;S* Vol./Book I;S |
| 01/11/2006 | **ISSUED TDCJ-ID COMMITMENT** (Judicial Officer: Miner, Hal ) *Event Code: ITC* |
| 01/11/2006 | **RANDALL CO SO TRANSPORT - CRI** *Event Code: TRANSPORT Memo: $394.80 - FLORENCE, CO* |
| 01/31/2006 | **Motion** *Event Code: MOT Memo: DER. MOT/EXPERT ASSISTANCE IN INDIGENT CASE - $1338.33 - VINCE GONZALES* |
| 01/31/2006 | **ORDER** *Event Code: ORD Memo: EX PARTE ORDER - PAYMENT OF FEE FOR MITIGATION SPECIALIST - $1338.33 FOR VINCE GONZALES - COPY TO AUDITOR* |
| 01/31/2006 | **Order To Pay Attorney Fee** (Judicial Officer: Miner, Hal ) *Event Code: OPAF Memo: $715.00/DAVID SIRMON - PRIVATE INESTIGATOR* |
| 01/31/2006 | **Order To Pay Attorney Fee** (Judicial Officer: Miner, Hal ) *Event Code: OPAF Memo: $17,172.00/SELDEN HALE* |
| 02/14/2006 | **RANDALL CO SO TRANSPORT - CRI** *Event Code: TRANSPORT Memo: RCSO $751.06* |
| 05/17/2006 | **Order To Pay Attorney Fee** (Judicial Officer: Miner, Hal ) *Event Code: OPAF Memo: $26,533.00/PAUL HERRMANN* |
| 05/18/2006 | **Order To Pay Attorney Fee** (Judicial Officer: Miner, Hal ) *Event Code: OPAF Memo: $3300.00/SELDEN HALE* |
| 07/21/2006 | **Subpoena Served** (Judicial Officer: Miner, Hal ) *Event Code: SUBPS Memo: CUSTODIAN OF RECORDS, HOWES HOME IMPROVEMENT* |
| 09/18/2012 | **BILL OF COST - INMATE WITHDRAWAL** (Judicial Officer: Miner, Hal ) *Event Code: BCW* |
| 11/06/2012 | **ORDER WITHDRAW INMATE TRUST FUND** (Judicial Officer: Miner, Hal ) *Event Code: OWDIT* |

## Financial Information

| | | | | |
|---|---|---|---|---|
| | **Defendant** KIMBERLIN, STEPHEN CRAIG | | | |
| | Total Financial Assessment | | | 54,364.00 |
| | Total Payments and Credits | | | 273.00 |
| | **Balance Due as of 01/15/2018** | | | **54,091.00** |
| 01/11/2006 | Transaction Assessment | | | 273.00 |
| 05/18/2006 | Transaction Assessment | | | 47,005.00 |
| 01/16/2013 | Payment | Receipt # 2013-149708 | KIMBERLIN, STEPHEN CRAIG | (72.11) |
| 01/23/2013 | Payment | Receipt # 2013-150745 | KIMBERLIN, STEPHEN CRAIG | (10.00) |
| 02/13/2013 | Payment | Receipt # 2013-152020 | KIMBERLIN, STEPHEN CRAIG | (5.00) |
| 03/14/2013 | Payment | Receipt # 2013-153824 | KIMBERLIN; STEPHEN; CRAIG | (10.00) |
| 06/19/2013 | Payment | Receipt # 2013-159291 | KIMBERLIN, STEPHEN CRAIG | (5.00) |
| 08/13/2013 | Payment | Receipt # 2013-162336 | KIMBERLIN, STEPHEN CRAIG | (10.00) |
| 12/18/2013 | Payment | Receipt # 2013-168919 | KIMBERLIN, STEPHEN CRAIG | (5.00) |
| 02/27/2014 | Payment | Receipt # 2014-172539 | KIMBERLIN, STEPHEN CRAIG | (10.00) |
| 03/25/2014 | Payment | Receipt # 2014-173934 | KIMBERLIN, STEPHEN CRAIG | (10.00) |
| 06/25/2014 | Payment | Receipt # 2014-179202 | KIMBERLIN, STEPHEN CRAIG | (10.00) |
| 08/18/2014 | Payment | Receipt # 2014-182115 | KIMBERLIN, STEPHEN CRAIG | (10.00) |
| 10/28/2014 | Payment | Receipt # 2014-185966 | KIMBERLIN, STEPHEN CRAIG | (4.20) |
| 12/10/2014 | Payment | Receipt # 2014-188549 | KIMBERLIN, STEPHEN CRAIG | (10.00) |
| 01/12/2015 | Payment | Receipt # 2015-189977 | KIMBERLIN, STEPHEN CRAIG | (10.00) |
| 04/28/2015 | Payment | Receipt # 2015-196574 | KIMBERLIN, STEPHEN CRAIG | (4.20) |
| 06/08/2015 | Payment | Receipt # 2015-199227 | KIMBERLIN, STEPHEN CRAIG | (10.00) |
| 07/08/2015 | Payment | Receipt # 2015-201316 | KIMBERLIN, STEPHEN CRAIG | (0.89) |
| 09/09/2015 | Payment | Receipt # 2015-205574 | KIMBERLIN, STEPHEN CRAIG | (10.00) |
| 10/15/2015 | Payment | Receipt # 2015-208142 | KIMBERLIN, STEPHEN CRAIG | (3.00) |
| 11/10/2015 | Payment | Receipt # 2015-209918 | KIMBERLIN, STEPHEN CRAIG | (1.19) |
| 01/18/2016 | Payment | Receipt # 2016-214412 | KIMBERLIN, STEPHEN CRAIG | (10.00) |
| 02/16/2016 | Payment | Receipt # 2016-216408 | KIMBERLIN, STEPHEN CRAIG | (1.00) |
| 04/12/2016 | Payment | Receipt # 2016-220790 | KIMBERLIN, STEPHEN CRAIG | (4.00) |
| 05/12/2016 | Payment | Receipt # 2016-223182 | KIMBERLIN, STEPHEN CRAIG | (0.39) |
| 08/11/2016 | Payment | Receipt # 2016-230044 | KIMBERLIN, STEPHEN CRAIG | (10.00) |
| 09/14/2016 | Payment | Receipt # 2016-232265 | KIMBERLIN, STEPHEN CRAIG | (4.00) |
| 10/17/2016 | Payment | Receipt # 2016-234504 | KIMBERLIN, STEPHEN CRAIG | (0.69) |
| 02/13/2017 | Payment | Receipt # 2017-242709 | KIMBERLIN, STEPHEN CRAIG | (10.00) |
| 07/20/2017 | Payment | Receipt # 2017-254301 | KIMBERLIN, STEPHEN CRAIG | (10.00) |
| 09/13/2017 | Payment | Receipt # 2017-258325 | KIMBERLIN, STEPHEN CRAIG | (2.50) |
| 01/10/2018 | Payment | Receipt # 2018-267013 | KIMBERLIN, STEPHEN CRAIG | (9.83) |

# APPENDIX S

Return to Search Results

# Offender Information Details

**SID Number:** 04093855

**TDCJ Number:** 01345531

**Name:** KIMBERLIN,STEPHEN CRAIG

**Race:** W

**Gender:** M

**DOB:** 1968-06-27

**Maximum Sentence Date:** 2048-06-22

**Current Facility:** ALFRED HUGHES

**Projected Release Date:** 2048-06-22

**Parole Eligibility Date:** 2025-12-22

**Offender Visitation Eligible:** YES

*Information provided is updated once daily during weekdays and multiple times per day on visitation days.* ***Because this information is subject to change, family members and friends are encouraged to call the unit prior to traveling for a visit.***

## SPECIAL INFORMATION FOR SCHEDULED RELEASE:

**Scheduled Release Date:**
Offender is not scheduled for release at this time.

**Scheduled Release Type:**
Will be determined when release date is scheduled.

**Scheduled Release Location:**
Will be determined when release date is scheduled.

Parole Review Information

## Offense History:

| Offense Date | Offense | Sentence Date | County | Case No. | Sentence (YY-MM-DD) |
|---|---|---|---|---|---|
| 2003-04-02 | DEL CONT SUB > 400 GRAMS | 2006-01-05 | RANDALL | 15,275-A | 20-00-00 |
| 2003-03-09 | MURDER | 2006-01-05 | RANDALL | 17,288-A | 45-00-00 |

Return to Search Results

---

*The Texas Department of Criminal Justice updates this information regularly to ensure that it is complete and accurate, however this information can change quickly. Therefore, the information on this site may not reflect the true current location, status, scheduled termination date, or other information regarding an offender.*

*For questions and comments, you may contact the Texas Department of Criminal Justice, at (936) 295-6371 or webadmin@tdcj.texas.gov. This information is made available to the public and law enforcement in the interest of public safety. Any unauthorized use of this information is forbidden and subject to criminal prosecution.*

---

New Offender Search

Texas Department of Criminal Justice | PO Box 99 | Huntsville, Texas 77342-0099 | (936) 295-6371

# APPENDIX T


RANDALL COUNTY
TEXAS
SHERIFF'S DEPARTMENT
TX1910000
24300
www.mugshots.com

# APPENDIX U

Email or Phone
Password
Log In
Forgot account?

**Craig Kimberlin is on Facebook.**

To connect with Craig, sign up for Facebook today.

Log In

or

Sign Up



Craig Kimberlin

Friends Photos Videos

## About Craig Kimberlin

No info to show

### Favorites

**Music**



B-Real of Cypress Hill

**Movies**




The Secret Life Of Pets

**Television**

Animal Planet's Too

**Athletes**



### Photos



See More Photos

### Wrong Craig Kimberlin? Try Again

Craig Kimberlin Search

### Others Named Craig Kimberlin


Craig Kimberlin


Craig Kimberlin

Alana
Blanchard

**Other** Donald J. Trump, Dani Mathers, Jessica Ashley, Kristen Nicole, Beth Williams, Sean Hannity, Mercedes Brito, Carmen Electra, Jenna Jameson, Nikki Leigh, Josephine Skriver, Elizabeth Hurley, Pamela Anderson, Fabricio Zaia, Ali Rafiq and more


**Craig Kimberlin**


**Melissa Craig**
(Melissa Joann Kimberlin)

See more people named Craig Kimberlin

## Others With a Similar Name


**Craig Davis**


**Rick Craig**


**Craig Alpert**


**Craig Ellis**


**Craig Rokuson**



**Craig Sole**


**Cathie Craig**


**Craig Weinrib**

**CONTACT INFORMATION**

No contact info to show

English (US) Español Français (France) 中文(简体) العربية Português (Brasil) Italiano 한국어 Deutsch हिन्दी 日本語

Sign Up Log In Mobile Find Friends Pages Help

Messenger Facebook Lite People Places Games Locations Celebrities Marketplace Groups Recipes Momer
Instagram About Create Ad Create Page Developers Careers Privacy Cookies Ad Choices Terms

Facebook © 2017





ook.com/photo.php?fbid=12399674460
.100009704498106.-2207520000.14785
ery Apple Disney TEAMS Parent Self Child Support - ESPN Prote
Craig Kimberlin's Photos
in Profile Pictures
Options Share



ney
TEAMS Parent Self
Child Suppor
obe-News
capital murder charges |
com | Amarillo Globe-News
Visit page
Share
TAP TO
REMOVE

# APPENDIX V

Email or Phone
Password
Log In
Forgot account?

**Cody Kimberlin is on Facebook.**

To connect with Cody, sign up for Facebook today.

Log In

or

Sign Up



Cody Kimberlin

Friends Photos Videos

## About Cody Kimberlin

WORK

**Cornerstone Church Wheeler**

**Maxey's Steakhouse**
Host (event)

EDUCATION

**Texas Tech University**
Class of 2015 · Lubbock, Texas

**Wheeler**
Wheeler, Texas

CURRENT CITY AND HOMETOWN

**Wheeler, Texas**
Current city

### Photos



+5

See More Photos

### Wrong Cody Kimberlin? Try Again

Cody Kimberlin Search

### Others Named Cody Kimberlin



**Amarillo, Texas**
Hometown

## Favorites

**Music**



Nicki Minaj

**Television**

Funker530 - Combat

**Games**

Ketchapp

**Athletes**



Ryan Sheckler

**Sports Teams**

Texas Rangers

**Sports**



Baseball

**Other**

Top Eleven Hack Free Tokens Cheats, Amazon.com, Free Xbox Live Gold Membership Codes, Certified Teens, Emo/Skater, Gatorade, Ohhh Shit √, Tag someone who, Diesel Babe, Dude Perfect, Top Vines, Eminem, HERB, Brennen Taylor, The Mind Unleashed and more



**Cody Kimberlin**



**Cody Kimberlin**



**Cody Kimberlin**



**Cody Kimberlin**



**Cody Kimberlin**



**Cody Kimberlin**



**Cody Kimberlin**

See more people named Cody Kimberlin

## Others With a Similar Name



**Cody Gantz**



**Cody Below**



**Cody M White**



**Cody An Brian**



**Sanja Cody**



**Cody Tilford**



**Cody Miller**



**Cody Gill**

**CONTACT INFORMATION**

# APPENDIX W

Email or Phone Password Log In

Forgot account?

**Jesica Kimberlin is on Facebook.**

To connect with Jesica, sign up for Facebook today.

Log In

or

Sign Up



Jesica Kimberlin

Friends Photos Videos

## About Jesica Kimberlin

EDUCATION



**River Road**
Class of 1998 · Amarillo, Texas

## Favorites

**Music**



DJ James Erik

**Movies**



VeggieTales

**Television**

## Photos



+145

See More Photos

## Others With a Similar Name



Kimberlin Martinez



Jesica Palavecino

Food Network

**Athletes**



Love Relationship

**Sports Teams**

Dallas Cowboys

**Other**

Entenmann's, Nations Lending, Sick Chirpse, LittleThings, Brian James NBC5, Re-Elect Judge Jerry Hefley, Lisa Leonard Designs, Stiles Hair Boutique, Wheeler Ink & Threads, Kristen Hampton WBTV Good News, City of Pampa Texas, 9Lilas, The Spice Gal, Gageby Store, The Works Auto Reconditioning and more



**Vicky Kimberlin**



**Jesica Blub**



**Jesica Bautista Latuga**



**Jesica Montero**

**CONTACT INFORMATION**

No contact info to show

English (US) Español Français (France) 中文(简体) العربية Português (Brasil) Italiano 한국어 Deutsch हिन्दी 日本語

Sign Up Log In Messenger Facebook Lite Mobile Find Friends People Pages Places Games Locations
Celebrities Marketplace Groups Recipes Sports Look Moments Instagram Local About Create Ad
Create Page Developers Careers Privacy Cookies Ad Choices Terms Help

# APPENDIX X

POSTED

CAUSE NO 015275A

| | | |
|---|---|---|
| STATE OF TEXAS | § | IN THE DISTRICT OF |
| | § | |
| VS. | § | RANDALL COUNTY, TEXAS |
| | § | |
| KIMBERLIN | § | 47th JUDICIAL DISTRICT |

## MOTION FOR CONFERENCE CALL

My name is Stephen Craig Kimberlin, Movant pro se. My Offender Number is 1345531. I am presently incarcerated in the Alfred D. Hughes Unit located in Coryell County, in Gatesville, Texas. I am unable to personally appear before the Court and give testimony in this cause and respectfully request the Court to issue an Order to conduct a conference call for the final hearing in this matter, so that I might give testimony. Movant does not wish to put the Court or Randall County to the expense or inconvenience of bench warranting and transporting him back to Randall County for this hearing; thus, a conference call would suffice.

In the alternative, Movant believe his sworn petition will adequately represent his tesimony.

## PRAYER

**WHEREFORE, PREMISES CONSIDERED** Movant prays that this Court will grant this motion and Order a conference call, or in the alternative, accept

FILED
2012 JUL 27 PM 1:57
JO CARTER, DISTRICT CLERK
RANDALL COUNTY, TEXAS
_______ DEPUTY

COPY

Movant's sworn petition as his testimony.

Respectfully Submitted,

Stephen Kimberlin

Stephen Craig Kimberlin
TDCJ-CID #1345531
Alfred D. Hughes Unit
Route 2 Box 4400
Gatesville, Texas 76597
**MOVANT PRO SE**

UNSWORN DECLARATION

I, Stephen Craig Kimberlin, TDCJ-CID #1345531, being presently incarcerated in the Alfred D. Hughes Unit, in Coryell County, Texas, declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

**EXECUTED** on this the 9th day of July, 2012.

Stephen Kimberlin
Stephen Craig Kimberlin
**MOVANT PRO SE**

CAUSE NO. 015275A

| | | |
|---|---|---|
| STATE OF TEXAS | § | IN THE DISTRICT OF |
| | § | |
| vs. | § | RANDALL COUNTY, TEXAS |
| | § | |
| KIMBERLIN | § | 47th JUDICIAL DISTRICT |

ORDER

**THE COURT,** having heard and considered Movant's "MOTION FOR FREE STATEMENT OF FACTS", the Court is of the opinion that the motion should be, and is hereby GRANTED/DENIED.

**BEING GRANTED,** the pertinent statement of facts from the "Hearing on Change of Venue" in the above - styled and numbered cause, along with the additionally requested court records, will be provided under the following conditions:

______________________________________________

______________________________________________

______________________________________________

______________________________________________

______________________________________________

Signed and **ORDERED** on this the _____ day of __________, 2012.

______________________________
JUDGE PRESIDING

# APPENDIX Y

NO. W-15,307-A-1

| | | |
|---|---|---|
| **EX PARTE** | § | **IN THE DISTRICT COURT** |
| | § | |
| | § | **47TH JUDICIAL DISTRICT** |
| | § | |
| **JOSHUA DAVID STOCKER** | § | **RANDALL COUNTY, TEXAS** |

**SUPPORTING AFFIDAVIT OF JEREMY MARC GREEN**

**TO THE HONORABLE JUDGE OF SAID COURT:**

Jeremy Marc Green appeared in person before me today and stated under oath:

"My name is Jeremy Marc Green. My date of birth is October 27TH, 1977. I am forty years of age, and I am fully competent to make this affidavit. The facts stated in this affidavit are within my personal knowledge and are true and correct.

I was introduced to Dustin Pool sometime around February, 2002 through an old high school friend, Jessica Vasquez, who was his wife at the time. I was a Branch Manager for ADT Home Security Services in Amarillo, Texas. Jessica asked if I could stop by their home at 5621 Quiet Circle, Amarillo, Texas to discuss a camera system for the outside of the home. At the appointment, I met Dustin Pool for the first time and he ordered a topnotch system for the time which cost around $3,000. I put in the order and then he went to the back room and he brought out cash and paid me. He said he got his money from an inheritance from his grandmother. I had never had a customer pay with cash like that before but I was happy to make the sale. Two days later, Dustin called to cancel the order and demanded his cash back. We canceled the order and he was issued a check back for a refund.

Two or three days after that, I got a call from Dustin asking me if I could come talk to him at his home on Quiet Circle. I showed up and he started telling me that he needed

to invest in a solid business and his wife, my friend, said that I would be a guy that he could trust as an honest businessman. Dustin asked me to look into what it would take to become a dealer for ADT as I already held a license with the Texas Private Security office. All it really took was cash, so I then made calls and started the process for the dealership. ADT required prospective dealers to have a certain amount of cash in the bank as they processed us through their due diligence department. Dustin supplied the deposit of around $20,000.00 cash, but stated he needed it back immediately. Through Attorney Steven Ivy, Dustin and I established a corporation named Security Systems Unlimited, Inc. There then was a stop in our approval process with the due diligence department with ADT due to something that came up under Dustin's name. I cannot recall so many years later exactly what the problem was. We then made the decision that I would have to be the President and CEO of the company and Dustin would only act as an officer. Dustin didn't like it but it was our only choice at the time in order to secure approval. Originally, Dustin was to be President and CEO and I was going to be the Vice President. ADT approved our dealership under my direction as the CEO per the altered structure. He later told me in a threatening way "(Y)ou know your name may be on everything but it's still all mine." By this point, I was starting to see Dustin's "alternative lifestyle" and his way of talking to others in a gangster type way. I was only a 23 year old kid and he really sounded kind of scary.

Our office was initially located at 4521 S. Western Street in Amarillo, Texas and opened with a red ribbon grand opening ceremony in May of 2002, replete with Commissioner Kevin Nap and the Amarillo Chamber of Commerce. ADT helped us set up our new dealership, and the ADT personnel at one point asked me what Dustin's deal as they seemed suspicious of his behaviors and actions. I said he inherited a lot of money and was really a silent partner. We hit the ground running and sold 28 contracts our first month for around $1,400 each. After we paid sales commissions, equipment cost and installation team we profited about $800 of that money, which was pretty good for the time. I kept the teams starting each week and sales kept coming in. I would pay Dustin on average around $1,000 per week.

I soon realized Dustin was more like an embarrassment when he would show up to the office often hammered on weed and alcohol, or out of it always with a bottle of Xanax pills in his pocket. New sales guy recruits usually quit the day after meeting him as he looked bad on drugs and was always acting mad about something, usually on the phone screaming at someone. I came to believe later that he was faking the calls to seem important as the screaming was a way to sound intense and intimidating. He would be either all over the place or a zombie that never left his home. He never came in or attempted to even know really what the company did. He slept all the time and you could never reach him when he was down. I soon realized he was a complete mess of a person but I was already in business with the guy and if I played my cards right, the company would continue successfully with him only being an officer and without him destroying our company. Or so I thought.

At some point during our second month in business, a guy named Adrian Gonzales (who I also knew from high school, although we never were really friends but knew each other's family) came to the company and said that it wasn't fair that I didn't understand what Dustin was involved in and that he knew that I had no Idea. Adrian then demanded that he and I both go to Dustin's house and wake him up and make him explain to me the situation. We went over there and had to beat on the door for almost 30 minutes and call continuously before finally his wife answered the door. We found Dustin in bed knocked out of it. Adrian then shocked him until he woke up. Once Dustin was coherent and awake, Adrian told him he must tell me of the situation. Dustin then proceeded to freak out, cussed out both of us and kicked us out saying he wasn't saying shit, and how dare we wake him up. Adrian then told me that all he could say was that Dustin was severely addicted to methamphetamine and was also selling it but wouldn't say any more, and then that Dustin needed to tell me. He then warned me to get away from Dustin. I explained about the company being incorporated and that neither of our personal issues could destroy the company. Adrian agreed that I was sucked into a bad deal and I needed to find an exit strategy.

One or two days later I got a call from Dustin telling me to go to his home on Quiet Circle so we could talk. Dustin then told me that he had been selling dope and was addicted to it and that's why he was acting so weird, but sold me on a story I believed to be just a hiccup in our situation, as I had never seen meth at that time. He said he was not selling it any longer and really needed more that $1,000 a week out of the company for pay each week and if it were not for him the company wouldn't exist. I, a scared young guy, just agreed to avoid confrontation. The problem was that we started having slower months four to five months in, not to mention attrition on accounts that didn't make payments and the company would get charged back the total paid for the contract, so then we were out the sales commissions, equipment, and installation cost, so it wasn't really the time for him to put the squeeze on the company. I did what I could with extra money to give to him, even while suffering myself by not paying myself some weeks, primarily out of fear of him. Ultimately, I explained and showed him our situation. We decided to rent and office up in the Herring Bank Building in downtown Amarillo on the 5th floor, as it was way cheaper than our original office. We also discussed our pay situation and his solution was for me to move into his home in his guest room and we could split bills until we got our sales back up, and we could then move on again. I agreed in a desperate attempt to save the company and our personal bills.

Once in his house, he had a lot of people that would come and visit and they would be in his game-room having meetings. All were gang/drug related or undercover cops. One night I walked in and Dustin, Ray Plascencio, and Ray's girlfriend Guin Garcia were smoking meth. I had never before seen it in my life. Dustin then put it in my face and told me to try it, as I had already been dabbling with weed and pills by now, so why not. When I then tried it for the first time I instantly was stung by its effects and I liked it. I felt zoned out but really good. They all were laughing at me and later told me it was ok, that it happens to each of us, and they then told me I smoked some of the purest meth around. I was instantly addicted to the drug. He then was more comfortable with it around me, and would bring in huge bags and cut it into bigger

bags, from one pound up to three pounds after dilution. Dustin explained that Shannon Burney had taught him how to cut the dope. Dustin told me that's how he got rich in first place; there was never really any inheritance. Also by this point, Dustin's wife, my old high school friend Jessica Vasquez, had left after our first month in business, as it was a short-lived marriage of only a couple of months.

One night after Dustin had been up tweaking for about a week with no sleep and started drinking alcohol and taking Xanax, he told me that people were out to get him for territorial issues in the dope game and he was worried people knew he was an informant for police. I was in shock. He also informed me that the house we lived in had wiretaps in the game room and kitchen areas and was a police traphouse. He explained that he had been pulled over in Plainview, Texas and was taken down by the DEA and the former Regional Narcotics Task Force the previous year, and that he was working for them, particularly Bill Redden, against different groups, in addition to making drug sales for the Task Force, from which he was allowed to keep ten percent of the proceeds. After he had been flipped, during a remodel of his house the police had installed wiretaps and cameras in the game room and kitchen to record transactions and that if I wanted anything done in private, not to do it in those rooms. I personally witnessed Dustin deliver controlled substances to police for their personal use and to deliver cash from drug sales to the police, as they would use Dustin to resell dope they had confiscated. One time in particular we were in a white Chevy Lumina that had our logo on it and just as we arrived at Western Bowl, Dustin received a call from some cops. We told them what vehicle to look for and they told us they had already identified our vehicle as they had been following us. We had a bag of dope in the car which Dustin took back to the cops and then returned to our vehicle without the dope and without cash.

Dustin stated to me that he would not let this affect me or the company and to keep on with business as usual. The only problem was that now I had an addiction to the drugs

and was also going down, and this crap scared the shit out of me as I was no gangster. I had to quickly learn the ways, though, like it or not. In fact, I had to begin assisting Dustin in delivering drugs to his clients, including a couple of trips to Plainview to deliver to an older female sheriff's deputy in deals that went down under a table in the Grandie's Restaurant that used to be located there off of I-27.

One night sometime around mid to late summer of 2002, we had a huge party at the house on Quiet Circle and Dustin invited all the people from different groups, almost as if it was staged. Now that I think of it, it was clearly staged to get all these people together while the cops could surveil the situation to make connections on groups. Dustin got called out by someone, with the guy saying he didn't care if it was Dustin's house he was going to take him out for his loud mouth. The party didn't last long but all connections connected I'm sure, with the cops recording everything. After this night is when Dustin told me he had to start selling again and for me to just run the company and keep it afloat and he would cover the house.

Dustin was a loudmouth but I believe he was like that while the cops were controlling his actions and listening to each call he made. I believe he was actually terrified and was used and controlled like a puppet. I believed through what I witnessed with my own eyes that his every move was controlled by drug officials, right down to the money that came through from Dustin, such as the $20,000 shown in the bank to get our dealership started only to be pulled right out so he could pay it back, to the drugs he would get to cut and redistribute to the public. Dustin was frequently in a rage and I believe the rage was fueled by the fact of the police' control over him and the danger they were exposing him to. One night while Dustin was up for a long time and drinking, he confessed he would receive drugs from drug officials and sell them under vehicle surveillance, and that his vehicles were rolling recording devices, and then give the cash back to the cops and they would allow him to hold onto a little of the cash so he could keep going. At one point I know his vehicles and his phones were confiscated by the cops. He complained that he was selling dope for them but they would only let

him keep scraps and he was getting only pennies He was used so he could establish the network of meth dealers and get them compromised so that they, like Dustin, and like another guy named Justin Bailey, could be leveraged into selling drugs for the police instead of themselves. He never would say names of cops other than Bill Redden. He mentioned him a lot, even amongst other groups of people I would meet. They called Redden the man of disguise because he was bald but would disguise himself as someone else with long hair. I even identified him on various occasions with either long hair, looking like a biker, or bald just running around town with his family; he has one of those faces you can't forget. Bill Redden would come to the house on Quiet Circle and would go to the backroom to transact with Dustin and would come out appearing to have just done dope. Dustin told me Redden was a banger, meaning he only shot it up and did not smoke it. Anyhow I continued to tried to continue to sell home security to anyone I could while still hiring guys each week that I could get excited to go out and sell friends and family and make my week easy.

I became very familiar with many of the people Dustin was dealing with. I knew that Craig Kimberlin and Dustin had done deals together but Dustin never indicated that there was a problem with Kimberlin. I never heard the name of Josh Stocker until after the case hit the news. I was aware of a problem with Josh Bledsoe after Dustin came home one night, scared and visibly shaking due to an incident at Stumpy's. Dustin stated that a bunch of cartel gangsters had hemmed him up at Stumpy's accusing him of being a snitch, and were about to beat the hell out of him and maybe kill him and Josh Bledsoe was one of the people about to attack him. The only thing that saved him was when Omar Mendoza, Big O, intervened and told everybody that "(W)e don't do this like this" and to trust him on it. Big O got everyone to back off of Dustin and kept them from doing what they were going to do in a public bar. Dustin was extremely shaken by the ordeal. Nevertheless, it was apparent in my conversations with Dustin that he was far more afraid of the cops, and violence from the cops, than the cartels, and it was because the cops were in a panic over the impending breakup of the Narcotics

Task Force and were closing up all their loose ends, eliminating people and groups who had worked for them.

One night about two weeks before Dustin was murdered I had a dream and I woke up crying and sweating as I had been up for days and had fell out. I dreamed that I could hear plumbing moving in the walls, and banging on the doors and windows. I run in to the living room and Dustin is piling up furniture against the door and I look out and see all these low riders and Hispanic people. I start to help him pile furniture up against the door as they try to get in. I then take his girlfriend at the time to the closet with her son and close the closet door. I then heard the door bash in and Dustin runs into the room and jumps on us in the closet saying "I'm not going to let them get you, J!" That's when I woke up crying, it felt so real. I then told Dustin of how real my dream was and he started laughing at me saying I was just fucked up.

A few days later, Dustin was acting crazy and hiding in the trees in the front yard at Quiet Circle with guns in hand and he was with Ray Plascencio saying that people were coming to get them. I hid in the house but watched as a car did pull up and two masked people got out of car, and then Dustin and Ray jumped out of the trees and started running at them, so they jumped in the car and hauled ass. Then Dustin and Ray jumped in Dustin's car and began chasing them. I had had enough of this shit, so I then left and went to my grandparents' house. I then made the decision I needed to leave Amarillo and get away from this madness that had ruined my life. A day later Dustin figured out I was done answering to him, or anyone else, and started demanding all cash from the bank from our company saying he needed it. I informed that I would not be giving over any cash, he informed me that I would never enjoy it. I took that as a threat on my life. I went to the bank and pulled out what cash we had left, not even $4,100, and headed to Colorado to live with a friend. Two weeks later he was dead. I do believe had I not left that he possibly would have murdered me as he was in a crazy state, and really doped up all the time, and with the I don't give a damn

attitude. He was threatening everyone I heard him come in contact with in his last few weeks of his life.

This is as factual as I can remember in my mind as a young man this was over 15 years ago, and I continue to pray that one day it will all come to and end and justice will be served to anyone connected in an unjust way in the set up of these people.

JEREMY MARC GREEN

SUBSCRIBED AND SWORN under oath before me on this, the 12TH day of January, 2018.

CHRISTOPHER J. MORGAN
Notary Public, State of Texas
Comm. Expires 03-01-2021
Notary ID 131025353

Notary Public, State of Texas

# APPENDIX Z

U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FILED
APR - 1 2003
CLERK, U.S. DISTRICT COURT
By ______ Deputy

COPY

**CRIMINAL COMPLAINT**
IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

UNITED STATES OF AMERICA

V.

NO. 2:03-MJ-26

**EMILIO SANCHEZ-VEJAR, (1)**
**also known as Emilio Sanchez-Bejar, also known as Emilio Martinez,**
**RAMON SANCHEZ-VEJAR, (2)**
**JULIO CESAR JACOBO, (3)**
**ROBERTO GARCIA-MAYORQUIN, (4)**
**also known as La Loca**
**DENISE MICHELLE CONTRERAS, (5)**
**DANIEL ARMANDO CONTRERAS, (6)**
**also known as Danny Contreras**
**DAVID FUENTES, III, (7)**
**CARL SIMPSON, (8)**
**ANGELICA LUPE LUJAN, (9)**
**IANUEL D. LUJAN, (10)**
**FABIO (Last Name Unknown), (11)**
**NIEVES THERESA VELA, (12)**
**also known as La Huanga, also known as Theresa**
**CATARINO RODRIGUEZ, (13)**
**MIGUEL GONZALEZ, (14)**
**JOSHUA CRAIG BLEDSOE, (15)**
**DAVID GARCIA, (16)**
**CANDACE BAILEY, (17)**
**TODD ALEXANDER MOORE, (18)**
**JOE LEON, (19)**
**OMAR MENDOZA, (20)**
**ROBERT BOBBY CASTILLO, JR. (21)**
**also known as B.J. Castillo**
**MANUEL ISSAC ROMERO, (22)**
**also known as Isaac Romero**
**RICHARD BITELA, (23)**
**ERMELINDA HERNANDEZ, (24)**
**DANIEL ANTHONY CASTRO, (25)**
**also known as Danny Castro**
**HRIS CASTRO, (26)**



04/08/2003 16:57 8063741853 SMITH WILSON DUNCAN PAGE 02

DENISE: HELLO?
DANIEL: WHAT'S UP?
DENISE: WHAT'S UP?
DANIEL: HEY, IS FABIAN AND THEM STILL HERE?
DENISE: UH-HUH.
DANIEL: ARE THEY STAYING AT YOUR HOUSE?
DENISE: UH-HUH.
DANIEL: OH. HAVE THEY SAID ANYTHING?
DENISE: HUH?
DANIEL: HAVE THEY SAID ANYTHING OR ACTED ANYWAY?
DENISE: UH-UH. WHY?
DANIEL: OKAY. OH, 'CAUSE, I GUESS DUSTIN POOL IS MISSING, HUH?
DENISE: HUH?
DANIEL: DUSTIN POOL IS MISSING.
DENISE: [GASPS]. SWEAR TO GOD.
DANIEL: FOR REAL.
DENISE: SINCE WHEN?
DANIEL: I DON'T KNOW, A WHILE ALREADY.
DENISE: WHO TOLD YOU THIS?
DANIEL: ALL KINDS OF PEOPLE. I ALREADY FOUND OUT.
DENISE: MIGUEL HASN'T... HASN'T TOLD ME NOTHING.
DANIEL: OH. AND AH... I GUESS HE WAS FUCKING WITH MONTERREY AND THEM, JAVIER.
DENISE: UH-HUH.
DANIEL: YEAH. DOES FABIAN KNOW THEM?
DENISE: WHAT?
DANIEL: DOES FABIAN KNOW THEM?
DENISE: MONTERREY?
DANIEL: YEAH.
DENISE: I DON'T KNOW, I DON'T THINK SO. FROM THAT... THAT CAR LOT?
DANIEL: YEAH.
DENISE: BUT WHAT WOULD THEY DO TO DUSTIN, WHY WOULD THEY TAKE HIM?
DANIEL: I DON'T KNOW. BECAUSE I... SOMEBODY TOLD ME THAT LIKE... SOMEBODY... HE HASN'T ANSWERED YET BUT AH... LIKE, THEY WANTED TO KNOW WHERE I LIVED N' SHIT, THAT THEY WERE LOOKING FOR ME.
DENISE: WHO WAS?
DANIEL: THAT'S WHAT I SAID. AND, I MEAN, I KNOW, FABIAN DOESN'T KNOW NOTHING AND HE DON'T KNOW NOBODY BESIDES THAT I KNOW. [U/I] WHY... THEY DON'T KNOW NOBODY THAT I KNOW. YOU KNOW WHAT I'M SAYING?
DENISE: WELL, I HAVEN'T TOLD NOBODY NOTHING AND... YOU KNOW...
DANIEL: I KNOW, THAT'S WHAT I'M SAYING, UM... [U/I] DON'T KNOW NOTHING, NOBODY THAT I KNOW. YOU KNOW WHAT I MEAN?
DENISE: YEAH. WHO TOLD YOU THAT THEY WERE LOOKING FOR YOU?
DANIEL: [U/I] CALLED ME AND TOLD ME THAT AH... THIS DUDE THAT HE KNOWS THAT... SOMEBODY THAT DUSTIN WAS TALKING TO. I GUESS...
[VOICES OVERLAP]
DENISE: WELL, WHAT WOULD THEY...
DANIEL: THE PEOPLE THAT...
DENISE: WELL, WHAT THEY HAVE TO DO TO... WITH IT?
DANIEL: THAT'S WHAT'S I'M SAYING.
DENISE: WHO WAS DUSTIN WORKING WITH? THOSE MONTERREY GUYS, YOU SAID?
DANIEL: YEAH, YEAH.
DENISE: I DON'T KNOW, I'M A HAVE TO INVESTIGATE THAT.
DANIEL: YEAH, INVESTIGATE THAT, LET ME KNOW.
DENISE: OKAY, BYE.
[END OF CALL]

Linesheet 04/03/2003 12:35:10

| | |
|---|---|
| **Case:** | MB-03-0007 |
| **Target:** | 433-3351 |
| **Line Id:** | 433-3351 |
| **Session:** | 840 |
| **Date:** | 03/30/2003 |
| **Start Time:** | 15:30:33 |
| **Duration:** | 00:03:11 |
| **Direction:** | Incoming |
| **Monitored By:** | br |
| **Classification:** | Pertinent |
| **Complete:** | Yes |
| **In Digits:** | 8053364660 |
| **Clean Number:** | 8053364660 |
| **Participants:** | CONTRERAS, DENISE |

**Comments** *Document contains no text*

**Synopsis**

IN: 336-4660
SUBS: JOE T. BALLIN

UM TELLS DENISE THAT HE JUST WOKE UP. DENISE IS GETTING DRESSED. UM TELLS DENISE THAT HE HAS THE CHIPS FOR HER. UM ASKS IF DENISE HAS ANY SAMPLES OF "PURE" LAYING AROUND. DENISE SAYS SHE CAN GET UM ONE AND WHEN SHE UM BRINGS HER THE CHIPS, SHE'LL GIVE IT TO HIM.

UM EXPLAINS THAT THIS GUY IS A LAWYER THAT BUYS POUNDS OF "PURE". UM STATES THAT THE LAWYER USED TO GET HIS STUFF FROM DUSTIN POOL. DENISE ASKS IF DUSTIN IS STILL MISSING AND UM SAYS YES.

DENISE SAYS THAT OMAR SAID THEY KILLED HIM. UM SAYS THEY DID. DENISE ASKS WHY AND UM SAYS DUSTIN HAD A HIT ON HIM. DENISE ASKS WHY AND UM SAYS HE DOESN'T KNOW BUT THAT HE HAD A HIT FROM THE "PINTA". DENISE ASKS WHY AND UM SAYS HE DOESN'T KNOW, HE JUST KNOWS HE HAD ONE. DENISE WONDERS WHERE THEY PUT HIS BODY AND UM SAYS NOBODY KNOWS.

DENISE ASKS IF UM REALLY THINKS THEY DID SOMETHING TO HIM AND UM SAYS YES. DENISE COMMENTS THAT DUSTIN WORKED GOOD SO WHY WOULD THEY DO IT. DENISE TELLS UM TO CALL HER BEFORE 18:00 BECAUSE DENISE WILL HAVE TO BE HOME AT 18:00. UM ACKNOWLEDGES.

Linesheet 04/03/2003 12:35:10

| | |
|---|---|
| **Case:** | MB-03-0007 |
| **Target:** | 433-3351 |
| **Line Id:** | 433-3351 |
| **Session:** | 842 |
| **Date:** | 03/30/2003 |
| **Start Time:** | 16:13:03 |
| **Duration:** | 00:10:19 |
| **Direction:** | Incoming |
| **Monitored By:** | br |
| **Classification:** | Pertinent |
| **Complete:** | Yes |
| **In Digits:** | 8062380156 |
| **Clean Number:** | 8062380156 |
| **Participants:** | CONTRERAS, DENISE |

**Comments** *Document contains no text*

Respectfully submitted,

s/JAMES EDD WOOLDRIDGE
JAMES EDD WOOLDRIDGE
S.B.T. No. 24010492
600 S. Tyler Street, Suite 1704
LB 12051
Amarillo, Texas 79101
TEL: (806) 418 8575
FAX: (806) 418 8576
Attorney for Petitioner,
Joshua David Stocker

**CERTIFICATE OF COMPLIANCE**

1. This document complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B) because, including the parts of the document exempted by Fed. R. App. P. 32(f): this document contains 435 words.

2. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5), and the type-style requirements of Fed. R. App. P. 32(a)(6) in that this document has been prepared in a proportionally spaced typeface using Apple iOS Pages 11.0 in Book Antigua 14 point font.

s/JAMES EDD WOOLDRIDGE
JAMES EDD WOOLDRIDGE