07-05-0284-CR

# REPORTER'S RECORD

VOLUME 7 OF 22 VOLUMES

TRIAL COURT CAUSE NO. 15,307-A

FILED
OCT 18 2005
SEVENTH COURT OF APPEALS
PEGGY CULP, CLERK

| | | |
|---|---|---|
| THE STATE OF TEXAS | ) | IN THE DISTRICT COURT |
| VS. | ) | RANDALL COUNTY, TEXAS |
| JOSHUA DAVID STOCKER | ) | 47TH JUDICIAL DISTRICT |

********************
PRETRIAL HEARING
********************

ORIGINAL

On the 12th day of July, 2005, the following proceedings came on to be heard in the above-entitled and numbered cause before the Honorable Hal Miner, presiding, held in Randall County, Texas:

Proceedings reported by Stenographic Method.

A P P E A R A N C E S

NAME: Mr. James Farren &
Mr. Jeramy Fowler
Randall County District Attorney's Office
SBOT NO: Unknown
ADDRESS: 501 16th Street
Canyon, Texas 79015
PHONE: (806) 468-5570
ATTORNEY FOR THE STATE.

NAME: Ms. C.J. McElroy &
Mr. Mike Watkins
Attorneys at Law
SBOT NO: Unknown
ADDRESS: 801 S. Fillmore/500 S. Taylor
Amarillo, Texas 79101
PHONE: (806) 371-0555/374-9584
ATTORNEY FOR THE DEFENSE.

# CHRONOLOGICAL INDEX

PRETRIAL HEARING
CAPTION . . . . . . . . . . . . . . . . . . . . . . . . 1
APPEARANCES . . . . . . . . . . . . . . . . . . . . . . 2
CASE CALLED . . . . . . . . . . . . . . . . . . . . . . 7
PRETRIALS HEARD . . . . . . . . . . . . . . . . . . . . 7

ORAL EVIDENCE:
JESSICA JEAN KIMBERLIN
DIRECT EXAMINATION BY MR. FARREN. . . . . . . . . . . . 16

BILL REDDEN
DIRECT EXAMINATION BY MR. FARREN. . . . . . . . . . . . 50

JOSHUA BLEDSOE
DIRECT EXAMINATION BY MR. FARREN. . . . . . . . . . . . 57

JEREMY CHAD ROY
DIRECT EXAMINATION BY MR. FOWLER. . . . . . . . . . . . 80
CROSS EXAMINATION BY MR. WATKINS. . . . . . . . . . . .112

BROOK VANDERGRIFF
DIRECT EXAMINATION BY MR. FARREN. . . . . . . . . . . .116
CROSS EXAMINATION BY MS. McELROY. . . . . . . . . . . .128

REPORTER'S CERTIFICATE. . . . . . . . . . . . . . . . .133

ALPHABETICAL INDEX


| WITNESS | DX | CX | VDX | RDX | RCX |
|---|---|---|---|---|---|
| BLEDSOE, JOSHUA | 57 | | | | |
| KIMBERLIN, JESSICA | 16 | | | | |
| REDDEN, BILL | 50 | | | | |
| ROY, JEREMY | 80 | 112 | | | |
| VANDERGRIFF, BROOK | 116 | 128 | | | |

EXHIBIT INDEX

| STATE'S EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|

NO EXHIBITS MARKED OR ADMITTED.

## EXHIBIT INDEX (CONTINUED)

| DEFENDANT'S EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
| --- | --- | --- | --- |

PROCEEDINGS:

July 12, 2005

(Both sides, the Defendant present, in open (court:

THE COURT: Okay. I have read these two statements by Jeremy Roy, and uh -- I guess there's two incidents with him, and it looks to me like we're going to require a separate analysis of each one. But as I was reading this statement and going through some law last night, it occurred to me that I never did find that language that I was talking about, about rule of evidence 403, where the judge said in convicta (phonetic) that -- that it's really inappropriate to do it in a pretrial hearing. I never could find that, but I got to mulling it over, and thinking about it, and looking at this case, and it's incredibly complexity, and it seems to me that -- that the reason for such a rule would be clear. It would be because you can't make these decisions in a vacuum. And I'm in a vacuum right now.

I don't have any facts to speak of. I don't have a -- if I made a decision, it would likely be wrong at this stage of the game. These are -- these decisions are all about context. They're all about deciding not only the relevance under 401 -- rule of evidence 401, and -- and whether it would fit within 404(b). Those are

contextual things that you can't make in a pretrial hearing, it seems to me, appropriately in a case this complex, because it -- you have to have heard everything. You have to put it in context. And -- and I can't say, well, it's relevant when there's not one shred of evidence in the -- in the record yet. That's a problem for me, and it's a problem for me making a ruling today. And, again, 403 is even more so.

One thing that troubled me in reading these statements from Mr. Roy was that one of the tests in the 403 balancing act is -- is -- is just how probative is the evidence towards the State's case?

Assuming that you've made it all the way through the fact that it is relevant to some degree, and you have made it through 404(b), that it fits one of those nouns that I keep talking about, then you have to -- one of the things that you have to decide is how probative it is to do a balancing test. That's all a balancing test is all about. And to do -- and to find out how probative it is, the strength of the rest of the case -- State's case bears on that. And there's some cases that say that. And there's some cases that say if the State has -- has ample evidence of the case -- on its case-in-chief on the -- on the facts surrounding the indictment, that it lessens the probative extraneous offense. There's some cases that say

8:33:12 that. Well, that's -- that's impossible for me to measure that today. I can't do that.

8:33:18 I have to have heard some evidence, and -- and seen the jury hear evidence before I could make that decision. That's the way it seems to me.

8:33:31 Okay. Mr. Farren, any thoughts on that?

8:33:32 MR. FARREN: No, Your Honor. I think your -- your statement is well taken, Your Honor. I agree with your evaluation of the problem of doing this pretrial since we're proffering information --

8:33:46 THE COURT: Summaries, yeah.

8:33:47 MR FARREN: Summaries to the Court. I will add that we anticipate, when all of the evidence is in from the State, the jury could easily have a couple of primary questions about Mr. Stocker. One, did he -- did he or the others realize the danger of putting this sock in the man's throat and -- and taping him up? And if they have evidence that it occurred on another occasion and if they learned from that, it would seem to me it would help them answer that question.

8:34:19 THE COURT: It bears on rebutting a defensive theory is what you're saying. That hadn't occurred to me.

8:34:26 MR. FARREN: Number two, it -- it has to do with the identity of who actually put the sock in the

man's throat. Now, whether it was Mr. Stocker -- we're going to hear throughout this trial conflicts about who actually did that. Whether it was Mr. Kimberlin, Mr. Stocker.

THE COURT: Rebutting another defensive theory?

MR. FARREN: And -- and if it was the individuals involved has done that on another occasion, we think that that will be probative. In anticipation and in proffering concepts and ideas, that's where we're going with this.

THE COURT: Okay. Thank you. Ms. McElroy.

MS. McELROY: Your Honor, we've found three different cases where they have held 403 balancing tests with the Court. We thought you might want to take a look at these.

THE COURT: All right.

MR. WATKINS: In fairness, pardon me -- some of these were held -- pardon me.

THE COURT: Were these pretrial?

MR. WATKINS: Some of these were held during the trial.

MS. McELROY: One was held during the trial.

MR. WATKINS: I think one of them was a pretrial hearing. I understand your concern about having

a pretrial hearing and not having any evidence.

THE COURT: It's all contextual.

MR. WATKINS: I -- I --

MS. McELROY: We would disagree on that.

THE COURT: How can it be correct -- how can any decision that I make be correct at this stage?

MR. WATKINS: Well, the reason we asked for this is to try to slow down having to remove the jury and having them sit for four hours --

THE COURT: Yeah, I agree. That concerns me.

MR. WATKINS: And we were just trying to help speed this along, because we're all as tired as anyone else. We're already worn out on this.

THE COURT: You better find some hidden strength then, because you're just starting.

MR. WATKINS: I understand. And I'll be there, but we're tired.

Yesterday, you made the comment that you couldn't do the 403 balancing until the evidence has been heard, and it's going to be heard in front of the jury.

The -- the cases that we found here --

THE COURT: I said that when I was tired. That's got to be wrong.

MR. WATKINS: Okay. Because I stayed up

most of the night working on that.

THE COURT: Okay.

MR. WATKINS: Because that -- I don't think that's appropriate.

THE COURT: That won't hurt you.

MR. FARREN: Are you suggesting it's the Court's fault you're tired?

MS. McELROY: Absolutely.

MR. WATKINS: It's James's fault. I'm -- I'm placing blame right now on the record.

THE COURT: No, after I -- ten seconds after I said that, I thought to myself last night, did I really say that? You're right. I can't let it get in without doing that.

MR. FARREN: In fairness to the Court, our interpretation in context when you said that, we thought you were saying that, I think I'm going to have to do that once we're into the jury part of the trial --

THE COURT: Yeah. And that's what I was thinking, so that's what we're going to do. I'm not going to make any definitive rulings today. And I will tell you this, after having thought about it all night. You may make an objection based on relevance, and then based on 404(b) and then a balancing test. And I may sustain it, but it may change as the context of the trial goes on.

I think it's like laying a predicate for a business records act. If you just offer the records and say to the judge, we're going to predicate them later, that doesn't work. You don't let them in to begin with. But once you lay the predicate, it's there. So it's like the State laying a predicate. They may very well get there.

So what I'm saying to both sides is, if -- if -- if the State opens with the Jeremy Roy kidnapping, they won't get it in. It's out of context. It's irrelevant at that point. That's the first test.

Then it may become relevant. Then it may not be there under 404(b). It may get there under 404(b) and that's going to make me do the balancing test. And it may be they had so much -- and by the time they get there they may have so much other evidence that its probative value is small and its prejudicial effect great. After I read this, there's some prejudice there. So that's what I'm saying. If I -- if I sustain you --

MR. WATKINS: It may change.

THE COURT: -- it may -- it may -- the State may persist and probably ought to. Do you understand that, Mr. Farren?

MR. FARREN: Yes, sir. I understand exactly what you're saying.

THE COURT: Yes.

MS. McELROY: Your Honor, in reference to some of these objections on a witness, will we be required -- could we ask the Court for a running objection, so we're not required to --

THE COURT: Yes. Yes. You're right. I agree. And we're going to do that. We're going to make it as easy on this jury as we can, starting with using this morning the best way we can.

MR. FARREN: And that is my understanding of the Court's advise to us yesterday was, that he's not going to give a running objection just through every witness, but once you've made it with Witness "A", then you don't have to keep doing it with Witness "A".

THE COURT: I would think that once a witness starts with a theme on a particular extraneous -- bad act or extraneous offense, and you object, and you want a running objection, and I have decided that the State gets it, sure you get a running objection. I think those are -- those are -- they help the judicial economy out for heaven sakes, if nothing else.

What I'd like to do this morning is I want to -- I want to hear some evidence that the State may want to put on that will save us time later on. What's going to end up happening is we're going to get to a witness and

the State's going to say, this is the Roy situation. I don't want them using the word kidnapping, or offense, or attempted murder, or whatever. I don't want any connotative words, I would like -- just like to use some -- and then we'll let the jury go out and we'll hear it then. And maybe we can save some time in that process by hearing some this morning.

MR. FARREN: Yes, sir.

THE COURT: Okay? Everybody kind of got a ground rule here?

MR. FARREN: Yes, sir.

THE COURT: I apologize about last night, trying to do that when we were tired, and I really had nothing to hang on, but -- okay.

Mr. Farren, you want to call some witnesses?

MR. FARREN: Yes, Your Honor. State calls Jessica Kimberlin.

THE COURT: Okay. Ms. Kimberlin, is she in jail?

MR. FARREN: No, Your Honor. She's incarcerated in my office at the moment.

MR. WATKINS: That's a point of incarceration.

MR. FARREN: It has been for me.

THE COURT: This is off the record.

8:41:06 8:41:47 8:41:49 8:41:55 8:41:57

(Off-the-record discussion).

THE COURT: Come up here, Mrs. Kimberlin. Would you raise your right hand.

(Witness sworn.)

THE COURT: Thank you, ma'am. Sit right there.

JESSICA JEAN KIMBERLIN,

having been first duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. FARREN:

8:42:06 8:42:06 8:42:09 8:42:10 8:42:15 8:42:17 8:42:17 8:42:18 8:42:21 8:42:23 8:42:24 8:42:25 8:42:27 8:42:28 8:42:29 8:42:30

Q. Would you state your name for the record, please.

A. Jessica Jean Kimberlin.

Q. And, Ms. Kimberlin, do you know a man named Stephen Craig Kimberlin?

A. Yes.

Q. How do you know him?

A. He's my husband.

Q. He's your husband. And how long have you and Mr. Kimberlin been married?

A. Six years.

Q. Six years. And do you have a child?

A. Yes.

Q. Just one. Right?

A. Yes.

Q. How where did you and Mr. Kimberlin meet?

8:42:32 A. At the lake.
8:42:33 Q. At Greenbelt?
8:42:35 A. Yes.
8:42:36 Q. About how old were you at that time?
8:42:37 A. I was 17.
8:42:38 Q. Okay. You were just getting out of high school. Right?
8:42:41 A. (Witness nods head up and down.)
8:42:41 Q. And when did you graduate from high school?
8:42:43 A. In '98.
8:42:45 Q. So about 1998, you were 17 years old, and you met Stephen Craig Kimberlin?
8:42:52 A. Yes.
8:42:52 Q. And after you met Mr. Kimberlin, at some point did -- did a relationship develop between the two of you?
8:43:00 A. Yes.
8:43:00 Q. And, eventually, you married?
8:43:01 A. Yes.
8:43:02 Q. How long after you met did you marry, approximately?
8:43:09 A. Six months.
8:43:09 Q. Okay. Now, after you and Mr. Kimberlin were married, at some point did you and your husband become involved in activity that involved methamphetamine?
8:43:24 A. Yes.

8:43:24 Q. How long after you married did that begin to happen?

8:43:29 A. About a year and a half.

8:43:30 Q. Okay. And when you first -- when you and your husband first became involved with methamphetamine, how did that happen? In other words, were you using it, or selling it, or what were you doing?

8:43:43 A. Selling it.

8:43:44 Q. Why were you selling it?

8:43:45 A. To make money.

8:43:46 Q. And were you and your husband struggling financially?

8:43:52 A. Yes.

8:43:53 Q. Prior to getting involved with that?

8:43:55 A. Yes.

8:43:56 Q. Do you -- as you remember it, did selling methamphetamine help at all with the finances?

8:44:03 A. Yes, sir.

8:44:04 Q. Did you make money from that?

8:44:05 A. Uh-huh.

8:44:07 Q. When you -- what was your role as this project developed? How did you play a role in that?

8:44:20 A. I -- I was just his wife. I mean. . .

8:44:25 Q. Were you ever present when methamphetamine was sold?

8:44:28 A. Yes.
8:44:29 Q. Where did you and your husband obtain this methamphetamine to sell to other people?
8:44:36 THE COURT: Let me admonish her for the record.
8:44:39 Ms. Kimberlin, you know you have the right to remain silent.
8:44:41 THE WITNESS: Yes.
8:44:42 THE COURT: I don't know what has transpired between you and the State, as far as your agreements about that, about your incriminating yourself on the stand, but you need to understand that you have the right to have a lawyer here, or you have the right to terminate this testimony at any time. Do you understand that?
8:44:56 THE WITNESS: Yes, I do.
8:44:57 THE COURT: Okay. I don't really know the background, but I tell that to all of the witnesses that are about to possibly admit commission of a crime.
8:45:08 THE WITNESS: Right.
MR. FARREN: And -- and for the record -- well, in fact, I'll just ask her.
8:45:11 THE COURT: Okay.
8:45:11 Q. (BY MR. FARREN) Your attorney is T.D. Hammons. Is that correct?
8:45:13 A. Yes, sir.

Q. He is here this morning. Is that correct?

A. Yes, sir.

Q. You and he had visited this morning?

A. Yes.

THE COURT: Does he need to be in here? He told me he would like to be here. I didn't know who his client was.

MR. FARREN: He knows --

THE COURT: Yeah, if y'all could find him. Let's just give him a chance to find him.

MR. FARREN: And I'll go ahead with stuff that is not --

THE COURT: Okay.

Q. (BY MR. FARREN) And you and Mr. Hammons have visited many times about what you're talking about here this morning?

A. Yes.

Q. And -- and you've been in our office, you and Mr. Hammons, and we've all talked about it?

A. Yes.

Q. And you have -- have you talked with him this morning?

A. Yes.

Q. Okay. So he's well aware and you're well aware of what the Judge is talking to you about?

8:45:58 A. Yes.

8:45:59 Q. Okay.

8:46:02 (Attorney T.D. Hammons present.)

8:46:03 THE COURT: Mr. Hammons.

8:46:05 MR. HAMMONS: Yes, sir.

8:46:05 THE COURT: Come up in front of the bar, and have a seat over by the bailiff, if you want to.

8:46:10 MR. HAMMONS: Yes, sir.

8:46:11 THE COURT: We've just started. I have admonished her about her Fifth Amendment rights to terminate this interview at any time.

8:46:21 MR. HAMMONS: I understand that, Judge. And I also can assure the Court that I have discussed that at length with her as well.

THE COURT: Okay.

8:46:26 MR. HAMMONS: I have discussed that at length with her.

8:46:29 THE COURT: Okay. Thank you. Okay. Thank you. Go ahead, Mr. Farren.

8:46:32 Q. (BY MR. FARREN) You've indicated at times you were present when you and your husband sold methamphetamine. Where were you obtaining the methamphetamine early in your relationship?

8:46:41 A. From -- from who?

8:46:43 Q. Yes.

A. Paul Buentello (phonetic).

THE COURT REPORTER: Could you say that again?

THE WITNESS: Paul Buentello.

Q. (BY MR. FARREN) Eventually -- eventually, you and your husband began to obtain methamphetamine from another source. Is that correct?

A. Yes.

Q. What source was that?

A. Chad Spanel.

Q. Chad Spanel. And then eventually another source?

A. Miguel.

Q. Okay. At some point, did you and your husband begin to obtain methamphetamine from Josh Bledsoe?

A. Yes.

Q. Now, the -- the amounts that you've obtained from Paul, and Miguel, and others, were those large amounts or fairly small amounts?

A. Large.

Q. Okay. The amounts that you obtained from Mr. Bledsoe, were they as large -- were they larger, or smaller, or how did that relate to the amount you were getting from these other guys?

A. They were larger.

Q. Larger. Okay. When -- how long -- how long do

8:47:44 you think you and your husband were involved in
8:47:49 methamphetamine activity before you began to obtain the
8:47:51 product from Josh Bledsoe, approximately?
8:47:56 A. About a year and a half.
8:47:57 Q. Okay. And when Mr. -- how did you and
8:48:02 Mr. Kimberlin come in contact with Josh Bledsoe?
8:48:05 A. Miguel.
8:48:06 Q. Through Miguel. And Mr. Bledsoe was obtaining
8:48:10 the methamphetamine from sources in Old Mexico?
8:48:13 A. Yes.
8:48:14 Q. When Mr. Bledsoe obtained the methamphetamine
8:48:19 from Old Mexico, is that when he would bring it to you and
8:48:23 your husband?
8:48:24 A. Yes.
8:48:24 Q. Did you help keep the books, keep up with how
8:48:27 much you got, and what was sold, the profits, and that
8:48:30 sort of thing?
8:48:32 A. Yes.
8:48:33 Q. About how often did Mr. Bledsoe bring a quantity
8:48:37 of this product to you?
8:48:39 A. Once a week.
8:48:40 Q. Once a week. And when he brought the product to
8:48:44 you, how long was it -- how long did it take to -- for
8:48:49 this product to be sold, to be distributed to folks who
8:48:54 paid for it, approximately?

8:48:55 A. About a week.

8:48:57 Q. Okay. And on the average at the end of the week, once you had sold the product did you keep all of the money, or did some of it go back to Mr. Bledsoe?

8:49:08 A. Some of it went back to Bledsoe.

8:49:10 Q. Can you give the Court an estimate, weekly, about how much money went back to Mr. Bledsoe?

8:49:17 A. I have no idea.

8:49:19 Q. Do you think that it was -- a few thousand dollars, or a few hundred dollars or many thousands of dollars?

8:49:30 A. It was probably around 500.

8:49:33 Q. Five -- 500 what?

8:49:35 A. Dollars.

8:49:35 Q. $500.00?

8:49:38 A. Yes.

8:49:39 Q. Well, how much methamphetamine do you think that you were obtaining from Mr. Bledsoe?

8:49:47 A. About three or four pounds.

8:49:51 Q. Okay. I'm confused, so help me understand. How much do you think a pound of methamphetamine was worth back then?

8:50:01 A. Okay. $1,200.00.

8:50:05 Q. A pound of methamphetamine?

8:50:07 A. Yes.

8:50:07 Q. Or an ounce?
8:50:10 A. A pound.
8:50:11 Q. And you think you were getting how many pounds?
8:50:14 A. Three or four.
8:50:15 Q. Okay. At any rate, you were obtaining quantities of methamphetamine from Mr. Bledsoe. You and your husband were -- well, let me ask you this: Did you and your husband sell all of these pounds or did you have other folks that -- that helped you?
8:50:30 A. Other people helped.
8:50:32 Q. Can you give the Judge the names of some of these people who were involved in -- in helping to distribute or sell this methamphetamine?
8:50:43 A. Joshua Stocker. Tommy Tucker.
8:50:48 Q. Have you ever heard of Rusty Garrett?
8:50:50 A. Yes, sir. Rusty Garrett.
8:50:51 Q. Have you ever heard of Tommy Tucker?
8:50:53 A. Yes.
8:50:54 Q. Tyler Hale?
8:50:55 A. Yes.
8:50:55 Q. Eric Girten (phonetic)?
8:50:56 A. Yes, sir.
8:50:57 Q. Jerrod Hawbaker?
8:50:58 A. Yes.
8:50:58 Q. Russell Evans?

8:50:59 A. Yes.
8:51:00 Q. Destry Keeling?
8:51:02 A. Yes.
8:51:02 Q. And, of course, you've already mentioned Miguel Gonzales?
8:51:06 A. Yes.
8:51:07 Q. And you mentioned Josh Stocker. Right?
8:51:10 A. Yes.
8:51:11 Q. Now, these people -- these other people that you've mentioned, were -- were -- was your husband on the same level with these people or did they basically work for him?
8:51:22 A. They worked for him.
8:51:23 Q. Okay. So he was in charge of the distribution ring?
8:51:28 A. Right.
8:51:29 Q. Including Mr. Stocker?
8:51:31 A. Uh-huh.
8:51:32 Q. How did you and your husband come into contact with Mr. Stocker?
8:51:36 A. Through Jerrod Hawbaker.
8:51:39 Q. All right. And what did Mr. Stocker -- what was his role in this group, in this orientation? What did he do?
8:51:48 A. He just sold meth.

8:51:56
Q. Okay. And did that work out okay?
A. At first.
Q. At first?
A. Yeah.
Q. Well, did problems develop?
A. Yes.
Q. What kind of problems?
A. He started --
Q. Was Mr. Stocker using his own product? Was he using meth?
A. Yes. He started, yes.
Q. Did that have an impact on him?
A. Yes.
Q. Did it have an impact on his personality?
A. Yes
Q. What did you see that was different about Mr. Stocker when he started using the met, compared to before he started using it?
A. He was uh -- he just started doing things on his own. Like -- I don't know how to put it.
Q. Did you and, particularly your husband, experience events where he would just decide things on his own and do things on his own without Mr. Kimberlin giving the approval?
A. Yes.

Q. Was that a problem?
A. Yes.
Q. Did Mr. Kimberlin not like that?
A. No.
Q. Okay.
THE COURT: What time frame are we going in here?
Q. (BY MR. FARREN) Yeah. This is -- you met him in '98. About a year -- about six months later you married. Is that correct?
A. Yes.
Q. You were obtaining and selling narcotics for about a year and a half after that, which put us to 2000, 2001?
A. Yes.
Q. Then in 2002, is that approximately when you began to deal with Mr. Bledsoe?
A. Yes.
Q. Or somewhere in that time frame?
A. Yes.
Q. Okay. Now, when did Mr. Stocker come into the picture, after you started dealing with Mr. Bledsoe, about the same time, later? Do you recall?
A. I don't recall.
Q. Okay. When you were dealing with Mr. Bledsoe,

was Mr. Stocker also a part of the organization?

A. Yes.

Q. Okay. Now, do you know a man named Jeremy Roy?

A. I know of him, yes.

Q. Have you heard your husband talk about Jeremy Roy?

A. Yes.

Q. Why was your husband talking about Jeremy Roy? What -- why did he come up in a conversation?

A. He -- he was one of Joshua Stocker's customers, and he -- I was told that he would -- he had stole some dope from Mr. Stocker.

Q. Okay. Have you ever heard any conversations -- let me ask you this. At some point, I believe in the year of 2002, was -- was your house, you and Mr. Kimberlin's house, was there a raid, was there a law enforcement raid at your home?

A. Yes.

Q. Do you know if that might have been around November 8th of 2002?

A. Yes.

Q. How did your husband -- your husband wasn't there when the raid occurred, were you?

A. No.

Q. You were?

A. Yes.
Q. And you ended up charged, didn't you?
A. Yes.
Q. How did your husband feel about that? Was he happy?
A. No.
Q. Was he unhappy?
A. Well, he was sad.
Q. Okay. Did you and your husband -- did your husband talk with you at all about who might have been responsible for giving these people information?
A. No.
Q. Okay. At any rate, do you know whether or not your husband participated in any efforts to capture or apprehend Jeremy Roy to get him in custody?
A. No.
Q. All right. Do you know a lady name Becka (phonetic)?
A. I know of her.
Q. Okay. Do you know whether your husband ever offered her money in conjunction with Joshua Stocker getting Jeremy Roy?
A. Yes.
Q. Okay. Tell the Court what you know about that. This event where Craig Kimberlin offered somebody else's

money to help Josh Stocker get Jeremy Roy.

A. He was -- Jeremy Roy was the one who had stolen the stuff from Joshua Stocker, and Rusty Garrett knew this girl, Becka. Jeremy Roy was at her house one night, and Rusty Garrett had told Craig that. And Craig had offered her $1,000.00 to let Joshua Stocker and somebody else go into her house and get Jeremy Roy.

Q. And do you -- did you and your husband, or Stocker or anyone else in the group talk about what happened when they got Jeremy Roy?

A. Yes.

Q. Okay. What were you told about it?

A. I was told that they went into the house with guns, and there was a lot of people in the house.

Q. Do you know whether any -- do you know any details about -- any duct tape, or boxes, or anything like that, or were you told any of those details?

A. No.

Q. Okay. That's fine. I want to ask you about another event that occurred sometime after this Jeremy Roy.

By the way, the Jeremy Roy event, did that occur shortly after the raid at your house, November 8th?

A. It was before.

Q. You think that was before?

8:57:54 A. Yes.

8:57:56 Q. Do you -- okay. Do you know whether Mr. Roy -- whether Mr. Kimberlin's group apprehended or kidnapped Mr. Roy once or more than once, or do you know?

8:58:14 A. I believe it was more than once.

8:58:16 Q. Do you know if the second incident occurred after the raid on your house?

8:58:22 A. I'm not sure.

8:58:23 Q. Okay. But you do know there were two?

8:58:25 A. Yes.

8:58:25 Q. But you're not sure of the sequence of the time. All right.

8:58:30 Do you recall some problems after the Jeremy Roy incident involving Mr. Bledsoe and a Ford Galaxy and a debt that Mr. Keith Simpson owed on some dope?

8:58:42 A. Yes.

8:58:45 Q. Did Mr. Stocker become involved in trying to solve this problem of Mr. Simpson owing for some dope?

8:58:54 A. No.

8:58:55 Q. Okay. Would it refresh your memory to look at your statement on that issue, on page two of your statement?

8:59:32 A. Okay.

8:59:33 Q. And I may have misled you the way I asked the question. In addition to debt, was there a point where

8:59:39 Mr. Simpson made threats about shooting up you and Mr.
8:59:43 Kimberlin's house?
8:59:44 A. Yes.
8:59:44 Q. Okay. Did Mr. Stocker get involved then?
8:59:46 A. Yes.
8:59:46 Q. Okay. Did you and Mr. Kimberlin know he was
8:59:51 going to take the actions he took, or, again, was this
8:59:55 just him launching out on his own?
8:59:57 A. Yes.
8:59:57 Q. All right. What -- what happened? Did you --
8:59:59 what --
8:59:59 THE COURT: Hold up. That was two questions
9:00:01 and she answered "yes".
9:00:04 A. I'm sorry. He was doing it on his own.
9:00:08 Q. (BY MR. FARREN) All right. What happened? What
9:00:09 did Mr. Stocker do?
9:00:13 A. Well --
9:00:16 Q. Do you know if he went to Canyon?
9:00:17 A. Yes, he did.
9:00:19 Q. Did he go to Canyon by himself or with others?
9:00:22 A. With others.
9:00:22 Q. Was his brother Michael involved?
9:00:25 A. Yes.
9:00:25 Q. Was Tommy Tucker involved?
9:00:27 A. Yes.

9:00:27 Q. Was Frank Chacon involved?
9:00:30 A. Yes.
9:00:30 Q. These are all -- at least, other than maybe Michael, these were people that were a part of Craig Kimberlin's organization?
9:00:35 A. Yes.
9:00:36 Q. Was Michael Stocker actually a part of the organization?
9:00:40 A. No, sir.
9:00:40 Q. But he was involved in this event in Canyon?
9:00:43 A. Yes.
9:00:44 Q. Now, when they got to Canyon, what did they do?
9:00:49 A. They went to some house, I'm not sure whose it was, but they had Keith Simpson there, and --
9:00:59 Q. Now, with the Jeremy Roy event, you -- you and other members of the conspiracy talked about guns being used and things of that nature?
9:01:06 A. Yes.
9:01:06 Q. Were guns used at this time?
9:01:09 A. Yes.
9:01:12 Q. And how did this -- this kidnapping or attempted kidnapping of Mr. Simpson go? Was it successful or was it a failure?
9:01:21 A. It was a failure.
9:01:22 Q. Why was it a failure?

A. Somebody had called the police.

Q. Okay. And do you know if Mr. Simpson wouldn't cooperate, didn't want to file charges?

A. Right.

Q. Right. Okay.

A. He hadn't.

Q. How did Mr. Kimberlin respond to Mr. Stocker doing this without Mr. Kimberlin knowing it or having ordered it?

A. Well, afterwards he was okay with it. I mean --

Q. Okay. All right. Do you know a person named Jamie Kellerman (phonetic)?

A. Yes.

Q. Who is Jamie Kellerman?

A. He was a friend who bought meth from us.

Q. And did he own a business called Molly? Maid (phonetic)?

A. Yes

Q. At some point, did you and other members of the conspiracy talk about a kidnapping of a Jerrod Hawbaker?

A. Yes.

Q. Mr. Hawbaker was taken to Molly Maid's, Mr. Kellerman's business?

A. Yes.

Q. Do you know if any violence occurred there?

A. Yes.
Q. What kind of violence?
A. I'm not real sure.
Q. Was it -- okay. Did -- and do you know if Mr. Stocker was involved in that kidnapping?
A. Yes.
Q. Okay. And, again, was that because of some relationship Mr. Hawbaker had to this -- this drug conspiracy?
A. Yes.
Q. Did he owe money?
A. Yes.
Q. By the way, Jeremy Roy, did he have the nickname Rooster?
A. Yes.
Q. And Jerrod Hawbaker, did he have the nickname Fish?
A. Yes.
Q. Now, when did -- have you ever heard of a man named Dustin Pool?
A. Yes.
Q. When did you first hear about Dustin Pool?
A. When Josh Bledsoe started coming around.
Q. Okay. So you've given us the sequence of events, and you and your husband's activity and eventually tying

into Mr. Bledsoe, and after that you began to hear about Mr. Pool?

A. Right.

Q. Where did -- was Mr. Pool a part of Mr. Kimberlin's drug group?

A. No.

Q. Okay. Who was Mr. Pool? Why did his name come up?

A. I had heard that he was not a very good person. He had screwed a lot of people.

Q. In -- in the drug business?

A. Yes. Over meth, yes.

Q. Okay. All right. So his name came up in connection with methamphetamine activity?

A. Yes.

Q. Do you -- from -- from the other members of your conspiracy, did you hear that he was also selling methamphetamine?

A. Yes.

Q. Do you know if he had some of the same customers that you and Mr. Kimberlin's group had?

A. Yes.

Q. Do you know if there was any competition between the two groups for these customers?

A. No.

Q. Okay. Do you know whether or not there was any problems with Chad Spanel, in which Mr. Dustin Pool was involved?

A. Yes.

Q. Okay. What was the problem?

A. When Chad Spanel got out of jail, he -- I guess Craig had heard he was buying from him, from Dustin Pool.

Q. Did Craig like that?

A. No.

Q. Did that upset him?

A. Well, yeah.

Q. Who -- who had Chad Spanel been obtaining his methamphetamine in the past?

A. I'm not sure.

Q. Do you know if it was from Josh Stocker?

A. Like before he went to prison?

Q. Right.

A. No.

Q. Okay. After he got out of prison, do you know if he obtained meth from Joshua Stocker?

A. Yes.

Q. Was he one of Mr. Stocker's primary customers?

A. Yes.

Q. Okay. Was Mr. Kimberlin happy about Mr. Pool trying to involve himself with one of Mr. Stocker's

[illegible] primary customers?

9:05:23 A. No.

9:05:23 Q. He was unhappy about it?

9:05:25 A. Yes.

9:05:25 Q. Were you ever present when anybody in your group
9:05:28 talked about this Pool problem, this Dustin Pool problem?

9:05:33 A. Yes, sir.

9:05:33 Q. Did it come up once or on many occasions?

9:05:36 A. Many.

9:05:37 Q. All right. Did -- did Mr. Kimberlin and
9:05:40 Mr. Stocker, did they like Mr. Pool? Were they happy
9:05:44 about his activities?

[illegible] A. No.

9:05:47 Q. How about the other members of the group?

9:05:49 A. No.

9:05:51 Q. Now, these -- these events in which you were
9:05:59 hearing about Mr. Pool, did these things take place
9:06:02 after -- you said after Mr. Stocker came into the picture?

9:06:06 A. Yes, sir.

9:06:06 Q. And so by 2002, Mr. Stocker -- I'm sorry,
9:06:10 Mr. Bledsoe came into the picture. It was after he came
9:06:12 into the picture that you began to hear about Mr. Pool?

9:06:16 A. Yes.

9:06:16 Q. So by 2002, the summer of 2002 and into the fall,
[illegible] was there a problem between your group and Mr. Pool's

distribution group?

A. Yes.

Q. Do you know anybody by the name of Bobby O'Conner (phonetic)?

A. What's the last name.

Q. Bobby O'Conner.

A. No.

Q. Do you know anybody by the name of Ray Placensio?

A. Yes, sir.

Q. How did you hear about Mr. Placensio?

A. He was involved with Dustin Pool.

Q. Who was -- do you know whether or not Mr. Pool, according to your group, was connected to the Texas Syndicate?

A. Yes.

Q. And did that concern your husband or other members of your group?

A. Yes.

Q. Why?

A. Because they were supposed to be, I guess, bad.

Q. Okay. So you -- you interpreted this, and other members of your group, that this could be a threat? Mr. Placensio being alined with Mr. Pool could be a threat to your group?

A. Yes.

9:07:27 Q. Who -- who do you think was the -- the main enforcer or muscle, if you would, for Mr. Kimberlin?
9:07:33 A. Frank Chacon.
9:07:34 Q. Frank Chacon. Okay. And Mr. Chacon and
9:07:39 Mr. Placensio were actually related in some remote way.
9:07:41 Is that right?
9:07:42 A. Yes.
9:07:43 Q. Cousins?
9:07:43 A. Yes.
9:07:44 Q. All right. Most of the problems involving --
9:07:50 when you heard these discussions about Mr. Pool and the
9:07:55 conflicts with your group, who was the person whose name came up most, Mr. Bledsoe, or do you recall?
9:08:02 A. Say that again.
9:08:04 Q. Who was having most of the problems with
9:08:06 Mr. Pool?
9:08:07 A. It was Bledsoe.
9:08:09 Q. Okay. What kinds of problems was he having?
9:08:13 A. One incident, he thought Dustin Pool had ran his
9:08:18 wife and kid off of the road.
9:08:21 Q. Okay. Now this was an Accura automobile. Is
9:08:25 that right?
9:08:25 A. Yes.
9:08:26 Q. And he believed that Mr. Placensio and Mr. Pool, or representatives of his, had run this car off the road?

9:08:34 A. Yes.
9:08:35 Q. Do you know if Mr. Bledsoe still actually owned that car or he was actually in the process of selling it?
9:08:42 A. He had sold it.
9:08:44 Q. To a man named Dibiase?
9:08:46 A. I'm not sure.
9:08:47 Q. Okay. But did Mr. Bledsoe and others talk about this in your presence, this event occurred?
9:08:52 A. Yes.
9:08:52 Q. And Mr. Bledsoe, did he take this as a threat against him and his family?
9:08:58 A. Yes.
9:08:59 Q. Was he happy about it?
9:09:01 A. No.
9:09:01 Q. Was Mr. Kimberlin happy about it?
9:09:04 A. No.
9:09:05 Q. In fact, were you and Mr. Kimberlin and your family friends with Mr. Bledsoe and his family, in addition to your business relationship?
9:09:13 A. Yes.
9:09:14 Q. Okay. And she has children as well?
9:09:17 A. Right.
9:09:17 Q. It's Kelly Grayless. Right?
9:09:20 A. Yes.
9:09:20 Q. All right. Now, in addition to this running --

9:09:23 do you know why they ran the car off of the road? Why
9:09:26 there were conflicts with Mr. Bledsoe?

9:09:28 A. No.

9:09:29 Q. Do you know if there was an event at Joe's Crab
9:09:33 Shack? If you know.

9:09:35 A. No.

9:09:35 Q. Okay. Do you think you heard about problems
9:09:37 between Mr. Pool and Mr. Bledsoe on one occasion or many
9:09:41 occasions?

9:09:42 A. Many.

9:09:42 Q. Did this come from your husband and from others?

9:09:45 A. From others.

9:09:46 Q. And when these discussions came up, was your
9:09:49 group unhappy about Mr. Pool and the various things they
9:09:53 talked about?

9:09:53 A. Yes.

9:09:54 Q. Okay. Do you know if there was eventually a
9:10:08 meeting at a place called Stumpy's Lounge?

9:10:11 A. Yes.

9:10:12 Q. What was the meeting about?

9:10:15 A. Uh -- Dustin Pool.

9:10:17 Q. Okay. Do you know if Mr. Pool was invited to
9:10:21 come to the meeting?

9:10:22 A. Yes.

9:10:23 Q. Did he come?

9:10:24 A. I'm not sure.
9:10:26 Q. All right. You don't know, but you know he was
9:10:30 invited?
9:10:31 A. Right.
9:10:32 Q. Did members of the group talk about what happened
9:10:34 at the meeting? Did your husband talk about it?
9:10:39 A. Yes.
9:10:40 Q. Okay. Josh Bledsoe had offered, I guess,
9:10:47 $10,000.00 for -- to do away with Pool. So according to
9:10:54 the information you received from other members of the
9:10:58 conspiracy, they believed Bledsoe had put out a $10,000.00
9:11:02 contract on Pool?
9:11:03 A. Yes.
9:11:03 Q. And do you know if that meeting occurred around
9:11:11 February 6th, or do you know?
9:11:13 A. I don't know.
9:11:15 Q. Do you think it was sometime early -- February
9:11:17 6th of 2003, or do you know if the meeting occurred
9:11:21 sometime earlier in the year 2003?
9:11:23 A. Early in the year.
9:11:24 Q. Okay. Do you know if Mr. Kimberlin and others of
9:11:32 your conspiracy ever actually confronted Mr. Pool? Went
9:11:36 to his house, for instance?
9:11:38 A. Yes.
9:11:38 Q. On one occasion or more than one occasion?

9:11:41 A. One.

9:11:41 Q. You know of one?

9:11:43 A. Yes.

9:11:43 Q. Why did they go to Mr. Pool's house?

9:11:46 A. I'm not sure.

9:11:48 Q. All right. Did you -- did you have a conversation with Mr. Kimberlin after they went to Mr. Pool's house?

9:11:54 A. Yes.

9:11:55 Q. Did he say anything about the meeting after he got back?

9:11:57 A. Yes.

9:11:58 Q. What did he tell you about the meeting?

9:12:00 A. He had said that Dustin Pool was real scared.

9:12:07 Q. Did he ever tell you after the meeting, Mr. Pool is in awe of me now?

9:12:11 A. Yes.

9:12:17 Q. Okay. Do you know who was with Mr. Kimberlin when he went there?

9:12:20 A. Frank Chacon and Joshua Stocker.

9:12:24 Q. Okay. Did you talk with either of them or just Mr. Kimberlin, if you recall?

9:12:29 A. I don't recall.

9:12:30 Q. All right. Did -- did you and Mr. Kimberlin and other members of your conspiracy -- was there an interest

in your group in making sure your customers got quality product --

A. Yes.

Q. -- methamphetamine? Was there ever any discussion about whether Mr. Pool offered quality product, or, in fact, he did not?

A. He did not.

Q. He did not. Okay. So it was the opinion of your group that your methamphetamine was of good quality, but his was not?

A. Right.

Q. Okay. Do you think this kind of discussion took place one time or more than one time among your group?

A. I'm not sure.

Q. Okay. Now, you have mentioned -- you've mentioned Rooster, Jeremy Roy, you've mentioned Jerrod Hawbaker, you've mentioned Keith Simpson. If -- if folks obtain a product from your group and they don't pay, what happens?

A. We try to collect.

Q. And what -- do you just send them a letter saying, you know, we're going to sue you?

A. Well, no.

Q. Okay. Do you send somebody over there to scare them?

A. Yes.
Q. Okay. And do you know if Mr. Pool operated the same way?
A. Yes.
Q. Do you know -- do you know a man named Gregg Seago (phonetic)?
A. No.
Q. Do you know if Mr. Bledsoe had any friends or relatives that he felt like Mr. Pool was threatening, because they hadn't paid for dope to Mr. Pool, if you know?
A. No.
Q. Do you know if Mr. Pool or representatives of Mr. Pool ever pursued Miguel Gonzales or members of his family at the mall?
A. No.
Q. Okay. The folks in your group, do you believe this was just a loose knit organization, or was there a lot of loyalty in this group?
A. There was a lot of loyalty.
Q. Was there any doubt about who was in charge? In other words, was Mr. Kimberlin the one in charge?
A. Yes.
Q. When folks like Mr. Stocker would launch out on their own and do things on their own, did Mr. Kimberlin

like that or did he not like that?

A. No, he did not.

MR. FARREN: That's all I have relevant to this issue, Your Honor. We anticipate her testifying later in the trial about additional information.

THE COURT: Other extraneous offenses or bad acts?

MR. FARREN: No.

THE COURT: Okay.

MR. FARREN: From this point on, we get into the actual graviment of the case, which is the kidnapping of Mr. Pool.

THE COURT: Oh, okay. Ms. McElroy, do you have any cross-examination you want to make about what she just testified to?

MS. McELROY: I don't think so, Your Honor.

THE COURT: You can step down Ms. Kimberlin. Thank you.

MR. FARREN: May I ask one quick question, Your Honor?

THE COURT: Sure.

MR. FARREN: I apologize.

DIRECT EXAMINATION (CONTINUED)

BY MR. FARREN:

Q. Just so the Court will have the full picture. Do

you know if Mr. Stocker ever made a trip to either Plainview or Lubbock and took a load of narcotics down there?

A. Yes.

Q. Do you know if something happened that he never was able to pay Mr. Kimberlin for it?

A. Yes.

Q. Okay. What was the explanation? Why wasn't he able to pay, according to Mr. Stocker?

A. I'm not sure.

Q. So you don't know what happened to the narcotic or why he didn't pay?

A. No.

Q. Was this a problem between Mr. Stocker and Mr. Kimberlin?

A. Yes.

Q. Okay. And Mr. Kimberlin wanted to be paid?

A. Uh-huh.

Q. And based on what you have said, Mr. Stocker -- it would be in his best interest to pay Mr. Kimberlin?

A. Yes.

MR. FARREN: That's all I have, Your Honor.

THE COURT: Thank you. You may step down, ma'am.

Any other witnesses?

MR. FARREN: Oh, yes, Your Honor. We have several. Mr. Bill Redden.

THE COURT: Mr. Redden, would you raise your right hand.

(Witness sworn.)

THE COURT: Thank you. Sit right there.

BILL REDDEN,

having been first duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. FARREN:

Q. Would you state your name for the record, please.

A. Bill Redden. R-e-d-d-e-n.

Q. How are you employed?

A. I'm employed by the City of Amarillo, Amarillo Police Department.

Q. And what is your assignment for the police department?

A. I'm assigned to the narcotics unit.

Q. How long have you been involved in the investigation of narcotics activity in the Amarillo area?

A. A little over 18 years.

Q. And in those 18 years, have you received any special training or education that better enables you to perform in this area?

A. Yes, sir, I have.

Q. Can you give us a quick summary of some of training.

A. I received training from the Amarillo Police Department. I received training through the FBI; from the Drug Enforcement Administration; the Department of Public Safety; Texas Narcotics Control Program and the Texas Narcotics Officers Association.

Q. And in those 18 years of experience, in which you've applied this training, how many -- can you give us an estimate of how many investigations you've been involved in?

A. I've been involved in a lot of investigations. Several hundred of them. I don't have an exact number.

Q. All right. First of all, based on your training and experience, what would a pound of methamphetamine sell for on the street back in 2002 or today, here in the Amarillo area?

A. It depends on whether it's considered pure, whether it's methamphetamine ice, or going to be what we call street dope.

Q. Okay.

A. It will range anywhere from 6,000 to 7,000 a pound for the street dope, which is cut pretty bad, up to 11, 12,000 a pound.

Q. Okay. So if somebody suggested 1,200, you would

9:18:49 say 12,000 --
9:18:51 A. For a pound?
9:18:52 Q. Yes.
9:18:52 A. 1,200 is way low.
9:18:56 Q. Okay. Do you know a man named Stephen Craig
9:19:03 Kimberlin?
9:19:03 A. Yes, I do.
9:19:04 Q. How do you know Mr. Kimberlin?
9:19:06 A. I was involved in an investigation with Special
9:19:09 Agent Clay Morris of the DEA. We had a large scale
9:19:14 conspiracy case we worked. Mr. Kimberlin came up involved
9:19:17 in that conspiracy case. Also was a suspect in the
9:19:21 homicide of Dustin Pool.
9:19:22 Q. And in the course of your investigation of Mr.
9:19:25 Kimberlin, did you come -- did you -- was he working alone
9:19:27 or with a group of people? Was there a conspiracy?
9:19:30 A. With Mr. Kimberlin?
9:19:31 Q. Uh-huh.
9:19:31 A. There was a conspiracy, yes:
9:19:34 Q. Do you know if Mr. Josh Bledsoe was a part of the
9:19:39 group?
9:19:40 A. Yes, sir, he was.
9:19:40 Q. Was Mr. Josh Stocker a part of the group?
9:19:43 A. Yes, sir.
9:19:43 Q. Frank Chacon?

A. Yes, sir.

Q. Tommy Tucker?

A. Yes, sir.

Q. And without going through the whole list, how many people do you think that were involved in this group, approximately?

A. In excess of 26. We indicted 26 in federal court, but there was in excess of 26 people involved in the conspiracy.

Q. How much product do you think this group was moving in a week, say?

A. In a week?

Q. Or whatever time period is easy for you to give us an estimate.

A. In a month, Special Agent Morris and I calculated that they were moving in excess of 100 pounds a month. Mr. Kimberlin, himself, was dealing in excess of 60 pounds a month.

Q. At 12,000 -- oh, by the way, was their product, in your opinion, a pure product or was it stepped on or cut?

A. Through the course of the investigation, we found that Mr. Kimberlin preferred pure methamphetamine, which is not cut, so it would be 10 to $12,000.00 a pound.

Q. Ten or $12,000.00 a pound at 60 pounds a month?

A. Yes, sir.

Q. Now, do you know a man named Dustin Pool?

A. Yes, I do.

Q. And do you know if he was involved in the methamphetamine trafficking?

A. Yes, he was.

Q. And do you know if he was alone or had people working with him as well?

A. He had his own organization, people he supplied.

Q. During the course of your investigation, did you encounter any evidence of competition between these two groups?

A. They were separate groups that were dealing methamphetamine in and around the Amarillo area, yes.

Q. Do you know if they had any of the same customers, they shared the same, if you know?

A. I don't know if they had the same customers, they had the same sources of supply from the information that we got.

Q. Okay. Do you know if there were any problems between the two groups, if you know?

A. Yes, sir.

Q. What were the problems in between the groups?

A. Competition between their business themselves. If they found somebody that was purchasing multi-pound

amounts, they would try to take that customer, making their organization more money.

Q. And one of the people -- you mentioned the federal charges that were filed, some 26 people charged. Was one of those Josh Stocker?

A. He was filed, but he was not filed on the conspiracy itself.

Q. Okay. What was his filed on?

A. Possession of narcotics with intention to distribute a firearm.

Q. But in your investigation, is it correct or not, that -- that the evidence indicated that he was a part of this conspiracy and a part of the group?

A. He was. Mr. Kimberlin would be getting his methamphetamine from the main source of supplies that we were investigating, and he would distribute it to Josh Stocker and other individuals.

MR. FARREN: I pass the witness.

THE COURT: Any questions?

MR. WATKINS: No questions.

THE COURT: Mr. Redden, you may step down.

MR. FARREN: State calls Josh Bledsoe, Your Honor.

MR. FOWLER: Judge, he's in custody downstairs. It will take a few minutes.

THE COURT: Do you want to take a quick break?

MR. WATKINS: I bet Karen wants one.

THE COURT: To the Murphy?

MR. FARREN: I met Mrs. Murphy yesterday, Your Honor.

MR. WATKINS: I think it'd be Mr. Murphy that James would be visiting.

THE COURT: Ten minutes.

(Recess.)

(Both sides, the Defendant present, in open (court:

THE COURT: Is Mr. Bledsoe in the courtroom? I thought we got a break to get him.

THE BAILIFF: We did. We brought him back upstairs.

THE COURT: Oh, okay. All right.

MR. FARREN: And for the record, Your Honor, his attorney is Laura Hamilton. She was with him last night when we visited with him. She's aware he's testifying this morning. She visited with him.

THE COURT: Is she here?

MR. FARREN: She is here, but at another hearing. She -- I was present when she explained the law to him, and we --

THE COURT: Come up here, Mr. Bledsoe.

THE WITNESS: Yes, sir.

THE COURT: Mr. Bledsoe, raise your right hand.

(Witness sworn.)

THE COURT: Mr. Bledsoe, you have the right to remain silent. I'm sure you're aware of that right. It is a right that never leaves you. If you say anything on that witness stand, it can possibly be used against you. Are you aware of that fact?

THE WITNESS: Yes, sir.

THE COURT: Are you also aware of the fact that you can terminate the -- the interview today at any time?

THE WITNESS: Yes, sir.

THE COURT: All right. Now, you have the right to have a lawyer present, if you want to proceed with your lawyer here. Do you want your lawyer here?

THE WITNESS: I'm okay.

THE COURT: Okay. Have a seat then.

MR. FARREN: Thank you, Your Honor.

JOSHUA BLEDSOE,

Having been first duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. FARREN:

9:37:29 Q. Would you state your name for the record, please, sir.

9:37:32 A. Joshua Bledsoe.

9:37:33 Q. And, Mr. Bledsoe, do you know a man named Stephen Craig Kimberlin?

A. Yes, sir.

9:37:39 Q. How do you know Mr. Kimberlin?

9:37:41 A. I used to sell him dope.

9:37:43 Q. You used to sell methamphetamine to him?

9:37:46 A. Yes, sir.

9:37:46 Q. Now, you obtained the methamphetamine from Old Mexico. Is that correct?

A. Yes, sir.

9:37:51 Q. And you would deliver it to Mr. Kimberlin?

9:37:53 A. Yes, sir.

9:37:54 Q. And do you know if Mr. Kimberlin was distributing this product to other people to sell it?

A. Yes, sir.

9:38:03 Q. Was he doing it by himself or were other people involved?

9:38:06 A. Other people were involved.

9:38:07 Q. Do you know if Joshua Stocker were involved?

A. Yes, sir.

9:38:10 Q. Frank Chacon?

9:38:11 A. Yes, sir.

Q. Mr. Kimberlin's wife, Jessica?
A. Yes, sir.
Q. How did you meet Mr. Kimberlin? How did you come in contact with him?
A. I met him through -- Gregg Ward (phonetic) is who I met him through.
Q. Do you know a man name Miguel Gonzales?
A. Yes, sir.
Q. Did Mr. Gonzales also play a role in this?
A. Yes, sir.
Q. All right.
A. He was Craig's other supplier.
Q. Okay. About how much methamphetamine do you think you were taking to Mr. Kimberlin and his group, say on a week, or weekly, or monthly basis?
A. We would get rid of 30 pounds a week.
Q. Thirty pounds a week. How much -- how much -- when you delivered the product to Mr. Kimberlin, did he pay you up front or did you come back and collect --
A. I fronted it to him.
Q. Huh?
A. I fronted it to him.
Q. You fronted it. So you picked the money up later?
A. Yes, sir.

Q. How long after you delivered the -- say 30 pounds, did you come back then and pick up the money?

A. Took about a week.

Q. About a week. How much money do you think you picked up on an the average on a weekly basis?

A. Anywhere from 100,000, maybe 200,000, sometimes even 300,000.

Q. Okay. Now --

A. Just depends on how good of a week he had.

Q. Now, did you get to keep all of that money or did some of that go back to your supplier in Old Mexico?

A. I paid for everything that I had fronted to me first and then I kept my money to myself, but I kept it in circulation.

Q. Do you know a man named Dustin Pool?

A. Yes, I do.

Q. How do you know Mr. Pool?

A. He was competition out there.

Q. All right. How long do you think that you were supplying methamphetamine to Mr. Kimberlin -- well, let me ask it this way. At some point, you and Mr. Kimberlin and other members of that group were arrested in a federal drug investigation. Is that correct?

A. That's correct.

Q. And that was sometime in 2003?

9:40:11
A. Yes, sir.

9:40:13
Q. Okay. How long before that -- by the way, do you think that was about June -- July of 2003, in the summer of 2000 --

9:40:24
A. It was April 4th.

9:40:26
Q. April 4th. Okay. How long prior to April 4th -- when that activity came to an end, for how long a period of time had you been supplying this methamphetamine to Mr. Kimberlin?

9:40:39
A. Three, four years.

9:40:41
Q. Okay. And how long had you known Mr. Pool?

9:40:45
A. I'd known him a lot longer than three, four years. I knew him before I even started selling dope.

9:40:53
Q. So you originally knew Mr. Pool, but it wasn't in connection to any narcotics activity?

9:41:00
A. I just knew his name.

9:41:02
Q. Just knew his name. Okay. When -- did you ever have any problems with Mr. Pool? Did -- did some disagreements arise between you and Mr. Pool?

9:41:12
A. Yes, sir.

9:41:13
Q. When did that start, approximately?

9:41:16
A. Well, he used to just pick fights with all of my friends. He would -- he'd call -- if there was a good friend that I had, that used to have dealings with him --

9:41:33
Q. Who was this friend?

A. K.J.
Q. A.J.
A. K.J.
Q. K.J. Do you know the rest of K.J.'s name or did you just know him --
A. Kevin Jackson.
Q. Kevin Jackson. Okay. Go ahead. You were telling us about Kevin Jackson and Mr. Pool.
A. Yeah. Anyways, they had some sort of bad dealings. And Dustin would call the house and threaten us over the phone, telling us to sleep on the floor, because he was going to come by and shoot the house up, and just make off-the-wall comments like that.
Q. When did -- when did these problems with Mr. Kevin Jackson and Mr. Pool arrive, and then you heard these threats about shooting up your house?
A. It had to have been maybe in -- maybe 2000, 2001, something like that.
Q. Okay. As far back at 2002, 2001.
Do you know a man named Gregg Seago (phonetic)?
A. Yes, sir.
Q. Who is Gregg Seago?
A. He's my dad's best friend. I call him my Godfather.

9:42:35 Q. Okay. And do you mean that in a Mafia sense or in a -- more of a religious sense?
9:42:40 A. A religious sense.
9:42:41 Q. Do you know if there were any problems between Mr. Pool and Mr. Seago?
9:42:46 A. Mr. Pool and Mr. Seago, yes, sir.
9:42:48 Q. Okay. What was the problem with Mr. Pool and Mr. Seago?
9:42:51 A. That Mr. Seago owed him $4,000.00 for something, and he kept Dustin and a guy name Ray Placensio -- kept calling and leaving voicemails on Craig's cellphone. And he was going to have his son, Cory Seago (phonetic), touched in prison by the Texas Syndicate, or they were going to drive by that house if he didn't make the $4,000.00 debt right.
9:43:13 Q. So they're trying to collect the 4,000 debt from Seago and threatening his son who's in prison?
9:43:18 A. That's correct.
9:43:19 Q. Do you know if Mr. Placensio was connected to the Texas Syndicate?
9:43:23 A. That's what I heard. That was the word on the street.
9:43:26 Q. That was the word on the street. Okay.
9:43:29 Did you ever talk to Mr. Kimberlin and other members of that conspiracy about the problem with Dustin

Pool?

A. Yes, sir.

Q. On one occasion or more than one occasion?

A. More than one occasion.

Q. Did you, and Mr. Kimberlin, and other members of the group ever go to Mr. Pool's house?

A. Yes, we did.

Q. Why did you go to his house?

A. Talked to him about all of the trouble he was causing.

Q. And was this a friendly meeting or unfriendly meeting? How would you describe it?

A. We went over there mad and left friendly.

Q. Okay. So you felt like maybe there was some success in this first meeting?

A. Talking to him.

Q. Was Stocker with you, Josh Stocker?

A. On one occasion he was.

Q. On one occasion. So was there more than one time you went to Mr. Pool's house?

A. We probably went over there two or three times.

Q. Was there ever a time when there was a meeting with Mr. Pool in your group, other than at his house?

Do you know if they ever picked him up from his car and there was a meeting at a Knight's Pool Hall?

A. Yeah.

Q. Okay.

A. Joshua Stocker was in a guy's car that he had repossessed, named Slim. He'd taken that car for $200.00, and Dustin pulled up, thought it was his buddy. Stocker told him to -- or, you know, he went over into the Knight's Pool Hall and Dustin followed. Stocker got out and pulled a gun on him and said, don't make me shoot you. My guy wants to talk to you.

Q. Okay. And so he brought Mr. Pool with him?

A. Right.

Q. And there was this meeting?

A. Right. And pulled to a duplex apartment.

THE COURT: Did you hear that said?

THE WITNESS: Stocker told me that happened.

THE COURT: So the Defendant told you that, you didn't hear it?

THE WITNESS: That's correct.

THE COURT: Okay. Thank you. Go ahead. I'm sorry.

Q. (BY MR. FARREN) Okay. At any rate, you either participated in meetings with Mr. Pool, or you heard from other members of the conspiracy about meetings with Mr. Pool on these problems that were developing between the two groups. Is that correct?

A. That's correct.

Q. Now, you indicated that at least one meeting you went there angry, but left on more friendly terms?

A. (Witness nods head up and down.)

Q. But did that solve the problem?

A. No, he kept messing with us.

Q. He keep with messing you? Was he making threats?

A. Yes, he was.

Q. Did he ever threaten you and your family?

A. Yes, he did.

Q. Did he and Mr. Placensio ever act like they were going to do a drive-by on you and your wife, Kelly Grayless?

A. Yes, they did.

Q. Did you ever have a confrontation with Mr. Pool at Joe's Crab Shack?

A. Yes, sir, I did.

Q. What happened at Joe's Crab Shack?

A. I was walking out after getting through eating, and I walked out and I was saying good-bye to my friend, David Garcia. And I was carrying my little girl in her car seat, and I saw his gold Accura Legion pull up real fast. He jumped out, he pushed me, and I almost dropped my little girl. It ticked me off, so I handed her over to my friend, David Garcia, and bowed up to him. I told him

to throw the first punch. He didn't want do fight.

He said he was just playing. Why was I tripping? And I told him, he just pushed me. And then he said, wait. He started asking me if I had eaten already, and that he offered to buy me something, when I told him I'd already eaten. So he said, well, hang on, I've got reservations in here. Let me let them know I'm here. But hang on, I still want to talk to you.

And so he goes inside, he hollers for Bobby Okonus (phonetic) and Ray Placensio, and they run out. Bobby gets in my face ready to jump me. And they were all ready to jump me.

Q. When -- when you had the confrontation with Mr. Pool and he called Ray Placensio and Bobby Okonus out, so there's you against three of them?

A. That's correct.

Q. What did you do? Did you try to get some help?

A. Yes, I told -- you know, I said --

Q. How did you do that?

A. I whipped out my cell phone and I started -- I called Craig Kimberlin and Stocker answered.

Q. Okay. When you talked to Stocker, what did you tell him?

A. Well, Ray was too busy talking to me. He said, who's that? I told him Stocker. He said, tell him I'm

9:47:32 going to slap him around like a little bitch. And then
9:47:36 Stocker overheard that. And he said, where are you? And
9:47:38 I told him that I was at Joe's Crab Shack, and they were
9:47:40 trying to jump me. He said to give him a couple of
9:47:42 minutes, and him and Craig would be right there.

9:47:47 Q. Eventually, though, there never was --
9:47:52 Mr. Kimberlin, and Mr. Stocker, and other members of your
9:47:55 group never actually got to Joe's Crab Shack, did they
9:48:00 because --

9:48:00 A. No. We'd drawn quite a crowd over there, and I
9:48:03 thought it would be any minute before the cops would show,
9:48:07 so I decide to just burn off.

9:48:08 Q. Did you call Kimberlin and -- or Stocker back and
say look --

A. The --

THE COURT REPORTER: Excuse me. One at a
9:48:13 time.

9:48:13 Q. (BY MR. FARREN) Did you call Mr. Kimberlin and
9:48:14 Mr. Stocker back?

9:48:16 A. Yes, I did.

9:48:17 Q. And did you tell them, it's okay. The deal, it's
9:48:20 over with, and --

9:48:21 A. I told them, don't worry about coming up here
9:48:24 that they're just a bunch of wienies.

9:48:26 Q. Did -- but how did Mr. Kimberlin and Mr. Stocker

respond to this one more problem with Mr. Pool?

A. Kimberlin said, fuck that, we're going to treat it like they jumped you.

Q. Okay. Do you know if -- in addition to the other meetings with Mr. Pool, do you know if Mr. Stocker ever went to see Mr. Pool on his own?

A. Yes, he did.

Q. And do you know if that meeting was successful?

A. No, it wasn't.

Q. Why --

A. Ray pulled an SKS out on Stocker, and -- was stolen from Stocker.

Q. When you say "Ray", Ray Placensio?

A. Yes.

Q. Mr. Placensio was living with Mr. Pool at the time. Is that right?

A. That -- that is to my understanding.

Q. Now, who was the primary enforcer or muscle for Mr. Kimberlin's group?

A. I think that would have been Frank Chacon.

Q. And who was the primary muscle and enforcer for Pool's group?

A. Mr. Placensio.

Q. Eventually, do you recall a meeting taking place at -- at Stumpy's Lounge --

9:49:33 A. Yes, sir.
9:49:34 Q. -- in Amarillo? Do you know about when that meeting occurred?
9:49:38 A. No.
9:49:39 Q. Do you know if it was sometime in the year -- early in the year of 2003?
9:49:43 A. Yes, sir.
9:49:44 Q. Okay. Who all was at the meeting, if you recall?
9:49:50 A. Well --
9:49:50 Q. Or tell us who you can remember who was at the meeting?
9:49:53 A. I got a call from my friend, Kevin. He told me to answer my phone, because my phone kept ringing, and it was a weird number, I didn't answer my phone. So my friend Kevin called and told me, and told me it was Cory Pendleton (phonetic) --
9:50:07 Q. This is Kevin Jackson?
9:50:08 A. Yes, sir.
9:50:09 Q. And he told you that this strange call you were getting was from Cory Pendleton?
9:50:14 A. Yes, sir.
9:50:14 Q. And so you would agree you would take this call from Mr. Penelton?
9:50:18 A. Well, I went ahead and called Cory, because I had just sold him my Accura to him that night, and traded for

a black Expedition. And Ray, Dustin and Bobby had chased them off of the road.

Q. So when you talked to Mr. Pendleton you learned that Ray Placensio --

A. Uh-huh.

Q. And Bobby Okonus (phonetic) --

A. Right.

Q. -- had chased the Accura?

A. Off of the road.

Q. Okay. And ran it off the road --

A. The --

THE COURT REPORTER: Excuse me. I can't get two at once.

Q. (BY MR. FARREN) And who was driving the Accura at that time?

A. A guy name Michael Dibiase.

Q. Is he the son of Ted Dibiase?

A. Yes, sir.

Q. The professional wrestler?

A. Yes, sir.

Q. And when they learned that Mr. Dibiase was driving the car and not your wife, Kelly, what did they say?

A. They ran up to him, pulled a gun, told 'em, where's that bitch? Bledsoe was telling him, we're going

to kill 'em.

Q. All right. When you learned about this, did you tell anyone else about it?

A. Yeah. I called Craig up and told 'em they were out hunting me down. And that's when he made the arrangement for me to meet him at Stumpy's. That -- and uh -- so Stocker and Doug Cash (phonetic) come pick me up in a white Ford pickup to take me to Stumpy's.

Q. So Mr. Stocker and Mr. Cash picked you up, and the three of you went to a meeting at Stumpy's?

A. That's correct.

Q. Now, the meeting at Stumpy's was called because you had told Mr. Kimberlin about your car being run off of the road, that they apparently believed belonged to your wife?

A. That's correct.

Q. Was -- was this event with the car and the meeting at Stumpy's, was this before or after the times you had gone to Mr. Pool's house to try to talk to him and when you had other meetings with him?

A. Yes, sir.

Q. It was after?

A. The -- yeah. That was right whenever uh -- Craig found out that Miguel's wife and kids were chased around the mall by Ray and them.

9:52:18 Q. When you say Miguel, are you talking about Miguel Gonzales?
9:52:21 A. Yes, sir.
9:52:22 Q. So his wife and members of his family were pursued around the mall?
9:52:25 A. By Ray and his buddies.
9:52:27 Q. By Ray Placensio and others that you believe are connected to Mr. Pool?
9:52:31 A. That's correct.
9:52:32 Q. Why were they pursuing Mr. Gonzales?
9:52:35 A. Because Mr. Gonzales used to work for Dustin Pool, and Dustin Pool had fronted him two pounds of dope. And, anyways, Miguel didn't pay for it, and so he owed a $10,000.00 debt. And uh -- Dustin kept trying to blackmail him, and take him -- dirty pictures of him with another girl, and threatening that he was going to show it to his wife, if he didn't make the $10,000.00 debt right. Miguel paid on it up to -- paid on it until it was about a $6,500.00 debt, and then just quit paying. And so that's when Dustin sent Ray and his boys to go collect the rest of it.
9:53:14 Q. So in addition to the other problems that you've described, and these meetings with Mr. Pool and various members of your group, including Mr. Stocker, you had Gregg Seago and his son being threatened?

A. Uh-huh.
Q. Your car's being run off the road?
A. Uh-huh.
Q. Miguel's family is being threatened?
A. Yeah. Craig's the one that took that personally about Miguel's family getting run off of the road. And since I happened to know where Dustin lived, Craig asked me if I would take him over there, and I took him over there. And I think at that time that's when Dustin got to tension (sic) with me, and when he saw me at Joe's Crab Shack by myself, that's when he thought he was going to get my back for taking Craig over to his house.
Q. So after all of these events, eventually, we end up with the meeting at Stumpy's?
A. Yes, sir.
Q. Okay. At the meeting at Stumpy's, what was the point of the meeting? What was supposed to happen?
A. Well, we were supposed to call Dustin up and I was going to fight him one-on-one.
Q. Did you try to -- did you know if efforts were made to call Mr. Pool?
A. Yes, sir.
Q. Did he come to the meeting?
A. No, sir.
Q. So he -- he declined to come and participate in

9:54:25 the meeting?

9:54:25 A. He said he was going to come, but then he didn't show up. And then my friend, Kevin Jackson, called me up again and said that a girl named Brandy, that worked up there as Jaguar's told them that they were just waiting for all of their friends to come over to come jump us.

9:54:38 Q. At Stumpy's?

9:54:39 A. At Stumpy's.

9:54:39 Q. But he never did actually show up at all?

9:54:41 A. He never showed up.

9:54:43 Q. Since Mr. Pool didn't show up, did the folks at Stumpy's, you and Stocker, and I think you said Mr. Cash and Mr. Kimberlin, do you know if there were other people at the meeting?

9:54:53 A. Yes, sir. I began calling other people and so did Craig, after we figured out that that's what they were doing.

9:54:59 Q. How many -- approximately how many people do you think went to the meeting, eventually, if you have an idea?

9:55:05 A. I know I called maybe four or five of my friends to show up. And then Craig, and Stocker, and Frank Chacon, Destry, and a couple of other guys.

9:55:16 Q. Jason Hickson there?

9:55:18 A. Jason Hickson was there. I called him.

Q. Okay. Since Mr. Pool didn't show, did the group go ahead and discuss the Pool problem anyway, since he wasn't there?

A. Uh-huh. Yes, sir.

Q. Was any kind of discussion -- was there any kind of discussion about $10,000.00 that took place?

A. No. The -- the debt discussion came up, whenever Miguel was sitting there. You know, he was trying to explain to Craig that -- you know, we need to handle this. And Miguel was telling him that we needed him killed. And I said, what's up with you Mexicans always wanting to kill people? It was kind of a joke, because the guys that I was working for offered to do it for ten grand.

Q. Okay. When you say the guys you were working with or for, these are your connections in Old Mexico?

A. Yes, sir.

Q. And so they were aware you were having problems with Mr. Pool?

A. Yes, sir. I slowed down on selling dope.

Q. All right. So it affected your ability to move narcotics?

A. Yes.

Q. So your connections in Old Mexico were offering to solve your problem for $10,000.00 by killing Mr. Pool?

A. That's correct.

Q. Was that ever discussed at this meeting at Stumpy's Lounge?

A. Yes.

Q. Did you intend for that to be a contract?

(Unidentified sound in the courtroom.)

THE COURT: What did you do?

MR. FARREN: The word "contract" was the trigger word, Your Honor.

MR. WATKINS: I think the fan bites the dust.

Q. (BY MR. FARREN) Did you intend for that to be a contract on Mr. Pool?

A. No, sir.

Q. Did you know if Mr. Kimberlin or Mr. Stocker either took it that way, or spun it so that they could claim it was a contract?

A. I think Kimberlin took it that way and wanted to prove to me that he could have it done.

MR. FARREN: May I have just a moment, Your Honor?

THE COURT: Yes.

Q. (BY MR. FARREN) When -- was there a lot of loyalty within Mr. Kimberlin's group? Was this just a loose knit group or are these folks pretty loyal to each other?

9:57:26 A. They're pretty loyal to each other.

9:57:28 Q. You mentioned that Mr. Kimberlin took Miguel Gonzales -- pursuing his family around the mall personally. Why -- why did he take that personally?

9:57:34 A. Craig was a house parent at Boy's Ranch for Miguel Gonzales.

9:57:40 Q. And so -- so members of this group not only were in business together, but they were friends, family friends, and so forth?

9:57:47 A. That's correct.

9:57:48 Q. Okay. A threat against one member of the group affected all of the group?

9:57:51 A. That's correct.

9:57:52 MR. FARREN: On this issue, that's all we have. Obviously, we will be calling him during the trial.

9:57:59 THE COURT: All right. Ms. McElroy.

9:58:02 MS. McELROY: We have no questions, Your Honor.

9:58:04 THE COURT: You may step down, Mr. Bledsoe.

9:58:10 MR. FOWLER: Your Honor, we call Jeremy Roy.

9:58:22 THE COURT: Mr. Roy's in custody?

9:58:24 MR. FARREN: No, Your Honor.

9:58:27 MR. FOWLER: No, sir.

9:59:01 THE COURT: Okay.

9:59:04 MR. FARREN: While he's coming, Your Honor,

for the record, I just want to make the Court aware of our logistics problem.

THE COURT: Okay.

MR. FARREN: There are either one or two additional homicide trials taking place in Amarillo. And many members of the Special Crimes Unit will be trying to jockey back and forth between all three trials. So we will do our best, but there's going to be conflicts as we go through it.

THE COURT: Are they going to take as long as this one?

MR. FARREN: No, Your Honor. Eventually, we'll have them all to ourselves.

THE COURT: Raise your right hand.

(Witness sworn.)

THE COURT: Thank you. Sit right there.

That's fine. Do what you have to do.

MR. FARREN: I just wanted to give you notice, Your Honor.

THE COURT: Okay. If you can give us some notice, and maybe work something else in, we won't waste this jury's time.

MR. FOWLER: May I proceed, Judge?

THE COURT: Yes. Go ahead.

JEREMY CHAD ROY,

having been first duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. FOWLER:

Q. Would you state your full name for the record,
0:00:19 please.
0:00:20 A. Jeremy Chad Roy.
0:00:21 Q. Jeremy, how old are you?
0:00:23 A. Thirty years old.
0:00:24 Q. And what do you do for a living?
0:00:25 A. I'm an electrician.
0:00:27 Q. Who do you work for?
0:00:28 A. Johnny B's Electric.
0:00:30 Q. I want to take you back to some events in 2002
0:00:33 and 2003. Do you know an individual name Josh Stocker?
0:00:40 A. Yes, sir, I do.
0:00:40 Q. Okay. Did you know him in 2002 and 2003?
0:00:47 A. Yes, sir, I did.
0:00:47 Q. What was your relationship with Mr. Stocker
0:00:47 during that time period?
0:00:48 A. He was my dope dealer.
0:00:51 Q. When you say "dope", what kind of dope are we
0:00:54 talking about?
0:00:55 A. Methamphetamine.
0:00:56 Q. How much would you purchase from Mr. Stocker on a
0:01:00 weekly or monthly basis?

A. It kind of varied.

Q. And were you purchasing this dope to use, or to sell, or to both?

A. Both.

Q. Do you know who Mr. Stocker was receiving his dope from?

A. Uh-huh. Yes.

Q. Who was that?

THE COURT: Let me admonish him.

Mr. Roy, you know you have the right to remain silent. You know it's a right that never leaves you. If you give it up here in this proceeding, what you say here possibly could be used against you. Are you aware of that?

THE WITNESS: Yes, sir.

THE COURT: You have the right to have a lawyer present during this proceeding, if you want one. Do you want a lawyer?

THE WITNESS: No. I don't -- no. I'm all right.

THE COURT: All right. So you're going to go ahead and willingly testify?

THE WITNESS: Yes, sir.

THE COURT: All right. Go ahead.

Q. (BY MR. FOWLER) Do you know who Joshua Stocker

was receiving his dope from?

A. I had a really good idea.

Q. And who was that?

A. Well, Craig Kimberlin and Josh Bledsoe.

Q. About how long did you purchase methamphetamine from Mr. Stocker before problems arose?

A. Actually, I think the very first time that I purchased methamphetamine from him, we had a problem.

Q. But after that problem was resolved, you eventually purchased from Mr. Stocker for a long period?

A. Off and on for eight months, maybe.

Q. Now, you know why you're here is to talk about two kidnappings?

A. Yes, sir.

Q. For the record, how many times were you, in fact, kidnapped and taken somewhere against your will?

A. Twice.

Q. And the first time that this happened, do you remember the approximate month and year?

A. The first time had to have been late August, early September, so. . .

Q. And this is of 2002?

A. Yes, sir.

Q. Okay. And can you tell the Judge how it started?

A. I was at an apartment in uh -- oh, I can't think

of the apartment's name, they're off of 15th Street. I was in an apartment, and a knock came at the door, and three gentlemen carrying guns came in. And was hit -- was hit in the back of the head with one of the guns, and put in a vehicle, and taken a short distance to a house where we traded vehicles.

Once I was in the vehicle, I had a knife at my throat. I was beaten repeatedly and kept in a floorboard. My eyes were taped.

Q. Let me stop you there and kind of go back to the beginning.

The three gentlemen that you described, do you remember their names?

A. Well, Joshua that was one of them. Actually said his name when he walked through the door. Mark Holland (phonetic) was the other one. The other guy's name was Taz (phonetic), and at one point in time I think I knew his real name.

Q. In your statement that you gave to Mark Brown, you mentioned Kenny?

A. Kenny, yeah.

Q. Mark Holland, was he Josh Stocker's kind of right-hand man?

A. Yeah, I guess. I don't know -- yeah. I think -- I think that they were pretty good friends really.

0:04:46 Q. And when you said that you voluntarily let them into the apartment --

0:04:51 A. I didn't, no. No, I actually told her, look through the peephole before you open that door, and -- you know, she ignored me, obviously. She was expecting them.

0:05:03 Q. And who is "she"?

0:05:06 A. Her name was Becka. I don't know what her last name was.

0:05:09 Q. And this was at the Historia (sic) Apartments?

0:05:14 A. Historia (sic), yeah.

0:05:14 Q. And so she let them in voluntarily?

0:05:16 A. Yeah.

0:05:16 Q. And then after they came in, what happened?

0:05:17 A. Well, I was told to get up and -- and leave. And I didn't do that immediately, and Kenny hit me in the back of the head with -- with the butt end of his rifle.

0:05:32 Q. Okay. What do you remember, what type of rifle?

0:05:36 A. Yeah. I'm thinking it was maybe an AR-15. Maybe.

0:05:42 Q. Okay.

0:05:47 A. I'm pretty positive it was an AR-15.

0:05:50 Q. Did you see whether Mark and Josh Stocker had weapons on them?

0:05:55 A. Yeah.

0:05:56 Q. What type of weapons did they have on them?

A. Well, Josh had a rifle and Mark had a pistol, what looked like a pistol.

Q. The rifle that Josh had, do you remember anything particular about it?

A. Not really. I got hit with the AR-15 that -- you know, the one that I remember.

Q. After you got hit when the AR-15, did you fall to the ground?

A. Yes.

Q. Okay. Were you in pain?

A. Uh-huh. Yes.

Q. And about how long were you in the apartment before you were moved to their vehicle?

A. I don't know. Thirty seconds.

Q. Okay. And do you know whose vehicle you were moved to?

A. Well, I think at the time it was Joshua's. I believe at one point in time it belonged to Tommy Tucker. I'm pretty sure it was a four-door, gold Cadillac.

Q. Did they do anything to restrain your hands or legs before you left the apartment?

A. No.

Q. Okay.

A. I think they were just trying to get me out of there as quickly as possible. The neighbors who were next

door were standing at the door watching, but -- you know, he was in the game, too, so. . .

Q. And when you say "in the game", that's a phrase many of the witnesses will use about people who are involved in the drug culture?

A. Yes, sir.

Q. So were you carried to the Cadillac or did you walk out on your own power?

A. Well, I mean, I was carried, kind of walked, kind of crawled, kind of drugged (sic), kind of getting in the car.

Q. Okay. And once you got into the Cadillac what happened?

A. I was put in the floorboard of the back seat. And Kenny, who they call Taz, had a very large knife, a very sharp knife at my neck.

I was told that I was going to be killed, and that I shouldn't threaten people like that. I believe -- I believe that was it.

Q. And about how long were you in the Cadillac?

A. Well, let's see. I don't know that it's even a mile from Astoria Park, where Josh was staying at the time.

Q. Do you remember where Josh was staying at the time?

A. Yeah. I was believe it was the corner of -- let's see. It would be 16th and Hayden.

Q. Was he staying there -- was this an apartment?

A. It was a house.

Q. Was he living with anybody?

A. Yes. A woman named Jill. I'm not that sure.

Q. And so you were taken to Josh Stocker's house?

A. Right. We didn't actually go in the house. They had Jill's white Taurus parked in the driveway, which faced 16th Street. I was pulled out of the Cadillac and put in it.

Q. Okay. And how long did you stay in the Taurus?

A. I don't know, for a while. I was really trying to figure out where I was going. I mean, I was in the floorboard in the back seat, and uh -- we went a long ways.

Q. Okay. Did you hear anyone make a cell phone call while you were in the Taurus?

A. Uh-huh. Several times.

Q. Who were the people making the cell phone call?

A. Well, they were all calling him "dad". I'm -- I mean, I can only assume that it was Craig. You know, that's an assumption.

Q. So you assumed that the three individuals in the vehicle who had kidnapped you were calling Craig

0:09:43 Kimberlin?

0:09:44 A. Uh-huh. Yeah.

0:09:44 Q. Do you remember anything they were telling

0:09:46 Mr. Kimberlin?

0:09:47 A. Well, no, I can't say that I do. You know, I

0:09:50 mean, I had a knife and a couple of guns, and I was being

0:09:55 beaten, you know, as badly -- well, Kenny and Mark could

0:10:01 beat me. I wasn't real concerned with what was going on

0:10:04 at the time.

0:10:04 Q. Do you know if Kenny -- his real name is Kenneth

0:10:09 Ray Martin?

0:10:10 A. I can't say that.

0:10:11 Q. Okay. After you were in the Taurus, do you know

0:10:13 where you were taken?

0:10:16 A. I mean, I really have no idea. Uh -- once I

0:10:20 found out, you know, later on -- I mean, I'm assuming it

0:10:27 would have been maybe Panhandle, because they -- Josh

0:10:32 actually stopped the vehicle and we were in a residential

0:10:36 area, and I got out, and my eyes were still taped. And

0:10:40 the first time that's the only thing they ever taped, was

0:10:44 my eyes. And --

0:10:46 Q. Let me stop you there. When did they put that

0:10:49 tape on you?

0:10:49 A. Well, just at some point.

0:10:51 Q. At some point when you're driving around?

0:10:52 A. Yeah. It was right after -- I believe it was once we moved from the Cadillac into the Taurus.

0:10:59 Q. What kind of tape did they put on you?

0:11:02 A. You know, I really -- it wasn't duct tape. I don't think --

0:11:07 Q. Was it Scotch tape like this?

0:11:10 A. No. It may have been electrical tape. I know they wrapped it around several times. I could see, you know, out of the bottom of the tape.

0:11:18 Q. And were you restrained? Were your arms and legs restrained in any way?

0:11:23 A. You know, I had a couple of guns on me and a really big knife at my throat.

0:11:29 Q. And so you believed they took you to Panhandle, Texas?

0:11:31 A. Well, just after hearing -- you know, where things happened. I mean that -- with my own judgment.

0:11:38 Q. So you didn't know at the time where they took you?

0:11:40 A. No. No, I was trying to figure it out.

0:11:43 Q. And about how long did this whole car ride in the Cadillac and Taurus take combined?

0:11:51 A. I want to say between an hour and an hour and a half.

0:11:59 Q. And did your car trip end at some point?

A. Yeah.

Q. Okay. Why or how did it end?

A. Well, it actually ended peacefully. It ended at Brook Vanderbrook's (sic) apartment it was at River -- River Falls, I think behind Albertson's at Bell. And you know -- well, I don't know.

Q. And so you were taken to Brook Vandergriff's apartment?

A. Yes, sir.

Q. And Brook is -- how is she related to Josh?

A. It was his girlfriend.

Q. Why were you taken to Brook Vandergriff's apartment?

A. Well, you see, I -- I had a little conflict with Josh, like I said on the very first thing, and we were discussing pretty heatedly the problem, and I threatened to kill him and Brook. Of course, I blew that off 15 minutes later, you know, but you say things.

Q. Why did you threaten to kill Josh and Brook?

A. Well, you're a drug dealer, you're supposed to be mean and tough, you know, and hard.

Q. Well, had Josh done anything to you that resulted in you threatening him?

A. Well, he -- I mean, he was just talking at that point. So, you know -- I mean, he had some pretty

offensive words and -- I mean, that put me on the defense. At this point, I had been to prison a few times, and you know --

Q. So there was trash talking on both sides, and it escalated?

A. Exactly.

Q. You said, I'm going to kill you and Brook?

A. Exactly.

Q. And then he kidnapped you?

A. Yes, sir.

Q. Do you remember a person named Rip or Ronnie Enman Pope (phonetic), who was involved in this?

A. Sure do.

Q. What was his involvement in this first kidnapping?

A. Now, I really don't know, other than his size. You know, he just beat on me a little bit. Really, he didn't -- he didn't do a whole lot. I mean, him and Josh talked about, you know, certain people that we knew, and people that didn't like me, and where they could take me, you know. Who wanted me or -- you know, whatever, but uh -- outside of that, Rip didn't really play a big role.

Q. Jeremy, when you're in the game, and you're buying drugs or selling drugs, to be an effective seller or user, how do you -- how do you carry yourself? How's

the best way to carry yourself amongst other people who are in the game?

A. Well, like I said, I mean, you're supposed to be tough, you know. I mean, you can't let people think that -- that they can take what you have or they'll take it. You know? So you listen to their rap music. You know, talking about selling drugs and carrying guns, you know. You carry loaded and unloaded weapons around.

For the most part it's all a front. And that's what I choose to believe. For the most part, it's all a front.

Q. And on this first kidnapping, were you made to apologize to Brook Vandergriff?

A. Yes, sir, I was.

Q. Did you, in fact, apologize to her?

A. From my knees, I apologized to her.

Q. Were any guns or knives displayed when you were apologizing?

A. Oh, yeah.

Q. Now, I want to go back to the second kidnapping. When do you believe that this kidnapping occurred?

A. The -- the second time?

Q. Yes, sir.

A. It was two days before Thanksgiving, 2002.

Q. And if my math is right, that'd be November 26th,

2002?

A. I guess. I have no -- I have no idea.

Q. And let's talk about why you were kidnapped before we go into the details. I'm taking you and Josh Stocker must have had some problems before you were kidnapped the second time?

A. I mean, obviously, we had problems from the first time. And, you know, that first time didn't leave a real good taste in my mouth, but what could I say, the dope was really good.

Q. So after the first kidnapping you still bought dope from Josh Stocker?

A. Yeah.

Q. What was the problem or the dispute about that resulted in the second kidnapping?

A. Well, I really can't say positively. Uh -- you know, off and on, I owed him money here. I owed him money there. I think the most really that it ever got up to was about $500.00. And I had a really good friend one night take her hard earned money that she worked for -- she wasn't not a dope dealer. And uh -- she gave me that money, and I paid off I think all but about $80.00, so when I was kidnapped a second time, the only money that was owed was about $80.00. So I really don't -- you know -- I mean, I have my opinions on why I was kidnapped

0:17:29 a second time, but. . .

0:17:30 Q. So for the most part, when you were buying from Josh Stocker, would you say you and him were pretty close to square in terms of owing money?

0:17:39 A. Well, no. You know, I always -- it was always up front, so I always owed him money.

0:17:45 Q. Okay.

0:17:45 A. You know? And I guess it was the very first time, you know, that kept me in that debt. You know, the very first time that I got from him.

0:17:55 Q. Would you -- during the course of your relationship with Mr. Stocker, would you ever pay him for drugs and then him come back and tell you later, oh, you owe me money, you never paid me for that?

0:18:06 A. No. No.

0:18:08 Q. Do you know if Mr. Stocker would ever tell others higher up the chain that you weren't paying it?

0:18:17 A. Yeah. I'm not the only one that he's said that about. We were all accused of not only paying, but stealing, breaking into his home, uh -- you know, just --

0:18:33 Q. In November of 2002, had you noticed a difference in Josh Stocker's demeanor, and attitude, and how he was carrying himself?

0:18:41 A. Uh-huh. Yes.

0:18:42 Q. And what did you notice?

A. Well, when -- the first time, you know, he hadn't been using long. You know, he just hadn't been. And I -- I kind of took him wrong. He didn't have that hard, you know, tough guy appearance or demeanor about him. And as our relationship grew, he continued to use, as well as I did, you know. And if you've seen the mug shots, we look horrible.

Q. Okay.

A. And --

Q. Do you believe he became more paranoid?

A. Absolutely.

Q. Okay. Do you have any knowledge of Josh Stocker being arrested in October of 2002?

A. Well, I mean, I know that -- yeah. I know of -- of two times, actually, I think.

Q. Okay. And did that contribute even more to his paranoia?

A. I'm sure it did.

Q. And do you know about Craig Kimberlin being arrested and his house being searched in early November of 2002?

A. Yes, sir.

Q. And so did you ever get the feeling that the Kimberlin, Stocker group was wondering why in the heck are we getting busted all of the time, somebody's snitching on

0:20:15 us?

0:20:16 A. Yeah. Absolutely. Ultimately, I think that's why I was kidnapped a second time.

0:20:23 Q. Because they thought you were the snitch for Stocker getting busted in November?

0:20:28 A. Well, I think that they thought that, because Josh Stocker told them that.

0:20:32 Q. And so let's get into the actual kidnapping. How did it start on the second time?

0:20:37 A. Well, I was living in a back house off of Milam, across from the old health department, and uh -- a guy had been telling me -- a mutual friend of ours had been telling me, you know, all day you need to get ahold of Josh. You need to get ahold of Josh. He needs to talk to you. And, you know, at this point, any time that happened it made me very nervous. Anytime Josh was around me, he was armed. Made it apparent that he was armed, and he never came alone. And, you know -- I mean, the people that he ran around with were, you know, not the greatest people in the world.

0:21:27 Q. And so did you call him?

0:21:30 A. Did -- you know, no, I didn't. They -- they showed up.

0:21:39 Q. Who is "they"?

0:21:40 A. Josh Stocker and a guy named Mike. I had never

seen or heard of him before.
Q. You don't know Mike's last name?
A. No. I mean, I didn't at the time. I've been informed who he was.
Q. Okay. And when they showed up, did you let them in?
A. Well, I mean, you don't really understand. When he showed up at my door, I didn't really have a choice.
Q. Okay.
A. You know, anytime that he showed up at my door, it was open.
Q. Okay. And so he was let in. Is that right?
A. No, he came in.
Q. He came in?
A. (Witness nods head up and down.)
Q. And did he display his weapons to you as soon as he came in?
A. Oh, every single time.
Q. Okay.
A. Every single time.
Q. So it was his routine, or habit, or custom to carry a weapon everyday in connection with this drug business?
A. Uh-huh. At least anytime he was around me.
Q. Okay. And so he came in, and what happened?

0:22:37 A. He asked if I -- if I had his -- if I had his money. And uh -- I didn't, but I had some meth. And uh -- amazingly, he wasn't concerned with that, and at some point during him asking me if I had his money, which at this point I think was only $80.00, Mike hit me pretty hard. And I've been hit quite a few times --

0:23:17 Q. He hit you with a fist?

0:23:20 A. Yeah, it was a fist.

0:23:21 Q. And then what happened?

0:23:22 A. There was some more talking. I mean, I knew that what was about to happen probably wasn't good, and Josh told me that I was coming with him. That somebody wanted to speak with me. And uh -- that I knew who that somebody was, and that I was going to come with him, or, you know, I was going to die. You know?

0:23:49 Q. And after he said this, then what happened?

0:23:50 A. Well, I was put in Mike's truck. It was a white Chevrolet step-side, late -- later model.

0:23:59 Q. Were your hands or feet or eyes taped or restrained in any way, at this point?

0:24:05 A. Not at this point.

Q. Okay.

0:24:06 A. Not at this point. But Mike had a gun, and he drove with his right hand and aimed the gun with his left. And Josh, of course, had a gun.

Q. Sure.
A. And they were both pointed at my side.
Q. So you get in Josh's pickup?
A. No, it was Mike's.
Q. Do you know where they took you?
A. Uh-huh.
Q. Where?
A. To River Falls, to Brook.
Q. Back to Brook Vandergriff's again?
A. Yeah, it was always back to Brook's.
Q. And what was the point of going back to Brook's?
A. Well, they had -- actually, they had moved to a little apartment over on Gregory, I believe it is, and there was nothing in the apartment. It was just an empty apartment, and that's where I was taken to, I guess, meet with Craig. You know, I couldn't be positive of that, because my eyes were, you know, bound when we got to the apartment.
Q. Okay. And that's what we want to talk about. When -- did your feet and hands ever get taped up?
A. Oh, yeah.
Q. Okay. At what point in time did they get taped up?
A. In Brook's apartment.
Q. In Brook's apartment. Was Brook there at her

0:25:29 apartment?
0:25:30 A. No, not this time. The first time she was.
0:25:32 Q. What were your feet and hands taped up with?
0:25:35 A. With duct tape.
0:25:38 Q. Were your hands taped in front of you or behind
0:25:42 you?
0:25:42 A. Well, behind me. Uh -- you know, I was stripped
0:25:48 naked down to -- I say naked, I say down to my underwear.
0:25:53 Q. So all of your clothing except your boxers --
0:25:55 A. Right.
0:25:56 Q. -- was removed?
0:25:57 A. Right.
0:25:58 Q. And then they duct tape your hands and duct taped
0:26:02 your ankles?
0:26:02 A. They duct taped my ankles, my knees. They duct
0:26:05 taped my hands behind my back. They duct taped my mouth
0:26:09 and they duct taped a towel around my eyes, so I couldn't
0:26:12 see who I was talk to.
0:26:14 Q. And so was the duct tape over the towel and then
0:26:19 the towel --
0:26:20 A. Yes, sir.
0:26:20 Q. -- was over your eyes?
0:26:21 A. Yes, sir.
0:26:22 Q. Was anything put into your mouth at this point?
0:26:25 A. Not -- not at this point.

Q. Okay. And we're still talking about Josh and Mike?

A. Right.

Q. And no one else had shown up at this point?

A. No. They were -- they were on their way. You see, Mike left the apartment to go down to the truck for something, and then at that point Josh pulled out his gun and put it in my mouth, and told me if -- if you tell him that me or Mark Holland gave you that phone number, Rooster, I will put a bullet in your head. I will kill you dead. I will kill you dead.

I said, Josh, where am I supposed to tell him I got this number? And he told me that he didn't know, but I better think of something.

Q. Before this kidnapping, what was the deal about calling Craig Kimberlin?

A. What do you mean, what was the deal?

Q. Why -- the conversation you just told us about, you better tell Craig you didn't get his number from me. What -- what was he referring to?

A. He had come to my mother's house. They -- Brook and him were actually looking for a new apartment. They was -- you know, before they moved to that one on Gregory, and he needed a place for his dogs. And my mom had a fence that was secure enough to keep them. And I mean --

I mean, he came as a friend that time.

Q. Okay.

A. And, you know, they stayed there for what a couple of days.

Q. And did he give you a phone number that turned out to be Craig Kimberlin's?

A. Yeah, he did.

Q. Okay. And you called that number?

A. I sure did.

Q. Who did you think you were calling when you called Craig Kimberlin?

A. I thought I was calling Josh Stocker, but that's actually not who I was calling.

Q. When you're in the game, was it protocol or customary for you to be calling Craig Kimberlin?

A. No, not me. Huh-uh.

Q. Okay. You were at a much lower level?

A. Yeah.

Q. Okay. And so back to the Brook's apartment. Josh puts a gun in your mouth and says what?

A. And says, if you tell him that I gave you this number or that Mark Holland gave you this number, Rooster, I will kill you. I will put a bullet in your head.

Q. Your nickname at the time was Rooster?

A. Yes.

0:28:48
Q. Okay. And why did he not want Kimberlin to know that he had given you Kimberlin's number?

0:28:56
A. For me to answer that would only be speculation.

0:28:58
Q. Okay.

0:28:59
A. I mean, I have my opinions, but I don't know --

0:29:03
Q. Sure. Sure. That's fine. And so after he put the gun in your mouth, what happened?

0:29:07
A. I asked him, you know, after -- after the gun was taken out of my mouth, I said, Josh, what am I supposed to tell him? How did I get that number? And he told me, well, I don't know, but you better think of something. And I thought and I thought. You know, I'm already down to my boxers. I'm not taped, but, you know, I just had a cocked .9 mm in my mouth. And, you know, we were both pretty strung out. You know, that's a volatile situation.

0:29:38
Q. And at this point, you still thought you were going to die?

0:29:41
A. Yeah. I mean --

0:29:43
Q. And after he took the gun out of your mouth and you visited for a little bit, was anything put in your mouth?

0:29:49
A. Yeah. Eventually, a sock was put in my mouth.

0:29:52
Q. Do you remember what kind of sock?

0:29:54
A. I mean, it was just a rolled up pair of socks.

0:29:57
Q. You don't remember whether it was a black dress

sock or a white tennis sock?

A. It was a white -- white sock.

Q. And was your mouth then taped over the sock?

A. Yes, sir, it was.

Q. What kind of tape did they put over the sock which was in your mouth?

A. The second time it was always duct tape.

Q. Okay. And you mean the second time, the second kidnapping?

A. Yes, sir.

Q. Okay. Once the sock was stuffed in your mouth, and you were -- your mouth was duct taped, how did that affect your breathing?

A. It was not good.

Q. How were you able to breath?

A. Well, it was very hard. And, you know, I asked, you know, could you please take the sock out of my mouth?

Q. Okay. You were breathing through your nose, I take it?

A. Yes.

Q. How did you ask, or tell them, or give them any idea that this sock and duct tape were having problems?

A. Well, I mean, I'm sure you've never been in the situation, but you can actually -- I mean, you can -- you can communicate. And I will say of the two, that Josh was

the more compassionate one and pulled the sock out, and asked me what I wanted, and I told him I can't breath with this sock in my mouth, you know. And at that point, the sock was left out. Well, until Josh eventually -- you know, left me with Mike, and he put it back in -- in my mouth, but --

Q. So you were doing some grunting, or moaning, or gesturing, or something, and got their attention?

A. I think I was just talking, I mean, as well as I could with a sock in my mouth.

Q. Sure.

A. Like I said, you know, if you've never been in the situation, you can communicate.

Q. Okay.

A. You know, enough to get them to take the sock out of your mouth and so they can hear what you're saying.

Q. And so Stocker takes the sock out of your mouth, you tell them you're having problems breathing, and for a time period you're left without a sock in your mouth?

A. Right.

Q. And you said at some point the sock was put back in your mouth?

A. Yes.

Q. Speaking of Brook's apartment, did anybody ever come over?

0:32:18 A. Yes.
0:32:19 Q. Who came over?
0:32:20 A. Well, again, my eyes were taped.
0:32:23 Q. Sure. Who'd you believe came over?
0:32:27 A. Craig Kimberlin and -- you know, I just can't be positive who else, but I know the man that was -- you know, standing over my head, was asking why I had his phone number. And when I called that phone number and asked for Josh, and he told me that he wasn't there and wanted to know who I was, well, this was supposed to be my drug dealer's numbers. Who are you, you know? And at that point he said Craig.
0:32:54 Q. Okay.
0:32:55 A. And this same person is standing over me, occasionally kicking me in the side of the head, asking me how I got his number. And, you know, I just had a .9 mm put in my mouth, telling me if you tell this man that I gave you this number or that Mark Holland gave you this number, I'm going to kill you.
0:33:19 Q. While your arms and feet were taped up, and you were duct taped on the eyes, were you ever kicked or beaten?
0:33:25 A. Yes.
0:33:30 Q. Okay. With your eyes taped, can you say for certain that Brook Vandergriff was not at that apartment?

0:33:47 A. I mean, unless she showed up with Craig and them, she wasn't there. There was nobody in the apartment when we got there. There was no furniture. There was nothing.

0:33:57 Q. She may have shown up later, you -- you just don't know?

0:34:00 A. She could have. I mean, she was at her other apartment on Gregory where they took me after Craig and them left.

0:34:06 Q. Okay. So when Kimberlin was interrogating you about why you called him and who gave him -- who gave you his number, who did you tell him gave --

0:34:15 A. Rip.

0:34:15 Q. Okay. Ronny Enman Pope (phonetic)?

0:34:17 A. Yes, sir. I didn't think about it. That was actually Josh's suggestion.

0:34:25 Q. Okay. At any time were you ever put into a box during the second kidnapping?

0:34:32 A. Yes, sir.

0:34:33 Q. When was that?

0:34:34 A. That was at their new apartment at Gregory, at Brook's other apartment. Yeah, I actually sat there taped and bound. I had a pretty lengthy conversation with Brook. She just kept looking at me saying I'm sorry.

0:34:51 Q. Okay. So the empty -- from the empty apartment, did you go to another location?

A. Yes, sir.

Q. Okay. And who was at the other location?

A. Well, I've been told it was Bledsoe's detail shop or some kind of shop, but I grew up in Amarillo, and I knew where I was at, and it's off of Western.

Q. Okay. And so when you were put in the box, what type of box was it?

A. Well, I'm assuming it was a stove box. Some large appliance box.

Q. Okay.

A. Maybe a really large microwave box. I mean --

Q. Were you ever -- when you were in the box, were you ever transported using a dolly?

A. Yes.

Q. Okay. And now I guess if you're in the box and you're blindfolded and can't see, you're speculating as to what you were transported in, but you believe it was a dolly?

A. Right. I mean, I was rolled.

Q. Okay. And when you were transported in this dolly, where were you transported to?

A. To -- to my truck, I guess. Back to the truck.

Q. Did they ever accuse you of being a snitch or informant?

A. After we got to the -- to the little mobile

0:36:19 trailer, whatever -- whatever it was --
0:36:22 Q. Okay.
0:36:22 A. -- yeah, absolutely.
0:36:24 Q. And did they ever suggest that your father was in
0:36:26 law enforcement?
0:36:27 A. Yes.
0:36:27 Q. Okay. What did they accuse your father of being?
0:36:31 A. Well, a United State's Marshal. And Lynn Ward's
0:36:38 name was involved several times.
0:36:40 Q. And at the time -- and at the time, what was the
0:36:44 occupation of your father?
0:36:48 A. He's the weapons training manager at Pantex.
0:36:53 Q. Okay. Now, you said that you were taken to this
0:36:58 little camper. Who took you to this camper?
0:37:05 A. Mike.
0:37:06 Q. And about approximately how long were you there?
0:37:09 A. How long was I at the camper?
0:37:11 Q. Yes.
0:37:13 A. Well, I mean a day and a half, something like
0:37:15 that.
0:37:16 Q. And there was an individual that you know by the
0:37:20 name of Crazy Eyes --
0:37:22 A. Yeah.
0:37:22 Q. -- who was -- you were in his charge?
0:37:24 A. Yes, sir.

0:37:24 Q. Okay. And you were still restrained. Is that right?

0:37:30 A. Uh-huh.

0:37:30 Q. And Crazy Eyes had guns?

0:37:32 A. Well, yeah. They all had guns.

0:37:35 Q. And Crazy Eyes was a member of the Banditos?

0:37:39 A. That's what I was told.

0:37:41 Q. And at some point, you and Crazy Eyes had a conversation, he made some phone calls, and you were eventually released?

0:37:49 A. Yes.

0:37:52 Q. Approximately, how long did this -- from start to finish, did the second kidnapping last?

0:37:59 A. Well, I mean, I guesstimated about 36 hours. Between 30 and 36 hours.

0:38:08 Q. So --

0:38:09 A. A day and a half.

0:38:10 Q. A day and a half. And during this time you were beaten. Is that right?

0:38:19 A. I've done a lot of time in prison, and it was the absolute worse beating I've ever received in my entire life. I was beaten by four men, including Joshua Stocker, while I was taped, bound, gagged. And uh -- yeah. Yeah, I received a beating.

0:38:44 Q. And Tommy Tucker was involved in this as well?

A. Yes, sir.

Q. What types of injuries did you have as a result of this 36-hour kidnapping?

A. Oh, my nose was broke. Tommy dislocated my shoulder several times. I mean -- you know, I mean my -- I looked like I run into a Mac truck. You know. My best friend, who is a pediatric intensiveness (sic) nurse saw me and immediately burst into tears, and tried to take me to the hospital. And guess what? I couldn't go to the hospital, because before I was, you know, let go I was told, you know, if anybody found out about this, if I talked to anybody about this, that, you know, I would be killed. And the --

Q. When Josh Stocker entered a room would the presence of the room or -- would that ever change when he would come into a room?

A. Absolutely.

Q. How would it change or how would -- did you notice something?

A. When Joshua was in a room --

Q. Well --

A. -- it just -- I felt evil. You know. I just -- I don't know. It's kind of like when I walked in that door back there, you know.

Q. And for the record, Ms. McElroy, the lady here,

and Mr. Watkins, the gentleman here, have visited with you before at your mother's house?

A. No. I actually visited with them at their office.

Q. At their office? Okay.

A. Their investigator is actually related to my family, and came to my mother's house to pick me up and -- and take me down there.

Q. So they were able to ask you questions about this. Is that right?

A. Uh-huh.

Q. Okay.

MR. FOWLER: I pass the witness, Your Honor.

MR. WATKINS: A couple of quick questions, Your Honor.

THE COURT: All right.

CROSS EXAMINATION

BY MR. WATKINS:

Q. How are you doing, Jeremy?

A. I'm a lot better.

Q. Okay. I want to talk a little bit about the second incident that you've been describing. Okay?

Uh -- you said that you were boxed -- or put in a box. Okay. Were you taped up at that point?

A. Yes. That is actually -- right before I was put

in the box, right before Mike put me in the box, like I said, of the two, Josh was a little more compassionate. He took the sock out of my mouth. Mike put the sock back in my mouth, purposely, right before --

Q. Where was Josh while you were being put in the box?

A. I have no idea. He left twice during -- during this entire thing. He left twice. And I know that one -- you know, the second time he left uh -- he actually went to my house where my infant son was sleeping to -- you know, to do whatever Josh did.

Q. Okay. Do you remember in your statement saying that he was asleep and no one could wake him up?

A. Yeah. Towards the end of it uh -- yeah, he had fallen asleep and nobody could wake him up. I think, eventually, that's -- inevitably, that's why it took so long before they let me go. We were waiting on Josh. When Josh showed back up -- I mean, it wasn't ten minutes --

Q. Okay. But it was Mike --

A. -- I was released.

Q. -- who put the tape back on you and put the sock back in your mouth. Who put you in the box?

A. Okay. Let there be no misunderstanding that I was taped the entire time from River Falls until -- well,

until I got to the -- to the trailer.

Q. Okay.

A. I was taped the entire time. Now, Mike put the tape back over my eyes, and put the sock back in my mouth, and put me in the box, and I guess used a dolly to load me in the truck. He did it by himself.

Q. Okay. You -- you don't know if there was a dolly or not?

A. I was rolling close to the ground. No. I was taped with a towel around my eyes, and a sock in my mouth, and stuffed in a box. I can't say for sure it was a dolly, but I was rolling.

Q. Okay. Let's talk about this box. You said it might have been a stove box or a refrigerator box?

A. I'm six foot three, and it had to be a pretty good size box for me to fit in.

Q. Okay. Were you able to stretch out in the box?

A. No. Not -- no. Huh-uh.

Q. Okay. Was there a lot of room beside you?

A. I mean, there was a little room. I really didn't have, you know -- I mean, there was a little room, you know. No, I couldn't stretch out, but -- I mean, I wasn't cramped into a fetal position, you know.

Q. Okay. So you weren't in a fetal position?

A. No, I was sitting on my butt with my feet on the

bottom of the box, and my hands were bound behind me. And loaded me in the truck, I'm assuming by himself. I don't know if Brook helped him or not, but. . .

Q. Okay. Now, did you learn that Mike is known as Michael Marquez (phonetic)?

A. Yes, that's what I've been told.

Q. Okay.

A. I believe I heard Josh, even after that, say his last name, but I couldn't -- I mean, I can't be positive of that.

Q. Okay. Now, did you keep using and selling dope after this incident?

A. Well, I mean, I used until I went back to jail, you know. I mean, yeah, I'm an addict.

Q. Were you selling it, too?

A. Not after -- not after that, no.

Q. Not after that?

A. No. Not for -- you know --

Q. Not for anyone?

A. Yeah.

MR. WATKINS: Pass the witness.

MR. FOWLER: No further questions, Judge.

THE COURT: Okay. You can step down. Let's take about a ten-minute break. Right at 11:00, let's be back in here by that clock.

0:__:37 (Recess.)

(Both sides, the Defendant present, in open court:

1:06:44 THE COURT: Thank y'all for coming late back in. Y'all be seated. Call -- call your next witness.

1:06:51 MR. FARREN: Brook Vandergriff, Your Honor.

1:06:57 THE COURT: Brook Vandergriff. Ms. Vandergriff, would you raise your right hand.

1:07:10 (Witness sworn.)

1:07:12 THE COURT: Thank you, ma'am. Sit right there. Go ahead.

1:07:23 MR. FARREN: Thank you, Your Honor.

BROOK VANDERGRIFF,

having been first duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. FARREN:

1:07:25 Q. Would you state your name for the record, please.

1:07:27 A. Brook Vandergriff.

1:07:30 Q. All right. Ms. Vandergriff, do you know a man named Josh Stocker?

1:07:37 A. Yes, sir.

1:07:37 Q. And you and Mr. Stocker were in a romantic relationship for a long period of time. Is that correct?

1:07:42 A. Yes.

1:__:_3 Q. And so this is very emotional for you to talk

1[illegible]6 about. Is that correct?
1:07:49 A. Yes.
1:07:52 Q. And I understand that. And if you -- if you'll
1:07:56 let me know if I need to pause from time to time for you
1:07:59 to compose yourself, we will do that. All right?
1:08:00 A. (Witness nods head up and down.)
1:08:01 Q. We understand you're under subpoena, and you
1:08:04 would like to be anywhere in the world but here.
1:08:09 A. Can we take a year break?
1:08:12 THE COURT: What did you say?
1:08:13 MR. FARREN: Can we take a break?
1:08:13 Q. (BY MR. FARREN) That's going to be up to the
1[illegible]7 Judge, ma'am. And we'll try to -- we'll try to move along
1:08:19 as quickly as we can. Okay?
1:08:21 All right. How long did you know Josh
1:08:24 Stocker?
1:08:25 A. We were common law married.
1:08:28 Q. Okay. How long were you together?
1:08:30 A. All together, almost five years, I guess.
1:08:33 Q. Okay. I'm not going to get into a lot of detail
1:08:38 about these events, I'm going to try to cover them in a
1:08:42 summary fashion. Do you understand that you're likely to
1:08:44 testify again later in the trial?
1:08:46 A. Yes.
1[illegible]6 Q. And that we will probably talk in more detail

then. Do you understand that?

A. Yes.

Q. Do you know a man name Jeremy Roy?

A. Yes.

Q. Was Jeremy Roy ever kidnapped and brought into your presence?

A. Yes.

Q. Once or more than once?

A. More than once.

Q. Twice. Is that correct?

A. Yes.

Q. The first time Mr. Roy was kidnapped and brought into your presence was he with Mr. Stocker?

A. Yes.

Q. And was he forced to apologize to you about some threats he'd made to you or about you?

A. Yes.

Q. The second time Mr. Roy was kidnapped and brought into your presence, did you see him in a box?

A. Yes.

Q. Was he duct taped?

A. Yes.

Q. The event in which he was in the box and duct taped, was that the second kidnapping or the first kidnapping?

A. The second.

Q. Do you remember about when the first one occurred?

A. October.

Q. All right. So you think around -- of 2002?

A. Yes.

Q. Okay. And you think the second kidnapping then occurred sometime after that first one?

A. Yes.

Q. When you -- when you saw Mr. Roy the second time, what -- what was his physical appearance? Let me ask you this: How did you respond seeing him taped up in a box at your apartment?

A. Not well.

Q. Did you get upset?

A. Yes.

Q. Did you talk to Mr. Stocker about it?

A. I woke him up, yeah.

Q. You woke him up. Was he hard to wake up?

A. Yes.

Q. Was that because he had been using a -- narcotics and was coming down, or do you know?

A. Yes.

Q. Okay. Did Mr. Roy -- what was his physical appearance at that time? Did it look like he had been

beaten or not?

A. No.

Q. When you talked to Mr. Stocker about this, what did you say to him?

A. Uh -- I wanted him to get Mike and Jeremy out of there.

Q. So a man named Mike was there with Josh Stocker?

A. Mike is the one that taped him up and put him in the box. Josh was asleep.

Q. Okay. So Mike was there, Josh Stocker was there, and it is your belief that Michael taped him up and put him in the box?

A. Yes.

Q. Okay. And did you tell Mr. Stocker you wanted everybody out of that apartment?

A. Yes.

Q. Which apartment was this? Where was it?

A. It was the one on Gregory Street.

Q. Have you ever heard of a man named Dustin Pool?

A. Yes, sir.

Q. Have you ever heard of a man named Ray Placensio?

A. Yes.

Q. Do you know if there was -- do you know if Mr. Pool was involved in the business of distributing or selling methamphetamine?

A. Yes

Q. And he had other people who worked for him?

A. Yes.

Q. Do you know a man named Craig Kimberlin?

A. Yes.

Q. And were you and Josh Stocker involved or at least Josh with Mr. Kimberlin?

A. Yes.

Q. Were -- were Josh and Mr. Kimberlin and others involved in the distribution and sale of methamphetamine?

A. Yes.

Q. Do you know if there were any conflicts or tension between Mr. Pool and his group of methamphetamine dealers, and Mr. Kimberlin and Mr. Stocker and that group of methamphetamine dealers?

A. Yes.

THE COURT: Hold up. Does Ms. Vandergriff have a lawyer?

MR. FARREN: She has Gregg Phifer as a lawyer, Your Honor. We have visited with Mr. Phifer and her in their presence. I was there when he advised her of her rights, and she will be glad to elaborate on that, Your Honor.

THE COURT: Yeah. Ms. Vandergriff, you know you have the right to remain silent. Did you know that?

THE WITNESS: Yes.

THE COURT: Okay. This is a Fifth Amendment right under the U.S. Constitution, and you have the right not to say anything in the proceeding if it might intend to incriminate you. That's a right that you always have and it never leaves you. If you say something in here that incriminates yourself, it could possibly be used against you. Are you aware of that?

THE WITNESS: Yes.

THE COURT: Okay. You also have the right to have your lawyer present, if you want to, before you testify, or you can stop the testimony at any time. Are you aware of those rights?

THE WITNESS: Yes.

THE COURT: Do you wish to give them up?

THE WITNESS: Uh -- yes, I guess.

THE COURT: All right. Thank you.

Q. (BY MR. FARREN) Ms. Vandergriff, we were talking about the tension between Dustin Pool and his group of methamphetamine dealers, and Craig Kimberlin and his group of methamphetamine dealers. Do you know if there were threats being made back and forth?

A. Yes.

Q. Most of the threats were coming from Mr. Pool, weren't they?

A. Yes.

Q. And were you ever at a meeting or just a get together at Craig Kimberlin's house, where there was discussion about Mr. Pool being a snitch and needed to be gutted like a fish?

A. Yes.

Q. Okay. Was Mr. Stocker present at that meeting?

A. Yes.

Q. Do you remember in a statement that you mentioned that this happened sometime early in 2003, when Mr. Kimberlin made that comment? Do you remember that?

A. I don't remember when it was.

Q. Okay. But if you included that in your statement, you wouldn't dispute that. You believe it was accurate when you gave the statement?

A. Yes.

Q. I want to talk to you real briefly about the kidnapping that occurred of Mr. Ray Placensio. Was Mr. Placensio connected to Mr. Pool?

A. Yes, sir.

Q. How was he connected to Mr. Pool?

A. He worked for him, I guess. They were friends.

Q. Okay. And were you at a meeting with Guinn Garcia, you, Josh Stocker, Destry Keeling and Chris Eaton that occurred at Chad Spanel's house?

1:15:38 A. Yes.

1:15:39 Q. Do you know if this was sometime in January or February of 2003?

1:15:42 A. I think so.

1:15:44 Q. At this meeting, was there a discussion about kidnapping Ray Placensio?

1:15:49 A. Yes.

1:15:49 Q. Why -- what was the purpose of kidnapping Mr. Placensio?

1:15:55 A. To get them to back off.

1:15:57 Q. To get Mr. Pool's group to back off?

1:16:01 A. Yes.

1:16:01 Q. Okay. And this kidnapping, it actually did occur, didn't it?

1:16:07 A. Yes.

1:16:08 Q. Where -- where did the actual kidnapping take place?

1:16:14 A. Out at Wal-Mart.

1:16:15 Q. Okay. Ms. Garcia agreed to -- to set her common law husband up, didn't she?

1:16:20 A. Yes.

1:16:20 Q. And so she led him into the Wal-Mart, and you folks were going to hide in the van, which she left unlocked, or some of your group?

1:16:31 A. Yes.

Q. Now, when -- when everyone was in place at the Wal-Mart, did something happen that sort of messed the plan up?

A. Yes.

Q. What -- was it Mr. Eason? Something happened to him?

A. Uh-huh.

Q. What happened to Mr. Eason?

A. Destry shot him in the foot.

Q. Okay. This was accidental, I assume?

A. Yes.

Q. What did you do in response to Mr. Eason being wounded in the foot?

A. I picked him up and took him to the hospital.

Q. Okay. You and Josh took him to the hospital, didn't you?

A. Yes.

Q. Destry Keeling remained behind, and he actually completed the kidnapping, didn't he?

A. Yes.

Q. And then once -- once he had Mr. Placensio in hand or in custody, you and Mr. Stocker received a call. Is that correct? If you know.

A. I don't know.

Q. At some point, did you -- at some point, did Mr.

Stocker return and join Mr. -- Mr. Destry Keeling in the kidnapping?

A. I don't know if he actually joined in the kidnapping. I know that he went to the garage.

Q. To Josh Bledsoe's shop?

A. Yeah.

Q. And that's where they held Mr. Placensio, didn't they?

A. Yes.

Q. Is that the shop over on Western Street, or did you know where it was?

A. It's by Wilbur Street, I know that.

Q. By Wilbur Street? Do you know if Mr. Placensio was beaten during the time he was held at the shop?

A. I was told he was.

Q. You were told by whom?

A. Josh.

Q. By Mr. Stocker? Okay. And do you know how long Mr. Placensio was held there? Did Mr. Stocker talk to you about that?

A. Three days. I'm not sure.

Q. Okay. Now, did you know about a meeting that took place at Stumpy's Lounge sometime around the end of January, early February?

A. They met there once, yeah.

[illegible] Q. "They" being who?

1:18:51 A. I'm not sure who all was there. I know Craig
1:18:52 was. I think Frank Chacon was there.

1:18:55 Q. Was Josh there?

1:18:56 A. We went there, yeah.

1:18:57 Q. You and Josh Stocker went there? Did you -- were
1:19:00 you inside in the meeting, or just -- just Josh go into
1:19:03 the meeting?

1:19:04 A. Just Josh went inside.

1:19:06 Q. Okay. So you don't know what was actually said
1:19:08 or happened at that meeting?

1:19:09 A. No.

[illegible] Q. The kidnapping of Mr. Placensio, did that take
1:19:16 place a few days after the Stumpy meeting or some time
1:19:20 after the Stumpy meeting?

1:19:21 A. I'm not sure if it was before or after.

1:19:23 Q. Okay. Do you know if, eventually, Dustin Pool
1:19:26 was kidnapped?

1:19:26 A. Yes.

1:19:27 Q. And did that take place after the Stumpy's
1:19:30 meeting?

1:19:32 A. I'm pretty sure it did.

1:19:34 Q. The kidnapping of Mr. Pool took place after the
1:19:39 kidnapping of Mr. Placensio, didn't it?

[illegible] A. Yes.

MR. FARREN: Pass the witness.

CROSS EXAMINATION

BY MS. McELROY:

Q. Ms. Vandergriff, if you know at the Stumpy's meeting, was Jessica Kimberlin present there?

A. I'm not sure.

Q. Was she present at most of the meetings?

A. Yes.

Q. Uh -- you say that there was discussion about this kidnapping. Right?

A. Yes.

Q. And y'all were included in -- in that discussion?

A. For Ray?

Q. Yes, for Ray.

A. I'm not understanding. I'm sorry.

Q. I mean, you all were -- you were sitting there. You were hearing it. You were a part of it?

A. Yes.

Q. Uh -- when Mr. Roy was brought to your home, now who was the one responsible for duct taping him and putting him in the box?

A. Mike Marquez.

Q. Did you and Mr. Marquez have a disagreement with one another?

A. Yes.

Q. What was that about?

A. He kidnapped somebody, and taped him up, and put him in a box in my house, and I highly disagreed with that.

Q. You asked him to leave?

A. Yes.

Q. Was he going through things in your room?

A. Yes.

Q. What was that about?

A. I have no idea. I walked into the room and he had guns on the bed and cleaning stuff to clean the gun with. And he had one of my knives -- one of my knives. He had a knife that I keep under the bed, under the mattress. And he said that that was his, that I keep under my mattress, and that was mine. And he was just acting weird.

Q. Now, did he bring these guns into your home?

A. Yes

Q. And he's cleaning them in your bedroom?

A. He's cleaning them in my bedroom, yes.

Q. Would it be -- I mean, was Mr. Marquez really high?

A. He usually was.

Q. Now, did you -- did you ask him to untape Jeremy?

A. Yes.

1:22:27 Q. Did he do that?
1:22:29 A. No.
1:22:32 Q. What did you have to do in order to get him untaped?
1:22:35 A. Wake Josh up.
1:22:37 Q. And then Josh untaped his mouth. Is that right?
1:22:45 A. I'm not sure who untaped his mouth. It may have been, I'm not sure.
1:22:50 Q. At some point in time, they left?
1:22:54 A. Mike Marquez and Jeremy did, yes.
1:22:58 Q. Did Josh stay there at the apartment?
1:23:00 A. Yes.
1:23:01 Q. Did he go back to sleep?
1:23:03 A. Yes.
1:23:03 Q. And you went back to sleep?
1:23:06 A. Probably.
1:23:08 Q. Okay. All right.
1:23:09 MS. McELROY: Pass the witness.
1:23:11 MR. FARREN: I have no other questions at this time, Your Honor. She will be called later in the trial.
1:23:16 THE COURT: Ms. Vandergriff, you may step down.
1:23:18 MR. FARREN: State calls -- I'm sorry.
THE COURT: That's okay. Go ahead.

MR. FARREN: The State calls Destry Keeling.

THE COURT: Destry Keeling. Is he --

MR. FARREN: He's downstairs in custody. It will take just a moment.

THE COURT: All right. Mr. Parker, I want you to take Mr. Stocker into custody, and I need to see the lawyers in my chambers for a minute. And then we'll -- it won't take but a second, and then we'll have you get him back, and --

MR. FARREN: And we believe this will be the last witness --

THE COURT: Okay. I'm going to do this now --

THE BAILIFF: Do you want me to bring him to the chambers?

THE COURT: No, I don't. I want you to just but him wherever you put him or leave him right there.

THE BAILIFF: Okay.

THE COURT: Chambers.

(Recess.)

(Both sides, the Defendant present, in open (court:

THE COURT: Thank y'all. Everyone be seated. Anyone got the Court's stapler?

MR. WATKINS: That would be the State

stealing the Court's stapler.

1:32:33 (Off-the-record discussion.)

1:32:38 THE COURT: Do you have another witness?

1:32:39 MR. FARREN: Your Honor, we had initially
1:32:41 planned to call Destry Keeling and Guinn Garcia, but at
1:32:45 this point, we don't think that will be necessary.

THE COURT: Okay.

1:32:47 MR. FARREN: This is all of the testimony
1:32:48 that we're going to present for the pretrial hearing --

THE COURT: All right.

MR. FARREN: -- on the issues --

1:32:50 THE COURT: All right. I'm going to
1 1 announce that this is very helpful. It will save an
1:32:55 enormous amount of time when we have to excuse the jury
1:32:59 during the so-called balancing test.

1:33:02 Is there anything else you want to present
1:33:05 in pretrial hearing, Ms. McElroy?

1:33:07 MS. McELROY: No, Your Honor.

1:33:07 THE COURT: Okay. We will be in recess
1:33:10 until at 1:00 when the jury comes back in.

1:33:13 (Lunch recess.)

THE STATE OF TEXAS )
COUNTY OF RANDALL )

I, Karen Morris, Deputy Official Court Reporter in and for the 47th District Court of Randall County, State of Texas, do hereby certify that the above and foregoing contains a true and correct transcription of all portions of evidence and other proceedings requested in writing by counsel for the parties to be included in this volume of the Reporter's Record, in the above-styled and numbered cause, all of which occurred in open court or in chambers and were reported by me.

I further certify that this Reporter's Record of the proceedings truly and correctly reflects the exhibits, if any, admitted by the respective parties.

WITNESS MY OFFICIAL HAND this the 18th day of October, 2005.

KAREN MORRIS, CSR 334
Expires: 12/31/2004
Official Court Reporter
108th District Court
Potter County, Texas
Potter County Courts Bldg.
Amarillo, Texas 79101
(806) 379-2357