03-05-00584-CR

FILED
OCT 18 2005
SEVENTH COURT OF APPEALS
PEGGY CULP, CLERK

# R E P O R T E R ' S R E C O R D

VOLUME 8 OF 22 VOLUMES

TRIAL COURT CAUSE NO. 15,307-A

| | | |
|---|---|---|
| THE STATE OF TEXAS | ) | IN THE DISTRICT COURT |
| | ) | |
| | ) | |
| VS. | ) | RANDALL COUNTY, TEXAS |
| | ) | |
| | ) | |
| JOSHUA DAVID STOCKER | ) | 47TH JUDICIAL DISTRICT |

*********************

STATEMENT OF FACTS

*********************

ORIGINAL

On the 12th day of July, 2005, the following proceedings came on to be heard in the above-entitled and numbered cause before the Honorable Hal Miner, presiding, held in Randall County, Texas:

Proceedings reported by Stenographic Method.

A P P E A R A N C E S

NAME: Mr. James Farren &
Mr. Jeramy Fowler
Randall County District Attorney's Office
SBOT NO: Unknown
ADDRESS: 501 16th Street
Canyon, Texas 79015
PHONE: (806) 468-5570
ATTORNEY FOR THE STATE.

NAME: Ms. C.J. McElroy &
Mr. Mike Watkins
Attorneys at Law
SBOT NO: Unknown
ADDRESS: 801 S. Fillmore/500 S. Taylor
Amarillo, Texas 79101
PHONE: (806) 371-0555/374-9584
ATTORNEY FOR THE DEFENSE.

## CHRONOLOGICAL INDEX

CAPTION . . . . . . . . . . . . . . . . . . . . . . . . 1
APPEARANCES . . . . . . . . . . . . . . . . . . . . . . 2
CASE CALLED . . . . . . . . . . . . . . . . . . . . . . 7
PRETRIALS HEARD . . . . . . . . . . . . . . . . . . . . 7
JURY SEATED . . . . . . . . . . . . . . . . . . . . . . 7
JURY INSTRUCTED BY COURT. . . . . . . . . . . . . . . . 7
STATE'S OPENING STATEMENT BY MR. FARREN . . . . . . . . 9
DEFENDANT'S OPENING STATEMENT BY MR. WATKINS. . . . . . .51

STATE'S ORAL EVIDENCE:

SRIPHAR NATARAJAN, M.D.
DIRECT EXAMINATION BY MR. FARREN. . . . . . . . . . . . 58
CROSS EXAMINATION BY MR. WATKINS. . . . . . . . . . . . 128
REDIRECT EXAMINATION BY MR. FARREN. . . . . . . . . . . 149
RECROSS EXAMINATION BY MR. WATKINS. . . . . . . . . . . 157
FURTHER REDIRECT EXAMINATION BY MR. FARREN. . . . . . . 160
FURTHER RECROSS EXAMINATION BY MR. WATKINS. . . . . . . 161

REPORTER'S CERTIFICATE. . . . . . . . . . . . . . . . . 170

ALPHABETICAL INDEX


| WITNESS | DX | CX | VDX | RDX | RCX |
|---|---|---|---|---|---|
| NATARAJAN, SRIPHAR | 58 | 128 | | 149 | 157 |
| | | | | 160 | 161 |

EXHIBIT INDEX

| STATE'S EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| SX-1 | AUTOPSY REPORT | 67 | 68 |
| SX-5 | BUSINESS RECORDS | 163 | 163 |
| SX-6 | BUSINESS RECORDS | 163 | 163 |
| SX-7 | BUSINESS RECORDS | 163 | 164 |
| SX-8 | BUSINESS RECORDS | 163 | 164 |
| SX-9 | BUSINESS RECORDS | 163 | 164 |
| SX-10 | PHONE RECORDS | 169 | 169 |
| SX-11 | PHONE RECORDS | 169 | 169 |
| SX-12 | PHONE RECORDS | 169 | 169 |
| SX-13 | PHONE RECORDS | 169 | 169 |
| SX-14 | PHONE RECORDS | 169 | 169 |
| SX-70 THROUGH | | | |
| SX- 147 | PHOTOS | 79 | 79 |
| SX-252 | AUTOPSY RECORDS | 127 | 127 |

EXHIBIT INDEX (CONTINUED)

| DEFENDANT'S EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|

| COURT'S EXHIBIT NO. | DESCRIPTION | FOR COURT ONLY |
|---|---|---|
| CX- 2 | DOCTOR'S LETTER | 7 |

PROCEEDINGS:

July 12, 2005

(Both sides present, in open court:)

THE COURT: You may be seated. Uh -- Parker, do you want to bring the jury in?

THE BAILIFF: We don't have the Defendant yet.

THE COURT: Where is the Defendant?

MR. WATKINS: I'm not in control of him.

THE COURT: I'm not either.

(Defendant present.)

THE COURT: Now, are we ready? Ms. McElroy, are you ready?

MS. McELROY: Yes, sir.

THE COURT: All right. Bring the jury in.

(Jury seated.)

THE COURT: Y'all go ahead and have a seat. Thank you, ladies and gentlemen. Everyone be seated.

Well, I want to thank y'all -- all 12 of you for coming back. No one can blame you if you took off.

Y'all are now the official jury and Mrs. Pflug (phonetic), you are a juror. Mr. Hill has turned up sick, and I have a letter from a doctor, which I have marked as Court's Exhibit No. 2, for the attorneys' information, and I'm going to give to my court reporter to

put in the record. But he's been excused, and so we had to use you before we thought we would. So you're here with us, and the rest of them will welcome you, I'm sure.

Let me tell y'all something at the outset that I forget to tell you yesterday. I view this process like this. Y'all are my partners. We are equal partners in this. I do control this courtroom and the process of this trial, but as you have been told, you are the judge of the facts. So you are the judges of the facts, and I'm the judge of the law, and as such, we are equal partners. And, again, in that vein, if you need something, you let me know. Don't be hesitant. Let me know if the water's too hot, or whatever. If you want it in the icebox or whatever, just let me know.

So with that, we -- the way this -- what we're going to do today is both sides -- are you going to make an opening statement after the Prosecution, Ms. McElroy, or are you going to reserve.

MS. McELROY: Yes, Your Honor. I believe Mr. Watkins will be doing our opening statement.

THE COURT: Today?

MS. McELROY: Yes, sir.

THE COURT: Okay. Both sides are going to be making an opening statement. They're going to tell you what they think the evidence is going to show. Listen

3:01:23 carefully, and hold them to it.
3:01:25 Mr. Farren, are you ready?
3:01:27 MR. FARREN: I am, Your Honor.
THE COURT: All right. Go ahead.
3:01:28 MR. FARREN: Thank you. Counsel.
3:01:29 MR. WATKINS: Mr. Farren.
3:01:31 STATE'S OPENING STATEMENT
3:01:31 MR. FARREN: Ladies and gentlemen of the
3:01:32 jury. As the Judge has just indicated to you, this is our
3:01:35 opportunity to share with you a summary of the evidence we
3:01:38 believe you will hear in this case. I want to talk to
3:01:40 you, first of all, about a lot of names you're going to
3:01:45 hear, because in this particular case there are so many
3:01:48 names, so many different characters that it -- it will be
3:01:52 difficult to keep up with all of the different players,
3:01:55 all of the different folks. And so I want to mention the
3:01:57 names now and have you -- give you something, at least,
3:01:59 that you can identify with as we go through this trial.
3:02:03 We anticipate that you're going to hear
3:02:08 from --
3:02:08 MR. WATKINS: Your Honor, may we approach?
3:02:10 We have an objection.
3:02:12 THE COURT: Sure. Come up.
3:02:13 MR. WATKINS: About as far as I can go, Your
Honor.

3:02:52
3:02:53
3:02:58
3:03:03
3:03:05
3:03:06
3:03:16
3:03:18
3:03:20
3:03:21
3:03:24
3:03:29
3:03:48
3:03:50
3:03:53
3:03:57
3:04:00
3:04:02
3:04:06
3:04:09
3:04:13
3:04:17

(At the bench, before the Court only:)

MR. WATKINS: We had a Motion in Limine granted by you, keeping the State from referring to any of this cartel, referring to any of the players as henchmen, this characterization.

THE COURT: I haven't seen it. Turn it, turn it to me.

MR. WATKINS: Throughout the whole thing it has "cartel" written.

MR. FARREN: Your Honor, the purpose --

THE COURT: I don't think that's a word of such connotation as to be a problem. I'll overrule your objection.

Step back.

(In open court:)

MR. FARREN: We think you're going to hear from somewhere between 27 and maybe 40 witnesses, during this trial from the State.

Now, some of the folks that you will hear from won't be particularly hard to remember. Dr. Natarajan, the Lubbock medical examiner, is going to testify in just a little while. He's going to talk to you at length about the autopsy performed on the body of Dustin Pool. There will be a lot of photographs, a great deal of scientific testimony. It will not be pleasant.

The photographs will not be pleasant.

I think you will learn from Dr. Natarajan and other witnesses that Mr. Pool had been dead for about three months by the time his body was found. I think you will learn from Dr. Natarajan and other witnesses that he had been incased in concrete most of that time, and that had had an impact on the rate of decay and decomposition, and the condition of his body at the time of the autopsy.

Again, you'll see a lot of photographs that depict where his body was found. How it was incased in concrete. How it was slowly chiseled out of the concrete. You will see pictures both of the exhumation scene, at a grain silo near McCormick Road and the railroad tracks, and photographs and testimony about the autopsy and the condition of the body.

We believe Dr. Natarajan will testify, in addition to a lot of other information that will be relevant and helpful to you, that Dustin Pool suffered two types of injury, either of which could have led to his death, one of which absolutely would lead to his death. We believe that Dr. Natarajan will talk to you about a -- a beating that Dustin Pool experienced prior to his death. And he'll point out how and why he believes Dustin Pool suffered a severe beating, trauma, bruises, broken ribs, a skull fracture. A huge skull fracture. And I believe Dr.

Natarajan will tell you that that alone could have led to Dustin Pool's death.

In addition to that, Dr. Natarajan will testify that at the time of the autopsy, Dustin Pool's entire head was incased in duct tape like a cocoon, from here all the way around his head. And that stuffed into his mouth was a sock. A sock that was so deep in his throat that in conjunction with the duct tape, he would have smothered to death. He would have suffocated. He could not breath. And he died, because he didn't have oxygen.

And we believe that Dr. Natarajan will tell you that he couldn't have lived more than 20, 30 minutes, certainly not as much as an hour with that sock in his throat and his head incased in duct tape.

You will hear from Jill Paulson, the mother of the victim, and she will identify for you the victim as he was alive, so that we know that the person that we're talking about at the autopsy is the same person who was missing.

You'll hear from Jessica Kimberlin. Jessica Kimberlin, you will learn, is the wife of Stephen Craig Kimberlin. She was a member of a group of drug dealers, along with her husband. And she will provide you with background information about how this group worked, how

3:07:30 they associated with each other. She will tell you a lot
3:07:34 about the various members of the group of these drug
3:07:39 dealers, and it will include Joshua Stocker, as one of the
3:07:43 folks associated with this group.

3:07:46 You'll hear from Jason Hickson, another
3:07:49 member of Stephen Craig Kimberlin's drug cartel.
3:07:56 Mr. Hickson will talk to you about various members of the
3:08:00 group. And he will talk to you about a meeting that took
3:08:03 place at Stumpy's Lounge in Amarillo. We'll talk more
3:08:06 about that in detail later. But you will learn from Mr.
3:08:07 Hickson and others that it was at this meeting at Stumpy's
3:08:13 Lounge, probably around February 6th of 2002, that the
3:08:16 fate of Dustin Pool was sealed. That the -- the agreement
3:08:19 was reached among the parties at that meeting about what
3:08:23 had to be done to finally solve the Dustin Pool problem.

3:08:29 You'll hear from Mark Brown. Mr. Brown is a
3:08:33 detective with the Amarillo Police Department. He was the
3:08:36 lead investigator in the homicide case. You'll learn that
3:08:40 Mr. Brown interviewed hundreds, hundreds of witnesses in
3:08:43 trying to figure out what happened to Dustin Pool. Where
3:08:47 he was, where his body was. You'll learn that Mr. Brown
3:08:53 uh -- almost olympian efforts to solve this case, and that
3:08:58 he finally did.

3:09:00 You'll will hear from Michael Elliston.
3:09:0? You'll learn that Michael Elliston is also -- or was also

a member of the drug group of Mr. Stephen Craig Kimberlin, and that it was at his farm near Panhandle, Texas where Dustin Pool experienced a beating that lasted probably ten to 15 hours, and, finally, his head was taped with duct tape, with a sock stuffed down his throat.

You will learn from David Chochet, a man who worked for Allen's Carpet Cleaning, here in at Amarillo, that he actually cleaned the carpet of the place were Dustin Pool was first apprehended, and that he saw the blood on the carpet and what appeared to be him to be blood on the carpet, and furniture, and other parts of this apartment. The apartment of the name of Tori Patrick, and you'll learn more about Ms. Patrick later.

You will hear from Guinn Garcia. Guinn Garcia you'll learn was the wife or at least the common law wife of a man named Ray Placensio. And that Ms. Garcia was associated with another drug group, another drug cartel. That drug cartel was run by Dustin Pool, and Ray Placensio was his main enforcer, his muscle, and Guinn Garcia was married to him. But at some point you will learn that Ms. Garcia crossed over to the other side and actually set up the kidnapping of her husband, Ray Placensio, who was the main enforcer for Mr. Pool. You will learn that this kidnapping occurred shortly prior to the kidnapping of Dustin Pool.

3:10:47 You'll hear from Efrain Ramos. He was a clerk at Best Buy (sic). Mr. Ramos will testify about a wallet that was discovered at Best Buy (sic). And we think there will be testimony that ties to Mr. Ramos's testimony that will tend to corroborate Guinn Garcia, Tori Patrick, and some other people who will tell you about what happened to Dustin Pool's wallet and how it ended up at Best Buy (sic).

You'll hear from Tori Patrick. Tori Patrick was the bait used to lure Dustin Pool to her apartment. You will learn they was encouraged in various ways to make some phone calls to Dustin Pool. Dustin Pool lived over in Randall County. But by these phone calls, they lured him over to her apartment, and that he was struck in the head by a fireplace poker at this apartment, and later moved to the farm where Mr. Elliston lived, where he ultimately suffered the injuries that caused his death.

You'll hear from Destry Keeling. Destry Keeling was also a member of the Kimberlin drug group. Mr. Keeling, you will learn, was not involved in the actual kidnapping of Dustin Pool. He was involved in the kidnapping of Ray Placensio, but not in the kidnapping of Dustin Pool. But Mr. -- Mr. Keeling, you will learn, after the kidnapping of Dustin Pool, after Mr. Pool was dead, he was contacted by Craig Kimberlin and by other

3:12:06 members of the drug group, and he was asked to come help
3:12:10 dispose of the body. And he helped put the body in the
3:12:15 grain silo, where it was incased in concrete, and
3:12:20 ultimately discovered three months later by Mark Brown and
3:12:23 other investigators.

3:12:25 You will hear from Josh Bledsoe. Josh
3:12:30 Bledsoe, you will learn, was a member of the Stephen
3:12:30 Kimberlin drug group. Mr. Bledsoe was the main supplier
3:12:35 of methamphetamine to Mr. Kimberlin, who had 25 to 30
3:12:38 people who worked for him distributing narcotics, selling
3:12:41 narcotics in your community, in your neighborhood. And
3:12:43 you will learn that Mr. Bledsoe had connections in Old
3:12:48 Mexico, and that these narcotics came from Old Mexico in
3:12:52 large quantities, pounds at a time. Thirty, 60 pounds a
3:12:58 month being delivered from Old Mexico to Mr. Bledsoe, who
3:13:01 would then deliver it to Mr. Kimberlin.

3:13:03 Mr. Kimberlin would then have his various
3:13:07 workers sell this product to members of our community, and
3:13:10 one of the folks who worked for Mr. Kimberlin y'all will
3:13:13 learn is Josh Stocker. And Mr. Bledsoe, you will learn,
3:13:17 was also present and participated in the murder of Dustin
3:13:21 Pool.

3:13:23 You will hear from Omar Mendosa. He was a
3:13:28 friend of Mr. Stocker. And we believe he will share with
3:13:32 you some things that Mr. Stocker told him after Dustin

Pool died.

We think you're going to hear from Brook Vandergriff. She was the girlfriend or common law wife of Joshua Stocker. And we believe you will hear from Ms. Brook Vandergriff that she was present when Mr. Stocker worked with Mr. Kimberlin, Mr. Bledsoe and other members of this drug group in distributing narcotics, and that she knows about some other events, some other kidnappings in which Josh Stocker played a role very similar to the kidnapping of Dustin Pool.

We think you'll hear from Bill Redden. Bill Redden was the lead investigator in a drug investigation that involved the DEA and local drug authorities. We think you'll learn during the trial that there were parallel investigations taking place. One investigation involving Mr. Redden was of the drug activities, not only of Craig Kimberlin, Josh Stocker and others, but Dustin Pool. And at the same time that that investigation is taking place, you will learn that Mark Brown was leading the investigation in the homicide. And that the two investigations dovetailed and came together, and were intertwined and interlocked.

You will hear from Jeff Rodden, Jim Burgess, Stan Rickwartz. These are all crime scene ID technicians who will share with you information about evidence that

3:( )7 was gathered at least three or four different scenes,
3:15:10 where evidence about the homicide could be found. Some of
3:15:14 the places, in summary, would be Tori Patrick's apartment,
3:15:18 where the initial assault and kidnapping took place. Out
3:15:22 at the farm near Panhandle, Texas, where additional
3:15:26 assaults and finally probably the death of Mr. Pool took
3:15:29 place, and evidence that was gathered at the grain silo,
3:15:33 where Mr. Pool finally ended up buried in concrete.
3:15:36 You will hear from Angela Rodriguez, Kathy
3:15:40 McCord and John Bundy. These people are lab technicians
3:15:43 at the Department of Public Safety. They will testify to
3:15:48 you about hair and fiber. Mr. Bundy, although there won't
3( )2 be much there, because with the passage of time, some
3:15:55 three months, the benefit of that kind of evidence had
3:15:58 become quite limited.
3:16:00 You will hear more from Ms. Rodriguez and
3:16:06 Ms. McCord, because their testimony will involve DNA. We
3:16:10 believe you'll hear testimony that will confirm that
3:16:15 Dustin Pool bled in the apartment of Tori Patrick. DNA
3:16:20 shows he was there and bled there. And that Dustin Pool
3:16:24 bled at the farm of Michael Elliston. Dustin Pool was
3:16:28 there and bled there, just like our witnesses will testify
3:16:32 that he was there.
3:16:32 We believe you will hear from Kelly
3( )5 Grayless. Kelly Grayless was the wife, common law wife of

3[illegible]9 Josh Bledsoe, the main supplier of narcotics to Craig
3:16:45 Kimberlin, Josh Stocker and other members of the group.
3:16:48 We believe you'll hear from Tyler Hale.
3:16:51 Tyler Hale was loosely associated with Mr. Kimberlin's
3:16:54 drug cartel. But what is important about Mr. Hale in this
3:16:57 trial is, you will learn from him that Josh Bledsoe's
3:17:03 Navigator, his vehicle, in which the body of Dustin Pool
3:17:05 was placed, was parked in his garage overnight while they
3:17:10 looked for a place to finally dump the body. And it
3:17:14 turned out to be the grain silo at McCormick and the
3:17:18 railroad tracks.
3:17:19 You'll hear from Chris Eason. Mr. Eason,
3[illegible]3 Brook Vandergriff, Guinn Garcia and others will tell you
3:17:27 that the kidnapping of Ray Placensio, which was shortly
3:17:30 before the kidnapping of Dustin Pool, served one primary
3:17:35 purpose. To send a message to Dustin Pool to back off.
3:17:40 To get out of their turf, to quit making threats.
3:17:44 You will learn in this trial that Dustin
3:17:47 Pool is not a nice person. That Dustin Pool was very much
3:17:51 like the people who killed him. In fact, Dustin Pool
3:17:55 would probably have done the same thing to him, if he had
3:17:58 gotten the upper hand.
3:18:00 You'll learn that Chris Eason participated
3:18:03 in the kidnapping of Ray Placensio with other people, to
3[illegible]6 send a message, to make a point. You better back off,

because you'll learn that Mr. Placensio suffered a beating much like the beating that Dustin Pool suffered. He just didn't have a sock stuffed down his throat and didn't die.

You'll hear from Denise or Glenda Keeling, the wife of Destry Keeling. You'll learn that Ms. Keeling was not involved in the kidnapping of Ray Placensio. She wasn't involved in the kidnapping of Dustin Pool. In fact, she wasn't involved in any of these events, she was simply a lady married to Destry Keeling. And she and Mr. Keeling both used drugs, and they obtained their drugs from Craig Kimberlin. But she and her family have what they call a lake house near Lake Meredith. And you will learn during the trial that Mr. Keeling, when he was contacted about where can we put the body, he -- he -- he came up with the idea of putting him in his wife's family's lake house at Lake Meredith, or at least that's where they were going to transport Mr. Pool.

Now, we think you'll learn that Mr. and Mrs. Keeling absolutely didn't realize that Mr. Pool was dead. That she thought these were people who had warrants out for their arrest, and they were looking for a place to hide. And when she found out they wanted to put a body of a dead man in this house, then she refused. And at that point, they had to come up with a plan "B", and that meant an overnight stay in Tyler Hale's garage, and finally a

3:19:46 final resting place at the grain silo.

3:19:49 We think you're going to hear from a number of other witnesses who -- you may hear from other witnesses who played somewhat of a supportive role in this story.

3:19:59 Now -- would you hand me the map, please.

3:20:03 Before we talk about the time line, that's the main thing I want to visit with you about, I want to talk with you for a few minutes about where these events occurred.

3:20:13 We believe you're going to hear testimony from many of the witnesses we've already talked about, that Dustin Pool lived in south Amarillo on Quiet Circle, in Randall County. That Tori Patrick lived at the River Falls Apartments along I-40, in Potter County. And that, eventually, she was convinced to participate in a scheme to call Dustin Pool and lure him to the apartment in Potter County, whereupon he was assaulted, bound, hauled in a box out to a farm near Panhandle, Texas, Mr. Elliston's place, where the assault continued for some ten to 15 hours, and he ultimately died. And that then the body was hauled up to Lake Meredith, Fritch, to the lake house, but when Ms. Keeling objected to the plan to putting a body there, that the body was then hauled back to Amarillo, placed in the garage of Tyler Hale, and

3:21:16 ultimately placed in the grain silo near the railroad
3:21:22 tracks and McCormick.

3:21:34 We believe the testimony in this trial will
3:21:37 demonstrate for you beyond any reasonable doubt that in
3:21:42 the summer of 2002, the fall of 2002, and leading into
3:21:49 2003, there was tension, building tension. Hostility
3:21:54 between two groups of people. Dustin Pool's drug cartel
3:22:00 and Stephen Craig Kimberlin's drug cartel. And that there
3:22:05 were threats. Threats of violence. Threats of shooting
3:22:09 up people's houses. Threats to kill people. Threats to
3:22:12 reach out and touch other people who were in prison.

3:22:15 And we think you'll learn that most of the
3:22:18 threats were coming from Dustin Pool. That Dustin Pool
3:22:21 was the primary problem. That Dustin Pool and his cartel
3:22:27 were not as big, and as powerful, and as profitable as
3:22:32 Stephen Craig Kimberlin's cartel, but he wanted to be as
3:22:36 big, and he wanted to be as powerful, and he wanted to be
3:22:40 in control, and he was making a lot of threats.

3:22:44 We think that you'll hear testimony that
3:22:46 during this time frame he hooked up with a man named Ray
3:22:52 Placensio. And the reason he hooked up with Ray Placensio
3:22:55 was that Ray Placensio was reputed to be a member of the
3:22:58 Texas Syndicate. A Hispanic Mafia group. Very powerful
3:23:04 in our prison system, but also with active members outside
3:23:08 of the prison system. And that Mr. Pool believed that Mr.

Placensio and the threats of the Texas Syndicate would give him the muscle, the power he needed to compete with Stephen Craig Kimberlin's drug group. And once he was connected with Mr. Placensio is when he really began to make a lot of threats, and talk about drive-by shootings, and talk about people getting hurt.

We think, specifically, that you'll hear about -- just three quick examples -- of people like Gregg Seago. Gregg Seago -- Mr. Bledsoe -- remember Mr. Bledsoe? He's the drug supplier to Mr. Kimberlin and to the drug cartel. But Mr. Bledsoe had a man who was very close to his family named Gregg Seago. In fact, he considered him his Godfather, not in a Mafia sense, but in a religious sense. And that Mr. Seago owed money to Mr. Pool for some drugs. And that Mr. Pool, because he wasn't being paid, was threatening Mr. Seago. He was going to do bad things to Mr. Seago. In fact, you'll learn that Mr. Seago's son was in prison, Cory Seago, and that there were even threats that Pool would have Placencio and the Texas Syndicate reach out and touch his son in prison, unless he came up with the money.

That Mr. Bledsoe was very upset about this, very unhappy, and he shared that unhappiness and his concern was Stephen Craig Kimberlin, and Josh Stocker, and other members of that cartel.

You will learn that Chad Spanel was a man that at one point obtained most of his narcotics from Josh Stocker, but that Pool was reaching out to trying to lure Spanel away from Stocker and make him his man, and have him deal with Pool. And that Mr. Stocker and others did not like this.

You'll learn that Mr. Pool had even talked about dressing up his group like the SWAT team, so that they'd look like police officers, and go over and raid Josh Bledsoe's house, and -- and obtain and steal a large quantity of this product, this methamphetamine, and make money.

Those are just some examples. There were lots of threats, and you'll hear about them. And there was lots of discussion and lots of talk about what are we going to do about Dustin Pool? And he's intruding into our turf. He's interfering with our business.

Now, on the other side of the coin, we think you'll hear testimony that Dustin Pool viewed these things in a different light. That Mr. Pool saw things this way. That he had these people that he had fronted drugs to. People like Miguel Gonzales, who was really a member of the Kimberlin cartel. People like Gregg Seago, who he had fronted drugs to, but who had not paid him. And every time he tried to collect there would be interference from

3:26:13
the Stephen Craig Kimberlin cartel, from Mr. Stocker and others, who were preventing him from collecting money for drugs that he had fronted to these people.

Now this conflict, this tension, this growing hostility between these two groups led to a -- conferences, meetings between representatives of the groups. Some of these meetings involved more than one member of the Stephen Craig Kimberlin drug cartel. Sometimes it would be Mr. Bledsoe, Mr. Stocker, Mr. Kimberlin, who would go to Mr. Pool's house and confront him. If you don't back off, bad things are going to happen. And Mr. Pool's response would be, why do you keep interfering with my efforts to collect the money that's owed to me for the drugs I've sold? Quit interfering in my business.

You'll learn there were more than one of these meetings. At his house, at a pool hall, in various situations. Sometimes more than one member of the Kimberlin group. Sometimes Mr. Stocker by himself would go and confront Mr. Pool. Sometimes they would have guns. Sometimes Mr. Pool would have guns. Sometimes they'd think they had the conflict resolved, but, ultimately, they did not. Ultimately, Kimberlin's group still saw Pool as a wanna be, who was making lots of threats and interfering with their people. And Pool saw Kimberlin's

group as the power in place that was preventing him from conducting business.

And finally -- finally and probably about February 6th of 2002, the Kimberlin group decided they would have one last meeting with Mr. Pool, at Stumpy's Lounge in Amarillo. Josh Bledsoe was there. Josh Stocker was there. Craig Kimberlin was there. Probably Tommy Tucker. A man named Jason Hickson. Lots of folks. Fifteen, 20 members of this drug group were at Stumpy's, and they were trying to invite Mr. Pool over for one last meeting.

Now, you can imagine Mr. Pool was less than enthusiastic about coming over and meeting 15 or 20 people in the Stephen Craig Kimberlin cartel on their turf. In fact, we think you'll hear testimony that Mr. Pool's response was to begin to gather members of his group over at Jaguar's Lounge in Amarillo. And when he had enough people together, he would go over and sort of ambush Kimberlin's group over at Stumpy's. Ultimately, Mr. Pool never showed up at all, and there was no meeting with Mr. Pool. The meetings were over.

And so a different kind of meeting took place at Stumpy's. At Stumpy's Lounge we believe that this evidence will demonstrate that the final discussion, the ultimate solution to the problem of Dustin Pool was

hatched. Josh Bledsoe, we believe, will testify that he talked about the fact that his connections in Old Mexico were concerned that Mr. Pool's interference was affecting Bledsoe's ability to move large quantities of narcotics, and they had volunteered to take care of the problem for him, and would do it for $10,000.00.

When Mr. Stocker talked about this $10,000.00 figure, in reference to the people that would kill Mr. Pool, Craig Kimberlin, Josh Stocker and others either misunderstood, or spun this, or maybe they had the right interpretation, but at any rate, they took this to be a $10,000.00 contract on the head of Dustin Pool.

Now, we think that you'll learn that in addition to all of these factors, Mr. Stocker had an additional problem. That he had somehow lost a quantity of narcotics for which he owed Mr. Kimberlin. Now, I don't know what happened to the narcotics. I don't know whether law enforcement authorities seized the narcotics, or he lost it, or used it up, or what, but Mr. Kimberlin believed Mr. Stocker owed him for some narcotics for which he hadn't been paid. And so either at this meeting at Stumpy's, or sometime thereafter, Mr. Kimberlin, who we think of as the puppet master, Mr. Kimberlin is the one who pulls everybody else's strings, and pushes everybody else's buttons, he's the one in charge, and he knows how

to manipulate people. And he knew how to manipulate Josh Stocker.

We think the evidence will show, directly or indirectly, by implication, he let Mr. Stocker know here's the solution to your problem, Josh. If you'll get Pool, Bledsoe will owe you $10,000.00, then you can pay me the money you owe me, and still have some money left, and we'll be rid of Pool.

Now, there's another version of the story that Mr. Stocker just went off on his own and did this to try to please Mr. Kimberlin, who was unhappy with him because he hadn't paid for the drugs. But whatever the correct version is, ultimately, Mr. Stocker is the one who apprehended Dustin Pool and then notified Mr. Kimberlin, because we believe you'll hear testimony that after the meeting at Stumpy's there was a kidnapping of Ray Placensio, and that Mr. Placensio was kidnapped by Destry Keeling, Chris Eason, Brook Vandergriff, and others. And that he was taken to Josh Bledsoe's shop near Wilbur and Western Street, and that he was beaten severely. Maybe up to 36 hours. Maybe even longer, but that he survived the beating and the kidnapping. We think you'll hear that the only purpose of that kidnapping was to send a message to Pool. You're next. And we think that you'll hear Mr. Pool took it that way. I'm next. This doesn't look

good. And that probably a short time thereafter, Josh Stocker met with Guinn Garcia.

Now Guinn Garcia, remember, was the common law wife of Ray Placensio. She had helped set up her own husband. She had crossed over to the other side, and she helped set him up for this kidnapping. And so now Mr. Stocker, who wants to please Mr. Kimberlin, and believes there's a $10,000.00 contract on Mr. Pool, comes to Ms. Garcia and says, listen, Ray Placensio and Dustin Pool are like this. Ray Placensio is his main man. He's his enforcer. You set up Ray for us. You know Pool, set up Pool. And Ms. Garcia's response you will learn is, I can't set up Pool. They know I'm the one that set up Ray. They don't trust me now. I can't do it. It will never work. But I know someone who can. I know Tori Patrick. And I know that Mr. Pool is interested in Tori Patrick. And I think we can get Tori Patrick to set up Mr. Pool.

And so probably on March 9th, during the day and the evening hours of March 9th, from the promise of money and other things, Tori Patrick began to call Dustin Pool. And that late on March 9th and the early hours of March 10th -- and she was calling from her apartment over at the River Falls Apartments in Amarillo. Mr. Pool, probably hearing messages left in his mailbox, responded to her calls. And in the early morning hours of March

3:34:29 10th, he arrived at Tori Patrick's apartment.

3:34:33 Now, by the time that he got to Tori Patrick's apartment, Josh Stocker, who was already waiting there with Guinn Garcia and Tori Patrick, had called his brother, Michael Stocker. And Michael Stocker had come over to the apartment, and the Stocker brothers were waiting there for Dustin Pool.

3:34:53 We think that you will learn that Mr. Kimberlin and other members of the cartel didn't know that this was going on at this point. And Mr. Kimberlin certainly, based on the other testimony, I think you will conclude would have approved. It sounds like, great, we're going to get Pool, but he didn't know it was going on at this point. So the Stocker brothers are hiding there.

3:35:17 Now, we think the testimony will show Guinn Garcia actually left with Chad Spanel a short time before Mr. Pool arrived. Now, Mr. Pool probably arrived in the early morning hours, 2:00, 3:00 in the morning, after the bars closed. And he came in and began to talk to Tori Patrick. And at some point, she arose from some furniture in the living room and walked toward the bathroom area. And as she left the room, the two Stocker brothers entered the room and confronted Dustin Pool. And that Dustin Pool was struck in the head with a fireplace poker. And that

3:36:00 blow from the fireplace poker very likely caused the
3:36:04 initial skull fracture, which probably got much bigger
3:36:08 later as he suffered additional beatings at the hands of
3:36:11 these people.

3:36:11 Once they struck him in this head with a
3:36:14 fireplace poker in Tori Patrick's apartment in the early
3:36:18 morning hours of March 10th, Michael Stocker transported
3:36:23 Tori Patrick to a Motel 6, and put her in a room there to
3:36:28 get her out of the way until they got through dealing with
3:36:31 Mr. Pool.

3:36:32 Now, by the time Michael Stocker -- Josh
3:36:37 Stocker stayed at Tori Patrick's apartment with Dustin
3:36:42 Pool, who's injured and bleeding from the head. Blood
3:36:45 which would later produce his DNA. And that he stays
3:36:47 there with him while Michael Stocker takes Tori Patrick to
3:36:53 the Motel 6 and puts her in the room. By the time he gets
3:36:57 back, Guinn Garcia has returned. Remember Guinn was the
3:37:00 one who couldn't set up Pool, but she knew Tori, who
3:37:05 could. And Guinn Garcia and Michael Stocker removed
3:37:08 Dustin Pool's car from the River Falls parking lot over to
3:37:10 Tiffany Square, a short distance away. So that his car
3:37:15 wouldn't be seen in the parking lot, in case someone's
3:37:18 looking for it. And then Michael Stocker, the brother of
3:37:23 Josh Stocker, took Guinn Garcia over and put her in the
3:37:27 room with Tori Patrick at Motel 6.

And we think you're going to learn that Tori and -- and Guinn weren't feeling real secure themselves at this point, and they actually changed hotels two more times within a matter of hours, but that's where they left them at first, Motel 6.

Now, in the meantime, Josh Stocker has the prize. He has Dustin Pool in hand. And who does he call? Craig Kimberlin. He calls Craig Kimberlin and says, in essence, we have the Pool man. And within a fairly short period of time, Stephen Craig Kimberlin arrives at the apartment, and Josh Stocker is there with Dustin Pool.

Now, what do we do with him? We have him, what do we do with him?

Stephen Craig Kimberlin has a plan, and he gets on the phone. He gets on the phone and he calls Michael Elliston. Remember, Mr. Elliston is the man who owns the farm out near Panhandle, Texas. Mr. Elliston is connected with this drug cartel in this way. His farm is located in a fairly remote location, where they could store narcotics, cut up narcotics in preparation for selling narcotics. And in return, Mr. Elliston would get paid sometimes. Sometimes he'd get the leftover narcotics. And he was a low level player in this group, but he had an important location, and that was this farm.

We think you'll learn that Stephen Craig

Kimberlin called Michael Elliston probably around 9:00 or 10:00 in the morning of the 10th of March, 2003, and convinces Mr. Elliston to come to Amarillo from the farm, which is about 22 miles away. It takes about 25 to 30 minutes to make the drive. And to bring with you, Mr. Elliston, bring a box. A box big enough that I can get in it.

And so Mr. Elliston, with some reluctance, finally agrees and comes with the box in the back of his pickup. And when he arrives, Mr. -- he let's Mr. Kimberlin know, I'm here with the box, where are you? And Mr. Kimberlin comes down and they visit in the parking lot. And Mr. Kimberlin explains Josh Stocker has Dustin Pool upstairs. And this Dustin Pool guy is a really bad guy. He's threatened people. He has done bad things to women, et cetera, et cetera. And so you're really doing a good thing, Mr. Elliston, by helping us. Now, what we want to do is put him in this box and move him out to your farm. And if I can get him in the box and out to the farm, I can calm Stocker down, because I'm afraid Stocker's going to do really bad things, and he's really upset up there, so you're really helping to save Pool's life, if you'll help us get him out to the farm.

So Mr. Elliston agrees, and they move the box upstairs with a dolly. And he sees Mr. Pool bleeding

in the apartment, Mr. Elliston does. And they load Mr. Pool in the box, and they tie it with straps and tie downs. And they put it back on the dolly, and they move it downstairs, and put the box in the back of Mr. Elliston's truck.

Mr. Elliston's told, now you haul the box out to your farm, and Stocker and I will follow you in Kimberlin's pickup.

Well, Mr. Elliston hauls the body out to the farm, but when he arrives Mr. Pool and Mr. Stocker are not behind him. And he's on the phone, where are you? And they don't arrive for 30 minutes.

Mr. Pool -- I mean, Mr. Kimberlin, always the manipulator, he has made sure that he and Mr. Stocker are nowhere near Mr. Elliston as he's transporting the body. In case he gets stopped on the way, they're not connected. But once Mr. Elliston has Stocker at the farm still tied up in the box, then he and Mr. Stocker arrive. And they unload Mr. Pool out of the box, and they move him to a room upstairs above a garage.

Mr. Elliston has what he calls a farm, but he's really a mechanic, and he kind of does shade tree mechanic work out there. He's sort of a contract mechanic guy. And he's got a room above his shop. Now, he has a home there as well, but he and his wife are estranged and

3:42:15 she's sort of living in the home and he's living out at
3:42:20 the shop.

3:42:20 And Mr. Stocker takes Mr. Pool upstairs,
3:42:23 who's still not doing too well, because he has a skull
3:42:27 fracture most likely from the blow from the fireplace
3:42:30 poker, and, eventually, then and at later times he bled at
3:42:35 the farm and the DNA will confirm that.

3:42:38 Now, Mr. Kimberlin, after a short period of
3:42:43 time, leaves. He left Mr. Elliston downstairs. And when
3:42:47 you meet Mr. Elliston, I think what you'll think of is
3:42:51 Barney Fife. He's downstairs, a little scrawny man,
3:42:55 wringing his hands, wondering how did I get into this mess
3:42:59 and what do I do now? Meanwhile, Stocker has Pool
3:43:03 upstairs and Kimberlin says, I'm going to town, I'll be
3:43:06 back later, and he heads back for Amarillo. And
3:43:09 Mr. Elliston can hear the assault on Mr. Pool beginning
3:43:14 upstairs and he is terrified.

3:43:18 Now, you'll learn Mr. Kimberlin stayed gone
3:43:21 several hours. We think the evidence will show that he
3:43:24 took care of some business in town and while he was there,
3:43:27 he called two people, Frank Chacon and Josh Bledsoe. Now
3:43:31 Frank Chacon is the equivalent of Ray Placensio.
3:43:37 Mr. Chacon, you will learn, is the muscle, the enforcer,
3:43:39 the man who heads the intimidation department for this
3:43:45 drug cartel. If you don't pay like you're supposed to,

you'll get a visit from Mr. Chacon or one of the people he sends to see you.

And so Josh Bledsoe and Frank Chacon return to the farm that evening, probably around 5:00, and join Josh Stocker and Mr. Pool upstairs. Mr. Elliston remains downstairs. And during the next several hours all four of these men, Stephen Craig Kimberlin, Josh Stocker, Josh Bledsoe, Frank Chacon, all four of these men in combination and sometimes alone, sometimes two of them, sometimes three of them, sometimes all four were upstairs beating and torturing Dustin Pool. And that this went on, and on, and on. And, finally, Mr. Elliston convinced Mr. Kimberlin, please, please take this somewhere else.

You'll learn that Mr. Kimberlin at that time makes contact with Destry Keeling. Now Mr. Keeling hasn't been involved in the kidnapping. He certainly is a member of this cartel. He was certainly involved in the Placensio kidnapping, and he certainly he would have gladly participated in this one, he wasn't recruited for this particular job, but he's contacted. And he's asked by Mr. Kimberlin, do you have a place where we can take the Pool man? And he thinks of his wife's place -- the lake house, which is really a trailer home up near Lake Meredith, outside of Fritch. And he tells his wife that he's got some friends in trouble with the police and have

warrants, and they need a place to hide. So she accompanies him, and they leave in the early morning of the hours of the 10th -- the 11th, actually. And by the 11th, they're headed up to Lake Meredith to await on the arrival of these men who are hiding from warrants. In the meantime, they're getting ready to move Mr. Pool.

Now, by this time Mr. Pool has broken ribs, a skull fracture, extensive trauma, you will learn from the pathologist all over his body. You will learn that there were claims, whether they're true or not remains to be seen, but there were certainly brags, and braggadocio, and bluster saying that a broom handle was used on the rectum area of Mr. Pool, that a pair of channel lock pliers were used on the testicles or some other area of Mr. Pool. And that whether all of the bragging and braggadocio was true or not, the actual trauma itself shows a horrible, horrible beating. But what finally assured the death of Dustin Pool was that either Josh Stocker, or Josh Bledsoe, or Kimberlin, or Chacon, or all of them together, and it really doesn't matter which one, because if they're in for a penny, they're in for a pound. One of them stuffed a sock into Dustin Pool's mouth and throat, and then they covered his entire head with duct tape. He has no air holes. His whole face is a cocoon of duct tape with a sock down this throat. And when you add

that to the trauma he'd already suffered, you will learn from the pathologist his fate was sealed and he died. He died because he couldn't breath.

Now, when they moved Mr. Pool from the farm they dragged him down the stairs in the early morning hours of the 11th, and they probably left and headed for the farm sometime after -- for the lake sometime after 2:00 in the morning.

You will hear testimony that he was dragged down the stairs and his head bounced on every step as they dragged him down those stairs. And if he already had a skull fracture, the pathologist will tell you that it had to have gotten a lot worse. And if he didn't already have one -- he -- he experienced a severe skull fracture at some point, we know that. If he didn't already have it, then he certainly got it sometime during the beating or going down the stairs.

The pathologist will tell you that ultimately it doesn't matter because if he hadn't a another mark on him, the sock and the duct tape would have killed him anyway.

So they moved him downstairs to Josh Bledsoe's Navigator, and they load him in the back of the Navigator. They wrapped him in a tarp, and probably a drop cloth that's used for painting purposes. And he's

3:48:51 wrapped in this blue tarp on one side, silver on the other, and he's got duct tape around various parts of his body, and ankles, and feet, and so forth. And he's got bungie cords around this tarp that he's wrapped in. And they tie him in the back of this Navigator, and then they throw some -- I think some lawn furniture and junk and stuff over, so that if anybody looks in the back it won't look like anybody's there. And they head off for Lake Meredith to meet Destry Keeling and Glenda Denise Keeling.

When they get to Lake Meredith it's probably 3:00, maybe 4:00 in the morning. And that's when Mrs. Keeling learns for the first time -- well, in fact, that's when Destry Keeling learns for the first time that Dustin Pool is dead. Now, he knew the group had apprehended happen Pool. He was told that. He knew they had kidnapped him, and he knew they had beat him like they did Ray Placensio, but he didn't know he was dead. Now, his wife didn't even know that there was a kidnapping.

You will learn that Mr. Keeling learned that Dustin Pool died in the following way. When the vehicle arrived at the lake house, he went to the back of the Navigator with Josh Stocker to open the door and get Mr. Pool out. And Mr. Stocker turns to him and said, the dude's dead. And Keeling, for the first time, knows this is not just a kidnapping now, it's a murder.

Now, you'll learn that Denise Keeling learned later that he was -- learned that he was dead and then a little later learned more details, because when Denise Keeling and Destry Keeling let it be known, we're not letting you put a body in this house, Josh Bledsoe, who is already panicking because he's got a dead body in back of his Navigator, Josh Bledsoe loses it. He hops in the Navigator and takes off for Amarillo with the body of Dustin Pool still in the back, leaving Destry Keeling, Denise Keeling and Josh Stocker standing there looking at the taillights disappearing down the road. And so they get on the phone.

Hey, puppet master, Mr. Kimberlin, Stocker -- Bledsoe's freaked out. He left with the body in the back of the Navigator. What do we do now? Because all we've got is this old Jeep. This beat up old Jeep that Destry Keeling borrowed in Amarillo, and we can't catch him.

We believe you will learn that Mr. Kimberlin said, don't panic. You guys turn around and stay at the lake house. I'll get Bledsoe on the phone. I'll get him calmed down. I'll get him turned around, and he'll come back, and then we'll go on with the plan.

Well, about that time Mr. Stocker's cell phone goes dead and he has no more contact with

Mr. Kimberlin that night. And Mr. Stocker says to Destry Keeling and his wife, I'm tired of Bledsoe and his antics. I'm not going back to that lake house. You're going to take me to Amarillo. Bledsoe's on his own. He and Kimberlin can figure out what they're going to do with the body, but I'm going back to Amarillo and you're going to take me. And so Mr. Keeling takes Stocker, Joshua Stocker, the Defendant, back to Amarillo.

Now, in the meantime, Mr. Kimberlin has gotten Josh Bledsoe on the phone and he has calmed him down and convinced him to turn around and go back to the lake house.

Now, I know at this point you're thinking, this is not organized crime, this is disorganized crime, because they go back to the lake -- Bledsoe goes back to the lake house. He's now sitting there alone with the Navigator and the body of Dustin Pool in the back. And he's on the phone to Kimberlin. They're not here. Where are they? And Kimberlin's trying to raise them, but he's not having any luck, Stocker's phone is dead. And, finally, even Kimberlin gives up and tells Bledsoe, go ahead and get back in the Navigator, come back to Amarillo. We'll meet you at 46th and Washington, at the United parking lot, and we'll take it from there. And so Bledsoe gets in the Navigator and heads back to Amarillo.

3:53:22 Now, in the meantime, the Keelings and Stocker are in the Jeep and they've got a head start, so they're much further down the road to Amarillo than Mr. Bledsoe. And Ms. Keeling, who has been loosely connected to Kimberlin's drug cartel, because that's where she buys her dope, she is beside herself. She is demanding an explanation. What's going on? I mean, drugs are one thing, but we're talking about a kidnapping and murder here. Josh Stocker, what's gong on?

We believe you will hear from Glenda Denise Keeling, who was not involved in any of the kidnapping, who was not involved in any of these crimes other than using narcotics, that she heard from the lips of the Defendant, he was squealing like a pig, so we had to do away with him, and so Stocker returns to Amarillo.

Now, they're trying to take him back to his truck. He doesn't have the keys. They end up having to take him out to, I think, either Lake Tanglewood or Timbercreek, I forget which. He gets his keys from his girlfriend, Brook Vandergriff, and they take him back to his pickup, but before that, they stop at a Wal-Mart because he's got to buy some clothes, because he's got -- not a whole lot, but some blood on his clothes. And Ms. Keeling saw all of this as well. In fact, she helped get the clothes for him.

Now, in the meantime, Mr. Bledsoe meets Stephen Craig Kimberlin and Frank Chacon at 46th and Washington in the parking lot of the United. Now, by this time not only is Mr. Stocker fed up with Bledsoe, so is Chacon and Kimberlin. And so, in essence, they say, look, we're going to take care of it. They take -- they take the body -- they take Mr. Bledsoe to his home and then they take his Navigator with the body still in the back, and they go to the house of Tyler Hale. Now, Tyler Hale is a man associated with them, buys dope from them, sometimes sells dope for them.

And Mr. Hale will tell you that he didn't know for sure that the body of Dustin Pool was in the back of the Navigator, but he suspected pretty strongly that was the case. And that if he'd let them keep the Navigator parked in the garage overnight, they would write off some of his debt to the cartel, and so he agrees. And the body of Dustin Pool lay in the tarp in the back of the Navigator overnight.

And then Frank Chacon and Stephen Craig Kimberlin, and Destry Keeling get together the next day. And Keeling tells them the story about Stocker, and about how he's not cooperative, and how he's not playing the game. He's tired of Josh Bledsoe. But the more immediate problem is, what do we do with the body that's laying over

3:56:27 there in the back of Tyler Hale's garage, in the back of
3:56:30 that Navigator?

3:56:32 Well, Destry lives in a trailer house near McCormick and the railroad tracks. He says to Mr. Chacon and Mr. Kimberlin, I've got a place. And they go out and inspect it, and they look, and it looks pretty good. It's abandoned. There's an underground chamber. They can put him down there and cover him up in concrete and put some dirt and debris over it. This thing has been abandoned probably 20 years, nobody will ever find the body. And that's what they did. And you know what folks? Destry Keeling was right. If that were the end of the story, they would never have found the body of Dustin Pool.

3:57:20 Dustin Pool wasn't a nice man, and he probably would have done the same thing to these folks if he had the chance. Nobody deserves to die the way he died, and nobody deserves the noble burial that he received. The only thing that changed the end of the story was, the drug investigation headed by Bill Redden. Because at the same time the homicide investigation's going on, the drug investigation's going on.

3:57:48 And shortly thereafter, in early April, the hammer falls on the Kimberlin drug cartel and everybody gets busted. Lot's of folks get arrested, including Stephen Craig Kimberlin, the leader. And Kimberlin is

sitting in jail, looking at a lot of federal time for the drug charges, and he comes up with a scheme, a plan. And here's the plan.

I can sell Josh Stocker and Josh Bledsoe down the river. And I can tell the -- the local law enforcement authorities, who are trying to find the body of Dustin Pool -- now, remember, it's been from March, April -- actually, now we're up to June and they still haven't found the body. I can sell those two down the river and say they killed him, and me, and Chacon, and Elliston didn't have anything to do with it. We did hide the body, but only to help out our friends. They're the ones that killed him. And so if I can get Elliston and Chacon to go along with me in this story, we may convince the law enforcement authorities that Stocker and Bledsoe are the ones who killed him and we weren't involved. But we've all got to tell the same story and we've got to stick with it.

In fact, he even contacts Elliston and says, now, Elliston, here's your story. You were out at the farm minding your own business, and along came Stocker and Bledsoe, and they had this guy Pool. And they started doing bad things to him. And you called me and said, hey, Mister In Charge, you're the guy calling all of the shots, come on out and do something about this. Get these guys

off of my farm. And your story to the police, Mr. Elliston, would be that when you called us we came, and we confronted Stocker, and we confronted Bledsoe, and we made them leave with Mr. Pool, and that's the last time you ever saw Pool. And then our story will be exactly like your story, only later out of feeling sorry for our friends, because they didn't know what to do after they killed him, Chacon and I got Destry Keeling we did help hide the body, but we don't know how he was killed, or where they killed him, or what happened after they left the farm.

And so that's the story that Mr. Kimberlin told. And it might have worked, but we'll never know, because it broke down. The plan crumbled, because he forgot about Barney Fife. The little man wringing his hands. The linchpin in this case.

You heard during opening -- during voir dire that we can't get a conviction on the uncorroborated testimony of co-defendants, and that's true. And we intend to offer testimony and evidence other than co-defendants. We intend to offer Chris Eason, to whom the Defendant confessed, and he's not a co-defendant. Denise Keeling, to whom the Defendant confessed, and she's not a co-defendant. And others, who are not co-defendants, who will corroborate what I've told you.

4:01:25 But the linchpin, the one witness who has the most credibility of all is Barney Fife. The little man wringing his hands, and here's why. Because after about 24 hours -- I think it was 24 hours. A short time after telling that initial story that Mr. Kimberlin told him to tell, he couldn't live with himself, and he gave a second statement in which he told the truth. He admitted, I wasn't out at the farm and they just showed up. Kimberlin called me and told me to bring a box to Amarillo, and when I did, I watched them load Pool in it. And then we were all out there and they're upstairs beating him. All four of them, including Stocker, Kimberlin, Chacon and Bledsoe.

Now, why does Mr. Elliston have such credibility? He's a co-defendant. He willingly participated in a kidnapping. He willingly participated in a kidnapping in which he could have reasonably and should have reasonably anticipated someone could die, so Mr. Elliston could be and, in fact, was charged with capital murder. But he wasn't charged with capital murder because of his first story, he was charged with capital murder because of his second story. And throughout this trial, and when you hear all of the testimony, especially Mr. Elliston, ask yourself this question. Why would little Barney Fife change his story from the first one to

4:03:11 the second one? Because the first one means he's guilty of what? Nothing. There is no --

4:03:21 MR. WATKINS: I'm going to object to this as being argument, not opening statement.

4:03:26 THE COURT: Overruled.

4:03:29 MR. FARREN: He's guilty of nothing if the first story's true. We'll present testimony I think that will convince you, if all he did was know about two people bringing a guy to his farm and didn't do anything to intervene, he may have a moral duty, but he has no legal duty. He's not guilty of anything. He couldn't be charged with any crime. But you will hear testimony that within a short period of time he changed his story and said, here's what really happened. And you will learn that his second story means what? He's a party to capital murder. And you need to ask yourself, who lies to change from, I didn't do anything, to I'm a party to capital murder?

4:04:12 The second story you will learn is the true story. And you will learn from other non-co-defendants that the Defendant has confessed to them, his participation in this crime.

4:04:26 Ultimately, you will hear from a number of co-defendants who will talk about his role. Josh Bledsoe will testify. He will tell you, I helped murder Dustin

4:04:40
4:04:42
4:04:49
4:04:52
4:04:56
4:05:00
4:05:04
4:05:07
4:05:14
4:05:18
4:05:23
4:05:25
4:05:30
4:05:36
4:05:40
4:05:48
4:05:52
4:05:57
4:06:01
4:06:02
4:06:05
4:06:07

Pool. I beat him until I was exhausted, and he was right there with us, and helped us do it.

You will hear from other co-defendants in this trial, other people who were involved, who will say, he was right there involved with us. But you will also hear the phone records, receipts from motels, other kinds of receipts that will confirm other parts of the story, and they're not co-defendants. And, finally, you will hear from a non-co-defendant like Chris Eason, Brook Vandergriff, Denise Keeling, who will tell you that he confessed that he participated in the murder of Dustin Pool.

And, finally, when you've heard all of the evidence, I believe you will conclude that Dustin Pool was not a nice man. That he was a person who probably would have done the same thing to them had he had the chance, but no one, no one deserves to die like that. And no one deserves to be buried in that ignoble way. And no one has the right to take the law into their own hands and treat another human being like garbage, no matter how bad they are.

We believe that you will return a verdict of guilty as charged in the indictment. Thank you.

THE COURT: All right. Ladies and gentlemen, let's take a quick break. Why don't we. If

4:06:15 y'all will be back in the jury room here at 20 after, by that clock -- let's say 25 after.

4:19:52 (Recess.)

4:20:02 (Both sides, the Defendant, the jury

4:20:55 (present, in open court:)

4:21:27 THE COURT: Thank you, ladies and gentlemen. 4:21:34 Everyone be seated. At the next break, I want y'all to do 4:21:38 something. Like I told you, we're partners. And I would 4:21:41 like to know what your thoughts are on how late you want 4:21:44 to work, how early you want to start. Whether you would 4:21:48 rather work Saturday mornings or not. I know the answer 4:21:51 to that, but whether you feel like we ought to. Y'all kind -- y'all kind of visit with each other about that. 4:21:59 Now, remember, not about the case, but about that, and 4:22:01 kind of give me some idea of what you want to do, and 4:22:04 we'll -- we'll do that. We'll work as hard as y'all want 4:22:08 to.

4:22:09 I have found that it's hard to work much 4:22:13 past 5:30 to 6:00, at the latest, because there's an awful 4:22:18 lot of information and, it's exhausting to listen and do 4:22:21 right and listen hard, and so y'all take that into account.

4:22:26 I have something else to ask you. I'm told 4:22:29 there may be some fairly graphic photos, autopsy-type photos. Are any of you prone to nausea? Would you feel

4:22:41 more comfortable if we gave you a trash can in there
4:22:46 (sic)? I'm not trying to scare you or impress you in any
4:22:49 way, but I'm just trying to -- to wonder about that.
4:22:55 Would you rather have one?

4:22:56 UNIDENTIFIED FEMALE JUROR: Yes. I'd rather
4:22:58 be safe than sorry.

4:23:00 THE COURT: All right. Mr. Parker, would
4:23:01 you make arrangements for that.

4:23:02 Mr. Watkins, are you ready?

4:23:05 MR. WATKINS: Ready, Your Honor. May it
4:23:07 please the Court. Mr. Farren.

4:23:08 THE COURT: Mr. Watkins.

4:23:10 DEFENSE'S OPENING STATEMENT

4:23:11 MR. FARREN: Counsel.

4:23:13 MR. WATKINS: Good afternoon. This is my
4:23:16 first chance to get to talk to you like this. Get to line
4:23:22 out kind of where our case is going to go, where we expect
4:23:26 everything is going to go here. Mr. Farren did a real
4:23:29 good job of lining out who -- who's going to be called,
4:23:32 since he gets to call them, but I expected him to call all
4:23:37 of those people. Okay? There weren't any surprises
there.

4:23:40 What I do want you to listen to as the
4:23:43 testimony comes out is that we have two kinds of people
4:23:49 being called. We have those who've made a deal or who

were involved in it somehow, who have some reason to be here and testify, and they were a part of it. And then we have the cops, the medical examiner, the carpet cleaner, the guy who worked at Best Buy (sic). Those who don't have anything. I want you to listen to the differences in their testimony.

I want you to listen to the first group that I've mentioned, those who have a reason to be here and to testify, who are a party to this. Josh Bledsoe. I don't see his list of characters right now, and I've just lost a bunch of the names, but all of those people who he listed as a part of the a cartel up here, I want you to listen to their stories. Listen to the versions of their stories, because most of those people have multiple versions of a story. I want you to listen to how they've changed.

He said you're going to hear from Mark Brown and you're going to hear an overview of how this case went. You're going to hear how when Mark Brown or one of the ID techs found evidence, then you're going to find out that so-and-so made a new statement and it changed to keep their deal.

Mr. Farren talked about that you're going to hear a story of torture, of drugs, cartels, things like that. That's not what this case is about. This case is about hearing the evidence dealing with the indictment.

4:25:52 In the course of committing and attempting to commit
4:25:57 kidnapping, intentionally causing -- intentionally commit
4:25:59 murder. It's the indictment. Not drugs, not cartels, not
4:26:06 torture, right there. That's your guiding -- guiding
4:26:15 post.

4:26:24 Mr. Farren said that we're going to hear
4:26:27 from the ID techs, Officer Rickwartz, Burgess and Rodden.
4:26:36 All good guys. All good officers. They're going to come
4:26:41 up here and they're going to testify to what they found,
4:26:43 what they submitted. I suspect you're going to hear that
4:26:46 they found 15 pages, 15 pages of evidence, and submitted
4:26:55 most of that evidence to Angela Rodriguez, Kathy McCord,
4:27:02 and John Bundy, to the DNA labs, to the hair and fiber
4:27:07 labs. I want you to listen to what they didn't find.
4:27:11 What wasn't brought out in DNA evidence. Whose DNA
4:27:18 evidence was not there.

4:27:27 Mr. Farren said that a part of his
4:27:30 corroboration is going to be phone records. You're going
4:27:34 to hear how all of these parties, who are those with
4:27:39 something to make a deal with, had lots of different
4:27:43 phones. How they had phones in different people's names.
4:27:49 How they used different phones for different people.

4:27:50 You're going to hear that a lot of these
4:27:53 phone records show a call made from one number to another
4:27:59 number. I don't think you're going to hear that there's

any evidence of who made that call, or who received that call, or on some of them, if the call was ever received.

I suspect that you're going to hear from Efrain Ramos, just as Mr. Farren said you would. I believe you're going to hear that he worked at Circuit City, not Best Buy. I think you're going to hear that he's a teacher out at Palo Duro High School. He's recently been made the head soccer coach. He's got a burgeoning career. He's has a fairly good guy. He's young, has a young family. I think you're going to hear that he's a substantial person, and he's one of those that's just kind of pulled into this case, because he found something. He found a billfold. I want you to hear what -- who he says left that billfold, and where it was left, and how -- what the conditions are of how he found it.

Mr. Farren said that you're going to hear about the kidnapping of Ray Placensio. I don't suspect you're going to hear it from Ray, but you're going to hear how badly he was beaten for 36 hours, maybe three days. You're going to hear how he was terribly beaten. I suspect that you're going to hear how 12 days later he was committing a murder in Amarillo, stabbing someone 47 times. He was so badly beaten at this kidnapping.

I suspect you're going to hear from

4:30:02 Mr. Elliston that he did have reason to change his story. I suspect that you're going to hear that he heard that the gig was up. That Kimberlin had given up the body. Things were changing. Kimberlin, the puppet master, who put all of this together had given it up, and everyone needed to start making their deal with the DA. I suspect he's going to tell you about some of that, and you're going to learn about some of that from -- from Burgess and from Brown.

4:30:47 A lot of the evidence that we're going to present to you is going to be through the cross-examination of the State's witnesses. You're going to hear from each of them why they have reasons to change their story. Every one of them you're going to hear started out protecting themselves. I know a little bit about that. I -- I wasn't involved, but I know a little bit about it. Let me give you a little bit of information. And as deals started being made, they started changing their stories, and you're going to hear how those deals evolved.

4:31:30 You're going to hear about the immunity agreements given. About the deals on other kinds of cases. The deals on cases out of this county. You're going to hear Mark Brown say that this was a complex perplexing case and that he needed help solving it. That Bill Redden needed help solving it, and deals started

4:32:03 getting cut, and everyone still protects themselves.
4:32:10 I think you're going to -- I know you're
4:32:14 going to hear from Dr. Natarajan. He's the medical
4:32:21 examiner down in Lubbock. Mr. Farren kind of introduced
4:32:24 you to him. He's going to tell you that whenever there's
4:32:27 a bruise on your body and you're dead, that he has a way
4:32:30 to look at that bruise and tell if it was caused before
4:32:34 death or after death. I think he's going to tell you that
4:32:37 he can tell on broken bones if they were caused before
4:32:41 death or after death, and that it's science, and that it's
4:32:48 the same way time, after time, after time. And he's going
4:32:53 to tell you which of the bruises on Dustin Pool were
4:32:58 before death and which of the big marks aren't even
4:33:05 bruises, they -- they appear to be bruises when you look,
4:33:08 were after death. Decompositional change.
4:33:13 He's going to tell you that the story he was
4:33:17 given during the autopsy of how this all went down dealt
4:33:22 with torture. Mr. Farren mentioned a broomstick up the
4:33:28 anus of Mr. Pool. I suspect he's going to testify there
4:33:33 is no scientific evidence of that, and there would be if
4:33:40 it had occurred.
4:33:42 The channel locks used on the testicle or
4:33:48 somewhere else on the body. No scientific evidence that
4:33:51 that occurred. You're going to hear the person who came
4:33:57 up with that story. You're going to hear other people say

that the person who came up with that story was the one doing it, but Dr. Natarajan is going to tell you that it didn't happen. It didn't happen.

I want you to listen for the corroborative evidence. Y'all gave us a list in voir dire of what kind of evidence would be corroborative with ten to prove. Listen for it. Mr. Farren says that three times Joshua Stocker confessed. Three different people he named Joshua Stocker confessed to. Listen to those people. Listen to their motivations. Listen to their deals. Listen to their own testimony about why they're on that stand on the day that they come to that stand. You're going to question these confessions. Every one of them has a reason and you're going to hear about that reason for coming in and saying what they're saying.

That's why we have to have corroborative evidence. That's why those lists of things, the fingerprints, the blood, the DNA. That's why you're looking for those. That's why we're going to hear from Angela Rodriguez, Kathy McCord, John Bundy, all of the cops. That's why we're going to hear from them, trying to build a case.

Listen to what's said on cross-examination, but listen to what those witnesses won't say. I know you'll listen to all of the evidence before you start

4:36:36 making up your mind. The Judge has told you to do that.
4:36:38 I appreciate your time and service on this jury.
4:36:42 Hopefully, we'll get done a little quicker than we have
4:36:47 estimated. Thank you.

4:36:49 THE COURT: Thank you, sir.

4:36:51 Call your first witness Mr. Farren.

4:36:53 MR. FARREN: State calls Dr. Natarajan, Your
4:37:43 Honor.

4:38:14 THE COURT: Doctor, would you raise your
4:38:16 right hand, please.

4:38:17 (Witness sworn.)

4:38:24 THE COURT: Thank you, sir. Sit right up
there.

4:38:28 Go ahead.

4:38:30 MR. FARREN: Thank you, Your Honor.

SRIDHAR NATARAJAN, M.D,

having been first duly sworn, testified as follows:

DIRECT EXAMINATION

4:38:34 BY MR. FARREN:

4:38:34 Q. Would you state your name for the jury, please,
4:38:36 sir.

4:38:37 A. Sridhar Natarajan.

4:38:38 Q. How are you employed?

4:38:40 A. I am the chief medical examiner for Lubbock
4:38:43 County.

Q. And is that a ME's office, a medical examiner's office?

A. Yes, it is.

Q. What's -- what's the difference between having a medical examiner's office and jurisdictions that don't have a medical examiner's office?

A. Well, Lubbock County, which is a medical examiner system, any death that occurs in a county is going to come under our jurisdiction as to decide whether -- how much of a death investigation has to be performed, as well as whether an autopsy needs to be conducted.

Q. And in jurisdictions where there's not a medicine examiner's office created, then a justice of the peace actually makes the decision about whether to call for an autopsy or not. Is that correct?

A. Yes, sir.

Q. And would you share with the jury a summary of the training and experience that you have that enables you to perform in this capacity, please.

A. I did my undergraduate in chemistry at Cornell University. I afterwards did a master of science at Alfred University, School of Engineering and Sciences. From there I went into the military. I received postgraduate training in nuclear engineering.

THE COURT REPORTER: Excuse me, what?

Postgraduate training in what?

4:40:00 A. In nuclear engineering. Afterwards I was on a
4:40:03 nuclear submarine. I left the service and then received a
4:40:07 military scholarship to medical school. Attended the
4:40:09 Medical University of South Carolina. After I received my
4:40:13 M.D. degree, I re-entered active duty service and went to
4:40:16 the Walter Reid Army Medical Center and the Brook Medical
4:40:20 Center, where I did my internship, as well as training in
4:40:24 anatomic pathology and clinical pathology. From there I
4:40:27 was retained at the Brook Army Center, where I was a
4:40:31 medical director of a variety of different departments.
4:40:33 Once my time commitment was finished with
4:40:35 the military, I left the service. I'm a lieutenant
4:40:40 colonel U.S. Army Reserves. I went to the Bexar County
4:40:43 Forensic Science Center in San Antonio, where I did
4:40:47 subspecialty training in forensic pathology, and from
4:40:49 there I was recruited to come out to Texas Tech in the
4:40:52 Lubbock area.

4:40:53 Q. (BY MR. FARREN) What is pathology and what is a
4:40:57 pathologist?

4:40:58 A. A pathologist is an individual who has been
4:41:01 trained through a residency program to look at a variety
4:41:05 of different organ systems, to make a diagnosis. And it
4:41:08 could be with the blood system, it could be involved with
4:41:12 chemistry, microbiology, as well as just anatomy or doing

4:41:15 biopsies and autopsies.

4:41:18 Q. And what is a forensic pathologist?

4:41:22 A. The forensic pathologist, after completing that training, goes on and does additional training where they're going to be trained on how to do a forensic autopsy, which will then provide a medical, legal opinion as to a cause of death and a manner of death.

4:41:38 Q. And you may have kind of already covered it, but if you would, explain what -- what is an autopsy.

4:41:46 A. An autopsy is going to be an examination of a body, which will involve possibly taking photographs, identifying the body, collecting evidence, doing an external examination of the body, evaluation of any clothing that may come with the body, as well as any other items.

4:42:07 Once the external examination is conducted, we'll go on and do what is known as an internal examination. This is where we'll actually cut into the body, examine the areas of the chest, the organs in the chest. The abdomen. Organs in the -- within the peritoneal or abdominal cavity. Examine the areas of the neck. Remove the brain. Examine the skull. And then, also, the autopsy may even go further and examine the extremities depending on if there's a need for that.

4:42:38 Once that's completed, I will provide a

4:42:40 cause of death, and depend on jurisdiction, we may give a
4:42:45 manner of death. I will complete this as a finalized
4:42:47 report, which is signed and then submitted to different
4:42:50 agencies.

4:42:51 Q. Now, this -- this written report that is signed
4:42:54 and submitted, is that called a protocol? Is that a title
4:42:59 of it, or is that just what some people call it?

4:43:01 A. I would say that's what some people call it.

4:43:04 Q. Okay. But -- but is a protocol usually reference
4:43:09 to some sort of written report about an autopsy and the
4:43:12 conclusions reached?

4:43:13 A. Yes, sir.

4:43:13 Q. Okay. And in your -- in your experience and your
4:43:22 career as a forensic pathologist -- how long have you been
4:43:27 a forensic pathologist?

4:43:29 A. This will be four years now.

4:43:30 Q. And how long have you been educated in the field
4:43:34 of pathology, in addition to forensic pathology?

4:43:39 A. This will be now going on nine and a half years.

4:43:45 Q. Okay. And in your experience as a forensic
4:43:48 pathologist, and in addition to your training and
4:43:50 education as a forensic pathologist, have you performed
4:43:55 actual autopsies and reached conclusions about --
4:44:00 scientific conclusions about the manner and means, or
4:44:02 cause and manner of death?

A. Yes.

Q. And what is the difference between those -- those two? Can you give us an example of a manner and means of death?

A. Yes. Uh -- I think by means you mean cause of death.

Q. Cause.

A. The cause of death is going to be the actual physiologic derangement that took place in the body that caused the individual to die. An example would be if somebody had been stabbed. The stab wound may end up causing a great deal of bleeding to take place, and then the individual may die because of the loss of blood. But the cause itself would be the stab wound, and then the additional derangement that would take place would be the hemorrhage.

The manner, though, is a different thing. That's going to be a medical, legal opinion. And for our office and for most offices in Texas we have five types of manners that we can describe death as. And those would be if they have a natural death, if there's an accidental death, a suicide, if there's a homicide. And then there's those cases where we use the term undetermined, if after a full investigation we're still not at the point where we can actually give you a medical, legal opinion as to the

4:45:18 manner.

4:45:19 Q. And in -- I want to ask if you -- if there was a time when you were called upon to perform an autopsy on a man by the name of Dustin Shawn Pool?

4:45:32 A. Yes, sir.

4:45:33 Q. Do you recall about when you performed that autopsy?

4:45:36 A. Yes, sir. This was -- it was initiated on the 16th of June, the year 2003, commencing at 9:15 a.m.

4:45:45 Q. And did you prepare a written report about what occurred during the autopsy and conclusions that you reached?

A. Yes, sir.

4:45:52 MR. FARREN: May I approach the witness, Your Honor?

4:45:55 THE COURT: Yes, sir.

4:45:56 Q. (BY MR. FARREN) I'm showing you what's been marked as State's Exhibit No. 1. And I realize there's some pages attached that may not directly involve you. And I ask if this at least includes the report that you created after performing the autopsy of Dustin Shawn Pool?

4:46:28 A. Yes, it does.

4:46:30 Q. The -- the additional pages, do you recognize the nature of these -- these documents, such as the certificate of death, and things of that nature?

A. Yes, I do.

Q. These also involve and name Dustin Shawn Pool. Is that correct?

A. Yes.

Q. These are actually certificates created by the justice of the peace in whatever jurisdiction. This particular case is in Randall County, as a result of having received your report of the autopsy. Is that correct?

A. Yes, sir.

MR. FARREN: Your Honor, at this time we'd offer State's Exhibit 1 into evidence.

MR. WATKINS: There is --

MR. FARREN: We'll be more than glad to redact it whatever way the Defense finds it acceptable.

THE COURT: Have you not seen this before, Mr. Watkins?

MR. WATKINS: Your Honor, there's a part of it that we've been provided. There's a part we've never seen before.

THE COURT: Oh, really?

MR. WATKINS: Yes. And we're trying to determine what that is and --

THE COURT: Why would that be?

MR. FARREN: Your Honor, we asked for a copy

4:48:32 from the justice of the peace's office, and when they sent us a copy, they had attached a death certificate, an additional document. We don't have a problem redacting the document down to just what he prepared, if that -- if that would solve the problem.

4:48:47 MS. McELROY: I think that would solve our problem.

4:48:50 MR. WATKINS: Yeah.

MR. FARREN: It's the actual report from Dr.
4:48:50 Natarajan we're interested in, it's just that's how we received --

4:48:51 THE COURT: Take it back from him, undo the staples, take out the parts that he never got, put the
4:48:56 staples in, and you then you can object or not.

4:48:59 MR. WATKINS: We have no objection, if it's
4:49:01 just the autopsy examination report.

4:49:11 THE COURT: All right.

4:49:12 MR. WATKINS: The toxicology report --

4:49:15 MS. McELROY: No.

4:49:25 MR. WATKINS: No, we never got that.
4:49:36 Basically, what we have are eight pages. Ten pages of --

4:49:41 MS. McELROY: This is the last page of what
4:49:43 we have. That is the -- there is a page in between that I
4:49:55 don't think we have. Yeah, we do.

MR. WATKINS: Yes. That is a part of the

autopsy.

THE COURT: Would you like to use the Court's stapler again?

MR. FARREN: No, I was able to preserve the staple out of efforts to preserve the county money, Your Honor.

The COURT: Okay.

MR. FARREN: It will help pay for the new Law-Mart building.

THE COURT: Any objection?

MR. WATKINS: Not as I believe he's amending to offer.

MR. FARREN: Right.

MR. WATKINS: No objection to that.

THE COURT: State's 1 is admitted.

MR. FARREN: Your Honor, we've also prepared copies of this document that we can redact to the same number of pages as this, and -- with the Court's permission. Without objections from Defense counsel, we'd like to provide those to the jury to read along with the doctor with the understanding that they would be returned after his testimony.

THE COURT: It took you about three minutes to do this. Are you going to take 36 minutes? Can we do it pretty quick?

4:51:12 MR. FARREN: Well, Jeremy is quicker than I am, Your Honor. And I can go ahead and begin visiting --

4:51:18 THE COURT: I have no objection to you providing those to the jury.

4:51:22 MR. WATKINS: We have no objection.

4:51:24 MR. FARREN: I'll go ahead and begin, Your Honor, and as he gets it ready --

4:51:30 THE COURT: All right. Do you need this back?

4:51:30 MR. FARREN: I need one of them. I can use this one.

4:51:33 THE COURT: Well, I just need one, too. I bet y'all can't wait to see it, after all of that discussion.

4:51:43 Q. (BY MR. FARREN) At the time of his death, based on your examination and the information you've provided, how old was Mr. Pool?

4:51:51 A. He was 26 years old.

4:51:54 Q. And do you have an estimate in the autopsy or examination report approximating the time of -- from the time that he died until the body was actually discovered?

4:52:05 A. Well, the information we have is that he was missing in the month of March of 2003, and then about three months later is when the body was actually discovered and submitted to us for an autopsy.

Q. Now, in -- in your examination -- or in your examination report you've indicated the cause of death to be what?

A. Cause of death was blunt force injuries and asphyxia.

Q. And asphyxia, for those who are not scientists, that would be suffocation or lack of air or oxygen. Is that correct?

A. The term in general is going to be lack of oxygen.

Q. Lack of oxygen. And what -- what can cause asphyxia or this lack of oxygen?

A. It can occur from a variety of ways. That's where this mechanism is going to be important, if you're asking in particular with this autopsy or just in general.

Q. The uh -- in your report you indicate final autopsy diagnosis. You've mention blunt force injuries to the head. Could you summarize for us what -- what you found in your autopsy to indicate blunt force trauma to the head?

A. Yes, sir. When we conducted this autopsy, as previously stated, we're going to go through different organ systems. With respect to the head, the scalp itself, because of the fact that the individual had -- was decomposing and had been dead for sometime, we reflected

the scalp, and that -- by that, we cut, reflect back the -- from the hairline and examine the skull. In doing so, we identified along the right side of the skull a fracture.

The fracture extended overlying what's known as the calvarial skull, which is going to be the top half of the skull, and then the fracture, again, extended down into the lower half of the skull known as the baser skull. So that was the main finding as far as the head goes. That's the blunt force trauma that was seen.

Q. In Roman numeral II you've mentioned in your report chest injuries. Can you give a summary real quickly what chest injuries you're making reference to?

A. The two main injuries that we identified, which is on page two, a -- there were left side rib fractures. These were fragmented fractures of the left ribs along their side. The second injury we found was a defect on the chest wall, which we examined further, and in which we found that the defect itself did not enter into the chest cavity. Those were the two significant findings for which he had chest injuries.

Q. And you also list contusions to the torso and extremities. Can you give us a summary of those?

A. Yes, sir. The torso, by that we're talking about both the area of the chest, the abdomen, and the back. In

examination of that, we did note that his body had a decompositional change taking place. However, despite that, we were able to identify multiple areas on the torso of where there was bruising or contusions. These were areas where the hemorrhage, when we cut into the body, we could see that the hemorrhage was deep into the tissue. Unlike areas adjacent to it, which we also cut into, which didn't have that. Similar findings were found on both the right upper extremity, the right arm area, the left arm area, as well as areas of the lower extremities of the legs.

Q. What is lividity?

A. Lividity is after an individual passes away. The heart stops to beat -- stops beating. The blood then is going to pursue by gravity areas of the body. So depending on how you're found, blood will seep and move towards areas that are pulled by gravity.

Areas that are pressed against something, the blood won't be able to go into those areas, and those are what we call areas of spared lividity.

Q. How can you tell the difference between -- well, let me ask you this: Can -- for all practical purposes, can I -- can I cause a bruise to a person after they've died and their heart stops beating? Can I -- can I cause a bruise to that person?

A. Generally, it's going to require a heart beat to have blood profuse into that area. There are areas of possibility that you may have localized, maybe a couple of areas. If somebody is struck very hard, there may be some blood that seeps into the tissue. And, again, that's going to be a matter of experience and how deep the hemorrhage is into the tissue to further decide what's known as antemortem bruising.

Q. At any rate, as an expert in the field, can you determine from -- by examining an area, whether it is a bruise which would have occurred prior to death or lividity, which occurred after death?

A. Yes.

Q. And were you able to do that in the case of Dustin Shawn Pool?

A. Yes. What we had here was -- and it's indicated in the report, there were numerous areas where there was discoloration to the body, which we felt was not bruising. It was just what we expect from decompositional change, and those areas are listed in the report. As well, we found areas that had localized pattern-type bruises, which was consistent with actual contusions.

Q. In your report, Roman numeral IV is used -- it's labeled asphyxia. Can you share with the jury a summary of the information that you found that would make -- that

would be connected to asphyxia?

A. In doing this autopsy, the decedent, it was noted that it was a fair amount of duct tape that was attached to the individual. In particular with the area of head, the duct tape was noted to be wrapped around the head, such that both the areas of the nostrils and the oral cavity was covered completely by the duct tape.

The duct tape, upon being removed we noted that a sock was found inside the oral cavity, the mouth of the decedent. The sock, approximately one-half of it had been pushed into the mouth, to the point where the back portion of the sock was -- had filled what is known as the posterior pharynx of the mouth. Essentially, the deep area of the throat.

So between the combination of the duct tape covering the areas of the nose and the oral cavity, as well as the uh -- sock, the way it had been wedged into the mouth, we used the term asphyxia as being a component to the cause of death.

Q. When you examined the body of Dustin Pool and observed the sock stuffed into the mouth and throat, and the head covered in duct tape, were you able to reach any conclusions, or do you have a scientific opinion about how long an individual, Mr. Pool in particular, could have survived with his entire head covered in duct tape and

that sock in his throat?

A. With the tape firmly placed on the head, covering those nostrils and mouth, as well as the depth of the sock and where it was located within the oral cavity, I would look in terms of minutes.

Q. So it's -- it's your opinion that it is impossible or at least unlikely, that Mr. Pool could have lived say an hour after this sock was placed in his throat and his entire head covered with duct tape?

A. If it's as firm as the number of layers on there, I would say it would be minutes.

Q. When you examined the body you have indicated there was some decompositional change. What is decomposition?

A. Once an individual dies there's going to be a sequence of events that takes place with the body, depending upon the environment. The decomposition is a general term that is going to describe the changes that takes place in the body. This is because, essentially, bacteria that's going to be breaking down within the body, bacteria entering the body through cavities. They are exposed to the environment, as well as if there's any type of predator activity present, which could be anything from ants, to carnivores, to beetles, a variety of other things like that.

Q. In the case of Mr. Pool -- well, let me ask you it sort of as a hypothetical. If -- if Mr. Pool had -- had died -- had been murdered, and left laying out in an open field for three months, would you have expected a different amount of decomposition than what you saw in the body that you actually did perform an autopsy on?

A. Yes.

Q. Do you -- were you given any information and were you able to reach any conclusions -- do you think that would have been more decomposition if he were laying out in an open field?

A. Much more.

Q. Why -- did you form an opinion as to why there was not more decomposition at the time you examined the body, if, in fact, he had been dead for three months?

A. Well, we based our -- there's decomposition to the body, but it's limited also by the fact that the way the body was placed within a concrete area, wrapped in a tarp, so there are things that actually retarded the abilities for decomposition to take place.

Q. So -- so being wrapped in the tarp and then if, in fact, if he was incased in concrete as you referred, that would have slowed the rate of decomposition. Is that correct?

A. Yes.

5:02:14 Q. If, in fact, he was wrapped in this tarp and incased in concrete, was the amount of decomposition that you witnessed about right? Would it be about what you would expect given that time period?

A. I don't know if I can associate exactly with a time period of three months, but it was not surprising to find the body in the state that it was, based on the information I received from where the body was recovered.

Q. There's another part of your report that includes toxicology. What is toxicology?

A. Toxicology is an analysis of body fluids, body tissues for both maybe prescription medications an individual may be taking, as well as elicit drugs.

Q. And in this particular report you -- you included, quote, liver ethanol 0.09 percent. What does that mean?

A. It means that ethyl alcohol was produced and retained within the body. In this particular case, because of the decompositional state, it could be as likely from decomposition as anything else. Your body will produce ethyl alcohol during decomposition.

Q. Okay. And so it is possible that Mr. Pool consumed alcohol sometime shortly prior to his death, but it's also possible that the decomposition produced the alcohol?

A. Yes.

Q. You also indicate liver amphetamines. That a screen was conducted and that it was positive. What does that mean?

A. It's similar to the alcohol. Amphetamines can be produced by the body as a byproduct during decompositional phases. So, again, this would -- without any other component to test, this very well may be decompositional change also.

Q. So he may have consumed amphetamines in some form prior to this death, but it may also be a result of decomposition?

A. Yes.

MR. FARREN: Okay. May I approach the witness, Your Honor?

THE COURT: Yes, sir.

Q. (BY MR. FARREN) I'm showing you what I have marked as State's Exhibit 70. I ask if you recognize what's depicted in that photograph?

A. Yes, sir, I do.

Q. And what do you recognize it to be?

A. This is a blue body bag, which is enclosing the decedent.

Q. Dustin Pool?

A. That is correct.

5:05:16 Q. Up on this television screen across the room from you is a larger reproduction broadcast of a photograph. Is -- do you recognize that to be the same photograph that you're looking at, a reproduction of your photograph?

5:05:36 A. Yes.

5:05:37 Q. And this is the way that this body arrived at your -- at your lab for the autopsy. Is that correct?

5:05:42 A. Yes.

5:05:45 Q. I'm showing you what's marked as State's Exhibit 71. I ask you if you recognize what's depicted in this photograph, and again --

5:05:53 MS. McELROY: Your Honor, if we might. Mr. Farren, are you laying the predicate to introduce these photographs with this witness? If we could, could we just see it, then we can introduce all of them.

5:06:03 MR. FARREN: Yeah, that would be great. I was going to wait until the end, but I can have him look at them all now, and then do the predicate, if you want, if that would be better.

5:06:12 MR. WATKINS: That would make it move faster.

5:06:14 MR. FARREN: Okay.

5:06:15 THE COURT: Whatever's faster.

5:06:17 Q. (BY MR. FARREN) Dr. Natarajan, I'm going to hand you photographs 70 -- marked as State's Exhibit 70, in

5:06:28 sequence, through 147. And I would ask if you would look at each of these photographs first, and then I have a few
5:06:32 brief questions to ask you about them?

A. (Witness complies.)

5:08:39 Q. Dr. Natarajan, have you had a chance to review
5:08:43 the photographs that have been marked in sequence, State's
5:08:46 70 through 147?

5:08:49 A. Yes, sir.

5:08:50 Q. And are these all photographs taken during the
5:08:53 autopsy of Dustin Pool, I think on June 16th, at your
5:08:57 offices there in Lubbock?

5:08:58 A. Yes.

Q. And do these photographs all accurately reflect
5:09:04 the way the events that are depicted in the photographs at
5:09:08 that time?

A. Yes.

5:09:09 MR. FARREN: Offer State's 70 through 147
5:09:12 into evidence, Your Honor.

5:09:13 MR. WATKINS: No objection, Your Honor.

5:09:14 THE COURT: State's 70 through 147 are
5:09:18 admitted.

5:09:19 Q. (BY MR. FARREN) We were about to look at State's
5:09:23 Exhibit No. 71. Again, what are we looking at here?

5:09:27 A. The body bag -- the blue body bag in which we
initially received the body in. It has been opened. You

5:09:38 can see it lying along the sides. Once we opened it up, we noted there were sheets wrapping this blue tarp that's on the picture there, and that's the main thing that you see here.

Q. Now, the blue body bag in State's 70, initially, that's -- it's your understanding that's a bag that the law enforcement authorities put everything else into for transport? That it wasn't -- it's a part of their equipment, it wasn't a part of the crime scene. Is that correct?

A. Yeah. As well as the sheets.

Q. As well as the sheets. Correct. State's Exhibit 72?

A. This is a closer view of the blue tarp. And the area that you're looking at here is at one end of the tarp and that's an exposed area, which later in the autopsy you'll see Mr. Pool's head.

Q. So the -- the -- the dark area there in the very center, is that the top of Mr. Pool's head?

A. Yes.

Q. And then in State's Exhibit 72, as we're seeing the top of his head there, are we actually looking at duct tape?

A. Yes. There is probably a fair amount of duct tape there. It would be better seen later.

5:10:49 Q. State's Exhibit 73?
5:10:52 A. This is, again, the same blue tarp which Mr. Pool is brought in with, but this is the area down by his legs.
5:11:01 Q. And the white or silver looking strip there, irregular looking in the photograph, do you know if that's duct tape?
5:11:09 A. That is duct tape, yes.
5:11:12 Q. State's Exhibit 74, do you recognize what is depicted there?
5:11:17 A. Yes. These are attachments to the tarp and they are labeled and described in the autopsy report, but from here we can see that there's some -- I think fiber-like -- fiber-type rope, as well as weaved rope, as well as some vinyl cord-type apparatus.
5:11:40 Q. And, again, State's Exhibit 75 is another photograph of some of the same objects?
5:11:47 A. Yes, it is.
5:11:48 Q. Okay. State's Exhibit 76. There's sort of a circular looking object with a -- a wire or hook extending from the circular object. What is that?
5:12:07 A. This is going to be one of these elastic stretch-type rubber bands, like a bungie cord, which is going to have the hooks at the end that you can attach to each other to hold something down.
5:12:20 Q. And, again, is there any duct tape or anything to

be seen in this photograph?
A. Yes. There's a -- in this one here the silver colored duct tape, which is underlying area of the bungie cord, as well as in other areas.
Q. State's Exhibit 77, what's depicted here?
A. Here we removed the items that we have described previously, laid them out on a separate cart and photographed them. And then in photographing them, we described them by color, as well as by width, and also giving lengths, and those are indicated in the autopsy report.
Q. State's Exhibit 78, what is depicted here, sir?
A. Here we've started moving the blue tarp away and underneath the decedent, Mr. Pool, is seen. This is the area of the head. Here we can see that there is still some loose rope that's flying around, a stick in the background, and then a variety of duct tape that is -- incased his head, particularly his face, as well as moving down into his torso.
Q. State's Exhibit 79?
A. Another photograph of the items which we've seen previously. Removed, photographed separately, and described in the autopsy report as a type of rope, and as well as lengths.
Q. State's Exhibit 80?

5:13:47 A. We're now looking at the feet of Mr. Pool, and the main thing that we note here is that he was wearing a pair of socks, and there is a firm tie down-type apparatus with an orange end to it, as well as noting that as we move up the leg there is additional duct tape noted.

5:14:14 Q. State's Exhibit 81?

5:14:18 A. We've continued to further remove the tarp, and in doing so we're noting that -- again, there is duct tape on the head, the torso, as well as now we can see that there is a tattoo on the area of the left shoulder.

5:14:33 Q. And so if we're looking at the tattoo, immediately to the right is a round dark object, what is that?

5:14:39 A. That's a partial roll of duct tape that is still attached after being wrapped around the body. That's residual duct tape that's been left.

5:14:49 Q. So the cardboard sleeve that the duct tape comes wrapped around, is that what -- that sort of a collapsed sleeve there. Is that correct?

5:14:59 A. Yes, with some duct tape still attached there.

5:15:02 Q. And even further to the right, in the very right edge of the picture, is that the head of Mr. Pool?

5:15:06 A. Correct. Yes.

5:15:09 Q. Okay. State's Exhibit 82?

5:15:13 A. In this photograph here we've removed the tarp,

essentially, overlying Mr. Pool, and we're now examining the body. This is essentially a full length photograph of the decedent, Mr. Pool, where we see the duct tape is not only around the torso, but it has been wrapped with both of his right and left arms. In addition to that, we see there is duct tape down by his lower abdomen. There's duct tape, as well as a tie down, in the area of the feet. And overall we note that there's decompositional changes taking place to the body.

Q. And in this particular photograph -- or from this photograph can you share with the jury what clothing was Mr. Pool -- still on the body of Mr. Pool at the time you performed the autopsy?

A. I would have to look at the report here.

Q. Yes.

A. There's a couple of items. We previously described -- this is on page three of the autopsy report at the bottom of the page. It states here that the decedent was wearing one dirty, damp white colored sock on each foot. There was a pair of torn dark plaid boxer shorts, which was -- which the waistband strap was still attached around the decedent. And then located between the body and the blue tarp was a long sleeved dark button down shirt, which was moist from decompositional fluids. And we noted that it didn't have any obvious defects in it

5:16:49 or specific tears.

5:16:51 Q. But the shirt was not actually on the -- being worn by the decedent, just the shorts and the socks were actually on his body?

5:16:59 A. Yes.

5:16:59 Q. Okay. State's Exhibit 83?

5:17:09 A. This is another view of Mr. Pool from the left side, going again from the head downwards. We note that the duct tape was circumferential around the head, around the upper torso involving the arms, and then proceeding downward -- if we look at the legs, we see there's duct tape strapped around the legs, as well as a portion of the tie down.

5:17:30 Q. Now, in this photograph there are a lot of -- there are a number of places where this is discoloration to the skin. Can you tell us whether these are bruises, lividity, or a combination?

5:17:41 A. What we did was we incised numerous areas of the body, basically cut into them, to ensure that we thought these were areas that may involve hemorrhage into the tissue, as opposed to just visually verifying that. We cut deep in and then examined the area that did have deep hemorrhage into them. Cut areas adjacent to them that did not have deep hemorrhage, and were able to use a control. And in doing so, it's listed within the report, again,

5:18:09 both areas we felt were decompositional change, as well as
5:18:13 areas of the extremities and the torso that we felt were
5:18:16 due to blunt force trauma.

5:18:22 Q. Okay. State's Exhibit 84. Again, in this
5:18:25 photograph there's a lot of discoloration, and your report
5:18:31 and some photographs later -- from your scientific
5:18:35 expertise you or any other expert would be able to tell
5:18:37 the difference between lividity and bruises while Mr. Pool
5:18:43 was alive?

5:18:44 A. Yes. It would be specifically -- lividity is if
5:18:48 there's still blood left in the tissue. A lot of the
5:18:53 blood that's in the body after it's decomposed like this
5:18:57 is basically absorbed or lost.

5:18:59 Q. So there may have even been discoloration at some
5:19:02 point that sort of disappeared with decomposition?

5:19:05 A. Yes.

5:19:08 Q. State's Exhibit 85?

5:19:11 A. This is the decedent, Mr. Pool. We're having
5:19:16 him placed on his right side, and we're looking at his
5:19:20 back and the area of his left buttock. And, again, we see
5:19:27 there is some duct tape around the area of the waist, as
5:19:30 well as the areas of the legs and the arms.

5:19:34 Q. State's Exhibit 86?

5:19:37 A. This is a photograph of the inside of the tarp.
5:19:40 Once the body was examined within the tarp it was moved on

a different gurney and the pictures were taken of the tarp itself.

Q. And so the tarp was blue on one side and silver colored on the other. Is that correct?

A. Yes.

Q. At the time that you performed the autopsy, you had -- you were given information that he had been dead approximately three months. The decomposition that occurred over that three month period, does that produce an odor?

A. Yes.

Q. And if exhibits are introduced later in the trial from -- for instance, this tarp and so forth, will some of that odor still be present?

A. Yes, it will.

Q. State's Exhibit No. 87?

A. Here we're looking at the abdomen right in the center. There would be the umbilicus or the belly button. And we're just noting that the duct tape is passing across the lower abdomen and also just to take a look at the skin of the abdomen as it compares to the different areas.

Q. State's Exhibit 88?

A. This is the feet of Mr. Pool. We've removed the socks, as well as the duct tape, and as well as the binding that was present on the ankles, which was noted to

be about six inches above the level of the ankles. This picture here depicts the depression type of bruising that took place in the area where the binding was very tightly bound to the legs.

Q. State's Exhibit 89?

A. It's a photograph of the decedent, Mr. Pool. He is partially on his right side. We're now looking at the genitalia of Mr. Pool. There is a greenish discoloration over the scrotum, which was essentially decompositional change. And then we see there are some variations and color of the skin over the areas of the hip versus the abdomen.

Q. State's Exhibit 90?

A. This is the decedent, Mr. Pool, lying on his left side. We're now looking at the areas of the buttock and the back of both sides, as well as both lower extremities, the areas of the legs and the feet. And then we note there is dirt and debris present, attached to the body, as well as the decedent was laying on some of it.

Q. Now, if -- if the dirt and debris that's present, that's either attached to the body or perhaps it's just recently been displaced from the body, was there any way for you to know at the autopsy whether this dirt attached at the time of death, or at the time of burial, or when that happened?

5:22:49 A. No.
5:22:52 Q. State's Exhibit 91?
5:22:57 A. This is a view of the decedent, Mr. Pool. We're looking at it from the area where we're viewing down on his head. You can see the landmark on his left shoulder, the tattoo. Also, we note that there's two rolls of duct tape, which have partially encompassed the torso and fully the face, but the rolls are still attached and they're being held up for the photograph.
5:23:22 Q. The two -- the two collapsed sleeves you've referred to, the duct tape rolls, is that -- on the screen the jury is viewing, is this one and is this one here?
5:23:33 A. Yes.
5:23:34 Q. And this tattoo is on the left shoulder?
5:23:37 A. Yes.
5:23:38 Q. And this area is the duct taped head?
5:23:40 A. Yes.
5:23:48 Q. State's Exhibit 92?
5:23:52 A. This is a view of the decedent, Mr. Pool, where as we previously said, that the head has been completely duct taped. We have now started lifting the duct tape off, and this is a photograph of a view as we're lifting the duct tape away. What you're going to be looking at in there is the portion of the individual's face.
5:24:11 Q. So are you -- where the hands are seen here in

this area here, is this the -- the bottom edge of the accumulated duct tape on the head?

A. Yes.

Q. And so you're -- you're peeling the duct tape, this -- this thickened area here, the duct tape up and over the head?

A. Yes. We're getting ready to lift it and remove it from the head. And due to the decompositional changes and the pasty nature now of the duct tape, it actually -- we were able to remove it intact from the head.

Q. Sort of like a cocoon then?

A. Yes.

Q. State's Exhibit 93?

A. In conducting the autopsy, this photograph essentially shows there was a variety of predators of the insect type that were noted to be found adjacent to the body and lying on the body. We took some photographs of that also.

Q. Now, based on the circumstances that you faced when you began the autopsy -- well, let me ask it this way first. Can vermin, or predators, bugs be of assistance in reaching conclusions in an autopsy? Is that possible?

A. Yes.

Q. If there's been a three-month lapse in time, and if the body is incased in concrete, does this have an

5:25:53 impact on how much help the bugs, the vermin, the various
5:25:53 entomological evidence might be to reach conclusions?
5:25:56 A. It can limit your interpretation. In this
5:25:58 particular case, when we were doing the autopsy, we
5:26:01 elected not to collect the different type of predators
5:26:06 that were present, based on the information that was given
5:26:08 to us at the time of autopsy as to when the individual had
5:26:11 been missing and when the individual had been recovered.
5:26:22 Q. State's Exhibit 94 -- 94?
5:26:25 A. This is a photograph of the decedent. Mr. Pool
5:26:31 is lying on his back. And what we're saying in the lower
5:26:34 portion are Mr. Pool's teeth, and there's also a
5:26:41 weave-like cloth that's -- that's being held by the blue
5:26:45 gloves.
5:26:46 Q. So this area would be Mr. Pool's teeth?
5:26:50 A. His lower teeth.
5:26:51 Q. His lower teeth. And this area where the gloved
5:26:55 hands, is this more of the duct tape being pulled back?
5:26:57 A. This is -- this is actually a portion of the
5:27:00 sock.
5:27:01 Q. This is a portion of the sock. Okay. State's
5:27:14 Exhibit 95?
5:27:18 A. This is a view of Mr. Pool from -- his he
5:27:23 laying on his right side. The slits towards the
5:27:28 the eyes.

Q. So this area are the eyes. Is that correct?
A. Yes. That's correct.
Q. This would be the nose area?
A. Yes.
Q. This would be the mouth area?
A. Correct.
Q. Okay. And this -- this object here, do you recognize what that is?
A. Yes. What we're seeing there is the sock, and now we're actually viewing the upper teeth.
Q. Now, when that photograph is made, is a portion of the sock still in Mr. Pool's mouth?
A. Yes.
Q. State's Exhibit 96?
A. This is a view of the decedent, Mr. Pool. We can see just for his landmark on the left side there is the tattoo on the left shoulder. The item that is being held on the left hand side of the screen is actually the duct tape that is previously discussed, because of the pasty nature and the decompositional change, the duct tape was able to be slid off of the face, and this is a photograph of it just as it is taken off.
Q. So the area here and the photograph that the jury is viewing is the duct tape that is sort of in this cocoon-like position as it's being pulled off of the head?

A. Yes.

Q. And then this would be a view of the top of Mr. Pool's head. Is that correct?

A. Yes.

Q. State's Exhibit 97?

A. This is the view of the decedent, Mr. Pool. We're looking, again, the face. And as previously stated, you can see the two areas that are slit-like, which would represent the eyes.

As you move downward from there, you will see a pair of blue gloves. Those gloves are now removing the sock that has been inserted into the oral cavity of Mr. Pool.

Q. State's Exhibit 98?

A. This is a view of the decedent, Mr. Pool. He has been placed on his back and it is just an overall view of the sock. The gag-like apparatus has now been taken out, and we can see there's a large amount of discoloration around the area of the cheeks and the lips. And then there's portions of tissue that's just basically been decomposed and removed.

Q. This discoloration you've made reference to, does it have any particular significance as far as you can tell in this case?

A. In this area we cut into the tissue in many areas

5:30:09 of the face, including areas of the cheeks. And we noted
5:30:12 that the areas of the cheek had deep hemorrhage in the
5:30:17 tissue there. It was suggestive, we felt, of bruising.

5:30:20 Q. So the -- the discoloration that you found around
5:30:22 the mouth, cheek and head area, based on your examination,
5:30:25 you don't believe this was lividity, but, in fact,
5:30:28 contusion or bruises?

5:30:29 A. Yes. I believe in our report we put it as
5:30:33 suggestive of bruising, unlike some other areas where the
5:30:37 body were -- were -- we were very confident it was
5:30:40 bruising.

5:30:41 Q. Now, the more decomposition that's taking place,
5:30:45 the more difficult it is to reach a conclusion about that.
5:30:48 Is that correct?

5:30:48 A. Yes.

5:30:50 Q. We've seen a number of photographs of a tattoo on
5:30:55 the left shoulder. I want to show you State's Exhibit
5:30:59 No. 99.

5:31:01 A. This is the decedent, Mr. Pool. Again, he's
5:31:06 lying on his back, and now we're looking at both the area
5:31:09 of the mouth, which is with the sock removed, and then if
5:31:12 we go down we see that this is his right arm that we're
5:31:16 looking at, and then there's an elaborate tattoo on the
5:31:22 right arm.

5:31:28 Q. State's Exhibit 100?

5:31:32 A. This is a close up view of what we previously had discussed at the beginning. We discussed there were injuries we noted on the chest. One part included rib fractures, another one was that there was a defect on the chest, and that as we -- further on autopsy, dissected it did not enter into the chest cavity. It was just noted to be a defect.

5:31:55 Q. Well, doctor, to be honest with you, I went through and picked out the photographs out of 500 and something photographs. This -- this object right here to the untrained eye looks like a part of the nail, with this being the head, and I have no idea if it is or not. Do you know what that is?

5:32:14 A. I know it's not a nail.

5:32:16 Q. It's not a nail. Okay.

5:32:18 A. It's most likely going to be some sort of dirt, debris, and maybe a wrinkling in the skin, and it might give some sort of artifactual perception of being something else.

5:32:30 Q. But during the autopsy you did not find a nail anywhere attached to the body?

5:32:34 A. No.

5:32:35 Q. State's Exhibit 101?

5:32:38 A. This is a view of the decedent, Mr. Pool, again, lying on his back. The head has been rotated to the

5:32:44 right. We're looking at the left arm. And in the area of
5:32:48 the left chest, which we described as having the rib
5:32:52 fractures, we noted that there was an overlying area of
5:32:57 this purple dull discoloration, which was consistent with
5:33:00 this blunt force trauma to the area of the underlying rib
5:33:04 fractures.
5:33:04 Q. The area you just referred to as being consistent
5:33:08 with blunt force trauma, is this the area I'm indicating
5:33:12 on the photograph the jury's looking at now?
5:33:14 A. Yes.
5:33:15 Q. That appears to be a relatively large area. Is
5:33:17 that correct?
5:33:18 A. I believe it covered -- I would have to look and
5:33:21 see exactly the number of rib fractures.
5:33:31 On the chest on the left side, the left
5:33:51 lateral rib number six, seven and nine, were fractured
5:33:55 with fragmented bony --
5:33:57 Q. The -- the actual fractures to the bone that you
5:34:00 observed, did you find that to be consistent with what
5:34:04 appears to be a bruising or contusion near to the outer
5:34:10 portion of the body in State's Exhibit -- I guess this is
5:34:14 101? Is that correct?
5:34:15 A. Yes.
5:34:16 Q. State's Exhibit 102?
5:34:20 A. This is just a close up view of the tattoo.

5:34:24 Q. Okay. That's on the left shoulder. Correct?
5:34:27 A. Yes.
5:34:28 Q. State's Exhibit 103?
5:34:32 A. We took several photographs of the hands and -- as well as the feet. These are just shots of the hands indicating that this kind of moist nature of the overlying skin, but also indicates that there was no evidence of injuries in certain areas.
5:34:49 Q. So to this -- to the left hand there's -- you didn't see any evidence of bruising or any contusions there?
5:34:55 A. In particular to the dorsum of the left hand, which would be this portion right here.
5:35:00 Q. The -- the dorsum being this portion here?
5:35:08 A. Yes. It's -- essentially, think of it as being the back of the hand.
5:35:11 Q. Now, in addition to -- if -- if I were to make a fist and were to strike Judge Miner, in addition to going to jail for contempt --
5:35:21 THE COURT: For a long time.
5:35:22 MR. FARREN: For a long time. Yes, sir.
5:35:25 Q. (BY MR. FARREN) -- could that result in contusions to the knuckle area of the hand and so forth?
5:35:29 A. It can, yes.
5:35:31 Q. And you didn't find any of that on the left hand

5:35:33 of Mr. Pool. Is that correct?
5:35:35 A. No. And we did -- again, as we did on many areas of the body, cut into the tissue to look at the underlying areas of skin and soft tissue.
5:35:45 Q. State's Exhibit 104?
5:35:47 A. This is the right hand. Again, we're looking at the dorsum or the back of the hand, on the right side. And, essentially, what we're seeing here is this moist decompositional change, as well as some skin peeling that's present. There's an area on the wrist, before we get to the hand, which has some focal area of discoloration.
5:36:10 Q. And were you able to determine whether that's just decomposition, or bruising, or --
5:36:14 A. I would have to look on this. I think there was several areas of extremities that indicated bruising.
5:36:22 Q. Do you have an opinion about whether you can actually have bruising as a result of tape or rope being tied and bound in some way?
5:36:30 A. Well, the answer is, yes, you can.
5:36:33 Q. Okay. That's all right. State's Exhibit 105?
5:36:38 A. This is the palm of the hand. Essentially, just showing that there's decompositional change without evidence of any bruising or lacerations.
5:36:48 Q. And is this the right or left hand?

A. This is going to be the right hand.

Q. Okay. State's Exhibit 106?

A. Again, another picture of the palm of the right hand showing the similar changes.

Q. State's Exhibit 107?

A. We're now looking at the decedent, Mr. Pool. He has been placed on his chest and abdomen. And we're beginning examination of the back. And this is just an overview of the back, which did have, essentially, three major areas of bruising present, which are described in the autopsy report by size and by the fact that those areas were incised into, again, indicating there was hemorrhage that went deep into the underlying tissue.

Q. And that would be indicative, in your opinion, of bruising or contusions?

A. Bruising or contusions due to blunt force trauma.

Q. Due to blunt force trauma. Okay. State's Exhibit 108?

A. Again, the decedent, Mr. Pool, lying on his chest and abdomen. We're now moving lower towards the feet. Here we see the lower half of the back, as well as areas of the buttocks and of the right arm.

Q. Again, is there any evidence in this photograph, 108, of bruising and contusions?

A. What was previously described on the back, as

5:38:26 well as areas of the left buttocks.

5:38:31 Q. Finally -- or next, State's 109?

5:38:35 A. Now, we're just looking at the lower extremity of Mr. Pool, and looking at it from the posterior or the back side, just to view and report from the autopsy focal areas of bruising that was present.

5:38:54 Q. State's Exhibit 110?

5:38:57 A. We are now taking a look at Mr. Pool. We're now going into the internal examination of the autopsy. And here we're looking at the head and the scalp itself has been reflected. And in reflecting it, what we're seeing is the right side of the skull and that there's a fracture present.

5:39:19 Q. Where I'm indicating on the jury's photograph, is the fracture running approximately along that line?

5:39:25 A. Yes.

5:39:26 Q. Now, the fracture itself, can you tell us approximately how long that fracture is?

5:39:34 A. Well, the fracture extended -- from this picture we see --

5:39:37 THE COURT: Mr. Farren, we're going to take a little break. We've been at it an hour and a half.

MR. FARREN: Yes, Your Honor.

5:39:43 THE COURT: Ladies and gentlemen, why don't you be in the jury room right straight up at 4:00 by that

5:58:45 clock. Y'all can visit about how late you want to stay.

5:58:45 (Recess.)

(Both sides, the Defendant, the jury

5:58:46 (present, in open court:

5:59:18 THE COURT: Thank y'all. Everyone be seated.

5:59:22 Okay. Mr. Farren, continue.

5:59:25 MR. FARREN: Thank you, Your Honor.

5:59:28 Q. (BY MR. FARREN) On the screen for the jury is

5:59:32 State's Exhibit 109 --

5:59:34 MR. FARREN: And can I have just a moment,.

5:59:40 Your Honor?

5:59:43 THE COURT: Yes.

5:59:57 Q. (BY MR. FARREN) I'm showing you what has been

6:00:04 marked as State's -- I think on the screen was 110, and

6:00:09 State's Exhibit 111 is now on the screen. Do you

6:00:12 recognize the picture on the screen being the same one

6:00:18 you're looking at?

6:00:18 A. Yes.

6:00:18 Q. Now, this is the same fracture with a measuring

6:00:22 device to give us some idea of the size. Is that correct?

6:00:25 A. Yes.

6:00:26 Q. Doctor, based on your training and experience,

6:00:30 can you give us -- can you quantify or somehow give us an

6:00:36 idea how serious a fracture this is? Is this some minor

little fracture or is it more serious than that?

A. Well, I don't think we can probably quantify it, but we can certainly look at it as to the extent that the -- I think the level of fractures. You can go from what we see as a linear fracture. In other words, a straight line fracture, which could occur from someone just falling backwards and striking their head, to a fracture to something like this, where it's more -- instead of being linear, it's described in the autopsy report as being U-shaped. It's an extensive fracture that involves not only the area of the top of the head, the calvarial skull, which have U-shaped, but then it proceeds into the base of the skull and then covers a portion of the base of the skull known as the area of the orbital plate. This would not be the front of the baser skull, the fracture goes into that, as well as the area right behind it, which is called the middle cranial fossa, another anatomic location. So it's a significant fracture.

Q. Have you seen fractures that occur in automobile accidents, skull fractures?

A. Yes.

Q. And have you seen fractures where a person bumps their head against something accidently or with not a lot of force?

A. Yes.

Q. Is this fracture more consistent with the kind of fracture you would see in an automobile accident or just a bump on the head?

A. I would say that this is a fracture that would be seen with a significant impact trauma.

Q. Okay. If -- if evidence were presented that Mr. Pool had been struck in the head with a fireplace poker, would -- with significant force, would the fracture you see here be consistent with that kind of act?

A. Yes.

Q. In addition to the skull fracture that we just talked about, we also visited about a number of contusions and rib fractures. There's some more photographs that we're going to look at in a few moments in reference to those, but keeping in mind all of the contusions, bruises broken ribs, skull fracture that you witnessed in the autopsy, do you have any opinion about whether Mr. Pool suffered a severe beating prior to this death?

A. The body showed several areas on the torso, as well as the extremities of significant areas of bruising. So each one of those was an independent area where they either struck something or something struck the body.

Q. If -- if -- if -- you had evidence or heard testimony that Mr. Pool was struck in the chest with a shovel handle, would that be consistent with some of the

6:03:31 6:03:33 6:03:38 6:03:41 6:03:47 6:03:50 6:03:51 6:03:54 6:03:58 6:04:01 6:04:04 6:04:09 6:04:13 6:04:16 6:04:22 6:04:24 6:04:26 6:04:29 6:04:32 6:04:37 6:04:41 6:04:45

injuries that you saw?
A. Yes.
Q. The skull fracture that we're still looking at on the screen here, is it possible for a skull fracture to originate from one event and be exacerbated or become even more serious as a result of additional trauma after that?
A. Yes.
Q. For instance, if Mr. Pool had been struck in the head with a fireplace poker and then later received additional blows to the head, or someone stomped on his head, or something of that nature, could that have caused the skull fracture to become even worse?
A. Yes. It could be either a propagation of the initial fracture, or it may be a second fracture that has been created and is now involved with the first fracture.
Q. And what you've just described as -- it's my understanding that you're suggesting there could be two fractures that actually join together?
A. Yes, it could -- the fracture we're looking at does not necessarily have to be implicated to one blow.
Q. Okay. And could that also occur as if you -- if Mr. Pool had a skull fracture and then he were dragged down a set of steps of the stairs and his head were bumping down the stairs, could that exacerbate the injury?
A. Yes.

Q. I'm showing you what is marked as State's Exhibit No. 112. You've mentioned that you -- incised events. In laymen's terms, did you make a cut into the skin --

A. Yes.

Q. -- of Mr. Pool? Is that one of these in this photograph?

A. Yes, it is.

Q. And what is the purpose, again, in doing this?

A. In areas that appear very suspicious for deep bruising, we wanted to cut into each of those areas. This area in particular was because it was so tightly bound just above the level of the ankles. It had a depressed area of bruising to it. We, again, just took a photograph after cutting into it.

Q. And did you form an opinion as to whether this was, indeed, a bruise?

A. Yes, we did. We felt it was a bruise, yes.

Q. Again, do you know if that's a bruise -- do you know if that was a result of a blow, or from being bound, or can you say for sure?

A. Most probably it's from being bound, simply because we can associate the area of depression and bruising with an overlying agent that was binding the legs.

Q. If a bruise results from being bound, can you

form any opinion or share any information with the jury that would help us understand whether -- could I bind you so tightly that it caused a bruise, or is it more likely that if I bound you very tightly and you suffered a beating, as you're struggling against that object that has you bound, that that would cause the bruise, or can you say?

A. Both are viable reasons for bruising of the leg, either the tight binding or the fact that an individual is trying to move violently, because they're being struck.

Q. State's Exhibit 113?

A. This is a closer view of one of the wounds or areas of bruising that's been cut, and it's to show along the wall of this skin the hemorrhage that's present into the underlying tissues.

Q. Earlier when we look at the photograph of the mouth, you indicated a discoloration along the wall of that cavity. Is this similar to this discoloration?

A. That -- the reason we used the word suggestive there was there was more of a blackened discoloration around the area of the mouth. Just cutting into the cheek there was appearance of blood that had seeped deep into the tissue, showing that there were areas of the cheek suggestive of bruising, but the actual area around the mouth, one, because of an accelerated rate of

6:07:28 decomposition because of the moist nature of that area,
6:07:33 as well as the duct tape and some of the color that was
6:07:36 coming off of the duct tape onto the soft tissue, that was
6:07:40 not an area where we could make an interpretation.

6:07:48 MR. FARREN: May I have just a moment, Your
6:07:50 Honor? I apologize.

6:07:51 THE COURT: Yes, sir.

6:07:53 Q. (BY MR. FARREN) At some point in the autopsy is
6:07:58 there some sort of a summary or list of areas where there
6:08:03 was trauma or injury?

6:08:05 A. Yes.

6:08:06 Q. Where would that be in your report?

6:08:08 A. There's a section -- it starts on page four of
6:08:12 the autopsy report. It's in bold letters. It's put out
6:08:17 as evidence of injury. And, essentially, what we have
6:08:20 there is over a period of page four, page five, page six,
6:08:27 and to the top of page seven, the majority of this are
6:08:32 areas of -- that were consistent with injuries within --
6:08:36 within the context of -- the body of this context, I also
6:08:39 have a couple of photographs indicating areas that were
6:08:42 not injuries, so we cut into this so that we could, again,
6:08:47 indicate we examined all areas of the body.

6:08:49 Q. But in your autopsy report, to describe those
6:08:51 areas that you believed showed evidence of trauma and
6:08:55 injury, it covered pages -- at least a part of page four,

6:09:02 6:09:04 6:09:07 6:09:15 6:09:16 6:09:19 6:09:24 6:09:29 6:09:32 6:09:34 6:09:41 6:09:44 6:09:46 6:09:49 6:09:51 6:09:55 6:09:59 6:10:03 6:10:04 6:10:08 6:10:11

all of page five, all of page six, and a part of page seven?

A. Yes.

Q. I'm showing you what's marked as State's Exhibit 114. Can you describe for the jury what we're seeing here?

A. Yes. This is a view of Mr. Pool, the decedent, placed on his back, and we're looking at the abdomen, the area of the genitalia -- a portion of the genitalia, and it's just one more -- we take several photographs at different angles to ensure that we have covered all parts of the body.

Q. Do you know whether this is trauma or discoloration we're seeing there? Do you have an opinion whether that's trauma or -- or what that may be?

A. I believe, again, with these -- I always refer to the report, because just looking at the photograph again, it can be a bit deceptive and you have to use the report.

There's areas on the chest that we defined as trauma. I don't believe on the area of the abdomen itself we noted any.

Q. When a person -- when a person dies like Mr. Pool, if there's tape or something on the skin, does -- does that -- as the body decomposes, does the blood tend to collect in that area, or can that contribute

to discoloration, or do we know?

A. Well, if you just have an area that's taped, you would expect there's not going to be any blood in that area because it's going to be pushed out by the pressure of the tape.

Q. I see.

A. The tape in this case did appear in areas of the chest to give off a portion of its color and, you know, leaked into the tissue.

Q. State's No. 115?

A. This is a photograph of Mr. Pool. We're looking at it from the head viewing down. The top of the skull has been removed. We can see his right arm as a landmark there. And now we're looking at the base of the skull.

Q. This is the -- the larger tattoo that we've talked about earlier and the sunburst tattoo was over on the left arm?

A. Yes.

Q. This is -- if he were standing up, it would be an overhead view looking down at the top of his head. Is that correct?

A. Yes.

Q. Okay. There's a line here -- if you look at the photograph the jury is viewing, there's a line there in the photograph. Can you describe to the jury what that

6:11:27 6:11:31 6:11:34 6:11:38 6:11:44 6:11:47 6:11:52 6:11:54 6:11:55 6:11:57 6:12:00 6:12:06 6:12:09 6:12:14 6:12:18 6:12:19 6:12:22 6:12:26 6:12:28 6:12:32 5:12:38 5:12:43

is?

A. Yes. As previously stated, we gave some anatomic landmarks. This the base of the skull you're looking at here. If you view the right side of it and you're looking at the middle area, that's known as the middle cranial fossa, meaning a pocket. And in that there's a fracture that extended all the way from the side of the lateral aspect, and it's moving inward toward the midline of the body.

Q. Is this the part of the same fracture that we were looking at earlier or is this another fracture?

A. Well, this fracture -- the fracture that was on the top of the head which was U-shaped, it did come around and it connected to this area here. So in the one aspect, it's contiguous with this, but could it have occurred from two separate blows, the answer's yes. I'm not able to state to you it's just one blow.

Q. But this fracture is significant enough that -- again, in laymen's terms, it penetrates the skull, it's the -- the entire depth of the skull?

A. This fracture alone can be a cause of death.

Q. Okay. I'm showing you what has been marked as State's Exhibit 116, and ask you if you can tell us what's depicted here?

A. This is the inside view of the chest cavity after

6:12:47 the organs and everything have been removed. And we're looking at the ribs that have what we call spiculated or pointed edge. They're fragmented and they're fragments of bone that were identified in the soft tissue. So it's essentially rib fractures where they're not just linear rib fractures, but they're actually blows that caused the bone to fragment.

6:13:12 Q. Okay. And so the first area I'm pointing to, is that one of those?

6:13:17 A. It would be below -- to your right.

6:13:22 Q. Up here?

6:13:22 A. Yes. And then if you -- yes.

6:13:24 Q. And then here?

6:13:25 A. Yes.

6:13:26 Q. And so these are -- these are not just cracked ribs, these are literally broken ribs?

6:13:31 A. Broken and fragmented.

6:13:34 Q. Broken and fragmented. And these broken and fragmented ribs -- we're, of course, viewing the injury from the inside of the body here. Some of the discoloration that you concluded was bruising or contusions earlier, was that on the outside of where these broken ribs are, adjacent to this area?

6:13:55 A. Yes.

6:13:56 Q. I'm showing you what's marked as State's Exhibit

117.

A. This is a view of the decedent, Mr. Pool, on his back. And we lifted up the right arm, and in doing so, if you take a look at the area of the right elbow and move toward the armpit, you will see an oval shaped area of bruising, and that was the purpose of this picture. As well as to show that on the right chest wall the difference as compared to the left chest wall, which had the discoloration and bruising, the right side did not have that and it did not have any rib fractures.

Q. And -- and so did you reach an opinion, based on scientific evidence in 117, is that bruising that we see near the elbow on the arm?

A. Yes.

Q. State's Exhibit 118?

A. This is a view of the decedent, Mr. Pool, lying on his back. The gloved hands are just again showing that there's multiple focal areas of bruising on the left arm and forearm.

Q. State's Exhibit 119?

A. 119 here is the view of the decedent, Mr. Pool. We're looking at the back of his head, and this was, essentially, just to show that most of the hair had been removed simply from that decomposition. It has fallen off. As well to show what we call a degloving effect.

6:15:40 The scalp, because of the decomposition is starting to
6:15:44 just slip away from the skull. And it was also to show
6:15:46 that there were no lacerations or any defect on the back
6:15:48 of the head.
6:15:49 Q. So you didn't see any indication of contusion or
6:15:52 trauma to the back of the head?
6:15:53 A. In the area where this skin was intact.
Q. I see.
6:15:56 A. Areas where skin has sluffed away, we couldn't
6:15:59 make a comment on that.
6:16:00 Q. All right. So there could have been contusions
6:16:02 or bruises to the back of the head, but not so severe that
6:16:06 they caused the skull fracture, but you wouldn't be able
6:16:08 to see them because the skin is just gone now?
6:16:12 A. Well, the back of the head most of the skin is
6:16:14 intact. It would be more if you're viewing that picture
6:16:16 to the right side, you can see that there's bone. You can
6:16:19 see bone actually present as opposed to scalp.
6:16:25 Q. States 120, is this the area that you're talking
6:16:29 about?
6:16:29 A. Yes. There could be some other scalp injury
6:16:32 here, which we would not identify simply because the scalp
6:16:34 in that area has been decomposed and gone away.
6:16:39 Q. But it -- if there had been a contusion to the
6:16:42 skin in this area, it wasn't so severe that it caused any

6:16:45 fracture to the skull?
6:16:45 A. Well, if you look at this picture onto the right side, a portion of that fracture which we have already discussed is present.
6:16:53 Q. All right. So you can actually see a little bit of the fracture we've talked about earlier, even in this photograph?
6:16:58 A. Yes.
6:17:02 Q. Okay. State's Exhibit 121. And -- and if you would view that for a moment, and then I'd like for you to look at 122, because I think that may be more helpful.
6:17:16 State's Exhibit No. 122?
6:17:18 A. These are areas -- this is a portion of the buttocks. And what we're seeing here is an area of actual bruising, which subsequently areas like this were cut or what we called incised into, and we can see the extended hemorrhage into the underlying soft tissue.
6:17:38 Q. And so on the screen the jury is viewing is State's Exhibit 121 and 122. 122 being the one where you have made the incision, and this is a part of the process that you use in evaluating whether the discoloration is in fact a bruise and a contusion?
6:17:53 A. Yeah. Just to make one correction on my part. It's not the buttock, it's the area of the shoulder.
6:17:59 Q. Yes, sir. I understand. Thank you.

State's Exhibit 123. And I believe, and correct me if I'm wrong, 124 is similar to 121 and 122. We have the discoloration and then an incision to try to evaluate it. Is that correct?

A. That's correct.

Q. Okay. And, again, is this just an attempt to determine whether this is a bruise or not?

A. Yes. We -- in doing this throughout the body, there are several areas of the body that we cut into that did not have any discoloration underneath, and was very consistent with decompositional change. As opposed to the localized, descript areas as you can see with bruising, which when cutting into did show this deep hemorrhage in the tissue.

Q. State's Exhibit 125. Ask if you recognize what's depicted here?

A. Yes. This is the decedent, Mr. Pool. He has been placed on his chest and abdomen. The area that we're looking at here, adjacent to where the gloved hand is, is the area of the anus and rectum.

Q. And if -- if -- if there were testimony that, for instance, a man named Josh Bledsoe claimed to have inserted a broom handle into Mr. Pool's anus prior to this death, during your autopsy you did not see evidence of that. Is that correct?

6:19:34 A. Correct.
6:19:36 Q. If there were other claims by other parties that someone stuck a fireplace poker -- inserted a fireplace poker into Mr. Pool's anus, again, no -- no evidence that that actually occurred?
6:19:51 A. That's correct.
6:19:54 Q. Okay. State's Exhibit 126?
6:20:03 A. 126 is a view of the area of the buttocks. And what we're showing here is that if you look on the right side of your screen, areas that we cut into did not indicate any sort of deep discoloration of the soft tissue. In comparison, looking on the left side of the screen, we can see once we cut into those areas, the amount of discolored and deep hemorrhage that was present despite decompositional change, we're able to use a control and compare the two areas.
6:20:35 Q. State's Exhibit 127?
A. Uh --
6:20:54 Q. I know it's difficult in a vacuum, but tell me --
6:20:57 A. This is the --
6:20:58 Q. -- is this the inside of the knee?
6:21:00 A. No. This is the decedent. He is lying on his chest and abdomen. That's the right arm, the back side. And, again, it's just to show that there's an area of bruising present. If you went a little bit lower, you

6:21:15 would actually be at the elbow.
6:21:18 Q. So is he face down here and this is the inside of
6:21:22 his arm?
6:21:22 A. Yes.
6:21:22 Q. Is this the armpit area?
6:21:25 A. Yes.
6:21:25 Q. Okay. And that's another area that appears to be
6:21:28 bruising, based on your examination?
6:21:29 A. Yes.
6:21:33 Q. State's Exhibit No. 128?
6:21:40 A. This is the same photo as the previous, only at a
6:21:46 closer view where we've cut into it. Once again, showing
6:21:49 the deep hemorrhage into the underlying soft tissue,
6:21:54 consistent with bruising.
6:21:55 Q. State's Exhibit No. 129?
6:22:05 A. This is the decedent, Mr. Pool. If you take a
6:22:08 look toward the left corner, you can see that tattoo is
6:22:13 present, so what we're looking at --
6:22:14 Q. This is the star tattoo here?
6:22:17 A. Yes. So we're looking at the left arm and
6:22:20 forearm, and the elbow is actually projecting towards you,
6:22:24 and it's to, again, show areas of localized discoloration,
6:22:30 which when cut into, again, was areas of bruising.
6:22:35 Q. State's Exhibit 130?
6:22:38 A. 130 is an example of areas of control. If you'll

look at the lower portion of your picture there you'll see a scalpel. You'll see areas that have been cut on the skin, and just to help you recognize that these areas do not have bruising with them, as opposed to the areas that we've seen already with the marked discoloration and hemorrhage.

Q. Finally, State's Exhibit 131?

A. In this particular case, because the individual was not identified, as well as the complexity of the autopsy, numerous X-rays were taken. And these are -- I think the following pictures are going to be X-rays of different areas of the body. Essentially, just showing there's gaseous changes, which show a haziness to the X-ray, but also indicating that the bones are intact.

Q. And State's Exhibit 132 and 133, do you recognize these as X-rays of the decedent's skull?

A. Yes. These were taken. Again, there was concern about identification of the body, and so we wanted to take several photographs or several X-rays in the event comparisons could be made later.

Q. Okay. State's Exhibit 134 and 135?

A. Again, X-rays both in the area of the chest and of the upper extremity, again showing the gaseous decompositional change present, without evidence of any kind of retention of foreign body.

6:24:20 Q. 136 and 137?
6:24:28 A. Similar descriptions of the opposite extremity,
6:24:32 including both the hand and the forearm.
6:24:35 Q. Okay. 138 and 139?
6:24:44 A. Again, similar findings involving the area of the
6:24:49 knee and as well as the other forearm.
6:24:54 Q. 140 and 141?
6:24:59 A. Again, showing the decompositional change of the
6:25:03 surrounding soft tissue with the intact bone structures on
6:25:07 X-ray.
6:25:08 Q. Now, Doctor, you know that I actually -- I
6:25:11 actually schemed during the break to jump to picture 170,
6:25:14 just to see if Jeremy was paying attention there.
6:25:17 Number 142 and 143?
6:25:22 A. These are X-rays of the area of both the chest
6:25:24 and the pelvis. Again, just showing there's no retention
6:25:29 of any type of foreign body, either like sharp force
6:25:34 injury type tools or projectiles.
6:25:38 Q. And you didn't find evidence of any bullets, or
6:25:41 knife wounds, or things of that nature. Is that correct?
6:25:44 A. No, we did not.
6:25:46 Q. But lots of blunt force trauma?
6:25:48 A. Yes.
6:25:49 Q. 144 and 145?
6:25:56 A. Again, additional photographs or X-rays of both

6:26:01 6:26:04 6:26:11 6:26:14 6:26:15 6:26:18 6:26:23 6:26:28 6:26:29 6:26:31 6:26:31 6:26:40 6:26:41 6:26:42 6:26:44 6:26:47 6:26:51 6:26:51 6:26:53 6:26:58 6:27:02 6:27:06

the feet, as well as the upper extremity, with the same type of decompositional changes.

Q. And, finally, 146 and 147. Do you recognize these to be photographs of injuries that we've looked at earlier?

A. Yes. The photograph on the lower portion there, where there's the three fingers, again, just pushing a little bit on the ribs to indicate the bony fragmented stipulated nature of the injuries.

Q. And that's here, here, and here?

A. Yes.

Q. And then this -- this line here, is this again that -- an interior view of that serious fracture that you were talking about earlier?

A. Yes.

Q. Okay. And is this the one that you felt like that alone could have caused death, although in this particular case asphyxia is mostly likely the cause of death?

A. Well, in this case, we combined the two. I'm not able to tell you whether this skull fracture or the asphyxia itself was the cause. I could tell you that either one of them by themselves could also be the cause.

Q. But the -- yeah. The taping of the sock alone would cause death?

6:27:09 A. Yes.
6:27:10 Q. If nothing else had occurred, that would cause death?
6:27:15 A. Yes, it would.
6:27:18 Q. Can you give us any idea what kind of size this person was? Height, weight, that sort of thing?
6:27:40 A. We have -- when we're doing cases where there's decomposition, the weights may not -- I can tell you what we have here. It may not adequately represent the weight of the individual.
6:27:51 Q. Right. I understand.
6:27:53 A. But on page four of the -- I'm looking -- I'm not sure if we put a weight on this individual.
6:28:22 Q. Okay. Would that -- would that be because after three months, I mean, it could have changed significantly?
6:28:30 A. No, I think it's an error on our part.
6:28:34 Q. Okay. A few moments ago we were talking -- actually, quit a while ago, we were talking about the presence of uh -- bugs, maggots, vermin, things of that nature. Do you have an opinion about when it is appropriate or it's at least going to be most scientifically helpful to collect those kinds of specimens?
6:29:12 A. When we have worked with entomologists on cases, it's most helpful if we have representative samples of the

6:29:30 6:29:32 6:29:36

surrounding dirt. And we have temperature changes. We have a good information on the climate that the individual was in. Those are the kind of things that the entomologist would like from us.

In this particular case, we did not do a collection for predator activity. Again, we felt that based on where the body was recovered from, as well as the information that we received at the time of doing the autopsy, that further collection was not needed.

Q. And it would have been of limited value, in your opinion?

A. In my opinion, it would have been of limited value, yes.

Q. Do you know an individual by the name of Neil Haskill (phonetic)?

A. No.

Q. Have you ever read any of his uh -- read his books or anything about entomology written by him?

A. I don't recall any.

Q. Okay. That's fine.

What is the -- explain to the jury, what is the mandible?

A. The mandible is the lower portion of your jaw. You have a maxillary component and a mandible component.

Q. And if -- if you have a body that is not

6:30:47 identified in any other way, can the mandible be of help in doing that?
6:30:53 A. Yes.
6:30:53 Q. Why is it helpful?
6:30:55 A. Well, most individuals will have some sort of dental work done. They may have had some X-rays, possibly of the jaw taken. And if we have an antemortem study done, in other words, a study of am individual when they were alive. We can now do a comparison both on dental exam, as well as bone structure, and see if it's equivalent to the person when they were identifiable.
6:31:25 Q. And so it can be a source of material for DNA testing. Is that correct?
6:31:29 A. It can, yes.
6:31:30 Q. Now, in this particular case do you know whether or not law enforcement authorities, particularly Mr. Jim Burgess, was able to actually lift prints from Mr. Pool?
6:31:40 A. I know that we attempted lifting prints, and it's indicated in the report that that was performed. I'm not aware of whether at the time of the autopsy what the results were.
6:31:52 Q. Okay. But at any rate, sometimes even after a period of three months or more, it's possible to lift prints from an individual and identify them that way?
6:32:03 A. Yes.

Q. And that was at least -- you do know that that was attempted in this particular case?
A. Yes.
Q. Okay. And in addition to that, however, you've talked about the mandible can be a source for DNA?
A. Yes.
Q. In this particular case, did you -- during your autopsy, did you remove and set aside the mandible of Mr. Pool?
A. Yes.
Q. And what did you do with the mandible?
A. The mandible, as well as other evidence collected, was given to the Special Crimes Unit of the Amarillo Police Department.
Q. Did you actually keep the mandible there at your offices for a while, and then it was picked up sometime after the autopsy, or do you know for sure?
A. We have an evidence collection sheet, I can tell you the date it was given. The mandible -- both the mandible and the maxillary component of the jaw was transferred over on 27 January 2004, at 11:30 in the morning.
Q. So you performed the autopsy in June of 2003. Is that correct?
A. Yes.

6:33:33 Q. And then you saved the mandible at your office, and Mr. Burgess from the police department, according to your records, picked it up January 27th of 2004?

6:33:49 A. Yes.

6:33:49 Q. Now, do you know where Mr. Burgess -- or Sergeant Burgess of the Amarillo Police Department, do you know where he took it after that, or do you know?

6:33:56 A. I don't know.

6:33:57 Q. Okay.

6:33:58 MR. FARREN: May I approach the witness, Your Honor?

6:34:00 THE COURT: Yes, sir.

6:34:37 While they're doing paperwork, ladies and gentlemen, what did y'all decide to do?

6:34:44 UNIDENTIFIED JUROR: I think we decided --

6:34:46 THE COURT: Don't all speak up at once now.

6:34:47 UNIDENTIFIED JUROR: -- we decided we could stay until 5:30.

5:34:50 THE COURT: Okay. Is that what everybody wants to do? Good.

5:34:53 What time do you want to come back tomorrow?

5:34:55 UNIDENTIFIED JUROR: 8:30.

5:34:57 THE COURT: Okay. Good for y'all. I'll ask you later about Saturday. I won't tie you down.

5:35:03 UNIDENTIFIED JUROR: We've already decided.

6:35 THE COURT: Huh?

6:35:05 UNIDENTIFIED JUROR: We've done decided.

6:35:07 THE COURT: You have?

6:35:08 UNIDENTIFIED JUROR: Uh-huh.

6:35:08 THE COURT: What do you want to do?

6:35:09 UNIDENTIFIED JUROR: No.

6:35:09 THE COURT: No? Okay. All right. That's
6:35:13 good. Okay. That's what we'll do.

6:35:15 Yeah. Sure. Go ahead.

6:35:18 MR. FARREN: May I approach the witness,
6:35:19 Your Honor?

6:35:19 THE COURT: Yes.

6:35:20 Q. (BY MR. FARREN) I'm showing you what I've marked
6:35:22 as State's 250. I ask if you recognize this -- this
document?

6:35:25 A. Yes, I do.

6:35:26 Q. Is this a true and accurate copy of the documents
6:35:30 that you just reviewed in answering the question about the
mandible?

6:35:34 A. Yes.

6:35:34 Q. And so this document is a copy of your records
6:35:37 showing that you had the mandible stored at your office
6:35:40 and that Jim Burgess picked it up on January 27th of 2004?

A. Yes.

6:35:48 MR. FARREN: I'd offer -- have you seen

this?

MR. WATKINS: I haven't seen it. No objection.

MR. FARREN: We offer State's Exhibit 250 into evidence, Your Honor. I'm sorry --

MR. FOWLER: It would be 251.

MR. FARREN: That should be 251. I apologize, Your Honor, I messed up.

THE COURT: Okay.

MR. FOWLER: 252.

MR. WATKINS: Well, we object if it's 252. Withdraw that objection for the record.

THE COURT: What is it?

MR. FARREN: It's going to be Exhibit 252, and I'll show it to Dr. Natarajan, again, just to make the record clear.

Q. (BY MR. FARREN) I have remarked the exhibit. We had mismarked it a moment ago. It's actually Exhibit 252. The same document you talked about a moment ago. Your answers would be the same about Exhibit 252. Is that correct?

A. Yes.

THE COURT: Let me look at it. 252 is admitted.

MR. FARREN: Thank you, Your Honor. Pass

6:37:17 the witness, Your Honor.

6:37:17 May I publish to the jury?

6:37:19 THE COURT: Yes.

6:37:27 MR. WATKINS: I will wait for James to sit down, so I can see the witness.

6:37:31 MR. FARREN: I'm so tall.

6:37:33 THE COURT: Yeah, hold up. Are you going to put them in that --

6:37:42 MR. FARREN: We could, Your Honor, but there are other photographs --

6:37:45 THE COURT: Okay. All right. Have you asked that they be published.

6:37:50 MR. FARREN: Yes. State's -- I'm asking 252 and State's 70 through 147 be -- be admitted.

6:37:59 THE COURT: 70 through 147 can be published.

6:38:03 MR. WATKINS: Since they were up there, I don't think it matters.

6:38:08 THE COURT: Okay. You may proceed.

CROSS EXAMINATION

6:38:10 BY MR. WATKINS:

6:38:11 Q. Hi, Dr. Natarajan. How are you?

6:38:13 A. Very good. Thank you.

6:38:15 Q. Before I forget, I want to thank you for giving Ms. McElroy and I a tour of your new facilities down in Lubbock.

A. You're very welcome.

Q. A couple of quick questions. I'm going to try to keep this short, but we'll see.

Just to clarify, you talked about, and we saw lots and lots of pictures on bruising. Okay. And in your report you call those contusions. Right?

A. Yes.

Q. Okay. And I think down in Lubbock you and I spent a lot of time figuring out what contusions were, trying to educate me. Is that correct?

A. Yes.

Q. Okay. And a contusion is a bruise?

A. Correct.

Q. Okay. And we saw multiple pictures up here, and I think we may have seen pictures -- some of those pictures may have been of the same bruise?

A. Very likely.

Q. Okay. Based on your report -- and you said earlier that it was the bottom of page four, all of page five, all of page six, and the top of page seven, had the external examination on it. Okay. But based on your report, what of the known bruises, the things you can definitely say are a bruise, how many of them are there, bruises?

A. Do you want me to go list them? Go through and

6:39:54 list them? I didn't count each one.

6:39:56 Q. Okay. Well, let me -- rather than doing that, let me run through them. On the bottom of page five, the next to the last full paragraph, it starts out, (reading) on the mid-chest is a four by three centimeter. Do you see that paragraph?

6:40:15 A. Yes.

6:40:15 Q. Okay. That indicates that there is one definite contusion, and that there's -- on the second number 5 by four centimeter that says similar hemorrhaging, but you don't say it's a contusion. Is that correct?

6:40:33 A. A similar hemorrhage, yes. It is a contusion.

6:40:35 Q. It is a contusion?

6:40:37 A. Yes.

6:40:38 Q. Okay. So that's two. And then the next paragraph down, I believe you've identified three separate contusions there. Is that correct?

6:40:49 A. Yes, with areas for each.

6:40:50 Q. Okay. Now, let's go back to the first paragraph you and I talked about. What area is that? Show us -- stand up and show us on your body.

6:41:01 A. Well, the mid-chest area.

6:41:04 Q. The mid-chest. Okay. And how far does the mid-chest go over? Into the middle of the side of the body, or what?

6:__2 A. It's a generalized description. We would say
6:41:15 this is mid-chest. This could be lateral chest. If you
6:41:18 wanted to anatomically describe it you would take the mid-
6:41:22 axiliary line and you would draw a vertical line down, and
6:41:24 that's used as a delineation between the anterior and the
6:41:28 lateral chest.

6:41:28 Q. Okay. All right. And the next area, the next
6:41:32 paragraph down it says mid-back. Where is the mid-back?
6:41:38 Exactly opposite the mid-chest on the back?

6:41:41 A. Yes. I think if you look at the back, you went
6:41:43 down the midline of the back, and then you went halfway
6:41:48 down, that would be the mid-back.

6:__9 Q. Okay. All right. Now, the next paragraph goes
6:41:53 into the next area -- or onto the next page. It's one
6:41:59 sentence at the bottom of five and on to six. I count
6:42:03 three contusions there. Is that correct?

6:42:08 A. We have one on the right elbow, which is nine by
6:42:12 eight. The left forearm, which is nine by seven. And an
6:42:18 eight by six on the left forearm also, next to the wrist.
6:42:24 That's three. Correct.

6:42:25 Q. Okay. So that's three. And then the next -- oh,
6:42:27 and those identify -- those are the extremities and each
6:42:32 one of those identifies where it is. The right elbow,
6:42:35 that kind of stuff. Right?

6:__5 A. Yes.

6:42:35 Q. Okay. Now, the next paragraph down identifies one contusion. Is that correct?
6:42:45 A. That's correct.
6:42:47 Q. Okay. And that's the one down by the ankle?
6:42:49 A. Correct.
6:42:52 Q. Okay. And then the next paragraph down identifies all of those areas that you looked that there weren't contusions?
6:43:01 A. Correct.
6:43:04 Q. And then the next paragraph down says you're in -- in parenthesis at the end of that paragraph it says, suggestive of contusions?
6:43:15 A. Correct.
6:43:15 Q. It's because you just couldn't tell. Right?
6:43:18 A. Right. Yes. That's correct.
6:43:20 Q. Now, Mr. Farren talked about the report of trauma to the anus, or to the rectum. Is that correct? With you a few minutes ago?
6:43:37 A. Yes.
6:43:37 Q. And you did review that and you took out the -- that part of the body and looked at all of the colon, I guess?
6:43:48 A. Right. We actually excised or cut out that area of the rectum, and then we do a longitudinal cut moving in toward what's known as the rectosigmoid area of the colon,

6:44:10 and then open it up, splay it open, and see if there's any
6:44:04 changes consistent with traumatic injury.

6:44:07 Q. Okay. Now, whenever the colon's in our body, is
6:44:12 it something that's straight?

A. No.

6:44:14 Q. Okay. It's real curved. Is that correct?

6:44:16 A. Correct.

6:44:18 Q. Almost curves back on itself like on a side of a
6:44:23 mountain road, back and forth?

6:44:25 A. Exactly.

6:44:26 Q. Okay. But whenever you inspect it, you take it
6:44:29 out and you lay it out flat. Is that correct?

6:44:31 A. Yes.

6:44:31 Q. Okay. Now, if a foreign object had gone up in
6:44:36 there, such as a broom handle, you would have expected to
6:44:39 find tearing, or ripping, or at least a contusion?

6:44:43 A. Yes.

6:44:43 Q. And you didn't find any of that?

6:44:45 A. That's correct.

6:44:46 Q. Okay. Now, why were you looking at this -- this
6:44:51 part of the body? What made you think I better check this
6:44:55 out?

6:44:55 A. Well, when we do the autopsy, we're going to
6:44:59 display open areas on somebody who has been traumatized in
6:45:02 this particular case. I was actually informed that there

6:45:06 had been some injury taken place to the anus and the
6:45:10 rectum, and so, you know, in that sense, I did it, you
6:45:14 know, for the sack of the autopsy to, again, just show a
6:45:18 negative to somebody who had thought there was injury
6:45:21 there.

6:45:21 Q. Okay.

6:45:22 A. But it's a part of our standard procedure --

6:45:25 Q. All right. But you had been provided a
6:45:28 statement?

6:45:28 A. Yes.

6:45:28 Q. Okay. And you read that prior to beginning the
6:45:31 autopsy, so you had an idea of where -- where to go and
6:45:34 where to look?

6:45:35 A. Well, I already knew where to go and where to
6:45:39 look. I do everything in the case.

6:45:40 Q. Okay.

6:45:41 A. But in this particular event, if I don't think it
6:45:43 was a statement, it may have been informed to me verbally,
6:45:48 I can't recall, but I also can just state that I knew
6:45:51 there was a concern about trauma to the rectum.

6:45:54 Q. Okay. Was there also concern about trauma to the
6:45:57 genitals?

6:45:57 A. Yes.

6:45:58 Q. And did you also autopsy those?

6:46:00 A. Yes.

6:46:00 Q. And did you find -- what -- what would you be looking for? How do you autopsy it and what are you looking for?

6:46:08 A. Well, first, if when we're doing the autopsy just on the external examination, as far as the genitalia goes, we're going to examine both the penis and the scrotal sack. We're going to look on the outside. In this case, the only thing I found on the outside of the scrotal sack was this grayish discoloration, that was consistent with decompositional change.

6:46:30 Then the sack is actually cut open, and inside, just like I did in other areas of the body to see if there's any areas of hemorrhage going into the tissue that I might have missed when I looked at it grossly, but not having cut into it. I didn't see anything there. Once I did that, I went ahead and removed each testicle, took it out of the scrotal sack, and cut into it and sectioned. And both when I held the testicle and examined it on the outside, I didn't see any evidence of injury, nor did I see any evidence of injury when I cut into the testicle and sectioned it.

6:47:03 Q. Okay. What kind of things were you looking at evidence of injury, say in the testicle?

6:47:09 A. One, it could be that there's a defect on the -- well, on the scrotal sack itself there may be a

6:47:15 laceration, a bruise, a hematoma that might have formed
6:47:20 and formed like a pocket. We didn't see anything like
6:47:23 that.

6:47:23 With respect to the testicle, the testicle
6:47:25 has a very unique color to it. It has a tan, white color.
6:47:28 And even when these were removed, it had a similar type of
6:47:32 color. With respect to injury, you would be looking at
6:47:35 like brownish red discoloration, which when you sectioned
6:47:39 it, it might go deeper into the tissue.

6:47:41 Q. Okay. Did you look at the cellular structure of
6:47:45 any of this?

6:47:45 A. No.

6:47:46 Q. You didn't make slides and look at anything?

6:47:49 A. No.

6:47:52 Q. Now, I see that you have your -- your file, based
6:47:58 on this autopsy here, and you've referred to it several
6:48:01 times today?

6:48:02 A. Yes.

6:48:02 Q. In that file, does it contain a witness statement
6:48:06 by someone -- a party to this?

6:48:26 A. I have -- I think there may be similar copies,
6:48:34 but I have a statement here. Do you want me --

6:48:39 Q. Let me ask you this: Is it a statement by a man
6:48:43 named Stephen Craig Kimberlin?

6:48:45 A. Yes.

Q. And do you remember when Ms. McElroy and I came down to the Lubbock, telling us you had reviewed that statement in preparing that autopsy?

A. Yeah, I think when I was doing the autopsy or shortly thereafter, I reviewed this.

Q. Okay.

A. Yes.

Q. All right. I want to talk about the duct tape that was around the head and upper torso. And my co-counsel's going through looking for a picture of that right now. We'll try to put a picture up here on the TV, so you can look at it in a minute.

Describe -- my understanding from reading the -- my understanding from reading the autopsy is that there were multiple layers around the head and face. Is that correct?

A. Yes.

Q. And that the tape was continuous, meaning it wasn't cut or stopped on down around the upper torso?

A. Right. The -- the roll of tape was attached to the head. I can't tell you if that roll of tape was one continuous -- just one roll by itself, or if it was just duct tape that was put on and more tape on top of it, because we simply removed it as one piece.

Q. Okay. Let me refer you to the TV screen up here.

6:[illegible]4 This is State's Exhibit No. 91, I believe. Could you
6:50:28 look -- yeah. State's Exhibit No. 91, which has already
6:50:34 been admitted. What -- what you're talking about is that
6:50:37 the duct tape is here. Right?
6:50:39 A. That's correct.
6:50:39 Q. And it goes on down to -- here's the bottom part
6:50:43 of it on -- on his body. Correct?
6:50:47 A. Right. Now, I don't know if it's all the same
6:50:50 duct tape.
6:50:50 Q. Okay.
6:50:51 A. I just know that as you follow it, it continues
6:50:55 onto the torso.
6:[illegible]7 Q. Okay. As a matter of fact, we're pretty certain
6:50:59 it's not the same, since we've got two rolls of duct tape.
6:51:02 Right?
6:51:02 A. Yes. There's additional duct tape.
6:51:04 Q. Yeah. And there's even more found later?
6:51:06 A. Yes.
6:51:07 Q. Okay. But my point is, continuous -- not
6:51:10 necessarily the same piece of duct tape, but it overlaps
6:51:13 and overlays and creates this extra long piece of binding.
6:51:20 Correct?
6:51:20 A. Right. I would have to undo all of the duct tape
6:51:24 to state whether it was one -- one piece or multiple
6:[illegible]9 pieces that were wrapped around there.

6:51:30 Q. Okay. And did you undo the duct tape?
6:51:32 A. No.
6:51:33 Q. Okay. I believe you testified that because of the decompositional sliminess you were able to remove it in one piece?
6:51:41 A. Right. I -- that would probably be overstepping what I should be doing in the autopsy. I felt that was evidence that was collected and needed to be passed on to law enforcement.
6:51:52 Q. Okay. Now, let me clarify something. You removed the piece that was over the head in one -- intact?
6:51:59 A. Yes.
6:51:59 Q. And gave it to the police officer?
6:52:01 A. Yes.
6:52:02 Q. But it's continuous around the head and down around the torso. So did you sever it for collection purposes?
6:52:12 A. I believe it indicates in the report it has been cut.
6:52:14 Q. Okay. By you or someone in the autopsy?
6:52:16 A. Right. Yes.
6:52:33 Q. Okay. I want to put State's Exhibit No. 100 up. Can you see that from where you are?
6:52:44 A. Yes.
6:52:45 Q. Okay. In your report you talk about a defect on

6:53:00 the upper -- is it right or left chest? I think it's upper right.
6:53:18 UNIDENTIFIED JUROR: Page six.
MR. WATKINS: Someone behind me said page six.
6:53:30 A. If you go to page six --
6:53:33 Q. (BY MR. WATKINS) The middle paragraph?
6:53:34 A. Yeah. Where it starts off, along the right side of the neck.
6:53:39 Q. Okay. Now, from here that kind of looks like a bullet wound or something, but it's not, is it?
6:53:45 A. No, it's not.
Q. As a matter of fact, it doesn't even go very deep, does it?
6:53:50 A. That's correct.
6:53:50 Q. Okay. And it's, by your determination, decompositional?
6:53:59 A. Yeah. I didn't believe that I could make a statement that this was true trauma.
6:54:05 Q. Okay. All right. And the black around it, I think you indicate is the tape fading into the skin?
6:54:12 A. That's -- I don't think I specifically stated it like that, but that's my feeling just by looking at the tape and the color as it weeped into the skin.
Q. Okay.

A. I believe it's probably from the tape.
Q. Okay. Now, on the toxicology you testified about that, that there was some liver amphetamine and some alcohol present. Is that correct?
A. Yes.
Q. Okay. And did -- I think you testified that it was just as possible for that to be present, because of decompositional issues, as that he had been out drinking and using methamphetamine?
A. Correct.
Q. Okay. Now, is either one of these a quantitative analysis?
A. Yes.
Q. Okay. Which one?
A. The ethyl alcohol component in the liver was given as a percent, .09 percent.
Q. Okay. And that's a quantitative analysis?
A. Yes.
Q. Is that equivalent to .08 being intoxicated limit, or is that --
A. You have to think of .08 as being in the blood. You know, in the liver, there is a value, but it's a -- it's a proportionate value, okay, compared to the blood. We'd have to do a proportionate change to compare it to the liver.

6:55:34 Q. Okay. And on the liver amphetamine class, the drugs of abuse screen on the very top, that's not a quantitative analysis?

6:55:46 A. Correct.

6:55:47 Q. Okay. Based on the decomposition of this body, and -- and what you were able to collect, would it have been possible to do a quantitative analysis?

6:55:56 A. You could have, except at the bottom it just says the amphetamine class positive results on the enzyme amino acephates screen are due to phenethylamine, a decomposition product. So the report is indicating to you that it is a decomposition product.

6:56:15 Q. Without a doubt?

6:56:15 A. Yes.

6:56:16 Q. So this report would indicate that he had used methamphetamine prior to his death?

6:56:21 A. No. The report would indicate that the product that we're testing at this time out is a decomposition product. It would not exclude the individual having taken methamphetamine at the time, or surrounding his death.

6:56:35 Q. Okay. If you'd wanted to discover if, in fact, he had used methamphetamine just prior to his death, what would you have tested?

6:56:45 A. Well, you would have to do the same thing, you

know. You would have to come up and see whether you get uh -- this is amphetamine, it's positive. It's not positive for methamphetamine.

Q. Okay. You talked about the decomposition and the way the body was originally placed down in a pit, in concrete, covered with concrete, that that slowed the -- I think you said retarded the decomposition. Is that correct?

A. Yes.

Q. Okay. Does also -- that have to do with the temperature that the body's stored at?

A. Yes.

Q. Okay. As a matter of fact, you have a cooler at your offices where you store bodies at what temperature?

A. About 40 degrees.

Q. About 40 degrees. Okay. And that's because it keeps them decomposing very slowly?

A. Correct.

Q. Okay. Did you think it was important in performing this autopsy to figure out what the depth of this pit was, or what the temperature of that was, or anything like that?

A. No.

Q. Why not?

A. Because in conducting this autopsy, knowing the

6:58:00 temperature was not going to make a difference with my
6:58:04 findings at the time of autopsy.
6:58:05 Q. Okay. Could you put -- do you have No. 81? Let
6:58:30 me see if I can find something else to go on to, until she
6:58:35 finds a picture.
6:58:36 You talked about with Mr. Farren that the
6:58:42 blood decomposes as time goes on as well?
6:58:46 A. Correct.
6:58:47 Q. Okay. And I think you said with -- in talking
6:58:51 with me down at your office that if there were blood on
6:58:55 your hand and you started decomposing, it would just kind
6:58:57 of join that -- that decomposition fluid, that slimy
6:59:01 stuff?
6:59:01 A. Yes.
6:59:02 Q. Okay. Does the blood within a contusion
6:59:06 decompose as quickly?
6:59:06 A. No.
6:59:07 Q. Okay. And why is that?
6:59:10 A. Because if you're actually talking about a
6:59:13 contusion, now you're talking about an impact that is
6:59:16 taking place to, let's say in this case, the skin and soft
6:59:21 tissue, which then releases the blood into the soft tissue
6:59:24 that becomes a container, where it's better preserved than
6:59:29 if it's in the vasculature of the body in any of the body
6:59:33 cavities, as well as if it's lying on the body.

6:59:35 Q. Okay. So if -- so it's kind of putting it in a little Tupperware or something?
6:59:40 A. Yes.
6:59:41 Q. Kind of sticking it away?
6:59:43 A. Yes.
6:59:43 MR. WATKINS: Would you put this on the screen?
6:59:46 Q. (BY MR. WATKINS) This is State's Exhibit 81. Can you see that very well?
6:59:52 A. Yes.
6:59:54 Q. Okay. You've described that this is after the tarp has been opened, but not removed, I believe?
6:59:59 A. I think so.
6:59:59 Q. Okay. Let me direct you to this area right here. What -- what is that?
7:00:11 A. I think I need the picture to look at that.
7:00:14 Q. Okay.
7:00:14 MR. WATKINS: Can you hand it to me? Do you mind if I use your 81?
7:00:22 MR. FARREN: No. No.
7:00:23 THE COURT: That is your 81. It's over there.
7:00:26 MR. FARREN: Well, we made two copies. Are you asking about --
7:00:31 MR. WATKINS: Hold on just a second. Go

ahead.

7:00:32 A. Are you asking about this duct tape?

7:00:35 Q. (BY MR. WATKINS) No, I'm asking about this kind of clear milky white --

7:00:41 A. Oh, this is a -- this was a plastic sheet that was found, also, inside -- between the body and the tarp.

7:00:49 Q. Okay. Now, having bought a house just two years ago, I do lots of self-home improvement. Could this be called a painter's tarp?

7:01:04 A. I think it had that look, yes.

7:01:05 Q. Okay. It's that thin plastic-type stuff?

7:01:09 A. Yeah. I think we gave a description of it in the report. Let me see if I can find that for you. On page five, fourth paragraph from the bottom.

7:01:24 Q. From the bottom?

7:01:25 A. I'll read this. It says, (reading) a plastic sheet is noted to be partially wrapped around the head and upper torso, which is easily removed and has dimensions of 83 inches by 37 inches.

7:01:36 Q. Okay. And you think that -- I don't want to put words in your mouth, but a painter's tarp type white?

7:01:46 A. It looks like it's consistent with that type of look.

7:01:49 Q. Okay. All right. You did point out in your report that there was some dirt and debris in the

7:02:06 wrappings with the body?
7:02:08 A. Yes.
7:02:09 Q. Okay. Was the body dirty?
7:02:11 A. I think the body was described as being moist had decompositional fluids overlying it, as well as adhering areas of dirt.
7:02:22 Q. Okay. So there was some -- what I would call soil attached to the body?
7:02:26 A. Yes.
7:02:35 Q. Okay. Mr. Farren asked you about entomological samples. Is it generally your -- your job to collect those or is that the police officer's job?
7:02:49 A. I would say it's my job to collect those.
7:02:52 Q. Okay. And you didn't collect any of them at this time?
7:02:54 A. I did not on this one.
7:02:55 Q. Okay. Now, did I hear you right, that there were no contusions on either the upper or lower hand, on either hand?
7:03:22 A. That's correct.
7:03:22 Q. Okay. And once again, contusions are bruises?
7:03:24 A. Yes.
7:03:25 Q. And you're going to have to teach me again, what are the words for cuts?
7:03:31 A. I would call them incise wounds, if they're

longer than they are deep; otherwise, they would be stab wounds.

Q. Okay. Now, on the skull fracture was -- was there an impression from an instrument or anything, indicating that it was a fireplace poker, wasn't a fireplace poker, was a whatever?

A. No.

Q. Okay. Is it a compressed skull fracture?

A. It was not a depressed skull fracture you mean.

Q. Depressed. Okay. I used the wrong word.

A. Right.

Q. Thank you for correcting me. It is not a depressed skull fracture?

A. No.

Q. Okay. All right. Mr. Farren asked you about the fracture expanding with additional trauma. You said it could actually be two that linked up?

A. Yes.

Q. Okay. Then he asked you about bumping your head down stairs, as you got dragged down stairs.

A. Yes.

Q. Would that make a difference if they were wooden stairs as opposed to concrete, or steel, or something?

A. I think you'd have two factors. One, the material is certainly going to be important, as well as

7:05:01 the violence of which the body is being pulled down something.

7:05:01 Q. Okay. You were asked about knowing Dr. Neal Haskell (phonetic), and you don't recognize his name. Is that correct?

7:05:50 A. No, I don't.

7:05:52 Q. What about Dr. Bob Bucks (phonetic)?

7:05:53 A. Yes.

7:05:54 Q. How do you know him?

7:05:55 A. I know Dr. Bucks through the Bexar County Forensic Science Center. He was the deputy chief medical examiner at the time I was being trained there.

Q. Okay. Did a lot of your training. Right?

7:06:05 A. Yes, he did.

7:06:06 Q. Okay.

7:06:08 MR. WATKINS: Pass the witness.

REDIRECT EXAMINATION

BY MR. FARREN:

7:06:09 Q. Really quickly, Dr. Natarajan. You were asked questions about trauma to the anus, talking about the -- the cavity itself, the organ. If -- if I claimed to have inserted a broom handle up Mr. "X's" anus six or eight inches, that -- that -- you would expect to find some trauma, some indication of that. Correct?

A. Yes.

Q. But if -- if I attempted to insert the broom handle and I only inserted it an inch, would there necessarily be trauma?

A. I would still expect there to be some trauma.

Q. A half inch?

A. Well, we're limiting our trauma then to the area of entry. And, again, in examination of the area of the anus, I didn't see any hemorrhage around there.

Q. So -- so in reality, there could have been activity involving a broom handle in the anus that didn't leave trauma, depending on how successful the attempt to penetrate was?

A. It's possible.

Q. Sure. You were asked about injuries from -- to the testicle areas. I can't remember if Defense counsel included this, but if you were -- if you were told that there was claims, braggadocio about using a pair of channel lock pliers on Mr. Pool's testicles, you would expect to find trauma?

A. Yes.

Q. But if, in fact -- in fact, I'd like for you to assume with me that Mr. Pool's DNA was, in fact, discovered on the teeth of the channel lock pliers. Would you have a scientific opinion as to whether or not those channel lock pliers came into contact with Mr. Pool in

some way, somewhere?
A. Well, it was probably -- I wouldn't be able to look and give you an anatomy of what was --
Q. But if his DNA is on the teeth of the pliers, they came into contact with Mr. Pool, that's the only way his DNA could be there?
A. That would be the most logical way, yes.
Q. Okay. How else would it be there other than it come in contact with it?
A. Well, if you had some component of that body removed and had it touched. I mean, if he physically did touch it.
Q. But other than -- I mean, if his DNA is on the teeth of the channel lock pliers then some portion of his body -- the pliers either touched some portion of his body or someone took some portion of his body and touched the pliers?
A. Right.
Q. Okay. And so if an individual tried to use the pliers on Mr. Pool and came into contact with his body, you wouldn't be surprised if his DNA were on the teeth of the pliers?
A. Correct.
Q. If someone held those pliers near his testicles, threatened to clamp down on his testicles, touched his

7:09:14 testicles, you wouldn't be surprised to find his DNA on the teeth of those pliers?

7:09:19 A. Correct.

7:09:21 Q. You were asked about the skull fracture and whether it was depressed. Now, earlier you said that it was consistent with a blow -- a significant blow from something like a fireplace poker or some object similar to that. Is that correct?

7:09:39 A. Correct.

7:09:39 Q. Is the fact that it's not a depressed skull fracture, does that change your opinion that it's consistent with a blow from a fireplace poker?

7:09:49 A. No.

7:09:49 Q. Why not?

7:09:50 A. Well, the depressed skull fracture is something where when the impact occurs it's so localized that it causes depression. It has to be with a violent force to cause the crack to go inward. Another possibility is that the instrument can strike the head and just cause a propagating fracture that in this particular case is like a U-shape, and then may extend into the baser skull or may have been a second blow.

7:10:20 Q. Have you seen fireplace pokers that are a metal rod and -- and on one side has sort of a hook to them?

7:10:29 A. Yes.

Q. If -- if I were to strike you with a fireplace poker and that hook hit your head, it would be -- if I hit you very hard it -- it might likely cause a depressed skull fracture?

A. Right.

Q. Because the hook would penetrate into the skull?

A. Yes.

Q. But if I struck you with the long, straight part of the rod, it would be less likely to be a depressed skull fracture?

A. That's correct.

Q. And it would be more likely to be a fracture like we saw in the photographs?

A. That's correct. Assuming that both impact velocities were equal.

Q. Right. You were asked about the alcohol and drugs, the -- the toxicology doesn't tell us anything about whether he was using drugs or alcohol prior to his death. After three months of decomposition, even in his -- incased in concrete, is there any way for you to know whether he was using drugs and alcohol prior to his death?

A. No.

Q. Just some things you just can't -- we just can't find out?

7:11:38 A. In this particular case, I would not be able to figure that out.

7:11:42 Q. You were asked about soil being attached to the body. Did you notice if the soil was attached to -- was it equally distributed around the body, or was it attached to a specific part or portion of the body?

7:11:56 A. I think in general it was just areas of gravel, dirt or soil, as well as this decompositional fluid, so if it had been localized it sort of smeared around.

7:12:09 Q. Okay. So -- so that could have occurred as the police removed the body and put it in the body bag and that sort of thing, could have moved the soil around?

7:12:17 A. That's possible.

7:12:18 Q. Okay. So if that occurred, then there's no way for you to know if it, in fact, was soil attached so some specific part of the body and then later got moved around?

7:12:30 A. That's correct.

7:12:31 Q. And if the body -- if the body were incased in concrete -- in other words, if the body is -- is placed in a pit and the -- a part of the body is -- that is down, that is closest to whatever surface it's on, if that happens to be soil and then over the top of that is concrete, if no one ever displaced the soil it most likely would be the part that was down against the soil?

7:13:05 A. I think I lost you on that question.

7:13:07 Q. Yeah, I thought it was a great question myself.
7:13:11 I advise my witnesses before every trial that lawyers --
7:13:16 we ask horrible questions, and that was one of them. Let
7:13:19 me try again.
7:13:23 I want you to imagine that -- that my body
7:13:28 is lowered into a pit, and then at the bottom of the pit
7:13:31 is soil, and I'm being lowered with my back toward that
7:13:34 soil. Without any other information, if I'm lowered
7:13:37 and -- and make contact with the soil laying on my back,
7:13:40 you would expect the soil to be attached -- if it attached
7:13:43 anywhere to my back, not to my front because it's facing
7:13:49 up?
7:13:50 A. Yeah. I think if I was looking at a body that
7:13:54 was laying on soil, I would expect that area to have a
7:13:59 different rate of decomposition than the rest of the body.
7:14:03 That's the type of thought process I would be looking at.
7:14:06 Q. Okay. Did -- did you see a different rate of
7:14:08 decomposition in this body or relatively the same rate of
7:14:12 decomposition?
7:14:13 A. It appeared to be relatively the same with the
7:14:15 exception like this oral cavity because that's just in an
7:14:18 area that would be accelerated.
7:14:28 MR. FARREN: May I have just a second, Your
7:14:30 Honor?
7:14:30 THE COURT: Yeah.

Q. (BY MR. FARREN) Doctor, just so we don't end up on some rabbit trail later on. There was -- there was evidence of some metal fragments found in the tarp and things of that nature. Do you recall that?

A. Yes, I do.

Q. If -- if you were given information -- I want you to assume that -- that where a part of the events occurred was a garage where sometimes welding and metal work took place. Would the metal fragments you saw, do you think that would be consistent with that sort of activity?

A. It could be, yes.

Q. Oh. Earlier you talked with counsel for the Defendant about the bruises, how many there were and so forth. I want to talk with you about the size.

On page five of your report, the very next to the last paragraph, as an example, you mentioned the left buttocks, a 14 by 10 centimeter area. How large is that?

A. It's going to be six to seven inches by about four inches.

Q. Okay. So a six-inch ruler, and then this tall, so that's -- that's roughly half the size of this legal pad?

A. Yes.

Q. Now, that's an area that you determined to be a

7:16:10 contusion. Does that mean it's the result of one blow or could it be the result of many blows?

7:16:19 A. It could be either, yes.

7:16:21 Q. Okay. So you just know that this is an area of discoloration that is a contusion, but it could be one blow or many blows

7:16:28 A. Yes.

7:16:29 Q. So when you say -- when you're asked there's two bruises, three -- three bruises, or three contusions, one contusion, that doesn't -- there is no way you can definitively answer how many blows caused those contusions?

7:16:48 A. That's correct.

7:16:52 MR. FARREN: Pass the witness.

7:16:54 MR. WATKINS: A couple of quick questions trying to get everyone out by 5:30.

RECROSS EXAMINATION

BY MR. WATKINS:

7:16:58 Q. On these metal fragments --

7:16:59 THE COURT: I'm glad you're trying, because that's going to happen.

7:17:04 Q. (BY MR. WATKINS) -- you said that they could be consistent with metal working, and welding, and stuff, but you don't know, do you?

7:17:10 A. I do not.

7:17:11 Q. You just do not know what they are?
7:17:13 A. That's correct.
7:17:15 Q. All right. Can I borrow this for a second?
7:17:19 A. Yeah.
7:17:19 Q. Talk about a body going down inside -- on soil. 7:17:26 Okay? This is the body, the magic marker. And it goes 7:17:30 down -- Mr. Farren was trying to say you're going to have 7:17:32 soil here at the bottom that touched.
7:17:35 What if we put it in a tarp? Do you expect 7:17:40 soil to get through the tarp?
7:17:43 A. I don't expect it overall to have contact with 7:17:45 the soil, no.
7:17:56 Q. Okay. How was this tarp wrapped around the body? 7:17:58 Let me ask this, so you don't have to take as much time. 7:18:02 Was this tarp wrapped -- had this body wrapped up pretty 7:18:06 tight?
7:18:06 A. Yes.
7:18:07 Q. Using ropes and pulleys and all sorts of stuff?
7:18:11 A. Yes.
7:18:14 Q. Okay. All right. Page seven, first paragraph 7:18:19 under "Internal Examination" of your report. I'm 7:18:27 fascinated with the brain.
A. Yes.
7:18:28 Q. Okay. It says, (reading) the brain is markedly 7:18:34 decomposed, gray, pasty, slightly -- how do you say that

word?

A. Viscous.

Q. Viscous. Thank you. And it weighed 860 grams.

A. Yes.

Q. Were you able to remove the brain and put it on a scale?

A. No.

Q. What -- was it kind of soupy?

A. You had to scoop it out.

Q. Had to scoop it out? Okay. And it was gray and pasty?

A. Correct.

Q. Okay. I -- I think whenever we were in Lubbock and I -- you described it as a split pea soup?

A. It would have a gray -- have a pasty type -- it looks like a split pea soup without putting water or anything in it. That type of pasty nature.

Q. Okay. But it was gray?

A. Yeah, overall gray. We also notice that on cross section showed a marked decompositional change, so that could be grayish-green to a light brown.

Q. Gray-green to a light brown. So it wasn't pink?

A. No.

Q. I always picture our brains being pink. I guess they're not?

7:19:42 A. They are after the first, second or third day of death, but not at this time period.

7:19:48 Q. Okay. Okay. And have you ever heard of DiMaio, Vincent DiMaio?

7:19:57 A. Yes.

7:19:58 Q. Okay. He wrote a book. Right?

7:20:00 A. Yes.

7:20:00 Q. Or several books actually --

7:20:03 A. Correct.

7:20:03 Q. -- on forensic evidence and that kind of stuff?

7:20:06 A. Yes.

7:20:07 Q. Okay. Are you aware of what he said about testing skeletal muscle for quantitative analysis of drugs of abuse, and alcohol, and things like that?

7:20:19 A. It would have be read back to me.

7:20:22 Q. Okay. So you're not familiar with it?

7:20:23 A. Well, I am familiar with it, I've read the book, but I couldn't reiterate what he's saying specifically about it.

7:20:31 Q. Okay.

7:20:31 MR. WATKINS: Pass the witness.

FURTHER REDIRECT EXAMINATION

BY MR. FARREN:

7:20:33 Q. Are you aware that Dr. DiMaio's actually been investigated for committing perjury in a case recently in

federal court?

A. No, I'm not.

MR. FARREN: If we could have Exhibit 52 -- 72.

Q. (BY MR. FARREN) Do you recognize this photograph that we -- we've talked about earlier as being the top of a tarp where the head is exposed?

A. Yes.

Q. And so the tarp's not tight at all there, is it?

A. That's correct.

Q. And so it could easily have gotten into the tarp through that opening, couldn't it?

A. Yes.

MR. FARREN: Pass the witness.

FURTHER RECROSS EXAMINATION

BY MR. WATKINS:

Q. In the description you got about how the body was buried, you were told it was covered in concrete. Correct?

A. I think we put down that it was partially -- in my circumstances, I believe I left it as placed in a grain elevator, covered over with cement and debris.

Q. Cement and debris. You mean the cement was covered with debris?

A. Well, the body -- the body was covered over with

cement and debris. I really couldn't go into any more detail than that.

Q. And you didn't see any pictures of the recovery site?

A. Yes, I did.

Q. Oh, you did?

A. Yeah.

Q. Okay.

MR. WATKINS: Pass the witness.

MR. FARREN: We have no other questions of Dr. Natarajan, Your Honor. We do have some business records we'd like to put in that doesn't require a witness, we have an affidavit.

THE COURT: Can I excuse him?

MR. FARREN: Yes, Your Honor. Subject to recall.

THE COURT: You can step down, sir. And as far as I'm concerned, you can go back to Lubbock, but you're subject to recall.

THE WITNESS: Thank you.

THE COURT: Thank you.

MR. FARREN: Thank you, Doctor.

THE COURT: All right. It's as good as 5:30. Y'all go home and have a nice night, and be in the courtroom at 8:25, and we will get started. Thank y'all.

7:23:37 Just pile them back up there on the rail.
7:23:40 (Jury retired from the courtroom.)
7:23:41 THE COURT: Ms. McElroy.
7:24:01 MS. McELROY: Yes, Your Honor.
7:24:03 THE COURT: Let's proceed. What -- what is
7:24:03 the objection? Well, let him proffer 'em, and then you
7:24:07 make your objection.
7:24:08 MS. McELROY: Okay.
7:24:09 MR. FOWLER: Judge, I have what is marked as
7:24:11 State's Exhibits 5, 6, 7, 8 and 9, business records that
7:24:14 have been on file. We'd ask that they be admitted.
7:24:19 MS. McELROY: Your Honor, we have some
7:24:21 objections based on this case --
7:24:26 MR. WATKINS: On these.
MS. McELROY: Oh.
7:24:26 MR. WATKINS: On 5 we don't have any
7:24:28 objection.
7:24:28 MS. McELROY: Never mind. I'm sorry.
7:24:31 MR. FARREN: On 5 there's no objection?
7:24:31 MS. McELROY: No.
7:24:32 THE COURT: State's 5 will be admitted. Lay
7:24:34 it right up here.
7:24:40 MR. FARREN: No objection to 6?
7:24:42 MS. McELROY: No objection.
7:24:44 THE COURT: 6 is admitted.

MS. McELROY: State's 7, no objection.

THE COURT: State's 7 is admitted.

MS. McELROY: Number 8, Defense has no objection.

THE COURT: State's 8 is admitted.

MS. McELROY: No. 9, we have no objection, Your Honor.

THE COURT: State's 9 is admitted. Is that as far as you went, Jeremy?

MR. FOWLER: No -- well, Judge, I have five more here we'd like to offer at this time State's 10, 11, 12, 13 and 14.

MR. WATKINS: These are -- these are the ones that I think we're going to have objections to.

THE COURT: That -- that pile is bigger than the Court's file with all of the records.

MR. FARREN: Those are the phone records, Your Honor.

THE COURT: Huh?

MR. FARREN: Those are the phone records.

MS. McELROY: Those are the phone records, Judge.

MR. WATKINS: Your Honor, on State's 10, 11, 12, 13, and is there a 14 -- let me make sure it's the same one. Okay. On all four -- on all five of these, 10

7:25:57 through 14, however many that is --

7:25:57 THE COURT: Yes.

7:25:58 MR. WATKINS: -- we object because under the business record's exception for a allowing things in, there are certain requirements that must be strictly adhered to. Certain requirements that must be substantially adhered to. The business record's affidavit has to be substantially adhered to.

7:26:17 The business record's affidavit on each of these five is not substantially adhered to. Basically, what they say is, I am the custodian of these records for these phone numbers. These records were forwarded to the Randall County District Attorney's office in Canyon, Texas in response to a subpoena from Mark Brown of the Special Crimes Unit. They are kept by the Southwestern Bell -- this does not say I am submitting these records. They are my records. They're saying that they were submitted at sometime in the future, and it doesn't even indicate that they've even looked at the records to make sure they're the same records. They don't substantially comply.

7:26:58 Additionally, one of the requirements of -- 9 point -- 90210 is that the records be filed with the clerk of the court with the affidavit. These say on the face of them, (reading) original on file in the Randall County DA's office.

The DA's office and clerk's office aren't the same. We would object to the admission on those grounds.

MS. McELROY: Additionally, Your Honor, one of the things that concerns us is, I think --

THE COURT: Let me see one. Let me see one of the affidavits. Thank you.

MR. WATKINS: And all of the affidavits are substantially the same, they just have different people.

MS. McELROY: On none of the affidavits, Your Honor, is there a representation as to how many pages were requested or how many were provided. Basically, it undercuts the reliability and the reason for a business record's affidavit. Most of these -- and you can tell on these, they were faxed to the DA's office. They weren't attached to the records themselves. We would object that they were not attached to records.

MR. FARREN: We have case law that approves the fax of those records, Your Honor.

MR. WATKINS: I'm sorry you have the case law, what?

MR. FARREN: That approves the fax method of --

MR. WATKINS: The entire record though, not --

7:28:31 THE COURT: I still don't understand your objection. You're saying this affidavit is no good?

7:28:36 MR. WATKINS: That's -- that's the first part of my objection, is the affidavit is not good.

7:28:40 THE COURT: Okay. And it's no good, why again?

7:28:43 MR. WATKINS: It doesn't substantially comply with 9.0 ---

7:28:46 THE COURT: In what way?

7:28:48 MR. WATKINS: Number one, it doesn't identify the number of pages. It doesn't identify that this person is certifying --

7:28:54 THE COURT: Oh, for heavens sake --

7:28:57 MR. WATKINS: -- swearing that these are the records that they provided. They're saying that these records were once provided.

7:29:01 THE COURT: That's overruled.

7:29:03 MR. FARREN: Thank you.

7:29:04 THE COURT: What's your next objection?

7:29:05 MR. WATKINS: That they were not filed with the District Clerk in compliance with 90210.

7:29:10 THE COURT: Where does it say that in 90210?

7:29:14 MR. WATKINS: I'm looking for the rules of evidence. There it is.

7:29:18 THE COURT: Filed with the clerk of the

court. Are they filed with the clerk of the court, Mr. Fowler?

MR. FOWLER: No, Judge.

MR. WATKINS: You have the Court's file.

MS. McELROY: No, they are not.

MR. FOWLER: What Mr. Farren's purpose of doing it this way was, all of these records have been provided to the Defense. That's agreed. Right?

MR. WATKINS: That's agreed.

MR. FOWLER: Okay. They have been provided well over a year ahead of time. And what I think Mr. Farren was trying to do in filing the business record's affidavit was to prevent our District Clerk from getting overwhelmed with that huge stack that you noted earlier.

MR. FARREN: Which would be in this file, Your Honor.

THE COURT: I understand that. I understand that.

MR. FARREN: Since they had a copy of the records, and we've indicated in our filing with the clerk that the original was on file in our office, Your Honor, then we do think that is substantial compliance.

THE COURT: I think it's substantial compliance. I'm going to overrule the objection. I'm

7:30:12 going to find that it does not affect the reliability of
7:30:14 the instruments. What were the numbers, 10 through what?

7:30:18 MS. McELROY: Oh, well, I think it's 11, 12,
7:30:22 13 --

7:30:22 MR. WATKINS: I have case law that says that
7:30:24 that's not --

7:30:26 MR. FOWLER: 10, 11, 12, 13, 14 --

7:30:28 THE COURT: I made my ruling.

MR. WATKINS: Okay.

7:30:29 THE COURT: Do understand it?

7:30:30 MR. WATKINS: I understand your ruling.

7:30:30 THE COURT: Do you accept it?

7:30:31 MR. WATKINS: I object to your ruling.

7:30:32 THE COURT: Okay. That's fine. I don't
7:30:34 need any side bar remarks about it. Don't do that anymore
7:30:38 in this trial, please.

7:30:39 Uh -- State's 10 through 14 are admitted.
We'll be in recess until 8:30.

MR. FARREN: Thank you, Your Honor.

(Evening recess.)

THE STATE OF TEXAS )
COUNTY OF RANDALL )

I, Karen Morris, Deputy Official Court Reporter in and for the 47th District Court of Randall County, State of Texas, do hereby certify that the above and foregoing contains a true and correct transcription of all portions of evidence and other proceedings requested in writing by counsel for the parties to be included in this volume of the Reporter's Record, in the above-styled and numbered cause, all of which occurred in open court or in chambers and were reported by me.

I further certify that this Reporter's Record of the proceedings truly and correctly reflects the exhibits, if any, admitted by the respective parties.

WITNESS MY OFFICIAL HAND this the 18th day of October, 2005.

KAREN MORRIS, CSR 334
Expires: 12/31/2006
Official Court Reporter
108th District Court
Potter County, Texas
Potter County Courts Bldg.
Amarillo, Texas 79101
(806) 379-2357