07-05-0254-CR

FILED
OCT 18 2005
SEVENTH COURT OF APPEALS
PEGGY CULP, CLERK

R E P O R T E R 'S R E C O R D

VOLUME 9 OF 22 VOLUMES

TRIAL COURT CAUSE NO. 15,307-A

| | | |
|---|---|---|
| THE STATE OF TEXAS | ) | IN THE DISTRICT COURT |
| | ) | |
| | ) | |
| VS. | ) | RANDALL COUNTY, TEXAS |
| | ) | |
| | ) | |
| JOSHUA DAVID STOCKER | ) | 47TH JUDICIAL DISTRICT |

*********************

STATEMENT OF FACTS

*********************

ORIGINAL

On the 13th day of July, 2005, the following proceedings came on to be heard in the above-entitled and numbered cause before the Honorable Hal Miner, presiding, held in Randall County, Texas:

Proceedings reported by Stenographic Method.

A P P E A R A N C E S

NAME: Mr. James Farren &
Mr. Jeramy Fowler &
Ms. Jennifer Cates
Randall County District Attorney's Office
Canyon, Texas 79015
SBOT NO: Unknown
ADDRESS: 501 16th Street
PHONE: (806) 468-5570
ATTORNEY FOR THE STATE.

NAME: Ms. C.J. McElroy &
Mr. Mike Watkins
Attorneys at Law
SBOT NO: Unknown
ADDRESS: 801 S. Fillmore/500 S. Taylor
Amarillo, Texas 79101
PHONE: (806) 371-0555/374-9584
ATTORNEY FOR THE DEFENSE.

CHRONOLOGICAL INDEX


CAPTION . . . . . . . . . . . . . . . . . . . . . . . . 1
APPEARANCES . . . . . . . . . . . . . . . . . . . . . . 2
CASE CALLED . . . . . . . . . . . . . . . . . . . . . . 7

ORAL EVIDENCE:

JILL PAULSON
DIRECT EXAMINATION BY MR. FOWLER. . . . . . . . . . . . . 13
CROSS EXAMINATION BY MS. McELROY. . . . . . . . . . . . . 18
REDIRECT EXAMINATION BY MR. FOWLER. . . . . . . . . . . . 20

JESSICA JEAN KIMBERLIN
DIRECT EXAMINATION BY MR. FARREN. . . . . . . . . . . . . 22
CROSS EXAMINATION BY MS. McELROY. . . . . . . . . . . . .124
REDIRECT EXAMINATION BY MR. FARREN. . . . . . . . . . . .157
RECROSS EXAMINATION BY MS. McELROY. . . . . . . . . . . .180
FURTHER REDIRECT EXAMINATION BY MR. FARREN. . . . . . . .185

JASON WAYNE HICKSON
DIRECT EXAMINATION BY MR. FOWLER. . . . . . . . . . . . .188
CROSS EXAMINATION BY MR. WATKINS. . . . . . . . . . . . .212
REDIRECT EXAMINATION BY MR. FOWLER. . . . . . . . . . . .230
RECROSS EXAMINATION BY MR. WATKINS. . . . . . . . . . . .230
FURTHER REDIRECT EXAMINATION BY MR. FOWLER. . . . . . . .232

BRANDON ROSS COTTON
DIRECT EXAMINATION BY MR. FARREN. . . . . . . . . . . . .234
CROSS EXAMINATION BY MS. McELROY. . . . . . . . . . . . .252
REDIRECT EXAMINATION BY MR. FARREN. . . . . . . . . . . .254

MARK KEITH BROWN
DIRECT EXAMINATION BY MR. FARREN. . . . . . . . . . . . .256

REPORTER'S CERTIFICATE. . . . . . . . . . . . . . . . . .321

ALPHABETICAL INDEX


| WITNESS | DX | CX | VDX | RDX | RCX |
|---|---|---|---|---|---|
| COTTON, BRANDON | 234 | 252 | | 254 | |
| HICKSON, JASON | 188 | 212 | | 230<br>232 | 230 |
| KIMBERLIN, JESSICA | 22 | 124 | | 157<br>185 | 180 |
| PAULSON, JILL | 13 | 18 | | 20 | |

# EXHIBIT INDEX



| STATE'S EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| SX-2 | STATEMENT | 186 | |
| SX-3 | STATEMENT | 232 | |
| SX-5 | MOTEL 6 RECEIPT | | |
| SX-9 | WAREHOUSE RECEIPT | | |
| SX-69 | PHOTO | 14 | 14 |
| SX-204 | PHOTO | 167 | 167 |
| SX-205 | PHOTO | 168 | 169 |
| SX-213 THROUGH SX-229 | PHOTOS | 308 | 307 |
| SX-230 THROUGH SX-234 | PHOTOS | 314/315 | 315 |
| SX-254 | INDICTMENT | 287 | 287 |

EXHIBIT INDEX (CONTINUED)

| DEFENDANT'S EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|

NO EXHIBITS OFFERED OR RECEIVED IN THIS VOLUME.

PROCEEDINGS:

JULY 13, 2005

8:25:32 (Both sides present, in open court:)

8:25:32 THE COURT: Ms. McElroy, do you want your
8:25:35 client here to make the housekeeping announcements or not?

8:25:39 MS. McELROY: I don't think it's necessary.

8:25:42 MR. WATKINS: Since we don't know what the announcements are.

8:25:42 MR. FARREN: Well, we'll do it -- if the
8:25:43 Court deems he should be here, Your Honor, we would be
8:25:46 glad to do it again.

8:25:48 THE COURT: All right.

8:25:49 MR. FARREN: One thing, Your Honor, is you
8:25:50 explained to the jury about the medical problem Mr. Hill
8:25:54 had. We would prefer, for appellate purposes, that on the
8:26:00 record Defense counsel reiterate what we talked about in
8:26:05 chambers, that they don't have an objection to the
8:26:08 releasing of Mr. Hill, due to the medical. I understand
8:26:10 that the Court has made its decision otherwise, but having
8:26:12 that on the record we think would be helpful.

8:26:15 THE COURT: Do you want to -- that's
8:26:18 essentially what happened. For the record, I'll confirm
8:26:21 that the Defense had no objection to it. We hardly had
8:26:24 any choice, any of us. We were presented with a juror who
8:26:29 was not going to come, and who did submit a medical

8:26:34 letter, and uh -- it wasn't a lot that I could do about it anyway.

8:26:40 MR. FARREN: That is right.

8:26:41 THE COURT: Ms. McElroy.

8:26:43 MS. McELROY: Your Honor, my basic understanding was that the Court felt like he was medically excused, and the Court granted an excuse, and that that was legitimate --

8:26:52 THE COURT: The Court felt it had no choice.

8:26:54 MS. McELROY: And we understand that, Your Honor.

8:26:56 THE COURT: Okay.

8:26:56 MR. FARREN: I just wanted to get something on the record, Your Honor.

8:27:00 THE COURT: That's all right.

8:27:02 MR. FARREN: Sometimes we are over cautious.

THE COURT: That's good. That's fine.

8:27:04 MR. FARREN: In addition to that, Your Honor --

8:27:06 (Defendant now present in the courtroom.)

8:27:08 MR. FARREN: -- we -- I don't know any other way to respond to a motion about -- it is a part of a Brady motion, which is standard stuff, a kind of revealed the deal motion. And what we'd like to do is put in the record at this time one statement that we think will cover

8:[illegible]4 any witness that testifies for the State that has any
8:27:29 pending charges or potential charges. And that statement
8:27:32 is that we -- the only deal in any sense that we've cut
8:27:39 with any witness is, each of them understand that if they
8:27:43 tell the truth, it -- we will take into consideration in
8:27:48 handling their case and it will certainly inure to their
8:27:52 benefit, that if they lie, it certainly will not benefit
8:27:56 them and will be harmful to them.
8:27:59 We have not given anyone any specific
8:28:01 promise about any specific amount of time, or that they
8:28:04 will either get probation, or go to jail, or anything of
8:28:07 that specific nature, except Destry Keeling has already
8:[illegible]3 pled to two years in prison to run concurrent with federal
8:28:17 time, that was already running in reference to drug
8:28:23 charges that he had.
8:28:26 And I think to be clear, Jessica Kimberlin
8:28:32 had -- has pending drug charges from the November raid
8:28:37 that we've made reference to where their house was
8:28:41 searched. And as I recall, and I will -- I'll verify
8:28:46 this, and if it's incorrect I'll clarify for the record, I
8:28:50 believe, initially, she was going to plead to 12 years in
8:28:53 prison, and at that -- prior to that plea, she indicated
8:28:59 an interest in cooperating with the State in her case as
8:29:04 well -- and her attorney is present in the courtroom
8:[illegible]7 now -- in her case as well. The only agreement we have is

8:29:12 that if she testifies we will take that into consideration
8:29:16 before disposing of her case, and it will inure to her
8:29:20 benefit if she tells the truth. If she lies, of course,
8:29:24 it will not benefit her, it will harm her. And can you
8:29:27 think of anything else?

8:29:29 MR. FOWLER: Judge, Brook Vandergriff, the
8:29:35 Defendant's significant other, she plead to unrelated
8:29:39 charges, unrelated drug charges. She was placed on
8:29:41 probation, and I believe her cooperation was taken into
consideration --

MR. FARREN: Yeah, that's correct.

8:29:44 MR. FOWLER: -- for her being placed on
8:29:46 probation. She is on felony probation right now.

MR. FARREN: But those charges are -- are
8:29:48 unrelated.

8:29:49 THE COURT: Is it necessary to disclose all
8:29:51 of that to me?

8:29:53 MR. FARREN: Well, we wanted -- for
8:29:54 appellate purposes we don't want to see an appeal in which
8:29:58 it is suggested that somehow any of this was hidden from
8:30:02 the Defense after they filed a motion that we reveal it.

8:30:05 THE COURT: Have you told this to them
8:30:07 before?

8:30:07 MR. FARREN: Oh, we've talked so many times,
8:30:09 Your Honor, probably we have, but I just -- I want the

8:30:11 record to reflect that we have given that --

8:30:14 THE COURT: Of course, they have the right to cross-examine these witnesses on these deals, or discussions, or however you want to refer to them.

8:30:21 MR. FARREN: Yes, sir.

8:30:22 MR. FOWLER: There was one other person that I can think of, Jason Hickson. He had a pending Motion to Revoke in your court, and the -- as you recall, it was pending for quite some time, and long before I was assigned to your court that an agreement was made if he cooperated on other cases, his Motion to Revoke would be dismissed, and -- you know, the Defense may want to inquire into that.

8:30:44 THE COURT: That's the reason that thing hung on, isn't it, Jennifer?

8:30:49 MS. CATES: Yes, Your Honor.

8:30:50 THE COURT: Okay.

8:30:51 MR. FOWLER: And it was unrelated to this matter.

8:30:54 THE COURT: Anything else? Have we got 12?

8:30:57 THE BAILIFF: Yes, sir.

8:30:58 THE COURT: Is everyone ready?

8:31:01 MR. FARREN: The State's ready to proceed, Your Honor.

8:31:05 THE COURT: Let's bring the jury in then. I

8:31:22 think what I'd like to do, if they're going to come in at
8:31:25 8:30, have ya'll in at 8:25, we can do these housekeeping
8:31:31 things every morning.

MR. FARREN: Yes, sir.

8:31:34 THE COURT: I was a cook in the Army and
8:31:35 they're saying -- it was plastered on all of the training,
8:31:40 clean as you go. Clean as you go.

8:31:51 (Jury seated.)

8:32:11 THE COURT: Everyone be seated. Well, good
8:32:14 morning.

8:32:15 THE JURY: Good morning.

8:32:16 THE COURT: Ready to go okay? Okay. Good.
8:32:17 Mr. Farren, call your next witness.

8:32:20 MR. FOWLER: Your Honor, we call Jill
8:32:22 Paulson.

8:32:23 THE COURT: Jill Paulson. Okay. Ms.
8:32:32 Paulson, would you raise your right hand.

8:32:34 (Witness sworn.)

8:32:42 THE COURT: Thank you, ma'am. Have a seat
8:32:44 right there.

8:32:48 MR. FOWLER: May I proceed, Judge?

8:32:51 THE COURT: Yes. Go ahead.

JILL PAULSON,

having been first duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. FOWLER:

Q. Please state your full name.

A. Jill Paulson.

Q. And, ma'am, you're the mother of Dustin Pool?

A. Yes.

Q. I know this may be difficult for you, so if you need to take a break, just raise your hand and let us know. What town do you live in?

A. Borger.

Q. How many children do you have?

A. I have two.

Q. And can you tell us their names and ages?

A. I have Dustin, which is deceased, and then Chris, his brother, and he's 33.

Q. And Dustin was the eldest?

A. He was the youngest.

Q. He was the youngest?

A. Dustin would be 29 now.

MR. FOWLER: Your Honor, may I approach the witness?

THE COURT: Yes, sir.

Q. (BY MR. FOWLER) Ms. Paulson, I want to show you what I have marked as State's Exhibit No. 69. Do you recognize it?

8:33:43 A. Yes, sir.
8:33:45 Q. And it's a picture of Dustin?
8:33:46 A. Yes.
8:33:47 Q. And is it fair -- a fair and accurate picture of Dustin around 2002, 2003?
8:33:52 A. Yes, sir.
8:33:57 MR. FOWLER: Your Honor, upon tendering to opposing counsel, State's Exhibit No. 69, we would offer it into evidence.
8:34:05 MS. McELROY: We have no objection, Your Honor.
THE COURT: State's 69 is admitted.
8:34:06 MR. FOWLER: Your Honor, may I publish it to the jury?
8:34:09 THE COURT: Yes.
8:34:18 Q. (BY MR. FOWLER) Ms. Paulson, do you remember what Dustin's cell phone number was back in 2002, 2003?
8:34:31 A. I believe it was 584-1515.
8:34:39 Q. And as a habit or routine of Dustin, did he always take his cell phone everywhere he went?
8:34:45 A. Yes.
8:34:53 Q. The indictment in this case states that the actions that started the kidnapping and eventual murder of your son was on March 9th, 2003. When was your last contact with Dustin?

8:35:09
A. It was on March the 9th. He called me that afternoon at approximately 3:00.

8:35:15
8:35:18
Q. Was there anything about that conversation at the time you had with Dustin that you thought was unusual?

8:35:22
8:35:28
A. Not at the time.

8:35:31
Q. Okay. Subsequent to that conversation, did you look back to that conversation, and in hindsight think something was unusual about that call?

8:35:33
8:35:39
8:35:40
A. Yes.

8:35:41
Q. And what was that?

8:35:41
A. Before Dustin hung up that day he said, Mother, I love you. Very specific, and that was not Dustin. When he was on the phone he was usually in a hurry, and he would say, love you, Mom, but he was very specific the way he said it and very slowly.

8:35:45
8:35:49
8:35:54
8:35:58
8:36:02
Q. And what conclusion or opinion did you draw later after this conversation about how he told you how he loved you?

8:36:06
8:36:10
8:36:13
A. I feel like Dustin knew that something horrible was going to happen. He did not discuss anything like that with me, but as a mother, in your gut you know that he had to have made -- maybe not even consciously, maybe it was subconscious, but I definitely feel he knew something was going to happen.

8:36:17
8:36:21
8:36:27
8:36:32
8:36:36
8:36:37
Q. And, Ms. Paulson, we can't go into the effects of

8:36:40 his passing on you at this stage of the trial, but being
8:36:46 missing for three months and his eventual discovery
8:36:51 obviously was devastating to you?

8:36:54 A. (Witness nods head up and down.)

8:36:58 Q. Ma'am, about Dustin's cell phone, around March
8:37:12 9th, 2003, did you ever attempt to subsequently call him
8:37:17 after you had talked to him on March 9th?

8:37:20 A. Not until I got a phone call from his ex-wife.

8:37:24 Q. And after you got the phone call from his
8:37:27 ex-wife, did you try to call his cell phone?

8:37:29 A. Yes, I did.

8:37:29 Q. And was there anything unusual about the response
8:37:33 you got when you tried to call his cell phone?

8:37:35 A. The cell phone had been disconnected.

8:37:39 Q. Was that unusual for Dustin?

8:37:42 A. Yes.

8:37:42 Q. Did you take any measures after the conversation
8:37:47 with the ex-wife to try to access Dustin's cell phone?

8:37:52 A. Yes, I did. I called Sprint PCS, is who his
8:37:57 service was through. I had them reconnect his phone.
8:38:00 They debited my checking account for it. I was able to
8:38:04 get the young man on the phone to give me the last phone
8:38:07 number that was dialed.

8:38:10 I immediately called the police department
8:38:13 and told them that I had had the phone turned back on, and

I gave them the phone number that was last made, the last phone call from his cell phone.

Q. Do you know whose number that was?

A. Yes. It was Tori Patrick.

Q. Did they provide you with the access code to his voicemail for his cell phone?

A. Yes, sir, they did.

Q. Did you ever use that access code and access his voicemail?

A. Yes, sir, I did. I also gave that number to the police department for them to listen to all of the messages.

Q. And there were some messages that had been built up, I guess, or never heard, or -- there was a lot of messages, is that right, when you accessed the messages?

A. Yes, there was.

Q. And one of the messages on his voicemail was from a person identifying herself as Tori Patrick?

A. Yes.

Q. And, naturally, you relayed this information to the police?

A. Yes.

Q. And the time frame where you were -- got the cell phone turned on, and accessing Dustin's voicemail, can you give us a time frame of how long after March 9th that was?

A. It was Thursday evening, following March the 9th.
Q. So March 9th was a Sunday, and so you're saying that Thursday after March 9th?
A. Right. I don't know, I guess that would be what, the 13th or 14th.
MR. FOWLER: Your Honor, I pass the witness.

CROSS EXAMINATION

BY MS. McELOY:
Q. I just have a few questions of you, Ms. Paulson.
Did Dustin have more than one cell phone?
A. Not that I'm aware of. That was the phone number I called him on.
Q. Okay. Did you ever know Dustin to carry more than one cell phone?
A. I never saw him carry more than one myself.
Q. I think you said that you had the phone reconnected is. Is that right?
A. Yes, ma'am.
Q. Did you listen to those messages that were on the phone?
A. Yes.
Q. Did you erase any of those messages that were on his phone?
A. No, I don't believe I did.
Q. Did you ever take this phone to an attorney?

8:40:25 A. No.
8:40:26 Q. So you never --
8:40:28 A. I didn't have his phone.
8:40:29 Q. You didn't have his phone?
8:40:30 A. As far as I know, his phone has never been found.
8:40:35 Q. Well, I -- are you telling me, you never had the actual phone, that you just called in and got the messages?
8:40:42 A. Yes, ma'am. I called from my home phone and dialed --
8:40:44 Q. Okay. So you're saying you didn't have the cell phone?
8:40:47 A. -- put his access code in to get messages. Yes, ma'am, I never had his cell phone.
8:40:52 Q. Okay. And to your knowledge, that cell phone was never recovered?
8:40:55 A. No, ma'am.
8:40:56 Q. And you never saw it?
8:40:57 A. No.
8:41:06 Q. Do you recall how many messages there were when you originally called?
8:41:10 A. Oh, no. I was in such a state of shock at that time and fear, I have no way to remember.
8:41:19 Q. So you didn't speak with Mr. Waggoner?
8:41:22 A. I talked to Mr. Waggoner two or three times.

8:41:?6 Q. Did he listen to the phone messages?
8:41:31 A. I think he did, but I can't be for sure.
8:41:35 Q. Okay.
8:41:36 A. I'm sorry, I just don't remember.
8:41:38 Q. Did you contact Mr. Waggoner before you contacted
8:41:41 the police?
8:41:42 A. Yes.
8:41:43 Q. Why did you do that?
8:41:45 A. Because I didn't know where to go, where to turn,
8:41:48 what to do, and he -- his name was on some papers that
8:41:55 Dustin had, and so I went to see him.
8:41:57 Dustin's father works out of the country,
8:?:?0 and he told me to go see a lawyer, that they would help me
8:42:04 get the police to talk to me. The first two police
8:42:07 officers that I got were not helpful to me at all. They
8:42:13 did not try to -- I don't know, I just didn't feel
8:42:18 comfortable with them, that they were going to help me.
8:42:20 And John Waggoner got ahold of Sergeant Mark Brown.
8:42:28 Q. Okay.
8:42:30 A. And Mark Brown actually got the ball rolling. I
8:42:33 felt like he was helping me.
8:42:34 Q. Okay. All right. Thank you, ma'am.
8:42:35 MS. McELROY: Pass the witness.
8:42:36 MR. FOWLER: Thank you.

REDIRECT EXAMINATION

BY MR. FOWLER:

8:42:39 Q. Ms. Paulson, one last question. Dustin's father, you said he works out of the country. What does he do?
8:42:45 A. He works on aircraft that uh -- for a company that contracts for the DEA.
8:42:52 Q. Okay. So is he in maintenance? Is that right?
8:42:55 A. Yes.
8:42:57 Q. But he is connected to the DEA?
8:43:00 A. That is correct.
8:43:00 MR. FOWLER: No further questions.
8:43:04 THE COURT: Any further questions from the Defense?
8:43:07 MS. McELROY: Nothing further, Your Honor.
8:43:10 THE COURT: You may step down, Ms. Paulson. Thank you. Thank you, ma'am.
8:43:21 Call your next witness.
8:43:25 MR. FARREN: State calls Jessica Kimberlin, Your Honor.
8:43:42 THE COURT: Jessica Kimberlin. Ms. Kimberlin, would you raise your right hand.
8:44:08 (Witness sworn.)
8:44:08 THE COURT: Thank you, ma'am. Have a seat right there.
MR. FARREN: I'm sorry, Your Honor.

8:44:30 THE COURT: Go ahead. Yeah.

JESSICA JEAN KIMBERLIN,

having been first duly sworn, testified as follows:

DIRECT EXAMINATION

8:44:31 BY MR. FARREN:

8:44:31 Q. Would you state your full name for the jury,
8:44:34 please.
8:44:34 A. Jessica Jean Kimberlin.
8:44:36 Q. Ms. Kimberlin, how old are you?
8:44:38 A. I'm 24.
8:44:39 Q. And where did you go to high school?
8:44:43 A. River Road.
8:44:44 Q. When did you graduate from high school?
8:44:46 A. In 1998.
8:44:48 Q. 1988?
8:44:49 A. '98.
8:44:49 Q. 1998. I get confused. That's so long after I
8:44:55 graduated from high school, it's hard for me to relate.
8:44:59 When you graduated from high school, was
8:45:03 there a graduation party, or trip, or anything like that?
8:45:06 A. Yes.
8:45:06 Q. Where did that take place?
8:45:08 A. At Greenbelt Lake.
8:45:11 Q. Greenbelt Lake. When you were at Greenbelt Lake
8:45:18 at your graduation event, did you -- well, let me ask you

8:45:23 this: Do you know a man named Stephen -- what was your name in high school?
8:45:26 A. Jessica. What do you mean?
8:45:30 Q. Your last name?
8:45:32 A. Broyles (phonetic).
8:45:33 Q. Broyles.
8:45:34 A. Yes.
8:45:35 Q. When you were at Greenbelt Lake, did you meet a man need Stephen Craig Kimberlin?
8:45:42 A. Yes.
8:45:42 Q. Had you -- you'd never known him before?
8:45:44 A. No.
8:45:44 Q. And did you and Mr. Kimberlin begin to see each other?
8:45:48 A. Yes.
8:45:49 Q. And did you and Mr. Kimberlin eventually marry?
8:45:52 A. Yes.
8:45:53 Q. How long did you and Mr. Kimberlin -- how long were you seeing one another before it resulted in a marriage?
8:45:59 A. About six months.
8:46:00 Q. About six months. Okay. And when you and Mr. Kimberlin married, did you live here in the area somewhere?
8:46:09 A. Yes.

Q. Where did you live at first?
A. At Dove Park Apartments.
Q. About how long did you live there, approximately?
A. A year maybe.
Q. Okay. After you lived at the apartments, where did you move next?
A. To my mom's house.
Q. At you mom's house. Where is that?
A. In Rolling Hills.
Q. In Rolling Hills?
A. Yes.
Q. And what street is that on, do you recall?
A. Rancho.
Q. Rancho Street?
A. Yes.
Q. And how long did you live on Rancho Street with your mom?
A. For about two months.
Q. And where did you move after that?
A. On Stagecoach.
Q. Stagecoach Road?
A. Yes, sir.
Q. Can you -- just for those of us who may not be familiar with that particular street, can you describe -- is that in the Amarillo area?

8:47:01 A. Yes.
8:47:01 Q. Is it south, north?
8:47:02 A. It's north. It's by the River Road area.
8:47:05 Q. Okay. So your mom's place, and on Rancho, and Stagecoach, those are all in the northern part of Amarillo. Is that correct?
8:47:17 A. Yes.
8:47:19 Q. Now, how were things financially at that time for you and your husband?
8:47:23 A. Good.
8:47:24 Q. Okay. You -- you weren't struggling at all?
8:47:29 A. Well, before that we were.
8:47:31 Q. Okay. Before --
8:47:33 A. Before --
8:47:33 Q. -- when you say "before that", before what?
8:47:35 A. Before we moved into the house on Stagecoach.
8:47:38 Q. Okay. Before you -- when -- when you lived in the apartment and lived with your mom then, financially things were a little tight?
8:47:45 A. Yes.
8:47:45 Q. Okay. You were having trouble paying bills?
8:47:47 A. Yes, sir.
8:47:48 Q. Why did things get better after you moved to Stagecoach?
8:47:51 A. Because we were selling drugs.

Q. All right. You and your husband were involved in selling methamphetamine?

A. Yes.

Q. How did you and your -- how did you and Stephen Craig Kimberlin become involved in selling methamphetamine? How did that happen?

A. We had known a guy named Paul Boetello.

Q. And you had obtained drugs from him?

A. Yes.

Q. And did you learn that he made money selling drugs?

A. Yes.

Q. And is this how you came up with the idea that if you're going to use them, maybe just sell them too and make some money?

A. Right.

Q. Now, I'm going to go back and cover this in detail, but just so we have an idea of where we're going, did you eventually sell and distribute more drugs than you were at first when you first got involved in it?

A. Yes.

Q. Eventually, can you give us an estimate of how much -- how many ounces, or pounds, or whatever of methamphetamine you and your husband were helping to distribute, say in a month?

A. In a month?

Q. Let me ask it this way. If -- if I were to suggest to you as much as 30 pounds a month, would that be -- would that surprise you?

A. No.

Q. And do you know -- by the way, the drugs that you and your husband were distributing, are you aware that at some point the drugs are fairly pure, in that they're not cut, they're not mixed with other things that are not drugs to make it look like there's more of it?

A. Right.

MS. McELROY: Objection, Your Honor. He's leading the witness.

MR. FARREN: I'll rephrase, Your Honor.

Q. (BY MR. FARREN) What do you call the process if you add powder, or sugar, or something to drugs? What phrase do you use?

A. Cutting it.

Q. Cutting it. Okay. If drugs are pure, in street parlay, what does that mean?

A. That they don't have any other substances in them.

Q. So it hadn't been cut or stepped on?

A. Right.

Q. If they've been cut, then it means something has

8:50:05 been added?

8:50:07 A. Yes.

8:50:07 Q. The product that you and your husband were involved in distributing, was this a pure product or had it been cut?

8:50:16 A. Some of it was pure.

8:50:18 Q. Okay. A pound of pure methamphetamine, do you -- based on several years involved in this business, how much is that worth on the street?

8:50:31 A. Around 12,000.

8:50:32 Q. $12,000.00 for a pound?

8:50:34 A. Yes.

8:50:35 Q. And you were moving as much as 30 pounds a month?

8:50:41 MS. McELROY: Objection, Your Honor. Leading.

8:50:42 MR. FARREN: Well, this is reiterating testimony that has already been given, Your Honor.

8:50:45 THE COURT: I'll overrule the objection. Go ahead.

8:50:47 Q. (BY MR. FARREN) You've testified that it's worth about 12,000 a pound, and that you folks were moving as much as 30 pounds a month, so that's a lot of money?

8:50:55 A. Yes.

8:50:56 Q. And so once you were on -- how long did it take for you to -- you and your husband to go from dealing

8:[illegible]6 small amounts of methamphetamine to where you were dealing
8:51:12 as much as 30 pounds a month?
8:51:13 A. Just a few months.
8:51:14 Q. Now, you've mentioned Paul --
8:51:20 A. Boetello.
8:51:21 Q. -- Boetello. Did you -- did you obtain any
8:51:26 methamphetamine or drugs from other sources?
8:51:27 A. Yes, sir.
8:51:27 Q. What are some of the other sources or people?
8:51:31 A. Miguel Gonzales.
8:51:32 Q. Miguel Gonzales.
8:51:33 A. Josh Bledsoe.
8:[illegible]4 Q. Josh Bledsoe? When did you first come into
8:51:37 contact with Miguel Gonzales?
8:51:40 A. It was sometime after we had moved into the house
8:51:44 on Stagecoach.
8:51:45 Q. And when did you come in contact with Josh
8:51:49 Bledsoe?
8:51:49 A. A few months after that.
8:51:52 Q. Okay. And I don't think I have clarified for the
8:51:56 jury how much time we're talking about. You graduated
8:52:00 from high school in 1998 you testified.
8:52:02 A. Yes.
8:52:03 Q. You and Mr. Kimberlin married about six months
8:[illegible]6 later. And there were a couple of moves, and you finally

8:52:10 end up on Stagecoach. How much time do you think elapsed from the time you graduated in '98, until you and Mr. Kimberlin were living on Stagecoach?

8:52:19 A. About a year and a half.

8:52:21 Q. All right. So is it -- would it be fair then to say that you met Mr. Miguel Gonzales and Josh Bledsoe a year to a year and a half after you graduated in 1998?

8:52:37 A. Yes.

8:52:39 Q. Okay. When you began to obtain drugs from -- let me put it this way. When you obtained drugs from Mr. Boetello, did you -- do you have a opinion about whether those drugs were pure or cut?

8:52:51 A. They were cut.

8:52:53 Q. Do you have an opinion about the quality of the drugs?

8:52:57 A. Not.

8:52:58 Q. Not good quality?

8:52:59 A. No.

8:53:00 Q. The drugs you were obtaining from Miguel Gonzales, were these pure or cut?

8:53:04 A. Cut.

8:53:05 Q. And the quality of those drugs?

8:53:06 A. Not very good.

8:53:07 Q. The drugs you were obtaining from Josh Bledsoe, pure or cut?

8:53:12 A. Pure.
8:53:12 Q. Pure. Quality?
8:53:14 A. Very good.
8:53:19 Q. Your customers, did they prefer uncut quality drugs, or did they like drugs that were cut and were of bad quality?
8:53:28 A. They liked good quality.
8:53:29 Q. Okay. And so of the three people you mentioned, did you end up dealing with one more than you did the others?
8:53:37 A. Yes, sir.
8:53:38 Q. Who?
8:53:38 A. Josh Bledsoe.
8:53:40 Q. And why?
8:53:40 A. Because the meth was better.
8:53:44 Q. Okay. Where -- where was the -- the meth that Mr. Bledsoe was supplying to you, from -- from where did it come?
8:53:54 A. Mexico.
8:53:55 Q. Mexico?
8:53:56 A. Yes.
8:53:56 Q. Did you or Mr. Kimberlin know from whom specifically Mr. Bledsoe was getting those drugs?
8:54:05 A. The Juarez Cartel.
8:54:08 Q. The Juarez Cartel? But that's a -- that's a name

8:54:11 or designation, but it's not a person, is it?
8:54:14 A. Right. No.
8:54:17 Q. Let me ask the question this way. If you had known specifically a person you could contact in Old Mexico and obtained the drugs, would you have been interested in doing it?
8:54:33 A. Yes.
8:54:35 Q. In other words, if you could cut Bledsoe out and just deal directly with Old Mexico, that would be fine?
8:54:41 A. Right.
8:54:41 Q. But you didn't know a specific person?
8:54:44 A. Right.
8:54:44 Q. And so did that mean you did need Mr. Bledsoe?
8:54:48 A. Yes.
8:54:48 Q. Okay. When you were -- when you were handling as much as 30 pounds in a month, how much time elapsed from the time that you began to deal with Bledsoe until you've reached the point you were handing that much?
8:55:05 A. I'm not sure.
8:55:06 Q. Well, if you graduated in '98, and you are involved with Mr. Bledsoe a year and a half later, that gets us to '99, maybe 2000?
8:55:18 A. It was at the end of 2000.
8:55:21 Q. Okay. By the year 2002 and in the early 2003, were you still dealing with Mr. Bledsoe?

A. Yes.
Q. Okay. So you had a long standing business relationship with him?
A. Yes.
Q. Your relationship with Mr. Bledsoe, was it just business, or did you and Mr. Bledsoe's family have any social contact?
A. We had social contact.
Q. Did he have a family, Mr. Bledsoe?
A. Yes.
Q. What kind of -- just a wife? Wife and kids?
A. Well, it was his girlfriend and her son.
Q. Did they live together?
A. Yes.
Q. Did they have children?
A. Yes.
Q. Did she have children?
A. They had a baby, yes.
Q. They had one child?
A. Yes.
Q. And you and Mr. Kimberlin, did you have children?
A. Yes, we had one.
Q. You have one child?
A. Uh-huh.
Q. By the way, are you -- let me ask you this. Are

you still married to Mr. Kimberlin?

A. Yes.

Q. Okay. Now, were you and Mr. Kimberlin distributing 30 pounds of methamphetamine a month by yourselves or did you have help?

A. We had help.

Q. How many people do you think were involved in the business with you and Mr. Kimberlin?

A. About five or six.

Q. Can you name some of those people for us?

A. Rusty Garrett, Josh Stocker, Destry Keeling Russell Evans, Eric Gurtan (phonetic), Tommy Tucker.

Q. Do you know anybody by the name of Tyler Hale?

A. Yes.

Q. Do you know anyone by the name of -- do you know anyone by the name of Jason Hickson?

A. No.

Q. Okay. Do you know anyone by the name of Garcia?

A. Yes.

Q. Do you know someone named Omar Mendosa?

A. Yes.

MR. FARREN: May I have just a moment?

Q. (BY MR. FARREN) Do you know anyone by the name of Jerrod Hawbaker?

A. Yes.

8:57:47 Q. The names that I've mentioned, are all or most of those people that were involved in the business to some extent with you and Mr. Kimberlin?
8:57:51 A. Yes.
8:57:52 Q. Now, do you know if -- do you know anyone by the name of Dustin Pool, or did you know someone by that name?
8:58:00 A. Yes.
8:58:01 Q. Why did you know Dustin Pool's name?
8:58:05 A. Just from people talking about him.
8:58:07 Q. The people that talked about him, were these people who were also involved in methamphetamine and the methamphetamine business?
A. Yes.
8:58:14 Q. Do you know if Mr. Pool was also involved in the business?
8:58:18 A. Yes.
8:58:18 Q. Was he a part of your group?
8:58:19 A. No.
8:58:21 Q. Was he a part of the competition?
8:58:23 A. Yes.
8:58:26 Q. Now, some of the other people you mentioned, Josh Stocker -- by the way, Frank Chacon, did you know Frank Chacon?
8:58:38 A. Yes.
Q. Was he a part of your conspiracy, your drug

conspiracy?

A. Yes.

Q. When did Josh Stocker become a part of this conspiracy to distribute methamphetamine, approximately?

A. Uh --

Q. Okay. Rather than give us a specific time, let's see if we can relate it to an event you've already talked about.

Did you and your husband come in contact with Josh Bledsoe first or Josh Stocker first?

A. Josh Bledsoe.

Q. You had -- you've indicated in your testimony so far that you think by the year 2000, at least, you were dealing with Josh Bledsoe?

A. Yes.

Q. And so sometime after that you came into contact with Josh Stocker?

A. Yes.

Q. Now, Mr. Bledsoe you've indicated was a supplier of narcotics to you from Old Mexico?

A. Yes.

Q. What was Mr. Stocker's role?

A. He dealt for us.

Q. He was -- he was a distributor for you?

A. Yes.

Q. So you -- Mr. Bledsoe was a source, and Mr. Stocker was a distributor who worked for your husband?
A. Right.
Q. Okay. Now, who was in charge of this group of people that you have mentioned? Who called the shots?
A. My husband.
Q. Craig Kimberlin?
A. Yes.
Q. And how -- how did the process work? In other words, once you obtained these narcotics from Mr. Bledsoe, what happened after that?
A. We sold either pounds or less to them guys that we mentioned before.
Q. Okay. So the list of people you've mentioned, you -- in your terms, you -- you sold some of this product to them?
A. Yes.
Q. And then what did they do with it?
A. They sold it to other people.
Q. And did those people then turn and maybe sell some of that or use some of it themselves?
A. Probably.
Q. Okay. Now, you said a pound or less. So sometimes you sold as much as a pound to some individuals that worked for you?

9:01:00 A. Yes.
9:01:02 Q. If you paid Mr. Bledsoe $12,000.00 for a pure pound of methamphetamine, how much would it sell for when you sold it to someone else?
9:01:14 A. I'm not sure.
9:01:15 Q. Okay. Would it sell -- would it sell for even more?
9:01:19 A. Yes.
9:01:22 Q. And that's how you made a profit?
9:01:24 A. Right.
9:01:27 Q. Did you make more profit or less profit if you sold -- if you split that pound up in smaller amounts? Did that result in more profit or less?
9:01:36 A. Yes, more profit.
9:01:37 Q. More profit? Okay. The methamphetamine that you were distributing through these other people who were connected to you and Mr. Kimberlin, was that just being sold in the Amarillo area? Where all was it being sold?
9:01:53 A. As far as I know, the Amarillo area.
9:01:56 Q. Do you know if Mr. Stocker ever made a trip south with some -- some methamphetamine?
9:02:05 A. Yes.
9:02:06 Q. Okay. Do you know where he was going with it?
9:02:08 A. Lubbock.
9:02:09 Q. Lubbock? Okay. So sometimes you did have

business or he had business in Lubbock?
A. Yes.
Q. Okay. Do you know -- can you tell us or give us any idea when this trip to Lubbock took place?
A. Around --
Q. Let's see --
A. -- March, 2003.
Q. -- you think this was sometime before that?
A. It was March, 2003.
Q. Okay. When he made this -- when he made this trip to Lubbock, did something unusual happen? Was there a problem between Mr. Stocker and Mr. Kimberlin?
A. Yes.
Q. What was the problem?
A. He owed him -- he owed Craig money.
Q. All right. What does it mean -- if I use the term in your parlance, "to front drugs", what does that mean?
A. To give them to them without paying.
Q. Okay. A minute ago you mentioned this group of people, and you said that you and Mr. Kimberlin sold drugs to this group. When you say that, did you always get the money when you handed them the drugs?
A. No.
Q. So sometimes the drugs were fronted?

9:03:19
9:03:22
9:03:25
9:03:25
9:03:27
9:03:29
9:03:32
9:03:33
9:03:38
9:03:38
9:03:39
9:03:44
9:03:47
9:03:50
9:03:53
9:03:59
9:04:03
9:04:06
9:04:09
9:04:14
9:04:15
9:04:17

A. Yes.

Q. And if they were fronted, you gave them the drugs and then they paid you after they sold the drugs --

A. Right.

Q. -- and got the money?

And the trip that you have mentioned that Mr. Stocker made to Lubbock, the drugs were fronted?

A. Yes.

Q. Okay. Did he ever pay you and Mr. Kimberlin for those drugs?

A. No.

Q. How did Mr. Kimberlin feel about that?

A. Not good.

Q. Okay. That didn't make him happy?

A. No.

Q. In your years of experience in this business, when an individual is fronted drugs and they don't pay for those drugs, what happens? What is the response?

A. They get confronted.

Q. And what does it mean to get confronted?

A. They go to them and --

Q. Do they threaten them?

A. Yes.

Q. And if they don't pay after they're threatened, what happens? Are the threats carried out?

9:04:25 A. Yes.
9:04:31 Q. Do -- do you believe that -- that violence was used at times to force people to pay for drugs they haven't paid for?
9:04:38 A. Yes.
9:04:38 Q. Do you think that happened once or many times?
9:04:42 A. Many times.
9:04:43 Q. And so Mr. Stocker owed Mr. Kimberlin for fronted drugs and he hadn't paid?
9:04:50 A. Right.
9:04:50 Q. And Mr. Kimberlin was unhappy?
9:04:53 A. Right.
9:04:57 Q. Now, prior to March of 2003, when do you think that you first began to hear about Dustin Pool? Do you think it was a few weeks, or months, or what?
9:05:11 A. It was months.
9:05:13 Q. Months. Do you think that you began to hear about Mr. Pool as early as 2002?
9:05:20 A. Yes.
9:05:24 Q. Okay. You've indicated earlier in your testimony that this discussion or these mentions of Mr. Pool were among this group that you've listed, these co-conspirators?
9:05:36 A. Yes, sir.
9:05:45 Q. What were you and the other conspirators talking

9:05:39 about when you talked about Mr. Pool? What was the subject of the discussion?

9:05:42 A. He was -- he owed people a lot of money.

9:05:49 Q. Did people owe him money?

9:05:52 A. I'm not sure.

9:05:52 Q. Okay. In the discussions you were involved in, were there ever discussions about Mr. Pool making threats?

9:06:03 A. Yes.

9:06:04 Q. Who were some of the people that he was threatening?

9:06:08 A. Josh Bledsoe.

9:06:09 Q. Josh Bledsoe. Your main supplier from Old Mexico?

9:06:12 A. Yes.

9:06:13 Q. Why was he threatening Mr. Bledsoe?

9:06:16 A. They were -- they didn't like each other.

9:06:21 Q. All right. You mentioned that your family and -- by the way, the other people in the conspiracy, were you also socially involved with these other people? For instance, Josh Stocker, did he have a wife or girlfriend?

9:06:39 A. Yes, sir.

9:06:39 Q. What was her name?

9:06:41 A. Brook Vandergriff.

9:06:42 Q. Did you ever socialize with Brook Vandergriff and Josh?

9:06:47
A. Yes.
9:06:50
Q. And in Mr. Bledsoe's case, his wife or
9:06:56
significant other was -- her name was what?
9:07:00
A. Kelly.
9:07:01
Q. Kelly Grayless?
9:07:03
A. Yes, sir.
9:07:03
Q. Do you know if Ms. Grayless, she and her husband
9:07:08
Josh Bledsoe, did they ever own an Accura?
9:07:12
A. Yes.
9:07:12
Q. Was there ever any discussion about something
9:07:16
that happened involving this Accura?
9:07:19
A. Yes.
9:07:19
Q. What happened?
9:07:21
A. Ray Placensio --
9:07:22
Q. Okay. Who is Ray Placensio?
9:07:25
A. He was with Dustin Pool.
9:07:27
Q. Okay. And just so the jury understands the roles
9:07:32
of the various folks involved, what did Frank Chacon --
9:07:39
what role did he play in your conspiracy, in your group of
9:07:44
folks?
9:07:44
A. He was a protecter, and --
9:07:46
Q. Is he one of the people who would go encourage
9:07:50
folks to pay if they didn't pay?
9:07:52
A. Yes.
9:07:52
Q. He would -- there would be this confrontation you

talked about?
9:07:56 A. Yes.
9:07:56 Q. And then threats?
9:07:57 A. Yes.
9:07:58 Q. And then carrying out the threats, if that didn't
9:08:02 work?
9:08:02 A. Yes.
9:08:02 Q. What did Mr. Placensio do for Mr. Pool?
9:08:05 A. The same thing. He would --
9:08:08 Q. Okay. So Mr. Placensio's role with Mr. Pool was
9:08:13 basically the mirror of Mr. Chacon's role for Kimberlin?
9:08:19 A. Yes.
Q. Okay. You were mentioning the Accura and Mr.
9:08:22 Placensio. What -- what did you learn from your
9:08:25 co-conspirators about this?
9:08:26 A. That he ran it off the road and thought that Josh
9:08:34 Bledsoe's wife and kid was in it.
9:08:35 Q. So you and the other conspirators discussed that
9:08:39 Ray Placensio, the enforcer for Mr. Pool, had run this
9:08:43 Accura off of the road, believing that Kelly Grayless and
9:08:46 the child were in the car?
9:08:48 A. Yes.
9:08:50 Q. How did the folks in your conspiracy feel about
9:08:53 that?
A. Not good.

Q. Were they --

A. They were unhappy.

Q. How about Mr. Kimberlin, how did he feel about it?

A. Unhappy.

Q. Now, eventually, if you know, do you know whether folks within your cartel or conspiracy ever discover that, in fact, Kelly Grayless was not in that particular vehicle?

A. Yes.

Q. Okay. Why wasn't she?

A. Because they had sold the car.

Q. Do you know anyone named Ted Dibiase or Mike Dibiase?

A. No.

Q. You didn't know who it had been sold to?

A. No.

Q. But, apparently, it had been sold, and they just thought Ms. Grayless was going do be in it?

A. Yes, sir.

Q. Once your conspiracy or cartel learned that she wasn't really in the vehicle, they just thought she was, did that change how they felt or were they still upset?

A. They were still upset.

Q. Why?

A. Just because of the fact that they thought they were in there.

Q. So -- but she wasn't, there was just a mistake. It was just lucky she wasn't in there?

A. (Witness nods head up and down.)

Q. Okay. Did you and other members of the -- of your cartel ever talk about an event that occurred at Joe's Crab Shack involving Mr. Bledsoe?

A. No.

Q. You didn't -- weren't involved in any discussions about that?

A. No.

Q. Okay. The event with the Accura, that's one event. Did Mr. Pool come up -- you've indicated earlier that there was talk about Mr. Pool and threats, and you used the plural. So was the Accura event the only time you and others talked about Mr. Pool making threats, or were there more than one time?

A. I'm not sure.

Q. Okay. All right. At any rate, I want to direct your attention -- well, let me take you back to November of 2002, around that time.

Were you ever at home when a group of police officers or law enforcement folks arrived at your home?

A. Yes.

9:11:12 Q. Do you remember about when that happened?
9:11:15 A. November 8th of 2002.
9:11:17 Q. November 8th of 2002. Was anyone else at home with you or were you there alone?
9:11:22 A. I was alone.
9:11:23 Q. Were there any drugs at your home at that time?
9:11:25 A. Yes.
9:11:26 Q. Was it a small quantity or a large quantity?
9:11:28 A. A small.
9:11:29 Q. Okay. If they had -- if they had arrived at your home on some other time, might they have found large quantities?
9:11:35 A. Yes.
9:11:37 Q. Was there any cash in your home at that time?
9:11:39 A. No.
9:11:40 Q. No cash. Was there any paraphernalia or items that would be used to either measure methamphetamine or use methamphetamine?
9:11:51 A. Yes.
9:11:52 Q. Okay. When the police arrived at your home, what did they do? Did they show you a search warrant?
9:12:00 A. Oh, yes.
9:12:01 Q. And did they search your home?
9:12:02 A. Yes.
9:12:03 Q. And did they seize what drugs and paraphernalia

there was there?

A. Yes.

Q. Did anything happen to you?

A. Yes.

Q. What happened?

A. I went to jail.

Q. And were you charged with possession of these drugs?

A. Yes.

Q. And do you have charges pending today?

A. Yes.

Q. And you are charged with what?

A. For meth.

Q. Okay. Now -- now, you were actually charged -- did -- did you serve some time in the Potter County jail in reference to drugs?

A. Yes.

Q. Was that in reference to this search warrant or are you sure?

A. Yes, it was.

Q. Okay. Now, eventually -- eventually, were you charged in connection with a larger amount of drugs or with a conspiracy to distribute drugs?

A. Yes.

Q. Are those charges still pending?

A. Yes.

Q. Now, before you testified, have you visited with me and other members of the Prosecution or law enforcement?

A. Yes.

Q. And have you entered into any agreement about your testimony here and -- and the charges pending against you?

A. No.

Q. Okay. Well, that's probably accurate, but I want to clarify for the jury. Is it -- is it your understanding that if you tell the truth it helps you?

A. Yes.

Q. What happens if you lie?

A. It would not be good.

Q. Okay. But you don't have a specific deal? I mean, you haven't been promised that you will get probation or that you will get a certain amount of time? You just know that if you tell the truth, it's going to help?

A. Right.

Q. Okay. How did your husband, Mr. Kimberlin, respond when he learned that his home had been raided and you had been arrested?

A. He was unhappy.

Q. Did you, and your husband, or other members of the group ever talk about how or why this happened? In other words, did someone -- what is a nark?

A. A person that tells on you.

Q. Okay. Did Mr. Kimberlin have any opinions about who had narked on him?

A. Yes.

Q. Who did he think narked on him?

A. Dustin Pool.

Q. So he believed Dustin Pool had somehow given information to law enforcement authorities that led to this raid on his home?

A. Yes.

Q. Do you know if he suspected anyone else?

A. Yes.

Q. Do you know who that might be?

A. Keith Simpson.

Q. Keith Simpson. Do you know if there was anyone else?

A. No.

Q. So you don't know of any others?

A. Right.

Q. Okay. Sometime after this raid on your home and your being arrested, and sometime after these threats you've talked about from Dustin Pool, sometime -- well,

9:15:30 sometime around the time of the Accura event, do you
9:15:35 remember a meeting that took place at Stumpy's Lounge?
9:15:39 A. Yes.
9:15:39 Q. Do you know any of the people who attended that
9:15:42 meeting?
9:15:43 A. Josh Stocker, Josh Bledsoe, Craig Kimberlin, and
9:15:49 then I'm not sure who else.
9:15:50 Q. Do you know if Jason Hickson was there?
9:15:52 A. No.
9:15:53 Q. Do you know if Tommy Tucker was there?
9:15:56 A. No.
9:15:57 Q. Okay. Do you know if there were other members of
9:15:59 your cartel that were there, but you just don't know for
9:16:02 sure?
9:16:03 A. Yes.
9:16:04 Q. Other members of the conspiracy were at the
9:16:07 meeting, but you're not sure of all of the names?
9:16:09 A. Right.
9:16:11 Q. Why -- why did this meeting -- did you actually
9:16:15 attend the meeting or were you just in the vicinity or
9:16:18 there?
9:16:18 A. I just showed up.
9:16:19 Q. Okay. Did you participate in the actual
9:16:23 discussions or anything there?
9:16:24 A. No.

9:16:24 Q. But from your -- from your husband or other co-conspirators, did you learn or understand what the purpose of the meeting was, what they were talking about?

9:16:34 A. Dustin Pool.

9:16:37 Q. Do you know if Mr. Pool was -- at least the idea was to have him come to this meeting?

9:16:43 A. Yes.

9:16:43 Q. Did he ever come to the meeting?

9:16:45 A. No.

9:16:46 Q. Do you know if there were ever any other meetings some of your group had with Dustin Pool prior to this?

9:16:54 A. Yes.

9:16:55 Q. Do you know if folks ever went to Mr. Pool's home?

9:16:59 A. Yes.

9:17:00 Q. On one occasion or more than one occasion?

9:17:03 A. One that I know of.

9:17:04 Q. One that you know of?

9:17:06 A. Yes.

9:17:07 Q. Okay. Did your husband talk to you about this meeting that he had with Dustin Pool at his home?

9:17:11 A. Yes.

9:17:14 Q. Now, this meeting took place sometime before the Stumpy's meeting. Is that right?

9:17:20 A. Yes.

9:17:20 Q. Do you know if your husband, Mr. Kimberlin, went to Dustin Pool's home alone or with other people?

9:17:26 A. With other people.

9:17:27 Q. Who all went, do you know?

9:17:30 A. Frank Chacon and Josh Stocker.

9:17:33 Q. Okay. Do you know if Josh Bledsoe ever attended any meeting?

9:17:36 A. No.

9:17:36 Q. You don't know?

9:17:38 A. I don't know.

9:17:38 Q. Okay. But you know at this meeting Josh Stocker and Frank Chacon were there?

9:17:44 A. Yes.

9:17:44 Q. Why did this meeting take place at Mr. Pool's home? What was the purpose of that meeting?

9:17:49 A. I'm not sure.

9:17:50 Q. After the meeting was over, did Mr. Kimberlin tell you anything about -- about the meeting, what happened?

9:17:59 A. He told me that Dustin Pool told him that he was in awe of him.

9:18:06 Q. And so Mr. Kimberlin after the meeting said to you, Dustin Pool told me, I'm in awe of you, Craig Kimberlin?

9:18:15 A. Yes.

9:18:23
Q. Now, when the meeting took place at Stumpy's, and Mr. Pool never showed up, were you present at any discussions after that about Dustin Pool? In other words, did he continue to be a source of discussion among the conspirators?

A. Yes.

Q. And so this problem of threats and Mr. Pool was still not resolved?

A. (Witness nods head up and down.)

Q. Do you know a man named Jeremy Roy?

MS. McELROY: Your Honor, we would object that the Prosecution get into this type of testimony under 401, 404(b) and 403.

THE COURT: Sustained.

MR. FARREN: May we approach, Your Honor?

THE COURT: Ladies and gentlemen, why don't we take a break for about ten minutes.

(Jury retired from the courtroom.)

THE COURT: Stay on that stand.

THE WITNESS: Okay. Yes, sir.

MR. FARREN: I'm just -- I don't -- I want to follow the Court's instructions. I -- I was under the impression that we had presented earlier testimony that the Court had decided that it was relevant, I guess.

THE COURT: I guess what I ruled was that it

can be --

MR. FARREN: Okay.

THE COURT: -- but you have to give -- you have to hang -- you have to pound the nails in the wall first. You -- with the jury.

MR. FARREN: Yes, sir. I'm not clear how I do that unless I find out if she knows it or ever heard of it.

THE COURT: Well, I can't really tell you how to proceed with your case, but for this if you're going to go into the extraneous offense with this witness, you're going to have to have the offense of the indictment proven a little bit first.

MR. FARREN: Well, I guess what I'm inquiring, Your Honor, is if I were to ask, do you know Mr. Roy and do you know whether or not Mr. Kimberlin ever believed Mr. Roy had snitched on him.

THE COURT: Well, okay. I -- I -- I -- we may have been --

MR. FARREN: I understand that --

THE COURT: -- I may have been premature. I -- I -- but -- but what I'm telling you now is, at this stage of the game with the evidence where it is now in this case, the extraneous offense is inadmissible, but you can touch around it, I suppose, with -- with --

9:21:29
9:21:33
9:21:37
9:21:41
9:21:42
9:21:43
9:21:44
9:21:45
9:21:47
9:21:49
9:21:57
9:22:01
9:22:05
9:22:08
9:22:13
9:22:17
9:22:19
9:22:20
9:22:22
9:22:25
9:22:29

MR. FARREN: Yeah. It is not my intention to try to have her relate what happened involving Mr. Roy, just some background information about whether he thought Politch (phonetic) snitched him off. He thought Roy snitched him off, and so forth.

THE COURT: I -- I -- yeah. Right.

MR. FARREN: And I appreciate the clarification, because I --

THE COURT: Well, I -- I did leave it a little confused, I'm sure.

MR. FARREN: Okay.

THE COURT: But what I ruled yesterday and I tried to say this in a clumsy way, those extraneous offenses can become relevant and then they can become --

MR. FARREN: Yes, sir.

THE COURT: -- admissible under 404(b) on one of those nouns, and it can be not so prejudicial as to outweigh its probative value. It can become all of those things, but you have to lay the base for all three of those first.

MR. FARREN: So for clarification, would the Court allow me to inquire from her if she has ever heard from Mr. Roy, from other co-conspirators including her husband?

THE COURT: Yes. Yes.

9:22:29 MR. FARREN: And whether there was discussion about whether he might have been involved in giving information to the police that lead to the bust.

9:22:37 THE COURT: I can't see anything wrong with that.

MR. FARREN: Okay.

9:22:38 THE COURT: I can't see anything wrong with that at all. I just -- I just wanted to nip that in the bud before we went too far.

9:22:46 MR. FARREN: No, I understand. And she -- for instance, she mentioned this to Keith Simpson, that's another extraneous.

9:22:52 THE COURT: It occurs to me that it's a cumbersome way to have to try a case to -- and it may involve bringing the witnesses back two or three times to finally hammer enough nails in to get -- to get through all of the gates to get to your extraneous offense --

MR. FARREN: No, I appreciate the clarification.

9:23:06 THE COURT: Let's take that up out of -- let's give it about five or six minutes, and that's all.

9:23:13 (Recess.)

(Both sides, the Defendant present, in

9:31:37 (open court:)

9:31:38 THE COURT: Before we bring the jury back in

I want to do one housekeeping matter. I want to gather up all of the jury questionnaires the Prosecution has, however many sets of copies you have, and I want the same from the Defense, and we're going to either secure them or destroy them, one or the other, depending on the outcome on what all the judges decide to do about jury information.

MS. McELROY: Would it be okay for us to bring them tomorrow then?

THE COURT: Yeah, I'm in no hurry for that. I just -- I just want to -- I don't want to let them get away. That's all.

MS. McELROY: We understand.

MR. WATKINS: We would ask that one copy be either sealed or somehow put in the record for appellate review later.

THE COURT: Well, I'm not sure that's going to be allowed. All of the judges are fashioning a rule in both counties about what to do in this, in view of what happened in the Serial (phonetic) case. And in view of what happened down here in another case involving Judge Pirtle and an attorney named Ron Spriggs, who subpoenaed all of the jurors to a Motion for New Trial. So we're going to make a decision on that, and when we do we will decide what to do with these particular questionnaires,

9:33:05 and jury lists.

9:33:08 Okay. Bring them in.

9:33:10 (Jury seated.)

9:33:47 THE COURT: Thank ya'll. Everyone be seated. Go ahead, Mr. Farren.

DIRECT EXAMINATION (CONTINUED)

9:33:50 BY MR. FARREN:

9:33:50 Q. When -- when we took a break a few minutes ago, I was asking you if you ever heard of a man named Jeremy Roy?

9:34:07 A. Yes.

9:34:07 Q. And was -- was Mr. Roy a member of your group, a part of your conspiracy? Did he distribute drugs for you? Is that how you know him?

9:34:19 A. For Josh Stocker, he did.

9:34:21 Q. For Josh Stocker?

9:34:22 A. Yes.

9:34:23 Q. So he was -- he was -- if this is a wheel and Mr. Stocker is one of the spokes, then Mr. Roy is someone below Mr. Stocker?

9:34:33 A. Right.

9:34:38 Q. Okay. Do you -- in addition to Mr. Kimberlin, do you remember anyone else talking about Mr. Pool being a nark or having to do with snitching people off?

9:34:49 A. Other than Craig you say?

Q. Uh-huh.
A. Josh Bledsoe.
Q. Josh Bledsoe. I want to direct your attention to February of 2003. Do you remember a meeting at your house in February of 2003?
A. Yes.
Q. Do you remember any of the people that attended that meeting?
A. Yeah. My husband, Josh Bledsoe, Josh Stocker and Destry Keeling.
Q. Okay. And -- and was the meeting to talk about the Dustin Pool problem?
A. Yes.
Q. This meeting about Mr. Pool, did Mr. Stocker mention anyone named Guinn Garcia?
A. Yes.
Q. Did you know Guinn Garcia?
A. I knew of her.
Q. Who was Guinn Garcia?
A. She was Ray Placensio's girlfriend.
Q. Do you know if they lived together?
A. I'm not sure.
Q. Okay. But you knew she was somehow connected to Ray Placensio?
A. Yes.

9:36:03 Q. When Mr. Stocker mentioned Guinn Garcia at this meeting at your house, how -- how did Guinn Garcia come up in this discussion? What -- what -- what was her -- well, why was she mentioned?

9:36:17 A. Josh Stocker had dealt to Guinn Garcia.

9:36:23 Q. So he had distributed methamphetamine to her?

9:36:27 A. Yes.

9:36:27 Q. Even though she's actually connected to Ray Placensio?

9:36:30 A. Right.

Q. Okay.

9:36:31 A. And he had gotten her to -- they had planned a thing --

9:36:39 MS. McELROY: Objection, Your Honor. I believe that this violates 401, 404(b) and 403.

9:36:45 THE COURT: Sustained.

9:36:50 Q. (BY MR. FARREN) At any rate, there was a meeting in which Guinn Garcia was discussed and it was in connection with Ray Placensio?

9:37:02 A. Yes.

9:37:16 Q. You've already mentioned that Mr. Placensio was involved in running the car, the Accura off of the road?

9:37:25 A. Yes.

9:37:26 Q. And that folks were upset about the fact that Mr. Placensio had run this car off of the road, believing that

9:37:40 Kelly Grayless, the wife or significant other of Josh Bledsoe were in the vehicle?
9:37:41 A. Right.
9:37:42 Q. You've indicated that this meeting was about how to solve the Dustin Pool problem?
9:37:48 A. Right.
9:37:48 Q. And without telling me any details, was the discussion about Guinn Garcia and Ray Placensio, was it part of a plan to solve the Dustin Pool problem?
9:38:03 A. Yes.
9:38:11 Q. Without telling me what the plan was, do you know if -- if they did come up with a plan?
A. Yes.
9:38:18 Q. And without telling me what the plan was, do you know if the plan was ever executed or carried out?
9:38:25 A. Yes.
9:38:44 Q. Do you know who all -- do you know who participated in carrying out the plan?
9:38:51 Let me ask it this way: Do you know if Guinn Garcia participated in carrying out the plan?
9:38:57 A. Yes.
9:38:58 Q. Do you know if Destry Keeling participated?
9:39:01 A. Yes.
9:39:01 Q. And he was one of the people at the meeting?
A. Yes.

9:39:03
Q. Do you know if Josh Stocker participated in carrying out the plan?
9:39:08
9:39:09 A. Yes.
9:39:16 Q. Do you know a man named Chris Eason?
9:39:20 A. Yes.
9:39:22 Q. Was he a part of your conspiracy, or did -- did you know him well, or just hear of him?
9:39:25
9:39:28 A. Hear of him.
9:39:29 Q. Do you know if he was one of those people out at the end, one of the spokes?
9:39:31
9:39:33 A. Yes.
9:39:34 Q. Do you know if he participated in carrying out the plan?
9:39:35
9:39:37 A. Yes.
9:39:45 Q. Do you know if anything happened to Mr. Eason while they were executing the plan?
9:39:49
9:39:51 A. Yes.
9:39:52 MS. McELROY: Objection, Your Honor; relevance.
9:39:55
9:39:55 THE COURT: I couldn't hear the question all of the way.
9:39:56
9:39:58 MR. FARREN: Okay. The question was: Did she know if something happened to Mr. Eason while they were executing the plan.
9:39:59
9:40:03
9:40:04 THE COURT: I'll overrule that objection.

9:…7 Q. (BY MR. FARREN) What happened to Mr. Eason while they were carrying out the plan?

9:40:12 A. He shot his foot.

9:40:14 Q. He got --

9:40:16 A. He shot himself in the foot.

9:40:17 Q. -- he shot himself in the foot. Okay.

9:40:30 Do you know if Mr. Kimberlin participated -- again, without telling me specifically what happened, do you know if Mr. Kimberlin participated in the events at all?

9:40:43 A. Yes.

9:40:43 Q. Did Frank Chacon participate in the events at all?

9:40:48 A. Yes.

9:40:54 Q. After this plan was executed, did you see your husband and Frank Chacon after this?

9:41:02 A. Yes.

9:41:02 Q. And did you talk with them?

9:41:03 A. Yes.

9:41:04 Q. And did they talk with you about the execution of this plan, what had happened?

9:41:09 A. Yes.

9:41:10 MR. FARREN: May we approach the bench, Your Honor?

9:…5 THE COURT: Yes, sir.

(At the bench, before the Court only:)

MR. FARREN: Your Honor, we believe that this event is different from --

(In open court:)

THE COURT: Ladies and gentlemen, I'm going to ask you to step out for just a second.

(Jury retired from the courtroom.)

THE COURT: All right. Go ahead.

MR. FARREN: Your Honor, we -- we understand the Court's caution in reference to an event such as Jeremy Roy, because it does not directly relate to the events of Mr. Pool, and threats, and, eventually, they're looking for a solution to the Pool problem. Roy comes in, in a different way. It comes in, in two ways. It shows lack of accident, mistake, things of that nature, because they learn the danger. And, two, it shows that one person in this group has participated in an event very similar with a sock, and tape, and so forth.

THE COURT: Right.

MR. FARREN: But it doesn't have any direct relation to the problem of -- of solving the problem with Mr. Pool.

THE COURT: And you're saying the Placensio kidnapping does?

MR. FARREN: Yes, sir. It is a part of the

pattern. In fact, the escalating pattern of -- of confrontations and trying to find a way to solve the Pool problem, just as they handled people who owed them money.

First there meetings, confrontations, talk. Then there were threats. And, finally, they began to carry out the threats. And we believe it's relevant, Your Honor. And we believe it's admissible.

THE COURT: Again, you sold me on that with your summaries, and I see -- I see your -- your strategy, and I think that's appropriate.

MR. FARREN: Okay.

THE COURT: But you have to lay the predicate here first.

MR. FARREN: Well, the predicate --

THE COURT: Don't you?

MR. FARREN: -- but the predicate, Your Honor, is that we have a group of conspirators.

THE COURT: Don't you have to lay before the jury the alleged kidnapping of Pool, and how it was done, and then his -- his murder first, and then have that in evidence to raise the issue as evidence about the extraneous offense and its pattern?

MR. FARREN: Well, Your Honor --

THE COURT: This chicken or the egg thing, that's all -- that's all I'm arguing.

9:44:25 MR. FARREN: -- to me, Your Honor, that would be --

9:44:27 THE COURT: Here is --

9:44:29 MR. FARREN: -- that would be similar to saying, before you can tell us they procured concrete and shovels, you have to show he was dead. Well --

9:44:37 THE COURT: That has to do with the -- the transaction of the -- of the offense in the indictment --

9:44:43 MR. FARREN: And we believe this goes to it. We believe --

9:44:45 THE COURT: You think this is a part of it?

9:44:48 MR. FARREN: We think that this is what the cases talk about, the difference between background context and transactional context.

9:44:59 THE COURT: Well, there's a bunch of cases that say background context is -- is not a part of 404(b).

9:45:06 MR. FARREN: According to the these cases, we think they say that it is, Your Honor.

9:45:12 THE COURT: Here's -- if I let you go into the kidnapping of Placensio now, at that point I think that's erroneous. Now, it may be cured when you finally hang the nails in the wall, having to do with the offense in chief. What's actually charged in the indictment. Do you follow what I'm saying?

9:45:40 MR. FARREN: Your Honor, if we have

introduced that Mr. Pool was kidnapped and murdered --

THE COURT: Yeah.

MR. FARREN: -- how would the facts leading up to that decision and event be any more or less relevant than they are now? I mean, we have alleged in the indictment that Mr. Pool was murdered by these people. We've established these are the people who were upset about Mr. Pool, who were looking for a solution of Mr. Pool, and that this meeting specifically was to resolve the Pool problem, and here's how we're going to do it. We're going to kidnap Ray Placensio, who they now know is his enforcer. It's not just background, this is transactional events, Your Honor. And uh -- it -- I just -- I don't understand how once they know Mr. Pool is dead and buried that this --

THE COURT: Well, I'll tell you how it makes it relevant in my view. The allegations are that Mr. Pool had duct tape wrapped around his head. In fact, it's proven, it's evidence now, and had the sock in his mouth. That is in evidence now, isn't it?

MR. FARREN: Yes, sir.

MS. McELROY: Not before the jury.

MR. WATKINS: Yeah, it is. Through the --

THE COURT: Yes, it is.

MR. WATKINS: -- through the medical

9:47:00 testimony.
9:47:01 MS. McELROY: Oh, Dustin, you say.
9:47:01 MR. FARREN: Your Honor, I think -- I think I see a way I can get there, and I don't think it's a problem. The ruling is okay. We're fine with it. I'm just going to take it in a different sequence.
9:47:11 THE COURT: Here's my problem. I don't know if I can let you go into that, knowing that you're going to cure the error later on by bringing this stuff in. I don't know if that's the law.
9:47:21 MR. FARREN: I understand.
9:47:22 THE COURT: See what I'm saying?
MR. FARREN: I think I can -- I think I can resolve the Court's dilemma.
9:47:23 THE COURT: You're not there yet. If the trial stopped here, you -- you --
MR. FARREN: Oh, sure.
9:47:27 THE COURT: -- you understand what I'm saying?
9:47:28 MR. FARREN: I think I can resolve it this way.
9:47:32 THE COURT: Okay. All right. Bring that jury back in.
9:47:35 (Jury seated.)
9:47:3 THE COURT: Thank you, ladies and gentlemen.

9:48:13 I apologize to you. Everyone be seated. I will try to keep those to a minimum. We have trouble hearing up here at this bench with all of the stuff and there is too many lawyers and that was the reason for that. Thank you for your patience. All right. Mr. Farren, go ahead,

9:48:31 MR. FARREN: Thank you, Your Honor.

9:48:32 Q. (BY MR. FARREN) Ms. Kimberlin -- and if you could -- you have kind of a soft voice, and if you could sort of sit forward this mike is over to the side. I want to make sure the jury can hear you. Okay?

9:48:56 I want to -- I want to direct your attention to some events that occurred sometime in March of 2003. Do you know a man named Mike Elliston?

9:49:12 A. Yes.

9:49:12 Q. How do you know Mr. Elliston?

9:49:15 A. He was -- we sold to him.

9:49:21 Q. Okay. You -- you -- he was involved in the conspiracy? He was one of the folks in the cartel?

9:49:28 A. Yes.

9:49:29 Q. Do you know if he has a farm or some farmland out near Panhandle, Texas?

9:49:33 A. Yes.

9:49:35 Q. Now, have you ever been there?

9:49:38 A. Yes.

9:49:38 Q. Okay. Did you drive there or ride with someone

else?

A. I rode.

Q. Do you recognize this as a map of the Panhandle area. In other words, if this area here is Amarillo, if this is -- where the green pin is Lake Meredith, the blue pin is the Amarillo area. This would be the southern part of Amarillo in Randall County. And if this is Panhandle, Texas, when you drove there, did you drive towards Panhandle?

A. I don't know.

Q. Okay. Okay. You just know it was outside of Amarillo somewhere?

A. Yes.

Q. And do you know if it was a long drive or maybe a half hour, an hour? Do you know?

A. I don't know.

Q. Okay. That's fine. Do you know -- did the -- did the cartel ever store any narcotics out there or cut narcotics up out there?

A. Yes.

Q. Okay. Do you remember any event around March 9th, 10th or 11th, where Mr. Kimberlin went to Mr. Elliston's farm?

A. Yes.

Q. Okay. When did -- what did you first know about

9:51 this? What happened first that you knew about, in connection with that event?

9:51:18 A. Like?

9:51:19 Q. Did Mr. Kimberlin receive a phone call?

9:51:21 A. Yes.

9:51:22 Q. Were you present?

9:51:23 A. Yes.

9:51:24 Q. Did you hear the conversation?

9:51:26 A. Yes.

9:51:27 Q. Okay. What was the conversation about? Who were they discussing?

9:51:33 A. Dustin Pool.

9:51:34 Q. Okay. Did Mr. Kimberlin tell who made the call to him?

9:51:38 A. Josh Stocker.

9:51:40 Q. Josh Stocker made the call. When he -- when he had finished this call, did he talk to you about it?

9:51:49 A. Yes.

9:51:50 Q. What did he tell you about his conversation with Mr. Stocker?

9:51:54 A. He had told me that Josh Stocker had gone to River Falls Apartments --

9:52:04 Q. Okay.

9:52:05 A. -- and to some girl's house, and was waiting for Dustin Pool there.

9:52:10 Q. Okay.
9:52:10 A. And he told him that he had Dustin Pool.
9:52:14 Q. So Mr. Stocker called Mr. Kimberlin and told him, I have Dustin Pool?
9:52:19 A. Right.
9:52:19 Q. It was your understanding it was at some girl's place at River Falls Apartments?
9:52:25 A. Yes.
9:52:25 Q. What did Mr. Kimberlin do then?
9:52:27 A. He got a bag together with some duct tape and rope, and then he left to go over there.
9:52:38 Q. Okay. So Mr. Kimberlin explained to you that he was going to go join Mr. Stocker?
9:52:43 A. Yes.
9:52:44 Q. And he took some duct -- duct tape and rope with him?
9:52:47 A. Yes.
9:53:13 Q. Did he indicate why he needed duct tape, rope, things like that?
9:53:18 A. He didn't know what kind of uh -- I guess, state Dustin Pool was in. They could have -- and I mean, he was just thinking of things that he might need.
9:53:30 Q. By the way, the call that he received from Mr. Stocker, and when he got the duct tape and rope together to leave to go over to River Falls Apartments,

did this event occur -- we were talking earlier about Ray Placensio and a plan then that was going to solve -- maybe solve the Pool problem?

A. Right.

Q. Did -- did this call and these events happen after that plan involving Mr. Placensio?

A. Yes.

Q. Okay. Now, when did you see Mr. Kimberlin again, after he got the call and left to go join Josh Stocker?

A. When did I see him again?

Q. Or when did you talk to him again?

A. Uh --

Q. Approximately?

A. -- I believe it was after --

Q. Let me ask you this: Did -- did you -- after he left to go join Mr. Stocker, did you talk to him or -- alone or with other members of the conspiracy after he had been out to Mr. Ellison's farm?

A. Yes.

Q. Okay. Do you know -- do you know when or how he got to Mr. Ellison's farm?

A. He drove.

Q. Okay. When he drove to Mr. Elliston's f
he drive by himself or was anyone else with him
know.

A. Okay. Which -- I'm mixed up on my times.
Q. Okay. You've told us that he left to go join Josh Stocker at those apartments.
A. Right.
Q. Did he tell you what happened after he got to the apartments?
A. Yes. I believe he came home after Mike Elliston was there --
Q. Okay.
A. -- at the apartments.
Q. Okay. Let's -- let's take it in sequence for the jury. He got the call, he left with the duct tape and rope. At some point after that, did he tell you what happened when he arrived at the apartment?
A. Yes.
Q. Okay. What did he tell you?
A. He had saw blood and stuff everywhere.
Q. Was Mr. Pool there?
A. Yes.
Q. Was Mr. Stocker there?
A. Yes.
Q. Did he talk with Mr. Stocker?
A. Yes.
Q. Did he and Mr. Stocker decide what to do with Mr. Pool?

9:56:02
A. Yes.
9:56:02
Q. What did they decide to do?
9:56:04
A. They decided to call Mike Elliston.
9:56:08
Q. And he's the man that has the farm out near Panhandle?
9:56:12
A. Yes. To see if he had a big -- to see if he knew of any way to move Dustin Pool out of the apartments without him being seen.
9:56:22
Q. Okay. So they're looking for a way to move Pool out of this apartment without anybody seeing what's going on?
9:56:29
A. Right.
9:56:30
Q. And did they come up with a way to do that?
9:56:32
A. Yes.
9:56:32
Q. How?
9:56:33
A. Mike Elliston had some kind of a big old box.
9:56:37
Q. Okay. And did Mr. Elliston have a pickup truck?
9:56:41
A. Yes.
9:56:42
Q. Do you know if he brought this box to Amarillo?
9:56:46
A. Yes.
9:56:46
Q. In his pickup truck?
9:56:49
A. Yes.
9:56:49
Q. Did Mr. Kimberlin talk with you about whether or not they put Mr. Pool in the box?
9:56:54
A. Yes, they did.

9: 4 Q. All right. Do you know -- do you know how they
9:56:56 got him in the box, if you know?
9:56:58 A. No.
9:56:58 Q. Okay. Did Mr. Kimberlin ever talk with you about
9:57:03 whether they put the box in the pickup truck?
9:57:05 A. Yes.
9:57:05 Q. Mr. Elliston's pickup truck?
9:57:08 A. Yes.
9:57:08 Q. Did Mr. Kimberlin talk to you about whether they
9:57:10 moved the box with Mr. Pool in it out to the farm?
9:57:14 A. Yes.
9:57:15 Q. Okay. And so -- so did they move it out to the
9: 7 farm?
9:57:17 A. Yes.
9:57:17 Q. And Mr. Pool was in the box?
9:57:19 A. Yes.
9:57:22 Q. Now, you indicated that when Mr. Kimberlin
9:57:25 arrived, Mr. Pool and Josh Stocker were at the apartment?
9:57:29 A. Yes.
9:57:30 Q. Was anyone else there according to your husband?
9:57:32 A. No.
9:57:33 Q. Okay. Did he and Mr. Stocker go with
9:57:39 Mr. Elliston? Did they ride in the same vehicle with
9:57:42 Mr. Elliston?
9: 2 A. No.

9:57:42 Q. How did -- did they go to the farm?
9:57:44 A. Yes.
9:57:45 Q. How did they get there?
9:57:47 A. I believe they took my truck.
9:57:50 Q. Okay. Your truck?
9:57:50 A. Yes.
9:57:51 Q. So when your husband left, he was actually in your vehicle?
9:57:54 A. Yes.
9:57:54 Q. What kind of vehicle was it?
9:57:56 A. It was a red Dodge pickup.
9:57:58 Q. A red Dodge pickup. It was your understanding that Mr. Kimberlin and Mr. Stocker went in your red Dodge pickup and Mr. Elliston took his truck with Pool in the back of the pickup?
9:58:11 A. Yes.
9:58:11 Q. Did Mr. Kimberlin or anyone else talk with you at any time about what happened after they got to the farm?
9:58:17 A. Yes.
9:58:18 Q. Okay. What happened?
9:58:20 A. They had beat Pool.
9:58:25 Q. Okay. "They" being who? Who were "they"?
9:58:30 A. Frank Chacon, Josh Bledsoe, Josh Stocker and Craig Kimberlin.
9:58:38 Q. And so your husband, Mr. Kimberlin, and other

members of your conspiracy told you that Craig Kimberlin, Josh Stocker, Josh Bledsoe and Frank Chacon beat Mr. Pool?
A. Yes.
Q. Did they ever tell you that Mike Elliston beat Mr. Pool?
A. No.
Q. Did only Mr. Kimberlin tell you this or did anyone else?
A. Frank Chacon.
Q. So Frank Chacon and Mr. Kimberlin both told you about this?
A. Yes.
Q. Did they give you any details about this beating? In other words, did this take place over a short time, a long time?
A. A long time.
Q. Over a long time. Did they use just their hands and parts of their body, or did they use other items, or do you know?
A. They used other things.
Q. Did they tell you any specific things?
A. Yes.
Q. What did they say?
A. A shovel handle.
Q. A shovel handle?

A. Yes.
Q. Did they say what they did with the shovel handle?
A. Yes.
Q. What did they say? I know this is not pleasant, I apologize.
A. They -- I don't know an appropriate way to say it.
Q. Did they suggest or claim that someone inserted the handle into Mr. Pool's rectum or anus?
A. Yes.
Q. Okay. Of course, you're just -- you don't know if it's true or not, you're just hearing them say this?
A. Right.
Q. Did they say who did it?
A. Yes.
Q. Who did they say?
A. Josh Bledsoe.
Q. Did they mention any other tools that were used?
A. No.
Q. Okay. Now, when you had this discussion with Mr. Kimberlin and Mr. Chacon, do you know -- where was Josh Stocker, if you know?
A. When I had the conversation about what had happened?

0:00:47
Q. Uh-huh. Did they tell you where -- Josh Stocker wasn't with -- was he with Mr. Kimberlin and Mr. Chacon?
0:00:49 A. No.
0:00:50 Q. Okay. Did they tell you where he was?
0:00:51 A. At that time they was doing away -- trying to do
0:00:56 away with the body.
0:00:57 Q. All right. So when you talked to Mr. Kimberlin
0:00:58 and Mr. Chacon, it was your understanding, based on your
0:01:03 discussion with them, that they still hadn't decided where
0:01:06 to dispose of the body of Mr. Pool?
0:01:08 A. Right.
0:01:10 Q. That must mean that they let you know that
Mr. Pool was dead?
0:01:14 A. Right.
0:01:15 Q. And so as a result of this beating, he had died?
0:01:18 A. Yes.
0:01:18 Q. And now they needed somewhere to put the body?
0:01:21 A. Yes.
0:01:21 Q. Was Mr. Stocker helping them in this endeavor?
0:01:25 A. Yes.
0:01:28 Q. How -- he wasn't there, why do you think he was
0:01:32 helping?
0:01:32 A. Well, because I know that him, Josh Bledsoe and
0:01:39 Destry Keeling were.
Q. Okay. So it's your belief that everybody was

0:01:46 trying to help find a place to put the body?
0:01:48 A. Right.
0:01:51 Q. But you never actually saw Mr. Bledsoe, or Mr. Stocker, or anybody else, or heard from them that they participated in disposing of the body?
0:02:01 A. Uh -- at the time or?
0:02:03 Q. At this time.
0:02:04 A. No.
0:02:08 Q. At this time, you're just talking to Frank Chacon and Craig Kimberlin?
0:02:12 A. Yes.
0:02:13 Q. Did you ever talk with Destry Keeling?
0:02:15 A. At the time?
0:02:17 Q. At this time.
0:02:18 A. No.
0:02:18 Q. Okay. Later did you talk to Destry Keeling?
0:02:21 A. Yes.
0:02:22 Q. And did Mr. Keeling tell you anything about disposing of the body?
0:02:28 A. Yes.
0:02:28 Q. Now, based on your earlier testimony, I want to make sure we're clear, Mr. Kimberlin and Mr. Chacon, they didn't claim Mr. Keeling was ever out at the farm or participated in the beating?
0:02:41 A. Right.

Q. Okay. Their version to you that there were five people actually out in the building where Mr. Pool was, if we include Mr. Elliston?

A. Yes.

Q. But four of those participated in the beating?

A. Yes.

Q. But Mr. Keeling talked to you about disposing of the body?

A. Yes.

Q. What did he tell you about disposing of the body?

A. Well, trying to anyways.

Q. Okay. What did he tell you about trying to?

A. That his wife had family that had a lake house out at Lake Meredith, and there was supposed to be a key out there, and -- I'm not sure what they were going to do with the body.

Q. Right. But at any rate, there was -- according to Mr. Keeling, there was an effort -- there was an effort to move the body up at this lake house up at Lake Meredith?

A. Yes.

Q. But did the body end up staying there?

A. No.

Q. Why?

A. Because they couldn't get into the house.

Q. Okay. And so how did the body end up coming back to Amarillo? How did it get from Lake Meredith back to Amarillo, according to Mr. Keeling?

A. They didn't know what to do with it.

Q. Okay. Do you know if -- if Mr. Keeling and his wife hauled the body back, or did Josh Bledsoe haul the body back?

A. Josh Bledsoe.

Q. Josh Bledsoe?

A. Yes.

Q. Was Mr. Stocker with him?

A. No.

Q. Okay. Why wasn't -- let me ask you this. When the body arrived at Lake Meredith, who had the body then?

A. I believe it was Josh Stocker and Josh Bledsoe.

Q. But when it came back to Amarillo, it was just Mr. Bledsoe?

A. Yes.

Q. Do you know why this change took place?

A. There was some kind of a mixup. Josh Bledsoe got scared and he ended up taking off by himself.

Q. Okay. Now, when -- when these events were occurring, did you ever overhear any phone calls during the time this body was going to Lake Meredith, or they were trying to figure out what to do with it at Lake

0:04:57 Meredith?
0:04:58 A. Yes.
0:04:58 Q. Were there one phone call or many phone calls?
0:05:01 A. Many.
0:05:01 Q. Okay. Who -- who do you -- who is it your understanding were involved in the phone calls? Was Mr. Keeling ever involved?
0:05:08 A. Yes.
0:05:08 Q. Was Mr. Bledsoe ever involved?
0:05:10 A. Yes
0:05:11 Q. Was Mr. Stocker?
0:05:12 A. Yes.
0:05:12 Q. Your husband, Kimberlin?
0:05:14 A. Yes.
0:05:15 Q. Do you know if Frank Chacon was involved?
0:05:17 A. I don't think so.
0:05:18 Q. Okay. So those four, you know of phone calls between these people during this process?
0:05:24 A. Yes.
0:05:25 Q. Do you know how the body got from the farm -- well, let me ask you this. Do you know where Mr. Pool died?
0:05:33 A. At the farm.
0:05:34 Q. You think he died at the farm?
0:05:35 A. Yes.

Q. Do you know how he got from the farm up to Lake Meredith? Is that when Mr. Stocker and Mr. Bledsoe had him?

A. Yes.

Q. Do you know if Ms. Keeling -- do you know Denise Keeling?

A. Yes.

Q. And Destry Keeling?

A. Yes.

Q. Do you know if they traveled with Mr. Stocker and Mr. Bledsoe and the body, or if they traveled separately?

A. Separately.

Q. So they met them up there?

A. Yes.

Q. Now, when everything went -- for lack of a better term, went south on them at Lake Meredith, things went awry, and you heard these phone calls, did Mr. -- did Mr. Kimberlin, your husband, reach any agreement to meet Mr. Bledsoe? If you know.

A. Oh, did my husband?

Q. Agree to meet Mr. Bledsoe?

A. Yes.

Q. And the body?

A. Yes.

Q. Do you know if he met Mr. Bledsoe by himself or

0:06:34 did he have someone else with him?
0:06:36 A. I'm not sure.
0:06:36 Q. Okay. But you know your husband went to meet Mr.
0:06:39 Bledsoe?
0:06:39 A. Yes.
0:06:41 Q. After he met -- do you know where he went to meet
0:06:44 Mr. Bledsoe?
0:06:44 A. No.
0:06:45 Q. Okay. Did he leave in a vehicle?
0:06:47 A. My husband? I'm not sure, actually.
0:06:51 Q. Okay. So you're not sure how he got to the
0:06:53 meeting?
0:06:54 A. No.
0:06:57 Q. After he met with Mr. Bledsoe, based on your
0:07:02 discussions with the group, who was involved in actually
0:07:07 figuring out what to do with the body? Was Mr. Bledsoe
0:07:12 involved? Did you ever see him or hear him talk to
0:07:14 anybody about it?
0:07:15 A. No.
0:07:15 Q. Okay. Well, let me ask it this way. Once --
0:07:22 once they had disposed of the body, do you know who knew
0:07:25 where the body was?
0:07:26 A. Yes.
0:07:26 Q. Who?
0:07:28 A. Frank Chacon, Craig Kimberlin, and Destry

0:07:32 Keeling, and myself.
0:07:33 Q. And yourself?
0:07:34 A. Yes.
0:07:34 Q. Did you help dispose of the body?
0:07:36 A. No.
0:07:37 Q. You just knew, because they told you?
0:07:38 A. Yes.
0:07:39 Q. So if -- if four people knew where the body was, and one of them did not participate in disposing of the body, can you tell the jury what three people did dispose of the body?
0:07:52 A. Yes. Craig Kimberlin, Destry Keeling, and Frank Chacon.
0:07:57 Q. So Mr. Stocker, Mr. Bledsoe did not know where the body was?
0:08:02 A. I'm not sure, actually.
0:08:04 Q. Okay. Unless they told them, they wouldn't know?
0:08:07 A. Right.
0:08:07 Q. All right. And did anyone ever tell you that Bledsoe or Stocker helped dispose of the body?
0:08:20 A. No.
0:08:20 Q. No one ever told you. Did anyone ever tell you that Mr. Elliston helped dispose of the body?
A. No.
Q. Okay. So the only thing you were told was that

those three?

A. Yes.

Q. Now, where did they dispose of the body?

A. At a grain elevator.

Q. Have you ever seen the grain elevator?

A. No.

Q. Have you ever been to Destry Keeling's home?

A. No.

Q. Do you know -- other than telling you it was in a grain elevator, did they tell you where the grain elevator was?

A. By Destry's house.

Q. Okay. Did -- did you know where Destry's house was?

A. Somewhere out by McCormick Road.

Q. Okay. So when you say you knew where the body was, you knew it was in a grain elevator somewhere near McCormick Road, near Mr. Keeling's house?

A. Yes.

Q. But you never have been to Mr. Keeling's house?

A. No.

Q. Okay. Did you -- did you do anything, specifically, to help murder Mr. Pool? In other words, did you drive anybody to the farm? Did you hand anybody a tool? Did you help in any way?

0:09:42 A. No.
0:09:42 Q. Okay. Did you help in any way disposing of the body?
0:09:48 A. No.
0:09:49 Q. Okay. Now, you looked puzzled. I want to make sure.
0:09:53 A. No.
0:09:54 Q. Only you know.
0:09:54 A. Well, I mean -- I mean, they called me and stuff just to --
0:09:58 Q. Well, I understand.
0:09:59 A. No.
0:10:00 Q. I mean, it's all a part of the conspiracy. You're a member of the group and everybody is in. If they're in for a penny, they're in for a pound. I'm not suggesting that, I'm just trying to find out what you physically or verbally did in connection to either of these events.
0:10:15 A. Okay.
0:10:15 Q. Okay. And when -- when you had the discussion with Mr. Kimberlin and Mr. Chacon, was -- was that after they had disposed of the body?
0:10:29 Well, I guess you -- did you have discussions both before and after they had disposed of the body?

A. Yes.

Q. And this is a detail and I -- I just want to make sure that the jury has the full picture. Did Mr. Kimberlin know, originally, that Destry's wife was up at the lake?

A. No.

Q. Did he find out later?

A. Yes.

Q. Was he happy about that?

A. No.

Q. Okay. That was a complication, wasn't it?

A. Yes.

Q. Destry Keeling was a part of your -- your cartel, your conspiracy?

A. Yes.

Q. But was his wife really -- I mean, she was a user?

A. Right.

Q. But did she ever participate really?

A. No.

Q. So she's a complication?

A. Right.

Q. Do you know, did they -- did they talk to you about how they disposed of his body? In other words, they just drive up there and throw the body in somewhere in

this -- in this grain silo or did they tell you more than that?

A. They told me more than that.

Q. What did they tell you?

A. They did not -- before they went they had went to Home Depo to buy concrete. That's all I knew. And then they came back and then they left to go do it.

Q. And -- and when they told you about the concrete, did you later see anything to indicate that, in fact, concrete was involved?

A. Yes.

Q. What did you see?

A. Bags of empty concrete.

Q. Okay. What happened to those empty bags?

A. I threw them in the dumpster.

Q. Okay. So you put them in the dumpster?

A. Yes.

Q. At least after Mr. Pool was in the grain silo, you -- you did at least participate in doing away with some of the evidence?

A. Yeah.

Q. Okay. Did you ever see any concrete or dried concrete on any of the -- any tools, or containers, or anything of that nature?

A. Yes.

Q. On what kind of items did you see it?
A. On shovels, and a -- a big square red tub.
Q. A big square red tub. Do you know what -- excuse me. Do you know what happened to the tub?
A. No.
Q. Did you ever see a big green trash can of some kind?
A. Yes.
Q. Do you know -- did it -- was it used in connection with this?
A. Yes.
Q. How was it used?
A. I believe they used it to put water in it.
Q. So the green container, was it larger than the red container?
A. Yes, sir.
Q. Quite a bit larger?
A. Yes, sir.
Q. You saw concrete residue in the red container?
A. Yes, sir.
Q. Did you actually see concrete in the green container or was it just for water?
A. I'm -- I'm not sure.
Q. Okay. Fine. Where did you see the red container?

A. In the back of my truck.
Q. All right. Where did you see the green container?
A. In the back of my truck.
Q. Okay. Now, do you know what happened to the green container?
A. It's in evidence.
Q. The police got it, didn't they?
A. Yes.
Q. But it didn't have concrete residue on it, to your knowledge?
A. No.
Q. But the red container, which did have concrete, we don't know what happened to it?
A. Huh-uh.
Q. Did you ever hear any discussion about the death of Mr. Pool being connected to some sort of a $10,000.00 contract or agreement to pay for his death?
A. Yes.
Q. Where did you hear that?
A. From Craig.
Q. What did Craig tell you about that?
A. He had told me that at that meeting at Stumpy's that Josh Bledsoe had put up $10,000.00.
Q. So Craig -- Craig told you that Bledsoe put out a

$10,000.00 contract on Pool?

A. Yes.

Q. And did he -- did he indicate how this -- was this money, in his opinion, should it be paid?

A. For the job that he had done?

Q. Yes.

A. In Craig's opinion?

Q. Yes.

A. Uh --

Q. Did Bledsoe owe somebody $10,000.00?

A. Yes.

Q. Okay. Did your husband have an opinion about whether everybody who participated should get some of the money or had some people forfeited their interest in it?

A. Okay.

Q. Had some people aborted -- had -- did -- did your husband have an opinion about whether everybody had carried out all of their roles as they should have?

A. Yes.

Q. Did he think everybody had?

A. No.

Q. Okay. Who did he think had -- had fallen down on the job?

A. Josh Stocker.

Q. Why did he -- why was he unsatisfied with or

0:...8 dissatisfied with Josh Stocker's performance?
0:15:42 A. Because I believe that he -- Josh Stocker is the
0:15:46 one who took Bledsoe up on the money.
0:15:51 Q. Oh, I see. Okay. So in your discussions with
0:15:57 Mr. Kimberlin, did -- are you suggesting that he thought
0:16:01 Mr. Stocker had acted on his own without going through
0:16:04 Mr. Kimberlin first?
0:16:04 A. Right.
0:16:07 Q. Did you ever hear Mr. Kimberlin talking about
0:16:12 anybody aborting mission? Did you ever hear that phrase?
0:16:15 A. No.
0:16:16 Q. Okay. Did Mr. Stocker ever come to you after
0:...9 these events, you and Mr. Kimberlin, and want money?
0:16:22 A. No.
0:16:23 Q. He didn't? You don't --
0:16:24 A. He didn't come to me, no. He -- he called.
0:16:28 Q. Okay. Who did he call?
0:16:30 A. My husband, Craig.
0:16:31 Q. What did he want?
0:16:32 A. The money.
0:16:34 Q. He wanted the whole 10,000?
0:16:36 A. Yes.
0:16:37 Q. Do you know if he was paid 10,000?
0:16:39 A. No.
0:...9 Q. You know he was not?

0:16:41 A. He was not, no.

0:16:43 Q. Do you know why he was not?

0:16:47 A. Basically, because he didn't do it on his own.

0:16:54 Q. Do you know if he -- did he ever tell you that he felt like Mr. Stocker hadn't carried out his part of the job?

0:17:03 A. Well, he felt like if he was -- if Stocker was going to take him up on it, then he should have carried out the whole thing --

0:17:12 Q. Okay.

0:17:13 A. -- on his own.

0:17:14 Q. And did he feel like Stocker had carried out the whole thing on his own?

0:17:18 A. No.

0:17:18 Q. No. He had to call Mr. Kimberlin?

0:17:20 A. Yes.

0:17:20 Q. Then after Mr. Pool was dead, in fact, he didn't even participate in disposing of the body?

0:17:25 A. Right.

0:17:34 Q. Do you know -- did you ever meet anyone named Tori Patrick after this?

0:17:40 A. Yes.

0:17:40 Q. How did you meet Tori Patrick?

0:17:43 A. She was -- she was the girl that lived in the apartment that --

Q. At River Falls Apartments?

A. Yes.

Q. Okay. And how did -- how did you meet her? Why did you meet her?

A. Because Craig was paying her.

Q. Okay.

A. He paid her to leave town.

Q. So he gave her some money to leave town?

A. Yes.

Q. Do you know how much money he gave her?

A. No.

Q. Okay. Do you know where she went?

A. I believe Dallas.

Q. Okay. Do you know if she stayed there or ever came back?

A. No, she did not.

Q. Okay. So she came back?

A. Yes.

Q. Did he end up having to give her some more money?

A. Yes.

Q. Sort of like trying to get rid of a kitten, they keep coming back?

A. Right.

Q. Did this get to be a problem?

A. Yes.

Q. Was Mr. Kimberlin happy about this situation?
A. No.
Q. When you met with Ms. Patrick, did you meet -- did you actually talk -- were you there with her when Kimberlin talked to her sometimes?
A. Yes
Q. One time or more than one time?
A. More than one time.
Q. Okay. And what was discussed? In other words, was it just money or was the discussion about being careful, don't talk about this --
A. Right.
Q. -- things --
A. Just don't -- keep your mouth shut.
Q. So even though she's being given money ostensively to leave town, in the context she's also being told to keep her mouth shut?
A. Right.
Q. Did your husband have one cell phone? Did your husband own a cell phone?
A. Yes, sir.
Q. Did he have one or more cell phones?
A. More.
Q. More?
A. More than one.

0:19:40 Q. How many do you think he had?
0:19:44 A. Two, I believe.
0:19:45 Q. Okay. Did he -- were his cell phones -- his cell phone accounts, were they always in his name?
0:19:52 A. No.
0:19:53 Q. Were they in other people's names?
0:19:54 A. Yes.
0:19:55 Q. Why did he do that?
0:19:56 A. Just so the police couldn't trace back the phone calls to him.
0:20:02 Q. So a way to protect his identity, if he made calls on those lines?
0:20:08 A. Right.
0:20:12 Q. Do you know anyone named Michael Marquest (phonetic)?
0:20:19 A. Yes.
0:20:19 Q. Were any of those cell phone numbers in his name?
0:20:22 A. Yes.
0:20:23 MR. FARREN: May I approach the witness, Your Honor?
0:20:40 THE COURT: Yes.
0:20:41 Q. (BY MR. FARREN) I want to show you a cell phone number and ask if you recognize or remember that number?
0:20:49 A. Yes.
0:20:5? Q. Was that one of the cell phone numbers that he

used?

A. Yes.

Q. This is -- would you read this to the jury then?

A. 433-7961.

Q. This cell phone or a phone number for a pager, do you recognize that?

A. Yes, sir.

Q. What number is that?

A. 464-4108.

Q. And was that one of the numbers he used?

A. Yes.

Q. Okay. There's a list here, do you -- this 353-8810, was that your home number?

A. Yes.

Q. Do you recognize any of these other numbers? If you recognize them.

A. No.

Q. Okay. Now, did -- these people who -- whose names were being used for a cell phone account, but in reality they were Mr. Kimberlin, did they just do this out of the goodness of their heart, they just wanted to help a buddy out?

A. Michael Marquest did.

Q. He did?

A. Yes.

0:21:54
Q. Did the other people do it for that reason, or --
0:21:54 A. One other person didn't even know about it.
0:21:57 Q. Okay. Did anyone get paid, if you know, to do
0:22:00 it?
0:22:00 A. No.
0:22:00 Q. Okay. Now, after you had these discussions --
0:22:22 well, let me -- let me back up a moment. Once -- once
0:22:30 Mr. Pool was dead and buried in the grain silo, did that
0:22:39 finally -- I assume that finally solved the Pool problem?
0:22:43 A. Right.
0:22:43 Q. You didn't have any more threats from Mr. Pool?
0:22:46 A. No.
Q. Prior to this -- prior to the death of Mr. Pool,
0:22:51 had you ever been -- I think you've already indicated,
0:22:55 you've been present in discussions about the Pool problem.
0:22:58 How are we going to solve it?
0:22:59 A. Yes, sir.
0:23:00 Q. And you've already indicated that there had been
0:23:02 meetings and confrontations with Mr. Pool?
0:23:03 A. Yes.
0:23:04 Q. You also mentioned a -- a meeting at your home,
0:23:11 and some folks who were there talking about a plan to
0:23:15 solve the Pool problem that involved Mr. Placensio?
0:23:18 A. Yes.
Q. And we talked earlier about who was there and who

participated in the discussion?

A. Yes.

Q. We've talked about -- do you recall talking about that plan was actually executed?

A. Yes.

Q. What was that plan?

MS. McELROY: Your Honor, we'd object under 401, 404(b) and 403.

THE COURT: Overruled.

Q. (BY MR. FARREN) What was that plan?

A. It was to --

MR. FARREN: Before you answer it, it is my understanding -- of course, we've done some of these out in other hearings. The Court has done a balancing test and determined that the prejudicial effect does not substantially outweigh the probative value.

THE COURT: I have done a balancing out under 403.

MR. FARREN: And you have reached that conclusion?

THE COURT: Yes, I have.

MR. FARREN: Thank you, Your Honor.

THE COURT: I note the Defense's exception. I'll give you a running objection.

MS. McELROY: Thank you, Your Honor.

Q. (BY MR. FARREN) What was that plan?

A. It was to get Guinn Garcia and Ray Placensio -- they were together, and they went to Wal-Mart. And when Ray Placensio went inside --

Q. Did Guinn go with him?

A. No, she stayed in the car. Oh, I'm not sure, actually.

Q. Okay. Let me ask it this way. It involved Ms. Garcia somehow getting Mr. Placensio to Wal-Mart?

A. Yes.

Q. Do you remember from the discussion if the plan was that when they returned, people would be hiding in their vehicle?

A. Right.

Q. How were they going to get in the vehicle?

A. Guinn would leave it unlocked.

Q. Okay. So is it correct that -- then, that Ms. Garcia and Mr. Placensio were going to go to Wal-Mart together, and she was going to leave this vehicle unlocked?

A. Yes.

Q. Apparently, Mr. Placensio wouldn't know that, and he wouldn't be expecting a crowd to be hiding in his van when he came back?

A. Right.

0:25:13 Q. And you've mentioned Mr. Chris Eason got shot?
0:25:20 A. Yes.
0:25:23 Q. The people that were at the meeting, Chris
0:25:29 Eason -- or at least Chris Eason, Destry Keeling, Josh
0:25:33 Stocker, do you know if Brook Vandergriff helped and
0:25:39 participated in the kidnapping?
0:25:42 A. Yes, she did.
0:25:42 Q. And that's Mr. Stocker's girlfriend?
0:25:44 A. Yes.
0:25:44 Q. Now, even though Mr. Eason became a casualty
0:25:48 during this, one of the walking wounded during this event,
0:25:52 did they still manage to carry out the kidnapping?
0:25:56 A. Yes, sir.
0:25:56 Q. Do you know how they did it? Do you know any of
0:25:58 the details?
0:25:58 A. No.
0:25:59 Q. Okay. At any rate, eventually, is it -- based on
0:26:06 your discussions with your co-conspirators, did they have
0:26:10 Mr. Placensio in custody, in hand?
0:26:11 A. Yes.
0:26:12 Q. What did they do with him? Where did they take
0:26:15 him?
0:26:15 A. They took him to Josh Bledsoe. He had -- Josh
0:26:20 Bledsoe had a garage.
0:26:21 Q. Okay. Do you know where that was located?

A. No.
Q. Have you ever heard of Wilbur Street?
A. No.
Q. Okay. So you don't know the location of the garage?
A. No.
Q. Just that it was -- do you know what happened to Mr. Placensio at this garage?
A. He was beaten.
Q. Okay. Now, did he die as a result of the beating?
A. No.
Q. So he survived? How long was he held?
A. I believe it was almost a full day. Maybe a day-and-a-half.
Q. Okay. So your understanding, as much as a day-and-a-half?
A. Yes.
Q. And he was beaten during this time?
A. Yes.
Q. Now, Mr. Pool is not related to Mr. Kimberlin or anybody else in your conspiracy? He's not a brother or a cousin or anything like that?
A. No.
Q. Mr. Placensio, however, he is related to one of

0:27:20 the people, isn't he?
0:27:21 A. Right.
0:27:22 Q. Who is he related to?
0:27:24 A. Frank Chacon.
0:27:25 Q. And did Mr. Chacon participate in beating Mr. Placensio?
0:27:29 A. Yes.
0:27:29 Q. And did Mr. Kimberlin participate in it?
0:27:32 A. Yes.
0:27:32 Q. And did Mr. Stocker participate in it?
0:27:34 A. Yes.
0:27:34 Q. And other members of the group?
0:27:36 A. Yes.
0:27:37 Q. But Mr. Placensio didn't die?
0:27:39 A. No.
0:27:42 Q. What was the point? Was this to send a message to Mr. Pool?
0:27:48 A. Yes.
0:27:48 Q. But it didn't work, did it?
0:27:49 A. No.
0:27:59 Q. You -- you've mentioned the meeting at Stumpy's. Uh -- that the -- the Placensio kidnapping, the attempt to send a message. And finally the kidnapping and death of Mr. Pool.
0:28:12 After Mr. Pool was dead, only four people

knew where the body was. And you just knew in general?
A. Right.
Q. Sometime after that, did something happen involving law enforcement and your cartel, your group of drug conspirators?
A. Yes.
Q. What happened?
A. They raided my house.
Q. Okay. So there was another raid on your house?
A. Yes.
Q. Was there a small amount -- was there any narcotics there?
A. Yes.
Q. Small or large?
A. Large.
Q. Was anyone arrested as a result of that raid?
A. Yes.
Q. Who?
A. Me and my husband.
Q. You and Mr. Kimberlin? How much -- how much -- how much in the way of narcotics was there this time?
A. I don't remember.
Q. But a lot?
A. Yes.
Q. Different from the first raid?

0:29:01 A. Yes.
0:29:03 Q. And were charges filed against you and your husband?
0:29:07 A. Yes.
0:29:08 Q. Now, do you know, were you charged in -- with state charges, or federal charges, or both, or do you know?
0:29:15 A. State.
0:29:15 Q. State. Now, was your husband charged with state, federal, or do you know?
0:29:20 A. State.
0:29:20 Q. Okay. Did you and your husband talk about your situation once that happened?
0:29:33 A. Yes.
0:29:33 Q. In other words, for instance, did you ever -- did either of you get out on bond?
0:29:39 A. Yes.
0:29:39 Q. Did you get out on bond?
0:29:41 A. Yes.
0:29:41 Q. Did your husband?
0:29:43 A. Yes.
0:29:43 Q. Did you ever talk about leaving the country?
0:29:46 A. Yes.
0:29:47 Q. What was the plan?
0:29:48 A. Well, before we got raided, we were going to

0:29:51 leave the country.

0:29:53 Q. Oh, before?

0:29:53 A. Yes.

0:29:54 Q. Why? Why were you talking about leaving the country?

0:29:57 A. Because we felt that -- I mean, the police were --

0:30:02 Q. So you felt like things were not looking good even before the raid occurred?

0:30:09 A. Right.

0:30:09 Q. Once the raid happened, it pretty much confirmed it?

0:30:12 A. Right.

0:30:17 Q. When you got out on bond -- when you made bond, how did you do that? In other words, did you put up a certain amount of money or did you use a bondsman?

0:30:29 A. A bondsman.

0:30:30 Q. Okay. Now, did you bond out first or did your husband?

0:30:33 A. It was at the -- at the same time.

0:30:38 Q. Did you and your husband ever discuss any arrangement or agreement he reached or talked to the law enforcement authorities about, in connection with his getting out on bond?

0:30:5_ A. Yes.

Q. What did he tell you about it?

A. He told me that he had made a deal with them to where if he told them everything that he knew, then he would -- they would drop his bonds -- well, lower his bonds and my bonds.

Q. Did he ever talk to you about any arrangement he made to tell them where Dustin Pool's body was?

A. Yes.

Q. And do you know if he did tell them where the body was?

A. Yes.

Q. And, eventually, they recovered Mr. Pool's body, didn't they?

A. Yes.

Q. Did your husband ever tell you whether he told them the whole truth about it or just a part of the truth?

A. He -- he had told me what he had told them, and I knew it was not the truth.

Q. Okay. What -- what did he tell them? Did he tell them he participated in the murder?

A. Uh -- no -- well, he did not participate in it.

Q. He told them he did not participate in the murder?

A. Right.

Q. You knew that was a lie, didn't you?

A. Right.
Q. Did he tell them he just helped dispose of the body?
A. Yes.
Q. As far as you knew, that was true?
A. Right.
Q. So he had left out the part where he had participated in the murder?
A. Yes.
Q. Did you ever talk with anyone else in the group, or with Mr. Kimberlin about how the rest of the group felt about him telling this story about how he wasn't involved in the murder, he just helped dispose of the body, if you were ever in any such discussions?
A. No, I was not.
Q. Did he ever talk to you about if -- if Mr. Kimberlin says to the police, look, I wasn't involved in the murder, who did he say was, or do you know?
A. I don't know.
Q. Okay.
MR. FARREN: May we approach, Your Honor?
THE COURT: Yes. I'll tell you what. This is a good time to call a break. My court reporter has not had one yet. I know we've sent y'all out a couple of times, but my court reporter hasn't had one.

0:33:14 That's a good person to blame it on. Why don't ya'll be back in the jury room at ten till 11:00.

0:33:31 (Jury retired from the courtroom.)

0:33:32 THE COURT: Who asked me? Was it you?

0:33:42 MR. FARREN: That's all I wanted to do, Your Honor. Is I really need to visit Ms. Murphy -- or Mr. Murphy.

0:33:49 THE COURT: Oh. That's all?

0:33:51 MR. FARREN: Yes, sir.

0:49:40 THE COURT: Okay.

(Recess.)

(Both sides, the Defendant present, in open (court:)

0:49:42 THE COURT: Okay.

0:49:42 THE BAILIFF: Okay. We're ready.

0:49:44 THE COURT: Where is your witness?

0:49:46 MR. FARREN: I'll get her. I'm sorry. She didn't realize.

0:50:04 (Jury seated.)

0:50:05 THE COURT: Thank you, ladies and gentlemen. Everyone be seated. Give you just a second before we get started again.

0:50:37 All right. Mr. Farren, you may continue.

0:50:39 MR. FARREN: Thank you, Your Honor.

DIRECT EXAMINATION (CONTINUED)

0:50:41 BY MR. FARREN:

0:50:41 Q. The discussion you had with Mr. Kimberlin, where he told you the story that he told the police, and you knew half of it -- or a part of it was a lie, the part where he didn't participate in the murder, do you recall testifying about that?

0:51:00 A. Right.

0:51:01 Q. Did he talk to you about an immunity agreement that he entered into?

0:51:05 A. Yes.

0:51:05 Q. What did he have to do for that immunity agreement to remain valid?

A. Tell the whole truth.

0:51:11 Q. Tell everything?

0:51:11 A. Yes.

0:51:12 Q. And so you knew at that point that if that's correct, he's blown the immunity agreement?

0:51:18 A. Right.

0:51:19 Q. And what happened shortly thereafter?

0:51:21 A. He -- a week after that, he got arrested again.

0:51:25 Q. And charged with what?

0:51:27 A. Capital murder.

0:51:28 Q. And so he -- he didn't tell everything, and then shortly thereafter he gets arrested for the very murder he said he didn't participate in?

A. Right.

Q. Do you -- did you ever talk to any -- you indicated that you talked to Destry Keeling at some point. Was this after this or before your husband was arrested for capital murder?

A. Uh --

Q. If you recall.

A. Well, we had -- I'm not sure what you're talking about.

Q. Okay. Let me ask it this way: Did you ever have any discussions with Mr. Kimberlin after he was charged with capital murder?

A. No.

Q. Okay. Did he ever talk --

A. You mean with Mr. Keeling?

Q. No, Mr. Kimberlin.

A. Okay.

Q. Did Mr. Kimberlin ever talk to you about an alibi, a birthday party?

A. Yes.

Q. What was that discussion about?

A. He wanted me to go and round up a few people and say that the day that Dustin Pool died was the day that I had a birthday party and that he was there, so --

Q. And you agreed to try to help do that?

A. Yes.

Q. But that's not true?

A. Well, I mean, I agreed to, but --

Q. You agreed to try to set up this story, but the story is not true?

A. Right.

Q. At some point, did you and Mr. Kimberlin make plans to go to Panama?

A. Yes.

Q. When did you do that?

A. That was before the house got raided.

Q. And did you make any arrangements to purchase a house down there?

A. Yes.

Q. What -- what kinds of things did you do toward the purchase of a house?

A. We sent $15,000.00 down to Panama.

Q. Now, when your house was raided, in addition to the narcotics, was there any money seized?

A. Yes.

Q. Okay. And was the money at your house or at other locations?

A. At other locations.

Q. Now, was some of it at the house?

A. Yes.

Q. Okay. Do you know how much was at the house?
A. No.
Q. How much -- what other locations did you have cash?
A. In a safety deposit box.
Q. Was there one box or more than one box?
A. Uh -- there was just one.
Q. Just one?
A. Yes.
Q. Okay. Do you know how much total money was seized?
A. I believe it was $265,000.00.
Q. Okay. And it wasn't unusual for you folks having that much cash, dealing 30 pounds of methamphetamine a month?
A. No.
Q. When you were involved with Mr. Kimberlin and the other conspirators in -- in the methamphetamine business, what was your lifestyle like?
A. It was very good.
Q. I mean, you had as much money as you could spend, didn't you?
A. Right.
Q. What's your life like now?
A. I am having to work for my money.

0:54:33 Q. Where do you work?
0:54:34 A. I work at Sonic. I'm a manager.
0:54:37 Q. You work at Sonic. You have your child?
0:54:39 A. Yes.
0:54:41 Q. Where are you living?
0:54:42 A. I live with my parents.
0:54:44 Q. You live with your parents. And you realize, of course, that you still have the criminal charges pending and we'll see how that's resolved?
0:54:55 A. Right.
0:54:55 Q. At one point, you -- were you ready to go ahead and plead to those charges?
0:55:02 A. Yes.
0:55:02 Q. And what was to be your sentence at that time?
0:55:05 A. I believe it was 25 years in prison.
0:55:08 Q. You think it was 25 years?
0:55:10 A. Yes.
0:55:11 Q. Anybody ever talk to you about 12 years in prison?
0:55:14 A. I thought it was two 12-year sentences.
0:55:18 Q. Okay. Two 12-year sentences. I want to show you what is --
0:55:50 THE COURT: Where's Craig when you need him?
0:55:54 MR. FARREN: I don't know.
0:55:54 Q. (BY MR. FARREN) Can you see the screen?

A. Yes.

Q. You mentioned some ropes and other items that your husband took when he left. Can you tell whether these ropes look like any of the material that he took, or can you tell?

A. I'm not sure.

Q. Okay. Co-counsel is putting State's Exhibit 84 -- a copy of Exhibit 84 on the screen. There's duct tape around the ankles of the person depicted there. Does that look like the duct tape that he took with him, or can you tell?

A. Yes.

Q. Co-counsel is putting on the screen State's Exhibit 82. We have testimony that the round object toward the bottom of the screen is the head of Dustin Pool covered with duct tape. Does that look like the duct tape that your husband took when he left, or can you tell?

A. I can't tell.

Q. Have you ever seen this person?

A. No.

Q. So you never met Dustin Pool?

A. No.

Q. You talked about at one point you were ready to plead to two 12-year sentences. Why didn't you just go ahead and do it?

A. Because I had my son.

Q. You want to raise your son?

A. Yes.

Q. And if you spend less time in prison, you'll get to spend more time with your son?

A. Right.

Q. Are you still using methamphetamine?

A. No.

Q. How is your marriage with Craig now?

A. Uh -- I don't hardly ever go see him.

Q. Have either of you filed for divorce?

A. Yes, I have filed.

Q. In spite of it all, do you still care about Craig?

A. I -- yes, I do.

Q. You realize your testimony here is not helpful to Craig?

A. Right.

Q. Do you understand that?

A. Uh-huh.

Q. Do you know how much money Stocker owed -- you mentioned a drug transaction or some drugs fronted to Mr. Stocker earlier that he never paid Mr. Kimberlin for. Do you know how much money he owed him?

A. I think it was around $8,000.00.

1:00:27 Q. After -- after Mr. Pool was dead, do you know if Mr. Stocker and your husband, Craig, ever resolved this debt that was owed?
1:00:32 A. No, I do not know.
1:00:35 Q. Do you know if Mr. Bledsoe paid off -- did he -- did he keep the contract, as you understood it to be, and pay the 10,000 to somebody?
1:00:46 A. Yes.
1:00:46 Q. You think he did?
1:00:47 A. Yes.
1:00:55 Q. You've testified at length about Joshua Stocker. Do you see him here in the courtroom today?
A. Yes.
1:01:01 Q. Would you point him out for us, please?
1:01:03 A. (Witness complies.)
1:01:04 Q. Are you pointing to the man with the blue shirt and the maroon tie with stripes, that's not wearing a coat?
A. Yes.
1:01:12 MR. FARREN: May the record reflect that she's identified the Defendant, Your Honor?
1:01:16 THE COURT: The record will so reflect.
1:01:17 Q. (BY MR. FARREN) Do you know if Mr. Kimberlin ever believed that -- you've mentioned that he thought that Mr. Pool had uh -- narked or snitched on him, and

1:01:50 1:01:53 1:01:56 1:01:58 1:02:01 1:02:03 1:02:04 1:02:05 1:02:08 1:02:12 1:02:14 1:02:22 1:02:23 1:02:26 1:02:28 1:02:29 1:02:37 1:02:40 1:02:53 1:02:56 1:02:57

Bledsoe also said something about that. Do you remember any discussions or any names of anyone else that they thought might have snitched them, snitched on them or narked them?

A. Uh --

Q. Do you know Keith Allen Simpson?

A. Yes, sir.

Q. Was his name ever mentioned?

A. Yes, it was.

Q. And, again, listen very carefully to the questions and just answer the question. Okay?

Do you know if there was ever any kind of a plan or scheme to deal with Mr. Simpson?

A. Yes.

Q. Do you know if that plan was carried out?

A. Yes.

MS. McELROY: Your Honor, we would object to that this line of questioning under 401, 404(b) and 403.

THE COURT: Overruled.

MS. McELROY: May we approach the bench?

THE COURT: Yes.

(At the bench, before the Court only:)

MS. McELROY: Sorry.

THE COURT: I don't have any idea where he's going.

1:02:59 MS. McELROY: Judge, on this Keith Simpson thing, this is a totally unrelated event. They -- where this was a dispute about a car, they are going to say Stocker --

1:03:11 THE COURT: Is it in here?

1:03:12 MR. FARREN: It is in the other list, Your Honor. We say the door was opened. Uh -- the reason we -- the reason we think things have changed is because of their opening statement, but I'm not attempting to get into the details of the event, just that they believed other people --

1:03:37 THE COURT: I'm not going to allow it.

1:03:39 MR. WATKINS: Yes, sir. Yes, sir. You're sustaining the objection?

1:03:43 THE COURT: I will sustain the objection. What?

1:03:47 MR. WATKINS: I was asking you if you were sustaining the objection.

1:03:49 THE COURT: I see it now. Yeah. Okay. All right.

1:04:17 (In open court:)

1:04:18 Q. (BY MR. FARREN) In addition to Mr. Pool and Mr. Simpson, do you know, was there any other people suspected of being a nark or a snitch? If you know.

1:04:31 A. No.

Q. There were not or you don't know?

A. No, I don't know of any.

Q. Okay. Did -- did Mr. Kimberlin or anyone else in the group ever have any discussions in your presence or with you about Mr. Pool's father being somehow connected to the DEA?

A. Yes.

Q. Okay. That did come up?

A. Yes.

Q. Is that a part of the reason that they thought he might be a snitch?

A. Yes.

MR. FARREN: Pass the witness.

CROSS EXAMINATION

BY MS. McELROY:

Q. Ms. Kimberlin, now I believe you testified that ya'll got married in 1998?

A. Yes.

Q. And you were how old?

A. I was 17.

Q. How old was Mr. Kimberlin?

A. He was 24. No, I'm sorry, 29.

Q. Okay. You said that you had some economic hard times to begin with. Is that right?

A. Yes.

1:05:46 Q. That things got better for you?
1:05:48 A. Yes.
1:05:51 Q. I believe that you testified that at some point in time that you had kept the books?
1:05:57 A. I helped with them.
1:05:59 Q. Okay. And so you were aware of what was coming in from different people and what was being paid out?
1:06:06 A. Yes.
1:06:07 Q. Did you do that for all of the different people?
1:06:10 A. Some of them.
1:06:18 Q. Did you participate in the conversations or the deal making?
1:06:23 A. Yes.
1:06:24 Q. Did you participate in helping cut the dope?
1:06:27 A. No.
1:06:30 Q. Did your husband discuss with you his business dealings with different ones?
1:06:35 A. Yes.
1:06:37 Q. Do you know Danny or Denise Contreras?
1:06:39 A. I know of them.
1:06:40 Q. Have you ever spoken to Danny or Denise Contreras?
1:06:44 A. No.
1:06:44 Q. Do you know if Mr. Kimberlin has?
1:06:46 A. I'm not sure.

Q. Did he ever tell you that is where he was getting his dope from?
A. No.
Q. You have had discussions with Mr. Bledsoe. Right?
A. Yes.
Q. Did Mr. Bledsoe ever relate to you that he was getting his dope from Denise and Danny Contreras?
A. Yes.
Q. Did Mr. Kimberlin meet the Contreras's through Mr. Bledsoe?
A. I'm not sure.
Q. So the person that brought the dope to you was Mr. Bledsoe?
A. Yes.
Q. Is that correct? Why is it Mr. Bledsoe was basically handing his business over to Kimberlin?
A. He was making about -- he -- he would end up making less money, but he would -- got to where he wouldn't have as much to do with it. If that make sense.
Q. In other words, he was -- he was passing this on to Craig to do the distribution part and he was sitting back collecting a portion of it?
A. Yes.
Q. What was his cut?

1:08:01
A. I'm not sure.
1:08:02
Q. But -- but didn't you just tell me that you kept the books?
1:08:05
A. Well, that's -- I did a part of it.
1:08:07
Q. Okay. Well, was it the same cut each time? I mean, was there a percentage that he was getting back?
1:08:15
A. Yes.
1:08:15
Q. Well, do you know what that is?
1:08:17
A. No, I don't.
1:08:22
Q. Prior to -- to testifying today, you've talked with Mr. Farren. Right?
1:08:26
A. Yes.
1:08:28
Q. How many times have you spoken with Mr. Farren?
1:08:34
A. Twice.
1:08:35
Q. Okay. You've only talked with him twice in the entire time that you've been charged with this offense?
1:08:43
A. Three times.
1:08:44
Q. Three times?
1:08:45
A. Yes.
1:08:46
Q. Okay. How long during those three times did you speak with Mr. Farren?
1:08:51
A. For a couple of hours.
1:08:53
Q. Each time?
1:08:53
A. Yes.
1:08:58
Q. Have you -- have you spent some time talking with

1:09:01 Mark Brown?
1:09:02 A. Yes.
1:09:03 Q. How much time would you say that you spoke with him?
1:09:06 A. It was about two days.
1:09:11 Q. Spent about two days with him?
1:09:11 A. Yes.
1:09:11 Q. Okay. Was there any other law enforcement folks there?
1:09:15 A. Uh -- Bobbie Ledbetter (phonetic).
1:09:22 Q. Does she work for the Randall County DA's office?
1:09:24 A. Yes.
1:09:25 Q. Was there anybody else there from the Drug Enforcement Agency?
1:09:33 A. Uh -- no.
1:09:37 Q. Okay. You gave an eight-page statement. Is that right?
1:09:44 A. Yes.
1:09:45 Q. And is that what you have with you today?
1:09:47 A. Yes.
1:09:48 Q. Do you have anything else with you that you have reviewed for your testimony?
1:09:51 A. No.
1:10:14 Q. Okay. I believe you testified that one of Craig's big deals was quality.

1:10:19 A. Yes.

1:10:20 Q. Okay. And so that was the reason why he was dealing with Bledsoe?

1:10:24 A. Yes.

1:10:25 Q. Uh -- Miguel Gonzales's dope you said wasn't good stuff?

1:10:31 A. Right.

1:10:33 Q. Ms. Kimberlin, during this time you were -- you were doing methamphetamine.

1:10:40 A. Yes.

1:10:40 Q. Right? Can you tell us what kind of habit you had at that point?

1:10:43 A. I had a pretty bad habit.

1:10:44 Q. When did you start doing meth?

1:10:47 A. Whenever we started selling, which was whenever we lived in the apartments, Dove Park Apartments.

1:11:01 Q. So are we talking about 1999?

1:11:06 A. Yeah. Late 1999, early 2000.

1:11:10 Q. Okay. Did Mr. Kimberlin do methamphetamine?

1:11:15 A. No, he did not.

1:11:16 Q. He never did methamphetamine?

1:11:17 A. Yes, he did, but not at that time.

1:11:19 Q. Okay. You started using methamphetamine. How did you use the meth? Did you snort it or did you shoot it?

A. I smoked it.
Q. Okay. Did that ever change?
A. No.
Q. You stayed -- you smoked it always?
A. Well, I mean, I snorted it sometimes.
Q. Okay. How much methamphetamine would you use during a day?
A. I'm not sure. Two grams. I mean, I don't know.
Q. Okay. Well, did the amount that you use tend to increase over time?
A. Oh, yes.
Q. Did that affect you physically?
A. Yes.
Q. Did that affect you mentally?
A. Yes.
Q. Did it affect the way that you are able to perceive events?
A. No.
Q. You don't feel like it has affected your memory at all?
A. Well, yeah. Well, yes, it has.
Q. I believe that -- that you talked about this stuff that your husband paid Tori Patrick. Can you tell me about the times that he paid her?
A. There was one time that he had given her some

1:13:05 money to go buy a new couch.

1:13:05 Q. Right. Do you know how much money?

1:13:08 A. I don't remember.

1:13:12 Q. Do you remember if he ever told you?

1:13:16 A. I think -- I think it was $1,000.00?

1:13:19 Q. Okay. Do you know how much money he gave her to go to Dallas on?

1:13:23 A. No, I don't.

1:13:25 Q. I think you testified she called him several times about giving him (sic) money?

1:13:28 A. Yes.

1:13:30 Q. Would he give her the same amounts, $1,000.00 each time or did it differ?

1:13:36 A. No. It was different.

1:13:37 Q. Was she extorting money out of him?

1:13:41 A. I believe so, yes.

1:13:43 Q. Uh -- in reference to getting ready, you said that -- that your husband responded to a call from Josh Stocker?

1:13:55 A. Yes. Uh-huh.

1:13:56 Q. And that he got together a bag?

1:13:58 A. Yes.

1:14:00 Q. Now, what did you tell me he put in the bag?

1:14:03 A. Duct tape and rope.

Q. Okay. Was there more than one roll, or just one,

or do you know?

1:14:09 A. I don't know.

1:14:12 Q. Okay. Was he excited when he left?

1:14:16 A. No.

1:14:19 Q. Had he called Frank Chacon?

1:14:22 A. I don't remember.

1:14:24 Q. Okay. Now, during this time that they're out at the farm, are you getting calls from Craig?

1:14:34 A. I may have called him once or twice, just to see what was going on.

1:14:39 Q. So did he ever call you back and say, I need you to call so and so?

A. No.

1:14:43 Q. Okay. When he came back in, what time was it, do you know?

1:14:51 A. Like for which?

1:14:56 Q. When he came in from the farm.

1:14:59 A. After they had --

1:15:01 Q. Yes. After they had Dustin Pool at the farm.

1:15:04 A. It was late at night. I'm not sure what time it was.

1:15:10 Q. But you think it was still nighttime?

1:15:13 A. Yes.

1:15:15 Q. Did anybody else come over at that point in time?

A. Frank was with him.

1:15:25
Q. Did Destry Keeling ever show up?
A. The next day he did.
Q. Okay. Well, are you talking about the next morning?
A. Yes. Yeah.
Q. Okay. So the next morning who all shows up?
A. Just Dustin.
Q. All right. Is Frank still there?
A. I don't remember.
Q. All right. And you were there?
A. Yes.
Q. And then they talked about what they wanted to do with the body?
A. Uh -- I'm not sure if it was then, but, eventually, yes.
Q. Okay. Well, if it wasn't then, when was it?
A. I don't remember.
Q. Well, there was some sort of meeting?
A. Right.
Q. Is that right?
A. Yes.
Q. And I believe you testified that Frank Chacon, and Destry Keeling, and your husband, and yourself was present?
A. Yes.

1:16:24 Q. And so ya'll discussed about what ya'll wanted to do?
1:16:28 A. What they wanted to do, yes.
1:16:29 Q. But you were there?
1:16:30 A. Yeah.
1:16:32 Q. Do you know whether or not your husband ever went out to the grain elevator to check it out?
1:16:39 A. I'm not sure.
1:16:40 Q. Uh -- you knew about where they were going to bury the body. Right?
1:16:46 A. Yes.
1:16:47 Q. And you knew what they planned to do?
1:16:49 A. Yes.
1:16:50 Q. Did you offer to help them?
1:16:51 A. No.
1:16:52 Q. Were you asked to help them?
1:16:54 A. No.
1:16:57 Q. During the point in time, I think you said that Craig would call you when they were at the elevator?
1:17:02 A. Yes.
1:17:04 Q. And what was he asking you about?
1:17:06 A. I was listening to the police scanner.
1:17:10 Q. Why?
1:17:11 A. Just to see if there was -- I mean, anybody was going close by there, or --

Q. So you were kind of like a lookout?

A. Yes.

Q. Okay. I believe that when -- you talked about when they got home. They had used your truck?

A. Yes.

Q. Did they leave a mess?

A. Yes.

Q. And what did you do with the mess?

A. I threw the bags of -- empty bags of concrete in the dumpster, and I just unloaded the truck into the garage. I mean, unloaded the stuff.

Q. Okay. Were they dirty when they got in?

A. Yes.

Q. What did you do with the clothes?

A. I stuck them in the garage.

Q. What happened to them after that?

A. I'm not for sure.

Q. Okay. Did you put the rest of the stuff up, the tub and shovels?

A. Yes, I just put it in the garage.

Q. Did you have to clean your car out?

A. Yes.

Q. In your statement you say that Bledsoe mentioned to you about the shovel handle?

A. Yes.

1:[illegible]25 Q. Do you remember when that conversation took place?

1:18:28 A. It took place the next day, after the beating occurred.

1:18:35 Q. What day do you believe that to be?

1:18:39 A. I don't -- I'm not sure.

1:18:41 Q. Okay. What did he tell you about that?

1:18:47 A. He was bragging that he took it to a point that -- he was -- I mean, he was just kind of showing me.

1:19:01 Q. Well, explain to me what you mean by showing you.

1:19:03 A. How far -- I mean, how far he put the shovel handle.

1:[illegible]2 Q. Into Dustin Pool's rectum?

1:19:14 A. Yes.

1:19:15 Q. When he showed you, did he show you with his hands?

1:19:18 A. Yes. He just told me it was like (indicating).

1:19:20 Q. Okay. Well, what -- how --

1:19:20 A. I mean, I'm not sure how long it was, but he just --

1:19:26 Q. Well, was it -- was it this or are we talking --

1:19:29 A. I'm -- probably like this (indicating).

1:19:32 Q. Okay. And he appeared to you to be bragging?

1:19:36 A. Yes.

1:[illegible]6 Q. He was pleased with himself?

A. Yes.
Q. Mr. Bledsoe had taken off in the Navigator in the evening while they were trying to transport the body back. Is that what you told us?
A. Yes. Yes.
Q. And so he -- was he in contact with Mr. Kimberlin at that time?
A. Yes.
Q. And were you present when Mr. Kimberlin was talking with him?
A. Yes.
Q. What was Mr. Kimberlin telling him?
A. Well, as -- which time was it? Whenever he took off from the farm?
Q. Yes.
A. He was telling him to meet Destry at Lake Meredith.
Q. Had Mr. Kimberlin rounded Destry up?
A. I believe so.
Q. Okay.
A. He --
Q. And so he's planned out how this is going to go?
A. Yes.
Q. And he gets on the horn and -- and tells everybody where they need to be?

1:20:35 A. Right.

1:20:38 Q. Mr. Bledsoe takes over after they go to the lake house?

1:20:43 A. Right.

1:20:44 Q. Do you know why he took off?

1:20:45 A. He got scared.

1:20:47 Q. So he takes off and he heads where?

1:20:50 A. Back to Amarillo -- well, back to the farm.

1:20:52 Q. Okay. And did he call your husband at that point?

1:20:56 A. Yes.

1:20:57 Q. And, if you know, what conversation went on there?

1:21:00 A. He had told him -- he had told Craig that he was heading back to the farm, and Craig told him, no, he wasn't, or if he did, if he showed up there then he was going to be shot.

1:21:15 Q. Okay. So it would be fair to say that Mr. Kimberlin was not very happy?

1:21:21 A. Right.

1:21:27 Q. I believe in your statement you say that -- that Mr. Hale was paid for the use of his garage?

1:21:35 A. Yes.

1:21:36 Q. Do you know how much money Mr. Hale was paid?

1:21:39 A. It was a couple of thousand.

Q. Okay. If you had said that it was two or 3,000, would that be right?
A. Yes.
Q. Again, he paid Tori?
A. Yes.
Q. Who else did he end up paying?
A. I believe he paid Destry some, and I believe Frank some, too.
Q. Okay. Whose money was he using to pay everybody?
A. Josh Bledsoe's.
Q. Now, in reference to Josh Bledsoe, on the money thing, Bledsoe fronts ya'll the dope. Is that right?
A. Yes.
Q. Okay. Then your husband distributes the dope?
A. Right.
Q. All right. Now, he comes back and he pays Mr. Bledsoe for the use of the dope, or whatever?
A. Right.
Q. And is that a set amount?
A. Is -- I guess it just depended on how much he gave us in the first place.
Q. Right. But I mean --
A. Right.
Q. Was there like a per pound price he was guaranteed to get back?

A. I don't know.

Q. Did the payment change according to how many times you cut the dope?

A. No. No, it didn't.

Q. So you paid Mr. Bledsoe the same amount?

A. Yes.

Q. Okay. Do you know how much you paid him?

A. No, I don't.

Q. How is it that Craig was paying these people Bledsoe's money?

A. What do you mean?

Q. Well, in other words, he is making money off of the sale of the dope. Right?

A. Craig? Or both of them?

Q. Craig.

A. Okay. Yes.

Q. Now, how is it that he has $10,000.00 of Josh Bledsoe's?

A. Like, how did he get it from him or --

Q. Yes. Yes.

A. I'm not sure if he just gave it to him or he just took it off of some of what he owed him. I'm not sure.

Q. Okay. So in other words, he's just deducting what he would be paying Bledsoe for the dope he got fronted?

A. I don't know.
Q. All right. Let's talk about Craig's cell phones. How many cell phones? I think you said two?
A. Yes.
Q. One of those was in Mike Marquest's name?
A. Yes.
Q. Was the other in Brian McGavick's (phonetic) name?
A. Yes.
Q. Did Brian McGavick know it was in his name?
A. No.
Q. How is it you came with his cell phone?
A. Brian McGavick used to work at B-Wireless (phonetic). And she (sic) set up a phone for Craig, in Brian's name for drugs, basically.
Q. Okay. So Craig was supplying her with dope?
A. Yes.
Q. So she owed him? When you were -- after this occurs, all right, when's the first time one of ya'll get arrested?
A. Whenever my house got raided.
Q. And that was?
A. In June of 2003.
Q. Okay. So in June of 2003, both of ya'll go to jail?

1:25:44
1:25:47
1:25:48
1:25:51
1:25:51
1:25:53
1:25:59
1:26:01
1:26:02
1:26:04
1:26:06
1:26:11
1:26:12
1:26:21
1:26:21
1:26:21
1:26:24
1:26:27
1:26:30
1:26:32
1:26:32
1:26:41

A. Yes.
Q. All right. And then you were released on bond?
A. Yes.
Q. But this is after your husband has given his statement?
A. Yes.
Q. At that time, in June of 2003, did you have other dope charges pending in Potter County?
A. Yes, I did.
Q. How many? Do you remember?
A. Three?
Q. Do you know what initially you were charged with?
A. In Potter County?
Q. Yes, ma'am.
A. They were -- I mean, I don't remember the amounts.
Q. Do you know --
A. But it was for meth, yes.
Q. Yes. But do you remember, were you charged with first degree felonies, second degree felonies?
A. For Potter?
Q. Yes, ma'am.
A. I believe they were just the lowest that you could get for a felony.
Q. A state jail?

A. Yes.

Q. A state jail?

A. Yes.

Q. Do you remember if that's what they were reduced to or if that's how they started out?

A. No, that's how they started out.

Q. Basically -- now, tell me if you know, Ms. Kimberlin, was -- was a part of Mr. Kimberlin's deal to get your Potter County cases taken care of?

A. Yes.

Q. And that happened?

A. Yes.

Q. And what did you end up getting on your Potter County cases?

A. As they were -- well, eventually or --

Q. Uh-huh.

A. I got four months.

Q. Okay. So you did four months in jail?

A. Yes.

Q. On felonies?

A. Yes.

Q. And you had three felonies?

A. Yes.

Q. But that was a part of the deal that Mr. Kimberlin had worked for both of ya'll?

1:27:41
A. Right.
1:27:41
Q. Did he have any cases pending at that time?
1:27:43
A. For Potter County?
1:27:44
Q. Yes.
1:27:45
A. Yes.
1:27:46
Q. What did he have pending?
1:27:47
A. I'm not sure. I don't remember.
1:27:49
Q. Did his cases get dismissed?
1:27:51
A. Yes.
1:27:52
Q. And that was -- that was -- that was all a part of him giving the statement?
1:27:58
A. Right.
Q. Part of -- well, let me jump back around here to the cell phones. Craig is carrying two cell phones?
1:28:26
A. Yes.
1:28:26
Q. Did he ever have more?
1:28:27
A. No.
1:28:30
Q. At the time the house was raided on Stagecoach, do you remember what was seized in evidence there?
1:28:40
A. There was a motorcycle.
1:28:43
Q. Okay. Do you remember about any kind of phones? Was there more than two phones?
1:28:50
A. At the one on Stagecoach?
1:28:53
Q. Yes, ma'am.
A. I'm not sure.

1:28:55 Q. Okay. Did Mr. Kimberlin carry a pager?
1:29:00 A. Yes.
1:29:00 Q. So he would carry that in addition to his phones?
1:29:03 A. Yes.
1:29:03 Q. Did you have a phone?
1:29:04 A. Yes.
1:29:05 Q. Did you have a pager?
1:29:06 A. No.
1:29:07 Q. Did you ever carry another phone?
A. No.
1:29:12 Q. Do you know whether or not Mr. Kimberlin ever had extra phones?
1:29:19 A. I don't remember.
1:29:20 Q. Would it be possible that he had extra phones that he used?
1:29:24 A. Yes.
1:29:27 Q. Would he ever have occasion to lend a phone to a certain party or give somebody a phone so he could get in touch with them?
1:29:38 A. I'm not sure.
1:29:40 Q. But he definitely had people in the cellular business that was willing to help him out?
1:29:47 A. Yes.
1:29:48 Q. I believe that you spoke with Mr. Farren about $265,000.00 that was seized?

1:29:59 A. Yes.
1:30:01 Q. Was there other monies that were seized?
1:30:03 A. Just from what was in the house. I don't remember how much was there.
1:30:08 Q. If I were to tell you it was over $15,000.00, would that sound right?
1:30:15 A. Yeah.
1:30:16 Q. Okay. Was there seizure of vehicles?
1:30:21 A. Yes.
1:30:22 Q. How many vehicles do you know?
1:30:24 A. There was two.
1:30:27 Q. Two vehicles? What were they?
1:30:29 A. A Dodge pickup and a motorcycle.
1:30:35 Q. Okay. On the cases that are pending here in Randall County, do you know what degree felony those cases are?
1:30:45 A. Yes.
1:30:46 Q. What degree felony?
1:30:47 A. First degree.
1:30:48 Q. First degree felony. Are they in a drug free zone?
1:30:53 A. Yes.
1:30:53 Q. What does a drug free zone do to those?
1:30:57 A. It makes them higher.
1:30:59 Q. Okay. Is your understanding that if you had pled

1:31:02 on the 12-year deal that you would have to serve 12 years and then serve another 12 years?

1:31:08 A. Right.

1:31:08 Q. So they would be stacked?

1:31:10 A. Right.

1:31:14 Q. During the time that all of this drug dealing and stuff is going on, your son is in your home?

1:31:18 A. Yes.

1:31:19 Q. And how old is your son in 2003?

1:31:22 A. Three.

1:31:23 Q. Three years old?

1:31:24 A. Well, four.

1:31:25 Q. Four?

1:31:25 A. Yes.

1:31:27 Q. You currently have custody of your son?

1:31:29 A. Yes.

1:31:33 Q. Now, I think you said that you didn't -- you didn't spend much time with Mr. Kimberlin anymore. Is that right?

1:31:39 A. No, not now.

1:31:42 Q. Well, did that change recently?

1:31:49 A. Is -- not recently, no.

1:31:52 Q. Okay.

1:31:53 A. It --

1:31:54 Q. Mr. Kimberlin has been in the Randall County jail

since when?

A. Since June of 2003.

Q. Okay. And over that period of time, how many times do you think you have visited with him?

A. Oh, well, a lot.

Q. A lot?

A. Yeah.

Q. Did he ever ask you to continue conducting the methamphetamine business while he was in jail?

A. No.

Q. Did you ever have someone named Christy Marquez (phonetic) come to you and say that you needed to sell these drugs?

A. Who?

Q. Do you know a guy named -- no, I'm sorry, Miguel Gonzales.

A. Okay. No. Not after.

Q. You don't know Miguel?

A. Well, I do know him, yes.

Q. Okay. Did Kimberlin, was he ever asked to sell the dope for Mr. Gonzales?

A. Yes.

Q. Was Mr. Kimberlin in or out of jail at that time?

A. He was out of jail.

Q. Okay. That's where I'm confused.

1:32:58 A. Yes.
1:32:59 Q. Did he help get rid of that money?
1:33:02 A. Yes.
1:33:02 Q. Or get rid of the drugs?
1:33:04 A. Uh-huh.
1:33:04 Q. And did he turn that money over to Miguel Gonzales's wife?
1:33:08 A. Yes.
1:33:08 Q. And her name is Christy?
1:33:10 A. Yes.
1:33:11 Q. During the time that Mr. Kimberlin's been in jail, has he asked you to help participate in the distribution of methamphetamine?
1:33:18 A. No.
1:33:18 Q. He's never solicited your help there?
1:33:21 A. No.
1:33:22 Q. To your knowledge, has he solicited anyone else's help in selling methamphetamine?
1:33:27 A. No.
1:33:31 Q. You are aware that all of the visitations that you've had with Mr. Kimberlin or a good majority have been videotaped?
1:33:39 A. Yes.
1:33:39 Q. You're aware that all of the conversations, generally, that Mr. Kimberlin has made have been

1:34 audiotaped?
1:33:45 A. Right.
1:33:45 Q. And you feel comfortable with the position that he hasn't tried to --
1:33:51 MR. FARREN: At this point, I'm going to object, Your Honor. If these questions are being asked in good faith, then they would be required to produce the documents, or videotapes, or tapes they claim has this information, so that she can either affirm or deny that at a specific time, at a specific place she did or did not do the things they're suggesting. If she denied it, they can then introduced those. If she admits it, that's the end of it. But she's being asked these things simply to imply to the jury that they occurred.
1:34:23 THE COURT: She's not there yet. She's about one step away. You may have a good objection, but she's not there yet.
1:34:30 MS. McELROY: Your Honor, we're not trying to make unasserted accusations. We have literally a hundred hours worth of audiotape from different things, and it was certainly our understanding that Mr. Kimberlin had tried to conduct some business.
1:34:48 MR. FARREN: Then we -- Your Honor, a proper question is: At this date, at this time, with this person, did you say or do these things, so she can know

what they're talking about, and either admit or deny. This is just being, are you being a bad person after you cut a deal?

THE COURT: Well, what's your reaction to that? Is that an objection?

MR. FARREN: That's an objection, Your Honor.

THE COURT: Okay.

MR. FARREN: These questions are not appropriate.

MS. McELROY: Your Honor, at this time, we'll review the tapes and we'll recall her if we want to do the specifics on it. We're fine with that.

THE COURT: All right.

MR. FARREN: Then until that's done, I'd ask that the jury be instructed to disregard the questions and responses, because right now they're exactly what I suggested.

THE COURT: Denied.

Are you nearly through, Ms. McElroy? I'm going to break about ten till 12:00 for lunch.

MS. McELROY: We're not through, Your Honor.

THE COURT: Okay. I'm not hurrying you, I'm just trying to understand where you're at.

MS. McELROY: Okay. I'll try to pick it up.

1:35:51 THE COURT: I'm not hurrying you. I'm just trying to get an idea of breaking at a good spot. That's all.

1:35:58 MS. McELROY: Okay.

1:35:58 Q. (BY MS. McELROY) On the Potter County charges, Ms. Kimberlin, were some of these for mushrooms?

1:36:18 A. Yes.

1:36:19 Q. Did you also sell mushrooms?

1:36:22 A. Yes.

1:36:23 Q. Who supplied those?

1:36:27 A. Josh Bledsoe.

1:36:29 Q. Okay. Did you ever have any dealings with the Asians? Ted, does that ring a bell with you?

1:36:37 A. Yes.

1:36:38 Q. And who was Ted?

1:36:40 A. He was one of our suppliers.

1:36:43 Q. What was he responsible with supplying?

1:36:46 A. Cocaine.

1:36:48 Q. Okay. The way the business worked, did you exchange different products?

1:36:54 A. No.

1:36:55 Q. Okay. So you would pay him directly?

1:36:57 A. Uh-huh.

1:36:58 Q. Okay. Did he ever buy dope from ya'll?

1:37:02 A. No.

1:37:02 Q. He was present -- was he present when one of these busts went down?
1:37:09 A. Yes.
1:37:10 Q. Was he taken to jail?
1:37:11 A. No.
1:37:13 Q. On the first bust on Stagecoach, were you the only one home?
1:37:16 A. Yes.
1:37:17 Q. All right. On the second time, that was a new house?
1:37:21 A. Uh-huh.
1:37:22 Q. And both you and Mr. Kimberlin went to jail that time?
1:37:24 A. Yes.
1:37:27 Q. Did you decide to move because you got busted the first time?
1:37:30 A. Yes.
1:37:31 Q. Okay. How is it that you -- you came to live at 7909 Success Street?
1:37:37 A. Like?
1:37:39 Q. Well, I mean, did you buy the house?
1:37:40 A. Yes.
1:37:41 Q. Well, how did you purchase the house?
1:37:43 A. We put $50,000.00 down.
1:37:47 Q. All right. Did you write a check for the 50,000?

1:37:52
1:37:53
1:38:01
1:38:02
1:38:07
1:38:09
1:38:15
1:38:17
1:38:24
1:38:28
1:38:31
1:38:38
1:38:38
1:38:40
1:38:42
1:38:45
1:38:49
1:38:51
1:38:57
1:39:01
1:39:05
1:39:05

A. No.

Q. Okay. How did you do that?

A. We got a Cashiers' check, each for under $10,000.00.

Q. Okay. And so ya'll -- ya'll financed it, you had a mortgage?

A. Yes.

Q. Since the time that Mr. Kimberlin has been in jail, he has not been able to provide any support for you?

A. No.

Q. Do you -- are you still living in your home?

A. No.

Q. Has that been -- has that been seized or mortgaged?

A. Yes. Yes, it was sold.

Q. Okay. Do you have a vehicle anymore?

A. I -- yes, I do.

Q. Okay. Was that one that was not seized?

A. No, I just got this one.

Q. Okay. When Mr. Farren and you had the discussion, when you decided you didn't want to go to jail, did he ask you about signing an immunity agreement?

A. No.

Q. So you don't have any sort of immunity agreement with him?

1:39:08 A. No.

1:39:10 Q. Your understanding with him is that if you testify truthfully then he'll consider that?

1:39:20 A. Right.

1:39:22 Q. And that if you don't testify truthfully, then he would consider that, too?

1:39:29 A. Right.

1:39:39 Q. In all of the discussions about you testifying here today, you have been represented by a lawyer?

1:39:45 A. Yes.

1:39:46 Q. And he has talked with you about this?

1:39:49 A. Yes.

1:39:49 Q. And he has talked with Mr. Farren about this?

1:39:51 A. Yes.

1:39:55 Q. When you gave -- well, let me get back.

1:39:59 When did you end up in the Randall County jail? Was it after the June 12th raid on the house?

1:40:07 A. When did I --

1:40:09 Q. In 2003, you got put in the Randall County jail?

1:40:12 A. Uh-huh.

1:40:13 Q. How long did you stay in jail?

1:40:15 A. It was about four days.

1:40:17 Q. About four days?

1:40:18 A. Yes.

1:40:19 Q. Then you got your bond reduced?

A. Right.
Q. And so you got back out?
A. Right.
Q. When is the next time you got arrested?
A. It was in November of 2003.
Q. Okay. And was that based on a search warrant?
A. It was based on the -- the search warrant in Potter County.
Q. Okay. All right. And then how long did you stay in Potter County jail?
A. Four months.
Q. Okay. And then from Potter County jail were you transferred to Randall County jail?
A. Yes.
Q. All right. And how long did you stay in Randall County jail?
A. About a week.
Q. About a week?
A. Yes.
Q. And then you made bond?
A. Yes.
Q. Since that day -- well, what day would that be?
A. I believe it was March 19th of '04.
Q. Okay. So from March 19th, 2004, have you been on bond this time?

A. Yes.
Q. So you've been on bond this entire time?
A. Uh-huh.
MS. McELROY: Pass the witness.

REDIRECT EXAMINATION

BY MR. FARREN:

Q. First of all, Ms. Kimberlin, you're not a lawyer. Right?
A. No.
Q. Do you understand all of the processes you've been asked about a few minutes ago, about dismissals, and filings, and things of that nature?
A. Kind of.
Q. All right. Let me see if we can clarify some things. When you were asked about some cases being dismissed, in reference to your husband in Potter County -- now, first of all, do you understand that whatever arrangements Potter County made or didn't make involved them? We -- that we weren't involved in that. Did you know that or not?
A. No.
Q. Okay. Do -- do you realize that the cases that you were asked about that were dismissed, that when it was learned that your husband lied, those cases were refilled?
A. Right.

1:42:33 Q. Okay. So -- so when you were asked about them being dismissed awhile ago, you weren't asked if they got refiled?
1:42:41 A. Right.
1:42:42 Q. But they were, weren't they?
1:42:43 A. Yes.
1:42:45 Q. Now, you pled to state jail felonies on a 12.44 reduction, which is a -- a legal procedure where you -- it reduces the punishment?
1:42:59 A. Right.
1:42:59 Q. And you pled to a year in the county jail, didn't you?
1:43:03 A. Yes.
1:43:03 Q. Now, you were asked some other questions a few minutes ago about being asked -- I don't know when or -- well, I guess where would be the Randall County Jail, but being asked to do bad things, continue to sell dope, things of this nature. And you're the only one who knows, you and Mr. Kimberlin, so I want to make sure we're clear.
1:43:32 Once -- once you agreed to tell the truth in this trial -- by the way, do you plan to testify in the trial of your husband, Mr. Kimberlin?
1:43:41 A. Yes, I do.
1:43:42 Q. And do you plan to tell the truth there?
1:43:44 A. Yes.

Q. And are you going to do the same thing at the trial of Frank Chacon?

A. Yes.

Q. Once you had agreed to do that, have you been involved in selling, or buying, or using drugs in any way?

A. No, sir.

Q. Has anybody asked you to do that anytime, anywhere?

A. No.

Q. Okay. Now, I want to visit with you about some information in your statement that I think will clarify some things on pages five and six of your statement. Okay?

When -- when Mr. Kimberlin -- when Mr. Kimberlin received the call that morning to go over to Tori Patrick's apartment, did he respond in any way to you about how he felt about this? Was he -- was he immediately happy, or did he indicate whether he had known this was about to happen, or did he say?

A. He didn't know that it was going to happen.

Q. He did not know that it was going to happen. Okay. But once he got the call, that's when he put together the bag with the tape, and the rope, and stuff?

A. Yes.

Q. Sometime -- sometime that evening, did you talk

1:45:?8 with Mr. Kimberlin while he was at the farm by phone?
1:45:13 A. Yes.
1:45:14 Q. Did he tell you anything about what Bledsoe,
1:45:18 Stocker and Frank were doing?
1:45:19 A. Yes.
1:45:19 Q. What did he say?
1:45:24 A. Uh --
1:45:24 Q. Would it refresh your memory to look at your
1:45:28 statement?
1:45:29 A. Well, it --
1:45:39 MR. FARREN: May I approach the witness,
1:45:41 Your Honor?
1:4?:?2 THE COURT: Yes.
1:45:45 Q. (BY MR. FARREN) Would you look at your statement
1:45:48 about here, and see if that refreshes your memory.
1:45:56 A. Okay.
1:46:00 Q. What did he tell you about Bledsoe, Stocker and
1:46:04 Frank, what were they doing?
1:46:05 A. Uh -- they were beating the crap out of Pool.
1:46:12 Q. Told you they were upstairs beating the crap out
1:46:17 of Pool?
1:46:17 A. Yes.
1:46:19 Q. And it was after that call that Craig and Frank
1:46:27 came back to the house. Is that when you first learned
1:?:?2 where they were, or did they talk about being at the farm

1:46:35 when they came back?
1:46:36 A. Yeah.
1:46:36 Q. Okay. Were you present when Craig Kimberlin made
1:46:43 a call to Destry and talked about going to the lake house?
1:46:48 A. No.
1:46:48 Q. Okay. Would it refresh your memory to look at
1:46:52 your statement?
1:46:55 THE COURT: Approach the witness.
1:46:57 MR. FARREN: May I?
1:47:09 A. Okay.
1:47:11 Q. (BY MR. FARREN) I know it's been a while, and
1:47:13 we've talked about a lot of information, so if it -- if it
1:47:17 helps at times to refer to your statement, you're allowed
1:47:20 to do that. Do you understand that?
1:47:21 A. Uh-huh.
1:47:21 Q. Okay. Do you know if he called Destry? Maybe
1:47:26 you weren't -- maybe he told you he made the call, I'm not
1:47:29 sure. Did you either hear the call or did he tell you he
1:47:34 made a call to Destry?
1:47:34 A. I don't remember.
1:47:35 Q. Okay. But -- but do you in your statement
1:47:37 include information that he called Destry?
1:47:39 A. Yes.
1:47:42 Q. Okay. And what did he want Destry to do?
1:47:49 A. Meet them in Fritch, Lake Meredith.

Q. And how were they going to know who to meet? Did he give them a description of the vehicle?

A. Yes.

Q. What was the vehicle?

A. A black Navigator.

Q. And whose vehicle was that?

A. Josh Bledsoe's.

Q. Okay. Now, after he made these arrangements with Destry Keeling, did he then talk to Bledsoe and Stocker?

A. Yes.

Q. And what did he tell them?

A. He told them to meet Destry.

Q. And that he would take them to this lake house?

A. Yes.

Q. Okay. Now, after he had finished these conversations, did he say anything else about what they had done to Pool?

A. Uh -- Josh Stocker had drug Dustin Pool down some stairs by his feet.

Q. And did he talk about what happened to his head --

A. Yes

Q. -- as he was being -- coming down the stairs?

A. It was just bouncing off of the stairs.

Q. Okay. Did he tell you anything about some tape

1:49:59 around Mr. Pool's head?
1:49:02 A. Yes, sir.
1:49:02 Q. Who did he say taped his head?
1:49:05 A. Josh Stocker.
1:49:08 Q. Now, Frank Chacon was also present when you were
1:49:11 talking with your husband, and did he talk about some of
1:49:15 these same things?
1:49:15 A. Yes.
1:49:15 Q. And so both Mr. Kimberlin and Mr. Chacon were
1:49:19 telling you about this?
1:49:20 A. Yes.
1:49:20 Q. And both of them were present and could hear what
1:49:24 the other person was saying?
1:49:25 A. Yes.
1:49:25 Q. Did either of them at any time deny or say that
1:49:30 the other one was saying something that was not true?
1:49:33 A. No.
1:49:52 Q. When -- when Mr. Chacon and Mr. Kimberlin told
1:49:56 you that Stocker taped Mr. Pool's whole head, did he say
1:50:05 he taped his whole head?
1:50:05 A. Yes.
1:50:06 Q. Why? Did they say why?
A. Uh --
1:50:09 Q. Would it refresh your memory to look at your
statement?

MR. FARREN: May I approach, Your Honor?

THE COURT: Let's break for lunch here. We'll continue this after lunch.

Ladies and gentlemen, why don't y'all be back in the jury room at ten after 1:00. That will give you about an hour and 20 minutes. Remember what I told you. No talking about this case. Thank you.

(Lunch recess.)

(Both sides present, in open court:)

THE COURT: Thank you. Ya'll be seated. Everybody ready?

MR. WATKINS: Not yet.

MR. FARREN: We need our witness and the Defendant.

(Defendant present.)

THE COURT: Okay. Bring them in.

(Jury seated.)

THE COURT: Thank you, ladies and gentlemen. Everybody be seated. Everybody have a good lunch? Not too big, I hope. It was too big?

We've got the courtroom as cold as we can make it. We have blankets. I'm not kidding, we have little cotton afghans. If you need one, just tell Mr. Parker. And uh -- remember yawning is contagious, so if you yawn hide it. Okay.

3:09:14 Go ahead, Mr. Farren.

MR. FARREN: Thank you, Your Honor.

REDIRECT EXAMINATION (CONTINUED)

3:09:25 BY MR. FARREN:

3:09:25 Q. When we broke for lunch, I was about to ask you about what you were told about who taped up Dustin's head with duct tape. Did Mr. Kimberlin, or Mr. Chacon, or both tell you that?

3:09:41 A. Frank did.

3:09:42 Q. And what were you told?

3:09:44 A. That he taped his whole head with duct tape.

3:09:49 Q. "He" who?

3:09:50 A. Stocker.

3:09:51 Q. Josh Stocker, the Defendant you pointed out earlier?

3:09:54 A. Yes.

3:09:54 Q. Did Frank tell you what he believed killed Dustin Pool?

3:09:58 A. The tape.

3:09:59 Q. The tape around Mr. Pool's head?

3:10:01 A. Yes.

3:10:03 Q. Now, did Mr. Chacon tell you anything about what happened after Mr. Pool was dead from the tape around his head?

3:10:14 A. Bledsoe had asked -- he started worrying about if

he was still alive or not.

Q. Well, did he talk about loading Mr. Pool in the back of the Navigator?

A. Yes, sir.

Q. And Mr. Bledsoe had concern about whether Mr. Pool was still alive?

A. Yes.

Q. Okay. Did Mr. Chacon or Mr. Kimberlin indicate how he was talking? Was he calm about it? Was he upset, happy, sad, what?

A. He was just freaking out.

Q. Freaking out. Okay. Now, you've told us about going up to Lake -- the trip up to Lake Meredith and how that all went awry, and didn't work out. Did they talk to ya'll about how Mr. Bledsoe acted at Lake Meredith when things didn't work out?

A. Yes.

Q. How did he act then?

A. He freaked out there, too.

Q. So he was doing a lot of freaking out.

Now, you were asked about some shovels, and clothes, and things of that nature. What did -- could you tell if there was anything on their clothing?

A. There was, yes.

Q. What was it?

3:11:22 A. Concrete.
3:11:23 Q. Concrete. And in the red tub, could you tell what that was?
3:11:27 A. Dry concrete.
3:11:28 Q. I want -- I want to show you some photographs. I want to show you what I've marked as State's Exhibit 204, and ask you if you recognize what's depicted in that photograph?
3:12:04 A. Yes.
3:12:05 Q. And -- and is this a photograph at your -- at your garage?
3:12:09 A. Yes.
3:12:10 Q. And what are those objects where my thumb is?
3:12:14 A. Shovels.
3:12:14 Q. And is anything on one of the shovels?
3:12:17 A. Yes.
3:12:17 Q. What?
3:12:18 A. Dry concrete.
3:12:19 Q. Does this photograph accurately depict the way they appeared in your garage at that time?
3:12:25 A. Yes.
3:12:28 MR. FARREN: State would offer 204 into evidence, Your Honor.
3:12:34 MS. McELROY: We have no objection.
3:12:35 MR. FARREN: Oh, I'm sorry, Your Honor.

THE COURT: Take a look at them. Okay. 204 is admitted.

Q. (BY MR. FARREN) Now, the jury can now see the photograph you were talking about earlier. Is there one or two shovels in the photograph?

A. Two.

Q. And is one of them clean and one of them has concrete on it. Is that correct?

A. Yes.

Q. Now, this photo -- again, you don't know what happened to the red tub. Is that right?

A. Right.

Q. And the green trash can, as far as you know it is in evidence?

A. Yes.

Q. I'm showing you what has been marked as State's 205. Do you recognize what is in this photograph?

A. Yes.

Q. Is this a picture of the same shovels?

A. Yes, sir.

Q. Just closer?

A. Yes.

Q. And in the same garage?

A. Yes.

Q. Does this picture accurately reflect the way they

appeared at the time?

A. Yes.

MR. FARREN: Offer State's 205 into evidence.

MS. McELROY: No objection, Your Honor.

THE COURT: State's 205 is admitted.

MR. FARREN: May wè publish?

THE COURT: Yes.

Q. (BY MR. FARREN) Now, the shovel on the left -- well, which of the two shovels is the one that has the concrete on it?

A. The one on the left.

Q. Okay. Showing you what has been marked as State's Exhibit 206. Ask if you recognize this item? If you do. If you don't, that's fine.

A. No, I don't.

Q. All right. That's fine.

I'm showing you what has been marked as State's 207. Do you recognize that item?

A. No.

Q. You do not recognize that? Okay.

The -- did -- do you remember if Mr. Kimberlin, Mr. Keeling, or any other members of the group had any wireless internet devices --

A. Yes.

3:15:37 Q. Called talk-abouts (phonetic)?
3:15:39 A. Yes, sir.
3:15:39 Q. And do you know if -- do you know what they looked like? Did you ever see any of them?
3:15:47 A. Craig's was red.
3:15:51 Q. The item I showed you a moment ago was -- could you tell the color of that item in the photograph?
3:15:59 A. Black.
3:16:00 Q. Okay. All right. Did you ever see Mr. Keeling's?
3:16:07 A. No.
3:16:07 Q. You didn't see it? All right.
3:16:28 THE COURT: Mr. Farren, don't lose the originals of my exhibits.
3:16:31 MR. FARREN: Yes, sir. They're right here.
3:16:33 THE COURT: All right. Just so my court reporter knows where they are.
3:16:36 MR. FARREN: Yes, Your Honor.
3:16:40 THE COURT: I'm not trying to imply you looked confused.
3:16:46 MR. FARREN: I wouldn't be offended, Your Honor. I'm trying to get in touch with my real self.
3:16:52 THE COURT: That is a trick.
3:16:54 MR. FARREN: Yes, sir.
3:16:56 Q. (BY MR. FARREN) Do you remember any discussion

3:17:08 with Mr. Chacon or Mr. Kimberlin about returning -- well,
3:17:15 let me ask you this first. You were asked questions on
3:17:18 cross about Tyler Hale and his garage and his place?

3:17:22 A. Yes, sir.

3:17:22 Q. What -- what role did Tyler Hale play? How did
3:17:27 he get involved in this?

3:17:28 A. They decided to put the body, which was in the
3:17:36 Navigator, into his garage.

3:17:38 Q. Okay. Do you know -- do you know if Mr. Bledsoe
3:17:42 was with them when they took the Navigator to Tyler Hale's
garage?

3:17:47 A. No, I don't know.

3:17:48 Q. You don't know. Okay. You just know that his
3:17:50 Navigator went to Tyler Hale's garage?

3:17:53 A. Yes, sir.

3:17:53 Q. And after the Navigator was at his garage, at
3:17:57 some point do you know if they took the Navigator back to
3:18:01 Mr. Bledsoe?

3:18:01 A. They -- I believe they took it back after they
3:18:07 disposed of the body.

3:18:08 Q. So after they had put Mr. Pool into the grain
3:18:12 elevator and done whatever they did with the concrete, it
3:18:16 is your understanding, based on your discussions with
3:18:19 them, that they returned the Navigator to Mr. Bledsoe?

3:18:22 A. Yes.

Q. Did they indicate whether Mr. Bledsoe -- the man who freaked out more than once that night, did he ask any questions about Mr. Pool?

A. Yes.

Q. What did he want to know?

A. If he was still alive.

Q. He wanted to know if he was still alive?

A. Yes.

Q. And did -- did Mr. Kimberlin or anyone tell you how they responded?

A. Craig told him sarcastically that he had made it.

Q. That he made it?

A. Yes.

Q. But he -- he explained to you that was a sarcastic comment?

A. Right.

Q. By the way, your statement is eight pages long, but does it cover everything that was said, done? I mean, how long would it be if it did?

A. I don't know.

Q. Well, this is a summary. Right?

A. Right.

Q. Did Mr. Chacon, or Mr. Kimberlin, or others ever talk about Mr. Bledsoe and how he acted throughout this event?

A. Like how?

Q. Well, did -- did they act like he had wussed out, that he was acting like a baby --

A. Yes.

Q. -- or was he being a brave guy like they were?

A. No, he was backing out.

Q. Were they -- were they saying things that sounded like they admired him for this?

A. No.

Q. How did it sound?

A. That he was --

Q. Did they make fun of him?

A. Yes.

Q. Now, you actually had a chance to talk to Mr. Bledsoe after this, didn't you?

A. Yes.

Q. When you talked to Mr. Bledsoe, how did he behave?

A. He was sad.

Q. Now, he talked about the shovel handle?

A. Yes. But he was also proud, I guess.

Q. Okay. So you already indicated that it sounded like he was bragging about what he had done?

A. Right.

Q. Do you know whether or not any of this bragging

was in response to being held in derision by the other people, or do you know?

A. I don't think so.

Q. Okay. Do you recall in your statement talking about how Bledsoe was really, really down about this? What did you mean by that?

A. I think that he regretted what had happened.

Q. How did Craig respond to his -- to Mr. Bledsoe's demeanor? Do you remember in your statement talking about anything Craig said when he realized how depressed Mr. Bledsoe was?

A. He was just worried about him going and telling.

Q. So did he talk to him about keeping his mouth shut?

A. Yes.

Q. Now, you were asked questions on cross-examination about folks getting paid. Do you know if they were actually paid or if money was taken off of the books that they owed to Mr. Kimberlin?

A. I don't know.

Q. All right. Do you know if Tyler Hale owed money to Mr. Kimberlin?

A. I don't know.

Q. You don't know. Okay. You don't know whether the others owed money to Mr. Kimberlin?

3:21:55 A. No.
3:21:57 Q. Let me ask you this. Was it unusual or was it a practice in the business of Mr. Kimberlin that he would write off some debt if you did certain things for him? Did that ever happen? If you know.
3:22:11 A. I don't know.
3:22:11 Q. Okay. That's fine.
3:22:28 MR. FARREN: May I have just a moment, Your Honor?
3:22:29 THE COURT: Yes, sir.
3:22:32 MR. FOWLER: Should be No. 9, James.
3:22:41 Q. (BY MR. FARREN) Now, in the course of hearings out of the presence of the jury, a large number of business records have been introduced into evidence. And I want to talk with you about State's Exhibit 9, one of those business records.
3:22:57 You mentioned earlier that it was your understanding that a purchase of furniture was made for Tori Patrick?
3:23:05 A. Yes.
3:23:06 Q. Why did she need new furniture?
3:23:09 A. Because Pool was sitting on her couch and there was blood all over it.
3:23:17 Q. Okay. So were you ever present during any discussions about the problem of her apartment being

messed up and blood on the furniture and things of that nature?

A. Yes.

Q. And so this was something that was talked about?

A. Yes.

Q. You indicated that you believe that at some point some arrangement was made to get her a new couch?

A. Yes.

Q. Do you know how that was done? In other words --

A. I remember one day Craig going to meet, I believe it was Tori and Guinn, at Warehouse Solutions.

MR. FARREN: May I approach the witness, Your Honor?

THE COURT: Yes.

Q. (BY MR. FARREN) I want to show you a portion of State's Exhibit 9, a business record, and ask you what -- this is a receipt from where?

A. Warehouse Solutions.

Q. Warehouse Solutions. For a?

A. A sofa.

Q. A sofa, a love seat?

A. Yes, sir.

Q. And so this is -- this was purchased at Warehouse Solutions, but you don't know by whom?

A. No.

Q. Did you ever know anybody by the name of Morgan Spool (phonetic)?

A. No.

Q. Okay. Oh, and the costs -- what was your understanding about the approximate costs of this furniture for Ms. Patrick?

A. I was told that Craig was giving her $1,000.00.

Q. And the price here is?

A. Eleven hundred.

Q. Okay. When Tori Patrick was given money to leave town, why -- why did Craig want her to leave town?

A. Because he was afraid she would talk.

Q. Now, the times that we visited with you, you were asked about that on cross-examination, was this done in the back, in the dark, in some secret way?

A. Visiting with you?

Q. Right.

A. No.

Q. I mean, it was -- you just came here and in broad daylight and visited with us?

A. Yes, sir.

Q. Your attorneys were present?

A. Yes.

Q. Your attorney was present.

Now, do you know if Mr. Hale was either paid

money or money was taken off of the books? He was rewarded in some way is your understanding?

A. Yes.

Q. Was Mr. Elliston ever paid?

A. I don't know.

Q. Was Mr. Stocker ever paid?

A. I don't know.

Q. Now, did you ever hear anything about Mr. Pool and Ray Placensio, and some sort of a tax people were going to have to pay if people were going to want to deal dope in this town?

A. No.

Q. Have you ever heard of Cody Construction Company?

A. Yes.

Q. What is Cody Construction Company?

A. It used to be one of our side businesses.

Q. Was it really a business?

A. Yes, it was.

Q. It was?

A. Yes.

Q. Was it used for other purposes than just a real legitimate purpose? Did you ever launder money through it?

Did you ever use the accounts of Cody Construction Company to put money in that really didn't

3( )7 come from the construction business?

3:27:19 A. Yes.

3:27:19 Q. Okay. Do you know about a deck that was built
3:27:28 for someone, a Mr. Elliston, or one of the people involved
3:27:33 by Cody Construction?

3:27:35 A. I'm not sure.

3:27:37 Q. Well, let me ask you this: To your knowledge,
3:27:42 you were married -- you're married to Mr. Kimberlin and he
3:27:45 had this construction company. Can you tell us any place
3:27:48 where he actually did some construction?

3:27:50 A. No.

3:27:50 Q. But you can tell us you put some money through
3( )3 the accounts --

3:27:53 A. Yes.

3:27:53 Q. -- that really came from the drug business?

3:27:56 A. Yes.

3:28:08 Q. Did -- did Mr. Kimberlin or Mr. Chacon ever talk
3:28:11 to you about Mr. Pool having been struck or hit with
3:28:16 anything at Tori Patrick's apartment?

3:28:19 A. Yes.

3:28:19 Q. What?

3:28:20 A. A fireplace poker.

3:28:38 Q. And, finally, one of the first questions you were
3:28:42 asked on cross-examination was about Mr. Bledsoe and his
3( )6 changing role in the drug business. When you -- at some

3:28:51 point, was Mr. Bledsoe more involved in the distribution part of the business?

3:28:57 A. Yes.

3:28:58 Q. And as you've indicated on cross-examination, he was moving more now to the supply end, and Mr. Kimberlin was taking over that part?

3:29:06 A. Yes.

3:29:08 Q. Did you ever hear any discussion from Mr. Bledsoe or any other members of your group about Mr. Bledsoe wanting to get out of the business all together and getting involved in a legitimate business?

3:29:20 A. Yes.

3:29:20 Q. Was that something that you heard once or many times?

3:29:23 A. I don't know.

3:29:24 Q. Okay. But it was discussed that Bledsoe was trying to get out and get into a legitimate business?

3:29:29 A. Yes.

3:29:31 MR. FARREN: Pass the witness. Oh, may I publish to the jury, Your Honor?

3:29:38 THE COURT: Yes.

RECROSS EXAMINATION

BY MS. McELROY:

3:29:41 Q. Ms. Kimberlin, do you ever recall your husband making a statement to you that he was planning on being a

3:29:54 witness and not a Defendant?
3:29:56 A. No.
3:29:58 Q. Uh -- can you tell me -- or do you know
3:30:02 approximately the date on which Mr. Kimberlin cut his deal
3:30:07 in order that ya'll would be released?
3:30:11 A. It was four days after we had gotten arrested.
3:30:16 No, actually, it was on Father's Day.
3:30:19 Q. Do you recall the date?
3:30:21 A. No, I don't.
3:30:22 Q. So --
3:30:23 A. It was on a Sunday. The Sunday after we'd gotten
3:30:28 arrested.
3:30:28 Q. And you got arrested on the 12th?
3:30:30 A. I don't remember.
3:30:31 Q. So it would be approximately June 15th or
3:30:36 thereabouts?
3:30:38 A. (Witness nods head up and down.)
3:30:40 Q. Do you recall -- you discussed that Mr. Kimberlin
3:30:44 had relayed to you that Dustin had been hit with a
3:30:50 fireplace poker?
3:30:50 A. Yes.
3:30:51 Q. Is that right? Do you remember anything about
3:30:54 him saying that Dustin Pool had pulled a gun on Josh
3:30:59 Stocker?
3:30:59 A. Yes.

3:[illegible]9 Q. And that I guess his being hit would be in
3:31:03 response to him having a gun pulled on him?
3:31:05 A. Yes.
3:31:10 Q. Now, when -- when Mr. Kimberlin gets out, he's
3:31:16 given his statement and he comes home and he tells you
3:31:18 this is what I said. Right?
3:31:20 A. Uh-huh.
3:31:21 Q. Okay. Are you ever with him when he goes to
3:31:24 other people and tells them this is what you need to say?
3:31:29 A. Yes.
3:31:29 Q. Do you know how many people he went to?
3:31:30 A. Three.
3:[illegible]2 Q. Who are those three?
3:31:34 A. Destry Keeling, Frank Chacon and Mike Elliston.
3:31:38 Q. Okay. Do you know whether or not he ever went
3:31:40 and talked to Guinn Garcia or Tori Patrick?
3:31:43 A. No, I don't know.
3:31:50 Q. Do you know if he sent anyone to go talk to Tori
3:31:54 or Guinn?
3:31:55 A. No.
3:31:57 Q. Do you recall Mr. Kimberlin having ever said
3:32:01 anything to you like, well, we're going to blame all of
3:32:03 this on Bledsoe and Josh Stocker?
3:32:07 A. No.
3:[illegible]5 Q. You said earlier that you gave a statement, this

eight-page statement. Is that right?
A. Yes.
Q. And you said that it took two days --
A. Yes.
Q. -- to get this statement done?
A. Yes.
Q. Did you work all day, each day?
A. Yes. Well, starting about 1:00 each day.
Q. Okay. Did you work into the evening?
A. Yes.
Q. And your attorney was with you?
A. Yes.
Q. Had you prepared this statement before you went in and talked to Mr. Brown?
A. No.
Q. So you wrote out your statement or talked about how your statement as you wrote it down?
A. Yeah. We talked about it.
Q. Okay. Mr. Brown asked you about different events?
A. Yes.
Q. And then -- and then you would write that into your statement?
A. Not necessarily, no.
Q. But he would suggest to you this is something

3:33:29 that may or may not happen?
3:33:30 A. Right.
3:33:31 Q. And then you would respond to that?
3:33:32 A. Yes.
3:33:33 Q. Okay. Did he ever show you any phone records?
3:33:37 A. No.
3:33:37 Q. Did he show you other people's statements?
3:33:40 A. No.
3:33:55 Q. Do you recall, did Mr. Brown ever say, well,
3:33:58 somebody else said something else?
3:34:02 A. No.
3:34:03 Q. Okay. So he just talked to you about only your
3:34:06 personal knowledge about anything?
3:34:08 A. Right.
3:34:08 Q. Okay. Okay. I think that -- Mr. Farren, felt
3:34:34 like you might be confused. Do you know whether or not
3:34:39 that you got the dismissal, based on Mr. Kimberlin giving
3:34:43 his statement?
3:34:44 A. Say that again.
3:34:46 Q. Do you know whether or not your Potter County
3:34:48 cases were dismissed as a result of Mr. Kimberlin giving
3:34:52 his statement?
3:34:52 A. I thought they were.
3:34:53 Q. Okay. Is there any doubt in your mind about
3:34:58 that?

3:35:00 A. No.

3:35:00 Q. Okay. All right.

3:35:05 MS. McELROY: Pass the witness.

FURTHER REDIRECT EXAMINATION

3:35:08 BY MR. FARREN:

3:35:08 Q. Just for clarification, Ms. Kimberlin. You were either present with Mr. Kimberlin or he told you about talking to Destry Keeling, Mike Elliston and Frank Chacon about what kind of story they were going to tell?

3:35:27 A. Yes.

3:35:28 Q. And what was the story they were going to tell?

3:35:30 A. The story that he had told.

Q. That he was not involved?

3:35:37 A. Right.

3:35:37 Q. Frank was not involved?

3:35:37 A. Right.

3:35:37 Q. And Mr. Keeling was not involved in the murder?

3:35:41 A. Right.

3:35:42 Q. But they disposed of the body?

3:35:44 A. Right.

3:35:45 Q. Now, you knew -- you said earlier that the truth was that Mr. Bledsoe, Mr. Stocker, Mr. Kimberlin and Mr. Chacon were directly involved in the murder?

3:35:57 A. Right.

Q. And Mr. Elliston was there?

3:35:59 A. Right.
3:36:01 Q. Well, if we're going to eliminate with this story Mr. Kimberlin and Mr. Chacon, who does that leave responsible for the murder?
3:36:12 A. Josh Stocker and Josh Bledsoe.
3:36:18 Q. Do you know if Mr. Elliston originally went along with that story?
3:36:23 A. I -- I think he did.
3:36:25 Q. Did you and Mr. Kimberlin ever talk about that, or anybody else?
3:36:30 A. About?
3:36:30 Q. Did Mr. Elliston change his story at some point?
3:36:34 A. I believe he did.
3:36:35 Q. And at that point, he told the truth?
3:36:37 A. Yes.
3:36:37 MR. FARREN: Your Honor, at this time -- oh, may I approach the witness?
3:36:43 Q. (BY MR. FARREN) You have a copy of your statement there. Right?
3:36:46 A. Yes.
3:36:46 Q. I'm showing you what we've marked as State's Exhibit No. 2. Do you recognize this to be another copy of the same statement?
A. Yes.
3:36:54 MR. FARREN: At this time, we'd offer

State's Exhibit 2 into evidence, Your Honor. There has been so much talk and discussion about the statements and so much suggestion, that perhaps other things were said about different events, that it's admissible under the rule of optional completeness and it's admissible as a prior consistent statement.

MS. McELROY: Your Honor, we would object to this statement being tendered into evidence. The jury has heard her testimony. We both had the opportunity to talk to Ms. Kimberlin. This is the State's witness. They have had plenty of time to develop that testimony. It's bolstering of the witness, Your Honor.

THE COURT: I'm going to -- I'm going to sustain the objection at this time, until I have a chance to -- at a break to read all eight pages.

MR. FARREN: Yes, Your Honor.

THE COURT: I'm not going to break it now, I will continue, and then I'll make a ruling at that time.

MR. FARREN: Yes, Your Honor. We pass the witness, Your Honor.

MS. McELROY: We have no further questions, Your Honor.

THE COURT: You may step down, Ms. Kimberlin. Thank you.

MR. FOWLER: Jason Hickson.

3:38:?9 THE COURT: Mr. Hickson, would you raise your right hand.
3:38:31
3:38:39 (Witness sworn.)
3:38:39 THE COURT: Thank you, sir. Sit right there.
3:38:53 MR. FOWLER: May I proceed, Judge?
3:38:55 THE COURT: Yes.

JASON WAYNE HICKSON,

having been first duly sworn, testified as follows:

DIRECT EXAMINATION

3:38:55 BY MR. FOWLER:
3:38:55 Q. Would you state your full name, please.
3:??:?3 A. Jason Wayne Hickson.
3:39:01 Q. Sir, how old are you?
3:39:01 A. Twenty-five.
3:39:02 Q. What do you for a living?
3:39:04 A. I'm an independent contractor. I put up metal buildings.
3:39:06
3:39:07 Q. Do you work for anyone in particular?
3:39:08 A. I work for myself.
3:39:10 Q. So you have your own business?
3:39:11 A. Yes.
3:39:12 Q. J.T. Builders? Well, where do you put up these metal buildings?
3:39:15
3:??:?5 A. Mainly residential, some commercial.

3:39:19 Q. What type of metal buildings are we talking about?

3:39:23 A. Garages, carports. Some people want shops behind their house.

THE COURT REPORTER: Excuse me?

THE WITNESS: Some people want shops behind their house.

3:39:32 Q. (BY MR. FOWLER) Storage sheds?

3:39:33 A. Yes.

3:39:35 Q. How long have you been in this business?

3:39:37 A.. About -- on and off, eight years, but in my own business, a year. About a year now.

3:39:44 Q. So full-time, a good year?

3:39:47 A. A year, yeah.

3:39:49 Q. Prior to becoming full-time, self-employed in this storage shed business, were you involved in a drug cartel along with Stephen Craig Kimberlin, Josh Stocker, Josh Bledsoe and others?

3:40:04 A. Yes.

3:40:04 Q. What was your role in this group?

3:40:07 A. I worked with Bledsoe.

3:40:09 Q. Okay. Out of all of the casts of characters, who was your best friend in the group?

3:40:15 A. I would have to say Bledsoe.

3:40:17 Q. That's Josh Bledsoe?

A. Yes.

Q. And when you say you worked for Bledsoe, worked in what way? What did you do for him?

A. Sold drugs.

Q. What type of drugs are we talking about?

A. Methamphetamine.

Q. Do you know where Josh Bledsoe was receiving the drugs that you got from him?

A. That I got from him?

Q. Uh-huh.

A. Danny and Denise Contreras.

Q. Sir, yeah. Could you just --

A. Yeah.

Q. -- speak up and lean a little bit forward.

A. Yes.

Q. And at some point, did Josh Bledsoe start receiving drugs from Old Mexico?

A. I believe so.

Q. Okay. What was Craig Kimberlin's role in this group?

A. He was Bledsoe's --

THE COURT REPORTER: Excuse me?

THE WITNESS: Bledsoe's main guy.

Q. (BY MR. FOWLER) When you say "main guy", what does that mean?

3:41:15 A. He did a bigger percent than anybody else did for Josh Bledsoe.

3:41:20 Q. Would Bledsoe give Kimberlin the methamphetamine in a pure form or would it be cut up?

3:41:29 A. I couldn't answer that.

3:41:31 Q. Okay. The methamphetamine that Bledsoe, and you, and Kimberlin were dealing with, what kind of quality was it?

3:41:41 A. Previous -- previous to be handed to me, I don't know.

THE COURT REPORTER: Excuse me. I didn't understand.

THE WITNESS: Previous to it being handed to me, I do not know.

3:41:48 Q. (BY MR. FOWLER) Okay. Did you use any of the methamphetamine while you were working for Bledsoe?

3:41:52 A. No, I did not.

3:41:55 Q. What was Josh Stocker's role in the group?

3:41:59 A. I didn't really know too much of him before the incident with -- with Pool, and me and Josh Bledsoe talked about him a couple of times at his house. And the only time I met him was that time at Stumpy's.

3:42:14 Q. Okay. Okay. And so you really weren't too familiar with Josh Stocker's role in the organization?

A. No.

Q. What was Frank Chacon's role in the organization?
A. I don't have any idea. I don't know Chacon.
Q. Besides working for Josh Bledsoe, would you also help him out for problems that Josh had if he needed some backup?
A. Sometimes.
Q. Okay. And you're a pretty big, stout guy. Is that right?
A. I suppose, yeah.
Q. And did you have a background in shoot fighting?
A. Yes, sir.
Q. What exactly is shoot fighting?
A. No holds barred fighting in the ring.
Q. Is that like that ultimate combat sometimes we see on TV?
A. Yes, sir.
Q. Ultimate street fighting, I think it's called?
A. Yes, sir.
Q. Did anyone else in the group have a background in the shoot fighting?
A. Yeah. When I first started when I was 18, Kimberlin was one of the first promoters.
Q. Did he actually ever fight in the shoot fight?
A. No, not that I know of.
Q. Did he ever tell people he fought?

3:43:20 A. Yeah.
3:43:20 Q. And that was a part of his representation, and he wanted to project an appearance that he was a tough, tough guy. Right?
3:43:28 A. Yes.
3:43:29 Q. But you actually did the shoot fighting?
3:43:32 A. Yeah.
3:43:33 Q. Which high school did you go to?
3:43:35 A. Caprock High School.
3:43:36 Q. How long have you known Josh Bledsoe?
3:43:40 A. Since 6th grade.
3:43:43 Q. Okay. And did Josh Bledsoe also go to Caprock with you?
3:43:46 A. Yeah, until he dropped out.
3:43:56 Q. Now, I want -- did you know Dustin Pool at all?
3:43:59 A. Yeah.
3:44:00 Q. How did you know Dustin?
3:44:02 A. I met him through Adrian Gonzales, I want to say about six -- six or seven years ago.
3:44:09 Q. Okay. Did you ever have a business relationship with him?
3:44:14 A. Somewhat. A couple of dabbles, but nothing consistent.
3:44:19 Q. Towards 2002, 2003 did Dustin Pool become a big distributor, seller of methamphetamine in the Amarillo

area?

A. Yes, he had a reputation.

Q. Did you know anyone who was in his group or organization?

A. Ray Placensio. Choppo (phonetic). That's about it.

Q. Choppo, do you know what his real name is?

A. No, I have no idea.

Q. Do you know a guy by the name of Bobby O'Connor (phonetic)?

A. Yeah.

Q. Was he also in Dustin's organization?

A. He could have been.

Q. Did you know of a Lupe Placensio (phonetic), Ray Placensio's brother?

A. No, I didn't know him. Never met him.

Q. At some point did there become tensions between Pool's group and Bledsoe and Kimberlin's group?

A. Yeah.

Q. Okay. Do you know approximately what time frame or when it started?

A. Around December, January.

Q. Would that be of 2002?

A. Right.

Q. Do you know what started the conflict?

3:45:32 A. Pool had tried to hire Ray. And I guess have Ray go rob (sic) Bledsoe and then Bledsoe caught wind of it, because somebody opened their mouth to somebody else, and it trickled down hill.

3:45:47 Q. Okay. So Pool was planning to -- did you say raid Bledsoe?

3:45:50 A. Yeah.

3:45:50 Q. Okay. And I guess he was trash talking and then Bledsoe found out about the trash talking?

3:45:56 A. Right.

3:45:56 Q. Did Pool ever tell you, personally, that he was going to go raid Bledsoe?

3:46:05 A. No.

3:46:06 Q. Okay. Did he ever ask you questions or information about Bledsoe, that could have helped him to raid him?

3:46:14 A. He asked me when -- he asked me one time if I knew when he took the money that he took to Mexico from the Contrerases.

3:46:24 Q. Okay. And so as Josh Bledsoe's good friend, you knew some details of Josh Bledsoe that other people didn't know. Is that right?

3:46:37 A. Not a lot, no. He was not stupid enough to let everybody know what he does.

3:46:42 Q. Okay. I mean, he was pretty -- he was pretty

3:46:4 tight with his information?

3:46:45 A. Yes.

3:46:51 Q. When Bledsoe caught wind that Pool was trying to raid him, what was Bledsoe's reaction?

3:46:59 A. I don't know for sure. I heard that Kimberlin and a couple of others went over to his house and had a talk with him.

3:47:05 Q. Who did you hear that from?

3:47:08 A. Bledsoe. Bledsoe and David Garcia.

3:47:12 Q. David Garcia?

3:47:13 A. Yeah.

3:47:16 Q. After Kimberlin and Bledsoe, Bledsoe went to talk to Pool, do you know of any other event after that that caused tension between the two groups?

3:47:26 A. Pool continued to make threats.

3:47:27 Q. What kind of threats did Pool make?

3:47:30 A. Oh, he called Josh's wife a bitch.

3:47:35 Q. He called Josh Bledsoe's wife the "B" word?

3:47:39 A. That was at the confrontation at Joe's Crab Shack.

3:47:44 Q. Okay. Let's talk about that. Were you at Joe's Crab Shack during this confrontation?

A. No.

3:47:49 Q. How did you learn about the confrontation?

3:4 1 A. Josh called me while it was going on.

3:47:53 Q. Josh Bledsoe called you --
A. Right.
3:47:55 Q. -- while it was going on?
3:47:56 A. Right.
3:47:57 Q. What did he tell you was occurring?
3:47:59 A. He just said he went there, and he was walking in, Pool was walking out. And that Pool said, hold on. He went inside and got Bobby, and whoever was with him, and then Josh and David went outside, and then Josh called me to up there.
3:48:12 Q. Did you go up there?
3:48:13 A. By the time I got in the car and he called me back on the cell phone, they'd already left.
3:48:17 Q. Did Bledsoe call anyone else to go up to Joe's Crab Shack?
3:48:22 A. Not that I know of.
3:48:23 Q. And then you said you learned that Bledsoe's significant other, Kelly Grayless, she was called a derogatory name at Joe's Crab Shack?
3:48:33 A. Right.
3:48:33 Q. What other events are you aware of that caused tension between the two groups?
3:48:38 A. Just repeated phone calls.
3:48:41 Q. Okay. By -- by whom?
3:48:43 A. By Pool making threats. And they said, we'll

meet us -- meet us there. They never showed up.

Q. Okay. If I could stick with the phone calls. Pool would call you, or call Bledsoe, or Kimberlin or --

A. All of us. Everybody. He called me making threats. He called Josh Bledsoe making threats. David Garcia making threats. If anybody else -- I don't know anybody else. Those are the three I know for sure.

Q. What was he threatening to do?

A. He told me that he knew where my mom lived, my sister, and I don't receive threats like that, so it was kind of off to me.

Q. Did he -- I mean, did he threaten to hurt them?

A. More or less, that's what he meant by it, yes. And then he called me and told me he was going to kill me one time. Then he told Josh about going to war with him.

Q. Okay. And would he ever threaten to turn everybody in?

A. Oh, yes. He told me that one time on the phone. I was talking to him and he said, well, you can just go tell everybody, I'm going to turn everybody in.

Q. And so naturally, people in the drug business got worried when he threaten to do that?

A. Oh, yeah.

Q. Was there some concern among you, and Bledsoe, and Kimberlin that he, in fact, was working with law

3:50:07 enforcement?

3:50:10 A. I thought he was.

3:50:11 Q. Okay. Did you have anything concrete to say, Pool is working with them or he's --

3:50:16 A. No.

3:50:17 Q. Okay. Just a suspicion?

3:50:18 A. Yes.

3:50:19 Q. And then, plus he's going around telling everyone he's going to turn everyone in?

3:50:25 A. Correct.

3:50:33 Q. Now, you mentioned a meeting at Stumpy's. Now, do you remember exactly when that was?

3:50:40 A. Late February, I think.

3:50:43 Q. Well, the indictment in this case says that the events that lead up to Dustin Pool's murder was March 9th, 2003.

3:50:50 A. Right.

3:50:52 Q. And in your statement that you gave to Mark Brown, I believe you said the end of January, 2003?

3:50:57 A. Yeah, it was sometime in February.

3:50:59 Q. Okay.

3:51:01 A. It could have been the end of January, I'm not sure.

3:51:03 Q. Okay. So maybe a month or a month-and-a-half before Dustin was --

A. Yeah.
Q. -- killed?
A. Yes.
Q. Who was at -- who called the meeting at Stumpy's?
A. Josh called the -- Bledsoe. He met him and David Garcia there.
Q. And was the meeting at Stumpy's, was it in response to all of these threats, and the --
A. Yeah.
Q. -- Joe's Crab Shack incident?
A. Yeah. To everybody, yeah.
Q. Okay. And it was to solve the problem?
A. Right.
Q. And Stumpy's is a bar in Amarillo?
A. Right.
Q. Okay. And -- and Stumpy's is located, I think, on 16th Street, in Amarillo?
A. Right.
Q. In between Washington and Harrison?
A. Correct.
Q. And what time of day did this meeting at Stumpy's happen?
A. About 3:00 a.m., 2:30.
Q. Did you eventually go to Stumpy's?
A. Yes.

3:52:11 Q. Did you go with anybody?
3:52:13 A. No, I went by myself.
3:52:14 Q. Okay. When you got to Stumpy's, did you see anyone outside?
3:52:18 A. Yeah.
3:52:18 Q. Who was that?
3:52:20 A. Kevin Jackson.
3:52:21 Q. And what's his role in this group?
3:52:23 A. I have no idea. He was sitting outside.
3:52:25 Q. Okay. Well, how did you know him?
3:52:26 A. How did I know him?
3:52:27 Q. Yeah.
3:52:28 A. He's best friends with Josh Bledsoe.
3:52:32 Q. Okay. Another good friend of Bledsoe?
3:52:34 A. Yeah. A good friend.
3:52:35 Q. And he's often referred to as K.J.
3:52:37 A. Right.
3:52:38 Q. He was outside sitting in a car?
3:52:40 A. In a truck, yeah.
3:52:41 Q. In a truck? Did you go up and visit with him before you actually went inside Stumpy's?
3:52:45 A. I think I said hi to him.
3:52:46 Q. Okay. Did you notice if he had anything?
3:52:49 A. Not that I know of.
3:52:50 Q. Did you notice if there were any weapons near

3:52:?4 him?

3:52:55 A. Uh -- no. I didn't see any.

3:53:05 Q. An AR-15 or an SKS, does that ring any bells?

3:53:09 A. Bledsoe said that he had one, but I never saw it.

3:53:12 Q. Okay. You never saw it?

A. Right.

3:53:13 Q. And you learned from Bledsoe that possibly Kevin Jackson had a SKS or a --

3:53:17 A. Yes.

3:53:17 Q. -- or an AR-15?

3:53:19 A. Right.

3:53:20 Q. So you say hi to Kevin, and then you go to bar, and who's in the bar?

3:53:24 A. There's a few people, a lot of people I don't know.

3:53:27 Q. Well, tell us the people you do know.

3:53:29 A. Josh Bledsoe is in there. David Garcia was in there. Tommy Tucker was in there. Kimberlin was in there, and Josh Stocker was in there.

3:53:41 Q. Now, the Josh Stocker that was in Stumpy's, do you see him in the courtroom?

3:53:44 A. Yes.

3:53:44 Q. Can you point him out for us?

3:53:46 A. Him right there (indicating).

3:5?:?7 Q. He's the person sitting across from me in the

blue shirt, maroon tie that's striped?

A. Yes, sir.

MR. FOWLER: Your Honor, I'd ask the record to reflect that the witness has identified the Defendant.

THE COURT: The record will so reflect. Hold up. Ms. King, can you hear okay?

JUROR KING: Uh-huh.

THE COURT: All right. Go ahead.

Q. (BY MR. FOWLER) Did anybody arrive after you to Stumpy's?

A. Not that I can remember.

Q. Okay.

A. I mean, those people are going in and out in the parking lot.

Q. Sure. And when you got to Stumpy's, were all of these people sitting around a table?

A. Three or four different tables.

Q. Okay.

A. There was quite a few people.

Q. What was the topic of conversation?

A. Just that -- you know, everybody in that bar -- everybody received threats, personal threats from him, and how we were going to get it stopped. And maybe -- a lot of people were talking about have a sit-down and talk with him.

Q. So this was kind of a brainstorming session to see how we can solve the Dustin Pool problem?
A. Right. He was supposed to show up, but he never did.
Q. How do you know that Dustin was supposed to show up at Stumpy's?
A. Bledsoe told me.
Q. Do you know if anybody actually called Pool on a cell phone from Stumpy's?
A. I think right before we left, Bledsoe tried to call him one more time.
Q. Did they get -- did Bledsoe get any response?
A. No.
Q. Was there any information conveyed to you that Pool knew you were at Stumpy's, and he was going to get some of his buddies and come up to Stumpy's and start a big fight?
A. He had called, I think, Kimberlin and told him something about that he wanted to go to war. And Kimberlin told us later on about that --
Q. Okay.
A. -- phone call.
Q. So Kimberlin got a call from Pool while he was at Stumpy's?
A. Right.

3:55:51 Q. And Pool said, we're at war?
3:55:55 A. Yeah.
3:55:56 Q. Okay. So what was Kimberlin's response to that?
3:56:00 A. He didn't have a real solid, you know, reaction to it. He just more or less wanted to have a sit-down and talk to him, too.
3:56:09 Q. Okay. Did anyone mention killing Dustin Pool at this Stumpy's meeting?
3:56:15 A. Uh -- I'm sure it was passed around and joked around, but I don't really -- can't really remember anybody really saying that.
3:56:23 Q. Do you remember if Bledsoe ever mentioned in passing the $10,000.00 to kill Dustin Pool?
3:56:31 A. Yeah, I remember something like that.
3:56:34 Q. Okay. What do you remember Bledsoe saying?
3:56:37 A. That it would be beneficial if everybody could come up with money to try to get rid of him.
3:56:43 Q. So Bledsoe was suggesting everyone kind of chip into a pot?
3:56:47 A. Something like that, yeah.
3:56:48 Q. And that money would be used as a contract for Dustin Pool's life?
3:56:53 A. Right.
3:57:00 Q. After Bledsoe said this -- well, what was people's reaction there at the meeting?

3:57:08 A. Uh --
3:57:11 Q. Were people volunteering to throw money into the pot?
3:57:14 A. No. I mean, it was just an idea that was thrown up really, more or less.
3:57:19 Q. And so after he mentions this, is that when the group came to a consensus to have a sit-down with him?
3:57:24 A. Yes, sir.
3:57:25 Q. What does that mean, a sit-down?
3:57:27 A. Just sitting down and talking to him, and just getting it to stop.
3:57:30 Q. Does that mean rough him up, or does that actually mean --
3:57:33 A. No, just talk to him. Just talk to him.
3:57:53 Q. You mentioned something in your statement, and I'm a little confused by it. You said -- you mentioned Bledsoe had mentioned that he would take Dustin to the river. What -- what did you mean by that?
3:58:07 A. He had said something about that, but that was not at that meeting.
3:58:11 Q. Oh, Okay.
3:58:11 A. It was at his house one time, and I don't know what he meant by that. It was just said.
3:58:16 Q. Do you know what river he was talking about?
3:58:19 A. I have no idea.

3:58:30 Q. Okay. After the Stumpy's meeting, did -- were you aware that -- that Ray Placensio actually got kidnapped, and assaulted, and held?
3:58:45 A. Yes.
3:58:45 Q. Were you involved in that?
3:58:46 A. No.
3:58:49 Q. Why -- why did some members -- or what was the purpose of kidnapping Placensio, Pool's right hand man?
3:59:01 A. Because whenever threats were made and then threats were made back, he would always say he was going to go get Ray, and Ray was going to get his "TS" buddies, or whatever. And so in taking out Ray, or showing -- making an example of Ray, what would Pool have to back himself up on, if he didn't have that?
3:59:20 Q. And you said Ray would get his "TS" buddies. What does "TS" mean?
3:59:25 A. Texas Syndicate.
3:59:26 Q. And that's a prison gang that operates --
3:59:28 A. Right.
3:59:28 Q. -- inside the prison and outside the prison?
3:59:31 A. Right.
3:59:31 Q. And so Dustin would tell your group that the Texas Syndicate was going to get involved in this feud?
3:59:39 A. I heard that a couple of times, yeah.
3:59:47 Q. And so, basically, the kidnapping of Ray

Placensio and the beating of him was to send a message to Dustin Pool?

A. Right.

MR. WATKINS: Objection; leading.

THE COURT: Overruled.

Q. (BY MR. FOWLER) I'm sorry, you may answer the question.

A. Yeah. Yes.

Q. After Ray Placensio was kidnapped and beaten, did the threats from Pool's -- did the threats from Pool stop?

A. No.

Q. What types of threats occurred after Placensio was kidnapped and beaten?

A. Pretty much the same as always had happened before.

Q. And did Dustin Pool ever personally threaten you after the Ray Placensio incident?

A. I kind of more or less stopped hearing from him too much anymore, because the main focus was on Bledsoe.

Q. Before the Stumpy's meeting, did you ever hear any idea about people who deal drugs in Amarillo were going to have to pay a tax to the Texas Syndicate?

A. No, I never heard anything like that.

Q. Okay. And then you were not involved in the kidnapping, or torture, or killing of Dustin Pool?

A. No.

4:01:20 Q. When it came up in the news -- well, how did you
4:01:24 first learn about it?

4:01:26 A. Hum. I heard from -- his mother called my
4:01:33 girlfriend at the time and my girlfriend told me.

4:01:36 Q. Okay. Who was your girlfriend at the time?

4:01:38 A. Laura Lucus (phonetic).

THE COURT REPORTER: Excuse me?

4:01:39 THE WITNESS: Laura Lucus.

4:01:40 Q. (BY MR. FOWLER) Okay. And Laura Lucus used to
4:01:44 be a girlfriend of Dustin Pool's. Is that right?

4:01:47 A. Right.

Q. And she dated Dustin for a significant time
4:01:50 before she dated you?

4:01:52 A. Right.

4:01:52 Q. And she had a child. Right?

4:01:54 A. Right.

4:01:54 Q. And what was the child's name?

4:01:56 A. Damien (phonetic).

4:01:57 Q. And Dustin and Laura actually lived together
4:02:00 before you started dating her. Is that correct?

4:02:02 A. Right.

4:02:03 Q. And he treated her child as if it was his own.
4:02:08 Right?

A. Right.

4:02:08
Q. And so I guess, you know, dating Dustin Pool's ex-girlfriend, that was probably another source of tension between you and Pool?
4:02:11
4:02:14
4:02:15
A. Not at first it wasn't.
4:02:17
Q. Did it become a source of tension?
4:02:18
A. It became one with him, yeah.
4:02:25
Q. And so Laura Lucus was the first one you heard about?
4:02:30
4:02:30
A. Right.
4:02:31
Q. Okay. And when she told you about it, did you -- did you have a good guess as to what happened to him?
4:02:39
4:02:41
A. I knew what happened to him.
4:02:43
Q. Okay. Why did you already know what happened to him?
4:02:46
4:02:46
A. Just events leading up to that, and knowing what his demeanor was the whole time. And knowing that the only way to deal with the problem, the only way that -- if he got kidnapped, there wouldn't be no -- there wouldn't be no letting him go.
4:02:51
4:02:55
4:02:58
4:03:01
4:03:03
Q. And so did you get the sense that after Placensio, and then after the threats by Pool, his murder was almost inevitable?
4:03:07
4:03:10
4:03:13
A. Somewhat, yes.
4:03:39
Q. Did you know or do you have any information if Josh Stocker was looking for Pool before Pool was
4:03:44

kidnapped or murdered?
A. No.
Q. Do you know if Josh -- was Josh Stocker doing any kind of surveillance on Pool, or any kind of investigation on Dustin Pool, before Dustin was kidnapped and murdered?
A. No.
Q. Okay. Jason, you've had some -- a run-in with the law. Is that right?
A. Yes.
Q. You were placed on deferred probation for aggravated assault?
A. Yes.
Q. Okay. And that's a felony in this state?
A. Yes. Right.
Q. And uh -- when were you put on probation for aggravated assault?
A. '97.
Q. Okay. When did you get off of probation?
A. 2003.
Q. Okay. And before you got off of probation, was there a Motion to Revoke your probation filed?
A. Yes.
Q. Okay. And you had an attorney. You hired an attorney. Is that right?
A. Yes.

4:05:07 Q. And your attorney worked out an agreement with our office that if you would cooperate on other matters --

4:05:15 A. Right.

4:05:15 Q. -- that you would be let off of probation?

4:05:18 A. Correct.

4:05:18 Q. And the other matters that you're cooperating on, is that still an ongoing investigation?

A. Yes, sir.

4:05:25 MR. FOWLER: Your Honor, I pass the witness.

THE COURT: Mr. Watkins.

CROSS EXAMINATION

BY MR. WATKINS:

4:05:29 Q. Mr. Hickson, my name is Mike Watkins. How are you?

4:05:32 A. Fine.

4:05:33 Q. We haven't met before, I believe, have we?

4:05:35 A. No, sir.

4:05:37 Q. Okay. Now, let's see. I understand you to say that you're basically Bledsoe's best friend?

A. No.

4:05:43 Q. Back in 2003?

4:05:44 A. Not his best friend, just friends.

4:05:46 Q. Just real good friends?

4:05:48 A. Pretty good friends.

4:05:49 Q. Okay. And you're a part of Bledsoe's

4:[illegible]0 organization, distributing narcotics. Is that correct?
4:05:55 A. Yes.
4:05:56 Q. Okay. And I think I understood you to say that Bledsoe's biggest customer was Stephen Craig Kimberlin?
4:06:03 A. Yes.
4:06:03 Q. And that would indicate to me that Bledsoe had other customers?
4:06:07 A. Correct.
4:06:08 Q. Okay. What other customers did he have?
4:06:11 A. That I know of?
4:06:12 Q. Uh-huh.
4:06:13 A. David Garcia.
4[illegible]4 Q. Okay.
4:06:16 A. I, myself. I mean, there's a couple more, but -- I mean, he's not going to sit there and spill it out, who all his people were.
4:06:24 Q. Okay. But he had other customers?
4:06:28 A. Yes.
4:06:30 Q. So if there's an allegation that Kimberlin had taken over Bledsoe's organization, that's not really true, is it?
4:06:40 A. No, I don't think he could.
4:06:40 Q. Okay.
4:06:42 A. Maybe as a front, yeah.
[illegible]7 Q. Now, you said that Mr. Bledsoe was buying his

4( )1 narcotics from the Contrerases?

4:06:55 A. Right.

4:06:56 Q. And you were asked at one point about buying it
4:06:58 from the Juarez Cartel?

4:07:01 A. Right.

4:07:02 Q. Okay. Is that the Contrerases?

4:07:04 A. No.

4:07:04 Q. No? He's buying it from two separate people?

4:07:08 A. Well, from what I understood -- from what Josh
4:07:11 made me understand, it was a three-way deal to where he
4:07:15 was with both the Contrerases and they would go down
4:07:17 there.

4( )8 Q. Say that again, because I'm hard of hearing.

4:07:20 A. It was him, plus both of the other Contrerases
4:07:23 would go down there.

4:07:24 Q. And they would all buy from someone in Mexico?

4:07:27 A. Yeah. Yeah. A joint venture, yeah.

4:07:29 Q. Okay. So he was -- he was kind of buddies with
4:07:32 the Contrerases?

4:07:33 A. Right.

4:07:33 Q. And that's Danny and Denise?

4:07:35 A. Right.

4:07:36 Q. Okay. And they kind of caravan down there or
4:07:40 take one, go together?

4( )2 A. Hire somebody to go down there, yeah.

4:07:13 Q. Hire someone to go? Okay.
4:07:51 Now, you have said that you were pretty
4:07:53 familiar with Dustin Pool prior to all of this coming
4:07:56 around. Is that correct?
4:07:57 A. Correct.
4:07:58 Q. How did you know Dustin?
4:08:00 A. Through -- through Adrian Gonzales, I met him.
4:08:08 Q. Okay. And how is that connection?
4:08:10 A. He used to work with Adrian Gonzales. They used
4:08:13 to work together.
4:08:14 Q. Okay. Meaning Adrian sold dope for -- for Pool?
4:08:17 A. No, Pool did for Adrian.
4:08:19 Q. Pool sold for Adrian?
4:08:20 A. Right.
4:08:21 Q. Okay. So Adrian -- now, you said he used to.
4:08:30 Does that mean that Pool had kind of taken of Adrian's
4:08:33 business?
4:08:33 A. No, he just shifted in a different direction.
4:08:36 Q. Okay. Now, was Pool buying from the Contrerases,
4:08:40 also? Or do you know?
4:08:43 A. I have no idea.
4:08:44 Q. Okay. I don't know is a fair answer. I'll tell
4:08:47 you that. Okay? I don't want you to guess at things. I
4:08:50 don't -- I just --
4:08:51 A. No.

4:08:54 Q. -- I want to know what the truth is.
4:08:54 Now, you said that Bledsoe ran a tight organization. Do you remember saying that a few minutes ago?
4:09:02 A. Yes. Yes.
4:09:03 Q. That's true. Right?
4:09:05 A. Yes.
4:09:05 Q. Okay. And you made a comment, he wasn't dumb enough to do that. He was a pretty sharp businessman, wasn't he?
4:09:14 A. Yes.
4:09:14 Q. Okay. Had other businesses as well as the dope trade?
4:09:19 A. Yes.
4:09:19 Q. As a matter of fact, the dope trade was truly a business to him?
4:09:22 A. Yes.
4:09:23 Q. He didn't use dope that much?
4:09:24 A. No.
4:09:25 Q. As a matter of fact, very seldom?
4:09:27 A. Not that I know of at all.
4:09:29 Q. Okay. And I think you just testified that you didn't use dope?
4:09:32 A. No, sir.
4 3 Q. Okay. It was a business for you?

A. Yes.
Q. Pretty profitable?
A. Yeah.
Q. Okay. And you managed not to get in any trouble over the dope business?
A. Right.
Q. Okay. Now, in talking with the DA, did they explain to you that -- that you can be held responsible for crimes up to so many years after the crimes occurred?
A. Right.
Q. Called the Statute of Limitations?
A. Right.
Q. And is it your guess that those have all run and you're -- you're safe to talk about all of this now?
A. Meaning?
Q. Meaning, are you coming here today concerned about your testimony is sworn and supposedly truthful?
A. Right.
Q. And that you could be indicted tomorrow, or next week, or --
A. Correct.
Q. I mean, are you aware of that or are you concerned about --
MR. FARREN: We'd object, Your Honor. That is a misstatement of the law. We can't prosecute someone

4:10:34 on their statement without a corpus to go with it. By law
4:10:38 that's insufficient.

4:10:40 THE COURT: Just rephrase it.

4:10:42 MR. WATKINS: Okay.

4:10:43 Q. (BY MR. WATKINS) What -- what I'm actually
4:10:45 looking at is, was there an agreement between you and the
4:10:50 State that you wouldn't be prosecuted for anything you
4:10:53 talk about up here today?

4:10:55 A. Was I told that?

4:10:56 Q. Uh-huh.

4:10:57 A. Yes.

4:10:57 Q. Okay. When were you told that?

4:11:03 A. A month ago.

4:11:04 Q. Okay. Now, when did you first start talking with
4:11:10 the State, whether it be a cop, or Mr. Farren, or Bobbie
4:11:14 Ledbetter, or someone from his office?

4:11:18 A. It was when they were looking for Pool.

4:11:21 Q. For Dustin?

4:11:22 A. I got arrested, yeah. And Mark Brown came to the
4:11:26 County.

4:11:26 Q. Did you -- did he just come see you?

4:11:29 A. Yes.

4:11:29 Q. Or did you send a letter or something?

4:11:31 A. No, he came to see me. I was there like for
4:11:34 three hours and he was there.

Q. Okay. He's got good radar, huh?

A. Well, whenever Pool was killed he left a -- a letter to his lawyer of four people it might be and I was on that letter.

Q. Pool left a letter to his lawyer?

A. Correct.

Q. Listing four people who might have killed him?

A. Correct.

Q. And you're one of them?

A. Correct.

Q. Okay. Now, you were arrested on April 26th of 2003?

A. Correct.

Q. Okay. At like 20:45, so that's what 6 -- no, 10:45. Is that correct?

A. Correct.

Q. In the evening?

THE COURT: 8:45.

MR. WATKINS: 8:45.

Q. (BY MR. WATKINS) You misled me. 8:45 in the evening. I don't do military time. I'm sorry. 8:45 in the evening?

A. Right.

Q. And within three hours, he was out there talking to you?

4:12:36 A. Yeah. It was pretty quick, yeah.
4:12:39 Q. You didn't -- had you even been booked in fully?
4:12:42 A. Yeah, booked in.
4:12:43 Q. And put in the orange jumpsuit and the whole bit?
4:12:47 A. Yes.
4:12:48 Q. Okay. And you made a statement on the 29th of April?
4:12:54 A. Right.
4:12:55 Q. What happened during those three days, between the 26th, when you got arrested and first talked to Brown, through the 29th?
4:13:06 A. Nothing.
4:13:07 Q. You're in jail?
4:13:09 A. Right.
4:13:09 Q. Did anyone come talk to you between then?
4:13:12 A. No. No.
4:13:13 Q. Okay. And then your bond was set on the 29th, by Judge Board. Is that correct?
4:13:26 A. Right.
4:13:26 Q. And that was through a video system?
4:13:29 A. Right.
4:13:39 Q. And then you made bond on the 30th?
4:13:43 A. Right.
4:13:44 Q. And you also signed a second statement. Is that correct?

A. Right.

Q. And this time the statement was typewritten, essentially the same as the first statement?

A. Right.

Q. Okay. And did you sign that at the jail, or did you go into Mark Brown's office and sign it, or did he come by your house?

A. It was in the jail.

Q. It was at the jail?

A. Yeah.

Q. Had you already made bond and he caught you as you were walking out to sign it or --

A. Yeah, it was pretty quick.

Q. Okay. So you were bonded out when you signed the second statement?

A. I can't remember. I mean, it was -- it was just quick, quick, quick.

Q. Quick, quick?

A. Yeah, I wasn't let out yet.

Q. Okay.

A. He brought me in there and then right after that they let me out.

Q. Okay. Now, that was on a -- you were arrested on a Motion to Revoke your probation?

A. Right.

Q. It's actually called a Motion to Proceed, because you had a special kind of probation where there was no conviction. Is that correct?
A. Right.
Q. And the State -- Mr. Farren and his office was asking to proceed to an adjudication of guilt?
A. Right.
Q. And it wasn't the first time a Motion to Proceed had been filed?
A. No.
Q. And as a matter of fact, this one was an amended Motion to Proceed, they had changed their allegations and added new allegations to it?
A. Right.
Q. Now, you testified that that Motion to Proceed was dismissed because of your cooperation in other cases?
A. Right.
Q. What cases?
MR. FOWLER: Judge, whoa, whoa, whoa. Excuse me. Objection. Judge, he is working on an ongoing investigation. If he -- it would severely compromise the ongoing investigation if he was to tell everybody in open court what he's working on.
MR. WATKINS: Your Honor, I -- I believe under -- is it Davis versus Alaska, I have a right to go

4:15:48 into his motives for being here to testify. It looks
4:15:52 awful suspect that he gets arrested, he makes a statement,
4:15:55 he makes bond, and much later, two years later his cases
4:15:59 literally are dismissed on the eve of his testifying.

4:16:02 MR. FOWLER: Judge --

4:16:03 MR. WATKINS: I think I have a right to go
4:16:05 into that kind of stuff. And he's made -- the State's
4:16:08 making an allegation that it's not for his testimony here,
4:16:10 but it's for something else that now they don't want me to
4:16:13 go into. It sounds awful suspect. I think I have the
4:16:17 right to find that out. Let the jury know.

4:16:20 MR. FOWLER: If I may, Judge. This Court is
4:16:22 well aware, I believe, of the circumstances surrounding
4:16:26 the dismissal of Mr. Hickson's Motion to Proceed, as it
4:16:31 was pending in your court.

4:16:33 THE COURT: I don't know the details, Mr.
4:16:33 Fowler.

4:16:36 MR. FOWLER: No, sir.

4:16:36 THE COURT: I just know that it appeared on
4:16:37 my dockets for some nine months, and I would call it every
4:16:41 month, and it would get passed by the agreement of the
4:16:44 Prosecution and the Defense. And -- but why was never
4:16:48 explained to me, other than in the most general of terms.

4:16:55 MR. FARREN: Your Honor --

4:16:56 THE COURT: I'm not sure, Mr. Watkins, that

4:17:01 4:17:06 4:17:13 4:17:19 4:17:25 4:17:27 4:17:32 4:17:33 4:17:35 4:17:35 4:17:42 4:17:48 4:17:52 4:17:54 4:17:56 4:17:58 4:18:02 4:18:06 4:18:11 4:18:35 4:18:38 4:18:48

you're entitled to go into the details of that, other than just to establish it in a general way.

Now, I will allow you to proceed without -- without divulging -- without eliciting answers that divulge stuff that might endanger him, or will endanger or jeopardize an investigation.

So if you can do that, I'm going to let you proceed.

MR. FARREN: May we have just a second, Your Honor?

THE COURT: Yeah.

MR. FARREN: And we will stipulate for the record, Your Honor, and I'm sure the witness will confirm, that these ongoing investigations, these other -- are not related to this case in any way, have no connection with this case.

THE COURT: Well, I'll tell you what I'll do. Why don't I give you a break and I'll arm wrestle these guys by myself. Why don't you be back in the jury room at 2:35.

(Jury retired from the courtroom.)

THE COURT: What I think you're entitled to is to elicit offenses. No names, no places, other than generally in a county, so to speak. Things like that, that won't endanger their investigation.

4:18:56 MR. WATKINS: Your Honor, with all due respect, the State is who brought up the issue of whether or not it was in this case.

4:19:05 THE COURT: They did.

4:19:05 MR. WATKINS: Okay.

4:19:05 THE COURT: I heard them do it.

4:19:08 MR. WATKINS: I feel like being able to fully cross examine and fully confront him, whenever he testifies that it was about another case, leaving the impression in the minds of the jurors that his testimony is absolutely freely given in this case, although he helps in other cases --

4:19:27 THE COURT: Look, I understand what you need to do and you're going to be able to do it. I'm going to let you do it, but there is absolutely no need for you to elicit disclosure of names of other people, names of other times -- specific times and places, that might jeopardize an investigation. You don't need to do that. You can ask enough questions of this witness to get what you want without -- without going into such specifics, that you jeopardize their -- their investigation.

4:20:04 So why don't you take the break, and start figuring out how to ask him questions generally. Okay?

4:20:13 MR. WATKINS: Okay. Note my objection.

4:20:14 THE COURT: I note it. Let's be in recess

4:20:17 until 2:35.

(Recess.)

(Both sides, the Defendant present, in open court:)

4:20:20 THE COURT: Thank ya'll. We got 12 in there, Mr. Parker?

4:32:48 THE BAILIFF: We do.

4:32:49 THE COURT: Bring them in. I didn't have a chance to look at that statement. I forgot to review it in light of 107, but I will.

4:32:59 (Jury seated)

4:33:01 THE COURT: Thank you, ladies and gentlemen. Everyone be seated. You may proceed.

4:33:34 MR. WATKINS: Thank you.

CROSS EXAMINATION (CONTINUED)

BY MR. WATKINS:

4:33:35 Q. Okay. Mr. Hickson, let's change subjects for a little bit.

4:33:42 I believe you said that Josh Bledsoe called this meeting at Stumpy's. Is that correct?

4:33:48 A. Called me. He called me. Correct.

4:33:49 Q. Called you?

4:33:51 A. Yeah.

4:33:51 Q. Okay. And you went there because of Josh Bledsoe?

4:34:54 A. Correct.
4:33:55 Q. Now, it was pointed out that you used to be a shoot fighter, and you're a big guy, and --
4:34:03 A. Yes.
4:34:04 Q. -- and all of that?
4:34:05 A. Yes.
4:34:05 Q. Did you also help protect Josh Bledsoe?
4:34:10 A. Hum. We -- we had a mutual friendship, so I guess so.
4:34:16 Q. Okay. You also made a comment, you said that there were repeated phone calls to Bledsoe, yourself and David Garcia by Dustin Pool making threats?
4:34:30 A. Correct.
4:34:30 Q. And at one of the threats you said, I don't receive threats like that?
4:34:36 A. Correct.
4:34:36 Q. What's that mean?
4:34:37 A. It means nobody has ever threatened me before. Nobody's that stupid.
4:34:44 Q. But Dustin did threaten you that way?
4:34:49 A. Correct.
4:34:51 Q. Okay. Now, you said in reference to -- that you -- in reference to the kidnapping not going well, you knew Dustin's demeanor?
4:35:04 A. Correct.

4:35:04 Q. What is Dustin's demeanor?
4:35:08 A. He's a phone lawyer.
4:35:09 Q. A what?
4:35:10 A. A phone lawyer.
Q. And what's that?
4:35:11 A. On the phone he's ten-foot tall and bullet proof, but in person he's a little girl, a fifth grade boy.
4:35:18 Q. Okay. So that kind of explained why he went out and hired some help?
4:35:32 A. Correct.
4:35:33 Q. Okay. And Ray Placensio and the "TS"?
4:35:36 A. Correct.
4:35:38 Q. The Texas Syndicate, now is that primarily a Hispanic gang?
4:35:44 A. Correct.
4:35:44 Q. Now, are they known for being pretty tough?
4:35:47 A. Yeah.
4:35:50 Q. Are they known for being able to reach out and touch people while they're in prison?
4:35:57 A. Correct.
4:36:04 Q. Concern -- I have a question about this letter that you mentioned.
4:36:07 A. Yes.
4:36:11 Q. Did you see the letter?
4:36:13 A. I never saw the letter.

4:36:13 Q. Okay. Who told you about the letter?
4:36:16 A. I heard about the letter from -- Laura Lucus said that his dad had the letter. That Pool's dad had the letter, that he told her about it. And that Pool's brother had the letter. And then I heard from Kelly Droan (phonetic), that his dad had a letter, that he received from a lawyer that stated that whether I be missing or dead, one of these people could be held accountable.
4:36:44 Q. Okay. And did -- you said that Mark Brown came and talked to you, because he knew about the letter?
4:36:51 A. No.
4:36:51 Q. No. I misunderstood you?
4:36:54 A. Yeah.
4:36:54 Q. Okay. Did you tell Mark about the letter?
4:36:57 A. No.
4:36:58 Q. Okay. Why did he -- I thought you said earlier --
4:37:07 A. I figured in my mind that that was the reason he was there. He never said that that was the reason, and I never told him that that was my thought as to why he was there.
4:37:19 Q. Okay. All right. Let's just -- you're thinking why Brown got to jail so fast?
4:37:23 A. Exactly.
4:37:25 Q. Okay. That's where I got confused, I think.

4:37:30 A. Right.

4:37:52 MR. WATKINS: Pass the witness.

REDIRECT EXAMINATION

BY MR. FOWLER:

4:37:53 Q. Jason, who are the other three names on the letter?

4:37:57 A. I had heard that Bledsoe was the first one, then I was the second one, and Tommy Tucker, and then Stocker.

4:38:03 Q. Josh Stocker?

4:38:05 A. Josh Stocker.

4:38:06 Q. And did you ever tell Mark Brown about the letter?

4:38:08 A. No, I did not.

4:38:14 Q. And you've never told myself, or Mr. Farren, or anyone else about the letter who works in the DA's office?

4:38:19 A. No. That was my previous thought as to why Brown was there.

Q. Sure.

4:38:22 A. Because he had received that from Pool's lawyer.

4:38:26 MR. FOWLER: I pass the witness, Your Honor.

4:38:30 THE COURT: Anything further, Mr. Watkins?

4:38:33 MR. WATKINS: May I have just a moment?

4:38:34 THE COURT: Yeah.

4:38:37 MR. WATKINS: Okay.

RECROSS EXAMINATION

BY MR. WATKINS:

Q. You said that after the Ray Placensio incident, that the threats didn't stop?

A. Correct.

Q. Okay. I think you said you didn't get anymore?

A. A couple. Nothing serious like it was before.

Q. Okay. But they kind -- kind of ramped (phonetic) up on Bledsoe. Right?

A. Right. Doing it off on me, yeah.

Q. Okay. Refocused used his attention?

A. Right.

Q. Now, one point. Was Bledsoe buying from Pool?

A. No.

Q. No? Never early in the phase?

A. No. Pool had conveyed to me that before all of this happened, he was getting it from Bledsoe.

Q. Okay. So Pool was a customer of Bledsoe for a while?

A. Right. Right.

Q. And then he switched sources?

A. Everybody kind of quit messing with him, because of all of the threats of him saying he was going to turn everybody in.

Q. Okay.

MR. WATKINS: Pass the witness.

4:39:46 MR. FOWLER: Your Honor, may I approach the witness?

4:39:48 THE COURT: Yes, sir.

FURTHER REDIRECT EXAMINATION

BY MR. FOWLER:

4:39:49 Q. Mr. Hickson, I want to show you what I have marked as State's Exhibit No. 3. Do you recognize that?

4:39:55 A. Yes, sir.

4:39:56 Q. And I'm pointing to a space on the document. Is that your signature?

4:39:59 A. Yes, sir, it is.

4:39:59 Q. Is that the statement that you gave to Mark Brown on April 30, 2003?

4:40:03 A. True.

4:40:06 Q. And this statement is consistent with the testimony that you just gave us. Is that right?

4:40:11 A. Yes, sir.

4:40:14 MR. FOWLER: Your Honor, upon tendering to opposing counsel, the State would offer State's Exhibit No. 3, to rebut an expressed or implied question as to the Defendant's motive or bias -- to the witness's motive or bias in testifying, prior consistency.

4:40:33 MR. WATKINS: Your Honor, uh -- if I understand what they're offering this for, I don't believe that's a proper reason to introduce this. They called the

witness -- they, I mean it -- there is no reason to introduce this.

THE COURT: Are you objecting to it?

MR. WATKINS: I'm objecting, yes.

THE COURT: Sustained.

MR. WATKINS: Thank you.

MR. FOWLER: I have no further questions, Judge.

THE COURT: You may step down. Thank you. Call your next witness.

MR. FARREN: State calls Brandon Ross Cotton, Your Honor.

THE COURT: Cotton?

MR. FARREN: Brandon Ross Cotton. C-o-t-t-o-n. They are retrieving him now, Your Honor.

THE COURT: Mr. Farren.

MR. FARREN: Yes, Your Honor.

THE COURT: Is he in custody?

MR. FARREN: Yes, Your Honor.

THE COURT: Are you Mr. Cotton?

THE WITNESS: Yes, sir.

THE COURT: Come up here and raise your right hand.

(Witness sworn.)

THE COURT: You go ahead. You may sit right

there. Before you begin, Mr. Farren, Mr. Parker -- Fowler.

MR. WATKINS: Would you like us to --

THE COURT: No, it doesn't concern you.

MR. WATKINS: Okay.

(Bench conference had among the Judge, Mr. Farren, Mr. Fowler, and Mr. Parker, only.)

THE COURT: All right. Thank you. Go ahead. Thank you.

MR. FARREN: Yes, sir.

BRANDON ROSS COTTON,

having been first duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. FARREN:

Q. Would you state your name for the jury, please, sir.

A. Brandon Ross Cotton.

Q. And, Mr. Cotton, you're -- you're dressed in civilian street clothing, but I notice you have on a pair of handcuffs?

A. Yes. I'm a Potter County inmate right now.

Q. And you're serving some time in the Potter County jail?

A. Yes, sir, for a misdemeanor.

Q. Yes, sir. For the heinous offense of?

4:44:43 A. Failure to ID.
4:44:45 Q. Failure to ID to a police officer, so you -- you didn't give the officer your name when he asked for it?
4:44:51 A. Yes, sir.
4:44:53 Q. Now, have you been -- have you been charged with other crimes in the past?
4:44:58 A. Yes, sir.
4:44:58 Q. Have you ever been convicted of any other crimes in the past?
4:45:01 A. Yes, sir.
4:45:02 Q. Any felonies?
4:45:03 A. Yes, sir, one.
4:45:04 Q. What felony?
4:45:05 A. Unlawful use of a motor vehicle.
4:45:07 Q. Unauthorized use of a motor vehicle. So you were joyriding in a car?
4:45:10 A. Yeah. On a motorcycle, yes.
4:45:13 Q. A motorcycle?
A. Yes.
4:45:16 Q. How long ago was that?
4:45:16 A. Three, four years ago.
4:45:17 Q. How old are you now?
4:45:18 A. I'm 26.
4:45:19 Q. So when you were 22, you were convicted of unauthorized use of a motor vehicle?

A. Well, it was a suspended sentence until I was 24, and then --

Q. You were on deferred probation?

A. Yes, sir.

Q. And did it get revoked?

A. Yes, sir.

Q. A Motion to Proceed?

A. Yeah, by choice. Yes.

Q. So you decided you'd rather do your time?

A. Yes, sir.

Q. How much time did you do?

A. I did a total of three months in the Potter County jail. I did a 12.44 reduction.

Q. Okay. I want -- I want to visit with you about some folks. Let me give you some names here. Craig Kimberlin. Do you know Craig Kimberlin?

A. Yes, sir.

Q. How do you know Craig Kimberlin?

A. He was a friend of mine, and I also worked for him for a little bit.

Q. What -- what kind of work did you do for Stephen Craig Kimberlin?

A. I was a money collector.

Q. Did you work with Frank Chacon?

A. On occasion.

4:46:13 Q. Well, let me ask it this way. Were you the only -- were you the only person who kind of helped collect money for Mr. Kimberlin, or did Mr. Chacon --
4:46:22 A. Oh, no. Yeah, Mr. Chacon and Destry Keeling, also.
4:46:28 Q. Okay. Now, this -- this money collection was from people who owed him for drugs. Is that right?
4:46:35 A. Yes, sir.
4:46:35 Q. So if they didn't pay, you were one of the folks who paid him a little visit?
4:46:39 A. Yes, sir.
4:46:40 Q. All right. I want to direct your attention to some time -- how long did you do this kind of stuff for Mr. Kimberlin?
4:46:53 A. For just a very short time. Just -- I would say about six months total.
4:46:59 Q. Okay. Can you give us a parenthesis (sic) where this started and ended about, what time?
4:47:10 A. About nine months before he got arrested.
4:47:12 Q. Okay.
4:47:13 A. And -- until he got arrested.
4:47:16 Q. So if Mr. Kimberlin was arrested in April, May, June of 2003, your -- your work with him would have been back in the late part of 2002?
4:47:27 A. Yes, sir.

4:47:27 Q. Okay. Fall of 2002?
4:47:29 A. Yes, sir.
4:47:29 Q. All right.
4:47:30 A. Thereabouts.
4:47:31 Q. Now, during that time, were you ever at a garage,
4:47:37 someone's garage and sort of a discussion took place?
4:47:39 A. Yes, sir, my garage --
4:47:41 Q. Okay.
4:47:42 A. -- at 5110 South Cockett, and the discussion was
4:47:47 about Dustin Pool.
4:47:50 Q. Okay. Do you remember Destry Keeling being
there?
4:47:55 A. Yes, sir.
4:47:56 Q. Josh Stocker?
4:47:57 A. Yes, sir. And Frank Chacon, too.
4:47:59 Q. And Chad Spanel?
4:48:00 A. No, Chad wasn't there.
4:48:03 Q. Was he at any meeting?
4:48:05 A. No, sir.
4:48:05 Q. If you included his name in a statement, was that
4:48:08 an error?
4:48:09 A. No. He was -- he was just another individual
4:48:12 that -- that I was associated with.
4:48:14 Q. Oh, I see. You -- in the statement you're just
4:48:16 telling about people you knew in the organization?

4:48:18 A. Yeah. The total, yes.
4:48:19 Q. But they weren't all necessarily at this meeting?
4:48:23 A. Oh, no.
4:48:23 Q. Okay. Now, did Josh Stocker ever -- well, let me put it this way. Did -- did -- did anyone ever talk to you about bringing some people to them?
4:48:44 A. Yes, sir. Oh, yes.
4:48:47 Q. Who did they want brought to them?
4:48:49 A. A Hispanic male named Ray and Dustin Pool.
4:48:54 Q. Did you know who Dustin Pool was?
4:48:57 A. I never personally met him.
4:48:58 Q. Had you heard of him?
4:49:00 A. Oh, yes. Oh, yes.
4:49:01 Q. How had you heard of him?
4:49:04 A. Well, through the years of me running around town, you know acting like a fool. I was associated with people that had, you know, bought drugs from him or partied with him.
4:49:14 Q. So you knew Dustin Pool to be the person in the methamphetamine or drug business as well?
4:49:20 A. Oh, yes. Oh, yes.
4:49:22 Q. As well as Mr. Kimberlin and his group?
4:49:24 A. Yes, sir.
4:49:24 Q. Do you know if there was any tension or conflict between these two groups?

4:49:28 A. Not until it was brought to my attention by Craig Kimberlin.
4:49:32 Q. What did Mr. Kimberlin tell you about this conflict?
4:49:34 A. Nothing really, as far as details. Just that he wanted him brought to him.
4:49:39 Q. Okay.
4:49:40 A. And wanted me to try to do that for him.
4:49:47 Q. Were you asked to bring Mr. Pool and this Ray fellow -- do you know Ray's last name?
4:49:54 A. I'm not sure. I think it's Ramirez, I'm not sure.
4:49:59 Q. But someone -- Dustin Pool and someone named Ray, connected to Dustin Pool?
4:50:04 A. Yes.
4:50:04 Q. Were you asked to do this, to bring these people in once or more than once?
4:50:11 A. Twice.
4:50:12 Q. Twice?
4:50:13 A. On two separate occasions.
4:50:14 Q. You've already indicated that Mr. Kimberlin asked you on one occasion?
A. Uh-huh.
4:50:18 Q. Who's the other person that asked you to do that?
4:50:22 A. Josh Stocker did the second time.

4:50:24 Q. Josh Stocker did it the first time or the second?
4:50:27 A. The second. The second time.
4:50:30 Q. Now, did you agree to do that?
4:50:33 A. Neither time, no.
4:50:34 Q. Why not?
4:50:36 A. I didn't know the individual, so I didn't have any personal malice against them, so I -- money really didn't tempt me to, you know, go after somebody I didn't know.
4:50:47 Q. So you were -- it was your understanding you were being offered money to do this?
4:50:51 A. Money or dope, yes.
4:50:54 Q. Now, when you went to collect money from people who owed Mr. Kimberlin, you didn't do that out of the goodness of your heart, did you?
4:51:03 A. No. No.
4:51:03 Q. Did you get paid?
4:51:05 A. Oh, yes.
4:51:05 Q. Well, you didn't know them either?
4:51:07 A. Well, on the occasions that I did actually do a collection, I did know those people.
4:51:15 Q. Oh, I see. So the people you collected from were people you did know?
4:51:18 A. Yeah. Yes.
4:51:19 Q. Okay. When -- when Mr. -- when Mr. -- well, let

me back up and ask the question this way.

You've mentioned Mr. Kimberlin, Mr. Stocker and Mr. Keeling. When you were working for Mr. Kimberlin, was -- was it your understanding that there was a group, a cartel, a collection of folks conspiring in the drug business?

A. Yeah. It was a cooperative effort from --

Q. Who was in charge?

A. Definitely, Craig. Craig was, definitely.

Q. Did Craig realize or did Craig ever know that Mr. Stocker had asked you to bring in Dustin Pool and Ray?

A. Well, Josh asked for just Dustin Pool, not Ray.

Q. Just Dustin Pool?

A. Yes.

Q. And Craig asked for Ray and Pool?

A. Okay.

Q. So the difference in the two requests were, Mr. Kimberlin wanted both Pool and Ray, but Stocker was interested in Pool?

A. Yes.

Q. What was Mr. Kimberlin's response when he learned that Mr. Stocker asked him to bring in Pool?

A. Well, he was in the room whenever the request was made, so he pretty much told him, no, not until I tell him to go will he go. And he was referring to me.

Q. Okay. And so you were present, Mr. Kimberlin is present, Mr. Stocker is present. Was Mr. Keeling also present?

A. Destry was and also his friend Don, too.

Q. A male named Don?

A. Yes.

Q. And so his response was, when this happened, is to tell you, you don't just go do these things when Stocker tells you?

A. Yeah, pretty much.

Q. Unless I tell you, you don't do it?

A. Exactly. He was pointing out that he was the one that was pushing my buttons.

Q. Had you had other experiences with Mr. Stocker, besides just at this meeting?

A. Oh, yeah. I was friends with Josh.

Q. Okay.

A. I thought of him like a brother.

Q. Do you see him in the courtroom?

A. The good looking guy sitting there.

Q. The person with a blue shirt, striped tie, no coat. Is that Mr. Josh Stocker?

A. Yes, it is.

MR. FARREN: Again, may the record reflect that he has identified the Defendant, Your Honor?

THE COURT: The record will so reflect.

Q. (BY MR. FARREN) What was your evaluation of Mr. Stocker when it came to physical confrontations to -- to -- in other words, would you agree with me that in most confrontations there's a talking part and there's a walking part?

A. Yes.

Q. There's a part where you talk about it and a part where you do it?

A. Yes. And Josh always seemed to be the talking individual.

Q. And when it got down to doing it?

A. It was usually left up to Frank, Destry and me.

Q. In fact, I think you indicated that in your statement, people always ended up cleaning up his messes?

A. He pissed a lot of people off. Excuse my language, but. . .

Q. So he had angered some folks?

A. Oh, yeah.

Q. How had he done that?

A. Oh, he's a very, you know, cocky individual, and tends to, you know, anger people whenever he tells them what they're going to do. When they don't do it, that's when they, you know, lash out.

Q. Did you ever hear Mr. Stocker -- the man who does

a lot of the talking, according to you, did you ever hear him talking to Dustin Pool?

A. On the telephone once, one time.

Q. You -- you became aware that Mr. Pool was missing at some point. Is that correct?

A. Yes.

Q. And eventually, of course, like the rest of us learned, that he was dead?

A. Yes.

Q. How long before you learned Mr. Pool was missing did you hear this conversation between Mr. Pool and Mr. Stocker on the phone?

A. Oh, it wasn't very long. Only like a week, I think.

Q. You think --

A. It was a week.

Q. -- in your statement you indicated maybe three weeks?

A. And it could have been up to.

Q. A week, three weeks, some short time before?

A. Yes, it was within a month, I know for a fact, because the seasons were changing.

Q. What was the -- the nature of this conversation? Was this a calm --

A. Oh, no.

4:55:38 Q. -- reasoned discussion?
4:55:40 A. No. It was very heated.
4:55:41 Q. Very heated?
4:55:42 A. Yes, sir.
4:55:42 Q. Did you know the content of the argument?
4:55:44 A. No, the content wasn't made, you know, known to me. I -- I know it was either of drugs or a woman. There is -- really, you don't argue like that unless it's one or the other.
4:55:57 Q. Now, did Mr. Stocker -- after -- after this phone conversation ended, did you -- well, did Mr. Stocker talk about it any more after that?
4:56:08 A. No. He's a very guarded individual when he doesn't want things to be known.
4:56:13 Q. Do you remember indicating that he -- he wouldn't let it go?
4:56:17 A. Yeah.
4:56:18 Q. What did you mean by that?
4:56:20 A. Well, he -- he oftentimes would refer back to, I need to get that -- that guy, you know. I need to find out where he is. You know, just in passing to other people, not to myself.
4:56:33 Q. Okay. And it was when you -- when he asked you to bring in Dustin Pool or bring Dustin Pool to him, was it before or after this phone conversation?

A. I'm not really sure.

Q. Okay.

A. That time was pretty cloudy. I was pretty out there on meth myself, and I really don't recollect the time periods very well.

Q. Do you know someone named Guinn Garcia?

A. Yes.

Q. How do you know Guinn Garcia?

A. Through the drug world and through Josh.

Q. Did you ever know if she lived with someone named Ray?

A. I'm not sure. I originally met Ray through Chad Spanel about six years ago, and they were pretty good friends. And uh --

Q. But at the time, you didn't know about any connection between the two of them?

A. No.

Q. Okay. That's fine. Were you ever with Guinn Garcia and Josh Stocker, the three of you together?

A. Yes, sir.

Q. When was that?

A. Once again, I don't know exactly on the time -- not sure on time periods, but it was after he had asked me to bring Dustin to him, and it was before he was arrested, you know.

4:58:03 Q. Okay.
4:58:03 A. It was within a three-week period there.
4:58:05 Q. If a week to three weeks before you had had this request from Mr. Stocker, this event where you were with Stocker and Guinn Garcia happened sometime after that?
4:58:15 A. Yes.
4:58:16 Q. If you indicated in your statement it was just two or three days before, would you disagree with that?
4:58:21 A. No, I wouldn't disagree with that.
4:58:33 Q. Now, sometime after that, did you -- did you come in contact after Dustin Pool's disappearance? Did you come into contact with -- with Mr. Stocker anymore?
4:58:49 A. One more time I did, yes.
4:58:50 Q. Where was that?
4:58:51 A. Out at Destry Keeling's -- I wouldn't say his house, but it was out at his shop near his house, which was about 100 yards from the grain elevator.
4:59:04 Q. So you were actually at Mr. Keeling's house, and later you realize -- when you found out where Mr. Pool's body was found, you realized it was near that grain elevator?
4:59:14 A. Yeah. It kind of creeped me out.
4:59:16 MR. FARREN: May I have just a moment, Your Honor?
4:59:23 THE COURT: Sure.

4:59:34 Q. (BY MR. FARREN) Did you ever -- did you ever talk with Mr. Stocker after Dustin Pool had disappeared about what had happened to Mr. Pool?

4:59:44 A. No.

4:59:45 Q. Did he ever tell you anything about it?

4:59:49 A. No.

4:59:54 Q. When Mr. Kimberlin and Mr. Stocker had both asked you to bring in Mr. Pool, and then you found out he was missing and later dead, what did you think?

5:00:08 A. Well, I -- I thought that one or -- or both of them had had something to do with it.

5:00:16 Q. But you never -- did you ever talk to Mr. Kimberlin about it after Mr. Pool -- you knew he was missing or dead?

5:00:23 A. I asked him and he told me to mind my own damn business, but Destry gave me --

5:00:32 Q. Did you talk to Destry Keeling about it?

5:00:34 A. Yes. Destry confided in me.

5:00:38 Q. And Mr. Keeling was, again, a part of this group of conspirators that -- that sold and distributed methamphetamine?

5:00:46 A. Oh, yes.

5:00:47 Q. What did Mr. Kimberlin tell you about Mr. Pool?

5:00:50 A. That something bad had happened to him, and that -- that he hoped God forgived (sic) him for being a

5:00:59 part of it.

5:01:00 Q. What part did he tell you he played in it?

5:01:03 A. Just being there for a friend, is pretty much --

5:01:07 Q. But he didn't say --

5:01:08 A. -- nothing specific.

5:01:09 Q. -- exactly what he did?

5:01:10 A. Yeah. Nothing specific.

5:01:11 Q. Did Destry ever talk to you about a gun?

5:01:28 A. Yes, two guns.

5:01:31 Q. Did he ever tell you anything about the history
5:01:34 of these guns?

5:01:35 A. No. And nothing more than the apparent, hey,
5:01:41 they -- they gave in the abduction of Ray Ramirez, who I
5:01:46 think --

5:01:47 Q. Or Ray?

5:01:48 A. Ray and Dustin Pool.

5:01:50 Q. Ray and Dustin Pool?

5:01:51 A. Yes.

5:01:52 Q. Do you know what happened to the guns?

5:01:54 A. Yes, I -- I stole the guns.

5:01:57 Q. And what did you do with the guns?

5:01:59 A. I gave them to a another drug dealer named Simone
5:02:05 (phonetic) to pay off a debt that a friend of mine owed,
5:02:07 and then later I turned them over to the police.

5:02:10 Q. Let me see if I can make sure I understand and

the jury understands.

Mr. Keeling indicated to you that these guns were involved in a kidnapping of a guy named Ray, and then Dustin Pool. And then you stole the guns from Mr. Keeling and ended up giving them to someone else that you owed money to for drugs?

A. No, I didn't owe the money to anyone.

Q. Oh, I see.

A. A friend of mine had gotten into a sticky situation with another drug dealer in town, and the only payment that I could think of that -- that would be substantial enough to cover that debt, so that this person wouldn't end up getting hurt, was -- you know, two nice guns like what Destry was holding on to. And, plus, Destry was pretty much out of his mind at the time, and --

Q. Out of his mind because of the use of drugs?

A. Oh, yes. And -- and because of the stress that he was under, you know, holding the secret like what he was holding. And he was really not taking very good care of the guns and keeping them away from, you know, like children. There was a lot of kids around his place. His daughter was 16 at the time, and she had an 18-year-old boyfriend that just loved guns, and he -- he had access to them.

Q. So you really stole the guns to protect the

5:03:36 children. Right?
5:03:37 A. Pretty much.
5:03:45 MR. FARREN: Pass the witness.

CROSS EXAMINATION

BY MS. McELROY:

5:03:51 Q. I just have a couple of questions.
5:03:54 A. Yes, ma'am.
5:03:55 Q. You got a couple of guns. Do you remember what
5:03:58 kind of guns they were?
5:03:59 A. A Mac-11 and a Tech-9 Uzi.
5:04:02 Q. Were did you find the guns?
5:04:03 A. They were in Destry's unlocked pickup, which was
5:04:06 a stolen pickup that was sitting outside of his friend
5:04:10 Don's house.
5:04:11 Q. Okay. You took this to Simone?
5:04:13 A. Yes.
5:04:18 Q. Did you ever have a conversation with Ms. Simone
5:04:24 about where you had gotten the guns?
5:04:25 A. Oh, yes. I told her exactly where they were
5:04:28 from.
5:04:29 Q. And is it your testimony that Destry told you
5:04:31 these were the guns that were used on Dustin Pool?
5:04:34 A. Used in the abduction of Ray and Pool.
5:04:37 Q. Okay.
5:04:38 A. And a friend of ours, Chris, he had been shot in

5:04:50 5:04:50 the foot accidently by Destry, with the Uzi, and uh -- that's one of the reasons I went ahead and stole them, because if you're going to shoot your friend in the foot by accident, you shouldn't be toting them around.

Q. So you're sort of the gun safety person?

A. I just don't like guns. You know, all of my friends have them.

Q. What kind of credit did you get for this Mac-11 and Tech-9?

A. It took $1,000.00 debt that was owed to Simone, and it took it off of my friend's head.

Q. You testified earlier that you had been to state jail or that it was a state jail on an unauthorized use of a motor vehicle?

A. Yes. But I got a 12.44 reduction, a misdemeanor sentence.

Q. Okay. And you originally were on probation. Right?

A. Yes, ma'am.

Q. And at some point in time they filed a Motion to Revoke your probation?

A. Yes, ma'am.

Q. And uh -- you decided that you'd just rather go on and do the Potter County time?

A. Yes, ma'am.

5:06:08 Q. That was a pretty good deal for you?

5:06:13 A. Yeah. Very much. My family couldn't afford the probation dues, and I was tired of stringing it along. I didn't want five years' probation, you know, so they went ahead and gave me three months in Potter County, so I was pretty relieved.

5:06:29 Q. Mr. Farren brought up that you are in jail now on a misdemeanor charge?

5:06:32 A. Yes, ma'am.

5:06:33 Q. When did that happen?

5:06:35 A. It was on -- let's see. It was June 29th.

5:06:41 MS. McELROY: I have no further questions.

REDIRECT EXAMINATION

5:06:45 BY MR. FARREN:

5:06:45 Q. The pretty good deal you were asked about, how long ago did that happen?

5:06:51 A. The 12.44 reduction?

5:06:53 Q. Uh-huh.

5:06:54 A. This happened -- let's see. I did three months, and I was released on January 1st, so --

5:07:00 Q. January 1st of what year?

5:07:02 A. Of this year.

5:07:02 Q. Okay. Did that -- did that reduction -- or did any of that have anything to do with your testimony in this case?

5:07:09 A. Oh, no. No.

5:07:11 Q. So when was the first time you and I met?

5:07:14 A. As a matter of fact, just the other day.

5:07:16 Q. Like ten days ago?

5:07:17 A. Yes, sir.

5:07:18 Q. And did you and I discuss in any way any kind of a deal or --

5:07:21 A. Oh, no.

5:07:22 Q. -- fix anything for you?

A. No.

5:07:24 Q. Or anything of that nature?

5:07:25 A. I wish, or I'd be out of jail. I should have asked.

5:07:33 Q. I believe it was our Lord that said, if you do not ask, you will not receive. But -- but the point -- I want to make sure that the jury understands. The 12.44 reduction, whatever happened had nothing to do to you testifying in this case. That all happened before I ever met you?

5:07:51 A. Yes. Gregg Phifer is a good lawyer.

5:07:56 Q. Okay. Oh, just so the jury has the full picture. Were you aware that Simone, she was Crystal Alexander, wasn't she?

5:08:06 A. I don't know. I just knew her as Simone.

5:08:10 Q. Okay. Were you aware that when -- when Mark

Brown and the law enforcement authorities recovered those weapons, that she explained that she was going to give them to her father for Father's Day?

A. Yeah.

Q. Yeah.

A. That's what she said she was going to do with them.

MR. FARREN: Pass the witness.

MS. McELROY: We have nothing further.

THE COURT: You may step down, Mr. Cotton. Thank you. Call your next witness.

MR. FARREN: State calls Mark Brown, Your Honor.

THE COURT: Will you raise your right hand, Officer Brown.

(Witness sworn.)

THE COURT: Thank you, sir. Sit right there.

MR. FARREN: Thank you, Your Honor.

MARK KEITH BROWN,

having been first duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. FARREN:

Q. Would you state your full name for the jury, please.

5:09:21 A. Mark Keith Brown.
5:09:23 Q. Mr. Brown, how are you employed?
5:09:25 A. Police officer for the City of Amarillo.
5:09:26 Q. How long have you been a police officer for the City of Amarillo?
5:09:30 A. For the City of Amarillo 23, 24 years. Nine years for the City of Cannon City, Colorado.
5:09:37 Q. Not Canyon, Texas, but Cannon, Colorado?
5:09:43 A. Correct.
5:09:43 Q. So 30 something years?
5:09:44 A. Thirty-five.
5:09:45 Q. And how long have you and I known each other?
5:09:47 A. Longer than that.
5:09:49 Q. You -- actually, you and my brother are about the same age. Is that correct?
5:09:54 A. Correct.
5:09:54 Q. And you and my brother grew up as friends?
5:09:57 A. Correct.
5:09:57 Q. And my friends and I being five or six older -- years older than you and my brother, you were often on the receiving end of a lot of fun things as we were growing up?
5:10:11 A. That's one way to put it.
5:10:16 Q. I want to direct your attention to the investigation -- and by the way, what do you do for the

Amarillo Police Department now?
A. Right now, I'm currently assigned to the Detective Division, working -- investigating cases south and west.
Q. And so you have a -- as a detective right now, you have a general assignment of various kinds of crimes that require follow-up investigation?
A. That would be correct.
Q. Back in 2003, was your assignment different?
A. Yes, sir, it was.
Q. What was your assignment at that time?
A. I was assigned as a homicide investigator to the Special Crimes Unit.
Q. The Special Crimes Unit is -- what is the Special Crimes Unit? Because we're going to use that term a lot during your testimony, so would you explain to the jury what SCU or the Special Crimes Unit is?
A. The Special Crimes Unit is a specific designation. It is to investigate homicides, suspicious deaths, missing persons that are under suspicious circumstances, things of that nature. And it's pretty well limited to just that, so we're not bogged down with investigating other crimes that will deter from that.
Q. The -- as an investigator, you now no longer are assigned to the Special Crimes Unit, did you get kicked

5:11:32 off of the team or did you ask to be moved?
5:11:35 A. They left the door cracked long enough and I got
5:11:38 through it.
5:11:40 Q. A lot of long hours?
5:11:41 A. Yes, sir.
5:11:42 Q. And you decided to move over to another area
5:11:47 where you could have a little more time with your family?
5:11:49 A. Yes, sir.
5:11:52 Q. In 2003, when did you first hear the name Dustin
5:11:58 Pool?
5:12:00 A. When an attorney -- a local attorney came to the
5:12:05 Special Crimes Unit and told me he was missing.
5:12:08 Q. Who was that attorney?
5:12:12 A. Jon.
5:12:13 Q. Jon Waggoner?
5:12:15 A. Waggoner. Correct.
5:12:16 Q. Okay. Now, do you know what Mr. Waggoner's
5:12:19 connection was with Mr. Pool?
5:12:20 A. I think he had represented him in some legal
5:12:24 matters, but I don't know what.
5:12:27 Q. Once Mr. Waggoner had expressed concerns to you,
5:12:32 did you learn there was any other -- by the way, I want to
5:12:37 back up a minute, I forgot to ask. The Special Crimes
5:12:39 Unit, do you have jurisdiction in just Amarillo, or where
5:12:42 all do you -- do you folks have -- do you work?

5:12:44 A. The Special Crimes Unit is authorized to work in Potter, Randall and Armstrong counties.

5:12:52 Q. And when you land from -- or you heard from Mr. Waggoner that there might be a problem with Mr. Pool, did you learn about any investigation of Mr. Pool as a missing person?

5:13:06 A. Yes, sir, I did.

5:13:07 Q. Do you know who was involved in that investigation?

5:13:09 A. The detective assigned to the missing person case at that time was Sergeant Sanford (phonetic).

5:13:15 Q. Obviously, you and Sergeant Sanford have known each other for a long time?

5:13:22 A. Yes, sir.

5:13:22 Q. Did you -- did you talk with Sergeant Sanford about where he was in his investigation?

5:13:26 A. Yes, sir.

5:13:27 Q. How long had that been going on, do you know? In other words, months, years?

5:13:33 A. Weeks.

5:13:34 Q. Weeks?

5:13:35 A. A couple of weeks.

5:13:37 Q. Okay. And his investigation began when Mr. Pool's wife or ex-wife and mother called the police department. Is that correct?

A. That's correct.

Q. Once you talked with Sergeant Sanford and you've already heard information from Attorney Waggoner, did you -- what did you and the Special Crimes Unit do? Was there enough there to start an investigation, or did you -- or not?

A. Not then.

Q. Okay.

A. After talking with Mr. Waggoner, I decided to just kind of run parallel with Sergeant Sanford and assist him in any way I could, until there was more credible evidence that -- that something bad had happened.

Q. And, eventually, did you feel like there was sufficient evidence that something bad had happened?

A. Yes sir.

Q. How long -- how long after this initial two-week investigation by Sergeant Sanford -- how much time do you think passed after that before Special Crimes was fully involved in the investigation?

A. Less than a month.

Q. Okay. Were you aware of any -- any other investigation involving narcotics or things of that nature which also dovetailed into this same issue and some of the same people that may have been involved in Dustin Pool as a missing person?

5:15:09 A. Yes, sir.

5:15:10 Q. Who was -- who was involved in that investigation?

5:15:13 A. Bill Redden, in the Narcotics Unit, and Clay Morris with the DEA, and I don't know who else might have had involvement in it.

5:15:28 Q. But you knew Mr. Redden, of course? You and Mr. Redden had been on the police department for --

5:15:32 A. Years.

5:15:33 Q. -- 20 years together? And you knew Clay Morris, with the DEA?

5:15:37 A. Correct.

5:15:38 Q. Mr. Morris actually transferred out to Virginia someplace, teaching in one of their schools now, isn't he?

5:15:46 A. Correct.

5:15:48 Q. Okay. Who were -- what was the nature of their investigation, and who were they looking at that it later turned out was connected to your investigation, and Mr. Sanford's investigation?

5:16:01 A. Names?

5:16:02 Q. Yes, sir.

5:16:02 A. Specifically, they were look at Omar Mendosa, David Garcia, several others, and including -- I'm thinking they were looking at Kimberlin -- Craig Kimberlin, and Josh Stocker. Josh Bledsoe.

Q. You mentioned David Garcia and Omar Mendosa. Were they connected, based on your investigation and what you -- and you've visited with the narcotics folks who were investigating, and the missing person folks who were investigating. You -- you people were sharing information?

A. Correct.

Q. Based on the information that you gathered, Mr. Garcia and Mr. Mendosa, which group are they connected with, as far as your understanding?

A. They were connected with a completely separate group from Craig Kimberlin, and Josh Bledsoe, and Josh Stocker, and --

Q. So the Kimberlin group involved Mr. Bledsoe, and Mr. Stocker, and others?

A. Correct.

Q. Mr. Garcia, David Garcia and Mr. Mendosa, do you know if they were connected to the person who might have been missing, Mr. Pool, or did you know at that time?

A. I did not know at that time.

Q. What specifically -- and I know this may have accumulated over days or even weeks, but what specifically led the Special Crimes Unit to conclude that there was sufficient evidence to believe Mr. Pool was missing under suspicious circumstances and may be a homicide?

5:17:34 A. When I got a telephone call from a young man by
5:17:39 the name of Jeremy Green -- I'm sorry, Jeremy Patrick.
5:17:44 Q. Okay. Now, who is Jeremy Patrick?
5:17:47 A. Jeremy Patrick is the ex-husband of one of the
5:17:50 Defendants in this case, Tori Keeler Patrick (phonetic).
5:17:58 Q. And what did Jeremy Patrick tell you that --
5:18:01 MS. McELROY: Objection. Hearsay, Your
5:18:04 Honor.
5:18:04 MR. FARREN: We're not offering it for the
5:18:06 truth of the matter asserted, Your Honor. We're mainly
5:18:08 offering it to show why he decided to involve Special
5:18:11 Crimes as -- in this as an onsite investigation. We're
5:18:15 not vouching that what Mr. Patrick told him was
5:18:18 necessarily true.
5:18:19 THE COURT: Then ask it a different way.
5:18:23 MR. FARREN: Okay.
5:18:30 Q. (BY MR. FARREN) When Mr. -- when you talked with
5:18:31 Mr. Patrick, did that create an interest in you to go to
5:18:39 talk to Tori Patrick?
5:18:40 A. Yes, it did.
5:18:43 Q. Okay. And before we get too far into this, let
5:18:46 me -- let me ask you about something that occurred later
5:18:49 in the investigation, because I don't want to forget to go
5:18:53 into it later.
5:18:54 Do you know a man named -- did you ever

visit with a man named Jason Hickson?

A. Yes, I did.

Q. And that was later in the investigation?

A. Correct.

Q. Okay. When you visited with Mr. Hickson, did he ever tell you anything about a letter or a document that -- that named four people who to look for if Pool ended up missing or dead?

A. I don't think I got that information from him. I got one -- I got that information from one closely -- that was close to him at that time.

Q. Okay.

A. But it only named one person.

Q. Okay. What person did you understand it named?

A. Josh Bledsoe.

Q. Okay. Did you ever see this document --

A. No.

Q. -- or just hear about it?

A. No. I got that firsthand from the young lady.

Q. Which young lady?

A. Laura Lee Lucus.

Q. And Miss Lucus was the girlfriend of Jackson Hickson at the time?

A. Correct.

Q. So during your investigation, this is the only

document that you know of that supposedly named someone --

A. Correct.

Q. -- that would have done bad things?

A. Again, it was verbal. I -- I saw no document.

Q. And based on what you were told, was this some document that -- had Dustin Pool written this name down and said if I come up missing look for this guy, or did they tell you that?

A. No. Laura -- Laura told me she had visited Dustin the night before he went missing, and that Dustin was worried, very worried. And he told her -- told her that if anything bad happened to him that Josh Bledsoe would be the one responsible for it.

Q. So she didn't even claim it was a document, she claimed Mr. Pool told her about this?

A. Correct.

Q. Okay. And when you visited with Mr. Hickson, he didn't tell you anything about any such document?

A. I don't recall any conversation about a document --

Q. Okay. That's fine.

A. -- with him.

Q. Back to the Patricks. After visiting with Jeremy Patrick, did you attempt to find Tori Patrick?

A. I did.

5:21:06
Q. And did you visit with her?
5:21:11
A. Yes, I did.
5:21:12
Q. What did you talk to her about?
5:21:14
A. The disappearance of Dustin Pool and her involvement in it, and what transpired and where.
5:21:21
Q. Did -- did you visit with her on one occasion or more than one occasion?
5:21:25
A. More than one.
5:21:26
Q. When you first visited with her, did she -- did she tell you she did know something about it or did she deny it?
5:21:37
A. Denied it.
5:21:37
Q. Okay. After your first visit with Ms. Patrick, when is the next time you think you visited with her?
5:21:47
A. Shortly after that. In fact, I think I had a grand jury subpoena issued for her. And I had officers on the Community Policing Squad looking for her to serve her with that grand jury subpoena. And they found her, and they called me, and I met with her on the corner of I-27 and Western.
5:22:10
Q. And when you met with her the second time, did you learn any more about Mr. Pool's situation than you did the first time?
5:22:20
A. Yes, sir.
5:22:20
Q. What did you learn the second meeting?

5:22:22 A. That she -- this is after I met with her at I-27 and Western. I invited her to the Special Crimes Unit.

5:22:29 Q. And did she come?

5:22:31 A. Or -- yes, she did.

5:22:33 Q. Okay. And once you and Ms. Patrick were at Special Crimes, how long did you visit with her?

5:22:39 A. Considerable amount of time. And I learned that she, in fact, was home in her apartment that night, and that Josh Stocker had come over and wanted her to call Dustin Pool to come to her apartment. And she had reluctant -- at first, didn't want to do it, and then later put in a call for Dustin, and he didn't answer the phone.

5:23:11 Q. When -- when she -- when she talked to you about Mr. Stocker being there, did she indicate anyone else was there?

5:23:17 A. No.

5:23:18 Q. She didn't mention Guinn Garcia? Did she mention Michael Stocker?

5:23:24 A. No, not at that time.

5:23:25 Q. Not at that time. Did you take any kind of a written statement from her then?

5:23:29 A. Yes, I did.

5:23:30 Q. Was it the only written statement that you took from her, or did you ever take any more statements from

5:23:35 her?

5:23:35 A. I think I took another one from her.

5:23:39 Q. When is the next time you think you visited with

5:23:42 Ms. Patrick after that?

5:23:46 A. I'd have to refer --

5:23:48 Q. Did you --

5:23:49 A. -- not long after that.

5:23:50 Q. So there were more visits with her after that?

5:23:54 A. Yes.

5:23:54 Q. Did you ever learn more details from her about

5:23:58 what happened that evening?

5:23:59 A. Yes.

5:24:00 Q. Did you learn whether there were other people

5:24:04 present?

5:24:04 A. Yes, I did.

5:24:04 Q. Who else was present according to her later

5:24:06 stories?

5:24:07 A. Guinn Garcia, Michael Stocker, and then after

5:24:13 Dustin arrived, Craig Kimberlin, Frank Chacon, Michael

5:24:20 Elliston. I can't think of any others right now, but they

5:24:32 came later.

5:24:32 Q. Okay. By the time you got to this part of the

5:24:34 story, or this -- this part of your investigation, and as

5:24:40 you're talking with Ms. Patrick, when she told you that

5:24:47 Josh Stocker was there and was encouraging her to call

Mr. Pool, this was a direct one-on-one contact with Mr. Stocker at the apartment. Is that correct?

A. That's correct.

Q. And when she talked about Ms. Garcia, that she was there with Ms. Garcia, she had face-to-face contact with her?

A. Yes.

Q. When she started talking about Mr. Kimberlin, and Mr. Chacon, and Mr. Elliston, did she actually -- was she actually there when they were there or she was told they came there?

A. She was told they came there. She left.

Q. Where did she go?

A. She went to Motel 6.

Q. How did she get there?

A. She was transported there by Michael Stocker.

Q. And did she know what happened to Michael Stocker after he left her at Motel 6?

A. No.

Q. Okay. And did she know what happened at her apartment, other than what other people told her after she went to Motel 6?

A. No.

Q. During the course of your investigation, did you -- were you ever able to -- either you, yourself, or

5:26:16 others assisting you, including our office, were you ever
5:26:21 able to obtain any records from Motel 6 that involved any
5:26:27 of these people, Michael Stocker and Guinn Garcia, any of
5:26:31 those people?
5:26:31 A. Yes.
5:26:32 Q. And have you reviewed those? I want to show you State's Exhibit 5.
5:26:36 MR. FARREN: May I approach, Your Honor?
5:26:37 THE COURT: Yes.
5:26:38 Q. (BY MR. FARREN) I will show you State's Exhibit
5:26:40 5 as a business record and ask you if you recognize this
5:26:43 as the record from Motel 6?
5:26:48 A. Yes.
5:26:51 Q. Is this a part of the record as well?
5:26:56 A. Yes, sir. It is a copy of the receipt that I got
5:26:58 from the clerk.
5:26:58 Q. And the receipt in State's Exhibit 5 indicates
5:27:01 that someone paid money for a room?
5:27:04 A. That's correct.
5:27:05 Q. And they -- was this cash money, as far as you
5:27:09 could tell?
5:27:09 A. Yes, sir.
5:27:10 Q. And who paid this money?
5:27:11 A. Michael Stocker.
5:27:12 Q. And now the dates on here are?

5:27:15 A. 3/9/03 and 3/10/03.
5:27:19 Q. And so March 9th and March 10th. And do you know how they measure their time there at the hotel? In other words, does it start at midnight, end the next midnight, or do they have different ways of measuring?
5:27:33 A. I think it starts at midnight -- I'm just thinking. I think it starts at midnight and ends at midnight.
5:27:37 Q. Okay. At any rate, sometime around March 9th or 10th, this record indicates Michael Stocker paid for a room at Motel 6?
5:27:46 A. Yes.
5:27:47 Q. Which is, in essence, in agreement with what Ms. Patrick told you?
5:27:52 A. Yes. Correct.
5:27:53 Q. Now --
5:27:55 THE COURT: What did you call it, State's 5?
5:27:56 MR. FARREN: State's 5. It's a little confusing. It's State's 5 and Motel 6.
5:28:04 THE COURT: Yeah. That kind of stuff is better in the morning when we're fresh.
5:28:09 MR. FARREN: Yes, sir, I understand. Our timing is off.
5:28:13 Q. (BY MR. FARREN) Once she had shared with you this information that she knew firsthand and this other

5:28:20 information that was secondhand or hearsay information, what did you do next?

5:28:25 A. After I talked to her?

5:28:28 Q. Uh-huh.

5:28:36 A. On -- I can't remember who I talked to after that.

5:28:38 Q. Did you ever go -- did you ever go to the apartment?

5:28:41 A. Oh, yeah, I did.

5:28:42 Q. And did you get a consent or a search warrant?

5:28:46 A. While I was talking to Tori, I asked her if she would consent to a search of her apartment, and she agreed to that. I presented her with a consent to search warrant, which she signed.

5:28:57 Q. Now, do you know if she would -- when did you first start talking to Miss Patrick, Tori Patrick?

5:29:04 A. The date?

5:29:05 Q. Approximately.

5:29:09 A. Mid-March. Late March of 2003.

5:29:18 Q. If your records indicate that on March 25th you talked to Jeremy Patrick, and your first contact with Tori was on the 26th, would that --

5:29:30 A. That would be accurate.

5:29:31 Q. Now, if your -- if your records indicate a search of Tori Patrick's apartment sometime around the 26th, do

you think that is fair?

A. That would be accurate.

Q. Now, was she -- was she -- what apartment -- at what apartment did she make these calls to Dustin Pool, according to her story?

A. The apartment that she was living in at the time, I believe, was River Falls Apartment. I think G-373, if memory serves me correct.

Q. Okay. And where was she living when you talked to her?

A. She had moved to the Candlewick Apartments.

Q. Do you know when she moved to the Candlewick Apartments.

A. After -- after Dustin Pool had been allegedly kidnapped from her apartment at River Falls.

Q. This search that was conducted, was that at the Candlewick Apartments or River Falls?

A. River Falls. The reason I asked her for consent was she still had control of it, the rent had not expired.

Q. It was still in her name?

A. Correct.

Q. Okay. And at this time was she still maintaining that she called Mr. Pool and he never showed up?

A. No.

Q. Okay. What was she saying by then about

5:31:04 Mr. Pool?

5:31:05 A. He called back. Called her back. Saw her number on his caller ID, and called her back, and said he was coming over.

5:31:13 She said that she told Dustin, don't come over. It's getting late. I'm getting ready to go to bed. And he said, I'm coming over anyway. She said, don't do that. And she says the next thing she knew, he was buzzing to get in the -- in the apartment complex.

5:31:37 Q. During the course of your investigation, did you obtain subpoenas for phone records of various individuals involved in your investigation?

5:31:47 A. I did.

5:31:48 Q. And you have reviewed those records?

5:31:50 A. Yes, sir.

5:31:52 Q. Do you know whether the records indicate that there were, in fact, calls -- by the way, is there -- is there any way on a land line, a regular land line, to tell -- if I called you from my phone and it's not a long distance call, is there any way to know I have made that call?

5:32:13 A. If you call -- from what I've been told by the phone company, if you call from a land line to a land line locally, there is no record of that phone call. There is just too many of them, too many switches, and there's no

5:32:26 record.

5:32:26 Q. So most of these records will involve a call either from a cell phone to a cell phone, or a land line to a cell phone, or vice versa?

5:32:35 A. That's correct

5:32:36 Q. A cell phone is what's going to be involved most of the time when we have a record of a local call?

5:32:39 A. Correct. Now, if you made a phone call from a land line to a cell phone, there will be a record of it on the cell phone.

5:32:45 Q. Having reviewed the phone records of various individuals involved, were you able to determine whether or not there, in fact, were calls from a phone identified to belong to Dustin Pool to Tori Patrick anytime around March 9th?

5:33:05 A. Yes.

5:33:05 Q. Do you know how many calls?

5:33:06 A. More than one.

5:33:08 Q. And if -- if your reports and records indicate a couple of calls around 11:35 --

5:33:18 A. That would about correct.

5:33:20 Q. And that these were a matter of seconds?

5:33:21 A. Yes.

5:33:22 Q. Now, based on your training and experience, when you have a call that lasts just a second, what does that

5:33:29 indicate to you?
5:33:30 A. Usually no answer, or they get their voicemail.
5:33:39 Q. Now, you did find records of calls from Dustin
5:33:45 Pool to Tori Patrick. Did you also find any records of
5:33:50 calls from Dustin Pool to Dustin Pool?
5:33:52 A. Yes.
5:33:53 Q. And what -- again, based on your training and
5:33:57 experience, what does that indicate to you?
5:33:59 A. Checking his messages.
5:34:00 Q. Now, she had told you that she had called him,
5:34:05 but he didn't respond. That was her first story?
5:34:08 A. Correct.
5:34:08 Q. And that changed to what later?
5:34:10 A. He called --
5:34:11 MS. McELROY: Your Honor, we'd object to
5:34:13 hearsay.
5:34:14 MR. FARREN: These are statements --
5:34:15 THE COURT: Overruled.
5:34:17 MR. FARREN: Thank you.
5:34:17 THE WITNESS: That he had called her back.
5:34:20 Q. (BY MR. FARREN) When -- when you -- when you
5:34:30 were visiting with Ms. Patrick, and she indicated that
5:34:34 Guinn Garcia and Josh Bledsoe -- Josh Stocker, I'm sorry,
5:34:39 and Michael Stocker were present, did you have an
5:34:44 opportunity then, to visit with any of those people?

Did you go talk to Guinn Garcia, or Josh Stocker, or Michael Stocker?

A. I talked to Guinn Garcia, eventually.

Q. And when you say "eventually", was this --

A. She was very --

Q. -- challenging?

A. -- very hard to find.

Q. Okay. Why was she hard to find?

A. She didn't want to be found.

Q. So how long do you think it took you to find her?

A. Weeks.

Q. Okay. Now, all of this time, these weeks that you're looking for her, I assume you were attempting to track down other leads and talk to other people as well?

A. Correct.

Q. Okay. But, eventually, you did talk to Guinn Garcia?

A. Yes.

Q. And -- and what did Ms. Garcia tell you when you talked to her?

A. She told me that Josh Stocker had approached her to find someone to set Dustin Pool up. And Guinn told --

MS. McELROY: Your Honor, I'm going to object. This is pure hearsay about what she told him. It also violates the confrontation clause. If he wants to

5:35:54

bring Ms. Garcia in, at least we'd have an opportunity to cross examine her.

MR. FARREN: Of course, we will bring Ms. Garcia in.

5:35:55 THE COURT: I'll sustain that objection.

5:35:57 MR. FARREN: May we offer it as an admission against penal interest by Ms. Garcia and co-conspirator in this case, Your Honor?

5:36:04 THE COURT: Yeah, you may. I'll overrule that objection.

5:36:06 MR. FARREN: Thank you.

5:36:07 Q. (BY MR. FARREN) What did Ms. Guinn tell you about her involvement in the disappearance of Dustin Pool?

5:36:11 A. That she had been approached by Josh Stocker to find someone -- or if she could find someone to set Dustin up. She said she couldn't do it, because she was too hot, quote, unquote, for setting Ray Placensio up in an earlier incident. And --

5:36:28 Q. Did you know about -- before this, did you know anything about the -- the kidnapping of Ray Placensio?

5:36:34 A. Yes.

5:36:35 Q. How did you know about it?

5:36:40 A. It was not reported to the police.

5:36:42 Q. You mean, Mr. Placensio was reluctant to call the police or report a crime against himself?

A. He was a little more than reluctant. He refused to. I found out about it and went to Ray's house and confronted him with it, and he absolutely -- he wouldn't tell me who was involved. He said he was beaten severely by numerous people, left for dead.

MS. McELROY: I object, Your Honor.

A. He would not do it --

MS. McELROY: This is going into a whole other incident. We would object to 401, 404(b) and 403. And, additionally, it's once again hearsay, and we will never get a chance to confront Mr. Ray Placensio about any of these statements.

MR. FARREN: I'll -- I'll withdraw the question -- or I'm not looking for what Mr. Placensio told him, Your Honor, and I apologize.

THE COURT: Oh, I understand that.

MS. McELROY: We -- we need to ask the Court to instruct the jury to disregard.

THE COURT: Yes. Ladies and gentlemen, disregard that statement by Officer Brown about what Mr. Placensio said. Don't consider it for any purpose.

Okay. Go ahead.

Q. (BY MR. FARREN) At -- at any rate, having talked with Mr. Placensio, and -- and in other ways, were you able to determine that no charges were ever filed?

A. Absolutely.

Q. Okay. In -- in other parts of your investigation, did you talk to anyone else who knew anything about the Placensio kidnapping?

A. Yes.

Q. Who else did you talk to?

A. Josh Bledsoe.

Q. Did you ever talk to Chris Eason?

A. Yes, I did. And Destry Keeling.

Q. And did you ever talk to Brook Vandergriff?

A. Yes.

Q. And so those -- did those people know anything about the Placensio kidnapping?

A. Yes, they did.

Q. Okay. Now, having visited with those people at sometime during your investigation, did you also talk with Guinn Garcia about whether she was present at Tori Patrick's apartment when this effort was made to reach Dustin Pool?

A. Yes.

Q. And did she indicate she was present?

A. Yes, she did.

Q. Was she still there when he arrived?

A. No, she was not.

Q. Do you know -- did she -- did she leave on her

5:39:06 own, or with someone, or do you recall?

5:39:08 A. She called a young man by the name of Chad Spanel

5:39:12 to come pick her up.

5:39:14 Q. And, again, if these calls take place land line

5:39:18 to land line, we don't have a record?

5:39:20 A. Don't have a record.

5:39:22 Q. So Ms. Garcia claims she was not there when

5:39:28 Mr. Pool arrived?

5:39:28 A. That's correct.

5:39:31 Q. Did she indicate whether she ever came back to

5:39:35 the apartment sometime that evening --

5:39:38 A. Yes.

5:39:38 Q. -- or the early morning hours?

5:39:39 A. Yes, she did.

5:39:41 Q. When she came back, who was there?

5:39:43 A. Michael Stocker, Josh Stocker, and Dustin Pool.

5:39:50 Q. And so Ms. Garcia didn't indicate that when she

5:39:54 came back she didn't name Craig Kimberlin, or Frank

5:39:58 Chacon, or anybody else, just those -- those three people?

5:40:00 A. Correct.

5:40:00 Q. And, of course, Ms. Patrick, according to her

5:40:03 statement, had already gone to Motel 6 by that time?

5:40:07 A. Right.

5:40:08 Q. Did Ms. Garcia indicate to you that she did

5:40:14 anything -- did she do anything once she arrived? First

of all, did she have any discussion with these people? And you don't necessarily have to go into what they said. Did she have a discussion with them?

A. Yes.

Q. After this discussion with these people, did she -- did she do something? Did she leave the apartment to do something?

A. Yes.

MS. McELROY: Your Honor, I'm going to object, again, on hearsay basis. I mean, Mr. Brown is telling us statements of what other people have told him. It violates our confrontation clause right to confront the witness.

MR. FARREN: Your Honor, I did not ask him -- he specifically did not tell us what they said.

THE COURT: Overruled.

Q. (BY MR. FARREN) After she had the discussion, what did she do?

A. She left the apartment.

Q. Did she leave alone or with someone?

A. She left with Michael Stocker.

Q. And what did she do?

A. She moved a car.

Q. Whose car did she move?

A. Dustin Pool's.

5:41:07 Q. Where did she move it?
5:41:09 A. To the Tiffany Square Apartment's parking lot.
5:41:13 Q. Once she moved the car to the Tiffany Square Apartment's parking lot, what did she do next?
5:41:21 A. She went back with Michael back to Motel 6, where Tori was.
5:41:27 Q. And after that, you don't -- you don't know again -- she didn't indicate -- well, that's okay.
5:41:37 Now, after you visited with -- with Ms. Guinn Garcia and Tori Patrick, did you ever talk with Michael Stocker? Not necessarily tell me what he said, did you talk with him?
5:41:52 A. Later on, yes.
5:41:55 Q. Did -- as a police officer, of course, you -- you're more aware than anyone that folks can decline to visit with you?
5:42:05 A. Absolutely.
5:42:06 Q. Did -- did Mr. Stocker talk with you, Michael Stocker, or did he decline to do so?
5:42:11 A. He declined.
5:42:13 Q. Now, with -- and listen carefully to the statement. Without telling me anything about --
5:42:21 MR. FARREN: May I have just a moment, Your Honor?
5:42:23 THE COURT: Yes.

5:43:14 MR. FARREN: This is tricky.

5:43:20 THE COURT: Mr. Farren, I'm going to call a break right now.

5:43:24 MR. FARREN: I have to apologize. It's real tricky.

5:43:27 THE COURT: Well, I can tell. Ladies and gentlemen, let's take 15 minutes. Be back there at 4:00. Thank you.

(Recess.)

(Both sides, the Defendant present, in open (court:

5:57:13 THE COURT: Okay. Bring them in.

5:57:16 (Jury seated.)

5:58:12 THE COURT: Thank ya'll. Everyone be seated.

5:58:32 Okay. Mr. Farren, are you ready?

5:58:34 MR. FARREN: Yes, Your Honor.

5:58:36 THE COURT: All right.

DIRECT EXAMINATION (CONTINUED)

5:58:37 BY MR. FARREN:

5:58:42 Q. Mr. Brown, at some point, did -- did Ms. -- you -- you've indicated Ms. Patrick met with you on several occasions, and -- and gave you more than one statement, without going into what she said?

5:59:03 A. Correct.

Q. Did Ms. Garcia give you a statement?

A. Yes.

Q. Did -- did she visit with you on more than one occasion?

A. Yes, sir.

Q. Okay. You've already indicated that you met with Mr. Michael Stocker. He declined to talk to you?

A. Yes.

Q. During the course of your investigation, did you visit with Mr. -- you said you visited with Mr. Placensio. How -- how long after it was reported to you that he had been kidnapped, did you visit with him?

A. Oh several weeks. Well, not several, a few -- a few weeks. A couple of weeks. Maybe even -- no, close to a month.

Q. Do you know if he -- if he had been charged with a crime in Potter County at that time?

A. Not at that time.

Q. Do you know when he was charged?

A. Later than that.

MR. FARREN: May I approach the witness, Your Honor?

THE COURT: Yes.

Q. (BY MR. FARREN) I'm showing you what we have marked as State's Exhibit 254. Were you still on the

6:00:15 Special Crimes Unit when Mr. Preciado was murdered in Amarillo?

6:00:20 A. Yes, sir, I was.

6:00:21 Q. Who was one of the defendant's in that case?

6:00:24 A. Ray Placensio.

6:00:26 Q. And being involved, do you know whether or not this is the indictment in that case naming Mr. Placensio, the defendant in the murder of Mr. Preciado?

6:00:33 A. It is.

6:00:34 Q. And the District Clerk up in Potter County is Caroline Woodburn. Is that correct?

6:00:41 A. That's correct.

6:00:42 Q. Was this filed -- can you tell when this was filed in Amarillo?

6:00:46 A. October 2nd, 2003.

6:00:48 MR. FARREN: We'd offer State's Exhibit 254 into evidence.

6:01:01 MS. McELROY: We don't object, Your Honor.

6:01:03 THE COURT: State's 254 is admitted.

6:01:06 Q. (BY MR. FARREN) Now, that doesn't necessarily -- when a person is indicted doesn't necessarily tell us when they're arrested?

6:01:10 A. No.

6:01:11 Q. They may be arrested, and may not make bond, and still may be in jail when -- when the indictment's

returned?

A. That's correct.

Q. But at least that's when the indictment is returned?

A. That's correct.

Q. When -- when you contacted Mr. Placensio, again, without telling me what he said, but did you see his physical appearance at that time?

A. Yes.

Q. How did he look?

A. Ill.

Q. I'm sorry?

A. Ill.

Q. Did he have any bruises, abrasions, marks on him?

A. He was healing. Yes, he had a few bruises that hadn't healed yet.

Q. Did you see him move around or attempt to move around when you talked to him?

A. He pretty much stayed on the couch.

Q. Okay. All right. Now, during the course of your investigation, did you -- did you form any opinion about whether there was any tension or conflict between Dustin Pool and his associates and Mr. Kimberlin and his associates?

A. Yes, I did.

6:02:17 Q. Do you know whether this tension was recent or had it been going on for a while?
6:02:24 A. Ongoing.
6:02:45 Q. When the search of Tori Patrick's apartment at River Falls was conducted, do you know whether any evidence was gathered at that time?
A. Yes, sir.
6:02:55 Q. What kind of evidence was gathered?
6:02:57 A. Blood evidence. Carpet evidence.
6:02:58 Q. So there was samples or sections of the carpet collected?
6:03:05 A. Yes, sir.
6:03:05 Q. Would that be because they believed there to be blood there?
6:03:09 A. Yes, sir.
6:03:16 Q. Do you know if that carpet -- if there had been any attempt to clean that carpet or remove this blood from the carpet after the event occurred?
6:03:27 A. Yes.
6:03:27 Q. Okay. Did you see any indication of that -- did you ever go to the apartment?
6:03:34 A. Yes, I did.
6:03:35 Q. Did you see any indication of that when you were there?
6:03:38 A. Yes, I did.

Q. All right. Did you see any bleach -- what appeared to be bleached areas of the carpet?

A. Bleached spots, yes, sir.

Q. Did you ever talk with anyone who worked for a carpet cleaning company?

A. Yes, I did.

Q. Okay. And without necessarily telling me what they said, did you -- did you -- was your purpose in visiting with them to talk about cleaning Tori Patrick's apartment?

A. Yes.

Q. At some point in your investigation, did you visit with Josh Bledsoe?

A. Yes, I did.

Q. Again, without telling me what Mr. Bledsoe told you, did he agree to talk to you?

A. Yes.

Q. Did you ever take a statement from him?

A. Yes.

Q. A short statement or a lengthy statement?

A. Several statements, and lengthy. Some short, most lengthy.

Q. Did you ever visit with Tommy Tucker?

A. Yes, sir.

Q. Did you take a statement from him?

A. I did.
Q. Did you ever visit with Omar Mendoza?
A. I did.
Q. Did you take a statement from him?
A. Yes, sir.
Q. Now, during this process of visiting with these various people, did you -- were you also involved in going to various physical locations in connection with your investigation?
A. Yes, sir.
Q. Did you visit any grain silos?
A. I did.
Q. One or many?
A. Many.
Q. What -- what -- what -- were all of those near Amarillo, or were some of them far away?
A. I think I've been to every abandoned grain silo in the Texas Panhandle.
Q. Some of them as far away as Childress?
A. Yes. And further.
Q. Did you ever visit the grain silo at McCormick near the railroad tracks?
A. In total, three times.
Q. When you went there the first time, did you find anything that indicated it was anymore likely a spot than

others you'd been, for the body of Dustin Pool?

A. I saw it, but I didn't register it the first two times.

Q. The third time you were at that grain silo, the situation was different, however. Is that correct?

A. That's correct.

Q. Okay. We'll get back to that in a moment.

Were there actual searches of other grain silos that were conducted, in addition to just going in and looking to see if it looked promising?

A. Yes.

Q. Have you ever been to a grain silo never Gruver, Texas?

A. Yes, I have.

Q. And was a search conducted there?

A. Yes, it was.

Q. Anything of significance found?

A. A dead cow.

Q. A dead cow. Did you visit at any time with a man named -- by the way, did you actually try aerial flights, looking for things maybe you could see from the air?

A. Yes, I did.

Q. Any help there?

A. No.

Q. Did you ever --

6:06:38 A. I located a couple of other spots I wanted to go look at when we landed, and did.
6:06:45 Q. Did you ever talk with Miguel Gonzales?
6:06:48 A. Yes, I did.
6:06:49 Q. Did you search any other grain silos in Randall County?
6:06:56 A. Yes.
6:06:57 Q. Go to other grain silos?
6:07:00 A. Yes. Yes.
6:07:05 Q. Were you ever -- and listen carefully. Were you ever in Childress, Texas during this investigation for some reason other than just to see if there were grain silos there?
6:07:20 A. Yes.
6:07:25 Q. At some point, did an arrest of Craig Kimberlin take place?
6:07:33 A. Yes.
6:07:35 Q. And a search of his home?
6:07:35 A. Yes.
6:07:35 Q. Now, was that in connection with Pool or with the drug case?
6:07:41 A. Both.
6:07:42 Q. On June 12th, 2003 then, then the search was conducted -- both you and the drug folks were hoping there might -- find something helpful there?

A. That's correct.

Q. To your -- to your know -- the drug folks found lots of stuff helpful to them?

A. Yes.

Q. Was anything found there that you thought was helpful to you?

A. Yes.

Q. What sort of things?

A. A shovel that had concrete on it, and cell phones. Uh --

MR. FARREN: May I approach, Your Honor?

THE COURT: Yes.

Q. (BY MR. FARREN) I'm showing you what has been admitted into evidence as State's Exhibit 204.

MR. FARREN: They're already in, Jeremy.

Q. (BY MR. FARREN) The jury is looking at the same photograph on the screen there. Are these the shovels you made reference to?

A. Yes, sir.

Q. And State's 205, do you recognize --

A. Yes.

Q. Is that a close up shot of the same set of shovels?

A. Yes, sir, it is.

Q. Now, the shovel on the left, is there anything of

6:09:08 significance there?
6:09:09 A. Yes. This is concrete.
6:09:11 Q. Okay. And by this time in the investigation, by June, did you -- did you think concrete was of significance to your investigation?
6:09:23 A. Yes, sir, I did.
6:09:31 Q. Have you ever been to anybody else's house named Crystal Alexander or Simone, a/k/a Simone?
6:09:39 A. I have.
6:09:39 Q. Why did you go to her house?
6:09:41 A. To serve a search warrant.
6:09:42 Q. And when you executed the search warrant at her house, were you able to -- did you gather any evidence connected to your investigation?
6:09:50 A. Yes.
6:09:50 Q. What did you collect?
6:09:53 A. A fully automatic Uzi-type weapon, a semi-automatic Uzi-type weapon. A hand grenade. All in a brown briefcase.
6:10:04 Q. And did you believe these were connected to -- you believe these were connected to your investigation in what way?
6:10:12 A. I was told --
6:10:14 Q. Without telling us what you were told, what did you believe?

6:10:16 A. I believed that one of the weapons may have been used in the kidnapping.

6:10:22 Q. In the Placensio kidnapping, the Pool kidnapping, both, or --

6:10:27 A. Both.

6:10:35 Q. Did you ever have a meeting with Stephen Craig Kimberlin at the Randall County jail?

6:10:40 A. I did.

6:10:46 Q. Without telling me what was said, did you visit with Mr. Kimberlin?

6:10:49 A. Yes, I did.

6:10:51 Q. And do you remember what time of the day or night this meeting occurred?

6:11:01 A. I got called around 6:30 in the evening, and responded right away. He had called -- or I was called by Agent Redden and told that Kimberlin wanted to talk to me about the murder.

6:11:17 Q. Now, Bill Redden was the man you mentioned earlier, who was heading up -- at least one of the people heading up the drug investigation?

6:11:25 A. Correct.

6:11:26 Q. On the 13th, you had -- I think on the 12th, you had conducted a search on Kimberlin's home and he had been arrested. And on the 14th, you and Mr. Redden end up talking with Mr. Kimberlin?

6:11:35 A. That's correct.
6:11:39 Q. How long do you think you visited with Mr. Kimberlin that -- what time was that, do you remember?
6:11:45 A. I got there between 6:30 and 7:00, and I don't think I left until 1:30, 2:00 the next morning.
6:11:54 Q. And was Mr. Redden there with you as well?
6:11:56 A. Yes, sir.
6:11:57 Q. Do you remember Clay Morris with the DEA?
6:11:59 A. Clay Morris was there.
6:12:02 Q. Okay. Now, again, without telling me what was said, what -- what was the next important event in your investigation?
6:12:11 A. While I was still there, I made arrangements to secure a crime scene.
6:12:16 Q. And where was that crime scene?
6:12:17 A. That same grain elevator, at McCormick and the Santa Fe railroad tracks.
6:12:25 Q. So after you visited with Mr. Kimberlin, did you and others go to that grain silo and conduct a search?
6:12:31 A. The next day.
6:12:32 Q. And were you there while the search was conducted?
6:12:36 A. I was.
6:12:36 Q. And did you recover the body of Dustin Shawn Pool from that grain elevator?

6:( )4 A. We did.

6:12:45 Q. How long did that take?

6:12:47 A. All day.

6:12:49 Q. How many people do you think were involved in
6:12:52 extracting the body?

6:12:55 A. Up to 30 people involved, in various different
6:13:01 assignments.

6:13:03 Q. Once the body -- once you had visited with
6:13:19 Mr. Kimberlin, the next day the search of the grain silo
6:13:19 was executed, was there an autopsy sometime after that?

A. Yes, sir.

6:13:19 Q. Now, did you actually attend the autopsy or did
6( )0 other folks?

6:13:20 A. I did not. Officers assigned to the Special
6:13:24 Crimes Unit, ID Section, did obtain the autopsy.

6:13:28 Q. Do you know Jim Burgess?

6:13:30 A. I do.

6:13:31 Q. Is he a crime scene technician, crime scene
6:13:32 technician with the Special Crimes Unit?

6:13:34 A. Yes, sir, he is.

6:13:36 Q. Stan Rickwartz?

6:13:36 A. Yes, sir.

6:13:36 Q. Mike Crandall?

A. Yes, sir.

6( )8 Q. And at that time, Jeff Rodden (phonetic)?

6:13:40 A. Yes, sir.

6:13:40 Q. Were they involved in this extraction of the body from the grain silo?

6:13:45 A. Yes, sir.

6:13:50 Q. Sometime after that event, did you talk with Mr. Bledsoe again?

6:13:54 A. Yes, sir.

6:13:55 Q. Around the 16th?

6:13:56 A. That's correct.

6:14:07 Q. Did -- did you talk with -- I'm not going to name the individual, I just want to know if you talked with a person who was a suspect in this case about a farm?

6:14:25 A. Yes.

6:14:29 Q. Did you ever obtain a search warrant for that farm?

6:14:33 A. I did.

6:14:33 Q. And was that search warrant executed?

6:14:36 A. Yes, sir -- well, it was not.

6:14:39 Q. Why was it not executed?

6:14:40 A. Because Mr. Elliston agreed to sign a consent to search, but the search warrant had been prepared and was in hand.

6:14:49 Q. And you had -- you had the search warrant with you and, in essence, uh -- it is a Bumper versus North Carolina (phonetic) case. It's I've got a search warrant,

6:15:03 he's given me consent, I'm going to execute this search warrant?
6:15:03 A. I didn't tell him that.
6:15:06 Q. He just gave you consent?
6:15:06 A. Yes.
6:15:08 Q. Were you there while the search warrant was
6:15:11 executed -- or while the search was complete?
6:15:13 A. Yes.
6:15:14 Q. Do you know if any evidence, physical evidence
6:15:16 was gathered at this farm?
6:15:18 A. Yes.
6:15:21 Q. Do you know if any suspected blood was recovered
6:15:25 at the farm?
6:15:26 A. Yes, it was.
6:15:27 Q. Now, the suspected blood, and the -- the carpet
6:15:30 samples from Tori Patrick's apartment, was that forwarded
6:15:34 somewhere to be analyzed?
6:15:36 A. Yes, it was.
6:15:36 Q. Do you know if the DPS lab in Lubbock was the
6:15:40 place it was forwarded?
6:15:41 A. That is where it was sent.
6:15:43 Q. And the suspected blood from the farm, was it
6:15:46 forwarded somewhere?
6:15:46 A. Yes, sir, it was.
6:15:47 Q. Where was it forwarded?

6:15:59 A. The same lab.

6:15:55 Q. Now, at some point, around the 18th of June, did you or others assisting you in the investigation learn about a wallet that had been recovered? And I think I misspoke in opening statement, I think I said Best Buy, but it was actually Circuit City?

6:16:13 A. That's correct.

6:16:14 Q. Do you know if this wallet -- the wallet was actually picked up by a patrol officer. Is that right?

6:16:19 A. At the store, yes, sir.

6:16:20 Q. And then when you learned about it, it was moved from the regular evidence area at the police department over to the Special Crimes evidence area?

6:16:28 A. That's correct.

6:16:29 Q. Do you know whose wallet that was or whose identification was in the wallet?

6:16:34 A. Dustin Pool.

6:16:37 Q. Without telling me what was said, did you ever visit with Frank Chacon?

6:16:41 A. Yes.

6:16:42 Q. Did he agree to give you his statement?

6:16:45 A. Yes.

6:16:48 Q. And did you ever talk with Stephen Craig Kimberlin again, and did he give you another statement?

6:16:56 A. Yes.

6:17:?6 Q. Did you ever visit with Destry Keeling?
6:17:02 A. Yes, sir.
6:17:02 Q. On one occasion or more than one occasion?
6:17:06 A. More than one occasion.
6:17:06 Q. Did you ever go back to the Elliston farm?
6:17:09 A. Yes.
6:17:10 Q. Okay. Did you ever talk to anyone named Eric
6:17:19 Gurton (phonetic) or hear about Eric Gurton?
6:17:22 A. Heard about him, never could find him.
6:17:24 Q. Do you know if he's still alive?
6:17:26 A. I don't know.
6:17:27 Q. Did you ever talk to anyone named Bates?
6:?1 A. Yes.
6:17:33 Q. Did you ever talk to anyone named Jeremy Roy in
6:17:37 connection with your investigation?
6:17:38 A. Yes, I did.
6:17:39 Q. Anyone named Brandon Ross Cotton?
6:17:42 A. Yes.
6:17:44 Q. And then in August of 2003, did you talk with
6:17:48 Mr. Bledsoe again?
6:17:50 A. Yes, sir, I did.
6:17:52 Q. Did you know who his common law wife or
6:17:56 significant other was?
6:17:57 A. Yes.
6:?7 Q. Who was that?

6:18:00 A. Kelly Grayless.
6:18:00 Q. Did you ever visit with her?
6:18:01 A. Yes, I did.
6:18:02 Q. Did you ever talk to Guinn Garcia sometime in September of 2003?
6:18:07 A. Yes, I did.
6:18:07 Q. Did you ever talk to anyone named Jason Myers during your investigation?
6:18:12 A. Yes, sir, I did.
6:18:13 Q. Did you ever talk to anyone named Fowler, that you recall?
6:18:18 A. First name?
6:18:19 Q. Kevin Fowler?
6:18:21 A. Yes.
6:18:24 Q. Did you ever talk to anyone named Glenda or Denise Keeler (sic), wife of Destry Keeling -- Keeling?
6:18:31 A. Keeling. Yes, I did.
6:18:32 Q. Did you visit with Destry again after you talked to her?
6:18:37 A. Yes, sir.
6:18:40 Q. By this time, we're talking October, November of 2003?
6:18:44 A. Yes, sir.
6:18:48 Q. The last time you talked to Bledsoe, according to your records, would have been around the 22nd of October,

6:18:56 2003?

6:18:57 A. That would be accurate.

6:18:59 Q. So your investigation had -- had run from sometime in March of 2003 until October of 2003?

6:19:10 A. Yes, sir.

6:19:13 Q. How many -- how many hours do you think you spent on this case in those eight, nine months?

6:19:20 A. Hundreds.

6:19:23 Q. You've already indicated an endless supply of grain elevators to look at?

6:19:31 A. Yes.

6:19:34 Q. I want to show you some photographs.

6:20:13 THE COURT: What numbers?

6:20:24 MR. FARREN: We're beginning with 213 and ending with 234, Your Honor.

6:20:33 Q. (BY MR. FARREN) I'm handing you a collection or a set of photographs we've marked in sequence State's Exhibit 213 through State's Exhibit 234. I'd ask if you'd go ahead and review all of the photographs first, and then just familiarize yourself, and keep them in this same order, and then we'll visit.

6:22:04 THE COURT: He's ready.

6:22:08 MR. FARREN: Okay.

6:22:21 Q. (BY MR. FARREN) First, I want to show you what we've marked as State's Exhibit 242. You recognize this

to be a reproduction of the outline of the rooms and so forth of Tori Patrick's apartment?

A. Yes, sir. This is one -- the one at River Falls.

Q. At River Falls. And does this accurately represent the relationship of the rooms and so forth, although it may not be drawn to scale?

A. Yes, sir.

MR. FARREN: And, Your Honor, for demonstrative purposes, may I use State's Exhibit 242 to assist in his testimony?

THE COURT: Any objection?

MS. McELROY: No objection, Your Honor.

THE COURT: Sure.

MR. FARREN: Thank you.

Q. (BY MR. FARREN) At this time, I'm showing you what's been marked as State's Exhibit 213. Do you recognize -- do you have 213?

MS. McELROY: Your Honor -- Mr. Farren, would it be okay if we turned that time line around. I think there are times that we haven't got to yet.

THE COURT: What?

MS. McELROY: They have another exhibit, Your Honor, and it includes events that we have not discussed yet.

THE COURT: Oh, okay.

Q. (BY MR. FARREN) Start with 213.

MR. FARREN: Just like a well oiled machine, isn't it?

Q. (BY MR. FARREN) I'm showing you what has been marked as State's Exhibit 213. Do you recognize what is depicted there?

A. Yes, sir.

Q. What do you recognize this to be?

A. This is the front doors of Tori Patrick's apartment at River Falls, 373. I believe the building is "G".

Q. And -- and perhaps to speed up the process a bit, 213 through 234, do you recognize all of these photographs to be various locations at Tori Patrick's apartment, the one you testified about earlier?

A. Both apartments. There are pictures in there.

Q. And do the -- do the photographs accurately reflect the way it appeared at that time, the --

A. Yes.

Q. -- the scene appeared at that time?

A. Yes, sir.

MR. FARREN: We'd go ahead and offer State's 213 and 234 -- through 234 into evidence, so we can display them up there.

MS. McELROY: Just a question. Mr. Farren,

6:25:21 are -- are these pictures in -- at what point in time were
6:25:26 these pictures taken?
6:25:28 Q. (BY MR. FARREN) Were these pictures made at or
6:25:31 near the time the search warrants were being executed?
6:25:33 A. Yes. As I pointed out just a second ago, some of
6:25:39 these are -- the back ends of these are pictures in her
6:25:45 new apartment at the Candlewick.
Q. Okay. Can you --
A. Yeah.
6:25:46 Q. Is it from --
6:25:48 A. I believe that's -- that may be. I know this is.
6:25:52 Not that one. This one. This is when she called us.
6:26:01 Q. Okay. All right. I'll tell you what, let's --
6:26:04 let's work with 213 through 229 at this point.
6:26:09 A. Yes. These --
6:26:10 Q. Are all of these at the River Falls Apartments?
6:26:12 A. Yes. And those are pursuant to the consent to
6:26:15 search.
6:26:15 Q. These were done in connection with your search of
6:26:18 the apartments, and that -- the apartment, and that
6:26:24 occurred about March 26th of 2003. Is that correct?
A. Yes, sir.
6:26:28 Q. And they accurately reflect the way it appeared
6:26:32 at that time?
A. Yes, sir.

6:26:39 MR. FARREN: Offer 213 through 229 into evidence, Your Honor.

6:26:41 MS. McELROY: No objection, Your Honor.

6:26:42 THE COURT: 213 through 229 are admitted.

6:26:46 Q. (BY MR. FARREN) State's Exhibit 214, this

6:26:55 appears to be a patch of carpet missing from a closet

6:27:00 area. Is that correct?

6:27:01 A. Yes, sir.

6:27:02 Q. And did you find -- you and the others --

6:27:09 investigators, did you find where that patch of carpet

6:27:10 went, in your opinion? Do you think you know where it

6:27:13 ended up?

A. Yes, sir.

6:27:16 Q. Where do you think it ended up?

6:27:18 A. In the living room.

6:27:19 Q. At another place in the carpet?

6:27:21 A. Yes, sir.

6:27:24 Q. I'm showing you State's Exhibit 215. Is -- is

6:27:33 this a view of where you think that piece of carpet ended

6:27:36 up?

6:27:36 A. Yes, sir.

6:27:37 Q. State's 216?

6:27:40 A. The same thing.

6:27:41 Q. Is that a close up of that same room?

A. Yes, sir.

6:27:5[illegible]
Q. Now, State's Exhibit 217, is that the same spot with that carpet missing?
6:27:53
6:27:54
A. Yes, sir.
6:27:57
Q. The carpet that was replaced by the section taken from the closet, do you know where it went? Do you know what --
6:28:01
6:28:07
6:28:07
A. No, sir.
6:28:07
Q. You don't know where it is or what happened to it?
6:28:10
6:28:10
A. It's missing.
6:28:10
Q. Okay. When -- when this carpet was re -- when this section of carpet was removed that you've talked about in 215 and 216 and 217, did there appear to be any discoloration in the underlying foam and padding under the carpet?
6:28:16
6:[illegible]9
6:28:27
6:28:29
6:28:30
A. Yes.
6:28:30
Q. Do you know if any effort was made to collect that -- those -- that portion of the foam and padding?
6:28:34
6:28:37
A. Yes.
6:28:38
Q. State's Exhibit 218, is that some of the discoloration that appears in that pad and so forth?
6:28:43
6:28:48
A. Yes. Yes, sir, it is.
6:28:50
Q. State's Exhibit 219, is this, again, some of the same area that was searched and collections made?
6:28:55
6:[illegible]8
A. Yes, sir.

Q. State's Exhibit 220?

A. Same area in the living room where the carpet had been removed.

Q. And do you recognize 221, just a different view of the same area?

A. Yes, sir.

Q. Now, in State's 221 and, again, in 222, do you notice a fireplace there?

A. Yes, sir, I do.

Q. Do you know when you conducted your search was there a fireplace poker with the other fireplace instruments that were there?

A. No, there was not.

Q. It was missing?

A. Yes, sir.

Q. State's Exhibit 223, is that still at the --

A. Same view, different angle.

Q. Different angle at River Falls?

A. Yes, sir.

Q. Now, you mentioned that you saw indications there of bleached areas in the carpet. Did you -- did you and the others see any products there that might have been used in the carpet?

A. Yes, sir. In the kitchen under the sink.

Q. I'm showing you Exhibit 224, and is this some of

6:30:12 the materials that you're talking about?

6:30:14 A. Yes, sir.

6:30:17 Q. Now, I want to show you -- I want to ask you if
6:30:19 you were present when anything was found in a trash can at
6:30:24 the River Falls Apartments?

6:30:26 A. I wasn't present when it was found, but I was
6:30:29 shown it when I came back.

6:30:31 Q. Okay. So you -- you came to the apartment while
6:30:33 that item was still there?

6:30:35 A. Yes, sir.

6:30:35 Q. I'm showing you State's Exhibit 225, did you
6:30:40 learn anything about this trash can while you were there?

6:30:43 A. Yes, sir.

6:30:44 Q. Is that where the item was recovered?

6:30:46 A. That's -- that's what I was told, yes.

6:30:48 Q. I'm showing you State's Exhibit 226. Do you
6:30:53 recognize this item?

6:30:54 A. Yes, sir.

6:30:56 Q. What is it?

6:30:57 A. This is a transfer of a title to Josh Stocker
6:31:04 from a gentleman named Justin Cooper, on a -- and it's
6:31:11 handwritten on notebook paper, for a 1992 Toyota pickup,
6:31:15 and it's dated 03/04/2002.

6:31:18 Q. And to the left of that document, is there
6:31:23 another document in the photograph?

A. Yes, sir.

Q. Now, what is that document?

A. It's entitled "Community Supervision and Corrections Department".

Q. And whose name is that -- is it a travel permit, is that what it is?

A. Yes, sir.

Q. Okay.

A. An agreement for travel purposes.

Q. And who is named in this travel permit?

A. Joshua David Stocker.

Q. And so the folks assisting you in the search indicated that this document and while -- it was recovered from the trash can there are at the River Falls Apartments?

A. Yes, sir.

Q. State's Exhibit 227. Again, is this the missing --

A. Yes, sir. This is the missing carpet in the living room.

Q. State's 228, is that some of the stained area?

A. Yes, sir. This is the living room area on this side of it, and this is the hallway that leads into the bedrooms that branch off that way.

Q. And 229 is, again, just another view?

6:32:26 A. This is of the bedroom where the carpet was cut out of the closet.
6:32:30
6:32:40 Q. Now, you indicated that -- 230, 231, 232, 233 and 234, you indicated that these were -- these photographs were actually from the Candlewick Apartment where Ms. Patrick moved later. Is that -- is that correct, or --
6:32:51
6:32:54
6:33:00
6:33:01 A. Yes. I -- I think that these are some things that she had left behind that she -- belonged to her son in --
6:33:06
6:33:12
6:33:12 Q. In the River Falls?
6:33:14 A. In the River Falls. I'm not sure. I think that -- I think this is the bathroom and things that she left behind. This is a coffee table in her new apartment, at the Candlewick Apartments.
6:33:16
6:33:19
6:33:23
6:33:24 Q. Okay. Without telling me what Ms. Patrick told you, why -- why were there photographs made of this table? What -- was it believed there might be blood on the table?
6:33:27
6:33:33
A. Yes, sir.
6:33:36 Q. Do you know if any blood was actually ever found on the table?
6:33:41
6:33:41 A. The stains that we found were not blood.
6:33:42 Q. Okay. But -- but that was -- you were looking to see if that were true?
6:33:46
6:33:47 A. Yes, sir.
6:33:48 Q. Okay.

6:33:49 A. She had some concerns.
6:33:53 Q. And on further review, you think 230 and 231 are at River Falls, some toys and things left behind there?
6:34:01 A. I believe they are.
6:34:02 MR. FARREN: We'd go ahead and offer 230 through 234.
6:34:30 THE COURT: Any objection, Ms. McElroy?
6:34:35 MS. McELROY: Your Honor, I didn't -- I didn't know if he included this when offering the predicate earlier. That would be my only question.
6:34:42 MR. FARREN: No, I let them out because he had indicated that he thought a part of these were at a different location, and has now explained. And he thinks 230 and 231 actually are a part of the River Falls set, and that these were from the Candlewick where the furniture had been moved.
6:34:57 MS. McELROY: My only objection would be, there's not a proper predicate at this point in time; otherwise, we have no objection.
6:35:00 THE COURT: You would like a predicate laid for 230 through 234?
6:35:04 MS. McELROY: Yes, Your Honor.
6:35:06 THE COURT: Let's do that right quickly.
6:35:09 Q. (BY MR. FARREN) 230 and 231, were they made near the time of the execution of the search warrant or this

6:35:12 search of the River Falls Apartments, as far as you can remember?

6:35:14 A. Yes, sir.

6:35:15 Q. The -- the photographs of 232, 233, and 234, that actually occurred a few days later. Did it not?

6:35:24 A. That's correct.

6:35:25 Q. And -- and it was a fairly short time after the -- the search at River Falls?

6:35:30 A. Yes, sir.

6:35:30 Q. And, again, without telling me what anyone told you, did you go look at this table after you talked with Tori Patrick again?

6:35:38 A. Yes.

6:35:39 Q. In fact, she contacted you?

6:35:42 A. Yes

6:35:42 Q. And you went there and looked at this table, you and the crime scene folks, to see if the stains were blood or not?

6:35:49 A. Yes.

6:35:50 Q. And did these pictures in 232, 233 and 234 accurately reflect the way the table appeared in the apartment Candlewick at that time?

6:36:03 A. Yes.

6:36:03 MR. FARREN: We'd offer 230 through 234, Your Honor.

MS. McELROY: No objection.

THE COURT: They'll admitted.

Q. (BY MR. FARREN) Do you know -- have you ever heard of a place called Clubhouse Cabaret?

A. Yes.

Q. Okay. Do you know if that's located in Potter County, Randall, where that's located?

A. I think it's is in Randall.

Q. Okay. In Randall. And Dustin Pool's home, do you know on Quiet Circle, was that in Randall County?

A. Yes, sir.

Q. Now, Tori Patrick's apartment at River Falls, was that in Potter or Randall?

A. Potter.

Q. That's in Potter. How about Tiffany Square Apartments?

A. Potter.

Q. The United Grocery Store at 46th and Washington, where is that located?

A. Randall.

Q. Randall County. And the grain silo at McCormick, near the railroad tracks, where is that located?

A. Randall County.

Q. Again, without telling me what Mr. Kimberlin said when you talked with him, did you contact a District

Attorney's office in a specific county after having visited with Mr. Kimberlin late into the night, the visit you talked about earlier?

A. Yes, sir, I did.

Q. After this visit late -- or when you're involved in this visit late into the night, what -- county's District Attorney's office did you contact?

A. The Randall County District Attorney.

Q. During the course of your investigation, did you travel to a farm -- you've already indicated that you traveled to a farm, Mr. Elliston's out near Panhandle, Texas?

A. That's correct.

Q. And in addition to the farm, did you ever travel or do you know if anyone ever traveled up to an area near Lake Meredith near Fritch, Texas?

A. Yes.

Q. Where this blue pin is on the map, is that, in your opinion, approximately where the River Falls Apartments are in Amarillo?

A. Yes, sir.

Q. This yellow pushpin in the map, is that near the grain silo where the grain silo would be near McCormick and the railroad tracks?

A. Yes, sir.

6:39:00 Q. And the green -- the green pushpin up near the lake, do you know if that is anywhere near where Glenda Denise Keeling's lake house -- her family's lake house is?

A. Yes, sir.

6:39:13 Q. And the red pushpin on the map, do you know if that is approximately where Mr. Elliston's farm or farmland is located?

6:39:21 A. Yes, it is.

6:39:25 Q. And these are all -- these pushpins are all on State's Exhibit 251, that's being used for demonstrative purposes.

6:39:50 When a homicide occurs in more than one county, based on 35 years of experience, the majority of that in the State of Texas -- well, first of all, what is your understanding of venue? Is that the geographic location where the prosecution execution would take place?

6:40:13 A. Yes, sir.

6:40:14 MS. McELROY: Your Honor, I think this is outside this expert's scope of expertise.

6:40:19 THE COURT: Venue?

6:40:20 MS. McELROY: This witness -- he's asking him about an opinion on proper venue. I think this is outside of the scope of Detective Brown's --

6:40:27 THE COURT: I'll overrule that. He can answer that question.

Q. (BY MR. FARREN) When you file a case, you have to figure out which DA's office to go to?

A. Yes, sir.

Q. And that's the venue, isn't it?

A. Yes, sir.

Q. Some 35 years of experience, most of it in the Texas law enforcement, and mostly around Amarillo, if a homicide occurs in more than one county, and the body is found in Randall County, does venue lie in Randall County?

A. Yes, sir.

MR. FARREN: May I approach the witness, Your Honor?

THE COURT: Yes. James.

MR. FARREN: Yes, Your Honor.

THE COURT: Are you getting to a good stopping point?

(Off-the-record discussion.)

THE COURT: Ladies and gentlemen, I'm going to excuse you for the day. I'm going to give you a little bit of your afternoon back. I know it's not much and I know we all agreed to work until 5:30, but we're all getting a little tired, and I'm judging by myself mostly. And if I'm not retaining stuff as well as I did this morning, maybe some of y'all aren't either. And a couple of ya'll have yawned. And so we're going to -- we're

6:42:00 going to stop for the evening. We -- we have some stuff
6:42:02 we have to do, too, that we'll take care of. So I'll
6:42:06 excuse you and see you again in the morning at 8:30.
6:42:10 Thank you.

6:42:17 (Jury retired from the courtroom.)

6:42:17 THE COURT: Anybody find that statute?
6:42:37 Found the charge, which is in 37.07 that's just the
6:42:43 charge. That's not the --

6:42:44 MR. WATKINS: The statute is in the
6:42:48 government code. The statute is in the government code.

6:42:51 THE COURT: You got to be joking. Do we
6:43:17 have anything to take up?

6:43:18 MR. FARREN: We don't have anything to take
5:43:21 up at this time.

5:43:22 THE COURT: Do you?

5:43:23 MR. WATKINS: I don't think we do.

5:43:24 THE COURT: All right. We'll be in recess
5:43:26 until 8:30. And see you in the morning.

5:43:26 MR. WATKINS: Thank you, Judge.

THE COURT: Thank you.

(Evening recess.)

THE STATE OF TEXAS )
COUNTY OF RANDALL )

I, Karen Morris, Deputy Official Court Reporter in and for the 47th District Court of Randall County, State of Texas, do hereby certify that the above and foregoing contains a true and correct transcription of all portions of evidence and other proceedings requested in writing by counsel for the parties to be included in this volume of the Reporter's Record, in the above-styled and numbered cause, all of which occurred in open court or in chambers and were reported by me.

I further certify that this Reporter's Record of the proceedings truly and correctly reflects the exhibits, if any, admitted by the respective parties.

WITNESS MY OFFICIAL HAND this the 18th day of October, 2005.

KAREN MORRIS, CSR 334
Expires: 12/31/2006
Official Court Reporter
108th District Court
Potter County, Texas
Potter County Courts Bldg.
Amarillo, Texas 79101
(806) 379-2357