07-05-0284-CR

REPORTER'S RECORD

VOLUME 10 OF 22 VOLUMES

TRIAL COURT CAUSE NO. 15,307-A

FILED
OCT 18 2005
SEVENTH COURT OF APPEALS
PEGGY CULP, CLERK

| | | |
|---|---|---|
| THE STATE OF TEXAS | ) | IN THE DISTRICT COURT |
| VS. | ) | RANDALL COUNTY, TEXAS |
| JOSHUA DAVID STOCKER | ) | 47TH JUDICIAL DISTRICT |

********************
STATEMENT OF FACTS
********************

ORIGINAL

On the 14th day of July, 2005, the following proceedings came on to be heard in the above-entitled and numbered cause before the Honorable Hal Miner, presiding, held in Randall County, Texas:

Proceedings reported by Stenographic Method.

A P P E A R A N C E S

NAME: Mr. James Farren &
Mr. Jeramy Fowler &
Ms. Jennifer Cates
Randall County District Attorney's Office
Canyon, Texas 79015
SBOT NO: Unknown
ADDRESS: 501 16th Street
PHONE: (806) 468-5570
ATTORNEY FOR THE STATE.

NAME: Ms. C.J. McElroy &
Mr. Mike Watkins
Attorneys at Law
SBOT NO: Unknown
ADDRESS: 801 S. Fillmore/500 S. Taylor
Amarillo, Texas 79101
PHONE: (806) 371-0555/374-9584
ATTORNEY FOR THE DEFENSE.

# CHRONOLOGICAL INDEX

CAPTION . . . . . . . . . . . . . . . . . . . . . . . . 1
APPEARANCES . . . . . . . . . . . . . . . . . . . . . . 2
CASE CALLED . . . . . . . . . . . . . . . . . . . . . . 7
STATE'S ANNOUNCEMENT. . . . . . . . . . . . . . . . . . 7

ORAL EVIDENCE:

MARK BROWN
DIRECT EXAMINATION (CONTINUED) BY MR. FARREN. . . . . . . 11
CROSS EXAMINATION BY MS. McELROY. . . . . . . . . . . . . 84
REDIRECT EXAMINATION BY MR. FARREN. . . . . . . . . . . . 89
RECROSS EXAMINATION BY MS. McELROY. . . . . . . . . . . . 91

TORI PATRICK
DIRECT EXAMINATION BY MR. FOWLER. . . . . . . . . . . . . 93
CROSS EXAMINATION BY MR. WATKINS. . . . . . . . . . . . .170
REDIRECT EXAMINATION BY MR. FOWLER. . . . . . . . . . . .203
RECROSS EXAMINATION BY MR. WATKINS. . . . . . . . . . . .205

BOBBIE LEDBETTER (JURY OUT)
DIRECT EXAMINATION BY THE COURT . . . . . . . . . . . . .210
CROSS EXAMINATION BY MR. WATKINS. . . . . . . . . . . . .212
CROSS EXAMINATION BY MR. FARREN . . . . . . . . . . . . .215

TORI PATRICK (JURY IN)
RECROSS EXAMINATION (CONTINUED) BY MR. WATKINS. . . . .217

MICHAEL WAYNE ELLISTON
DIRECT EXAMINATION BY MR. FARREN. . . . . . . . . . . . .220
CROSS EXAMINATION BY MS. McELROY. . . . . . . . . . . . .297
REDIRECT EXAMINATION BY MR. FARREN. . . . . . . . . . . .314

REPORTER'S CERTIFICATE. . . . . . . . . . . . . . . . . .326

ALPHABETICAL INDEX


| WITNESS | DX | CX | VDX | RDX | RCX |
|---|---|---|---|---|---|
| BROWN, MARK | 11 | 84 | | 89 | 91 |
| ELLISTON, MICHAEL | 220 | 297 | | 314 | |
| LEDBETTER, BOBBIE | 210 | 212 | | 215 | |
| PATRICK, TORI | 93 | 170 | | 203 | 205<br>217 |

# EXHIBIT INDEX

| STATE'S EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| SX-11 | PHONE RECORDS | | |
| SX-176 | PHOTO | 20 | 20 |
| SX-177 | PHOTO | 21 | 21 |
| SX-178 | PHOTO | 22/23 | 23 |
| SX-179 | PHOTO | 24 | 24 |
| SX-180 | PHOTO | 25 | 25 |
| SX-181 | PHOTO | 25 | 25 |
| SX-182 | PHOTO | 26 | 26 |
| SX-183 THROUGH | | | |
| SX-192 | PHOTO | 28 | 29 |
| SX-194 | PHOTO | 36 | 36 |
| SX-195 | | | |
| SX-196 | PHOTO | 36 | 36 |
| SX-199 | PHOTO | | |
| SX-200 | PHOTO | | |
| SX-201 | PHOTO | | |
| SX-202 | PHOTO | | |
| SX-203 | PHOTO | 38 | 38 |
| SX-207 | PHOTO | 40 | 41 |
| SX-208 | PHOTO | 40 | 41 |
| SX-209 | PHOTO | 40 | 41 |
| SX-210 | PHOTO | 40 | 41 |
| SX-211 | PHOTO | 40 | 41 |
| SX-212 | PHOTO | 40 | 41 |
| SX-236 | PHOTO | 44 | 44 |
| SX-255 | CHART PHONE CALLS | 52 | |
| SX-260 | STATEMENT | 315 | 319 |
| SX-297 | PHOTO | | |

EXHIBIT INDEX (CONTINUED)

| DEFENDANT'S EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| DX-1 | BUSINESS RECORD | 178 | 179 |
| DX-2 | BUSINESS RECORD | 197 | 197 |
| *DX-3 AKA COURT'S EXHIBIT NO. 3 | | | |
| DX-4 | PHOTO | 308 | 308 |
| DX-5 | PHOTO | 308 | 308 |
| DX-6 | PHOTO | 308 | 308 |

*ADMITTED FOR THE COURT ONLY. NOT FOR THE JURY.

PROCEEDINGS:

JULY 14, 2005

(Both sides, the Defendant present, in open (court:

7:45:14 THE COURT: Okay. Okay. Y'all ready?

8:28:24 MR. FARREN: Yes, Your Honor.

8:28:25 THE COURT: All right. Go ahead, Mr. Farren.

8:28:28 MR. FARREN: Your Honor, I wrestled with this during the evening hours trying to figure out ethically what I needed to do, and I don't know anything to do, and I don't know anything to do except put everything on the record and let the Court help us decide.

8:28:41 Jill Paulson was asked some questions yesterday, about having erased some material on the phone messages, or something of that nature. And she testified, I believe, that she didn't remember doing anything like that. She was then, by prearrangement, released from the rule and allowed to sit in the courtroom during the testimony of other witnesses.

8:29:06 She approached me yesterday concerned, because after visiting with her mom and talking about it, she indicated to me that she did remember now that Jon Waggoner had told her when she visited with him about the situation, that, yeah, just go ahead and erase the stuff

about girlfriends calling and stuff like that, which she did. She -- she did not remember it when she testified.

Now, I'm more than willing to put her back on the stand and clarify it, but the problem is the rule's been invoked and she's been sitting in the courtroom. And that's why I said, I don't know what to do except lay it out for the Court and let everybody decide what to do.

THE COURT: I don't -- I don't remember any testimony that she could have heard that would -- would result in a -- in a violation of the spirit of 614. I don't -- I don't remember anything that she could have heard that she might comport her testimony to, which is the purpose of it.

MR. FARREN: Right. And that's my understanding as well, Your Honor. I don't remember anything the rest of the day that had anything to do with the phone messages, but that's my only --

THE COURT: The only thing that was testified to were the records by Detective Brown. That is his appropriate title? Detective?

MR. FARREN: Detective. Yeah. He's a sergeant. He's a detective.

THE COURT: And I don't have -- I just don't believe there is any -- any violation of the spirit of 614, because I can't remember anything she could have

heard that would -- would logically be a basis for her changing her testimony.

What's the Defense's reaction to this?

MS. McELROY: Your Honor, I mean, I don't think that -- you know, I don't know that there's any sort of real need for her to come back and say that.

MR. FARREN: Well, I don't either. And I -- again, I wrestled with this. I didn't know how to find out, because, obviously, I can't go to the Defense and say, are you going to call Waggoner or somebody to impeach her, just to make it look like she's not a truth teller? Other than that, I don't know what the purpose would be, but that's my dilemma. I don't have any way to know, and so I don't know.

THE COURT: Well, I think what I'll do is keep her back under the rule, and have her sit out, and if somebody wants to do something with this -- if the Defense wants to do something with this, or if -- or if you want to call her back and clear it up, either way, I suppose that's within your purview.

MR. FARREN: Okay.

THE COURT: It's still your case-in-chief.

MR. FARREN: Yes, sir.

THE COURT: It's hard for me to believe that a member of the bar would tell somebody to do that.

8:32:12 MR. FARREN: Well, I'm just repeating what -- what I was told, Your Honor.

8:32:16 THE COURT: I understand.

8:32:17 MR. FARREN: That is what I was told yesterday afternoon, and I didn't -- again, I don't -- I didn't know what to do, other than lay everything out.

8:32:27 THE COURT: Yeah. Well, you have --

8:32:28 MR. FARREN: I'm darn sure not going to commit ethical violations.

8:32:33 THE COURT: The Court appreciates that and I'm sure the Defense does, too.

8:32:37 MR. WATKINS: We do appreciate it.

8:32:39 THE COURT: And now we know this, and I think probably the best course is if y'all are going to release somebody from the rule, talk to me about it, and I'll probably go along with it. I probably would have gone along with that.

8:32:50 MR. FARREN: Oh, it was a decision that you had made earlier in pretrial discussions.

8:32:54 THE COURT: Did I? Oh, I did?

8:32:56 MR. FARREN: Yes. Because it was the mother of the Defendant, you had said that after she testified --

8:33:00 THE COURT: Well, that was over a month ago. How could the Court be expected to remember that?

MR. FARREN: Oh, I understand, Your Honor.

8:33:05 8:33:06 8:33:10 8:33:12 8:33:14 8:33:18 8:33:46 8:33:50 8:33:53 8:33:53 8:33:57 8:34:03 8:34:05 8:34:07 8:34:13 8:34:14 8:34:38 8:34:43 8:34:48

We've slept since then.

THE COURT: Yeah. If this trial goes a month, that's the time. You'll hear the bell go off. There wouldn't be anything remembered.

Let's bring them in.

THE BAILIFF: All rise.

(Jury seated.)

THE COURT: Good morning. Thank y'all. Everyone be seated. Well, good morning, ladies and gentlemen.

Y'all look a lot fresher than the last time I saw you. Get a little sugar in you with those donuts. You'll be ready to pay attention.

Okay. Mr. Farren, do you want to call Sergeant Brown back?

MR. FARREN: Yes, Your Honor. Sergeant Mark Brown.

(Witness Mark Brown resumes the stand.)

DIRECT EXAMINATION (CONTINUED)

BY MR. FARREN:

Q. Sergeant Brown, yesterday, I believe when we broke for the day, we were talking about your ongoing investigation and the various efforts that were made to find everyone, talk to everyone. One of the people that you talked with, it's our understanding, was a man named

Jason Hickson. Is that correct?

A. Yes, sir.

Q. And I believe I asked you this yesterday, but I just want to make sure. Is it -- was it your testimony yesterday that you never heard anything about any list with anybody's names on it to be suspects in case something happened to Mr. Pool? You -- you never knew anything about such a list?

A. No, I didn't.

Q. During the course of your investigation, was it of interest to you to talk to people who either knew Pool, or were related to Pool, or married to Pool, or things of that nature?

A. Yes, sir.

Q. Do you know if Dustin Pool had been married before?

A. Yes, sir.

Q. And -- and to whom had he been married, or at least one of the people?

A. Jessica Pool.

Q. And in addition to that, do you know if he'd been married or lived with a lady name Laura Lucus?

A. Yes.

Q. And in your effort to talk with people who might be able to share information about Pool, who's missing and

8:36:03 possibly dead, did you visit with Laura Lucus?
8:36:07 A. Yes, I did.
8:36:08 Q. And who was living with Laura Lucus at that time?
8:36:12 A. Jason Hickson.
8:36:14 Q. Okay. Now, do you have an independent memory of why you talked to Jason Hickson?
8:36:23 A. His name came up several times as possibly being one at a meeting that was held at Stumpy's bar.
8:36:32 Q. But you -- but you do have an independent memory of having talked to Laura Lucus?
8:36:38 A. Yes.
8:36:38 Q. And you know he was living with her?
8:36:41 A. Yes.
8:36:41 Q. And so that's certainly a distinct possibility of one of the people who was mentioned, Jason Hickson?
8:36:46 A. Yes.
8:36:55 Q. During the course of your investigation, did you spend some time at a farm belonging to a man named Michael Elliston?
8:37:11 A. Yes, I did.
8:37:13 Q. And I think you testified yesterday that you had a search warrant for the farm, but you didn't actually have to execute the see warrant. Is that correct? If not, would you explain that to the jury?
8:37:29 A. That is correct. We had gone to the Carson

County Judge's office and met with the judge and the sheriff, and the farm we wanted to search was in Carson County. With the assistance of the sheriff and permission of the sheriff, we were able to obtain a search warrant based on the information that we had obtained up to that point, and once the warrant was signed, went with the sheriff back to Mike Elliston's farm.

Q. Now, just to keep our geography straight, you've indicated in your testimony yesterday events and locations that were in both Randall and Potter County?

A. Yes, sir.

Q. And now you're about to conduct a search on a farm in Carson County?

A. Correct.

Q. At some time during the investigation, did a part of your investigation involve -- involve events that happened, I believe, in Hutchison County?

A. Yes, sir.

Q. Up in Lake Meredith?

A. Correct.

Q. Okay. So we've got at least four counties involved?

A. Yes, sir.

Q. Without telling me anything Mr. Elliston said to you, was he cooperative when you arrived at the farm and

talked with him?

A. Yes, sir.

Q. Okay. At some point, again, without telling us what was said, did he give you a statement?

A. Yes, he did.

Q. Did he, subsequent to that statement, give you a second statement?

A. Yes, he did.

Q.. How much time elapsed between the first statement and the second statement, if you recall?

A. I don't recall.

MR. FARREN: May I have just a moment, Your Honor?

THE COURT: Yes.

MR. FARREN: May I approach, Your Honor?

THE COURT: Yes.

Q. (BY MR. FARREN) I haven't marked these for identification purposes, but I want to show you four documents and ask if you recognize these four documents?

A. Yes, I do.

Q. And these documents are dated as to when they were created. Is that correct?

A. Yes, sir.

Q. Would you agree with me that there is one document dated June 17th?

3:40:32 3:40:37 3:40:38 3:40:44 3:40:48 3:40:53 3:40:54 3:40:55 3:40:57 3:40:59 3:41:03 3:41:12 3:41:19 3:41:24 3:41:24 3:41:25 3:41:27 3:41:32 3:41:35 3:41:35 3:41:38 3:41:38

A. Yes, sir.
Q. Another document is dated June 24th?
A. Yes, sir.
Q. A third document is dated July 17?
A. Yes, sir.
Q. And, finally, there's a document dated December 22nd?
A. That's correct.
Q. All in the year of 2003?
A. Yes, sir.
Q. Now, again, without telling me what was said to you, you're familiar with the contents of these documents?
A. Yes, sir.
Q. The June 17th statement from Mr. Elliston, is it consistent with or different from the July -- June 23rd statement?
A. Different.
MS. McELROY: Your Honor, I'd object. I don't believe that that's a relevant question for this witness. We can hear from Mr. Elliston, and the jury can decide whether those statements are different.
THE COURT: What does that mean?
MS. McELROY: I just -- I don't think that Mr. Brown's opinion as to whether Mr. Elliston's statements are different is really relevant, as opposed to

allowing the jury to consider Mr. Elliston's testimony and decide for themselves whether it was different.

MR. FARREN: Except that it has a huge impact on how he conducts his investigation, Your Honor.

MS. McELROY: I think that he's making a comment on the evidence, Your Honor.

THE COURT: Comment on the evidence.

MS. McELROY: Yes, Your Honor.

THE COURT: No, he's -- that's just his opinion that there is a conflict, and that's within the purview of ordinary opinions in the rules of evidence.

MS. McELROY: Yes, sir.

THE COURT: I'll overrule the objection, if it was one.

MS. McELROY: Yes, sir.

Q. (BY MR. FARREN) In your opinion, is there a difference between June 17th and June 24th, the two statements?

A. Yes, sir, there is.

Q. Is it a slight difference or a huge difference?

A. A huge difference.

Q. And did that have an impact on the course of your investigation?

A. It did.

Q. Now, the two other statements, July 17 and then

8:42:38 in December 22, would you characterize those statements as different from the June 24th statement -- I'm sorry. Well, yeah. That's correct. You actually have one statement here from Judy Elliston. Is that correct?
8:42:58 A. Right.
8:42:58 Q. Okay. But the December 22nd statement, would you characterize that as vastly different from the June 24th statement or merely adds information to the June 24th information?
8:43:12 A. That one adds.
8:43:14 Q. Okay. All right. Just to make the record clear, and I -- I created the confusion. The documents I showed you a minute ago, there's four documents with the name Elliston on it, but one of them is actually Judy Elliston. Is that correct?
8:43:51 A. That's correct.
8:43:52 Q. And who is Judy Elliston?
8:43:54 A. Judy Elliston is Mike Elliston's wife.
8:43:57 Q. And of the four documents I -- the four documents we talked about a while ago, the Judy Elliston statement is the July 17th dated document. Right?
8:44:10 A. That's correct.
8:44:11 Q. The other three are Mr. Mike Elliston?
8:44:14 A. Correct.
8:44:22 Q. When you -- when you conducted the search at

Mr. Elliston's farm, again, without repeating anything Mr. Elliston may have said to you, were you present during the search?

A. Not the entire search.

Q. You were, but you were present during part of the search?

A. Yes, sir.

Q. And did you and those working with you collect evidence and take it with you from that location?

A. I did not collect any evidence, the identification team did.

Q. Again, Jim Burgess?

A. Yes, sir.

Q. Mike Crandall, Rickwartz, Rodden, these were all people working with you at various times in this investigation?

A. Yes, sir.

Q. And those are crime scene --

A. Investigations.

Q. -- all of them were at that time crime scene technicians?

A. Technicians. Correct.

Q. I'm showing you what has been marked as State's Exhibit 176. Do you recognize what's depicted in this photograph?

8:45:38 A. This, I believe, is the house south of Mike Elliston's house.

8:45:42 Q. Okay. And does it accurately reflect the way the house appeared at the time you were there?

8:45:49 A. That house, yes.

8:45:54 MS. McELROY: We have no objection, Your Honor.

8:45:56 THE COURT: Which number is that?.

8:46:00 MR. FARREN: No. 176, Your Honor.

8:46:02 THE COURT: 176 is admitted.

8:46:12 Q. (BY MR. FARREN) The jury's now seeing the same photograph you talked about a moment ago on the screen. You have indicated that is Mr. Elliston's house?

8:46:20 A. No, that's the house south of Mr. Elliston's house.

8:46:25 Q. Do you know if Ms. Elliston was living in the house, and he was living in the shop, or do you know for sure?

8:46:33 A. I know. He had taken up residence in the shop.

8:46:38 Q. Okay. I'm showing you what is marked as State's Exhibit 177. Do you recognize what's depicted there?

8:46:47 A. Yes, sir. This is the house that Mike -- this is Mike Elliston's shop.

8:46:50 Q. Okay. And that's where he was living at the time?

A. That's correct.

Q. And does this photograph accurately reflect the way it appeared at the time you were there?

A. Yes, sir, it does.

MR. FARREN: Offer State's 177.

MS. McELROY: No objection, Your Honor.

THE COURT: State's 177 is admitted.

Q. (BY MR. FARREN) Now, Mr. Elliston and Judy Elliston were a bit estranged at the time. In other words, they were still married, but she was living in the house and he was living over in the shop. Is that correct?

A. That's correct.

Q. On the left side of the photograph the roof of the building is different. There's a second floor?

A. Yes, sir.

Q. What was on that second floor?

A. That is a loft. He had a workbench up there, and some tools, and it was -- it was separate from the lower end of it. The lower end of it was primarily the storage and a staircase, and then a big garage that goes out to the right.

Q. Now, in either the house or the shop, this is the only upstairs room. This is the only place you go up a set of stairs to get to. Right?

A. Correct.

Q. Okay. I'm showing you State's Exhibit 178. Do you recognize what's depicted there?

A. Yes, sir.

Q. Is it correct that these are the same two -- or at least a photograph of the portions of the same two buildings that shows the relationship between the two buildings?

A. Okay. I think there's some confusion. This house is the neighbor's house. Elliston's house is on the east side of this shop.

Q. Okay. But it still --

A. But it still represents both pictures as depicted.

Q. So -- so the trailer house or the doublewide that we looked at earlier then is actually a neighbor's house?

A. Correct.

Q. And then on the back side of the photograph we've already looked at is another house, and that's where Ms. Elliston lived?

A. That's correct.

Q. Okay.

MR. FARREN: Offer State's Exhibit 178.

THE COURT: Let's take a little recess. Let's pause just a minute here --

MR. FARREN: Okay.
THE COURT: -- while they get the equipment working.
MR. FARREN: Offer State's 178.
MS. McELROY: No objection.
THE COURT: State's 178 is admitted. There's some confusion in my mind and probably in the jury's about what is what.
MR. FARREN: I'll get it.
THE COURT: Okay.
Q. (BY MR. FARREN) This -- this building here then is -- is the neighbor's house. Is that correct?
A. Yes, sir.
Q. And then this is the south end of the -- the back end of the shop, opposite of where the upstairs room is. Is that right?
A. That's correct.
Q. And what you were explaining to the jury a moment ago is that on the back side of this, on the south side of this building, is where Mrs. Elliston's house is?
A. On the east side of it, yes, sir. It's about where those two clouds are together, just to the left of that would sit the house.
Q. Right. I'm showing you what has been marked as State's Exhibit 179. Is this sort of a mile marker or

8:51:52 road indicator sign in rural Carson County?
8:51:56 A. This is an address on County Road 307.
Q. Okay.
8:51:58 A. It's house number 380.
8:52:04 Q. Who lived there?
8:52:06 A. Mike Elliston.
8:52:07 Q. Okay. So this shows up, but the address is actually 380?
8:52:09 A. County Road 307.
8:52:12 Q. County Road 307. And this -- this photograph accurately reflects the way the sign appeared at that time?
8:52:15 A. Yes, it does.
MR. FARREN: Offer State's 179.
8:52:16 MS. McELROY: No objection.
8:52:17 THE COURT: State's 179 admitted.
8:52:31 Q. (BY MR. FARREN) I'm going to show you what's marked as State's Exhibit 180. Do you recognize what's depicted in this photograph?
8:52:42 A. The name Elliston on a piece of barn wood.
8:52:44 Q. And this was hanging out on one of the buildings at the -- at the location --
8:52:48 A. I believe it's on the shop.
8:52:49 Q. On the shop. Does it accurately reflect the way it appeared at that time?

8:52:54 A. Yes, sir.

8:52:55 MR. FARREN: Offer State's Exhibit 180 at this time.

8:52:58 MS. McELROY: No objection.

8:52:59 THE COURT: State's 180 is admitted.

8:53:46 Q. (BY MR. FARREN) I'm showing you what has been marked as State's Exhibit 181. Do you recognize what is depicted in this photograph?

8:53:53 A. Yes, sir. This is the east side of the shop, also showing the south end of the garage door.

8:53:59 Q. And does this photo accurately reflect the way that it appeared at that time?

A. Yes, sir.

8:54:02 MR. FARREN: Offer State's 181.

8:54:05 MS. McELROY: No objection.

8:54:07 THE COURT: 181 is admitted.

8:54:15 Q. (BY MR. FARREN) Now, Mark, a minute ago you were talking about the house where Ms. Elliston lived, being on the other side of the shop. Are we now on the other side of the shop?

8:54:30 A. Yes, sir.

8:54:30 Q. Okay. And if we continued over this way, we would reach Ms. Elliston's -- where she was living?

8:54:36 A. Yes.

8:54:42 Q. I'm showing you what has been marked as State's

Exhibit 182, and I ask if you recognize what's depicted in this photograph?

A. Yes, sir. This is Mike Elliston's Dodge pickup, the green one, and this is the back side of the house. This is the entry door into the house.

Q. The house where Ms. Elliston stayed?

A. That's correct.

Q. And does this photo accurately reflect the way the pickup and house appeared at the time?

A. As we walked up on it.

MR. FARREN: Offer State's 182.

MS. McELROY: No objection.

THE COURT: 182 is admitted.

Q. (BY MR. FARREN) So as to the photograph that the jury is looking at now, the vehicle is Mr. Elliston's green pickup, and then this is the -- an entrance into the house that you've been talking about where Ms. Elliston lived?

A. Yes, sir.

Q. The one that was on the other side of the shop?

A. Right.

Q. I'm showing you what has been marked as State's Exhibit 183. I ask if you recognize what is depicted in this photograph?

A. Yes, sir. This is the bed of Mike Elliston's

pickup, the same pickup -- that pickup.

Q. The pickup that's on the screen now, the photograph you're looking at, is actually a photograph showing the inside of the bed or the bed area of the pickup?

A. That's correct.

MR. FARREN: Offer State's 183 into evidence.

MS. McELROY: No objection.

THE COURT: 183 is admitted.

BY MR. FARREN: If you would, put 182 back up, please.

Q. (BY MR. FARREN) I'm showing you State's Exhibit 182 again. At this time or later in the investigation, did this pickup become of significance to you in your investigation?

A. Very significant.

Q. Why did you believe it to be significant?

A. I learned --

Q. Without telling me what anyone said.

A. I learned that this pickup was used to transport Dustin Pool from Tori Patrick's apartment to this location.

Q. Okay. And -- and do you know how it was transported? In other words, was he just sitting in the

8:57:46 back of this pickup, or how was he transported?
8:57:50 A. He was -- I learned that he was transported
8:57:52 inside a metal box that was secured with a tie down strap.
8:58:08 Q. I'm going to show you what has been marked as
8:58:12 State's Exhibit 184. Do you recognize what's depicted
8:58:15 here?
8:58:15 A. Yes, sir.
8:58:18 Q. In fact, I'm going to have you go ahead and look
8:59:24 at State's 185 -- well, actually, 184 through 192 in
8:59:34 sequence. Go ahead and view all of those now, please.
9:00:10 THE COURT: Which ones?
9:00:14 MR. FARREN: 184 through 192.
9:00:17 THE COURT: Okay.
9:00:18 Q. (BY MR. FARREN) Have you -- have you viewed all
9:00:18 of those photographs?
9:00:20 A. Yes, sir.
9:00:21 Q. And are these all photographs of the interior of
9:00:24 the lower shop area that we've talked about earlier?
9:00:27 A. Yes, sir.
9:00:28 Q. And do they all accurately reflect the way it
9:00:31 appeared at the time you were there?
A. Yes, sir.
9:00:34 MR. FARREN: Offer State's 184 through 192.
9:00:37 MS. McELROY: No objection.
9:00:39 THE COURT: 184 through 192 are admitted.

Q. (BY MR. FARREN) Real quickly, I want to go through these. Would you agree that these are merely various views of the lower shop area, which was in a bit of a disarray at the time?
A. Yes, sir.
Q. No. 184?
A. Yes, sir. This is a workbench just covered in tools and miscellaneous items.
Q. No. 185?
A. The same area, the lower shop. Tools.
Q. What did Mr. Elliston do at this shop? What -- I mean, he called -- everyone called this a farm, but was he a farmer?
A. No.
Q. Was he a mechanic?
A. More likely a mechanic. He erected metal buildings, things of that nature.
Q. And -- and so the shop had lots of tools, and equipment, and things of that nature?
A. Yes, sir.
Q. Would you -- would you describe it as a neat, orderly place?
A. No.
Q. State's 186? The same --
A. The same view. Garage area. Littered.

Q. Okay. State's 187?

A. This is a picture of some duct tape.

Q. Did you see -- did you see a lot of duct tape out there?

A. Quite a bit.

Q. Again, State's 188?

A. Different colored duct tape.

Q. When you conducted this search, was this before or after you had discovered the body of Dustin Pool, if you recall?

A. After.

Q. After. And so when you conducted the search, did you believe that duct tape might be of significance in your investigation?

A. Yes.

Q. State's 189?

A. That's a strap. A tie down strap.

Q. And, again, having already exhumed the body of Dustin Pool, had you -- did you believe that tie down straps and things of that nature might have significance?

A. Yes, sir.

Q. Again, 190, some more duct tape. Is that correct?

A. Yes, sir.

Q. 191?

A. A toolbox.
Q. So --
A. Miscellaneous hammers on the back wall. Rubber mallets.
Q. Without telling me what anyone said, did you believe that there might be tools or instruments commonly found in a mechanic or shop like this that could be of significance in your investigation?
A. Yes.
Q. I'm showing you State's 192.
A. This is a tarp, silver in color. I believe this tarp is silver on both sides.
Q. Because you had already exhumed the body of Dustin Pool, did you believe that a tarp or tarps might be of significance in your investigation?
A. Yes, sir.
Q. Although the one at the burial site was actually blue on one side and silver on the other. Is that correct?
A. That's correct.
Q. I want to show you what's marked as State's Exhibit 247 and 248. Do you recognize what is depicted in these photographs?
A. Yes, sir, I do.
Q. Okay. These are aerial shots of the silo of

9:05:33 McCormick and the railroad tracks. Is that correct?

9:05:36 A. That's correct.

9:05:37 Q. And do these shots accurately depict the way the

9:05:40 area appeared at that time?

9:05:42 A. At that time, yes, sir.

9:05:43 MR. FARREN: Offer State's 247 and 248 into

9:05:46 evidence.

9:05:46 MS. McELROY: No objection, Your Honor.

9:05:48 THE COURT: 247 and 8 (sic) are admitted.

9:06:01 Q. (BY MR. FARREN) The jury is now viewing the

9:06:03 photograph you looked at a moment ago. Is this the

9:06:06 railroad tracks here?

A. Yes, sir.

9:06:07 Q. The silo is about this area. Is that right?

9:06:10 A. Right. Just about the middle of the picture,

9:06:12 that dark spot right beside the tracks.

9:06:15 Q. Okay. Do you know if that grain silo is still

9:06:25 there today?

9:06:25 A. I know it's not still there.

9:06:25 Q. What happened to the grain silo?

9:06:28 A. It burned down.

9:06:29 Q. How long after you exhumed -- you and others

9:06:34 removed Mr. Pool from his concrete incasement, did the

9:06:38 grain silo burn down?

9:06:39 A. Within weeks. A few weeks.

Q. When you were at the grain silo, was there anything combustible or anything that you saw that would result in some accidental fire?

A. No.

Q. I'm showing you what we have marked as State's 242. I ask if you recognize what's depicted in this drawing or diagram. Oh, I'm sorry. Wrong one. I've got too many exhibits.

242 is Ms. Patrick's apartment that we talked about yesterday. Correct?

A. Yes, sir.

Q. My first clue is when Mark looked at me like I'd grown a head. Why are we doing it again?

State's Exhibit 243, do you recognize what's depicted here?

A. This is a diagram of Mike Elliston's garage and shop.

Q. And the -- does the diagram accurately reflect the relationship of the various rooms and where the walls are, and so forth, whether it's actually at scale or not?

A. Yes, sir.

Q. Now, the diagram -- there's a part to the -- to the right -- to your left, my right, that depicts the upstairs area. Is that correct?

A. That's correct. And it's detached from the

drawing on the right, so you can see everything on the second floor and not cover up this area.

Q. And so that relationship is obviously not -- not correct, but there's not any other way to draw it in a two dimensional --

A. Correct.

Q. -- space, than to put it over on the side?

A. Correct.

MR. FARREN: Your Honor, for demonstrative purposes only, I would ask that I be allowed to display 243 for this witness and various witnesses?

MR. WATKINS: Can I see it?

MS. McELROY: No objection.

THE COURT: Sure. Yes. It's admitted for that purpose.

MR. FARREN: This is the upstairs.

THE COURT: Yes. Okay. Yeah. Is it to scale?

MR. FARREN: No. And it is not to scale, Your Honor, but it is -- it is -- accurately reflects the relationship of the room.

THE COURT: Okay.

Q. (BY MR. FARREN) Earlier, Detective, you were talking about the shop area, and we looked at a lot of photographs of an area that was in disarray. Is this area

here, the area we've been looking at that has all of the equipment, and tape, and tools, and things of that nature?

A. Yes, sir. All of this area here.

Q. And then this area here is -- what is in this area?

A. This is storage. And this is the stairwell that leads up to -- you pick up the stairs, you make a right turn, and then you enter onto the second level.

Q. And then this part of the drawing is the detached part you've talked about a moment ago?

A. Correct.

Q. And it actually sits above this portion?

A. That's right.

Q. And this shows the stairs going down, and this shows the stairs going up?

A. Same set of stairs.

Q. Okay. I'm showing you what we have marked as State's Exhibits 194 and 196. I ask if you recognize what is depicted in those exhibits?

A. Yes, sir.

Q. That's a photograph of the stairway you just talked about. Is that correct?

A. That's correct.

Q. Do these photos accurately reflect the way -- one view is sort of going up the stairs. That's 194. Is that

9:11:17 correct?

9:11:17 A. Yes, sir.

9:11:18 Q. The other view is looking down the stairs, 196. Is that correct?

9:11:22 A. That's correct.

9:11:23 Q. Do these photographs accurately reflect the way they appeared at the time?

9:11:27 A. Yes, sir.

9:11:28 MR. FARREN: Offer State's 194 and 196 into evidence.

9:11:30 MS. McELROY: No objection.

9:11:33 THE COURT: State's 194 and 196 admitted.

9:11:47 Q. (BY MR. FARREN) And so the photograph appearing on the screen, the jury sees now, is 196. That's a view down the stairs. Is that correct?

9:11:58 A. Yes, sir.

9:11:59 Q. And 194, if we were walking up the steps and looked down as we walked up, that's how they would appear?

9:12:09 A. Yes, sir.

9:13:30 Q. I'm showing you what we have marked as State's Exhibits 199, 200, 201, 202, 203 and ask if you recognize what's depicted in those photographs?

9:13:52 THE COURT: What were those numbers again?

9:13:54 MR. FARREN: 199 through 203, Your Honor.

9:13:57 Q. (BY MR. FARREN) Now, as you indicated earlier,

you weren't present through the entire search. Do you know if these photographs are objects and items that may have been dealt with while you were not present?

A. Yes, sir. I did see this. I know where this is.

Q. Let's talk about State's 203 then.

A. This is the upstairs attic area that was covered up with plywood.

Q. Now, when you say the upstairs attic area, are we talking about the shop?

A. Yes, sir.

Q. Can you point out to the jury where the upstairs attic area is?

A. Right here where it says hidden storage. It would be through this area right here, back in here (indicating).

Q. And in this storage area, what is this? What are the objects that you see in the photograph? Can you --

A. I see two fans, some copper pipe, some insulation, and a metal chair.

Q. A metal chair. Is it laying on its sided?

A. Yes, sir.

Q. Does this accurately reflect the way it appeared at that time?

A. Yes, sir.

MR. FARREN: I offer State's 203 into

evidence.

MS. McELROY: No objection.

THE COURT: State's 203 is admitted.

Q. (BY MR. FARREN) Can you see the photograph as it is being displayed to the jury now?

A. Yes sir.

Q. This -- this box-like object here, with the grate across the front, is that one of the fans you were talking about?

A. Yes, sir.

Q. Then there's a circular object here with sort of braces going up to a smaller circular object, what is that?

A. That's the base of the chair.

Q. That's the base of the chair. So if we turn it up, the chair would be sitting up?

A. Correct.

Q. So instead of legs -- four legs, it has a circular base?

A. Yes, sir.

Q. Now, did you remove this chair from the storage area or did someone?

A. Someone did.

Q. And so that was collected during your search of this farm?

9:17:00 A. Correct.

9:17:02 Q. And it was -- without telling me what anyone told you, did the chair have a significance to you in your investigation of this crime?

9:17:11 A. It did.

9:18:32 Q. I want to take you from the farm, Mr. Elliston's farm, back to Mr. Kimberlin's house. You indicated earlier that you were present during the search of Mr. Kimberlin's house, Craig Kimberlin's house. Is that correct?

A. Yes, sir.

9:18:51 Q. During that search, did you or anyone helping you with the investigation recover any pagers or wireless internet communication devices?

9:19:04 A. Lots of cell phones.

9:19:06 Q. Cell phones, things of that nature?

9:19:08 A. Uh-huh.

9:19:09 Q. I want to show you State's Exhibit 207 through 212 in sequence, and ask if you recognize what's depicted in these photographs?

9:19:38 A. Yes, sir.

9:19:39 Q. And --

9:19:41 A. I saw this object there.

9:19:42 Q. Okay. And these are all photographs of the same object. Is that correct?

9:19:46 A. Yes, sir.
9:19:47 Q. And do these photos accurately reflect the way the objects appeared at that time?
9:19:53 A. Yes, sir.
9:19:53 Q. Now, they're all photographs of the same object, but the object is -- would you agree, is an electronic device, and what appears on the screen can change depending on what button you push and things of that nature?
A. Yes, sir.
9:20:06 Q. So some of these photographs -- what's on the screen is different, but it's the same object in each case?
9:20:11 A. Correct.
9:20:13 MR. FARREN: Offer State's 207 through 212 into evidence, Your Honor.
9:20:24 MS. McELROY: May we approach, Your Honor?
9:20:35 THE COURT: Sure.
9:20:37 (At the bench, before the Court only:)
9:20:48 MS. McELROY: My objection is to No. 207 specifically and 208, because it references somebody had taken them around and they were now in protective custody. I'm afraid they are going to infer. . .
9:21:07 THE COURT: I can't hear you.
9:21:09 MS. McELROY: I'm sorry. I'm afraid the

jury is going to infer then that's our client that is taking him around or in protective custody.

MR. FARREN: That is what --

MS. McELROY: I'm afraid that the jury is going to think it is our client that they're talking about there. You can read the messages on it. It says, (reading) Jay took the cops around, and so it really --

MR. FARREN: Your Honor, they are objects in plain view in a search, collected legally.

THE COURT: I'm going to overrule your objection, and tell you that it is in view. It is proper for cross-examination with this witness who has testified to this. Do you have any objections to these other pictures?

MS. McELROY: No. It was specifically those two, Your Honor, because of the inference, and that we have steered away from that.

THE COURT: I don't think that makes a difference and I'll overrule your objection. And a -- 207 through 212 are admitted.

(In open court:)

Q. (BY MR. FARREN) The object you've talked about in 207 through 212 is an object that was recovered during the search of Stephen Craig Kimberlin's home?

A. Yes, sir.

9:22:46 Q. Do you know about where this was located or do you recall?
9:22:48 A. I don't recall.
9:22:50 Q. Okay. But it was at the home?
9:22:51 A. Yes, sir.
9:22:55 Q. In State's 297, there is some -- something
9:23:05 written or writing that appears on the screen, and it's a
9:23:08 little bit fuzzy. Can you make it out?
A. Yes, sir.
9:23:11 Q. What does it say?
9:23:12 A. I believe it says, (reading) I took the cops
9:23:15 somewhere and is now in protective custody. I'll fill
9:23:20 you.
9:23:22 Q. Now, can you tell for sure if that's "I" or "J"
9:23:26 took the cops?
9:23:27 A. It's "J". I'm sorry.
9:23:29 Q. So you think that's a "J"?
9:23:30 A. I see the hook on it now.
9:23:34 Q. "J" took the cops --
A. Yeah.
9:23:34 Q. -- somewhere and now is in protective custody?
9:23:37 A. Custody.
9:23:37 Q. (Reading) I'll fill you, and then that's all it
9:23:39 shows?
9:23:40 A. That's all it shows.

Q. In State's 208, does that appear to be a con -- continuation of the sentence that we were reading in 207 or the message?

A. Yes.

Q. Can you make out any or all of that?

A. (Reading) I'll fill -- in protective custody. I'll fill you in when I see you.

Q. Okay. State's Exhibit 209, again, there's some wording there, but can you make that out? I can't. I don't know.

A. If last two words are "still up".

Q. State's Exhibit 210, can you make out what is there?

A. Yes.

Q. Would you read that to the jury.

A. (Reading) Not much. Our friend hasn't been disturbed. Has he, question mark.

Q. (Reading) Our friend hasn't been disturbed, has he?

A. Correct.

Q. And State's 211.

A. (Reading) Yes. In snow. Less than cherry. Greater than. Yes, I home. Address, edit, save, delete.

Q. Okay. And finally 212.

A. (Reading) Not too long. I need to catch the

attorney.

Q. Okay. I want to show you what has been marked as State's Exhibit 236, and ask if you recognize what is depicted there?

A. That's the same chair that we looked at earlier, but this is at our crime laboratory.

Q. This is at the Special Crimes Unit lab at the Amarillo Police Department?

A. Yes, sir.

Q. All right, sir. Or at the Special Crimes Unit?

A. Yes, sir.

Q. Does it accurately reflect the way it appeared at that time?

A. Yes, sir.

MR. FARREN: Offer State's 236 into evidence.

MS. McELROY: No objection.

THE COURT: 236 admitted.

Q. (BY MR. FARREN) Now, earlier when we saw the chair, it was in a storage area up in the attic at the Elliston farm. The round base is now sitting on a flat surface and the chair is sitting up. Is that correct?

A. That's correct.

Q. Okay. Now, earlier I visited with you, and you explained to the jury that your investigation -- during

your investigation, at least four geographic areas were involved?

A. That's correct.

Q. Some of it in Randall County, some of it in Potter County, some in Carson County, and, finally, up near Lake Meredith in Hutchinson County. Is that correct?

A. That's correct.

Q. The green pin, again, what does that indicate to you if it's connected to your investigation?

A. That's the area where there sits a mobile home that became important in the investigation.

Q. Okay. There has been testimony in the trial that Mr. Pool's body was transported to a lake house near Lake Meredith, what was described as a lake house, and things went awry, and the body ended up coming back to Amarillo. Have you ever been to the lake house or seen the lake house?

A. No, I have not.

Q. Do you know if other members of the Special Crimes Unit have actually been there and seen it, if you know?

A. I don't believe anyone within the unit have been up there.

Q. Do you know -- do you know if some representatives from the District Attorney's office have

been there?

A. Yes, I do.

Q. They have been there?

A. Yes, sir.

Q. Earlier in your testimony, we reviewed a visit that you paid to -- I think you were asked to come to talk with Stephen Craig Kimberlin after he had been arrested in June.

A. Yes.

Q. Or was it -- in June. Do you recall earlier in your testimony you indicated that after your visit with him, the next day, the exhumation of Dustin Pool's body began?

A. Yes, sir.

Q. Do you know if Mr. Kimberlin, after your visit with him and after the recovery of Dustin Pool's body, do you know if he bonded out of jail?

A. Yes, he did.

Q. Okay. Subsequent to your visit with him, and recovery of the body, and his bonding out of jail, did -- was anyone else arrested?

A. Yes, sir.

Q. Do you know who else was arrested?

A. Yes, sir.

Q. Could you share with the jury a list of those

folks?

A. Destry Keeling was arrested, and Frank -- Frances, also known as Frank Chacon was arrested.

Q. Do you know if, eventually, Tori Patrick, Guinn Garcia, Josh Stocker, Mike Elliston were arrested?

A. Those were -- those people were arrested at subsequent dates from when Keeling and Chacon were arrested.

Q. Okay. So first Frank Chacon and Keeling, and then later the other people I've mentioned?

A. Yes, sir.

Q. Without sharing with us anything Mr. Kimberlin said, did he provide you with a written statement, a document?

A. Yes, sir, he did.

Q. Do you know if Mr. Chacon, Mr. Keeling, Mr. Elliston, and particularly Mr. Stocker, do you know if those folks were given an opportunity to see what Mr. Kimberlin had written in his statement? Without telling us what's in it, just did they see it and know what was in it?

A. No.

Q. Okay.

MR. FARREN: May I have just a moment, Your Honor?

THE COURT: Yes, sir.

MR. FARREN: May I approach the witness, Your Honor?

THE COURT: Yes, sir.

Q. (BY MR. FARREN) Again I have not marked these, but I want you to look at three documents with -- they're three documents, two of them with the same date, one with a different date. Ask if you recognize those documents?

A. Yes, sir.

Q. The documents dated June 15th, whose name appears on those documents?

A. Stephen Craig Kimberlin.

Q. And June 20th?

A. Stephen Craig Kimberlin.

Q. Again, without telling us what's in the documents, did you -- is this the document that -- that was created when you visited with Mr. Kimberlin just prior to the exhumation of Mr. Pool's body?

A. Yes, sir.

Q. Okay. So June 15th. And then subsequent to that, some additional information was provided on the 20th?

A. Yes.

Q. And we have visited about Mr. Elliston earlier. You talked to Mr. Kimberlin and got this statement on June

15th, and then on June 17th you obtained that statement, according to your earlier testimony, from Mr. Michael Elliston?

A. That's correct.

Q. Do you have an opinion based on 35 years of experience and training, the statement of Mr. Kimberlin on June 15th and even the 20th, and the statement of Mr. Elliston on the 17th, are those two statements consistent with each other?

A. Somewhat.

Q. Okay. The statement Mr. Elliston gave on June 24th, is that consistent with Mr. Kimberlin's statement on the 15th?

A. No, sir.

Q. Is it slightly different or extremely different?

A. Extremely different.

Q. It's very different?

A. Yes.

Q. I'm showing you what we've marked as State's Exhibit 255. It's actually four pages, which we'll staple together, depending on the Court's ruling in a few moments. But I ask you to look at this document and tell me if you recognize it?

A. Yes, sir, I do.

Q. What do you recognize this to be?

A. This is a chart that I designed based on information from the statements that I had taken in reference to cell phone calls that were made.

Q. When -- when you say it was in reference to statements you were taking, the actual numbers and times that you wrote on there came from the phone records. Is that correct?

A. That's right.

Q. Okay. And these -- this chart depicts phone calls that according to these phone records are attributed to phones that were in the name of or assigned to various people. Is that correct?

A. Yes, sir.

Q. Are some of the calls in State's Exhibit 255 from the records, calls made by Josh Stocker between March 10th and March 11th of 2003?

A. Yes, sir.

Q. Or made by a phone assigned to him?

A. Yes, sir.

Q. Are some of the phone calls here, according to the records, calls made from a phone that was assigned to Tori Patrick or Dustin Pool?

A. Yes, sir.

Q. Are some of the calls -- some of the calls involved a phone number of Ray Placensio?

9:37:?6 A. Yes. Actually, the phone is in his --
9:37:24 wife/girlfriend's name.
9:37:26 Q. Okay.
9:37:27 A. But he had the phone.
9:37:29 Q. It was a phone that you believe was connected to
9:37:31 Mr. Placensio?
9:37:32 A. Right.
9:37:32 Q. According to their records, the diagram you
9:37:35 created from the phone records, do some of these calls
9:37:37 involve a phone that was assigned or you believe was
9:37:40 connected to Michael Stocker?
A. Yes, sir.
9:?2 Q. Some of the calls involved Craig Kimberlin's
9:37:46 phone?
9:37:46 A. Yes, sir.
9:37:46 Q. Some of the calls involved Mike Elliston's phone?
9:37:51 A. Yes, sir.
9:37:52 Q. Do some of the calls involve Josh Bledsoe, or a
9:37:57 phone assigned to Josh Bledsoe?
9:38:00 A. Yes, sir.
9:38:01 Q. Do some of the calls involve Frank Chacon?
9:38:04 A. Yes, sir.
9:38:05 Q. Some of these calls to the La Quinta Motel or the
9:38:11 La Quinta Inn?
A. Yes, sir.

9:38:11 Q. Some of the phone calls involve Destry Keeling?
9:38:15 A. Yes, sir.
9:38:16 Q. Some of these calls involve Tyler Hale?
9:38:19 A. Yes, sir.
9:38:19 Q. And, finally, does at least one of the calls involve the Comfort Inn?
9:38:25 A. Yes, sir. Yes, sir.
9:38:28 Q. These calls, would you agree on your chart, are calls from the records that were made sometime March 10th through March 11th?
9:38:38 A. Yes, sir.
9:38:39 Q. And do these calls play any significance in your investigation of the death of Dustin Pool?
9:38:46 A. Yes, sir.
9:38:47 MR. FARREN: Offer State's 255.
9:38:53 MS. McELROY: Your Honor, we have a number of objections to the phone chart.
9:38:57 THE COURT: This is a good time for a break. Y'all be back in the jury room at 10:00.
9:39:04 (Jury retired from the courtroom.)
9:39:18 THE COURT: I need a copy of it, if y'all are going to talk about it.
9:39:22 MR. FARREN: Yes, sir. Do you want me to go make a copy now?
9:39:26 THE COURT: Yeah. Let's -- let's take a

ten- minute break and come back in here in ten minutes.

(Recess.)

(Both sides, the Defendant present, in open (court:)

THE COURT: Thank y'all. Be seated. Okay. Just give me a minute to look at this.

MS. McELROY: Okay.

THE COURT: What is the significance of the different colors?

MR. FARREN: It's just -- each person has a different color or they tried --

THE COURT: Okay. All right. What are your objections?

MR. FARREN: We don't mind if you want to convert it to black and white.

THE COURT: Well, I don't know if that's. . .

MS. McELROY: Your Honor, I would like to address like separate -- separate objections. Okay.

THE COURT: I wish you would.

MS. McELROY: Our first objection is the fact there are calls on here listed from Dustin Pool, and it's put into this record, although Mr. Pool's cell phone records aren't in evidence. They aren't contained in the business record affidavits, which they have tendered, so

that's outside of the scope of the evidence.

THE COURT: I haven't looked through this -- for the record, I want it -- I want it in the record that pile of documents, that it constitutes State's -- somewhere between 4 and 14, is six to seven inches high, containing what appears to be many hundreds of pages if not thousands (sic). I want it on the record that the Court has not looked at one single sheet, and does not have the time to go through them and see if there is a call in those hundreds of pages involving Dustin Pool.

MS. McELROY: Your Honor, I have -- I have looked through here, and I do not find it contains any -- these Business Records Act affidavits, any of the records that we received that have Dustin Pool's phone calls on them. They came from a separate entity. They came from like a PIN register, from a federal deal. They haven't been introduced into evidence. So we would exclude -- we would ask to exclude any of the calls that Dustin Pool has made on here --

THE COURT: All right. Mr. Farren.

MS. McELROY: -- because it's not verifiable.

MR. FARREN: And I may need assistance from co-counsel here, Your Honor, because --

THE COURT: Sure. Yes. I'm not limiting

9:53:?7 just you or Ms. McElroy. Everybody can pipe in. Give the
9:53:02 Court some help. If you need help from Sergeant Brown,
9:53:06 who has looked at these records probably, and who, I
9:53:09 guess, prepared this summary, then go to him.
9:53:13 MR. FARREN: Your Honor, first of all, some
9:53:15 of the -- some of the -- and I want to make sure I
9:53:19 understand the objection, because there are going to be
9:53:21 portions of this chart which will -- will indicate Dustin
9:53:26 Pool made a call, but you'd have to look at somebody
9:53:31 else's phone record to know it, because what it records is
9:53:34 his incoming call to their cell phone. And so just
9:53:38 because -- I mean, it's not that simple to simply say,
9:53:?2 well, Dustin Pool's records are not there or whatever,
9:53:45 because some of these records will be recorded on somebody
9:53:48 else's phone, it's just that it records an incoming call
9:53:50 from him.
9:53:50 THE COURT: Let me ask a question here. In
9:53:55 that situation where the information that is in these
9:53:59 admitted records is somebody else's phone and the call
9:54:04 does come from Dustin Pool, or another person whose
9:54:09 records are not, do the records show the name Dustin Pool
or the --
9:54:13 MR. FARREN: It shows the number, Your
9:54:14 Honor.
9:54:?4 THE COURT: -- shows a number?

9:54:17
9:54:19
9:54:21
9:54:22
9:54:25
9:54:32
9:54:36
9:54:40
9:54:43
9:54:45
9:54:52
9:54:52
9:54:56
9:54:58
9:55:02
9:55:05
9:55:07
9:55:08
9:55:10
9:55:15
9:55:16

MR. FARREN: It shows a number, which we can verify.

THE COURT: Okay. All right.

MR. FARREN: Now, I think my -- my co-counsel was explaining to me this morning -- I'm kind of like you, I managed to dodge the stack and laid it off on my co-counsel. And it's my -- and I'm going to let him elaborate, but it's my understanding that a part of the factual argument that's being made, a part of it is accurate.

In other words, I think some of this information, apparently, may have come from a PIN register, as opposed to phone records, but I just want to point out --

THE COURT: What's a PIN register?

MR. FARREN: A PIN register is a -- a method, a step, a phone company can take. It will begin to keep a record of who a person calls from their land line.

THE COURT: Oh.

MR. FARREN: And it requires a court order. It is not as intrusive as a wiretap, which requires a search warrant --

THE COURT: Okay. It's like a limited wiretap that records the numbers to it?

9:55:20
9:55:25
9:55:28
9:55:29
9:55:30
9:55:31
9:55:34
9:55:38
9:55:41
9:55:44
9:55:51
9:55:53
9:55:53
9:55:55
9:55:56
9:55:59
9:56:01
9:56:01

MR. FARREN: Exactly.

MS. McELROY: Yeah.

THE COURT: Based on a federal warrant?

MR. FARREN: It was based on information gathered during, I think, the federal investigation.

THE COURT: Okay.

MR. FARREN: And I think some of the -- some of the information on our chart, apparently, is in reference to the PIN register.

Now, not -- most of the time, I think it's recording calls Mr. Pool is -- is making to someone else's phone call, but I'm going to let Jeremy clarify, if we know which ones we think --

MS. McELROY: Your Honor, could I continue my objection before --

THE COURT: You said you wanted to do it -- one objection at a time --

MS. McELROY: Yes.

THE COURT: -- is what you told me when you began.

MS. McELROY: Yes, sir, but --

THE COURT: I thought you finished the first one.

MS. McELROY: No, sir.

THE COURT: Oh, my Lord. Okay. Go ahead.

I apologize.

MS. McELROY: In reference to the objection --

THE COURT: Tell me when you are done with objection number one.

MS. McELROY: Okay. Thank you, Your Honor. We were told they couldn't pick up the lines when it was a house call. So in other words, this is -- in this -- in reference to this call from Dustin Pool, the only way to verify that call would be from Dustin Pool's records, because they don't have the house phone numbers, and so it's not -- it's a land line, and they didn't do or issue subpoenas for land line numbers, and they don't generally keep those. This is to Tori Patrick's land line, and so we don't have it verified on the other end of the phone call, so the only way that it gets in there is from Dustin Pool's PIN register.

MR. FARREN: Just for clarification, could you delineate specifically which call you're talking about? The March 10th at 3:12 a.m.?

MS. McELROY: Yes. Yes. Yes, sir.

MR. FARREN: Okay.

MS. McELROY: And then again at 3:39 from Dustin Pool to Tori Patrick.

MR. FARREN: And it's your understanding --

and I'm just looking for clarification. I'm not arguing with you. It's your -- it's your argument then that this is a call from Dustin Pool to Tori Patrick's land line, and that Pool's phone records are not a part of the phone records, and we obviously can't have something from the land line, because it wouldn't record it without a search warrant or something any way?

MS. McELROY: Yes.

MR. FARREN: Okay.

THE COURT: Is your argument that there is no evidentiary foundation for any of the Dustin Pool's to or from Tori Patrick's phone numbers?

MS. McELROY: Yes, Your Honor.

THE COURT: It could involve her land line?

MS. McELROY: Yes, sir.

MR. FARREN: We can redact this, Your Honor, to reflect that. May I just have a moment to visit with co-counsel and Mr. Brown, because he worked on this --

THE COURT: Sure. Yeah.

MR. FARREN -- to make sure --

THE COURT: You guys go over to the corner.

MS. McELROY: And also in reference to that, we're going to have problems here.

MR. FARREN: I'm listening.

MS. McELROY: Okay. We're going to have

9:58:15 problems here on this one, because without Dustin Pool's PIN register, which she calls from a land lined to his cell phone, his cell phone records aren't in evidence. So any of the calls from Tori to Dustin, or Dustin to Tori, there's three. One, two, three.

MR. WATKINS: These -- these three calls are all picked up from the PIN register and they're not supported by anything else in these records.

MR. FARREN: Okay. That's fine. I understand your argument on the PIN register. I'm trying -- just trying to figure out where we are.

MR. WATKINS: We were just trying to point out that we hadn't discussed that first one.

MR. FARREN: Okay. Thanks.

(Off-the-record discussion between DA Farren (and Witness Brown.)

MR. FARREN: I see. May I clarify?

THE COURT: I don't know. Can you?

MR. FARREN: May I have an opportunity to attempt that, because I now understand what -- what has happened.

THE COURT: All right.

MR. FARREN: These records that have been admitted, in fact, do contain the records of the PIN register. Those records reflect every call that is talked

9:59:54 about in this chart.

9:59:55 THE COURT: All right.

9:59:57 MR. FARREN: We, however, made an error when
0:00:01 we offered the records. We believed that all of those
0:00:05 records to be records that came, like all the other phone
0:00:12 records, from the phone companies in the regular way,
0:00:15 which, in fact, part of the records that were introduced
0:00:17 and are now in evidence are the result of the PIN
0:00:21 register. And so the Court is -- is -- has information
0:00:25 from two sources.

0:00:28 Part of the argument is accurate, that --
0:00:34 that the phone records that were discussed do not include
0:00:39 this information, but the records that are in evidence do.
0:00:42 It's just that we didn't realize part of those were PIN
0:00:46 register records, so that's where we are. It is in
0:00:50 evidence, it's just not the normal kind of phone records
0:00:53 that we're talking.

0:00:54 THE COURT: Let me ask a question here. And
0:00:57 anybody that can answer this question pipe up. You said
0:01:01 that a PIN register was a -- a -- sort of machine or
0:01:06 something they put on the particular land line box down at
0:01:10 the phone company office, and it tends to make a record, I
0:01:16 guess, on some sort of electronic media, of all of the
0:01:21 incoming calls and outgoing calls. And then someone takes
0:01:25 that -- at some point in time, takes that machine off of

that little box and takes it somewhere and turns that into typewritten data somewhere.

MR. FARREN: That's correct.

THE COURT: Is that -- my question: Does that person work for Southwestern Bell or do they work for the federal government?

MR. FARREN: The -- I -- it is my understanding the person who actually converts it to a written document works for Southwestern Bell. They're simply obeying a court order.

THE COURT: So it's a Southwestern Bell record?

MR. FARREN: It is, Your Honor, but the problem -- I don't want to mislead the Court.

THE COURT: Okay.

MR. FARREN: The problem is, the affidavits --

THE COURT: Uh-huh.

MR. FARREN: -- that support the introduction of those phone records would not include the PIN registers, because they came to light in a different way.

MS. McELROY: They got these records from the DEA agent, that got forwarded to you all. And so they came from the DEA to the DA's office, and so --

MR. FARREN: When we introduced those we did not realize that we had some PIN register records in with all of those phone records.

THE COURT: So the affidavit introducing them is wrong.

MS. McELROY: Yes.

MR. FARREN: The affidavit introducing the records is correct, it just doesn't make reference to some documents that ended up in evidence, because we didn't realize those weren't a part of the regular phone records. They look basically the same, but we agree with co-counsel --

THE COURT: I'm still a little confused. Are you saying what happened on the State's exhibit that I've already admitted is that there's an affidavit and it is attached to a pile of phone documentation, and that somehow the federal -- the DEA -- the stuff from the DEA got intermixed in there before they -- the affidavit was stapled to it?

MR. FARREN: That's correct, Your Honor. That's correct.

In other words, we -- when we were putting this together -- they looked on paper very similar, and so we simply did not realize at that time the PIN register -- that that information came from the PIN register.

0:03:43 THE COURT: The vast majority of those records are, of course, do make correct reference -- the affidavits do make correct reference to the vast majority of these phone records, but the ones that came from the PIN register are not documents to which those affidavits refer. That is correct.

0:04:01 MS. McELROY: Your Honor --

0:04:02 THE COURT: Well, I need somebody to refer to the specific State's exhibits that contain these pen registers.

0:04:10 MS. McELROY: State's Exhibit No. 11 contains Dustin Pool's PIN register records in it.

0:04:16 THE COURT: Okay. So, again, I need to know your objection. They are already in evidence. What is your objection?

0:04:23 MS. McELROY: Our objection, Your Honor, is that they are improperly -- they have been improperly admitted. And I believe they aren't admissible under a business record's affidavit. And they weren't properly proffered to the Court, and so we are re-submitting our objection at this time before this comes before the jury, and --

0:04:48 THE COURT: I'd like to put something in the record here. States 11 has not been published to the jury yet.

0:04:55 MS. McELROY: Right. That's correct.

0:04:57 MR. WATKINS: That's correct.

0:04:59 MR. FARREN: And, Your Honor, we -- we think that we can make the Court's decision fairly simple in that if -- if we have given the Court incorrect information, unintentionally, that led to the admission of an exhibit, then we would like permission to withdraw the exhibit to a later time.

0:05:18 THE COURT: Okay. I think that's appropriate. I can certainly understand how this happens. I can't imagine looking at a pile of documents that deep and thinking they're perfect.

MR. FARREN: Well, we just didn't realize --

0:05:30 THE COURT: I know how that can happen.

0:05:32 MR. FARREN: -- if they were PIN registers, and we certainly do not want an exhibit admitted that's not properly included in an affidavit.

0:05:40 THE COURT: I will grant your request to withdraw State's 11. And what I'd ask you to do is try to figure out -- if you're going to bring it back in some fashion, including this --

0:05:53 MR. FARREN: Your Honor, when I say withdraw the exhibit, I guess I should explain to the Court, it would only be a portion of Exhibit 11, because part of it is -- are records of Dustin Pool, but I think we both

agree now which portion is PIN register and -- and we would like to withdraw that portion and let the rest of Exhibit 11 remain in evidence.

THE COURT: Do you have any objection to that, Ms. McElroy?

MS. McELROY: Your Honor, our specific objection is to the PIN registers.

THE COURT: So -- so you have no objection to me leaving the -- I don't know how to say it. I guess just the ordinary Southwestern Bell telephone records in State's 11 and leaving it in evidence?

MS. McELROY: Yes.

MR. WATKINS: Your Honor, they're actually --

MS. McELROY: The Sprint ones.

THE COURT: I'm sorry. Sprint. Okay. They're all the same. Everyone knows that.

MS. McELROY: We're just asking that the Dustin Pool records be taken out.

MR. FARREN: Right.

MS. McELROY: The PIN register.

MR. FARREN: And the remainder of State's Exhibit 11 are phone records that are -- are -- that are referred to by the affidavit.

THE COURT: Okay. With that objection, we

will -- we will allow this redaction out of State's 11 of the PIN register records -- so-called PIN register records.

Have you finished your first objection?

MS. McELROY: Yes, Your Honor.

THE COURT: Huh?

MS. McELROY: Yes, Your Honor. We finished the first one.

THE COURT: Well, have you?

MS. McELROY: Yes.

THE COURT: I haven't made any ruling on 255, yet.

MS. McELROY: I'm sorry.

THE COURT: What -- what -- I'm having a hard time understanding your objection. Let me -- let me see if I can clarify this.

MS. McELROY: Okay.

THE COURT: Does your objection have to do with 255, or did it have to do with State's 11?

MS. McELROY: It has to do with 255, Your Honor.

THE COURT: I thought so. Again, restate your first objection you have.

MS. McELROY: We're asking that these be taken out, because they cannot be very verified --

THE COURT: Which one?

MS. McELROY: We're asking that this chart be excluded.

THE COURT: The whole chart?

MS. McELROY: Yes. Because there are items that aren't contained -- this is being offered as a summary.

THE COURT: That's correct.

MS. McELROY: And there are items they are referencing throughout the chart that haven't been -- contained in the chart and admissible in evidence.

THE COURT: Okay. I'm going to -- I'm going to require you to show me specifically which ones.

MS. McELROY: Okay. Your Honor, in reference to the second call that is listed --

THE COURT: Yes.

MS. McELROY: -- we've already done that objection. March 10th. Time: 2:54. Caller: Tori Patrick. Receiver: Dustin Pool.

THE COURT: Okay.

MS. McELROY: The second one, March 10th. Time: 3:12. A call from Dustin Pool to Tori Patrick.

THE COURT: Okay.

MS. McELROY: The next one our objection is on March 10th -- sorry. March 10th, 3:39, from Dustin

Pool to Tori Patrick.

THE COURT: Okay.

MS. McELROY: Those we object to, based on the fact that this is a summary and the records are not in evidence.

THE COURT: Are there any other phone calls that you object to on that basis, in 255?

MS. McELROY: Not on that same basis, Your Honor.

THE COURT: All right. I'll grant your objection on those three calls. Not on the entirety of 255, yet.

What's your second objection.

MS. McELROY: Our second objection, Your Honor, has to do with a phone call made March 10th, 3:28, Ray Placensio to Dustin Pool. And then, again, March 10th, 3:45, from Ray Placensio to Dustin Pool.

These are based on hearsay statements from Rebecca Certa (phonetic), saying that Ray told her that he talked to someone.

It says on here -- it references on the deal that it reference Certa's statement over here.

THE COURT: Are you saying -- are you saying that there's -- there are items in here that are taken from statements?

MS. McELROY: Yes.

THE COURT: Not from admitted evidence?

MS. McELROY: Your Honor, what we're getting at is, that she's saying that her phone number that she left with Ray, and then we'll never get to cross-examine Ray and say, okay, Ray, did you call --

THE COURT: Granted.

What is the next objection?

MS. McELROY: The other -- the other objection that we have is an inadmissibility argument, Your Honor, that is on each and every one of these in which the calls are listed and they're referencing a line of people's statements.

Our position is, Your Honor, that this is impermissible bolstering of the witnesses. It is --

THE COURT: Well, it's obvious that this is more than a mere summary of business records. I'm going to exclude all of 255.

Bring the jury back in.

(Jury seated.)

THE COURT: Thank you, ladies and gentlemen. Everyone be seated. Go ahead Mr. Farren.

MR. FARREN: Thank you, Your Honor.

DIRECT EXAMINATION (CONTINUED)

BY MR. FARREN:

0:12:08 Q. Now, Detective Brown, I want you to -- I want you to make you aware that there are a large number of phone records that have been admitted into evidence under business record's affidavits. And uh -- we have visited earlier about these records, and, in fact, on many occasions, haven't we?

0:12:30 A. Yes.

0:12:30 Q. And these are records that you and other investigators, they've assisted you, gathered during the course of your investigation. Is that correct?

A. Yes, sir.

0:12:40 Q. You obtained those by issuing subpoenas out of our office to the various phone companies?

0:12:47 A. That's correct.

0:12:47 Q. Have you reviewed those phone records and did you use those phone records in the course of your investigation?

0:12:53 A. Yes.

0:13:01 Q. In the course of your investigation, and in reviewing those records --

0:13:07 MR. FARREN: May I approach the witness, Your Honor?

0:13:09 THE COURT: Yes.

0:13:11 Q. (BY MR. FARREN) This is just so you and I can stay on the same dates, and so forth. Are you aware of

0:13:16 any phone calls from -- from a number associated with
0:13:21 Stephen Craig Kimberlin to Dustin Pool, on February 6th,
0:13:25 about 12:40 a.m.?

A. Yes, sir.

0:13:28 Q. How many calls were there?

0:13:30 A. Three.

0:13:31 Q. And then on February 6th, about 1:13 to 1:14
0:13:35 a.m., any calls from Josh, a phone associated with Josh
0:13:40 Stocker to Dustin Pool?

0:13:41 A. Yes, sir.

0:13:42 Q. How many calls?

0:13:44 A. Two.

0:13:45 Q. Do you know if the meeting at Stumpy's Lounge
0:13:48 occurred about February 6th, the same time these calls
0:13:52 were made?

0:13:53 A. Yes sir.

0:13:57 Q. Now, you may have already testified about this,
0:14:00 so I apologize if I'm going over it again, I just can't
0:14:03 remember. Is it correct that -- that other than doing a
0:14:12 wiretap or something like that, there's no way to know
0:14:15 what calls are made from a land line to a land line --

0:14:18 A. Right.

0:14:19 Q. -- unless it's long distance?

0:14:20 A. Correct.

0:14:22 Q. There's just no ordinary way that a record is

0:14:25 created of that by the phone company's equipment?
0:14:29 A. That's what I've been informed by the phone
0:14:32 companies.
0:14:32 Q. Now, if -- if a person makes a call from a land
0:14:35 line to a cell phone, the cell phone would record that
0:14:39 incoming number?
0:14:40 A. Yes, sir.
0:14:40 Q. And if a person makes a call from their cell
0:14:44 phone to a land line, again, the cell phone would have a
0:14:48 record of that?
0:14:49 A. Yes, sir.
0:14:50 Q. But there wouldn't be a record on the receiving
0:14:55 end, there would just be a record that that number was
0:14:57 called from the cell phone to the land line?
0:14:57 A. That's correct.
0:15:07 Q. On March 10th -- on March 10th at -- by the way,
0:15:20 when I asked you earlier about some calls on February 6th,
0:15:24 was that February 6th, 2003?
0:15:26 A. Yes, sir.
0:15:26 Q. Okay. On March 10th, do you -- does your review
0:15:33 of the phone records indicate any calls from Josh Stocker
0:15:37 to Michael Stocker in the early morning hours?
0:15:42 A. Yes.
0:15:44 Q. Do you -- based on the records, can you give us
0:15:47 approximately when those calls were made -- or that call?

0:15:57 0:16:09 0:16:13 0:16:19 0:16:22 0:16:26 0:16:30 0:16:31 0:16:33 0:16:35 0:16:38 0:16:43 0:16:44 0:16:46 0:16:52 0:16:58 0:17:01 0:17:02 0:17:05 0:17:27 0:17:31 0:17:38

A. Uh -- 2:43 a.m.

Q. Okay. On March 10th, in the early morning hours, based on your review of the phone records, were there any calls from -- excuse me.

Again, were there any later calls from Michael Stocker to Josh Stocker or vice versa?

A. There were two later calls from Michael Stocker to Josh Stocker.

Q. Was there a call around 4:36 a.m.?

A. Yes, sir.

Q. And then another one around 4:49 a.m.?

A. I'm showing one at 5:04.

Q. I'm sorry. I'm sorry. 5:04 a.m.?

A. Yes, sir.

Q. Do you know if there was a call from Michael Stocker to Tori Patrick during that same time frame, about 4:49 a.m.? And I know this is confusing, I apologize.

A. 4:49?

Q. Yes.

A. Yes. Yes. That one -- that one is in the record.

Q. Okay. Yesterday we talked about State's Exhibit 5, a receipt from Motel 6. Are you now aware of kind of how they measure their days for their billing purposes?

A. Yes, sir.

0:[illegible]3 Q. What time does their billing day begin?
0:17:46 A. 5:00 a.m.
0:17:47 Q. And it ends -- 24 hours later is 5:00 a.m.?
0:17:49 A. 5:00 a.m..
0:17:53 Q. Now, based on the receipt -- State's Exhibit 5,
0:18:02 and the other documents in State's Exhibit 5, can you tell
0:18:09 me approximately when Michael Stocker checked Tori Patrick
0:18:19 into -- or Michael Stocker paid for a room at Motel 6?
0:18:26 According to this record, is it in the early morning hours
):18:31 of March 10th?
):18:37 A. 4:49 a.m.
):18:39 Q. About 4:49 a.m.?
):[illegible]2 A. Yes, sir.
):18:42 Q. And so about 4:49 a.m., Michael Stocker paid cash
):18:49 for a room at the Motel 6, on March 10th, 2003?
):18:54 A. Yes, sir.
):18:54 Q. And according to the phone records, at 5:04 a.m.,
):19:00 Michael Stocker called Josh Stocker?
):19:03 A. Yes, sir.
):19:03 Q. Called him at 4:36, and again at 5:04?
):19:07 A. Yes, sir.
):19:07 MR. FARREN: May I approach the witness,
):19:12 Your Honor?
):19:12 THE COURT: Yes.
):[illegible]4 Q. (BY MR. FARREN) Now, according to the phone

0:19:22
records, again, do you recall if there were any calls from Josh Stocker to Craig Kimberlin in the early morning hours -- to refer to your records -- early morning hours of March 10th?

0:19:32 A. Josh Stocker to Craig Kimberlin?

0:19:35 Q. Yes, sir.

0:19:36 A. Yes, sir.

0:19:36 Q. How many calls?

0:19:39 A. Four of them.

0:19:40 Q. Between 5:59 and 7:27 a.m.?

0:19:44 A. Yes, sir.

0:19:44 Q. And then were there any calls -- after the calls from Josh Stocker to Craig Kimberlin, were there any calls from Craig Kimberlin to Michael Elliston?

A. Yes, sir.

0:19:55 Q. How many calls?

0:19:55 A. Seven.

0:19:56 Q. Between what time?

0:19:58 A. 8:30 to 10:07 a.m.

0:20:02 Q. So Josh Stocker's records show four calls from Kimberlin between 5:59 and 7:27, and then there's seven calls from Kimberlin to Michael Elliston from 8:30 to 10:07 in the morning, beginning -- we're in daylight time by then on March 10th?

A. Yes, sir.

Q. On March 10th, do your records -- do your review of the records indicate any calls from Michael Elliston to Craig Kimberlin?

A. Yes, sir.

Q. How many calls?

A. I'm showing -- showing three.

Q. Okay. The first one about what time?

A. 11:04 a.m.

Q. So we have Mr. Kimberlin calling Mr. Elliston seven times?

A. Yes.

MS. McELROY: Your Honor, I'm confused. Did you say Mr. Elliston to Mr. Kimberlin?

Q. (BY MR. FARREN) I'm sorry. Mr. Kimberlin to Mr. Elliston seven times?

A. Yes.

Q. And then finally a call from Mr. Elliston to Mr. Kimberlin?

A. Yes.

Q. Now, later in the day, on March 10th, does your review of the records show calls from Craig Kimberlin to Josh Bledsoe?

A. Yes.

Q. How many calls? Let me narrow it down for you. From say 12:29, 12:30 to about 1:00, were there any calls

from Kimberlin to Bledsoe?

A. Yes, sir.

Q. How many calls?

A. I'm showing two on this record, but this -- this was for a different purpose. There may have been more.

Q. If the records indicate three calls during that time, would you disagree with that?

A. No, I would not.

Q. Okay. And then around 4:40, 4:55 p.m. on March 10th, do you know if Mr. Kimberlin, again, called Josh Bledsoe?

A. Yes.

Q. And then around 5:00, did Mr. Kimberlin call Frank Chacon?

A. Yes, he did.

Q. Now, on that same day, going into the afternoon, 5:30 until about midnight, were there any calls from Josh Stocker to the La Quinta Inn?

A. Yes, sir.

Q. About how many calls do you recall?

A. I believe I have four. Yeah, four.

Q. Between 5:30 and 11:40?

A. Yes, sir.

Q. Now, during that same time frame, about 10:00 p.m., this would be late on March 10th, do you show

0[illegible]6 a record on Mr. Kimberlin making a call to Destry Keeling?
0:23:00 A. Yes, I do. Not on the 10th. The -- the record I
0:23:05 have here is on the 11th.
0:23:07 Q. Is it in the early morning hours on the 11th?
0:23:11 A. Yes, sir.
0:23:13 Q. All right. Then uh -- so now we've gone from the
0:23:22 early morning hours when Mr. Stocker was calling
0:23:26 Mr. Kimberlin, and then Mr. Kimberlin was calling
0:23:28 Mr. Elliston, and Mr. Elliston finally called
0:23:31 Mr. Kimberlin back after seven calls. And we've got calls
0:23:34 front Kimberlin to Bledsoe and Chacon in the afternoon?
0:23:39 A. Yes, sir.
0[illegible]9 Q. We've got Stocker calling the La Quinta Inn late
0:23:43 into the 10th?
0:23:45 A. Yes.
0:23:46 MS. McELROY: Objection, Your Honor;
leading.
0:23:48 MR. FARREN: Well, I'm summarizing evidence.
0:23:50 THE COURT: I'll overrule the objection.
0:23:51 Q. (BY MR. FARREN) And then we're in the early
0:23:52 morning hours of the 11th. Is that correct?
0:23:54 A. That's correct.
0:23:54 Q. The early morning hours of the 11th, do your
0:23:57 records -- your review of the records show any calls from
[illegible]1 Destry Keeling to Mr. Kimberlin?

A. Yes.
Q. About what time? Is that around 2:06?
A. Yes.
Q. So if there were testimony earlier of a trip by Mr. Keeling up to Lake Meredith in the early morning hours of the 11th, to meet Josh Stocker and Josh Bledsoe, this would -- your records would indicate a call from Mr. Keeling to Mr. Kimberlin in that same general time frame?
A. Yes, sir.
Q. In that time frame, do your review of the records show a call from Mr. Kimberlin and Mr. Bledsoe?
A. Yes.
Q. About 2:28 a.m.?
A. Yes, sir.
Q. By the way, if there were testimony earlier in the record that Mr. Kimberlin had called Michael Elliston and told him to bring a box to Amarillo on the morning of the 10th, the seven calls you made reference to earlier would be in that time frame?
A. Yes.
Q. Now, on March 11th, in the early morning hours between -- about 3:30 and 4:30, do your records show another call from Mr. Kimberlin to Mr. Keeling?
A. Yes.

0:25:26
Q. About 3:41?
A. Yes, sir.
0:25:30
Q. Now, if there were testimony earlier that a trip was made to Lake Meredith with the body of Dustin Pool, by Josh Stocker and Josh Bledsoe, to meet Destry Keeling and his wife, Denise Keeling, but that problems arose and they couldn't get in the house, and that subsequently, Mr. Bledsoe panicked and left with the body. In the early morning hours, did you -- do your records reflect any calls from Mr. Kimberlin to Destry Keeling between 4:29 and 4:36 a.m.
0:26:09
A. Yes, sir.
0:26:10
Q. How many calls?
0:26:12
A. One.
0:26:14
Q. Okay. Keep reviewing the other --
0:26:16
A. The other records? The other records reflect five calls.
0:26:20
Q. Okay. So suddenly it's 4 -- it's between 4:29 and 4:36 a.m., at a time when we have testimony of some events at Lake Meredith, we have -- suddenly have five phone calls in about ten minutes?
0:26:35
A. Yes.
0:26:38
Q. Are there any phone calls from Mr. Kimberlin to Mr. Bledsoe in that same time frame?
A. Yes, sir.

Q. How many phone calls?
A. Three.
Q. Now, if there were testimony earlier -- well, let me ask you this first. Later, between 4:30 and about 6:12 a.m. -- 4:41 and 6:12, do your records show calls from Bledsoe to Kimberlin?
A. Yes, sir.
Q. How many calls?
A. Nine.
Q. Nine calls from 4:41 to 6:12?
A. Yes.
Q. If there were testimony earlier that Mr. Bledsoe was persuaded to return to the lake after he had panicked, but by that time Mr. Stocker and the Keelings had left, those nine phone calls would be in that general time frame from Bledsoe to Kimberlin?
A. Very consistent with it, yes.
Q. At 6:19 a.m., do your records indicate a call from Kimberlin to Frank Chacon?
A. Yes.
Q. At 6:23 from Kimberlin to Bledsoe?
A. Yes.
Q. And, finally, at 6:58 on the morning of the 11th, a call from Kimberlin to Tyler Hale?
A. Yes, sir.

Q. Now, if there was testimony earlier that Mr. Kimberlin finally conceded defeat at the lake, and told Mr. Bledsoe to come back to Amarillo and meet him at 46th and Washington at the United, and that eventually plans were made, and, in fact, carried out to take the body to Tyler Hale's garage?

A. That would be very consistent with that phone call.

Q. Now, do your records indicate on the 11th later that morning -- well, later that morning, around 8:30 to 8:40, Josh Stocker called the Comfort Inn?

A. Yes, sir.

Q. And, finally, even later in the day, as its dark at 10:14 and 11:42, did Kimberlin call Tyler Hale?

A. Yes. Both times.

Q. Again, without -- without telling us what everyone said, in the course of your investigation, did you visit with and take statement -- a statement or statements from Tori Patrick?

A. Yes, sir.

Q. Did you visit with and take a statement or statements from Guinn Garcia?

A. Yes, sir.

Q. Did you visit with and take a statement or statements from Destry Keeling?

0:29:43 A. Yes, sir, I did.
0:29:44 Q. Did you visit with and take a statement or statements from Josh Bledsoe?
0:29:47 A. Yes, sir.
0:29:49 Q. Did you visit with -- visit with and take statements from numerous other individuals to whom we have made reference in the last few minutes in testimony about the phone calls?
0:30:00 A. All of them.
0:30:02 Q. And based on your review of the phone call records and the statements that you took, are the statements consistent with the information you see in the phone calls or inconsistent?
0:30:12 A. Consistent.
0:30:13 MR. FARREN: Pass the witness.

CROSS EXAMINATION

0:30:21 BY MS. McELROY:
0:30:21 Q. Mr. Brown, in review of these many phone records, when you are looking at someone's records, you can't tell whether that person is actually using that phone, can you?
0:30:34 A. No, ma'am.
0:30:35 Q. There's no indication if you corresponded to someone else, if that's the person actually answering the one that shows that it's being called to?
0:30:43 A. No, ma'am.

0:30:44 Q. In your experience in law enforcement, would you agree with me that oftentimes people that are in this sort of business carry many cell phones with them?

0:30:56 A. Yes.

0:30:57 Q. And have many phone numbers?

0:30:58 A. Yes.

0:30:59 Q. And can you tell me, Mr. Brown, who Stephen Craig Kimberlin's records were in?

0:31:07 A. Michael Marquez (phonetic).

0:31:09 Q. Okay. And who were Destry Keeling's phone numbers in?

0:31:13 A. Bobby Johnson.

0:31:14 Q. Who were -- who were any of the other people who actually was their -- it wasn't their name on any of the cell phone records?

0:31:24 A. I think there's one or two others, but you'll have to bring up the names.

0:31:29 Q. Okay.

0:31:31 A. Corresponds --

0:31:32 Q. Did Mr. Bledsoe have records in his name, or would they have been in Miguel Gonzales' name?

0:31:38 A. No, I don't think they were Miguel.

0:31:41 Q. Sorry. Would it have been Talmo's (phonetic) name?

0:31:45 A. Yes, Robert Talmo.

Q. Okay. So this was sort of a frequent occurrence, would you say?

A. Yes.

Q. Do you ever find out who Daniel Jacques (phonetic) is?

A. No, I didn't.

Q. Okay. There was testimony earlier from Jessica Kimberlin that Mr. Kimberlin had cell phone records and numbers from Brian McGavic's (phonetic) -- in the name of Brian McGavic and other people. Did you pull those records, too?

A. I have some of them, but they were at a time period that I wasn't really keying on. I wasn't in the drug investigation. My intent was the missing person, slash, homicide. I kind of tried to keep my focus between the early days in March, forward.

Q. In -- in reference to the testimony that you gave earlier to Mr. Farren, as far as phone calls between certain parties and certain parties, what we're really talking about is from a certain number to a certain number. Is that more accurate?

A. Correct. Correct.

Q. Now, Mr. Brown, you would agree with me that there is no way to tell that these people, based on what line it is, are the people that are actually using the

phone?

A. On what line?

Q. On whatever phone line.

A. Telephone line?

Q. Yes, sir.

A. No. I'll agree with you.

Q. And you would also agree with me, wouldn't you, that there's a distinct possibility that they were using more than one telephone?

A. Yes.

Q. Would it also be possible that a phone could be given to another person? Is that something that happens fairly frequently?

A. Certainly.

Q. Would they have passed different phones around to the different people?

A. I'm sure they do.

Q. When you went to speak to each of these individuals, you took statements from these people. Correct?

A. Yes.

Q. Did you show them the phone records?

A. No.

Q. Did you ask them if they'd gotten phone calls, based on reviewing the phone records?

A. I asked them if they had received phone calls or made phone calls. Primarily, asking them what happened, and in the process of them telling me what happened, they would tell me that they or someone else made a phone call. I then went to the phone records to verify that.

Q. Okay. You -- you didn't think it odd that they would remember a phone call from five or six months before you actually spoke with them?

A. No. This was a pretty traumatic thing in most of their minds. A lot of it was well remembered.

Q. Could you tell me on an average how many phone calls these folks would make in a day?

A. I would hate to make a guess. Numerous.

Q. Would it -- would it be what you would consider voluminous?

A. Yes, I would.

Q. These were -- these were frequent callers, were they not?

A. Yes.

Q. And often calls would run way into the late night and early morning hours?

A. 24-7.

Q. Would it -- would you agree with me, that there's over 700 calls in 36 hours in these records between what is submitted up there?

0:35:06 A. I would certainly not disagree.
0:35:12 Q. Tedious work, Mr. Brown. Tedious work.
0:35:19 In reference to -- to the phone calls, there again, we don't have any idea -- based on a printout from the phone company, we wouldn't have any idea what was being said? This isn't a wiretap?
0:35:36 A. No. No.
0:35:38 Q. Okay. And would you agree with me that probably the amount of phone calls might have to have something to do with the drug usage?
0:35:50 A. Some of them, yes. The time frame that I was focused on was primarily to deal with Dustin Pool.
0:35:59 Q. Yes, sir.
0:35:59 A. And I didn't look at any of the other records, unless I was wanting to check to see what they said was true.
0:36:07 Q. So you -- you went through these records with a purpose. Is that right?
0:36:11 A. Yes. Yes.
0:36:12 Q. So you were keyed into specific times, and specific dates, and whatever?
0:36:15 A. Yes. In an area that they described.
0:36:19 MS. McELROY: I'll pass the witness.

REDIRECT EXAMINATION

0:36:26 BY MR. FARREN:

Q. A moment ago you were asked by Defense counsel about talking to these people, and them telling you about phone calls. In fact, you were even asked how could they possibly remember phone calls from that far back. Do you recall that?

A. Yes.

Q. Do you recall explaining, well, you know, you might not remember calling saying pick up eggs on the way home, but calling in reference to a homicide might make a little more impression on your mind?

A. Yes.

Q. Did you ask Tori Patrick if she called Dustin Pool on the late evening hours of the 9th and the early morning hours of the 10th?

A. No.

Q. Did she tell you she did though?

A. Yes.

Q. And did she indicate why she called him?

A. To get him to come to her apartment.

Q. Okay. Now, again, if those calls were made from a land line to a land line, there's no way for you to get a record of that?

A. You couldn't verify it, no.

Q. Did -- we talked yesterday, and, again, I just lost track, so correct me if I'm going into an area we

have already covered.

In the course of your homicide investigation, did you become aware of increasing attention and hostility between Pool's group and Kimberlin's group?

A. Yes.

MR. FARREN: Okay. Pass the witness.

RECROSS EXAMINATION

BY MS. McELROY:

Q. Mr. Brown, you specifically looked for one number for one person, connected to one number for one person. Is that right?

A. Yes. Yes.

Q. And your perspective or overview was in a very limited time frame and scheme?

A. That -- that was my focal point, yes.

MS. McELROY: May I? Are the photos that you introduced over here?

MR. FARREN: I think they're all up there. I think some are there and some are there.

MS. McELROY: May I approach the witness?

THE COURT: Yes, ma'am.

MS. McELROY: Sorry.

THE COURT: Those -- those may be this mornings.

MS. McELROY: Okay. That's the ones I was looking for.

Q. (BY MS. McELROY) I think Mr. Farren and you discussed some pictures here about some stairs, and I'm digging through here to find the ones of the stairs.

Here is the picture of the stairs. I believe it's State's Exhibit 194, and this is State's 196. And you were actually in the farm?

A. Yes.

Q. And are these stairs wooden?

A. Yes.

Q. Okay. And the landing is wooden?

A. Uh-huh.

Q. All right. Now, did they collect evidence on these stairs, do you know?

A. I believe that they did.

Q. Okay. But that would have been another officer. Right?

A. Yes.

Q. An ID tech?

A. Correct.

MS. McELROY: Pass the witness.

MR. FARREN: We have nothing further of this witness, Your Honor. We may need to recall him later, but at this time, we have no other questions.

THE COURT: That seems likely. You may step down, Detective. Thank you.

THE WITNESS: Thank you, Judge.

MR. FOWLER: Your Honor, we call Tori Patrick.

THE COURT: Ms. Patrick, would you raise your right hand.

(Witness sworn.)

THE COURT: All right. It will be all right, just sit right down there.

MR. FARREN: May I approach, Your Honor? We're are going to need these.

THE COURT: All right. Thank you.

TORI PATRICK,

having been first duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. FOWLER

Q. Would you please state your full name.

A. Tori Brook Keeler (phonetic) Patrick.

Q. Ma'am, how old are you?

A. Twenty-six.

Q. Where do you work?

A. At Tejas Broadcast.

Q. What -- are you married?

A. Divorced.

Q. Do you have any children?
A. One.
Q. How old is your child?
A. Four years old.
Q. And that's a son?
A. Yes.
Q. And what's your son's name?
A. Kadden Dean Patrick (phonetic).
Q. Ms. Patrick, do you understand that you are charged with capital murder --
A. Yes, sir.
Q. -- as a result of this case?
A. Yes, sir.
Q. And you and your attorney have reached an agreement with Mr. Farren in our office, for you to testify in this case. Is that right?
A. Yes, sir.
Q. What is your understanding of the agreement that you have with Mr. Farren, and our office?
A. That I'm -- I don't understand what you mean.
Q. Well, what -- what is your understanding of the agreement that has been reached between you and your attorney, and Mr. Farren and our office? What is your deal, or do you have a deal?
A. I don't have anything promised from y'all. All I

0:42:42 know is that if I testify it may be a little bit better.
0:42:47 I'm testifying anyway, because I can't sleep with this on
0:42:49 my mind.
0:42:50 Q. Okay. Tori, and if you could, maybe speak a
0:42:51 little bit closer to the microphone. You have a soft
0:42:55 voice there.
0:42:56 A. I'm sorry.
0:42:57 Q. So as a -- part of the agreement you've reached
0:43:00 is that there really is no agreement --
0:43:02 A. I have no agreement whatsoever.
0:43:04 Q. Okay.
0:43:04 A. I have nothing.
0:43:07 Q. And as a part of the agreement, you have to tell
0:43:11 the truth. Is that correct?
0:43:12 A. Well, yes, sir.
0:43:13 Q. And do you know Josh Stocker?
A. Yes, sir.
0:43:28 Q. Do you see him here in this courtroom?
0:43:31 A. Yes, sir.
0:43:31 Q. Can you point him out for us?
0:43:33 A. (Witness pointing).
0:43:34 Q. Can you describe an article of clothing he's
0:43:38 wearing?
0:43:38 A. Yes. He's wearing a blue tie.
0:43:42 Q. Is he also wearing a --

0:43:47
A. And a peach colored button down shirt.

0:43:47 Q. A peach button up shirt.

0:43:48 MR. FOWLER: Your Honor, I'd asked the

0:43:50 record to reflect that Ms. Patrick has identified the Defendant.

0:43:54 THE COURT: The record will so reflect.

0:43:56 Q. (BY MR. FOWLER) Did you come to know Josh

0:43:58 Stocker in the year 2003?

0:44:00 A. I knew him before that.

0:44:02 Q. Okay. So let's -- let's start from the

0:44:03 beginning. How did you first know Josh Stocker?

0:44:05 A. I met him at Grace Community Church.

0:44:07 Q. Okay. What ages were you and Josh when you met

0:44:10 him at the church?

0:44:11 A. About 15 -- 14, 15.

0:44:13 Q. Okay. And did you and him come to know each

0:44:17 other from services --

0:44:18 A. Yes.

0:44:18 Q. -- and Sunday school?

0:44:20 A. Yes.

0:44:22 Q. Say after -- what high school did you go to?

0:44:24 A. Randall High School.

0:44:25 Q. And did you graduate?

0:44:27 A. Yes, sir.

0:44:27 Q. And when -- what year did you graduate?

A. 1997.

Q. After you graduated from high school, did you maintain a friendship with Mr. Stocker?

A. No.

Q. When did you first become reacquainted with Mr. Stocker?

A. In 2003.

Q. Okay. Under what circumstances did you become reacquainted with Mr. Stocker?

A. I actually told Guinn that I was going to sell a car stereo that I had, and uh -- she told me she knew a guy that wanted to purchase the stereo, and that's when I met Josh again after all of this time.

Q. Okay. And the Guinn you're talking about is a lady by the name of Guinn Garcia?

A. Yes, sir.

Q. And at the time period in 2002 and 2003, you and her were good friends?

A. Yes.

Q. And so you're looking to sell a car stereo, and you mention it to her, and she says Josh Stocker may by interested?

A. Actually, she didn't say Josh Stocker. She said Josh, and I didn't know until he came that she was talking about Josh Stocker.

Q. Okay. And when you became reacquainted with him, where did he come to, what location?

A. My apartment at River Falls, G-373.

Q. And when he came to your apartment, did you realize, hey, we know each other from church way back when?

A. Yes.

Q. And did Mr. Stocker purchase the stereo from you?

A. Yes, he did, but not directly from me.

Q. Who -- who did he purchase the stereo?

A. Guinn. He gave the money to Guinn.

Q. And what kind of stereo was this, again?

A. I believe a Pioneer brand car stereo.

Q. I'm sorry?

A. Just a Pioneer brand car stereo.

Q. A car stereo. And was this the speakers, or the deck that you put into your dashboard, or --

A. Only the deck with a remote.

Q. Okay. After you sold him the stereo, did you ever hang out with Josh Stocker?

A. Like? Yes, for just a couple of times after that.

Q. Okay. And was he really more friends with Guinn than he was with you?

A. Yes.

0:46:38 Q. Okay. How would you characterize his friendship with Guinn at the time?
0:46:46 A. They just used to hang out together. Go drive around together. And then from what Guinn has told me, they messed around and things, you know.
0:46:58 Q. Okay.
0:47:01 A. Other than that. . .
0:47:03 Q. So Josh Stocker and Guinn Garcia were good friends and may have been romantic at some point or another?
0:47:11 A. Yes.
0:47:15 Q. Okay. Now, did you also, in 2003, know Dustin Pool?
0:47:21 A. Yes, sir.
0:47:21 Q. How did you come to know Dustin?
0:47:24 A. Through Guinn.
0:47:26 Q. And how would you characterize Guinn's relationship with Dustin Pool?
0:47:30 A. He was her drug dealer.
0:47:33 Q. And did Guinn introduce you to Dustin?
0:47:36 A. Yes.
0:47:37 Q. And before March 9th, 2003, how many times do you think you met Dustin Pool?
0:47:44 A. I don't know.
0:47:45 Q. Okay. Would it be a handful, a dozen, 20 times?

0:47:50 A. Probably about a dozen times.

0:47:53 Q. Now, did you ever hang out as friends with Dustin Pool before March 9th, 2003?

0:48:01 A. Yes.

0:48:02 Q. Before March 9th, 2003, did Dustin Pool ever express a romantic interest in you?

0:48:11 A. Yes.

0:48:12 Q. Okay. Were you accepting of those advances to you or did you rebuff them?

0:48:21 A. I rebuffed.

0:48:22 Q. You turned him down --

0:48:24 A. Yes.

0:48:24 Q. -- I guess is a better word?

0:48:28 Before March 9th, 2003, did Dustin Pool ever indicate to you that he had concerns about his safety?

0:48:36 A. Yes.

0:48:36 Q. What concerns did he indicate to you?

0:48:40 A. All he told me was that there was a group --

0:48:43 MR. WATKINS: I'm going to object to hearsay as to what Dustin Pool told her.

0:48:48 MR. FOWLER: Your Honor, I believe it goes to the state of mind of the victim.

0:48:51 THE COURT: I'll overrule the objection. You may answer.

0:48:53 A. He had told me that there was a group of people

0:49:03 that were after him and wanted to kill him, which I rode
0:49:01 in his car one time and his windshield had been busted
0:49:05 out, had been shot out.
0:49:07 Q. (BY MR. FOWLER) Did he say who was involved in
0:49:09 this group of people who was after him?
0:49:10 A. I asked him that, and he said it was nobody that
0:49:13 I knew. They were up in the gang.
0:49:23 Q. When he expressed these concerns to you, did he
0:49:25 appear to be worried about it?
0:49:27 A. Not really.
0:49:28 Q. Okay. And so did he tell you what his reaction,
0:49:35 or what did he --
0:49:37 MR. WATKINS: I'm going to object again. He
0:49:39 said it was going toward the state of mind, but she just
0:49:43 testified he wasn't worried about this.
0:49:46 MR. FARREN: It's just --
0:49:49 THE COURT: Do you have --
0:49:51 MR. FOWLER: Your Honor, he wasn't worried
0:49:52 about it, that goes to his state of mind.
0:49:55 THE COURT: That's right. I'll overrule the
0:49:57 objection again.
0:50:01 Q. (BY MR. FOWLER) Did he tell you anything he did
0:50:03 in response to this group's threats to him?
0:50:07 A. He didn't tell me anything he did, he just said
0:50:10 that he would -- he wasn't worried about it. That it

0:50:12
would be handled from his side. You know, that is just his --.

0:50:20
Q. Did Josh Stocker, before March 9th, 2003, ever mention to you tensions he had with Dustin Pool?

0:50:30
A. Not to me, but to Guinn.

0:50:33
Q. And Guinn would relay that to you?

0:50:36
A. Yes.

0:50:37
Q. Did Josh Stocker before March 9th, 2003, ever ask you or Guinn to do any type of surveillance on Dustin Pool?

0:50:48
A. Just one time he asked Guinn -- for us to drive by a house, and we did. And Dustin's car was there, and we stopped at a pay phone, if I remember correctly, or Guinn used her cell phone, I don't remember for sure, and called Josh and told him he was at that location.

0:51:04
Q. And so you and Guinn got in a car and drove by Dustin's house?

0:51:07
A. Not by Dustin's house, by another house that Dustin was at.

0:51:10
Q. And did you see Dustin's vehicle there?

0:51:12
A. Yes.

0:51:12
Q. And then after you saw his vehicle you called -- or somebody -- Guinn called Josh and told him what you found?

0:51:18
A. Yes.

Q. On March 9th -- or before March 9th, 2003, did Josh Stocker ever approach you about setting up Dustin Pool?

A. No.

Q. On March 9th, 2003, did Josh Stocker approach you about setting up Dustin Pool?

A. Yes.

Q. Can you tell the jury what -- what were you doing on March 9th, 2003?

A. I don't remember exactly. I know I was at my house, Guinn was there, Josh was there, and eventually Michael was there, and we were getting high. Me and Guinn were, at least.

Q. What were you getting high on?

A. Methamphetamine.

Q. So -- and at this time period, you were a user of methamphetamine?

A. I had been clean for three years, until two days before this.

Q. And so who first brought up, if you remember, the subject of setting up Dustin Pool?

A. Guinn and Josh together. I don't remember who first, or nothing.

Q. And what -- what was said first about the Dustin Pool subject?

A. Josh was talking about that he didn't like Dustin, and Guinn brought up the fact during that statement that Josh -- that I knew Dustin, and Dustin had called me numerous times, and Guinn told Josh that.

Q. Okay. You knew Dustin Pool through Guinn?

A. Yes.

Q. Did Guinn ever tell you, hey, I know Dustin Pool, too?

A. Yeah, he knew she knew him.

Q. Okay. So everyone was aware in this conversation that Guinn knew Dustin Pool?

A. Yes. But they weren't getting along at that time.

Q. And were you asked to do anything concerning Dustin Pool?

A. Yes.

Q. What were you asked to do?

A. To call and get him over to my apartment.

Q. How many times on March 9th, 2003, were you asked to get Dustin Pool over to your apartment?

A. Several.

Q. Okay.

A. By Guinn and Josh.

Q. And what was your initial reaction?

A. At first, I told Guinn I didn't -- I didn't want

to, but --

Q. Why did you not want to set up Dustin Pool, initially?

A. I didn't want to get involved at first, with anything -- anybody getting hurt.

Q. And did they say what would happen to Dustin Pool if you were successful in getting him to your apartment?

A. No. All I was told is that Josh wanted to fight him. That he couldn't ever get Dustin to come out of his house to meet him. They tried numerous times, but Dustin wouldn't meet him. That they wouldn't do it in my apartment.

Q. Okay. About how many times, roughly, were you asked to get Dustin over to your apartment on March 9th?

A. I don't know how many times. They -- they asked me for about two hours, off and on. I don't know.

Q. Okay. And do you think they were -- were they pursuing this subject actively with you when -- when the three of you were hanging out at your apartment?

A. We had -- we would talk about it for a minute, but then we would talk about something else. Yeah, it came up in conversation.

Q. And at some point, did you eventually agree to try to lure Dustin Pool to your apartment?

A. Yes, sir.

Q. Why did you relent and agree to get him over there?

A. So that they would stop asking me to do it. I really didn't think Dustin would call me back. A lot of times you'd call Dustin and you don't get a return call until a day or two later.

Q. Now, during this conversation, was money ever discussed --

A. No. No amount was discussed or anything like that.

Q. In general terms, was money ever discussed? That is, you would be rewarded if you helped set up Dustin Pool?

A. I knew -- I would say yeah, it was.

Q. So you agreed to call Dustin because, one, you want to get them off of your back and stop bugging you, but also --

A. Yes, sir. I didn't think he would show up or call.

Q. -- but also there was some kind of talk you might get some money out of this?

A. I don't know that the money was said, but, yes.

Q. And so do you remember approximately what time you called Dustin Pool?

A. I don't. I would guess around 11:00, but I don't

know.

Q. Did anybody answer?

A. No.

Q. Did you leave a message?

A. No.

Q. Do you remember Dustin's cell phone number back then?

A. I --

Q. If you don't remember --

A. I might remember part of it.

Q. 584-1515?

A. Yes.

Q. Was that the phone number you called?

A. Yes.

Q. After you called him and got no answer, then what happened?

A. Uh -- I don't remember if he called me back then -- I think I called again and he didn't answer. And then I just didn't call anymore, and then he called later -- way later in the early hours of Monday morning.

Q. Okay. Before you made the calls to Dustin, what were you -- what was the plan? What were you going to say to him to try to get him over to your apartment?

A. I really didn't know.

Q. But the point of the two phone calls was to try

0:57:03 to get him to your apartment?
0:57:05 A. Really, if he would have answered, I wouldn't
0:57:07 have to say a whole lot to get him over there.
0:57:10 Q. Okay. Because of his romantic interest in you?
0:57:13 A. He's that way with every female pretty much.
0:57:17 Q. So he was a lady's man, I guess you could say?
0:57:20 A. In his eyes, uh-huh.
0:57:23 Q. And so you called twice. The second time did you
0:57:26 get an answer or not?
0:57:27 A. No.
0:57:28 Q. Did you leave a voicemail?
0:57:30 A. Not that I remember.
0:57:32 Q. And is it still the three of you in your
0:57:35 apartment, Guinn, Josh Stocker and you?
0:57:37 A. I believe so.
0:57:50 Q. While you, Guinn and Josh Stocker were at your
0:57:55 apartment, did Josh make any phone calls to anybody?
0:57:57 A. He was on the phone, yes.
0:57:58 Q. Do you remember anybody in particular he was
0:58:00 calling?
0:58:02 A. Not for sure. I know that he tried to call
0:58:05 Dustin a couple of times --
0:58:07 Q. Okay. Did --
0:58:10 A. -- from the home phone.
0:58:12 Q. From your home phone? Did Josh Stocker's

brother, Michael Stocker, eventually come to your apartment?

A. Yes, sir.

Q. Do you know how he got there or who summoned him to go there?

A. Well, I know he brought his truck over there.

Q. Okay. I mean, did Josh call him?

A. Yes, Josh called him.

Q. Do you remember approximately what time Michael came over?

A. No, I don't.

Q. Okay. Do you think it would be late at night, early morning hours --

A. Yeah. It was midnight probably, or maybe a little bit after that.

Q. And when Michael got there, was Guinn still there?

A. Yes.

Q. And what happened when Michael came into your apartment?

A. Nothing happened at that point. I mean, him and Josh had gone out to the balcony and smoked at one point, and me and Guinn were inside. And Guinn ended up leaving shortly after that.

Q. Okay. So your apartment there at the Three

0:59:10 Rivers had some kind of balcony or patio you could go outside?

0:59:14 A. Yes, sir.

0:59:14 Q. And so Michael and Josh went outside?

0:59:18 A. To smoke.

0:59:19 Q. To smoke. Okay. Do you know why Michael came to your apartment?

0:59:24 A. Because Josh told him he needed help with something, that he was in trouble.

0:59:30 Q. Did you see Michael bring anything into your apartment when he arrived?

0:59:37 A. No.

0:59:37 Q. Did you see him carry anything to your apartment?

0:59:38 A. No. I know he did bring something in.

THE COURT REPORTER: Excuse me for a second. Thank you.

0:59:57 THE COURT: How are you doing?

0:59:58 Q. (BY MR. FOWLER) Ma'am, what was your last --

1:00:00 A. I know he brought something in, because I saw it later, but I didn't see him bring it in at that time.

1:00:05 Q. Okay. And before -- before we leave your apartment and start getting into the actual event, on March 9th, during the day, did you ever see Josh Stocker with a new wallet?

1:00:22 A. No, I don't -- no.

:23
Q. After Michael arrived, he goes on the balcony and smokes with Josh, what happened after that?

1:00:36
1:00:40 A. They come back inside and Guinn leaves.

1:00:44 Q. Okay. Do you know why Guinn left?

1:00:47 A. Not exactly. She just said she was going to go with Chad Spanel.

1:00:50
1:00:51 Q. Did Chad Spanel actually come into your apartment?

1:00:55 A. No, he didn't.

1:00:56 Q. How did she know Chad was there at the complex?

1:00:59 A. By cell phone.

1:01:00 Q. Okay. And so then at that point Guinn leaves and it's you, Michael Stocker and Josh Stocker?

1:06
1:01:10 A. Well, Josh walked out with Guinn, and I don't know if Chad -- I never did see Chad. He walked out with Guinn and he came back up.

1:01:13
1:01:17
1:01:18 Q. Okay. And so then it was you, Josh and Michael at your apartment?

1:01:21
A. Yes, sir.

1:01:22 Q. And when Michael came into your apartment, was he doing drugs as well?

1:01:25
1:01:27 A. I don't remember. I know that he was offered drugs.

1:01:29
1:01:32 Q. And then at some point, did Dustin Pool call back?

01:35

A. Yes.

Q. Okay. Did he call your land line?

A. Yes. I believe so, yes. Yeah, because I don't think my cell phone was --

Q. And your land line at the time, was it 457-173 --

A. Yes.

THE COURT REPORTER: 3 what? 8?

THE WITNESS: Uh-huh.

Q. (BY MR. FOWLER) Okay. Did you answer the phone?

A. Yes.

Q. And who was on the other end of the phone?

A. Dustin Pool.

Q. And what was your conversation?

A. I know that we had a conversation about Ray Placensio, and then I know that Dustin was going to come over, but he was going to get dressed. He was at home when he called. And I told him at one point not to come over, but he came any way.

Q. Did he ever tell you that he was at a bar or --

A. Yes. He said he had been at the Clubhouse.

Q. What is the Clubhouse?

A. It's a strip club.

Q. Okay. The Clubhouse Cabaret?

A. Yes.

Q. There on the e-way?

A. Yes.

Q. And did he tell you he was coming home from there?

A. When he called he said he was at his house.

Q. Okay.

A. And it was after bar closing time.

Q. And what time is the bar closing time?

A. 2:00.

Q. Okay. And so were you having reservations about getting him over to your apartment at this first phone call that he called you back?

THE COURT: Do you understand the question?

THE WITNESS: Not really, no.

THE COURT: All right. Tell him.

Q. (BY MR. FOWLER) Let me say this. That's okay, because sometimes I get jumbled and garbled.

You told us early you told Dustin don't come over. Right?

A. Yes. But I don't remember -- did it -- that was the first time he called or the second time I talked to him, because I talked to him two times.

Q. Okay. And so after the first conversation with him, how did you leave the conversation with him? Was he coming over?

A. Yes.

Q. Okay. And then did he call back --

A. No, I tried to call him back.

Q. Why did you try to call him back?

A. To tell him not to come over, and he said he was coming anyway. I tried again to call him, and he wouldn't answer the phone.

Q. And why were you trying to tell him not to come over?

A. Because -- I don't know. I started just -- it was late already, and -- I don't know, I started having doubts.

Q. Did Josh Stocker and Mike Stocker hear you call him and say don't come over?

A. I remember at one point I was talking to Dustin and telling him not to come over, which he said he was coming anyway. Josh was whispering, telling me to get him over here.

Q. Okay. And so he called back a second time. Do you remember how far apart?

A. I have no idea.

Q. Was it hours or minutes?

A. No, it wasn't hours. Probably minutes.

Q. And so he calls back a second time, and what does he say?

A. I don't -- I don't remember.

1:04:44 Q. Okay. After he calls back the second time, does he eventually come to your apartment?

1:04:51 A. Yes.

1:04:53 Q. When he got -- when you get to your apartment complex, do you have to be buzzed in by something?

1:04:58 A. Yes.

1:04:59 Q. Did he press the -- or did you get buzzed at your apartment by him?

1:05:04 A. I talked to him through the intercom, yes.

1:05:07 Q. Who buzzed him into your complex?

1:05:09 A. I did, after I talked to him.

1:05:10 Q. And after you buzzed him in, did he show up at your door?

1:05:13 A. Yes.

1:05:14 Q. And where was Josh and Michael at before he came into your apartment?

1:05:20 A. Before he came in, Josh was in the living room closet and Michael was in the hallway.

1:05:28 Q. Okay. And did you let Dustin into your apartment?

1:05:30 A. Yes, sir.

1:05:30 Q. And what happened after he came in?

1:05:33 A. After he came in, he sat down on the love seat and I was sitting on the big couch. And he was telling me about -- he just bleached his hair blond, and then shortly

1:05:45 right -- well, after he got there his phone rang, and it
1:05:48 was Ray Placensio.

1:05:50 Q. Okay.

1:05:51 A. And he told Ray where he was. He was at my
1:05:54 apartment.

1:05:56 Q. And then -- so he has a phone call with Ray
1:05:59 Placensio, and then what happened?

1:06:01 A. And then Dustin sat on the couch for a minute,
1:06:05 and he was talking to me. And then he realized -- Dustin
1:06:09 knew that I didn't do drugs, that I hadn't done them for a
1:06:12 long time, but I was high that night. He could tell, and
1:06:16 that made Dustin leery.

1:06:19 Q. And so he figured out that you were high on
1:06:26 narcotics?

1:06:26 A. Yes.

1:06:28 Q. And what was his reaction once he figured out you
1:06:32 were high on narcotics?

1:06:32 A. He was leery of what was going on around.

1:06:36 Q. And what did he say to you?

1:06:40 A. He just said -- he said, are you high? I tried
1:06:44 to lie, and I said, no, but he knew.

1:06:47 He said, you don't get high. He said,
1:06:48 what's going on here? And then he started walking around
1:06:52 my apartment.

1:06:53 Q. Before this, say in the month before this you

knew him, had he been trying to get you high?
A. Yeah. He offered to get me high and I never did.
Q. So does he get up from where he was sitting?
A. Yes.
Q. And where does he go to?
A. To the kitchen first.
MR. FOWLER: Your Honor, may I approach the witness?
THE COURT: Yes.
Q. (BY MR. FOWLER) Tori, I want to show you what has been marked as State's Exhibit 242. Do you recognize that?
A. Yes.
Q. And is that a diagram of your apartment unit there at the River Falls complex?
A. Yes.
Q. Can you show us just where the couch and the love seat were at that time?
A. Yes. The couch was here, the love seat was here, and this table was actually pushed back to here, and the desk is where it's at.
Q. Okay.
A. And there was a table over here and the coffee table was in front of the couch.
Q. And so he gets up from where he's sitting and he

1:08:06 walks to where?

1:08:07 A. Into the kitchen.

1:08:08 Q. And was anyone in the kitchen?

1:08:10 A. No.

1:08:10 Q. And what did he do after he walked into the
1:08:13 kitchen?

1:08:13 A. Walked back into the living room and then started
1:08:16 to walk in the hallway.

1:08:18 Q. Okay. Now, did you say Josh was hiding in a
1:08:21 living room closet?

:08:22 A. That's what I thought. He was there, yes, at one
:08:24 time --

:08:24 Q. Okay.

:08:25 A. -- whenever I opened the door.

:08:27 Q. And after Dustin checked out the kitchen, where
:08:29 did he go?

:08:29 A. He started to walk into this hallway.

08:32 Q. What happened next?

08:33 A. Josh and Michael blocked him from the hallway.
08:37 And that's when I realized Josh had moved locations, I
08:40 guess, as I didn't see him move locations.

08:43 Q. Do you know where they were hiding from or where
08:45 they came out from?

08:46 A. Yeah. Michael was on this side of the wall and
08:49 Josh was on this side of the wall, and they just came out

:52 right there.

1:08:53 Q. And where were you? Were you still sitting when he was walking into that little hallway?

1:08:58 A. No. When he started walking in that hallway I stood up, and I was standing right here, and Dustin was standing right in front of me.

1:09:05 Q. And so when he encountered Michael and Josh, what was said? When he -- when he -- when him and Josh and Michael met in that little --

1:09:16 A. Do you want me to tell you exactly what was said?

1:09:18 Q. Yes.

1:09:18 A. Okay. When they were around the corner, Michael had his shotgun -- I believe it was a shotgun in his hands, and Josh had a fireplace poker. And when he came around the corner Josh said, hey, mother fucker.

1:09:33 Q. So there were some curse words said. Is that right?

1:09:36 A. Yes, sir.

1:09:36 Q. And what was Dustin's reaction?

1:09:38 A. He just started backing up and trying to dial his phone.

1:09:44 Q. Okay.

1:09:44 A. And he was just saying, oh, God, the whole time. That's all I heard him say.

:09:52 Q. The shotgun -- the shotgun that you saw Michael

with, did it have any kind of special handle or did you notice anything about that?

A. I didn't ever notice anything about it.

Q. Okay. Prior to Josh and Guinn getting to your apartment earlier in the day, did you keep firearms at your house?

A. No.

Q. Do you own any firearms?

A. No, sir.

Q. So how did that shotgun get to your house?

A. Well, I know it was brought in a sand volley ball box, because I took that out later, but I never actually saw him bring it into the apartment.

Q. So after this event, you uncovered a sand volley ball box?

A. That that gun would fit it.

Q. And you disposed of that later on after this incident?

A. Yes, sir.

Q. The fireplace poker, where did that come from?

A. I had a fireplace poker in my apartment.

Q. And that's on the diagram. And did you have a utensil set?

A. It comes with -- the apartment had it there.

Q. So it was furnished by the apartments?

A. Yes.

Q. And was there a poker in the set?

A. Yes.

Q. And was there a broom?

A. Yes.

Q. And a fireplace -- a little fireplace shovel as well?

A. Yes.

Q. So when Dustin comes up to Michael and Josh, you said there was an exchange of words, and then Dustin started backing up?

A. Towards the balcony.

Q. And what were Josh and Michael doing when Dustin was backing up?

A. I couldn't see, because I was sitting in the bathroom.

Q. How did you get into the bathroom there?

A. I walked through there. Josh told me to go in the bathroom, and I did. Of course, that's what I was going to do anyway.

Q. Did -- did he yell at you to get in the bathroom or did he tell you, or --

A. What was your question?

Q. Did Josh yell at you to get into the bathroom or did you go on there -- go in there at your own suggestion

A. He didn't yell at me, I just went in there, and he just kind of -- you know, like just kind of touched me on my back like to go. You know.

THE COURT REPORTER: Excuse me. He kind of what?

THE WITNESS: Like just kind of touched me on my back like to go.

Q. (BY MR. FOWLER) Okay. Did you have to walk past Josh and Michael to get into the bathroom?

A. I had to walk around Dustin and past them. I walked actually in between Michael and Josh, and I bumped into Dustin a little.

Q. What did you do when you got in the bathroom?

A. Sat on the bathtub, the edge of the bathtub.

Q. And was your bathroom door shut or opened?

A. I left it cracked. I was trying to hear what was going on.

Q. And what did you hear happened?

A. All I heard was scuffling, and then I heard someone got hit. I mean, I heard someone got hit. I could hear a hit, like --

Q. Like a thud?

A. I don't know. Like -- like how you punch somebody. The sound you make. I don't know what kind of sound that is exactly. I knew someone got hit.

Q. You heard a sound and you assumed somebody had gotten hit?

A. Yes, sir.

Q. And then what happened?

A. And then I motioned Josh to come to the bathroom, and I asked who got hit. And he said, Dustin, because Dustin started yelling at the top of his lungs -- I mean, before he got hit. And I asked Josh, who got hit. And he said Dustin. I asked him what he hit him with? He said his fist. And I said why is he bleeding? And he said because he had leather gloves on, which he did. He said the leather gloves cut him.

Q. Did you hear Dustin Pool yelling at the top of his lungs before you heard that noise?

A. Yes.

Q. What was he yelling?

A. He was trying to yell help. He got like half of that word out.

Q. And I take it, this was all going on in a matter of seconds. Is that right?

A. It went very quick.

Q. Okay. So you motioned -- when you motioned to Josh to come here and talk with him, had you left the bathroom and gone into the --

A. I mean, I stepped to the edge of my bathroom. I

just kind of yelled at Josh.

Q. Okay. And were you able to see Dustin?

A. I could see that he was bleeding.

Q. Where did you see he was bleeding from?

A. His head.

Q. Was it gushing out, or trickling out, or what?

A. It wasn't like gushing, but it's running, yes. I mean, it was on -- it was starting to get on my couch a little bit, yes.

Q. And what was Dustin doing to his wound on his head?

A. At that time he just leaned over the couch. I saw he had his hand up, and he was telling Josh to wait, that he couldn't hear anything. He couldn't see. To give him a second, he was dizzy.

Q. Was he coherent -- when he was talking, was he coherent and --

A. He was loopy a little bit, yeah.

Q. So maybe a little bit disoriented?

A. Yes.

Q. After you talked with Josh, and he told you he hit him with his fist, and his fist was gloved, what happened next?

A. I was in the bathroom again, and this time I'm freaking out.

Q. Why are you freaking out?

A. Because of the situation. Because someone is hurt. I mean, yeah, I'm freaking out.

Q. When you're saying you were freaking out --

A. I was crying. I had my hands over my ears and I would say rocking back and forth on the bathtub.

Q. Were you having a nervous breakdown?

A. Uh -- pretty much. I mean, I was still coherent, yeah.

Q. And did you hear anything when you were in bathroom freaking out?

A. I could hear them talking, but I couldn't hear exactly what was said. And at one time I heard Dustin begging for his life.

Q. What specifically did you hear when you said Dustin was begging for his life?

A. At one point, I heard Dustin telling Josh, please don't kill me. Please don't kill me. That's right after he got hit.

Q. And did you hear Dustin say anything else while you're in the bathroom freaking out?

A. No. I mean, I could hear him talking, but I couldn't make out what words were being said.

Q. Okay. What was Michael doing at this time? Do you know?

A. He his just standing to the left, that I remember.

Q. So was the confrontation more between Dustin and Josh, or Dustin and Michael?

A. More between Dustin and Josh.

Q. And then at some point, did you again talk with Josh?

A. Yes.

Q. Okay. What did you tell him?

A. This -- the next time I talked to Josh is when he came to the bathroom asking if I had ice and a bag to put it in for Dustin's head.

Q. What was your response?

A. I told him there was a bag in the kitchen. Take him --

THE COURT REPORTER: Take him to the?

THE WITNESS: I told him that if he went into the kitchen he could find a bag for ice, or use a sack, or anything, to hold ice in a towel. And I told him to put pressure on his head, it would stop the bleeding. That's what Josh's concern was.

Q. (BY MR. FOWLER) And now when all of this was going on, where was your son, Kadden?

A. Asleep in his room.

Q. And how old was Kadden at this time?

A. He was like two -- one-and-a-half. Two.

Q. And after Josh asked you for the ice, what happened next?

A. Dustin was lying in between the coffee table and the couch, and he had ice and stuff on his head, and Josh was sitting right in front of him on the coffee table. They were talking. Dustin was sitting up at this time. He was coherent.

Q. What were they talking about?

A. I don't know. All I heard Dustin say -- Josh asked him the question, and he said, yeah, but I don't know what Josh asked him.

Q. Did you ever hear Dustin or Josh say anything about being at war?

A. That was later.

Q. Okay. Okay. And so they're having a conversation, and then what happens?

A. That was --

THE COURT REPORTER: Excuse me?

THE WITNESS: That wasn't between Josh and Dustin that was said.

Q. (BY MR. FOWLER) Okay. Okay. We'll come to that later.

A. Okay.

Q. Then after Dustin and Josh are having this

1:18:31 conversation, what happens next?
1:18:34 A. Josh tells me to get my stuff together, because I'm going to leave, because it was easier for me to leave than all of them to leave.
1:18:42 Q. Did you tell Josh to get the --
1:18:44 A. I just wanted everybody to go, but it wasn't possible with the situation that was going on for them to just -- it was easier for me to just -- to leave.
1:18:55 Q. And so whose suggestion was it first that you leave your own apartment?
1:19:01 A. I believe Josh.
1:19:04 Q. And where did he suggest that you needed to go?
1:19:09 A. He told me to get my stuff together and hold on a minute, and he would figure it out. And him and Michael were talking. Josh came back and said, you're going to go with Michael. And you're going to go to Motel 6. I don't know -- yeah. I don't know if Josh told us Motel 6 or just told us to go to a motel.
1:19:28 Q. When Dustin was sitting there next to the coffee table, was he made -- was he frisked, or searched, or --
1:19:38 A. Yeah. Josh told him to empty his pockets and put everything he had on --
1:19:43 Q. I'm sorry. Could you repeat that?
1:19:44 A. Josh had a bandana on and he took it off and told --

THE COURT REPORTER: Excuse me. What? Josh had on a what?

THE WITNESS: A bandana on, and then took it off. And told Dustin to put everything that was in his pockets in that bandana.

1:19:51
1:19:54
1:19:55

Q. (BY MR. FOWLER) And what did you see Dustin put into Josh's bandana?

1:19:58
1:20:01

A. I don't know that I saw him actually put -- I didn't.

1:20:04
1:20:05

Q. Okay. Did you later see what was put into the bandana?

1:20:12
1:20:12

A. No.

Q. Do you know if at some point Dustin gave his wallet to Josh Stocker?

1:20:17
1:20:18

A. According to Guinn, yes.

1:20:20

Q. Oh, okay. So you heard about that later, you didn't see that?

1:20:22
1:20:22

A. Right.

1:20:25

Q. So Michael and Josh had the conversation. They decide you need to go to Motel 6. What happens next?

1:20:28
1:20:31

A. Me and Michael take a fireplace poker. Michael cleans it off -- well, we both cleaned it off really, and put it in this sand volleyball box that was in my house, that I told you about. And we got Kadden and just took a few things, not much, and me and Michael left.

1:20:35
1:20:39
1:20:43

1:20:52
1:20:57
1:21:00
1:21:01
1:21:04
1:21:06
1:21:08
1:21:09
1:21:10
1:21:13
1:21:18
1:21:21
1:21:21
1:21:23
1:21:23
1:21:34
1:21:36
1:21:43
1:21:52
1:21:52
1:21:52
1:21:52

Q. And where did you go?

A. I followed him to Motel 6 on Paramount.

Q. What car -- or do you remember what car or vehicle he was in?

A. A white truck. I don't know. I think a Dodge, I'm not for sure.

Q. And so you drove your own vehicle and followed him to Motel 6?

A. Yes.

Q. And when you got to Motel 6, what happened?

A. Michael went in and got the room, and brought me the key out to the car, and then we both went up to the room.

Q. Okay.

MR. FOWLER: Your Honor, may I approach the witness?

THE COURT: Yes.

Q. (BY MR. FOWLER) Tori, I want to show you what has been marked as State's Exhibit No 5, a hotel bill in the name of Mike -- Michael Stocker. He paid for the room? Is that right?

A. Yes.

Q. And he gave you the key?

A. Yes.

Q. And if the records of Motel 6 showed that Michael

Stocker checked in at 4:49 a.m., does that sound about right to you?

A. Yes.

Q. Do you go up to your room that Michael has purchased for you?

A. Yes.

Q. Does Michael go in the room?

A. Yes.

Q. And what happens in the room?

A. I just laid Kadden down and talked to Michael, and then we talked to Josh a couple of times.

Q. Who talked to Josh?

A. I did.

Q. How did you talk to Josh?

A. Because I called to tell -- Michael, actually, is the one who called him and told him what room we were in, so that Josh could call us.

Q. So Michael had called Josh and basically said, Tori's checked into the --

A. Yes.

Q. -- Motel 6?

A. Yes.

Q. And then did Michael leave the Motel 6?

A. Yeah. He stayed probably 30 minutes before he left.

Q. Okay. Were you still freaking out at this time period?

1:23:07 A. Yes

1:23:13 Q. After he leaves the Motel 6, what happens?

1:23:21 A. He left Motel 6 and I guess went back to my apartment, because he brought Guinn back over there later, or she came back.

1:23:29 Q. Okay. So, eventually, Guinn showed back up at the Motel 6?

1:23:33 A. Yes.

1:23:33 Q. And how long did you and Guinn stay there at the Motel 6?

A. I don't know an exact time.

1:23:45 Q. Do you know how Guinn got to the Motel 6?

1:23:48 A. I don't remember if she ended up -- I don't remember how she --

1:23:51 Q. Okay. Sure.

1:23:52 A. We weren't at the motel very long, we checked into another room.

1:23:57 Q. Why did you decide to leave that Motel 6?

1:24:01 A. Guinn just -- I don't know. We were just freaking out, basically.

1:24:05 Q. Okay. Paranoia?

1:24:08 A. Yes.

Q. And that was probably introduced by the drugs you

were using. Right?

A. Yes, sir.

Q. And the situation that you were in?

A. Yes, sir.

Q. And which hotel did you go to next?

A. La Quinta Inn, on Ross.

Q. And how did you get to the La Quinta?

A. Drove.

Q. Okay.

A. I met Guinn over there. She went and got the room, and I went and took Kadden to the baby-sitter.

MR. FOWLER: Your Honor, may I approach the witness?

THE COURT: Yes.

Q. (BY MR. FOWLER) I want to show you, Tori, what has been admitted as State's Exhibit No. 6, the records from La Quinta. It shows that you checked in -- or Michael Stocker checked in at 6:27 a.m., on now what is March 10th, 2003?

A. That sounds right.

Q. Did you actually know Michael had purchased the room or not?

A. No, because I took Kadden to the baby-sitter by myself.

Q. After you get to La Quinta, how long were you

1:25:27 there?

1:25:29 A. Not very long there either.

1:25:30 Q. What was the problem with the La Quinta?

1:25:33 A. Me and Guinn -- I showed back up and met Guinn, because she called and told me where she was at, the room number at La Quinta. And I showed up and Guinn and me had stuff in one of Guinn's bags, we had a bong and some methamphetamine.

1:25:51 Q. What's a bong?

1:25:53 A. I don't know how you describe it. It's just something to smoke with.

1:25:57 Q. Okay. Can you show the jury with your hands about how big it is?

1:26:02 A. I mean it's -- I guess you can make them however big you want. Ours was about that big (indicating).

1:26:08 Q. Okay. Can you do that again --

1:26:09 A. I'm sorry.

1:26:10 Q. -- for the jury to see?

1:26:11 A. About that big (indicating).

1:26:14 Q. And a bong, is it kind of a device that has some water in it, and you're able to -- I guess, get a better buzz off of the methamphetamine you're using?

1:26:25 A. Well, it's just a way to smoke it.

1:26:27 Q. Okay. And so whose bong was it?

1:26:29 A. Guinn's.

Q. And was it discovered by somebody --

A. Yes.

Q. -- associated --

A. It was discovered by, I think, housekeeping and management came up there, and --

Q. Do you know -- once you checked into the La Quinta, how long were you there before the housekeeping discovered this bong?

A. Not long, because when I got there Guinn had already told me that it had been discovered right when I got there, so. . .

Q. And so what was your reaction to the hotel folks finding a bong there?

A. Same as Guinn's, we wanted to leave.

Q. Paranoid again?

A. Uh-huh. Yes, sir.

Q. Afraid? And so what did you and Guinn decide to do about your situation at the La Quinta?

A. We got our stuff and left, and we went to Comfort Suites.

MR. FOWLER: Your Honor, may I approach the witness?

THE COURT: Yes.

Q. (BY MR. FOWLER) Can you tell us where the Comfort Suites are?

1:27:38 1:27:40 1:27:44 1:27:44 1:27:46 1:27:47 1:27:48 1:27:52 1:27:52 1:27:55 1:28:04 1:28:05 1:28:05 1:28:08 1:28:08 1:28:11 1:28:16 1:28:22 1:28:24 1:28:26 1:28:27 1:28:30

A. I don't know it's off of I-40. I don't remember the exit exactly.

Q. Do you know whose name the Comfort Suites uh -- room --

A. Christa Brashers (phonetic).

Q. And who is Christa Brashers?

A. My aunt.

Q. Why did she rent a room for you at the Comfort Suites?

A. I didn't have -- if I remember correctly, I had (sic) my driver's license -- I hadn't got everything out of my apartment. I grabbed a couple of things. And Guinn didn't have her license, or didn't want to put it in her name.

Q. And are you close to your Aunt Christa?

A. Yes.

Q. And now it shows the receipts that have been admitted into evidence as State's Exhibit No. 7 shows that your aunt got the room at 23:36.

UNIDENTIFIED JUROR: Eleven.

Q. (BY MR. FOWLER) That's 11:36 p.m.

A. Okay. Well, I don't know where we went from La Quinta. I guess drove around.

Q. So there's some time between the La Quinta and the Comfort Inn, where you think you were driving around?

1:28:44
A. I might have been at my mom's. There's no telling. I think me and Guinn split up a little while. I don't remember. That was two years ago.

1:28:49
Q. Sure. Sure. And was the baby -- was Kadden still at the baby-sitter, or had you picked Kadden up before you checked into the Comfort Inn?

1:28:57
A. No, I took him to my mom by the time I went to the Comfort Inn.

1:29:02
Q. Okay. When you were at the Comfort Inn, did you and Guinn check in together? Did you get there at the same time?

1:29:12
A. I believe so.

Q. And did anyone call either you or Guinn at the Comfort Inn?

1:29:21
A. Guinn talked to Josh -- or tried to call Josh, but he never answered the phone.

1:29:27
Q. Okay. Do you know approximately how many times she was trying to call him?

1:29:31
A. I don't know.

1:29:31
Q. Well, was it one or five?

1:29:32
A. I don't know, because when I got to the room I fell asleep. I hadn't slept in days -- a couple of days.

1:29:39
Q. Do you remember about how long you were asleep --

1:29:42
A. No.

Q. -- at the Comfort Inn?

1:29:46 When you woke up, was Guinn there?
1:29:48 A. No.
1:29:49 Q. What did you do when you woke up?
1:29:51 A. I woke up and found a note from Guinn. She was
1:29:54 with Chad Spanel and would be right back.
1:29:57 Q. And now Chad Spanel, we kind of heard his name,
1:30:01 but who is he? Who is he associated with?
1:30:05 A. I don't know a whole lot about him, but I know he
1:30:09 knows Craig Kimberlin, and he knows Destry Keeling, and
1:30:12 Chris Eason, and Guinn.
1:30:14 Q. Okay. And was he good friends with Guinn?
1:30:17 A. Yes.
1:30:18 Q. And do you know if Chad Spanel was good friends
1:30:22 with Josh Stocker?
1:30:24 A. They knew each other. I don't remember if they
1:30:27 were friends.
1:30:28 Q. So Guinn comes over to the Comfort Inn, and then
1:30:32 what happens?
1:30:32 A. And then shortly after that, Josh was up in the
1:30:38 early morning hours of Wednesday. That was Tuesday night.
1:30:44 Right?
1:30:44 Q. How did Josh know -- or was Josh informed that
1:30:49 you were at the Comfort Inn?
1:30:52 A. By Guinn, yes.
1:30:53 Q. And do you know -- did he get a ride to the

Comfort Inn or did he drive over himself?

A. He drove there.

Q. Now, after -- when Josh comes by, had you been back to your apartment?

A. Yes, sir.

Q. Why did you go back to your apartment?

A. I was told not to go until I got a phone call, but no one ever called, so I went back.

Q. Who told you don't go back to your apartment?

A. Josh -- well, Guinn told me that Josh said that.

Q. And why did you go back to your apartment?

A. Well, I wanted to get my stuff for one. I mean, everything I own is there. Clothes, makeup, everything.

Q. You needed more --

A. Yeah. I hardly took anything when I left.

Q. -- clothes, toiletries, things of that nature?

A. Yes. Things for my son.

Q. What did you notice when you were there at your apartment when you went back?

A. Everything was different.

Q. How was everything different?

A. When I walked back into my apartment it smelled like bleach and stale cigarettes. And there was -- my glass table had been moved up close to the door, and on that table was Dustin's wallet, cell phone, and his ID was

1:[illegible]2 taken out of his wallet like displayed. And there was
1:32:07 blood on the couches. And there was blood on the floor in
1:32:11 between the coffee table and the couch. And then there
1:32:14 was busted glass -- not in the bathroom, but right in
1:32:17 front of the bathroom there's a mirror. There was busted
1:32:21 glass. There was blood on the sink, dripping down on the
1:32:23 floor.
1:32:24 Q. Okay. And so there's blood in many locations?
1:32:27 A. Yes.
1:32:28 Q. And it smells of bleach and cigarettes, and the
1:32:31 furniture has been moved?
1:32:32 A. Uh-huh. Yes.
1:[illegible]4 Q. What was your reaction when you got there?
1:32:36 A. Uh -- to get out of there real quick. I didn't
1:32:40 know what --
1:32:42 Q. How did you --
1:32:42 A. -- I freaked out.
1:32:43 Q. -- how did you know it was Dustin Pool's wallet
1:32:46 that was left there in your apartment?
1:32:48 A. Well, because the driver's license was laying
1:32:50 right besides it. It was out, so I'm assuming.
1:32:53 Q. Do you know if there was any cash in the wallet?
1:32:55 A. I didn't even open the wallet to look.
1:32:58 Q. Did Dustin Pool -- when you knew him, did he
1:[illegible]2 carry around a lot of cash?

A. Usually.

Q. Okay. How much, if you can give us an estimate, would he carry on him at any time?

A. That depends. If he's out collecting money or something, he might have a lot on him at one time. If he's not, normally probably --

Q. Hundreds of dollars?

A. Yes. Uh-huh.

Q. Did you -- when you got back to your apartment, did you pick up some additional items for you and Kadden?

A. No. I just grabbed the wallet, cell phone, and driver's license, and put it in my pocket and left.

Q. Why -- why did you do that?

A. Because I didn't know what else to do with it. I didn't know what had happened at that point.

Q. And where did you go?

A. Back to the Comfort Suites to ask Guinn or Josh why did that -- why that was there.

Q. Did you ask Guinn why Dustin's wallet and cell phone was left in your apartment?

A. Yes. And she said that she didn't know, and I could ask Josh when he got there. When I got back to Comfort, Josh still wasn't there.

Q. And when Josh later arrived at the Comfort Inn, did you confront him about the wallet and the cell phone?

1:[illegible]6 A. Yes.
1:34:06 Q. What was his response?
1:34:08 A. He just told me to wipe my prints off of it and
1:34:11 give it to him.
1:34:12 Q. To do what?
1:34:13 A. Wipe my prints off of it and give that stuff to
1:34:14 him.
1:34:25 Q. And so if we could kind of reconstruct this.
1:34:33 March 9th is a Sunday. You're hanging out with Guinn and
1:34:36 Josh. Early morning, March 12th, hours, Dustin calls
1:34:41 you --
1:34:42 A. March 12th, no.
1[illegible]3 Q. March 10th, I'm sorry. Dustin comes over. You
1:34:46 check in per the hotel bill at Motel 6 --
1:34:49 A. Uh-huh.
1:34:50 Q. -- March 10th, 4:49. La Quinta, March 10th.
1:34:56 Comfort Inn is 23:36, that's 11:00 p.m., on March 10th.
1:35:01 You fall asleep, wake up, Guinn's not there. You go back
1:35:06 to your apartment. Come back to the Comfort Inn, and then
1:35:10 Josh subsequently arrives. And so that would put us on --
1:35:14 A. In --
1:35:15 Q. -- mid-day on the 11th. Is that right?
1:35:20 A. Josh was there in the morning.
1:35:21 Q. Okay.
1[illegible]2 A. At Comfort.

1:35:25 Q. So the morning hours of the 11th?
1:35:25 A. Uh-huh. Yes.
1:35:41 Q. Do you remember when you left the Comfort Inn?
1:35:45 A. We left in the morning to go to Wal-Mart.
1:35:47 Q. Why did you go to Wal-Mart?
1:35:49 A. Because Josh arrived and we went to get a steam vac, because I was freaking out about my apartment. I didn't know --
1:35:57 Q. When you say he arrived in the morning, was it daylight morning or dark --
1:36:02 A. Yes, around 8:30.
1:36:04 Q. Okay. So you go to Wal-Mart. And the purpose of going to Wal-Mart was what?
1:36:09 A. To buy a steam vac.
1:36:11 Q. And which Wal-Mart do you go to?
1:36:14 A. I-40 East.
1:36:15 Q. The one there at I-40 and Grand?
1:36:18 A. Uh-huh.
1:36:18 Q. And what did you purchase
1:36:20 A. A steam vac.
1:36:21 Q. Who -- who went to Wal-Mart?
1:36:23 A. Me, Josh and Guinn, in separate vehicles.
1:36:27 Q. And did you purchase anything else?
1:36:29 A. A steam cleaner.
1:36:31 Q. Walking into the Wal-Mart, was anything said?

A. I remember Josh telling me something similar to -- might not be word-for-word. He said, you look like you've seen a ghost. He said don't act so scared. Then he was like kind of yelling -- not yelling, but he was talking real loud, talking about what they did to Dustin, that they killed Dustin. Because Guinn was all paranoid, because there was people in the parking lot. She was worried that somebody would hear Josh.

Q. So on your way to -- into Wal-Mart, in the parking lot, the Defendant is telling you how Dustin Pool was murdered?

A. He wasn't saying how, he just said -- he made a reference to what had happened. I don't remember exactly word-for-word what was said.

Q. Did you conclude --

A. He talked about that to Guinn before we went to Wal-Mart.

Q. -- did you conclude after what he said that Dustin had been murdered or just beaten up?

A. I had already -- he said right before -- that conversation took place before we went to Wal-Mart. I -- that -- he -- when he showed up to Comfort Suites, they had that conversation then.

Q. I see.

A. And I mean, I blocked my ears. I didn't want to

1:37:50 hear, but I know that, yeah.

1:37:52 Q. Did he say anything how uh -- you had made him happy or --

1:37:57 A. He -- coming back to Comfort Suites, he was smiling and said that Dustin had been taken care of. That no one would find him. That he was buried somewhere.

1:38:08 Q. Now back to the money issue, did you get any money at this time or was it discussed?

1:38:14 A. When Guinn --

1:38:15 Q. At the Comfort Suites. I'm sorry.

1:38:18 A. Not at the Comfort Suites.

1:38:21 Q. Okay.

1:38:31 MR. FOWLER: Judge, I wanted to let you know that this may be a good stopping point. Do you want to keep going until 12:00?

1:38:37 THE COURT: Are you going to continue with this witness?

1:38:39 MR. FOWLER: Yes, sir. I'd imagine another hour-and-a-half on direct, I would think.

1:38:43 THE COURT: Okay. Yes, it is a good time to break. Ladies and gentlemen, why don't y'all go to lunch, and uh -- be back in the jury room at let's say ten after 1:00.

1:38:51 (Lunch recess.)

(Both sides, the Defendant present, in open

(court:

THE COURT: Everyone might as well be seated until we get the 12th juror. Still don't have it?

THE BAILIFF: (Shakes head side to side.)

THE COURT: Bring them in.

(Jury seated.)

THE COURT: Ladies and gentlemen, everyone be seated. All right. Mr. Fouler, are you ready?

MR. FOWLER: Yes, sir.

THE COURT: Go ahead.

MR. FOWLER: Thank you, Judge.

DIRECT EXAMINATION (CONTINUED)

BY MR. FOWLER:

Q. Ms. Patrick, after we broke I thought -- my colleague thought of some more questions, detailed oriented, to clear up.

You said when Josh and Michael encountered Dustin Pool, Michael had the shotgun and Josh had the fireplace poker?

A. Yes, sir.

Q. And then you said when you left the apartment to go to Motel 6, Michael took the poker with him?

A. Yes, sir.

Q. Did you see what you did with the fireplace poker?

3:16:37 A. It was put in the sand volley ball box.
3:16:41 Q. And where did the sand volley ball box go?
3:16:44 A. In his truck.
3:16:45 Q. Did you ever see the poker or the sand volley ball box begin?
3:16:49 A. No.
3:16:50 Q. Can you kind of describe or show with your fingers what the tip or the end of the fireplace poker looked like?
3:16:57 A. It's hard to tell, it was black.
Q. Okay.
3:16:59 A. I mean, when we wiped it off there was a little bit of blood on the --
3:17:05 Q. Okay. And can you show for the jury with your fingers. Was it crooked, was it straight, how was it?
3:17:11 A. It kind of goes straight, and then just like a fireplace poker goes off.
3:17:16 Q. So it has a like crook --
3:17:18 A. Yeah. Uh-huh.
3:17:22 Q. -- at the end of it? Okay. Did you ever see the shotgun again after you left your apartment to the Motel 6?
3:17:29 A. No.
3:17:30 Q. And then at the break we were visiting, and you told me I asked a bad question, so let's go. I had asked

3:17:42
you if you ever saw Josh Stocker with a new wallet on March 9th, 2003.

A. Right.

3:17:44
Q. And you answered no. Is that right?

3:17:46
A. Yes, sir.

3:17:46
Q. Before March 9th, 2003, had you ever seen Josh Stocker with a second wallet?

3:17:52
A. Yes. He had a different wallet at one point he was putting his stuff in.

3:17:56
Q. And you don't know if it was new?

3:17:59
A. Right.

3:18:00
Q. And did he transfer credit cards?

A. I don't know exactly what he transferred, just stuff.

3:18:11
Q. Okay. So he moved stuff from one wallet to another?

3:18:14
A. Yes.

3:18:15
Q. And that was before March 9th?

3:18:17
A. Yeah, probably.

3:18:18
Q. And where did you see him with this second wallet?

3:18:22
A. At my apartment.

3:18:24
Q. Okay. And now back to the Comfort Inn. Your Aunt Christa Brashers checked you in at 11:30-ish p.m., on March the 10th. You fell asleep. Is that right?

A. Yes.
Q. You woke up, Guinn had gone, and there was a note from Guinn saying she'd left?
A. Yes.
Q. Okay. Then you went back to your apartment?
A. Yes.
Q. You picked up Dustin Pool's wallet, cell phone --
A. And ID.
Q. -- and ID, and went back to the Comfort Inn?
A. Yes.
Q. And there was the first time you saw Josh Stocker?
A. He wasn't there when I got back there.
Q. Okay. You get back, and then a little bit later Josh Stocker comes by the Comfort Inn?
A. Right.
Q. And this is -- you said an estimate, but you think it's 8:30-ish or so in the morning?
A. Around there somewhere.
Q. Okay. Daylight, but it was morning hours?
A. Yes.
Q. And that was the next day, March 11th. Is that right?
A. Yes.
Q. And when Josh Stocker subsequently arrived to the

3:19:46 Comfort Inn, what was your, and his, and Guinn's
3:19:50 conversation?
3:19:51 A. He shows up and I asked him about the wallet,
3:19:56 phone, and ID. And he asked why I went back to my
3:19:59 apartment, because I wasn't supposed to go back until he
3:20:03 called Guinn, or whatever. And I told him I went back
3:20:06 because he never called.
3:20:08 And then he told me to wipe my prints off of
3:20:12 them, and I did that, and I gave them to Josh. And then
3:20:15 he starts telling the story. I walked out the room,
3:20:18 because I didn't --
3:20:19 Q. Telling you what story?
3:20:20 A. Well, not telling me, but telling Guinn. I
3:20:22 mean -- I guess what happened to Dustin.
3:20:24 Q. Okay. And you walked out of the room?
3:20:26 A. Yeah.
3:20:27 Q. Okay. Why did you walk out of the room?
3:20:30 A. Two reasons. Because first of all, I'm freaking
3:20:32 out still and I just came back from my apartment, and it's
3:20:36 in the condition it's in, and I'm not knowing what -- I
3:20:40 mean, I want -- I'm just confused. I don't know what's
3:20:44 going on. I wanted that taken care of, I guess. And,
3:20:48 also, I didn't want to hear any details, anything that
3:20:50 they did to Dustin.
3:20:51 Q. And then so you, Guinn, and Josh go to the

Wal-Mart at I-40 and Grand in different vehicles?
A. Yes.
Q. And what gets purchased at the Wal-Mart?
A. A steam vacuum and a steam cleaner.
Q. And who bought it?
A. Josh.
Q. Do you know how he paid for it?
A. Cash.
Q. And then where did you go after Wal-Mart?
A. Followed them to -- well, they followed me. I don't remember. We went to my apartment.
Q. Okay. Back to the River Falls?
A. Yes.
Q. And what did you do when you got to your apartment?
A. Guinn and Josh put the vacuum together.
Q. And then what happened?
A. And then I started to clean my apartment.
Q. And what areas did you want cleaned or needed to be cleaned?
A. The -- the spot I started on was the one between the coffee table and the couch.
Q. Can you show us with your hands or arms how big the spot was?
A. Probably about that big (indicating).

Q. Okay. And what color was it?

A. It looked black. Like burned carpet.

Q. And what other spots needed to be cleaned?

A. Well, there was blood on the couches, but you can't really clean that with it, with a -- with a steam vacuum. There had been like -- there was some spots on the carpet that somebody had already cleaned, when I left -- I don't know when it got done, but there was bleach on my carpet that had been spilled, or something, but there was also blood in the bathroom.

Q. Was your carpet beige, was that the original color?

A. Beige to light tan.

Q. Light tan? Okay. With the bleach -- had your carpet already been discolored?

A. It discolored the carpet.

Q. Okay. So was it that bleached white color?

A. Yeah.

Q. So why did you try steam cleaning and not Josh Stocker and Guinn?

A. I don't know, because it's my apartment, I guess. I don't know. They were cleaning, too. Well, like Guinn was using towels and trying to clean stuff. I just got the steam cleaner and just started.

Q. And what was Josh doing?

A. I don't remember. I know they were sitting and talking at one point. I don't know. I don't remember exactly.

Q. And did you have some kind of cleaning chemicals in your apartment or did you buy those at Wal-Mart?

A. I had some. Guinn went and bought some more though and came back.

Q. Okay. Well, let's keep there on our initial cleaning effort. Did you break out any -- did you use any of the chemicals that were under your sink?

A. Yes, sir.

Q. Okay. Did you have any success with that?

A. No.

Q. Did you have any success with the steam vac cleaner?

A. No.

Q. Was it making the spots better or worse?

A. Making them -- it smeared across the carpet.

Q. Okay. So were the original spots getting bigger?

A. Yeah.

Q. But they were smearing, I guess?

A. Uh-huh.

Q. And how did you react to the cleaning not going too well?

A. I had a nervous -- I flipped out, or whatever. I

3:23:52 made Josh and Guinn mad.

3:23:56 Q. What -- how did you make them mad?

3:23:58 A. Because I just freaked out. I was cleaning and I could see the blood and stuff going up to the machine, because it's clear, and I just looked at Josh and Guinn and told them I thought someone was breathing on the back of my neck. And I don't know, I just sat down and flipped out pretty much.

3:24:16 Q. And you realized that --

3:24:17 A. They were wanting me to hold it together. I was holding it out.

3:24:20 Q. And you realized it was Dustin Pool's blood you were cleaning?

3:24:24 A. That's what made me uh -- uh-huh.

3:24:27 Q. So after this cleaning, and you flipped out, and they got mad, then what happened? What did you do next?

3:24:42 A. I don't remember.

3:24:42 Q. Okay. Do you know where you went next?

3:24:47 A. No.

3:24:49 Q. Did you stay the night there at your apartment?

3:24:53 A. Yes. Yeah, we did.

3:24:56 Q. And was your son staying that -- the night with you at your apartment, or was he --

3:25:00 A. I don't remember. He was probably at Mom's.

3:25:03 Q. Do you know if Guinn stayed with you at your

3:25:05 apartment that night?

3:25:07 A. I'm pretty sure she did, because I know I didn't want to stay by myself.

3:25:17 Q. And now you mentioned that Guinn at another time went and bought some more cleaning materials?

3:25:24 A. Yes, sir.

3:25:25 Q. How -- how many days after?

3:25:26 A. No, that was the same day.

3:25:28 Q. Oh, the same day?

3:25:28 A. Because we ran out -- I already had that stuff at my house, whole bottles of everything, and we used the rest of what I had. It didn't work. Guinn and Josh went to the store.

3:25:41 Q. Now, we're going to hear from one of the fingerprint guys at the police department. He's going to say that --

3:25:48 MR. WATKINS: Objection. He's testifying about what a witness is about to come in and testify to.

3:25:56 THE COURT: What's your objection?

3:25:57 MR. WATKINS: Hearsay.

3:25:58 THE COURT: Overruled.

3:26:00 Q. (BY MR. FOWLER) Well, I think the fingerprint expert is going to tell us your prints, and Guinn's prints, and Ronald Brown's (phonetic) fingerprints were on the cleaning supplies that were under your sink?

3:26:10 A. Sir that would be true.
3:26:13 Q. Who is Ronald Brown?
3:26:14 A. He was my fiancée and we broke up in February.
3:26:17 We lived together. That's why his hand print would be on
3:26:21 those bottles.
3:26:22 Q. How come Josh Stocker's fingerprints wouldn't be
3:26:26 on the cleaning supplies?
3:26:27 A. Me and Guinn were the ones -- I'm the one that
3:26:30 got the cleaning supplies from under the sink. And I
3:26:35 started pouring it on all of the stuff.
3:26:35 Q. Was Josh -- did he do any of the cleaning?
3:26:38 A. Not really. He said he wasn't a maid.
3:26:46 Q. At this time period, did -- had you ever met a
3:26:49 person by the name of Craig Kimberlin?
3:26:52 A. Not at this time.
3:26:53 Q. Did you know who he was?
3:26:54 A. Not at this time. I might have been told later
3:26:58 that day. Guinn had talked about him at some point before
3:27:02 I had met him, but not -- not before this happened.
3:27:04 Q. Did you have an occasion to meet him a few days
3:27:08 after this?
3:27:08 A. Yes.
3:27:08 Q. Okay. Where did you meet him?
3:27:10 A. At my apartment.
3:27:11 Q. Okay. Do you know who arranged the meeting?

3:27:14 A. I'm assuming Guinn, because she told me that he was coming over.

3:27:20 Q. Before Craig came over on this meeting a few days later, how was the condition of those stains on the floor and on the couch? Were they still there?

3:27:33 A. Yes.

3:27:35 Q. Did Craig bring anyone with him to your apartment?

3:27:40 A. No.

3:27:42 Q. And uh -- who else was there with you and Craig at your apartment?

3:27:47 A. Guinn.

3:27:48 Q. And what -- what did y'all discuss?

3:27:52 A. We didn't really discuss anything, Craig kind of told us what was -- Craig showed up and he mentioned that his shoulders were sore, he couldn't hardly move his arm. And he said they mixed concrete by hand. He told us what they did to Dustin. And he said that they buried him under a 40-foot -- a well that started at a 40-foot basement, or something like that.

3:28:20 Q. And so did he tell you that Dustin Pool had been beaten to death?

3:28:27 A. Yes, sir.

3:28:27 Q. And he told you that his body had been disposed of?

3:28:30 A. Yes.

3:28:31 Q. And that he had been mixing concrete. Is that right?

3:28:36 A. Yes. Uh-huh.

3:28:36 Q. But he said it was in a well?

3:28:38 A. Said they buried him underneath a well that started out as a 40-foot basement.

3:28:45 Q. Okay. And was he confident that nobody was going to find Dustin Pool?

3:28:48 A. Yes. And he said Josh aborted the mission -- whatever.

3:28:52 Q. He said Josh. Which -- what -- Josh who?

3:28:54 A. Josh Stocker.

3:28:55 Q. And did he say how he had aborted mission?

3:28:58 A. He said he left them with the body.

3:29:01 Q. Did Craig also kind of survey the carpet problem and couch problem?

3:29:07 A. Yes.

3:29:08 Q. Okay. And what was decided after the meeting with Craig?

3:29:10 A. Craig said he would take care of my couches. They had cleaning crews on the payroll, and that he would call a guy to come look at the carpet, which that guy did come that night. And that if he couldn't get the stains out of the carpet, they would just replace the entire

3:29:25 carpet.

3:29:26 Q. So a carpet cleaner that Craig Kimberlin knew eventually came over to your apartment later that night?

3:29:35 A. Well, not a crew, just one man.

3:29:37 Q. Oh, just one. Do you know his name?

3:29:39 A. Eric Gurton (phonetic).

3:29:40 Q. Did he bring anyone with him?

3:29:42 A. His son.

3:29:43 Q. How old was his son?

3:29:44 A. I'm guessing seven or eight --

3:29:47 Q. So --

3:29:48 A. -- maybe.

3:29:48 Q. -- a small boy?

3:29:49 A. Uh-huh.

3:29:50 Q. And what did -- were you at the apartment when Eric Gurton and his son showed up?

3:29:56 A. Yes.

3:29:57 Q. And what took place in your apartment?

3:30:00 A. Eric just -- Craig just said when Eric gets here don't tell him anything about what happened. Don't say anything, let him do his job. And he came in there and tried to clean it, but nothing worked. He gave up.

3:30:10 Q. What did he try to clean the stains with?

3:30:12 A. Some kind of cleaner he had that was better than what I had, and then he tried bleach, too.

3:30:19
Q. And uh -- did -- what was -- what happened after the -- Eric Gurton's cleaning efforts didn't work too well?
3:30:26
3:30:30
3:30:30
A. Allen's Carpet Care was called.
3:30:33
Q. And did they eventually come over?
3:30:38
A. Yeah, they did. I wasn't there though.
3:30:41
Q. Was this the next day?
3:30:42
A. Possibly -- Allen's -- I don't remember.
3:30:48
Q. Okay. No, that's fine.
3:30:50
A. Allen's may have been.
3:30:51
Q. Were you there when Allen's Carpet Cleaning came over?
3:30:54
3:30:54
A. No.
3:30:55
Q. Did you get -- how did you know they had cleaned your apartment?
3:30:59
3:30:59
A. Because when I came home Guinn said that there was an Allen's Carpet Care receipt. She stuck it on my candle holder that was hanging up on the wall, and I went to grab it, and she signed my name on it.
3:31:01
3:31:05
3:31:10
3:31:12
Q. And do you know who paid for the carpet?
3:31:16
A. She told me Myers did. Jason Myers.
3:31:17
Q. Who is Jason Myers?
3:31:18
A. One of Guinn's friends.
3:31:21
Q. How -- how well did the Allen's Carpet Cleaning people do in getting the stains out?
3:31:24

3:31:26 A. Pretty good with the couches, except for if you flipped the cushions over it was obvious where someone heavier sat down. The stains in the carpet, they -- it was untouched.

3:31:40 Q. Now, when Allen's Carpet Cleaning came over, had the carpets already been cut out from the closet?

A. No.

3:31:47 Q. Okay. When did the carpet from the closet get cut out and put into the living room area?

3:31:52 A. The same time the couches were taken out, because the couches were burned and so was that piece of carpet.

3:31:58 Q. Do you remember approximately when your couches were taken out of your apartment?

3:32:03 A. I think the following day after Allen's was there.

3:32:08 Q. Who took your couches out of your apartment?

3:32:12 A. Craig said it was Eric.

3:32:14 Q. How were these people -- how did he -- was -- how was he able to get to into your apartment?

3:32:18 A. I gave Craig a key at one of the meetings I had.

3:32:25 Q. And so did you actually see the person who cut the carpet out of the closet and put it into the living room area?

3:32:32 A. No.

3:32:35 Q. But you noticed it on a subsequent trip to your

3:32:39 apartment?

3:32:40 A. Yes.

3:32:40 Q. Okay. And now the days after March 9th, did you
3:32:46 start having meetings with Craig Kimberlin?

3:32:49 A. Yes.

3:32:50 Q. Do you remember the first time you met him?

3:32:52 A. Yes.

3:32:52 Q. And where was that at?

3:32:53 A. Oh, the first time I met him was at my apartment.

3:32:55 Q. Okay. And then --

3:32:56 A. And at Stumpy's at -- like 3:00, 3:30 in the
3:32:59 morning.

3:33:00 Q. Okay. Stumpy's Bar in Amarillo?

3:33:01 A. Yes.

3:33:02 Q. What was talked about at Stumpy's?

3:33:04 A. Uh -- I don't remember exactly. He talked about
3:33:10 if the police got involved, he told me to sign a search
3:33:14 warrant, so that it wouldn't look bad.

3:33:16 Q. To do what?

3:33:16 A. To sign a search warrant for my apartment. Said
3:33:20 if that was ever asked by the police to sign it. He told
3:33:23 me that, and --

3:33:23 Q. So did he mean to let them come into your
3:33:26 apartment?

3:33:26 A. Yes.

3:33:26 Q. Okay. And did he take any security precautions when you arrived at Stumpy's?
3:33:33 A. Not at that time.
3:33:35 Q. Okay. Was Josh Stocker there at Stumpy's when you were talking to Craig?
3:33:41 A. No.
3:33:41 Q. Did you have any more meetings with Craig Kimberlin?
3:33:44 A. Yes, sir.
3:33:44 Q. Can you tell us the location?
3:33:46 A. Different places. Wal-Mart a couple of times on Coulter. Bailey's. Slim's. Stumpy's.
3:33:58 Q. What's Bailey's?
3:33:59 A. Bailey's is on Bell. It's, I don't know, a bar, a pool hall, I guess.
3:34:06 Q. And were these meetings with Craig Kimberlin -- I mean, what was the purpose of having these meetings with him?
3:34:11 A. Basically, I think that the purpose was that he didn't -- he was just making sure that I wasn't freaking out. He didn't want anybody going to the police. And, eventually, the purpose of the meetings came for him to find a way to get rid of me.
3:34:27 Q. So he -- he started off with he wanted to make sure you are kind of a team player?

3:34:31 A. Right.

3:34:32 Q. And you weren't going to spill the beans to the cops?

3:34:35 A. Right. Right.

3:34:37 Q. When -- when you were at the Comfort Inn visiting with Josh Stocker, did he give you any money at the time?

3:34:43 A. No.

3:34:45 Q. Okay. And did he ever give you money after the Comfort Inn?

3:34:48 A. Yes.

3:34:49 Q. Okay. How much did he give you?

3:34:50 A. $400.00.

3:34:51 Q. What was that for?

3:34:53 A. When I was cleaning my apartment, I was telling Guinn that even if it was cleaned, and things, that the police -- I mean, I just knew I couldn't stay at that apartment. Plus, my lease was up. I couldn't afford it by myself. And Josh gave me $400.00 and told me to look for an apartment. Plus, I was --

THE COURT REPORTER: Excuse me. Plus what?

3:35:15 THE WITNESS: I was getting on him and Guinn's nerves that day.

3:35:19 Q. (BY MR. FOWLER) And so did you go reserve another apartment?

3:35:23 A. Yes, I did.

Q. Where at?
A. Candlewick.
Q. Did Craig Kimberlin ever give you any money?
A. Yes.
Q. How much did he give you?
A. In total, I don't know.
Q. After cleaning your carpets, did you ever leave for Dallas?
A. Yes.
Q. And why did you go to Dallas?
A. Because I went to a meeting at Bailey's, because Craig paid me, I had to go. And when I got there, he gave me money. I think 15,000 (sic). And I was real tired, because I hadn't slept like in five days, and Craig wanted me to go to Dallas right then, and I told him I was tired. And he said that I had to go. He didn't -- he better not find out I had his money and didn't leave. So I went to Dallas that day. That morning.
Q. Did you want to go to Dallas, Texas?
A. That would be fine, I guess, but -- I mean, I had been told that by another person, too. I didn't want to go right then, at 5:00 in the morning.
Q. And was the point of going to Dallas to avoid law enforcement?
A. No. Craig -- well, I mean, that's Craig's

excuse, but really Craig wanted me gone.

Q. Wanted to kill you?

A. No -- well, eventually, that's what I heard.

Q. So Josh Stocker gave you 400, Craig gave you 1,500 --

A. At that time.

Q. -- at that time to go to Dallas. So now we're up to 1,900. Did you ever receive any more monies from Josh Stocker or Craig Kimberlin?

A. From Craig.

Q. How much more did you receive?

A. One time Jessica gave me 800, and there was another -- well, Craig gave me money for my couches. He paid for my couches.

Q. Okay. So Jessica Kimberlin, Craig's wife gave you $800.00?

A. Yes. There might have been -- at one of the meetings, Craig might have given me money at another time. I don't remember.

MR. FOWLER: Your Honor, may I approach the witness?

THE COURT: Yes, sir.

Q. (BY MR. FOWLER) Tori, I want to show you what has been admitted into evidence as State's Exhibit No. 9. It's a bill from Warehouse Solutions, dated March 17th

3:37:29
3:37:31
3:37:33
3:37:35
3:37:37
3:37:38
3:37:40
3:37:40
3:37:44
3:37:45
3:37:47
3:37:51
3:37:56
3:37:59
3:37:59
3:38:03
3:38:04
3:38:05
3:38:08
3:38:10
3:38:11
3:38:13

2003.

A. Yes.

Q. Were you there at Warehouse Solutions?

A. I signed this paper.

Q. Okay. Whose name did you sign?

A. Morgan Sprool's (phonetic).

Q. But that's your handwriting?

A. Yes, sir.

Q. Why did you have to sign Morgan Sprool's name at Warehouse Solutions?

A. Because if you've ever been to Warehouse Solutions, in order to shop there you have to have a membership. And if you don't, you have to pay for one, and Craig didn't want to pay for a membership. Guinn said her uncle had one there. And said sign his name, so I did.

Q. And who else was with you at Warehouse Solutions?

A. Guinn and Craig.

Q. And what was purchased there?

A. Two couches -- well, a couch and a love seat.

Q. Did you pick them out?

A. Yes.

Q. And who paid for the couches?

A. Craig.

Q. And it looks like the total bill is $1,093.85?

A. (Witness nods head up and down.)

Q. Is that what the bill says?

A. Yes.

Q. And it says cash of $1,100 was paid, and change was given to Craig Kimberlin?

A. Yes.

Q. Okay. And were the couches, were they delivered to your apartment at River Falls, or did they go to the Candlewick apartment?

A. They were delivered to Candlewick.

Q. And at one point, did Craig ever arrange for you to see an attorney?

A. Yes, he did.

Q. And did you go visit with this attorney, suggested you go see?

A. Me and Guinn did, yes.

Q. Now, the -- the attorney, did you ever pay that attorney money?

A. No.

Q. Did you get the feeling somebody else had paid the attorney money?

A. Craig said that he had paid her. But it was somebody else's -- I mean he paid --

Q. Did you ever receive any more money from Jessica, or Craig, or Josh Stocker?

3:39:25 A. Maybe from Craig, I don't remember.
3:39:28 Q. You remember about how much more of --
3:39:30 A. It wasn't much more.
3:39:33 Q. About how long did you spend in Dallas?
3:39:42 A. I don't even remember the exact time. I came back for problems with my son.
3:39:46 Q. Well, was it days, weeks, months?
3:39:49 A. Days.
3:39:49 Q. Okay. Did you go to Dallas before you met with Mark Brown?
3:39:53 A. No.
3:39:54 Q. Or after?
3:39:55 A. After.
3:39:55 Q. Okay. And Mark told us, before you came in here, he met with you on March 26th, 2003?
3:40:04 A. That's probably correct.
3:40:06 Q. And you gave him a one-page statement at the time. Is that right?
3:40:10 A. Yes.
3:40:14 Q. And you also gave him consent to search your apartment. Is that right?
3:40:18 A. With Craig's permission, yes.
3:40:21 Q. Before you gave Mark Brown consent to search your apartment, did you call Craig or check with him?
3:40:28 A. No. Craig had already said that at a meeting the

last time we talked to him.

Q. Okay. And I think Mark and the other officers went to your apartment the next day on the 27th?

A. Yes.

Q. And the statement that you gave Mark, on March 26th, 2003, was that a truthful, and accurate, and full --

A. It was a made up story.

Q. Okay. And who suggested that you make -- or did anyone suggest that you make up the story?

A. Craig suggested a couple of things to the story. Me and Guinn got together and put it together.

Q. And then, eventually, you gave another statement on June 28th, 2003, to an investigator in our office in conjunction with the agreement that you cooperate. Is that right?

A. Yes.

Q. And then I believe on July 22nd, as you remembered some more details, you also provided another statement. Is that right?

A. Yes.

Q. Have -- have you ever been convicted of a felony or misdemeanor --

A. Never.

Q. -- in this state or any other state?

A. No. Never.

MR. FOWLER: I pass the witness, Your Honor.

CROSS EXAMINATION

BY MR. WATKINS:

Q. Hi, Ms. Patrick. My name is Mike Watkins.

A. Hi.

Q. How are you today? A little nervous?

A. Yes.

Q. Okay. I have some questions, based on your testimony and your statements. Let's start out: Mr. Fowler started out with you talking about what agreement you have for your testimony today.

A. I don't have an agreement for any testimony.

Q. Okay. Now, do you remember a day back in June of 2003, when you were in jail and you were represented by Jamie Watson, when Mr. Farren and Ms. Ledbetter came out and talked to you?

A. Yes.

Q. Okay. And on that day did you sign an immunity agreement with Mr. Farren?

A. No. I never have seen an immunity agreement.

Q. You've never seen one?

A. No. I've never been given anything like that.

Q. Okay. In talking with the DA, did they agree to recommend a reduction of your bond for your testimony?

A. They --

3:43:04 Q. Wasn't your bond originally set at --
3:43:07 A. Right. I don't know why it was. I mean, I don't -- I don't know the reasons why.
3:43:11 Q. Just out of nowhere --
3:43:13 A. Well, I don't know anything about the law. I've never been in trouble. You know? I don't know.
Q. Okay. All right.
3:43:20 A. I knew what I was charged with. I didn't feel like --
3:43:23 Q. Let me -- let me slow you down, and let's ask questions and answers, so we don't lose the court reporter or the jury. Okay?
3:43:30 Your original bond was pretty high. Is that correct?
3:43:32 A. Yes, sir.
3:43:33 Q. What was it?
3:43:33 A. $1,000,000.00.
3:43:35 Q. And you're currently out on bond right now?
A. Yes, sir.
3:43:38 Q. How much?
3:43:40 A. I think $10,000.00.
3:43:41 Q. $10,000.00? That's quite a difference, isn't it?
3:43:46 A. Yes, sir.
3:43:47 Q. And you've been out on bond for how long?
3:43:53 A. About a year and a half. I don't know.

Q. Okay. And during your first couple of statements you were represented by an attorney, Jamie Watson. Is that correct?

A. Yes, sir.

Q. Now, she's not your attorney any longer?

A. No, sir.

Q. She actually works for the Randall County DA's office now?

A. Yes, sir.

Q. Okay. Who's your attorney now?

A. Jeff Robinette (phonetic).

Q. Okay. And is he here today?

A. He doesn't live in town.

Q. Okay. So he's not in the courtroom?

A. No, sir.

Q. Okay. Now, you say that there's not an agreement, but you understand that you still stand charged with capital murder?

A. Yes, sir.

Q. And that there's been some discussion about if you give truthful testimony that that will be taken into consideration when your case is taken care of?

A. Yes, sir.

Q. Okay. Just no one's ever mentioned an exact time?

A. No, sir.
Q. Okay. Now, you're not hoping for a life sentence, are you?
A. No, sir.
Q. You're kind of hoping for probation, or a lesser sentence, or something like that, aren't you?
A. Well, whatever one would hope for over prison.
Q. Okay. Or maybe that goes away?
A. Well, yeah, I wish that, but. . .
Q. Okay. But you just don't know?
A. Right.
Q. Now, has -- your case, it's pending at what we call complaint. Is that correct?
A. What does that mean?
Q. Well, has it -- has it ever been indicted?
A. No.
Q. You don't -- you know those terms?
A. Not really.
Q. Okay. That's fine. All right. You said that you second met Josh Stocker. You knew him as a kid, when y'all were all kids. Right?
A. Yes.
Q. And the second time you run into him is whenever you want to sell a stereo?
A. Yes.

Q. Okay. And I think you said it was a Pioneer stereo?

A. It might have been, I'm not for positive, but I think it was.

Q. All right. Was it out of your car?

A. No, it was out of Ron Brown's car, I bought it for him, so when we split up he took everything nice that he bought me, so I took that.

Q. Okay. Was it a pretty nice stereo?

A. Yeah, it was a nice stereo.

Q. Yeah. How much did you -- did you sell it to Josh?

A. Yes. Well, I -- well, Guinn did.

Q. Guinn did.

A. That's what she said.

Q. How much did you get out of it?

A. 125.

Q. 125. Okay. Probably worth a lot more than that brand new?

A. I charged it to my credit card for $336.00 on sale.

Q. And where did you buy it?

A. Best Buy.

Q. Best Buy. Okay. And when did that transaction occur? How -- if you don't remember the day, how close in

3:46:48 time to when all of this other stuff that you've been talking about?

3:46:53 A. I'm not sure.

3:46:54 Q. Well --

3:46:55 A. I mean, maybe --

3:46:55 Q. -- was it the day before?

3:47:01 A. I don't know.

3:47:02 Q. Okay. In your most recent statement, I think you say that it was early in the month of March, 2003?

3:47:12 A. That's possible, yes.

3:47:14 Q. Okay.

3:47:14 A. Because it was -- I was not around Josh very long before this incident happened.

3:47:19 Q. Okay. So if this all started on March 9th in the late evening hours, and March 10th of the early morning hours, it was less than ten days?

3:47:27 A. Yes. Probably.

3:47:28 Q. Okay. All right. Okay. And you said that you knew Dustin Pool prior to this?

3:47:43 A. Yes.

3:47:44 Q. That he had been hitting on you for some time?

3:47:47 A. He's just like that. That's his character.

3:47:51 Q. How long had you known Dustin?

3:47:53 A. About -- probably a little over a year --

3:47:58 Q. Okay.

3:48:00 A. -- and-a-half.
3:48:00 Q. Did you know that he was a drug dealer?
3:48:02 A. Yes.
3:48:03 Q. Okay. Now, earlier you said you'd been clean for some lengthy amount of time --
3:48:07 A. That's true.
3:48:08 Q. -- prior to this? Did you -- was he your previous drug dealer?
3:48:12 A. He was never my drug dealer.
3:48:15 Q. How did you know him? Where did you meet?
3:48:17 A. Because me and Guinn were friends. That was her drug dealer. I met him at Guinn's house.
3:48:23 Q. And you and Guinn were friends?
3:48:25 A. Yeah. Me and Guinn have been friends for a long time.
3:48:29 Q. Okay. Pretty hard to stay clean with people around you doing dope?
3:48:33 A. Not when you've been clean for a while.
3:48:35 Q. Okay.
3:48:35 A. But whenever I got back on, eventually.
3:48:37 Q. Okay. Were you back on before or after all of this stuff happened?
3:48:43 A. I had just started doing it again a couple of days before this happened, and then I stayed on it after this for a while.

Q. Okay. Was it pretty easy to get back into it?

A. Well, it was at that time, because of the things that had happened.

Q. Okay. Now, you said that there was never any money discussed in -- when Guinn said she needed help getting Dustin to come around so Josh could talk to him?

A. Right.

Q. Okay. You weren't hurting for money at your -- to pay your rent?

A. No, I had a good job.

Q. You had a good job?

A. Uh-huh.

Q. Okay. And everything was just pretty much hunky-doory?

A. Everything was fine, I guess.

Q. Okay. All right. Everything was good at your job. Right?

A. Yes.

Q. Okay. You -- had you had any recent uh -- situations where they called you down for attitude or calling in sick too much?

A. Probably call-ins, yeah.

MR. WATKINS: Your Honor, at this time, subject to the business records -- whoops, got too much there. Subject to the business records, we would offer

3:50:22 Defendant's 1. These have been previously filed.

3:50:24 THE COURT: Subsequent to my -- to business

3:50:26 records?

3:50:27 MR. WATKINS: The business record's rule.

3:50:28 The business record's exception.

3:50:29 THE COURT: You're submitting them under

that?

MR. WATKINS: Yes.

3:50:31 MR. FOWLER: They've been provided to us,

3:50:33 Judge. We have no objection.

3:50:35 THE COURT: D-1 will be admitted. Is all of

3:50:42 this D-1?

3:50:43 MR. WATKINS: All of that is D-1.

3:50:45 THE COURT: I need you to provide it be

3:50:47 attached or put some sort of substance. . .

3:51:01 Q. (BY MR. WATKINS) And where did you work?

3:51:03 A. Northwest Texas Hospital.

3:51:04 Q. And what was your position there?

3:51:07 A. Patient care specialist.

3:51:09 Q. Okay. And what does that mean?

3:51:11 A. CNA is the same thing, just without a license.

3:51:14 Q. I'm sorry?

3:51:15 A. Just without a license. It's the same thing as a

3:51:18 CNA. A certified nurses' assistant.

3:51:21 Q. All right. Thank you. When you use all of these

initials I get lost.

A. Sorry.

Q. That's okay. Had you called in quite a bit just prior to all of this, sick and problems with your kid, and --

A. I'm sure I had.

Q. Now, my understanding is you worked weekends kind of?

A. Uh-huh.

Q. Yes?

A. Yes.

Q. Okay. Yeah, you have to answer "yes" and "no" --

A. Yes, sir.

Q. -- so she can get it down.

A. I'm sorry. Yes.

Q. And how long had you worked at Northwest Texas?

A. For five years.

Q. Okay. And shortly after all of this you uh -- quit or were asked to quit?

A. I quit.

Q. Okay.

MR. WATKINS: May I publish the business records to the jury?

THE COURT: Yes, sir.

Q. (BY MR. WATKINS) Do you think that your recent

3:52:25 uptake of methamphetamine use contributed to your problems at work?
3:52:31 A. Eventually, yes.
3:52:33 Q. Okay. Now, I'm not sure I understand what the living arrangement was over in River Falls. Did Guinn live with you?
3:52:45 A. She started staying there because her and Ray Placensio were having problems, and he wouldn't get out of her house.
3:52:51 Q. Okay. So sometimes she was there --
3:52:53 A. She was there like the last week and a half or two weeks straight.
3:52:58 Q. She was there a lot, but her permanent residence was somewhere else?
3:53:03 A. Yes.
3:53:03 Q. Okay. But she was sleeping there and eating there?
3:53:06 A. Yes.
3:53:07 Q. Okay. All right. And you two are pretty good friends, or you were at the time?
3:53:15 A. Were.
3:53:16 Q. Okay. And had Dustin been to your apartment before?
3:53:25 A. No.
3:53:26 Q. No.

A. He had been outside of my apartment before, but not in it.

Q. Okay. Did he call you at the apartment very often?

A. Yes.

Q. Okay. Did he call for you or for Guinn?

A. Both.

Q. Both. Okay. Let's talk about uh -- that evening when you say Josh came over. About what time do you think it was that Josh came over?

A. I don't know exactly. I was -- it was -- I don't know.

Q. Okay. Let me -- let me give you some time frames, so maybe we can narrow it down. You have an 18-month or two-year-old son. Right?

A. Yes, sir.

Q. Or at that time he was that age?

A. Yes, sir.

Q. By the name of Kadden?

A. Yes.

Q. Had Kadden gone to bed?

A. Yes.

Q. And what time does Kadden usually go to bed?

A. At that time, oh, about 8:00.

Q. 8:00?

A. That's about the time I can get him down. He fights sleep.
Q. He doesn't want to go to sleep?
A. No.
Q. Okay. Kind of a normal two year old?
A. Uh-huh.
Q. Terrible twos? Do you watch regular TV shows?
A. Yes.
Q. What do you watch after Kadden goes to bed?
A. Whatever is on, but if I have company, I usually don't watch TV.
Q. Okay. Then you had company --
A. It will be on, but I'm not paying attention to it.
Q. Okay. Was it midnight when Josh came over?
A. It was before midnight.
Q. Okay. So between 9:00 and midnight?
A. That's fine.
Q. Okay. I don't want to put words in your mouth, I'm just trying to figure this out.
A. That's probably a good time frame.
Q. Okay. And had you talked to Dustin or -- let me ask you this: Did you have caller ID on your phone?
A. I don't remember if I did. It wasn't on the phone. I don't remember if I had a separate deal or not.

3:55:37 Q. A separate box?
3:55:38 A. I don't remember.
3:55:39 Q. Okay. Uh -- do you know if you had talked to Dustin or he'd tried to call you that night?
3:55:48 A. Yes.
3:55:48 Q. How many times?
3:55:49 A. I don't know how many times he called. I talked to him one time earlier that night, about Ray Placensio --
Q. Okay.
3:55:55 A. -- for Guinn, because she asked me to.
3:55:58 Q. Okay. About what time was that?
3:55:59 A. I don't know.
3:55:59 Q. Before or after Kadden went to bed?
3:56:02 A. I don't know.
3:56:02 Q. You just don't remember?
3:56:04 A. No. When you're high all of your time runs together.
3:56:07 Q. Okay. And then sometime later, Michael Stocker came over?
3:56:20 A. Yes.
3:56:21 Q. And you said you saw him come through the door of the apartment. Correct?
3:56:28 A. I mean, I saw him show up there. I wasn't -- I didn't like probably watch him walk in the door.
3:56:35 Q. Okay. When you're high, do your events also kind

3:56:38 of run together like your time?

3:56:39 A. No, but I was probably sitting on my couch

3:56:42 talking to Guinn, not paying attention to what Michael and

3:56:46 Josh were doing.

3:56:47 Q. Okay. So you have to be buzzed into your

3:56:49 apartment building?

3:56:50 A. Yes. But anybody can buzz them in, it's right

3:56:52 next to the door.

3:56:53 Q. Okay. So you don't remember getting up and

3:56:55 buzzing --

3:56:55 A. I didn't buzz him in, somebody else did.

3:56:57 Q. Either Josh or Guinn?

3:56:59 A. I believe Josh.

3:57:01 Q. Okay. And you didn't -- now, had you ever meet

3:57:04 Michael before?

3:57:05 A. Yes.

3:57:05 Q. Did you know him back in the days of church

3:57:08 school together or when?

3:57:08 A. Yes. But he was like -- he was a lot older than

3:57:12 the last time I saw him.

3:57:13 Q. Okay. Had you met him other than back in the

3:57:16 church days?

3:57:16 A. No.

3:57:16 Q. Okay. So when he came in, did you all talk?

3:57:21 A. Yeah.

3:57:24 Q. Strike up your old friendship?
3:57:24 A. Not really like that. I mean, I didn't know Michael very well.
3:57:27 Q. Oh, okay. All right. And you didn't notice him carrying anything in?
3:57:33 A. I didn't pay attention.
3:57:35 Q. Okay. What were you and Guinn talking about?
3:57:40 A. I don't remember, that was two years ago.
3:57:42 Q. Okay. Well, the reason I ask is, you remember a lot of very specific details.
3:57:48 A. Yeah. There are things that were said that bother me that I do remember.
Q. Okay.
A. Uh-huh.
3:57:53 Q. But other things we don't remember. Right?
3:57:56 A. Well, I mean, just a conversation that's not important, just every day conversations I don't remember.
3:58:04 Q. Okay.
3:58:05 A. It's not important.
3:58:09 Q. Now, you were shown --
3:58:11 MR. WATKINS: May I approach the witness?
3:58:12 THE COURT: Yes, sir.
3:58:15 Q. (BY MR. WATKINS) You were shown this diagram earlier.
MR. WATKINS: Has this been admitted into

3:58:19 evidence, Mr. Farren?
3:58:20 MR. FARREN: Just identified for
3:58:23 demonstrative purposes. I don't have an objection to it,
3:58:25 but --
3:58:26 MR. WATKINS: I'm not sure I want to admit
3:58:28 it. Let me get a sticky note.
3:58:31 MR. FARREN: So far it's been identified by
3:58:34 number, and it's demonstrative.
3:58:37 MR. WATKINS: Thank you.
3:58:38 Q. (BY MR. WATKINS) You pointed earlier with
3:58:40 Mr. Farren kind of where things sat around in here.
3:58:42 A. Yes.
3:58:43 Q. Okay. Let's -- can you write the word "couch" on
3:58:49 to top one of those sticky notes?
3:58:53 THE COURT: Ms. McElroy.
3:58:55 MS. McELROY: Yes, Your Honor.
3:58:55 THE COURT: You go up and go on that left
3:58:57 side of the witness, and you hold the thing up against the
3:59:00 wall so I can see it, too.
3:59:03 MS. McELROY: Okay.
3:59:03 MR. FARREN: If you're going to write on it,
3:59:05 do you have tape --
3:59:07 MR. WATKINS: I'm -- I'm writing on a sticky
3:59:10 note.
3:59:11 THE COURT: Right over here.

MS. McELROY: I'm --

MR. FARREN: Yeah. We may have to reuse this later, and --

MR. WATKINS: That's fine.

MR. FARREN: -- we don't want to spend the county's money.

Q. (BY MR. WATKINS) If you will write "love seat". Hold it up against the wall, that would be easier.

THE COURT: That's what I intended.

MR. WATKINS: Yeah.

THE COURT: Kind of stand back from it back to --

Q. (BY MR. WATKINS) Okay. Could you stick those kind of where the couch and love seat were sitting?

A. (Witness complies.)

Q. Okay.

MR. WATKINS: We're done for right now.

THE COURT: Take your seat, Ms. McElroy.

MS. McELROY: Yes, sir.

THE COURT: Thank you. You did good.

MS. McELROY: Thank you.

Q. (BY MR. WATKINS) Okay. And I think you said that you thought Josh was hiding in the closet in the living room?

A. That's where he originally was.

4:00:15 Q. Now, that's kind of a pantry type area, isn't it?
4:00:19 A. I guess so, yeah.
4:00:21 Q. Okay.
4:00:21 A. I don't know. It's a whole -- it's a big closet. It slides from one hall all the way to the door of the front at the entrance.
4:00:28 Q. It's got two doors that slide across it either way?
4:00:32 A. Yes.
4:00:33 Q. And one side has shelves and one has a place for coats and --
4:00:37 A. Right.
4:00:37 Q. -- and hangers?
4:00:39 A. Right.
4:00:39 Q. Okay. But that's not where you saw him come from later, was that your testimony?
4:00:47 A. Correct. Yes.
4:00:49 Q. Where did you see him come from later?
4:00:50 A. The hallway.
4:00:51 Q. Okay. Now, that's a pretty small hallway?
4:00:54 A. Well, I mean, it's just on the other side of the wall.
4:01:00 Q. Okay. And you went and hid in the bathroom and sat on the bathtub?
4:01:25 A. Yes.

4:01:32
4:01:34
4:01:36
4:01:37
4:01:42
4:01:44
4:01:47
4:01:49
4:01:52
4:01:55
4:01:59
4:02:05
4:02:06
4:02:07
4:02:28
4:02:32
4:02:32
4:02:38
4:02:41
4:02:41
4:02:43

Q. Okay. And that is what you had agreed to do?
A. Yes.
Q. Earlier in the evening?
A. Yes.
Q. Now, you also said that you didn't have any idea that any fight was going to go on in your apartment?
A. They weren't supposed to -- they weren't supposed to fight in my apartment.
Q. So why would you need to go hide?
A. I don't -- I don't know. I mean, that was just what -- because they were going to -- what Josh was saying he was going to go get him in a choke hold, to get him out of my apartment.
Q. Okay.
A. And that -- until they got him out, that's where I was supposed to go.
Q. Okay. Okay. And then after the scuffle, Josh came and asked for ice to put on Dustin's head?
A. Yes.
Q. And now you're uh -- I don't know of -- I don't want to get this wrong, a patient care specialist?
A. Yes.
Q. Okay. Do you have some training in that kind of stuff?
A. Yes.

4:02:45
Q. And did you go help?
A. No.
Q. Okay. I think you also said that you heard a whap, like something hitting something, and Dustin started yelling and screaming for help, and he didn't get the word help all the way out. That kind of stuff. Is that correct?
A. He was hollering for help before he got hit.
Q. Before he got hit, he started hollering?
A. Yes, sir.
Q. And started trying to use the cell phone?
A. He had the cell phone in his hand the entire time.
Q. Okay. Trying to wake the people up in the next apartment, or get your attention, and just anything --
A. I guess he was -- he started yelling loud.
Q. Pretty loud?
A. Yeah.
Q. Okay. Oh. The court reporter has trained us to listen for that tape recorder. We get quiet whenever it clicks.

THE COURT: She types that down when you say that.

MR. WATKINS: I know. And this as well.

THE COURT: Stick to the deal.

Q. (BY MR. WATKINS) Okay. Okay. Uh -- now, you said that after all of this, you all went to a hotel. Correct?

A. The night this happened?

Q. Yes.

A. We went to Motel 6.

Q. Okay. Motel 6. And you drove?

A. I drove my car and Michael drove his own vehicle.

Q. Okay. Now, I thought you were freaking out pretty bad?

A. I was.

Q. Okay. But you were okay to drive?

A. Probably not.

Q. But you did drive?

A. Uh-huh. Yes.

Q. Okay. All right. And when you went back to your apartment a day and a half later, or something like that, you found Dustin's wallet with his ID kind of displayed?

A. It was displayed.

Q. Huh?

A. It was displayed, yes.

Q. Okay. Was it propped up?

A. No. It was laid out. My table was moved right in front of the door, so that's the first thing you see when you walk in.

4:05:17 Q. Okay. And his cell phone was there also?
4:05:21 A. Yes.
4:05:21 Q. Okay. And the last time you saw this wallet and cell phone, they were together?
4:05:25 A. Yes.
4:05:26 Q. And they were -- you gave them to Josh Stocker?
4:05:29 A. Yes.
4:05:30 Q. Okay. And is this the cell phone that -- you may not know this, but that he called you on earlier that evening?
4:05:38 A. Could be.
4:05:38 Q. Okay. You suspect it was?
4:05:40 A. I assumed so.
4:05:43 Q. You've said that he emptied his pockets earlier. Is that correct?
4:05:48 A. Yes. He put -- he gave everything to Josh.
4:05:51 Q. Did more than one cell phone get emptied out of his pocket?
4:05:55 A. I didn't actually see everything that he put in there.
4:05:58 Q. Okay. All right. You were asked about how much money Dustin had in his billfold, and I think you said I didn't look in it?
4:06:13 A. I didn't.
4:06:14 Q. Okay. But that oftentimes Dustin carried lots of

4:06:18 money with him?

4:06:19 A. Yes, he would flash it around.

4:06:20 Q. Okay. Especially when he was out collecting. Is that correct?

4:06:24 A. Uh-huh.

4:06:25 Q. Did you go out collecting with him?

4:06:26 A. One day I did, but not by choice. I wanted a ride home and he was giving me a ride home, but on the way to take me home he had to stop at two different places.

4:06:35 Q. Okay. Now, a little later y'all went and tried to clean up the carpet, and the sofa, and stuff?

4:07:01 A. Yes.

4:07:02 Q. And you had some cleaning supplies, as I guess any mother of a two-year-old would have?

4:07:08 A. Yes.

4:07:09 Q. Under your sink?

4:07:09 A. Yes, sir.

4:07:10 Q. Do you remember what kind of cleaning supplies you had?

4:07:12 A. Yes. I had like bleach, and I had some carpet cleaner, and then --

4:07:18 Q. Like Renewsit (phonetic)?

4:07:20 A. Like -- it's called Incredible, actually. It's from the Hoover store.

4:07:25 Q. Incredible?

A. Yeah.
Q. And what else?
A. And some red bottle of carpet cleaner. I don't remember the name of it.
Q. Like a red metal bottle?
A. No, like a spray bottle.
Q. A spray bottle? Okay. Do you remember a red bottle -- or a red and white metal bottle of -- what is it called, Energene Spot Cleaner (phonetic)?
A. Yes. That's what Guinn came back with later when she went and bought some more cleaners.
Q. Okay. Now, she had to go buy cleaners because you used up what y'all had?
A. Correct.
Q. Okay. And I assume that all got thrown away?
A. Yes. I guess so.
Q. Okay.
A. It should have.
Q. Okay. And then was there some left over from what Guinn had gone to buy?
A. No.
Q. Huh-uh? Did it get thrown away, too?
A. Yeah, I'm assuming so. Me and Guinn both cleaned up the apartment. Threw everything away, unless something got left behind by accident.

4:09:13
Q. Okay. Uh -- Mr. Fowler went down a list of all of the money and all of the benefits that you got for your participation in this. Do you remember that?

4:09:18
A. I remember him asking me about money, yes.

4:09:21
Q. Okay. $400.00 from Josh Stocker to go get an apartment. Is that correct?

4:09:29
A. Are you asking me?

4:09:31
Q. Uh-huh.

4:09:32
A. Yes.

4:09:35
Q. And $1,500.00 to go to Dallas?

4:09:39
A. Yes.

4:09:40
Q. Okay. Now, you felt like you needed to move out of this apartment because this had happened in it?

4:09:48
A. Well, my lease was up also, and when me and Ron broke up, I couldn't afford to pay -- I didn't want -- it was 685 a month to live there.

Q. Okay.

4:09:59
A. It was expensive. It leaves me with almost no money after you pay all of that and the bills. It's easier to live somewhere cheap anyway.

Q. Okay.

4:10:07
A. But my lease was up anyhow, but, yes, after that happened, I didn't want to stay in that apartment. It was like haunted to me.

Q. Okay. So the expense and all of this going down

is kind of what made you decide to move out?

A. Yes.

Q. Okay.

MR. WATKINS: Your Honor, at this time, I would offer Defendant's No. 2, under the business records exception to hearsay.

THE COURT: What is it?

MR. WATKINS: It's the business records of River Falls Apartments.

MR. FOWLER: Judge, they have been provided to us. We have no objection.

THE COURT: D-2 is admitted.

MR. WATKINS: Whenever you're done with those, I'd like to show them --

THE COURT: Later on put it on that bench back there.

MR. FOWLER: Yes, sir.

THE COURT: Not the biggest batch, but the batch on the right. Thank you. That's great.

Q. (BY MR. WATKINS) While the Judge is going through those records, let me ask you a couple of more questions, then I'll come back to them.

Talked about 400 from Josh, 1,500 from Craig, and about 1,100 in sofas, and money for an attorney. What attorney was that?

4:12:12 A. Laura Hamilton.
4:12:15 Q. Okay. And you didn't pay her, but you felt like someone had?
4:12:22 A. I was told someone had.
4:12:24 Q. Okay. But you don't know how much?
4:12:27 A. Craig at one time said he paid 80,000 for me to be represented by her.
4:12:33 Q. Did you say 80 --
4:12:36 A. 80,000.
4:12:39 Q. 80,000? And you think you got some small pittance at different times from Craig, but you don't remember exact amounts?
4:12:47 A. Not really. I know one time Jessica wanted me to meet her at a laundry mat, and I didn't have any gas to get there and she gave me $10.00 for me to come and meet her.
Q. Okay.
4:12:59 A. For gas money, or just little stuff like that.
4:13:01 Q. Okay. Did you get any dope?
4:13:02 A. No, I didn't get anything from them. Guinn and me, we got high together. I didn't ever pay for drugs.
4:13:08 Q. You didn't ever pay for drugs?
4:13:09 A. No.
4:13:10 Q. Okay. All right. And why -- why didn't you pay for drugs?

A. Because Guinn would just smoke with people for free all of the time.
Q. Guinn smoked with other people for free?
A. She smoked -- yeah, sometimes. She always smoked with me for free.
Q. Okay. All right. I'm confused here. Guinn was buying it and smoking it with you for free?
A. Yes.
Q. Okay. All right. So you weren't buying it. Because she was giving it to you?
A. Yes.
Q. So if Guinn was not around, you didn't smoke any dope?
A. Guinn was always around.
Q. Okay. Now, you -- in your March 26th statement, you make a comment that Dustin was bleeding from his upper forehead. Where -- where was --
A. The March 26th statement, is that the one with Mark Brown? Is that the statement I made to Mark Brown?
Q. Yes.
A. I said before that that statement was also a made up story.
Q. The entire thing was made up?
A. Yes. Yes, pretty much.
Q. Not -- not an ounce of truth in it?

4:14:19 A. Well, I don't know. I don't remember what it says.

4:14:22 Q. Okay. Well, let me ask you this: You said you saw Dustin bleeding?

4:14:24 A. Yes.

4:14:25 Q. Where was he bleeding from?

4:14:27 A. His head, but I don't remember what -- it was like this side, I believe, because it was running on my couch. I didn't sit there and just stare at him.

4:14:34 Q. Okay.

4:14:35 A. I was also getting my stuff together. I was high, I was panicking, and I didn't -- I wasn't there very long. I left shortly after this happened.

4:14:42 Q. This was a pretty traumatic event?

4:14:45 A. Yes, very.

4:14:46 Q. Walking out and seeing a guy bleeding on your couch?

4:14:48 A. Yes.

4:14:53 Q. All right.

4:14:53 MR. WATKINS: Are you finished with those, Your Honor?

4:14:55 THE COURT: I am.

4:14:57 MR. WATKINS: Thank you.

4:14:58 THE COURT: Thank you.

4:15:00 Q. (BY MR. WATKINS) I'm showing you what's been

4:15:01 admitted into evidence as Defendant's No. 2. These are
4:15:06 the business records of River Falls Apartments.

4:15:10 A. Okay.

4:15:10 Q. Do you know a Sharon Cooper (phonetic)?

4:15:12 A. No, I don't.

4:15:13 Q. Okay.

4:15:16 A. Who is she?

4:15:17 Q. She's the apartment manager.

4:15:19 A. I dealt with Patty Felker (phonetic).

Q. Okay.

4:15:21 A. And she no longer works there.

4:15:25 MR. FARREN: Your Honor, I'm going to object
4:15:26 to Defense counsel answering questions.

4:15:29 THE COURT: This is his witness.

4:15:31 MR. FARREN: Our witness.

THE COURT: It's his witness.

4:15:32 THE WITNESS: Patty Felker doesn't work
there --

4:15:34 THE COURT: Hold up. Hold up.

4:15:36 MR. WATKINS: Okay. All right.

4:15:36 THE COURT: Hold up!

4:15:39 MR. WATKINS: I need to -- okay.

4:15:39 MR. FOWLER: Your Honor, I would object to
4:15:41 defense counsel --

4:15:42 THE COURT: Let's get -- keep it where it's

supposed to be. Sustained.

MR. FOWLER: Yes, sir.

Q. (BY MR. WATKINS) I'm going to ask questions, rather than you. Okay? Because that's the way we have to do this.

Is this a note that you left at the apartment?

A. Yes, it is.

Q. Okay.

A. With the advise from Mark Brown.

Q. Okay. And do you remember what day you gave notice that you wanted to terminate your lease?

A. No, I don't. I don't know if I terminated my lease, I believe my lease was fixing to be up anyways. If I remember correctly, I just wasn't going to renew it.

Q. Okay. Let me ask you if you see this second page.

A. Okay.

Q. Is this your signature on this second page?

A. Yes.

Q. And what is the title of this page?

A. Okay, yeah. And then it says, because I can't afford it.

Q. Please read the --

A. "Residence's Notice of Intent to Move Out".

Q. Okay. And your reason for moving out?

A. (Reading) I cannot afford it, which is as I stated earlier, because me and Ron broke up.

Q. And what date does it say you'll surrender your premises?

A. March 31st -- is crossed out. March 31st, 2003.

Q. Okay. And what dates does it say you signed this or delivered this notice?

A. June 26th of '03.

MR. WATKINS: Publish to the jury?

THE COURT: Yes.

Q. (BY MR. WATKINS) If -- through the investigation, it came to light that you did this because you needed money, is that true?

A. No.

MR. WATKINS: Pass the witness.

REDIRECT EXAMINATION

BY MR. FOWLER:

Q. Ms. Patrick, counsel asked you why Ray -- why Guinn was staying at your house, and you said Ray and her were having problems. What problems was Ray Placensio and Guinn having?

A. Ray is violent. And he had shot her little girl in the neck with a BB gun at one time. He has tazing (phonetic) me in my neck with a tazer (phonetic) gun.

Q. Did Ray and Guinn have any other problems that you know of?

A. Yeah, he hit her, and he was drugging her, and putting Demerol in her food.

Q. Did you know of anything being done to Ray Placensio?

A. Yes.

Q. What did you know of?

A. I found out about it after it happened.

Q. And what was that?

A. Guinn told me what they did. Guinn said that he was kidnapped at Wal-Mart. Josh Stocker accidently shot Chris Eason in the foot during the time.

Q. So you knew he had been kidnapped?

A. Yes, after.

Q. Now, some of the other comments in your Northwest Texas Hospital records, Tori's well organized, completes work in a timely manner. Able to get along with staff. Communicates well with patients. Always willing to help others. Hard worker. Also does a good job with her patients. Team player. Takes direction easily. Strong work ethic and dependable. Does that sound about right, the job evaluation?

A. Yes.

MR. FOWLER: Your Honor, may I approach the

4:19:41 witness?

4:19:42 THE COURT: Yes.

4:19:43 MR. FARREN: We will just put it up here.

4:19:47 Q. (BY MR. FOWLER) Tori, we're going to put a page
4:19:49 on that was from the business records, that Mr. Watkins
4:19:54 introduced from the River Falls Apartments.

4:19:57 Is this the note that you left to the folks
4:20:00 at the apartment complex?

4:20:02 A. Yes. Mark Brown told me to write that note.

4:20:06 Q. And you reference the carpet in there. Is that
4:20:09 correct?

4:20:09 A. Yes. It -- it had already been cut out at that
4:20:13 time by the police.

4:20:14 Q. The police had already come and cut out some of
4:20:17 the carpet?

4:20:17 A. Yes. A lot of the carpet.

4:20:19 Q. Okay.

4:20:30 MR. FOWLER: Your Honor, I'll pass the
4:20:31 witness.

RECROSS EXAMINATION

4:20:32 BY MR. WATKINS:

4:20:33 Q. Just out of curiosity, did you get your deposit
4:20:36 back from River Falls?

4:20:37 A. No.

4:20:38 Q. Okay. Did they send you a bill?

4:20:39 A. No.

4:20:51 MR. WATKINS: May I approach the witness?

4:20:53 THE COURT: Yes.

4:20:54 Q. (BY MR. WATKINS) Earlier, I asked you about a immunity agreement, and you said you'd never seen anything like that.

4:21:08 A. Not to my knowledge. I'm not familiar with the law either.

Q. Okay.

4:21:11 A. I don't know what an indictment is, as I told you.

4:21:13 Q. Okay. I'm going to hand you what's marked for informational purposes as Defendant's 3, and I want you to read it, but not out loud, just to yourself, to see if it refreshes your memory.

4:21:32 A. Who is this from, first of all? Whose statements --

4:21:35 Q. I'm not going to answer your question. Just read it. Now, if it doesn't refresh your memory, then tell me that.

4:21:50 A. I have -- I never -- this is not refreshing any memory of mine.

4:21:55 Q. Okay. You said that -- well, after this happened, Guinn spent the night with you in that apartment at River Falls?

4:22:14 A. I believe so. I know I didn't stay by myself.
4:22:17 Q. Okay. How much longer did you and Guinn remain friends?
4:22:20 A. We were friends all the way until we went to jail.
4:22:24 Q. Which was in June?
4:22:25 A. June.
4:22:26 Q. Early July, maybe?
4:22:28 A. Late June.
4:22:28 Q. Late June? Okay. You said that you were familiar with Ray, and that he was violent, and that he had shot Guinn's little girl in the neck with a BB gun, and that he hit on Guinn. That kind of stuff?
4:22:49 A. Yes.
4:22:50 Q. You were also familiar with an incident in which he was allegedly kidnapped?
4:22:55 A. I was familiar with it after it happened.
4:22:57 Q. After it happened. What about one where he kidnapped and killed someone else?
4:23:03 A. I didn't -- I don't know nothing about that.
4:23:07 Q. You don't know anything about that?
4:23:07 A. Huh-uh.
4:23:07 Q. Okay.
4:23:28 MR. WATKINS: Your Honor, may we -- may we approach the bench for just a second?

4:23 THE COURT: Yeah. Come on up.
4:23:51 (At the bench, before the Court only:)
4:23:51 MR. WATKINS: Your Honor, I -- the State is
4:23:55 required to provide Brady material to us. There is a memo
4:24:00 or a part of an incident report in what the State has
4:24:04 provided to us, indicating that there is use of an
4:24:07 immunity agreement signed by Mr. Farren, and Ms. Patrick.
4:24:11 It never has been provided to us. At this point, we're
4:24:15 kind of left with a situation of calling Ms. Ledbetter,
4:24:18 who made the memo --
4:24:19 MR. FARREN: Can I see that?
4:24:21 THE COURT: May have to. Let's -- let's
4:24:22 take the jury out and let's look into it.
4:24:25 (In open court:)
4:24:25 THE COURT: Ladies and gentlemen, we're
4:24:26 going to take a break here. If y'all would be back in the
4:24:29 jury room at a quarter until 3:00. Thank you.
4:24:57 (Jury retired from the courtroom.)
4:24:57 THE COURT: Well, I for one, could use about
4:24:59 a ten-minute break here. Uh -- let's be back in here, and
4:25:09 Markus, if you'd keep the Defendant here, and keep this
4:25:12 witness on the witness stand, let's be back here at 2:40.
4:25:16 (Both sides, the Defendant present, in open
4:34:12 (court:
4:34:13 THE COURT: Be seated. Let me see that,

please. Let me read it first.

MR. FARREN: Yes, sir.

THE COURT: And, in fact, with the Court's permission, I'd like to put Ms. Ledbetter on the stand, outside of the presence of the jury. I think we can clear this up.

Okay. Let me look at it.

(Pause.)

THE COURT: Okay.

MR. FARREN: For the record, Your Honor, this issue has come up during our preparation for this trial. We believe there was discussion about an immunity agreement with Ms. Watson, when she represented her at that time. We believe Bobby Ledbetter knew that there was this discussion, and had assumed that an agreement had been drawn up and signed.

I do not recall ever actually drafting the agreement and having it signed. I believe this witness is testifying truthfully when she says there was no agreement signed. I think she will respond to questions, do you remember talking about such an agreement, but we don't believe the agreement actually exists anywhere in writing to produce. We can't find it, her attorney can't find it. The only other possible trace on it is on Ms. Farren's computer at that Sheriff's Department, because that's

4:36:13 4:36:14 4:36:18 4:36:21 4:36:24 4:36:26 4:36:27 4:36:31 4:36:32 4:36:33 4:36:40 4:36:40 4:36:43 4:36:45 4:36:45 4:36:46 4:36:49 4:36:51 4:36:52

where Ms. Ledbetter met with her. Ms. Farren is currently checking to see that if in her files there's a copy, but an unsigned one.

We think that's what occurred, and we have no problem with Defense counsel asking her about that. We don't mind putting Ms. Ledbetter on the stand, out of the presence of the jury to clarify that.

THE COURT: I would like to do that. Would you produce Ms. Ledbetter. And would you step down for a minute.

MS. McELROY: Can we enter it into the Court's --

THE COURT: Raise your right hand.

(Witness sworn.)

THE COURT: Sit right there, Ms. Ledbetter.

THE BAILIFF: Do you want Ms. Patrick in here, Judge?

THE COURT: That will be just fine. Just -- because we're not going to take very long.

You let me do it.

MR. FARREN: Yes, sir.

BOBBIE LEDBETTER,

having been first duly sworn, testified as follows:

DIRECT EXAMINATION

THE COURT: Ms. Ledbetter, have you seen

this document that I am going to term as Court's 3?

THE WITNESS: I glanced over it, but I didn't get to read it.

THE COURT: Okay. Why don't you read it.

Is this something she prepared for just notes or something --

(Off-the-record discussion with the Court (and Mr. Farren.)

THE WITNESS: Okay.

THE COURT: So you've read it?

THE WITNESS: Yes, sir.

THE COURT: Is that a note that you prepared for yourself or for internal use?

THE WITNESS: Yes, sir.

THE COURT: All right. It makes reference to a written or a signed use of immunity agreement.

THE WITNESS: Yes, sir.

THE COURT: To your knowledge, is there in existence anywhere a signed use of immunity agreement by Tori Patrick?

THE WITNESS: Not to my knowledge.

THE COURT: Pass the witness to Mr. Watkins first, I guess. Do you have some questions for her?

MR. WATKINS: Your Honor, I don't have any questions of Ms. Ledbetter, with that testimony --

4:38:15 THE COURT: Okay.

4:38:16 MR. WATKINS: -- I don't, no.

4:38:18 THE COURT: I'm building a record here.
4:38:20 Anybody else you want to talk to her from the DA's office
4:38:22 about this purported use of immunity agreement?

4:38:28 MR. WATKINS: Let me ask her a couple of questions.

CROSS EXAMINATION

BY MR. WATKINS:

4:38:30 Q. Ms. Ledbetter, is this an incident report that
4:38:35 you typed up and submitted?

4:38:39 A. I don't -- I don't call them incident reports. I
4:38:41 mean, I do supplements sometimes or I'll make notes of
4:38:44 interviews, or things that I'm present for.

4:38:47 Q. Okay. Do you see the -- at the top it says,
4:38:49 (reading) IR number 0323750?

4:38:53 A. Yes, sir.

4:38:54 Q. Is that the -- does "IR" stand for incident report?

4:38:57 A. Yes, it does.

4:38:58 Q. And does that refer to the Special Crimes or the
4:39:02 Amarillo Police Department incident report number that
4:39:04 deals with the death of Dustin Pool?

4:39:06 A. I don't know that for certain now, but by seeing
4:39:08 it on top of that report, I would -- I would assume so. I

4:39:11 will double check.

4:39:16 Q. If I show you the incident report that's been provided to us, would -- would that help you --

4:39:24 MR. FARREN: Here you go, Mike.

4:39:26 A. Yes, it would help me.

4:39:29 MR. WATKINS: I'll bring it all back to you just like this.

4:39:33 Q. (BY MR. WATKINS) This is from your employer, Mr. Farren, the incident report in this case. Does this appear to a supplement to this incident report?

4:39:45 A. Yes, sir.

4:39:46 Q. Do you prepare these kind of incident reports to identify them, to remind you what happened during your part of the investigation of a case?

4:39:56 A. Yes, sometimes I do.

4:39:57 Q. And when you prepare them, do you try to be as accurate and truthful as you can be?

4:40:02 A. Yes, sir, I do.

4:40:03 Q. Okay. And does this one, in fact, say that Ms. Patrick agreed that she wanted to speak with Mr. Farren and she signed the use immunity agreement?

4:40:13 A. Yes, it does.

4:40:14 Q. Okay. Do you know if there is a use immunity agreement anywhere?

4:40:20 A. I have not been able to locate one, no, sir.

4:40:23 Q. Do you remember speaking --
4:40:27 THE COURT: No -- no more sugar.
4:40:31 Q. (BY MR. WATKINS) Do you remember speaking with
4:40:36 Ms. Patrick on June 28th of 2003?
4:40:38 A. Yes, sir, I do.
4:40:40 Q. Okay. And you met at the sheriff's office in
4:40:43 jail --
4:40:43 A. Yes, sir.
4:40:43 Q. -- with her and with her attorney?
4:40:46 A. Yes, sir.
4:40:47 Q. You have independent memory of those -- of that
4:40:49 visit or is it this incident report?
4:40:51 A. No, I remember being there that day.
4:40:53 Q. Okay. Do you have independent memory of not
4:40:57 filling out the use of immunity agreement and having even
4:41:01 sign?
4:41:01 A. I don't. I remember discussing that. I don't
4:41:04 remember anything actually being signed but we discussed
4:41:08 that whichever one that was willing to talk to us.
4:41:13 Q. Okay. You don't remember one way or the other?
4:41:16 A. I don't -- I know -- I remember talking about it
4:41:18 because I remember leaving the room, so that Ms. Patrick
4:41:22 could visit with her attorney out of my and Mr. Farren's
4:41:25 presence.
4:41:25 Q. Okay.

4:41:28 MR. WATKINS: Pass the witness.

4:41:30 MR. FARREN: Just a couple of quick
4:41:32 questions, Your Honor.

CROSS EXAMINATION

BY MR. FARREN:

4:41:33 Q. When you drafted this document in which we've
4:41:38 made reference, and I -- I think perhaps we should mark it
4:41:42 at least for some sort of exhibit outside -- outside of
4:41:45 the trial record for appellate purposes -- but when you
4:41:49 drafted this, because of a practice that we often exercise
4:41:55 where we do use a documented use immunity, did you assume
4:42:00 that one -- because we'd talked about it, that one had
4:42:03 been signed?

4:42:03 A. That -- that could very well be.

4:42:06 Q. But you don't -- you don't remember specifically
4:42:10 seeing her sign such a document?

4:42:11 A. No, I -- I don't.

4:42:12 Q. And you -- you know that Ms. Watson, her attorney
4:42:16 at the time, has searched her files and cannot find such a
document?

4:42:19 A. Yes, sir. I've talked to Ms. Watson.

4:42:21 Q. And you know that we cannot locate such a
4:42:24 document anywhere in our office?

4:42:25 A. Yes, sir, I know that, too.

4:42:28 MR. FARREN: That's all I have.

THE COURT: All right. You can step down, Ms. Ledbetter. Leave Court's 3 right there.

MR. FARREN: I didn't realize you'd already marked it.

THE COURT: Yes, sir. For the same reason you wanted it marked, some way to identify it. It will be here for the people to use.

MR. WATKINS: Okay. And it's going into the records --

THE COURT: Right. I asked Ms. Watson be brought in. I want to ask her --

MR. FARREN: She's on vacation, Your Honor.

THE COURT: Oh, she is?

MR. FARREN: Yeah. Now, we can try to get her --

THE COURT: She's not here?

MR. FARREN: No, but I think --

THE COURT: That's pretty handy. And I'm sure her answers are going to be the same, and I -- at such time you can conveniently have her come -- don't cut any vacation short. Don't do any of that.

MR. FARREN: She will return before this trial is over.

THE COURT: Okay. Then we'll just -- we'll just continue this little -- this little record. But I'm

4:43:13 satisfied there's not any kind of Brady violations here.
4:43:17 Can we continue with this witness?

4:43:20 MR. WATKINS: Certainly. Certainly.

4:43:21 THE COURT: All right. Bring this jury back
4:43:23 in.

4:43:52 (Jury seated.)

4:43:53 THE COURT: Thank you, ladies and gentlemen.
4:43:55 Everyone be seated.

4:43:56 MR. WATKINS: Is it still my witness?

4:43:58 THE COURT: Yes, it is your witness. I
4:44:00 think you were about finished though.

4:44:03 MR. WATKINS: I think I am.

(Witness Tori Patrick resumes stand.)

RECROSS EXAMINATION (CONTINUED)

BY MR. WATKINS:

4:44:04 Q. Ms. Patrick, a couple of more quick questions. I
4:44:07 promise. I asked you about a use of immunity -- or about
4:44:11 an immunity agreement earlier. Do you remember that?

4:44:13 A. Yes, sir.

4:44:14 Q. And you don't remember signing anything.
Correct?

4:44:16 A. Yes, sir.

4:44:17 Q. Do you remember talking with the DA's office
4:44:19 about them not using your testimony against you?

4:44:22 A. Yeah. We've -- we've talked about it.

4:44:24 Q. Okay. And that's the general understanding, is that whatever you tell them won't be used against you?
4:44:31 A. Yes.
4:44:32 Q. Okay. How many times have you talked with the DA's office all together?
4:44:38 A. Maybe -- maybe just three times.
4:44:46 Q. Okay. Now, there's the statement on June -- or July 22nd. Correct?
4:44:53 A. Yes, sir.
4:44:54 Q. Okay. And the statement on July 3rd?
4:44:59 A. Do what now?
4:45:00 Q. Said you gave a statement to Investigator Ledbetter, to Bobbie Ledbetter --
A. Yes.
4:45:04 Q. -- on July 3rd. Is that correct?
4:45:06 A. Yes. Yes.
4:45:07 Q. Okay. And then you gave one to Ms. Ledbetter -- Ms. Ledbetter on June 28th?
4:45:22 A. June 28th is when I was in jail. Yes, that was that statement. I'm not aware of July 3rd. Is it not the same thing?
4:45:32 Q. Well, the June 28th --
4:45:33 A. I don't understand.
4:45:39 Q. -- 28th appears to be --
MR. FOWLER: Judge, if I may interrupt

4:45:45 Mr. Watkins. I think they're the same statement. That --

4:45:48 THE WITNESS: There was like --

4:45:48 MR. FOWLER: -- that later statement didn't

4:45:49 have the waiver of rights on it, and when Ms. Ledbetter

4:45:52 noticed that it didn't have the waiver, she prepared a new

4:45:54 one and put the waiver back on.

4:45:57 THE COURT: Verbatim, the same?

4:45:58 MR. FOWLER: Yes.

4:45:59 Q. (BY MR. WATKINS) Okay. So on July 3rd, you

4:46:02 signed -- you resigned a statement?

4:46:03 A. The same one from the 28th.

4:46:05 Q. The same one from the 28th?

4:46:07 A. Yes.

4:46:08 Q. Okay. But that was another -- you had contact

4:46:11 with the DA's office on July 3rd and June 28th?

4:46:15 A. Yes. Just to sign the same statement, yes.

4:46:18 Q. Okay. And then you had contact with Mark Brown

4:46:26 back on 3/26?

4:46:29 A. Yes.

4:46:30 Q. March 26th?

4:46:30 A. Yes.

4:46:32 Q. Okay. Did you have contact with the DA's office

4:46:34 in preparing for trial? As they were preparing their case

4:46:42 and putting their witnesses together, did you come in and

4:46:44 talk to them?

A. Briefly. I talked to Farren for maybe three minutes.

Q. Okay.

A. Seriously.

Q. Did you talk to anyone else?

A. No.

Q. Okay. Ever talk to anyone on the phone?

A. I've called to see if -- what about court time and stuff. Other than that, no.

MR. WATKINS: Pass the witness.

MR. FOWLER: No further questions, Judge.

THE COURT: You may step down, ma'am. Thank you. Call your next witness.

MR. FARREN: State calls Michael Elliston, Your Honor.

THE COURT: Okay. Come around here, Mr. Elliston. Raise your right hand, please.

(Witness sworn.)

THE COURT: Thank you, sir. Sit right there.

Go head.

MICHAEL WAYNE ELLISTON,

having been first duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. FARREN:

Q. Would you state your full name for the jury, please.

A. Michael Wayne Elliston.

Q. Mr. Elliston, how are you employed?

A. Presently, I'm working part-time for my dad and rebuilding my house out there.

Q. When you say "out there", where is out there?

A. Out at what they call "the farm". It's my property out there in Carson County.

MR. FARREN: May I approach the witness, Your Honor?

THE COURT: Yes.

Q. (BY MR. FARREN) Mr. Elliston, this is a microphone, and I know it's sort of at the side. It's weird, because it's here and the jury is there, but as best you can, look at them and talk into the mike.

THE COURT: It's really not designed to be uncomfortable, but it's designed by the county commissioners.

MR. FARREN: I'm glad you said that, Your Honor, and not me.

Q. (BY MR. FARREN) Mr. Elliston -- and speak up, because they need to hear you and the court reporter needs to hear you. Okay?

A. Okay.

4:49:01 Q. How long have you lived out there on that -- how much land is there out there?
4:49:06 A. There's -- we have about 20 acres out there all together. Five acres on the original plot, and we bought 15 acres next to us.
4:49:15 Q. How long have you lived out there?
4:49:18 A. Over 15 -- over 18 years.
4:49:25 Q. Okay. And you mention that you're rebuilding something there. What are you rebuilding?
4:49:29 A. Well, we had a fire out there. We're rebuilding my house, and uh -- trying to establish a shop out there for me to work in.
4:49:38 Q. The -- when did the fire occur, do you know?
4:49:41 A. It was a year ago February.
4:49:43 Q. Okay. And this was a grass fire. Is that correct?
4:49:47 A. Yes, sir.
4:49:48 Q. Was your home the only one affected?
4:49:51 A. No, sir. There were three or four homes in the area.
4:49:54 Q. Okay. And so you just happened to be in the path of a grass fire, you and some other folks out there?
4:49:59 A. Yes, sir.
4:50:00 Q. Okay. Before the -- before all of what brings you here today, and the fire, and so forth, those -- those

4:50:07 15 to 18 years before that, what did you do out there then? What --
4:50:12 A. I had an auto body shop. A small auto body shop.
4:50:15 Q. So you -- you repaired dented fenders, and things of that nature to automobiles?
4:50:23 A. Minor work and paint.
4:50:26 Q. And paint work?
4:50:27 A. Yes.
4:50:29 Q. Okay. And are you married now?
4:50:32 A. Yes, I still am.
4:50:33 Q. You're still married to Judy?
4:50:35 A. Yes.
4:50:35 Q. And how long have you and Judy been married?
4:50:38 A. Let's see, 20 -- got married in 1980, so 25 years.
4:50:47 Q. Okay. So what does Judy do?
4:50:49 A. She works for the state, inspecting nursing homes.
4:50:53 Q. Okay. Have either you or Judy filed for divorce?
4:51:01 A. No, sir.
4:51:01 Q. Okay. Are you separated?
4:51:02 A. Yes, sir.
4:51:03 Q. But you're still friendly and on speaking terms?
A. Yes, sir.
4:51:06 Q. And were you somewhat estranged back in March of

4:51:11 2003?

4:51:12 A. Yes, sir.

4:51:12 Q. Okay. And in March of 2003, this was before the fire, you had your shop and then did you also have a house?

4:51:23 A. Yes, sir.

4:51:25 Q. Were you and Judy living together in the house at that time?

4:51:29 A. Oh, I was staying in the shop at night. I was sleeping out there, but I did go in the house to eat and stuff.

4:51:36 Q. Okay. Sure. Sure. Again, even then, you and your wife were on speaking terms, but it was stressed?

4:51:44 A. Yes.

4:51:44 Q. The marriage was under stress?

A. Yes, sir.

4:51:49 Q. Okay. How -- how long had -- had there been this estrangement between you and your wife?

4:51:59 A. Oh, it -- it had started getting strange (sic) for about a year and a half probably before all of this.

4:52:04 Q. Do -- do you know a man named Stephen Craig Kimberlin?

4:52:08 A. Yes, sir.

4:52:09 Q. How did you meet Mr. Kimberlin?

4:52:11 A. I met him through a mutual friend in order to buy

drugs.

Q. Okay. Had you purchased drugs from other people before you purchased them from Mr. Kimberlin?

A. Yes.

Q. How long had you been -- what kind of drugs were you purchasing?

A. Meth.

Q. And how long had you been purchasing meth and using it?

A. Uh -- on a regular basis, probably a year prior to meeting Craig.

Q. Okay. Did the stress and strain of your marriage, was it related to your use of methamphetamine and the people that brought you under -- in association with, or do you know?

A. I -- I believe it probably added quite a bit to it, now that I think back on it.

Q. You uh -- how much methamphetamine were -- were you using by March of 2003?

A. By March of 2003? I am fairly sensitive to it. It doesn't really take a whole lot. I would say probably what they call an 8-ball a week, sometimes more.

Q. And can you -- can you explain to the jury what an 8-ball is? How much is an -- is that an eighth of an ounce?

4:53:3
A. An eighth of an ounce.

4:53:34
Q. Okay. So an eighth of an ounce would last you a week?

4:53:36
4:53:37
A. Yes, sir.

4:53:37
Q. Is that because you're a great big husky guy like you are?

4:53:41
4:53:41
A. It just doesn't take -- it never did take very much to. . .

4:53:43
4:53:44
Q. How did you -- how did you first -- how were you first introduced to methamphetamine?

4:53:47
4:53:50
A. I have a couple of cousins that were truck drivers at the time, and they introduced me to it.

4:53:54
4:54:0
Q. Did you find -- did you find methamphetamine to be addictive? Did you feel like once you started using it, you felt the need to continue to use it?

4:54:03
4:54:07
4:54:09
A. I did feel the need to continue to use it. I don't know if it had the pull on me a lot of people seem to have from it. What I'm trying to say is, I can go through a few days of being tired and seem to function all right.

4:54:12
4:54:14
4:54:19
4:54:22
4:54:24
Q. Well, how you could go for a few days, somehow you always ended up coming back to it though?

4:54:28
4:54:30
A. Yes, sir.

4:54:31
Q. Do you think part of being addicted is telling yourself you're not, yet somehow you keep going back to

4:54:5

4:[illegible]7 it?
4:54:38 A. Yeah. Well, yeah, that could be the case. Yeah,
4:54:42 because -- yeah, I can see that.
4:54:50 Q. By March of 2003, how long had you known Stephen
4:54:55 Craig Kimberlin then, approximately?
4:54:58 A. Uh -- probably about a year.
4:55:02 Q. Okay. And in March of 2003 -- well, let me back
4:55:11 up and ask you this: In addition to buying
4:55:14 methamphetamine from Stephen Craig Kimberlin, did you have
4:55:18 any other business relationship with him? In other words,
4:55:21 were you involved in more than just buying and using meth?
4:55:26 A. No, sir, other than I did do a -- did start
4:[illegible]0 building a shop for him at one time.
4:55:32 Q. Okay. I probably didn't phrase the question very
4:55:36 well. Did Mr. Kimberlin and his associates ever cut up
4:55:42 narcotics out at your place?
A. Yes, sir.
4:55:44 Q. And did they ever store narcotics at your place?
4:55:46 A. Yes, sir.
4:55:47 Q. Okay. And at times were you either paid money,
4:55:52 or given some of the methamphetamine in return for letting
4:55:54 them use your farm for this purpose?
4:55:56 A. Yes, sir.
4:55:56 Q. Okay. Now, do you know -- do you know anyone
4:[illegible]4 named Frank Chacon?

4:56:04 A. Yes, sir.

4:56:05 Q. Do you know him through your association with Mr. Kimberlin?

4:56:08 A. Yes, sir.

4:56:09 Q. Do you know anyone named Josh Bledsoe?

4:56:12 A. Yes, sir. Slightly, not very much.

4:56:14 Q. Okay. So you know Mr. Kimberlin better than you know Mr. Bledsoe?

4:56:18 A. Yes, sir.

4:56:18 Q. Do you know Mr. Chacon -- I mean Mr. Kimberlin, better than you know Mr. Chacon?

4:56:24 A. Yes.

4:56:24 Q. Do you know Josh Stocker?

4:56:26 A. Yes.

4:56:27 Q. Okay. And, again, do you know Mr. Kimberlin better or Mr. Stocker better?

4:56:31 A. Mr. Kimberlin better.

4:56:32 Q. Okay. Do you see Josh Stocker here in the courtroom today?

4:56:36 A. Yes, I do.

4:56:37 Q. There's a male wearing sort of a -- I guess females would tell me a peach colored shirt with a blue tie, no coat, sitting at table. Is that Joshua Stocker that you're talking about?

4:56:49 A. Yes, sir.

MR. FARREN: May the record reflect that he has identified the Defendant, Your Honor?

THE COURT: The record will so reflect.

Q. (BY MR. FARREN) You indicated that you met Mr. Kimberlin about a year before -- approximately a year before March 9th of 2003. When is the first time you ever met Josh Bledsoe?

A. Oh, before March of -- I had probably met him three or four times. Probably a month-and-a-half before, maybe two months.

Q. Had you met -- had you him at the farm or somewhere else?

A. At Kimberlin's house.

Q. At Kimberlin's house. Mr. Chacon, how many times do you think you've come in contact with him?

A. Five, or six, or seven times.

Q. Were those encounters at the farm or at Mr. Kimberlin's house?

A. At first they were at Kimberlin's house, but then Frank did come out to my house.

Q. So Mr. Chacon, Mr. Kimberlin has been to the farm on many occasions?

A. Yes.

Q. Mr. Chacon has been to the farm a few times?

A. Yes, sir.

4:57:54 Q. And -- but Mr. Bledsoe, you only encountered him at Mr. Kimberlin's house --
4:57:58 A. Uh --
4:57:58 Q. -- up until March 9th, as far as --
4:58:01 A. I believe he might have came out with Kimberlin at one time. One time or two.
4:58:04 Q. Okay. Okay. But -- but he and Mr. Chacon had not been there nearly as much as Mr. Kimberlin?
4:58:09 A. Yeah.
4:58:09 Q. Okay. Mr. Stocker, had you met him -- where had you met him prior to March 9th?
4:58:14 A. At a -- at a -- Kimberlin's house.
4:58:17 Q. Okay. Do you know if he'd ever been to your farm?
4:58:20 A. Stocker had been to my farm a few times.
4:58:23 Q. A few times. But, again, like Mr. Chacon and Mr. Bledsoe, not as much as Mr. Kimberlin?
4:58:27 A. Sir, I -- I -- I have to say that I was confused. Bledsoe, the only time he came to my farm was on March uh --
4:58:36 Q. The -- the time around March 9th?
4:58:39 A. Yes, sir. He never had been to my place, Mr. --
4:58:41 Q. So you had met Mr. Bledsoe prior to that, but the only time you remember him being at the farm was the events that occurred March 9th and 10th, along in there?

4:58:50 A. Yes, sir.

4:58:51 Q. Okay. Have you -- have you ever met anyone named Destry Keeling?

4:59:01 A. I have met him at Craig's house once or twice. He -- I wasn't really introduced to him, but I do know who you're talking about.

4:59:13 Q. Now, we've named several people. Were all of these people involved with Mr. Kimberlin in the methamphetamine business?

4:59:21 A. Yes, sir. I believe so, yes.

4:59:22 Q. Okay. Had you met other people who were associated with Mr. Kimberlin who were also in the methamphetamine business, if you -- if you remember?

4:59:30 A. I -- I -- I -- I remember meeting a few people, but for the most part, I tried not to.

4:59:35 Q. Why is that?

4:59:37 A. I didn't like the association. One thing else is, Kimberlin was keeping things at my house. I did not want anybody to know. It would put my family and myself in danger.

4:59:52 Q. Okay. Did Judy realize what was going on? I mean -- let me ask you this. How much did she know about what was going on?

5:00:03 A. She knew there was drugs out there, but she didn't know the amount.

5:00:15
5:00:20
5:00:20
5:00:21
5:00:32
5:00:37
5:00:40
5:00:43
5:00:46
5:00:49
5:00:51
5:00:54
5:00:59
5:01:02
5:01:07
5:01:09
5:01:13
5:01:13
5:01:19
5:01:22
5:01:25
5:01:28

Q. To your knowledge, did you -- you were using methamphetamine. To your knowledge, was Judy ever using methamphetamine, if you know?

A. I believe she did.

Q. Okay. When -- when you would go to Mr. Kimberlin's house, was it just to buy drugs, or was it for social occasions, or why were you there?

A. To buy drugs.

Q. Okay. When drugs were stored at your farm, did you ever -- how did they get to the farm? Did you bring them there or did Mr. Kimberlin bring them there?

A. Mr. Kimberlin and Stocker brought them there.

Q. Okay.

A. It happened -- it just happened to be that Kimberlin and I had talked about it. He said that things were getting hot at his house, so to speak, and he wondered if he could -- he was looking for a place to store them for a couple of weeks until he found a more permanent place.

Q. Okay. And how long prior to March 9th, 10th, 11th, along in there, how long had this -- this suggestion or practice for Mr. Kimberlin begun to take effect where they were keeping some of the drugs at your place because of heat in Amarillo?

A. It was a few months.

5:01:32
Q. Okay.
5:01:32
A. And like I said, I was under the impression it was going to be for a couple of weeks.
5:01:37 5:01:40
Q. So on this particular issue, Mr. Kimberlin suggested, do this for me and it will only last two or three weeks?
5:01:44 5:01:48 5:01:49
A. Yes, sir.
5:01:49
Q. But it turned out it didn't last just two or three weeks?
5:01:52
A. No, sir.
5:01:53
Q. It lasted months?
A. Yes, sir.
5:01:54
Q. Did you often have that experience with Mr. Kimberlin where he would tell you something -- explain things that -- this will be a minor event, and it turned out to be a much more major event?
5:01:56 5:02:02 5:02:05 5:02:08
A. Yes, sir. Yes, sir, I have.
5:02:09
Q. How did you feel about that?
5:02:11
A. I felt like I was being used.
5:02:14
Q. But why didn't you just quit associating with Mr. Kimberlin?
5:02:17 5:02:20
A. That got harder and harder to do as time went on.
5:02:23
Q. Why did it become harder?
5:02:30
A. I -- I guess Kimberlin is the type of person that -- well, he even talked about things that he did to people
5:02:36

5:02:39 that, you know, didn't pay, or -- not necessarily he did, he had somebody else do.

5:02:45 Q. Did you feel like Mr. Kimberlin was somebody you could say no to?

5:02:49 A. No, sir, I don't. No, I was having a hard time.

5:02:53 Q. How tall are you?

5:02:55 A. Uh -- five foot nine.

5:02:57 Q. What do you weigh?

5:02:58 A. Back then about 160. About 175, I think now.

5:03:05 Q. Now, how much did -- how tall was Mr. Kimberlin?

5:03:07 A. He was big. Six foot two or three, something like that.

5:03:12 Q. Well over 200 pounds?

5:03:13 A. Yes, sir.

5:03:14 Q. And the folks that -- that he associated with, Mr. Chacon, Mr. Stocker and others, did -- did they concern you as well?

5:03:26 A. Yes, sir.

5:03:29 Q. Okay. And, of course, there was the methamphetamine?

5:03:32 A. Yes, sir. Yes, sir.

5:03:36 Q. I want to direct your attention to -- I want to direct your attention to the early morning -- fairly early morning hours of March 10th, 2003. Do you remember receiving some phone calls from Mr. Kimberlin on that

morning?

A. Yes, sir.

Q. Did you receive one call or many calls?

A. Many calls. Right at first I was reluctant to answer the phone.

Q. Now, did you know -- could you tell who was calling? Did you have Caller ID or something?

A. Yes sir.

Q. When you talked with Mr. Kimberlin, why was he calling? What did he want?

A. He was wanting a favor from me.

Q. Okay. What kind of favor? What did he want you to do?

A. He wanted to know if I had a box that would store uh -- what do they call large clocks?

Q. A grandfather clock?

A. A grandfather clock, or something of that size.

Q. Okay.

A. He said that he had -- in an apartment complex, he needed to be able to get something out of an apartment complex.

Q. Did he ever suggest to you that it needed to be big enough that he could get in it if he wanted to?

A. Yes, sir, he did.

Q. Okay. Now, if the phone records that have been

5:05:14 introduced into evidence show that morning some nine phone
5:05:17 calls, I believe -- let me make sure. No, I'm sorry,
5:05:34 seven phone calls from Mr. Kimberlin to Mr. Elliston,
5:05:38 about the time -- well, between 8:30 and about 10:00 that
5:05:42 morning. Is that about the time that you remember getting
5:05:45 all of these calls?

5:05:46 A. Yes, sir. I believe the first couple I didn't
5:05:50 answer, but then he would call me and I would tell him
5:05:53 that I would look around and see if I could find something
5:05:56 that would match what he was wanting.

5:06:00 Q. Now, you -- in fact, you did have something,
5:06:04 didn't you?

5:06:05 A. Yes, sir, I did.

5:06:05 Q. Did you tell him that right away?

5:06:07 A. No, sir.

5:06:08 Q. Why not?

5:06:10 A. I didn't want to get involved.

5:06:12 Q. Was that because of your past experiences where
5:06:15 it's just a little favor and then it turns out to be a lot
5:06:19 more complicated than that?

5:06:20 A. I find myself in -- in a place that I was not
5:06:24 comfortable with.

5:06:25 Q. When -- eventually, did you finally give up and
5:06:31 admit to him that you did have such an object?

5:06:35 A. Yes, sir.

5:06:35
Q. Okay. If the phone records show that along about this time you actually made one call to him, rather than receiving a call from him, would that be consistent with your memory that you finally did call him?

5:06:49
A. Yes, sir.

5:06:50
Q. What did you tell him when you called him back?

5:06:53
A. I told him I thought I might have something that would work out for him.

5:06:57
Q. And what were you talking about when you told him this? What object did you have in mind?

5:07:02
A. I had a refrigerator, it was a small refrigerator that only had one lid on it that I had put plywood in, that I used as a work box. I would put my tools in the back of my pickup in them and I was able to lock it, so. . . .

5:07:16
Q. So am I understanding you correctly that this was, in essence, an old refrigerator that you had lined with wood and made sort of a toolbox out of it?

5:07:26
A. Yes, sir.

5:07:27
Q. Okay. After you talked with Mr. Kimberlin -- well, let me ask you this way. Did you -- did you load the box in your vehicle first and call Kimberlin, or did you call Kimberlin first, if you remember?

5:07:39
A. I believe -- I believe I called Kimberlin first, and he asked me to bring it up and drop it off at an

5:07:48 apartment for him.

5:07:49 Q. So your understanding was, you were just going to bring this box from the farm to some apartment and drop it off?

5:07:53 A. Yes, sir.

5:07:54 Q. Did you load it in your truck?

5:07:55 A. Yes, sir, I did.

5:07:57 Q. And you had a green Dodge pickup at that time?

5:07:59 A. Yes, sir.

5:08:00 Q. And so do you know how long it takes to drive from your farm to Amarillo?

5:08:09 A. To approximately right there, about 25 to 30 minutes.

5:08:12 Q. Okay. I'm showing you what has been marked and admitted at State's 182, and the jury has already seen. Is that a picture of your pickup truck?

5:08:27 A. Yes, sir.

5:08:30 Q. I'll try to do this. The Court has indicated a preference for this, so we will try this.

5:08:59 If this is Amarillo, would -- where this push pin is located, would that be about where your farm is located?

5:09:08 A. Yes, sir.

5:09:08 Q. And if -- if you were told that an investigator from our office drove -- drove this to measure the

distance and time, it took 22 minutes following the speed limit, does that sound about right?

A. Yes, sir.

Q. And, in fact, it's about 22 miles.

A. Okay.

Q. So if you loaded your box in the truck and you headed for Amarillo, did you know the address to which you were to go, or were you given directions, or what?

A. I was told to go to the apartment building behind Albertson's on I-40 and Bell.

Q. And -- and he was just going to meet you once you got there, or you were supposed to call him, or what?

A. I was supposed to call him, and he was -- he was going to come down and talk to me.

Q. Now, did you bring anything in addition to this box with you? Did you have a dolly or something?

A. Yes, sir, I had a dolly.

Q. Okay. Now, again, did you think that you were going to be using the dolly, or were you just going to leave the box and dolly with him, because he said he was going to move something?

A. He said that he was going to move something, and his pickup was parked. I saw his pickup.

Q. So that made you feel a little better, that maybe you were going to be able to just drop it off and it would

5:10:30 be in his pickup?
5:10:31 A. Yes, sir.
5:10:33 Q. When you arrived there -- by the way, where was your wife at that time, do you remember?
5:10:37 A. I believe she was either at work or at home. She worked a lot of nights and stuff at that time.
5:10:43 Q. So you're not sure, she may have been at home?
5:10:45 A. I believe -- I don't think she was.
5:10:47 Q. Okay.
5:10:48 A. I think she was at work.
5:10:49 Q. And does your wife's work require her to travel some?
5:10:52 A. Oh, yes.
5:10:52 Q. And so she inspects nursing homes over a large geographic area?
5:10:57 A. Yes, sir.
5:10:59 Q. Okay. You -- if you got the phone calls, the seven phone calls between 8:00 and about -- 8:30 and about 10:00, how -- how long do you think it took you to get the box, and the dolly, and everything in the truck? Half an hour, hour, do you have any idea?
5:11:19 A. I don't believe it took me very long. Probably -- maybe 20 minutes.
5:11:23 Q. Okay.
5:11:24 A. If I had something in the box to get out and

stuff.

Q. So you load the -- you load the box in the truck, you drive the 25 minutes or so, to the location in Amarillo. And did you call Mr. Kimberlin on your cell phone?

A. Yes, sir.

Q. And if the phone records show at 11:04 a call from you to Mr. Kimberlin, that would be -- that would be consistent with about the time that you would have arrived at that location?

A. Yes, sir.

Q. When you called Mr. Elliston, did he then make contact with you?

A. Mister?

Q. I'm sorry. When you, Mr. Elliston, called Mr. Kimberlin, did he then make contact with you?

A. He came downstairs and got in the pickup with me.

Q. Okay. So you're there in the parking lot. Did you know then or do you know now that that's the River Falls Apartments?

A. I do know that's the River Falls Apartments.

Q. Okay. So you're in the parking lot of the River Falls Apartments and he gets in the vehicle with you. What happened next?

A. We begin talking. He starts telling me about a

situation that's -- he says that Stocker has got him into. He says, you know, I'm having to rely on a friend to try to get another friend out of trouble. And he began to tell me about Pool. And tells me uh -- that he was up for statutory rape, and that he was just a bad guy in general. And they needed to get some information out of him, but he pretty much just told me that he was hassling a girl that was there in the apartments. Uh --

Q. Now, did he talk with you at all about trying to calm this situation down, that he was concerned about Stocker's volatility towards this man Pool?

A. Yes, sir. He did say that he wanted to -- that Stocker wanted to do away with the guy right there in the apartment. He said, you know, if we can get this guy away for a while, maybe we can get things calmed down, and we can get a little information from him, and then we'll be out of your hair. I -- he asked me what time. I said 5:00, because that's when my wife got home.

Q. So by -- by this time, it has become obvious to you that you're not just going to be allowed to drop off the box?

A. Yeah.

Q. All right. Well, I guess you're a pretty happy camper at that time?

A. No, I was not.

5:13:53 Q. After Mr. Kimberlin explained the situation to you, and now has -- the promise has gone from you'll just have to drop off the box to we'll be out of your hair by 5:00 or so, what happened next?

5:14:08 A. We -- we still planned on Kimberlin putting it in his pickup.

5:14:14 Q. Okay.

5:14:15 A. And he --

5:14:18 Q. So the discussion involved, eventually, the box would end up in his pickup?

A. Yes, sir.

5:14:22 Q. Did you -- did you and Mr. Kimberlin unload the box?

5:14:25 A. Yes, sir, we did.

5:14:26 Q. Did you use the dolly?

5:14:27 A. Yes.

5:14:28 Q. And was the -- was the box and the dolly taken up any stairs, or was it on the first floor? Do you recall?

5:14:36 A. I believe we went up one story or maybe two, I'm not for sure, but I do know that Kimberlin took it up in the elevator and I went up the stairs.

5:14:45 Q. Okay. Why -- why did you go up the stairs? Was there not room for all of you -- two of you and the box?

5:14:52 A. I believe so.

5:14:51 Q. Okay. All right. At any rate, even then you had

5:15:01 the privilege of climbing the stairs, instead of riding the elevator?

5:15:01 A. Yes, sir.

5:15:02 Q. Well, once you're up -- well, how far did you know to go upstairs? Did he tell you it's on the second floor, third floor, wherever it was?

5:15:10 A. I'm sure he did, but I don't recall.

5:15:12 Q. Okay. When you had finished climbing the stairs, did they emerge into a hallway, or do you recall?

5:15:19 A. I believe -- yeah, went into a hallway. I believe he gave me an apartment number, but I'm not sure though.

5:15:26 Q. At any rate, when you got to the floor you thought you were supposed to be on, was he already there or did you beat him there? Who got there first, you or the box?

5:15:34 A. I believe we got there about -- at the same time.

5:15:36 Q. And you saw Mr. Kimberlin?

5:15:37 A. Yes. Uh-huh.

5:15:38 Q. Did you and Mr Kimberlin enter an apartment?

A. Yes, sir.

5:15:40 Q. Do you remember the number?

5:15:41 A. No, sir, I don't.

5:15:42 Q. Okay. You remember entering an apartment?

5:15:45 A. Yes, sir.

5:15:49 Q. Did you, and Mr. Kimberlin, and the box, did all three of you go into the apartment?
5:15:52 A. Yes, sir, we did.
5:15:52 Q. Once you were in the apartment, what did you see?
5:15:55 A. Uh -- I saw somebody that had like a pillowcase over their head.
5:16:04 Q. A pillowcase over their head?
5:16:06 A. Yes, sir.
Q. Okay.
5:16:06 A. Now, it was in the other room. I tried -- I tried to stay -- I think there was like a kitchen area that I first walked into, and I stayed -- I stayed there, and uh -- Kimberlin, and. . .
5:16:26 Q. There has been some testimony that this drawing is a relatively accurate representation of that apartment. If that's correct -- and this is the front door area, this is the living room area, and I think a bedroom. A bathroom here, and so forth. The kitchen area over here, and a patio and bedroom here.
5:16:51 When you came in, where -- where did you see the person, approximately, that had the pillowcase on their head?
5:16:58 A. Approximately up here (indicating).
5:16:59 Q. Okay. And let me make sure I don't confuse you. The -- the drawn items here are -- that's the way it was

when the drawing was made, but we have testimony that the furniture was actually arranged like these two pink slips here.

A. Okay.

Q. But the person you saw was about where?

A. He'd be approximately that far.

Q. Somewhere near where this couch and love seat are depicted as being?

A. Yes, sir.

Q. And they had a pillowcase over his head?

A. I believe so.

Q. Okay. Now, you're in there and Mr. Kimberlin is in there. The man with the pillowcase over his head is there, and the box. Did you see anyone else?

A. Stocker was there.

Q. And Mr. Stocker, the man you identified a few moments ago?

A. Yes, sir.

Q. Where was Mr. Stocker in relation to the pillowcase man?

A. I believe when we -- I don't know if he came to the door to open the door, and then go back directly -- directly back over to where he was, or if we just -- I don't think that we walked directly in, I believe that Kimberlin had to knock on the door, and Stocker came over

5:18:05 to it.

5:18:05 Q. At any rate, at some point was Stocker over close
5:18:09 to the pillowcase man?

5:18:10 A. Yes, sir.

5:18:12 Q. Now, did -- did you notice anything about the
5:18:15 pillowcase? Was it -- was there anything that caught your
5:18:18 attention?

5:18:18 A. I -- I believe that I saw -- I don't know if I
5:18:22 saw it at that time, but I believe I saw a blood stain.

5:18:26 Q. Okay. So you either then or at some point you
5:18:30 believe you saw blood oozing through this pillowcase?

5:18:35 A. Yes, sir.

5:18:35 Q. What did you think about that?

5:18:36 A. It scared me. Once, again, I realized I was in
5:18:42 way too far. I didn't know exactly what to do. I did
5:18:47 hear Stocker and Kimberlin talking, and asking the guy if
5:18:52 he wanted to walk out on his own, and be a man, walk out
5:18:55 on his own and not make a sound, they wouldn't have to put
5:18:59 him in the box. And the man said that he was pretty weak
5:19:03 kneed, and he didn't know if he could make it.

5:19:05 Q. Okay. So first of all, you had Mr. Kimberlin
5:19:11 make statements about some pretty violent activity, and
5:19:15 collecting from folks, but now you're witnessing something
5:19:18 that tends to support what you've been told?

5:19:20 A. Yes, sir.

5:19:?0 Q. Then you hear a discussion between Mr. Stocker,
5:19:28 Mr. Kimberlin, and the pillowcase man, which you assumed
5:19:31 to be Pool, I guess?
5:19:32 A. Yes, sir.
5:19:32 Q. About whether he's able to walk. Whether he's
5:19:35 going to be man enough to walk, or whether they're going
5:19:38 to have to put him in the box?
5:19:40 A. Yes, sir.
5:19:41 Q. He indicates he doesn't think he can walk?
5:19:44 A. Yes.
5:19:45 Q. So what happened, did they put him in the box?
5:19:47 A. At that time, in the kitchen I was close to the
5:19:?0 window, but I could hear that they were putting him in the
5:19:53 box, yes.
5:19:53 Q. Did you actually assist in putting him in the
5:19:55 box?
5:19:56 A. No, sir.
5:19:56 Q. At some point, was the box -- was there a way to
5:19:59 close the box up or was it just opened?
5:20:02 A. The box, I had a toe (sic) down strap around the
5:20:08 box, and the dolly, so that when you hauled it, it
5:20:16 wouldn't fall off of the dolly.
5:20:19 Q. Okay. Did -- did -- did the dolly completely
5:20:20 cover the opening or was there some space?
5:?4 A. Oh, the -- the door? The dolly was at the back

of the refrigerator.

Q. Okay. So there was a door on the refrigerator?

A. Yes, sir.

Q. All right. So it's not just opened on one side, it has the door?

A. Yes, sir.

Q. Once Mr. Pool -- or the pillowcase man is in the refrigerator box, was the door closed?

A. Closed and the strap put back on.

Q. So if -- if this is the box and I'm the dolly, is the back of the box up against the dolly?

A. Yes, sir.

Q. And the front -- the door is over here?

A. Yes, sir.

Q. And then is the strap going all the way around the dolly --

A. Dolly.

Q. -- me and the box?

A. Yes.

Q. So if -- if you were the pillowcase man and you're inside the refrigerator, once the strap is tightened down, it's going to be impossible to open the door, isn't it?

A. Yes, sir.

Q. Now, how is the pillowcase man going to breath?

A. There were holes in the box from the back of the refrigerator -- from the front of the refrigerator where the old handle and stuff had been, and the back of the refrigerator it wasn't completely lined with plywood.

Q. Okay. So you weren't -- you knew the person could breath in there?

A. Yes, sir.

Q. Okay. It's not like where we hear children get into a big old refrigerator out in the field and suffocate? You knew this refrigerator, there was air getting into it?

A. Yes.

Q. Once we have the pillowcase man in the box, and the dolly is reattached to the box with the strap, door, what happened next?

A. He said, you know, that green box is going to look pretty -- it's not going to match my red pickup.

Q. Okay. So the color of this refrigerator box was green?

A. It was approximately the same color of my pickup.

Q. About the same color as the pickup. And Mr. Kimberlin is saying what now?

A. He's saying that it was going to stand out like a sore thumb in the back of his pickup.

Q. So -- so all of a sudden the box that was going

5:22:37 to go in Mr. Kimberlin's truck, it can't go in there
5:22:37 because it will stand out too much?
5:22:39 A. Yes.
5:22:39 Q. But in your truck it would sort of blend in?
5:22:43 A. Yes, sir.
5:22:44 Q. Now, did you really buy that, or did you just, again, can't say no to Mr. Kimberlin?
5:22:49 A. I -- I felt at the time I couldn't say no. A pretty big fear factor going on -- going on there.
5:23:00 Q. I mean, looking back on it, does it seem a little silly to suggest that just because the color matches your truck, that's the one that ought to haul the box?
5:23:10 A. Yes, sir.
5:23:12 Q. At any rate, the box ends up in your truck?
5:23:16 A. Yes, sir.
5:23:17 Q. And so the -- the -- the farmer who was just going to drop the box off, now has the box in back of his truck and only now there's a human being in it?
5:23:28 A. Yes, sir.
5:23:29 Q. How did you feel about that?
5:23:32 A. I -- I've -- I've thought all the way home of how I could -- Stocker and Kimberlin were supposed to be following me home.
5:23:43 Q. Okay. Let's talk about that a moment. The next promise you're made is, you haul the box, but we'll be

5:23:50 right behind you. We'll follow you?

5:23:52 A. Yes, sir.

5:23:55 Q. On the way to the farm, did -- did you -- what -- what were you thinking?

5:24:02 A. I was thinking that if I could pull over and open up the box and get him out, but I was afraid that if they saw me doing it, then I might, you know, be the next one in the box.

5:24:14 Q. Okay. And so they told you they were following you, but you weren't sure how close they were following you?

5:24:23 A. No, sir.

5:24:25 Q. Now, did you drive directly to the farm?

5:24:27 A. Directly to the farm.

5:24:28 Q. So we're talking about another 25 or 30-minute drive?

5:24:32 A. Yes, sir.

5:24:33 Q. When you arrived at the farm, what happened next?

5:24:37 A. I pulled -- pulled into my garage, uh -- right off of -- you know, I didn't want the neighbors, you know, hearing anything, and it was cooler in my garage. He would be cooler in the box in my garage, and I was supposed do that until they got there anyway.

5:24:57 Q. So you were supposed to go ahead and pull your vehicle into the shop?

5:25:00 A. Yes, sir.
5:25:03 Q. And uh -- when you -- when you got your vehicle -- once you had delivered your vehicle into the shop and -- the box is still in the back of your pickup?
5:25:16 A. Yes, sir.
5:25:17 Q. Where were Kimberlin and Stocker?
5:25:19 A. They were not behind me.
5:25:21 Q. So they -- they said they were going to follow you, but when you looked they're not there?
5:25:26 A. No.
5:25:27 Q. What did you do?
5:25:29 A. I called them and asked him where he was at. And at the time being, I thought that Dustin Pool was asleep, but he woke up. If he was asleep, and --
5:25:50 Q. Let's visit about that. Now, once again, Mr. Kimberlin, who not only talks violence, now you've seen some violence, has you in a situation, a person that you don't feel like you can say no to. And now you begin to hear the pillowcase man in the box. You can tell he's conscious?
5:26:16 A. Yes, sir. And -- and he's mad, and he's yelling at me to let him out of the box.
5:26:23 Q. Did he -- did he indicate any consequences if you didn't let him out of the box?
5:26:28 A. He was going to kick my ass.

5:[illegible]0 Q. So Mr. Pool, who has been assaulted and strapped
5:26:36 into a box, is now threatening you?
5:26:41 A. Yes, sir. He's -- he's kicking on the door, and
5:26:43 I'm afraid what would happen, if he does get out. I
5:26:47 don't --
5:26:47 Q. So you didn't find -- that didn't encourage you
5:26:49 to let him out of the box?
5:26:51 A. No, sir.
5:26:51 Q. Okay. How long do you -- how much time do you
5:26:58 think passed until Mr. Kimberlin and Mr. Stocker arrived?
5:27:01 A. I don't know. It seemed like forever. Maybe 45
5:27:08 minutes. I'm not for sure.
5:[illegible]9 Q. Did you talk with either of them about, where
5:27:12 have you been?
5:27:13 A. Yes. I called Craig a couple of times, I
5:27:16 believe.
5:27:17 Q. And what was the explanation?
5:27:20 A. He said he didn't want to draw attention. That
5:27:25 they're following far behind, that way they didn't draw
5:27:29 any suspicion about what was going on.
5:27:31 Q. Of course, did it occur to you that if something
5:27:36 had happened, you made a traffic violation, or they
5:27:38 thought you were speeding, and you were stopped, you're
5:27:41 the only person with the man in the box, not Mr. Kimberlin
5:[illegible]3 or Mr. Stocker, they're 45 minutes away? At any rate,

they finally arrived?

A. Yes, sir.

Q. And when Mr. Kimberlin and Mr. Stocker arrived, what happened next?

A. They got him out of the box. Uh -- and I moved my pickup out.

Q. And now when -- did they -- I guess the dolly is still strapped to the box?

A. They just undid the strap, I believe.

Q. At any rate, the dolly and the box come out of your vehicle?

A. The dolly and the box stay in my vehicle, I believe they get him out of the box.

Q. I see. So they open the box and get him out, but the other two items just stay in your pickup?

A. Yes, sir.

Q. Okay. And once he's out of the box, what did you do with the pickup?

A. I took my pickup out of my garage, and Kimberlin parked his pickup in the garage.

Q. There's been testimony that this drawing is a rough representation, it's not to scale, but it reflects the -- the relationship of the room and so forth, of your garage area and your shop.

A. Yes, sir.

Q. Would you agree that that appears to be --

A. Yes, sir.

Q. -- an accurate -- so when you say the garage area, is that this area here?

A. Yes, sir.

Q. And then is this storage area down here?

A. Yes, sir.

Q. And this is the stairway?

A. Yes, sir.

Q. And do you recognize that this is set to the side to represent the second story, but it actually, in a three dimensional world, would sit up here?

A. Yes, sir.

Q. Okay. So when you pulled into the garage with the pillowcase man in the box, can you point out to the jury where -- where you were pulling in?

A. I believe I backed my pickup into the garage.

Q. You backed it in. So when they took the -- Mr. Pool out, they just could take him out of the back of your truck and then you drove the truck back out?

A. Yes, sir.

Q. Once -- once they had him out and you had the truck out the garage, what happened next?

A. I went upstairs to see if everything -- I didn't know -- I had some stuff up there I didn't want them to

5:30:14 mess with, or whatever, but I just went up there. As I
5:30:17 came down the steps, they were coming down the hallway
5:30:20 with Pool.

5:30:20 Q. The hallway in the upstairs room?

5:30:23 A. No. No, sir. Downstairs.

5:30:25 Q. Downstairs.

5:30:25 A. Downstairs. And they were fixing to head up.
5:30:28 And that's when Mr. Kimberlin said to me, see, he's a big
5:30:33 guy. He's as big as I am, or something -- some effect
5:30:35 like that. He still had the pillowcase over his head. I
5:30:38 went to my office.

5:30:39 Q. Okay. So -- so Mr. Kimberlin and Mr. Stocker
5:30:43 went upstairs with the pillowcase man, and you went to
5:30:48 your office. Is that this area here?

5:30:49 A. Yes, sir.

5:30:54 Q. Now, was the pillowcase still on his head at that
point?

5:30:58 A. Yes, sir.

5:32:20 Q. Now, Mr. Elliston, at this time I'm showing you
5:32:22 what has been marked as State's Exhibit 203 and 236. Do
5:32:31 you recognize -- first of all, in 203, the area -- the
5:32:37 room that the objects are in or the space it's in?

5:32:41 A. Not --

5:32:42 Q. Did you have some storage area in your place?

5:32:44 A. Yes, I did. My attic was the storage area.

5:32:46
Q. Okay.

5:32:46
A. And uh -- you could get to my attic through the second floor.

5:32:52
Q. And do you recognize this to be a chair, with a circular stand?

5:33:01
A. Yes, sir.

5:33:01
Q. And this is the same chair over here. Is that correct?

5:33:01
A. Yes, sir.

5:33:02
Q. And do you know how the chair got into this attic?

5:33:07
A. I thought I -- think I originally had -- I had chairs with it, I was planning on re-doing. I had -- I'm a junk collector. I had a lot of stuff that I moved in and out, if I felt like I could redo it, or something, and sell it.

5:33:24
Q. Did you put the chair up there?

5:33:26
A. Upstairs. Yes, sir, I did.

5:33:29
Q. Now, once -- once they were upstairs with Mr. Pool and you were in your office, what happened next?

5:33:42
A. Kimberlin said that he had to go to town and run some errands. Do something with his wife, I believe.

5:33:50
Q. So did he come back downstairs and visit with you about that?

5:33:54
A. Yes, sir.

5:33:54 Q. Okay. Did he come to your office?
5:33:56 A. Yes.
5:33:57 Q. Okay. And he -- he told you that he was going back to town, back to Amarillo?
5:34:03 A. Yes, sir.
5:34:03 Q. Okay. Where was Mr. Stocker?
5:34:04 A. He was upstairs with Pool.
5:34:06 Q. Okay. And did Mr. Kimberlin leave?
5:34:09 A. Yes, sir, he did.
5:34:11 Q. Now, when -- you indicated earlier, when you arrived at the River Falls Apartments, you recognized his pickup. Is that the same vehicle they came to the farm in?
5:34:23 A. Yes, sir.
5:34:24 Q. Okay. So when Mr. Kimberlin left, did he leave in his vehicle?
5:34:28 A. Yes, sir. I opened up the garage and let him out.
5:34:33 Q. All right. And so when he left, that -- that left Mr. Stocker upstairs with Mr. Pool, and the only vehicles there at that point were yours?
A. Yes, sir.
5:34:44 Q. Okay. Did you ever go back upstairs --
5:34:48 A. No, sir.
5:34:48 Q. -- once Mr. --

5:34:49 A. No, sir.
5:34:49 Q. From the time Mr. Pool arrived with the pillowcase over his head, until Mr. Pool left wrapped in a tarp later, did you ever go upstairs?
5:35:00 A. No, sir.
5:35:01 Q. Did you hear anything upstairs?
A. Yes, sir.
5:35:04 Q. What is the first thing you heard after Mr. Kimberlin left?
5:35:11 A. It sounded like Stocker was just beating him down, and just kept at it.
5:35:19 Q. Could you hear anything -- other than the sounds of the beating, could you hear anything from Mr. Pool?
5:35:25 A. Yes, I could -- I couldn't really distinguish exactly what he a was saying, but Pool and Stocker were talking back -- talking back and forth during this.
5:35:39 Q. Did you ever hear anything that made you believe that anyone was in pain or suffering discomfort?
A. Yes. Yes, sir.
5:35:45 Q. Some or a lot?
5:35:47 A. It became a lot. And it just didn't seem to stop.
5:35:54 Q. Did Mr. Kimberlin ever come back to the farm?
5:35:57 A. Yes, sir.
Q. How much time do you think lapsed from the time

that Kimberlin left until he returned to the farm, approximately?

A. It was a couple or three hours, I believe, because -- I believe when he got back, it was actually time for them to already have him gone by 5:00.

Q. So -- so the -- the promise that all of this would be straightened out by around 5:00 or so, was either already violated or close to being unfulfilled?

A. Yes, sir.

Q. When Mr. Kimberlin returned, was he alone or with people?

A. No, he was -- he was with Bledsoe and Frank Chacon.

Q. So Frank Chacon, and Mr. Bledsoe, and Mr. Kimberlin returned. Now, when Mr. Kimberlin left he was in his pickup?

A. Yes, sir.

Q. When he came back to the farm, was he still in a pickup?

A. No, sir. He was in a Navigator or something. It was Bledsoe's vehicle, I found out.

Q. Do you recall the color?

A. I believe it was gray or a --

Q. Was it dark colored?

A. Yes, sir.

5:37:07 Q. Okay. But you're not sure, black, gray, dark color?
5:37:10 A. Yes.
5:37:11 Q. Okay. Now, while Mr. Kimberlin was gone, did Mr. Stocker ever come downstairs?
5:37:21 A. He would come down there every once in a while for a short period, and then he would go back up. One time he came down and he said -- he asked me if I heard him getting loose upstairs. And he said that he kind of indicated for me to grab something and we would go upstairs together. And I -- I just let him go on back upstairs, and I went right back to my office.
5:37:44 Q. So when -- when you say that Mr. Stocker talked about him getting loose, did you -- loose from what? Did you know to what he was making reference?
5:37:51 A. He was making reference to -- they had -- I had some gray tape out there, and I guess they were using that, because Stocker said something about -- to the effect that my gray -- my tape was not very good tape.
5:38:03 Q. So Mr. Stocker was not happy with the quality of your duct tape?
5:38:11 A. Yes, sir.
5:38:17 Q. I'm showing you State's Exhibit 187. I ask if you recognize what's depicted there?
5:38:28 A. Yes, sir. I had all -- various kinds of tapes.

5:38:30 When I'd find them on sale, I would buy it.

5:38:33 Q. State's Exhibit 188, is that also a different color duct tape?

5:38:39 A. Yes, sir.

5:38:39 Q. And so did you have a lot of duct tape out there?

5:38:40 A. Yes, sir, I did.

5:38:41 Q. By the way, State's Exhibit 189 is -- is that the kind of a cord or strap --

5:38:53 A. Strap.

5:38:53 Q. -- that what used on the box?

5:38:53 A. Yes, sir.

5:38:53 Q. Okay.

5:38:53 MR. FARREN: Go ahead and put up 189, if you could.

5:38:56 THE COURT: Is it in?

5:38:57 MR. FARREN: Yes. All of these are in, Your Honor.

5:39:00 Q. (BY MR. FARREN) So State's Exhibit 189, as the jury can now see, that -- that's the kind of strap you were talking about earlier?

5:39:09 A. Yes, sir.

5:39:09 Q. And State's Exhibit 187, that's the kind of tape you're talking about?

5:39:29 A. That was some of it. I had some gray tape, some yellow tape.

Q. Different colors, but this is commonly known as duct tape. Right?

A. Yes, sir.

Q. Do you know if it was particularly the gray duct tape that Mr. Stocker believed lacked quality?

A. I think it was the yellow.

Q. Yellow? Okay. So the yellow duct tape was the duct tape that wasn't very good.

Now, I want to show you State's 192.

MR. FARREN: No pressure, Jeremy.

Q. (BY MR. FARREN) Do you recognize what is depicted here?

A. A gray tarp.

Q. Okay.

A. Yes, sir.

Q. Did you have various tarps out there as well?

A. Yes, sir, I did.

Q. Were some of the tarps blue on one side and silver on the other side?

A. I had one out there.

Q. Now, in addition to the tarps, and the tape, and so forth, did you have some thin plastic or semi-plastic sheets of material?

A. Yes, sir, I did.

Q. What were those?

5:40:39 A. That -- if I'm correct and assume what you're saying there, I had boughten (phonetic) some sheeting for -- I was building a house, and it was good wind protection. And I bought it at one of the lumber yards, a going out of sale -- or out of business, and I bought a big roll of it.

5:41:01 Q. Okay. If someone didn't know better, might they think it's like a drop cloth you could use to paint with?

5:41:07 A. Oh, yes, sir.

5:41:09 Q. In fact, you could use it for that?

A. Yes, sir.

5:41:11 Q. So Mr. Stocker at some point, at least sometimes, would come downstairs. This is during the time that Mr. Kimberlin is taking care of errands in Amarillo, and at one point he indicated that there was a problem in that Mr. Pool was getting loose?

5:41:29 A. Yes.

5:41:29 Q. How did you know he had been taped, if you hadn't gone upstairs?

5:41:34 A. I did not know.

5:41:35 Q. Okay.

5:41:37 A. Other than they asked me if I had tape.

5:41:39 Q. Okay. So you just assumed that's what he was talking?

5:41:41 A. Yes.

Q. You didn't actually see him taped?
A. No, sir.
Q. When they -- when they took him out of the box to take him upstairs, other than the pillowcase, was he taped in any way then?
A. I glanced up at him uh -- and that was it. I -- they were acting very -- Stocker and Kimberlin were acting very uh -- nice to the guy at the time. They were helping him, you know, where to walk and place your foot there.
Q. They wouldn't want him to bump into anything?
A. Yeah.
Q. Yeah. And so at that point, as far as you know he wasn't restrained in any, just the pillowcase?
A. Yes, sir.
Q. Did he still have the pillowcase?
A. Yes, sir.
Q. And then -- and then later they asked about tape, or Stock -- did -- did both of them ask about tape or just Stocker, if you recall?
A. I do not recall.
Q. Okay. But someone asked you about tape?
A. Yes, sir.
Q. And then later you heard about him getting loose?
A. Yes, sir.
Q. And Stocker complaining that the tape wasn't very

5:42:39 good, because he kept getting loose?

A. Yes, sir.

5:42:42 Q. So that's what led you to believe he was taped

5:42:47 up.

5:42:47 THE COURT: Mr. Farren, we need a break.

5:42:49 MR. FARREN: Yes, sir. I'm sorry, Your

5:42:51 Honor.

5:42:51 THE COURT: All right. Ladies and

5:42:52 gentlemen, would you be back in that jury box -- or the

5:42:55 jury room at 4:00 by that clock. Thank you.

5:42:58 (Recess.)

(Both sides, the Defendant present, in open.

5:56:08 (court:

5:56:08 THE COURT: Thank y'all.

5:56:09 Mr. Elliston, would you have a seat back up

5:56:39 here. As soon as he does, bring the jury back in.

5:56:47 (Jury seated.)

5:57:13 THE COURT: Thank you, ladies and gentlemen.

5:57:14 Everyone be seated.

5:57:15 All right, Mr. Farren.

5:57:20 MR. FARREN: Thank you, Your Honor.

5:57:22 Q. (BY MR. FARREN) Once Mr. Kimberlin, Joshua

5:57:28 Stocker, the Defendant in this case, and Joshua Bledsoe

5:57:33 arrived at the farm in Mr. Bledsoe's Navigator, what

5:57:37 happened next?

5:57:43
A. Things just went out of control, basically, as far as Bledsoe went upstairs, I believe, first. And it seemed like I could hear that the beatings were getting worse, because I was under the impression at that time that Stocker and Bledsoe were beating him up pretty bad.

Q. That's how it sounded to you anyway?

A. Yes, sir.

Q. So Mr. Stocker didn't come downstairs when Mr. Bledsoe went upstairs?

A. He might have a couple of times, but he went right back up.

Q. Well -- and uh -- so we can get the context or the big picture here, is it correct or not that Mr. -- do you believe Mr. Pool finally left your farm around 2:00 in the morning?

A. Yes, sir.

Q. From the time that Bledsoe, Stocker, and Kimberlin arrived, which was around 5:00 or maybe a little after, until 2:00 in the morning, during that time period is it correct or not that all four of those men, Stocker, Kimberlin, Chacon, Bledsoe --

A. Yes, sir.

Q. -- all four of them were upstairs at various times in various combinations?

A. Yes, sir.

Q. Okay. And it would be difficult to describe every combination, is that --

A. Yes, sir.

Q. Okay. When these four men in various combinations were upstairs, was there ever a time when you felt like the beatings stopped?

A. I -- I really -- there was times that I went into the house uh --

Q. All right.

A. -- but I was afraid that things would even get worse if I stayed in there. I don't know why.

Q. So when you could hear what was going on, did it ever sound like things stopped or just -- they were just rotating whoever -- whoever was doing the beating?

A. It just seemed like they were rotating.

Q. Now, at some point, were -- was there an inquiry made to you about food, about eating something?

A. Yes. Yes.

Q. Who talked to you about that?

A. Craig did.

Q. What did he say?

A. He was saying that he wanted to know if -- if I could get my wife to go into town and get some sandwiches. At that time she'd gotten home.

Q. Now she's -- she's --

A. In the house.

Q. -- she's not in the shop, she's in the house?

A. Yes.

Q. Did you talk to your wife about getting some food?

A. Yes, I did. She stated that she was also hungry. That she would go in -- it took me a little bit of talking. It wasn't real easy, because she had things going. Getting laundry and stuff going.

Q. Where -- I guess the easiest way to ask it, is what kind of food -- did she go get some food?

A. Yes, sir.

Q. What kind of food?

A. Subway sandwiches.

Q. And where was the closest Subway sandwich shop from you?

A. I believe it was on I-40 and Grand.

Q. So -- in Amarillo, not Panhandle?

A. Yes, sir.

Q. Okay. And do you know for sure that that's where she got them, or you just know she went after -- she brought Subway, and you assumed that's the place?

A. I believe -- I believe that's where she got them, because usually -- there is a Subway at the TA Truckstop -- used to be TA Truckstop. It was no longer

6:01:12 there, but it was only just opened for short hours. I
6:01:15 don't think it was opened quite as late.
6:01:17 Q. How late do you think it was when you -- that
6:01:19 this effort to obtained food occurred?
6:01:22 A. About 8:30 or 9:00.
6:01:23 Q. Okay. So you think the one at TA was closed by
6:01:27 then?
6:01:27 A. Yes, sir.
6:01:28 Q. Now -- now, there was Josh Stocker, Josh Bledsoe,
6:01:34 Craig Kimberlin, Frank Chacon, you, your wife and
6:01:40 Mr. Pool. Seven people. How many sandwiches were
6:01:44 purchased?
6:01:44 A. I believe that there was four or five sandwiches.
6:01:49 Q. And your wife came back with the food?
6:01:53 A. Yes.
6:01:55 Q. Did she take some of the food with her to the
house?
6:01:58 A. Yes, sir. She took a sandwich.
6:02:01 Q. The rest of the food she left with you?
6:02:03 A. Yes.
6:02:03 Q. And what did you do with the food?
6:02:04 A. I brought the food into my office and told them
6:02:07 that it was there.
6:02:14 Q. And did all four men come down and eat?
6:02:17 A. No, sir.

Q. So they're still working in shifts, but they're taking time to eat?

A. I believe -- best I can recall, that Bledsoe was the only one that really ate any part of his sandwich. I don't believe Frank Chacon or Craig Kimberlin had ate'en (phonetic) very much, if any, of theirs.

Q. Okay. So they may have -- Kimberlin indicated he -- he wanted to get food, but then he didn't end up eating it?

A. Yes, sir.

Q. And you don't think Mr. Chacon did?

A. I don't believe so.

Q. You said you thought Stocker did. How about -- I mean Bledsoe. How about Mr. Stocker?

A. I don't recall.

Q. Okay. You're not sure about him.

Now, earlier, when you went to Amarillo and brought Mr. Pool back with the pillowcase on his head in the refrigerator box, you remember we talked about some phone calls and you probably arrived around 11:00 or so in Amarillo?

A. Yes, sir.

Q. And then there's the process of getting Mr. Pool in the box, and down to the pickup, and the drive back to the farm. What time do you think, approximately, that you

6:03:27 arrived back at the farm?
6:03:30 A. Uh -- I'm not for sure what time. Probably about
6:03:38 an hour-and-a-half.
6:03:39 Q. So 12:30, approximately?
6:03:42 A. I believe so.
6:03:42 Q. Okay. So you think you were back at the farm
6:03:45 with Mr. Pool by about 12:30. And we realize you're
6:03:50 estimating?
6:03:50 A. Yes, sir.
6:03:50 Q. And you think Mr. Pool finally left your farm
6:03:54 about 2:00 in the morning?
A. Yes, sir.
6:03:56 Q. So 13 to 14 hours later?
6:04:00 A. Yes, sir. And one of the reasons I can remember
6:04:01 that it was about 2:00 is because out where we live, the
6:04:10 Panhandle Police Department would do a drive-by about that
6:04:12 time as the shift closed. And I kept trying to tell them
6:04:18 that -- you know, they better get him out of there before
6:04:21 the police came around, you know, because at that point, I
6:04:24 didn't know what I was going to do, but I was hoping that
6:04:27 I was going to be man enough to do something.
6:04:35 Q. Have you -- had you been talking to Mr. Kimberlin
6:04:40 or anyone else about them leaving?
6:04:44 A. Yes. And Kimberlin mentioned on several times,
6:04:47 you know, we'd already been out here longer than we

6:04:55
6:04:57
6:04:59
6:05:04
6:05:06
6:05:06
6:05:10
6:05:18
6:05:22
6:05:26
6:05:31
6:05:38
6:05:39
6:05:41
6:05:43
6:05:49
6:05:53
6:05:57
6:06:00
6:06:04
6:06:05
6:06:07

should. He was, I guess in a way, trying to reassure me that things was -- you know, were going to wrap up pretty quick and they would be getting out.

Q. And by 2:00 in the morning, he's only nine hours past his deadline at that point?

A. Yes, sir.

Q. So Mr. -- Mr. Pool you think arrived around 12:30, leaves around 2:00, thirteen and a half hours. And other than the times that you left and went to the house, do you believe that the beating was virtually continuous?

A. Yes, sir.

Q. How did you finally persuade -- what -- what brought about the fact that they finally left?

A. I don't know.

Q. You were talking to them about the police?

A. The police -- I was talking about the police, but at one point, all four of them were down in my garage area and they weren't exactly wanting me to hear what they were saying, but they were discussing different avenues, I guess, on -- at the time of what they were going to do.

Q. Was -- were all four of them involved in the discussion or could you tell?

A. Yes, I believe all four of them.

Q. You believe all four were. Okay. And could -- could you hear clearly what was being said, or are you

just surmising that that's what was being talked about?

A. Well, they were in the process of trying to get out of my garage.

Q. Okay.

A. I -- I -- I surmised that.

Q. So at least you believe they were making plans to leave?

A. Yes, sir.

Q. Okay. After this discussion took place in the downstairs area, what happened next?

A. They got ready to leave.

Q. Okay. Well, when they got ready to leave, did they make any preparations to take with them what they brought when they came?

A. Yes, sir.

Q. Did you see anything take place upstairs?

A. I did not see anything, but I was asked if I had a tarp, and if -- I don't know if the plastic was up there already in that upstairs room --

Q. Now, by plastic, is this thin, almost veneer-like stuff we talked about earlier that could be used as a drop cloth?

A. Yes, sir.

Q. Do you think some of that was used in preparing to remove Mr. Pool?

6:07:17 A. Yes, it could have been.

6:07:18 Q. Okay. But you don't know for sure?

6:07:20 A. I don't know for sure.

6:07:21 Q. Okay. I want to show you what has been admitted as State's Exhibit 71. Does that -- does that look like the tarp that you had at your farm?

6:07:53 A. Yes, sir.

6:07:59 Q. How about State's Exhibit 72, does that look like it?

6:08:03 A. Yes. Yes, sir.

6:08:08 Q. State's Exhibit 74, does that look like the tarp and maybe some of the straps and tie downs you had out at the farm?

6:08:18 A. Yes, sir.

6:08:21 Q. State's Exhibit 75, same thing, would you agree?

6:08:25 A. Yes, sir.

6:08:26 Q. Did you have any bungie cord type things with hooks, that were stretchy out there?

6:08:32 A. Yes sir.

6:08:32 Q. State's 76, does that look like --

6:08:38 A. Yes, sir.

6:08:42 Q. State's Exhibit 77, do any of those items look familiar?

A. Yes, sir.

6:08 Q. Do you think those items may have been at your

6:08:50 farm at one time?
6:08:51 A. Yes. Yes, sir.
6:08:52 Q. State's Exhibit 78, does that look like a part of
6:08:57 your tarp?
6:08:57 A. Yes, sir.
6:09:03 Q. State's Exhibit 80, see the little orange object
6:09:08 there?
6:09:09 A. Yes, sir.
6:09:09 Q. Does that look familiar at all?
6:09:11 A. Yes, sir, it does.
6:09:13 Q. How about that silver duct tape, does that look
6:09:16 like this kind of duct tape you had?
6:09:18 A. Yes, sir.
6:09:27 Q. State's Exhibit 82, any of that tape or any of
6:09:33 the -- the inside of this silver side, does that look like
6:09:38 this silver side of your tarp?
6:09:40 A. (Witness nods head up and down.)
6:10:13 Q. When was the next time you saw Mr. Pool, after he
6:10:17 was taken upstairs with the pillowcase on his head?
6:10:20 A. I never did see him after that.
6:10:22 Q. Did you see an object leave your farm wrapped in
6:10:26 that blue tarp that we looked at a few moments ago?
6:10:30 A. I was in my office.
6:10:31 Q. All right. So you didn't actually see it?
6:10:33 A. No, sir.

6:10:33 Q. Did you see anything -- any of the events when he was brought down the stairs?
6:10:39 A. I heard some events.
6:10:41 Q. What did you hear?
6:10:46 A. It sounded like his head was hitting each step on the way down.
6:10:52 Q. Now, while you were in the shop, did -- did you come out of the shop once he was downstairs? Did you see him actually loaded into any vehicle or anything?
6:11:02 A. I did not see him loaded into any vehicle.
6:11:03 Q. Did you hear any discussion about him being loaded in the vehicle?
6:11:07 A. I knew that he had been loaded in the vehicle.
6:11:10 Q. How did you know that?
6:11:13 A. I sure hoped he wasn't still back upstairs. They were fixing to leave.
6:11:20 Q. It was obvious they were leaving?
6:11:24 A. Yes, sir.
6:11:24 Q. Did Mr. Kimberlin or anybody else talk to you before they left about the problem, or the -- that they would be back, or that you needed to clean up, or anything?
6:11:33 A. Uh -- he said that they would be back to clean up.
6:11:40 Q. Now, what did you think that they were going to

6:11:42 clean up?

6:11:45 A. Well, it sounded like they had been beating him.
6:11:47 I mean, I -- I figured that they would need to clean up --
6:11:51 I'm sure the guy had bled, you know. And I didn't know
6:11:57 what else --

6:11:57 Q. Did they ever come back and clean up?

6:12:00 A. No.

6:12:01 Q. Who cleaned up?

6:12:02 A. I did.

6:12:06 Q. How did you clean up? What are some things that
6:12:09 you did to clean up?

6:12:11 A. I had uh -- the floor upstairs was made out of
6:12:16 rubber mats that you put together.

6:12:18 Q. Those rubber squares?

6:12:21 A. Yeah. They're about two-and-a-half foot by --
6:12:25 and the next morning -- well, it was already morning, but
6:12:29 I mean after sunlight came up I panicked, and I ran
6:12:33 upstairs and I saw mats that looked like they had blood on
6:12:38 them, and I stuffed them in a bag. I dropped them out of
6:12:44 the top window upstairs onto the ground, and went
6:12:49 downstairs and grabbed the bags and took them out to the
6:12:53 trash can and threw them away.

6:12:55 Q. Now, do you have -- in the city we have dumpsters
6:12:57 that are picked up on a regular basis. Do you have
6:12:59 similar --

A. Yes, sir.

Q. -- receptacle?

A. Yes, sir.

Q. A dumpster?

A. Yes, sir.

Q. And how often do they come by and pick up the trash?

A. Once a week.

Q. Eventually, some law enforcement authorities contacted you. Do you recall that? Came and talked to you?

A. Yes, sir.

Q. Had the trash already been picked up by then?

A. Yes, sir.

Q. So the tiles were gone?

A. Yes, sir.

Q. What else did you do to clean up?

A. There was a -- they told me they started cleaning up, and I remember a plastic bag that was about half full of stuff, a trash bag, and one that was full -- was almost full, that seemed to be like stuffed with plastic or something like -- you know, they painted or something, and they stuffed it with drop cloths in a plastic bag.

Q. And did you dispose of that as well?

A. I threw those away, too.

6:13:53 Q. Did you do anything else to clean up?
6:13:55 A. Not upstairs.
6:13:56 Q. Did you do anything to clean up on the stairs?
6:14:00 A. No, sir, I don't believe so.
6:14:02 Q. Did you do anything to clean up downstairs?
6:14:04 A. No, sir.
6:14:05 Q. Okay. Once you had all of the tile out of the way and this bag of stuff that you assumed they had already used to put stuff in, did you feel like you had gotten rid of most of the stuff?
A. Yes, sir.
6:14:29 Q. Were there any -- were there any chairs up there, any --
6:14:33 A. There was that white chair that I saw in the picture.
6:14:35 Q. Okay.
6:14:36 A. But I -- I had just kind of finished that room off -- off up there. I had not started putting stuff in storage -- stuff in there.
6:14:46 Q. I understand. So when -- when they arrived and went upstairs, that chair was not in storage then, was it?
6:14:56 A. No. No, sir. I -- I believe I did put that chair in the -- in the attic.
6:15:01 Q. So in addition to the tiles and the bag, you put the chair over in the storage area of that --

A. Yes, sir.

Q. Did you hear from Mr. Kimberlin again, the next day after this?

A. Yes, I did. And Kimberlin told me when I cleaned up, if I cleaned up he said not to throw it in the trash. He told me to burn it or get rid of it somehow, but not to throw it in the trash. And you know once again, my bravery kind of flared up after he was gone, and I thought, well, if he wants it out of the trash, he can come get it out of the trash. You know, I was not brave in front of him.

Q. So in an act of defiance, you threw the stuff in the dumpster even though he told you not to?

A. Yes.

Q. Now, did you -- did you hear about anyone getting arrested sometime after this?

A. Uh --

Q. Did you ever know about Mr. Kimberlin being arrested, or Mr. Stocker, or Mr. Bledsoe?

A. Oh, later on?

Q. Yes, sir.

A. Yes, sir, I did.

Q. That was two or three months later, wasn't it?

A. Yes, sir. But. . .

Q. Okay. When they were -- how did you hear about

6:16:27 them being arrested?

6:16:30 A. On the news.

6:16:31 Q. On the news? Okay. Did -- did you know why they were arrested? Did you wonder whether it was in reference to this thing with Mr. Pool, or if it was for something else, or did you know?

6:16:43 A. I really knew it was for the Pool deal, because I actually seen my house on the news.

6:16:50 Q. You had seen your house on the news? Had anyone come and talked to you about the Pool event before you heard they were arrested?

6:16:58 A. Uh -- a guy was over at Craig's house, and the guy that you -- Destry --

6:17:09 Q. Destry Keeling?

6:17:09 A. Yes, sir.

6:17:09 Q. And so sometime after this March 10th and 11th event, or 9th, 10th, 11th event, you were over at Mr. Kimberlin's house, and you and Mr. Destry Keeling was also there?

6:17:22 A. Yes.

6:17:22 Q. Okay. What happened while you were there?

6:17:25 A. Destry was telling Craig about his encounter with Sergeant Brown.

6:17:33 Q. So Mr. Keeling was telling Kimberlin some guy named Brown had come to talk to him?

6:17:40 A. And Kimberlin was really interested in the way I was reacting, because I believe at that point and before this point, Kimberlin was afraid that I was a -- narking him out, so to speak, and he became very suspicious of me, and kept in contact with me a lot. And uh -- he said that he was going to be moving uh -- getting out of the country, and I was hoping that it was going to be pretty soon, because I did not feel like my life was very much until he did.

6:18:20 Q. Did -- did you ever learn that Mr. Kimberlin had given a statement to the police and revealed were the body of Dustin Pool was?

6:18:37 A. Uh -- those -- those events back then were pretty confusing to me.

6:18:45 Q. Let me ask it this way: Did Mr. Kimberlin ever contact you and talk to you about a story that he wanted you to tell, a version of what happened?

6:18:55 A. We talked about that after Stocker and Bledsoe took off in the Navigator that night.

6:19:03 Q. So even -- even that night he talked to you about that?

6:19:06 A. Yes, sir.

6:19:07 Q. What did he -- what did he tell you that night was going to be the story?

6:19:10 A. Well, he told me that Stocker was a loose cannon.

6:19:15 That he -- he basically blamed the whole thing on Stocker and Bledsoe. And at the time I knew too much already. I knew that Craig had a hand in it, too, but he was saying now this is what -- you don't ever place us there. Don't ever tell -- don't tell anybody that we ever went upstairs. He's talking about himself and Frank Chacon.

And he said -- he told me that if Stocker and Bledsoe was to show back up at my place to shoot them, because -- and then call the cops. And, you know, I couldn't -- but he was basically starting to cover his end of the bases at that time on the way back into town.

Q. Now, you indicated after that night he was in contact with you a lot. He -- he showed a lot of interest in visiting with you on a frequent basis?

A. Yes, sir. About a day later or two days later, I was so tired at the time -- I can't remember exactly how long it was, but I got concerned, and I had to know if uh -- they killed him out there or not. And I had called Craig, because Craig said on the way into town, if we need to talk to anybody, we can just talk amongst ourselves. You know, if we're going to have a problem with this, we need to talk amongst ourselves.

So I called Craig and he told me he would meet me at Gebo's. When I met him at Gebo's, Destry was with him at the time.

Q. Okay. Are you talking about Destry Keeling?
A. Destry Keeling.
Q. Yes, sir.
A. And Craig assured me that Dustin Pool was still alive. And so I said, well, I hope that -- he said Bledsoe was in charge of the thing then. You know, Bledsoe was -- and he blamed it on Bledsoe at that time.
Q. Okay.
A. He said that -- I said, well, good. Maybe Bledsoe will have a chance to do the right thing. You know, get the guy to the hospital or whatever, but Craig indicated to me at that time he was still alive.
Q. How long after they left the farm that night did you have the meeting at Gebo's? How much time passed do you think?
A. Maybe 24 hours or a little more --
Q. So a day -- just a day or so?
A. Yes, sir. I was having a hard time with it. You know, once again, I didn't know what I was going to do, but I had to find out. You know, I had --
Q. When did you learn that Dustin Pool, in fact, was not alive, that he was dead?
A. Uh -- the time frame is hard uh -- for me to get -- get with, but I believe it was probably about a month or two months later that I found out.

6:21:58
Q. Did -- did you hear this from some person, or did you hear it on the news that they found his body?
6:22:02
A. I believe that I heard on the news -- I believe I heard that they were looking for him at the time -- his ex-wife or something at the time.
6:22:11
Q. That he was missing and they were looking for him.
6:22:13
Did you -- did you ever hear on the news that he was, in fact, dead and they found his body, if you recall?
6:22:24
A. Uh -- I don't remember them saying that they found the body -- found the body.
Q. Okay.
6:22:34
MR. FARREN: May I approach the witness, Your Honor?
6:22:36
THE COURT: Yes, sir.
6:22:38
Q. (BY MR. FARREN) Mr. Elliston, I -- in fact, I'm going to -- Mr. Elliston, I have marked three items for identification purposes. I have marked one State's 256, 247, 258. Do you remember the first time you talked with Mark Brown? I'm -- not telling us when that occurred. Do you remember him coming and talking to you?
6:24:01
A. Yes, sir.
6:24:01
Q. And did you ever give him a written statement in which you claimed that Stocker and Bledsoe arrived at your

6:24:13
6:24:13
6:24:18
6:24:18
6:24:18
6:24:22
6:24:26
6:24:26
6:24:29
6:24:32
6:24:40
6:24:41
6:24:42
6:24:43
6:24:45
6:24:50
6:24:53
6:24:59
6:25:03
6:25:09
6:25:11

farm with Pool?

A. Yes, sir.

Q. That you were there, and they showed up with Pool?

A. Uh-huh.

Q. Would you look at State's 256 and tell me -- now, this statement is dated June 17th. Is that right?

A. Uh-huh.

Q. Would you look that over and tell me if that's the statement where you told this story about Stocker and Pool arriving -- Stocker and Bledsoe arriving with Mr. Pool.

A. Yes, sir. It was the first statement.

Q. That was your first statement?

A. Yes, sir.

Q. Was that true?

A. Parts of it was true.

Q. Parts of it were true. Which parts were true?

A. Well, they did go -- come out -- oh, well, no, that was a lie, I brought him out there, but Stocker and Bledsoe both taking turns beating him up.

Q. So the part of statement on 256, on June 17th that's true is, that Stocker and Bledsoe, you believed, had beaten Mr. Pool?

A. Uh-huh.

Q. But the part about them bringing him to the farm, that wasn't true, was it?
A. No, sir.
Q. And it certainly implies, if it doesn't say this, that Stocker and Bledsoe were the only people --
A. Yes, sir.
Q. -- who beat on him?
A. Uh-huh. Yes, sir.
Q. Now, on June 24th -- I'm showing what's been marked as State's Exhibit 258. Did you give another statement to Mr. Brown -- Sergeant Brown?
A. Yes, sir, I did.
Q. And the second statement, did you tell the truth?
A. Yes, sir.
Q. You told about how you got called to come to Amarillo?
A. Yes, sir.
Q. And loaded the -- you guys loaded him in a box and took him out to the farm?
A. Yes, sir.
Q. They beat on him forever?
A. Yes.
Q. And, finally, he was hauled away?
A. Yes, sir.
Q. Now, why did you tell this first story? How did

6:26:12 you arrive at this story?
6:26:13 A. That was what was agreed to uh -- on the way into town that night.
6:26:20 Q. Now, after Mr. Bledsoe and Mr. Stocker left in the -- did they leave in the black Navigator?
6:26:30 A. Yes, sir.
6:26:31 Q. Okay. And as far as you know, Mr. Pool was with them?
6:26:34 A. Yes, sir.
6:26:35 Q. And then how did -- how did Mr. Chacon and Mr. Kimberlin leave the farm?
6:26:40 A. I took them into town.
6:26:41 Q. So you took them in your vehicle?
6:26:43 A. Yes, sir.
6:26:43 Q. So the three of you -- was this the green Dodge pickup?
6:26:46 A. No, sir. I took my wife's car.
6:26:49 Q. Took your wife's car. So the three of you are in this car and you're talking on the way back to Amarillo?
A. Yes, sir.
6:26:54 Q. And what kind of agreement was reached?
6:26:57 A. Well, Kimberlin basically said that we were going to cover ourselves. And that he basically kind of spilled out the story on the way into town, blaming Stocker and Bledsoe for everything. And how they'd showed up at my

house. And I had called Craig, because I didn't know what to do about them being -- showing up at my place.

Q. So in State's 250 -- 256, the June 17th statement, you were following the story line that you guys agreed on that night. And that is, you're out at your farm minding your own business, and Stocker and Bledsoe showed up with Pool?

A. Yes, sir.

Q. And then you called Kimberlin, because he's the guy in charge of these people. Hey, get out here and get these people off of my farm?

A. (Witness nods head up and down.)

Q. And that -- the story then involves, doesn't it, that they did actually come to the farm, but they just made Bledsoe and Stocker leave, and that's basically the last you know?

A. (Witness nods head up and down.)

Q. Now, did you realize at that time and now, that if you're out at your farm minding your own business when two thugs showed up and beating this guy up, and you make them leave, you're not guilty of anything, are you?

A. Yes, sir.

Q. And State's 250 -- in State's 258, however, on June 24th, when you gave this statement did you realize that if this statement's true, you could be charged with

6:28:52 and prosecuted for capital murder?

6:28:55 A. I did not realize I could be charged and prosecuted for capital murder. The reason I gave that statement is because it was true.

6:29:05 Q. Well, did you realize what that second statement meant?

6:29:08 A. I was in big trouble.

6:29:10 Q. Certainly in big trouble?

6:29:11 A. I was in big trouble, but I did not kill the guy. And I knew that I did my part, reluctant -- I didn't even see how anybody could see it was (sic) reluctant in my position.

6:29:28 Q. Yes, sir. Did -- did you realize then or do you realize now that in the State of Texas that if you're in for a penny, you're in for a pound?

6:29:36 A. Yes, sir.

6:29:39 Q. But you would agree with me, your actions that night were far different from the other four?

6:29:45 A. Yes, sir.

6:29:46 Q. Okay. Now, you gave another statement on December 22nd to Sergeant Brown, and it doesn't contradict your -- your June 24th statement, it just adds additional information?

6:30:00 A. Yes, sir.

6:30:02 Q. Eventually, law enforcement authorities came to

6:30:07 your farm and conducted a search. Is that correct?

A. Yes, sir.

6:30:11 Q. Did you admit to them, look, I've gotten rid of a lot of the stuff?

6:30:16 A. Yes, sir.

6:30:16 Q. But did you agree to let them search?

6:30:19 A. Yes, sir.

6:30:19 Q. And they had full access to the -- to the area?

A. Yes, sir.

6:30:22 Q. Did that include the stairway going upstairs?

A. Yes, sir.

6:30:27 Q. And it included access to the area around the 7th step of that stairway?

6:30:33 A. Yes, sir.

6:30:40 Q. Now, did you and Mr. Kimberlin -- or did Mr. Kimberlin ever suggest to you that you were going to benefit in some way from cooperating with him, in addition to staying alive? Did you owe him any money?

6:30:54 A. Yes, sir, I did.

6:30:55 Q. Did he agree to take money off the books that you owed him?

6:30:59 A. Yes, sir.

6:31:01 Q. Do you -- do you know Tori Patrick or Guinn Garcia? Have you ever met any of those people?

6:31:07 A. No, sir.

6:31:07 Q. Had you ever been convicted of a felony in this state or any other state?

6:31:12 A. No, sir.

6:31:13 Q. Have you been charged with a serious crime before this?

6:31:16 A. No, sir.

6:31:17 Q. Do you remember at some point that evening any one of the group going into the house, leaving the shop and going into the house?

A. Yes, sir.

6:31:27 Q. Who -- who went into the house?

6:31:29 A. Stocker did.

6:31:30 Q. Now, did -- did you do anything? I mean, how did you -- did he let you know he wanted to go in the house?

A. Yes, sir.

6:31:38 Q. Why did he want to go into house?

6:31:40 A. He needed to use the restroom.

6:31:43 Q. You didn't have a restroom out at the shop?

6:31:46 A. No, we had a urinal though, but didn't have a --

6:31:47 Q. But if you wanted to shower or anything, your wife --

6:31:50 A. Yes.

Q. -- you still went in and used the house?

A. Yes.

6:31:51 Q. Did you do anything in response to this request

6:31:53 to go use the restroom in the house?

6:31:56 A. Yes, I asked my wife to go to another room.

6:31:59 Q. And so at this point they've all been out at the shop. And she knows there's some folks there. You're not going to eat five Subway sandwiches?

6:32:08 A. Yes, sir.

6:32:09 Q. But she doesn't know who's there or for sure what all is going on?

6:32:10 A. No, sir.

6:32:11 Q. So you go in to make sure she goes into a different part of the house and she doesn't see Stocker?

6:32:16 A. Yes, sir.

6:32:17 Q. Now, when you were inside the shop, you've indicated that you could hear clearly the pain --

6:32:27 A. Yes.

6:32:27 Q. -- and discomfort of Mr. Pool?

6:32:30 A. Uh-huh.

6:32:31 Q. Could your wife not hear even at the house?

6:32:33 A. No, sir. Our shop was 75 feet away from our house. Plus, that was just the living room area. She was mainly in the back of the house, which was another 75 feet away, doing laundry and stuff back there.

6:32:51 Q. And so you truly believe that --

6:32:53 A. I truly believe.

6:32:54 Q. -- she couldn't have heard?

6:32:56 A. No, sir.
6:32:57 Q. Now, did you do -- when were you working with automobiles, did you do welding, and brazed metal, and things of that nature?
A. Yes, sir.
6:33:05 Q. There's -- there's been testimony that at the autopsy, in this tarp there was some metal fragments. Could that have been from welding or working on vehicles?
6:33:13 A. Yes, sir. That tarp I used is a shade tarp. Actually, I was building Kimberlin's garage, welding on it with that tarp. And it's pretty weather beaten, because I had left it out in the wind a couple of days. But, yeah, I used it to deflect sparks from my weld and for shade at times.
6:33:33 Q. Did -- did they ask you for a tarp or did they just --
6:33:36 A. Kimberlin asked me for a tarp.
6:33:39 Q. So you selected the tarp?
6:33:40 A. Yes, sir.
6:33:44 Q. When he asked you for the tarp, did he tell you why he needed it?
6:33:47 A. He didn't want to get any blood -- you know, I knew the guy had been beat up. Now, I didn't know he was dead. He said he didn't want to get any blood on Bledsoe's vehicle.

Q. You and I, and other members of my office have met on more than one occasion and talked about the things that happened. Is that correct?

A. Yes, sir.

Q. And uh -- we've -- we've visited about you coming here and testifying?

A. Yes, sir.

Q. And is it correct, that we've reached an agreement about your testimony?

A. You told me to -- that there wasn't any agreement. That you was not offering me a deal, but if I was able -- if I was willing to testify and tell the truth, that you might go easier on me, or it would be better than if I didn't cooperate.

Q. So if you testified and tell the truth it will help up?

A. Yes, sir.

Q. And if you lie, what?

A. It's going to hurt me.

Q. And that's it. That's the agreement?

A. Yes, sir.

MR. FARREN: Pass the witness.

THE COURT: Which one of y'all's going to do it?

MR. WATKINS: Ms. McElroy.

THE COURT: All right.

CROSS EXAMINATION

BY MS. McELROY:

Q. Mr. Elliston, I believe that you said that you got a phone call from Stephen Kimberlin to come up to Amarillo. Is that right?

A. Yes, sir -- yes, ma'am.

Q. And then he called and asked you to come bring a box. Is that right?

A. He called me uh -- and asked me, first of all, if I had a box.

Q. Okay.

A. Okay.

Q. Now, did you guys have several communications back and forth about boxes and availability of boxes?

A. Well, he called me a couple of times and I didn't answer the phone, but he -- he called me and asked me for a box. I told him I would look around and see what I said. I believe he either called me back or I called him. I'm pretty sure he called me back, because he kept making phone calls.

Q. I believe you testified with Mr. Farren that you had a methamphetamine drug addition?

A. I use methamphetamine.

Q. Were you using methamphetamine on March 9th,

6:36:09 10th or 11th?

6:36:11 A. Yes.

6:36:13 Q. Mr. Elliston, how heavy a drug abuse problem did you have?

6:36:17 A. I used about an 8-ball a week.

6:36:21 Q. Okay. Did that -- I think you -- you said something to Mr. Farren that that made your times estimates kind of off?

6:36:29 A. No, ma'am. My times estimates have been off -- I mean, as far as dates and everything, I never kept up with that very well.

6:36:37 Q. Okay. Did it make it any worse?

6:36:39 A. It probably made it worse, yes.

6:36:41 Q. Okay. You had known Mr. Kimberlin for a year, year and a half?

6:36:51 A. Yes, ma'am. I believe so.

6:36:51 Q. Did you socialize with Mr. Kimberlin?

6:36:52 A. No, sir -- no ma'am. I'm sorry. No, ma'am. Usually I did -- was just over there -- we would visit while I was over there, but mainly just to buy drugs.

6:37:03 Q. Did you play pool with them at Slim's?

6:37:06 A. No, ma'am.

6:37:08 Q. So you were kind of kept out of the picture?

6:37:10 A. Yes, ma'am.

6:37:14 Q. Your wife, you said that she -- she is with the

6:37:18 health department?

6:37:18 A. Yes, ma'am.

6:37:21 Q. And what does she do?

6:37:21 A. She was inspecting nursing homes to make sure

6:37:24 they are up to standards.

6:37:26 Q. Do you have children?

6:37:26 A. Yes, ma'am. We have one child.

6:37:28 Q. How old is your child?

6:37:30 A. She is 18 -- 19. Almost 19.

6:37:33 Q. In 2003 she was 17?

6:37:35 A. Yes, ma'am.

6:37:36 Q. Well, where is she during all of this stuff going

6:37:39 on?

6:37:39 A. She went to a private boarding school where you

6:37:43 work part of the day and go to school. It's a Christian

6:37:46 school in Nebraska.

6:37:48 Q. In Nebraska?

6:37:51 A. Uh-huh.

6:37:51 Q. So she was away at school?

6:37:52 A. Yes, ma'am.

6:37:58 Q. All right. Now, you've testified that

6:38:03 Mr. Kimberlin basically told you that Dustin Pool was this

6:38:06 bad guy?

6:38:08 A. Yes.

6:38:08 Q. Is that right?

A. Yes, ma'am. They told me he was hassling the lady in the apartment that it belonged to. And -- and this lady had a child, and he was hassling -- you know, he was just not very nice with this lady and everything, so I believed them.

Q. Okay. So, basically, he's telling you this story that -- that Mr. Pool is an ugly, terrible person, and that you're helping this girl out?

A. Yes.

Q. Okay. Well, did you know who this girl was?

A. No, ma'am.

Q. Did you ask him who it was?

A. No, ma'am.

Q. So you were basically willing to come up here and bring a box to help somebody you don't know?

A. I came up here, originally, just to bring a box.

Q. Okay. All right. But as it went down, things didn't turn out that way. Isn't that right?

A. That is right.

Q. And, Mr. Elliston, at the time it didn't turn out that way, could you not have walked down, and got back in your car, and drove home?

A. I don't believe I could have.

Q. You couldn't have walked out of the apartment and gone to the next door neighbor and said, call the police?

6:39:26 A. No, ma'am. I don't think I could do that. No, ma'am.
6:39:29 Q. You couldn't have -- when you were driving down
6:39:31 the road, you couldn't have driven to the police
6:39:34 department, parked your vehicle and gone inside and said,
6:39:37 whoa, I've been rookie-dooed?
6:39:40 A. Now, I had thoughts of doing that, but I had
6:39:44 already heard of what Kimberlin and Stocker had done.
6:39:49 Q. Okay. Mr. Elliston, could you or could you not
6:39:55 have driven your box in your truck directly to Northwest
6:39:58 Texas Hospital, and gone to the emergency room? "Yes" or
6:40:00 "no"?
6:40:01 A. Yes, I could have.
6:40:02 Q. Could you have gone directly to the police
6:40:07 department and asked for some help at that point?
6:40:09 A. Yes, I could have.
6:40:10 Q. Was it your conscious choice not to do that?
6:40:19 A. It's something I wanted to do.
6:40:21 Q. But you didn't?
6:40:22 A. But I did not do it.
6:40:24 Q. Now, when you get to the farm, and you and Dustin
6:40:30 are the only ones, okay, you're the only ones there --
6:40:35 A. Yes, ma'am.
6:40:47 Q. -- at your home. Is that right?
6:40:47 A. Yes, ma'am.

6:40:47 Q. Why could you not have gotten Mr. Pool out of the box and let him go?
6:40:47 A. After he -- I had actually thought about doing that, but when --
6:40:49 Q. Yes, sir.
6:40:52 A. -- when he did wake up, he was mad.
6:40:53 Q. Yes. But --
6:40:54 A. Now -- now, you have to understand, I also thought about the safety of my family.
6:40:58 Q. All right.
6:40:59 A. Now, if this guy gets out of this box and my wife comes home --
6:41:04 Q. All right. Just a moment. Now, my understanding of your testimony is that you got to your place at 12:30. Is that correct, "yes" or "no"?
6:41:11 A. Around 12:30.
6:41:12 Q. Okay. You also testified awhile ago that your wife was not expected home until 5:00. Is that right?
6:41:19 A. That is right.
6:41:22 Q. Did you really expect that Dustin Pool was going to stand outside of your home until 5:00 to ambush your wife?
6:41:26 A. Ma'am, we were in the process of building a house.
6:41:29 Q. No. Mr. Elliston, please answer my question.

6:41:31
Did you anticipate --

6:41:31
A. It could have very well have happened, if you understand the way my house was being built. My house -- we were building -- okay. I'm sorry.

6:41:45
Q. All right. Now, for your involvement in this, you were basically paid in dope. Is that right?

6:41:54
A. No, ma'am.

6:41:55
Q. Okay. The money was taken off of your dope debt?

6:41:58
A. No, ma'am.

6:42:00
Q. Okay. So I didn't -- I didn't understand correctly when Mr. Farren asked you and you replied that money that you owed Stephen Craig Kimberlin was taken off of your books for your help?

6:42:10
A. You're right. Exactly. But it was because I had bought a garage building from him for around $3,000.00, that I had been building at his place for him. He decided to sell it, and I still have the metal out there, and it did not burn in the fire.

6:42:29
Q. Okay. So it didn't have anything to do with you helping him?

6:42:33
A. He knocked the -- he took what I was owing him for that building off of the books.

6:42:38
Q. Okay. Okay. And you're saying that was approximately $3,000.00 in monetary value?

6:42:43
A. Yes, ma'am.

6:42:4? Q. Now, I think you testified earlier that you basically stayed in your office area. Is that right?

6:42:53 A. Yes, ma'am.

6:42:54 MS. McELROY: May I approach the witness, Your Honor?

6:42:57 THE COURT: Yes, ma'am.

6:43:04 MR. FARREN: One of the shop --

6:43:06 MS. McELROY: This is not it.

6:43:14 MR. WATKINS: C.J., do you want me to hold it up there?

6:43:17 MS. McELROY: You need a holder.

6:43:19 THE COURT: Yes. That would be good..

6:43:?3 MS. McELROY: You don't look much like --

6:43:26 Q. (BY MS. McELROY) All right. Mr. Elliston, I think you testified, didn't you, that there's an office area downstairs. Is this the office area down here?

5:43:34 A. Yes, ma'am.

5:43:35 Q. And this is where you testified you backed your truck into?

5:43:39 A. Uh-huh.

5:43:39 Q. Is that right? Does this office have a door on it?

5:43:42 A. Right there.

5:43:43 Q. Did you shut your door?

5:4?:?4 A. Yes, ma'am.

6:43:44 Q. Okay. Now, how many feet would you say that you are from here to the entry to the stairwell?

6:43:54 A. The shop was 50 feet long to the back of the wall, from the wall to wall,.

6:44:01 Q. Okay.

6:44:01 A. And I believe that this was ten foot -- about 12 foot to this doorway right here.

6:44:09 Q. Okay.

6:44:09 A. And the shop area was a very narrow office area. Just basically where I had a desk and everything. It was about six foot in and about four foot over.

6:44:22 Q. Okay. And this is -- this is a wall here. Right?

6:44:26 A. Yes, ma'am.

6:44:26 Q. Okay. And there's a wall here?

6:44:28 A. Yes, ma'am.

6:44:28 Q. And there's things lining all along here. Is that right?

6:44:32 A. Yes, ma'am.

6:44:32 Q. Okay. Now, your testimony, I believe, is that Dustin Pool was taken upstairs to this floor. Is that right?

6:44:40 A. Yes, ma'am.

6:44:41 Q. Okay. Thank you. You said that you could hear the different things, but you then couldn't understand

6:44:53 what was being said. Was that your testimony?
6:44:55 A. I could hear different things being done to him.
6:44:58 Q. Okay. Well, I believe that -- that what I understood your testimony to be is that you said that you could hear sounds, but you couldn't make out what people were saying?
6:45:13 A. I could not always -- I couldn't always make out -- I mean, I heard certain words, yes, ma'am, I sure did, but I didn't know the whole gist of it.
6:45:24 Q. Okay. So would it be -- I believe that you testified that there were all of these rubber mats all over the floor upstairs. Is that right?
6:45:46 A. Yes, ma'am.
6:46:08 Q. I'm going to show you what we're going to mark -- what number. . .
6:46:14 MR. WATKINS: 5 is our next one.
6:46:22 MS. McELROY: Okay. This is Defendant's 5.
6:46:24 MR. FARREN: Uh-huh.
6:46:24 MS. McELROY: Defendant's 5. 4, 5 and 6.
6:46:29 MR. FARREN: 4, 5 and 6.
6:46:37 Q. BY MS. McELROY) Mr. Elliston, I'm going to show you what has been marked as Defendant's 4. And I'm going to ask you, do you recognize what is in this picture?
6:46:48 A. Yes, ma'am.
6:46:49 Q. Okay. Tell -- tell the jury what is in that

6:46:51 picture.

6:46:53 A. It's my office.

6:46:53 Q. Does this fairly --

6:46:54 MR. FARREN: Just to save time, Your Honor, she's already showed me the photographs. We have no objection to the admission and then he'll be able to freely talk about it.

6:47:03 THE COURT: Right. Uh -- without a predicate?

6:47:07 MR. FARREN: We don't need a predicate. We've seen them, Your Honor.

6:47:07 THE COURT: Defendant's 4, 5, and 6 are admitted.

6:47:11 MS. McELROY: Thank you, Your Honor.

6:47:11 Q. (BY MS. McELROY) I'm going to show you here. This is marked as Defendant's Exhibit No. 5. Is this also your office?

6:47:16 A. Yes, ma'am.

6:47:17 Q. And I'm going to show you Defendant's Exhibit No. 6. Is this also your office?

6:47:23 A. Yes, ma'am.

6:47:23 Q. Okay. Did you have the same kind of rubber tiles downstairs as upstairs?

6:47:26 A. Yes, ma'am. Except for I didn't have any of the smaller ones upstairs, I had just the larger ones.

Q. Okay. Was there anything else under the rubber?
A. In my office?
Q. No, sir. Upstairs.
A. Oh, wood floor.
Q. Was that plywood or solid wood?
A. It was wood planks.
Q. All right.
MS. McELROY: We'd ask to publish.
THE COURT: Thank you. Just a second. Okay. Thank you.
Q. (BY MS. McELROY) All right. Mr. Elliston, let's get back to the deal. You said that Mr. Kimberlin left at some point in time and went back to town?
A. Yes, ma'am.
Q. And that he left Mr. Stocker there. Is that right?
A. Yes, ma'am.
Q. Now, you're downstairs in your office. Is that right?
A. For most of the time. There was a couple of times I went to the house, I believe.
Q. But you never went upstairs?
A. No, ma'am.
Q. For any reason?
A. No, ma'am.

6:48:45 Q. You weren't in the vaguest notion curious about who this guy was?

6:48:50 A. No, ma'am.

6:48:52 Q. Well, Mr. Elliston, I'm kind of confused. I mean, you were okay with it because he was a bad guy and you were doing this girl a favor, but then you're not okay with it when you get home?

6:49:04 A. I realized I had made a mistake.

6:49:09 Q. Did they collect, if you know, any of this duct tape that was out at your farm?

6:49:28 A. Collect it?

6:49:29 Q. At some point in time, they executed a search warrant on your farm?

5:49:33 A. Yes, sir.

5:49:33 Q. Do you know whether or not they took into evidence any of this duct tape stuff?

5:49:37 A. I believe so.

5:50:00 Q. Originally, Mr. Elliston, you were charged with capital murder. Is that right?

5:50:06 A. Originally, yes.

5:50:07 Q. Okay. What was your bond at that time, Mr. Elliston?

5:50:10 A. $1,000,000.

5:50:11 Q. I'm sorry?

5:50:12 A. $1,000,000.

6:50:13 Q. Were you able to make that kind of a bond?
6:50:16 A. No, ma'am.
6:50:17 Q. How long did you stay in jail?
6:50:19 A. Two months.
6:50:21 Q. What -- what happened at that point in time?
6:50:24 A. Uh -- my lawyer, Joe Marr Wilson, got bond for me, and I'm not exactly -- sure exactly of what instances took place to have that happen.
6:50:42 Q. Well, would it have been right after you gave a statement for the -- the District Attorney?
6:50:50 A. Not right after. I believe -- ma'am, I'm sorry I may be confused. I believe I gave a statement before I went to jail.
6:51:00 Q. Well --
6:51:03 MS. McELROY: May I approach the witness?
6:51:04 THE COURT: Yes, ma'am.
6:51:16 Q. (BY MS. McELROY) Just for clarification sake, and perhaps this might help you, Mr. Elliston. This is the 23rd of June.
6:51:35 At the time that you gave this statement, Mr. Elliston, were you incarcerated?
6:51:41 A. Uh -- I was incarcerated after I gave that statement.
6:51:45 Q. Okay. All right. At some point in time, your bond was then lowered to $25,000.00. Is that right?

6:51:56 A. I believe so. I'm not for sure on that.
6:51:59 Q. You are not for sure?
6:52:00 A. Huh-uh.
6:52:01 Q. But you are for sure that you're out of jail now. Right?
6:52:04 A. Yes, ma'am.
6:52:05 Q. And you've been out of jail since that time?
6:52:07 A. Yes, ma'am.
6:52:09 Q. You mentioned that your attorney had -- had talked with you about this. Right? And he had -- he had secured a bond arrangement?
6:52:19 A. Yes, ma'am.
6:52 Q. Mr. Elliston, I believe that you said that you realized that you've made a terrible mistake. Isn't that your testimony?
6:52:49 A. Yes, ma'am.
6:52:50 Q. But wouldn't you agree with me that when you allowed Mr. Kimberlin -- or agreed with Mr. Kimberlin to allow him to bring dope out to your place and cut it, would you agree with me that that was a terrible mistake?
6:53:04 A. Yes, ma'am.
6:53:04 Q. Would you agree with me then that when you went and -- and transacted, and dealt with dope, and held dope for Mr. Kimberlin that that was also a terrible mistake?
6:53:16 A. Yes, ma'am.

6:53:16 Q. Would you agree with me, Mr. Elliston, it was a terrible mistake for you to show up at the River Falls Apartments with a box and participate?

6:53:24 A. Yeah, that was an error in judgment. I was kind of misled in that.

6:53:30 Q. During the point in time where Mr. Kimberlin has moved his dope cutting business to your farm, what are you getting from this? What's your cut in this?

6:53:42 A. I get to clean up.

6:53:44 Q. What does that mean?

6:53:45 A. That means that when he left, I would clean up what was there and then I was able to keep that for myself.

6:53:54 Q. Okay. So are we talking about an ounce, two ounces, four ounces?

6:53:59 A. Depending on how much he cut up.

6:54:02 Q. Were you then selling that to other people?

6:54:05 A. No, ma'am.

6:54:06 Q. This was personal use?

6:54:10 A. Yes, ma'am. It was not in my best interest.

6:54:15 Q. I see. You stand charged with -- with capital murder. Is that correct?

6:54:27 A. I have received a letter saying that that is not going to be -- I would have to get the letter, but they said that they're probably not going to charge me with

capital murder in the -- in the letter that I got while I was in jail. I received that letter at home from Sergeant Brown, I believe.

Q. Okay. Uh -- do you have any idea what they wanted to reduce that to?

A. No, ma'am. Once again, my paperwork got lost in the fire, and I don't remember.

MS. McELROY: Pass the witness.

REDIRECT EXAMINATION

BY MR. FARREN:

Q. You mentioned Sergeant Brown sent you a letter saying that you might not be charged with capital murder?

A. It was not -- I can't remember the wording on it, but uh -- it didn't seem to be -- it didn't seem to me to be at the time as bad as a capital murder charge, but I -- I can be mistaken on that, because I don't remember the letter, especially.

Q. Okay. Let me ask it this way. Number one, you don't have the letter because it burned up in the fire?

A. Yes, sir.

Q. Do you know whether Sergeant Brown may still have a copy in his computer or something, if you know?

A. It could very well be.

Q. Okay. But you've never gotten any such letter from us?

6:56:00 A. No. No, sir.

6:56:01 Q. And do you understand that Sergeant Brown doesn't have the power to make an agreement with you one way or the other about the prosecution?

6:56:09 A. Yes, sir.

6:56:09 Q. Okay. So from us, the only discussion we've had is, if you tell the truth, it helps, if you lie, you're toast?

6:56:15 A. Oh, yes.

6:56:16 Q. Now, you were asked some questions a few minutes ago about reducing your bond, or maybe you won't get prosecuted as strongly, if that somehow affected the story that you're telling today. Do you remember that?

6:56:31 A. Yes, sir.

6:56:31 Q. Would you agree with me or disagree, that the statement you gave, the second statement that you gave Mark Brown on the 24th, is it substantially the same story that you've told this jury today?

6:56:45 A. Yes.

6:56:46 Q. And when you gave this statement on the 24th, a week after the first statement, you never even talked to us at that time, had you?

A. No.

6:56:56 Q. You didn't have any arrangement?

A. No.

Q. And you weren't out on bond, were you?
A. No.
MR. FARREN: Your Honor, we'd offer State's 260, which is a copy of that statement, into evidence under the following theories.
It is a prior consistent statement made prior to the suggestion that he had some reason to fabricate or embellish his story, and it is consistent with his testimony today and tends to rebut their theory that he was somehow influenced by us to tell his story today.
THE COURT: Answer a couple of questions for us about exhibit numbers. That's 260?
MR. FARREN: Yes, Your Honor.
THE COURT: Is it the same thing as 256, 7 or 8?
MR. FARREN: No, Your Honor, those were -- yes, those were for the purposes of --
THE COURT: Identification?
MR. FARREN: -- identification.
THE COURT: I understand that. But is 60 (sic) the same as one of those?
MR. FARREN: Yes, sir, it is. It is the same as 258, except 258 I've written all over.
THE COURT: Yeah, okay. But 258 was the

June 28th statement?

MR. FARREN: That is correct, Your Honor.

THE COURT: Ms. McElroy.

MS. McELROY: Your Honor, I was hunting for this deal. It's under 801?

MR. FOWLER: 80324.

MS. McELROY: Is that the process that you're submitting it under? Are you submitting it under 80324?

MR. FARREN: Prior consistent statement.

MS. McELROY: Your Honor, I don't -- I don't believe that this is the type of thing that we're talking about. I mean, he's saying this is the statement. We didn't go into the fact and say, you gave this statement and you lied, and you lied, and you lied, and you lied. And then he says, oh, but I gave this statement and I told the truth, told the truth. So I don't -- I don't understand how that is --

MR. FARREN: That's exactly what we have, Your Honor. They suggested that his testimony today has been influenced by promises or hopes of help from us. But he gave this statement, which he says is essentially the same, prior to any of the events that they suggested influenced him.

It is a prior consistent statement made

prior to any suggestion of a -- a reason for him to fabricate or embellish this story. And it fits exactly 80324 -- or 803, prior consistent statement -- I don't know.

THE COURT: 80324?

MR. FARREN: I believe it's an 803, as a prior consistent statement. I may be wrong.

THE COURT: 801 --

MR. FARREN: 801 --

THE COURT: -- 1-B -- check that out.

MR. FARREN: I know the theories, Your Honor. I don't know the numbers. I apologize.

THE COURT: I don't either.

MR. FARREN: Yes, Your Honor. 801, parentheses, small "e", capital "B". Statements which are not hearsay.

THE COURT: Well, Ms. McElroy?

MS. McELROY: Your Honor, our position on this is that we did not attack his -- his previous statement as being untruthful. We didn't touch on that statement, and in my opinion -- you know, to be able then to allow the State to admit the other statement on top of it, I don't think that's correct. We didn't impeach his motivations of giving this. He sat there and told us that he lied.

7:00:38 MR. FARREN: That's what a prior consistent statement is, Your Honor. It's a statement showing he told the same story prior to the time they suggested he had a reason to fabricate it.

7:00:49 MS. McELROY: But, Your Honor, elicited the testimony.

7:00:50 MR. FARREN: No, Your Honor, they elicited the testimony.

7:00:53 THE COURT: No, he said it while you were --

7:00:56 MR. FARREN: No, they -- they said --

7:00:57 THE COURT: No, sir. He said --

7:01:00 MR. FARREN: Well, the --

7:01:01 THE COURT: -- that the two statements were in conflict. You elicited that.

7:01:05 MR. FARREN: That's a different statement, Your Honor. That's the statement made on June 17th. This is the June 24th statement.

7:01:11 THE COURT: Right.

7:01:13 MR. FARREN: And it's consistent with his statement today and they're suggesting that his statement today is not true.

7:01:18 THE COURT: I see what you're saying.

7:01:19 MR. FARREN: This statement was made prior to the time they claim there was a reason to lie.

7:01:22 THE COURT: I'll overrule the objection. I

7:01:26 admit 260.

7:01:32 Q. (BY MR. FARREN) Mr. Elliston, do you recall an event at the farm that involved some channel lock pliers when Mr. Pool was there?

7:01:42 A. I remember Bledsoe looking at them. And I -- figured he was thinking about using them for some kind of torture, and I told him to leave them where they were.

7:01:54 Q. Do you know if Bledsoe or anyone ever did use them for that purpose?

7:01:58 A. I believe they were gone. Somebody -- they were gone when I went to look for them in the spot I had seen them.

7:02:05 Q. They weren't in the same place they were before Pool arrived?

7:02:09 A. No, sir.

7:02:10 Q. Did you later find them?

7:02:11 A. Yes, sir, I did.

7:02:11 Q. Did you turn them over to the police?

7:02:13 A. Yes, sir, I did.

7:02:13 MR. FARREN: May I approach the witness, Your Honor?

7:02:15 THE COURT: Yes, sir.

7:02:16 Q. (BY MR. FARREN) I'm showing you what has been marked as State's Exhibit 259. And I ask do you recognize -- does that look like the pliers?

A. Yes. Yes, sir.

MR. FARREN: Your Honor, we're not going to offer them at this time. We'll have to have another witness to do that, but I did want to get him to identify it at this time.

THE COURT: Okay.

Q. (BY MR. FARREN) Do you remember turning those over to Sergeant Burgess about December 22nd?

A. Yes, sir.

Q. And that was the -- that was the day that you gave the third statement, the one that you said was in addition -- additional information to the one you gave on June 24th?

A. Yes, sir.

Q. Now, did you hear anyone talk about a broom handle, or a shovel handle, or anything like that?

A. Yes.

Q. Who talked about that?

A. Bledsoe did.

Q. And I know this is not pleasant, but what did Mr. Bledsoe say about this handle?

A. He came running downstairs, and Chacon and Kimberlin were in the office, and he was bragging about how the guy wasn't a virgin. And he was -- he was saying something about how far he stuck it up this guy's ass.

Q. Up his rectum? His anus?

A. Yes, sir.

Q. Are those the words he used, or did he use a different word?

A. Ass.

Q. Ass. Now, you just know he said that. You didn't see it happen?

A. No, I did not see it happen.

Q. What was -- did Kimberlin respond to that, did he --

A. He could tell that I was up -- I was upset. And he said something -- I believe he said something to the effect that you're not impressing him by coming down here and bragging. I can't -- it's been, you know, a while. I made a comment at one time that, you know, it takes a whole lot to go kicking a guy, because Bledsoe come down once before complaining his foot hurt. And I made a comment to him that it takes a whole lot to go kicking somebody who was tied up, or something, or held down, or something like that.

See, this all happened right after they'd gotten out to the farm. And here Stocker had been beating on the guy all day long, and I -- I didn't know how much -- I didn't know if the guy could take, you know. I didn't --

Q. Okay. So you didn't know if it was true or not?
A. No.
Q. Whatever it was that Kimberlin said, did he indicate to Bledsoe, look, you're not impressing him with this bragging. You may think you're impressing him, but you're just upsetting him?
A. Yes.
Q. Now, you've mentioned during cross-examination that you were -- you were asked a number of questions -- do you recall being asked a number of questions about why didn't you just leave? Why didn't you call the police, why didn't you drive to the police station?
A. Yes.
Q. And you -- do you recall indicating that you did not believe that you could do that because you had heard what Stocker and Kimberlin had done?
A. Yes.
Q. What had you heard?
A. I had heard --
MS. McELROY: Objection, Your Honor. I believe that that will violate 401, 404(B) and 403.
MR. FARREN: We believe it opened the door.
THE COURT: No, sir. Sustained.
Q. (BY MR. FARREN) Do you -- when they left in the Navigator, and as far as you know, Mr. Pool was gone, the

box that you described earlier, it was still there at the farm? They didn't load him back in the box?

A. No, they didn't.

Q. Okay. I think you were asked a few moments ago if you were using drugs that night?

A. Yes, sir.

Q. Were you the only one?

A. No.

Q. Who else used drugs?

A. I believe everyone.

Q. Including Mr. Stocker?

A. I believe so.

Q. What drugs were used?

A. Meth.

Q. Methamphetamine?

A. Uh-huh.

MR. FARREN: May I publish State's 260, Your Honor?

THE COURT: Yes.

MR. FARREN: Pass the witness.

MS. McELROY: We have nothing further, Your Honor.

THE COURT: You may step down, Mr. Elliston. Okay. Ladies and gentlemen we're going to break for the evening. That's enough. I have had enough. And I'll see

7[illegible]3 you in the morning at 8:30. Have a good night and remember what I told you.

7:07:30 MR. FARREN: Thank you, Mr. Elliston.

7:07:44 THE COURT: We'll be in recess until the morning at 8:25, for everybody here.

(Evening recess.)

THE STATE OF TEXAS )
COUNTY OF RANDALL )

I, Karen Morris, Deputy Official Court Reporter in and for the 47th District Court of Potter County, State of Texas, do hereby certify that the above and foregoing contains a true and correct transcription of all portions of evidence and other proceedings requested in writing by counsel for the parties to be included in this volume of the Reporter's Record, in the above-styled and numbered cause, all of which occurred in open court or in chambers and were reported by me.

I further certify that this Reporter's Record of the proceedings truly and correctly reflects the exhibits, if any, admitted by the respective parties.

WITNESS MY OFFICIAL HAND this the 18th day of October, 2005.

KAREN MORRIS, CSR 334
Expires: 12/31/2006
Official Court Reporter
108th District Court
Potter County, Texas
Potter County Courts Bldg.
Amarillo, Texas 79101
(806) 379-2357