07-05-0284-CR

1

FILED
OCT 18 2005
SEVENTH COURT OF APPEALS
PEGGY CULP, CLERK

# REPORTER'S RECORD

VOLUME 11 OF 22 VOLUMES

TRIAL COURT CAUSE NO. 15,307-A

| | | |
|---|---|---|
| THE STATE OF TEXAS | ) | IN THE DISTRICT COURT |
| | ) | |
| VS. | ) | POTTER COUNTY, TEXAS |
| | ) | |
| JOSHUA DAVID STOCKER | ) | 47TH JUDICIAL DISTRICT |

*********************

## STATEMENT OF FACTS

*********************

ORIGINAL

On the 15th day of July, 2005, the following proceedings came on to be heard in the above-entitled and numbered cause before the Honorable Hal Miner, presiding, held in Potter County, Texas:

Proceedings reported by Stenographic Method.

A P P E A R A N C E S

NAME: Mr. James Farren &
Mr. Jeramy Fowler
Randall County District Attorney's Office
SBOT NO: Unknown
ADDRESS: 501 16th Street
Canyon, Texas 79015
PHONE: (806) 468-5570
ATTORNEY FOR THE STATE.

NAME: Ms. C.J. McElroy &
Mr. Mike Watkins
Attorneys at Law
SBOT NO: Unknown
ADDRESS: 801 S. Fillmore/500 S. Taylor
Amarillo, Texas 79101
PHONE: (806) 371-0555/374-9584
ATTORNEY FOR THE DEFENSE.

CHRONOLOGICAL INDEX


CAPTION . . . . . . . . . . . . . . . . . . . . . . . . 1
APPEARANCES . . . . . . . . . . . . . . . . . . . . . . 2
CASE CALLED . . . . . . . . . . . . . . . . . . . . . . 7
JURY SEATED . . . . . . . . . . . . . . . . . . . . . . 12

ORAL EVIDENCE:

EFRAM RAMOS
DIRECT EXAMINATION BY MR. FARREN. . . . . . . . . . . . . 13
CROSS EXAMINATION BY MR. WATKINS. . . . . . . . . . . . . 18
REDIRECT EXAMINATION BY MR. FARREN. . . . . . . . . . . . 24
RECROSS EXAMINATION BY MR. WATKINS. . . . . . . . . . . . 26
FURTHER REDIRECT EXAMINATION BY MR. FARREN. . . . . . . . 28

GUINN GARCIA
DIRECT EXAMINATION BY MR. FOWLER. . . . . . . . . . . . . 30
VOIR DIRE EXAMINATION BY MS. McELROY. . . . . . . . . . . 84
DIRECT EXAMINATION (CONT) BY MR. FOWLER . . . . . . . . . 85
CROSS EXAMINATION BY MS. McELROY. . . . . . . . . . . . . 91
REDIRECT EXAMINATION BY MR. FOWLER. . . . . . . . . . . .129
RECROSS EXAMINATION BY MS. McELROY. . . . . . . . . . . .133

DAVID COCHET
DIRECT EXAMINATION BY MR. FARREN. . . . . . . . . . . . .137
CROSS EXAMINATION BY MR. WATKINS. . . . . . . . . . . . .146

DESTRY KEELING
DIRECT EXAMINATION BY MR. FARREN. . . . . . . . . . . . .148
CROSS EXAMINATION BY MR. WATKINS. . . . . . . . . . . . .296

REPORTER'S CERTIFICATE. . . . . . . . . . . . . . . . . .331

ALPHABETICAL INDEX


| WITNESS | DX | CX | VDX | RDX | RCX |
|---|---|---|---|---|---|
| COCHET, DAVID | 137 | 146 | | | |
| GARCIA, GUINN | 30 | | 84 | | |
| | 85 | 91 | | 129 | 133 |
| KEELING, DESTRY | 148 | 296 | | | |
| RAMOS, EFRAM | 13 | 18 | | 24 | 26 |
| | | | | 28 | |

# EXHIBIT INDEX

| STATE'S EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| SX-19 | RECEIPT | 142 | 142 |
| SX-62 | WALLET | 17 | 17 |
| SX-148 THROUGH SX-156 | PHOTOS | 231 | 231 |
| SX-160 THROUGH SX-162 | PHOTOS | 231 | 231 |
| SX-174 | PHOTO | 253 | 254 |
| SX-239 | PHOTO | 188 | 188 |
| SX-240 | PHOTO | 196 | 196 |
| SX-241 | PHOTO | 196 | 196 |
| SX-265 THROUGH SX-269 | PHOTOS | 274 | 274 |

EXHIBIT INDEX (CONTINUED)


| DEFENDANT'S EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| DX-7 | LETTER | 117 | 118 |
| DX-8 | DOCUMENT | 120 | 120 |
| DX-9 | DOCUMENT | 122 | 123 |
| DX-10 | PROBATION REPORT | 122 | 123 |
| DX-11 | AMENDED MOTION | 122 | 123 |
| DX-12 | REPORT OF VIOLATION | 122 | 123 |
| DX-13 | REPORT OF VIOLATION | 122 | 123 |
| DX-14 | INDICTMENT | 134 | 134 |
| DX-15 | INDICTMENT | 136 | 136 |
| DX-16 | PHONE RECORDS | 303 | 303 |

07:45AM PROCEEDINGS

JULY 15, 2005

(All sides, Defendant present, open
(court:

08:32AM THE COURT: Thank you all. Be seated.

08:33AM MR. FARREN: We have a couple of short matters, Your Honor.

THE COURT: Oh, okay.

08:33AM MR. FARREN: We continued yesterday afternoon to find anything in the way of a written immunity agreement with Tori Patrick. I talked with Jamie Watson again on the phone, and she had searched her entire file from when she represented her, and could not find a written agreement.

08:33AM We did find in Mrs. Farren's computer at the sheriff's office a record of an immunity agreement that was typed that has her name on it. Of course, it is not signed. But I have marked that, and I would like to make that a part of the record, either for appellate purpose or whatever, and I would like to provide --

08:33AM THE COURT: What are you going to call it?

08:33AM MR. FARREN: I just marked it as State's Exhibit 261.

08:33AM THE COURT: Okay. All right.

MR. FARREN: I'm providing a copy of that to Defense counsel, Your Honor. We don't care that -- I mean, it's up to them whether they want it published to the jury or not. But I just want the record to reflect that we do have a signed immunity agreement with Brook Vandergriff. I have marked it is as 262, and I would like to offer it. I have given a copy to the Defense.

State's Exhibit 263 is an immunity agreement with Guinn Garcia. And I'm giving them a copy.

THE COURT: Okay. Did they get this before today?

MR. FARREN: No, I just found all of these last night and that --

THE COURT: You didn't know about them until now?

MR. FARREN: Well, I knew, but I didn't --

MR. WATKINS: Your Honor, actually, we had 263. We've had it, but we haven't had Ms. Vandergriff's until today.

MR. FARREN: This is out of an abundance of caution, to try to make sure we've given them everything we have, Your Honor.

And then we have a plea agreement that I have labeled as 264, with Josh Bledsoe. It is signed but, of

course, it has not been executed. In other words, no official court action has been taken in reference to . that.

THE COURT: 262 is Vandergriff?

MR. FARREN: 262 is Vandergriff. It's a proffer -- titled proffer agreement. 263 is a signed use -- use immunity agreement with Guinn Garcia.

THE COURT: Hold on, I'm writing this down.

MR. FARREN: Sorry.

THE COURT: Is 262 signed?

MR. FARREN: 262 is signed by Brook Vandergriff.

THE COURT: Okay.

MR. FARREN: And by a representative of our office. 263 is signed. And 264 is a signed plea agreement, but it is --

THE COURT: Is it Bledsoe?

MR. FARREN: It is Bledsoe, but, again, it is not -- I mean, it's never been filed with the a clerk, or the Court, or anything of that nature. And I think they've had some of these and some they haven't, but just to be on the safe side I just made a copy of all of them, so that -- to make sure --

THE COURT: Okay. I want -- I want 262,

08:36AM three and four kept in the same category with Court's
08:36AM No. 3, and I don't want them given to the jury, yet,
08:36AM unless somebody offers them for that purpose.

MR. FARREN: Yes, sir.

08:36AM THE COURT: I'm not making a ruling on that.

08:36AM MR. WATKINS: On 261, we would ask that
08:36AM it not be published to the jury unless someone offers it
08:36AM and goes through all of the process.

08:36AM MR. FARREN: (Nods head up and down.)

08:36AM MR. WATKINS: It would just be a Court's
08:36AM exhibit.

08:36AM THE COURT: Well, okay. I mean, that's
08:36AM the way it is for now for sure.

08:36AM MR. WATKINS: Oh, okay.

08:36AM THE COURT: Anything else?

08:36AM MR. WATKINS: I don't believe so.

08:36AM MR. FARREN: We have nothing else.

08:36AM THE COURT: Okay. Let me ask the
08:36AM Defense. Do you have any other evidence from any
08:36AM direction that there's been any kind of Brady violations
08:37AM concerning plea agreements, use immunity agreements
08:37AM or -- or any other name for those kinds of potential
08:37AM Defendant's documents?

08:37AM MS. McELROY: Your Honor, I'm -- I'm not

08:37AM aware of any -- any specific Brady agreement, Brady
08:37AM violation. I think that we --
08:37AM THE COURT: I'm asking if you have any
08:37AM other evidence. It's a "yes" or "no" question.
08:37AM MS. McELROY: The only evidence that we
08:37AM have came from Ms. Ledbetter, when she said that
08:37AM everybody that they talked to that was going to testify
08:37AM was given an opportunity to sign a use immunity
agreement.
08:37AM Is it Mr. Farren's testimony that you provided
08:37AM all of those that have signed it?
08:37AM MR. FARREN: For the record, I'll say
08:37AM that is a standard practice in the office. My
08:37AM independent memory of the Tori Patrick situation, and
08:37AM the reason for the confusion is, I believe that was
08:37AM drafted, I believe it was discussed, and I believe we
08:37AM had planned to sign, I just don't think we ever got
08:37AM around to actually doing it. I think it was just an
08:37AM error and we never did sign it. And I think her
08:38AM testimony was correct. I don't think she had ever
08:38AM signed the use immunity agreement.
08:38AM THE COURT: Okay. So you have no another
evidence?
08:38AM MR. FARREN: No, sir.
MS. McELROY: My only concern --

THE COURT: So for the time being, we can stop taking evidence on the Brady stuff at this point. Is that right?

MS. McELROY: Yes, Your Honor.

THE COURT: That's good. Well, I'm going to make a finding at this point that there's been no Brady violation. If there are -- if these documents do exist, they're lost in the bowels of the D.A.'s office somewhere.

Bring them in.

(Jury seated.)

THE COURT: Thank you, ladies and gentlemen. Everyone be seated.

Well, good morning.

THE JURY: Good morning.

THE COURT: Everybody ready to go? It's Friday. And on Monday I'm going to tell you it's Monday again. Okay. All right.

Mr. Farren, call your next witness.

MR. FARREN: State calls Efrain Ramos, Your Honor.

THE COURT: Efrain?

MR. FARREN: I believe it's E-f-r-a-n (sic), but there may be two f's.

THE COURT: Mr. Ramos, come up here.

08:39AM Would you raise your right hand.

08:39AM (Witness sworn.)

THE REPORTER: Would you spell your first name, please.

08:39AM THE WITNESS: E-f-r-a-i-n.

08:40AM THE COURT: Thank you, sir. Sit right there.

EFRAIN RAMOS,

having been first duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. FARREN:

08:40AM Q. Good morning, Mr. Ramos.

08:40AM A. How are you doing?

08:40AM Q. You work at Palo Duro High School. Is that

08:40AM correct?

08:40AM A. Yes, sir.

08:40AM Q. You teach in the social studies department?

A. Yes, sir.

08:40AM Q. And then you are a coach --

A. Yes, si.

08:40AM Q. -- as well? In fact, you just had a promotion

08:40AM to head soccer coach?

08:40AM A. Yes, sir.

08:40AM Q. Okay. Congratulations.

08:40AM A. Thank you.

08:40AM Q. And you work there with -- actually, with Mr. Watkin's wife. Is that correct?
08:40AM A. She's my boss.
08:40AM Q. Okay. I'll try not to get you in any more trouble than we have to.
08:40AM Prior to working at Palo Duro High School, or perhaps you worked part time, I'm not sure, but at some point, did you work at Circuit City?
08:41AM A. Yes, sir.
08:41AM Q. Were you teaching at the time, or was this prior to beginning your teaching career?
08:41AM A. It was prior to the beginning of my teaching career.
08:41AM Q. And what did you do at Circuit City?
08:41AM A. I was a sales counselor.
08:41AM Q. Okay. And what is a sales counselor?
08:41AM A. I guess -- we deal with customers, kind of help them pick out what they want to get.
08:41AM Q. Okay. All right.
08:41AM A. And kind of give them any special that we're running.
08:41AM Q. Okay. And this -- were you working there in May, June, July of 2003?
08:41AM A. Yes, sir.
08:41AM Q. Okay. And, in fact, when did you leave

Circuit City? Do you recall?
A. I left probably about mid-July of 2003.
Q. Okay. And did you -- did you ever come into contact with -- or do you remember a man named Dustin Pool?
A. Yes, sir.
Q. How did you know him?
A. He went into the store one day.
Q. Okay. So you just remember encountering him in Circuit City as a customer?
A. Yes, sir.
Q. At some point, do you remember hearing about Mr. Pool being dead or them finding Mr. Pool's body?
A. Yes, sir.
Q. How did you hear about that?
A. The news.
Q. Just on the news?
A. Right. News broadcast.
Q. And when you heard this report involving Mr. Pool, did -- did that spark your memory that you remembered he had been a customer?
A. Yes, sir.
Q. Okay. Did it cause you to remember anything else, or did you connect it to anything else when you heard about that?

08:42AM A. When I heard that he was dead, we had his
08:42AM wallet at the store. And we'd had his wallet for some
08:42AM time. And when I saw that he had been dead -- I went
08:42AM and -- well, not immediately, but the next day at work I
08:42AM kind of told them that I thought that that wallet that
08:42AM we'd was a guy that had been dead, so we called the
08:43AM police.
08:43AM Q. Okay. So -- and you were working with a
08:43AM Mr. John Berkholder (phonetic) at that time. Correct?
08:43AM A. Yes, sir.
08:43AM Q. The two of you worked together?
08:43AM A. Yes, sir.
08:43AM Q. So you and Mr. Berkholder once -- I guess you
08:43AM mentioned to Mr. Berkholder that, hey, I heard about
08:43AM Pool. And remember that wallet we have? And then the
08:43AM two of you called the police?
08:43AM A. Exactly.
08:43AM Q. Okay. Now, you and I have visited about this
08:43AM before. Is that correct?
A. Yes, sir.
08:43AM Q. And you indicated, I think more than once,
08:43AM that you don't know when the wallet showed up there or
08:43AM how it showed up there. Just that it -- it, apparently,
08:43AM was turned in, or found, or something, and you folks
08:43AM have the wallet?

A. Yes, sir.

Q. Okay. And you just remembered that when you heard that Mr. Pool's body had been found?

A. Yes.

MR. FARREN: May I approach the witness, Your Honor?

THE COURT: Yes, sir.

Q. By Mr. Farren) I'm showing you what has been marked as State's Exhibit 62, and ask if you would look at this.

Now, the wallet is now in a plastic bag. Would you agree?

A. Yes, sir.

Q. But is this the wallet and -- and certainly the ID is there, and some other cards and things. Is this the wallet that you found and turned over to the police?

A. Yes, sir.

MR. FARREN: We'd offer State's Exhibit 62 into evidence, Your Honor.

MR. WATKINS: No objection.

THE COURT: State's 62 is admitted.

MR. FARREN: Pass the witness. May I publish to the jury, Your Honor?

THE COURT: Yes, sir.

CROSS EXAMINATION

BY MR. WATKINS:

Q. Hi, Efrain.
A. Good morning.
Q. How are you doing today?
A. Pretty good.
Q. Now, you and I have also discussed this case a couple of times. Is that correct?
A. Yes, sir.
Q. Most of our discussions actually have been the logistics of getting you here, so you didn't miss summer school?
A. Right.
Q. Because you're teaching summer school this year?
A. Yes, sir.
Q. Now, Mr. Farren pointed out that -- that you actually worked with my wife up at the school. That's not going to affect your testimony in any way, is it?
A. No, sir.
Q. And I basically told you I want you to come tell the truth?
A. Yes, sir.
Q. Okay. Now, you remembered Dustin Pool from your encounter with him on the sales floor. Is that

08:45AM correct?

08:45AM A. Yes, sir.

08:45AM Q. Why did you remember him?

08:45AM A. Well, he just -- just his behavior. And when I found his wallet -- I think when I -- when I seen his wallet there, it'd been -- I guess some time had passed, but it was early enough for me to remember talking to him, because he was somewhat strange. He was just -- kind of strange behavior, kind of gangly, kind of --

08:45AM Q. And did he try to talk to you down on price?

08:45AM A. Yes, sir, he did.

08:45AM Q. And how -- what was interesting about that?

08:45AM A. Well, he -- what he told me, he asked -- was looking at a certain radio. I don't remember which one it was. But I went and tried to work a deal for him, and I don't remember what promotion we ran, but I gave him the best deal possible. And he tried to say that he knows I can probably get it cheaper than that. He didn't want to do the install or whatever. He just knew that he wanted to get the radio for cheaper. And I said, well, I mean, I can get it for cheaper. I can probably -- he said he knew that I could get it at customer price, and he wanted me to do that. And I told him I'd lose my job if I did.

08:46AM And then he said that -- well, he asked me how

much they paid me there at Circuit City. And then he said that he'd match my salary if they fired me. And he -- which he was joking, and whatever. And I told him that if you can match my salary, then why don't you just buy the radio at full price?

Q. Made a lot more sense, didn't it?

A. Yes, sir.

Q. Now, you -- you said an install. You worked in the car stereo department. Is that correct?

A. Yes, sir. I worked as a sales counselor. Sometimes I did work a little bit of both. And probably about the time that -- that I quit, they had restructured the company, and so you had to do a little bit of sales and do a little bit of installs. And so I kind of did a little bit of both.

Q. Okay. But when you're talking about he was looking at a radio, you're not talking about a box that sits on your desk, you're talking about something that goes in a car?

A. That's correct.

Q. Okay. All right. And do you remember if he was there with anyone?

A. He was there with -- with a lady -- with a girl.

Q. Okay. And did you recognize anything about

her?

A. She was good looking.

Q. Okay. Now, where did -- did you find this billfold?

A. I did run into it. I did find it.

Q. Okay.

A. I don't know if I was the first one to find it, but I did find it, and I asked the people, you know, that had been there. They said, yeah, I've seen it.

Q. Okay. And you looked in it to see whose it was?

A. Right.

Q. And did you recognize the picture on the driver's license?

A. Yes, sir.

Q. Okay. And you remembered him, because of this bizarre experience --

A. Right.

Q. -- of trying to sell him a radio?

A. Right.

Q. Okay. Did you do anything after you found the billfold?

A. We tried to contact him. I looked him up in our -- our -- in some of our customer profiles. You can just go on the computer and kind of get like phone

08:48AM numbers, and addresses, and stuff. I went and found
08:48AM some of his phone numbers, and tried to call those
08:48AM numbers, and I never could get ahold of anybody.
08:48AM Q. Did you leave a message, or do you remember?
08:48AM A. If I got an answering machine, I probably did,
08:48AM but I don't remember if I did or didn't for sure.
08:48AM Q. Okay. And a fair answer in trial is, if you
08:48AM don't remember, I don't remember is a fair answer.
08:48AM A. Yeah, I don't remember.
08:48AM Q. Okay.
08:48AM A. No.
08:48AM Q. Where did -- when you found the billfold,
08:48AM where was it?
08:48AM A. Uh -- I want to say it was on the countertop
08:49AM in the road shop, in the install bay, but I don't
08:49AM remember exactly the exact spot I found it. I just know
08:49AM it was in our department.
08:49AM Q. Okay. And the road shop is in the back of the
08:49AM Circuit City where they have garage doors to pull cars
08:49AM in and stuff?
08:49AM A. Right. There's an install bay, then there's a
08:49AM sales floor. And we're in the same department. You can
08:49AM have access to the install bay, but, you know, it's
08:49AM separated somewhat.
08:49AM Q. Okay. So this sale's counter is not in the

install bay, it's actually in the air conditioned part of the store?

A. There's a -- there's a counter in the -- on the sales floor that has a computer where we do all the transactions. But there's also a counter in the install bay, where the customers come in and check their vehicles in.

Q. Okay. Do you remember which counter you were at?

A. I don't remember. I just know I found it in my department.

Q. Okay. And you did what you're supposed to do with this billfold. Right?

A. Yes, sir.

Q. Turned it over to --

A. A manager.

Q. -- to a manager? Was that John Berkholder?

A. Yes, sir.

Q. Okay. And it went into your lost and found?

A. I -- I guess we left it around -- we left it in the road shop. If it's a road shop customer, more than likely they'd come back for it, so we left it in the road shop. Because I remember when I came to -- when we were -- said we had the wallet, the wallet was in the road shop when we called the police to come get

08:50AM it.

08:50AM Q. Okay. All right.

08:50AM A. I do remember that.

08:50AM MR. WATKINS: Pass the witness.

REDIRECT EXAMINATION

BY MR. FARREN:

08:50AM Q. If I were to come to the Circuit City back in that time when you were working there, March, April, May, June, July through there, and I wanted to have a radio or stereo installed in my vehicle, where would I go?

08:51AM A. After purchasing the radio on the sales floor, you would pick it up at the front counter of the store, and then you'd drive your vehicle around to the back to have it installed.

08:51AM Q. Would that be at the road shop?

08:51AM A. In the road shop, yes.

08:51AM Q. In the road shop.

08:51AM MR. FARREN: May I approach the witness, Your Honor?

08:51AM THE COURT: Yes.

08:51AM Q. (BY MR. FARREN) I'm showing you what has been marked and admitted into evidence as State's Exhibit 8. And now you have testified earlier that you didn't know when the wallet got there. You just remembered it when

08:51AM you saw Mr. Pool's name come up on the news?
08:51AM A. That's correct.
08:51AM Q. Right. But Mr. Pool wasn't the only customer at Circuit City connected with Mr. Pool. Mr. Stocker was a customer there, wasn't he?
08:52AM A. Yes, sir, according to that.
08:52AM Q. Okay. And this business record shows that he made a purchase, and it would have been a purchase -- an event that would have involved the road shop?
08:52AM A. Yes, sir.
08:52AM Q. What date did those events occur?
08:52AM A. Looks like --
08:52AM MR. WATKINS: Your Honor, I'd object. This witness has not testified that he has any personal knowledge of what Mr. Farren is inquiring into.
08:52AM MR. FARREN: This is a record from --
08:52AM THE COURT: It's in evidence. He's being asked about a record in evidence. He doesn't have to have personal knowledge. Overruled.
08:52AM MR. FARREN: Thank you.
08:52AM Q. (BY MR. FARREN) According to this business record from where you worked, those events would have been on the 11th -- on March 11th of 2003?
08:52AM A. Yes, sir.
08:52AM Q. So you don't know when Mr. Pool's wallet

08:52AM showed up at Circuit City. But you do know that
08:52AM Mr. Stocker was there at the road shop where the wallet
08:52AM was found on March 11th?
08:52AM A. According to that receipt, yes, sir.
08:52AM Q. According to that receipt.
08:53AM MR. FARREN: Pass the witness.

RECROSS EXAMINATION

BY MR. WATKINS:

08:53AM Q. These questions about Mr. Stocker being there
08:53AM on a certain day, do you have any independent
08:53AM recollection of that?
08:53AM A. No, sir, I don't.
08:53AM Q. Is all of that based on the fact that
08:53AM someone's shown you that receipt this morning or
08:53AM sometime recently?
08:53AM A. Yes, sir. I dealt with a lot of customers
08:53AM that I don't remember.
08:53AM Q. Okay. You just happened to remember this one
08:53AM because he died?
08:53AM A. Right.
08:53AM MR. WATKINS: May I approach the witness?
08:53AM THE COURT: Yes, sir.
08:53AM Q. (BY MR. WATKINS) I want to refer you back to
08:53AM State's 8, what you were just talking about. This
08:53AM second page -- actually, third page of State's 8, that

08:53AM says customer service information center. Service system.

08:53AM A. Yes, sir.

08:53AM Q. Okay. Do you recognize this as something out

08:53AM of Circuit City?

08:53AM A. Yes, sir. That looks like when we pull up the

08:53AM information on the computers, that's just a direct

08:54AM printout on what shows up on our screen.

08:54AM Q. Okay. And Mr. Farren asked you, does this

08:54AM show that he purchased a -- some kind of a radio with an

08:54AM install on March 11th?

08:54AM A. Yes, sir.

08:54AM Q. Okay. Now, I want you to notice down here

08:54AM there's another date on here. What date is that?

08:54AM A. The 14th of March.

08:54AM Q. Okay. And do you remember what any of these

08:54AM codes mean?

08:54AM A. Not specifically, no, sir.

08:54AM Q. Okay. Do you -- when someone took -- when

08:54AM someone bought a car stereo --

08:54AM A. Right.

08:54AM Q. -- and they were going to have it installed?

08:54AM A. Right.

08:54AM Q. Was it always installed on that exact date?

08:54AM A. Not always.

Q. Okay. If it was installed on a second date, would it show on your screen what day it was released?
A. Yes, sir.
Q. And what does this second column indicate to you?
A. The release date.
Q. Okay. And so with that information, would it indicate whoever bought this, whatever happened, that it was bought on one day and released or installed on another date?
A. That's correct.
THE COURT: Any other questions?
MR. WATKINS: I'm thinking for just a second. If I may have a minute.
Q. (BY MR. WATKINS) One other question: I'm showing you State's Exhibit No. 69. Is this the guy that you remember the sales encounter with?
A. Yes, sir.
MR. WATKINS: Pass the witness.

FURTHER REDIRECT EXAMINATION

BY MR. FARREN:
Q. Mr. Ramos, in fact, according to the business record on Mr. Stocker, you were the one who waited on him. Right?
A. Yes, sir. According to that information.

Q. And if he made a purchase on the 11th, the installation may have taken place on the 11th, but it might have taken place on the 14th. Right?

A. That's true.

Q. But he would have paid for it on the 11th?

A. That's true.

MR. FARREN: Pass the witness.

MR. WATKINS: No further questions.

THE COURT: You may step down, Mr. Ramos. Thank you.

Call your next witness.

MR. FOWLER: Guinn Garcia.

MR. FARREN: Your Honor, correction. We're going to go ahead and call Mr. Cochet. We have to get him on an airplane to go back. David Cochet. C-o-c-h-e-t, I believe.

This is Ms. Garcia. I'm sorry.

THE COURT: They want David Cochet.

MR. FARREN: He is not here. The plane didn't make it. I apologize. We'll go ahead with Ms. Garcia.

(Witness sworn.)

THE COURT: Thank you, ma'am. Sit right there.

MR. FOWLER: May I proceed, Judge?

THE COURT: Yes.

GUINN GARCIA,

having been first duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. FOWLER:

Q. Would you state your full name, please?
A. Guinn Cordell Garcia.
Q. And, Guinn, if you could lean a little bit more toward that microphone, you've got a real soft voice. And, Guinn, how old are you?
A. Thirty-one.
Q. Are you married? Divorced?
A. Divorced.
Q. Okay. How many kids do you have?
A. Two.
Q. What are their ages?
A. Twelve and nine.
Q. Are they both daughters?
A. Yes.
Q. Okay. Guinn, where are you currently staying right now?
A. In Randall County.
Q. At the Randall County Jail?
A. Yes, sir.
Q. And how long have you been in the Randall

County Jail?

A. Two weeks.

Q. Guinn, in 2002 and in 2003, did you know a drug organization headed by Dustin Pool?

A. Yes.

Q. How did you know about that organization?

A. I worked with them, I guess, yeah.

Q. Okay. Did you work for Dustin Pool?

A. Yes.

Q. What specifically did you do for him?

A. Sold drugs for him.

Q. And what type of drugs?

A. Methamphetamine.

Q. And about how long had you been -- or did you work for Dustin Pool?

A. Probably two years.

Q. Two years. Were you familiar with a drug organization headed by Josh Bledsoe and Craig Kimberlin?

A. Yes, sir.

Q. How were you familiar with that organization?

A. Just from Dustin and -- just from Dustin.

Q. Okay. And so you didn't actually work for that organization, did you?

A. Not until later.

Q. Okay. Not until later. And Dustin, was he

the first one that informed you about the other organization?

A. I don't know if he specifically did. I mean -- he just -- when you're doing that, you know of it.

Q. Okay. Did you become aware at some point of tensions between the two organizations?

A. Yes.

Q. Do you know what first started the tensions?

A. To the best of my knowledge, I believe it was when Greg Seago started owing us some money.

Q. And now Greg Seago, is he, I guess, a family friend of Josh Bledsoe's? Do you know?

A. I believe he's his Godfather.

Q. Okay. And when Greg Seago owed Dustin money, what was Dustin trying to do?

A. Just collect it.

Q. When you're in the drug business, how do you go about collecting money from people who owe you?

A. There's a lot of different ways. Most, I guess, if it's hard to get it, you use force.

Q. Okay. I mean, you don't send a certified letter and take them to small claims court, do you?

A. No.

Q. Okay. Sometimes you have to use threats?

A. Most people do, yes.

Q. Sometimes you probably need a little bit maybe muscle, bigger guys than you, stronger guys and you send them over to threaten people?
A. Yes, sir.
Q. And why was it a problem when Dustin Pool was collecting from Greg Seago?
A. Because uh -- it affected Bledsoe personally, I guess.
Q. He took that as a personal attack on him, I guess?
A. (Witness nods head up and down.)
Q. Is that correct?
A. Yes.
Q. Did you know --
THE COURT: Ma'am, you're going to have to speak up, so she can take it. Okay?
THE WITNESS: Okay?
THE COURT: Sometimes she can't see you nod your head.
THE WITNESS: Okay. I'm sorry.
Q. (BY MR. FOWLER) Did you know of any other problems between Dustin Pool's organization and the Bledsoe/Kimberlin organization?
A. There was just an ongoing war between them. I mean, it was just --

09:02AM Q. Do you know of any other specific events that lead to that ongoing war?

09:02AM A. Uh -- there was a time at Joe's Crab Shack when Dustin's friends and Bledsoe got in a big argument whenever I -- I mean, I guess it -- one time whenever I started working with Craig and them, that really made Ray and them mad.

09:02AM Q. Okay. Who was Dustin Pool's kind of right-hand man or enforcer?

09:02AM A. Ray.

09:02AM Q. Okay. Ray Placensio?

09:02AM A. Placensio.

09:02AM Q. Okay. And what was your relationship to him?

09:03AM A. He was my boyfriend until then.

09:03AM Q. Okay. Did you all live together?

09:03AM A. Yes, sir.

09:03AM Q. Is he the father of your children?

A. No.

09:03AM Q. Approximately, how long did you all live together?

09:03AM A. Well, we lived together probably -- probably six months before he went to prison. And then when he got out of prison, probably another year and a half.

09:03AM Q. Did Ray Placensio ever claim to be a member of the Texas Syndicate?

A. Yes.
Q. And do you know if there are prison gangs that operate inside prisons and also operate outside of prisons?
A. Yes, sir.
Q. Did -- would Ray brag or talk trash about how he was in the Texas Syndicate to people around town?
A. Yes.
Q. Did he have any ideas about the Texas Syndicate and what their involvement should be in this war between the two groups?
A. Yes, sir.
Q. What was Ray's idea?
A. He felt like they should pay taxes to the Syndicate. And if they didn't, they shouldn't get to work in this town.
Q. Okay. Who did he feel like should pay tax to the Texas Syndicate?
A. Craig, and anybody working for Craig.
Q. Okay. I don't get it. Why -- why did he feel they should be paying a tax to the Texas Syndicate?
A. He felt like the Texas Syndicate was, I guess you could say the head over all of the Texas plains, the whole Amarillo area, all of that.
Q. Okay. And I guess in other towns, would

people who sell drugs, would they pay tax to the Texas Syndicate?

A. I don't know exactly how it was done.

Q. So did he ever inform Kimberlin, Bledsoe or anyone associated with them about this tax idea, that they needed to be paying a tax?

A. Not in front of me, but -- I mean, I assumed he did, the way -- when he told me he did.

Q. What did you think about this tax idea?

A. I thought it was stupid, really. I just -- I kind of laughed it off, not around him, of course.

Q. Why did you think it was stupid?

A. I don't know. Because I just didn't see how anybody could monopolize a drug gang.

Q. Do you know Joshua Stocker?

A. Yes.

Q. Do you see him in the courtroom?

A. Yes, sir.

Q. Can you point him out for us?

A. (Witness points.)

Q. Can you describe an article of clothing that he's wearing?

A. A white shirt.

Q. With a blueish red, white checked tie?

A. Yes.

09:06AM MR. FOWLER: Your Honor, I'd ask the record to reflect she has identified the Defendant.

09:06AM THE COURT: Record will so reflect.

09:06AM Q. (BY MR. FOWLER) How did you know Joshua Stocker?

09:06AM A. Through Chad Spanel.

09:06AM Q. And who was Chad Spanel?

09:06AM A. A friend of mine.

09:06AM Q. Okay. Which organization was Chad Spanel associated with?

09:06AM A. With Craig and Josh.

09:06AM Q. Was Josh associated with the same organization that Craig and Bledsoe were in?

09:06AM A. Yes, sir.

09:06AM Q. Do you know what Josh's role was in that organization?

09:07AM A. No, not specifically.

09:07AM Q. Okay. When did you first come to know Josh Stocker?

09:07AM A. Whenever me and Ray were about to break up.

09:07AM Q. Okay.

09:07AM A. And chunk it out.

09:07AM Q. When were you and Ray about to break up? Do you remember the time frame there?

09:07AM A. It was shortly after Chad got out of prison.

09:07AM I don't --
09:07AM Q. Would that be about November, 2002? Does that sound right?
09:07AM A. It was right before Christmas, yes.
09:07AM Q. Okay. And now, I don't want to go into details, but Ray Placensio was incredibly physically abusive to you. Is that right?
09:07AM A. Yes.
09:07AM Q. And you were getting tired of it?
09:07AM A. Yes.
09:07AM Q. And so how did you get to know Josh Stocker?
09:08AM A. Chad.
09:08AM Q. And Chad knew Josh Stocker?
09:08AM A. Yes, they worked together.
09:08AM Q. And how did you -- why did you know Chad? How did you come to know Chad?
09:08AM A. Well, I knew Chad before he went to prison. We dated, and then we started dating whenever Ray left.
09:08AM Q. Okay. And when did you start to work for the Kimberlin/Bledsoe organization?
09:08AM A. Right after Ray left.
09:08AM Q. Okay. So that, again, November of 2002 time period?
09:08AM A. Yes.
09:08AM Q. After you separated with Ray, did y'all remain

on friendly terms?

A. No.

Q. Okay. I mean, did y'all speak at all?

A. On the phone yelling at each other.

Q. Had Ray -- was he living with Dustin Pool?

A. Yes.

Q. And not only were they working together, but they were also pretty close friends. Is that right?

A. Yes.

Q. Did you know of any other tensions between the two groups? Any other specific incidents that caused problems between the two groups?

A. Like I say, the deal with Seago.

Q. Right.

A. And Chad -- whenever Dustin asked Chad to work for him, that irritated Craig and them a lot.

Q. So when Chad Spanel got out of prison, he was working for Craig Kimberlin. Is that right?

A. Yes, sir.

Q. At some point, Dustin Pool tried to lure him away and get him to start working for him?

A. Yes, sir.

Q. And that was another source of tension?

A. Yes.

Q. And was Chad Spanel -- was he Stocker's

09:10AM customer, or was Stocker his customer?

09:10AM A. He was Stocker's customer.

09:10AM Q. Was he one of Josh Stocker's best customers?

09:10AM A. I don't know.

09:10AM Q. Okay. Did Dustin Pool, when you were around
09:10AM him, did he ever talk trash about this other group and
09:10AM what he was going to do to them?

09:10AM A. Yes. I mean, not specifically what he was
09:10AM going to do to them. But at that point in time, I
09:10AM wasn't around a whole lot. But what things I did hear,
09:10AM it was obvious they were --

09:10AM Q. Okay.

09:10AM A. -- not on good --

09:10AM Q. Did Dustin Pool ever tell you that he was
09:10AM going to get a bunch of guys and dress up like SWAT
09:10AM people and go raid Bledsoe's house?

09:11AM A. Yes.

09:11AM Q. What did he tell you he was going to do?

09:11AM A. He didn't tell me specifically. It was when
09:11AM Ray still lived in my house. They came to my house,
09:11AM talked about it, I guess. Went to Wal-Mart, purchased
09:11AM the stuff, and went -- and they came back to my house
09:11AM after they made an attempt to collect it.

09:11AM Q. Do you know what they purchased at Wal-Mart?

09:11AM A. Paint ball. Stuff you use for paint ball.

Q. Any type of clothing or anything?
A. I don't know specifically about clothing. I know that they had some stuff, and --
Q. And the point was to dress up like police officers to make it look like they were real?
A. I believe so.
Q. Okay. At some point, did you get tired of Pool and Ray and working for them, and you decided to go work for Kimberlin?
A. Well, I got tired of Ray --
Q. Okay.
A. Making -- threatening me and all of that stuff, yes.
Q. And at some point, did you participate or initiate the kidnapping of Ray Placensio?
A. Yes, I did.
Q. Who asked you to?
MS. McELROY: Your Honor, we would object to the admission of this testimony based on 401, 404(b), and 403.
THE COURT: Overruled.
Q. (BY MR. FOWLER) Who asked you to set up Ray Placensio?
A. Josh Stocker.
Q. Okay. And was anyone else wanting Ray

09:12AM Placensio set up?
09:12AM A. Excuse me? What?
09:12AM Q. Did anybody else want Ray taken care of?
09:12AM A. Craig.
09:13AM Q. Do you remember, approximately, when the event
09:13AM with Ray Placensio happened?
09:13AM A. Uh -- I don't know the exact day.
09:13AM Q. Okay. February 12th, 2003, would that sound
09:13AM right?
09:13AM A. Yeah.
09:13AM Q. Okay. Uh -- and was there a meeting held to
09:13AM formulate some kind of a plan?
09:13AM A. Yes.
09:13AM Q. Okay. Where was that held at?
09:13AM A. Chad Spanel's.
09:13AM Q. Apartment?
09:13AM A. No, he had his house.
09:13AM Q. And who was at the meeting?
09:13AM A. Me, Josh, Destry, Chris, and I think Josh's
09:13AM girlfriend. I think she was there, Bridgett (sic).
09:14AM Q. Brook Vandergriff?
09:14AM A. Brook. Brook. That's all.
09:14AM Q. Destry. You mean Destry Keeling?
09:14AM A. Yes.
09:14AM Q. And Chris Eason?

09:14AM A. Yes, sir.

09:14AM Q. And do you remember what time of the day the meeting occurred at?

09:14AM A. It was pretty late in the evening. Chad was about to get off of work, so it was around 10:00.

09:14AM Q. And when you said Josh, you mean Josh Stocker. Right?

09:14AM A. Yes, sir.

09:14AM Q. Okay. And what was the plan that was created at Chad Spanel's house?

09:14AM A. I was to get Ray with me alone. And we had decided that I would get him to go to Wal-Mart with me.

09:14AM Q. And what was the plan about what would happen at Wal-Mart once you got there?

09:15AM A. They would -- they would get him like from the car, or whatever. I would leave it unlocked, and they would get him from then on after I went in and came out.

09:15AM Q. So the plan was you and Ray were to go to Wal-Mart by yourself. Go inside the Wal-Mart, and then the rest of the group would get in your vehicle, and then when you returned, it would be kind of like an ambush deal?

09:15AM A. Yes.

09:15AM Q. Okay. And was there any talk beforehand about what was to be done to Ray Placensio?

A. They were going to beat him up.
Q. And did you go over to Dustin Pool's house to meet Ray Placensio?
A. Yes, I did.
Q. And both Dustin and Ray were there at Dustin's house?
A. Dustin wasn't there for a minute, and I had to wait -- we had to actually wait for him to get there and then we left.
Q. And then you left in your vehicle?
A. Yes.
Q. And what type of vehicle was that?
A. It was my mom's van.
Q. And did you, in fact -- did you and Ray go to the Wal-Mart?
A. Yes.
Q. Okay. Which Wal-Mart did you go to?
A. Coulter and 45th.
Q. And did you, in fact, go inside to the Wal-Mart?
A. Yes, we did.
Q. And were you aware of anything that happened to a member of the group at that time?
A. Later on I learned that Chris had been shot in the foot.

09:16AM Q. Okay. So at the time you were at the
09:16AM Wal-Mart, you didn't know anything else was going on
09:16AM with the other group?
09:16AM A. No, sir, I didn't.
09:16AM Q. So you and Ray go to Wal-Mart. Do you come
09:16AM out and go back to your van?
09:16AM A. Yes, sir.
09:16AM Q. When you got to your van, what happened?
09:16AM A. We got in and I guess Destry pulled a gun on
09:17AM Ray.
09:17AM Q. Okay.
09:17AM A. And told me to drive.
09:17AM Q. And was the point of the plan to kind of make
09:17AM it look to Ray that you weren't involved in this? You
09:17AM were just as surprised as he was?
09:17AM A. Yes.
09:17AM Q. And so where did Destry tell you to go?
09:17AM A. To Josh Bledsoe's shop on Canyon E-way.
09:17AM Q. Okay. Is that by the Canyon E-way and roughly
09:17AM Western Street?
09:17AM A. It was between, yes.
09:17AM Q. Okay. And did the three of you, in fact, go
09:17AM to Josh Bledsoe's shop?
09:17AM A. Yes.
09:17AM Q. Were any -- were you wondering why any --

Chris, Josh Stocker and Brook, where they were at this time?

A. Was I wondering?

Q. Uh-huh.

A. No.

Q. Okay.

A. I just figured that's how they --

Q. Did you make a phone call to Josh Stocker when you were on your way to Bledsoe's shop?

A. No, Destry did.

Q. Okay. And uh -- when you got to Josh Bledsoe's detail shop, did anybody else show up later?

A. Josh was there. Uh -- he was the only one that I seen outside that was there.

Q. Josh Stocker?

A. Yes.

Q. And did Destry, in fact, take Ray out of your van and go into the shop?

A. We all had to get out. We both got out and sat on the ground.

Q. And did Ray plead with Destry to let you go?

A. Yes.

Q. Okay. And so he was -- he kind of bought into the plan that you weren't involved?

A. Yes.

09:18AM Q. And then what happened next?
09:18AM A. Josh told me to leave.
09:18AM Q. And did you?
09:18AM A. Yes.
09:18AM Q. Where did you go?
09:19AM A. I went to my house.
09:19AM Q. Okay. Do you know how long Ray was held at
09:19AM Josh Bledsoe's detail shop?
09:19AM A. Not specifically. I believe over -- like over
09:19AM a day.
09:19AM Q. Did Josh Stocker ever tell you later what
09:19AM happened inside the detail shop?
09:19AM A. A little bit. Not -- not really any detail or
09:19AM information, but I mean, I -- I pretty much just got the
09:19AM idea that they beat him up real bad.
09:19AM Q. And now during this time period in February of
09:19AM 2003, were you friends with a lady by the name of Tori
09:19AM Patrick?
A. Yes, sir.
09:20AM Q. How were you friends with her?
09:20AM A. How was I friends with her?
09:20AM Q. Uh-huh. How did you come to know her?
09:20AM A. Through another mutual friend, Crystal, a few
09:20AM years ago, before that.
09:20AM Q. Okay. And so before February, March of 2003,

09:20AM how long were you and Tori friends?
09:20AM A. Probably two years.
09:20AM Q. Okay. Would y'all run around together?
09:20AM A. Yes.
09:20AM Q. Okay. Now, Tori told us yesterday that she would get her drugs from you. Is that a fair statement?
09:20AM A. Yeah.
09:20AM Q. Okay. And did you actually live with Tori at any point?
09:20AM A. Uh -- I had a key to the apartment. My -- I didn't have any belongings there, like a lot of -- like all of my stuff wasn't there, no. I still lived at my house on Pryor, but I had my own key there. She would let me come and go as I pleased.
09:21AM Q. Okay. And was that the River Falls apartment?
09:21AM A. Yes.
09:21AM Q. And after the Ray Placensio kidnapping and beating, did any of the tensions settle down between the two groups?
09:21AM A. No.
09:21AM Q. Do you know why not?
09:21AM A. It just made everything like, way worse.
09:21AM Q. Okay.
09:21AM A. I don't -- I know Ray didn't bother me anymore. That's the only thing that settled down.

Q. Do you think Ray eventually figured out that you did, in fact, set him up?
A. Yes.
Q. Before March 9th, 2003, did Josh Stocker ever come to you asking you to set up Dustin Pool?
A. It was -- well, I mean, he asked everybody. He never came specifically and said, will you do this? It was just like, I have got to find somebody to find him.
Q. Okay. So he discussed it with you?
A. Yeah, it was discussed a few times among --
Q. And, Guinn, if you could speak up a little bit more.
A. I'm sorry.
Q. That's okay. Who else did he discuss setting up Dustin Pool with?
A. Tori.
Q. Did you hear him ask her --
A. Chad. Did I do what?
Q. How many times did he discuss it with Tori before March 9th, if you can give us an estimate?
MS. McELROY: Your Honor, I believe that's outside of this witness's personal knowledge.
THE COURT: Sustained.
Q. (BY MR. FOWLER) How many times did you hear

09:22AM Josh Stocker discuss setting up Dustin Pool with Tori
09:22AM before March 9th?
09:22AM A. One.
09:22AM Q. Okay. And what was Tori's reaction?
09:23AM A. She was eager to do it.
09:23AM Q. Why do you think -- why was she eager? Why
09:23AM did she show an eagerness?
09:23AM A. She had trouble at the time paying her rent.
09:23AM She was really worried about paying her rent. She was
09:23AM losing her job.
09:23AM Q. When -- when you heard Josh Stocker and Tori
09:23AM talking about this, was money ever mentioned?
09:23AM A. Yes.
09:23AM Q. Okay. Was a specific amount ever mentioned?
09:23AM A. She asked how much and he just told her, don't
09:23AM worry about it. Your rent will be paid. And you will
09:23AM be taken care of. There was no real specific amount
09:23AM set.
09:23AM Q. So there was talk in general terms that she
09:23AM would get rewarded or get some kind of monetary benefit
09:23AM out of this?
09:23AM A. Yes.
09:24AM Q. And then, again, did you hear Josh Stocker ask
09:24AM Tori Patrick to set Dustin Pool up on March 9th, 2003?
09:24AM A. Yes.

09:24AM Q. Do you remember, approximately, where you were and what time of the day that was?

09:24AM A. At the apartment? In River Falls? It was about probably 10:00 or 11:00, because Chad was about to get off work.

09:24AM Q. 10:00 or 11:00 p.m.?

09:24AM A. P.M.

09:24AM Q. Were the three of you hanging out at Tori's apartment?

09:24AM A. Yes.

09:24AM Q. And what were you all doing?

09:24AM A. Uh -- he had brought -- Josh had brought a stereo over and -- or no, he was coming to get his stereo from Tori. She was trying to sell it, because she was trying to pay her rent. He was going to buy it from her.

09:25AM Q. And did he, in fact, purchase the stereo from Tori?

09:25AM A. Yes.

09:25AM Q. Were you all watching TV, watching movies? I mean, what else were you doing there at Tori's?

09:25AM A. No, we were not watching TV. We were just -- nothing, just sitting around.

09:25AM Q. Using drugs?

09:25AM A. Probably, yes. Yes.

Q. And so did Tori finally agree to make the call to Dustin Pool?
A. Yes.
Q. Did she, in fact, call his phone number? Did you see her call the actual phone number?
A. I seen her pick up the phone and dial the phone number.
Q. Do you know if she left a message for Dustin Pool or not?
A. Yes.
Q. And do you know how many times in the evening she called Dustin Pool?
A. Maybe two, three times before I left.
Q. Did Josh Stocker make any phone calls before you left Tori's apartment?
A. I don't -- I can't remember. I don't think so.
Q. Okay. Did anyone come over to the apartment before you left?
A. Michael.
Q. Michael who?
A. Stocker.
Q. And is he related to the Defendant?
A. His brother.
Q. Do you know who's the older and who's the

younger brother?
A. I believe Josh is older.
Q. And approximately what time do you think -- and I know this is hard, but estimate-wise, what time did Michael come over?
A. Probably 11:00, maybe 11:30.
Q. Okay. Sure. And, again, these are estimates. Right?
A. Yes.
Q. And you were using drugs at the time. Right?
A. Yes.
Q. Okay. Do you know how or why Michael Stocker came to the apartment?
A. Josh told him to.
Q. Okay. Did you see Michael Stocker bring anything into the apartment with him?
A. I didn't see.
Q. Okay. How long was Michael there before you left?
A. It was real brief, probably five minutes.
Q. Okay. When Michael first got into Tori's apartment, did Michael and Josh do anything together?
A. They went to the balcony to talk.
MR. FOWLER: Your Honor, may I approach the witness?

THE COURT: Yes.

Q. (BY MR. FOWLER) Guinn, I want to show you the -- what's been marked as a diagram of Tori's apartment. And just look that over and see if you can get your bearings there.

Which area of the apartment did you see Josh and Michael go to when Michael first got there?

A. The patio right here (indicating).

Q. Okay. And you're pointing to an area indicating the patio?

A. Yes.

Q. And how long were they outside on the patio?

A. It was really quick, maybe three minutes, four minutes.

Q. Okay. And were they doing anything in particular in the patio?

A. I didn't pay much attention. There's a curtain. I didn't see.

Q. Okay. Great. And, Guinn, you said that you left with Chad Spanel. Did you call him to come pick you up?

A. It was -- I mean, at night when he got off he usually would come get me. And he'd call me and tell me he was fixing to be there.

Q. So he -- so do you remember approximately --

09:29AM well, okay. You told us that. Did Chad actually come up to the apartment to pick you up, or was he waiting at the parking lot?

09:29AM A. No, he waited downstairs.

09:29AM Q. Okay. And was anybody else with him when he came to pick you up?

09:29AM A. No.

09:29AM Q. And where did you and Chad go to?

09:29AM A. His house.

09:29AM Q. And before you left Tori's apartment, had Dustin Pool called back?

09:29AM A. No.

09:29AM Q. And what did you do when you and Chad arrived at his house?

09:30AM A. He took a shower -- or we sat and talked a little bit, but then he jumped in the shower.

09:30AM Q. Did anything happen while you were at Chad's house, anything unusual?

09:30AM A. Well, Tori had called me a few times.

09:30AM Q. And do you know why Tori was calling you?

09:30AM A. No, I didn't -- not at first. I sort of had an idea later when they were really eager for me to get back.

09:30AM Q. Okay. Did she ask you to go back to the apartment?

A. Yes. She asked me, are you coming back? And I said, well, I wasn't planning on it until later, but, yeah, I'll come back.

Q. Do you remember what Tori's demeanor was or how -- was she excited? Was she calm? Nervous? Scared? I mean --

A. The first phone call she was just -- she was just normal sort of, the first phone call.

Q. Okay. And then subsequent phone calls?

A. The second one, she was kind of talking low, but really eager for me to get back, I guess you would say.

Q. Okay. And did you eventually make it back to Tori's apartment?

A. Yes, sir.

Q. How long were you at Chad's house before you went back to her apartment?

A. I went right back whenever they told me they needed me to come back.

Q. Okay. And do you think you were at Chad's 30 minutes? An hour? Couple of hours?

A. A total, it was a few -- well, he didn't get in the shower until probably an hour. And then when he got out of the shower, I told him I have to go. I need you to take me back. So maybe an hour and a half.

09:31AM Q. What was his reaction to having to shuttle you back to Tori's apartment?
09:32AM A. He was irritated.
09:32AM Q. Did he, in fact, take you to Tori's?
09:32AM A. Yes, sir.
09:32AM Q. When you got to Tori's apartment, were you looking for anything in particular?
09:32AM A. Yes. I was looking for Dustin's car in the parking lot.
09:32AM Q. Did you ask Chad to drive around the parking lot?
09:32AM A. Yes, I did.
09:32AM Q. And did y'all, in fact, drive around the parking lot?
09:32AM A. Yes.
09:32AM Q. Did you see Dustin Pool's vehicle?
A. No.
09:32AM Q. Which vehicle were you looking for?
09:32AM A. The Legend or the Tahoe.
09:32AM Q. Okay. An Acura Legend he used to drive?
09:32AM A. Yes.
09:32AM Q. He used to drive a Tahoe, as well?
09:32AM A. Yes.
09:32AM Q. And when you didn't see those two vehicles, what was your reaction?

58

A. I felt a little bit better.
Q. Why did you feel better?
A. Because I really didn't want to go up there if he was up there.
Q. Why not?
A. I just didn't want to be really in the middle of any arguing and stuff.
Q. And did you and -- after you circled the parking lot, did you go up to Tori's?
A. Yes, sir, I did.
Q. Did Chad go with you or did he leave?
A. No, he left.
Q. When you got up to Tori's apartment, what did you see? Who let you in?
A. Josh let me in.
Q. And what did you see?
A. Uh -- the back of Dustin. He was sitting on the floor by the couch, and he was holding a rag or something on his head.
Q. Okay. And could you tell from that first glance if he was in any kind of pain?
A. Well, I mean, he had something on his head.
Q. Well, how was the lighting inside the apartment when you arrived?
A. It was dark.

Q. Were there any lights on?

A. The TV was on, which made the living room light up, and the hallway light could have possibly been on.

Q. Okay. And what observations did you make of Josh and Michael Stocker when you first got into the apartment?

A. Michael wasn't there.

Q. Okay. Was Josh holding anything when he first let you in?

A. No -- I mean, I don't know.

Q. And if you don't remember, say you don't remember.

A. I don't remember.

Q. Did you see any weapons in the apartment that night?

A. No.

Q. Okay. When you got into Tori's apartment, what happened? What did you do?

A. Josh told me to stay back, like kind of out of the -- out of Dustin's view. And he handed me some money and told me to be quiet. He didn't want Dustin to know I was there.

Q. Why did he hand you some money?

A. Uh -- he wanted me to go and get Tori. Tori

needed some stuff for her kids, some milk and Pampers.

Q. Do you remember, Guinn, if the Defendant got money out of his wallet, or did he get the money out from another source, another location?

A. He got it from -- he had put everything in a bag, Dustin's keys, and I believe he got it from Dustin's wallet.

Q. And do you remember, approximately, how much Josh Stocker gave you right then?

A. It was probably $300.00, three or $400.00.

Q. When you were at the apartment, did anybody show up while you were there?

A. Michael Stocker.

Q. Based on your past friendship with Dustin Pool, would he carry large amounts of cash on him?

A. Always.

Q. Can you estimate how much he would have on him?

A. He usually never had less than $1,000.00.

Q. And when Michael showed back up at the apartment, did he tell you where he had been?

A. Well, yes.

Q. Okay. And where did he tell you he had been?

A. That he took Tori to a motel room, her and her kids to a motel room.

09:37AM Q. And what -- what happened next once Michael arrived back at Tori's apartment?

09:37AM A. Josh asked me to move his -- Dustin's car down the street and to go help give Tori some money to get what she needed for her kids.

09:37AM Q. Okay. And now, did this confuse you since you had looked for Dustin's car and didn't see it in the parking lot?

09:38AM A. Yes.

09:38AM Q. What did you say in response to that?

09:38AM A. I said, his car's not out there.

09:38AM Q. And what did Josh Stocker do?

09:38AM A. He went and asked Dustin how he got there.

09:38AM Q. And what did Dustin say?

09:38AM A. He said he had driven Jessica's car.

09:38AM Q. Did you know what Jessica's car was?

09:38AM A. Yes. Yes.

09:38AM Q. And -- and who is Jessica?

09:38AM A. It was Dustin's wife.

09:38AM Q. Ex-wife at the time, or soon to be ex-wife?

09:38AM A. I think it was ex-wife at the time. I'm sorry.

09:38AM Q. And Jessica Pool, I believe she went by -- her maiden name is Jessica Vasquez?

09:38AM A. Yes, sir. Uh-huh.

09:38AM Q. And what car did you say she drove?
09:38AM A. It was a Monte Carlo, a green one.
09:38AM Q. And when Dustin told Josh Stocker he came in Jessica's car, could you get a gauge or sense of what condition he was in?
09:39AM A. He was -- I mean, he was not good.
09:39AM Q. Okay.
09:39AM A. He was not in a good state.
09:39AM Q. Was he coherent? Was he talking as he normally would talk?
09:39AM A. No, he wasn't talking like he would normally talk, but he was talking.
09:39AM Q. Okay. Was he woozy?
09:39AM MS. McELROY: Your Honor, I don't know that --
09:39AM THE WITNESS: I don't know.
09:39AM MS. McELROY: -- if she has the ability to say whether he was woozy or not.
09:39AM THE COURT: Is that an objection?
09:39AM MS. McELROY: Yes, Your Honor.
09:39AM THE COURT: Sustained.
09:39AM Q. (BY MR. FOWLER) Did you hear -- was there any other conversations between Josh Stocker and Dustin Pool?
09:39AM A. Yeah. He just -- I mean, I asked if

everything was okay. He said that he was going to give Dustin some counseling. I think that is about it.

Q. How do you interpret that? What does "counseling" mean?

A. Well, given the situation and all of the events up until then, I just assumed that he was going to -- I assumed they were going to beat him up or something, you know.

Q. Okay. Did Dustin Pool ever ask to go to the hospital or anything like that?

A. I believe he did. I believe he said he needed to go.

Q. Okay. And what was Josh Stocker's response?

A. He told him he didn't need to go.

Q. Was Josh -- was the Defendant, how was he -- was he being cordial and polite to Dustin Pool? Or --

A. No.

Q. -- how would you describe how he was behaving toward Dustin Pool?

A. Violently.

Q. Okay. And so after he asked you to move Dustin's car, did you, in fact, move Dustin's car?

A. Yes, sir.

Q. Where did you move -- well, I guess Jessica's car, to --

A. To the Tiffany Square Apartments right up the street.

Q. And about how far of a drive was that for you?

A. It is about a quarter of a mile, I guess.

Q. Okay. So just two or three minutes?

A. Yeah, not even.

Q. Okay. And did anyone follow you?

A. Yes.

Q. Who followed you?

A. Michael Stocker.

Q. What did you do once you got to the Tiffany Square Apartments?

A. I parked Jessica's car, and I left the keys in it, got out. Got in the truck with Michael and drove to Motel 6.

Q. Did he drop you off there at Motel 6?

A. He went in with me.

Q. Did y'all ever go and stop and get anywhere -- and get Tori the diapers or whatever she needed?

A. No. We didn't do that until later.

Q. Okay.

MR. FOWLER: Your Honor, may I approach the witness?

THE COURT: Yes.

Q. (BY MR. FOWLER) Guinn, I want to show you

09:42AM what has been marked and admitted as State's Exhibit No.
09:42AM 5. If the records of Motel 6 showed that Michael
09:43AM Stocker got a room at 4:49 a.m., on March 10th, does
09:43AM that sound about right to you?
09:43AM A. Yes.
09:43AM Q. And when you got to Motel 6, what did y'all do
09:43AM there?
09:43AM A. We went in. Michael made a phone call to
09:43AM Josh. We were there for a few minutes. Tori briefed me
09:43AM on what happened, you know, told me about it. And then
09:43AM we left.
09:43AM Q. How long do you think that you were at the
09:43AM Motel 6 before you left?
09:43AM A. Not very long. Probably -- not even an hour.
09:44AM It was pretty quick.
09:44AM Q. When you were interacting with Michael
09:44AM Stocker, what was his demeanor like?
09:44AM A. He was just anxious to get a phone call or
09:44AM anxious to talk to Josh, because he -- he was eager to
09:44AM get back home. He was in trouble by his girlfriend or
09:44AM fiancee, or whoever. He was worried about that.
09:44AM Q. And after you were at the Motel 6, where did
09:44AM you go?
09:44AM A. To La Quinta on Ross --
09:44AM Q. I'm sorry,

09:44AM A. Sorry.
09:44AM Q. Why did you leave the Motel 6?
09:44AM A. I can't remember exactly why we left. I'm pretty sure it was because checkout time was going to be soon. I mean, they -- she was going to get another room. She didn't want to get it there anyway. And I mean, that's the best -- to the best of my knowledge, that's the reason why. I can't really remember.
09:45AM Q. Tori told us yesterday that paranoia was starting to set in on her part. She was getting paranoid?
09:45AM A. Yes, sir.
09:45AM Q. Do you think that's a fair description?
09:45AM A. Yes.
09:45AM MR. FOWLER: Your Honor, may I approach the witness?
09:45AM THE COURT: Yes.
09:45AM Q. (BY MR. FOWLER) I'm showing you what has been marked and admitted into evidence as State's Exhibit No. 6, records from the La Quinta Inn. If the records there show that you checked in at 6:27 a.m., on March the 10th, 2003, would that sound about right to you?
09:45AM A. Yes.
09:45AM Q. And how long were you at the La Quinta Inn?
09:45AM A. Probably 15 minutes, if that. We went

09:45AM upstairs, put her stuff there, because she had to drop
09:46AM her kid off at daycare before 8:00, and she still had to
09:46AM go get his stuff from her house.

09:46AM Q. Why did you only spend a few minutes at La
09:46AM Quinta Inn?

09:46AM A. Well, we had put our stuff up there and we had
09:46AM to hurry.

09:46AM Q. I see.

09:46AM A. That's the motel we really had to hurry, so
09:46AM she could drop her son off. And then we came back later
09:46AM and left quickly again.

09:46AM Q. And when you came back later to the La Quinta
09:46AM and left, what was the reason why you left there?

09:46AM A. Because we walked in and the housekeeping had
09:46AM walked in, and we were unpacking stuff. I mean -- no,
09:46AM she had already unpacked our stuff, because we had just
09:46AM left one bag there. And she was going through it, and
09:47AM we told her -- I mean, we were just standing there. It
09:47AM was kind of -- it was just kind of weird, because she
09:47AM didn't leave. She wouldn't leave, you know what I mean?
09:47AM She was going through our stuff.

09:47AM Q. The housekeeping person?

09:47AM A. Yes. And I don't think she really knew
09:47AM English, but still, she just sat there, you know. It
09:47AM was a weird situation.

09:47AM Q. Did they discover anything?

09:47AM A. There was drug paraphernalia in there.

09:47AM Q. What kind of paraphernalia?

09:47AM A. Scales. I don't know what all exactly. I just know there were scales, baggies.

09:47AM Q. A bong, do you think?

09:47AM A. Probably.

09:47AM Q. And so you and Tori got startled by the housekeeping situation. And then what did you decide to do?

09:47AM A. We went across the highway to the Comfort Inn.

09:47AM MR. FOWLER: Your Honor, may I approach the witness?

09:48AM THE COURT: Yes.

09:48AM Q. (BY MR. FOWLER) Guinn, I want to show you what has been marked and admitted as State's Exhibit No. 7, the receipt from the Comfort Inn. It shows that Christa Brashears (phonetic), Tori's aunt, checked in at 11:36 p.m., on March 10th, 2003. Does that sound about right to you?

A. Yeah.

09:48AM Q. And that was the room you stayed in, was the one Tori's aunt had actually gotten for you?

09:48AM A. Yes.

09:48AM Q. When you were going back and forth, or going

09:48AM from hotel, to hotel, to a hotel, had you heard at all from Josh Stocker?
09:48AM A. No.
09:48AM Q. Were you trying to get ahold of him?
09:48AM A. Yes.
09:48AM Q. Why were you trying to get ahold of him?
09:48AM A. So I could know what was going on, so I could know what happened.
09:48AM Q. Okay. Do you remember if Brook Vandergriff, the Defendant's girlfriend, was calling you trying to find Josh Stocker?
09:49AM A. She might have called Chad. I don't believe she called me.
09:49AM Q. Okay. And so you checked in at 11:30 p.m., on March the 10th. Did you fall asleep there at the Comfort Inn?
09:49AM A. Tori fell asleep.
09:49AM Q. Okay. And when Tori fell asleep, what did you do?
09:49AM A. I had Chad come get me.
09:49AM Q. And so Chad Spanel came back to pick you up at the hotel?
09:49AM A. Yes.
09:49AM Q. Did you leave a note for Tori?
09:49AM A. Yeah -- yes, probably. I usually did. I

09:49AM can't remember specifically, but probably.
09:49AM Q. And what -- what did you do on March the 11th? Do you remember what you did that day?
09:50AM A. I waited. I tried to get ahold of Josh, waited for him to call, went to my house.
09:50AM Q. Did you ever make it back to the Comfort Inn that day?
09:50AM A. Yes.
09:50AM Q. Okay. Do you remember, approximately, what time you made it back to the Comfort Inn now on March the 11th?
09:50AM A. I don't know exactly what time it was, but it was as soon as Tori woke up.
09:50AM Q. Okay. So would that be morning sometime?
09:50AM A. I'm sorry.
09:50AM Q. That's okay.
09:50AM A. It was -- I don't know. It was probably -- gosh, I mean it was mid-day. I don't know what time it was.
09:51AM Q. And when you made it back to the Comfort Inn, Tori was there?
09:51AM A. Yes.
09:51AM Q. Did anybody else show up while you were there?
09:51AM A. No.
09:51AM Q. Okay. Had Josh Stocker -- had you made

contact with him?

A. No.

MR. FOWLER: Your Honor, may I approach the witness?

THE COURT: Yes.

Q. (BY MR. FOWLER) Guinn, I want to show you what has been marked and admitted into evidence as State's Exhibit No. 8, and which is receipts from Circuit City under the name of Josh Stocker, and shows a stereo was purchased on March 11th, 2003.

A. Uh-huh.

Q. Were you with Josh Stocker when he made this purchase?

A. Yes.

Q. And do you remember what he purchased there at Circuit City?

A. It was uh -- just pretty much a whole system, I guess, speakers, amp --

Q. Do you know why he needed to purchase a whole system when he just bought that stereo from Tori a couple of days before?

A. Well, he had more than one car. I don't know. I don't know what stereo went in what car or what.

Q. Okay. When you were at -- before you went to Circuit City with Josh Stocker, did you meet up with

him?

A. Yes.

Q. Where did you meet up with him?

A. Well, he -- finally, we got ahold of him finally at the Comfort --

Q. And did he make his way back to the Comfort Inn?

A. Yes.

Q. And when he got there, can you describe his demeanor? How was he acting?

A. He was laughing, just describing events that had happened with Dustin at -- it was uh -- it was unreal. I mean, I didn't believe it, because it was so unreal the way he was acting. The way he was laughing about it.

Q. And what was he telling you happened?

A. He just kept saying that they were driving around with Dustin Pool's body over -- all over Fritch. And I just -- I mean, it was -- it was to the point where it was just not believable.

Q. It was just a crazy story, and just --

A. Yeah.

Q. You couldn't believe it?

A. Huh-uh.

Q. And did he tell you that Dustin Pool had been

killed?

A. Well, I kind of assumed that when he said he was driving around with him in the back of his -- with his body in the back of a car.

Q. Did he give you any details about how he had been killed?

A. No.

Q. Or where he had been killed?

A. No.

Q. Did he say if anybody else was driving around with Dustin Pool's body?

A. Josh Bledsoe.

Q. Did he give you any details about how that came about?

A. All I remember was him saying there was an argument between them in the -- when -- as they were driving with him in the back and somehow Josh got -- I mean, moved to the driver's seat or whatever. And he said he left him there, left him there or something.

Q. Bledsoe left him there or Josh Stocker left him there?

A. He said Bledsoe left him there. So he was driving around with him in the back of his car.

Q. And so after he was laughing and telling you about this, what happened next?

09:55AM A. Tori was freaking out about her carpet being dirty, wanted to go to Wal-Mart and get something to clean it up with. She said she would try to clean it or --

09:55AM Q. Would a fair description of Tori's demeanor be that was she was freaking out about her apartment?

09:56AM A. Yes, she was freaking out.

09:56AM Q. Okay. And then just to back up and clarify, the Defendant told you that Josh Bledsoe was driving around with Dustin Pool's body?

09:56AM A. Yes.

09:56AM Q. And after Tori was freaking out about her apartment, did she show any items to you or to Josh Stocker?

09:56AM A. Dustin's wallet and -- mainly the wallet. I remember her freaking out about the wallet.

09:56AM Q. Did she have the wallet there with her there at the Comfort Inn?

09:56AM A. Yes, she brought it. She showed it to me.

09:56AM Q. And did you look at the wallet?

09:56AM A. Oh, and his cell phone. I'm sorry. She had his cell phone and his wallet. Did I look at it? Yeah.

09:56AM Q. Okay. And did it appear to be Dustin Pool's wallet to you?

09:57AM A. To the best of my knowledge, it was.

MR. FOWLER: Your Honor, may I approach the witness?

THE COURT: Yes.

Q. (BY MR. FOWLER) Guinn, I want to show you what has been admitted into evidence as State's Exhibit No. 62. And then it has some cards and identification in it. Does this appear to be the wallet that you saw at the Comfort Inn?

A. Yes.

Q. And you recognize this as being Dustin Pool's wallet?

A. Yes.

Q. Who -- what did Tori do with the wallet?

A. She handed it to Josh.

Q. And did Josh tell her anything about the wallet?

A. He acted like he just forgot it there.

Q. And so did you and -- did the three of you go to Wal-Mart to figure out a plan to clean Tori's apartment?

A. Yes.

Q. Did you all go in separate vehicles, or the same vehicle?

A. Separate vehicles.

Q. And who did you ride with?

A. Josh.
Q. And Tori followed in her vehicle?
A. Yes.
Q. And when you got to Wal-Mart, what was purchased?
A. A cleaner, a steam cleaner, carpet --
Q. Anything else purchased there at the Wal-Mart?
A. No.
Q. Which Wal-Mart did you go to?
A. Grand Street.
Q. The one at I-40 and Grand?
A. Yes, sir.
Q. And after these purchases were made -- who paid for the purchases?
A. Josh.
Q. And do you know if he paid cash, credit card or check?
A. I'm pretty sure he paid cash.
Q. Why are you pretty sure he paid cash?
A. Because I don't remember standing there watching him sign for anything. Or -- I'm sure he paid cash.
Q. Do you know where the cash that he paid for this steam vac came from?
A. No, I don't.

THE COURT: I'm going to give the jury a break.

MR. FOWLER: Yes, sir.

THE COURT: Why don't you take 15 minutes and be in the jury room at 10:15.

(Recess.)

(Both sides, the Defendant present, in (open court:

THE COURT: Thank y'all. Be seated. Y'all ready to bring the jury in? Okay. Bring them in.

(Jury seated.).

THE COURT: Thank y'all. Be seated. You may proceed, Mr. Fowler.

MR. FOWLER: Thank you, Judge.

DIRECT EXAMINATION (CONTINUED)

BY MR. FOWLER:

Q. Tori (sic) -- Guinn, I'm sorry. Speak up just a little bit please into the microphone.

A. Okay.

Q. And I think we left off, you purchased some cleaning materials at Wal-Mart. Is that right?

A. Yes.

Q. And did you and Josh Stocker and Tori make it over to Tori's apartment over at the River Falls Apartment complex?

A. Yes, sir.
Q. What did you notice when you first got back into her apartment?
A. What did I notice? Well, she pointed out a bloodstain on the carpet and the couch.
Q. Did the apartment smell in any particular way?
A. Like chemicals, cleaning...
Q. A smell that you would associate with bleach?
A. Yes.
Q. Okay. Did you see anything else on the carpet besides bloodstains?
A. Just uh -- a stain around the bloodstain, like a white --
Q. Okay. Did it appear to you to be a bleach stain on the carpet?
A. Yes.
Q. And when the three of you got back to her apartment, what did you do when you got there?
A. Tried to help her clean it up, clean it off of the carpet.
Q. Did the steam vac need to be assembled?
A. Yes.
Q. Who assembled it?
A. I -- I think we all tried.
Q. Okay.

10:22AM A. We all had done it.
10:22AM Q. And did the -- did you get the steam vac working?
10:22AM A. Yes.
10:22AM Q. Who tried to clean the carpet with the steam vac?
10:22AM A. All three of us.
10:22AM Q. Did it work?
10:22AM A. No.
10:22AM Q. What was not working?
10:22AM A. It didn't come up.
10:22AM Q. The blood was not coming out of the carpet?
10:22AM A. No. Well, it appeared to be a bloodstain, or it just set in with bleach, or --
10:22AM Q. Was the steam vac making things worse or better?
10:23AM A. I feel like it made it worse.
10:23AM Q. Why do you feel like it made it worse?
10:23AM A. Because it made it like brown. It made another stain on top of that stain, and it was white and then the carpet was tan.
10:23AM Q. And so at some point, did you decide to try a different tact, a different plan to try to clean the carpet?
10:23AM A. Well, Josh had been telling her the whole time

to wait and have the carpet cleaners come.

Q. And did he suggest any carpet cleaners? Did he have any ideas for that?

A. I don't know. I don't think he suggested any certain one. He just said call somebody.

Q. How many -- how long did you try to clean the carpet at Tori's apartment?

A. Not very long. Probably an hour, hour and a half, maybe, if that.

Q. And what happened? What happened next after you ended the cleaning efforts?

A. He was anxious to get to Circuit City, so we left.

Q. So you and him left Tori's apartment to go to Circuit City?

A. (Witness nods head up and down.)

Q. And is that "yes"?

A. Yes.

Q. And did Tori go with you?

A. No.

Q. Did Josh Stocker still have Dustin Pool's wallet at this time?

A. Yes.

Q. Okay. And Tori had given it to him, like you said, at the Comfort Inn. Is that right?

10:24AM A. Yes.

10:24AM Q. When you got to Circuit City, what happened?

10:24AM A. He threw the phone in the parking lot and the wallet -- no, I don't know if he threw the phone -- threw the wallet for sure in the parking lot. And then we went inside.

10:24AM Q. And what did you buy inside?

10:24AM A. The stuff for his system.

10:25AM Q. Okay. Who was driving to Circuit City?

10:25AM A. He did.

10:25AM Q. And you're in his vehicle?

10:25AM A. Yes.

10:25AM MR. FOWLER: Your Honor, may I approach the witness?

THE COURT: Yes.

10:25AM Q. (BY MR. FOWLER) Guinn, I want to show you what has been admitted as State's 62. Can you hold it and show us how the Defendant threw Dustin Pool's wallet out of the vehicle?

10:25AM A. How he threw it?

10:25AM Q. Yes.

10:25AM A. Do you want me to throw it?

10:25AM Q. No, I don't want you to throw it. But with your arm, make any motion that you saw the Defendant make.

10:25AM A. I'm sorry. He just tossed it out, like it was unimportant.
10:25AM Q. Like it was a piece of trash?
10:25AM A. Yes.
10:25AM Q. How long do you feel that you were at the Circuit City?
10:26AM A. It was a good while. It was probably -- probably at least two hours.
10:26AM Q. Do you know if he had the stereo or the equipment that he purchased installed that same day?
10:26AM A. Yes, sir. That's what took so long.
10:26AM Q. And after Circuit City, where did you go?
10:26AM A. Back to the apartment, I think. I had him take me. He had to go -- I don't really remember where I went. I think I might have went to my house, but he had to get back because Brook was calling and calling.
10:26AM Q. Brook Vandergriff?
10:26AM A. Yes.
10:26AM Q. Did you see Josh Stocker give Tori Patrick any money?
10:27AM A. Yes.
10:27AM Q. Okay. Where did that occur at?
10:27AM A. At her -- at River Falls Apartments before we went to Circuit City.
10:27AM Q. What was the money for?

10:27AM A. For the deposit on a new apartment.

10:27AM Q. Do you know how much the Defendant gave Tori?

10:27AM A. I believe it was -- I believe it was $400.00.

10:27AM Q. Cash?

10:27AM A. Yes.

10:27AM Q. The money that the Defendant had given Tori for the new apartment, had purchased the equipment from Circuit City, and had bought the steam vac from Wal-Mart, did you form an opinion as to where that money came from?

10:27AM A. Yes.

10:27AM Q. Where do you believe that money that he spent came from?

10:28AM MS. McELROY: Your Honor, we object. I believe this is speculation on the witness's part unless she has personal, firsthand knowledge.

10:28AM MR. FOWLER: Your Honor, I believe she can testify as to what her opinion is as to where the money came from.

10:28AM MS. McELROY: Without personal knowledge, where is the relevance as to her opinion?

10:28AM THE COURT: That is just speculation. I'll sustain the objection.

10:28AM Q. (BY MR. FOWLER) Do you know if Josh Stocker had any money on him on March 9th or March 10th?

A. No, he didn't.

Q. Okay.

MS. McELROY: Your Honor, may I inquire of the witness as to how she has personal knowledge as to my clients?

THE COURT: I agree. Take her on voir dire, please.

VOIR DIRE EXAMINATION

BY MS. McELROY:

Q. Ms. Garcia, you testified that you knew that Mr. Stocker had no money. Now, how is it that you would know that?

A. If he had any money, it wasn't very much. I mean, because we were all without work, and that was another urgency that he had to get Dustin --

Q. All right. Let me ask you this: Did he ever open up his wallet and show you how much money he had?

A. No.

Q. Okay. Did he ever tell you that uh -- I have absolutely no money?

A. He made --

Q. Yes or no.

A. -- he made statements in front of me and Chad that, we're all broke.

Q. Excuse me. Did he ever say to you directly, I

10:29AM have no money on me?

10:29AM A. No.

10:29AM Q. Thank you.

10:29AM MS. McELROY: Your Honor, we would reassert she doesn't have personal knowledge as to whether he had any money, and these assertions are speculation on her part.

10:29AM THE COURT: Mr. Fowler?

10:29AM MR. FOWLER: Your Honor, again, I believe she can testify as to whether she thinks the Defendant had money, if she has an opinion. She is a lay witness and she can give an opinion in that regard.

10:29AM THE COURT: That is not the kind of thing that is under the ordinary purview of a regular person's understanding. That is not what is meant by the rule on opinions. I'll sustain the objection.

DIRECT EXAMINATION (CONTINUED)

BY MR. FOWLER:

10:30AM Q. Let's -- let's talk about the Defendant's work situation. The questions Ms. McElroy was asking you, you said that the Defendant admitted that he was out of work?

10:30AM A. Yes.

10:30AM Q. Do you know how that came about?

10:30AM A. He had a debt with Craig that had to be paid.

10:30AM Q. He owed money to Craig Kimberlin?
10:30AM A. Yes.
10:30AM Q. So do you feel that Craig Kimberlin had cut him off?
10:30AM A. Yes.
10:30AM Q. Did the Defendant talk to you about his financial problems?
10:31AM A. Not other than making statements like that.
10:31AM Q. Like what statements?
10:31AM A. Like, we're all broke. Just --
10:31AM Q. While you were at Circuit City, did the Defendant make any other comments about what happened the day before regarding Dustin Pool?
10:31AM A. There was this one detail uh -- part that he told me. And that was pretty much all, is when he told me that -- what Dustin had said about me.
10:32AM Q. And what did he tell you that Dustin said about you?
10:32AM A. He said that -- he said that I was -- he said that I was -- he said that I -- he wanted Josh to, you know, be the one to kill him or what -- he said he wanted him to do it, because he kept asking him if I was good in bed, and telling him that I was just playing him. And just making uh -- bad remarks about me.
10:33AM Q. What was the Defendant's demeanor when he told

you these comments?

A. He was just pretty much the same. He was -- when I first seen him, like it was funny.

Q. Do you know if -- when the Defendant had been cut off by Kimberlin, if the Defendant went to Dustin Pool looking for work?

A. Yes, he did.

Q. How do you know that?

A. Dustin told us about it

Q. And did Dustin let the Defendant work for him?

A. No.

Q. And do you know after that if that got thrown in Craig Kimberlin's face, and Dustin Pool said something to the effect, listen, your own boy, Josh Stocker, is over here coming to me looking for work?

A. Yes.

Q. And how did Josh Stocker react to it being uncovered that he went to Dustin Pool looking for work?

MS. McELROY: Your Honor, we would object. This is going to be her observation, and it's speculation as to what was the motivation and his reaction.

THE COURT: His question was, how did the Defendant react. As long as she limits her testimony to what she observes, then I'm going to let her testify to

that.

MS. McELROY: Yes, sir.

THE COURT: Objection overruled.

Q. (BY MR. FOWLER) Ms. Garcia, you may answer the question.

A. He was upset.

Q. Now, after these events unfolded, was Josh Stocker hard to get ahold of?

A. Yes.

Q. Would you try calling his cell phone?

A. Yes.

Q. Would you get any responses?

A. No.

Q. Approximately for how long was the Defendant hard to get ahold of after these events?

A. I talked to him one time after all of that happened, and never talked to him again.

Q. Now, ma'am, I believe you gave a statement to Mark Brown of the police department in September of 2003?

A. Yes, sir.

Q. And Mark Brown, in fact, told us that you, too, were hard to get ahold of right after these events. Is that correct?

A. Probably, yes.

10:36AM Q. And now -- and to let the jury know a little bit about your background, you -- at the time this happened, you were on felony probation for drug offenses. Is that right?

10:36AM A. Yes, I was.

10:36AM Q. And your probation was pending out of Judge Board's court, I believe. Is that right?

10:36AM A. Yes.

10:36AM Q. And you hired an attorney for that. Right?

10:36AM A. Yes, sir.

10:36AM Q. And you have been charged with aggravated kidnapping and tampering with evidence. Is that right?

10:36AM A. Yes, sir.

10:36AM Q. And you have an attorney for those charges, as well?

10:36AM A. Yes, sir.

10:36AM Q. What is the understanding of any agreement that you have worked out with Mr. Farren and our office?

10:37AM A. I don't have an agreement. Any punishment I get is going to be based on me telling the truth and my knowledge, and even my guilty part in what happened.

10:37AM Q. And what happens if you don't tell the truth?

10:37AM A. I don't know. I'm sure I will go to prison for a long time.

10:37AM Q. And when I asked you when you first took the

10:37AM stand where you were staying, and you told us you were
10:37AM at the Randall County Jail?
10:37AM A. Yes, sir.
10:37AM Q. Can you tell us why you're at the Randall
10:37AM County Jail?
10:37AM A. Failure to report uh -- the way I'm supposed
10:37AM to, the times I'm supposed to.
10:37AM Q. So you have been all of this time reporting to
10:37AM a probation officer. Is that right?
10:37AM A. Yes, sir.
10:38AM Q. And you had some problems with your probation.
10:38AM Right?
10:38AM A. Yes.
10:38AM Q. And, in fact, I believe you also had a dirty
10:38AM drug test?
10:38AM A. Yes.
10:38AM Q. And you were supposed do go to out-patient
10:38AM rehab and you didn't go. Right?
10:38AM A. I went.
10:38AM Q. Okay.
10:38AM A. I -- the last day I did not go. I was sick.
10:38AM Yes, I did not go.
10:38AM Q. And so the bond that you were let out on was
10:38AM increased, and this new charge was filed, and you ended
10:38AM up in the Randall County Jail because you weren't

10:38AM behoving, basically?

10:38AM A. Right. Yes.

10:38AM MR. FOWLER: Your Honor, may I approach the witness?

10:38AM THE COURT: Yes.

10:38AM Q. (BY MR. FOWLER) I want to show you what has been admitted into evidence as State's 69. Is that the Dustin Pool that you knew?

10:38AM A. Yes.

10:39AM MR. FOWLER: Your Honor, I pass the witness.

THE COURT: Ms. McElroy.

CROSS EXAMINATION

BY MS. McELROY:

10:39AM Q. Ms. Garcia, I believe that you testified -- well, first let me back up and ask you this: Is Daniel Jaquez (phonetic) your cell phone -- or did you ever use a cell phone by this person?

10:39AM A. Daniel who?

10:39AM Q. Jaquez.

10:39AM A. Not that I'm aware of.

10:39AM Q. Were you ever -- did you have a cell phone?

10:39AM A. When?

10:39AM Q. During this period of time, March of 2003.

10:39AM A. Yes.

10:39AM Q. What phone number was that?

10:39AM A. I don't know. It was -- I don't know the phone number, but it was under Tori's name.

10:39AM Q. I'm sorry.

10:39AM A. It was under Tori's name.

10:39AM Q. It was under Tori's name? Do you remember who provided the service?

10:39AM A. Sprint, I believe.

10:39AM Q. Did you ever use or have the cell phone number with the number 336-5072?

10:40AM A. No, I don't believe so.

10:40AM Q. Did you ever use anyone else's cell phone?

10:40AM A. Not that I can remember.

10:40AM Q. Did you ever use Chad Spanel or Morgan Sprool's phone?

10:40AM A. Oh, Morgan got one in his name whenever Tori had it turned off.

10:40AM Q. Okay. Do you remember what that number was?

10:40AM A. It was a long time ago. I don't.

10:40AM Q. Okay. All right. Do you have any memory of using a phone with the numbers 584-9000?

10:40AM A. No.

10:40AM Q. That was Morgan's phone. Do you remember using that phone?

10:40AM A. I don't remember the numbers. He had one and

he had another one --

Q. There were two phones?

A. Yes.

Q. Okay. And was it a frequent occurrence for y'all to kind of trade phones around?

A. No.

Q. Well, didn't you just tell me that you would use other people's phones?

A. No, I used his -- that phone. He got it for me in the name -- whenever Tori had mine turned off, the one that was in her name.

Q. Okay. But you didn't run around with a cell phone in your name, Guinn Garcia?

A. No.

Q. Okay. So you would use someone else's cell phone?

A. Yes, I did.

Q. Okay. Ms. Garcia, you testified earlier that you had a live-in relationship with Ray Placensio?

A. Yes.

Q. Do you remember how long you had been with him?

A. Probably -- like I said earlier, I was with him probably half a year before he went to prison, and then when he got out, probably a year, year and a half.

Q. Okay. And do you remember giving testimony in a court case entitled, the State of Texas versus Ricky Gallegos?

A. Yes, I do.

Q. Do you remember testifying for the State in that matter?

A. Yes.

Q. Can you tell me, briefly, why you were testifying for the State then?

A. Uh -- I pretty much just told them what I knew. There was a meeting held at my house. And --

Q. Well, you were involved with Ray. Correct?

A. Yeah.

Q. Okay. And Ray was a member of the Texas Syndicate. Is that right?

A. I believe so.

Q. Okay. And during that time, he was holding meetings?

A. Yes.

Q. Okay. And at one of those meetings, can you tell me, do you know who Bobby O'Connis is?

A. I was not allowed to be there present during the meetings.

Q. I understand. Do you know who Bobby O'Connis is?

A. Yes, I do.
Q. Do you know Mr. Valdez (phonetic)?
A. I met him, yes.
Q. Do you know Lupe Rodriguez (phonetic)?
A. Yes, I do.
Q. So you knew all of these people?
A. Yes.
Q. Can you tell me if you know how many people were charged in this particular case?
A. I don't know.
Q. Did you know Ricky Ricardo Gallegos (phonetic)?
A. Yes.
Q. How did you know him?
MR. FARREN: Your Honor, if I may -- and this is not an objection or anything. I realize it's his (sic) witness. I was wondering if we can all stipulate that Mr. Gallegos was a co-defendant in the Pracioto murder with Mr. Placensio, so that the jury has some context of what this is all about.
MS. McELROY: That's fine, Your Honor.
MR. FARREN: So these are from the transcript of the Gallegos murder trial, who is the co-defendant to Placensio in the Pracioto murder.
THE COURT: All right. Mr. Farren, since

we've raised it, let's clear it up for the jury a little bit. Go into a little more detail.

MR. FARREN: And we'll provide a written summary to the Court, so we can both sign it.

THE COURT: All right. Okay. That's good.

MR. FARREN: It is my understanding that these questions are from the transcript of the Ricky Gallegos trial, and that Ricky Gallegos is a co-defendant or was a co-defendant to Mr. Ray Placensio. Both of them, and I think some others charged in the homicide of Pracioto in Potter County in Amarillo.

THE COURT: All right. I hope that clears it up for them. I worry about them getting bits and pieces of this and not understanding the context.

MR. FARREN: Yes, Your Honor.

THE COURT: You and I know, because a part of it is in my court up there. Anyway -- all right.

Q. (BY MS. McELROY) You testified, did you not?

A. Yes, I did.

Q. In this event? And you testified in Mr. Gallegos' trial. Do you anticipate testifying against Ray Placensio?

A. Probably.

10:45AM Q. His trial hasn't been yet held. Is that correct?

10:45AM A. I'm -- not to the best of my knowledge.

10:45AM Q. Well, you haven't been called to court or anything?

10:45AM A. No.

10:45AM Q. Was Ray the head of the "TS" at that time?

10:45AM A. No, not to the best of my knowledge. It was -- they were trying to decide who was going to be the head. As far as I knew, it was Bobby and a guy named K.O. before that.

10:45AM Q. Okay. Now, did the Texas Syndicate, they were dealing drugs?

10:46AM A. Yeah.

10:46AM Q. Okay. And so you were working for them?

10:46AM A. No.

10:46AM Q. No. Where were you getting your drugs from?

10:46AM A. Dustin Pool.

10:46AM Q. Okay. So it's your testimony that the Texas Syndicate was taking over Dustin Pool's drugs?

10:46AM A. No. Dustin asked them to kind of come in and help him, as far as having someone to back him, like collecting and stuff like that.

10:46AM Q. Okay. But I think your testimony earlier on direct was that the "TS" were wanting people to pay tax

in order to sell dope?

A. Yeah, Ray always said that.

Q. Right. Well, Dustin Pool was an independent drug dealer at that time, was he not?

A. Yes.

Q. All right. So would it be logical that then they would expect him to pay that tax, also?

A. Well, when they --

MR. FOWLER: Your Honor, I'd object to speculation.

THE COURT: Sustained.

Q. (BY MS. McELROY) For your testimony, were you given any immunity agreement in Potter County?

A. (Witness shakes head side to side.)

Q. You -- did you have any sort of -- did you have any sort of deal with the Prosecutor in Potter County in order to have your testimony?

A. (Witness shakes head side to side.)

Q. I'm sorry?

A. A deal? No.

Q. You were just a bystander?

A. A bystander?

Q. Yes. You -- you weren't charged in this offense?

A. No.

10:47AM Q. Okay. So you were subpoenaed to testify about it. Right?

10:47AM A. Yes.

10:47AM Q. Do you know when this murder took place?

10:47AM A. Specific dates, no, I don't.

10:48AM Q. Well, if I were to tell you that it was February 24th, would that sound about right?

10:48AM A. I don't know a specific date. I mean, I don't --

10:48AM Q. All right. I'm going to ask you if Ray (sic) -- February 27th of 2003 sounds accurate to you?

10:48AM A. I don't know.

10:48AM Q. Okay. Do you know whether or not Mr. Pracioto (sic), in concert with these other people, ended up murdering Jesse Pracioto?

10:48AM A. You mean Placensio? Or Pracioto?

10:48AM Q. Yes. I'm sorry. Did Ray Placensio, and Bobby O'Connis, and Mr. Valdez, and Ricky Ricardo Gallegos, and Vincente Flores, did they go in on February 27th and stab Jesse Pracioto to death?

10:49AM A. I do not know.

10:49AM Q. And you testified at this trial?

10:49AM A. I testified to him telling me that he showed his heart when I asked him about it.

10:49AM Q. Okay. And that was the sole purpose of your

10:49AM testimony?

10:49AM A. Yes.

10:49AM Q. Okay. So, basically, because of the

10:49AM statements that he had made to you?

10:49AM A. Yes.

10:49AM Q. Because y'all were living together?

10:49AM A. No, we weren't living together.

10:49AM Q. You weren't living together?

10:49AM A. (Witness shakes head side to side.)

10:49AM Q. But he's confiding in you about murdering

10:49AM somebody?

10:49AM A. We fought on the phone just about every phone

10:49AM call. I asked him on the phone if he had something to

10:49AM do with that, because I heard. And he said, you don't

10:49AM worry about it. I showed my heart. I did what I had to

10:49AM do.

10:49AM Q. Okay.

10:49AM A. During that time, he was trying to get back

10:49AM with me and ...

10:50AM Q. All right.

10:50AM A. -- and that --

10:50AM Q. I think you testified on direct that you were

10:50AM divorced. Is that right?

10:50AM A. Yes.

10:50AM Q. To your knowledge, has there been any activity

10:50AM on that divorce? Are you, indeed, legally divorced?
10:50AM A. I don't know if I am -- if the paperwork has been through. I have been to a divorce hearing. I don't know if it has been finalized, if that's what you're asking.
10:50AM Q. Okay. So if we had a court document that said that the case had been dismissed without an entering of a divorce decree, you wouldn't have any -- you wouldn't argue with that, would you?
10:50AM A. Do what? I'm sorry.
10:50AM Q. If I had a document that said that your divorce petition had been dismissed, meaning you're still married, you wouldn't be surprised?
10:50AM A. No. I never got -- no.
10:50AM Q. Okay. Let's talk about your statement here. Now, you said that Josh paid Tori for the stereo. Was that like the day before the Dustin incident?
10:51AM A. I think he paid for it. The day before I ran downstairs and showed it to him, and I think he paid for it, I'm pretty sure on the day of all of this.
10:51AM Q. On the same day before that evening. Is that what you're telling me?
10:51AM A. I can't say I know exactly when he paid for it. I'm sorry.
10:51AM Q. Okay. But was it shortly around the time that

we're talking about?

A. Yes.

Q. Okay. You and Ray have a falling out. Is that correct? Is that your direct testimony?

A. Like after --

Q. No. I'm talking to -- prior to y'all helping plan him being set up?

A. Yes, we had a falling out.

Q. Okay. So y'all are angry with each other. Is that right?

A. Yeah, he moved out. We broke up.

Q. Okay. Were you still dealing dope for Dustin at that point?

A. That's pretty much when it came to a stop.

Q. Okay. So then once you're not dealing dope for Dustin Pool, you're without a resource to get dope from. Is that right?

A. Well, I could still get it from Dustin if I wanted to. I just -- I was mad. I was mad at him.

Q. So --

A. I didn't -- I didn't want to go there and be around Ray and have anything with Ray, to have any reason to be around me.

Q. So you're telling me that you could go and get dope from Dustin, even though you set up his right-hand

10:52AM guy?
10:53AM A. Yeah.
10:53AM Q. Okay. You -- you're living with Tori at this point in time?
10:53AM A. I didn't live with her. I had a key to her apartment. I didn't live there. All of my belongings, everything I had was on Pryor Street where I lived.
10:53AM Q. Okay.
10:53AM A. I was able to come and go as I wanted, because I had a key.
10:53AM Q. If -- if Ms. Patrick had said in her testimony that you stayed with her for the two or three weeks before this because Ray wouldn't move out, would she be lying?
10:53AM MR. FOWLER: Your Honor, I'd object --
10:53AM THE WITNESS: I don't know --
10:53AM MR. FOWLER: I think that's a mischaracterization of Tori's testimony. I think she stated, to my recollection, that she would crash there every now and then.
10:53AM MS. McELROY: My understanding of it, Your Honor, is that Ms. Patrick said that Ms. Garcia stayed with her because Ray wouldn't leave the apartment or the house where Ms. Garcia and he lived. That was -- that was what I had written down.

THE COURT: I'll overrule the objection. You may answer.

Q. (BY MS. McELROY) Was Ms. Patrick lying?

A. Ray didn't stay there. My mom moved in, and my -- he left. It was not -- I didn't stay there because of that.

Q. Okay. So if Tori had said that, then she was lying?

A. I guess so.

Q. All right. You sit and y'all talk about the Ray -- the Ray incident. Right? And you help in the planning of this event. Is that right?

A. I was there when -- yes.

Q. Okay. And so you're -- you're asking -- or y'all are talking about this deal. Is that right?

A. Yes.

Q. And you say to him, I know what we can do. I'll go get him and -- and take him to Wal-Mart. Is that what you said?

A. No.

Q. Well, you had a plan as to how this was going to work?

A. Uh -- I don't know whose idea it was to go to Wal-Mart or whatever they -- I can't specifically say I said, let's go to Wal-Mart. But I was there --

10:55AM Q. Well, you --
10:55AM A. -- when we decided that's how it would be.
10:55AM Q. Okay. Did you go over -- I think you said in your direct testimony that you went over and you got Ray from Dustin Pool's house?
10:55AM A. Yes.
10:55AM Q. And this is after y'all have already broken up?
10:55AM A. Yes.
10:55AM Q. And you tell him, okay. I've got to go get insulin for my mother?
10:55AM A. Yes.
10:55AM Q. And you get in the van and you go to Wal-Mart?
10:55AM A. Yes.
10:55AM Q. Is that right?
10:55AM A. Yes.
10:55AM Q. And, of course, you knew what was coming next?
10:56AM A. Yes.
10:56AM Q. And you knew that he was going to be beat up?
10:56AM A. Yes. I assumed so.
10:56AM Q. You assumed so?
10:56AM A. (Witness nods head up and down.)
10:56AM Q. I think you testified on direct that Tori was having a hard time with money. Is that your testimony?
10:56AM A. Yes.

Q. That uh -- I believe that you said in your statement that she was having a hard time paying for her rent?

A. That is what she was worried about, mainly paying her rent and losing her job.

Q. If Ms. Patrick was to testify that she didn't have money concerns and that she was making -- making good money, would that be an accurate statement?

MR. FOWLER: Judge, again, I would object as a mischaracterization of Tori's testimony. I think Tori told us that the apartment was too expensive for her.

THE COURT: That's what I remember.

MS. McELROY: Your Honor, she also testified that she wasn't concerned, that she had enough money and that she was making good money at her job.

THE COURT: That's right. She did. I'll overrule the objection.

Q. (BY MS. McELROY) In reference to the event with Dustin Pool, you were -- you were involved in the planning of this incident, were you not?

A. I left.

Q. You left? When is it that you left?

A. I left the apartment. He asked -- he was there. I mean, Josh asked her if she could get him over

10:58AM there. I was still there. She said, yes, she could get him over there. She made a few attempts to get him over there, and then I left. Anything that was decided after that, I don't know until the point when I got back.

10:58AM Q. Okay. Well, let me rephrase the question. You were certainly privy to the fact that they were trying to get Dustin over to Tori Patrick's house?

10:58AM A. Yes, sir, I was aware.

10:58AM Q. And you were certainly willing to come back and help out with Tori?

10:58AM A. I did not know what they wanted me to come back for so bad. I didn't know. But, yes, I was coming back. She was my friend. She was asking me. It was obvious that she wanted me to come back there for some reason, yes.

10:58AM Q. So you were willing to do that?

10:58AM A. Yes.

10:58AM Q. You were willing to help out by moving the car?

10:58AM A. Yes.

10:58AM Q. Okay. And you were willing to help out when it came to babysitting Tori?

10:59AM A. Yes.

10:59AM Q. And you were willing to move from motel, to motel, to motel?

A. Anything to get her to be quiet, I did.

Q. And then you were willing to go with her and to help get cleaning products to clean up this mess?

A. Yes. Yes.

Q. And were willing to go back there and help run the steam cleaner and clean up whatever you could?

A. Yes, I did.

Q. Did y'all go around the apartment and clean up anything else?

A. No, ma'am.

Q. You just focused on the carpet?

A. There wasn't -- I mean, from what I could tell, there was nothing else to be cleaned.

Q. Okay. You looked around -- you looked around the apartment and there wasn't any other place that had any other blood on it?

A. Right, other than the couch.

Q. Okay. But y'all didn't attempt to clean that up?

A. I -- no, I think it -- we decided to call the carpet cleaner.

Q. And is it true that you were the person that called the carpet cleaner?

A. I believe so.

Q. And you were also there at the apartment when

11:00AM the carpet cleaners came to clean the carpet?
A. Yes.
11:00AM Q. And so you stayed there through them cleaning
11:00AM up the apartment. Is that right?
11:00AM A. Yes. She had to work. She asked me if I
11:00AM would stay there.
11:00AM Q. Okay. Did you then, you know, pay for it?
11:00AM Did you pay the man to clean the carpet?
11:00AM A. Yes.
11:00AM Q. How much did you pay the man?
11:00AM A. I don't remember.
11:00AM Q. Okay. Was it in cash?
11:00AM A. Yes.
11:00AM Q. All right. Did he give you a receipt to sign?
11:01AM A. Yes.
11:01AM Q. And did you sign your name or Tori's name?
11:01AM A. Tori's.
11:01AM Q. Okay. I think you testified on direct that
11:01AM Josh, when y'all were at Circuit City, bought a whole
11:01AM system. Was that your testimony?
11:01AM A. I don't know exactly what was bought. I just
11:01AM -- I know that they had a lot of installation to do of
11:01AM the speaker. I don't know exactly what was bought. I
11:01AM know that there was quite a bit bought, and quite a bit
11:01AM had to be installed.

Q. Okay. So if there was two different dates on a receipt, one that might indicate when it was purchased and one that indicates when it was installed, that would be wrong?

A. For that specific car? I don't know.

Q. Okay. But it was your testimony, wasn't it, that he bought it on the same day and it got installed on the same day?

A. I don't know exactly if he bought the stereo, and the speakers, and the amps, and everything on the same day. No, I do not know that. I know there was a lot of stuff purchased and a lot of stuff had to be installed.

Q. And your testimony is that it was installed on that day?

A. Okay. I don't know if he purchased a stereo prior to that day, and that was the stereo that had to be installed. I'm not clear what you're saying.

Q. Let me clear this up. I'm not concerned whether it is this stereo or that stereo. What I'm getting at is that your testimony on direct was that you went in, Josh purchased a stereo system, and he had it installed that day?

A. Yes.

Q. Okay. Now, if there was a receipt that

11:03AM indicated that there was another date on that receipt that it was installed in, are you not remembering or are you lying?

11:03AM MR. FOWLER: Your Honor, I object as argumentative and speculation.

11:03AM THE COURT: Overruled.

11:03AM THE WITNESS: I'm not --

11:03AM THE COURT: Answer the question.

11:03AM THE WITNESS: -- remembering that it was installed on another day?

11:03AM Q. (BY MS. McELROY) Yes.

11:03AM A. Oh, well, I guess I'm not remembering, because I know we sat there for about two hours in the waiting room while they installed something in the car.

11:03AM Q. Okay. So your testimony is they installed something on that day?

11:03AM A. Yes.

11:03AM Q. Absolutely. All right. I believe -- let me get this right. Now, you said that you had known Chad a long time, Chad Spanel?

11:04AM A. Uh-huh.

11:04AM Q. How long a time had you known Chad?

11:04AM A. A few years even before he went to prison. Probably, I don't know, five, seven -- probably seven years.

Q. Had y'all had a romantic relationship during that previous time?

A. No.

Q. Okay. Y'all were just friends?

A. Well --

MR. FOWLER: Judge, I would object. I think the witness is confused at the time frame that Ms. McElroy is asking about.

THE COURT: Well, she's something. So I want you to answer the question. If you don't understand the question, tell the interrogator, whoever's asking, that you don't understand it. If you do understand it, I want you to answer it.

THE WITNESS: Okay. Are you asking --

THE COURT: Hold up. Ask the question again.

MS. McELROY: Yes, Your Honor.

Q. (BY MS. McELROY) I believe it was your testimony on direct that you had known Chad Spanel prior to March of 2003? Is that correct?

A. Yes.

Q. Can you tell me how much longer you had known Chad than on that time during the -- March 2003?

A. Probably five years.

Q. Five years. And I asked you if you had had a

previous romantic relationship with Mr. Spanel.

A. Before he went to prison, yes.

Q. Do you know when that was?

A. Probably six months before he went to prison.

Q. Okay. Mr. Spanel, he was dealing dope, also?

A. Yes.

Q. Okay. Did you buy dope from Chad, or did he buy dope from you?

A. Both.

Q. Okay. So y'all kind of exchanged?

A. (Witness nods head up and down.)

Q. Did Mr. Spanel -- did he also -- did he buy dope from Stephen Kimberlin?

A. Uh -- not up until that point, he didn't -- he owed him money from before he went to prison and he had to go through Josh.

Q. Okay. But he was dealing dope for Dustin?

A. No.

Q. He wasn't dealing any dope for Dustin?

A. (Witness shakes head side to side.)

Q. Okay. Now, Ms. Garcia, can you tell me, when were you initially arrested on this offense?

A. Uh -- October 31st of 2003.

Q. Okay. Did you stay in jail for a long time?

A. Almost a year.

Q. Okay. Did you have an attorney?
A. Yes.
Q. Okay. And what were you charged with, if you know?
A. Kidnapping.
Q. Okay. Was it just kidnapping?
A. I was arrested -- I was initially arrested on tampering with evidence. Then it was -- then I bonded out on it. And the next day I was arrested on kidnapping.
Q. Okay. And I believe you just said that you stayed in jail about a year on the kidnapping deal?
A. Yes.
Q. Before you got out on bond?
A. Yes.
Q. So when were you released on bond next?
A. It was like October 11th or October -- the beginning of October sometime.
Q. Okay. I believe that the Prosecution covered with you that you have a use immunity agreement or immunity agreement?
A. That I have to tell the truth? Yes.
Q. Yes. Uh -- is it your understanding that you're protected from any more charges being filed on you?

A. No, I have to tell the truth, and my punishment is going to be -- go off of that. Me telling the truth, even my guilty part in it, everything that I know, to the best of my knowledge.

Q. Okay. And so -- and so you are doing that today. Right?

A. Yes.

MS. McELROY: I'm sorry. Your Honor, I have misplaced something.

THE COURT: What are we looking for?

MR. FARREN: The immunity agreements --

MS. McELROY: No, that's okay.

THE COURT: Something else?

MS. McELROY: I apologize, Your Honor.

THE COURT: That's all right.

MS. McELROY: Here it is. May I approach the witness, Your Honor?

THE COURT: Yes, ma'am.

Q. (MS. McELROY) Ms. Garcia, I'm going to hand this to you and ask you if you might read it over to yourself.

A. (Witness complies.)

THE COURT: Have you marked it?

MS. McELROY: Not yet, Your Honor. I need to do that.

THE COURT: What was State's 5?

THE WITNESS: This is --

Q. (BY MS. McELROY) Okay. And you received a copy of this, did you not?

A. Yes, ma'am.

MS. McELROY: Could we have these marked as --

(Pause.)

MS. MCELROY: -- 7.

Q. (BY MS. McELROY) Ms. Garcia, this is a piece of correspondence, is it not?

A. Yes.

Q. Can you tell me what the date is?

A. December 29th, 2004.

Q. And you received a copy of this. Right?

A. I believe so, yes.

Q. And this is filed in the Court's file, is it not? Is there a file mark there?

A. Yes.

Q. Okay. Can you read this to me right here?

MR. FOWLER: Your Honor, I'd object to her testifying from a document that is not in evidence. It's hearsay.

THE COURT: Sustained.

MS. McELROY: All right.

11:13AM Q. (BY MS. McELROY) Ms. Garcia, can you tell me
11:13AM whether or not after having an opportunity to read this
11:13AM over and look it over, if it's not -- if it does not
11:13AM state that you are out on bond and have a pending offer
11:13AM from the State that will be accepted?
11:13AM MR. FOWLER: Objection, Your Honor,
11:13AM assumes facts not in evidence.
11:13AM MS. MCELROY: Your Honor, we would like
11:13AM to offer this into evidence as a certified copy of the
11:13AM Court's -- this document --
11:13AM THE COURT: On this D-7 -- .
11:14AM MR. FARREN: Yeah, could we --
THE COURT: -- D-7.
11:14AM MR. FOWLER: Judge, again, we would --
11:14AM same objection. One, it's a hearsay document. Two,
11:14AM it's not even out of this case -- this file. It's out
11:14AM of Judge Board's files. And the relevance --
(Pause.)
11:14AM MR. FOWLER: No objection, Your Honor.
11:14AM THE COURT: What?
11:14AM MR. FARREN: Well, Your Honor, we don't
11:14AM want the jury to think we're trying to hide it from
11:14AM them. There's no problem. Let them put it in.
11:14AM THE COURT: That's all right. It's his
11:14AM witness. So there's no objection? Did I hear you

right?

MR. FOWLER: That's correct, Judge.

THE COURT: Okay. All right. Then I'll admit it. D-7 is admitted.

Q. (BY MS. McELROY) Ms. Garcia, does this letter not say that you're out on bond, that you have a pending offer from the State that you will probably accept?

A. Does that -- does it say I'm on bond? I know I received one when I was in jail that said that.

Q. Well, let me -- just a minute.

MS. MCELROY: May I approach the witness?

THE COURT: Yes.

Q. (BY MS. McELROY) Ms. Garcia, if you'll read right there, does that not say, (reading) we would respectfully request a pass on all of our client's cases. She is out on bond and has a pending offer from the State that we will probably accept?

A. Yes, it does.

Q. And that letter was sent to the District Attorney's office, to you, and to the clerk of the Court?

A. Yes, I guess. Yes.

Q. I believe you testified earlier that you didn't have any plea agreement?

A. Well, I -- to me, 100 percent honest, I never

11:15AM -- they might have sent that to my house or something,
11:16AM but I didn't read that. Uh --
11:16AM Q. But you agree with me that is what it says?
11:16AM A. Yes. Yes.
11:16AM Q. Okay. All right.
11:16AM MS. MCELROY: May we publish to the jury,
11:16AM Your Honor?
11:16AM THE COURT: Yes.
11:16AM Q. (BY MS. McELROY) Ms. Garcia, do you have
11:16AM current felony cases pending?
11:16AM A. Kidnapping and -- yes, I do.
11:16AM Q. Okay. Do you have motion to revoke your
11:16AM probation?
11:16AM A. Yes.
11:16AM Q. When were you originally put on probation, Ms.
11:16AM Garcia?
11:16AM A. Almost six years ago.
11:16AM Q. And what was that for?
11:16AM A. Delivery of a controlled substance.
11:16AM Q. Can you tell me what degree felony that is?
11:16AM A. No, I don't know.
11:16AM Q. Okay. So -- you don't know if you would go to
11:17AM County jail or to a prison?
11:17AM A. Well, I'm sure I would go to prison.
11:17AM Q. Okay. And that was a case that you pled on

six years ago?

A. Well, I have done almost six years on it, probation, yes.

Q. So you're about ready to get off of probation?

A. (Witness nods head up and down.)

Q. Okay.

A. Yes.

Q. During the time that you have been on probation -- well --

MS. MCELROY: Let me approach the witness, Your Honor.

THE COURT: All right.

(Pause.)

MR. FOWLER: No objection to Defendant's 8, Your Honor.

THE COURT: Let me see it. Defendant's 8 is admitted.

MS. McELROY: Thank you, Your Honor.

Q. (BY MS. McELROY) Ms. Garcia, I'm going to show you this document. And can you tell me -- can you read this right here, what the number is?

A. 13 -- 13 -- 113-B. 13,113-B.

Q. Okay. And does this reference your case?

A. Yes.

Q. And is this the case that you're currently on

probation for?

A. Yes.

Q. Okay. You are on deferred probation?

A. Yes.

Q. Does that mean that you don't have a felony conviction?

A. Yes, I believe so.

Q. All right. There are rules on probation. Right?

A. Yes, ma'am.

Q. Okay. You were asked to follow the rules on the probation. Is that right?

A. Yes, ma'am.

Q. Okay.

MS. McELROY: May I publish, Your Honor?

THE COURT: Yes.

Q. (BY MS. McELROY) During the time that you have been on probation since April 2nd, 2001, have they filed any motions to proceed to adjudicate your guilt?

A. Yes.

Q. Okay. Have any of those hearings been held?

A. No.

Q. Okay. Ms. Garcia, did they file a motion to revoke your probation -- when was that filed, if you know?

A. Uh -- I don't -- I don't know exactly.

MR. FOWLER: Judge, I have looked at the documents Ms. McElroy has provided, and to save a little time, I have no objection to their admittance when they're offered.

THE COURT: The ordinary way we do this is give a number first.

MS. McELROY: I'm sorry, Judge.

MR. WATKINS: I'm numbering.

MS. McELROY: May I approach the witness, Your Honor?

THE COURT: Yes, ma'am.

MS. McELROY: Did you want to look at the documents?

THE COURT: No, but I would really like to know the numbers. Thank you.

THE COURT REPORTER: Could I know the numbers, too?

MS. McELROY: 9, 10. 11 and 12.

THE COURT: Otherwise, the appellate court might assume that we introduced the entire table.

MR. WATKINS: That's going to be number 13.

MR. FARREN: We have no objection on that.

THE COURT: Do you think it will fit on that rail?

Q. (BY MS. McELROY) Ms. Garcia, is this a Motion to Revoke your probation in Cause 13,113-B?

A. Yes.

Q. Okay.

THE COURT: Just a second. D-9 through 13 are admitted.

MS. McELROY: Oh, I'm sorry, Your Honor.

THE COURT: That's all right.

Q. (BY MS. McELROY) Would -- would you agree with me that it lists several violations of your probation?

A. Yes.

Q. Okay. Can you tell me what this says that you've done to violate it? Condition number one?

A. Uh -- placing -- did intentionally and knowingly possess with intent to deliver a controlled substance.

Q. Okay. Was that more than four grams?

A. Yes.

Q. But less than 200?

A. Yes, ma'am.

Q. Okay. Did this -- does this have a violation here? What does it say right here?

11:22AM A. (Reading) The Defendant --

THE COURT REPORTER: Excuse me. Speak up.

THE WITNESS: (Reading) The Defendant --

THE COURT REPORTER: Excuse me. You need to speak up.

11:22AM THE WITNESS: (Reading) The Defendant admitted to using methamphetamine every two or three days for the months of March, 2002 --

11:23AM THE COURT: Ms. McElroy, for the record, are you still talking about Defendant's 9?

11:23AM MS. McELROY: I am still speaking about Defendant's 9.

11:23AM THE COURT: Thank you, ma'am.

11:23AM Q. (BY MS. McELROY) All right. I think that -- in number four, uh -- it says here that you -- did you fail to report? Can you tell me what dates that they are alleging that you failed to report?

11:23AM A. For the months of 2001 -- October of 2001, December of 2001, January of 2002 and April of 2002.

11:23AM Q. So there's like five months that you didn't show up over at probation. Is that accurate?

11:23AM A. (Witness nods head up and down.)

11:23AM Q. According to this document, it is. Right?

11:23AM A. Yes.

Q. All right. Did you ever have a hearing on this?

A. No.

Q. Okay. So this has been pending and was filed on May of 2003, and it has been pending since May of 2003?

A. Yes.

Q. And there hasn't been any hearing on that?

A. No.

Q. Okay. So you are still on probation?

A. Yes, ma'am.

THE COURT: Any further questions, Ms. McElroy?

MS. McELROY: Yes, Your Honor. I'm sorry. May I publish to the jury?

THE COURT: Yes. Describe 10, 11, and 12 for me, for the record.

MS. McELROY: Defendant's 10 is basically the statement or the report of probation violation done by the probation officer --

THE COURT: Thank you.

MS. McELROY: -- with a recommendation.

THE COURT: 11?

MS. MCELROY: 11 is an Amended Motion to Revoke her probation.

THE COURT: First amended?

MS. McELROY: Yes, sir.

THE COURT: All right.

MS. MCELROY: And No. 12, again, is a report of violation.

THE COURT: What is the date of 10, so I can distinguish them?

MS. McELROY: 10 was July 22nd, 2002, Your Honor.

THE COURT: Okay.

MS. McELROY: Did we get to 12?

THE COURT: 12 is what?

MS. McELROY: 12 is another report of violation. It's dated June 11, 12002.

THE COURT: Okay. Thank you. Go ahead and publish.

Q. (BY MS. McELROY) All right. Ms. Garcia, you have -- now, I believe you testified earlier that you had been out on bond for how long after sitting there for a year?

A. Uh -- from October, the beginning of October until like two weeks ago.

Q. Okay. And you were reporting to your probationer (sic) -- probation officer?

A. Yes.

11:26AM Q. And I think you testified with uh -- with the Prosecution that there began to be problems with that?

11:27AM A. Yes.

11:27AM Q. That you weren't reporting to the probation department anymore?

11:27AM A. Well, a part of my reporting was going to my classes, and -- reporting to her once a week.

11:27AM Q. Okay.

11:27AM A. So going to my class was not -- was a part of not reporting.

11:27AM Q. Okay. I believe the Prosecution mentioned with you that you had tested dirty on a UA?

11:27AM A. Yes.

11:27AM Q. Had you been using methamphetamine during this time?

11:27AM A. Yes.

11:27AM Q. Have you been selling methamphetamine during the time you have been on bond?

11:27AM A. No.

11:27AM Q. You never sold methamphetamine during this entire time?

11:27AM A. No.

11:27AM Q. What is it you do for a living?

11:27AM A. Uh -- my mom just died, and I was -- I mean, I

11:28AM don't have a job right now. I don't currently have a

job. My mom just passed away and left me some money.

Q. When is the last time you had a job? Has it been more than five years?

A. No. I worked for my mom's CB shop for -- until -- well, up until she died.

Q. Okay. Were you a full-time employee?

A. I guess. Well, yeah.

Q. Okay. How much did you make a week?

A. Just whatever I -- we worked on commission, whatever my commission was.

Q. On average, what was your commission per week?

A. Probably -- probably 2 -- $250.00 a week, if that, about 2.

Q. Okay.

A. Sometimes more, sometimes less.

Q. That was enough money to provide for your rent, and food, and car payment?

A. My mom -- I didn't pay rent. I lived in her house.

Q. Okay. Well, Ms. Garcia, why did you sell dope? During March of 2003 and on from that, why were you selling dope if you had a job?

A. Probably -- probably to support my habit.

Q. Okay.

A. Probably.

Q. Was the money pretty good?
A. Yeah, it was okay.
Q. Was it better than commissions at your mom's CB shop?
A. Yes.
THE COURT: Any other questions?
MS. McELROY: Can I have just a moment, Your Honor?
THE COURT: All right.
MS. McELROY: We're getting pretty close here.
THE COURT: Okay.
MS. McELROY: All right. I'll pass the witness, Your Honor.
THE COURT: Do you have any questions, Mr. Fowler?
MR. FOWLER: Yes, sir, I do.
THE COURT: All right.

REDIRECT EXAMINATION

BY MR. FOWLER:

Q. Guinn, after you, and the Defendant, and Tori tried to clean Tori's apartment with a steam vac from Wal-Mart, did the professional carpet cleaners ever come over?
A. Not that day.

11:31AM Q. A different day?
11:31AM A. Yes.
11:31AM Q. And who gave you the money or how -- how were they paid?
11:31AM A. Josh paid for it.
11:31AM Q. Josh Stocker?
11:31AM A. Yes.
11:31AM Q. And did he hand you the money?
11:31AM A. I believe so, yes.
11:31AM Q. And did -- did you give the money to Jason Myers (phonetic)?
11:31AM A. Yes.
11:31AM Q. And then Jason Myers actually handed the money to the carpet people?
11:31AM A. Yes.
11:31AM Q. After the carpet cleaning people came there, did you have another occasion to go to Tori's apartment and meet with Craig Kimberlin about the apartment situation?
11:31AM A. Yes.
11:32AM Q. What was Craig Kimberlin's reaction to the Defendant bringing in some professional carpet cleaners?
11:32AM A. He was like livid.
11:32AM Q. Why was he livid?
11:32AM A. Because he said that he had people to do that,

11:32AM and Josh knew better.

11:32AM Q. Basically, he had people on the payroll to clean carpets?

11:32AM A. Yes.

11:32AM Q. Okay. And were you with Tori when she picked out the new couches at Warehouse Solutions, and Mr. Kimberlin paid for them?

11:32AM A. Yes.

11:32AM Q. Now, I'm a little confused. Ray Placensio, he knew who had kidnapped him and beat him up. Right?

11:32AM A. Yes.

11:32AM Q. And he -- eventually, did you know if he was released?

11:32AM A. Yes, he was.

11:32AM Q. Okay. Dustin Pool, why then was it necessary to move Dustin Pool's car from Tori's apartment to the Tiffany Square Apartments?

11:33AM A. I guess he didn't want anybody to know that he was there or had been there.

11:33AM Q. And then to clear up your phone numbers at the time, your pager number, was it 345-8025 at the time?

11:33AM A. I'm not good with numbers, but...

11:33AM Q. Okay. That's fine.

11:33AM A. I don't know.

11:33AM Q. Do you know if your cell phone was 373-2061?

11:33AM A. Yes.

11:33AM Q. Okay.

11:33AM MR. FOWLER: I pass the witness.

11:33AM MR. FARREN: Wait just a second.

11:33AM MR. FOWLER: Judge, I have been informed I have one more question. May I approach the witness?

11:33AM THE COURT: We all saw it. Go ahead.

11:34AM Q. (BY MR. FOWLER) Guinn, I want to show you what's been admitted into evidence as State's Exhibit No. 9. I want to show you what has been marked and admitted into evidence as State's Exhibit No. 9, the receipt from Warehouse Solutions. The purchaser of the couch is shown as Morgan Spruell. Did Morgan actually purchase the couches?

A. No.

11:34AM Q. And did Tori Patrick actually sign Morgan's name at Warehouse Solutions?

11:34AM A. Yes.

11:34AM Q. And who is Morgan Spruell?

11:34AM A. He is -- okay. My brother and his sister are together. They lived together for like ten years, 12 years. So he is a friend of the family, I guess. I mean -- not by marriage. But they're in the family, sort of. I don't know how to explain it.

11:35AM MR. FOWLER: I have no further questions,

11:35AM Judge.

11:35AM THE COURT: Okay. Ms. McElroy, anything

11:35AM further? Hello?

11:35AM MS. McELROY: I had the one question, and

11:35AM then it went. One moment. All right.

RECROSS EXAMINATION

BY MS. McELROY:

11:35AM Q. Well since it was so -- oh, I think I

11:35AM remember. Just one more question.

11:35AM Ms. Garcia, just for clarity's sake, you have

11:35AM pending in -- Cause No. 13,113-B, is that the cause

11:35AM number where you have a Motion to Proceed pending?

11:35AM A. I --

11:36AM Q. Is that the one you're on probation for?

11:36AM A. Motion to Proceed?

11:36AM Q. To revoke your probation.

11:36AM A. Uh -- I --

MR. FOWLER: Judge --

11:36AM THE WITNESS: Yes.

11:36AM MR. FOWLER: Judge, excuse me. I'd

11:36AM object. I think it's been asked and answered. And I

11:36AM think the documents speak for themselves as to what

11:36AM cause number they're in.

11:36AM MS. MCELROY: The only reason, Your

11:36AM Honor, is that -- because there's two other cause

numbers, and I was trying to get a distinction.

THE WITNESS: I don't know --

THE COURT: Well, if there's two other cause numbers, then go into that. But he's correct, and I'll sustain his objection to anything having to do with 13,113, which are the documents D-9 through D-12.

MS. McELROY: Yes, Your Honor.

Q. (BY MS. McELROY) Ms. Garcia, are you charged by indictment in Cause No. 14,389 with possession of a controlled substance with intent to deliver?

A. Yes, I guess. I mean, I -- there are so many different papers now, and ...

MS. McELROY: Your Honor, may I approach the witness?

THE COURT: Yes.

MR. FOWLER: Judge, we have no objection to D-14.

THE COURT: D-14?

MR. FOWLER: Yes, sir.

THE COURT: D-14 is admitted.

MR. FOWLER: And the number in the other indictment is 14,389-B, as in "boy".

THE COURT: B?

MR. FOWLER: Yes, sir.

MS. McELROY: Pardon me. May I approach

the witness, Your Honor?

THE COURT: Yes.

Q. (BY MS. McELROY) I'm going to show you what has been marked as D-14, and I'm going to ask you what it is.

A. It's an indictment.

Q. Okay. Does it say, the State of Texas versus Guinn Garcia?

A. Yes, ma'am.

Q. Okay. And that is you. Right?

A. Yes.

Q. And uh -- this is an indictment saying that you were delivering methamphetamine?

A. Yes.

Q. Is that right?

A. Yes.

MS. MCELROY: We'd ask that D-14 be admitted, Your Honor.

THE COURT: D-14 was admitted.

MS. McELROY: Thank you. May I publish, Your Honor?

THE COURT: Yes. Excuse me. Do y'all have a group of these?

MR. WATKINS: I think this is it.

MS. McELROY: I think this is it.

THE COURT: Very good.

MR. FOWLER: Judge, I have looked at D-15, and we have no objection.

THE COURT: D-15 admitted.

MS. MCELROY: May I approach the witness, Your Honor?

THE COURT: Yes.

Q. (BY MS. McELROY) Ms. Garcia, I'm going to show you what has been marked as Defendant's Exhibit 15. And can you tell me what that says?

A. It's indictment number 15,372-B.

Q. Okay. And can you tell me what it's for?

A. It's an indictment for felony kidnapping.

Q. Okay.

A. With my name on it.

MS. McELROY: May I publish, Your Honor?

THE COURT: What is the number?

MS. McELROY: D-15.

THE COURT: No, no, 15 what?

MS. MCELROY: Oh, the cause number? 15,327-B.

THE COURT: Let me see it. Thank you. Yes, you may publish.

MS. MCELROY: Thank you. We'd pass the witness, Your Honor..

11:39AM MR. FOWLER: We have no further questions, Your Honor.

11:39AM THE COURT: You may step down, ma'am. Ladies and gentlemen, let's break for lunch. Y'all be back at 1:00. Okay?

11:39AM (Lunch recess.)

11:39AM (Both sides, the Defendant present, in open court:

11:39AM THE COURT: Thank y'all. Be seated. All right.

(Jury seated.)

01:12PM THE COURT: Thank y'all. Be seated. All right. Mr. Farren, call your next witness.

01:17PM MR. FARREN: State calls David Cochet, Your Honor.

01:17PM THE COURT: Okay. Mr. Cochet, come up here, please. Would you raise your right hand.

01:17PM (Witness sworn.)

01:17PM THE COURT: Thank you, sir. Sit right there.

DAVID COCHET,

having been first duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. FARREN:

01:17PM Q. Would you state your full name to the jury,

please, sir.

A. David Anthony Cochet.

Q. And, Mr. Cochet, you used to live here in the Amarillo area. Is that correct?

A. Yes.

Q. You now live down around Ft. Worth?

A. Dallas.

Q. Dallas. Okay. And when you lived here, you were involved in the carpet cleaning business?

A. Yes, sir.

Q. And is that what you are still doing down around Dallas?

A. Yes.

Q. When you worked here in Amarillo, were you employed by or associated with Allen's Carpet Cleaning?

A. Yes, sir, I worked with them.

Q. I want to direct your attention back to March 12th of 2003. Do you recall going to the River Falls Apartments over on I-40 and Amarillo, and cleaning some carpets over there?

A. Yes, I do.

Q. How did you learn that you needed to go to that location?

A. From my boss, Allen. He called and they set up an appointment to go.

01:18PM Q. So someone called your employer, and your employer dispatched you to do the job?
01:18PM A. Yes.
01:18PM Q. Now, did you have uh -- a company vehicle, or did you use --
01:18PM A. Yes, a company vehicle.
01:18PM Q. Is this a van, pickup?
01:18PM A. It's a van.
01:18PM Q. Okay. A van. And I assume you had all of your equipment in there?
01:18PM A. Yes, sir.
01:18PM Q. Okay. So you -- do you recall what time of day you might have arrived there, if you recall?
01:18PM A. I don't really recall, to tell you the truth. I think it was around 3:00, maybe. I'm not sure.
01:19PM Q. When -- do you happen to remember the apartment number or anything of that nature?
01:19PM A. No, I don't.
01:19PM Q. Okay. When you went there to clean the carpet, was there a logistical problem? In other words, did you have a problem as far as getting your equipment to the carpet that had to be cleaned?
01:19PM A. Yes, because I had to use a lady's apartment across the hall. I came through her balcony to their apartment.

Q. So to get your equipment to the apartment you were originally sent there to clean, you had to actually pull some of your lines through another lady's apartment?

A. Yes.

Q. Okay. And did she agree to allow you to do that?

A. Yeah. I offered her $30.00 to clean her living room, give her a break.

Q. Okay. So you made an arrangement with her to clean some of her carpet at a reduced price?

A. Yes, sir.

Q. If she would let you bring these lines through her apartment to the other apartment?

A. Yes, sir.

MR. FARREN: May I approach the witness, Your Honor?

THE COURT: Yes.

Q. (BY MR. FARREN) I'm showing you what I've marked as State's Exhibit No. 19. Do you remember getting her -- writing out some sort of receipt for her?

A. I kind of think I did.

Q. Well, let me ask you this: Does this State's Exhibit No. 19 refresh your memory about it?

A. Yeah. Allen's Carpet.

01:20PM Q. Okay. And did you write this out --
01:20PM A. Yes.
01:20PM Q. -- or at least sign it?
01:20PM A. Yeah. Yes, I signed it.
01:20PM Q. Okay. And is this the receipt that you gave the lady who let you --
01:20PM A. Yes, sir.
01:20PM Q. -- pull the line through hers?
01:20PM A. Yes, sir.
01:20PM Q. This is an exact, accurate reproduction of that. Is that correct?
01:20PM A. Yes.
01:20PM Q. By the way, when you were working for Allen's Carpet, you -- it was not unusual to recreate some kind of record like this that you had given somebody a receipt?
01:20PM A. No.
01:20PM Q. Now, this is not actually -- this shows an address at another location. Did you just use a piece of paper or something you had?
01:21PM A. I think I had a -- yes, I think I had a piece of thing -- I don't know if that's the lady's piece of paper off of her --
01:21PM Q. Okay. So you don't know if you had that or if she did --

A. Yes, sir.

Q. -- but this is your writing and your receipt for it?

A. Yes, she wanted a receipt for it.

MR. FARREN: Offer State's 19 into evidence, Your Honor.

MR. WATKINS: No objection.

THE COURT: State's 19 is admitted.

Q. (BY MR. FARREN) And the receipt that we talked about a moment ago, this shows apartment G-374?

A. Yeah.

Q. Does that refresh your memory as to whether 373 was the apartment you were going to or you still don't --

A. I still don't remember.

Q. This indicates that you shampooed some carpet, and you were paid $30 cash?

A. Yes.

Q. And the date on that, March 12th --

A. Yes.

Q. -- 2003?

A. Yes.

Q. Now, the main reason that you were there, though, was not to clean this lady's -- the 374, it was to clean this other apartment?

A. Yes.
Q. Once you got your equipment -- made the arrangements to get your equipment into the other apartment, and you began to look at this surface that you had to clean, did you notice anything about it that caught your attention?
A. Yes, there was a lot of blood.
Q. A lot of blood?
A. Yeah.
Q. Where all did you see blood?
A. In the dining room or -- in the living room and uh -- on the couch.
Q. And were you given any explanation about this blood? Did you ask about it?
A. I was kind of joking with them. They said it was a bloody nose. Somebody had a bloody nose.
Q. Did you believe that?
A. I run into a lot of customers. I don't really believe it now, but I can't really tell them no, either.
Q. No, I understand that. I'm not asking if you -- if you said to them, I don't believe you, I'm asking you --
A. No, I didn't believe --
Q. -- within your mind, did you believe that story?

A. I kind of shined it off, actually. No, I didn't believe it.

Q. Why did you -- why did you have doubts about that explanation?

A. Because it was a lot of blood, so,,,

Q. You felt like it was too much for a bloody nose?

A. Yeah.

Q. And did you, in fact, clean the carpet?

A. Yes, I did.

Q. And do you think that your equipment -- were you able to remove --

A. On the carpet --

Q. -- the stain?

A. -- on the carpet and on the couch, I removed most of the stain, yeah. I'm pretty sure I got it, because it was kind of fresh.

Q. So because it wasn't -- did you have an opinion as you worked with it whether it was completely dried yet, the blood?

A. It wasn't dry, no.

Q. Okay. So did that make it more likely that you'd be able to get most of it out?

A. Yes. Yes.

Q. When you finished your efforts, were you paid?

A. Yes.

Q. Now, when you first arrived there, did you visit with someone about what they wanted you to do?

A. Yes, sir. There was a woman there that greeted me at the door, and she showed me what she wanted.

Q. Later when you finished and you were paid, did the lady pay you or did someone else?

A. A man did.

Q. A man did?

A. Yeah.

Q. And you -- do you know, was it a credit card or check?

A. It was cash.

Q. Cash?

A. Yes.

Q. Do you know where this man got the cash to pay you?

A. He came out of the room with the cash. I don't know.

Q. So he came from another room in the apartment to where you were?

A. Yes.

Q. And handed you the cash?

A. Yes.

01:24PM MR. FARREN: Pass the witness.

CROSS EXAMINATION

BY MR. WATKINS:

01:24PM Q. Hi, Mr. Cochet. My name is Mike Watkins. How are you?

01:24PM A. Fine.

01:24PM Q. You said this other man came from another
01:24PM room?

01:25PM A. Yeah. The living room is right there and
01:25PM there's a bedroom. He came from the bedroom.

01:25PM Q. Okay. Now, if I remember right, there are two
01:25PM bedrooms in this apartment. Do you remember that?

01:25PM A. Yeah, but he came out of this side. I guess
01:25PM the living room is here, the bedroom on this side and
01:25PM bedroom on this side. He came out of this one.

01:25PM Q. Okay. All right. And was he there the whole
01:25PM time that you were cleaning the carpet?

01:25PM A. No, he showed up later.

01:25PM Q. Okay.

01:25PM A. I seen him later. I don't know if he showed
01:25PM up later. I seen him later.

01:25PM Q. Okay. Now, if your hoses had to come across
01:25PM someone else's apartment through the hall, through the
01:25PM front door and into the apartment, doesn't it make sense
01:25PM if he walked in behind you, you would have seen him?

A. Not if he had been in the bedroom.
Q. If he was already there, you wouldn't have seen him?
A. That's what I mean.
Q. And did you ever see him come in?
A. No, but, I mean, he just came out through the side.
Q. Okay. What did the man who paid you look like?
A. I really don't remember, to tell you the truth.
Q. Okay. Do you see that person in this courtroom?
A. The guy I have a picture of is like -- light brownish hair, I don't know.
Q. So you don't see him in the courtroom?
A. I don't remember what he looks like, to tell you the truth.
Q. Okay. All right.
MR. WATKINS: Pass the witness.
MR. FARREN: I have no other questions of this witness.
THE COURT: You may step down, Mr. Cochet.
MR. FARREN: Thank you, Mr. Cochet.

01:26PM State calls Destry Keeling.

MR. WATKINS: Is Mr. Cochet released so he can go back?

MR. FARREN: Yeah, we have no objection.

MR. WATKINS: We don't have any

01:26PM objection.

01:26PM THE COURT: Thank you. You are released.

01:27PM Mr. Keeling, come on up here. Would you raise your

01:27PM right hand, please.

01:27PM (Witness sworn.)

01:27PM THE COURT: Thank you. Sit right up

01:27PM there on that chair.

01:27PM Go ahead.

01:27PM MR. FARREN: Thank you.

DESTRY KEELING,

having been first duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. FARREN:

01:27PM Q. Would you state your full name to the jury,

01:27PM please, sir.

01:27PM A. Destry Shannon Keeling.

01:27PM Q. And, Mr. Keeling, it's obvious from your

01:27PM attire and from the handcuffs that you are currently

01:27PM incarcerated. Is that correct?

01:27PM A. Yes, sir, I am.

01:27PM Q. You -- is it correct that you're serving at this time both a federal sentence and a state sentence?
01:28PM A. Yes, sir.
01:28PM Q. And what is your -- what were you charged with federally?
01:28PM A. Uttering counterfeit responsibilities (sic).
01:28PM Q. So you were passing counterfeit money?
A. Yes, sir.
01:28PM Q. And then your state charge was what?
01:28PM A. Tampering with evidence.
01:28PM Q. And that -- that charge was this same case we're here about today. Is that correct?
01:28PM A. Yes, sir, it is.
01:28PM Q. And you were involved in the Dustin Pool situation. Right?
01:28PM A. Yes, sir.
01:28PM Q. Do you know -- by the way -- well, let me go ahead. Do you know a man named Stephen Craig Kimberlin?
01:28PM A. Yes, I do.
01:28PM Q. How did you meet Mr. Kimberlin?
01:28PM A. Through selling drugs.
01:28PM Q. Selling drugs?
01:28PM A. Yes, sir.
01:28PM Q. Okay. How long have you known Mr. Kimberlin?
01:28PM A. Going on five or six years now.

01:28PM Q. Okay. This is the year 2005. If you have known him five or six years, then that would put us back to 1998, '99, 2000, along in there?
01:29PM A. Around in 2000, yeah.
01:29PM Q. Around 2000?
01:29PM A. Yeah, 2000, 2001.
01:29PM Q. And did you sell different kinds of drugs or were you involved with just one drug primarily?
01:29PM A. Primarily methamphetamine.
01:29PM Q. Okay. Did you use methamphetamine?
01:29PM A. Yes, I did.
01:29PM Q. And then you also sold it?
01:29PM A. Yes, sir.
01:29PM Q. Okay. Did you also know anyone by the name of Miguel Gonzales?
01:29PM A. Yes, sir.
01:29PM Q. Did you know Josh Stocker?
01:29PM A. Yes, I do.
01:29PM Q. Did you know Jessica Kimberlin?
01:29PM A. Yes, sir.
01:29PM Q. Frank Chacon?
01:29PM A. Yes, sir.
01:29PM Q. Tommy Tucker?
01:29PM A. Yes, sir.
01:29PM Q. Did you know Josh Bledsoe?

A. Yes, sir.

Q. Were you an active participant with Mr. Kimberlin's group of people that distributed methamphetamine?

A. Yes, I was.

Q. Okay. Now, do you see Josh Stocker here in the courtroom?

A. Yes, I do.

Q. There's uh -- a man wearing a white shirt with no jacket and a tie seated at the table, at counsel table. Is that Mr. Stocker?

A. Yes, it is.

MR. FARREN: May the record reflect he has identified the Defendant, Your Honor?

THE COURT: Record will so reflect.

Q. (BY MR. FARREN) Now, I want to direct your attention to the year 2002, the summer and the fall of 2002. You knew Mr. Kimberlin at that time. Correct?

A. Yes, I did.

Q. And you were involved in the methamphetamine activity that you have talked about then?

A. Yes, sir.

Q. Did you -- had you ever heard of or come into contact with anyone by the name of Dustin Pool?

A. I had heard of him, yes.

01:31PM Q. Okay. And what -- what had you heard about Mr. Pool?

01:31PM A. Uh -- just that he was another drug dealer.

01:31PM Q. Okay. During your connection with Mr. Kimberlin, and Mr. Stocker, and Bledsoe, and Chacon and the others, did you learn of any kind of a conflict or tension between Mr. Pool and his group and Mr. Kimberlin and his group?

01:31PM A. Yes, I did.

01:31PM Q. What kind of problems were there?

01:31PM A. It was just -- started out I guess as an argument between Dustin Pool and -- and Josh Bledsoe, I believe.

01:31PM Q. Do you know what the argument was about?

01:31PM A. I -- honestly, I don't.

01:32PM Q. Did --

01:32PM A. I remember there was uh -- an argument because he had run Pool -- Pool had run uh -- Bledsoe's family off of the road one day.

01:32PM Q. Okay.

01:32PM A. And uh --

01:32PM Q. And this event where Mr. Bledsoe's family was run off of the road, did you hear that from Mr. Bledsoe?

A. Yes, sir.

01:32PM Q. Where were you when you heard about that?

A. I was at Craig Kimberlin's house.
Q. So you were at Mr. Kimberlin's house, and Mr. Bledsoe was telling you about it?
A. Yes, sir.
Q. Do you remember anybody else that was there at the time?
A. Pretty much everybody you mentioned.
Q. So a lot of the Kimberlin cartel or group was there?
A. Yes.
Q. As they talked about this, did you get the impression that was a one-time event, or did it appear to be an ongoing problem, or could you tell?
A. It had been ongoing between the two parties.
Q. Do you remember Mr. Stocker making a telephone call during that meeting, or did you hear about a call?
A. Yes.
Q. What can you tell us about this phone call that Mr. -- that Josh Stocker made?
A. Well, he called Dustin Pool, I guess, because he -- the two knew each other. And I guess he wanted to have a meeting and squash the problem, you know.
Q. How did this -- did this conversation -- what was the demeanor? How did Mr. Stocker act during this conversation?

01:33PM MR. WATKINS: Your Honor, we would object to this line of questioning under 401, 404 and 403.

01:33PM THE COURT: I'm sorry. I really don't understand that. I know what those rules say. Fill me in a little bit.

01:33PM MR. WATKINS: May we take approach?

01:33PM THE COURT: Yes.

01:34PM (At the bench, before the Court only:)

01:34PM MR. WATKINS: Your Honor, we think they are about to get into some extraneous bad acts that have previously been excluded.

01:34PM THE COURT: Which ones?

01:34PM MR. WATKINS: Oh, I'm objecting to preserve my -- to preserve on the Ray kidnapping. I have to object with each witness.

01:34PM THE COURT: Well, okay.

01:34PM MS. McELROY: Does the Prosecution intend to go into whatever meetings went on between Mr. Pool and our client?

01:34PM THE COURT: Hold on. If he's preserving his error on the Placensio kidnapping, I'm going to overrule the objection. You're not going into the --

01:35PM MR. FARREN: Jeremy Roy.

01:35PM THE COURT: -- Roy deal yet, which is think one.

01:35PM MR. FARREN: No, sir. Not yet. And if somehow it looks like we're wondering over there, he is about to, I'll stop him, Your Honor, and we will come up to the bench.

01:35PM THE COURT: Okay. Good. Good. Step back, so I may rule. Thank you.

(In open court:)

01:35PM THE COURT: Thank you, Mr. Watkins. I understand the context of your objection, and I overrule it.

01:35PM MR. WATKINS: Thank you.

01:35PM Q. (BY MR. FARREN) Again, what was Mr. Stocker's demeanor? How was he acting during this conversation with Mr. Pool on the phone?

01:35PM A. They were having an argument. It was obvious that they were arguing with each other.

01:35PM Q. Okay. All right. Do you know a man named Ray Placensio?

01:35PM A. Yes, I do.

01:35PM Q. And was Mr. Placensio connected with Mr. Kimberlin's group?

01:36PM A. No.

01:36PM Q. Who was he connected with?

01:36PM A. Dustin Pool.

01:36PM Q. Okay. How was he connected to Mr. Pool?

A. The way I took it, he was his hired bodyguard.

Q. Did Mr. Kimberlin have folks who played a similar role for him?

A. Yes, he did.

Q. And were you one of those people?

A. Yes.

Q. And Frank Chacon?

A. Yes.

Q. Do you know a guy name "Rip" or Ronnie Ingram Pope (phonetic)?

A. Yes, sir.

Q. Was he one of the -- kind of enforcers?

A. Yes, but during this time, "Rip" was incarcerated.

Q. At this time, Rip was -- was locked up. He wasn't at the meeting?

A. Right. He -- yes.

Q. How about Tommy Tucker?

A. Yes.

Q. Was he -- he was -- and is it correct or not, and clarify for us, a lot of this simply involved you folks collecting from people who maybe hadn't paid like they should have?

A. That's what most of our job was, yes.

Q. Now, do you remember part of the discussion

01:37PM being that in order to get -- to take care of this
01:37PM Dustin Pool problem, we're going to have to take care of
01:37PM the Placensio problem?
01:37PM A. Yes. That's -- in order to get to Pool, you
01:37PM had to get Placensio out of the way.
01:37PM Q. So there just wasn't any way to deal with the
01:37PM Pool problem without dealing with Placensio?
01:37PM A. Right.
01:37PM Q. Okay. And do you remember any discussion
01:37PM about, we've been trying to get Ray, but we haven't been
01:37PM able to do it. We just can't get him nailed down
01:37PM somewhere?
01:37PM A. Yeah. There was -- there was a time when we
01:37PM actually went after Ray and chased him for a while.
01:38PM Q. But --
01:38PM A. You know, whenever he slipped away from us, we
01:38PM were not able to catch him.
01:38PM Q. During this meeting, did anyone offer any kind
01:38PM of reward if someone could get Pool, or Placensio, or
01:38PM any of these people?
01:38PM A. Yes.
01:38PM Q. Who?
01:38PM A. Josh Bledsoe.
01:38PM Q. What do you remember about this offer from
01:38PM Mr. Bledsoe?

A. I remember he was -- he was pissed off, you know. He was mad, for the fact that we couldn't catch -- we couldn't get this guy, you know, and --

Q. Now, when you say "this guy", it was your understanding at this time you're talking about Placensio?

A. Well, in the beginning it was when the money was made, it was for Pool.

Q. For Pool?

A. Right.

Q. Okay.

A. And then there was -- there was uh -- also something offered later on to get Placensio out of the way. But there wasn't never a figure put on that.

Q. Was there a figure put on Pool?

A. Yes, it was.

Q. What did you understand about Pool?

A. It was $10,000.00.

Q. Did you ever attend a uh -- another meeting at Chad Spanel's house in reference to Mr. Placensio?

A. Yes.

Q. Do you know Chris Vandergriff (sic)?

A. Yes, I do.

Q. Josh Stocker?

A. Yes.

01:39PM Q. Chris Eason? Do you remember him?

01:39PM A. I just know Chris. I don't know the last name.

01:39PM Q. Okay. Let me ask you this: The Chris you know, did he get shot in the foot?

01:39PM A. Yes, sir.

01:39PM Q. Okay. So we'll just call him Chris who got shot in the foot. Okay?

01:39PM A. Yeah.

01:39PM Q. So we have got Brook Vandergriff, Destry Keeling, Josh Stocker, Chris-who-got-shoot-in-the-foot?

01:40PM A. Yes.

01:40PM Q. Mr. Spanel, was he there at that time, or did he arrive later?

01:40PM A. He arrived later.

01:40PM Q. All right. Did he participate in the meeting, the discussion, or did that just happen to be at his house?

01:40PM A. It was just at his house.

01:40PM Q. And why -- what was the purpose of the meeting at Mr. Spanel's house? I understand it was about Mr. Placensio. But what was the purpose? What were you trying to decide?

01:40PM A. We was trying to figure out a way that we could get Ray Placensio out of the way, how we could

catch him.

Q. And at this particular meeting, was there a lady named Guinn Garcia?

A. Yes, sir.

Q. And who was Guinn Garcia? Or who is Guinn Garcia?

A. She used to date Ray Placensio.

Q. They used to live together?

A. Yes, sir.

Q. By the time you had this meeting, were they living together then?

A. No.

Q. They'd broken up?

A. Yes.

Q. In fact, Placensio was living with Pool by then, wasn't he?

A. Yes, he was.

Q. Okay. Now, Ms. -- since Mr. Placensio was sort of an enforcer or bodyguard for Mr. Pool, how is it that Ms. Garcia is meeting with a group of people who are associated with Mr. Kimberlin?

A. She was involved with Josh Stocker at the time, I believe.

Q. Okay. And do you -- do you know if there was any kind of domestic problems between Placensio and

Garcia, or did you know anything about it?

A. Yes.

Q. There was?

A. Yeah. He threatened her and her kids.

Q. Did -- did you guys come up with a plan, you and Ms. Garcia and Ms. Vandergriff, of any kind of a plan or a way to get it done?

A. We all did.

Q. Okay. What was the plan?

A. For her to get ahold of Ray and ask him to go with her to pick up some medicine for her mother at Wal-Mart.

Q. Okay.

A. And when she got him in the store, Stocker and I were going to slip into the van and kidnap him when they came back out.

Q. So she was going to leave the vehicle unlocked where you could get in?

A. Yes, sir.

Q. When she and Mr. Placensio returned, it would sort of be an ambush or a surprise?

A. Yes.

Q. Okay. Now, the -- do you remember -- can you tell me whether or not this meeting was on February 12th, or do you remember the date?

A. I don't remember the date.

Q. Do you think that it was in early February or some time in February?

A. I'm sure it was.

Q. Okay. Did you, in fact -- were you able to kidnap Mr. Placensio?

A. Yes, sir.

Q. And did that event occur on the same day of the meeting or on some later day?

A. Later day.

Q. Okay. How much later do you think it was?

A. I mean, it was not much later. A few days later.

Q. Now, Mr. Keeling, I mean, you realize, of course, that if Mr. Placensio wanted to cooperate with the police and be a complainant, you could be charged with his kidnapping?

A. Yes, sir.

Q. But you're not particularly worried about that, because Mr. Placensio is not about to cooperate with us, is he?

A. No, he is not.

Q. Now, at any rate, when the kidnapping finally did take place, at which Wal-Mart did it occur?

A. The Wal-Mart at Coulter.

Q. And how did you know to go there? Did someone call you or how --

A. We had set it up ahead of time with Guinn Garcia.

Q. I understand. But was it to be on a certain day and a certain time?

A. Yes. It was on the same day that we met at Chad Spanel's house.

Q. Okay. Maybe you misunderstood my question earlier. So the kidnapping happened on the same day of the meeting?

A. Oh, yes, sir. I thought you were talking about the meeting at Kimberlin's house.

Q. At Kimberlin's. I'm sorry. I apologize. The meeting at Spanel's occurred, and later that same day the kidnapping of Mr. Placensio occurred?

A. Yes.

Q. When Ms. Garcia and Ray Placensio arrived at Wal-Mart -- by the way, were they in some kind of a van?

A. They were in her van.

Q. Okay. And they got out and went into the Wal-Mart?

A. Yes, sir.

Q. Where were you when they got out and went into the Wal-Mart?

A. I was with Josh Stocker.
Q. Were you guys in another vehicle?
A. Yes, sir.
Q. Okay. Was everyone in the vehicle or were some of the people out on foot watching, or do you know?
A. No, it was me, and Josh, and Chris in the vehicle.
Q. In the vehicle. Okay. Where was Brook?
A. I don't remember if she was with us or I -- I believe it was her car that we were in.
Q. Okay. If -- if -- just to clarify, to jump ahead a little bit, and we'll jump back. If Brook and Stocker took Chris to the hospital after he got shot in the foot, then Brook would have been there. Right?
A. Yes.
Q. Do you remember if she helped take him to the hospital?
A. I don't remember.
Q. Okay. That's fine.
A. Because she wasn't -- afterwards, she wasn't where I took Ray, so I don't remember.
Q. Okay. So you remember later on she wasn't there, so you're not sure she was there?
A. Right.
Q. Okay. At any rate, you do know that you, and

01:45PM Stocker, and Chris Eason -- or
01:45PM Chris-who-got-shot-in-the-foot, the three of you were
01:45PM there?
01:45PM A. Yes.
01:45PM Q. After Placensio and Ms. Garcia go into the
01:46PM Wal-Mart, did all of you get in the van?
01:46PM A. Chris and I did.
01:46PM Q. And what happened when you got in the van?
01:46PM A. I uh -- was putting this machine gun together
01:46PM that I had, and I slid the bolt back. I -- I wasn't
01:46PM familiar with it, it was a new gun. And my hand touched
01:46PM the trigger, and it went off and shot Chris in the foot.
01:46PM Q. Okay. Do you know if you guys were in the van
01:46PM when that occurred?
01:46PM A. Yes, we were. I was getting in the van. He
01:46PM was already in the van.
01:46PM Q. How many shots do you think were fired?
01:46PM A. I believe it was about nine shots.
01:46PM Q. It doesn't take long to fire nine shots out of
01:46PM one of these weapons, does it?
01:46PM A. No, it was a split second, and it was nine
01:46PM shots.
01:46PM Q. Do you know a lady named Crystal Alexander or
01:47PM Simone?
01:47PM A. No.

Q. Do you know anybody named Wes? I don't know a last name.
A. I don't know. I probably do, if I see them. I'm better with faces than I am with names.
Q. Do you know Brandon Cotton?
A. Yes.
Q. Do you know if Brandon Cotton somehow later ended up with some of the weapons used in this event?
A. Yes, sir.
Q. Do you know how he ended up with them?
A. He stole them from out of my pickup.
Q. But you don't know what he did with them after that?
A. As far as -- I mean, I just heard that he had traded them for dope.
Q. Okay. At any rate, you and Chris Eason were about -- or in the process of hiding in the van. Chris gets shot in the foot?
A. Yes.
Q. And so did that mean that you had to abort the plan to kidnap Placensio?
A. No. That -- that was the first thought, but -- I was determined to get him, you know.
Q. Okay. So what did you do with Mr. -- with Chris-who-got-shot-in-the-foot?

A. There was a lady that was putting groceries in her car next to us. When the gun went off and -- she START took off, you know, obviously. First, I told him just to be quiet, you know. We'd get him to the doctor later, but he was in too much pain. So he grabbed a buggy, and I told him to walk and head towards Coulter and act like he wasn't hurt. That's basically what he did.

Q. Do you think that's an order like, be taller? That you can just do that?

A. No.

Q. Okay. So, eventually, someone had to go ahead and take Chris to the hospital?

A. Yes.

Q. Okay. And so you know -- if I understood your earlier testimony, you're sure that Josh Stocker was a part of that, and you don't know if someone else may have assisted him or not?

A. Right.

Q. Okay.

A. I know Stocker took him to the hospital.

Q. Okay. And that left you in the van alone then?

A. Yes.

Q. And did Guinn Garcia and Mr. Placensio return

01:49PM to the van?

01:49PM A. Yes, they did.

01:49PM Q. When they were -- by the way, the weapons that Mr. Cotton took from you, do you remember what those were? Was one of them a Tech-11 or a Tech-22?

01:49PM A. No, it was uh -- it was a -- both of them were .9 millimeters.

01:49PM Q. Both of them were .9 millimeters?

01:49PM A. One was a Tech-9 and the other one was a Mac-10, I believe.

01:49PM Q. A Mac-10 and a Tech-9? All right.

01:49PM And Chris, do you know if he was just hit once in the foot?

01:50PM A. Several times.

01:50PM Q. Several times. So he really was injured?

01:50PM A. Oh, yeah.

01:50PM Q. Pretty badly? So you're still in the van, and, eventually, Mr. Garcia and Mr. Placensio return to the van. Were you able then to get the drop on him?

01:50PM A. Yes. Uh-huh.

01:50PM Q. Now, did -- was part of the plan that it would appear that Ms. Garcia was also being kidnapped?

01:50PM A. Yes, I had to make it look like she was a part of it, for her safety.

01:50PM Q. And do you think at least at that time it was

successful, that Ray bought that?
A. Oh, yes, he did.
Q. Okay. Once they were back in the vehicle, did you make one of them drive the vehicle?
A. Uh -- the plan was to uh -- let her go, and Stocker to drive. But obviously, Chris got shot, so I was by myself. So I made her drive. And uh -- then I called Stocker and he met me at a Toot'n Totum and uh -- then we followed him to where we was taking Ray.
Q. And that's -- and you don't know what happened to Chris. You're assuming he was left at some medical facility --
A. Stocker told me he took him to the hospital.
Q. Okay. Where did you take Guinn Garcia and Ray Placensio at that point?
A. To a detail shop.
Q. And who --
A. Josh Bledsoe's.
Q. It was Josh Bledsoe's shop?
A. Yes.
Q. Do you know about where that was located?
A. I know where it is at. I don't know the address of the shop.
Q. All right. Once you were at the detail shop what happened next?

A. We -- Stocker pulled up beside me, and got Ray out. And Guinn left. And then Bledsoe showed up.

Q. Now, when Guinn left, was there any -- did Mr. Placensio make any pleas on her behalf?

A. Oh, yes.

Q. What was he saying on her behalf?

A. He was begging for me to let her go.

Q. And so that worked into the plan fine?

A. Right.

Q. And so you then magnanimously agreed to let her go?

A. Yes.

Q. Now, once she is out, how did she leave? Did she take the van?

A. Yes, I believe so.

Q. Now, once she left, that leaves you, Stocker, and Mr. Placensio at the detail shop?

A. Yes.

Q. And was anybody else from the Kimberlin group there at that point?

A. Bledsoe.

Q. Bledsoe had already arrived, or was he just there?

A. No, he showed up about that time.

Q. Okay.

01:52PM A. And he had somebody else with him.
01:52PM Q. Did you know who that was?
01:52PM A. No, it was some guy from the cartel.
01:52PM Q. Okay. So somebody else with Kimberlin's group?
01:52PM A. Yes. Bledsoe's group -- it was one of the main drug cartels.
01:53PM Q. I see. All right. Did you guys move Mr. Placensio into the shop?
01:53PM A. Yeah, he walked in there.
01:53PM Q. Okay. But I mean, you didn't stay out in the open where everybody could see you?
01:53PM A. No. No, we went in one of the bays, shop bays.
01:53PM Q. Now, once you went inside, what happened next?
01:53PM A. Next, Miguel Gonzales showed up. I guess he had problems with Placensio too.
01:53PM Q. With Placensio?
01:53PM A. Yes.
01:53PM Q. Did you know anything about those problems? Did you know anything about his family getting chased out at the mall or anything?
01:53PM A. Yes. I believe at the mall, he ran into him and pulled some guns out on him and his family.
01:53PM Q. Okay. And so now we have Miguel, Bledsoe,

01:53PM someone else that you're not quite sure, Stocker, you,
01:53PM the five of you and then Placensio?
01:53PM A. Yes. And then Craig Kimberlin showed up, him
01:54PM and Frank Chacon, and then Tommy Tucker showed up
01:54PM afterwards.
01:54PM Q. So we've got eight or ten people from your
01:54PM cartel by that time?
01:54PM A. Yes.
01:54PM Q. What happened then?
01:54PM A. They started beating on Placensio.
01:54PM Q. How did they do that? Did they just --
01:54PM somebody hold him and somebody else hit him, or did they
01:54PM just take turns fighting him? How did it work?
01:54PM A. I held a gun on him to start with. And uh --
01:54PM Stocker made him get down on his knees and taped his
01:54PM hands up.
01:54PM Q. What kind of tape do you use?
01:54PM A. Duct tape.
01:54PM Q. Duct tape? And now, his hands were taped
01:54PM behind him?
01:54PM A. In front of him.
01:54PM Q. Front of him? Do you have any idea whether --
01:54PM who all participated in beating Mr. Placensio?
01:54PM A. Everybody I mentioned.
01:54PM Q. Okay.

A. Except for the guy that came with Bledsoe. And uh -- I believe he later left, you know.

Q. How long did this go on, do you think?

A. A couple of days.

Q. Okay. By the end of a couple of days, what kind of condition was Mr. Placensio in?

A. In bad shape.

Q. Did you stay there the whole two days?

A. Yes, I did.

Q. Did every one stay there the two whole two days?

A. Me and Josh did.

Q. You and Josh Stocker?

A. Yes, sir.

Q. And the others, did they -- did they all leave at the same time, or at various times?

A. Various times. And they would come back, you know, at different times.

Q. So we had various combinations of the group that you mentioned who came during the two-day period?

A. Yes.

Q. And do you think there were other people in the cartel that you haven't mentioned who may have shown up from time to time?

A. If there was any, there wasn't any to my

knowledge.

Q. Okay. Now, we know Mr. Placensio survived this event, because he is currently awaiting trial in Amarillo on another murder?

A. Yes.

Q. How did it come to an end? How was it decided that this had gone on long enough?

A. I guess after the third day, he was released.

Q. Do you know how, or were you there when that happened?

A. No.

Q. So at some point, you finally did leave?

A. Yes, yeah.

Q. So you weren't there --

A. I was sent home after two days, you know. Stocker left, and I was sent home.

Q. You were sent home by whom?

A. By Craig.

Q. By Craig?

A. To get some rest, yeah.

Q. And Craig ran things, didn't he? He called the shots?

A. Oh, yeah.

Q. Okay. You were married at that time. Is that correct?

01:56PM A. Yes, sir.
01:56PM Q. Are you still married?
01:56PM A. No, sir.
01:56PM Q. You and -- you were married to Glenda Denise
01:57PM Keeling?
A. Yes, sir.
01:57PM Q. She prefers Denise, doesn't she?
01:57PM A. Yes, sir.
01:57PM Q. I learned that the hard way when I called her
01:57PM Glenda. She doesn't like to be called Glenda, does she?
01:57PM A. No.
01:57PM Q. How long had you and Denise been married?
01:57PM A. Fifteen years.
01:57PM Q. And Denise wasn't really a part of the cartel,
01:57PM but she did use meth sometimes?
01:57PM A. Yes.
01:57PM Q. Did Denise wonder where you had been for two
01:57PM days?
01:57PM A. When I came home, all of my stuff was out on
01:57PM the front lawn.
01:57PM Q. Did you take it as a sign that she was not
01:57PM happy?
01:57PM A. Yes, sir.
01:57PM Q. Did you and Denise -- were you able to patch
01:57PM it up at that point?

01:57PM A. Yes, after --
Q. It took a while?
01:57PM A. -- a couple of days of begging and pleading,
01:57PM yeah.
01:57PM Q. Okay. All right. And you were begging and
01:57PM pleading, because regardless of the rest of your
01:57PM lifestyle, you and Denise care about each, don't you?
01:58PM A. Yes.
01:58PM Q. Where were you living at that time?
01:58PM A. Off McCormick Road.
01:58PM Q. Out near McCormick Road?
01:58PM A. Yes.
01:58PM MR. FARREN: May I approach the witness,
Your Honor?
01:58PM THE COURT: Yes, sir.
01:58PM Q. (BY MR. FARREN) I'm showing you what has been
01:58PM marked as State's Exhibit 247 --
01:58PM THE COURT: Is this in?
01:58PM MR. FARREN: Yes.
01:58PM THE COURT: Oh, okay. Very good.
01:58PM MR. FARREN: And I believe -- Jeremy,
01:58PM what exhibit number is that one?
01:58PM MR. FOWLER: 248.
01:59PM Q. (BY MR. FARREN) And -- and 248 is appearing
01:59PM on the screen. I believe they're actually the same

01:59PM photograph, just one of them is larger and the color's
01:59PM better. Looking at the photograph on the screen, would
01:59PM you agree that it appears to be the same aerial shot
01:59PM you're looking at in 247?
01:59PM A. Yes, sir, it is.
01:59PM Q. And does this appear to be a picture of the
01:59PM area where you lived out on McCormick?
01:59PM A. Yes.
01:59PM Q. And this -- where my pen is pointing there, is
01:59PM that a grain silo?
01:59PM A. That's a grain elevator, yes.
01:59PM Q. A grain elevator? Okay. And -- and your
01:59PM house is somewhere near this area, that grain elevator
01:59PM area?
01:59PM A. Yes, on down. Move your pen on --
01:59PM Q. Here?
01:59PM A. No. Keep going. Yeah, right over there.
01:59PM Q. All right. So you had a trailer -- a trailer
01:59PM home somewhere in that area there?
A. Yes, sir.
01:59PM Q. Okay.
01:59PM A. It was the third one.
01:59PM Q. Back this way?
01:59PM A. Right there, yes, sir.
02:00PM Q. This one?

02:00PM A. No. Right -- right there. Yes, sir.
02:00PM Q. This one right here --
02:00PM A. Yes, sir.
02:00PM Q. -- that was your place? And then this grain elevator, this was a metal building, wasn't it?
02:00PM A. Yes, it's metal -- well, it was wood with tin around it.
02:00PM Q. Right. A wood frame with metal siding?
02:00PM A. Yes. Yes, sir.
02:00PM Q. Okay. And that -- that elevator was -- it was abandoned. It hadn't been used in a long time, had it?
02:00PM A. It had been abandoned for several years.
02:00PM Q. In fact, it had an old abandoned car sitting inside of it, didn't it?
02:00PM A. Yes, sir.
02:00PM Q. Who did the elevator belong to?
02:00PM A. Bobby Johnson.
02:00PM Q. And you worked for Mr. Johnson. In addition to your others activities, you worked for him some?
02:00PM A. Yes, sir.
02:00PM Q. What did you do for him?
02:00PM A. I was maintenance.
02:00PM Q. Was that an 8:00 to 5:00 kind of thing, or contract?
02:00PM A. Just all of the time, just whenever something

02:01PM broke or needed something done.

02:01PM Q. After you -- after you got home and patched things up with Denise, when did you learn that Placensio had been released?

02:01PM A. Shortly after that, I talked to Craig Kimberlin and he told me that he had been released.

02:01PM Q. Okay. And I want you to listen to the next question very carefully, and answer just the question I ask you. Okay?

02:01PM A. Okay.

02:01PM Q. Do you know a man named Jeremy Roy?

02:01PM A. Do I know him?

02:01PM Q. Do you know him? Have you ever met him?

02:01PM A. No.

02:01PM Q. Okay. That's all I wanted to know. After this event with Placensio -- well, let me ask you this first: You've already indicated that at the meeting at Craig's house, when the Pool problem was discussed and the fact that to get to Pool, we've got to take care of Placensio. Did you -- was it your understanding, or did you think that if you guys could intimidate Placensio, it would get Pool to back down?

02:02PM A. Oh, yeah.

02:02PM Q. Did it work?

02:02PM A. He stayed hid, Pool did.

02:02PM Q. So you feel like it had some impact?
02:02PM A. Oh, yeah. Yeah.
02:02PM Q. Do you know if there were any more threats or any more problems after that?
02:02PM A. Well, I don't understand the question, "threats"?
02:02PM Q. Do you -- earlier -- do you understand or do you believe that Pool was making threats against other members of your group prior to this?
02:02PM A. I don't -- I don't know. I remember we tried to talk to him on the phone. I was in a vehicle with Stocker, and he had tried to talk to him one time, and he got into an argument. Pool wouldn't meet with us. All we was trying to do is get him to meet with us and talk, you know, and try to work out a solution to the problems.
02:03PM Q. Did you ever attend any other meetings where there was any discussion about a contract on Pool or $10,000.00 on Pool?
02:03PM A. Yeah. That was at Craig's house.
02:03PM Q. Okay. At Craig's house, but were you ever at a meeting at Stumpy's?
02:03PM A. Yes.
02:03PM Q. Was there any discussion at Stumpy's about that?

A. Yes.

Q. Did -- did someone offer some money for bad things to happen to Pool at that meeting?

A. I mean, yeah, it was the same thing.

Q. Same -- same context? Same discussion?

A. Yes.

Q. And was Bledsoe the one making the offer again?

A. Yes.

Q. Okay. After that meeting, do you know if the meeting at Stumpy's was before or after the meeting at Mr. Kimberlin's house?

A. After, I believe.

Q. Okay. Now, after the meeting at Stumpy's, did you and Mr. Kimberlin ever talk about whether Kimberlin believed there was a contract on Pool, if you recall?

A. I can't -- well, I mean, that is a hard question. Kimberlin had -- he had a lot of Josh's money anyways. I mean, he had control of Josh's money --

Q. Okay.

A. -- Bledsoe. So he knew -- he had made comments before that the money was there, you know.

Q. Okay. Did you ever talk with Josh Stocker? Did he think there was a contract out on Pool?

A. Yes.

MS. McELROY: Your Honor -- sorry.

Q. (BY MR. FARREN) I want -- I want to move forward in time to around March 9th, 10th, and 11th. Do you remember -- let me ask this first: Did you carry some sort of device that allowed you to communicate with Mr. Kimberlin electronically, other than a phone?

A. Yes.

Q. What kind of device was that?

A. It's called a talk-about (phonetic).

Q. Is that sort of a wireless internet?

A. It's a wireless -- it's like a pager, but it's more like a computer, you know.

Q. Okay. And you could send text messages to each other over it?

A. Yes.

MR. FOWLER: James, it's around 207 to 212.

MR. FARREN: Okay.

Q. (BY MR. FARREN) I want to show you a series of photographs that are already in evidence, and marked as State's 207 through 212. Have you ever seen a device like that before?

A. Yes.

Q. Okay. Is that one of the talk-abouts?

A. Yes, sir. It's not mine, but it's one of

them, yeah. Yes.

Q. Okay. All right. Now, this device -- let me ask it this way: Do you remember around March 9th, 10th or 11th, receiving some sort of a message from Stephen Craig Kimberlin in the early morning hours --

MR. WATKINS: Your Honor, we're going to object to this. Can we approach to discuss this?

(At the bench, before the Court only:)

MR. WATKINS: Your Honor, we believe that what they're about to elicit testimony of is about the proffer that Mr. Stocker had made that previously --

MR. FARREN: No. I just -- I just wanted him --

THE COURT: What proffer?

MR. WATKINS: He made a proffer to the federal government into the Potter County District Attorney's office, give us the body and we'll make you a deal.

MR. FARREN: We're not going into that.

THE COURT: I didn't know anything about that.

MR. WATKINS: You previously ruled on it.

MR. FARREN: No. We're not going into that.

THE COURT: Okay. Do you withdraw your

objection?

MR. WATKINS: I withdraw my objection.

MR. FARREN: Just to save some time -- just to let the Court know, we don't think that's admissible, because it's a part of pretrial negotiations between the Defendant and the government. So you don't have to worry, we're not trying to get that in unless you guys just kick the door off of the hinges, we will get to it. We're not going there.

THE COURT: Wait a minute. What else don't I know?

MR. FARREN: There's a lot, Your Honor. There's a ton.

THE COURT: Thank you for putting it that way.

MR. FARREN: There's a ton, Your Honor, believe me..

THE COURT: Okay. All right. All right.

MR. WATKINS: I withdraw my objection, Your Honor.

THE COURT: Okay. Go ahead.

(In open court:)

Q. (BY MR. FARREN) Around March 10th, in the early morning hours, sometime before you made a trip up to Fritch and Lake Meredith, did you get some sort of a

02:08PM electronic message on your talk-about from
02:08PM Mr. Kimberlin?
02:08PM A. I -- I got a phone call on my mobile --
02:08PM Q. Okay.
02:08PM A. -- from him. I don't remember if he talked to
02:08PM me on the talk-about at that time.
02:08PM Q. And either on your wireless internet device or
02:08PM by phone, did you come into contact with Mr. Kimberlin
02:08PM in the early morning hours of the 10th, and later make a
02:08PM trip up to Lake Meredith?
02:09PM A. Yes, I did.
02:09PM Q. Okay. Did someone else go with you up to Lake
02:09PM Meredith?
02:09PM A. My wife did.
02:09PM Q. So you and Denise went up there?
02:09PM A. Yes.
02:09PM Q. Why did you go up to Lake Meredith?
02:09PM A. To meet Josh Bledsoe and Josh Stocker.
02:09PM Q. Now, what were you told was -- why -- why were
02:09PM you going to Lake Meredith to meet them, or Fritch to
02:09PM meet them?
02:09PM A. To let them use the lake house that belongs to
02:09PM my wife's grandmother.
02:09PM Q. All right. So your family -- your wife's
02:09PM family has a house, a dwelling there they call a lake

02:09PM house?

02:09PM A. Yes, sir.

02:09PM Q. And you had had a conversation with Mr. Kimberlin about Josh Stocker and Josh Bledsoe utilizing this dwelling?

02:09PM A. Yes.

02:09PM Q. What did you understand was to be the purpose of -- why where they going to use it? What for?

02:09PM A. To put Pool in to recuperate.

02:10PM Q. So you believed Mr. Pool to be alive, like Placensio?

02:10PM A. Yes.

02:10PM Q. And that they were going to let him heal up, and then what?

02:10PM A. And then turn him loose.

02:10PM Q. Okay. What did your wife think was going to happen?

02:10PM A. That they were going to go down there and fish.

02:10PM Q. Okay. So you didn't tell your wife the real reason they wanted to use the place?

02:10PM A. I didn't tell her a lot of things.

02:10PM Q. I understand. How did you and your wife get to Fritch?

02:10PM A. We -- I borrowed a Jeep from a friend of mine.

Q. And how long do you think it took you to drive up to Lake Meredith or Fritch?
A. However long it takes to get there. I stopped and got some fuel, and went straight there.
Q. So an hour or maybe a little more?
A. Yes.
Q. Do you remember what time of the night or morning that you left to go up there, approximately?
A. It was late.
Q. Okay. Do you think it was after midnight?
A. Probably.
Q. Okay. Once you arrived in Fritch, what -- what were you to do then? How were you going to meet them?
A. At the Alsup's.
Q. At the Alsup's in Fritch?
A. Yes, sir.
Q. I'm showing you what has been marked as State's Exhibit 239. Do you recognize that building?
A. Yes, that's it.
Q. That's the Alsup's in Fritch?
A. Yes.
Q. This is where you met Mr. Stocker and Mr. Bledsoe?
A. Yes, sir.

Q. You just pulled into the parking lot there?

A. Yes. I pulled up and uh -- was fixing to go in, and they pulled up to this side over here.

Q. Okay. Just a second.

MR. FARREN: Offer State's 239 into evidence.

MR. WATKINS: Your Honor, we -- this looks different. We don't have any objection. We would state we haven't seen that picture before, though.

THE COURT: State's 239 is admitted.

MR. FARREN: Thank you.

Q. (BY MR. FARREN) I will let you hold this a second.

A. Okay.

Q. You indicated a moment ago, you parked in the parking lot here at somewhere on this side?

A. Yeah. See where that pickup is at?

Q. Over here?

A. Over on that side, yes, sir.

Q. Right there?

A. Yes. I didn't pull up to the building though.

Q. But about -- in the general area where this pickup is?

A. Yes.

Q. And then how long were you there when Bledsoe

02:12PM and Stocker arrived?
02:12PM A. Just uh -- you know, a few minutes. They wasn't there. I guess they had already been there, and pulled out --
02:12PM Q. So you think they had arrived, but didn't want to sit there and be suspicious, so they left and came back?
02:12PM A. Right.
02:12PM Q. So do you think maybe they saw you when you pulled in, and then knew to come back?
02:12PM A. Right, then came back.
02:13PM Q. Now, once -- once they -- once they arrived -- by the way, what vehicle were they in?
02:13PM A. Bledsoe's Navigator.
02:13PM Q. Is that a black colored Navigator?
02:13PM A. Yes, sir.
02:13PM Q. Who was driving, do you remember?
02:13PM A. Bledsoe.
02:13PM Q. And now, didn't your wife think it was kind of strange that folks were going to come up to the cabin and fish at 2:00 in the morning, or whatever it was?
02:13PM A. Yeah.
02:13PM Q. In all -- well, let me ask it this way: Do you remember talking with me earlier -- do you remember indicating that perhaps she thought they had warrants

02:13PM out and they were going to maybe fish, but it was a
02:13PM place to lay low?
02:13PM A. Right. Yeah. They were going to lay low for
02:13PM a little while.
02:13PM Q. So there was more than fishing involved, but
02:13PM she didn't have any idea --
02:14PM MR. WATKINS: I'm going to object to
leading.
02:14PM MR. FARREN: Okay. I'll rephrase, Your
02:14PM Honor.
02:14PM Q. (BY MR. FARREN) As you -- as you indicated
02:14PM earlier, you had information of Mr. Keeling. Right? I
02:14PM mean, Mr. Kimberlin?
02:14PM A. I had information?
02:14PM Q. From Mr. Kimberlin about, that they had Pool?
02:14PM A. Yes. Yeah, that's what he said when he called
02:14PM me. Said they had their friend with the pool service.
02:14PM Q. Okay. Did she have knowledge of that?
02:14PM A. My wife?
02:14PM Q. Right.
02:14PM A. Oh, no.
02:14PM Q. Okay.
02:14PM A. No.
02:14PM Q. Now, once you -- once you saw Stocker and
02:14PM Bledsoe, did you make contact? Did you talk to them?

A. Yeah.
Q. At the Alsup's?
A. Yes.
Q. Did -- did -- did Denise leave the vehicle or did she just wait?
A. No, she was driving the Jeep.
Q. Okay.
A. I had -- I got out and walked over to --
Q. Okay.
A. -- Stocker's window.
Q. Did -- could you find the lake house? How many times had you been there?
A. I only had been there a couple of times.
Q. And this is like, say, 1:00 or 2:00 in the morning?
A. Yeah. It was dark.
Q. Do you think you could have found the lake house in the dark?
A. Me? Myself?
Q. Yes.
A. No. That's why I had Denise there. I actually ran into the water one night trying to find it.
Q. Okay. Did Mr. Kimberlin know that you had taken Denise with you?
A. No.

Q. Do you think that he would have liked that idea?

A. No.

Q. After you talked with Stocker and Bledsoe, did you get back in the vehicle with your wife?

A. Yes.

Q. And what happened then?

A. We went to look for the lake house.

Q. In fact, did your wife have problems finding it?

A. Yes, sir, she did.

Q. How long do you think it took to find it?

A. It was a little over an hour before we finally found it.

Q. And it's kind of a maze out there?

A. Yes, sir.

Q. The roads are -- at any rate, you eventually did find the lake house?

A. Yes.

Q. Now, once you located the lake house, what did you do next? Once you were there and stopped?

A. Uh -- backed the Navigator up. Actually, Stocker made me move the Jeep, so they could back it in there.

Q. Okay. And -- and where was Denise at that

time?

A. She was in the Jeep.

Q. Now, once the Navigator was backed -- backed up, did you go to the back of the Navigator?

A. Yes.

Q. Why did you go back there?

A. Stocker was -- he walked to the back of it.

Q. So you assumed that's where Mr. Pool was?

A. Yes.

Q. Now --

MR. FARREN: May the witness step down for just a moment, Your Honor?

THE COURT: For what purpose?

MR. FARREN: To demonstrate what happened at the back of the Navigator, Your Honor.

THE COURT: Is it necessary?

MR. FARREN: I think it will be to the jury.

THE COURT: All right. You may step down.

Q. (BY MR. FARREN) I want you to assume with me that this podium is the back of the Navigator. I'm going to be Destry Keeling, and I want you to be Mr. Stocker. Where do I need to stand to be in the right place?

A. Right there (pointing).

Q. I'm right here. Okay. And I understand I'm facing, but I want the jury to be able to see. As you're getting -- you're about to open the back of the Navigator. Right?

A. Stocker is, yes.

Q. Stocker is. Denise is in the vehicle --

A. Yes.

Q. -- some distance away?

A. Yes.

Q. Could Denise hear what you and Mr. Stocker were saying, or do you know?

A. At first, I didn't -- I didn't worry about it.

Q. I understand.

A. But then after he said what he said, then the first thing I did was turn around to make sure the windows were up, you know.

Q. When you began -- when he began to open the back of the Navigator --

A. Yes, sir.

Q. -- what was said?

A. He said, this dude's dead.

Q. This dude's dead.

A. Yeah.

Q. And that's when you looked, because you're

02:17PM worried about Denise?
02:17PM A. Right.
02:17PM Q. Have a seat.
02:18PM A. (Witness complies).
02:18PM Q. Now, once you realized -- once you heard this
02:18PM from Stocker, what did you do then?
02:18PM A. I remember there was a bunch -- a bunch going
02:18PM on in my mind. I was worried about Denise. I was
02:18PM trying to keep it calm, you know. Bledsoe was freaking
02:18PM out. He was -- he was going berserk.
02:18PM Q. Now, whether or not Denise heard that
02:18PM conversation at the back of the Navigator, what did she
02:18PM think when all of this broke out? This doesn't sound
02:18PM like a fishing trip now.
02:18PM A. No. No, she -- she really didn't say much.
02:18PM It was kind of weird. Even on the trip back, Stocker --
02:18PM Q. There was --
02:18PM A. -- Stocker was in the back seat, and she still
02:18PM wasn't -- I mean, she knew something was going on, you
02:19PM know.
02:19PM Q. But there was a conversation on the way back,
02:19PM wasn't there?
02:19PM A. Yes.
02:19PM Q. Okay. But before we get to that, was there
02:19PM any discussion between you and Mr. Stocker or Bledsoe,

or for that matter, Denise, that -- about whether or not they were still going to get to use this lake house?

A. Yes.

Q. What was the discussion?

A. The discussion was, no, that we couldn't leave him there.

Q. Now, prior to -- prior to the point where you were going to open the door, had there already been some problems with the key and stuff?

A. Yeah. I had to look for the key where it was supposed to be, and it wasn't there.

MR. FARREN: May I approach the witness, Your Honor?

THE COURT: Yes.

Q. (BY MR. FARREN) I'm showing you what has been marked as State's Exhibit 240 and 241. Do you recognize what is depicted in these photographs?

A. Yeah.

Q. Is that the lake house?

A. Yes, sir.

Q. Does that accurately depict the way it appeared at that time, except it was dark?

A. Yes. Yes, sir.

MR. FARREN: Okay. Offer State's 240 and 241 into evidence.

02:20PM MR. WATKINS: No objection.

02:20PM THE COURT: State's 240 and 241 are admitted.

02:20PM Q. (BY MR. FARREN) State's 240, is that a front view?

02:20PM A. Yes, it is.

02:20PM Q. So this is sort of uh -- am I correct that this appears to be a trailer home with a -- sort of an awning or top built over it?

02:21PM A. Yes. That's what it is.

02:21PM Q. Then there's a porch on the front. Where -- can you help me indicate to the jury where you backed the Navigator up?

02:21PM A. To the right side of the picture. No.

02:21PM Q. Over here?

A. Over there. Yes, sir.

02:21PM Q. So you and Mr. Stocker were standing somewhere in this area when that conversation took place?

02:21PM A. Yes.

02:21PM Q. And then State's 241, just so the jury has an understanding of what we're talking about, that's a -- is that the side view of the house? Is that correct?

02:21PM A. Yes.

02:21PM Q. Okay. You have already indicated that Bledsoe was, quote, freaking out. That was your testimony a

02:22PM little bit earlier. Right?
02:22PM A. Yes.
02:22PM Q. Why -- why was he freaking out? Did he -- did
02:22PM he say what was upsetting him?
02:22PM A. He didn't want that dead body in his vehicle.
02:22PM Q. So he doesn't want it in the Navigator, and
02:22PM you don't want it in the lake house, so what's the
02:22PM solution?
02:22PM A. First, he was going to throw him out on the
02:22PM ground, and I told him no, you're not. Then he wanted
02:22PM to put him in the Jeep, and I told him no.
02:22PM Q. Now, is he whispering at this point?
02:22PM A. No, he gets to where he's getting -- being too
02:22PM loud.
02:22PM Q. And where is Denise during that part of the --
02:22PM A. She's still in the Jeep.
02:22PM Q. Now, she has to know something's up.
02:22PM A. Yeah, because she -- obviously, she's not
stupid, you know.
Q. Okay.
02:22PM A. I'm sure she thought we was having an
02:22PM argument, because Bledsoe's freaking out and Stocker
02:22PM pretty much told him to shut up, you know.
02:23PM Q. You've described your role in this group, your
02:23PM work that you did for Mr. Kimberlin. What was Stocker's

02:23PM role? What did he do?
02:23PM A. He started out selling drugs, you know. And
02:23PM then his role was to enforce pretty much whatever Craig
02:23PM wanted done.
02:23PM Q. Had you dealt with him on any specific
02:23PM projects for Mr. Kimberlin?
02:23PM A. Dealt with Stocker?
02:23PM Q. Uh-huh.
02:23PM A. Yes.
02:23PM Q. What was your experience with him? Did he --
02:23PM did he follow Mr. Kimberlin's instructions always
02:23PM exactly or did he strike out --
02:23PM A. Not always, no.
02:23PM Q. Did you -- were there some people in the group
02:23PM that you'd rather work with than others?
02:23PM A. Yes.
02:23PM Q. Was Stocker one of the ones you liked to work
02:23PM with or would rather not?
02:24PM A. There was -- there were times I wouldn't want
02:24PM to work with him.
02:24PM Q. Why?
02:24PM A. Just -- he's kind of a loose gun, you know.
02:24PM Sometimes a loose cannon.
02:24PM Q. Kind of a loose canon. How about Bledsoe?
02:24PM What was his role in this -- this cartel?

02:24PM A. To start with, he was the link between us and
02:24PM the cartel.
02:24PM Q. He was the link to Old Mexico, wasn't he?
02:24PM A. Yes. Right.
02:24PM Q. The source?
02:24PM A. Yes.
02:24PM Q. In your experience with all of the folks that
02:24PM were in this cartel, did Bledsoe -- I mean, let me ask
02:24PM it this way: You, Tommy Tucker, Frank Chacon, would you
02:24PM characterize those three and others as timid, shy kind
02:24PM of people?
02:24PM A. (Witness shakes head side to side.)
02:24PM Q. I mean, you folks can pretty well handle
02:24PM yourselves?
02:24PM A. Oh, yeah.
02:25PM Q. And Mr. Stocker was a lot like you folks?
02:25PM A. Yes.
02:25PM Q. How about Mr. Bledsoe? Did he fit in that
group?
02:25PM A. No.
02:25PM Q. How was he different?
02:25PM A. He was like a child.
02:25PM Q. How did the group treat Bledsoe?
02:25PM A. Well, at first with a lot of respect, you
02:25PM know. He was --

02:25PM Q. He was your connection?

02:25PM A. Yeah, you know. Bledsoe -- like I said, he's like a child. He's a pushover. Once people realized that, they kind of treated him like that, you know.

02:25PM Q. Do you think he was treated with respect?

02:25PM A. Not after -- not after a while, no.

02:25PM Q. And do you think they held him in derision, made fun of him?

02:25PM A. Towards the end, yeah.

02:25PM Q. Okay. How was Stocker treating Bledsoe that night?

02:25PM A. Stocker was wanting him to calm down and shut up. He was -- he threatened -- threatened to kick his ass, you know.

02:26PM Q. Did it work? Did Bledsoe calm down?

02:26PM A. Well, he left Stocker there, standing there.

02:26PM Q. I understand. Let's talk about that. At some point, Mr. Bledsoe departed the scene. Is that correct?

02:26PM A. Yes, he did.

02:26PM Q. How did that happen?

02:26PM A. Stocker -- Bledsoe was screaming, you know. Prior to that, he had tried to break a window out in the lake house. He was determined to leave that body there. He didn't want no part of it.

02:26PM Q. So he was even prepared to break a window out

to get in to get that body out of that Navigator?

A. Yes.

Q. And -- but that wasn't successful?

A. No. And then he was wanting to -- towards the end, when I told him, no, we can't do this, we can't do that, and uh -- Stocker was agreeing with me. And then, you know, I -- you've got to understand I had my wife there, too, you know. This guy's trying to bust windows out on her mom's -- on her grandmother's lake house. I don't know, he's being loud. He's freaking out, I mean, he's got a dead body in his Navigator, you know. Stocker finally tells him to shut up. And uh -- he wanted to -- I remember Bledsoe wanted to grab -- he tried to open the door again to the Navigator.

Q. The back -- the back door?

A. Yes. He was wanting to go pull him out, and throw him on the ground, and take off.

Q. Now, you indicated that you -- you intervened at that point?

A. Yes. Yes. And uh -- that's when Stocker told him to shut up. It was his problem. He was going to deal with it. And uh --

Q. And what did Bledsoe do then?

A. He just took off, jumped in the front of the Navigator and took off.

Q. So it's -- it's backed up to the place, so it's not hard to leave?
A. Yeah, he just pulled out in front, straight out.
Q. So that leaves you, Stocker and Denise, the two of you are standing there, I take it?
A. Yes.
Q. And is Denise still in the Jeep?
A. Yes.
Q. Now, the vehicle Mr. Bledsoe's driving, you have described as a black Lincoln Navigator. I assume a late model, a fairly new vehicle?
A. Brand new, yes.
Q. Brand new. And the vehicle you're driving, is it brand new?
A. No.
Q. Describe for us this vehicle you were driving or Denise was driving?
A. It's a Jeep -- an older model Jeep Cherokee.
Q. Okay. Did -- did you folks attempt to pursue the Navigator?
A. To start off, yeah. We couldn't find him anywhere, though.
Q. Even if you could, could you catch him if he didn't want you to, do you think?

A. Not in that Navigator, no.

Q. Okay. Well, the man you talked to that got you there in the first place was Mr. Kimberlin?

A. Yes.

Q. So did you call him?

A. Yes.

Q. Did you call him or --

A. Stocker did.

Q. -- Stocker? Stocker did. Did you have a cell phone with you, if you remember?

A. I mean, I had a cell phone. I don't remember if I had mine with me or not.

Q. Do you know -- do you know if Denise had one?

A. No, she didn't.

Q. Okay. So you know -- you know Denise did not. And uh -- you know Denise did not, and you don't remember for sure if you did, but you know Stocker did have one?

A. Yeah. The reason I know he did, because the battery went dead on it.

Q. Uh -- how did you learn the battery went dead on his?

A. He was talking to Craig.

Q. And if Mr. -- if there's been testimony that Mr. Pool was -- calls were made to Mr. Pool on the late

evening hours of the 9th, and then he actually showed up and was apprehended on the early morning hours of the 10th, and spent the day on the 10th out at the farm, and then you got a call sometime after that midnight, this would all be happening in the early morning hours of the 11th. Right?

A. Yes.

Q. Okay. There have been a number of phone records introduced in trial already that -- and these records indicate a call from Mr. Kimberlin's number to your number, your cell phone --

A. Okay.

Q. -- about 2:06 a.m., on the 11th.

A. Okay.

Q. Would that be consistent with what you have been talking about?

A. Yes.

Q. And then a call from Mr. Kimberlin to you about 3:41 a.m., on the 11th.

A. Okay.

Q. Do you think that's about the time things were falling apart out there?

A. Yes. I'm sure it -- it would have to be about the time he took off back to town.

Q. And then it shows five phone calls from 4:29

02:31PM to 4:36 a.m. from Kimberlin to you. So that would
02:31PM indicate there's a lot of stuff happening somewhere?
02:31PM A. Oh, yeah.
02:31PM Q. Uh -- do you remember if your -- was your cell
02:31PM phone in Bobby Johnson's name?
02:31PM A. Yes.
02:31PM Q. Okay. Was that 570-2219?
02:31PM A. I believe so.
THE COURT REPORTER: Excuse me for a second.
02:32PM (Pause in the proceedings.)
02:32PM Q. (BY MR. FARREN) Once -- when Mr. Stocker was
02:32PM on the phone with Craig Kimberlin, what was the
02:32PM conversation about?
02:32PM A. About -- Pool -- Bledsoe headed back to town
02:32PM with Pool.
02:32PM Q. Now, could you -- could you hear both sides of
02:32PM the conversation?
02:32PM A. No, I could hear -- at times I could hear
02:32PM Craig shouting through the phone.
02:32PM Q. So Craig was upset?
02:32PM A. Oh, yeah. I -- he was -- more or less said --
02:32PM stated that he would shoot Bledsoe on sight if he showed
02:32PM back up at the farm with that body.
02:32PM Q. So he wasn't supposed to go back out to the

farm?
A. No.
Q. Okay. Prior to that conversation involving the farm, did you realize that's where Stocker and Bledsoe were coming from to Lake Meredith, or did you know?
A. Did I realize --
Q. Did Kimberlin say they're going to come from the farm up to Lake Meredith and meet you, or did you know where they were coming --
A. No, I didn't know where they were coming from to start with.
Q. But now you're hearing a conversation about if you go back to the farm?
A. Yes.
Q. So now you knew where they'd come from?
A. Yes.
Q. Okay. Had you ever been to the farm?
A. No.
Q. But you knew what it was?
A. Yes.
Q. Had you ever met Mr. Elliston?
A. Yes.
Q. Okay. Over at Craig Kimberlin's house, or do you know?

A. His house and a couple of times with Craig to make some drops.

Q. Okay. But you'd never actually been to the farm?

A. No, I never -- I refused to go. . .

Q. Okay. When -- when Mr. Stocker finished this heated conversation that you've described with Mr. Kimberlin, what happened next? Now, by the way, is this conversation taking place in the Jeep as you're driving down the road?

A. Yes.

Q. Okay. What happened then, after that conversation?

A. After they talked?

Q. Yes, sir.

A. We drove back to Amarillo.

Q. Well, do you know if that's what Mr. Kimberlin wanted?

A. No. No. He wanted for us to go back and wait.

Q. For Bledsoe?

A. Yes. He said he was going to get ahold of Bledsoe and have him turn back around.

Q. Well, apparently, that's not what you did.

A. No.

Q. Why not?
A. Stocker said that was Bledsoe's problem.
Q. That's Bledsoe's problem, and?
A. He -- he didn't want to go back.
Q. And so what did he want to do?
A. He wanted to -- he wanted to go back to town, back to Amarillo.
Q. And so what did you decide to do?
A. Take him back to town.
Q. Okay. And I mean, even if that's what Kimberlin wants, at that point you've got the choice of taking Stocker back to town and going back and be with Mr. Bledsoe and a dead body. So --
A. I'll be honest with you. I had my wife with me. The dude wasn't supposed to be dead to begin with, you know? I wanted just to get rid of Stocker. I wanted -- you know what I mean? I wanted -- I don't know, I just -- it wasn't supposed to go down like that.
Q. Okay. Did you drive back to Amarillo?
A. My wife did.
Q. Your wife drove, and you and Mr. Stocker were in the vehicle with her?
A. Yes.
Q. Do you recall some discussion about what had happened on the way from the lake back to Amarillo?

A. About what had happened? To Pool or --
Q. Do you remember Denise and Stocker -- not necessarily a long conversation, but a conversation about what had happened?
A. As far as -- I mean, she was -- she was curious, you know. She wanted to know what was going on. I mean, that's obvious. Stocker was covered in blood and that -- that alarmed her. And, you know, when we first -- when we first got out on the road, he -- every time we seen a cop -- I mean a car, it was a cop to him, you know what I mean? And so he was kind of freaking out. And she was wanting to know what's going on, you know?
Q. And do you remember Stocker telling her at least part of it?
A. Part of it.
Q. What did he tell her, if you remember?
A. Right. I mean --
Q. Let me ask it this way: By the time you got back to Amarillo, did she realize that Mr. Pool was dead?
A. I don't think so, no.
Q. You don't think so?
A. No.
Q. Okay. But you know there was at least a

02:37PM conversation about this?

02:37PM A. Yes. Yes.

02:37PM Q. Would you -- would you characterize the trip back to Amarillo -- what was going through your head?

02:37PM A. To be honest with you, I just -- I wanted to be somewhere else, you know.

02:37PM Q. Okay. Do you believe there was conversation that you may not know what was said?

02:37PM A. Oh, yeah.

02:37PM Q. Okay. At any rate, you've mentioned that he had blood on his clothing. And the three of you were headed back to Amarillo. Where did he want to go when you got to Amarillo?

02:37PM A. To Wal-Mart.

02:37PM Q. Why did he want to go to Wal-Mart?

02:37PM A. To get a charger for his phone.

02:37PM Q. A charger for his phone, because it was dead?

02:37PM A. Yes.

02:37PM Q. And did he -- did he want to get anything else?

02:37PM A. Clothes.

02:37PM Q. Now, did -- did he choose Wal-Mart because they're open 24-hours a day?

02:38PM A. I imagine.

02:38PM Q. Do you know which Wal-Mart you went to?

02:38PM A. The one on Grand Street.
02:38PM Q. When you got to the Wal-Mart, what happened next?
02:38PM A. My wife went in and got some clothes for him.
02:38PM Q. Okay. You -- you certainly noticed the blood. Do -- do you know whether or not she knew there was blood?
02:38PM A. Oh, yeah. That's the reason she went in to buy them.
02:38PM Q. Okay. Did she buy the charger, as well?
02:38PM A. No. He went back in, I believe after that, after he had a change of clothes.
02:38PM Q. So it's your memory that she went and got the clothes, brought them back. He changed and then he goes in and buys the charger?
02:38PM A. Yes.
02:38PM Q. Once -- once he had the clothing and the charger -- by the way, do you know what happened to those clothes?
A. No.
02:38PM Q. All right.
02:38PM A. I believe he took them with him.
02:38PM Q. Okay. Once he had the clothes -- the change of clothes and the charger, the three of you are back in the vehicle, the Jeep, what happened next?
02:39PM

A. Then I took my wife home.
Q. You dropped your wife off at your place that we looked at a minute ago?
A. Yes.
Q. Stocker still with you?
A. Yes.
Q. Where did you -- where did you and Mr. Stocker go after that?
A. To his house.
Q. To his house?
A. Yes, where he lived.
Q. Do you remember going by his pickup first?
A. Yes.
Q. Okay.
A. There wasn't -- he didn't have the keys to it.
Q. Okay. So you went to the -- did you go to the pickup before you dropped Denise off or after, if you remember?
A. I don't remember. I might have went before, I think, and then that's when she wanted to go home and be with the girls.
Q. Are you -- just so we have the sequence as best we can, are you confident that Wal-Mart is the first stop?
A. Yes.

02:39PM Q. Okay.
02:39PM A. Pretty sure.
02:39PM Q. The second stop then, was it the -- where was his pickup parked?
02:40PM A. At Tori Patrick's apartment.
02:40PM Q. At River Falls?
02:40PM A. I believe so.
02:40PM Q. Okay. Do you know where that is?
02:40PM A. Yes.
02:40PM Q. Do you remember over --
02:40PM A. I-40 and Bell Street.
02:40PM Q. Okay. The next stop then was either the pickup, or you dropped Denise off, one of the two?
02:40PM A. Yes.
02:40PM Q. You're just not sure?
02:40PM A. Not sure. I -- we might have went to the pickup first, before anything, but --
02:40PM THE COURT: Mr. Farren?
02:40PM MR. FARREN: Yes, sir.
02:40PM THE COURT: Find a place to land in the next few sentences. If you sound like you're coming to a break --
02:40PM MR. FARREN: We are, Your Honor.
02:40PM THE COURT: All right. Get there and then tell me when.

MR. FARREN: Okay.

Q. (BY MR. FARREN) Whenever you got to the pickup, whether it was before or after you dropped Denise off, you do know he didn't have his keys?

A. Yes.

Q. Okay.

A. Yes.

Q. Eventually, did you take him to his home to get his keys?

A. Yes, I did.

Q. Where was his home?

A. Out by Lake Tanglewood.

Q. Okay. And when you arrived there, do you know if Brook Vandergriff was there?

A. Yes, she was.

Q. And was she a happy camper?

A. No, she wasn't.

Q. Why was she unhappy?

A. Because she hadn't seen him in two or three days. And she hadn't had any food in the house.

Q. So did they have a -- did they have an intellectual discussion about it?

A. They had an argument, yes.

Q. Did he retrieve his keys?

A. Yes.

02:41PM Q. And did you take him back to his pickup?

02:41PM A. Yes, I did.

02:41PM Q. Okay. So we have Wal-Mart, Denise at home, the pickup and Lake Tanglewood. We know Wal-Mart was first, and Lake -- Lake Tanglewood and the pickup were the last two stops, we're just not sure where Denise fit in on that. Is that right?

02:41PM A. Yeah. I took Denise home. When we realized that we had to go get his keys -- okay. He lives out there by us, you know, not far from where we live.

02:42PM Q. You and Denise had children. Right?

02:42PM A. Yes.

02:42PM Q. Was it getting close to school time?

02:42PM A. Yes. She had to get home and get the kids ready to go to school.

02:42PM Q. So that gives us a bit of a time reference, because she had to go home and get the kids ready for school?

A. Yes.

02:42PM MR. FARREN: This is a pretty good time to break.

02:42PM THE COURT: Ladies and gentlemen, why don't we take a break until 3:00.

(Recess).

(Both sides, the Defendant, the jury

(present, in open court:)

THE COURT: Thank you, ladies and gentlemen. Everyone be seated.

Mr. Farren.

MR. FARREN: Thank you, Your Honor.

THE COURT: Yeah, go ahead.

Q. (BY MR. FARREN) Mr. Keeling, I want to visit with you for just a minute more about the trip back from Amarillo. And in all -- you know, in all honesty, you and I talked about this in the hallway during the break, didn't we?

A. Yes, sir.

Q. Am I correct or not, you -- you correct me, have you been really worried about your wife and this whole process, your -- your plea, the trial and everything?

A. Yes.

Q. In spite of your concerns, sir, I need you to tell the jury about the conversation on the way back from Lake Meredith. What did Mr. Stocker tell Denise in your presence on the way back?

A. He told her that uh -- Bledsoe was on his way back with Dustin Pool, and that -- I mean, she was asking questions now. You got to understand that.

Q. Yes, sir.

A. And you got to understand, too, she's -- she doesn't have anything to do with any of my drug activity, you know.

Q. I understand.

A. None of it. And I always tried to keep her and the kids away from that. But, of course, she's human, and she was wondering what was going on, you know. And he had made a comment to her, whether it was to me or her or whoever, that he had flopped around in the back, you know, Pool did, in the back of the Navigator. And he had kind of described a little bit about what had happened.

I'm not sure that she realized that, you know, Pool was dead. Do you know what I mean?

Q. Do -- do you recall Mr. Stocker telling her anything about what happened at the farm?

A. Yeah, about how -- how they beat the guy.

Q. Okay. So he did talk about that?

A. Just briefly. I -- I -- I didn't want him to say anything, you know, too much more than what needed to be said. I mean, it's obvious there was an argument at the lake house. Bledsoe spun off, and then -- then the phone call, and then the blood on Stocker.

Q. And I realize it was a brief conversation, because as you say, you cut it off, didn't you?

A. Yes.

Q. Once you had taken him -- Mr. Stocker back to his pickup, now he has his keys, and he's back at his pickup, and you dropped him off. Is that correct?

A. Yes.

Q. What did you do then?

A. Went to Craig's house.

Q. Went to Kimberlin's house?

A. Yes.

Q. When you got there, was Mr. Kimberlin there?

A. At Craig Kimberlin's? Yes.

Q. Was anyone else there?

A. Frank Chacon.

Q. Frank Chacon. Do you know if Jessica was there?

A. Yes, she was.

Q. Was there uh -- a meeting or a conversation about the situation?

A. Yes, we'd talked about it.

Q. When did you go to Frank's house? What -- what time -- in other words, if you dropped Joshua Stocker off at his pickup, and your wife is worried about getting the kids ready for school in the same kind of time period, what time do you think you ended up at Kimberlin's house?

03:02PM A. It was in the afternoon.
03:02PM Q. Okay. So did you go home and rest for a
03:02PM while?
03:03PM A. I had --
03:03PM Q. Or do other things?
03:03PM A. I really don't remember. I remember taking
03:03PM Denise home to get the kids ready, and then taking Josh
03:03PM out to his house to get the keys, then back out to the
03:03PM pickup. And then -- it was probably 10:00 or 11:00, you
03:03PM know, by then. It had to be. And then I went from
03:03PM there to Craig's house.
03:03PM Q. All right. So sometime -- it was well up in
03:03PM the day then, by the time you got there?
03:03PM A. Yes.
03:03PM Q. Okay. When you got there, Frank Chacon is
03:03PM there, Craig Kimberlin is there, Jessica is there and
03:03PM there's a meeting?
03:03PM A. Yeah. Yeah. I asked him what he did with the
03:03PM body.
03:03PM Q. Was Jessica a part of the discussion or just
03:03PM there?
03:03PM A. She was just there.
03:03PM Q. Okay. What did he tell you about the body?
03:03PM A. That he was in a safe place.
Q. Okay.

A. He had him hid somewhere.
Q. He what?
A. He had the body hid.
Q. But you didn't know where?
A. No, not at that time.
Q. Do you know if Mr. Chacon knew where, or do you know?
A. I don't know.
Q. Okay.
A. I'm sure he did. I mean, I assumed he did.
Q. Okay. Did -- did you understand that it was some permanent hiding place or that you still needed to find a final resting place for Mr. Pool?
A. It was just a place for him to put the -- to get the body away from Bledsoe, and to store it until we found a place to put the body.
Q. So you learned enough to know that, apparently, the body was no longer with Mr. Bledsoe?
A. Yes.
Q. Did you know where Bledsoe was?
A. Bledsoe was at his house.
Q. Okay. The last time you knew anything, the body was in the back of the Navigator. Did you know if it was still in the Navigator, or not?
A. At this time, I didn't.

03:04PM Q. You did not know at this time?

03:04PM A. Not when I went to Craig's house, I didn't.

03:04PM Q. So you've explained to the jury kind of what limited amount of information you had about the Navigator, and Mr. Bledsoe, and you, and Frank, and Craig Kimberlin are having a discussion?

03:05PM A. Yes.

03:05PM Q. What did you guys decide?

03:05PM A. To do with the body?

03:05PM Q. Yes, sir.

03:05PM A. I -- he was asking me what, you know, if I had a place to put a body, Craig was. And I -- you know --

03:05PM Q. Was there any talk about going back to Lake Meredith?

03:05PM A. Yes, there was. There was.

03:05PM Q. Tell the jury about that.

03:05PM A. He -- he wanted to know if I had a hole to put the body in, you know. And I remember asking him, why ask me? He said, you know, because you always know what to do. And we discussed putting him in -- in the lake. And he'd asked me about buying some chains to wrap around the body, and taking him out to the lake and dumping him. And I -- I wasn't too set on that deal, you know. Bodies -- bodies come up, they rise, you know.

223

03:06PM Q. You didn't think that was a very good idea?

03:06PM A. No, I didn't.

03:06PM Q. You felt like, eventually, that body might come to the surface and that was a problem?

03:06PM A. That -- that, and he wanted to get a boat and go out there on the middle of the lake in the middle of the night and look like the three of us were fishing. I didn't like that idea either.

03:06PM Q. Why not?

03:06PM A. You know, it wasn't fishing season really. You just don't go out there on the lake in a boat in the middle of the night, you know, drinking beer and fishing. I just didn't like it.

03:06PM Q. So you just didn't think it was a very good plan. You didn't think it was going to work?

03:06PM A. No, I didn't.

03:06PM Q. So did -- did he ask you, okay, what's your plan?

03:06PM A. He asked me -- he knew that I had access to a backhoe.

03:07PM Q. To a backhoe?

03:07PM A. Yes.

03:07PM Q. Okay.

03:07PM A. He asked me if I could get a backhoe. He wanted me to dig a hole out on his other house, you know

at Stagecoach. And uh --

Q. Before we finish talking about the backhoe, it occurred to me that we've left Mr. Stocker hanging, and I want to get back to that for a moment. Did Mr. Kimberlin want to know, okay, here you are at my house. Where's Stocker?

A. He wanted to know where Stocker was, yes.

Q. What did you tell him?

A. I mean, he took off. I told him I dropped him off at his pickup.

Q. And so you didn't -- did you know -- did Stocker tell you where he was going?

A. No, he didn't. He'd told me that he'd planned to go to Craig's house, you know. And I thought that was where he was going to go.

Q. But he wasn't there when you got there?

A. No, he never showed up. Craig was mad because I didn't have Stocker call him. And I told him that Stocker's phone was dead.

Q. Well, but you had your cell phone. I mean, did he kind of wonder why didn't you use your cell phone?

A. Probably. I mean, he was pissed, you know.

Q. Okay. So -- I mean, everybody's just not real happy?

03:08PM A. No.

03:08PM Q. But you do have an even bigger problem than that, and that's Mr. Pool?

03:08PM A. Yes.

03:08PM Q. Do -- do you know Tori Patrick? You mentioned earlier that you dropped him off at his pickup and that it was Tori Patrick's apartment. Do you know her?

03:08PM A. I do now. I didn't prior to that.

03:08PM Q. Okay. But you -- okay. And so when you say I dropped her at Tori Patrick's apartment, you're identifying it as her apartment, based on information you learned later. At that time, you just knew it was an apartment?

03:08PM A. Yeah. At that time, I didn't know who the apartment was. I knew that's where his pickup was, and he told me that's where he had gotten the guy.

Q. Okay.

03:08PM A. At some stripper's apartment, is what he said.

03:09PM Q. At some stripper's apartment. Did -- did you know if it was the River Falls apartment, or did you know the name then?

03:09PM A. Not then I didn't.

Q. Okay.

03:09PM A. It was behind the Albertson's.

03:09PM Q. Behind the Albertson's on I-40?

A. Yes.
Q. And -- but you now know it's River Falls?
A. Yes.
Q. At any rate, Mr. Kimberlin -- you've -- you've indicated a lack of enthusiasm for the lake plan, and now we're talking about the backhoe plan?
A. Yes.
Q. Okay. He knew you had access to a backhoe, and then what?
A. At first, he wanted to know, because he knew I lived in Gruver for a while. And he wanted to know if I had a place there I could put the body, and I told him no. And uh --
Q. Did it concern you that all of his plans involved putting the body somewhere on your property?
A. Yes. Oh, yes.
Q. None of it involved putting it on his property?
A. No. Yeah, it concerned me. I mean, you know -- and it also concerned moving the body again clear across the country. That concerned me, you know.
Q. Yes, sir.
A. It concerned me that he wanted to just go dump it out at the lake. And I knew it would be me and Frank more or less doing it, you know. That concerned me.

Q. You suspected Mr. Kimberlin might be keeping a low profile in connection with disposing the body?

A. He always did.

Q. At any rate, there was discussion about some property at Gruver, and you -- you nixed that. Are you still talking about the backhoe, even though --

A. Yes. He still -- he was still wondering -- he wanted to know how long it would take me to dig a hole. I told him two or three minutes with a backhoe, you know, because I have used them quite a bit. And he wanted to know if it could be done inconspicuously out there at his place, you know, out there at Stagecoach.

Q. When he said his place, what was he talking about?

A. His -- they had a double-wide out on Stagecoach.

Q. Okay. So, finally, there's some discussion that might involve his land and his property?

A. At this point, he's getting desperate for a place to put the body.

Q. Okay. So when he wanted to know if this could be done inconspicuously, did you know of any way to dig a hole with a backhoe where no one would notice?

A. No. I told him that somebody's going to see us, you know. And I had taken him -- I kind of do

03:11PM everything. I drive a truck, too, you know. And I'd taken him some hot mix for his driveway.

03:11PM And he said, well, you could spread out a little bit of that and then run around behind the house and dig a hole, and go back and spread out a little bit more, you know. And I started thinking it might work. And then we couldn't get the backhoe, so we had to squash that idea.

03:12PM Q. Now, Mr. Keeling, you were -- when you first heard from Mr. Kimberlin about wanting you to go up to Lake Meredith, and they were going to -- Bledsoe and Stocker were going to come up there with Mr. Pool, why -- why would you get involved? I mean, you hadn't done anything up to that point.

03:12PM A. We were all close, you know.

03:12PM Q. It was a part of being in the cartel, wasn't it?

03:12PM A. Yes.

03:12PM Q. Okay. Well, at least now there's some discussion about using Mr. Kimberlin's land, but you couldn't get the backhoe, so -- so now what do you do?

03:12PM A. I told him about the grain elevator.

03:12PM Q. Okay. The grain elevator that you and I talked about in the aerial photo a little earlier?

03:12PM A. Yes.

Q. And what did he think of that?

A. He said he wanted to look at it, so we went and looked at it.

Q. When you say "we", was it just you and Mr. Kimberlin, or Mr. Chacon --

A. Just me and Craig.

Q. Just you and Craig. Was that in the same afternoon?

A. Yes. Frank had had to go do something with his son, so he left. So we went. We discussed it. We had -- we had discussed it and Frank had to leave, I believe something to do with his son, or something maybe. And he said if we come up with something, let him know. And then I thought about the grain elevator, and Craig said he wanted to go look at it.

Q. Now, that property and the elevator actually belonged to Mr. Bob Johnson?

A. Yes, sir.

Q. And that's the man you worked for?

A. Yes, sir, at the time.

Q. Okay. Was it still daylight on the 11th when you guys --

A. Yes. It was daylight when I took Craig out to look at it. It was late -- it was late in the evening, probably afternoon, because we drove around looking for

a boat. Then we drove around looking for a trailer for the backhoe. We spent most of the afternoon trying to figure out what to do with this body. And uh -- and then I decided -- when I thought about the grain elevator, Craig had said he wished he just had a hole we could throw him in and cover him up. That's what made me think of the grain elevator.

MR. FARREN: May I approach the witness, Your Honor?

THE COURT: Yes.

Q. (BY MR. FARREN) Mr. Keeling, I'm going to show you what I have marked as State's Exhibit 148, 149, 150, 151, 152, 153, 154, 155, 156, 160, and 162. If you would, look those over and see if you recognize what's depicted in those photographs and then we'll talk about them. You can hand me each one as you finish.

Do recognize what's depicted in these photographs?

A. Yes, I do.

Q. Now, I noticed you paused at number 156. Are you not quite sure on that one?

A. No, I'm sure.

Q. Okay. All right. Do you -- do all of these -- these are all photographs either at or near or around the grain elevator. Is that correct?

03:17PM A. Yes, they are.
03:17PM Q. Do they all accurately depict the way it appeared at that time?
03:17PM A. Yes, they do.
03:17PM MR. FARREN: Offer State's 148 through 156, and 160 and 162.
03:17PM MR. WATKINS: No objection.
03:17PM THE COURT: State's 148 through 156 and 160 and 162 are admitted.
03:17PM MR. FARREN: Thank you, Your Honor.
03:18PM THE COURT: There you are. Thank you.
03:18PM Q. (BY MR. FARREN) First of all, State's Exhibit 148, the jury is now looking at the same photograph up on the screen. Would you describe what we're seeing in this photograph?
03:18PM A. This is the -- right outside of the -- let's see. I'm trying to see where I'm at here.
03:18PM Q. Let me ask it this way.
03:18PM A. It would be on the east side of the building.
03:18PM Q. Okay. So if we're standing at the grain elevator looking away from it, this is what we would see --
03:18PM A. You're going to see this.
03:18PM Q. -- in one of the directions from the grain elevator?

03:18PM A. Yes.
03:18PM Q. Okay. State's Exhibit 149?
03:19PM A. Okay. This is from the north side of the building.
03:19PM Q. And that's a dirt road and some of the objects that are around there?
03:19PM A. Yes. This is the road that runs up beside it, and --
03:19PM Q. So this -- this area here is a dirt road. Is that right?
03:19PM A. Yes. Take your pen to the left and that's where my house -- no, the other side. Right back over there. Back behind all of that, though, is where I lived.
03:19PM Q. Okay. State's Exhibit 150?
03:19PM A. That's the grain elevator.
03:19PM Q. That's a partial view of the grain elevator?
03:19PM A. Yes.
03:19PM Q. Okay. State's 151? And that's a view from a little further back, see more of the building --
03:19PM A. Yes. Yeah. That's from the south side of it.
03:20PM Q. Okay. 152, would you agree we're kind of looking past the grain elevator here to some of the same areas we saw in another shot, where we're standing at the elevator looking at --

A. Yes. Same -- same view.

Q. State's 153?

A. That's inside the elevator.

Q. That's inside the building that you've referred to as the grain elevator?

A. Yes.

Q. And that's an abandoned car there?

A. Yes, it is.

Q. Now, right in front of the car is a square looking -- something square appears on the floor. Do you see that there?

A. Yes. Yes, sir.

Q. What is that, sir?

A. That's a grain bin. That's where the trucks pull through and empty their load.

Q. So there's a cavity underneath the floor here?

A. Yes, sir. There's also one underneath the car, too.

Q. Underneath the car, as well? Another opening?

A. Yes.

Q. State's Exhibit 154. That's a closer picture of the same cavity?

A. Yes. See, normally, this would have grates on it.

Q. And by grates, is that like you would see

03:21PM in --
03:21PM A. Like pipes.
03:21PM Q. And just -- just past this, this debris here, is that the front end of that abandoned vehicle we were looking at a moment ago?
03:21PM A. Yes. Yes, it is.
03:21PM Q. Okay. 155. And let's go ahead and look at 156. Would you agree that 156 is a closer view of what we see beside the old abandoned car?
03:22PM A. Yes, it is.
03:22PM Q. Now, a minute ago when you said that ordinarily it might have a grate over it, is this what you're talking about?
03:22PM A. Yes.
03:22PM Q. So that open hole we saw earlier, if it had the grate over it, that's kind of what it would look like?
03:22PM A. Yes.
03:22PM Q. Now, State's Exhibit No. 160, do you recognize this as being down in the cavity underneath?
03:22PM A. Yes, that's -- this's a wall. There's a petition wall that separates the two -- the two bins, grain bins underneath the ground.
03:22PM Q. Underneath that hole and abandoned car we looked at a moment ago, we're down inside there. Is

that correct?
A. Yes.
Q. This gray looking stuff, it looks like liquid that is dried on the walls. Do you know what that is?
A. Yes.
Q. What is that, sir?
A. That's concrete.
Q. Do you know how that concrete got there?
A. Yes, I do.
Q. How did it get there?
A. From the concrete that was mixed, poured over Dustin Pool's body.
Q. States 162, is that concrete we're seeing on the wall there?
A. Yes, it is.
Q. And we're going to come back to this in a little while, but I want to ask you, that debris and stuff we see, when you folks finished with the concrete, did you take any steps to -- to make it look like it had been there a long time?
A. Yes, we did.
Q. What did you do?
A. When we was completely finished, we spread a bunch of that debris down in there.
Q. For demonstrative purposes -- in other words,

for the purpose of demonstrating, not for the purpose of necessarily putting it into evidence, I want to show you State's Exhibit 244. Does this look like a drawing of an overhead view of the grain elevator if the top were gone and we could look down at that old abandoned car in the opening?

A. Yes, it is.

Q. And do you think it -- whether it's to scale necessarily, does it reflect the relationship of the walls, and the car, and each other --

A. Yes.

Q. State's Exhibit 245, do you recognize that as a drawing, an attempt in a two-dimensional way to draw underneath the floor and where the body ended up?

A. (Witness nods head up and down.)

Q. If this was the body?

A. Yes.

Q. And, again, while it may or may not be to scale, does it, as best we can in a two-dimensional drawing, reflect the relationships of the walls and things to each other?

A. Yes, it does.

MR. FARREN: Your Honor, we would ask permission to use State's Exhibit 244 and 245 for demonstration purposes

03:25PM MR. WATKINS: We'd have no objection.
03:25PM THE COURT: You'll be allowed to.
03:25PM MR. FARREN: Thank you, Your Honor.
03:26PM Q. (BY MR. FARREN) We're looking at State's Exhibit 244. This is the drawing that you identified earlier as being a two-dimensional reproduction of the upper part of the grain silo, if we were looking down on it. Would you agree with me that this represents the old abandoned car that was there?
03:26PM A. Yes, it does.
03:26PM Q. This is the opening that we can see in front of the car?
03:26PM A. Yes, it is.
03:26PM Q. And this is that partial grate or opening that we can kind of see sticking out from under the car?
03:26PM A. Yes, sir.
03:26PM Q. And this represents the big open area you can drive the car into?
03:26PM A. Yes.
03:26PM Q. And then the railroad tracks up above?
03:26PM A. Yes.
03:26PM Q. Okay. State's Exhibit 245, the jury is now seeing. Again, it's as best we can do in a two-dimensional drawing. But would you agree that we're now looking underneath the floor that we could see in

03:27PM the early photographs we talked about earlier, and -- and see that the cavity that's underneath and the place where the body finally ended up?

03:27PM A. Yes.

03:27PM Q. Okay. Once you had -- once you had visited the -- the silo with Frank, what did he think? Did he think that was a pretty good idea?

03:27PM A. Well, Craig did --

03:27PM Q. I'm sorry. Stephen Craig Kimberlin. I apologize.

03:27PM A. Yeah. Craig thought it was a good idea. He said he wanted to show it to Frank.

03:28PM Q. And, eventually, did you take Frank there, as well?

03:28PM A. Yes, we did.

03:28PM Q. And did the three of you reach a conclusion as to whether or not that was the best of the plans available?

03:28PM A. Yes.

03:28PM Q. Did you decide it was?

03:28PM A. Oh, yeah, by far.

03:28PM Q. Now, what -- what did you do after that in preparation to carry out your plan?

03:28PM A. We -- we went to buy the supplies that it would take to -- for the concrete.

03:28PM Q. Okay. So you were going to need some concrete, or Sakrete?
03:28PM A. Yes.
03:28PM Q. Explain to the jury what is Sakrete?
03:28PM A. It's a premixed concrete.
03:28PM Q. So all you have to do is add water?
03:28PM A. Add water and mix it, yeah.
03:28PM Q. Mix it up, and then it will set up?
03:28PM A. Yes.
03:28PM Q. You needed concrete. What else did you need?
03:28PM A. We needed shovels.
03:28PM Q. Okay.
03:28PM A. We needed a container to mix it in, a hand trowel to spread the concrete with, and we needed flashlights. And we needed a large trash can that was waterproof to carry water, because there's no water down at the grain elevator.
03:29PM Q. Where did you go to try to procure these items?
03:29PM A. We went to the building center over on Coulter.
03:29PM Q. There's a couple of places that it would seem might have that kind of stuff. Lowe's?
03:29PM A. Lowe's or Home Depo, yes.
03:29PM Q. Do you remember which you went to?

03:29PM A. I don't remember. Right off, I don't remember the name. I just believe it was the one on Coulter.
03:29PM Q. I'm showing you what has been admitted into evidence as State's Exhibit 204 and 205.
03:30PM A. Yes.
03:30PM Q. Do you recognize what's depicted in these photographs?
03:30PM A. Yes, I do.
03:30PM Q. The jury's looking at State's 204. And in 205, we see a closer view. Are these -- can you tell if these look like the items you purchased?
03:30PM A. Yes, they do.
03:30PM Q. And is that -- do you think cement on one of the shovels?
03:30PM A. Yes.
03:30PM Q. Okay. Or Sakrete, I guess?
03:30PM A. Right.
03:30PM Q. Now, what were some of the other items that you mentioned that -- that was decided would be of help? Did you buy any sources of light?
03:30PM A. Yes. We bought -- it was dark. We had to do it at night, you know.
03:30PM Q. So you had decided that it would be done in the dark of night?
03:31PM A. Yes.

03:31PM Q. Okay. So what kind of light sources did you purchase?
03:31PM A. Uh -- those clips -- the ones you put on your head with a --
03:31PM Q. Okay. Some sort of a flashlight that you can attach to your head?
03:31PM A. Yes.
03:31PM Q. And this frees your hands up to work, and, yet, you still have light?
03:31PM A. Yes.
03:31PM Q. So you got concrete and sources of light. Anything else you remember?
03:31PM A. Concrete. Like I said, a tub to mix it in.
03:31PM Q. Okay. Do you remember anything about the tub you bought?
03:31PM A. It's just a -- it's just a plastic tub.
03:31PM Q. Do you recall --
03:31PM A. About as wide as this podium here.
03:31PM Q. Okay. Do you recall the color?
03:31PM A. I believe it's gray. Gray or blue, I can't remember. It might have been green. It's what bricklayers use.
03:31PM Q. Okay. Did you have a container to put -- you mentioned water. Was this the same container the water
03:32PM was in?

03:32PM A. No. No.

03:32PM Q. Do you remember the color of the container that you used for water?

03:32PM A. A black trash can.

Q. You think it was black?

A. Yeah.

03:32PM Q. But at any rate, was the water container bigger?

03:32PM A. Oh, yes.

03:32PM Q. So one was bigger than the other. When you saw these items, was -- was it at night?

03:32PM A. When I saw them, we went and bought them at the store.

03:32PM Q. Okay. So you bought these. These weren't items that anybody already had, the trash cans and stuff?

03:32PM A. No. We went and bought all of this.

03:32PM Q. Okay. All right. Once you had your -- your concrete, and tools, and your containers, what did you do next?

03:32PM A. Then we went and retrieved the body.

03:32PM Q. Where did you go to retrieve the body?

03:32PM A. From a friend of Craig's house.

03:32PM Q. Did you know this person?

03:32PM A. I know him, yes. I met him a couple of times.

Q. Do you know anyone named Tyler Hale?
A. Yes.
Q. Was that the individual where the body -- it's his house where the body was?
A. Yes. It was in his garage.
Q. In his garage?
A. Yes, sir.
Q. Okay.
MR. FARREN: I apologize, Your Honor. It will be just a moment.
Q. (BY MR. FARREN) Was this house attached or a detached garage, if you remember?
A. It wasn't attached.
Q. Okay. When you arrived at the house, who all was -- how did you get there? What vehicle did you use?
A. Craig Kimberlin's pickup.
Q. Now, did -- do you know if Jessica had a pickup and Craig, or was this Jessica's pickup?
A. It was Jessica's pickup.
Q. It was Jessica's?
A. Yeah, he bought it for her.
Q. Sure, I understand, but it -- if she's testified earlier about her pickup, you're talking about the same one?
A. Yes.

Q. As far as you know?
A. A red Dodge pickup.
Q. A red Dodge pickup. And when you arrived at Tyler Hale's house, did all of you go in to talk to Tyler or did he come out? What happened?
A. No, he stayed in and Craig went in and talked to him.
Q. What did you and Frank do?
A. We filled -- we used his water hose and filled up the trash container full of water.
Q. Okay. So -- and both the trash container and the smaller tub were like rubber, Tupperware kind of things?
A. Yes.
Q. When you filled it, was it sitting in the back of the truck?
A. Yes.
Q. Okay. And did you and Mr. Chacon take care of this while he was inside talking --
A. Yes.
Q. -- to Tyler Hale?
A. Yes.
Q. When -- when you were filling the trash container with water, did -- did you see where the body -- did you know where it was yet?

A. I -- he told me it was in the garage, in the back of the Navigator.

Q. Okay. So by then you've learned that it is in this Navigator?

A. I'd known prior to that.

Q. Okay. So sometime during the --

A. From the day, yes.

Q. -- earlier discussions?

A. Yes.

Q. So you now at some point knew it was in the same vehicle it was when you had known about it?

A. Yes.

Q. Did Mr. Hale, did Tyler Hale ever come out where you guys were, if you remember?

A. No, he stayed in the house.

Q. Okay. Did -- did anyone ever open up the garage so you can get to the Navigator?

A. I believe I did. That -- the kitchen is in the back side of his house. There's a little back porch there, but I believe he has got a button --

Q. So this is an electrically operated garage door?

A. Yes.

Q. And so at some point --

A. The garage.

03:37PM Q. -- it opened. So you assumed someone pushed a button somewhere?
A. Yes.
03:37PM Q. Okay. Once the garage door was opened, could you see the Navigator?
03:37PM A. Yes.
03:37PM Q. Okay. And you filled your container. You have your equipment. You now are at the Navigator with the body in it. What did you do next?
03:37PM A. I went inside the house.
03:37PM Q. Okay. Did Frank come in with you? If you remember?
03:37PM A. I believe I left Frank out there. He was still filling the container up when I went into the house.
03:37PM Q. When you got in the house, did -- were Frank -- I mean, were Craig and Mr. Hale talking or what were they doing?
03:37PM A. Yes. They were smoking weed and talking.
03:37PM Q. Okay. And did you join them?
03:37PM A. I sat down. I don't smoke weed. I have asthma, so I sat down and was visiting with them.
03:37PM Q. Okay. And uh -- after they had smoked some marijuana and you guys talked, what happened then?
03:38PM A. Craig uh -- I think they exchanged a pistol

03:38PM and then they exchanged some -- Craig gave him some dope and some cash.

03:38PM Q. Did Mr. -- had you -- I forget. Had you met Tyler Hale before?

03:38PM A. Yes, I had.

03:38PM Q. Okay. Had you ever been to his house before?

03:38PM A. Never.

Q. Okay.

03:38PM A. I'd always -- I'd be at Craig's house or something when he would come up.

03:38PM Q. Okay. Was he one of the distributors of Mr. Kimberlin, or did he just buy from him, or do you know?

03:38PM A. He bought from him sometimes.

03:38PM Q. Did he ever sell for him?

03:38PM A. I'm sure he sold a little bit, you know, it's just. . .

03:38PM Q. Would you characterize him as a regular member of the cartel, or just sort of on the edges?

03:38PM A. On the edges. He's a friend -- more or less just a friend of Craig's.

03:38PM Q. Okay. Did you know -- did you have any information, or did you wonder why he let them put this body in his garage overnight? Was there any discussion about that at all?

A. Craig paid him for it.

Q. Okay. Do you know if he paid him directly with money, or did he take some of his debt off of the books, or do you know?

A. Yeah. He took some debt off of what he owed him.

Q. Okay. Once -- once Tyler Hale and Craig and you had visited in the kitchen, Mr. Chacon's finished filling up the container, what happens next?

A. Then we left.

Q. Okay. When you left, who was driving Jessica Kimberlin or Craig Kimberlin's red Dodge pickup?

A. Craig was.

Q. And who drove the Navigator?

A. I did.

Q. And, of course, you knew where the silo was. Did you lead or did they --

A. I lead.

Q. You lead. So they're following you and you guys go back over there. Do you remember where Tyler Hale's house was located?

A. Over off of Washington. On the south end of Washington.

Q. Are you familiar with the -- with the grocery store, the United at 46th and Washington?

A. Yes, I am. Yes.
Q. How far is Tyler Hale's house from that grocery store?
A. Probably three blocks.
Q. Okay. So if folks had the Navigator at the United, it would be a very short drive to Tyler Hale's house from there?
A. Yes.
Q. Okay. How far do you think it is from Tyler Hale's house, around 46th and Washington, over to the grain silo?
A. Not very far. A couple of miles. Two miles.
Q. Destry, I'm afraid the jury's having a hard time hearing you.
A. I'm sorry.
Q. I know you're unconsciously doing it, but anyway --
A. It's not very far.
Q. Okay. And once you got to the grain silo with the Navigator and red Dodge pickup, what time do you think it was by the time you got there? Or another way of putting it, was it dark by then?
A. Oh, yeah. Yes.
Q. Okay.
A. That was the whole thing, we wanted to wait

03:41PM until after dark. I didn't want -- there's a couple of people that lived right there by the grain elevator. We didn't want them -- of course, be caught. You know, we didn't want to be caught doing it, and uh --

03:41PM Q. Do you have a -- do you know a man or have a friend named Bobby Boney (phonetic)?

03:41PM A. Yes, I do.

03:41PM Q. And Mr. Boney lives right across from it?

03:41PM A. Across from it, yes.

03:41PM Q. Were you concerned that Mr. Boney might see you there?

03:41PM A. Yes.

03:41PM Q. When you arrived at the grain elevator, did you guys have your headlights on or off, or what did you do?

03:41PM A. We -- we pulled into the trailer park on the -- there's a back way to get in, you know, where we don't have to go through the trailer park.

03:42PM Q. Let's -- let's look at that real quickly.

03:42PM A. You can see it from that aerial right there.

03:42PM Q. If this is facing north and this is the grain silo, what's the back way?

03:42PM A. Okay. Where the grain silo is at, where your pen was just at, is McCormick.

03:42PM Q. Right,

03:42PM A. Okay. Go on. Keep coming to the right of the photo. All right. Yeah. Right down there. There's a -- you can see it. It's a white dirt road that follows beside the train track.

03:42PM Q. Okay. And there's a fork in the road or a bifurcation. Now, you can come there or you can come here?

03:42PM A. Yes.

03:42PM Q. Which way did you folks go?

03:42PM A. We -- we went --

03:42PM Q. Closest to the track or further away?

03:42PM A. Closest to the track. And we -- there's a -- I believe there was a -- some junk or something there. We had to cut around. At one point in time you've got to come around, so you've got to come where Bobby Boney's trailer's at.

03:43PM Q. So you were trying to stay as far away from all of these folks as you could, but at some point you -- you were forced to come to this side here?

03:43PM A. Yes. Yeah.

03:43PM Q. But only for a short distance?

03:43PM A. Yes.

03:43PM Q. Did you -- do you remember if you turned out your headlights or thought that might make it even more suspicious?

03:43PM A. Yeah, when we -- once we got to the grain elevator, we turned them out.
03:43PM Q. Okay. You certainly didn't just sit there with your lights on?
03:43PM A. No.
03:43PM Q. Did you -- did you park either of the vehicles inside the cavity of the grain elevator we looked at earlier or did they both stay outside?
03:43PM A. No. I -- I backed the Navigator into the south -- south end of it. There's an overhead door that slides, and I backed up through it to the front of that car that we seen earlier.
03:44PM Q. With -- with that hole in the floor that we looked at earlier?
03:44PM A. Yes.
03:44PM Q. And where was the red Dodge pickup?
03:44PM A. You have to -- okay. Where I backed up is actually a ramp. Okay. He was beside the ramp. He pulled up beside the ramp to get as close as he could to it.
03:44PM Q. Okay. And you wanted it close, because you were going to have to move some of the product in order to bury Mr. Pool?
03:44PM A. Yes. Yes.
03:44PM Q. Once the Navigator and the Dodge pickup were

in position, what did you do next?

A. We pulled the body out.

Q. Okay. When -- I assume you had to open the Navigator up to do that?

A. Yeah. Well, Frank was waiting on me when I backed up. He opened it up.

Q. I'm showing you what has been marked as State's Exhibit 174. Now, I realize that there are some items in the picture that -- with which you're not familiar. I'm -- I'm making reference only to the blue tarp and anything attached to the blue tarp.

A. Yes.

Q. Do you recognize that portion of this picture?

A. Yes, I do.

Q. And what do you recognize that to be?

A. Dustin Pool.

Q. All right. So when you saw him, although there's some other items in the picture, is that how he appeared inside that tarp?

A. Yes.

Q. Okay. And this accurately reflects that, except for the other items?

A. Yes.

MR. FARREN: We'll go ahead and offer 174, Your Honor. We will provide additional testimony

about the other items later.

MR. WATKINS: No objection.

THE COURT: States 174 is admitted. Let me see it.

MR. FARREN: Oh, I'm sorry.

Q. (BY MR. FARREN) Now, when -- now, the items we talked about a moment ago, obviously -- well, maybe it's not obvious. When you were moving the body from the Navigator, you didn't have a stretcher or anything like this, did you?

A. No.

Q. Okay. When you moved Mr. Pool in this blue tarp from the Navigator to the final resting place, I guess temporary resting place, how did you guys do that? How did you get him out of the vehicle and into this cavity under the grain silo?

A. Like I said, when I backed up, Frank was guiding me in. And uh -- by the time I got out he had the back open, and he had grabbed Dustin around the top part of his torso, and uh -- pulled him out. And uh -- Dustin was real heavy, I guess, and fell. He dropped him. And he asked me to help him, and we reached down. I grabbed the -- lower part of him, he grabbed the top part, and sat him down the hole.

Q. So you were down at what you believed were the

03:48PM feet?

03:48PM A. Yes.

03:48PM Q. Did you notice the top of the tarp was
03:48PM somewhat opened and it didn't cover up the head?

03:48PM A. All you could see was his hair. The head was
03:48PM covered with the tarp, but you could see his hair
03:48PM sticking out.

03:48PM Q. Do you -- of course, you were looking at him
03:48PM with a flashlight at night?

03:48PM A. Yes.

03:48PM Q. Did -- did you know that was his hair, or you
03:48PM just thought it was his hair?

03:48PM A. It looked like hair to me.

03:48PM Q. You said that he was pretty heavy. How did
03:48PM you -- were you able -- the two of you able to lift him?

03:48PM A. Yeah. With some effort, yes.

03:48PM Q. And once you had him up, were there stairs to
03:48PM get down into this hole? How did you get him down to
03:48PM the bottom of this cavity?

03:48PM A. Just dropped him down the hole.

03:48PM Q. So he just dropped like a sack of
03:48PM potatoes down --

03:49PM A. Yeah.

03:49PM Q. How did -- well, who went into the hole with
03:49PM him?

A. Frank did.
Q. He went -- Mr. Pool went in first, and then Frank?
A. Then Frank. And then he jumped down in there.
Q. Once he was down in there with him, did you join him, or was he down there by himself with Mr. Pool?
A. I had joined him, and then uh -- I'd gotten back out, then Craig had -- Craig had gotten down in there, too, at one point in time.
MR. FARREN: May I approach the witness, Your Honor?
THE COURT: Yes, sir.
Q. (BY MR. FARREN) Now, it's difficult -- would you agree, it's difficult to -- unless you've been there and seen it, it's difficult to explain, isn't it?
A. Yes, it is.
Q. Once he was down -- the cavity that he was dropped into originally, is that where he ended up --
A. No.
Q. -- or did he end up in a different cavity?
A. Can I try to explain?
Q. Yes, sir, if you would, as much as you can.
A. This would be the hole we dropped him in.
Q. Right. Actually, if we were -- if we were to do it -- the best way would be to actually think of this

03:50PM as the hole in front of the car.

A. Yes.

03:50PM Q. Right? And you dropped him down in here.

03:50PM A. Yeah, the car is sitting here.

Q. Right.

03:50PM A. And this is the hole. Here's the Navigator.

Q. Right.

03:50PM A. We slid him head first down in here. There
03:50PM was a piece of -- some piece of tin and some tires in
03:50PM there. He kind of slid down that. After he hit, he
03:50PM slid down to the bottom of this hole.

03:50PM Q. And is that a flat bottom?

03:50PM A. No.

03:50PM Q. Yeah. Explain to the jury --

03:50PM A. It goes at a triangle, so the grain can fall.

03:50PM Q. So it's like an upside down pyramid?

03:50PM A. Yes, it is.

03:50PM Q. And that's so that you don't have a lot of
03:50PM corners to try to get grain out of. Right?

03:50PM A. Right.

03:50PM Q. Just have one corner?

03:50PM A. One corner, yes.

03:50PM Q. Okay. So he's down in the bottom of this
03:51PM upside down pyramid?

03:51PM A. Yes. Once -- once it falls in the hole it

opens up, which would be this area here. And the way they've got this shown is, it shows it going out in one -- it's kind of like a ramp that goes down in the hole. And then you hit this main hole -- here's one hole, then here's the other that holds grain.

Q. Is there a -- is there a wall?

A. There's a wall here. There's a wall that divides and then a wall that goes all the way up.

Q. Right. So there's some space between the wall and the top of the -- of the floor that you would have been on if you were walking upstairs. Right?

A. Yes.

Q. And so there's some space between this retainer wall, and the -- here is your ceiling if you're up by the car --

A. Right. It would be the -- okay. Here's the ceiling. What you're talking about would be the grate.

Q. Right.

A. And then here's the wall underneath it. It's probably -- there's probably this much distance here, you know, from the top of that wall to the grate.

Q. And did Mr. Pool remain in the bottom of the upside down pyramid, or did you folks move him to a different spot?

A. Frank picked him up and threw him over this

03:52PM wall --

03:52PM Q. And so he went over the wall into the other chamber. Have you ever heard it referred to as a boot pit or something like that?

03:52PM A. Yeah.

03:52PM Q. Okay. It's just another chamber?

03:52PM A. Right.

03:52PM Q. Now, is the floor of the second chamber also an upside pyramid, or is it different?

03:52PM A. Yeah, they're the same way.

03:52PM Q. Okay. And if -- if this silo were still in operation and a train came along to pick up grain, there would be more than one hole to get to the upside down pyramid and suck the grain out?

03:52PM A. Yes.

03:52PM Q. And so you've --

03:52PM A. Right.

03:52PM Q. -- got several chambers like that?

03:52PM A. Yes.

03:52PM Q. With a retainer wall between them, but those walls don't reach all the way to the --

03:52PM A. Right. So the grain can spill over each side.

03:53PM Q. Okay. Once Mr. Pool was over this retainer wall into the second upside down pyramid chamber, what did you guys do next?

A. Frank jumped in there and got him positioned, and then actually pushed him down, you know, because he was stiff. And then we -- then we started mixing the concrete.

Q. Did you mix the concrete back at the truck and carry it over there?

A. No. No. I carried the water in the five-pound bucket.

Q. Okay.

A. And after we -- after we'd already unloaded the Ready-mix, the Sackrete, we had already unloaded that, had it ready. We'd already cleaned out the silo where Pool was going to be.

Q. So you got -- the chamber you put him in, you actually cleaned some debris out so he would go all the way to the bottom?

A. Yes. Yes.

Q. Okay. All right. Where -- where was the Sakrete? Did you stack it up by the hole or did you go ahead and put it down in the hole, or --

A. We stacked it up by the hole to begin with. And then -- I mean -- more or less, I told Craig he needed to get in there and help.

Q. Yeah. Where was Mr. Kimberlin while you and Mr. Chacon --

03:54PM A. While we were doing all of this, he was outside of the grain elevator. Said he was -- you know, watching -- had his pistol, and he said he would keep watch.

03:54PM Q. So he was guarding you against an attack from Mr. Boney or someone?

03:54PM A. From anybody, I guess. Yes.

03:54PM Q. But wherever he was guarding you, it was away from the shovels and the work?

03:54PM A. Yes.

03:54PM Q. At some point you, apparently, expressed to him some dissatisfaction with the arrangement, and encouraged him to join in?

03:55PM A. Yes.

03:55PM Q. Okay. Did he then help?

03:55PM A. Yeah. He got down in there and mixed the concrete.

03:55PM Q. Okay. Now, earlier you described two kinds of Tupperware tubs, a big one with water and a smaller one. Is that what you mixed the concrete in?

03:55PM A. Yeah. The smaller one -- it's just a bin that bricklayers use, you know, for when they're mixing.

03:55PM Q. Okay. And once you had this mix, did you pour it over the wall into the chamber where Mr. Pool was?

03:55PM A. Yes.

03:55PM Q. Is that how we ended up with some dried cement on the sides of the wall?

03:55PM A. Yes, it is.

03:55PM Q. How many sacks of Sakrete or cement do you think you brought with you, if you -- do you have any idea?

03:55PM A. I don't remember, but around 20 --

03:55PM Q. Okay.

03:55PM A. -- to the best of my knowledge.

03:55PM Q. So quite a bit?

03:55PM A. Oh, yeah. Yeah.

03:55PM Q. And then did you have enough water to mix it --

03:55PM A. Yes.

03:55PM Q. -- the cement you needed?

03:56PM A. Yes, we did.

03:56PM Q. How long do you think it took to mix this cement and pour it over this retainer wall, over on top of Mr. Pool?

03:56PM A. I'd estimate about an hour, probably.

03:56PM Q. Do you think it was past midnight then?

03:56PM A. Oh, yes.

03:56PM Q. So we're into the early morning hours of the 12th by then?

03:56PM A. Oh, yeah. It's at least 2:30 by the time we

got done. I'm thinking that's when it is.

Q. Actually, I guess it would be in the early morning hours of the 13th, because if the body stayed in Mr. Hale's garage overnight of the 11th, that would put us into the 12th.

A. Well, when I went and got the body it wasn't -- I mean, it wasn't that late. It was about 11:00 or 12:00 then, probably.

Q. Okay. At any rate, whichever day we're on, it's after midnight into the next day?

A. Yes.

Q. Okay. Now, once -- once you had -- did the cement completely cover Mr. Pool?

A. Yes, it did.

Q. Once the cement completely covered him, what did you do next?

A. Frank jumped over there with that -- I guess you'd call it a spade. You know, it's a hand trowel, a concrete finishing trowel that we bought, also. And he smoothed -- smoothed the concrete to make it look like the bottom of the silo did originally.

Q. When you say it's a shovel trowel, can you describe it for me?

A. Yeah. It's got a handle on it. It comes up, a wooden handle. It's in a spade shape. It's flat.

It's a -- it's like a flattened out spoon, about this big.

Q. Okay. All right. So it's sort of like a -- a little hole or something on it?

A. Yeah, but it's flat. It's for finishing concrete.

Q. And what did he do with this object?

A. He -- he finished the concrete to make it look like it originally did down at the bottom of the silo.

Q. Except now it's not an upside down pyramid, though, is it?

A. No, it -- it still has got the three sides on it, but then it's flattened out.

Q. Right.

A. Instead of going to a point like it did before.

Q. Right. You've still got --

A. It's still got the same pitch --

Q. -- the higher up the pyramid, but it comes to a flat point?

A. Yes..

Q. Okay. All right. A flat area rather than a point.

Did you do anything -- did you, or Mr. Chacon, or anyone else do anything with the concrete once he had

it smoothed out?

A. Yes. We -- me, and Craig, and Frank -- you know, you've got to understand this is an abandoned elevator. Lots of pigeons were there, owls, and a lot of debris, so we basically just swept it all under -- you know, through the grates, on top of him.

Q. And what was the purpose of that? Why did you do that?

A. To make it look like -- like it did originally, you know.

Q. So it -- the hope was it would look like it had been that way for 20 years?

A. Right. Like nobody messed around with it.

Q. Now, once -- once you had -- once you had finished all of that, did you collect your tools and sacks and all of that stuff, or do you remember?

A. Yeah. We collected everything.

Q. And as far as you know, did the empty sacks go back to Craig's house?

A. Yes, he took all of them. We put them in trash bags.

Q. Okay. All right. You still have two vehicles. You have the Navigator and the Dodge pickup. When you left, who drove the Navigator?

A. I did.

266

Q. And who drove the Dodge pickup?
A. Craig.
Q. Did you guys go to Craig's house?
A. No.
Q. Where did you go?
A. We went to Bledsoe's house.
Q. When you arrived at Bledsoe's house, what did you do?
A. I gave him the keys. Went in and gave him the keys to the Navigator.
Q. Did he ask any questions? Was he curious about what the situation was?
A. Well, he'd been -- he'd been calling the whole time wondering where his vehicle was. He was worried about his vehicle.
Q. Worried about his vehicle?
A. Yeah.
Q. Was he worried about Mr. Pool?
A. He kept calling wanting to know where his Navigator was.
Q. Okay.
A. His truck. He called it his truck.
Q. His truck. When you took it back to him, did he -- I mean, he now has his truck. Is he still asking questions or is he satisfied that he has his truck?

A. Well, when I walked -- when I went -- i pulled up that night and I gave him -- I went in and gave him his Navigator. I had concrete dust all over me, so I told him that he might want to have it -- his Navigator cleaned the next day. And then he said all right. And he asked me if the dude made it.

Q. Did the dude -- did the dude make it? Is that what he asked?

A. That's what he asked me.

Q. Were you -- was either Mr. Kimberlin or Mr. Chacon with you when this --

A. They were standing there by this time.

Q. Did you or either of them reply to this comment?

A. Yeah.

Q. What --

A. I mean, I didn't say anything. I about fell over, you know. I couldn't believe that's what he -- i mean, he was being serious. He looked at me and said, did the dude make it?

And Craig -- I had to grab Craig, because Craig was fixing -- fixing to punch him, you know. I guess he couldn't -- he couldn't believe it either.

Q. Did anybody say anything to him in response that you recall?

A. Told him to -- Craig told him to go get us something to drink.

Q. Okay. So did you guys -- I mean, by something to drink, just water or something?

A. No. Run up to the store and get us a 20-ounce Dr. Pepper.

Q. Oh, okay. And did he do that?

A. Yes, he did.

Q. Okay. So how long do you think you were there?

A. Thirty minutes, 35 minutes.

Q. Okay. Now, do you know Kelly Grayless?

A. Yes.

Q. And who is Kelly?

A. That's Josh Bledsoe's girlfriend.

Q. Okay. Does she live with him?

A. Yes, she does.

Q. Do they have children together?

A. They have -- yes, they do.

Q. Okay. Or a child?

A. A child.

Q. Was she there?

A. Yes, she was.

Q. And was she present during this exchange at all?

04:03PM A. No. She come, I guess, out of her bedroom down the hallway. We were in the front living area. And I remember her waving at us, and she went into the kitchen, and then we were kind of being quiet, because she was standing there. And then she went into the back -- they've got a den in the back, and she went down there. And that's when he asked about --

04:03PM Q. So he -- you believe he waited until she was out of earshot to start talking about it?

04:03PM A. Yes.

04:03PM Q. Okay. At any rate, after approximately a half hour you had something to drink, you talked, and did the three of you then leave?

04:03PM A. Yes.

04:03PM Q. And all in the Dodge pickup?

04:03PM A. Yes.

04:03PM Q. Where did you go?

04:03PM A. Craig's house.

04:03PM Q. And once you arrived at Craig's house, was there anyone else there?

04:04PM A. His wife.

04:04PM Q. Okay. And did the four of you talk about what had happened?

04:04PM A. Yeah. We uh -- I was tired. I was fixing to leave, and Craig had asked Jessica if -- if uh -- she

could find a pair of shorts or something for Frank. Frank was going to go ahead and shower there. I was just going to go home. And the dog was smelling of us. And Jessica kept joking about -- she kept saying, the dog's -- I smell dead people, you know. And -- they kind of explained to me -- told me a little bit more about what had happened, you know, to Pool.

Q. What did they tell you had happened?

A. They basically told me the whole story. When Stocker -- how Stocker had waited for three days in Tori's apartment, kind of another setup deal like it was with Ray. And it took three days for the guy to get there. I remember them joking about how he borrowed somebody's other vehicle because he didn't want nobody to know that he was seeing this girl.

Q. You mean Pool had borrowed someone else's car?

A. Yeah. Come to find out, it was his ex-wife's vehicle. But I remember them joking about that.

Q. That would be a clever ploy to use your ex-wife's vehicle.

A. I guess. You know?

Q. At any rate, something about him hiding in Tori Patrick's apartment, and then what did they tell you had happened then?

A. He said he was hiding in the bathroom, I

guess, or he used the bathroom. He come out and Pool was there, and he had grabbed a fire poker and struck him on the forehead with it.

Q. A fireplace poker?

A. Yes.

Q. And did they indicate after he struck Mr. Pool what happened after that? Do you know how he got to the farm?

A. Yeah, I do.

Q. How -- according to -- you just know what they told you. Right?

A. Yeah, I know what Stocker told me and Craig and Frank told me.

Q. What did Stocker tell you?

A. He told me that -- basically, the same thing that Craig and them did. That he'd waited on the guy, and that he had -- after he hit him, he wrestled with him, I guess, you know. Had contained him, and then he called Craig. And Craig had -- Craig and Frank -- I guess Craig called Frank, and they come to the apartment. And then I guess Craig had called a farmer --

Q. Do you know Michael Stocker?

A. I don't know Michael, but I had found out that he had been there.

Q. Who did you learn that from?
A. Originally from his brother.
Q. So Josh told you that?
A. Originally.
Q. So it was -- at least the story that you were told involved Josh Stocker, Michael Stocker, Kimberlin and Frank Chacon?
A. Yes. Well, originally, uh -- Stocker -- Josh Stocker didn't want -- he didn't want Craig to know that his brother was there to help him, or -- also, I guess. Tori and Guinn had been there also at the time.
Q. Guinn Garcia?
A. Yes. And I guess they'd all -- I guess he got rid of all of them before Craig got there, before Craig showed up.
THE COURT: I'm going to give them a break.
MR. FARREN: Yes, Your Honor.
THE COURT: Ladies and gentlemen, take 15 minutes. Come back in the jury room at 4:25.
(Recess.)
(Both sides, the Defendant present, in (open court:)
THE COURT: All rise, please. Thank y'all. Everybody ready to bring the jury back in?

MR. FARREN: We are, Your Honor.

MR. WATKINS: Ms. McElroy's on her way back now.

THE COURT: You don't know where Mr. Brad Parker is, do you? There he is. How many have we got?

THE BAILIFF: Waiting on one.

THE COURT: All right.

(Jury seated.)

THE COURT: Thank you, ladies and gentlemen. Everyone be seated. Go ahead, Mr. Farren.

MR. FARREN: May I approach the witness, Your Honor?

THE COURT: Yes, sir.

DIRECT EXAMINATION (CONTINUED)

BY MR. FARREN:

Q. Mr. Keeling, at this time, I'm showing you State's Exhibit 265 through 269, and ask if you recognize what's depicted in those photographs?

A. Yes, I do.

Q. And these are pictures of Tyler Hale's house and the garage that you testified about earlier. Is that correct?

A. Yes, sir.

Q. Do these photos accurately depict the way it appeared at that time?

04:22PM A. Yes, sir, they do.
04:22PM Mr. Farren: Offer State's Exhibits 265 through 269 into evidence, Your Honor.
04:22PM MR. WATKINS: No objection.
04:22PM THE COURT: Be admitted.
04:22PM Q. (BY MR. FARREN) This is State's Exhibit 265. And is this the back door --
04:22PM A. Of the house.
04:22PM Q. -- of the house? And then -- this is, is this the garage?
04:22PM A. Yes, sir.
04:22PM Q. Okay. And 266 is a little better view of the garage door itself?
04:23PM A. Yes.
04:23PM Q. 267 is the front of Mr. Hale's house?
04:23PM A. Yes.
04:23PM Q. And 269 -- 268 is just a different -- that's inside the garage itself, or do you remember being in the garage or seeing in the garage?
04:23PM A. Oh, yeah. I've been in there a time after that, too.
04:23PM Q. Okay. When were you there another time?
04:23PM A. My wife and I had stopped by just to talk to him.
04:23PM Q. Just to visit? Okay. Now, do you -- have you

met Detective Mark Brown of the Amarillo Police Department?

A. Yes, I have.

Q. And when did you -- approximately when did you first come in contact with Mark Brown?

A. The first time? Him and another detective came out to my house and asked me questions about Dustin Pool.

Q. Did they indicate -- do you remember why they thought you would know something about it? What led them to you, do you know? Or did they --

A. Bledsoe and Stocker had been arrested prior to that.

Q. So did they tell you that's why they were there, or you just surmised that? You just assumed?

A. They -- they asked me -- Mark Brown had asked me questions if I knew them two, and then asked me if I knew Frank Chacon, and if I knew Craig Kimberlin. And that I -- and wanted to know how I knew them. And then he had said that he had heard that I was the man to talk to, you know, that I knew where the body was at.

Q. When you visited with them on the first occasion, did you provide them with any kind of a written statement?

A. No, I didn't.

04:25PM Q. How long did you think you visited with them?

04:25PM A. Twenty minutes, probably.

04:25PM Q. Okay. Did -- what did you tell them? I don't know anything about it, or --

04:25PM A. Yeah.

04:25PM Q. Did you go see anyone or talk to anyone after they left?

04:25PM A. I went to Craig's house.

04:25PM Q. Was Craig Kimberlin there?

04:25PM A. Yes, he was

04:25PM Q. Did you and Mr. Kimberlin discuss this --

A. Yes, we did.

04:25PM Q. -- this situation? What did you -- what did you talk about?

04:25PM A. About me denying knowing anything -- you know, having anything to do with Dustin Pool's body being -- or him being missing at that time. And --

04:26PM Q. And so just to make sure I understand, was -- was that your agreement with him then, that you're just denying knowing anything at all?

04:26PM A. Yes.

04:26PM Q. Did that ever change?

04:26PM A. Yes.

04:26PM Q. When did it change?

04:26PM A. After Craig was arrested --

04:26PM Q. Now, when you say when Craig was arrested, when Mr. Kimberlin was arrested for drug charges?
04:26PM A. For drugs, yeah.
04:26PM Q. Okay. Do you know if that was sometime in June?
04:26PM A. He -- he was raided. I don't know. Late March, early June, something like that, I guess. I don't remember exactly.
04:26PM Q. Okay. Sometime after -- after the Pool event?
04:26PM A. Oh, yes. Yes. It was a while after. He was raided uh --
04:26PM Q. Whenever that was, did something change?
04:26PM A. Yes. Yes, it did.
04:27PM Q. Did it change while he was in jail or after he got out?
04:27PM A. After he was out. I wasn't aware of -- that he was out and then I --
04:27PM Q. How did you learn that he was in jail?
04:27PM A. I got a phone call one night. And I -- I stopped to use a phone, a pay phone to call him. All I had was that talk-about at the time.
04:27PM Q. When you say you got a phone call, from him?
04:27PM A. Yes.
04:27PM Q. Was this a phone call or message on your talk-about?

04:27PM A. Well, you could call the talk-about from a cell phone -- or I could leave a message on his cell phone, so uh -- he left me a number to call, you know. I didn't know -- I didn't recognize the number at the time.

04:27PM Q. So the last you heard he was still in jail?

04:27PM A. Yes.

04:27PM Q. Okay. So you called this number and it was him?

04:27PM A. Called this number and it was him. And at first, I kind of freaked out, you know. I remember my wife asking me what's wrong? And I told her, you know, I think I might have -- I think I just talked to a ghost, you know, something like that. You got to understand, Craig had a three million dollar bond.

Q. Right.

04:28PM A. And a few days later, he's calling me on his cell phone, you know. He wants me to meet with him, and --

04:28PM Q. Now, during the phone conversation, did you ask or did he explain how it is that he made this three-million dollar bond?

04:28PM A. No, he never -- he never did.

04:28PM Q. Did you go meet with him?

04:28PM A. Yes, I did.

04:28PM Q. When you met with him, did he explain that?
04:28PM A. Yes, he did.
04:28PM Q. Okay. What did he tell you?
04:28PM A. He told me that they -- he said that I could call him a snitch or whatever, but he -- that they gave him his life back. He said he was sorry that he told them where the body was in exchange for his freedom. And he would work with the DA, and -- if they would put him in protective custody.
04:29PM Q. Okay. So his explanation was that he had told them where the body was and he was going to do some additional work for them in the drug area?
04:29PM A. Yes.
04:29PM Q. Okay. How did you feel about that?
04:29PM A. Well, I mean, he was the one that called me, you know. Said he needed my help. Said he didn't want to go to the pen, you know.
04:29PM Q. When you say he's the one that called me, do you mean the night that all of this started for you?
04:29PM A. Yes. He's the one that called me for help, you know. And I mean, first off, I felt betrayed, you know. I felt like I was trying to save him and his family, you know. Me and Cody were real close at the time. That's his son. And I felt like, you know, I did this for him and his family. And then I felt like he

betrayed me.

Q. Did he -- when he told you that he told them where the body was, did he indicate that he'd also given you up?

A. Yes.

Q. Okay. So now you know not only --

A. He was trying to talk me into turning myself in.

Q. Okay. He just wanted you to do the right thing?

A. Yeah. He said that he didn't have the money to bail me out, but -- he said he had given them all of his money, all of my money, basically everything. And uh -- he didn't have the money to bail me out. But, you know, if someone would come in, he would try to get me some money.

Q. Did he talk with you about -- out of the goodness of your heart, you're just going to fall on the sword and go turn yourself in, and --

A. No. He said he devised a plan. His exact words was, he's not going to let those two, meaning Josh and Josh, take us all down.

Q. Okay.

A. He said, I told you in the beginning I wasn't going to let them take us down. And uh -- he said that

04:31PM he'd already talked to Frank, and Frank had already
04:31PM turned himself in, and had told them what he wanted them
04:31PM to tell him. And he wanted me -- he wanted to go over
04:31PM the story with me, wanted me to say the same thing.
04:31PM Q. Okay. So it was your understanding that
04:31PM Mr. Chacon had told a story that was somehow fabricated
04:31PM or agreed to between Mr. Kimberlin and Mr. Chacon?
04:31PM A. Yes.
04:31PM Q. And now he wanted you to turn yourself in and
04:31PM tell a similar story?
04:31PM A. Yes.
04:31PM Q. And what was the story you were to tell?
04:31PM A. That Stocker and Bledsoe had called me, and I
04:31PM had called him and let him know about it. And that
04:31PM Frank -- I got ahold of Frank to help -- that everything
04:31PM kind of went wrong between those two to begin with. And
04:31PM I took the body and got Frank to help me, and we buried
04:32PM the body.
04:32PM Q. Now, in this version of the story, was
04:32PM Mr. Kimberlin involved in disposing the body?
04:32PM A. No, the only -- in his version, the only time
04:32PM he'd heard about it was me calling him and letting him
04:32PM know that these guys wanted me to help him, you know.
04:32PM Q. In -- in this version of the story, did
04:32PM Mr. Kimberlin or Mr. Chacon have anything to do with the

04:32PM death of Dustin Pool?
04:32PM A. No, they did not.
04:32PM Q. In fact, only you and Mr. Chacon even had anything to do with the disposal of the body?
04:32PM A. Yes.
04:32PM Q. And Mr. Kimberlin --
04:32PM A. He just knew about it.
04:32PM Q. -- he just hadn't reported it?
04:32PM A. Yeah. We reported in to him, I guess.
04:32PM Q. How about Mr. Elliston? Was he ever mentioned anywhere?
04:32PM A. Not in a -- yeah, he was mentioned. That -- in his version he wanted me to give was that they had taken the body out there to Michael's place, and uh -- they had left from there. And then that's when they called me and wanted me to go to meet them at the lake house, you know.
04:33PM Q. In that version, was Mr. Elliston involved in the murder at all?
04:33PM A. No, he wasn't involved.
04:33PM Q. He was just out there minding his own business and they showed up?
04:33PM A. Yes. Yeah. They just needed a place to take the body, I guess. That's where we kept the dope, so that's where they were going to put the body at.

04:33PM Q. And so it was your understanding in this version that Mr. Pool was already dead, or they took him out there and he died, or died before he got there, or do you know for sure?

04:33PM A. Are you talking about the version he wanted me to tell?

04:33PM Q. The version he wanted you to tell.

04:33PM A. I'm sorry. I'm confused.

04:33PM Q. Well, I understand. Believe me. I think everyone in the room --

04:33PM A. Yeah. The version he wanted me to tell was that those two had killed -- that Josh and Josh had killed Pool, and that they had taken him out to the farm or something, you know, and got Michael involved, and then got ahold of me, and --

04:34PM Q. By Michael, you mean Michael Elliston?

04:34PM A. Yes.

04:34PM Q. And got you involved?

04:34PM A. And then called me, and wanted me to take -- take the body and dispose of it. And I asked Craig what was his involvement in all of this, you know. You know, what did he tell? What's he going to tell?

04:34PM Q. So in this version of the story, Craig, what did you do? That's your question. Right?

04:34PM A. Right. Right. And his involvement was, I

04:34PM called him because of my loyalty to him, and let him know what was going on. And that's how he knew where the body was.

04:34PM Q. What did you think of this plan?

04:34PM A. I thought it was crap. I mean. . .

04:34PM Q. I mean -- so how did you respond?

04:35PM A. Well, it pissed me off. I mean, I didn't -- I didn't say a lot to him. My wife had went outside -- she left because she saw the look in my eyes, you know. Her and Jessica went out to the garage. I just remember, I kept looking at him shaking my head. I couldn't believe what I was hearing. I just couldn't believe it.

04:35PM And it all started going together, and Craig was going to write a book. And it all started going together. I started seeing the pictures of all of the pieces going together, you know. That maybe this was the ultimate crime for him and he could get away with it.

04:35PM Q. When you had had the discussions with Frank, and Craig, and Jessica, after you dropped the Navigator off of Bledsoe's house, by then did you understand and realize that Frank and Craig --

04:35PM A. Oh, yeah. I knew the whole story.

04:36PM Q. -- were involved in the actual death of

04:36PM Mr. Pool?

04:36PM A. By then I knew the whole story.

04:36PM Q. Okay.

04:36PM A. Yeah, I wanted to know -- if I'm going to help

04:36PM them, I wanted to know first of all how many people knew

04:36PM about it. You know? That was my first question. If I

04:36PM help you, how many people know about it?

04:36PM And second of all, if I help you, then you

04:36PM can't ever tell anybody, you know. I mean, it's got to

04:36PM be between us three and that's it. That's the main

04:36PM reason I felt betrayed, I mean -- because I told Craig,

04:36PM I said, I have a family that I love very much.

04:36PM Q. So when you say, if I help you, the three of

04:36PM us are the only ones that will know, and we can't tell

04:36PM anybody else. You mean what really happened when you

04:36PM agreed to help bury the body?

04:36PM A. Yes. Yes.

04:36PM Q. Well, my question though is, did you agree to

04:36PM go along with this fantasy that Mr. Kimberlin --

04:36PM A. I did at first. Yes, I did. Actually, I gave

04:36PM that statement to Mark Brown the first time, the one

04:36PM Craig wanted me to.

04:36PM Q. So if you -- if the earliest written statement

04:36PM that we have from you is on June 20th, you were telling

04:37PM the story Mr. Kimberlin wanted you to tell?

A. June 20th?

MR. FARREN: May I approach the witness, Your Honor?

THE COURT: Yes.

Q. (BY MR. FARREN) There's a handwritten statement and a typed statement.

A. Okay. Yes.

Q. Okay. Now, the typed statement was actually created June 23rd. Is that right?

A. Right. Right.

Q. Okay. We'll call it the June 23rd statement then. At any rate, June 20th to the 23rd, you and Mr. Brown are visiting about -- about what occurred?

A. Right.

Q. And this is after your visit with Mr. Kimberlin, after you learned that he bonded out of jail and he had told you that -- this fantasy he wanted you to tell?

A. Yes.

Q. Well, the June 23rd statement, you would agree with me, has a lot of information about Placensio and --

A. Yes, it does.

Q. -- being out at Lake Meredith?

A. Yes.

Q. And all of the things that went wrong?

04:38PM A. This -- see, there had to have been -- there's another statement, there has to be somewhere that I gave prior to this one.
04:38PM Q. So do you think you gave a verbal statement prior -- well, there's -- now, there's a -- there's a June 20th statement. Do you -- do you know if this is the same statement?
04:38PM A. See, I gave two statements. The first one was -- I believe had to be the written one on the 20th, I guess. Yeah. That's -- this is the one that I gave that's Craig's story, and then the 23rd is my story.
04:39PM Q. Okay. The June 20th statement is a handwritten statement?
04:39PM A. Yes.
04:39PM Q. Is that in your handwriting or do you know?
04:39PM A. No.
04:39PM Q. Is that your signature?
04:39PM A. Yes. That's uh -- Mark Brown's handwriting.
04:39PM Q. Okay. So you would talk to Mr. Brown about it and he would write the things down as you talked. Eventually, you reviewed it and signed it?
04:39PM A. Yes.
04:39PM Q. In this statement, would you -- and you don't have a copy of that with you, do you?
04:39PM A. Not that one, no.

Q. You have the typed 23rd?
A. Yes.
MR. FARREN: May I approach the witness, Your Honor?
THE COURT: Yes.
Q. (BY MR. FARREN) In the handwritten statement, would you agree that you got a call from Josh Stocker?
A. Right.
Q. But in reality, the truth would be you got a call from Craig Kimberlin?
A. Yes.
Q. Okay. And without going through this entire statement, do you recall visiting with Mr. Brown and I, and indicating that, basically, you could just substitute Mr. Kimberlin's name for Stocker or other people's names here, at least as far as the phone calls and such?
A. Yes.
Q. Would you agree or disagree that there are parts of the June 20th statement which are true?
A. Oh, yeah.
Q. The body did go to Lake Meredith?
A. Yes.
Q. There were problems. He finally ended up in a grain silo?

04:40PM A. Right.

04:41PM Q. But that part of the story which leaves Mr. Kimberlin out and Mr. Chacon out of the actual homicide, that's not true, is it?

04:41PM A. No, it's not.

04:41PM Q. When you gave the June 23rd statement, how did that come about? Why did you give a second statement?

04:41PM A. Actually, to be honest with you, I gave the first statement uh -- when I was done, Mark Brown got up to leave and he said, are you sure this is -- this is true? This is a correct statement? And I said, yeah. And he kept looking at me. And uh -- I guess he could tell I was lying, you know. And I basically told him sit down. It's going to be a while. And --

04:41PM Q. Okay. There's about a three-day lapse. Was that conversation right at the end?

04:42PM A. No. See, now the three-day lapse is because I went to his office afterwards to make the statement that I'd given to him. I'd given him the original statement, but then I went to his office so he could document it three days later.

04:42PM Q. So when you went to him three days later, you discussed this first statement?

04:42PM A. Yes.

04:42PM Q. And he asked you, are you sure you told me the

04:42PM truth in this statement?

04:42PM A. Yes.

04:42PM Q. And at some point, you said sit down. We're going to be here a while?

04:42PM A. Yes.

04:42PM Q. Okay. Have you reviewed this handwritten -- I mean, the typed statement from June 23rd?

04:42PM A. Yes, I have.

04:42PM Q. Is the June 23rd statement consistent -- I realize it's not word-for-word, but is it consistent with what you have told the jury today?

04:42PM A. Yes, it is.

04:42PM Q. And is what you told the jury today and what's in your June 23rd statement, is that what happened?

04:42PM A. Yes, it is.

04:42PM Q. Now, you -- would you agree that you gave an additional -- a very short additional statement on August 27th? I think this is where you talked about giving the pagers or the talk-about or something?

04:43PM A. Yes.

04:43PM Q. And then on -- there was another statement, I think, on August 4th. Again, you're talking about the pagers and trying to get those for him. Do you recall?

04:43PM A. (Witness nods head up and down.)

04:43PM Q. Now, at some point after you gave this

statement, this June 23rd typed statement, did you end up being arrested and charged with tampering with evidence?

A. Yes.

Q. Okay. Were you ever charged in conjunction with the federal drug investigation for which Mr. Kimberlin was originally involved or in jail?

A. No.

Q. Were you charged with some federal crime other than the tampering -- I mean, the counterfeit, passing the counterfeit money?

A. No.

Q. Do you have other convictions in the past?

A. No.

Q. So currently you have a -- a federal conviction for the counterfeiting?

A. Yes.

Q. Or passing the counterfeiting money?

A. I passed it --

Q. And a state conviction for tampering with evidence in this case. Is that correct?

A. That's correct. Yes.

Q. And those, to your knowledge, are your only two convictions?

A. Yes, sir.

Q. Have you had other run-ins with the law in the past?
A. Oh, yeah.
Q. Mr. Kimberlin -- Mr. Kimberlin. Mr. Keeling --
A. Yes, sir.
Q. -- for a large portion of your life you've -- you've lived a life that involved a lot of criminal activity, haven't you?
A. Yes, sir.
Q. And, in fact, you and your brother, Doug, both have been in a lot of trouble, haven't you?
A. Yes, we have.
Q. You've used drugs?
A. Yes, sir.
Q. You've sold drugs?
A. Yes, I have.
Q. You've purchased drugs?
A. Yes, I have.
Q. You're involved in this counterfeiting, or at least passing the money. By the way, where did you get this counterfeit money?
A. Honestly, it was a ten-dollar bill that I passed. And it wasn't like I had a whole bunch, it wasn't like I was making it --

04:45PM Q. Well, did somebody give it to you?

04:45PM A. It was given to me in a drug deal, you know.

04:45PM Q. Well, there's one other issue I want to talk with you about, but before I do that, I just -- why -- why should the jury believe you?

04:45PM A. I don't know. I mean, that's up to them. I have no reason to lie, you know.

04:45PM Q. Let me ask you this: You've been sitting out here in the Randall County jail for how long?

04:46PM A. Going on three months now.

04:46PM Q. Okay. You were in federal custody prior to that?

04:46PM A. Yes, I was.

04:46PM Q. When you got here, who else is in this jail with you? Is Craig Kimberlin out there?

04:46PM A. Craig Kimberlin and Frank Chacon.

04:46PM Q. Frank Chacon out there?

04:46PM A. Yes.

04:46PM Q. Tommy Tucker's out there?

04:46PM A. Yes.

04:46PM Q. Miguel --

04:46PM A. Miguel Gonzales. Actually, he's in the same prison I'm in.

04:46PM Q. The same pod?

04:46PM A. No, in a different --

Q. You mean when you're serving your federal time?

A. Right. Yes.

Q. Omar Mendoza's out there?

A. To the best of my knowledge, he just got there not too long ago. But, yeah, he's there.

Q. Is that a particularly friendly environment for you, in light of the fact that you're going to come here and testify?

A. No. No, it's not.

Q. But you still came here and testified?

A. Yeah.

Q. Why?

A. I -- you know, it's something that's been bugging me. I don't know. It wasn't right. I mean --

Q. Do you remember making a promise to me?

A. Yeah.

Q. What did you promise me you would do?

A. I'd tell the truth.

Q. Are you keeping your promise?

A. Yes, I am.

Q. One last issue. Are you aware that the grain silo burned down?

A. Yes, I am.

Q. And until you pled guilty to the state

charges, is it true or not, that no one knew who caused the grain silo to burn down?

A. That's true, yes.

Q. What did you tell us during the -- when you pled? Who burned it down?

A. I told you who burned it down.

Q. Did your dad do it?

A. Yes, sir.

Q. Now, do you understand in order to file a criminal charge we have -- we've got to have a complainant. Did -- does Mr. Johnson want to pursue criminal charges in that case?

A. I don't know.

Q. Up until then, nobody knew who burned it down?

A. No.

Q. You didn't have to tell us, did you?

A. No.

Q. But you did?

A. (Witness nods head up and down.)

Q. Is there anything that I've forgotten to ask you or that we need to talk about that you can think of?

A. I don't know -- I just --

Q. Did -- did Josh Stocker ever talk to you about the situation after Kimberlin bonded out and he began to reveal, I basically let the cat out of the bag. I told

them where the body is?
A. Did Stocker ever talk to me?
Q. Uh-huh.
A. No, he was incarcerated.
Q. Okay. So you never visited with him?
A. Not after Craig had bonded out.
Q. And by the -- okay.
MR. FARREN: Pass the witness.
THE COURT: Who's going to take this one?
MR. WATKINS: I am.
THE COURT: Fine. Let's go.

CROSS EXAMINATION

BY MR. WATKINS:

Q. Mr. Keeling, you and I've met before. Is that correct?
A. Yes, it is.
Q. All right. My name is Mike Watkins.
A. Yes.
Q. Okay. Let's kind of go over some stuff here real quick. You said that you had heard of Dustin Pool before?
A. Yes.
Q. Had you ever met him?
A. No, I've never met him.
Q. Had you ever seen him?

04:49PM A. Uh -- I seen him through his front door one time, just -- you know. I couldn't tell you what he looked like, other than seeing him on the news and the papers.

04:49PM Q. Okay.

04:49PM A. He had a tarp around him. His front door looked like what those do there.

04:49PM Q. Kind of glass?

04:49PM A. Yeah.

04:49PM Q. Okay. Let's go back and talk about this Chris who got his foot shot. Okay?

04:50PM We -- Mr. Farren has been referring to him as Chris Eason, and I think we all agree that Chris Eason is the name, even though you don't know his last name.

04:50PM A. Right.

04:50PM Q. You said that there were nine shots fired when you accidentally discharged the weapon?

04:50PM A. Yeah.

04:50PM Q. Okay. How -- how long did you have to wait in the car, the van, alone for Guinn and Ray to come out?

04:50PM A. It wasn't long.

04:50PM Q. A minute?

04:50PM A. Five minutes. Six minutes.

Q. Five minutes? Six minutes?

04:50PM A. Something like that.

Q. Okay. So they had been in there for a little while?

A. Yeah.

Q. Because you'd been out in the parking lot for a little while --

A. Yes.

Q. -- shooting someone by accident?

A. Yes.

Q. Okay. When -- I mean, I've never shot a -- did you say it was a Mac-9?

A. A Mac-10.

Q. A Mac-10. I've never shot a Mac-10, but I've shot a .9 mm. They're not silent.

A. No, it's loud.

Q. It was pretty loud. As a matter of fact, you said it scared the lady next to you and she took off?

A. Yeah.

Q. There's a security guard that goes around Wal-Mart. Did they not come over and check it out?

A. I -- no, because I'm sure they had of -- they would have, but I -- I decided to stay in the van, you know. And uh -- and just fate it, I guess. Whatever happens, happens. You got to understand, I was -- I was high, too, you know.

Q. Okay. And the police never drove by and

checked out this shooting report?

A. I'm sure they did. I mean, to my knowledge --

MR. FARREN: Well, I'm going to object. That -- that assumes facts that are not in evidence. No evidence that anybody ever reported the shooting, Your Honor.

THE COURT: Sustained.

MR. WATKINS: I'll -- I'll --

Q. (BY MR. WATKINS) You never saw the police drive by the van while you were sitting there?

A. The police? No. No.

Q. Or the security people?

A. The security guy was driving around in his little truck he's got.

Q. Okay. When the gun went off, did other people in the parking lot react?

A. All I was -- all I was focused on was the lady next door.

Q. And she was focused on getting out of there?

A. Yeah. Yeah.

Q. Okay. Okay. In the Placensio deal, you said that several people came by Mr. Bledsoe's shop, and this is a car detail shop, if I'm not mistaken?

A. Yes.

Q. And you said that one of them was Miguel

Gonzales?

A. Yes.

Q. Okay. Now, is he a part of y'all's group?

A. Yes.

Q. And did Ray and Miguel have an issue?

A. Yes, they did.

Q. What was that issue?

A. They had gotten into it over an incident they had at the mall. And uh -- I guess Pool and Ray had pulled some guns on Miguel and his family. And so then they had an altercation. I mean, they -- basically, they'd -- he asked me if it was all right if -- you know, if he could fight him.

Q. Who asked you?

A. Miguel. And Ray was scared, because I had a gun, you know, a machine gun holding at him. And I said, yeah. You know, I told -- I remember telling Ray that he had my word. I'm not going to touch him, you know. They could -- they could fight him, and so they fought.

Q. Okay. And what was the outcome of that?

A. Ray -- Ray had the upper hand.

Q. Ray beat up Miguel?

A. Yeah. More or less, yeah.

Q. Okay. And then whenever Kimberlin's noticed

that, did he say anything?

A. Yeah. When Craig got there, he was pissed. He was furious.

Q. That Miguel had been beat up?

A. That -- that I even let it happen.

Q. Okay.

A. You know. . .

Q. All right. On this -- while Ray was there were you there for most of the time he was there?

A. Yes, I was.

Q. Okay. Was he using his cell phone calling people?

A. Ray?

Q. Yeah.

A. No.

Q. No?

A. Not to my knowledge, no.

Q. Okay. Now, I think you said that this happened the same day that Chris Eason got shot in the foot. Right?

A. Yes. Same evening, yes.

Q. So if Chris Eason went to the hospital on February 12th, that would be the same day that this all started?

A. Yes.

04:55PM Q. Would it surprise you if there were 58 phone calls from the evening of February 12th for the next three days on Ray Placensio's cell phone?

04:55PM A. Yeah. Yeah.

04:55PM Q. So y'all weren't letting him call?

04:55PM A. No. No, he wasn't in any shape to call either.

04:56PM MR. WATKINS: May I approach the witness?

04:56PM THE COURT: Yes.

04:56PM Q. (BY MR. WATKINS) I'm showing you a single page that's marked Defendant's 16.

04:56PM A. Okay.

04:56PM Q. First let me do this.

04:56PM MR. WATKINS: This is a part of the business records that y'all introduced. This is just a single page out of it. Your Honor, we -- I guess it already had been offered.

04:56PM MS. McELROY: It's already admitted.

04:56PM MR. FARREN: It's our understanding that this same document is in evidence as a different exhibit. This is one page out of those records. I don't have an objection to them separating out one page.

04:56PM THE COURT: Well, I sure don't either. I don't want the jury to have to find that one page in that eight-inch stack.

MR. WATKINS: We don't either. And we would offer Defendant's 16.

MR. FARREN: No objection.

THE COURT: Defendant's 16 is admitted.

MR. WATKINS: Okay.

Q. (BY MR. WATKINS) I'm showing you Defendant's 16.

A. Okay.

Q. Which this is with a lot of other pages that have been admitted as Ray Placensio's cell phone.

A. Okay.

Q. Okay? And it comes back to 683-0575. Do you remember that number?

A. 683?

Q. 683.

A. Huh-uh. Yeah, it's familiar. 0575. That's familiar.

Q. Okay. Let me show you the part that's highlighted.

A. Okay.

Q. What day and time does it say that the highlighting starts?

A. 2/12, at 10:19 p.m.

Q. Okay. And at the bottom of the highlighting, what date is that?

04:57PM A. 2/15.
04:57PM Q. Okay. And is it safe to say that your testimony with Mr. Farren was that Ray was abducted sometime after dark?
04:57PM A. Oh, yeah. Yeah, it was dark.
04:58PM Q. Okay. And so that'd be sometime around 10:00 in the evening, it would be dark in February?
04:58PM A. Yes.
04:58PM Q. Maybe earlier than that, but it would be dark?
04:58PM A. It was dark when I -- when I was in the van, it was dark.
04:58PM Q. And three days from that day would include the 13th, 14th, and 15th?
04:58PM A. Yes, sir.
04:58PM MR. FARREN: I'm sorry --
04:58PM MR. WATKINS: I was going to publish it.
04:58PM MR. FARREN: Yeah, I just wanted to look at it.
04:58PM THE COURT: Let me see it.
04:59PM MR. WATKINS: Sorry. May I publish?
04:59PM Q. (BY MR. WATKINS) Okay. Let's move on to the meeting at Stumpy's. Do you remember that meeting?
04:59PM A. Yes.
04:59PM Q. Okay. I need you to speak up just a little bit, because I'm hard of hearing.

04:59PM A. Yes, I do.

04:59PM Q. Thank you. Now, you said that there were lots of people from your group there, and someone from Bledsoe's cartel? Do you remember saying that?

04:59PM A. Yeah. Yeah. There was a guy named Rocky, I believe, there.

04:59PM Q. Rocky? Okay. And was he Bledsoe's friend or from somewhere higher up than Bledsoe?

05:00PM A. No, I'm sorry. Yes, there was a cartel guy there. I thought you were talking about the ones from Dustin Pool's. I believe there was a guy there -- an inside guy that we had on Pool's side, but -- but, yeah, as far as cartel, you're talking about one of the cartel guys?

05:00PM Q. Right.

05:00PM A. Yeah.

05:00PM Q. Okay. And this is someone from out of state?

05:00PM A. Probably from Mexico.

05:00PM Q. Probably from Mexico? Okay. And is he kind of calling the shots?

05:00PM A. He's just kind of observing.

05:00PM Q. Okay.

05:00PM A. More or less to see how things are done here, you know.

05:00PM Q. Okay. Do you know the guy's name?

A. No, I don't.
Q. What did he look like?
A. A Spanish guy.
Q. Tall? Short? Fat? Skinny?
A. Short, medium build, I guess.
Q. Okay. Dark complected?
A. Yeah.
Q. Who -- who were you with there?
A. I was with Craig.
Q. With Craig? Did you arrive there with Craig?
A. I don't remember.
Q. Okay.
A. If it was with him, or with Stocker, or --
Q. Okay. Now, Mr. Bledsoe was there?
A. Yes, he was there.
Q. Now, Mr. Bledsoe brought someone with him, as well?
A. Yes.
Q. Okay. And do you know who that was?
A. No.
Q. Have you ever heard the name Jason Hickson?
A. I've heard it, yeah.
Q. You don't know if that was him there?
A. I don't know.
Q. Okay. Can you describe the guy that

05:01PM Mr. Bledsoe brought?
05:01PM A. No.
05:01PM Q. Okay. Do you remember if he had a shaved head or --
05:01PM A. I don't remember.
05:01PM Q. Okay. Did Mr. Bledsoe bring the cartel guy that you were talking about earlier?
05:01PM A. I'm not sure.
05:01PM Q. He was just there?
05:01PM A. Yeah. I don't know if he brought him or -- or what.
05:01PM Q. All right. I think you said Miguel Gonzales was there?
05:02PM A. I believe so.
05:02PM Q. All right. Let's talk about the trip up to Lake Meredith.
05:02PM A. Okay.
05:02PM Q. And let me scoot down just a little bit, so I can see over Ms. McElroy's head. Sitting down is a problem. Standing up, it never is.
05:02PM Okay. What time do you think that you got the first call from Craig?
05:02PM A. I'm not sure.
05:02PM Q. Was it dark?
05:02PM A. The first time I got the call?

05:02PM Q. About, I need your help.
05:02PM A. No. No, it probably wasn't dark.
05:02PM Q. Okay.
05:02PM A. See, I had just gotten out of the hospital when I got the phone call.
05:02PM Q. All right. And let me back up. Let me slow down and ask you about that.
05:03PM You had been in the hospital for a drug overdose?
05:03PM A. Yes.
05:03PM Q. Okay. And it had been pretty serious, hadn't it?
05:03PM A. Yeah, I died.
05:03PM Q. How long had you been in the hospital?
05:03PM A. A few days.
05:03PM Q. Okay. Is a few like two days?
05:03PM A. Three days, probably.
05:03PM Q. Three days? Which hospital?
05:03PM A. BSA, I believe.
05:03PM Q. Okay. Now, at one of our breaks, I came up and I talked to you. And by the way, you and I have talked before, haven't we?
05:03PM A. Yes, we have.
05:03PM Q. Other than today?
05:03PM A. Yes, we have.

Q. Ms. McElroy, and I, and Ms. Garrison, my investigator, came out to the jail and talked to you?

A. Yes.

Q. Okay. I came up at the break and said hi to you, and talked to you, and asked you about your hospital visit?

A. Yes.

Q. And I asked you how many times you'd been to the hospital on an overdose?

A. Yes.

Q. And you said just once?

A. Yes.

Q. And you still believe that to be true?

A. Yeah.

Q. Okay. And that was two days before you got this call from Kimberlin, you'd been released?

A. No. I -- I'd just left the hospital that morning when I got the phone call, I believe.

Q. Okay. So 12 to 14 hours after you get out of the hospital, Mr. Kimberlin's calling on you?

A. Yeah. Probably. I don't know exactly how many hours.

Q. The same -- the same calendar --

A. I had just gotten out, yes.

Q. Okay. Are you -- I mean, are you up to full

05:04PM speed at this point?

05:04PM A. What do you mean?

05:04PM Q. Are you -- physically, you're pretty strong.

05:04PM But after you've been in the hospital, are you --

05:04PM A. I was kind of weak. I remember Craig asking

05:05PM me how I felt, too, when he called.

05:05PM Q. Okay. Whenever you say you died, they had to

05:05PM resuscitate you?

05:05PM A. Yes.

05:05PM Q. They had to use like, the paddles and stuff?

05:05PM A. No, they didn't have to use the paddles. They

05:05PM injected me with something.

05:05PM Q. Okay. Into your heart?

05:05PM A. No, I had uh -- I had an IV.

05:05PM Q. Okay. And then did they have to do this more

05:05PM than once?

05:05PM A. Twice.

05:05PM Q. Okay. And that's why you said you died twice?

05:05PM A. Yes.

05:05PM Q. Your heart stopped two different times?

05:05PM A. Yes.

05:05PM Q. So you were pretty sick?

05:05PM A. Yes, I was.

05:05PM Q. Did the doctor tell you to quit using drugs?

05:05PM A. Yes, he did.

Q. Okay. But you didn't at that time. Right?

A. No.

Q. So he calls you and tells you he has a problem. He needs to store Dustin up there. You think Dustin's alive, for a couple of days while he revives?

A. Yes.

Q. Okay. And you asked your wife about it. And she's hesitant, but she's willing to let you do it?

A. Yes.

Q. Okay. Because you mentioned that she did some narcotics occasionally?

A. Yes.

Q. But she wasn't a part of the drug trade, so to speak?

A. No.

Q. And this is probably her source of narcotics, directly through you?

A. I'm her source.

Q. Okay. But your source is her source?

A. Yes.

Q. Okay. So she gives in and lets you -- lets you do it?

A. (Witness nods head up and down.)

Q. But you're concerned that you can't find the place?

05:06PM A. Yes.

05:06PM Q. Okay. So you take her with you?

05:06PM A. Yes.

05:06PM Q. Now, does she keep a key to this place at her house, at y'all's house?

05:06PM A. No, she doesn't.

05:06PM Q. Okay. And so in one of your statements where you said you had the wrong key, that wasn't right?

05:07PM A. No. The key to the lake house used to be kept underneath something on the porch.

05:07PM Q. Okay.

05:07PM A. And uh --

05:07PM Q. Kind of a hide-a-key at the lake?

05:07PM A. Right. And when we got there we couldn't find the key.

05:07PM Q. Okay. And I assume the whole family knew where the hide-a-key was?

05:07PM A. Yes. If anybody wanted to use the lake house, that's why the key was there.

05:07PM Q. Okay. And someone had moved the key?

05:07PM A. I -- to the best of my knowledge, her -- my wife's brother had moved it prior to that, but we didn't know that.

05:07PM Q. Okay. So you couldn't get in. Everyone started looking for the key. Is that correct?

05:08PM A. Yeah.

05:08PM Q. I believe your statement says that everyone got out of the car, even Denise got out and started looking for the key?

05:08PM A. Yes, she went to the front porch.

05:08PM Q. Okay. People went around back looking for where a hide-a-key might be hiding in open windows and stuff?

05:08PM A. No, we weren't looking for the key at that time.

05:08PM Q. Oh, okay. What were you looking for at that time?

05:08PM A. Looking for a window that might be open.

05:08PM Q. Okay. And no one found one?

05:08PM A. No.

05:08PM Q. And Bledsoe tried to break one?

05:08PM A. Yes.

05:08PM Q. And failed at that, as well?

05:08PM A. Yes.

05:08PM Q. Now, at one point did y'all agree that maybe you should break a window?

05:08PM A. Uh --

05:08PM Q. Did Kimberlin offer to pay for a window if you just went ahead and broke one?

05:08PM A. Yeah. At one point, we got ahold of him and

05:08PM he'd offered to pay for the window, have it fixed.
05:08PM Bledsoe had offered, too, at one point.
05:09PM Q. But y'all decided that it wasn't a good idea
05:09PM to break this window?
05:09PM A. No. No. You've got to understand there's
05:09PM neighbor's there, too.
05:09PM Q. Right.
05:09PM A. Next door. You know?
05:09PM Q. And how close are the neighbors?
05:09PM A. They're real close.
05:09PM Q. Like a normal house lot?
05:09PM A. Normal, yeah.
05:09PM Q. Okay. Now, Bledsoe, I think you testified
05:09PM started freaking out.
05:09PM A. Yes, he did.
05:09PM Q. Making a lot of noise. What kind of things
05:09PM was Bledsoe saying?
05:09PM A. He wanted to get out of there. He wanted to
05:09PM leave the body and get out of there.
05:09PM Q. Did he say, I want to leave the body and get
05:09PM out of here?
05:09PM A. Pretty much, yeah.
Q. Okay.
05:09PM A. He kept telling me to take the body. I guess
05:09PM he expected me just to take the body, you know.

Q. Okay. And you didn't want it?

A. No, I didn't want it.

Q. Okay. Just had to ask that. I thought I knew the answer. Then Bledsoe took off, and you and Josh and Denise head back to Amarillo?

A. Yes.

Q. Okay. And Denise, either at this point or during the drive back, knows that there's something going on?

A. Yeah.

Q. Okay. You're trying to protect her, but she's smart enough to know something's going on?

A. Something's going on, yes.

Q. And Josh has blood on his clothes?

A. Yes.

Q. And so she knows even more that something's going on?

A. Yes.

Q. Y'all get back to Wal-Mart, and she agrees to go in and get clothes, so that the rest of the world doesn't know something else is going on?

A. Right.

Q. Pardon me. Okay. I'm sorry. I had a list of things I wanted to cover. And I covered a bunch of them in that one area. So I have to find where I am now.

05:11PM Oh. Now, you had trouble finding the house. Denise had trouble finding the house in the dark?

05:11PM A. Yes.

05:11PM Q. And Bledsoe took out of there. Do you -- I mean, is it easier to get out of where the house is than it is to get back in?

05:11PM A. Yeah. Once we were there, we knew how to leave.

05:11PM Q. Made sense after you'd seen it?

05:11PM A. Oh, yes.

05:11PM Q. Okay. And then Bledsoe was supposed to go back. Was he going to have trouble finding the house, do you think? If they'd caught him and turned him around?

05:12PM A. I imagine, yes.

05:12PM Q. Okay. Now, which side of the lake is this house on? Is it over by the marina?

05:12PM A. It's close to the marina, yeah. But it's going to be probably on the south side, southeast -- or southwest of the marina.

05:12PM Q. So if you're at the marina, do you go to Sanford, across the dam into Sanford and the --

05:12PM A. No, no, you don't go across the dam.

05:12PM Q. It's on the other side?

05:12PM A. Right.

Q. Okay. All right.

MS. McELROY: Your Honor, may we approach for a moment?

THE COURT: Sure.

(At the bench, before the court only:)

MS. McELROY: We have quite a bit more on Mr. Keeling. Do you want us to continue or do you want us to come back on Monday.

THE COURT: What?

MS. McELROY: I said, I think we have more to do on Mr. Keeling. Do you want us to keep going or do you want us to come back Monday? I noticed what time it was.

THE COURT: I want you to keep going.

MS. McELROY: Okay.

THE COURT: I didn't know, is that all?

MS. McELROY: I know you told someone they could go at 5:30.

THE COURT: You don't need to approach every time you need something. Step back.

(In open court:)

MR. WATKINS: All right. Sorry about that.

Q. (BY MR. WATKINS) Okay. You're back at -- you're back in Amarillo, and y'all are out getting the

goods to finish this job, so to speak.

Did you say that you do or don't remember which store you went to buy this stuff?

A. I just know it was by Coulter, not the one by the highway.

Q. Okay. So if that's Lowe's -- at 45th and Coulter?

A. Yes.

Q. Okay.

A. Over by the Wal-Mart Super Center.

Q. Okay. And there's a lake across the street?

A. Yes.

Q. Okay. I want to ask about --

MR. WATKINS: Are the diagrams of the -- still up there? May I approach?

THE COURT: Yes.

MR. FARREN: The tags are on the back, if you need to identify them.

MR. WATKINS: Oh, okay. All right. I'm going to put State's 245 back up here.

Q. (BY MR. WATKINS) Now, these pictures, I understand what the State is trying to do here, but I'm not sure that everyone else does. This -- number one, let me start with the other chart. 244. Okay. This is the big pit, so to speak. Is that correct?

A. Yes, sir.
Q. I'm pointing to the one underneath the car.
A. Yes.
Q. And the one in front of the car is a littler opening. Is that also a littler pit?
A. This is an opening that falls down into this. See, this is split.
Q. Okay.
A. Underneath the car is split. You've got a pit here and a pit here.
Q. Let me stop you --
A. This is the car --
Q. -- let me stop you for just for a second. I don't have anything -- put your finger -- is the retaining wall that we talked about earlier?
A. It's going to be about right through here.
Q. Right through the front windshield of the car?
A. Yes. All of this is the other half, is this part here.
Q. Okay. All right. I think I have a better understanding of that now. Let me come back to this one.
By the way, on 244, when this was in use, this is where the grain truck would drive in and drop the grain?

A. Yes.
Q. Not in this one?
A. No.
Q. This one was more of an access pit?
A. Probably.
Q. Okay. And there was the retaining wall, so that when this was full it could spill over into this other side?
A. Right. Right.
Q. Okay. Okay. So the small opening on -- on this diagram, which is 245, would be where on here?
A. Right here (pointing).
Q. Okay. So it's showing that as the small opening?
A. Right.
Q. That is, you think, where the small opening is?
A. Yes. Yes.
Q. And from there, this pit, if you drop down in there, at the very top it's biggest, it's the widest dimension?
A. Yes.
Q. And the longest dimension?
A. Oh, yes.
Q. And as you go down every foot or so, it gets

05:17PM more and more narrow?

A. Yes.

Q. Okay.

05:17PM A. See, this is -- this is just basically showing how they have got this dimension here, showing how the wall goes down like this from the small hole. See? And then I guess you'd have your -- I mean, it's not -- it's not really like it is, but it --

05:17PM Q. Okay. My point is that the hole doesn't go further sideways out across the -- underneath the driveway there?

05:18PM A. No. No.

05:18PM Q. Okay. All right. And when y'all dropped the body -- or when Frank dropped the body, first he dropped it coming out of the Navigator?

05:18PM A. Yes.

05:18PM Q. Okay.

05:18PM A. Yes.

05:18PM Q. And then he dropped the body down into the small pit. Is that correct?

05:18PM A. Yes.

05:18PM Q. And did you say that was head first?

05:18PM A. Yes.

05:18PM Q. And then you said that he picked up the body and threw it over the retaining wall?

A. Yes.
Q. He must be a pretty big guy?
A. He's strong.
Q. Okay. Did the body clear the retaining wall?
A. Yes.
Q. So it -- how -- when you're standing there looking at the retaining wall, how tall is that retaining wall? Do you need to stand up?
A. Yes. It's about -- probably about right here.
Q. About to your eye height?
A. Probably, yeah.
Q. Okay. So he picks up this body, Dustin Pool, and throws it over?
A. Uh-huh. Well, he picks him up and sets him on top of the wall, and then grabs his feet and pushes him on over.
Q. Okay. And are you helping him with this?
A. No.
Q. So he's -- he's pretty much manhandling this body?
A. Yes. Yes.
Q. Okay. And he sets it up on the retaining wall?
A. Uh-huh.
Q. And then pushes it on over?

05:19PM A. Yes.
05:19PM Q. When it goes on over, does it fall on its side? On its head? On its back?
05:19PM A. It goes down head first. He put it over the wall head first.
05:19PM Q. Okay. How far of a drop on the other side of the wall is it?
05:19PM A. It's a pretty good drop.
05:19PM Q. Further than it was on the side you were standing on?
05:19PM A. Yes. Yes.
05:19PM Q. Okay. If -- could it be as much as 12 feet?
05:20PM A. Yeah. I would say about 12 feet, probably.
05:20PM Q. Okay. And was there debris and stuff down at the bottom of that pit?
05:20PM A. There was owl droppings and pigeon droppings.
05:20PM Q. And then concrete?
05:20PM A. Right.
05:20PM Q. Did you kind of clean the bottom of the pit out?
05:20PM A. Yes.
05:20PM Q. Okay. Now, how many bags of concrete do you think y'all bought?
05:21PM A. Probably around 20.
05:21PM Q. Twenty? And how big of a bag?

05:21PM A. Eighty-pound bags.
05:21PM Q. Eighty? I'm going to call it concrete and Sakrete sometimes, but you understand --
05:21PM A. It's Sakrete. Ready-mix Sakrete.
05:21PM Q. Is there a difference between Sakrete and concrete?
05:21PM A. Yes, there is.
05:21PM Q. Then I'll try to use the right name. So about 20 80-pound bags of Sakrete?
05:21PM A. Uh-huh.
05:21PM Q. Okay. And you were hauling enough water to mix it up?
05:21PM A. Yes.
05:21PM Q. Okay. Did you have water left over?
05:21PM A. Yes.
05:21PM Q. Okay. Who was doing the actual mixing?
05:21PM A. Craig was.
05:21PM Q. Craig was?
05:21PM A. Well, him and Frank were switching off.
05:21PM Q. Okay. Whenever Craig was mixing, what was Frank doing?
05:21PM A. He was tearing bags.
05:21PM Q. Okay. Getting it ready to mix?
05:21PM A. Yeah. He would pour -- he would add Sakrete and add water to it as Craig was mixing.

05:22PM Q. Okay. So would you -- would they mix one bag and then dump it over?
05:22PM A. Yeah, pretty much.
05:22PM Q. Okay. And would they just kind of dump it or did they get over there and pour it?
05:22PM A. Well, they poured it where it wouldn't splatter a lot.
05:22PM Q. Okay. So someone had to get over into the next pit?
05:22PM A. No, they could lean over. See, there was a bunch of junk, tires and fence posts and stuff that had been thrown down in there.
05:22PM Q. That you could stand on?
05:22PM A. Right.
05:22PM Q. Okay.
05:22PM A. Yeah. Kind of move stuff around where they could stand up there and set the mixer on top, the mixing tub on top of the wall, and then they could pour it over, you know.
05:22PM Q. Okay. Uh -- and you said it took most of the night. Is that correct?
05:23PM A. It took a while.
05:23PM Q. Now, have you ever mixed Sakrete before?
05:23PM A. Yeah. I mixed a lot of concrete before.
05:23PM Q. Is it pretty hard work?

A. Yes.

Q. Okay. How thick would you say this concrete was?

A. It was different. I mean, it wasn't consistent. You've got two guys in the dark trying to hurry up and mix. I mean, some batch -- may be a little thicker than others --

Q. I asked you a bad question. Let me stop you there, because I think I asked a bad question. Whenever I asked how thick, you took it to mean how soupy.

A. Right.

Q. What I meant was the depth that covered the body.

A. Oh. Oh. We wanted it to cover at least -- you know, cover around the body and then cover it. So I would say at least four feet.

Q. Okay. Did you accomplish your goal?

A. Yes, we did.

Q. Okay. Was the bottom of the boot where the concrete level came up, was it completely sealed all the away across the bottom of the boot?

A. I don't understand.

Q. In other words, did you make it look like that was the new bottom of the --

A. Yeah, that's what we did, was make it -- that

05:24PM was the whole point of it, make it look like that was the bottom.
05:24PM Q. Okay. Now, I'm kind of jumping around. I'm sorry.
05:24PM Back to Tyler Hale's house. Actually, I'm going in the right order on this one. When y'all went by to get the body, Craig gave Tyler something. Is that correct?
05:24PM A. Yes.
05:24PM Q. What did Craig give Tyler?
05:24PM A. He gave him some cash and some dope.
05:24PM Q. And a pistol?
05:24PM A. I believe so, yes.
05:24PM Q. And I think you testified he also wiped some money off of the books for him?
05:25PM A. Yes.
Q. Okay.
05:25PM A. Craig was -- was good at that, wiping money off of the books for favors.
05:25PM Q. Okay. Any idea how much money he wiped off Tyler's books?
05:25PM A. I don't have any idea.
05:25PM Q. Okay. Any idea how much money he gave him?
05:25PM A. No, I don't have any idea.
05:25PM Q. Okay. What kind of gun?

A. Uh -- 45 or a .9 mm, something like that. That is usually what Craig -- what he had, you know.
Q. Okay. And a lot of dope or --
A. Not a lot.
Q. Just enough to get high?
A. Probably what he'd normally order from Craig, you know. A quarter pound, something like that.
Q. Okay. And I think you said Tyler was just a user, not a dealer?
A. No, he sold, too.
Q. Oh, he sold, too? Okay. All right. Let's go back to the grain elevator for a minute.
You said that you did this at night, because you didn't want Bobby Boney or anyone else --
A. We didn't want anybody to see us.
Q. Right. But you named Bobby --
A. Plus, you've got to understand, there's trains that go through there constantly, too.
Q. Right.
A. We didn't want the trains, you know, the engineers to see us and then call the law.
Q. Okay. Now, is this neighborhood well lit?
A. No, it was dark.
Q. So would the head lanterns not call attention?
A. Oh, yeah. But when you're down in the hole

05:26PM and you're looking down, you don't really have much to
05:26PM worry about. We're inside the elevator, underneath it,
05:26PM actually.
05:26PM Q. Tried to be as inconspicuous as possible?
05:26PM A. Yes. Yes.
05:26PM Q. Okay. Now, Mr. Farren talked a little bit
05:27PM about the trouble you'd been in, and -- and your
05:27PM testimony, and things like that, didn't he?
05:27PM A. Yes.
05:27PM Q. Okay. You, until recently, stood charged with
05:27PM tampering with the -- with the evidence?
05:27PM A. Yes, sir.
05:27PM Q. Okay. And you recently entered a plea of
05:27PM guilty on that, didn't you?
05:27PM A. Yes, I did.
05:27PM Q. And what was your punishment?
05:27PM A. Two years.
05:27PM Q. Two years, TDCJ?
05:27PM A. Yes.
05:27PM Q. What was the maximum possible punishment on
05:27PM that charge for you?
05:27PM A. It carried two to ten.
05:27PM Q. And ten was the maximum?
05:27PM A. Yes.
05:27PM Q. And two was the minimum?

A. Yes.
Q. As a matter of fact, is that two allowed to run with your federal sentence?
A. Yes, it is.
Q. Which is longer than two?
A. It was 24 months.
Q. Twenty-four months. Okay. So, basically, you'll finish your federal sentence and be done?
A. Yes.
Q. Now, let's go back to --
THE COURT: I'm going to call it a week. Ladies and gentlemen, I'll see you Monday morning at 8:30. Remember what I told you by not talking about it, and thank you. Y'all have been really good.
(Jury retired from the courtroom.)
THE COURT: Bring him back at 8:20 and the Defendant at 8:20.
What do you need?
MR. FARREN: I don't need anything. I thought you might want to know that we're about half-way through the witness list.
THE COURT: Okay.
(Recess for the evening.)

THE STATE OF TEXAS )
COUNTY OF RANDALL )

I, Karen Morris, Deputy Official Court Reporter in and for the 47th District Court of Randall County, State of Texas, do hereby certify that the above and foregoing contains a true and correct transcription of all portions of evidence and other proceedings requested in writing by counsel for the parties to be included in this volume of the Reporter's Record, in the above-styled and numbered cause, all of which occurred in open court or in chambers and were reported by me.

I further certify that this Reporter's Record of the proceedings truly and correctly reflects the exhibits, if any, admitted by the respective parties.

WITNESS MY OFFICIAL HAND this the ______day of October, 2005.

KAREN MORRIS, CSR 334
Expires: 12/31/2006
Official Court Reporter
108th District Court
Potter Courts Building
Amarillo, Texas 79101
(806) 379-2357