07-05-0275-CR
1

FILED
OCT 18 2005
SEVENTH COURT OF APPEALS
PEGGY CULP, CLERK

REPORTER'S RECORD

VOLUME 12 OF 22 VOLUMES

TRIAL COURT CAUSE NO. 15,307-A

| | | |
|---|---|---|
| THE STATE OF TEXAS | ) | IN THE DISTRICT COURT |
| V. | ) | RANDALL COUNTY, TEXAS |
| JOSHUA DAVID STOCKER | ) | 47TH JUDICIAL DISTRICT |

*********************

GUILT/INNOCENCE PROCEEDINGS

*********************

On the 18th day of July, 2005, the following proceedings came on to be heard in the above-entitled and numbered cause before the Honorable Hal Miner presiding, held in Randall County, Texas:

Proceedings reported by Stenographic Method.

**A P P E A R A N C E S**

ATTORNEYS FOR THE STATE:

NAME: Mr. James Farren & Mr. Jeremy Fowler
Randall County District Attorney's office
SBOT NO:
ADDRESS: Randall County Courthouse
16th Street and 5th Avenue
Canyon, Texas 79015
PHONE: (806) 468-5570

ATTORNEYS FOR THE DEFENDANT:

NAME: Ms. C. J. McElroy & Mr. Mike Watkins
Attorneys at Law
SBOT:
ADDRESS: 801 S. Fillmore Street
Amarillo, Texas 79101
PHONE: (806) 371-0555

VOLUME 12
CHRONOLOGICAL INDEX

JULY 18TH, 2005


PAGE

STATE'S ORAL EVIDENCE CONT.

APPEARANCES . . . . . . . . . . . . . . 2
CASE CALLED . . . . . . . . . . . . . . 6

WITNESSES:
DESTRY KEELING (RECALLED):
CROSS EXAMINATION CONT. BY MR. WATKINS . . . . . 6
REDIRECT EXAMINATION BY MR. FARREN . . . . . . 18
RECROSS EXAMINATION BY MR. WATKINS . . . . . . 27
FURTHER REDIRECT EXAMINATION BY MR. FARREN. . . 30

JOSHUA BLEDSOE:
DIRECT EXAMINATION BY MR. FARREN . . . . . . . 31
NOON RECESS . . . . . . . . . . . . . . 153
CROSS EXAMINATION BY MS. MCELROY . . . . . . . 179
REDIRECT EXAMINATION BY MR. FARREN . . . . . . 204
RECROSS EXAMINATION BY MS. MCELROY . . . . . . 208

CHRISTOPHER EASON:
DIRECT EXAMINATION BY MR. FARREN . . . . . . . 214
CROSS EXAMINATION BY MR. WATKINS . . . . . . . 227
REDIRECT EXAMINATION BY MR. FARREN . . . . . . 235

MICHAEL CRANDELL:
DIRECT EXAMINATION BY MR. FOWLER . . . . . . . 240
CROSS EXAMINATION BY MR. WATKINS . . . . . . . 253
REDIRECT EXAMINATION BY MR. FOWLER . . . . . . 259
RECROSS EXAMINATION BY MR. WATKINS . . . . . . 262

BROOK VANDERGRIFF:
DIRECT EXAMINATION BY MR. FARREN . . . . . . . 263

BILL REDDEN:
DIRECT EXAMINATION BY MR. FARREN . . . . . . . 292

EVENING RECESS . . . . . . . . . . . . . 315
REPORTER'S CERTIFICATE . . . . . . . . . . 316

ALPHABETICAL INDEX -- JULY 18TH, 2005


| WITNESSES | DX | CX | RDX | RCX | FRDX |
|---|---|---|---|---|---|
| BLEDSOE, JOSHUA | 31 | 179 | 204 | 208 | |
| CRANDELL, MICHAEL | 240 | 253 | 259 | 262 | |
| EASON, CHRISTOPHER | 214 | 227 | 235 | | |
| KEELING, DESTRY | 18 | 6 | 30 | 27 | |
| REDDEN, BILL | 292 | | | | |
| VANDERGRIFF, BROOK | 263 | | | | |

INDEX OF EXHIBITS -- JULY 18TH, 2005

| EXHIBITS | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| SX-4 | PHONE LIST | 290 | 290 |
| SX-17 | WALLET | 249 | 249 |
| SX-18 | CARPET PADDING | 252 | 252 |
| SX-61 | TRASH CAN | 302 | 302 |
| SX-63 | PAGER | 25 | 25 |
| SX-64 | LIGHTING | 25 | 25 |
| SX-270 | SKETCH | 246 | 246 |
| | | | |
| DX-17 | PHOTO | 7 | 7 |
| DX-18 | PHOTO | 7 | 7 |
| DX-19 | PHOTO | 7 | 7 |
| DX-20 | PHOTO | 10 | 10 |
| DX-21 | PHOTO | 10 | 10 |

PROCEEDINGS

July 18th, 2005

(All sides, Defendant present, open (Court:

THE COURT: We've got 12, I presume?

THE BAILIFF: Yes, sir.

THE COURT: Bring them in.

(Jury seated.)

THE COURT: Well, good morning. Thank you all for coming back. I appreciate it. I apologize about the delay this morning. We just had some logistic problems, and like I said, it's my job -- it's a lot like a traffic cop and I'm directing people here and there, and sometimes it works real well, and sometimes it doesn't. So blame it on early Monday morning, creaky bones, is all I'm going to say about it.

Mr. Watkins, are you ready to continue your cross examination?

MR. WATKINS: I'm ready.

CROSS EXAMINATION (CONT.)

BY MR. WATKINS:

Q. Good morning, Mr. Keeling.

A. Good morning.

Q. How are you this morning?

A. I'm okay.

MR. WATKINS: May I approach the witness?
THE COURT: Yes, sir.
Q. By Mr. Watkins) I'm showing you what I've marked as Defendant's Exhibit 17, 18 and 19. Without describing them, would you look at these and tell me if you recognize those pictures.
A. I do.
Q. Do they fairly and accurately depict what they purport to depict?
A. Yes, they do.
MR. WATKINS: Offer Defendant's 17, 18, and 19.
MR. FARREN: We have no objection.
THE COURT: D-17, 18 and 19 are admitted.
Q. By Mr. Watkins) Okay. Showing you D-17. What does that appear to be?
A. The silo.
Q. Okay.
A. The -- underneath there, where ...
Q. Is it safe to call it the grain pit?
A. Yes.
Q. And is this the one where you poured the concrete?
A. Yes. It looks as though it is.
Q. Okay. And you see all that debris down in

there. Is that what you have testified that you kicked down in there?

A. Yes, sir.

Q. Okay. And 18, what does this one show to depict?

A. The same area with the worker in there.

Q. Okay. Now, across the top of this photograph, furthest away from the worker, there is a wall and you can kind of see the top of the wall?

A. Yes.

Q. Is that the retaining wall that the body was thrown up on and then pushed on over?

A. Yes, it is.

Q. Okay. And Defendant's 19, what is that a picture of?

A. The same picture, except it's got -- shows the wall with both sides of it.

Q. Okay. All right.

A. Both --

Q. And on the right side of the wall, you see a little concrete smear?

A. Yes.

Q. About how far down to the ground was it from the top of the wall?

A. I'm not sure. I mean --

Q. Whenever you were standing there, did you see over the wall?

A. You would have to lean over it to see over it.

Q. So was it about your head height?

A. Yes, it's pretty tall.

Q. And how tall are you?

A. I'm six foot.

Q. Six foot. So five foot six, or somewhere in there would be the height of that wall?

A. I estimate that, yes.

Q. Okay. And then about how far down on the other side?

A. Twelve feet.

MR. WATKINS: May I publish?

THE COURT: Yes.

Q. By Mr. Watkins) Now, I'm showing you what has been marked as Defendant's No. 20 and 21. I'm going to ask if you recognize these.

A. Yes.

Q. Okay. Do they fairly and accurately depict what they purport to depict?

A. Yes, they do.

MR. WATKINS: Offer Defendant's 20 and 21.

MR. FARREN: We have no objection, Your

Honor.

THE COURT: D-20 and 21 are admitted.

Q. By Mr. Watkins) Okay. In Defendant's 20, does this show the position of the body as you left it? Let me refer you just to 20 right now.

A. Okay. Yes, it does.

Q. Okay. And I assume that kind of near the middle of the picture in the corner of the boot is where the head is?

A. Yes.

Q. And is that lower to the ground than where the feet are?

A. Yes, it is.

Q. Okay. And then on 20 -- or 21, I'm sorry, do you see this up here?

A. Yes.

Q. And what is that?

A. This is a -- appears to be the concrete.

Q. Okay. So does that fairly and accurately represent how deep the concrete was?

A. Yes, it does.

Q. And I think you testified that at some points it was as deep as four feet?

A. Yes.

Q. And it appears about how deep at its minimum

to the top of the blue tarp?
A. A few inches -- six inches.
MR. WATKINS: Okay. May I publish?
THE COURT: Yes.
Q. By Mr. Watkins) Okay. I apologize if I ask you a question again from what I asked the last time. I'm trying not to duplicate, but it's been a long time since we talked.
A. Yes.
Q. You -- do you know a Jason Wayne Hickson?
A. No.
Q. Okay.
A. It doesn't -- the name doesn't sound familiar.
Q. Okay. If you saw a photo it might be familiar but it might not? You just don't recognize the name?
A. I don't recognize the name.
Q. All right. You testified last Friday that Mr. Kimberlin started telling people what to say if they were asked about all of this. Is that correct?
A. Yes, he did.
Q. And I think he told you -- or you testified that he gave you one story to go out and give certain people, and maybe he would give another story to someone else to go give certain people. Is that correct?
A. From my understanding, sir, it was -- he had

given me the same story he gave Frank Chacon, which was --

Q. Okay. All right. So there basically was one story that was supposed to be the party line?

A. Yes.

Q. That everyone was supposed to tell?

A. Yes.

Q. Who all did you tell this story to?

A. Just Mark Brown.

Q. Okay. What I'm talking about is, did you go to Guinn Garcia and say, here is what we're going to say?

A. I don't remember me personally talking to her. There was a couple of times that I had visited with her along with Kimberlin. But as far as me talking to her, no, sir.

Q. Okay. When you went with Mr. Kimberlin, was that one of those times saying hey, here is what we're going to tell everyone?

A. It was -- I mean, there was times when I was there, yes, sir, that he would tell her, you know, what he expected her to say or do.

Q. Were there other people that you went to see that this happened with?

A. One other time, there was Tori Patrick.

Q. Okay. Just kind of shore up the whole lie, so to speak?
A. Yes.
Q. Okay. And you're just aware of one story that was put out there, not a multiple series of stories?
A. Just one.
Q. Okay. Did you ever go with Mr. Kimberlin or go yourself to speak with Mr. Elliston, the farmer?
A. After all of this?
Q. Yes.
A. No, sir. I don't recall that.
Q. Okay. Or did he come to Mr. Kimberlin's house while you were there?
A. No.
Q. Okay. What about Tyler Hale? Did y'all go talk with Tyler?
A. The last time I seen Tyler was when I received the body from his house.
Q. Okay. And did y'all discuss what you were going to say at that point?
A. I didn't, no, sir.
Q. Okay. When you went and picked up the Navigator at Tyler's house, did you stop and talk with Tyler?
A. As I stated before, I had -- I went in --

prior to leaving, I went into his house for a few minutes, and Craig and him were talking. And I mean, because I'm really not -- I'm just fairly acquainted with him, you know. I'm not good friends with him like Craig is.

Q. Okay. Did -- now, that is where you filled the big trash can with water. Is that correct?

A. Yes, sir.

Q. Did Mr. Hale ask why you needed all of that water?

A. I assume he knew. He didn't ask me.

Q. Okay. So he was good to go with the getting the water and helping Mr. Kimberlin?

A. Yes.

Q. Okay. Now, I believe last Friday you testified that one of the reasons you came forward with your June 23rd statement was because Kimberlin had promised to make bond for you and then he wasn't making bond and that kind of stuff?

A. Well, that wasn't the reason but that is something that happened.

Q. Okay. Did you receive -- in making these statements -- and you made four statements. Is that correct?

A. Four statements?

Q. Yeah. Let's see, you made one on June 23rd. And you made one on 8/4, August 4th. And you made one on October 9th, and then you had made your first one on June 20th?
A. Yes.
Q. Okay. So you made four different statements over the period of investigation on this case?
A. Yes, that -- yeah. It was follow-up statements, is what it was.
Q. Yeah.
A. And other questions were asked.
Q. By Detective Brown or Sergeant Burgess?
A. Yes.
Q. Okay. And often times they were there together, is that correct?
A. Yes.
Q. Okay. Now, your first statement was June 20th. Did you receive any promise of help with your cases or any immunity agreement or anything like that?
A. No, sir, I have not.
Q. Okay. Now, I noticed that you had been arrested on June 13th for several charges, including burglary of a motor vehicle, possession of prohibited weapon, theft, that kind of stuff, in Potter County. Is that correct?

A. Yes.

Q. And then you gave your first statement on June 20th, and your next statement on June 23rd?

A. Yes.

Q. Okay. And then on June 26th, all of those cases were dismissed. Is that correct?

A. That is correct.

Q. Okay. And then on -- do you remember getting arrested for warrants on July 17th of '03?

A. Yes.

Q. Do you remember making a statement to call Mark Brown, he'll straighten it out?

A. Who will straighten it out?

Q. I assume Mark Brown.

THE COURT: Just listen to the question and answer it in as short a sentence as you can. That was a yes or no question.

THE WITNESS: Yes, sir. I didn't understand what he was talking about.

THE COURT: All right. If you don't understand, tell him that.

THE WITNESS: Okay.

Q. By Mr. Watkins) Do you remember being arrested about 2:00 in the morning on July 17th of '03 on warrants?

THE COURT: He answered that question.

THE WITNESS: Yes.

MR. WATKINS: Okay. Sorry.

Q. By Mr. Watkins) Do you remember repeatedly saying to the officer who arrested you, contact Mark Brown, homicide detective, he will take care of all of this, and my lawyer?

A. I don't remember saying that. I do remember saying that -- telling them to get ahold of Mark Brown because I had just talked to him, and I should have had a warrant. It was a federal warrant.

Q. Okay. Now, in August of '03, you had an unauthorized use of a motor vehicle charge. Is that correct?

A. Yes.

Q. Okay. And was that case eventually dismissed?

A. Yes, it was.

Q. And then most recently, you pled on a case related to this one, tampering with physical evidence?

A. Yes.

Q. And you received a two-year sentence in the Texas Department of Criminal Justice?

A. Yes, I did.

Q. And that is going to run concurrent with the federal sentence you're already serving?

A. Yes, it is.

Q. And when do you expect to get out on your federal sentence?

A. I believe in August of 2006.

Q. Okay. And in August of 2006, do you suspect you'll be transported to TDC, or do you think you will have been released from that sentence?

A. I'm not sure yet. I haven't heard anything on it.

Q. Okay. You don't suspect that you'll have much more time to do, if any?

A. I don't know.

MR. WATKINS: Pass the witness.

REDIRECT EXAMINATION

BY MR. FARREN:

Q. These other charges that you were asked about, now these were in Potter County?

A. Yes, sir, they were.

Q. And do you know why they got dismissed?

A. Because I was with -- I was with -- I was riding with a person and we got the same charges. Those weren't my charges.

Q. Okay. So those dismissals don't have anything to do with us or this case?

A. No, sir, they do not.

Q. Okay. You and I have visited many times?
A. Yes, sir.
Q. Have we ever talked about these Potter County cases?
A. Not one time, no, sir.
Q. Now, when you made -- when you told Mark Brown the truth, when you abandoned Kimberlin's fantasy and told Mark Brown the truth, what kind of deal did you have with me? Had you ever met me?
A. I had never met you, no, sir.
Q. You haven't cut any deal with me?
A. No, sir, I haven't.
Q. Later, you pled to the pending charge of tampering with evidence in this case and pled to two years in prison?
A. Yes, sir, I did.
Q. And that's a done deal, isn't it?
A. Yes, sir, it is.
Q. Now, if I called you -- if I called you to the stand yesterday, or I guess it was Friday, and if you told a different story than what you told at your plea, you could be charged with perjury, couldn't you?
A. Yes, I could.
Q. But what if you got up there just today or yesterday and said you know, Farren, I just don't

remember. My memory has failed. What could I do?
A. To the best of my knowledge, there is nothing you could do.
Q. I could get your statement and say, does this refresh your memory? And if you said to me, you know, it really doesn't, I mean your deal is done?
A. Yes, sir, it is.
Q. But you're still here testifying?
A. Yes, sir.
Q. Why are you here? Why did you come here and testify?
A. Because I need to tell the truth, I mean --
Q. Did you give me your word?
A. I gave you my word, yes, sir.
Q. Now, Mr. Keeling, do you understand the jury knows you use drugs? You've sold drugs. You've passed counterfeit money. You helped hide a body. They know that. Do you understand that?
A. Yes, sir, I do.
Q. But in spite of all of that, does your word mean something to you?
A. It's all I've got left in this world.
Q. In fact, it was your loyalty to Mr. Kimberlin that got you into this?
A. Yes, it was.

Q. And you gave your word to me?
A. I did, sir.
Q. Now, I asked you earlier if you know -- and just listen carefully and just answer the question -- if you knew Jeremy Roy and you indicated you did not. Do you remember that?
A. Yes, sir.
Q. Do you know anyone named -- or goes by "Rooster"?
A. I don't know him. I know of him, sir.
Q. Okay. I want to talk to you about the silo fire. We mentioned that, that it burned later. And I think I may have left the jury with some mis-impression here. Where were you when the silo fire occurred?
A. I was in jail.
Q. All right. And how did you find out about the fire?
A. My dad told me.
Q. Okay. Was your dad in -- was your dad inebriated, drunk when he did it?
A. Yes, sir, he was drunk.
Q. Did you know anything about the fire until after it happened?
A. No, sir, I didn't.
Q. Do you know why your dad did this? Why --

A. He -- like I said, he was drunk. And he said -- his words to me were, he was tired of people going out there to look at it, you know.
Q. Did he think it was going to help you some --
A. He probably thought at the time that it would help keep from developing more evidence against me.
Q. Was there any evidence left?
A. No, sir, there wasn't.
Q. So it didn't help you at all?
A. No, it didn't.
Q. Okay. And in fact, Mr. Johnson is probably glad to be rid of the --
A. I would think he would be glad, yes, sir.
Q. All right. Now, you were asked about was there just one story. Do you recall in your plea indicating there were multiple stories?
A. Indicating?
Q. Do you remember telling us during your plea agreement that you just told one story -- you told the first story which was Kimberlin's lie?
A. Yes.
Q. Then you told the second -- gave the second statement to Mr. Brown and that was the truth?
A. Yes, sir.
Q. And then you gave two more supplemental

statements, but did they contradict the second statement or just add to it?

A. Just add to it.

MR. FARREN: May I approach the witness, Your Honor?

THE COURT: Yes.

Q. By Mr. Farren) I want to see if this refreshes your memory about what you were asked about a moment ago, or it helps you understand what we're talking about. If you would read the last part of this page.

A. (Witness complies.).

Q. Do you understand what I'm asking you there?

A. Yes.

Q. Okay. The Defense asked you a few moments ago if there was just one story, and you responded that you were telling one story.

A. Yes, sir.

Q. But what was Mr. Kimberlin doing?

A. He was telling other stories.

Q. He was telling other stories?

A. Yes, sir.

Q. Did these different stories, some of them have to do with where the body was? Once he's in a wall, and once he's at the lake, and once he's --

A. Right. And once he's at a hog farm.
Q. Hog farm. Why was he telling these different stories?
A. I guess to throw the police off.
Q. Okay. And there were -- and rumors were rampant?
A. Yeah, I heard so many different rumors.
Q. Do you know if Mr. Kimberlin, if he told, A, one story, and B, a different story, then if the police came to him with either A story or B story, then he knew who had talked to the police, because he knew which story he told which person?
A. Yes.
MR. FARREN: Approach the witness, Your Honor?
THE COURT: Yes.
Q. By Mr. Farren) Showing you what we've marked as State's Exhibit 64. I ask if you recognize this item?
A. Yes, I do.
Q. What is this?
A. This is a -- the head lamp that I used that night.
Q. So this is the light you talked about that you could put on your head?

A. Yes, sir, it is.
Q. And you gave this to Sergeant Burgess or the police department, anyway?
A. Yes.
Q. Earlier, we visited about your talk about your wireless communication device. Do you recognize that?
A. Yes, I do.
Q. And what is this?
A. This is -- they talk about that -- when I gave the testimony to -- the way we contacted each other.
THE COURT: Is that another number?
MR. FARREN: Yes, sir.
Q. By Mr. Farren) And this is State's Exhibit 63. Is that correct?
A. Yes, sir.
MR. FARREN: Offer State's 63 and 64 into evidence, Your Honor.
MR. WATKINS: No objection.
THE COURT: State's 63 and 64 are admitted.
Q. By Mr. Farren) You testified yesterday -- Friday, I mean, about Mr. Kimberlin talking about maybe wanting to write a book?
A. Yes, sir.
Q. Did Mr. Kimberlin ever talk to you about the

Sopranos?

A. All the time.

Q. All the time?

A. Yeah, he -- he owns the -- all of them.

Q. All the tapes?

A. Yeah.

Q. The videos?

A. The videos.

Q. Why? Was what is it about the Sopranos?

A. Their lifestyle.

Q. Well, did Mr. Kimberlin like it, dislike it?

A. Yes, oh, yeah, very much so. I mean, he liked to -- to act like that at times, you know.

Q. Did he talk about it -- you said he talked about it all the time. Do you know if he ever watched these things?

A. Oh, yes.

Q. Just once or many times?

A. No, all the time he watched it.

MR. FARREN: May I publish to the jury?

THE COURT: Yes.

MR. FARREN: Pass the witness.

MR. WATKINS: Your Honor, at this time I'd offer Defendant's No. 22 as a certified copy of a public record.

MR. FARREN: We have no objection.

THE REPORTER: Is that 22?

MR. WATKINS: Defendant's 22.

THE COURT: What did you say the purpose of this is?

MR. WATKINS: Your Honor, he just indicated that the charges that have been dismissed against him were all Potter County charges --

MR. FARREN: Excuse me, Your Honor. That is a misrepresentation. I asked him specifically about Potter County check cases.

THE COURT: That is correct.

MR. WATKINS: Well, maybe I misunderstood.

THE COURT: Maybe you did. You've already proved this. Is this cumulative?

MR. WATKINS: Your Honor, let me ask a question and we'll see if we need to enter this.

THE COURT: All right.

RECROSS EXAMINATION

BY MR. WATKINS:

Q. Now, Mr. Keeling, you were asked earlier about the charges that I have gone through with you that had all been dismissed?

A. Yes.

Q. And the ones from June 13th were Potter County charges. Is that correct?
A. Yes, sir.
Q. Okay. Then the unauthorized use of a motor vehicle, it was a Randall County charge. Right?
A. Yes, sir, it was.
Q. Okay. And we're in Randall County now?
A. Yes, sir.
Q. Okay. You mentioned that you're testifying because your word is all you have left?
A. Yes, sir.
Q. Now, you had given your word to Stephen Craig Kimberlin. Is that correct?
A. Yes.
Q. And when he bailed on you, your word didn't matter anymore, you gave your word to someone else. Is that correct?
A. When he bailed on me?
Q. Uh-huh.
A. Yes, sir. He was going to --
THE WITNESS: I'm sorry, Your Honor. Yes, sir.
Q. By Mr. Watkins) Okay. Now, we've talked about these different stories that were given by Mr. Kimberlin. Isn't it true that the basic designation of

these stories was to blame it off on the two Joshes?

A. Yes, that is true.

Q. And one last thing. You mentioned that just prior to going out and burying this body, you had been in the hospital over a drug overdose. Is that correct?

A. That is correct, yes.

Q. And I think you testified the other day that you had been to the hospital one time on a drug overdose?

A. Yes, sir.

Q. Okay. Do you remember on June 13th, when you were arrested on all of those Potter County charges that I talked about, that you went to the hospital on that day?

A. Yes.

Q. Okay. And that was on a drug overdose. Correct?

A. No, sir. No, sir.

Q. Why did you go to the hospital that day then?

A. I -- when they arrested me, I was -- I couldn't breathe. I didn't have my inhaler with me and it was real hot in the back seat of the police vehicle. And uh -- the officer looked back there and I was sweating and couldn't breathe, and he called an ambulance.

Q. Okay. Now, you were with someone that day. Is that correct?

A. I was with Bobby Boney, yes.

THE REPORTER: Who?

THE WITNESS: Bobby Boney.

MR. WATKINS: For the court reporter, it's spelled B-o-n-e-y.

Q. By Mr. Watkins) And he went to the hospital with you also?

A. Yes.

Q. Okay. Did he also have asthma?

A. No.

Q. Was he showing the same symptoms that you were?

A. I have no idea. He was in a different vehicle.

Q. Okay.

MR. WATKINS: Pass the witness.

FURTHER REDIRECT EXAMINATION

BY MR. FARREN:

Q. Well, regardless of how many times you have been to the hospital and why you have been, if the records at BSA indicate you were checked in on the 10th and checked out later that same day on the 10th, that would be consistent with your testimony about the 10th?

A. Yes.

MR. FARREN: Pass the witness.

THE COURT: Any further questions?

MR. WATKINS: Pass the witness.

THE COURT: You may step down, sir. Thank you.

MR. FARREN: State calls Joshua Bledsoe, Your Honor. And I apologize, he's downstairs.

(Witness sworn.)

THE COURT: Yes, sir.

MR. FARREN: Thank you.

JOSHUA BLEDSOE,

Having been first duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. FARREN:

Q. State your name for the jury, please.

A. Joshua Craig Bledsoe.

MR. FARREN: May I approach, Your Honor?

THE COURT: Yes, sir.

Q. By Mr. Farren) Mr. Bledsoe, this is the best we have. If you could sit up a little and kind of talk -- I know it's hard to face the jury and talk into the mike, but as best you can. Mr. Bledsoe, you and I have met on more than one occasion and visited, haven't we?

A. Yes, sir.

Q. And are you aware that your personality, you have a tendency to if I ask you what time it is, you want to tell me how to build a clock. Do you realize that?

A. Yes, sir.

Q. Okay. We're going to try to stay on subject. And I know that -- I know that you have a tendency to tell a lot of information. We will get to everything but it will work better if you listen carefully and just answer the question you're asked. Okay?

A. Yes, sir.

Q. All right. How old are you, sir?

A. Twenty-seven.

Q. And do you know a lady named Kelly Grayless?

A. Yes, sir.

Q. You and Ms. Grayless had a relationship. Is that correct?

A. Common-law marriage.

Q. And how long were you and Ms. Grayless together?

A. Five years.

Q. And do you have children?

A. Yes, sir.

Q. How many?

A. One daughter.

Q. Okay. Do you know a man named Stephen Craig Kimberlin?

A. Yes, sir.

Q. How did you meet Mr. Kimberlin?

A. Through a friend of mine, Greg Ward.

Q. Okay. And when you met Mr. Kimberlin, was this in -- was this a social meeting or did it have to do with the drug trade business?

A. The drug trade.

Q. Okay. How long have you been involved in drug trafficking?

A. Five years, maybe.

Q. Okay. And how long ago did you meet Mr. Kimberlin?

A. It had to have been when I first started, about five years ago.

Q. Okay. So you met him early on in the business?

A. Right.

Q. Is it -- did you have some source of drugs in Old Mexico?

A. Yes, sir.

Q. Was this a cartel -- I mean, you were just one customer of this cartel. Right?

A. That's right.

Q. What cartel was this?
A. I don't know. They didn't really have a name.
Q. Okay. Who did you deal with?
A. Francisco Chavez.
Q. And Mr. Chavez, you dealt with him in Old Mexico or at the border?
A. He always had somebody come deliver it to me in Amarillo.
Q. All right. How did you learn about this man? How did you come into contact with him?
A. I had a friend that I used to work with at Patrick Electric that introduced me to him.
Q. And what was his name?
A. Norm.
Q. Okay. So Norm introduced you to Mr. Chavez?
A. Yes, sir.
Q. And did he just do this out of the goodness of his heart, or why would he introduce you to this man?
A. I asked him to introduce me.
Q. And did that cost you anything?
A. $10,000.00.
Q. So you paid your friend, Norm, $10,000.00 for just an introduction to Mr. Chavez?
A. That is right.
Q. Why were you willing to spend that kind of

money just to meet Mr. Chavez?
A. Because I knew he was a good connection.
Q. Okay. So it was more than just an introduction. It was an introduction and Mr. -- and Norm was vouching that you were safe to deal with?
A. That's correct.
Q. Okay. And did you begin to deal with Mr. Chavez?
A. Yes, sir.
Q. When you obtained -- and by the way, the kind of narcotics we're talking about, is that methamphetamine?
A. Yes, sir.
Q. When you would obtain the methamphetamine from Mr. Chavez, however he got it from him to you, how much -- well, let me ask you this: Did you obtain the same amount every time or did it vary?
A. It varied.
Q. Okay. And would you characterize the amount to be larger -- a larger amount as time went on?
A. Yes, sir.
Q. Okay. When you first began to deal with Mr. Chavez, what amount do you think you were obtaining from him, say, in a week?
A. It started out two pounds at a time. Then it

went up to ten pounds at a time, then it went to 20 pounds at a time, then it went all the way up to 30 pounds at a time. Then they started giving me 30 pure pounds and you can make 90 pounds of dope with 30 pure pounds.

Q. So once you got 30 pounds of pure meth, you can mix it with some other powder or something of that nature?

A. MSN.

Q. MSN. And it turns into 90 pounds?

A. That's correct.

Q. Okay. A pound of pure methamphetamine, how much do you think you paid for a pound of pure methamphetamine?

A. $9,000.00.

Q. And a pound of pure methamphetamine would sell --

A. $15,000.00.

Q. Up to $15,000.00. When you first began to deal with Mr. Chavez, did you -- how did your one or two pounds get distributed? Did you sell it a pound at a time or a few ounces at a time? How did you sell it?

A. When I first started?

Q. Yes, sir.

A. A pound at a time.

Q. Okay. Were these local customers?
A. Yes, sir.
Q. Was it always the same customers?
A. Yes, sir.
Q. Okay. Did you ever begin to sell -- sell your product to Mr. Kimberlin?
A. Yes, sir.
Q. And you think this was early on in your business?
A. Yes, sir.
Q. Okay. Eventually, when you were making the most money and moving the most product, how much do you think you were delivering? How many pounds do you think you were delivering to Mr. Kimberlin, say, in a week?
A. Thirty.
Q. Thirty pounds. And this was pure by then toward the end?
A. I wouldn't give him 30 pure pounds. I was giving him maybe 15 pure pounds at a time. And then I mean, it finally graduated up to giving him the whole 30 pure pounds, because I didn't like sitting on it.
Q. Okay. And if this was selling for $9,000.00 a pound -- so we're talking $270,000.00?
A. That's correct.
Q. Okay.

A. Cost me $300,000.00 to pay him off.

Q. So when you would deliver this product to Mr. Kimberlin, did he have individuals who would distribute it, sell it to other people in smaller quantities?

A. Yes, sir.

Q. Okay. How long after you delivered your product to Mr. Kimberlin were you able to go back and pick up your money?

A. I'd go every other day and pick up $50,000.00. And just, you know, sometimes a grand total at the end of the week, he had a good two, $300,000.00 for me.

Q. So in a week, you think it may have been as much as 200, $300,000.00, but this wasn't just a one-time visit. You would go more than once in a week?

A. That's correct.

Q. Now, in your dealings with Mr. Kimberlin, did you also come into contact with Frank Chacon? Did you know Frank Chacon?

A. I didn't know him, but I saw him over there.

Q. So you didn't -- you weren't introduced to him or anything, you just saw him there?

A. Well, I got introduced, this is Frank, but that's about as far as it went.

Q. Okay. Did you know Jessica Kimberlin?

A. Yes, that is Craig's wife.

Q. Did Jessica and Craig ever socialize with you and Kelly Grayless?
A. Not ever with Kelly Grayless.
Q. Never with Kelly. But at times, did you go out to eat with Jessica and Craig or was it strictly business?
A. Strictly business.
Q. Okay. Did you ever come into contact with Josh Stocker?
A. Yes, sir.
Q. How did you meet him?
A. Same way I met Frank Chacon.
Q. At Craig's house?
A. That's correct.
Q. How long have you known Josh Stocker? Let me ask it this way: Have you known him as long as you've known Mr. Kimberlin, or a shorter period of time?
A. Probably a shorter period of time.
Q. Okay. Do you know or did you know a man named Dustin Pool?
A. Yes, sir.
Q. How did you know Dustin Pool?
A. Well, he was known as a big drug dealer. And I eventually ended up selling him dope a couple of times. And then he went back off to Denise Contreras

but I've always just known who he was.

Q. So his primary source of supply were the Contrerases. But at times he obtained from you?

A. That is correct.

Q. Do you know a man named Kevin Jackson?

A. Yes, sir.

Q. Was there some sort of ill will or hard feelings between Kevin Jackson and Dustin Pool?

A. Yes, sir.

Q. What was the problem between them?

A. There was a bunch of different things that happened with them, I mean...

Q. So they had problems?

A. That's correct.

Q. And Mr. Jackson, is he a close friend of yours?

A. I consider him like my little brother.

Q. Okay. So he is really close to you?

A. (Witness nods head up and down.)

Q. When the problems developed between Kevin Jackson and Dustin Pool, did that have an impact on you at all? Did it bother or concern you?

A. It bothered when Dustin would call up at the house, because I was Kevin's roommate, and Dustin used to call and threaten us over the phone a bunch.

Q. What kind of threats did he make?

A. One time that I can remember, he told me to sleep on the floor because he was going to have the place shot up.

Q. Did you talk to Kevin about this? Did you express your concern to him about this problem?

A. Yeah. We got a bunch of friends together and we went to go try to fight him at a park but he would never show up.

Q. Okay. Now, when you got these friends together, were any of those friends Craig Kimberlin and those guys, or were these other people?

A. These were other people.

Q. How long ago did these problems with Kevin Jackson develop, and then you were kind of dragged into it?

A. Maybe two or three years ago.

Q. Okay. Now, two or three years ago, you were already dealing with Mr. Kimberlin, supplying a product to him?

A. That is right.

Q. Was he -- by that time, was he your only customer, or did you deliver to other people also?

A. I was delivering to other people, but it finally graduated to where I introduced everybody I knew

to him. That way I only had to mess with him.
Q. And so you had simplified your business to where you were just dealing with one supplier, and then Mr. Kimberlin was receiving your product. And then you just picked up the money and you didn't have to worry about dealing with anybody else?
A. That is right.
Q. Now, eventually, did some problems develop between you and Mr. Pool directly? In other words, not indirectly through Kevin Jackson, but between the two of you directly?
A. Yes, sir.
Q. Well, what kinds of things began to happen?
A. Well, after Craig called me up and wanted me to take him by Dustin's house because Miguel or -- or Miguel's family was chased around the mall by Bobby and Ray.
Q. And so Mr. Kimberlin was unhappy about that?
A. Yes. So I took Craig over to Dustin's house, and then Dustin got a beef with me. He was upset with me, you know, that I was showing people where he lived.
Q. Okay. Well, prior to that -- and explain to the jury whether this connects to the earlier problems with Dustin through Kevin Jackson, or whether this ties to the problems that Craig was having with Mr. Pool. Do

you recall hearing from -- I think Mr. Garcia about somebody named Jesus or Jesus, Bullet and Bobby?

A. I was at my friend David Garcia's house when a friend of David Garcia's had came over named Jason Meyers (phonetic).

Q. Right.

A. And he told me that I needed to be careful because Dustin was telling these guys that I was an easy jack move. They're members of the Texas Syndicate. And Dustin had a spy shop where he sold spy equipment.

Q. Now, let's explain that to the jury. Do you mean electronic surveillance video cameras, alarms?

A. He had catalogues to where he could order police gear. He could -- he had ways to get alarms, cameras.

Q. And at any rate, you were hearing that he and others of his group thought you were an easy Jack. What does that mean, jack, easy jack?

A. Easy jack move. It means that they were going to dress up like the S.W.A.T. team and kick in the door and have a false raid, to rob me.

Q. Okay. So whether true or not, you were being told that he was considering this plan?

A. He had been bragging about it at the titty bars and just all over the street.

Q. Okay. How did you feel about that?
A. Well, I thought it was a joke at first, you know, because I didn't think he would do anything like that. And then I started seeing him drive by my house with a bunch of people in his car.
Q. Okay. How long did this happen before you and Craig and others made a visit to Mr. Pool's house, because he had threatened Miguel Gonzales' family? Which of these two events occurred first?
A. I believe it was the Miguel Gonzales incident first.
Q. Okay. So you think that actually happens first. So at some point, you and Craig went to Mr. Pool's house because of an event involving Miguel Gonzales' family?
A. That is correct.
Q. Who went with you, just you and Craig?
A. Just me and Craig.
Q. Okay. And do you know why Mr. Kimberlin was upset that Mr. Pool had somehow threatened Miguel Gonzales' family? Why did that matter to Mr. Kimberlin?
A. Craig used to be a house parent for Miguel Gonzales at Boys Ranch.
Q. Mr. Kimberlin worked at Boys Ranch for a while, didn't he?

A. To my understanding.

Q. In fact, he later worked at the Juvenile Detention Center for Jane King here in Randall County. Right?

A. Yeah, I have also heard that.

Q. And so at some point, he moved on from his efforts to help the youth, and he became involved in your business?

A. That is correct.

Q. Now, after this -- how did this visit go at Mr. Pool's house? What happened when you got there?

A. We pulled up and knocked on the door. And Dustin was standing at -- he came up to the door with a Tech 22.

Q. A Tech 22 is an automatic weapon. Is that correct?

A. Yes, sir.

Q. How did Mr. Kimberlin respond to that?

A. Well, he was freaked out. He had a .9 mm on him, too.

Q. Did you have a weapon on you?

A. Yes, sir.

Q. In fact, you and Mr. Kimberlin, that whole group, everyone carried weapons, didn't they?

A. Yes, sir.

Q. Including Mr. Stocker?
A. Yes, sir.
Q. Now, but when you say Mr. Kimberlin had a nine millimeter, are you talking about a nine millimeter pistol?
A. Yes, sir.
Q. So one man is standing with a fully automatic sort of a rifle, and the other guy has a pistol?
A. Kind of shaped like a Tech 9.
Q. Okay. At any rate, did anybody start shooting?
A. No.
Q. Okay. What happened?
A. Dustin got nervous, and he said he was using his laser sight on the Tech 22 to make his dog go crazy. He said his dog likes to chase the laser sight. And he handed the gun over to me and said look here, and I checked it to take the bullet out of the chamber, and it wasn't even loaded.
Q. Okay. So Mr. Pool takes steps to convince you that look, I wasn't serious. Look, it's not even loaded?
A. That's correct.
Q. Okay. Now, once the gun issue is resolved, what happened next?

A. Well, he told us to come inside and sit down and Craig asked who all was in there, so he said he was all by himself, so we went in there and checked the house to make sure --

Q. So you and Mr. Kimberlin are a little bit leery, and you check to make sure you're not going to get ambushed?

A. That is right.

Q. Okay. Once that is completed, did the two of you talk, or the three of you talk?

A. We sat down in Dustin Pool's kitchen table and talked.

Q. What was the subject of the discussion? Mr. Gonzales' family?

A. Yes, sir.

Q. And did Mr. Pool have some -- did he deny that he had done it or admit it or what?

A. No, he wasn't denying he did it. He said that Miguel owed him for two pounds of dope that Miguel had robbed him for.

Q. And so how did Mr. Kimberlin respond to that?

A. He was pissed off. He said that -- to not be chasing his wife and kids around. If you have a beef with Miguel, let me know, and I'll arrange it for you two to fight one on one. Don't be chasing people

around.

Q. Okay. So Mr. Kimberlin is suggesting to Mr. Pool, if you've got a problem with Miguel, let's let you and Miguel deal with it and don't drag his family into this?

A. That's correct.

Q. If you have any idea -- and it's been a while, but if you have -- how long do you think this meeting lasted?

A. Maybe a couple of hours.

Q. Okay. So this was a lengthy discussion?

A. Yes, sir.

Q. Did you discuss anything else besides the problem with Mr. Gonzales at that meeting?

A. Dustin asked me if I was going to help him collect from my godfather.

Q. Now, when you say your godfather, people immediately think of the Sopranos and the Mafia and such?

A. No, sir, that is a religious --

Q. So you mean truly your godfather in a religious sense?

A. Yes, sir.

Q. Okay. And his name is Mr. Seago. Right?

A. Yes, sir.

Q. Greg Seago?
A. Yes, sir.
Q. And does he have a son?
A. Cory Seago.
Q. Do you know where his son was at that time?
A. Prison.
Q. All right. Had you heard anything from Mr. Seago about problems he was having with Mr. Pool?
A. They kept calling and harassing him about a $4,000.00 debt.
Q. Okay. And this harassment, did it ever involve Mr. Sego's son, who was in prison?
A. Yeah, they said that if he didn't make the $4,000.00 debt right, that they were going to have his son, Cory Seago, touched in prison by the Texas Syndicate.
Q. And did you and Mr. Seago think that was possible?
A. Oh, yeah.
Q. Why did you think that was possible? What -- how could Mr. Pool make something happen in prison?
A. Well, because he was running with Bobby O'Connis (phonetic) and Ray Placensio and they were both known members of the Texas Syndicate.
Q. Okay. So because his associates are involved

in the Texas Syndicate, you and Mr. Seago believe that threat was possible, that he could reach and touch his son?

A. Yes, sir.

Q. How did you respond to Mr. Pool's complaint, which is the same complaint he had about Mr. Gonzales? I'm trying to collect debts here. These people are not paying me. What did you tell him?

A. I told him I would help him collect the debt, you know, go about it a different way.

Q. So both you and Mr. Kimberlin are saying the way you're going about collecting your debts is, this is not going to work?

A. We feel like you should -- if you had a problem with that person that owed you money, you should be taking it up with that person, not his family.

Q. Okay. After this lengthy meeting with Mr. Pool, did you feel like things had been resolved, or did you think things were just as bad as when you arrived?

A. No, we thought we had it all resolved.

Q. Okay. And I assume you and Mr. Kimberlin left and everything was on friendly terms as far as you could tell?

A. Yes, sir.

Q. Okay. After this meeting, did you have any

more problems with Mr. Pool?
A. Well, I was at Craig's house and Stocker came over there and said that Chad Spanel was being bullied around by Dustin Pool.
Q. Okay. Who is Chad Spanel?
A. Stocker's main customer.
Q. So one of Mr. Stocker's important customers is Chad Spanel, and Mr. Stocker was telling Mr. Kimberlin that Pool was creating a problem with his main customer, Mr. Spanel?
A. Right.
Q. What was the problem?
A. That they were trying to take him -- that Dustin wanted to sell dope to Chad and cut Stocker out.
Q. How did Mr. Kimberlin respond when he learned this from Mr. Stocker?
A. Well, Stocker went over there and they pulled an SKS that had been stolen from Stocker on him. And then Stocker went over there and explained the situation to Craig, and Craig was pissed off about it.
Q. Let's stop and back up a minute. During his conversation with Mr. Kimberlin, Mr. Stocker said he had gone to talk to Pool?
A. Yes, sir.
Q. Okay. And Mr. Pool's response was to pull a

weapon on him like it happened to you?
A. Well, Ray pulled the gun on --
THE REPORTER: Who?
THE WITNESS: Ray Placensio.
Q. By Mr. Farren) Okay. So according to Mr. Stocker talking to Mr. Kimberlin, when he went to talk to Pool, Ray Placensio was there with Pool?
A. Yes, sir.
Q. And Mr. Placensio pulled some kind of an automatic weapon?
A. SKS.
Q. SKS. And explain to me, what is an SKS?
A. It's an assault rifle.
Q. Okay. Now, I assume Mr. Stocker was not particularly pleased about that response?
A. No, he was really upset.
Q. And how did Mr. Kimberlin feel about it?
A. Craig was upset that Stocker went over there to Dustin's house, because he felt like that, you know, Stocker needs to take his problems to Craig, and Stocker had no business going over there to Dustin Pool.
Q. So Mr. Kimberlin's -- first of all was upset with Stocker, because Kimberlin is running things and he's the one calling the shots?
A. That's right.

Q. Did Mr. Kimberlin express whether he was happy, unhappy, anything about Mr. Pool?

A. He was mad about it.

Q. Okay. So he wasn't happy with either one?

A. Right.

Q. Did Mr. Kimberlin express to you or in your presence any ideas about what he was going to do, how he was going to respond to this?

A. No, sir, he didn't -- I mean... no, sir. He never really explained to me what they were going to do.

Q. Okay. So at that point, you didn't hear about a plan to respond to the Chad Spanel situation?

A. No, sir.

Q. Did you ever hear from anyone in this group that they did respond, or did it just work itself out? If you know?

A. I don't know if it ever worked itself out or not. I know the next thing you know, Ray is getting kidnapped and --

Q. Okay. Did you ever make any other trips to Mr. Pool's house, or -- did you ever make any more trips to Mr. Pool's house? You and Kimberlin, or anybody that you can remember?

A. That was the only trip I can remember taking to his house.

Q. Okay.
A. No, wait. There was another time, I made a -- after Dustin had been kidnapped the first time Frank took --
Q. Hold on. We're going to lose the jury. That is my next question. If you didn't actually participate in any other meetings with Mr. Pool, did you hear from people in the group about other meetings with Mr. Pool?
A. Right.
Q. And one of those was a -- what you called the first time Pool was kidnapped. Explain to the jury what you mean by that.
A. Well, how he got kidnapped or --
Q. Yes, sir.
A. Well, Stocker had taken this guy, Slim's, car for 200 bucks.
Q. Okay. So Stocker has a guy named Slim. He has taken his car from Slim because Slim owed him some money?
A. Well, he owed Chad Spanel $200.00 and Stocker was going to collect it for Chad.
Q. Okay. Anyway, there was a debt, and he had taken this car in lieu of paying this debt?
A. That's correct.
Q. All right. Now, we have Mr. Stocker with this

car. What happened next?

A. Well, Dustin pulled up behind him and thought it was his buddy and began flashing his lights. And Stocker calls up Craig and says hey, I got Dustin behind me. And Dustin -- or Craig says tell him I want to talk to him. So Stocker pulls off into The Knight's Pool Hall, and Dustin pulls up beside him. Stocker gets out -- pulls a gun on Dustin and says, don't make me chase you. My guy wants to talk to you.

Q. And did Mr. Stocker end up bringing Mr. Pool to Mr. Kimberlin?

A. I believe it was Stocker's duplex where Dustin Pool was taken.

Q. Okay. But they took him to Stocker's duplex but was the purpose to meet Mr. Kimberlin?

A. That's correct.

Q. And did that meeting take place?

A. Yes. It was about Dustin trying to get people to rob us, because it was not only me trying to get robbed by the S.W.A.T. team, or the false S.W.A.T. team, but they had Craig and Miguel and a couple of other people listed that they were going to hit.

Q. So at this meeting, there was more discussion about the problem of Mr. Pool making threats against people?

A. That's correct.
Q. Now, after the meeting with Mr. Pool, do you know if he was taken back to his car at Knight's Pool Hall?
A. First, me, Frank and Stocker and Dustin, we all drove over to Dustin's house, because Ray was over there and we wanted to talk to Ray about it, too.
Q. So while they're meeting with Mr. Pool --
A. I went with them, too.
Q. You went over to Mr. Pool's house where Placensio was?
A. We took Pool to his house to talk to Ray.
Q. So before taking him back to his car, you took Pool back to his own house to meet with Ray Placensio?
A. We talked to Ray, and then after we got done talking to Ray, me and Stocker took Dustin in his Trans Am to Slim's back up to Knight's Pool Hall where he got in his car and left.
Q. So he was released and got back in his car?
A. That's right.
Q. This particular meeting, did you feel like it was successful? Did you feel like maybe we finally got this --
A. Yes, we did. That is when he told us that it was okay to come to his house, to talk any problems out

him -- with him.

Q. So you feel like maybe we've opened some lines of communication here?

A. That's correct.

Q. Now, did you either hear about or attend any other meetings between the -- your group or some of your group, and either Mr. Pool or Mr. Placensio? And I'm not talking about Mr. Placensio's kidnapping yet. I'm just talking about meetings where you're trying to get things worked out, if you remember?

A. I don't remember anything like that.

Q. All right. So if there were any other meetings, you didn't attend or didn't hear about it?

A. That's right.

Q. Okay. Did you have any more problems with Mr. Pool after he indicates look, you guys come on over and talk any time. We'll talk these things out, and that is the way to resolve it, is we'll just visit?

A. That, and he started making Craig believe that he would start going to Craig to buy dope, and Craig really appreciated that.

Q. Okay. So it sounds like everything has been worked out. But had it been worked out or was there still problems?

A. Well, we thought it was worked out, but Dustin

was still going around talking trash at the titty bars, and he was going to -- you know, I don't know.

Q. Did you have any kind of a meeting or contact with Mr. Pool at Joe's Crab Shack?

A. Yes, sir, I was -- it was right after me and Craig went to go talk to him about Miguel, and I was up there at Joe's Crab Shack eating with my wife and kids. And I had my friend, David Garcia, with me. Anyway, as we got finished eating and I walked out, and I saw Dustin's gold Acura Legend pull up real fast.

Q. So you saw a gold Acura Legend that you recognized as associated with Pool?

A. That is Pool's car.

Q. Was anyone else in the car with Pool?

A. No, he was by himself.

Q. Okay. And let me back up a minute. Before we talk about Joe's Crab Shack, I want to ask you if you had ever seen Mr. Pool's car driving around anywhere near your house?

A. Yeah, right after I heard about them going to rob us, that they were going to rob us, I had seen him drive by my house.

Q. Was anyone in his car with him then?

A. Oh, yeah.

Q. One or many people?

A. I could maybe count maybe five or six people, and -- not that many. It was full.

Q. Okay. There were a lot of people in the car. Did you recognize any of the people in the car?

A. Not until I was at Joe's Crab Shack.

Q. Okay. But was this the same vehicle that you saw at Joe's Crab Shack, or was it a different vehicle when they were driving into your house?

A. No, it was the same vehicle.

Q. Same vehicle. And what did you think was going on when this vehicle went -- were you by yourself or were you walking somewhere?

A. When he drove in front of my house?

Q. Uh-huh.

A. Me and Kelly were fixing to walk to Toot 'n Totum.

Q. So you and your wife were going to walk to Toot 'n Totum, and you see Pool's car. What happened next?

A. Well, he slowed down real slow. He turned his headlights off, and turned his music down all of a sudden. And then I saw the back window rolled down, and I saw a bald-headed Mexican. And I wasn't sticking around for the rest. So I ran and got inside my house because I thought they were going to pull a drive-by.

Q. So you thought there was going to be some kind of drive-by shooting, and you send Kelly running and you head for the house?

A. Yeah, I don't think Kelly even made it out of the house yet. She was at the door and I told her to turn around, get back in there and duck.

Q. But at any rate, you took steps to try and protect Kelly, and then you went in?

A. That's correct.

Q. And again, that is the same vehicle you later saw at Joe's Crab Shack?

A. Yes, sir.

Q. But again, before we talk about Joe's Crab Shack, do you know if in November of 2002 there was a police raid in Mr. Kimberlin's house?

A. Yeah, I knew that.

Q. Okay. And how did Mr. Kimberlin feel about that? What did he think was going on?

A. About the raid?

Q. Yeah.

A. He was pretty scared, and I know that he was driving off and his wife was left there, and uh --

Q. But, did he -- how did he think the police figured out to raid him? Did he think somebody snitched him off?

A. He thought Dustin told on him.

Q. Did he think anybody else did or just Dustin, as far as you know?

A. Dustin, as far as I know.

Q. He let you know that at least he suspected Dustin?

A. That's correct.

Q. All right. And how did he feel about that? Was he happy that Dustin had snitched or narked him?

A. He didn't know for sure, but he was talking pretty bad about it, like Dustin was the one that was responsible for it.

Q. Okay. Now back to Joe's Crab Shack, the event at Joe's Crab Shack, about when do you think this happened? Are we still in 2002? Are we now into 2003?

A. I would be guessing if I answered that question.

Q. Okay. Do you think it was after Craig's house was raided in November of 2002?

A. Yeah, pretty sure.

Q. Okay. Do you remember a meeting at Stumpy's Lounge?

A. Yes, sir.

Q. Okay. Did the Joe Crab Shack event occur prior to the meeting at Stumpy's?

A. It happened the same day before. You know, it was before the Stumpy's meeting, but it was the same day.

Q. Okay. So if the Stumpy's meeting was on February 6th, then you think that Joe's Crab Shack event was on that same day?

A. That's correct.

Q. Now, you're at Joe's Crab Shack. I think you indicated you had already eaten?

A. Yes, sir.

Q. And you're about to leave?

A. Right.

Q. Who is with you?

A. Me and David, Kelly, her cousin, Samantha. Her son, Quentin --

Q. Okay. So you've got family and your friend, David, with you? Did you have your child with you?

A. Aubrey, yes.

Q. Where was she?

A. She was in her car seat that I was carrying.

Q. Okay. So you were carrying her as you're leaving Joe's Crab Shack?

A. That is right.

Q. What happened next?

A. Dustin parked -- he like slid into the parking

spot, jumped out and ran over there. And he pushed me. And I almost dropped Aubrey, and then it really pissed me off. So I handed her over to David and I bowed up to him --

Q. Okay. So he parks the car, comes out and confronts you and shoves you?

A. Right.

Q. And obviously, you're concerned about your child. You hand the child over to your friend, Mr. Garcia?

A. Yeah.

Q. Then what did you do?

A. I tried to fight him. And he asked me -- then all of a sudden, he starts to freak out, and he asked me why I was tripping. And I said because you just pushed me. He said well, hang on, man. He said I'm playing with you, man. I didn't mean to push you that hard. And he said -- then he went on about have I eaten yet. And I said yeah, I had already eaten. Then he explained, then he started talking to me about how he was upset with Craig about how Craig kept butting in every time he tried to collect from certain people.

Q. So Craig was butting in, in reference to what? Collecting his debts?

A. Yeah. He didn't -- Dustin didn't like it when

Craig was telling him he couldn't collect from Miguel by chasing his wife and kid around.

Q. Okay. So did he ever indicate to you, talk to you about any kind of reservations he had there at Joe's Crab Shack?

A. Yeah. He told me to hang on, that he needed to let some people know that he was there. I took his -- I didn't really know. I was still upset. But he ran in there and hollered for Bobby and Ray, and they ran out and got in my face ready to jump me.

Q. Okay. So at any rate, he gets Bobby and Ray to come out of Joe's Crab Shack?

A. That's right.

Q. And by Bobby, you mean Bobby O'Connis?

A. That is right.

Q. And Ray Placensio?

A. That's correct.

Q. And these are people you believe are connected to the Texas Syndicate?

A. I know they're connected to the Texas Syndicate.

Q. Okay. And now you're there, and you're facing two people you believe are the Texas Syndicate, and Mr. Pool, who you have already had problems with?

A. That's right.

Q. What did you do?

A. Well, I was a little nervous. But I didn't show them that I was scared. I told them -- I said so you guys want to jump me? And Dustin, you can't fight me one on one? Then I said how about I just even up the odds real quick? And I whipped out my cell phone. They asked me who I was calling. I told them Craig. And Stocker and Craig were up at Texas Dodge buying a truck. So Stocker answered Craig's cell phone, and he said, what is going on? And then that's when Ray asked me, who is that? And I told him Stocker. And he said oh, tell him I'm going to slap him around like a little bitch.

Then Stocker overheard that on the phone, and got pissed off. He said what the fuck did he just say? And he said, where are you? And I told him I was at Joe's Crab Shack, and he said give him two minutes and he would be right there with Craig.

Q. Okay. And did Mr. Placensio and Mr. O'Connis and Mr. Pool, did they realize then that your plan was to have Kimberlin and Stocker come join you?

A. Uh-huh. And Ray and Dustin got real scared and they started back-pedaling.

Q. Did you call or make contact with Jason Hickson?

A. It was at the Stumpy's meeting --

Q. That was at Stumpy's. So you didn't call Mr. Hickson right when you were at Joe's Crab Shack?

A. I called him after.

Q. Afterwards. Okay. So Mr. Kimberlin and Mr. Stocker are about to ride to your rescue. Your opponents here realize that, and you indicated they were acting like they were --

A. Yeah, Ray started saying oh, man, you ain't got to get them involved. And we can squash this. We'll just sit down and talk about it. And anyways, you know, I wasn't ready to listen to them want to talk about it. I was ready to fight. And anyways, we started drawing a big crowd. And I had a gun on me and $5,000.00 in my sock. So I thought it was probably a wise idea to go ahead and split out of there.

Q. So you didn't think a meeting with the police would be particularly wise at that point?

A. That's right.

Q. So what did you decide to do?

A. Well, I turned around and left. And then they started making fun of me, telling me you're not going to wait on your bitches to show up? And I just turned around and laughed it off and got in my truck and drove off.

Q. Now, Kelly got upset about this, didn't she?
A. Yeah, she was really pissed.
Q. Why was she upset?
A. She thought I should not have even humored them and played their game. Whenever Dustin came up to me and pushed me, she said I should have just walked away right from the very start.
Q. Did you let Kimberlin and Stocker know that it wasn't going to be necessary for them to come?
A. Yeah. As I was driving off, I called Craig back and I told him don't even worry about coming up. They're a bunch of pussies. They're all talk.
Q. Okay. Later, on that day, did you get some strange phone calls, a number that you didn't recognize on your caller ID?
A. That is right.
Q. What was that about? What happened?
A. It was my friend, Cory Pendleton (phonetic), calling me up. I had just sold my Acura Vigor that my wife drove around to Cory. And Cory sold it to his friend named Michael Dibiase.
Q. You had a -- what color -- what kind of color of a car was this?
A. It was a maroon Acura Vigor.
Q. Okay. It was a maroon or red looking Acura

Vigor?
A. That's right.
Q. And you had -- did you originally -- you bought the Navigator from Cory Pendleton, didn't you?
A. Yeah. First I traded it for an Expedition, but he couldn't ever get the title on it, so I ended up getting a Navigator.
Q. But had you gotten the Acura, the maroon colored Acura from Cory Pendleton at first, or had you gotten it somewhere else?
A. I bought that from my friend, Shannon Cable (phonetic).
Q. Okay. So at any rate, you have either sold this to Mr. Pendleton, or he's kind of selling it to you, to Mr. Dibiase --
A. It was the same night that when we were trading cars, I had traded for the black Expedition that night.
Q. So this is all involved in a car transaction?
A. Right.
Q. Okay. And everyone knew that Kelly had been driving the maroon Acura. Right?
A. Dustin knew it because I used to deal with him.
Q. Okay. When you started getting these strange

-- by the way, Mike Dibiase is the son of Ted Dibiase, the professional wrestler. Right?

A. That's correct.

Q. You didn't actually know Mr. Dibiase or deal with him. You were just dealing with Cory?

A. I met him with Cory after they ran my Acura off the road and --

Q. We'll get to that. But at the time of the car transaction, you were just dealing with Cory. You didn't deal directly with Mr. Dibiase?

A. That's correct.

Q. Okay. You started getting these phone calls, and you didn't recognize the number. Is that --

A. Yes, sir.

Q. Okay. What happened next?

A. Well, my friend, Kevin Jackson, called me up and he said hey, how come you're not answering your phone? And I said, well, I didn't know whose number that was. Did you get a new number? And he said, no, that is Cory Pendleton. And I said, what does he want? And he said that he was pissed off because Mike had just gotten -- Mike had just gotten chased off the road in an Acura. And they ran up to him and pulled guns on the guy driving and said where is that bitch, Bledsoe, tell him we're going to kill him.

Q. You talked to Mr. Jackson about this. And did he encourage you to take the call from Mr. Pendleton?

A. Yes, sir.

Q. And did you take a call from Mr. Pendleton after that?

A. I called Cory.

Q. Okay. You called him because you now knew the number?

A. Right.

Q. And Mr. Pendleton, did he confirm to you what Mr. Jackson was claiming?

A. Yes, sir.

Q. When you say "they" ran this Acura off the road, who were "they"?

A. The description I got, they said it was two Mexican guys, so I'm assuming it was Bobby and Ray.

Q. Because you believed it was connected to Mr. Pool, and because it was two Hispanics you believed it was --

A. Well, they were in Dustin's gold Acura Legend.

Q. Okay. And the car sounded like Mr. Pool's, as well?

A. Yeah. And everybody knew Dustin drove that Acura Legend. Even Mike did.

Q. How did you feel about that?

A. Well, I felt like he was targeting my family because of me.

Q. Okay. And that fit the pattern, didn't it? You had talked to Pool about dragging Miguel's family into it. You talked to Pool about dragging Sego's family into it, and now he is dragging your family into it.

A. Yeah, I felt like I fucked up.

Q. Okay. Now, at some point -- and this may be out of sequence, so listen carefully. Did Mr. Kimberlin at some point believe that Mr. Pool was dragging his family into it?

A. Did Craig feel like his family was getting drug into it? I felt like he thought it was a matter of time before his family got drug into it after they went and targeted my family.

Q. Did Mr. Kimberlin ever talk to you or anyone else in the group talk to you about Pool asking around, asking the Mendozas and others, what did they ask them?

A. Well, they were trying to pay people for information on where Craig lived.

Q. Okay. And how did Mr. Kimberlin feel about them getting information about where he lived?

A. Well, that was the last straw.

Q. So now they're dragging Kimberlin's family

into it?

A. Yes, sir.

Q. All right. So we've got the Joe's Crab Shack event. We've got the word you have. It sounds to you like Bobby O'Connis and Ray Placensio have run the car they believed was your wife's off the road. What did you do? How did you respond?

A. Well, I called Craig up and I told them they were hunting me down, that I didn't know what to do about it. And he told me that I was just going to have to fight Dustin one on one to get this over with. So I agreed with him. And I said well, would you be there if his friends try to jump in? And he said even if you get your ass kicked, nobody is going to jump in. So that's why I decided to go ahead and call up K.J. (phon.), and Keith and everybody. They were outside waiting.

Q. Okay. Mr. Kimberlin's response is the way to resolve these things is not to drag people's families into it, it's to have the two people who have a problem meet one on one and settle it, man to man?

A. Right.

Q. And that fits the pattern of Mr. Kimberlin's approach to the problems?

A. Right.

Q. You began to make phone calls to some other

people you mentioned just a minute ago. Why were you calling these people?

A. Because I didn't -- I didn't really trust Craig and his bunch, because I barely knew them. I knew Craig, but I didn't know Stocker and Frank, so I wanted people there that I trusted.

Q. When you say you barely knew them, you mean you weren't close friends. Now, you had been dealing with them in a business relationship for five years?

A. I knew everybody's name, but I knew Craig. He was the only friendship that I had with any of those guys.

Q. All right. So you were beginning to look for some folks who have a personal interest in you as well as Mr. Kimberlin and others who may have just a business interest?

A. That's right.

Q. Okay. When you called these people, what did you tell them?

A. I told them that I was going to go up to Stumpy's to fight Dustin.

Q. Okay. And did you think that was what was going to happen, that you guys were all going to get to Stumpy's, and somehow you would get Dustin there and you and Dustin would resolve this, man to man, one on one?

A. Right.
Q. And did this meeting at Stumpy's take place?
A. It took place, but Dustin never showed up.
Q. All right. Do you know what time of the day or night this meeting took place?
A. It was late.
Q. Late. Okay. And do you remember the people, or as best you can, can you tell us who was at the meeting at Stumpy's?
A. I know for sure it was me. It was Stocker. It was --
Q. Stocker. Do you mean Josh Stocker?
A. Josh Stocker.
Q. Okay.
A. A guy named Doug Cash (phonetic). Those two had picked me up and taken me over to Stumpy's.
Q. And when you say those two, what two?
A. Doug Cash and Josh Stocker.
Q. So Doug Cash and Josh Stocker picked you up and you went with them to the meeting?
A. Right.
Q. By the way, do you see Josh Stocker in the courtroom today?
A. Yes, sir.
Q. Can you point him out for us, please?

A. Right over there, (pointing).
Q. There is a man wearing a kind of a light green shirt and a tie with no coat. Is that the person you're talking about?
A. Yes, sir.
MR. FARREN: Would the record reflect he has identified the Defendant, Your Honor?
THE COURT: The record will so reflect.
Q. By Mr. Farren) When you got to the meeting with Mr. Cash and Mr. Stocker, was Mr. Kimberlin there or did --
A. Craig was over there at a pool tournament that they were having.
Q. Okay. Do you know if Mr. Chacon was there?
A. Yeah, he was there.
Q. Okay. Do you know if -- did Jason Hickson come?
A. I called him, too.
Q. Okay.
A. We started calling more people after we figured out that Dustin was having all of his friends' group up over there at Jaguar's?
Q. Do you know if Tommy Tucker was there, if you remember?
A. Yeah, Tommy was there. Destry was there.

Q. And most of Mr. Kimberlin's group eventually was there. Is that right?
A. Uh-huh.
Q. Okay. How did Mr. Pool know -- how did he know to come to the meeting? Did you -- I mean, how would he know that he was supposed to come?
A. When, when I first showed up at Stumpy's, see, we didn't call everybody until, you know, after we figured out they were grouping up because it was supposed to be, you know...
Q. Okay. The jury doesn't know what you mean by "grouping up", and --
A. "Grouping up" means that Dustin was calling his friends and they were all getting up there. They were getting the numbers --
Q. Okay. We're getting ahead of ourselves. Hold on just a second. When you first -- before you ever got to Stumpy's to meet Pool one on one, why did you think Pool would show up? I mean, were you going to call? Did Craig call him? How would he know to be there?
A. Well, we didn't know for sure if he would show up. I went over there and Craig called him up on his cell phone -- well, I think it was Tommy Tucker's cell phone they used, but I'm not sure whose cell phone.
Q. But at any rate, it's your understanding

someone made a call to Pool while you were there?

A. That's right. Well, I know Craig made the phone call, but I don't know whose phone he used.

Q. But at any rate, you believe Mr. Kimberlin called Mr. Pool. Could you hear both sides of the conversation or just one?

A. Just one side of the conversation.

Q. And based on that, did you understand that Mr. Pool was coming or not coming?

A. Craig told him, he said hey Dustin, he said are you looking for Bledsoe? And he -- I am assuming he said yes. And he said, you can quit running people off the road now. He is up here at Stumpy's.

Q. Okay. Did this conversation -- was this fairly brief or a real long conversation?

A. Craig told me -- well, it was maybe a 20 or 30 minute phone conversation.

Q. So a pretty long conversation. At the end of the conversation, did Mr. Kimberlin indicate whether Pool was coming or not?

A. Dustin said he was going to come because we agreed to -- that we were going to talk before we fight. And anyways, then my friend Kevin Jackson called me up and he told me that a girl named Brandy at Jaguar's told him that they --

Q. So you're waiting for Mr. Pool. And then you get some additional information from your friend, Kevin Jackson?

A. Right. That Dustin was up there at Jaguar's waiting for all of his friends to get there.

Q. So you believe he is at Jaguar's, and you get a call from your friend, Kevin Jackson, and he tells you something about some girl named Brandy?

A. Right.

Q. What information did he have about Brandy that connected to Mr. Pool? How did all of this tie together?

A. Brandy said that she overheard Dustin and Ray talking about those dumbasses think we're coming up there to talk to them.

Q. Okay. And Brandy worked at Jaguar's?

A. Yeah. And then she overheard Ray ask Dustin if the guns were still on the car.

Q. So according to Brandy, according to Kevin Jackson, Brandy overheard Pool and others talking, and they're getting a group together and there's guns involved?

A. Right.

Q. And they're coming to Stumpy's to -- basically, you guys think there is going to be a talk

and they're saying it's going to be an ambush?

A. Right. And that's when I wanted to leave and then Craig told me no, just go over there and tell Stocker to call up some friends, explain to them what is going on. And then so I told Stocker -- Stocker was calling some people. And then I went over there and I called my own friends because I didn't trust those guys.

Q. So -- I mean, at this point, we're approaching the O.K. Corral. We're fixing to finally get this solved, once and for all?

A. Right.

Q. Did Mr. Pool ever show up?

A. No.

Q. He never showed?

A. No. As a matter of fact, me, Stocker and Doug Cash got into Stocker's white Ford pickup and drove down the highway to -- over there to Jaguar's, because Stocker was a little pissed off that Dustin was trying to beat up a girl. So we were going to go over there and take the fight to him, but the cops were there.

Q. Okay. Did everybody end up back at Stumpy's to talk about what are we going to do about this Pool problem? Did you guys end up talking that night?

A. Yeah. Well, we were waiting for him to show up. Everybody was -- we were talking about different

ways to get him out of our hair.

Q. So I mean, you'd gone to his house. You had visits. You'd -- somebody actually -- Stocker basically kidnaps him over to a meeting --

A. Well, he wasn't taped up the first time.

Q. Well, I understand. But my point is, you guys have tried lots of ways to get this problem solved?

A. Right.

Q. And it just won't go away?

A. Right.

Q. So the meeting at Stumpy's, there is a lot of discussion. At some point, did you talk about $10,000.00 taking care of the problem?

A. Jason Hickson mentioned that we should just get a pound of dope, because he knew a way to sneak into Dustin's garage and plant it in one of Dustin's cars, and we would just call Crime Stoppers. Craig said that would be the same as snitching. So then Miguel Gonzales says fuck it, you guys are just going to have to kill them. And I said what's up with you Mexicans wanting to kill people? Because the guys that I was dealing with, they were pissed off that -- you know, because I kept calling them and telling them to slow down, don't bring anything --

Q. Stop just a second. When Miguel Gonzales said

something about look, I think you're just going to have to kill him, that brought to your mind some problems you're having with your Mexican contacts, your Hispanic contacts in Old Mexico. What was the problem? Why were they -- why did they care about Dustin Pool?

A. Well, because I had a -- you know, I had a bunch of heat on me. They -- you know, they were driving by my house. I felt like I was going to get robbed at any day. So I was telling them not to bring me -- supply me with any dope, to slow down --

Q. So your problems with Mr. Pool was slowing down business?

A. Right.

Q. And your suppliers in Old Mexico are not happy about business slowing down?

A. That's right.

Q. And so did they learn that the reason for the slow down was Mr. Pool? Did you tell them that?

A. I told them that I had problems with a guy named Dustin Pool.

Q. And their response was what?

A. They told me that if I needed it taken care of that they could send a guy down, and I could pay him $10,000.00, and that is all I would have to give him was a picture and an address.

Q. So these guys in Old Mexico said look, Pool -- I don't know this guy Pool, but we'll send somebody up there and for $10,000.00, we'll solve the problem. I mean, we're handling 30 to 90 pounds of dope, $270,000.00, in a week. $10,000,00 is nothing, is it?

A. Yeah, they ultimately ended up just telling me they would do it for free, too.

Q. Okay. But at any rate, these guys in Old Mexico suggest that for $10,000.00, the problem could be solved. And now you're at Stumpy's, and Miguel has brought up killing him, and you responded by telling them about the Old Mexico people?

A. Right.

Q. What did you say? What did you tell them?

A. I -- you know, I didn't take it serious. I didn't think Dustin was that big of a threat. I thought he was just mainly just running his mouth and talking a bunch of trash. And I knew that they would just take Stocker and Craig going over there to settle him down again.

Q. When you explained to them about your friends suggesting that in Old Mexico, was it your intent to put out a $10,000.00 contract on Pool?

A. No, sir.

Q. Okay. Do you believe that Kimberlin, Stocker,

anybody else, do you believe anybody else took it that way or spun it that way?

A. I think Craig Kimberlin is the only one that took it that way.

Q. Okay.

A. But that's when he started telling Stocker and everybody else --

Q. Do you know if Mr. Stocker was in debt to Mr. Kimberlin?

A. Yes.

Q. Why was he in debt to Mr. Kimberlin?

A. He had gotten busted with a half pound of dope that he owed Craig for, plus he had financed a '66 Galaxy through him.

Q. Okay. So in your business, if I pick up a pound of dope from you and you front it to me --

A. Right.

Q. -- and I don't pay you, I'm going to pay you after I sell it. If I get busted by the police and I lose the dope, do I still owe you for the dope?

A. Yes, sir.

Q. Okay. And that was what happened to Mr. Stocker. He owed Mr. Kimberlin money?

A. Right.

Q. Did Mr. Kimberlin suggest to Mr. Stocker that

the Pool -- the $10,000.00 Pool deal might help resolve this problem? Or do you know --

MS. MCELROY: Your Honor, I'd object. There's no way that he would know that --

THE WITNESS: I have no idea --

THE COURT: Hold up. Do what?

MS. MCELROY: He was asking the witness about whether or not Mr. Kimberlin had talked to Mr. Stocker, and there is no indication that he would necessarily have that information.

MR. FARREN: I'll rephrase, Your Honor.

THE COURT: Sustained.

MR. FARREN: I'll rephrase.

Q. By Mr. Farren) Did you hear Mr. Kimberlin, Mr. Stocker or anyone else in your group talk about whether Stocker could solve his debt problem to Mr. Kimberlin if he collected the $10,000.00 for getting Mr. Pool?

A. No, I never heard that -- anything like that.

Q. Okay. That's fine. When the meeting ended -- did this meeting, this discussion at Stumpy's, did it go on for a short time or a long time?

A. We were there for hours. I think I finally got back home at about 3:00 in the morning.

Q. When you left the meeting, did you -- what did

you think had been resolved, or had anything been resolved? I mean --
A. We just thought they were scared to show up.
Q. Did you believe after the meeting that -- did you believe after the meeting that -- that somebody was out there trying to collect on a $10,000.00 contract on Pool that you had put out?
A. I had no idea of anything going on like this.
Q. When was the next time you heard from Mr. Kimberlin or anyone else in reference to Pool?
A. I heard from Stocker a couple of days after that -- he told me that he was at my shop and one of his guys had been shot.
Q. Okay. When you heard one of his guys had been shot, what did you think?
A. Dustin -- one of --
THE REPORTER: I didn't hear your answer.
THE WITNESS: I felt like maybe Ray or somebody shot Stocker, Craig or somebody.
Q. By Mr. Farren) And did you want to know why they were at your shop?
A. Yeah.
Q. Okay. Where was your shop?
A. At McCarty and Wilburn (phonetic), at the corner.

Q. Okay. And what kind of shop was it?
A. A detail shop.
Q. For cars?
A. Yes, sir.
Q. Okay. When you got this call and you learned somebody had been shot, did you go to the shop?
A. Yes, sir.
Q. Okay. Did anyone tell you why they were at the shop before you got there, or did you learn that after you got there?
A. I learned that after I got there.
Q. When you got there, what did you find out?
A. They said that they had nowhere else to go and Craig told them that that was a good place to take him.
Q. Take who?
A. Take Ray.
Q. Now, did you know they had Ray, or you learned that after you got there, you said?
A. I learned when I got there and saw him face down on the floor.
Q. Okay. So he's face down on the floor, Mr. Placensio?
A. Yes, sir.
Q. How is he dressed?
A. He is fully dressed in Versace clothes.

Q. Versace clothes. So he's wearing nice clothes?
A. Yes, sir.
Q. And he -- is he on his back?
A. On his stomach.
Q. He's on his stomach. Face down. Is he tied? Bound? Or not?
A. Not yet. They're just pointing the gun to his head.
Q. Okay. When you arrived, was Mr. Stocker there?
A. Yes, sir, him and Destry Keeling were there.
Q. Who had the gun?
A. Both of them had guns.
Q. Okay. Were they both holding the guns on Placensio?
A. I think Destry was the one holding the gun while Stocker came out and talked to me.
Q. Were Destry and Mr. Stocker the only people you saw there at that time other than Mr. Placensio?
A. I had brought one of the guys that I dealt with, with me.
Q. Okay. So one of the cartel guys from Old Mexico was actually with you when you arrived?
A. Right.

Q. And when you visited with Mr. Stocker, what was -- what was the conversation about? What did you guys talk about?
A. Well, I ran in there first and asked Ray who he had shot. And he said that he didn't shoot nobody. Can we please just talk about this.
Q. So he denied shooting anyone. Did you ask Stocker?
A. No, it was Destry who came and spoke right up and said he accidentally shot his friend in the foot. He had a gun that was fully automatic that had a hair trigger.
Q. So Destry said, no, I'm the one --
A. Right.
Q. Did he say who he shot, if you remember?
A. No, I didn't ask no names. He just said a friend.
Q. You just knew he accidentally shot a friend. All right. So once you arrived and you found out that the shooting was actually an accidental shooting of one of Destry's friends and it wasn't Placensio who shot somebody or somebody else with the Pool organization, what did you do next?
A. When I talked to him, I asked him why he -- why they thought they should run my wife's car off the

road, and he said that he thought it was his friend, Tito. And then I said that's how you greet your friends, you pull guns on them and run them off the road? And he said no, no, and I explained to him, do you know my wife and kids are always in that car? And he said no. And I tell him well, I know you're just doing that for Dustin's benefit. But I drive a black Expedition, so if y'all decide to hunt me down, that's what I drive.

Q. So you feel like his explanation that it's his friend, Tito, didn't make much sense, because why would he point a gun at his friend?

A. Right.

Q. And so you're taking this opportunity to try to tell Placensio to leave your family alone, to deal directly with you?

A. Right. I didn't want my wife and kids hurt.

Q. What happened next?

THE COURT: Mr. Farren, I'm going to call a break.

(Recess.)

(All sides, Defendant present.)

(Open court, jury seated.)

THE COURT: Thank you all. Everyone be seated.

Go ahead, Mr. Farren.

MR. FARREN: Thank you, Your Honor.

Q. By Mr. Farren) I believe when we paused for a break, you were explaining that Mr. Placensio was face down. Mr. Keeling was holding a gun on him, and you were talking with Mr. Stocker, and that a member of the cartel from Old Mexico actually accompanied you to the shop. Do you recall that?

A. Yes, sir.

Q. When you visited with Mr. -- and I think we even got past that. You visited with Mr. Stocker, and you went over and began to confront Mr. Placensio about these problems?

A. Yes, sir.

Q. After you talked with Mr. Placensio and you didn't buy his story about his cousin, Tito, what happened next?

A. It was his friend, Tito.

Q. Okay, his friend.

A. Sorry.

Q. That's all right.

A. Well, Stocker had -- well, me and Gray, we had -- you know, he told me that he didn't have no problems with me, that it was -- Dustin was the only one that had the problems. He was the only one that pulled the gun on

the car.

Q. So Mr. Placensio was indicating that it was Ray Placensio and Dustin who had run the car off the road?

A. Right. He was trying to put everything on Dustin instead of himself.

Q. Okay.

A. So I told him, you know, well, I know you're just doing that for Dustin, but I drive a black Expedition, so if you -- y'all have already heard that. So anyways, we shook hands, you know, after he told me he didn't have no problems with me. And then Stocker came and pulled me to the side --

Q. Now, when he shook hands, is he still laying in the floor and he just raises up his hands?

A. That's right.

Q. Okay.

A. So anyway, Stocker comes and pulls me to the side and he says, you don't believe that piece of shit, do you? And I said, I don't know. What do you think? And he said, well, he is not going to talk his way out of an ass whipping from me. So then Stocker goes over and he is like, straggling him, you know, standing up.

Well, Ray is still on the floor face down, and Ray's wallet and stuff was laying beside him. And

Stocker picked -- or well, first, he asked Ray to stand up. Ray said no way. You guys will jump me. So then Stocker gets over and straddles him, and he's picked up -- he's picked up Ray's wallet and he starts slapping --

Q. Now you said his wallet and stuff. Was there a cell phone with the wallet, or do you know?

A. No, it was just a bunch of junk that was in his pocket.

Q. Okay.

A. And anyway, he picked Ray's wallet up and started slapping him upside the head saying, I thought you were going to slap me around like a little bitch. What's up now? And anyways, just a little bit of mental abuse for a little bit. I mean, it only took about ten minutes to work Ray up to where Ray said he would fight Stocker one on one. So Ray asked me and Destry if we would step out -- well, he told us, he said, if you and Destry -- you know, he looked at me and he said, if you and Destry step out for a minute, I'll fight Stocker one on one. So we did. We went around and there is a hole looking into the garage so we could watch them fight and Stocker beat the crap out of Ray with no weapons.

Q. Okay.

A. And then -- so anyways, I go over there and Ray has been whupped. I tell Stocker that I want this

out of my shop. Stocker said --

Q. When you say, I want this out of my shop, you mean you want them to take Placensio and leave?

A. Yeah, I didn't like the whole kidnapping situation being at my shop where I had my name under where I could be in trouble.

Q. Okay. What happened next?

A. Well, I -- Stocker didn't want to leave. So I called up Craig, and I told Craig -- I said hey, you know, I need this out of my shop. And Craig says, oh, he is already up there? And he said hang on. I'm on my way up there. So I told him -- so anyway, about five minutes later comes, and him and Frank get there and --

Q. So Craig Kimberlin and Frank Chacon?

A. Yes, sir.

Q. Okay. They arrive and then what happened?

A. Craig pulls up. And he jumps out of his truck and his friend is with him. And he says, where is he. And I said well, he's in the very last garage over there. And I said Stocker already beat the shit out of him. And he said well, he was trying to, you know, he was telling me about how Ray was going around asking and trying to pay people for info on where he lived.

Q. On where he, Craig Kimberlin, lived?

A. So you know, we were all kind of joking

around. And Craig, he took my bottle of aspirin and said, if this screaming gives you a headache, take two of these. I brought Cokes and powdered donuts. And so anyway -- so they -- you know, they're dragging all of this stuff in. Craig had brought duct tape, Listerine mouth wash.

Q. Now, why the Listerine mouth wash?

A. Well, whenever they had beat Ray over the head with the shovel, it cut his face up a couple of times and they started pouring mouth wash in his cuts and they were burning him with lit cigarettes.

Q. Okay.

A. Anyway, so Craig goes in there and he takes like just a flying run at Ray and just punches him like a football. And Ray slid across the shop and Craig is over there talking shit to him, and said oh --

Q. When you say he -- like a football, do you mean he kicked him?

A. Yeah, he lined himself up and took a run at him like he was going to punt a football.

Q. Where was Mr. Placensio? On the floor?

A. Yeah.

Q. So he is on the floor and Craig runs and kicks it --

A. Yeah.

Q. Okay. And then what happened?

A. Then he starts talking a bunch of trash to him telling him you know, you looking me up, Ray? What were you going to do when you found my house? Were you going to drive by on it? And then he starts littling (sic) him by calling him -- I thought you were a bad ass Texas Syndicate member. Aren't you going to get up and do something? You know, and just -- and then at that time, Craig handed the duct tape and he straddles over Ray, and that he takes a whole line of duct tape and gets right behind him and just pulls, you know, he is pulling Ray up like that (indicating) and then he is just going over the hair and all --

Q. Okay. Where is the duct tape? Where did he put the duct tape?

A. Around Ray's whole face.

Q. Okay.

A. The same way Dustin was taped.

Q. Okay. Now, was his nose exposed, or do you know?

A. Well, you could see like a little -- like this part wasn't covered up. You could see this part, but his nose was covered but --

Q. Okay.

A. There were air holes.

Q. So jumping ahead in time, when you saw Ray being taped like this (indicating), later when you saw Pool taped, you believed it was very similar the way the two people were taped?

A. Yes, sir.

Q. Okay. Go ahead.

A. So anyway, they taped him up. And then I started explaining to Craig that I really wanted this out of my shop. And he said well, watch this. This is how you handle it when someone is fucking with you.

Q. Now, before you go on, when they taped Mr. Placensio's face up and it reminded you later when you saw Pool, did you see them put a sock or anything in Mr. Placensio's mouth?

A. No.

Q. Okay. So there was that difference?

A. I didn't even know Dustin had a sock in his mouth.

Q. Okay. So you didn't know about that part?

A. Right.

Q. I apologize for the interruption. Go ahead.

A. Well, they got him all taped up, and then I'm explaining to Craig that I want it moved out of my shop. And Craig says, don't worry, we're going to, you know, if any trouble comes of this I'll take the heat.

And so then I left. I left and then I came back the next day. And they -- there was Stocker. There was Miguel Gonzales, there was Destry, Tommy Tucker. There was a quite a few people there and...

Q. Now this is the next day?

A. Right. And then Craig said that he had some arrangements to move it out of the shop. And so I said okay. And I left again, because I didn't want to be caught there, you know, because they were being really loud. And --

Q. Now, this detail shop, did you have employees?

A. Yes, sir.

Q. Were the employees there?

A. No.

Q. Okay. Was it not in operation at this time?

A. It was probably about 9:00 at night when all of this was going on.

Q. But we're already into the next day?

A. Yeah.

Q. Were there employees there the next day?

A. No, I had called them and told them not to come.

Q. Okay. So when it started, it was late enough at night. No employees were there. And the next day until you get it out of the shop, you don't want your

employees to see this?
A. Right, plus a couple of them had showed up, and Craig and them were at the gate turning them away telling them that they couldn't come in.
Q. Okay. So I guess this wasn't particularly good for business at the shop?
A. No.
Q. You're wanting to believe and it's the next day, and you checked and they were saying they were going to go but they haven't, and you left again. What happened next?
A. Well, then I came back the next day by myself, and -- to make sure that they had left and cleaned up. And I noticed that Ray was laying on the floor all duct taped up, and he looked lifeless.
Q. So this is the third day?
A. Right.
Q. And Ray is still there?
A. Right.
Q. And he is taped up with what kind of tape?
A. Duct tape.
Q. And he looked lifeless to you?
A. Yes, I thought he was dead.
Q. What did you do then?
A. Well, I went over there and I nudged him. And

he wasn't making any sounds at first. And then finally he sounded real woozy. And so I helped -- I lifted him up and sat him up against the wall in there. And then I told him I was going to take the tape off. And I took it off slow because it was hurting him because his face was all bruised and cut up. And then he was complaining of having a horrible headache. So the aspirins that Craig had brought were still there, so I give them a couple of them, and so -- there was also Cokes, because the guy hadn't eaten in three days. And I gave him some powdered donuts.

Q. Now, didn't you just assume that? I mean -- you hadn't been there --

A. No, they were bragging about they didn't let him go to the rest room. They didn't let him eat.

Q. Okay. So based on what you were told from other people, then, you didn't think he'd eaten or gone to the rest room?

A. Every time he had fallen asleep, they had sprayed him with some water, really cold water out of a high pressured hose. And then they would get on the other side of the wall, because it was a tin wall. And they would throw golf balls at it, and it sounded like gun shots. And that would freak him out really bad. And they did a number of horrible things.

Q. All right. Did you eventually get the tape off of him?

A. Yeah, I took the tape off of his face, but I was too scared to take the tape off his hands and feet because I didn't want him running and making a jump at me. I was by myself.

Q. Did you -- how long were you there by yourself with Mr. Placensio?

A. I had probably been there for about 30, 45 minutes. And then Tommy Tucker pulled up. And he came up to me and he said that -- he said Craig called me and told me to come up and make sure -- you didn't let him go. He said Stocker went over to Burger King to go get him something to eat. He was supposed to be standing guard over Ray. He said let's just tell --

Q. Did Tucker tell you how he knew Stocker had gone to Burger King?

A. Craig had called Stocker and Stocker told him he was at Burger King.

Q. So Craig checked on the guard, and the guard admitted, I'm getting burgers?

A. Right.

Q. Okay. So you and Mr. Tucker now were there with him. And did Craig send Tucker, since he now knows Stocker has left him?

A. Right. And he knows that I'm up there at the shop, and he wants -- he told Tommy to make sure I didn't let him go.

Q. Now, how did Craig know you were at the shop?

A. I believe I called him and told him.

Q. Okay.

A. You know, he was there by himself.

Q. Okay.

A. I felt like they were trying to leave me holding the bag.

Q. Okay. Did you and Mr. Tucker discuss the situation?

A. Me and Tucker? Yes, Tucker said that we should let him go and tell him he escaped, because they are -- because Craig was asking Tommy to kill him, but Tommy didn't want to. So then they approached Stocker about it, and Stocker didn't want to kill him either. So then Craig got upset about it and he was messed up about the whole situation. He was mad at me for wanting to let him go. He was mad because nobody wanted to kill him, like that --

Q. And what happened then? What did you and Mr. Tucker do?

A. Well, by that time, Craig and Frank had pulled up, and Craig comes flying up into the parking lot and

he sees Ray is untaped. And he's mad, he's yelling at Tommy, telling him, I thought I told you to not to let Bledsoe let him go. And then Tommy, he didn't want to hear about it. So he just got in his car and left. And then Frank comes out, and he is walking over there and he is telling me -- or I'm telling Frank, I said come on, man, please let him go. He's taken enough.

Q. Now, Frank was actually related to Ray Placensio?

A. That's when Frank told me that they were cousins. And I said -- and he said, don't worry. I love my aunt. We're not going to kill her son. He said -- but he's got to convince us he is not going to start any more shit. And then so I left. And then before all that I had -- you know, whenever I had untaped him, I had given him some money because he was talking about how his clothes were ruined, and that he told me that Stocker had robbed him for a hundred bucks.

Q. After you left -- when you left, Ray was still there?

A. Right.

Q. And Kimberlin had arrived. Tucker had left, but Kimberlin had arrived?

A. Kimberlin and Chacon were there. And then I heard that they later got him a motel to stay at so he

could have one of his friends come pick him up.

Q. Now, are you aware that Mr. Placensio is a Defendant in the Preciado murder up in Potter County? Did you realize that?

A. I had heard about it when I was in county.

Q. Okay. So you don't -- you don't know anything -- any details about that? You didn't hear about it?

A. I know the guy's name was "Blue" (phonetic), that got stabbed a whole bunch of times. Bobby O'Connis got sentenced for 37 years for conspiracy to commit murder. And it was a hit for the Texas Syndicate.

Q. When was the next time you heard from either Mr. Stocker or Mr. Kimberlin or somebody else in your group in reference to either Placensio or Pool or any of their group?

A. It had to have been from Kimberlin. He told me that Dustin was up there at the titty bars, and he was really pissed off about what happened to Ray and that they were going get even with us because Ray's older brother, Lupe, that they called "Joker" was getting out of the penitentiary. And he was a big man with Texas Syndicate and he didn't give a fuck about going back. And they said that Frank was going to get it the worst.

Q. Okay. And after you got this information from

Mr. Kimberlin, did you receive a phone call from Mr. Kimberlin in reference to or somehow connected to Mr. Pool?

A. Yeah, because we found out -- or Craig was telling me about how a girl named Jessa started calling up Frank Chacon, wanting him to come over by himself. Well, you know, Frank hadn't heard from her in years and he got to feeling weird about it. So he started asking from everybody he knew, and he found out that Dustin had offered her some dope to set him up with those guys. So Craig took that as a last straw and decided to go do something.

Q. So even after Mr. Placensio has given this attitude adjustment for about three days, Mr. Pool's response is to continue to talk trash, as you say, and threaten everybody with Lupe, and now, apparently trying to get this girl, Jessa, to set up Frank Chacon?

A. Right.

Q. And so you have had meetings. You had guns involved. You have gone to Stumpy's. You have had confrontations at the Crab Shack. And it's just on and on and on. When is the next time you heard from Mr. Kimberlin about Pool?

A. He called me up while I was at my detail shop, and he said what are you doing? And I said nothing.

And he said hey, I got someone here that wants to say sorry. And I said what? And he said hang on. Let me get him for you. And I could hear the phone shifting. And he turned around and I heard him hit somebody really hard. And I heard ahh, it was just screaming, and pain screaming. And I said you got Dustin? Are you crazy? He is going to narc on you. And he said yep, chicken is in the coop. And he said, do you know how to get to the farm? I told him no, I don't know how to get to the farm. I had never been there. That was Craig's stash house.

And anyway, he told me that, you know, did I want to come over. I told him no, I don't really want to come over there, because you know, I had already learned what they did with Ray. So anyways, Craig explained to me that he had some money at his house that he needed me to come over there to pick up, because he didn't like having money or drugs at his house while he was in the middle of doing something that could, you know, get him in bad trouble.

Q. Now, it was your understanding that this call, he was at the farm when he called you?

A. Right.

Q. Okay. And this activity you were talking about, he didn't want money at his house and so forth,

did you understand then that he was coming back to Amarillo from the farm?

A. Yeah, he said he was coming to town in a little bit, that he had a couple of errands to run, so he would call me when he got in, so I remember I went and ate with Kevin and Laurie, and Kelly was also there at Logan's Roadhouse, and we were eating and then Craig called me up and told me he was there at the -- he told me he was there at his house and for me to come over, and to pick the money up.

So I went over there. I picked up $50,000.00 from him. Frank had just walked out the door right when I walked in the door. He had to go do something real quick. And then he started telling me --

Q. Okay. Before you go on, I just want to make sure the jury understands the sequence. Earlier in the day, you got a call at your detail shop from Mr. Kimberlin?

A. Right.

Q. And you learned for the first time that he had Mr. Pool. The chicken was in the coop?

A. That is right.

Q. About what time of the day do you think that was?

A. I'm guessing, but I think 3:00.

Q. Okay. He indicated he's coming to town. He's going to run some errands and he would check with you later. So you've gone to eat at Logan's Roadhouse?
A. Right.
Q. And you get a second call from Mr. Kimberlin. About what time do you think it was when you got the second call?
A. Maybe 7:00 or 8:00 in the evening.
Q. So it's late enough to be eating?
A. I'm still getting --
Q. Okay. I understand. It's late enough that you've gone to eat supper?
A. Right.
Q. You respond to the call and go to his house. Is that correct?
A. That is correct.
Q. And you pick up the $50,000.00?
A. That's right.
Q. Mr. Chacon was leaving about the time you arrived?
A. Uh-huh.
Q. To run some errand?
A. Right.
Q. Did you remain there with Mr. Kimberlin while Mr. Chacon was gone?

A. Yeah.
Q. Okay. Did Mr. Chacon return?
A. Yes, he did.
Q. How long do you think it was before he returned?
A. We were there long enough to count out and make sure that all $50,000.00 was there.
Q. Did you talk with Mr. Kimberlin while you were counting the money and so forth about the call that you had gotten earlier about Mr. Pool?
A. I told him that, you know, I didn't really want to go. And then he told me that, you know, well, you got to go because this is how you're going to get your respect. Too many people take your kindness for weakness. And then he started reminding me about, I need to treat that like my wife and kids were in the car. And he just juiced (sic) me out to go, like that. I don't think it's fair to blame him but --
Q. Okay. But -- I understand. By the time Mr. Chacon has returned, you have had this conversation with Mr. Kimberlin and you're thinking maybe you should go. Maybe this is the way to get this solved once and for all?
A. Right, yeah.
Q. Okay. So Mr. Chacon returns. What happened

next?

A. Well, we got -- we agreed to take my Navigator and we went over there -- because I just got my Navigator, and I wanted Craig to take a ride in it. So we went to Toot 'n Totum, we filled up with gas, got Cokes, and we went over to one of his customer, Randy's house.

Q. Do you know if it's Randy Campbell?

A. That sounds right.

Q. Okay.

A. And ran over there. Craig and Frank went in for a little while. I waited in the Navigator. And then they got back out and got in my truck.

Q. Now, why didn't you go into Mr. Campbell's house?

A. That was Craig's customer.

Q. So that is a no, no, isn't it? It's his customer and it's not cool to bring outsiders in?

A. We didn't step on each other's toes.

Q. Okay. So you wait in the Navigator. Frank and Kimberlin go into Campbell's house. And they take care of whatever business they're taking care of, and they come back to the Navigator?

A. Right.

Q. And then what happened?

A. Then Craig gets in, tells me to hit I-40. So I go and I hit I-40.
Q. And rather than take us through a lot of details, if you saw the map -- if you saw a map of the area, do you think you would be able to tell about where the farm is?
A. I can just kind of tell you like what I was seeing. I remember going down I-40, and I saw the Triple X store. And we got out there. I turned under the overpass going towards Potter County. And then I see a flashing yellow light. I'm not sure if it was a yellow or a red light. I wasn't paying that close attention, because Craig was sitting talking to me telling me, you know, how the scenario went down and how they got Dustin Pool.
Q. So you're on the way to the farm, and is he giving you directions about how to get there?
A. Yes, sir.
Q. And he is also giving you some details about how all this came about?
A. Yes, sir.
Q. If this is Amarillo -- if this is Amarillo and we're headed out towards Panhandle, does this red pin look like about where the farm would have been that he directed you to? Or can you tell?

A. I can't honestly tell.

Q. All right. That's fine. That is no problem. Now, at any rate, you had to have directions. You didn't know how to get there.

A. Right.

Q. Eventually, you arrived at the farm, I assume?

A. Right.

Q. Once you arrived at the farm, what happened next? By the way, the details he told you before you got to the farm, did he tell you how they got Pool and how they got him to the farm?

A. I asked him whose idea it was to go grab Pool, and he said that Stocker did this on his own to redeem himself for what happened with Ray, leaving Ray at my shop alone. And plus, I guess Stocker got into debt with him and thought this was going to smooth everything over.

Q. So how did Stocker -- according to Mr. Kimberlin, how did Stocker get Pool?

A. Well, he told me that Stocker had waited around this chick's apartment for three days waiting for Dustin to show up. And I said how did he know Dustin would show up, and he said that Dustin cheats on his wife and goes over there and gets pussy off of this chick.

Q. Okay. And once -- was Mr. Kimberlin's version of what happened that Mr. Pool came to this girl's apartment?

A. Yeah.

Q. And then what happened?

A. He said that Stocker was inside the apartment waiting, and when Dustin came in, Stocker went over there, busted Dustin upside the head with a fireplace poker.

Q. How did they get Mr. Pool from the apartment or the place where the girl lived to the farm?

A. Stocker called Craig up and asked him, he said hey, I got Dustin. What do you want me to do next? And then Craig told him to come up with something. And then Craig told me that he had called the farmer and asked the farmer -- the farmer is Mike Elliston, by the way. I only know him as the farmer. And the farmer -- he asked the farmer to bring a container large enough to put Dustin in, so they could move him out without being seen. And I guess the farmer had a big green box because I saw it when I pulled up into the -- into the farmer's garage. And Craig said, that is my lunch box that I carry Dustin in.

Q. Okay. Now, once you have made the drive out to the farm and Mr. Kimberlin has been telling you about

supposedly how these things occurred, then when you pulled up in the Navigator and he pulls out this green box, what happened next?

A. We all go upstairs and we hear whomping sounds and big smacking sounds with a stick.

Q. When you say you went upstairs, had you ever been there before, been to the farm?

A. That was my first time.

Q. Okay. Was it well lit downstairs? Could you see very well downstairs?

A. Dimly lit. It was lit enough that I could safely say that the farmer was a pack rat.

Q. A pack rat? Okay. You didn't feel like the downstairs was kept particularly neat?

A. No, sir.

Q. And this stairway, do you remember how you got to it? Was it in the middle of the floor or where was it?

A. I remember going straight through the garage and then I remember making a left. There were some stairs, and then there is a little flatway. And you make a right and go up some more stairs. And then there is this little bitty area, and it was really dark up there.

Q. Okay. And so once you got upstairs -- now,

this is you and Mr. Kimberlin and Mr. Chacon. Is that correct?

A. Uh-huh, yes, sir.

Q. And once the three of you got upstairs -- now, you indicated you could already hear something. What did you hear?

A. Smacking sounds.

Q. Okay.

A. And then Craig had already told me that Stocker had found a shovel handle that was about five foot in length and three quarters of an inch in diameter. And that every time Dustin said something he didn't like, he would smack him with it.

Q. When you got upstairs what did you see?

A. I saw Dustin all taped up sitting in a chair, in his boxers.

MR. FARREN: May I approach the witness, Your Honor?

THE COURT: Yes, sir.

Q. By Mr. Farren) I'm showing you what's been marked as State's Exhibit No. 203. And if we --

A. Yes, that is the chair.

Q. Okay. Now, it's laying over on its side there, isn't it?

A. Yes, sir.

Q. This round area here is the base. Is that correct?
A. That is correct.
Q. And the jury is now looking at the picture up on the screen. Is that the same picture you're looking at?
A. Yes, sir.
Q. Now, when you saw the chair, it was where?
A. It was kind of sitting in the center of the -- the center towards the back of the room upstairs.
Q. And where was Mr. Pool?
A. Sitting in the chair.
Q. This is State's Exhibit No. 236. That is the -- do you recognize that as the same chair, only sitting up now?
A. Yes, sir.
Q. Okay. Now, was Mr. Pool just sitting in this chair?
A. He was all taped up sitting in the chair.
Q. When you say he was all taped up, was his head and face taped then?
A. Yes.
Q. Now, was his -- was there a later time when his head and face were taped more?
A. Yes, sir.

Q. Okay. So there was some tape on his face then, but not like later?
A. It was taped like Ray at first to where you could see the nose holes.
Q. Okay. And how about his hands? How were they taped?
A. They were bound totally. The tape was wrapped all the way around them. You couldn't even really see his hands.
Q. And do you know if his ankles or feet were taped?
A. His ankles had some bungee cord around it.
Q. Okay.
A. And I believe also he had duct tape, too. But I'm not sure.
Q. All right. When -- do you know if he was taped to the chair?
A. No, sir.
Q. Or just sitting in the chair?
A. Sitting in the chair. I asked why he had been stripped, and he said that they were checking for a wire.
Q. Now, you asked why he was taped and what?
A. I asked why he was naked, and they told me that they were looking for his wire because they thought

he was a snitch.
Q. Okay. So according to them, his clothes had been removed to see if he had some clandestine recording device or something on him?
A. Yes, sir.
Q. Had you ever heard anything about him being involved in the DEA or his father being involved in the DEA?
A. I heard that his dad worked for the DEA. He was supposed to be working on airplanes for them.
Q. When you saw Mr. Pool in the chair, as you said Mr. Kimberlin has gotten you juiced up, what did you do then?
A. I walked up to him and I asked him why he was fucking with us, and he said he wasn't. Then I asked him why would he chase my wife's car off the road, and he said that they thought that was Ray's friend, Tito. And I called him a fucking liar and I punched him in the chest, and he fell out of the chair. And then I began interrogating him some more, and asking him what if my wife and kids were in the car. Would you have still pulled a gun and he didn't answer me, so I just -- I lost it and I started kicking him in the stomach, ass and back.
Q. Now, when you struck him and he was in the

chair, did he remain in the chair?
A. No, he fell.
Q. He fell. So now he's on the floor?
A. Yes.
Q. And is that when you were kicking him?
A. Yes, sir.
Q. Did you kick him once or more than once?
A. Kicked him several times.
Q. In fact, sir, eventually, did you say earlier that you were exhausted?
A. Yes, sir.
MR. FARREN: May I approach the witness, Your Honor?
THE COURT: Yes.
Q. By Mr. Farren) Now, I'm showing you State's 84. Does that look like the duct tape you saw?
A. Yes.
Q. Does that look like the bungee cord?
A. Yeah.
Q. State's 83?
A. Yes, sir.
Q. State's 80 is a closer photo. Is that little red knob part of the bungee cord?
A. Yes, that is the way I remember it.
Q. After you were exhausted, did anyone else

visit with Mr. Pool?

A. Craig started -- Craig and Frank started interrogating him on a girl named Jessa setting Frank up. And they started jumping him together, just kicking back and forth. And then they finally stopped and they asked him what he was doing.

Q. Now, after Mr. Chacon had explored the Jessa situation, did Mr. Kimberlin talk to him about --

A. Being a snitch.

Q. Being a snitch, about the raid on his house in November?

A. Yes, sir.

Q. Did Mr. Stocker visit with Mr. Pool during this time?

A. Yeah. It was like they were interrogating a terrorist. They -- Craig would sit in front of him and ask him questions. When he gave the wrong answer, he would give Stocker the nod or Frank Chacon the nod or me the nod to do something.

Q. How long do you think you were specifically striking, kicking, assaulting Mr. Pool before you became exhausted? Can you give us an estimate?

A. It wasn't much.

Q. Were there other times that evening when you assaulted Mr. Pool again?

A. Well, after they brought food to eat, you know, and Kelly kept calling me wanting to know where I was, and I was just trying to weasel my way out...

Q. Okay. Let's back up a minute. When you first arrived, you said Mr. Kimberlin had you juiced up. You struck him. He fell out of the chair and you kicked him until you were exhausted. Can you give us any idea? Was this a few minutes, 30 minutes, an hour? Do you have any idea?

A. No, I would be guessing.

Q. All right. Do you have any idea how long the interrogation about Jessa went on?

A. It didn't take very long. Frank was beating him pretty hard.

Q. Okay. Let me ask it this way: After -- did each one of the four of you take a turn at Mr. Pool while you were there?

A. Everybody was taking turns.

Q. Okay. So you say turns, plural. So there wasn't just one time. There were turns. There were more than one time when each of you worked on Mr. Pool?

A. Right.

Q. How long do you think -- and we will get into the details of what occurred in a moment. But how long do you think all of this went on before it finally ended

and Mr. Pool was taken away? Do you think --
A. It would have been maybe 3:00 in the morning, because Mike Elliston was telling Craig the best time to move him would be at shift change.
Q. For the police. Right?
A. That's correct.
Q. So Mr. Elliston was wanting him out of there and he thought if it was around shift change, it was less likely that you would be caught moving him?
A. Right.
Q. Okay. So you think you got there sometime late in the evening after you had eaten supper at Logan's?
A. Well, they had also brought Subway. Mike Elliston's wife brought Subway. But as far as --
Q. But as far as time, you think you got there sometime after you had eaten at Logan's. And then this went on until maybe as late as 2:00 or 3:00 in the morning?
A. Yes, sir.
Q. Okay. Now you have mentioned Subway sandwiches. Do you know if the farmer was married?
A. No, sir, I didn't know that. But Craig told me that -- I asked who brought Subway and Craig told me the farmer's wife.

Q. And did everyone get a sandwich or just some of you or --

A. They brought enough sandwiches for everybody but I don't think they were all eating, because most of them were high. I think me and Frank were the only ones that weren't high.

Q. When you say they were "high", they were using narcotics?

A. They had stolen some dope that they found on Dustin, and they were, you know, using his crack pipe and they were getting high and talking about what shitty dope Dustin had.

Q. So Mr. Pool had some narcotics or methamphetamine on him which they had taken. And in between taking turns beating on Mr. Pool, folks were smoking his dope?

A. When they -- when Craig called everybody down to eat Subway.

Q. Okay. So we're taking turns beating Mr. Pool. We're having a few sandwiches, smoking a little dope. Do you ever see his wife, Mr. Elliston's wife? Did you ever see her?

A. No, sir. I was just told she brought the sandwiches.

Q. Do you know -- do you know if there was a

separate house besides the place you were in? Or do you know?

A. No.

Q. So you don't know where she was?

A. No, I don't know.

Q. You were just told she brought sandwiches?

A. Right.

Q. And did you seat a sandwich?

A. I ate part of one, but I could barely eat.

Q. And you indicated that you thought someone else ate a sandwich or part of one, but you thought just the two of you. Who was the other person, you thought?

A. Me and Frank Chacon, I think were the only ones eating.

Q. So you don't think Stocker or Kimberlin ate anything?

A. I don't know if they did or not.

Q. But you don't remember seeing any?

A. No, I just remember seeing them getting high.

Q. Okay. Now, do you remember a pair of channel lock pliers that were involved -- that were used at some time during the --

A. Yes, sir. At one point in the interrogation, Craig was taking them and he was knocking Dustin upside the head, giving him light taps. And then it kept

getting harder and harder and moved towards his cut and --

Q. Tell us about the cut. What cut?

A. Well, when Stocker had bashed him over the head with the fireplace poker, it gashed his head open pretty bad to where you could see right into it. It looked like I could see his skull.

Q. Okay. And do you remember where this cut was? Can you --

A. I believe it was on this side of the head and there was a pretty big gash.

Q. Okay. Now, the channel lock pliers. How did they come into play?

A. Well, it was real cluttered up there. And there was a table sitting up there. And Craig was kicking Dustin all over the room. And anyways, he got kicked into the table that a bunch of tools were sitting on, and they fell down on the floor. And I remember I was picking them up because Dustin was rolling over all kinds of -- just trash that was on that table. And I remember picking everything up, and Craig asked me to hand him the channel lock pliers.

Q. What happened then?

A. Well, that's when Craig started tapping him over the head with the channel lock pliers.

Q. Well, after he tapped them, did he use them in any other way?

A. Well, I believe Frank Chacon got them and then they were trying to get him to talk, but Dustin was just tightened up, and he didn't want to say nothing anymore. And so anyways, they decided that they were going to put the channel locks down there by his nuts. I don't know if they squeezed it or not, but he screamed in pain.

Q. So you saw the channel locks down by his testicles, and you heard him scream?

A. He was laying on his stomach and they put the channel locks up underneath.

Q. Okay. You believe the channel locks were near his testicles or on his --

A. That's the direction they were headed.

Q. And you heard him scream?

A. Yes, sir.

Q. So you assumed that they did use them, but you can't say you actually saw them squeeze his testicles with them?

A. I wasn't trying to look.

Q. Okay. Now, are you aware that in -- we're going to talk about some statements you gave in a moment. But you've given a tape recorded statement and a written statement. You're aware of that?

A. Yes, sir.

Q. And then some supplemental statements that added additional information. Do you recall that?

A. (Witness nods head up and down.)

Q. Do you remember that in one of the statements, you indicated that Mr. Chacon was using the channel locks, but in another statement, the word "Craig" is used. Do you know why the word "Craig" is used in connection with using the channel locks?

A. Because he was hitting Dustin over the head with the channel locks.

Q. But there is a part of one statement where you indicate that he used them near his testicles?

A. Now, that was Frank that used them on the testicles.

Q. So, if one of the statements indicates that you said Craig, either it's a typo or you misspoke because you're confident it was Chacon and not Craig?

A. That is right.

Q. Okay.

A. Plus I was pretty nervous when I was giving those statements. I had just been taken down by the S.W.A.T. team in front of my parents and my grandma on Father's Day.

MR. FARREN: May I approach the witness,

Your Honor?

THE COURT: Yes.

Q. By Mr. Farren) I want to show you what has been marked as State's Exhibit 259. Does that look like the pair of channel lock pliers?

A. I didn't really remember what they looked like.

Q. Okay. But you don't know if this is exactly the same pair. But that's what you're talking about when you say a pair of channel lock pliers, something like that?

A. Yes, sir.

Q. Now, the channel lock pliers, you have explained to the jury the process that was taking place and the various subjects and so forth he was interrogated about. The sandwiches, and then finally it came to an end, you think at 2:00 or 3:00 in the morning. How was it decided that it would end? You've mentioned the farmer wanting him out of there. But who made the decision, okay. Enough is enough?

A. Well, it had -- you know, Kelly called me and she wanted to know where I was because she thought I was out cheating on her. So I told Craig that I needed to leave, and then Stocker comes up behind me and says he also needs to leave because Brook was at home sick. And

he needed to at least get a phone charger for his cell phone.

Q. Why did he need a phone charger for his cell phone?

A. The battery was dead.

Q. Okay. So he's having battery problems and he wants to get a charger?

A. He was worried about Brook being at home by herself sick.

Q. So both you and Stocker are indicating to Kimberlin that, you know, we need to be heading to the house. How did Mr. Kimberlin respond to that?

A. Well, he was pissed off. He -- you know, he felt like Stocker had just went in there, got this whole situation going, and then didn't want to finish it out.

Q. Of course, then not only are you and Mr. Stocker indicating you want to leave, Mr. Elliston is indicating he wants everybody to leave?

A. Right.

Q. So eventually, was it decided to end it and move Mr. Pool out of there?

A. Yes, sir.

Q. When that decision was made -- you remember looking at some photographs a minute ago. I was asking you about his ankles?

A. Yes, sir.
Q. Did you see his head also on that picture?
A. No, but I got a mental picture.
Q. All right. Let me ask it this way: You've mentioned that there was some tape on his face earlier. Was his head taped any differently before he left?
A. Well, Craig said that, you know, he made a -- he said that Craig said, all right, you know, if you guys want to leave you got to help us move him before y'all leave. So we go upstairs, and they're retaping Dustin because he is talking and it's annoying him --
Q. When you say "they" are retaping Dustin, who are they?
A. It was Craig and Stocker.
Q. So Craig Kimberlin and Josh Stocker were involved in taping him?
A. Craig had him up on his knees and he had started retaping around his face. And he got to the nose, and then I remember asking Craig why they were retaping him. And he said that -- he told Stocker to assume what he was doing. And he came over to me and he explained that they were just scaring him, and that he can't be, you know, he can't make any noise while we're moving him, because if we get pulled over by the police, you know...

MR. FARREN: Approach the witness, Your Honor?

THE COURT: Yes, sir.

Q. By Mr. Farren) I'll show you what has been marked as State's Exhibit 97. In fact, it has been admitted as State's Exhibit 97. When you first saw Mr. Kimberlin (sic) -- Mr. Pool taped, was his mouth covered with tape?

A. Yes, sir.

Q. Okay. And when you came up and saw them retaping him, do you know if they ever took the tape off of his mouth, if you know?

A. No, he -- he had tape on his mouth.

Q. Did you ever see -- I'm showing you State's Exhibit 97. Did you ever see a sock that looked like that?

A. No, no, I didn't.

Q. You didn't see them put this sock in his mouth?

A. No.

Q. You don't know how the sock got there?

A. No, I don't.

Q. State's Exhibit 91, there are two rolls of duct tape here. Does that look like the kind of duct tape rolls they were using?

A. Yes, sir.
Q. Do you know if they used more than one roll of duct tape?
A. No, I had no idea how many rolls they used.
Q. Did you talk to them about how they were taping his face and head?
A. Yeah. I asked them why they were doing it.
Q. And what did they say?
A. They just said they were scaring him and then they told me that, you know, they couldn't have him making any noise while they were transporting him, because if we got pulled over and he started making noise, it would just --
Q. Now, when you were at Ray Placensio's kidnapping at your detail shop, you were able to communicate, to talk to Mr. Placensio, according to your earlier testimony. Do you remember that?
A. Repeat the question.
Q. Well, your earlier testimony indicated that you and Placensio shook hands, and you described conversations with him. Do you remember that? You talked to him?
A. Yeah.
Q. How was he able to talk to you? Was his mouth taped?

A. Who? Ray's mouth?
Q. Ray's mouth? Yes.
A. Yeah, they would untape him to let him make comments.
Q. Okay. So in Ray's case, we had some tape that could just be pulled off his mouth and put back?
A. Right.
Q. Was that the way Mr. Pool was at first when you got there?
A. At first.
Q. Okay. Now, later, however, as you looked at the picture and you describe it, his whole -- it's like a cocoon, isn't it?
A. Yeah, it was.
Q. In Ray's case, when they pulled the tape back and he talked, did you see any sock in his mouth or did they have to pull the sock out of his mouth?
A. No, he didn't have no sock.
Q. And in the case of Mr. Pool, you don't know how that sock got there?
A. No.
Q. You've indicated earlier in the events at the farm with Mr. Pool that they would interrogate Mr. Pool. Was Mr. Pool able to respond like Mr. Placensio did? Did he talk at times?

A. Yeah, he was answering questions.

Q. And when he answered questions, did they ever have to take a sock out of his mouth for him to talk?

A. I don't remember the sock at all. I mean, I learned about the sock when the complaint was filed, or whenever I was arrested on Father's Day, that said something about asphyxiation due to the duct tape around his head, and he had his sock stuffed in his mouth.

Q. So when you were charged with capital murder, in the charging instrument, the complaint, it explained that the allegation was that he died because he had a sock stuffed in his mouth and his face taped up and --

A. That's how I knew about the sock.

Q. Okay. Once this taping process was completed and Mr. Kimberlin said, oh, we're just scaring him, what happened next? Did they ever put his clothes back on?

A. Huh-uh.

Q. Okay. Did they just carry him downstairs with the tape on his head, and that was it?

A. Well, Dustin and Stocker, they were bickering back and forth with one another as I was walking up the stairs. And Stocker -- or Dustin had told Stocker that you'll never get away with this. People are already looking for me.

Q. Was -- this obviously must have been before

his whole head was like a cocoon.
A. I don't know how he was able to make the statement. I couldn't see Dustin. It was -- I am walking up the stairs, and I know he was talking. But his voice wasn't very clear. I mean, it did sound like he probably had some tape on it but I can't tell you that to be sure because I wasn't looking at him. I just heard it.
Q. So when you first came up the stairs, had they begun retaping him them, or had they already finished it?
A. Yeah, yes, sir.
Q. They had finished or they had begun?
A. There was already tape on his head. And they started to retape him again. And I remember him sitting up on his knees, and Stocker was making the final wrap of tape while Craig was explaining to me that they were just scaring him. And then Stocker jerked up on the tape, and he was trying to tear it without using his hands.
Q. Okay.
A. He almost fell down the stairs when they did that, and they were just slamming him around.
Q. But this conversation you heard, do you know if that was as they began to retape him, or after they

finished retaping his head?

A. It was while they were retaping it.

Q. While they were. Okay. At any rate, the taping of the head was finally completed. What happened then?

A. And Craig spread out a blue tarp and rolled Dustin up in it. And then they started to put a motorcycle tie down and the bungee cords around him. And then I really wanted to know why he was doing all that. And he said so we don't get blood everywhere while we move him.

Q. By the way, earlier you indicated that you struck Mr. Pool and he fell out of the chair and you kicked him repeatedly?

A. Yes, sir.

Q. Were you wearing anything on your hands?

A. I was the only one there not wearing gloves.

Q. So other people were wearing gloves?

A. Everybody was wearing gloves except me.

Q. Do you know what kind of gloves, if you know?

A. They were all wearing gloves. Stocker was the only one that had the unique kind of gloves that looked like motorcycle dirt bike gloves maybe.

Q. So all the gloves were leather, but you felt like Cha -- Stocker or --

A. Stocker.

Q. Stocker's were different somehow, but you -- but you think they were leather, as well?

A. Right.

Q. Now, why were you wearing gloves?

A. Well, I didn't -- I don't know. I just -- I didn't see any reason to. I mean, I went over there thinking that we were just going to rough him up. I didn't, you know, know he was going to die.

Q. Okay. Now --

A. I don't think any of us knew he was going to die.

Q. So you're not sure if the death of Dustin Pool was intentional or not?

A. I don't believe it was intentional.

Q. Okay. When you got this tarp, what did they do with the tarp you mentioned?

A. Craig spread out a blue tarp and rolled up in it, and then started putting motorcycle tie downs and bungee cords around it. And I really wanted to know why he was doing all that, and he said so we don't get blood everywhere while we move him around.

Q. Okay. So once they had him wrapped up in the -- in the tarp, did they put bungee cords around it? Is that what you said?

A. Bungee cords, motorcycle tie downs. I think they were just using what they could find.

MR. FARREN: May I approach the witness?

THE COURT: Yes, sir.

MR. FARREN: Sorry.

Q. By Mr. Farren) State's 174. Now, I realize this was in a different setting than where you saw him. But just the tarp itself and the tie downs and so forth, does that look like what you saw?

A. Yeah.

Q. Once he was in the tarp and wrapped up and we have the bungee cords around him and the tie downs, what happened next?

A. Me and Craig carried him down the stairs.

Q. And was that uneventual? Did it just -- you just carried him down the stairs? Did anything happen unusual as you were going down the stairs?

A. Well, as we got him down the first flight of stairs, Dustin was freaking out, trying to get free. Or maybe he was trying to take the tape off his face. I don't know.

Q. Do you think there was any chance, Mr. Bledsoe, he was trying to breathe?

A. That has kind of occurred to me, after all of this has happened.

Q. Okay. Go ahead. He is not reacting favorably to the situation, and you're trying to get him down the stairs?

A. He is freaking out. And Craig tells him to quit moving or he'll drop him. And then when we got there right on the flat spot, he dropped him. And then he tried to pick him back up and then he just started trying to scoot him. And I had his legs, and we were going down the bottom stairs and then finally Craig, he just got mad and he put him down. And he used his foot, and pushed him down with his shoulder. Craig put his foot on Dustin's shoulder, and pushed him down.

Q. Mr. Bledsoe, would it surprise you if other witnesses claim that you pulled him down the stairs and that his head bounced on every step as he was coming down the steps?

A. I think that would be a little hard to believe since Dustin was so much bigger than I was.

Q. At any rate, as you remember it, there was some kind of event on the stairs, and he ends up falling down the stairs?

A. I had him by his feet, and then Craig pushed him down. And then I kind of fell down with him, but then I ended up jumping out of the way. And they had asked me to try to drag him over there, but I couldn't

do it. I wasn't strong enough.

Q. All right. He is finally at the bottom of the stairs. Where was your Navigator?

A. In the garage.

Q. Had it been in the garage since the time you arrived, or had you moved it in later?

A. The time I arrived.

Q. Okay. When you pulled into -- when you put the Navigator in the garage, did you just pull into the garage or did you back it in? Or how did you put it in there?

A. I pulled straight in.

Q. Okay. Did you ever turn it around to where the back end was there?

A. No.

Q. Okay. Would it fit completely into the garage, or was part of it --

A. Yes, sir. It fit completely in the garage.

Q. When you got Mr. Pool down to the bottom of the stairs, the Navigator is there in the garage, what did you do next?

A. Well, they were asking me, would I take Dustin to Stocker's truck, and I told them that I didn't really want to.

Q. Did you know where Stocker's truck was?

A. They said it was in town at Stocker's house.
Q. Okay. Now, why were you reluctant to take Stocker and Mr. Pool to Stocker's truck?
A. Dustin was bleeding everywhere, and Kelly wanted me home right then. And I was ready to get away from the situation.
Q. Okay. Now, he was bleeding, but that was the whole purpose of wrapping him up in the tarp, right, to keep --
A. Right.
Q. Okay. Did you finally agree to take him to Mr. Stocker's truck?
A. Yeah.
Q. Okay. And so did he end up in the back of your Navigator?
A. Yes, Craig and Frank and the farmer was finding stuff in his garage to put stuff down in the back. It was some -- like loose Styrofoam they were putting down.
Q. Hold on just a second. First of all, let's get Mr. Pool in the back of the Navigator. Let's get him in the Navigator. Where in the Navigator was Mr. Pool placed?
A. In the back.
Q. In the back. Does this have some sort of a

hatch?

A. A hatch.

Q. A hatch. Okay. And who put him in the back of the Navigator?

A. I believe it was Frank and Craig.

Q. All right. Once he was in the back of the Navigator, he is wrapped in the tarp that you just looked at a moment ago. Right?

A. Right.

Q. Once he is in the back of the Navigator, what happened next?

A. They asked us to -- they wanted to wait around for shift change.

Q. Before that, though, you mentioned a moment ago that they put some other stuff in the Navigator. What other stuff did they put in there?

A. Oh, well, after they put the Styrofoam down, they put a deal to where -- because the back seat was there. They had Styrofoam placed up against the back seat, and then they padded it all the way around. And the floor -- and then they put Dustin on top of it and then they put a card table and metal folding chair on top --

Q. So basically, they put some Styrofoam and some things, in case the tarp leaked or he -- some blood got

out, they were trying to keep it from getting on the Navigator itself. Right?

A. Right.

Q. Now, Mr. Pool goes in there on top of those protective steps, and then they piled some --

A. Card table and folding chairs.

Q. And what was the purpose of that? Why did they put that in there?

A. Craig explained to me that if I got pulled over and then I shined a flash light in the back, it wouldn't look suspicious.

Q. Now, I want to interrupt the story for just a moment and talk about the Navigator. What happened to the Navigator after these events? After all of these terrible things happened, did you keep the Navigator?

A. Are you talking about after I pulled into Tyler Hale's garage and then they --

Q. Yeah, I'm talking about -- I want to jump ahead in time past all of that. We're going to come back to that. But I want you to explain to the jury, where is the Navigator? What happened to it? Let me ask you, did the police ever come seize your Navigator?

A. I don't know if they did or not. I was in jail. I just know that I -- a friend of mine, Cory Pendleton, got it and took it back up to Topeka, Kansas.

Q. Okay. So the last you know it was somewhere in Kansas?

A. Right.

Q. Okay. And was the purpose to get rid of it because it had been used in the murder or the death of Mr. Pool?

A. Yes.

Q. Okay. And so the same Cory Pendleton that you were involved with when you originally acquired it helped you get it back up to Kansas?

A. I just told him I didn't want it anymore.

Q. You didn't tell him why?

A. No, well, I was in jail anyway.

Q. Okay. All right. At any rate, we're back at the farm. He is in the back of the Navigator. You're about to take Mr. Pool and Mr. Stocker to Mr. Stocker's truck. Is that your understanding of what is going to happen?

A. That is what my understanding was, but that's not the way it happened.

Q. Okay. And when did you find out that's not the way it was going to happen?

A. Right before I hit an underpass going back towards Amarillo, Stocker asked me where I was going. I told him I was taking him and Dustin to his truck. And

because Craig had kept telling me all along this was Stocker's mess, let him clean it up. So anyways, Stocker said, I can't belive that he didn't tell you that -- he didn't tell you we were meeting Destry in Fritch.

Q. Now, were you ever aware -- did you ever talk to other people in the group besides Mr. Kimberlin? Were you aware that when he was telling you about how this was all Stocker's problem, and he created this problem, were you aware that he was telling Stocker it was all of your fault. You had caused the problem?

A. No, I didn't know all that.

Q. But it was never Mr. Kimberlin's fault?

A. Right.

MR. FARREN: May I approach the witness?

THE COURT: Yes.

Q. By Mr. Farren) You're headed back to Amarillo from the farm. And you already explained that you don't know exactly where it was. But you -- did you understand that you were going somewhere in the general direction of Panhandle when you went out there? Do you know where Panhandle, Texas is?

A. No, I knew I was going towards Lake Meredith, Fritch.

Q. No, no. I'm talking about when you were first

going out to the farm. Did you think you were going towards Lake Meredith then, I mean, in --

A. Whenever I first left the farm, no. I thought it was --

Q. No, no. When Mr. Kimberlin and Mr. Chacon and you were in the Navigator and you first were leaving Amarillo to go to the farm, did you think you were going toward Panhandle, or did you know?

A. I had no idea where they were going.

Q. Okay. Now at some point you're about at an underpass going into Amarillo. Is that what you said?

A. Right.

Q. This was as you're leaving the farm with Mr. Pool?

A. Right.

Q. And Mr. Stocker said what are you doing? Where are you going?

A. Yes.

Q. And then what did you say?

A. I told him that I thought I was taking him to Stocker's truck.

Q. And he said what?

A. He said no, we're meeting Destry in Fritch.

Q. And if this pin is at Lake Meredith in Fritch, is that where you ended up, at Lake Meredith in Fritch?

A. Yeah.

Q. Did you know what road you took to get there, if you remember?

A. I don't remember.

Q. You just know that you were about to get back to Amarillo and told no, we're going up to Lake Meredith?

A. Right.

MR. FARREN: Your Honor, for the record, I've dropped the farm on the floor, but I'll put it back on the map a little bit later.

Q. By Mr. Farren) How did you feel when you found out -- I mean, you thought you were about to relieve yourself of Mr. Stocker and Mr. Pool. And now you find out you get to drive to Meredith. How did you feel about that?

A. I wasn't happy about it.

Q. Okay. But you went on up there?

A. Yes, I did go up there.

Q. Now, do you know how long it took to drive from Amarillo up to Fritch, or Lake Meredith?

A. No, a couple of hours, maybe.

Q. Okay. When you arrive at Fritch -- by the way, on the way did you and Mr. Stocker talk about Mr. Pool?

A. Yeah, I kept asking Stocker to check on him. And he said that he didn't want to turn around because if you crawled back up there, it would look suspicious if we passed a cop.

Q. Okay. Now, Mr. Bledsoe, would you agree with me that --

MR. FARREN: Well, may I approach, Your Honor?

THE COURT: Yes.

Q. By Mr. Farren) I want to ask if this refreshes your memory about some of the events that happened at the farm before you left.

A. Yes.

Q. Do you remember noticing a specific time when something happened that made you reach a conclusion about Mr. Pool's condition?

A. When we got him downstairs, Craig, Frank, Stocker, Michael Elliston, they were all talking about you know, where they were going to take Dustin next, because they wanted to take him someplace else besides the farm so they could convince him not to go to the cops.

Q. Yes, sir, but rather than what they talked about, what did you notice -- and you noted the time?

A. We looked over there, and he wasn't struggling

anymore. So we all walked over there and we looked at him. Craig opened up the tarp so we could see him. And Craig -- you know, he kind of moved his hands and his feet, and then he made a noise and then his head just kind of fell. And -- but anyways, after they had seen his hands and feet and he made the noise, you know, because I freaked out and said he was dead. And then Craig told me, told you he's not dead, because he made that little noise and hand movement. Then the -- then his head and his hands and feet, just -- they all just went limp, you know, and I looked at my cell phone. It was 2:15 A.M., on March the 11th.

Q. Did you ever see him move again after that?

A. No.

Q. You included that in your statement, didn't you?

A. That I never saw him move again?

Q. And that it was 2:15?

A. Yes.

Q. Do you believe he was dead at that point? Do you remember -- do you believe it now?

A. Yes, because Stocker had kicked him after they had saw him move, called him a faker. And after he kicked him he didn't make any noises.

Q. Now, Mr. Bledsoe, would you agree with me that

you and others who have talked to you throughout this process, would you agree with me that at times, you folks make statements to cover your own posterior, CYA statements to make yourself look better?

A. Yeah, nobody was trying to get convicted of capital murder.

Q. Right. So everybody is spinning it, everybody is laying things on other people, aren't they?

A. Yeah, everybody is finger pointing.

Q. Now, you're about to talk to the jury about the trip from Amarillo to Meredith. And you were about to tell us that you asked Mr. Stocker to do what, check on Mr. Pool?

A. Yes, sir.

Q. Now, in all honesty, Mr. Bledsoe, if you had believed he was dead at 2:15, why would you want Mr. Stocker to check on him?

A. Because they were sitting there trying to convince me that they had just knocked him out. And that he was just passed out, and that I just, you know, it was wishful thinking wanting him to still be alive.

Q. In fact, sir, isn't it true that at another time in another statement, you claimed that you even saw him move and thought he was alive at Tyler Hale's house? Do you remember saying that?

A. No, I would have been --

MR. FARREN: May I approach --

THE WITNESS: -- just trying to cover my butt on that one.

Q. By Mr. Farren) But do you remember saying that, telling Sergeant Brown that?

A. I don't remember telling him that.

MR. FARREN: May I approach the witness, Your Honor?

THE COURT: Yes, sir.

THE WITNESS: I remember telling Sergeant Brown that I thought I heard him moving in the Expedition on the way to the -- Lake Meredith.

Q. By Mr. Farren) Would you read what is highlighted in yellow there, sir, and see if that refreshes your memory? Don't read it out loud. Just read to yourself. I'm sorry. That is my fault. Read to yourself.

A. I know. That's why I didn't sign the statement.

Q. Okay. But signed statement or not, sir --

A. Yeah, I said that I was trying to cover myself because I didn't want to get in trouble for murder.

Q. And when you say you thought you saw him breathing at Tyler Hale's house, did you see him

breathing at Tyler Hale's house?
A. No.
Q. Because you knew he was dead, didn't you?
A. Yes, I did.
Q. He was dead back at the farm, wasn't he?
A. He was dead at 2:15 A.M., I believe.
Q. And when you were asking Mr. Stocker to check on him, that may be what you want to believe, but that is not the truth, is it, sir?
A. No, I really did ask Stocker to check on him.
Q. Well, I understand that. But that's just wishful thinking, like you said?
A. Wishful thinking.
Q. At any rate, you're now headed for Lake Meredith. From time to time, you're asking Stocker to check on him. How did he respond?
A. He was freaking out. He was really high and he was -- kept seeing white surveillance vans. He kept -- the cops were going to get us pulled over. I was doing five miles an hour under the speed limit to avoid getting pulled over, and he kept telling me I was speeding and he was making me a nervous wreck.
Q. And he had been smoking meth?
A. Meth.
Q. Out at the farm?

A. Right.
Q. And I think you said one other person. I don't remember who.
A. Craig Kimberlin.
Q. Now, did you smoke meth?
A. No, sir.
Q. At the farm?
A. No, sir, I've never done drugs.
Q. So you didn't do drugs?
A. That's correct.
Q. Had you ever seen anyone who had been doing the product that you sold, meth, behave like this, this paranoid behavior?
A. I had never really hung out with people while they're high. And I had seen it before, but it wasn't a very common thing.
Q. So you just sold the product. You don't stay around to see what effect it had?
A. I sold to people that were making money off of it, not using it.
Q. Okay. But at any rate, he's seeing a policeman behind every tree, and you're on the way to Fritch?
A. Right.
Q. And you arrived in Fritch. What did you do

when you got to Fritch?

A. Well, we pulled up into an Alsup's because Stocker told me that that was Destry in a jeep Cherokee.

MR. FARREN: May I approach the witness, Your Honor?

THE COURT: Yeah, I tell you what we're going to do. We're going to break here for lunch. Would you be back in the jury room at 1:20.

(Noon recess.)

(Jury seated.)

(All sides, Defendant present.)

THE COURT: Thank you, ladies and gentlemen. Everyone be seated. Are you ready to proceed, Mr. Farren?

MR. FARREN: Yes, Your Honor.

THE COURT: All right.

Q. By Mr. Farren) I think when we broke for lunch, we were talking about arriving at the Alsup's in Fritch. Do you recall that?

A. Yes, sir.

MR. FARREN: May I approach the witness, Your Honor?

THE COURT: Yes, sir.

Q. By Mr. Farren) I'm showing you what has been admitted as State's Exhibit 239. Does that look like

the Alsup's store where you met them?
A. Yes, sir.
Q. Now, do you recall where they were parked? Do you know if they were parked over on this --
A. Yeah, yes, sir.
Q. Toward that. Is that correct?
A. Yes, sir.
Q. Okay. You had never been to Destry's lake house or anything like that. Right?
A. No, sir.
Q. And you were with Josh Stocker in the Navigator, and Mr. Pool was in the back. Was Mr. Keeling -- Destry Keeling alone, or with someone?
A. He was with some lady. I later found out it was his wife.
Q. Okay. How did you get from the Alsup's store to this lake house?
A. Destry got out and told -- he came up to Stocker at the passenger's side window, and asked him to -- he said follow us. So we followed Destry.
Q. Okay. Now, what time do you think it was by then? You indicated that around shift change was when the farmer thought it was going to be best to leave the farm. And you thought that's 2:00 or 3:00 in the morning, if it's an hour up to Lake Meredith, it's the

early morning hours, at least. Right?

A. Yes, sir.

Q. Now, were you able to get to the lake house right away, or did it take a while?

A. No, it seemed like it took hours to finally find it.

MR. FARREN: May I approach the witness, Your Honor?

THE COURT: Yes, sir.

Q. By Mr. Farren) I want to show you what's been marked as State's Exhibit No. 240 and admitted. Do you remember the lake house at all? Does that look like it?

A. I remember that porch area.

Q. Okay. And when you arrived in the Navigator, did you pull up? Did you pull up into this area or did you back in there? How did you -- what did you do?

A. If you bring that picture over here I'll show you.

Q. Okay. This is State's Exhibit No. 240.

A. It was kind of like right up in front of there, see where you can see the tire marks, kind of?

Q. Okay. And were you pointing in or backed in?

A. Pointing in.

Q. Okay. So is it correct that you indicated that as you remember it, you pulled into this area here?

A. Yes, sir.

Q. And the front of the Navigator was pointing towards the house?

A. Yes, sir.

Q. Now, once you were at the lake house, what did you do next?

A. We got out. And Destry went up to the door and he figured out that he didn't have the right key. And so they -- you know, they wanted to call somebody in Destry's family to come show up with a key and wait around. And I didn't really want to so then --

Q. Why not?

A. Well, because we had Dustin in the back of the Navigator, and I was really itching to get away from the situation. Anyways, they convinced me that we should just leave the Navigator parked in front of that house right there, and go to the store so we could think of what to do next.

Q. What did you think of that plan?

A. I didn't like that plan at all.

Q. Now, when you said "they" were you talking to all three of these people?

A. Just Destry and Stocker.

Q. Just Destry and Stocker. Where was Destry's wife?

A. She stayed in that Jeep Cherokee.
Q. Okay. So she is still in the jeep. And how were you and Mr. Stocker getting along at that point? Were you guys --
A. We were both nervous, very high strung.
Q. Did the conversation become heated, unfriendly at some point?
A. Yeah, when I told them I was going to leave.
Q. Okay. Why did you decide to leave?
A. Because we weren't getting nowhere. I had asked if I could knock a window out so I could crawl through and unlock the door, and Destry said sure, if you'll pay for the window. So I went in there and I guess it was a double paned window or something, because it wouldn't break. Because I hit it with that shovel handle that they had.
Q. The shovel handle that who had?
A. That was used on Dustin.
Q. Oh, I see. So you had that with you?
A. Yeah.
Q. How did that end up in the Navigator?
A. Craig was getting everything, you know, cleaned up at the farm. And -- and you know, they took that with them.
Q. Do you know what they did with any other

things that they cleaned up?

A. I know that it was all gotten rid of.

Q. Okay. So -- but you're aware that they were trying to clean things up when you left?

A. Yes.

Q. Now, did you see anything put into any bags or container, if you remember?

A. No, I don't remember nothing.

Q. Okay. That is fine. And this shovel handle ended up in your vehicle. Do you know if Kimberlin put it there, or Stocker or did you? Do you know who did?

A. I think Craig -- and we were all trying to straighten up the -- before we left. And then I think Craig ended up putting everything that he thought, you know, was evidence, in there so he could get rid of it later.

Q. Okay. Did -- do you know what happened to the chair Dustin was sitting in?

A. No, I didn't know what happened to it.

Q. Okay. But you were unsuccessful in breaking out the window?

A. Yeah, it made a really loud noise, and I wanted to go ahead and go, because I thought we woke up some neighbors doing that, and I didn't want them to call the park ranger and you know, come discover what we

had going on.

Q. When you indicated you wanted to leave, how did Mr. Stocker feel about that?

A. He told me I wasn't going nowhere.

Q. What did you do?

A. I told him watch me, and I got in my Navigator and I took off and they started to chase me on foot. And then shortly after I made it up the road, and then I made a right going down the main street. And then Craig starts calling me, asking me what the fuck I was doing.

Q. So you -- you've made it far enough that you made at least one turn?

A. That is correct.

Q. And then you got a call from Mr. Kimberlin?

A. That is correct.

Q. Did he indicate how he knew that something was going on? Did he explain that?

A. I think Destry had his cell phone on him, and he called Craig and was telling him what was going on, that I was panicking.

Q. So you think someone called Mr. Kimberlin and told him what was going on?

A. Yeah, that would be the only explanation that I knew of.

Q. Did you talk with Mr. Kimberlin when he called

you and wanted to know what are you doing?

A. Yes, I did.

Q. Okay. And did you guys reach an agreement about what you were going to do next?

A. He told me that I better turn around if I didn't want this shit to happen to me --

THE COURT: Let me see counsel up here.

THE REPORTER: Are you on the record, Judge?

(Discussion off the record, at bench.)

(Open court.)

THE COURT: Mr. Bledsoe.

MR. WOOD: I apologize. I heard you.

THE COURT: I don't want you to use any profanity or obscene words anymore, unless they're elicited from you in a question. Okay?

THE WITNESS: Yes, sir.

THE COURT: All right.

Q. By Mr. Farren) Once you were -- once you had talked to Craig and he had indicated he wanted you to come -- go back, did you agree to do that?

A. Yes, I did.

Q. Now, did you have any problem finding the lake house?

A. I did at first. It was really dark and I

couldn't really remember exactly which one, but then I ended up finding it.

Q. But you hadn't gone very far so --

A. That is correct.

Q. When you arrived back at the lake house, who was there?

A. No one.

Q. So you didn't see the Jeep Cherokee?

A. No, they left.

Q. And you didn't see Destry or any -- or his wife or Stocker?

A. No, they had all gone.

Q. Now, did you see any lights, any car lights or anything as you were going back that you thought might be them, or you just don't know what direction they went?

A. No, I didn't know what direction they went.

Q. Okay. Once you were back at the lake house, how long do you think you waited there?

A. Maybe 10, 20 minutes. And I called Craig back up and told them that they weren't here.

Q. Did you call Craig one time or several times?

A. Several.

Q. Okay. Why did you keep calling Craig?

A. I was scared. And he was calm. And he just

kind of knew how to handle things, and tell me what to do next.

Q. Okay. So after about 20 minutes -- and you've talked to Mr. Kimberlin several times, they're still not back, what did you do then?

A. He told me to go ahead and come on into town and to call him when I got in.

Q. Now, at any point in the conversations when you tried to leave the lake house, did he talk -- did you talk to him about wanting to bring Mr. Pool to his house or take Mr. Pool to the farm, or did the conversation get that far?

A. When I called him -- whenever I made it back into Amarillo, I called him. He told me to meet him at the United on -- it was 46th and Washington Street.

Q. But that was after you had already gone back to the lake house, you guys made that decision. Right?

A. That is right. When I pulled back into Amarillo and called Craig.

Q. Right. But prior to going back to the lake house, was there any discussion with Mr. Kimberlin about you wanting to bring the Navigator to him or go back to the farm, or do you remember anything like that?

A. He just said to meet him at the United on Washington Street.

Q. All right. So you went back to the lake house. They're not there. You call him several times. 20 minutes or so pass, and then you guys decide, okay, come on back to Amarillo and I'll meet you at 46th and Washington at the United?

A. That is correct. That is what -- where Craig told me to meet him.

Q. Right. Do you have any idea how long it took you to drive from Lake Meredith back to Amarillo?

A. No, I don't remember about how long a drive it is.

Q. You indicated that when you went to the lake you drove a little bit under the speed limit to be cautious?

A. Yes, sir.

Q. Did you use that same practice going back?

A. Yes, sir.

Q. Okay. Now, when you arrived back in Amarillo, did you go directly to the United at 46th and Washington?

A. No, I ended up driving around for a little bit and I went and parked on the residential street.

Q. Why did you do that?

A. Because they weren't there at the United.

Q. Okay. So --

A. And I didn't want to stay there because United has got a bunch of video cameras watching the parking lot.

Q. When you first got back to Amarillo, did you call Mr. Kimberlin and say okay. I'm here. Or I'm at the United or what?

A. I told him, I'm here. And anyways, it took him a little bit and then he showed up at the United and then he called me and wanted to know where I was at. And I told him I'm right around the corner. And I pulled up, and then he told me to follow. And I followed --

Q. Hold on just a second. So you -- out of caution, you didn't want to sit in the United parking lot at that time of the morning. You were afraid it might draw attention?

A. Yes, sir.

Q. So you ended up parking somewhere you thought was safer. When he gets there, he called you and you knew to come back over?

A. That's right.

Q. Once you were back there, what happened next?

A. I followed him down to 46th, and I think it was -- I'm not sure what street we turned on, but it was a residential street. And we pulled into the -- I

pulled into -- he pulled his truck out and then they were pointing out the window to pull into the driveway. And then they had the garage raised up and they told me to pull straight into the garage.

Q. Okay. Hold it just a second. How far do you think -- I assume you followed Mr. Kimberlin because he said -- he instructed you, follow me?

A. Yeah.

Q. Okay. And you followed him how far, do you think?

A. It wasn't but a couple of blocks.

Q. So somewhere near that United is where you ended up?

A. Yes, sir.

Q. And when you arrived at this -- was this a house?

A. Yes, sir.

Q. When you arrived at the house, you mentioned they moved a truck. Now, who were they?

A. That was Craig Kimberlin's red Dodge pickup truck. And they were in the street, and they swung wide. And then I think it was Frank Chacon that pointed his finger out there towards the driveway to pull in.

Q. So you're saying they're in front of you and they moved their truck out of the way and --

A. They pulled just a little ahead and was showing me which house to turn into.

Q. Had you ever been to that house before?

A. No, sir.

Q. Do you -- have you ever been there since?

A. That was the only time.

Q. Do you think you would recognize it if you saw it again? Because if you can't, I don't want to look through all of these pictures to find them.

A. I just remember it was a little rinky dink house with a single car garage.

Q. Okay. That is good enough. So was this an attached garage or a detached garage?

A. Looked like a detached garage.

Q. Okay. And when they pointed to the garage, did you say the door was already up, or they raised the door?

A. It was open.

Q. It was open. Was there anything inside the garage?

A. No.

Q. Were you able to pull your Navigator in there?

A. Yes, sir.

Q. Once your Navigator was inside the garage what did you do next?

A. They shut the door. I got out, and I thought that we were going to unload Dustin there. And -- so I could take my Navigator and go home. But when I reached in there -- I went around and opened up the back passenger door and leaned over the seat. And -- because I was going to go ahead and fold it down so we could pull him out because there wasn't enough room to open up the hatch.

Q. I see. So you could lower your seat and bring something from back there out through the side door?

A. Yes, sir.

Q. Okay. So that was your plan?

A. Yes, sir.

Q. And what happened when you tried to execute that plan?

A. Well, Craig came up behind me and he asked me what I was doing. And it scared me. I jumped, and I just told him that I was checking on him to see if he was okay. And he told me don't touch him. Leave him alone. And then I said, well, let's at least take the tape off of him, and he said that he didn't want to because he didn't want to wake him up because he thought he was in a lot of pain. And he thought that if we took the tape off that it would pull on the cut on his head and make it worse.

Q. Now, you remember our conversation before lunch, or your testimony just before lunch. When he said these things to you, you've conceded that at least part of you knew Dustin was already dead?
A. Yeah.
Q. What did you -- how did you respond when he said, well, I don't want to pull the tape loose? I might hurt him. What did you think?
A. I knew that they were sitting there steadily trying to convince me that he was alive so I wouldn't freak out.
Q. And you -- part of you wanted to believe he was still alive?
A. That is correct.
Q. All right. So he is suggesting that no, no, no, we don't want to move him out. That is a bad plan. So what was his plan?
A. He said that Destry had gotten the right key to the lake house, and that they were going to take him back up there to the -- to Fritch, and put him in the lake house and convince him not to go to the cops.
Q. So how did you respond to that?
A. Well, I told him we'll take him out in my Navigator so I can leave. And he said that he didn't want to move him around a whole lot, that it would look

suspicious if he used his truck, because there wasn't a good place to hide him back there, and put stuff on top of him in his dually.

Q. You wouldn't want to use Mr. Kimberlin's truck, of course. So did you finally agree to leave your Navigator?

A. Because Craig started shouting at me and telling me I didn't have a choice, and just go ahead and get in his truck.

Q. And did you get in his truck?

A. Oh, yeah, I was scared.

Q. All right. So when you left, your Navigator was sitting in this garage near the United, somewhere within a couple or three blocks?

A. Yes, sir.

Q. And you got into the red Dodge pickup?

A. With Frank Chacon.

Q. With Frank Chacon. So did Mr. Kimberlin join you in the truck?

A. He was driving.

Q. Once Mr. Kimberlin is behind the wheel, there's you, and Mr. Kimberlin, you, and Frank Chacon in the vehicle?

A. Yes, sir.

Q. What happened next?

A. Well, they drove me back to my house.

Q. And once they got you back to your house, what happened then?

A. Craig told me that I would have my Navigator back before I woke up, and that to just relax. Everything is okay. Don't worry about nothing. It was mainly Frank telling me all this. Craig, you know, he's just, yeah, yeah, what Frank is saying. And then I got out. I went inside the house and Kelly was awake, and she wanted to know where I had been.

Q. Now, was Kelly a happy camper at this point?

A. No, she was very mad. She thought I was cheating on her.

Q. When you went in the house, did Mr. Kimberlin and Chacon come in with you, or did they leave?

A. No, they left.

Q. They left. So did you attempt to convince Kelly that you hadn't been cheating on her? Did you talk to her about it?

A. She was pretty mad at me, and just went ahead and she got out and got in the Lexus and drove off, and I locked myself in the bedroom.

Q. And where was your daughter?

A. She was with Kelly.

Q. She took her with her?

A. Yeah.
Q. What time of the day do you think it was by the time you --
A. Very early morning hours.
Q. Do you think it was -- was it daylight yet?
A. Yeah, it was the crack of dawn.
Q. So you think it was around dawn at this time?
A. Yeah, maybe 5:45, 6:00. Right when it was getting light outside.
Q. Okay. How long did Kelly stay gone? Do you know.
A. No, I don't remember. I was in another place just -- I was too busy thinking about other things to care about what she was doing.
Q. Okay. Now, eventually, did your Navigator -- was your Navigator returned to you?
A. Yes, sir.
Q. Okay. How much time passed before you saw your Navigator again?
A. I think they took the whole day, and then later on, then I think it had to have been maybe 3:00, 4:00 in the morning when they showed up. And Destry was driving my Navigator. He pulled up in my truck, and then Frank Chacon and Craig Kimberlin pulled up alongside the curb. And they got out and all went in,

and me and Kelly were in the front room. And I had asked Craig, is Dustin okay? And he was kind of joking, laughing. And he said, yeah, he is okay. He is over there in the lake house. He is laughing, giggling, having a great time. But they were all covered in concrete dust.

Q. Did you ask about this concrete dust?

A. I was afraid to ask. I already knew.

Q. So you didn't think they were being honest with you?

A. No, I knew they weren't being honest.

Q. How long did they stay at your place -- now, this is Mr. Kimberlin and Mr. Chacon and Destry Keeling. Right?

A. Yes, sir.

Q. How long do you think they stayed?

A. Just -- I remember Craig asking me, he said hey, will you run up to the store and get us some Cokes because we don't want to go in because we're all dirty. So I rode with them up there to a gas station, went inside, bought them some Cokes, and then they drove me back home, and then shortly after that they left.

Q. And was Kelly there when they brought the Navigator back?

A. Yes, she was.

Q. Was she part of a conversation or just there?
A. She was like in the kitchen, but she was eavesdropping.
Q. Okay. When did you first hear from Mark Brown of the Amarillo Police Department, Special Crimes Homicide Unit?
A. I don't remember the exact day. I remember where I was at, though.
Q. Where were you?
A. Builder's Square off of Soncy. He called my cell phone.
Q. And did you agree to meet with him?
A. Yes.
Q. Before you went to meet with him, did you talk to anybody?
A. I called Craig and told him that the Special Crimes guy was wanting to talk to me.
Q. And what was Craig's response?
A. He told me, don't talk to them, that he would get me a lawyer. And to not go. And I thought that that would just be sending up a red flag, you know, ducking the police. So I went ahead and went.
Q. And after you talked to the police, did you visit with anybody after that?
A. Any cops?

Q. No, after you --

A. No, I went straight over there to Craig and told him what was said.

Q. So you talked to -- when Mr. Brown called you, you let Craig know that you were going to go over there. And then after you talked to Mr. Brown, you went back and talked to Kimberlin again or contacted him again?

A. Yes, sir.

Q. And -- what was your conversation with Mr. Kimberlin about when you --

A. Everything that Mark had told me.

MR. FARREN: May I approach the witness, Your Honor?

THE COURT: Yes, sir.

Q. By Mr. Farren) Eventually, you gave Sergeant Brown a statement, didn't you, sir?

A. Yes.

Q. Now, in fact you -- in total, you gave five different statements. You've reviewed these. You know in -- at least in general what is in these various statements. Right?

A. Yes, sir.

Q. Now, would you agree with me that one statement is dated June 16th. Correct?

A. Right after I got arrested.

Q. Okay. And then there is a statement on August 22nd. Correct?
A. Yes, sir.
Q. And then you gave some additional statements in October, one on the 15th, one on the 20th, one on the 23rd. Do you remember those?
A. Yes, sir.
Q. Now, these are fairly brief. These are just adding some additional --
A. Stuff that I forgot.
Q. The two big statements are the June 16th statement and the August 22nd statement. Right?
A. Right.
Q. Now, the June 16th statement is 20 pages long. Is that correct?
A. I guess, yeah.
Q. Now, that was tape recorded?
A. Right.
Q. And so it includes Mr. Brown's questions to you and your answers?
A. Yes, sir.
Q. So that is part of the reason that it's longer, would you agree?
A. I think so.
Q. And then the statement you gave on August 22nd

is ten pages long. Is that correct?
A. That is correct.
Q. Now, would you agree with me there is some difference between the June 16th statement and the August 22nd statement. Some of the details are different?
A. Yes. I was trying to save myself in the first statement I gave.
Q. Okay. But in both of these statements, you concede that you and three other men beat Dustin Pool and he died?
A. That is right.
Q. It's just that in the first statement, you tried to suggest that --
A. He was still alive when I left.
Q. Right. Eventually, you entered an agreement with us. Do you recall that? With the State of Texas to testify?
A. That you wouldn't seek the death penalty on me.
Q. And that is my next question. What is your understanding of our agreement?
A. I don't think there really is an agreement anymore, because you had told me they weren't going to seek the death penalty on anybody. But now you're not

doing it to anybody, so I'm just up here trying to make things right with Dustin's family and friends.

Q. Okay. Well, what did you agree to do?

A. Just accept responsibility for my actions.

Q. Did you agree to testify and tell the truth?

A. Yes, sir.

Q. And it's your understanding of our agreement that we wouldn't seek the death penalty against you if you testified and told the truth?

A. That's right.

Q. Now, you understand you could still end up doing life in prison?

A. Oh, I know that.

Q. When you gave this statement on June 16th, you didn't have any agreement then, did you?

A. No, sir. I was scared.

Q. But even on June 16th, you said that you and three other men, including Josh Stocker, beat Dustin Pool?

A. Yes, sir.

Q. And eventually he died?

A. Yes, sir.

Q. On the August 22nd statement, the only difference -- the major difference is you come a lot closer to accepting responsibility for your role in this

thing?
A. That is right.
Q. Now, do you also -- you also have federal charges, drug charges against you. Is that correct?
A. Yes, sir.
Q. What was the result of those charges? Have you pled?
A. I've pled out and got -- I ultimately got 14 years, six months. But it was two seven-year sentences -- two 87 month sentences, run concurrent.
Q. And whatever you did with the feds had nothing to do with us. We weren't involved in that in any way?
A. No.
Q. And before you were brought back here to testify -- you're actually serving time in federal prison right now. Right?
A. That is correct.
Q. Prior to that, did you have any criminal convictions of any kind?
A. No, sir.
Q. Does the cell phone number 433-4636 --
A. Sounds like Craig's number.
Q. Okay. Do you know anybody Talmo (phonetic)?
A. Oh, Robert Talmo? That was my cell phone. I'm sorry.

Q. Okay. And whose name was that in?

A. It was in Robert Talmo's name. My cell phone was.

Q. But you used it?

A. Right.

Q. Okay. Are you concerned at all about the fact that you have testified here about what that is going to mean down the road for you? Not from us, but from the people you share a prison with?

A. Oh, I know it's a life threatening thing that I'm doing right now.

Q. Why is it life threatening?

A. Snitching is not accepted in prison.

MR. FARREN: Pass the witness.

THE COURT: Ms. McElroy.

MS. MCELROY: Thank you, Your Honor.

CROSS EXAMINATION

BY MS. MCELROY:

Q. Mr. Bledsoe, I believe that we started out a long time ago. Let's talk about how this got started for a minute, shall we? You said that Dustin and you had known each other before any of this started. Right?

A. Yes, ma'am.

Q. Were you friends together, in fact?

A. At one time.

Q. Okay. Did the trouble start up when he started threatening Miguel Gonzales?

A. Yeah.

Q. How long ago was that?

A. I would be guessing if I answered that question.

Q. Well, I mean, how -- was it years or months before?

A. Years or months before the trouble started?

Q. Yes, sir.

A. It had -- I guess it was happening all in 2003.

Q. Okay. Now, you had found out that Dustin was planning to do -- I think you called it an easy jack move?

A. That is correct.

Q. So basically, they were threatening to come in and take your dope and your money?

A. That is right.

Q. So that had to be pretty threatening?

A. I was scared.

Q. And then he goes -- and I may have the sequence wrong. Does he do the fake drive-by then? Is that what happens next?

A. Right after I heard about him going to jack

me.

Q. Okay. And you took that pretty serious?

A. Yes, I did.

Q. And that was pretty scary?

A. Yes, it was.

Q. Then we have the incident involving your godfather. Right?

A. That is correct.

Q. And this is somebody who is really close with you. Right?

A. Yes, ma'am.

Q. How much did your godfather owe Dustin?

A. I don't know if it was him that owed the money, or if it was his son that owed the money. But it was a $4,000.00 debt.

Q. Okay. Was Dustin wanting you to pay the money off?

A. No, I told him that I would help him try to collect that money.

Q. Okay. And Dustin wasn't satisfied with that. Is that right?

A. Yeah, because he wasn't getting his money.

Q. Well, if Dustin is threatened to have his son touched in prison, why isn't his father doing something to pay the debt?

A. Because his father didn't have the money.

Q. And this was a debt owed by the son. Is that right?

A. I have no idea who actually owed that debt.

Q. Okay. Was there some other trouble between David Garcia and Mr. Pool?

A. Yeah.

Q. What kind of trouble was that?

A. Dustin had sold David Garcia an amplifier for a car stereo for $400.00. And something -- like David couldn't pay him $400.00, and so Dustin began threatening him, too.

Q. Well, what was Dustin threatening to do with Mr. Garcia?

A. Get the Texas Syndicate after him.

Q. Were you close with Mr. Garcia?

A. Best friend.

Q. So this was something that you felt personal about?

A. Yeah.

Q. Did you and Mr. Garcia talk about this threat?

A. Yeah, I called Dustin and talked to him about it.

Q. So you called Dustin?

A. Right.

Q. And y'all have several different conversations. Is that right?

A. I was going to pay Dustin the $400.00 for him to just leave David alone.

Q. Okay. Did that happen?

A. No.

Q. Do you know a guy named Jason Hickson?

A. Yes, I do.

Q. Do you know whether or not Dustin Pool was threatening him?

A. I know that Jason Hickson was dating Laura, Dustin's ex. And I know that Dustin didn't like Jason Hickson for that reason.

Q. Did y'all ever discuss that he was being threatened also?

A. I don't know. I really only know the stuff that happened with me.

Q. What was Mr. Hickson's role in your organization?

A. He was just my friend.

Q. He -- you wouldn't classify him as a protector?

A. No.

Q. Well, for instance, you told us that when you were at Stumpy's, and you felt threatened with Dustin

you called Jason Hickson. Isn't that what your testimony was?

A. Yes.

Q. Well, why is it you would call Jason Hickson?

A. To have some friends there.

Q. Well, I understand about friends, but we were talking about -- unless I'm not understanding, you guys were feeling like they were going to jump y'all?

A. That is correct.

Q. Okay. So Mr. Hickson isn't just some friend.

A. Yeah, that is what he is. He is a friend.

Q. Well, would it be a friend that you felt would be capable of standing up and protecting you?

A. I know he wouldn't let me get hurt.

Q. Okay. Was Mr. Hickson dealing dope for you?

A. No, ma'am.

Q. He never dealt any kind of dope for you?

A. No, ma'am.

Q. Well, if Mr. Hickson testified earlier that he dealt dope for you, then Mr. Hickson is lying. Right?

A. I probably gave him one quarter pound, but I wouldn't consider him selling dope for me.

Q. Well, I mean, you gave him a quarter pound --

A. He couldn't pay for it, so I mean how can you call that selling for me?

Q. So it was a gift?
A. No, it wasn't a gift. It was just he couldn't pay for it, and he was too good of a friend. So I didn't really want to jack with giving him any more dope than that.
Q. Okay. I think you testified on direct with Mr. Farren that you started out delivering one or two pounds. Is that right?
A. To Jason Hickson?
Q. No, no. He was talking about that you started out with different amounts, that you started out dealing dope in two pound amounts, and then eventually went all the way up to 30 pounds of pure dope?
A. Yeah, I'm pretty sure it was evident to everybody that I was a dope dealer.
Q. Well, and in that vein, who else did you sell dope to?
A. Ultimately, it all went to Craig Kimberlin.
Q. I understand ultimately. But in between times, were you distributing dope to other people?
A. Yes.
Q. Did you distribute to Miguel Gonzales?
A. Yes, at one time.
Q. Did you sell dope to Dustin Pool?
A. At one time.

Q. Who were the other people that you would have dealt dope from?
A. I sold dope to Justin Bailey (phonetic), a guy named Craig Ward. Tim McDaniel, sold dope to a couple of people.
Q. Okay. But you're saying that the only guy that you sold dope to by the end of this period of time was Stephen Craig Kimberlin?
A. That is who I ultimately ended up doing all of my business with, for like the last two years.
Q. Okay. Do you know Danny and Denise Contreras?
A. Yeah, I went to high school with them.
Q. Okay. Were you getting dope from the Sanchez/Baxer cartel?
A. No.
Q. You're getting -- you're not getting dope from Denise and Danny?
A. No, ma'am.
Q. You're getting dope from a different cartel?
A. Yes.
Q. Okay. Did you all switch around, if somebody was short on dope did one of y'all front the other dope?
A. No.
Q. Okay. So if you have a specific dope deal then you're only going to get your dope from that one

connection?

A. I only dealt with one person. I don't know about everybody else's business.

Q. Okay. Well, what was your standard practice?

A. I dealt with people that I have already mentioned.

Q. Okay. You were making really good money at this. Is that right?

A. I felt like I was.

Q. I think you said with Mr. Farren that things kind of took a different tone when you felt like your family had been attacked. Is that right?

A. Yes, ma'am.

Q. Did that occur when they did the fake drive-by on you, or when they ran the car off?

A. When they ultimately ran the car off the road.

Q. Why was that such an important event to you?

A. How would you feel if somebody had ran somebody in your family off the road and pulled his guns on them and told them they were going to kill somebody?

THE COURT: Mr. Bledsoe, you're not here to ask questions. So you answer questions. Do you understand me?

THE WITNESS: Yes, sir.

Q. By Ms. McElroy) You felt very personally

threatened?

A. Yeah.

Q. Even though in reality, your wife wasn't in the car. Isn't that right?

A. That's right.

Q. Mr. Bledsoe, let me ask you, how big a person are you?

A. Five six, 180 pounds.

Q. How big was Dustin Pool?

A. I don't know.

Q. Was he six three?

A. That would be a good --

MR. FARREN: Asked and answered, Your Honor, he said he didn't know.

THE COURT: Overruled.

Q. By Ms. McElroy) Do you have a guess as to how much he weighed? Was he a skinny guy?

A. No, I don't know.

Q. Okay. He was bigger than you?

A. Yes.

Q. Were you physically intimidated by him?

A. Yes.

Q. Let's talk about the Joe's Crab Shack incident for a minute. I believe it was your testimony on direct that you're coming out after you have eaten. Is that

right?

A. Yes, ma'am.

Q. And David Garcia is with you also?

A. Yes.

Q. And Dustin gets out and shoves you. Is that what you told us?

A. That is what I told you.

Q. You had to have been really angry about that. Were you angry?

A. Yeah.

Q. Did you feel humiliated?

A. Yeah.

Q. Then you said that y'all were -- that you were bowed up. Is that right?

A. Yeah, we were going to fight.

Q. And you were ready to do that?

A. Yes, I was.

Q. But then you said Dustin said something about he had to make reservations. Is that what you told us?

A. To that effect, yes.

Q. Then I understand your testimony to be that Ray and Bobby O'Connis come running out and jump in your face?

A. After Dustin ran in there and hollered for them.

Q. Well, Mr. Bledsoe, I'm a little perplexed. If he had jumped in your face and had gone to run in there, why didn't you get in your car and leave then?

A. I didn't want them to think that they had me scared, because I thought they would jack with me more if they knew I was scared.

Q. Are you familiar with the phrase "punked"?

A. Yeah.

Q. Okay. Does that basically mean that if I make you afraid or you look afraid, then the next thing that is going to happen is I'm going to take your business?

A. Take my business?

Q. In other words, if you show weakness, Mr. Bledsoe, does that invite someone to take over your business?

A. No.

Q. Okay. So it wasn't important for you to pretend not to be afraid of these guys?

A. Oh, it was important for me not to be afraid of them, just because I didn't want them messing with me anymore.

Q. If they felt like they could keep messing with you, then ultimately wouldn't they take your business away from you?

A. I don't think so.

Q. Okay. Would you agree with me that Dustin Pool and Ray Placensio and Bobby O'Connis, they were really picking on you?
A. They were picking on all of us.
Q. But it was really centered on you. Isn't that true?
A. It was centered on Stocker and Chad Spanel --
Q. No, I think I asked you, wasn't it really centered on you, yes or no?
A. No.
Q. So everybody else was having their car run off the road. Is that right?
A. Miguel's wife and kids were chased around. Stocker had a gun pulled on him whenever he went to go talk to him about Chad Spanel getting taken away by Dustin. Frank was getting set up by a girl named Jessa. Everybody had their reasons. I know everybody would like to point the finger at me, but --
Q. Well, Mr. Bledsoe, I think you're misunderstanding. I am not pointing the finger at you. I think there was obviously an intensity or anger, maybe a jealousy, because you're the direct connection. Isn't that right?
A. For Craig.
Q. Right. Did Dustin Pool want you to sell dope

to him instead?
A. Did Dustin want me to sell dope to Dustin?
Q. Right. I mean, isn't Dustin Pool trying to get you to sell dope to him or cut the other guys out of business?
A. Dustin had his own thing going with Denise Contreras.
Q. Okay. So this wasn't business. This was personal with you?
A. Personal that he ran my wife's car off the road?
Q. Yes, sir.
A. Yeah, it became personal.
Q. I think that you testified on direct that at some point in time, you felt like that you had messed up and your family was being targeted. Was that --
A. Yeah, I testified to that.
Q. Well, Mr. Bledsoe, did it occur to you that when you got in the dope dealing business that there might be some serious repercussions out of that?
A. I really never thought that far.
Q. Mr. Bledsoe, would you characterize yourself as a violent person?
A. No, ma'am.
Q. Would you characterize yourself as somebody

who is easy to anger?
A. No.
Q. Have you ever hurt or hit another person before?
A. Yes.
Q. I believe you testified that you called Stephen Kimberlin up and you said they are hunting me down?
A. Yeah.
Q. Is that how you felt inside?
A. Uh-huh.
Q. You said that when you were at the meeting at Stumpy's that one of the cartel guys was with you?
A. Yes, he was.
Q. Can you tell me who that was?
A. Thomas Rojas.
Q. Is he connected in any way to the Sanchez/Baxer people?
A. I don't believe so.
Q. He is not a cousin?
A. I don't think so.
Q. You also said that they had offered to get rid of Dustin Pool for free. Is that right?
A. Yes, they did.
Q. But you didn't think that was a good idea?

A. No, I didn't think that was a good idea.
Q. In reference to the Stumpy's incident, you said that they didn't show up?
A. That is right.
Q. And you also said that you thought it was because they were scared?
A. I think the reason they didn't show up is because they got in trouble over there at Jaguar's.
Q. So there was some other something going on over there?
A. Yes, ma'am.
Q. How long had you known Bobby O'Connis or Ray Placensio?
A. I had never known them.
Q. So until they came out of Joe's Crab Shack, you didn't have any interaction with them?
A. I had known their names and I had seen Bobby in the back of Dustin's gold Acura Legend, when they passed by my house. I didn't know it was Bobby until they ran out of Joe's Crab Shack with one of his work shirts on.
Q. So Bobby was working at Joe's Crab Shack?
A. No, he had a Top Notch Body Shop uniform that said "Bobby" on it.
Q. Oh, okay. I understand. You said that -- I

think you testified earlier that Stocker called you up and said, we've got Ray over here at the detail shop?

A. He didn't say Ray was over here at the detail shop. He said I'm over here at your detail shop and I need you to come over here. One of my guys has been shot.

Q. And this was after hours. Right?

A. Yeah.

Q. Now, there is a fence around your property, is there not?

A. Yes, ma'am.

Q. And the bays would lock. How would they get in?

A. Okay. It was a sliding gate, and they were able to take the sliding gate off the wheels and move it over far enough to where they could pull in a car. And then the last garage door was broken, and I couldn't lock it.

Q. Okay. Mr. Bledsoe, I think you talked about that your agreement was basically that they weren't going to seek the death penalty. Is that right?

A. Yes, ma'am.

Q. And in fact, I believe that you signed a sort of a plea agreement with the State that says that they would basically prosecute you for murder?

A. Right, that still carries a life sentence.
Q. Right. But that punishment range is what?
A. Five to 99, I believe.
Q. Okay. In reference to your federal cases, you were originally charged with a couple of different things. Isn't that right?
A. Intent to distribute.
Q. Right. But one of those, the conspiracy was dismissed due to your plea bargain?
A. That is right.
Q. Okay. So basically, your sentence is for 87 months?
A. Yes.
Q. And that translates to seven years and three months?
A. That's correct.
Q. You are currently in the Three Rivers facility in San Antonio?
A. Yes, ma'am.
Q. In order for you to have one of these cases dismissed for the feds, what did they require you to do?
A. I had to plead out.
Q. I understand. But were you debriefed? Did you talk to somebody at the DEA? Did you talk to --
A. Are you asking me if I snitched?

Q. I guess that is what you would call it.
A. Yeah, I snitched.
Q. So you gave information about other people?
A. Yes, ma'am.
Q. You told us that the way that you ended up meeting your direct connection was that you paid some guy you worked at Patrick Electric with. Is that what you said?
A. Yes, ma'am.
Q. And you paid him $10,000.00?
A. That is right.
Q. Well, at Patrick Electric, where in the world did you get $10,000.00?
A. He let me pay payments to him.
Q. He let you pay payments. And is it your testimony that you didn't have any involvement in the drug trade at all until you met Norm?
A. No, I was selling weed before I was selling meth.
Q. Okay. So you had been selling weed. How long have you been selling weed for?
A. Maybe two years, guessing.
Q. So you had decided to kind of up the ante?
A. No, I was trying to find a better weed connection, and I ended up with a meth connection.

Q. Well, would you agree with me that meth is a lot more profitable than weed?
A. I would.
Q. Now, Mr. Bledsoe, I believe that you testified that you don't do methamphetamine. Is that right?
A. That is correct.
Q. And it has never been your practice to do any type of drugs?
A. That is correct.
Q. So during all of these events, you had a clear mind?
A. Yeah.
Q. And you -- you made careful, thoughtful decisions?
A. Made some stupid decisions.
Q. But those weren't impaired by dope?
A. No, ma'am.
Q. I think you testified that Mr. Stocker beat up Ray?
A. Yes, he did.
Q. If Mr. Keeling said that Ray and Miguel Gonzales fought, and that Miguel -- no, that Ray whipped Miguel, did that happen?
A. Yeah, that is correct, too.
Q. So were you guys doing like fight club --

A. I wouldn't call it a fight club, it was everybody just beating on Ray.
Q. But you didn't have anything to do with that?
A. No, I didn't. I didn't want to get involved with the Texas Syndicate.
Q. Mr. Bledsoe, I think that you said on direct with Mr. Farren that you had to tell your employees to stay home that day. Isn't that right?
A. That is right.
Q. And that wasn't very good for business. Is that correct?
A. Well, I was paying them out of my own pocket because the business hadn't really gotten started up yet, so it didn't really affect me.
Q. Well, is it your contention that your employees didn't know about your dope dealing business?
A. Oh, they knew.
Q. Did some of them deal dope for you?
A. No.
Q. Did some of them buy dope from you?
A. No.
Q. I think you said that when you went in to see about Ray, that you took the tape off of his face. Is that right?
A. That is correct.

Q. But you were too afraid to take the tape off of his hands and feet?

A. That's right.

Q. So the fear is still really strong at that point?

A. Yes, ma'am.

Q. One of the things that Mr. Farren talked about with you is that Kimberlin called you and said I need for you to come over here and pick up this fifty grand I've got?

A. Yeah.

Q. And then at least my understanding of it is that you went and picked up the fifty grand?

A. That is correct.

Q. Well, what -- are you driving around with it in the Navigator?

A. Yes, ma'am.

Q. Okay. So this whole time that all of this is going around, you've got $50,000.00 in the Navigator with you?

A. That wasn't uncommon for me.

Q. After all of this trouble between Ray Placensio and Bobby O'Connis and whoever is named Jesus or Bullet or Smoke Dog or whoever all of these people -- right? Do you -- you said you learned about the Jesse

Preciado murder?

A. While I was in Randall County.

Q. While you were in Randall County. Is that after you were arrested on these charges?

A. Yes, ma'am.

Q. So you never heard anything on the street about what had happened with Blue?

A. Just what was going -- all the inmate rumors going through Randall County.

Q. I think you said that Frank sat you down and that he had a talk with you, and that he got you juiced up to go out to the farm?

A. No, I didn't say Frank. I said Craig.

Q. I'm sorry. I thought you said Frank. And he told you that in order for you to have any respect that you had to do something. Right?

A. I was going to have to stand up to him.

Q. I think you testified that they had mistaken your kindness for weakness?

A. That is how Craig felt about me.

Q. Well, did you -- had you decided that you pretty much needed to set that straight?

A. Yeah.

Q. I think you also talked with Mr. Farren about the statement that you gave, and some of the several

written statements where you said that you kept asking about whether Dustin was alive or not?

A. Yes, ma'am.

Q. And, I mean, you gave a 20-page, single spaced interview basically with Mark Brown, and you insisted in that that he was alive and breathing all the way up to Tyler Hale's house. Isn't that true?

A. I was trying to get out of a murder rap.

Q. But you would agree with me that your statements about Dustin being alive were a common theme in many of your statements here?

A. It was in the one June 16th statement that I tried to keep saying he was alive.

Q. Okay. Well, I mean, if Destry Keeling had testified that when he came in to give you your keys and you asked well, how is Dustin -- I mean, yeah, isn't that what you asked him?

A. No, I am not supposed to ask questions. But what do you mean by "keys"?

Q. When he returned the keys to the Navigator to you, when they were bringing your Navigator home, didn't you ask or inquire of Destry Keeling or Kimberlin or Chacon, you know, how is Pool doing?

A. Yeah, I asked them.

Q. Well, that wasn't in his statement to Mark

Brown, was it? I mean, these people that said you said that didn't lie, did they?

A. The people that said I said what?

Q. That you asked whether or not Dustin was alive or not.

A. Yeah, I asked that.

Q. Mr. Bledsoe, I believe that you were asked by the Prosecution about -- that being a snitch was a bad thing. Isn't that right?

A. It's a horrible thing.

Q. But in fact, you had already made -- and procured the snitch deal with the federal case. Isn't that right?

A. It wasn't going to be so out in the open until you brought it out.

Q. Let me ask you, Mr. Bledsoe, there has been a lot of discussion in all of the statements about you are the person who put this shovel handle in Dustin Pool's rectum.

A. That didn't happen.

MS. MCELROY: Pass the witness, Your Honor.

MR. FARREN: May I have a moment, Your Honor?

THE COURT: Sure.

REDIRECT EXAMINATION

BY MR. FARREN:

Q. What happened to all that money you made?

A. Well, I had a bunch of it fronted out. And I was constantly, you know, keeping the cycle going, making them happy by paying them so quickly. So I always used all of my profit to pay them off quicker. I was buying cars like every other day of the week.

Q. So you spent a lot of it. Correct?

A. Yeah.

Q. But a lot of it was part of a cash flow. In other words, you had to pay Mr. Sanchez and Mr. Rojas when you got the --

A. I had to pay Mr. Chavez, not Sanchez.

Q. I'm sorry. Mr. Chavez. You're right. Sanchez/Baxer -- the Contreras deal, yours was with Rojas and Chavez. You had to pay them in order to keep getting the dope. Right?

A. That is correct.

Q. And so if you're fronting -- if you're fronting dope to other people, then once you're locked up, they don't have a lot of incentive to pay you, do they?

A. That is right.

Q. So there is a lot of happy campers out there

that had maybe --

A. There is a lot of people that got rich when I got busted.

Q. Right. Now, you were asked about, well, they're going to take over your business. That would be impossible, wouldn't it?

A. Yeah.

Q. Because they don't have the connection in Old Mexico?

A. That and Craig didn't like Dustin.

Q. I understand, but no one was going to be able to take your business unless they could find out your connection and figure out how you were getting the dope?

A. That is right.

Q. And in fact, Mr. Kimberlin and the others would have loved to have cut you out of the deal and dealt directly with Old Mexico?

A. Yes.

Q. But they couldn't do that because you were the only one that had the connection?

A. Right.

Q. In your dealings with Mr. Kimberlin, how did he feel about Stocker? What did he think of Stocker?

A. Repeat the question.

Q. Did he ever talk to you about Stocker? Did he

feel like boy, Stocker is a great guy? What a great relationship?

A. Who? Craig?

Q. Yeah.

A. Yeah, he thought -- I mean, he didn't really talk about him like he was a great guy. He just said that Stocker was very loyal to him. And he said that well, I mean, I basically got the understanding that Craig thought of Stocker as a crash dummy.

Q. Okay. What do you mean by that?

A. It means Stocker was dumb and would do anything for Craig.

Q. He could talk to him -- him into anything?

A. Anything.

Q. Now, the sentence that you got in federal court, those are guidelines. Right? There is a set law that says how much you get?

A. Yes, sir.

Q. And the federal prison that you're in, it's -- is that kind of a country club prison? You play golf every day?

A. No.

Q. What is it like?

A. It's like being away from your family, losing all of your friends.

Q. Now, you understand you deserve to be where you are?

A. Yeah.

Q. But it's -- if it's suggested that you got some sweet deal on the federal deal, it's not a country club, is it?

A. No. It wasn't a sweet deal. I got sentenced at the top of the guidelines.

Q. Do you remember Mark Brown telling you your life was in danger?

A. Yes, he told me that.

Q. When did he tell you that?

A. When I was at Builder's Square.

Q. When he first called you?

A. When he first called me.

Q. Is that what encouraged you to at least find out why he was calling? Did you want to find out why your life might be in danger?

A. I didn't take him serious. I didn't think I really had a hit on me.

Q. Did it at least make you curious?

A. Well, I went over there and asked Craig if I had a hit on me, and he started giggling, and said no, you don't have a hit on you. But then I found out later that Stocker was approaching Dove (phonetic) Keeling,

Destry's brother, about a 30-aught-6 to come shoot me in the head.

Q. And after all, between Mark Brown and Craig Kimberlin, once you check with Mr. Kimberlin, well, you would certainly trust Mr. Kimberlin?

A. Yeah, I thought he was a good friend.

MR. FARREN: I apologize, Your Honor. Just a moment. We'll pass the witness.

RECROSS EXAMINATION

BY MS. MCELROY:

Q. Part of the reason the guidelines that you hit the top of it, would you have -- well, let me back up and try to ask this better. You had two different cases, and they dismissed one. Isn't it true that you would have had more time had that case not been dismissed?

A. I thought it was all one case.

Q. There was a conspiracy part in another case, and you only pled to one.

A. Right. They dropped the conspiracy. They made that deal with everybody.

Q. Okay. But again, because of the -- pleading on only one case, that lowered the sentencing range?

A. Oh, yeah.

Q. Okay. Thank you.

MS. MCELROY: Pass the witness, Your Honor.

MR. FARREN: I have no other questions. Your Honor. We conceivably could call the witness back if certain issues arise, but we have no questions at this time.

THE COURT: You have that right. You may step down, sir. Thank you.

MR. FARREN: May we approach, Your Honor?

THE COURT: Yeah. Why don't we just take a break? If y'all will be back in the jury room at a quarter 'til 2:00.

(Jury excused, proceedings held.)

THE COURT: At this time, we anticipate calling Jeremy Roy as a witness, Your Honor. We believe that lack of accident or mistake is certainly an -- we believe that mistake or accident is an issue. We believe intent is an issue. We believe this is an almost exact footprint common scheme and plan.

We think it specifically goes to the issue of was there anyone in this group who had ever participated in an almost identical event where a sock was placed in their throat. We know in Mr. Placensio's case where Destry Keeling was there, no sock was placed in his throat, at least there is no testimony to that. We had

a sock in Mr. Pool's throat, and we have one other instance where one member of this group participated in that. We think it goes to accident, mistake, intent and specifically to the identity of the person who put the sock in his throat.

MS. MCELROY: Your Honor, may I respond?

THE COURT: Yes.

MS. MCELROY: It is our contention, Your Honor, that any of these issues that have been raised have been raised by the Prosecution and elicited by the Prosecution. We have not elicited testimony that it was an accident or mistake. We have not elicited other testimony about the intent. In fact, intent can be inferred from the event itself.

In reference to Mr. Farren's idea that because someone else had a sock stuffed in their mouth, I would point out to the Court that the party responsible for the sock in Jeremy Roy's mouth was Michael Marquez (phonetic). Now, it was done while my client was asleep in another room. So I guess in that context, you know, he was there. But it is not identical.

Further, Your Honor, we would argue that they don't need this to help prove any of the 404(B) exceptions, that's not being offered for that. That it is being offered for character conformity to show that

my guy is a bad guy, and that he is -- he is a bad dude. And for no other purpose, Your Honor. And we would object to it under 404(B) and under 403 --

MR. FARREN: What we're hearing in cross examination, Your Honor, it is obvious the defense in this case. The defense in this case is that whatever our client did or did not do, that really Mr. Pool was actually alive until he got to the grain silo. And they dropped him down 12 feet in this pit, and he hit his head, and then they smothered him with concrete. If nothing else, this testimony will clarify once and for all what happens when you put a sock in someone's throat and cover it up with tape.

Mr. Roy is a living experiment. He only lives because they took the sock out, and they didn't take it out of Mr. Pool's throat. And that's why he didn't die when they dropped him in the grain silo and covered him with concrete. He was already dead.

THE COURT: Well, I haven't seen that. That has not been obvious to me, that defense. That's the first of its kind to occur to me.

MS. MCELROY: It would be the first that it occurred to us --

THE COURT: Well, I have heard the case to this point, and I am going to exclude the Jeremy Roy

testimony on the kidnapping. I've done a balancing test. One of the things I have to look at in a balancing test -- and I know judges are not supposed to make a comment on the weight of the evidence, but I'm required to in a 403 balancing test situation. It's one of those little dilemmas that they put on you. So I'm going to make a comment on the weight of the evidence. Your case in chief so far on the elements of the indictment is compelling. It's formidable, and there is no necessity to go into something that is as prejudicial as that kidnapping. And I'm not going to jeopardize this verdict, whatever the verdict, because of that. I -- I understand how close you are to the case. So you know that. But I'm telling you somebody that has just seen it for the first time, and your case is compelling, and thus reducing the probative of the kidnapping --

MR. FARREN: I understand. May I inquire on one issue?

THE COURT: Sure.

MR. FARREN: I'm assuming the Court is simply in the same posture you've been all along. I'm evaluating this as we go along. If things change, if I feel like at some point it becomes admissible, it's still a possibility?

THE COURT: If they open the door in some

way, then we'll revisit it. But it's not going to change that particular element of the 403 test. You understand what I'm saying?

MR. FARREN: I understand.

THE COURT: You have presented such a strong case on your case in chief that it's reduced absolutely your necessity for this.

MR. FARREN: And we realize that is a danger, Your Honor. And I understand what the Court is saying.

THE COURT: What -- my interest is in protecting this verdict.

MR. FARREN: Yes, sir. Your Honor, we would move as rapidly as we can. I just learned a few minutes ago that we had Mr. Roy here, and we had some other people that are not here yet. We'll get them here as quickly as we can.

(Recess.)

THE COURT: Thank you, ladies and gentlemen. Everyone be seated. Mr. Farren, call your next witness.

MR. FARREN: State calls Chris Eason, Your Honor.

THE COURT: Okay.

(Witness sworn.)

CHRISTOPHER EASON,

Having been first duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. FARREN:

Q. Would you state your name for the jury, please, sir.

A. Christopher Eason.

Q. And do you go by Chris Eason?

A. Yes, sir.

Q. And Mr. Eason, do you live here in the Amarillo area?

A. Yes, sir.

Q. And have you lived here most of your life?

A. Yes.

Q. Do you know a man named Josh Stocker?

A. Yes, I do.

Q. Do you see him here in the courtroom today?

A. Yes.

Q. There is a man in the -- I call it green, sort of an off green colored shirt with a tie and no coat, sitting at counsel table. Is that Josh Stocker?

A. Yes.

MR. FARREN: May the record reflect he has identified the Defendant, Your Honor?

THE COURT: Record will so reflect.

Q. By Mr. Farren) Mr. Eason, I want to take you back to early 2003. Well, let me back up first and ask how did you meet Josh Stocker? How do you know him?

A. Through Chad Spanel. I was friends with Chad and he was friends with Chad, so...

Q. Do you know Stephen Craig Kimberlin?

A. Yes.

Q. Do you know Destry Keeling?

A. Yes.

Q. Brook Vandergriff?

A. Yes.

Q. And back in January, late January, early February of 2003, do you remember attending a meeting at Chad Spanel's house with, I think Destry and Josh Stocker, Brook Vandergriff, maybe some other folks. Do you recall that?

A. I remember being there in February.

Q. Okay. In February?

A. February.

Q. Mr. Spanel, he wasn't actually at the meeting, was he? He was still at work. Or is that correct?

A. He locked himself in his room that night.

Q. Okay. Had you folks already been talking at his house before he came home or --

A. Yes.

Q. Then he went in the room and closed the door?
A. Uh-huh, he was mad.
Q. What was the meeting about?
A. The kidnapping of Ray.
Q. You folks were talking about kidnapping Ray Placensio?
A. Yes.
Q. Why were you talking about doing that?
A. I just knew there was confrontation between the two groups.
Q. Okay.
A. I didn't know why.
Q. What group was Ray Placensio a part of?
A. He was Dustin's right-hand man.
Q. Dustin's right-hand man. I know you're nervous. Take your time. We're fine. When you say Dustin, you mean Dustin Pool?
A. Yes, sir.
Q. So he was Dustin Pool's right-hand man. And there was conflict between that group and what other group?
A. Craig Kimberlin and Destry, and Josh and "Spoon" --
THE REPORTER: And who?
THE WITNESS: Chad Spanel.

Q. By Mr. Farren) Did you and the others -- was it your understanding that if you kidnapped Mr. Placensio, that it might send a message to Mr. Pool to kind of back off?
A. I don't know if we were sending a message.
Q. You just agreed to help?
A. Yes.
Q. Okay.
A. I wasn't sure about the whys.
Q. Okay. Whatever the reasons, you agreed to help. How did you folks decide that it was going to happen? Oh, Guinn Garcia was there also, wasn't she?
A. Yes.
Q. And she was the common law wife or live-in of Mr. Placensio?
A. Right.
Q. How did you folks decide this was going to happen? What were you going to do?
A. There was just different ideas thrown out on the table of how to get him. And because Guinn was there, and she was, you know, his common law wife or whatever, that she could get to him or could get him out of Dustin's house and to where he needed to be to be taken.
Q. Okay. And where he needed to be, was that

Wal-Mart?

A. That is where it ended up being, yes.

Q. Okay. And do you know if -- was the idea that she would get him out of their vehicle --

MR. WATKINS: I'm going to object to leading.

MR. FARREN: Okay. I'll rephrase, Your Honor.

Q. By Mr. Farren) Once he was at Wal-Mart, do you know what Ms. Garcia was supposed to do?

A. Take him in the store and give time to get in the van and come back out.

Q. And how were you going to get in the van? Was it --

A. Unlocked. She left it unlocked.

Q. And did -- did the group that you've talked about -- well, first of all, did she get him to the Wal-Mart?

A. Yes.

Q. And did the group that you were with, did they go to the Wal-Mart?

A. Yes.

Q. Okay. And did she manage to get him out of the van?

A. Yes, he went into Wal-Mart. They went in

together.

Q. Once she went into the Wal-Mart with Mr. Placensio, what did you guys do next?

A. Josh and his girlfriend dropped us off and Destry and I --

Q. And Josh and his girlfriend, that's Brook Vandergriff. Right?

A. Yes.

Q. They dropped you and Destry off. Where did they drop you off?

A. In the parking lot. After we had the van coming in, and then going into the store.

Q. Okay. And then what happened?

A. Then we got into the van and waited. And that's when I got shot.

Q. Okay. How did you get shot? What happened?

A. We were going down because everybody could see us in the van, and he had a machine gun with him. So we both laid down and I guess he pulled the trigger when he was adjusting himself, and shot my foot.

Q. Do you know if the weapon that he fired, was this a fully automatic weapon?

A. Fully automatic.

Q. Did it fire once or more than once?

A. My ears were ringing. I couldn't tell. I

only got hit once.

Q. But you were hit once, but you don't know how many shots may have been fired?

A. I was not sure.

Q. When you realized you were hit what did you do next?

A. I tried to get out of the van, and it took a couple of minutes because Destry didn't want to let me go. And I finally talked him into letting me go to the hospital.

Q. How did you get to the hospital?

A. Brook and Josh drove me there.

Q. And once they had you at the hospital, what did you do then? Did they go with you in the hospital?

A. I think they both went in. I don't know -- I don't remember. I think Josh left and I don't remember if she stayed or not. I just went to the emergency room.

Q. And what did you tell them? Did you tell them the truth?

A. No.

Q. Okay. What did you tell them?

A. I told them -- the first story I told them was it was a drive-by and somebody shot me, and they didn't buy that one. So they came to the hospital room the

next day, and said, you want to tell us the truth? And I said sure. And then I made up another story about me buying drugs from some Spanish people and they were showing me their weapon, and I got shot that way.

Q. All right. Did you ever talk to Mr. Stocker or Brook Vandergriff or any of those folks after you got out of the hospital about what happened after you left? Were they able to kidnap Mr. Placensio?

A. Yes, I think I talked to Destry about it.

Q. Okay. All right. So you learned that they did actually complete the kidnapping?

A. Yes.

Q. And did you know what happened after that?

A. No, not really.

Q. Now, eventually sometime after this, did you hear that something had happened to Dustin Pool?

A. Yes.

Q. What did you -- what did you understand or what did you hear about that?

A. The day after it happened, Josh and Guinn came to the house and told me about it.

Q. So Josh and Guinn Garcia were with you?

A. Yes.

Q. What did Mr. Stocker tell you?

A. He said that they went to the apartments and

Tori got him from his house to go over there, and that he was waiting for him. And that he got him -- I think with a fire poker or something. And he hit him in the head. And then he said they took him to a lake or something, and they had to get a box to carry him out of there with.

Q. So they mentioned a lake and they had to have a box to carry him out?

A. Uh-huh.

Q. Did he say anything else?

A. He told me about some people kicking him around and putting a gun in his mouth and stuff like that. I don't remember.

Q. Did he say who else was involved?

A. No.

Q. You don't remember any other names mentioned?

A. No, I --

Q. Okay. And Miss Garcia was with him then?

A. Yes.

Q. Did Miss Garcia talk to you about it as well? Or did she just hear him talking about it?

A. She wasn't saying much. She was real upset about the whole thing.

Q. How about Mr. Stocker? Was he upset?

A. No, we were both talking about it and uh --

Q. Did -- had Mr. Stocker had any problems with Mr. Kimberlin before this?

MR. WATKINS: I'm going to object until he lays a predicate as to his personal knowledge.

MR. FARREN: I'll ask it differently, Your Honor.

Q. By Mr. Farren) Had you ever talked to Mr. Stocker or Mr. Kimberlin or other people in that group about whether Mr. Stocker had been cut off for some reason from getting narcotics from Mr. Kimberlin?

A. Not until later on after everything happened.

Q. Okay. When you did talk to someone do you remember who?

A. I talked to Destry, I talked Craig, Chad.

Q. What did they tell you about the problem?

A. Just that he owed them money, and he was making it seem like everybody else owed the money and not him.

Q. How upset was Guinn when he was telling you about this? Do you remember visiting with us earlier about that?

A. Yes. She was -- we were kind of laughing back and forth about the deal. And she had tried to laugh, and then she would have to hold herself from throwing up.

Q. So she was throwing up as she was hearing this?

A. She was holding it down but she was really upset about it.

Q. Now, you and Mr. Stocker didn't particularly care for Mr. Pool, did you?

A. No.

Q. Why not?

A. I just knew him as the enemy, because Chad and him were enemies. And Ray and Josh were enemies. That is the -- all I really knew.

Q. Did you ever come into contact, personally come into contact with Mr. Pool at his house? Were you ever there?

A. In January, I was there.

Q. And was he there alone or were there other people there?

A. He was there with a Spanish guy. I think he was a Texas Syndicate guy.

Q. Now, do you know a Rocky Bustos?

A. Yes.

Q. Did part of your feelings about Mr. Pool arise from something you learned about Mr. Bustos?

A. It was later on when I learned about that.

Q. Okay. What did you learn?

MR. WATKINS: I'm going to object as to what he learned, hearing about what he has learned from someone named Rocky Bustos as hearsay.

MR. FARREN: We're not offering it for the truth of the matter asserted, merely that he heard it and it created an opinion in his mind. It may have been true. It may not have been true, but it still had an impact about how he felt about Mr. Pool. We're not suggesting that it even is true.

THE COURT: Let me hear the answer and then I'll rule.

MR. FARREN: All right, sir.

Q. By Mr. Farren) You didn't particularly like Mr. Pool. Correct?

A. Right.

Q. What did you learn from Mr. Bustos about something Mr. Pool had in mind for you?

A. He offered Rocky Bustos $10,000.00 to kill either Chad and I, or Josh and Chad.

MR. WATKINS: Your Honor, I'm going to renew my objection as hearsay.

MR. FARREN: May I -- may I elaborate just a bit more and you can rule one way or the other?

THE COURT: Yes, go ahead.

Q. By Mr. Farren) You don't know if that is

true, do you, sir?

A. No, I do not.

Q. You just know that is what you were told?

A. Yes.

Q. And did that have an impact about how you felt about Mr. Pool?

A. Yes.

Q. Okay. Now, you understand, Mr. Bustos may not have known that for sure. He may have just been spreading rumors?

A. Right.

THE COURT: I'm going to allow that hearsay. That's not for the truth of the matter, and I'll allow it.

Q. By Mr. Farren) Did you know of other people, the other people who had had problems with Mr. Pool, these kinds of threats and things?

A. Just Josh and Chad had problems with Dustin back and forth.

Q. Had they told you about having problems with him?

A. I witnessed a phone call where Dustin was leaving messages about going to war and he was on Chad's cell phone.

Q. Did you know Josh Bledsoe?

A. I've never met him, no.
Q. So you didn't know him?
A. No.
Q. Now, you first learned about what happened to Mr. Pool when Mr. Stocker told you in Miss Garcia's presence?
A. Yes.
Q. Did you know anything from Mr. Stocker or anybody else in that group about some, specifically why there were problems between Stocker and Pool?
A. Chad had told me that the problems started because they fronted some -- Ray and Dustin fronted them some drugs, and they weren't any good. So they didn't pay for them and that caused a problem between them.
Q. So in their opinion, they weren't pure quality so they just didn't want to pay it?
A. Right.
Q. But Mr. Pool and Mr. Placensio didn't like that?
A. Right.
MR. FARREN: Pass the witness, Your Honor.

CROSS EXAMINATION

BY MR. WATKINS:

Q. Mr. Eason, my name is Mike Watkins. I don't

believe we've ever met, have we?
A. No.
Q. Okay. Now, were you pretty close with Destry?
A. I had only met him a few times before all of this happened. I wasn't that close with him, no.
Q. I'm sorry?
A. I wasn't that close with him, no, I met him a few times.
Q. But you were pretty close with Chad Spanel?
A. Yes.
Q. And I think you called him "Spoon"?
A. "Spoon".
Q. Okay. Now, you said that he came home during this meeting in which Destry and Brook and Guinn and Josh were all at, and he was mad so he locked himself in his room?
A. Yes.
Q. Do you know what he was mad about?
A. He was probably mad at me because I got his surveillance cameras that night.
Q. What did he have surveillance cameras for?
A. So nobody would steal his vehicle.
Q. Were you living in the house with him?
A. Yes.
Q. Were y'all dealing drugs out of the house?

A. No, I was just doing drugs.
Q. Just doing them?
A. I had a good job, so I didn't deal drugs at the time.
Q. And what kind of job did you have?
A. At the post office.
Q. Okay. Now, you said that y'all laid down. You and Destry laid down in the van. Is this like one of those custom vans with plush seats and a bench and that kind of stuff in it?
A. If I remember right it had the two bucket seats, I guess you call them, the single seats, and then it had the big one in the back.
Q. Okay. Where did you lay down?
A. Between -- behind them seats and before you get to the back.
Q. Okay.
A. Where the back seat is right there, our heads were on the back seat.
Q. Okay. The two of you together?
A. Yes.
Q. So it was pretty tight quarters?
A. Yes.
Q. Okay. And this gun accidentally went off?
A. Yes.

Q. At least you think it was an accident?
A. I hope so, yes.
Q. Okay. And you got hit one time?
A. Yes.
Q. Now, if Destry had testified that there were -- it expended nine rounds?
A. Okay.
Q. Would you believe that to be true?
A. My ears were ringing so long that could be true, yes, that was pretty close.
Q. All right. Which direction was the gun pointed in the car like --
A. Facing downward. My foot was right here and he was going down, and it was always at a downward angle towards the bottom of the pavement, I guess.
Q. Okay. Now, did this -- did it go through, the other bullets go through the vehicle?
A. They said they saw at least one that went all the way through to the --
Q. Okay. Your ears were ringing, so I assume that means it was pretty loud?
A. Yes.
Q. Destry at first wouldn't let you get out of the car. Is that correct?
A. Yes, sir.

Q. I assume you were bleeding?
A. Yes.
Q. Did you wrap your foot in something or --
A. No.
Q. Just finally got out of the car and started walking?
A. Yes, sir. I was hopping from car to car and I got a shopping cart, and I hopped until they picked me up.
Q. Okay. And "they" would be Josh and Brook?
A. Yes, sir.
Q. Were there other cars in the parking lot at Wal-Mart?
A. Yes.
Q. And did anyone look at you, did anyone offer to help you?
A. No, I tried to make it where nothing was wrong. I seen a couple of people look at me like when I got out of the van, but I just kind of hopped along the car, tried not to look obvious about it.
Q. Okay. Now, Destry told us that there was a car right next to the van, that when the gunshots went off they peeled out of there. Do you remember that car?
A. I remember two women looking around kind of scared because they were right next to us. I don't

remember if they took off. I remember landing on that car so they might have took off after I left.

Q. Okay. Now, in your statement, you said that Destry told you that Frank nearly got sick over handling the body?

A. Yes, that's what he told me.

Q. That's what Destry told you?

A. Yes.

Q. Did Destry tell you why he was getting sick? Was it the smell?

A. Just because it was kind of a spooky deal, they had the body. It was dark and it was stiff, and they dropped him and -- it was stiff and just --

Q. He told you they dropped him?

A. Yes, that's what he told me.

Q. Did he tell you any specifics on that?

A. About dropping him? No, they just unloaded him and they dropped him. That's all they told me.

Q. Did Destry tell you where they put him?

A. Yes, in the grain elevator by his house.

Q. Now, when is Destry telling you all of this?

A. It was probably September of 2003.

Q. Okay. So after lots of people had been arrested?

A. Yes.

Q. Okay. And you made your statement five months after Destry told you this?

A. Sounds right.

Q. Okay. And that would be February 24th of 2004?

A. Right.

Q. Okay. How did you feel about giving a statement to the police?

A. Well, they came and arrested me for some traffic tickets. They came to my house and my girlfriend answered the door. And I was changing one of the babies and they came in there and got me, and they took me to the police station. And they already told me most of what they knew -- what everybody had told them about me and everything. So I was in there for a little bit and then I went to jail.

Q. Okay. Were you offered anything? Any help for your testimony?

A. No.

Q. So it's coincidental that your theft by check charge was pled about a week later to probation?

A. I had already been in jail for a month, I think. And the month before Destry told me that I was in jail for the hot checks. And that time I was in jail for parking tickets or speeding tickets or something

like that.

Q. Okay. Do you remember pleading and receiving probation?

A. Yes.

Q. On a theft charge?

A. Yes.

Q. Check charge?

A. Yes.

Q. Okay. And that -- you got that probation on March 8th of 2004. Correct?

A. Right.

Q. And that was here in Randall County?

A. Yes.

Q. Okay. Oh, I think -- one last thing. You said that you and Stocker were laughing and joking about what all had happened with Pool. And Guinn was so upset she was getting ill?

A. Yes.

Q. Okay. Now, y'all were doing dope. Right?

A. Yes.

Q. Okay. Did you do all the dope that they brought over?

A. No.

Q. How much dope was brought over?

A. Just by guessing, I would say somewhere

between a quarter of a pound and a pound.

Q. Okay. Now, we heard testimony earlier that that would be worth like $2,000.00 to $9,000.00, depending on where in that range it is. Is that about right?

A. Yes, that sounds right.

Q. Okay. That is a lot of dope, isn't it?

A. Yes.

Q. Okay. Now, when Destry came around telling you --

MR. WATKINS: Pass the witness.

REDIRECT EXAMINATION

BY MR. FARREN:

Q. Earlier, you indicated that you had heard from Mr. Stocker about taking him to the lake, taking Pool to the lake. Do you recall that?

A. Yes.

Q. In fact, he claimed they dumped him in the lake, didn't they?

A. Somewhere in New Mexico. That's just where he told me, yes.

Q. And when you testified a few moments ago, do you remember testifying that you learned from Destry they actually buried him in a grain silo?

A. Yes.

Q. So then you knew what Stocker told you about the lake, that part wasn't true?
A. Right.
Q. Okay. Destry talked about a lake, as well, but not a lake in New Mexico?
A. Right.
Q. What lake did he talk about?
A. I couldn't be sure, I think it was Meredith.
Q. Okay. And did he talk about a lake house?
A. Yes, sir.
Q. What did he say about this lake house?
A. He said they waited there for a while and they kept getting impatient. And I can't remember if they broke the glass to get in or if they just waited there.
Q. So he talked to you something about breaking a glass at the lake house?
A. Yes, to open the door.
Q. Okay. Did he indicate -- did he ever mention the name Bledsoe to you?
A. Yes. Because they were using Bledsoe's vehicle to drive the body.
Q. And did he tell you anything about -- when he mentioned Bledsoe was Stocker also with Bledsoe?
A. He didn't -- -- I don't remember him mentioning that they were together.

Q. Okay. At any rate, did he mention anything about Mr. Bledsoe taking off with the body or taking off?
A. Taking off, because he didn't want nothing more to do with it. He was freaking out or whatever.
Q. Now, when that happened, did Destry indicate what the response was? What do we do now that Mr. Bledsoe is taking off?
A. He said that's when they called Craig.
Q. So they called Mr. Kimberlin?
A. Yes.
Q. And after they called Mr. Kimberlin, do you remember what he said happened after that?
A. Just that they drove the body to the elevators. And I don't remember if they went to pick up supplies to bury him or --
Q. Who did he indicate -- who did Destry indicate was with him when they put the body in the grain elevator?
A. Craig, and himself, and Chacon, Frank Chacon.
MR. FARREN: May I approach the witness, Your Honor?
THE COURT: Yes.
Q. By Mr. Farren) I just want you to clarify for me, because if you would read the first -- about three

sentences in this part of your statement, starting from there (pointing)?

A. Right.

Q. Read the last sentence here and about the first three sentences there, please. Just to yourself, not out loud.

A. Okay.

Q. Now, when Mr. Stocker was telling you about what had happened, and Ms. Garcia was not feeling well, this was when he was telling you about what they had done to Mr. Pool. Is that correct?

A. Yes.

Q. And then according to your statement, the next person you talked to about this was Mr. Keeling?

A. Yes.

Q. And would you agree that Mr. Keeling said they had taken him to the Lake Meredith, that is the lake house?

A. Yes.

Q. Okay. Well, is the "they" there, the same as the "they" you were talking about earlier when you were talking about "they" had done something to Mr. Pool?

A. I would assume so. I didn't see anybody until the next day, so I mean, if the same people were involved then they would be together the whole time,

except for Josh, who took off, Bledsoe.

Q. And you mentioned something about the body being stiff when they were putting him in the silo? Is that correct?

A. Yes.

Q. Did Destry tell you anything that Mr. Kimberlin wanted him to do after the body was in the silo?

A. Check up on the elevator every day.

Q. So he was to check on it, make sure nobody was finding out where --

A. Make sure nobody was snooping around the elevator.

MR. FARREN: Pass the witness. Oh, I'm sorry. May I real quickly?

Q. By Mr. Farren) How long were you -- how long were you incapacitated as a result of the gunshot wound?

A. I was on crutches for four months and a moon boot for two months after that.

Q. So it messed up your foot pretty good then?

A. Yes.

MR. FARREN: Pass the witness.

MR. WATKINS: Pass the witness.

THE COURT: You may step down, sir. Thank you. Call your next witness.

MR. FOWLER: Omar Mendoza.

(Pause in the proceedings.)

MR. FOWLER: Your, Honor, I think I have a place to keep him. We can go ahead and call Mr. -- Sergeant Crandell, and then we won't have to wait on him.

(Witness sworn.)

THE COURT: Thank you, sir. Sit right there.

Go ahead.

MR. FOWLER: Thank you, Your Honor.

MICHAEL CRANDELL,

Having been first duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. FOWLER:

Q. Would you please state your full name?

A. Michael Allen Crandell.

Q. Sir, where do you work?

A. For the Amarillo Police Department.

Q. What are your job duties there?

A. I'm a forensic technician for the Special Crimes Unit.

Q. Can you tell us what a forensic technician does?

A. Our basic function is to document, collect,

and process, and preserve evidence of all types.

Q. Have you had any special training in those areas?

A. Yes, I have.

Q. Could you tell us a little bit about your credentials and your training in that area?

A. Certainly. I joined the police department September 1st, 1976. The first six years, I worked as a patrol officer, investigating various types of crimes. In 1982, I transferred into the identification unit of the Amarillo Police Department. In addition to the numerous hours of training that I received formally, I also received one-on-one instruction from my supervisors.

I also have completed a minimum of 800 hours plus of formal training, in all areas or all aspects of evidence collection.

Q. Were you assigned to the Special Crimes Unit back in March of 2003?

A. Yes, sir.

Q. And were you assigned to work on a homicide involving Dustin Pool?

A. Yes, sir.

Q. As part of your job duties, did you witness Miss Tori Patrick give Sergeant Mark Brown consent to

search her apartment?
A. Yes, I did.
Q. After you witnessed Miss Patrick give consent to search her apartment, what did you do?
A. I got her keys for the apartment from her, and then went to the apartment preparing to search the apartment.
Q. Okay. Did anybody else go with you to Ms. Patrick's apartment?
A. Yes, sir.
Q. Who else?
A. Sergeant James Burgess.
Q. And where was Ms. Patrick's apartment located?
A. I have to check my notes. The apartment was 6041 I-40 West, Building G, Apartment 373.
Q. And is that at the River Falls apartment complex?
A. I believe it is, yes, sir.
Q. Did you make entry into her apartment?
A. Yes, I did.
Q. And what did you first notice?
A. Immediately noticeable in the living room was a lack of furniture, and several large stains on the carpet, which appeared to be bleach stains.
Q. Okay. And did you make any other initial

observations?

A. Yes, sir.

Q. What were those?

A. There was a section of the carpet about two feet by one foot that had -- that appeared to have been patched on the south wall of the living room.

Q. Okay. Did you further investigate to see where that patch had come from?

A. Yes, sir.

Q. And what did you determine?

A. We determined that the patch of carpet had apparently come from one of the bedroom closets where it had been cut from the closet carpet and moved to the living room carpet.

Q. Was that patch -- had it actually been secured to the carpet that was around it?

A. Yes, it had.

Q. Could you determine what had been secured with?

A. It appeared to be hot metal glue.

Q. Okay. When you noticed that patch, what did you do?

A. First thing, since it was not my case, I pointed out to Sergeant Burgess and from that point on, we took a -- what we call a forensic light source, and

examined the area around the carpet.

Q. Can you tell the jury a little bit about how this forensic light source works?

A. Certainly. A forensic light source puts out a beam, if you will, of highly intensified single color lights. Using different filters or different color glasses, you can see items that are fluorescent or different wavelengths of light. We use that forensic light source, we search for hair, bodily fluid stains, things like that.

Q. When you perform -- when you used this forensic light source, what did you notice about the apartment?

A. About the apartment?

Q. Yes, or did you find anything when you used this light source?

A. I believe Sergeant Burgess found several hairs in the carpet that he collected.

Q. And Sergeant, would it be fair to say that Sergeant Burgess was the lead ID technician on this case?

A. Yes, sir.

Q. After you used the light source, what else did you and Sergeant Burgess do while you were in there?

A. I was assigned to draw a diagram of the scene

and do a search of the entire apartment.

Q. Okay. And how did you go about drawing a diagram of the scene?

A. Basically, we start with a fixed reference point which could -- in this case would be one corner of the apartment, and make a rough sketch of what is there, the different sizes of rooms, entirely down to that fixed reference point.

Q. Okay.

MR. FOWLER: Your Honor, may I approach the witness?

THE COURT: Yes.

Q. By Mr. Fowler) Sergeant, I want to show you what's been marked as State's Exhibit No. 270. Do you recognize that?

A. Yes, sir.

Q. What is it?

A. This is a crime scene sketch of the Patrick apartment.

Q. Okay. And are the table and chairs in this diagram as you found them that day that you went in there?

A. Yes, sir.

Q. Now, there are some measurements on here. Did you take the measurements?

A. Yes, I did.

Q. Now, it says "not to scale" on the diagram. What does that mean?

A. That simply means that the measurements are only a representation of the actual -- the measurements on the sketch are accurate. However, they're only a representation of the actual measurements as would appear on a scale drawing of the apartment.

MR. FOWLER: Your Honor, upon tendering to opposing counsel, the State would offer what I've marked as 270.

MR. WATKINS: No objection.

THE COURT: State's 270 is admitted.

MR. FOWLER: Your Honor, may I approach the witness?

THE COURT: Yes.

Q. By Mr. Fowler) Sergeant Crandell, I want to show you what has been marked as 242. Is that the same diagram that's in State's 270 that was just admitted?

A. Yes, sir.

Q. And can you approximately point out to us where you noticed the carpet that had been patched in the living room?

A. Yes, sir. This would be the front door of the apartment as you go in. This area on the left-hand side

would be the living room area. The patch area appeared to be right over in here in front of what would be the couch. I'm sorry, did you say stains also?

Q. Yes, sir. Go ahead.

A. There were several stains around the patched area. Also, a large stain, a bleached stain in that door right there.

Q. Okay. And the carpet that was cut out from the bedroom closet, can you point that -- where the hole was there?

A. Yes, sir. The carpet was cut from this area of this closet.

Q. Okay. Thank you. Now, we have been using this for other purposes, and there was not a couch nor love seat in the apartment when you made entry?

A. That is correct.

Q. Okay. Thank you. Did you also search other areas of the apartment besides the living room?

A. Yes, I did.

Q. Did you find anything of interest?

A. Yes, I did.

Q. What did you find?

A. In the kitchen trash can, I found a black men's wallet, and also discovered several containers of bleach and stain remover in the kitchen cabinets and the

living room closet.

Q. Sergeant, I want to show you 225 that has been admitted into evidence. Is this the trash can that you were discussing with us earlier where you found the men's wallet?

A. Yes, sir.

MR. FOWLER: Your Honor, may I approach the witness?

THE COURT: Yes, sir.

Q. By Mr. Fowler) Sergeant, I want to show you what has been marked as State's Exhibit No. 17. Do you recognize that?

A. Yes, sir.

Q. What is it?

A. This is the wallet that I found in the trash can.

Q. Okay. And attached to State's 17, do you recognize those pieces of paper?

A. Yes, sir.

Q. And what are they?

A. These are the pieces of paper that were inside of the wallet. The first one is an agreement for travel privileges for Joshua Stocker. And the second is a handwritten transfer of title for a 1992 Toyota pickup to Josh Stocker.

Q. And is this in the same or similar condition as when you took it back in late March of 2003?

A. Yes, sir.

Q. Sergeant Crandell, I want to show you what's been admitted into evidence as State's Exhibit 226. When you removed the wallet from the trash can, I -- did you empty the contents and put it on the counter top and photograph that?

A. Yes, I did.

MR. FOWLER: Your Honor, upon tendering to opposing counsel, the State would offer what is marked as State's No. 17.

MR. WATKINS: Are the two pieces also part of 17?

MR. FOWLER: Yes.

MR. WATKINS: No objection.

THE COURT: Let me see it. State's 17 is admitted.

Q. By Mr. Fowler) Did you seize or collect any other evidence there at Ms. Patrick's apartment?

A. Yes, I did.

Q. What else did you collect?

A. I say "we", as in me and Sergeant Burgess, collected the top layer of the carpet, the carpet padding underneath it, and all of the containers of

bleach and stain remover that we found.

Q. Okay.

MR. FOWLER: Your Honor, may I approach the witness?

THE COURT: Yes, sir.

Q. By Mr. Fowler) Sergeant, I want to show you what has been marked as State's Exhibit No. 17 -- 18, I'm sorry. Do you recognize that?

A. Yes, sir.

Q. What is it?

A. It's a piece of the carpet padding that was removed from the concrete underneath the patched carpet, in the living room of the Patrick apartment.

Q. Again, referring to State's Exhibit No. 242, can you point out for us where State's Exhibit 18 came from?

A. In this area where the couch is present now, on the west end, which would be this end of the large patch.

Q. Okay. What, in particular, about State's 18 led you to go ahead and collect it?

A. It was stained with a dark brown colored -- what appeared to be blood, dried blood.

Q. And did you notice this using the alternative light source or --

A. No, sir.

Q. Under normal conditions?

A. That was under normal conditions.

Q. Now, after you collected State's Exhibit No. 18, what do you do with it once you collect it?

A. I turned everything that I collected over to Sergeant Burgess.

Q. And eventually -- or do you know if State's Exhibit No. 18 got sent to the DPS lab in Lubbock, Texas?

A. I don't have any knowledge of that, sir.

Q. Does Sergeant Burgess handle the submission of evidence to the DPS lab in Lubbock?

A. Yes, sir.

MR. FOWLER: Your Honor, upon tendering to opposing counsel, we would offer State's Exhibit No. 18.

MR. WATKINS: Your Honor, we would object to 18, since there is no further testimony as to what this actually is or what it may -- the stain is. It has no evidentiary value at this time.

MR. FOWLER: Judge, I believe there are photographs of State's 18 and the surrounding area already into evidence.

THE COURT: Overruled. State's 18 is

admitted. Can I see it, please?

Q. By Mr. Fowler) Sergeant Crandell, did you make a videotape of the scene at Tori Patrick's apartment?

A. Yes, I did.

Q. Can you tell us when the time frame was when you made the videotape?

A. We entered the apartment at about 2:00 in the afternoon. After the cursory search that we made, it probably would have been 30 minutes to an hour after that.

Q. And was the videotape made on a machine or a device that is capable of making accurate recordings?

A. Yes, sir.

Q. And once you videotaped Tori Patrick's apartment, did you turn that videotape over to Sergeant Burgess?

A. Yes, sir.

Q. Did you notice anything in particular about the fireplace equipment set that was in Miss Patrick's apartment?

A. Yes, sir.

Q. What did you notice?

A. The fireplace equipment was on a stand. It had places for three fireplace utensils. One of the

fireplace utensils was missing and could not be found anywhere in the apartment.

Q. Okay. And do you remember which fireplace utensils were present and which one was missing?

A. Yes, sir. The two fireplace utensils that were there were a shovel and a small broom. The fireplace poker was missing.

Q. Now, you also went with Sergeant Burgess to Mike Elliston's farm in Carson County in June of 2003?

A. Yes, sir.

Q. And is it also the same situation, Sergeant Burgess was the lead ID tech at that scene, as well?

A. Yes, sir.

MR. FOWLER: Your Honor, may I publish State's 17 and 18 to the jury?

THE COURT: Yes, sir.

MR. FOWLER: We pass the witness, Your Honor.

CROSS EXAMINATION

BY MR. WATKINS:

Q. Hi, Sergeant Crandell. How are you?

A. Fine, sir.

Q. A couple of quick questions. I want to go to this billfold that you found in the trash can. You saw a picture up here a few minutes ago of the trash can?

A. Yes, sir.

Q. Was that taken before or after you had found the billfold?

A. It was taken before.

Q. Okay. And where within the trash can was the billfold?

A. It was down near the bottom.

Q. Down near the bottom?

A. Yes, sir.

Q. Also contained in the billfold were -- or in the trash can, I'm sorry, were both empty bottles of bleach and Energine and stuff like that. Right?

A. Yes, sir.

Q. And did you collect those?

A. Yes, sir.

MR. WATKINS: May I have just a moment, Your Honor?

THE COURT: Yes, sir.

Q. By Mr. Watkins) Now, Sergeant, I'm looking at the evidence log, items collected from 6040 I-40 West, and it seems to me like all the bleach bottles and things like that came from under the sink or in a closet.

A. I don't recall exactly where each one of the bottles came from.

Q. Would it help if I show you the evidence log?
A. I didn't make the evidence log, sir.
Q. Okay. So it wouldn't help?
A. Not really.
Q. Okay. You distinctly, though, remember collecting trash out of the trash can that included cleaning supplies and stuff like that?
A. As I said, I don't remember where each bottle came from. I do know that there were stain remover bottles and bleach bottles underneath the kitchen counter tops and in the living room closet. I cannot remember if there was anything other than a wallet and other small items of trash in the trash can.
Q. Okay. All right. Now, whenever you first got up there, you said that part of your duties as a -- I think you said you were an ID tech. Is that correct?
A. That would be close enough, yes, sir.
Q. Okay. Just so I get it right, what did you say?
A. Probably forensics tech.
Q. Forensics tech?
A. We're known by several different names.
Q. Okay. You said that your -- one of your jobs was to collect relevant evidence. Is that correct?
A. It was to collect evidence, yes, sir.

Q. Collect evidence, in general?
A. Yes, sir.
Q. Okay. So you collect both relevant and irrelevant evidence?
A. At the time, we do not know what is relevant and what is not.
Q. Okay. Now, in this case, you -- did you have an opportunity to ever see the body at the autopsy or anything?
A. No, sir.
Q. Okay. So you didn't have an opportunity at that time at the autopsy to collect any entomological evidence because you weren't there?
A. That is correct, sir.
Q. Do you remember a day in June when my co-counsel and I came to Special Crimes?
A. Yes, I do.
Q. Okay. And we brought someone who collected some entomological evidence?
A. Yes, sir.
Q. And do you remember who we brought?
A. Yes.
Q. What was his name?
A. Dr. Neal Haskell.
Q. And were you familiar with Dr. Haskell?

A. Yes.
Q. How were you familiar with him?
A. I attended a conference in which he gave a presentation on entomology.
Q. Okay. And during that presentation, did he tell you how -- the proper method to collect these little bugs?
A. He briefly went over some aspects of collection, like I said, it was a conference and he only had a short period of time.
Q. Okay. Have you had other conferences and other training on how to collect this kind of evidence?
A. No, sir.
Q. Okay. Now, during the time that we were there, did you see Dr. Haskell collect some evidence?
A. Yes, I did.
Q. And what procedure did he follow to collect the evidence?
A. He first labeled a sterile vial with the specimen, placed the label inside of the vial, filled it with Isopropol alcohol, and collected the specimen with tweezers and placed each specimen into the sterile vials and sealed it.
Q. Okay. And you watched him collect this evidence off of several pieces of other evidence. Is

that correct?

A. Yes, sir.

Q. Okay. As a matter of fact, it was pieces that we specifically asked you to pull out so that he could see?

A. Yes, sir.

Q. Okay. And did you see any problems with his collection technique based on what you knew?

A. Based on my standards of evidence collection, I would have changed gloves after each specimen. When a -- one specimen had dropped off of a piece evidence, it was not immediately picked up. Another piece of evidence -- or another specimen was collected at the same time as that piece of evidence was. Those were the only problems that I could see about his evidence collection techniques.

Q. Okay. On the one piece of evidence that fell off of another piece of evidence, that was actually photographed, was it not?

A. Yes, sir.

Q. Okay. And it was collected into a separate bottle, was it not?

A. Yes, sir.

Q. And labeled as one that had fallen off of the piece of evidence?

A. Yes, sir.
Q. Okay. And do you believe that that would be the proper way to identify what had happened?
A. What had happened?
Q. Yeah. You said that it fell off of a piece of evidence having not been collected.
A. Yes, sir.
Q. And that he then collected it, you photographed it, if I'm not mistaken?
A. That is correct.
Q. And was that the proper remedial step to take?
A. Probably, yes, sir.
Q. Okay.
MR. WATKINS: Pass the witness.

REDIRECT EXAMINATION

BY MR. FOWLER:

Q. Sergeant Crandell, this Dr. Haskell that came to your lab, you said he didn't use gloves?
A. Well, he did use gloves, yes, sir.
Q. What were your concerns about the way he used gloves?
A. He did not change gloves in between each specimen.
Q. Why did that cause you some concern?
A. Because of the bacteriological and possible

contamination of other DNA.

Q. And do you also remember on that day it was rather stuffy in the lab?

A. Yes, sir, it was.

Q. And Mr. Haskell is a fairly heavyset man. Is that right?

A. Yes, sir.

Q. And do you remember him sweating very profusely that day?

A. I didn't notice it.

Q. And Mr. Farren and myself were there. Is that correct?

A. Yes, sir.

Q. And we missed -- when Dr. Haskell collected some of the specimens, would he pour it into a pan?

A. Yes, sir.

Q. Okay. Where did he get that pan?

A. I supplied him with the pan from our lab.

Q. And what was that pan usually used for?

A. Photo chemicals.

Q. And did he pour the -- did he -- when he looked at different pieces of evidence, would he pour the specimens that he needed into the same pan time after time after time?

A. Yes, sir.

Q. And you mentioned with Mr. Watkins that he even looked at a piece of evidence and some specimens actually fell on the table. Is that correct?

A. That is correct.

MR. FOWLER: Just a moment, Your Honor. Your Honor, may I approach the witness?

THE COURT: Yes, sir.

Q. By Mr. Fowler) Sergeant Crandell, I'm handing you a book. Do you recognize that book?

A. Yes, sir, I do.

Q. Well, what is it?

A. This is a copy of Dr. Haskell's book on entomology.

Q. And is that your copy of the book?

A. Yes, it is.

Q. Okay. Does it say anywhere in there about collecting specimens two years after the death?

A. I read through it, and I don't remember anything about a time on -- in the book.

Q. Isn't it correct that chapter five mentions collecting the specimens at the autopsy, at the death scene?

MR. WATKINS: I'm going to object to him testifying about what is in the book. That would be hearsay.

MR. FOWLER: Judge, I assume they're going to tender Dr. Haskell as an expert witness, and I believe we're allowed to go into some of the treatises that he has written in this area.

THE COURT: I don't see any harm in it. I'll overrule the objection.

THE WITNESS: Yes, chapter five is titled, Collection of Entomological Evidence at the Death Scene.

Q. And what is chapter six?

A. Chapter six is Entomological Collection Techniques at Autopsy and for Specific Environments.

Q. And does he list -- is there any chapters listed about collecting specimens two years at a location other than the autopsy or death scene?

A. I don't remember anything in there.

MR. FOWLER: Your Honor, I pass the witness.

RECROSS EXAMINATION

BY MR. WATKINS:

Q. The items that Dr. Haskell collected, were they collected from items that had been preserved in evidence in this case?

A. Yes, sir.

Q. Okay. Had most of those items been collected

and stored in a freezer?

A. That's correct, sir.

Q. And is the idea behind storing evidence in a freezer to protect biological evidence?

A. Yes, sir.

MR. WATKINS: No further questions.

THE COURT: You may step down, sir. Thank you. Call your next witness.

MR. FARREN: State calls Brook Vandergriff, Your Honor.

(Witness sworn.)

BROOK VANDERGRIFF,

Having been first duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. FARREN:

Q. Would you state your name for the jury, please.

A. Brook Vandergriff.

Q. And Ms. Vandergriff, you live here in the Amarillo area. You don't have to give us an exact address, but you're in the Amarillo area?

A. Yes.

Q. You're going to have to speak up a little. I know this is difficult for you. And that microphone is -- and have you lived in the Amarillo area most of your

life?
A. Yes.
Q. You grew up here?
A. I grew up in Borger.
Q. Grew up in Borger? Do you know Josh Stocker?
A. Yes.
Q. How do you know Josh Stocker?
A. We were common law married.
Q. You and Mr. Stocker were together for how long?
A. On and off about five years.
Q. Okay. And you still care about him, don't you?
A. Yes.
Q. And this is difficult for you, isn't it?
A. (Witness nods head up and down.)
Q. And I understand that. And if we need to pause from time to time, you let me know, okay? Is there some Kleenex there?
A. (Witness nods head up and down.)
Q. How did you meet Mr. Stocker?
A. When I moved back from college, we met at Speeds, the Pool Hall.
Q. Where were you going to school?
A. In Liberal, Kansas.

Q. Would you agree Mr. Stocker has on kind of an off green shirt and a tie, no coat, sitting at counsel table?

A. Yes.

MR. FARREN: Again, I --

THE COURT: The record will reflect she has identified the Defendant.

MR. FARREN: Thank you, Your Honor.

Q. By Mr. Farren) When you met Mr. Stocker, had you ever been involved in any -- in the use of methamphetamines at all?

A. Once or twice, when I was like 17.

Q. Okay. But it wasn't a regular practice?

A. No.

Q. Do you -- was Mr. Stocker using methamphetamines when you met him?

A. No.

Q. Did the time come when both of you, however, were using methamphetamines?

A. Yes.

Q. Now, do you know Stephen Craig Kimberlin?

A. Yes.

Q. How did you get to know Mr. Kimberlin?

A. We just -- Josh introduced me to him. I had been to his house a couple -- more than a couple of

times.

Q. Did you know Jessica Kimberlin?

A. Yes.

Q. Did you and Mrs. Kimberlin socialize together?

A. Yes.

Q. And were you aware by that time that Mr. Stocker was part of a group that Mr. Kimberlin sort of supervised, or organized that involved distribution of methamphetamines?

A. Yeah, it was later in our relationship, about two years into it.

Q. Okay. That -- so it was a couple of years before you felt like he was really involved with this group?

A. Yes.

Q. I want to direct your attention to about February of 2003. Do you recall being at Mr. Kimberlin's house on Success Street in early February of 2003?

A. Yes.

Q. Do you remember any other people who were there?

A. Josh Bledsoe, Frank Chacon, Destry Keeling, Jessica Kimberlin.

Q. Now, were you and Jessica in the same room

with all the guys or were you in a different room?
A. Me and Jessica were in the living room.
Q. But could you hear some of the things going on in the other room?
A. Yes.
Q. So these two rooms were adjacent to each other?
A. Yes.
Q. And you could hear what was being said?
A. Some of it, yes.
Q. And what were they talking about in the other room? Who were they talking about?
A. Dustin Pool.
Q. And what were they saying about Mr. Pool?
A. I believe it was Bledsoe was saying -- talking about money, about getting rid of Dustin Pool. And Craig Kimberlin said that he was a snitch, and a snitch deserves to be gutted like a fish.
Q. So a snitch deserves to be gutted like a fish, and Mr. Bledsoe is talking about money in connection with getting rid of Dustin Pool?
A. Yes.
Q. Could you tell why Mr. Kimberlin was upset? Just at this snitch comment?
A. Just, I don't know for sure why. Just -- I

know there were some threats made by Dustin Pool towards his family.

Q. Now, on the way home from this gathering at Mr. Kimberlin's house, did Mr. Stocker tell you anything else about what was said in the meeting?

A. That Bledsoe put up $10,000.00 to have Dustin Pool killed.

Q. And you indicated that Mr. Stocker called Mr. Pool after this?

A. Yes.

Q. Okay. Do you know that? Or did he tell you that?

A. I was there when he called.

Q. Were -- why did he call Mr. Pool?

A. To warn him that they were going to kill him.

Q. Did that worry you that he is calling Mr. Pool?

A. They all talked big. I didn't think anything would ever come of it.

Q. Well, I understand. But if Mr. Kimberlin is that upset and Mr. Bledsoe is talking about, you know, we're talking about gutting him like a fish, and Mr. Bledsoe is putting up money to have him killed, and these are Mr. Stocker's friends and associates, did it worry you that he is calling this very man that they

were wanting to do away with? What if it got back to him?

A. I was pretty much worried the whole time.

Q. Okay. So it did concern you?

A. Yes.

Q. Was there some connection between Mr. Stocker and Mr. Pool?

A. Other than they were -- were on separate teams?

Q. Uh-huh.

A. No, not --

Q. Were they always on separate teams?

A. Well, I don't really know. I mean --

Q. Do you know if there was ever a time when Mr. Stocker had -- that problems had developed between Mr. Stocker and Mr. Kimberlin, and Mr. Stocker couldn't get any product to sell to make money?

A. They had issues with each other.

Q. Do you know if during that time Mr. Stocker had ever gone to Mr. Pool and tried to go to work for Mr. Pool doing the same thing for him that he had done for Kimberlin?

A. I knew that they met once. But I don't know if it was because he was trying to go work for him.

Q. Okay. Do you know if that had anything to do

with making some calls to Mr. Pool after this meeting where he was going to get gutted like a fish or killed?

A. I'm sorry. I didn't --

Q. Let me rephrase. You had been at a meeting where you heard those things that we've already reiterated, bad things about Pool. It prompts Mr. Stocker to call him. Do you know if he felt some obligation to call him because he had somehow become connected to him? He had either gone to him and tried to go to work for him, or had gone to work for him?

A. The way I took it at that point, Josh had never really hurt anybody. Someone dying is a big deal. I mean, he is -- he doesn't --

Q. Okay.

A. He wasn't like that.

Q. Okay. Now, you indicate that things died down for a while after that. And then after a few weeks, there was a time when Mr. Stocker, Josh was gone for quite a while. Do you remember that?

A. Yes.

Q. You got really upset, didn't you?

A. Yes.

Q. Because you didn't know what was going on?

A. Yes.

Q. When he came back after being sort of missing

for a while, who was he with?
A. He was with Destry and his wife.
Q. Destry Keeling and Denise?
A. Yes.
Q. Had you met Destry before? Well, you met him at least once. Did you know Denise, his wife?
A. Yes.
Q. Now, when he came back with Destry and Denise, did you and Mr. Stocker talk?
A. Not for very long.
Q. Was it a friendly discussion or an argument?
A. We were arguing.
Q. Okay. What were you arguing about?
A. That I got sick and he took off, and I didn't have a car or food or anything.
Q. You had actually had pneumonia, hadn't you?
A. It was going into pneumonia, yeah.
Q. And then here he disappears and leaves you to fend for yourself, so you're not particularly pleased, are you?
A. No.
Q. Did he indicate where he had been or what he had done during that time he was missing?
A. He said that he went to Wal-Mart. Other than that, he never really told me much.

Q. Did he mention buying a shirt?
A. Yes.
Q. So he was with Destry and his wife. He mentioned being at Wal-Mart and having bought a shirt?
A. Yes.
Q. Now, did you think that offered any explanation for being gone for how long? How long had he been missing?
A. I couldn't tell you how long he was gone.
Q. More than a day?
A. It was about a day, yeah.
Q. Okay. You didn't think it took 24 hours to buy a shirt at Wal-Mart?
A. When we were arguing, I really wasn't asking too much after that.
Q. When Mr. -- when Destry and his wife left, did Mr. Stocker leave with them?
A. Yes.
Q. Do you know why he came back to your place and then left again with them? Did you know why?
A. No.
Q. Okay. Now, of course you've already indicated you are pretty sick. And do you recall what you did after he left?
A. I had locked myself in the bathroom.

Q. Did you finally go to sleep?
A. Yes.
Q. When did you first see Mr. Stocker again?
A. When I woke up the next day.
Q. So the next day you saw him again, how was he behaving then? How did he act?
A. Nervous.
Q. Was he worried?
A. He was worried about Craig.
Q. Why was he worried about Craig, his friend?
A. Because they weren't friends then.
Q. What had happened to end the friendship?
A. Craig was messing with his head. Josh didn't put up with it, and Craig wasn't used to people not putting up with it, because Craig was a bully.
Q. Did he indicate -- you guys needed to go somewhere where Craig wouldn't know where you were?
A. Yes.
Q. And what did you do?
A. We went to my mother's house.
Q. How long did you stay there?
A. About a week, week or two.
Q. When he told you that he was worried about Mr. Kimberlin coming after you guys and that you needed to go somewhere, did he tell you anything about the Dustin

Pool problem?

A. No, not -- he said that, you know, the only thing he told me was that Tori had called Dustin Pool, and that he was going to go over there and talk to Dustin.

Q. Okay. Before we get to that part, you remember giving a statement to Sergeant Brown about these events, Mark Brown with the police department?

A. Yes, sir.

Q. Would it refresh your memory if you were able to look at the statement a moment and about -- what he told you about Mr. Pool?

A. Yes, uh-huh.

MR. FARREN: May I approach the witness, Your Honor?

THE COURT: Yes.

Q. By Mr. Farren) Just to yourself, not out loud, would you read this sentence that I circled here?

A. Okay.

Q. What did he say about Mr. Pool?

A. Just that the Dustin Pool situation was over.

Q. He said the Dustin Pool situation was over. Now, what was the Dustin Pool situation? You have already mentioned Mr. Kimberlin is upset, and there is this meeting. Had there been ongoing problems with Mr.

Pool?

A. Yes, Craig had problems with him making threats, and it was pretty much back and forth.

Q. And now Mr. Stocker says the Dustin Pool situation is over?

A. Yes.

Q. Did he say why? How?

A. No.

Q. Okay. You were about to tell us about a girl named Tori. I want to talk about that in detail, but was it in this context when he is talking about Tori that he told you the Dustin Pool situation is over?

A. I'm sorry?

MR. FARREN: May I approach the witness, Your Honor?

Q. By Mr. Farren) I am going to show you your statement again. You indicated that you looked at this thing, and then immediately you go into this one.

A. I meant, I didn't hear the question.

Q. I'm sorry. Okay. I know that.

A. Sorry.

Q. That is okay. I'll try to speak more slowly and be articulate, because I know that all of us attorneys sometimes get things garbled, and I apologize. When he talked with you about the Dustin Pool -- I think

he said the Dustin Pool thing was over, is that when he began to tell you about this Tori girl?

A. Yes.

Q. What did he tell you about the -- about Tori?

A. That she was going to call or that she had called Dustin Pool. And he was supposed to go to her apartment, and Josh was going to go over there and talk to him.

Q. Okay. So how did he -- he know that Tori had called Pool? How did he learn that? Did he say?

A. He talked to her.

Q. So she told him this?

A. Yes.

Q. Okay.

A. I'm not sure --

Q. All right. I understand. And do you know if he had also talked to Mr. Bledsoe, or he just went over there after he talked to her?

A. He just went over there, as far as I know.

Q. Did he -- what did he say after he got there? What happened?

A. He said that he got there and that Bledsoe had shown up. And Bledsoe was acting kind of crazy, erratic, and he went to the rest room and Josh just left.

Q. So he went there to talk to Mr. Pool. And he told you that Bledsoe arrived and was acting weird and so he left?
A. Yes, he said it got weird.
Q. Later that night did you get a call or -- did you get a call from Craig Kimberlin?
A. Yes.
Q. Why did he call?
A. He was looking for Josh.
Q. And did Josh want to talk to him?
A. No.
Q. Did he -- did Mr. Kimberlin explain to you why he wanted to talk to Josh?
A. All he said was that the money was on the table and Josh had walked away from it. He was mad.
Q. So there was money on the table and Josh just walked away from it. Did he explain anything more about this money?
A. He said that it was split up five ways.
Q. And in -- who got the split? Who had ended -- who were the five who got some of this money?
A. Craig kept two. Bledsoe kept two. And he didn't name the other three.
Q. Was this the money that Bledsoe had supposedly put up for Pool?

A. I assume so.
Q. Okay. Did he explain what he meant when he said Josh, the money was on the table and that Josh wasn't going to get his split, or did he say why?
A. No.
Q. Now, apparently Mr. Kimberlin wanted to meet with you, or with you and Josh about this. Is that correct?
A. Yes, he said if I would meet him he would talk to me about it, but he didn't want to talk on the phone.
Q. So he didn't want to tell you over the phone, but if you meet with him, he'd explain?
A. Yes.
Q. And how did Mr. Stocker respond to that?
A. Hell, no.
Q. He wasn't going to let you meet with him?
A. No.
Q. Did you continue to stay at your mom's place?
A. Yes. For a little bit.
Q. Now, Mr. Stocker had a truck, a vehicle. Is that correct?
A. Yes.
Q. Do you know anything about what he had done with his vehicle at that time?
A. It was -- I'm not sure which vehicle was at my

mom's house. There was -- I think it may have been parked at my mom's house.

Q. Do you remember anything about it being hidden?

A. No, I mean, it was -- we had it hid at my mom's house. I can't remember if we were in the truck or --

Q. Okay. If you indicated in your statement that it was hidden, you just meant it was at your mom's house?

A. Yes.

Q. Okay. That's fine. Do you remember any meetings with Destry Keeling along about this time?

A. Yes.

Q. Did you and Stocker both talk to Destry, or just you?

A. Just me.

Q. Where did you talk with Mr. Keeling?

A. I drove out to his house. We went to a shed that this -- that was behind his house, or I guess in front of his trailer.

Q. And did he want to know where Stocker was?

A. Yes.

Q. Because he thought Stocker was coming to the meeting, didn't he?

A. Yes.
Q. But Josh didn't come, did he?
A. No.
Q. And so what did you tell Mr. Keeling when he wanted to know where Josh was?
A. That he was safe.
Q. Okay. How did he respond to that?
A. He didn't really respond.
Q. Why didn't Stocker want to go to this meeting with Mr. Keeling?
A. He didn't trust them. He thought they were trying to set him up.
Q. Okay. Did he say why -- why did they want to set up Josh?
A. No.
THE COURT: I'm going to call a break here. Ladies and gentlemen, take a quick ten minutes and be back in the jury room at 4:40.
(Recess.)
(Jury seated.)
(All sides, Defendant present.)
THE COURT: Thank you all. Everyone be seated. All right. Mr. Farren.
MR. FARREN: Thank you, Your Honor.
Q. By Mr. Farren) When we took a recess, you

were telling us about a meeting with Destry in which he -- he thought Stocker was going to come but he didn't, so you met with him. And then afterwards you went back and reported the meeting to Josh. Is that correct?

A. Yes.

Q. Now, did he mention anything about what happened to Mr. Pool? Any specifics that you didn't know already, that you hadn't heard about?

A. He said that Bledsoe had stuffed a sock down Pool's mouth and covered it with tape.

Q. So Keeling told you that Bledsoe put a sock in his mouth. Did -- did Keeling claim he was there and saw this, or did he hear this from someone else?

A. I believe he saw it. That is what he implied to me.

Q. So it was your understanding that Mr. Keeling was actually present when that happened?

A. Yes.

Q. Okay. And in addition to the sock, there was tape. Is that correct?

A. Yes.

Q. And did he give you his opinion as to exactly how Mr. Pool died?

A. That he suffocated on his own blood, is what he said.

Q. Now, did Mr. Keeling share with you how Mr. Kimberlin was doing? How was he behaving, because Josh was acting pretty strange. How did Destry indicate Mr. Kimberlin was behaving?

A. Nervous.

Q. Do you remember saying that Kimberlin was going nuts, that Destry said he was going nuts? Do you remember anything about that?

A. Yes.

Q. What did he mean by that, or did Destry explain that to you?

A. He didn't really explain it.

Q. Did he indicate anything about the relationship between Destry and Mr. Bledsoe at this point?

A. Between Kimberlin and Bledsoe? Just that basically he was -- that the body was hid and nobody knew where it was. And he was kind of using it as leverage over Bledsoe.

Q. So he had some leverage over Bledsoe, because he knew where the body was and Bledsoe didn't?

A. Yes.

Q. And that is what Keeling told you?

A. Yes.

Q. Was it your understanding that Mr. Keeling

knew where the body was?

A. Yes.

Q. Okay. So you went back and talked with Josh about what Destry had said. How did Josh respond to that?

A. He didn't trust any of them.

Q. Okay. Now, did you eventually actually talk face to face with Mr. Bledsoe?

A. Yes.

Q. Okay. Where did that happen?

A. It was at a Mexican restaurant in Canyon. I'm not sure of the name.

Q. Were you with Josh? Were the three of you there?

A. Yes.

Q. Okay. And when you met with Mr. Bledsoe, how did Mr. Bledsoe act about what had happened to Mr. Pool?

A. Emotional.

Q. Okay. Do you remember talking about it was -- he told you it was eating him up inside?

A. Yes.

Q. Did he act like it was?

A. Yes.

Q. Okay. Now, you knew that Josh was reluctant to meet with Kimberlin, was worried about Kimberlin

coming after him. How about Mr. Bledsoe? Did he indicate how he felt about Mr. Kimberlin?

A. I got the feeling that he didn't trust him either.

Q. Okay. Did Mr. Bledsoe tell you anything about -- now, Mr. Keeling had already talked to you about the body had been disposed of, but not very many people knew where it was. Did Mr. Bledsoe tell you anything about disposing of the body?

A. Yes.

Q. What did he say?

A. He was nervous that it was going to be linked back to him, because they had buried him with his clothes on, and they just wrapped him up with a blue tarp. There was just too many ways that it could be traced back to him.

Q. So he wasn't happy about the fact that he was just wrapped in this blue tarp?

A. No.

Q. And he indicated his clothes were on?

A. Yes.

Q. Now, are you sure he said his clothes were on, or just worried that they hadn't gotten rid of the clothes?

A. It could be. He just said with his clothes.

Q. So you don't know whether he meant that the clothes were on, or he was just worried about whether someone had disposed of the clothes appropriately?

A. Right.

Q. In your meeting with Mr. Bledsoe, did he say anything about this $10,000.00, and Pool?

A. He explained why he put it up.

Q. Why did he?

A. He said that his wife and kid was run off the road by Dustin Pool, and that Dustin had pulled a gun on them.

MR. FARREN: May I have just a moment, Your Honor?

THE COURT: Yes.

Q. By Mr. Farren) Do you remember a time when Stocker did tell you to call Kimberlin? He did want you to talk to him?

A. Yes.

Q. Why -- what did he want you to do?

A. Tell him to get out of the apartment, that the cops were called.

Q. So Mr. Stocker told you to call Mr. Kimberlin and to tell him to get out of there, the cops were coming?

A. Yes.

Q. Did you know if that was true or not?
A. I assumed not.
Q. Okay. Do you have any idea why Stocker wanted you to do that?
A. Because they were trying to clean up evidence.
Q. Okay. Well, so when he wanted you to call Craig and tell him the cops were -- everybody needs to get out of the apartment, what apartment do you think it was?
A. Tori's apartment.
Q. Okay. So you thought they were there cleaning it up?
A. Yes.
Q. How did it help Mr. Stocker to interfere with Mr. Kimberlin's cleaning the apartment?
A. Do you want my opinion on it?
Q. Did he ever tell you?
A. No.
Q. Okay. So when you made the call, did you actually reach Mr. Kimberlin?
A. No.
Q. You got Jessica?
A. I called Jessica.
Q. Did you ever end up talking to Mr. Kimberlin?
A. No.

Q. Did you talk to anyone besides Jessica?
A. Frank Chacon was on three-way.
Q. So there was a three-way call set up and you talked with Mr. Chacon. What did you tell Mr. Chacon?
A. That -- what Josh had told me to tell him, that the police were on their way, and that they should stop doing what they're doing.
Q. Now, you mentioned -- Jessica said something to Frank about just in case it was true, did you get the impression that she wasn't buying this story?
A. I got the impression that she wasn't sure if Josh was bluffing or not.
Q. Okay. Frank talked to you about his feelings toward Josh had changed?
A. Yes.
Q. Did he say why?
A. He just said that Josh was different, he had changed.
Q. Now, did you let him know that you had delivered the message like he asked you to?
A. Yes.
Q. And what was his response?
A. I don't think he had one.
Q. Now, do you remember the phone number, 236-8952?

A. Yes.
Q. And why do you remember that phone number?
A. Because it was somebody's phone number that I used to call. I'm not sure. I think it was mine, maybe.
Q. That was your phone number, wasn't it?
A. Yeah, maybe.
Q. And do you remember the phone number 433-0018?
A. Yes.
Q. Was that Josh's phone number?
A. I think so. I'm not sure.
Q. When Josh was gone during that period of time and that you were sick, and when he came back with the Keelings and you were very upset with him, do you remember trying to reach him?
A. Yes.
Q. Did you try to reach him once or more than once?
A. More than once.
Q. Would it surprise you if the phone records that have been introduced indicate that you called him 24 times in about -- on the 10th, in 24 hours?
A. I would be surprised it wasn't more.
Q. Do you remember calling Guinn Garcia during that time?

A. I think I did.
Q. Several times or just one time?
A. I'm not sure.
Q. If the records indicate as many as six times that wouldn't surprise you?
A. Probably not.
Q. Why were you calling Guinn?
A. I was calling anybody who would know where he was at.
Q. Why did you think Guinn would know?
A. Because we had been around her a couple of times.
MR. FARREN: May I approach the witness, Your Honor?
THE COURT: Yes.
Q. By Mr. Farren) I show you State's Exhibit No. 4. Do you recognize this document?
A. Yes.
Q. And what is that?
A. It was my phone list.
Q. And this is a phone list you agreed to give to Sergeant Brown during the investigation. Is that correct?
A. Yes.
Q. And these are -- to the best of your

knowledge, accurate numbers that tie into these various people?

A. Yes.

MR. FARREN: Offer State's Exhibit 4.

THE COURT: What did you call it?

MR. FARREN: State's Exhibit 4.

THE COURT: Do we not have a 4 already?

MR. FARREN: No, sir. We started with State's Exhibit 7. We're about to get to those earlier numbers now.

THE COURT: Wait a minute. To be sure, what are the business records?

MR. FARREN: Five through --

THE COURT: They start with 5 then?

MR. FARREN: Yes, sir.

MR. FOWLER: Five through 14.

THE COURT: Okay. I missed on the first one. That's why I had a 4.

MR. FARREN: I understand.

THE COURT: Okay. Any objection to State's 4?

MS. MCELROY: No, Your Honor.

THE COURT: Okay. State's 4 is admitted, maybe again.

Q. By Mr. Farren) Real quickly, I just want to

make sure I understand an answer that you gave to an earlier question. You had actually been to Mr. Pool's house on one occasion with Josh, hadn't you?

A. Yes.

Q. Is that the meeting you were talking about?

A. No.

Q. Okay. So you know there was at least one meeting between Josh and Pool. And then you and Josh were at his house on some other occasion?

A. Yes.

Q. Okay.

MR. FARREN: Pass the witness. Oh, may I publish to the jury, Your Honor?

THE COURT: Let me look at it.

MR. FARREN: Oh, I'm sorry.

THE COURT: Yeah.

MR. FARREN: Thank you.

THE COURT: Yes, you can.

MS. MCELROY: We have nothing of this witness, Your Honor.

THE COURT: All right. You may step down, Ms. Vandergriff. Thank you. Call your next witness.

MR. FARREN: State calls Bill Redden, Your Honor.

(Witness sworn.)

BILL REDDEN,

Having been first duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. FARREN:

Q. Would you state your name for the jury, please, sir?
A. Bill Redden, R-e-d-d-e-n.
Q. How are you employed?
A. Employed by the City of Amarillo at the Amarillo Police Department.
Q. How long have you been with the Amarillo Police Department?
A. Almost 25 years.
Q. And do you have any specific assignments with the police department?
A. Yes, sir, I'm assigned to the narcotics unit.
Q. What does that mean? What does the narcotics unit do?
A. We are assigned with investigating narcotics related offenses inside the city limits of Amarillo.
Q. And I want to direct your attention back to 2002, going into 2003, have you -- do you know anyone by the name of Stephen Craig Kimberlin?
A. Yes, I do.

Q. How do you know Mr. Kimberlin?

A. He was involved in a large scale methamphetamine distribution organization that myself and Special Agent Clay Morris with the DEA worked a case on.

Q. How many people were in this group that you were investigating that were connected to Mr. Kimberlin, approximately?

A. The group that he was connected with had in excess of 26 people.

Q. Now, how did this work? What did this group do that involved narcotics?

A. There were two individuals, actually three individuals, I'm sorry, that were responsible for bringing in approximately 100 pounds of methamphetamine a month into Amarillo. It would be distributed to other members or different organizations which would dispense it to their people and be sold on the streets.

Q. The -- this product that was coming in from Old Mexico, was there a single source through whom this product came to Mr. Kimberlin, or multiple sources?

A. Mr. Kimberlin had multiple sources.

Q. Okay. Was one of the sources Josh Bledsoe?

A. Yes, sir, it was.

Q. And are you familiar with the Sanchez/Baxer

cartel in Old Mexico?

A. That is the target that we originally started out with.

Q. Now, did it turn out that Mr. Pool (sic) was connected to the Sanchez/Baxer group, or to someone else? Mr. Bledsoe, I mean.

A. Mr. Bledsoe was tied in with the Sanchez/Baxer group.

Q. You believe he was?

A. Yes, sir.

Q. Now, if Mr. Bledsoe indicated that he was dealing with somebody by the name of Chavez and Rojas, do any of those names ring any bells?

A. The Rojas does. But I know that he was also getting his methamphetamine from Denise Contreras, who was getting her stuff from the Sanchez/Jocovo organization.

Q. So is it possible that based on your investigation and your knowledge of this, that Mr. Bledsoe was dealing with a branch of the Sanchez/Baxer group, but he just knew he was dealing with Chavez and Rojas, and he didn't realize who it was tied to?

A. That is possible.

Q. At any rate, he was bringing in large quantities of narcotics, wasn't he?

A. Yes, sir, he was.

Q. Now, how much is a -- how much will a pound of methamphetamine bring, a pure, uncut pound of methamphetamine, what is that worth?

A. The wholesale value is going to run anywhere between $10,000.00 and $12,000.00, depending on the amount that you're buying.

Q. And re-sold on -- in bulk, if it's sold as a pound to someone else, what would be the profit ordinarily?

A. If somebody was to purchase a pound and then sell it to another individual?

Q. Yes, sir.

A. Depends on what type of profit margin they would want, they would make at least $1,000.00.

Q. Perhaps more?

A. It was probably more, because once you get a pound of pure, then you cut it at a cutting agent, which makes twice the product and then it's sold down to smaller quantities to the suppliers.

Q. And when you say a cutting agent, if it's cut or stepped on, that means they have added some supposedly benign substance to it, and it looks like there is more meth there, but it really has something else mixed with it?

A. That's correct.

Q. How did you first learn about either Mr. Kimberlin or Mr. Bledsoe? Who did you learn about first?

A. We learned about Mr. Bledsoe first.

Q. And how did you learn about him?

A. Through the course of the investigation, we had several people that were cooperating with us. This case started off as a conspiracy that ended up going into what is called a federal wire tap, where we ended up going on three telephones to listen to the conversation, to develop our conspiracy case that we had. Through working with confidential informants, they gave us information about people that were involved in the organization that were getting pound amounts from Jocovo/Sanchez, and from Denise Contreras, and Danny Contreras, as well. His name came up through that.

Q. Now, the narcotics that the Contrerases were receiving was from the Sanchez/Baxer group, as well?

A. Yes.

Q. And the narcotics that Bledsoe was receiving was from Sanchez/Baxer but through a different channel or different avenue. Is that correct?

A. They would be like third down the line, he would have been third down the line. You've got

Jocovo/Sanchez brothers. Then you have Denise Contreras and then Josh Bledsoe.

Q. And we've heard the names of Mr. Chavez and Mr. Rojas, also a man named Chappa (sic). Do you know who is Chappa?

A. Chappo.

Q. Chappo.

A. Chappo. That is Americo (phonetic) Rivera.

Q. Okay. The -- once you had the wire taps and were able to listen through a court order to the conversations, did it confirm what your informants were telling?

A. Yes, sir, it did.

Q. Now, when was all of this taking place, approximately?

A. We started the federal wire tap in March of 2003. We ended it April the 2nd of 2003, which we also executed, I believe it was in excess of ten search warrants on a residence.

Q. But your investigation began long before that?

A. In approximately April of 2002. It took us a year to work it out.

Q. In order to get this -- a court order from either a state judge or a federal judge, you've got to bring them probable cause and background information?

A. Yes, sir, that is correct.
Q. During the course of this investigation, did you also learn about a man named Dustin Pool?
A. Yes, sir.
Q. Now, was Mr. Pool connected to Mr. Bledsoe or Kimberlin, or not connected to either one of them?
A. I was already familiar with Mr. Pool from having worked cases on him in the past. He was getting his methamphetamine from the same type organization, but was a separate organization from the Kimberlin organization.
Q. Okay. Do you know if these groups even realized that ultimately there were some connection up the line from their source, or did they realize it or not?
A. I don't think that each one of them knew who the top person was, otherwise they would have tried to go to that person directly.
Q. Sure. Because if you can cut out the middle man, you're always better.
A. Correct.
Q. Now, did you know whether there was any tension or conflicts between Mr. Pool and his group, and Mr. Kimberlin and his group?
A. Yes, sir.

299

Q. What kind of problems were there?

A. Typical drug dealing type of friction that you would have at each other. They would know that they were getting -- one of their customers might be getting pounds of methamphetamine from that particular organization. They would like to have that money so they would like to get that person back over to their side.

I do know that there was friction between two people that were supplying Mr. Kimberlin, as well, from the organization. So it's standard for them to try to take that customer back over into their side.

Q. So there is natural competition for a limited number of customers in the first place?

A. That is right.

Q. Then in addition, if they're trying to steal each other's customers, additional tension?

A. Yes, sir.

Q. Based on your years and years of experience in the field, do they ever interfere with each other's attempts to collect money for dope they fronted?

A. Yes, they do.

Q. And that is always a source of tension?

A. Money is the main source of it, yes, sir.

Q. At some time during your investigation of

these various drug dealers, did the Special Crimes Homicide Unit become involved in a parallel investigation?
A. Yes, sir.
Q. And that involved Mr. Pool, didn't it?
A. Yes, sir, it did.
Q. When did you first realize that there was some connection between their investigation and yours?
A. It would have been shortly before we started the federal wire tap. It would have been approximately March, early March, I guess, of 2003.
Q. Okay. Mr. Pool -- are you aware, you worked with Sergeant Brown with Special Crimes Unit. Again, these were parallel investigations but you shared information?
A. Yes, sir, we did.
Q. So you're aware that Mr. Pool was reported missing shortly after March 9th, 10th, 11th, along in there by his girlfriend and his mother?
A. Yes, sir, I was.
Q. And of course, this is a name you were familiar with?
A. Yes, sir.
Q. And without going into all the details, is it correct that eventually you and Sergeant Brown realized

that there was really a connection?

A. Yes, sir, there was.

Q. Did you assist at various -- well, at any time with any -- in any searches of any homes or locations in which there was evidence that assisted you in your investigation, but also turned out to be evidence in the homicide case, as well?

A. Yes, sir.

Q. Were one of those places Stephen Craig Kimberlin's home?

A. Yes, sir, it was.

Q. Do you remember when that search was conducted?

A. June the 12th of 2003.

Q. When that search was conducted, did you see a large green trash can?

A. Yes, sir, I did.

Q. And did you seize that trash can?

A. Yes, sir, I did.

MR. FARREN: May I have just a moment, Your Honor?

THE COURT: Yes.

Q. By Mr. Farren) I want you to look closely because this is a really small exhibit. So I'm showing you what has been marked as State's Exhibit 61.

Attached to this is a piece of paper. Do you recognize what that is?

A. Yes, sir. This is an evidence tag with my name on it.

Q. Are you able to identify State's Exhibit 61?

A. Yes, sir.

Q. And how can you do that?

A. This is the exhibit that I took from Stephen Craig Kimberlin and Jessica Kimberlin.

Q. And you know that because of the evidence tag?

A. Yes, sir, I have the tag.

Q. And you found this item where?

A. 7901 Success in Randall County, Texas.

Q. And then you filled out this evidence tag --

THE COURT: 7901 what?

THE WITNESS: Success. Success Street.

THE COURT: Thank you.

Q. By Mr. Farren) One green trash can might look like another, so this tag allows you to identify it as the can that you recovered?

A. Yes, sir, that is correct.

MR. FARREN: Offer State's Exhibit 61 into evidence, Your Honor.

MS. MCELROY: I have no objection.

THE COURT: State's 61 is admitted.

Q. By Mr. Farren) When you were there, did you also see some shovels?
A. Yes, sir, I did.
Q. Did you seize those or did someone else?
A. Sergeant Mark Brown would have been the one to seize it.
Q. I'll show you what has been admitted as State's Exhibit No. 205, and I realize a shovel is a shovel. But --
A. Yes, sir.
Q. But does that appear to look like the shovels you saw?
A. Yes, sir.
Q. Did you notice anything interesting about one of the shovels?
A. It looks like it's got concrete and residue on it, and it had some red spots on it, as well.
Q. Now, Agent Redden, eventually a large number of people were arrested and charged in connection with your investigation of this drug conspiracy?
A. Yes, they were.
Q. And is one of those people Stephen Craig Kimberlin?
A. He was not charged in the conspiracy, but he was charged incident to the conspiracy for possession

with intent to deliver.

Q. How did that arise?

A. Several defendants that we had in custody on the conspiracy case were in the Randall County jail because that is where they housed the federal inmates. We had one of the individuals that was cooperating with us by the name of Miguel Gonzales, who was one of the suppliers to Mr. Kimberlin. He had told us during the debriefing that he had been supplying large amounts of methamphetamine to Mr. Kimberlin for his organization, as well as Josh Bledsoe. They were competing with each other within their own organization to supply him.

I was able to verify the information that he had given me through phone calls from the jail.

Q. Now, once Mr. Kimberlin was incarcerated and charged with a drug related charge, at some point were you summoned to the Randall County jail to meet with Mr. Kimberlin?

A. Yes, sir, I was.

Q. And who initiated this meeting?

A. Mr. Kimberlin did.

Q. So he asked some deputy to call you, and you came?

A. He asked Sergeant Barry McNutt to get ahold of me. Dennis Hendley, also a deputy for Randall County

who I worked with for years, was contacted by Sergeant McNutt, and he called me and told me that Kimberlin wanted to visit with us.

Q. So Kimberlin tells McNutt, McNutt tells Hendley, and Hendley calls you?

A. Yes, sir, that's correct.

Q. And did you go meet with him?

A. Yes, sir, I did.

Q. So this would have been sometime after his arrest in June?

A. June the 14th.

Q. And when you went to meet with him, what did he want?

A. Special Agent Clay Morris and I went to meet with him. He wanted to talk to us about the drug conspiracy case that we have been working, and the charge that he had pending on him, which was the drug conspiracy at the time.

From talking and working with Sergeant Brown, I knew that Mr. Kimberlin was involved in the homicide of Dustin Pool.

Q. So you believe him to be a suspect or somehow connected to the homicide?

A. Yes, sir, I do.

Q. When he met with you and talked with you about

the -- this drug case, did he talk about anything else, any other case?

A. He talked about visiting with Sergeant Brown about the homicide case, and stated that he knew where the body was.

Q. And once you knew he wanted to talk about the homicide case, did Mr. Brown become involved?

A. Yes, sir, he did.

Q. Did somebody summon him to the jail?

A. I did.

Q. So at that point, we've got Mr. Kimberlin, Clay Morris with DEA, you're there and now Sergeant Brown has joined you?

A. Yes, sir.

Q. Once you had Mr. Brown there, did Mr. Kimberlin indicate he was ready to tell you what he knew? Or did he need some more steps taken before he would visit with you?

A. He needed some more steps taken. He wanted to visit with the district attorney that would be in charge of the case of the homicide. He hadn't told us yet where the body was, and we informed him that we needed to know which county the body was in.

Q. So he wanted you to call the D.A, because he wants to hear from the horse's mouth. Sometimes D.A.'s

are referred to some other part of the horse, but from the horse's mouth, whether he can reach some sort of arrangement or agreement on this?

A. Yes, sir. We had told him that we had no authority to do that, that the D.A was the only one.

Q. So you said you know, which D.A. do you want us to call because we've got to know which one to call, you know, where the body is, or at least which D.A. to call?

A. That is correct.

Q. And he said to call who?

A. The Randall County D.A.

Q. And that meeting took place, and Mr. Kimberlin was given a use immunity agreement. Is that correct?

A. Yes, sir, he was.

Q. Now, did he just immediately sign this thing and start talking?

A. Not in the presence of the D.A. He had to be explained what the use immunity agreement was.

Q. So that was explained to him and this document was left with him?

A. That's correct.

Q. At this point, it's just a fill-in-the-blank document.

A. It had to be signed by him and we signed it as

well.

Q. Right. But at that point, nobody signed anything, other than maybe the D.A, and then it's up to him whether he wants to sign or not?

A. Correct.

Q. So did he immediately sign it, or did this take a while for him to make his decision?

A. He vacillated on the decision for just a little bit, and then signed the agreement, at which time you, the D.A. left, and Sergeant Brown, Special Agent Morris and I visited with him.

Q. So I left. I signed it, he signed it. I left. Was there any discussion with him while I was there about anything other than what this legal document played?

A. Just the explanation of the use of immunity agreement.

Q. After I left, did he then agree to talk to you?

A. Yes, sir, he did.

Q. Did he tell you where the body of Dustin Pool was?

A. Yes, sir.

Q. And did you go out there the next day at all when they exhumed the body?

A. Yes, sir.
Q. So you were present at the grain site?
A. We helped exhumed the body, yes, sir.
Q. And of course, would you agree with me that once the body had been extracted, it pretty much confirmed that he had told the truth about where the body was?
A. He had told the truth about where the body was, how it was wrapped, and that it was encased in concrete.
Q. Now, when he visited with you that night at the jail, did he indicate how he knew where the body was?
A. He had said that they -- he, Frank Chacon and Destry Keeling, had been the ones to bury the body at the grain elevator.
Q. And were the three of them involved in the homicide, according to him?
A. According to him, no.
Q. Now, his use immunity agreement said that if he told the truth, he had an agreement. If he lied, he had nothing?
A. That is correct.
Q. And later, were you able -- and Sergeant Brown to confirm whether he told the truth or lied, or did you

form an opinion?

A. Sergeant Brown was, from other information he received, he got back with me and told me what he had found out. We realized that he hadn't been truthful and a warrant was issued for his arrest.

Q. So he was re-arrested, charged with the homicide when it was determined that he had lied about his participation?

A. That is correct.

Q. And was it -- was the search when you recovered this trash can subsequent to this meeting or prior to that meeting, or do you recall?

A. When I recovered the trash can, it would have been on June the 16th, whenever he was released from jail the first time, after cooperating and telling us where the body was at.

Q. And how did you know that this trash can had any significance? Was it significant in your drug case or homicide case?

A. It was significant in a homicide case because he had told us where they had gone to buy the supplies that they used to mix the concrete to cover the body with.

Q. And did he indicate this trash can was used -- did it hold the water that was used to mix the concrete?

A. That is correct.

Q. Do you know an individual named Brandon Cotton?

A. I do.

Q. And did at some point you visit with Mr. Cotton and did he give you information?

A. Mr. Cotton?

Q. Uh-huh.

A. I served him with a subpoena for this case.

Q. Well --

A. But I don't recall.

Q. At some point did you get a search warrant based on some information that Mr. Cotton gave you, if you recall?

A. I don't recall.

MR. FARREN: May I approach the witness?

THE COURT: Yes, sir.

Q. By Mr. Farren) Would you look this over and see if this refreshes your memory?

A. Okay. I'm sorry this was a separate case. Yes, yes.

Q. And I -- maybe I didn't explain it. Not necessarily in connection with the homicide, or directly to the drugs, but did you visit with Mr. Cotton about a case?

A. Yes, sir, I did.
Q. And did this involve some automatic weapons?
A. Yes, sir. He was under the impression that they had been used in the Dustin Pool homicide, and he told me where they were.
Q. In fact, he had stolen them from Destry Keeling, hadn't he?
A. Yes.
Q. And then he sold them to Chrystal Alexander (phonetic) or Simone, a/k/a Simone?
A. Correct.
Q. And so you obtained a search warrant based on what he told you?
A. Yes.
Q. And did you go to Chrystal Alexander, Simone's house?
A. Yes.
Q. And sure enough, you recovered some automatic weapons?
A. Yes, sir.
Q. Now, again, according to him, they were involved in either the Pool case or the Placensio case or both?
A. Right.
Q. But the weapons were where he said they were?

A. Yes, that's correct.

Q. I want to take you back to November the 8th of 2002. During a search -- or I think the word used throughout this trial has been a raid, but was there a search at Mr. Kimberlin's house on Stagecoach?

A. Yes, sir.

Q. Okay. And -- who was there -- was Mr. Kimberlin actually there or just Jessica?

A. I wasn't present at that warrant. But the Potter County Sheriff's Department had run that warrant, and I believe Jessica Kimberlin was the one there at that time.

Q. And she ended up being charged, didn't she?

A. Yes, sir.

Q. With possession of drugs?

A. Yes, sir, that's correct.

Q. In your efforts with Mr. -- with Sergeant Brown, did you know if Mr. Kimberlin believed that Dustin Pool was the snitch responsible for this search on November 8th, or do you know?

A. I don't know that.

MR. FARREN: Pass the witness.

MS. MCELROY: We don't have any questions of the witness.

THE COURT: You may step down, Officer

Redden. Thank you.

MR. FARREN: May we approach, Your Honor?

THE COURT: I'm going to excuse the jury. I'm going to let them go.

MR. FARREN: That's fine.

THE COURT: It's too late to start another witness today, so I'm going to let you go early. Don't forget I gave you ten minutes back today, so I might have to have it another day. I'm just kidding will you all. Y'all have a good evening, remember what I told you.

(Jury excused.)

MR. FARREN: We will finish by Thursday, as our case in chief, it's not going to take as long as I thought, maybe Wednesday evening.

THE COURT: Well, we'll have a little charge conference at the beginning of --

MR. FARREN: I just wanted the Defense and this Court to know that it's moving more quickly on the back end than I anticipated.

MR. WATKINS: Your Honor, with his announcement on that, we do have some witnesses we intend to call.

THE COURT: That will be fine. How long will they take?

MR. WATKINS: I assume a day, day and a half. Between a day and a day and a half. Depends on what kind of cross examination Mr. Farren does.

MR. FARREN: With that in mind, I'll do my best to finish by Wednesday, and that might get us there.

THE COURT: We'll work hard and we'll try to get it done.

MR. WATKINS: So our witnesses are from out of town.

THE COURT: I want your witnesses here Thursday. I might not want to delay for the weekend.

(Evening recess.)

THE STATE OF TEXAS )
COUNTY OF RANDALL )

I, Robyn Womack, Deputy Official Court Reporter in and for the 47th District Court of Randall County, State of Texas, do hereby certify that the above and foregoing contains a true and correct transcription of all portions of evidence and other proceedings requested in writing by counsel for the parties to be included in this volume of the Reporter's Record, in the above-styled and numbered cause, all of which occurred in open court or in chambers and were reported by me.

I further certify that this Reporter's Record of the proceedings truly and correctly reflects the exhibits, if any, admitted by the respective parties.

WITNESS MY OFFICIAL HAND this the 18th day of October, 2005.

Robyn Womack

ROBYN WOMACK, CSR 4470
Expires: 12/31/2006
Certified Reporter
5603 Foxcroft Dr.
Amarillo, Texas 79109
(806) 236-3312