07-05-0284-CR

FILED
OCT 18 2005
SEVENTH COURT OF APPEALS
PEGGY CULP, CLERK

# R E P O R T E R ' S R E C O R D

VOLUME 13 OF 22 VOLUMES

TRIAL COURT CAUSE NO. 15,307-A

| | | |
|---|---|---|
| THE STATE OF TEXAS | ) | IN THE DISTRICT COURT |
| V. | ) | RANDALL COUNTY, TEXAS |
| JOSHUA DAVID STOCKER | ) | 47TH JUDICIAL DISTRICT |

*********************

GUILT/INNOCENCE PROCEEDINGS

*********************

On the 19th day of July, 2005, the following proceedings came on to be heard in the above-entitled and numbered cause before the Honorable Hal Miner presiding, held in Randall County, Texas:

Proceedings reported by Stenographic Method.

**A P P E A R A N C E S**

ATTORNEYS FOR THE STATE:

NAME: Mr. James Farren & Mr. Jeremy Fowler
Randall County District Attorney's office
SBOT NO:
ADDRESS: Randall County Courthouse
16th Street and 5th Avenue
Canyon, Texas 79015
PHONE: (806) 468-5570

ATTORNEYS FOR THE DEFENDANT:

NAME: Ms. C. J. McElroy & Mr. Mike Watkins
Attorneys at Law
SBOT:
ADDRESS: 801 S. Fillmore Street
Amarillo, Texas 79101
PHONE: (806) 371-0555

VOLUME 13

CHRONOLOGICAL INDEX

JULY 19TH, 2005


| | PAGE |
|---|---|
| STATE'S ORAL EVIDENCE CONT. | |
| APPEARANCES | 2 |
| CASE CALLED | 7 |
| WITNESSES: | |
| OMAR MENDOZA: | |
| DIRECT EXAMINATION BY MR. FARREN (JURY IN) | 8 |
| DIRECT EXAMINATION BY MR. FARREN (JURY OUT) | 11 |
| VOIR DIRE EXAMINATION BY MS. MCELROY (JURY OUT) | 14 |
| DIRECT EXAMINATION CONT. BY MR. FARREN (JURY IN) | 16 |
| CROSS EXAMINATION BY MS. MCELROY | 22 |
| REDIRECT EXAMINATION BY MR. FARREN | 24 |
| JAMES BURGESS: | |
| DIRECT EXAMINATION BY MR. FARREN | 29 |
| CROSS EXAMINATION BY MS. MCELROY | 101 |
| REDIRECT EXAMINATION BY MR. FARREN | 118 |
| RECROSS EXAMINATION BY MS. MCELROY | 122 |
| JOHN BUNDY: | |
| DIRECT EXAMINATION BY MR. FOWLER | 124 |
| TYLER HALE: | |
| DIRECT EXAMINATION BY MR. FARREN | 132 |
| NOON RECESS | 148 |
| CROSS EXAMINATION BY MS. MCELROY | 168 |
| REDIRECT EXAMINATION BY MR. FARREN | 174 |
| ANGELA RODRIGUEZ: | |
| DIRECT EXAMINATION BY MR. FARREN | 176 |
| CROSS EXAMINATION BY MR. WATKINS | 194 |
| KATHY MCCORD: | |
| DIRECT EXAMINATION BY MR. FARREN | 197 |
| CROSS EXAMINATION BY MR. WATKINS | 218 |
| REDIRECT EXAMINATION BY MR. FARREN | 222 |
| KELLY GRAYLESS: | |
| DIRECT EXAMINATION BY MR. FARREN | 223 |
| CROSS EXAMINATION BY MR. WATKINS | 241 |
| GLENDA KEELING: | |
| DIRECT EXAMINATION BY MR. FOWLER | 245 |
| CROSS EXAMINATION BY MS. MCELROY | 267 |
| REDIRECT EXAMINATION BY MR. FOWLER | 275 |
| STATE RESTS | 276 |
| REPORTER'S CERTIFICATE | 277 |

ALPHABETICAL INDEX -- JULY 19TH, 2005


| WITNESSES | DX | CX | VDX | RDX | RCX | FRDX |
|---|---|---|---|---|---|---|
| BUNDY, JOHN | 124 | | | | | |
| BURGESS, JAMES | 29 | 101 | | 118 | 122 | |
| GRAYLESS, KELLY | 223 | 241 | | | | |
| HALE, TYLER | 132 | 168 | | 174 | | |
| KEELING, GLENDA DENISE | 245 | 267 | | 275 | | |
| McCORD, KATHY | 197 | 218 | | 222 | | |
| MENDOZA, OMAR | 8,11,16 | 22 | 14 | 24 | | |
| RODRIGUEZ, ANGELA | 176 | 194 | | | | |

INDEX OF EXHIBITS -- JULY 19TH, 2005

| EXHIBITS | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| SX-16 | CARPET | 66 | 66 |
| SX-24 | SWABBING | 66 | 66 |
| SX-22 | CONCRETE SACK | 88 | 88 |
| SX-25-28 | PHOTOS | 191 | 191 |
| SX-29 | PHOTOS | 181 | 181 |
| SX-31-38 | METAL PIECES | 61 | 61 |
| SX-39 | ENVELOPE | 90 | 90 |
| SX-53 | SOCK | 91 | 91 |
| SX-65 | PLIERS | 77 | 77 |
| SX-157 | PHOTO | 80 | 80 |
| SX-158 | PHOTO | 80 | 80 |
| SX-159 | PHOTO | 80 | 80 |
| SX-161 | PHOTO | 80 | 80 |
| SX-163 | PHOTO | 80 | 80 |
| SX-164 | PHOTO | 80 | 80 |
| SX-165 | PHOTO | 80 | 80 |
| SX-166 | PHOTO | 80 | 80 |
| SX-167 | PHOTO | 80 | 80 |
| SX-168 | PHOTO | 80 | 80 |
| SX-169 | PHOTO | 80 | 80 |
| SX-170 | PHOTO | 80 | 80 |
| SX-171 | PHOTO | 80 | 80 |
| SX-172 | PHOTO | 80 | 80 |
| SX-173 | PHOTO | 80 | 80 |
| SX-175 | PHOTO | 80 | 80 |
| SX-193 | PHOTO | 75 | 75 |
| SX-195 | PHOTO | 50 | 50 |
| SX-197 | PHOTO | 50 | 50 |
| SX-198 | PHOTO | 50 | 50 |
| SX-199 | PHOTO | 50 | 50 |
| SX-200 | PHOTO | 50 | 50 |
| SX-201 | PHOTO | 50 | 50 |
| SX-202 | PHOTO | 50 | 50 |
| SX-206 | PHOTO | 86 | 86 |
| SX-235 | PHOTO | 62 | 62 |
| SX-237 | PHOTO | 91 | 91 |
| SX-238 | PHOTO | 91 | 91 |
| SX-246 | MANDIBLE | 58 | 58 |
| SX-253 | LAB FORM | 57 | 57 |
| SX-259 | PHOTO | 186 | 186 |
| SX-271 | SKETCH | 86 | 86 |
| SX-272 | SKETCH | 84 | 84 |
| SX-273 | SKETCH | 84 | 84 |
| SX-274 | REPORT | 129 | 129 |
| SX-275 | REPORT | 179 | 179 |
| SX-276 | REPORT | 200 | 200 |

EXHIBIT INDEX CONTINUING -- JULY 19TH, 2005

| EXHIBITS | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| DX-23 | PHOTO | 110 | 110 |
| DX-25-28 | PHOTOS | 112 | 112 |
| DX-29-33 | PHOTOS | 101 | 101 |

PROCEEDINGS

July 19th, 2005

(All sides, Defendant present:

THE COURT: Bring them in.

(Jury seated, open court.)

THE COURT: Thank you all. Everyone be seated. Well, good morning.

THE JURY: Good morning.

THE COURT: Y'all ready to go? All right. I just want to tell you, you've really been attentive and you've been a great jury. Thank you for that. It made my job easier and I appreciate it. I've noticed it. I thank you. All right. Mr. Farren, call your next witness.

MR. FARREN: State calls Omar Mendoza, Your Honor. And I believe he is on the stand.

THE COURT: Mr. Mendoza, raise your right hand.

THE WITNESS: I plead the Fifth.

THE COURT: All right. Just raise them both.

(Witness sworn.)

THE COURT: Thank you.

MR. FARREN: For the record, Your Honor, the questions that we're going to pose to him will not

involve anything he has done or anything he has said, only what he has heard. So the Fifth Amendment would have no bearing on any of his testimony, Your Honor.

THE COURT: All right. And do I need to admonish him?

MR. FARREN: It's up to the Court. But the questions will not involve any action he has ever taken or any statement he has ever made. It will involve what he heard only, and I don't understand how what he heard could incriminate him in any way.

THE COURT: I'll listen to the questions before I make that decision. Go ahead.

OMAR MENDOZA,

Having been first duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. FARREN:

Q. Would you state your name for the Court, please.

A. I plead the Fifth.

Q. You understand, sir, that if you refuse to follow a lawful order of this Court, the Judge can hold you in contempt and sentence you up to six months in the county jail?

A. I plead the Fifth.

Q. You understand the Judge can continue to add

six-month contempt charges, and that those do not run concurrent with your other time in federal pen, and that you would have to do them day for day when you finish that sentence. Do you understand that, sir?

A. I plead the Fifth.

MR. FARREN: We would ask the Court to instruct the witness to answer proper questions, Your Honor.

THE COURT: Mr. Mendoza, I'm instructing you to answer the questions from the lawyers.

THE WITNESS: I plead the Fifth.

THE COURT: All right, sir.

Will you take the jury out, please.

(Jury excused, proceedings held.)

THE COURT: Mr. Mendoza, I know that I'm just a state judge, and I know that the threat of a contempt sentence on you is just like a mosquito bite compared with what you have. But I'm going to do what the district attorney says. I'm going to hold you in contempt and I'm going to sentence you to -- I will sentence you to consecutive terms of contempt if you don't answer. Do you understand that?

THE WITNESS: Yes, sir.

THE COURT: Okay. You have to answer the questions that do not incriminate you. All right? Now,

are you going to continue to take the Fifth?

THE WITNESS: Yes, sir.

THE COURT: All right. Well, I'll hold in you contempt, and I sentence you to six months in the Randall County jail.

Anything else, Mr. Farren?

MR. FARREN: No, Your Honor. If he will not answer the questions, obviously there is nothing we can do.

THE COURT: All right.

MR. FARREN: We would ask that he be admonished at this time that however many contempts he gets is day for day according to the law. It's up to the Court's discretion, of course. But by law, it does not run concurrent with his federal sentence. And by law, he would still be obligated to serve that time after he finishes the federal sentence.

THE COURT: That will happen to you --

THE WITNESS: Yeah, but can I tell you what happened? These people offered me a deal, right? And they fucked me out of my deal. So now they shouldn't even use it, because I went to trial and that was part of a deal --

THE COURT: Well, I don't have anything to do with that, Mr. Mendoza. And whatever deal they

offered you is not any of my business. But under the law, you have to answer the questions. Mr. Farren, ask him another question.

MR. FARREN: Yes, Your Honor.

Q. By Mr. Farren) Mr. Mendoza, when you say you were offered a deal, you're talking about the federal prosecutors. Right? Vicki Lamberson. Is that correct, sir?

A. Yeah, but it was part of -- for this, too.

Q. Okay, sir, you understand we had nothing to do with Vicki Lamberson --

A. Well, then, you shouldn't use a statement, because it was part of the deal with Vicki Lamberson. It should be --

Q. You understand, I don't know anything about your deal with Vicki Lamberson. I know nothing about it?

A. Well, then, you shouldn't use your statement.

Q. Okay. You're free to have your opinion, sir. I merely want to ask you about some things you heard, not anything you did, not anything you said, not any action on your part whatsoever. I merely want to ask you about some things you heard. Do you understand that, sir?

A. Yeah, I understand.

Q. Okay. And do you understand that if the Judge -- if you end up with two or three years in contempt charges, you'll still have to do that when you finish that?

A. I understand that.

Q. Well, sir, then all we're asking you to do is tell the truth and answer questions about what you heard. I'm not going to ask you about any drug activity you were involved in, or anything you've done of that nature.

THE COURT: And I'm going to add this to it. If somebody does ask you about that, like the Defense, you don't have to answer it. But the questions that do not incriminate you, you have to answer them, Mr. Mendoza. I don't take any pleasure in stacking one six-month contempt sentence on top of another, which merely adds to your burden. But I will.

THE WITNESS: I know you will.

THE COURT: And I am asking you to answer the questions.

THE WITNESS: All right.

THE COURT: All right. Ask him a couple of questions. Let's just try it out.

Q. By Mr. Farren) Mr. Mendoza, is it your intent now to answer questions about a conversation you had

with Josh Stocker in the Randall County jail? Will you answer what -- not what you said, not about anything you've done, only what he said to you. Will you answer those questions, sir?

A. What's in it for me?

Q. Well, again, sir --

THE COURT: What's in it for you, Mr. Mendoza, is two to three years that you won't have to serve in the Randall County jail on contempt charges.

THE WITNESS: I'll be 50-something years old. It really don't matter.

THE COURT: It will at that time, I promise you. I'm 50-something years old, and I promise you it will matter at that time.

THE WITNESS: All right. Yes or no, that's it.

MR. FARREN: Okay. That's fine. I think I can couch the questions in such a way that you can answer yes or no.

THE COURT: All right. I don't want to keep jerking this jury back and forth, so I'm telling everybody now that if I have to hold you in contempt, I'm going to do it in front of the jury.

MS. MCELROY: Your Honor, I wasn't clear about something. Was he saying that he felt like he

shouldn't answer because this was part of an attorney/client privilege conversation that he had made a proffer of -- to the federal prosecutors. Is that what he is saying?

THE COURT: I don't think I heard that. But you're free to take him on voir dire right quick and ask him.

MS. MCELROY: May I?

THE COURT: Yeah. Introduce yourself to him.

VOIR DIRE EXAMINATION

BY MS. MCELROY:

Q. My name is C.J. McElroy. I represent Josh Stocker. Mr. Mendoza, I was a little confused by your testimony earlier. Are you saying that you feel like you shouldn't have to divulge your conversations or parts of your statement because this was part of a proffer or a plea negotiation in the federal court?

A. Yes, with Dean Roper, my attorney.

Q. And was this done -- was this statement done in exchange for some kind of consideration on the federal prosecutor's part?

A. Where I would get ten years.

Q. Now, that is not what happened, is it?

A. I went to trial and decided not to do it.

Q. Okay. So I guess what I'm saying is did you feel like that was considered pretrial negotiations between you and your attorneys?

A. It was.

Q. Okay.

MS. MCELROY: I would submit, Your Honor that -- although he doesn't have a Fifth Amendment criminal accusation against him, if -- I guess if his understanding is this was made in context of a proffer then I understand why he might have some reluctance.

THE COURT: Well, I'm glad you understand it. What does that mean? Are you objecting in some fashion?

MS. MCELROY: I would object if it violates an attorney/client privilege and is part of the plea negotiations and proffer that was made to the federal court.

MR. FARREN: Your Honor, I'm not going to ask questions about any meetings he had with his attorneys, any proffer he made, any agreements he made. I'm going to ask him about a conversation in which he heard statements from Josh Stocker prior to May 13th, and that he gave this statement before he ever pled in federal court, before he had this conversation, before he ever pled in federal court, before he went to

trial --

THE COURT: I'll overrule the objection, Mr. Mendoza, let me tell you something. I've been a judge for two and three quarter years, and I've never held anybody in contempt. I don't want to do that either, okay? I have never done it. And I would like to continue that record, and I would hate to break it today. And I am going to -- on your assurance that you will answer the questions of Mr. Farren just about that one thing, then I'm going to withdraw that one contempt of six months I just gave you. Okay?

THE WITNESS: Yes, sir.

THE COURT: Okay. All right. Have we got a deal?

THE WITNESS: Yes, sir.

THE COURT: All right. Bring that jury back in.

(Jury seated.)

THE COURT: Thank you all. Everyone be seated. Sorry about that interruption. All right. Go ahead, Mr. Farren.

MR. FARREN: Thank you, Your Honor.

DIRECT EXAMINATION CONT.

BY MR. FARREN:

Q. Mr. Mendoza, I want to ask you if you remember

having some conversations with Josh Stocker in the Randall County jail prior to May of 2003?

A. Yes.

Q. And do you recall in these conversations whether or not Mr. Stocker told you he hit Dustin Pool in the head with a fireplace poker?

A. Yes.

Q. And when he told you about that, did he tell you that blood started coming out of his head?

A. Yes.

Q. Did he tell you that a Mr. Bledsoe had offered $10,000.00 to have Mr. Pool, or Dustin Pool taken care of?

A. Yes.

Q. Did he tell you that -- that Dustin died because when they were moving him down the stairs, his head kept hitting the stairs?

A. I don't remember.

MR. FARREN: May I approach the witness?

THE COURT: Yes.

Q. By Mr. Farren) I want to show you a copy of your statement. And let -- and don't read it out loud, but if you read it to yourself --

A. (Witness complies.)

Q. Does that refresh your memory, sir?

A. I didn't type that.
Q. I understand. But this is your signature. Right?
A. Yeah, I just signed it.
Q. Yes, sir. Does that refresh your memory?
A. Well, if it's there, yeah.
Q. Okay. Do you remember in your statement saying that they had taped up his head, and as they moved him down the stairs, his head kept hitting the stairs?
A. I don't remember that.
Q. Okay. You don't remember. When you gave the statement, though, you believed it was accurate. I mean, you were telling what you remembered then. You just don't remember now?
A. Well, the detective was typing it.
Q. I understand. But he was typing what he learned from you as the two of you talked. Is that correct?
A. I believe so.
Q. And you were trying to give him accurate information at that time, weren't you, sir? I mean, you weren't trying to lie to him?
A. No, I wasn't lying.
Q. So you were trying to tell him truthful

information?

A. Yeah.

Q. You're just saying you don't remember it now?

A. No.

Q. Okay.

MR. FARREN: Your Honor, he has indicated that it was accurate at the time he gave the information. He does not remember it now, however. Therefore, it is a past recollection recorded. I ask that I be allowed to read that statement to the jury.

MS. McELROY: Your Honor, we would re-assert our objection that this was part of a plea negotiation, and therefore subject to some privileged --

THE COURT: I'll overrule the objection. You may read the statement.

MR. FARREN: (Reading) Stocker said Bledsoe offered $10,000.00 to have Dustin taken care of. Stocker said they took Dustin to a farmhouse where they got him upstairs and they were shoving a shovel handle up his butt. Stocker sometimes would say they wrapped Dustin up with tape, and other times he would say that Craig and Frank did. Stocker said Dustin died because when they were moving him Dustin kept hitting the stairs. When Bledsoe passed out, they told Bledsoe that Dustin died because he was smothered from the tape.

Stocker said they told Bledsoe this so that he would quit panicking. He told them they had wrapped Dustin three times because Dustin kept getting loose. Stocker did tell me the body is not buried.

And that concludes the rest of his statement, Your Honor.

THE COURT: Okay.

MS. McELROY: Your Honor, I would have a slight objection here, because the Prosecution has only read a portion.

MR. FARREN: I'll be glad to read the entire statement, Your Honor.

THE COURT: I think that would be appropriate. Go ahead and finish it out.

MR. FARREN: Yes, sir. This actually precedes what I read. I'll begin at the beginning. (Reading) My name is Omar Mendoza. I'm 25 years old. My date of birth is 5/25/77. My permanent address is 602 Pittsburgh. Since April, I have been in the Randall County Jail and have had numerous opportunities to talk with Josh Stocker.

Over the times we have visited, I have been told things about Dustin. Stocker has told me about a time when he beat up a guy named Ray and how they got a girl to set him up. Stocker has told me about a guy

named Craig paid a girl $7,000.00 to set Dustin up, and to get him to come to an apartment. Stocker said that Frank Chacon and Craig were there at the apartment from the get-go. Stocker said that when he, Craig and Frank showed up at the apartment, Dustin was already there, and Dustin had a gun in his waist band. And when he went for it, Stocker said he hit Dustin with the fire poker in the head, and when he did, blood came from his head.

Stocker said that Bledsoe offered $10,000.00 to have Dustin taken care of. Stocker said that they took Dustin to a farmhouse, and when they got him upstairs they were shoving a shovel handle up his butt. Stocker sometimes would say he wrapped Dustin up with tape, and other times he would say Craig and Frank did.

Stocker said that Dustin died because when they were moving him, Dustin's head kept hitting the stairs. But when Bledsoe passed out, they told Bledsoe that Dustin died because he was smothered from the tape. Stocker said they told Bledsoe this so he would quit panicking. He told me they had wrapped Dustin three times because Dustin kept getting loose. Stocker did tell me the body is not buried. This is true and correct to the best of my knowledge. It's signed by the affiant, Mr. Mendoza, and by Mark Brown, as a sworn

statement. There is some writing above that, but it simply is the oath, before me the undersigned.

I have no other questions of this witness, Your Honor.

THE COURT: Ms. McElroy.

MS. MCELROY: Thank you, Your Honor.

CROSS EXAMINATION

BY MS. MCELROY:

Q. Mr. Mendoza, we have never met before today?

A. (Shakes head side to side).

Q. You're currently in federal custody. Is that right?

A. Yes, ma'am.

Q. Can you tell me what your federal sentence is?

A. 210 months and 120 months, running concurrent.

Q. How long in calendar years is that?

A. About 25 years and ten months.

Q. Okay. Did you do this statement or offer this statement as part of a plea negotiation before you had been to trial?

A. Yes, ma'am.

Q. Were you told that you would be given a different sentence because you had given this statement?

A. Ten years.

Q. Do you feel that that influenced what you

said?

A. Cooperate, yeah.

Q. Yeah. That plea bargain didn't come about?

A. I decided not to do it.

Q. Now, the Prosecution has spoken with you since you have been brought back to Randall County. Is that right?

A. Yes, ma'am.

MS. MCELROY: May I approach the witness, Your Honor?

THE COURT: Yes.

Q. By Ms. McElroy) Mr. Mendoza, I'm going to show this to you without reading it. Let me show you what this is so we can talk about it.

A. Yes, ma'am.

Q. Okay. All right. Well, I want to give you an opportunity to see it before we discuss it. When you talked to the District Attorney, did he offer you an immunity agreement?

A. Yes, ma'am.

Q. And basically, what did he tell you about that?

A. That I won't be charged with nothing that I say.

Q. Okay. All right. Did he also tell you that

if you testified, that he would send a letter to the federal prosecutor saying that you cooperated?

A. Yeah, to get a time credit.

Q. I'm sorry?

A. To get a time credit.

Q. What does that mean?

A. Like rule 35, like they'll cut your time. But he said it wasn't like -- what do you mean? Like he is just going to ask her to give me a time credit, but he said he don't know if it will come through.

Q. Okay. But you know your other deal didn't come through?

A. Yes, ma'am.

Q. All right.

MS. MCELROY: I'll pass the witness.

MR. FARREN: May I approach the witness, Your Honor?

THE COURT: Yes, sir.

REDIRECT EXAMINATION

BY MR. FARREN:

Q. Now, Mr. Mendoza, the date on the statement we read a moment ago was May 13th, 2003. Correct?

A. I got busted April 2nd, 2003.

Q. Right. April 2nd, you were arrested. 2003, you gave this statement to Mark Brown. Later, you went

into plea negotiations, you and your attorney, with the feds. Correct?

A. We never went to a plea. I decided to go to trial.

Q. I understand. But you talked about a plea, and later decided not to do that and went to trial. Correct?

A. Well, yeah, he said he'd give me a bond, and he would give me a plea agreement --

Q. And that began later?

A. No, before that.

Q. Well, you were arrested in April, sir. Your negotiations didn't begin until June. Do you recall that, sir?

A. My negotiations been through the whole time he was talking to the Prosecutor. I was locked up.

Q. Mr. Brown, sir. I'm not talking about -- I'm talking about Mr. Brown. Mr. Brown was not involved in your negotiations with the federal people, sir,

A. Oh, so you're saying I just would talk to Mark Brown for nothing?

Q. Yes, sir.

A. No, sir.

Q. Did you say in here that you were agreeing to talk to him because he was going to help you with your

federal deal?

A. Well, I don't know. My attorney handled that. That's what he got paid for.

Q. Well, it doesn't say anything about that, sir.

A. Well, that's my attorney, sir.

Q. Well, if the records showed that you entered into negotiations in a trial down the road long after this, you wouldn't disagree with it, would you, sir?

A. What do you mean?

Q. If the records show that your federal proceedings began after this, you wouldn't disagree with that, would you, sir?

A. I guess not.

Q. Okay. And you would agree --

MR. FARREN: May I approach again?

THE COURT: Yes.

Q. By Mr. Farren) The date on this letter from me is June 30th, 2005. Right?

A. Yes, sir.

Q. So that's two years after this. Right? 2003 to 2005. That's two years later. Right?

A. Obviously, yes, sir.

Q. Would you agree with me, sir, that when I came to talk to you, when we brought you back from the federal pen and I came to talk to you, you told me that

you were reluctant to testify because you felt like you had been misled in your earlier federal negotiations. Is that correct?
A. They didn't give me the bond.
Q. And that is why you were reluctant to talk with me and be cooperative. Isn't that correct?
A. Because I got lied to.
Q. Okay. Not by me, by the federal people. Right?
A. It was part of the whole deal. My lawyer was making the deal, not me. I don't know what he was doing.
Q. And would you agree that the letter that you were asked about a moment ago is a letter from me to Ms. Lamberson saying would you please review a copy of an immunity agreement, and -- excuse me. This is a letter to your attorney, Cheryl Strom (phonetic), up in --
A. Pennsylvania.
Q. Pennsylvania. Right? And it says that I would talk to Ms. Lamberson and tell her that you cooperated, and I would give your attorney a copy of an immunity agreement. That's what I agreed to do. Right?
A. Yes, sir.
Q. And you understand, and you have had a copy of a use immunity agreement. It says, it's not immunity

from ever being prosecuted for anything. It just says whatever you say won't be used against you. Right?

A. Yeah, I won't be charged, what you just told me.

Q. Right. It's a use immunity agreement. Now, I also sent a copy of your statement to your attorney in Pennsylvania. Right?

A. Yes, sir.

Q. And I told her and you that I would tell Ms. Lamberson that you were cooperative. And if it helped you, it helped you, but I couldn't guarantee you it would. It might, it might not. Right?

A. That's right.

MR. FARREN: Pass the witness.

MS. MCELROY: We don't have any further questions.

THE COURT: All right. Mr. Mendoza, you can step down. Thank you.

THE WITNESS: I didn't mean disrespect.

THE COURT: I understand, sir. Thank you for cooperating.

THE WITNESS: Yeah.

MR. FOWLER: Jim Burgess.

MR. FARREN: Your Honor, for the sake of expediency and convenience, it may be easier for Mr.

Burgess to stay close to the exhibits rather than try to run back and forth, with the Court's permission.

THE COURT: Suits me. Officer Burgess, would you raise your right hand.

(Witness sworn.)

THE COURT: Before you start, is there any reason to keep this trash can in the courtroom?

MR. FARREN: No, Your Honor. In fact, the reason these exhibits are on the cart is we're hauling them around in the trash, but once it's disappeared --

THE COURT: Well, when the jury retires to deliberate, we will put them all back in the trash, but we take this out of here for now.

JAMES BURGESS,

Having been first duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. FARREN:

Q. Would you state your name for the jury, please.

A. James Burgess.

Q. And how are you employed?

A. Police officer for the Amarillo Police Department.

Q. How long have you been with the Amarillo

Police Department?

A. Twenty-five years.

Q. And what do you do for the police department?

A. I am currently assigned to the Potter/Randall County Special Crimes Unit. It's a specialized unit that specifically investigates homicides, officer-involved shootings, fire deaths and baby deaths.

Q. And how long have you been with the Special Crimes Homicide Unit?

A. Since 1991.

Q. And were you -- have you received any special training or education that enables you to perform in this capacity?

A. Yes, sir. My specific assignment in the Special Crimes Unit is what you would refer to nowadays as a crime scene investigator. My job is to process a crime scene, which entails photographing, sketching, videotaping, collecting evidence, processing evidence for latent prints, comparing latent prints to known prints, looking at the evidence to see what type of analysis needs to be further performed on the evidence, and then sending those items to the appropriate laboratory for analysis.

And the other job is to attend the autopsies, to photograph and document those, bring back evidence

from the autopsies such as clothing, maybe some known head hair, blood and fingernails, or maybe the blood or something like that, that is attached to the victim.

Q. And have you ever testified as an expert in this field based on your training, education, and many years of experience? Have you testified as an expert in this area in courtrooms in the State of Texas?

A. Yes, sir, I have.

Q. One time or many times?

A. Many times.

Q. In preparation for this trial, is it correct that you and I, Mr. Fowler and other members of our staff have met with you, in fact, have met with you and Defense counsel on more than one occasion?

A. Yes.

Q. And on those occasions, have we actually looked at and reviewed again, sometimes members of my staff, sometimes with Defense counsel, various physical items that were involved in the investigation of the death of Dustin Pool?

A. Yes.

Q. And sometime prior to trial, did you and I visit about -- out of hundreds of possible exhibits, a limited number that we anticipated attempting to present during the trial?

A. Yes, sir, we did.

Q. Is it correct that downstairs right now is a tarp, rolls of tape, wadded up tape, bungee cords, some 60-something exhibits, tie downs, rope, transporting sheets, a thin plastic sheath that was with the tarp. Are those things all downstairs?

A. Yes, sir.

Q. And we could bring those up here and you could identify them?

A. Yes, we could.

Q. And if you -- if we lay the proper predicate, we could offer those into evidence?

A. That is correct, yes.

Q. If we do that, though, is it going to create a problem?

A. The smell of the items would create a problem.

Q. There is still a lot of --

A. Body decomposition.

Q. All right, sir. And so they're there and available, if necessary. But for propriety's purposes perhaps it's better if we don't bring them?

A. Yes, that's correct.

Q. How did you become involved in the investigation of the death of Dustin Pool? How did you become called in to participate?

A. I was first contacted by Lieutenant -- to meet Sergeant Crandell at an apartment complex located on Bell Street, on 6040 Bellpree, and to meet Sergeant Crandell at Apartment G, 373, which was the apartment of, at that time, Tori Patrick. We were assisting --

Q. Is this the River Falls apartment, by the way?

A. Yes, it is. We were called in because the investigators that were working the missing persons case of Dustin Pool, Sergeant Kennedy and Sergeant David Sanford had felt that there was some foul play involved. So they had obtained a consent to search the apartment, and went into the apartment and found some suspicious stains on the carpet.

And from their information, some furniture had been removed. So we were called to -- to examine that apartment to see if there was evidence that would substantiate their suspicion of foul play.

Q. And did you, in fact, go to that location, sir?

A. Yes, sir, I did.

Q. And did you assist in gathering evidence at that location?

A. Yes, I did.

Q. How long do you think you spent there with the other technicians?

A. We went into the apartment at 2:24. And myself and Sergeant Crandell left at 9:30 that evening. So approximately seven and a half hours.

Q. During that time, did you observe some anomaly or something that you found unusual about the carpet in that apartment?

A. Yes. Some bleach stains in the living room carpet, poured in the middle of the living room, and some bleach stains toward the hallway that leads into the back bedroom, and some dark colored red stains.

Q. The red stains that you observed, based on training and education and many years of experience, did you have a -- any suspicion about what those red stains might be?

A. Yes, we did.

Q. What did you believe them to be?

A. We believed them to be blood. So therefore, we decided to use a chemical blood reagent to help substantiate our suspicions.

Q. And did you -- this is simply a -- something that if it reacts in a certain way, that's a further indicator to you that it is blood. Is that correct?

A. It's just a presumptive test, yes.

Q. It's a presumptive test. It's not conclusive?

A. That is correct.

Q. And did you conduct that test, sir?

A. Yes, sir, we did.

Q. And what was the -- what was the result of the presumptive test?

A. We actually performed two tests. I did a leuco-malachite test on one particular stain. It indicated positive. Then later, we decided to use a chemical known as luminol, that -- which allows blood to luminesce. And of course, we had to wait until dark to perform this procedure. And we did get some positive reactions from that, as well.

Q. And so both tests at least were presumptive that there was blood present?

A. That is correct, yes.

Q. Now, once you had completed those tests, what did you do next?

A. Well, that was toward later in the evening when we waited until it was dark to perform that test. Prior to that time, myself and Sergeant Crandell examined the carpet, noted the stains, noted that the -- that one part of the carpet was a cut -- had been replaced with a cutout section.

We located where that section had been removed. It had been removed from a bedroom, closet of the apartment. We then decided that we needed to get

the alternate light source, and that we have a forensic light to help us to search the areas around the cutout sections. So I left at that time to go obtain that and to prepare the chemical for luminol, while Sergeant Crandell remained behind and photographed and sketched and searched the apartment.

Q. I'm showing you what has been admitted as State's Exhibit No. 215. Do you recognize what is depicted in that photograph?

A. Yes, I do.

Q. And now State's 216?

A. Yes.

Q. Is this the area, the anomaly in the carpet that you mentioned a moment ago where you were conducting some of these tests?

A. Yes.

Q. Showing you State's 214. Were you able later to determine that, in fact, the carpet in --

A. 215 and 216, which is the same piece of carpet.

Q. I think it's 215 and 214. No, 215 and 16, you're right.

A. State's Exhibit 215 is kind of an overall view of the cutout section, its location. And State's Exhibit 216 is a close-up. It has a ruler. And then

State's Exhibit 214 is the cutout section in the -- I mean, the closet of the bedroom, and which the carpet is shown in State's Exhibit No. 215, 216, fits --

Q. So someone had cut out carpet in 214 and placed it in these other two locations?

A. That's correct.

Q. And this was hot glued in the --

A. That is what it appeared.

Q. It appeared to be hot glued. Okay. At any rate, it wasn't just laying there loose. It had been attached somewhere?

A. Yes.

Q. I'm showing you State's Exhibit 218. Do you recognize any of these spots there?

A. Yeah. This is the -- where the carpet has been removed, focus on -- there is some red stains there.

Q. And are these part of the red stains that you suspected to be blood and performed presumptive tests on?

A. Yes.

Q. Okay. I'm showing you State's Exhibit 18. I ask if you recognize this exhibit?

A. Yes.

Q. And what is this, sir?

A. This is a -- the backing of the carpet, the padding that was removed from the living room floor by Sergeant Crandell, which he turned over to me, and I later submitted to the lab.

Q. And so you received 18 from Sergeant Crandell, who testified earlier in the trial, and State's Exhibit 18. And later you turned State's Exhibit 18 over to a laboratory?

A. Yes.

Q. What laboratory?

A. The Department of Public Safety Crime Lab in Lubbock, Texas.

Q. And after you had obtained State's Exhibit 18, it was either in your control or secured in some way that you knew it was preserved until you took it to the lab. Is that correct?

A. That is correct.

Q. And you're familiar with the lab in Lubbock. Is that correct?

A. Yes.

Q. And once they received the exhibit there, again, it's either directly in someone's control there or it's preserved in a secure location where it can't be tampered with?

A. Yes.

Q. In addition to your efforts at the River Falls Apartments, did you assist at any other location in investigating the death of Dustin Pool?

A. Yes, I did.

THE COURT: Mr. Farren, why don't we have Detective Burgess sit down until he gets through this piece. That would be easier, you working with the photos. It's probably easier to do that until we get to that.

MR. FARREN: Okay.

Q. By Mr. Farren) And let me take you back to the River Falls Apartments a moment, a couple of issues that I forgot to ask about. At this time, I'm showing you State's Exhibit 219. And my associate has given me this trusty laser pointer, which I have absolutely no idea how to operate. And I'll try not to disintegrate anyone.

You're looking at the same photo that the jury is currently looking at. Let's see if I can make this -- it's coming on.

A. Okay.

Q. Well, I grew up on a farm near Childress, and we pretty much did things by hand. Would you agree -- would you explain to the jury -- I'm pointing to some circles on the drawing?

A. Yes.
Q. What are those circles -- and what -- what do those circles indicate?
A. When we photograph -- when we utilize luminol, it's very dark in the room. So any time we get a -- where we have an indication of where blood is, in which a luminescence, a concentration of luminescence, we take a pen and mark it, because we can't see it all that well in the dark. So we circle those areas where we have a presumptive test, a positive, suspected positive reading of blood present.
Q. Okay.
A. So that is what those blue marks are. That's from after the luminol tests.
Q. So these presumptive tests that you mentioned, were part of those tests conducted in this square area where you've talked about earlier actually collecting some samples from the padding?
A. Yes.
Q. Then in addition, the presumptive tests showed indications of blood at these other spots, as well. But the samples were actually collected from the square cutout area?
A. Yes, and a few other areas were collected.
Q. I want to show you State's Exhibit No. 221.

Does a -- do you recognize what is depicted in this photograph?

A. Yes.

Q. This is the same apartment you have talked about earlier. Correct?

A. That is correct, yes.

Q. And would you agree that this is the fireplace area in that apartment?

A. Yes.

Q. And these are -- for lack of a better term, some fireplace tools, a scoop and broom and that sort of thing that are usually associated with a fireplace. Right?

A. Yes.

Q. Now, was there any item missing from this group of tools when you were there?

A. Sergeant Crandell noted that the fireplace poker was missing from the fireplace.

Q. I want to show you what has been marked as State's Exhibit No. 232. Do you recognize what is depicted in this photograph, sir?

A. This is a photograph that Sergeant Crandell took of a coffee table that was owned by Tori Patrick.

Q. And this -- this investigation or checking of the coffee table, did that happen at a later time than

when you were first looking at Miss Patrick's apartment at River Falls?

A. Yes.

Q. And was that because Miss Patrick indicated that she had seen things on here that might be blood, and you guys wanted to check that, as well?

A. That's correct, yes.

Q. Do you know whether it turned out this was blood or not?

A. I believe that I submitted a sample of swabbing that Sergeant Crandell obtained, and no blood was detected.

Q. And so that gives the jury a feel for the process. If there is a suspicion of, luminol or other presumptive tests may or may not help, and -- but you don't just take a guess. I mean, if you think there is a possibility, further tests are conducted. If there is an indication that you're on the right track, then more tests are conducted --

A. If we don't perform the tests, we will collect it and we'll submit it, if we have a strong suspicion that it might be, or if we have any doubt. If we just don't know, we go ahead and take it.

Q. Did -- now, you were mentioning a few moments ago that in addition to the River Falls Apartments, you

assisted in some other investigation in another physical location. Can you tell us where that was?
A. Other than the apartment?
Q. Yes, sir. Were you at Mike Elliston's farm?
A. Yes, I was.
Q. And why did you go there?
A. We had -- by that time we received some information that Dustin Pool had been taken to that location, and probably held captive there for a short time. I believe also at that time we had some indication that he may have died at that location.
Q. I am --
MR. FARREN: May I approach the witness, Your Honor?
THE COURT: Yes.
Q. By Mr. Farren) I'm showing you what has been marked as State's Exhibit 176. Do you recognize that to be of a -- I guess --
A. That is an adjoining house to his property.
Q. That is the house next to Mr. Elliston's place. Then 181 --
A. This would be Mr. Elliston's place. This is actually his garage. His house is off to the right.
Q. And have you -- in State's Exhibit 181, you -- have you been inside there and assisted in collecting

evidence inside that location?

A. Yes, sir, I have.

Q. Now, there is an upstairs area that obviously the roof is higher than the rest. Is -- was it -- any of your efforts take place in that room and the upstairs?

A. A lot of our efforts was spent in the upstairs area.

Q. Now, I'll show you State's Exhibit No. 203 and State's Exhibit No. 236. Do you recognize what is depicted in these two photographs?

A. Yes, sir. State's Exhibit No. 203 is what we're looking at. It's the white metal, circular end, which is a base of a chair, a swivel chair with its webbing missing. This was a photograph in the attic, what I refer to as an attic of the second upstairs portion of Mr. Elliston's home. It was behind a false wall, which we found this chair on a second visit, not our first visit.

And then State's Exhibit No. 236 is a photograph of the chair in our lab where I photograph it before I start to examine it and -- for evidence.

MR. FARREN: May I have just a moment, Your Honor? I apologize.

THE COURT: Yes, sir.

Q. By Mr. Farren) Are you familiar with a stairwell that -- a stairwell and steps that lead up to this second floor that you mentioned a few moments ago at Mr. Elliston's farm?

A. Yes, sir, I am.

Q. Can you -- can you describe for the jury sort of how this stairwell is set up, how it was arranged?

A. When you -- when you walk into the main entrance of Mr. Elliston's -- what we refer to as his shop, as you walk in and off to the right, there is some stairs in the back. It's a narrow stairway and it goes straight up to this upstairs room.

Of course, the shop is cluttered with a lot of items. As a matter of fact, there is a roll of carpet on the stairway that had been there. There was no carpet on the steps, but the roll of carpet was there, and you -- it leads up to this smaller room that had some tables, a work counter or whatever with -- just filled with tools and other miscellaneous items.

MR. FARREN: May I approach, Your Honor?

THE COURT: Yes.

Q. By Mr. Farren) I show you what has been marked as State's Exhibit 194 and State's Exhibit 196. Do you recognize what is depicted in those photographs?

A. Yes, State's Exhibit 199 and 196 are

photographs of the steps --

Q. I think it's actually 194.

A. 194?

Q. I think it's 194.

A. 194 is a close-up of the photograph on the left, showing some steps. And then a photograph on the right is the photograph of the stairway.

Q. It's actually looking down?

A. Down. Actually looking down.

Q. Now, in the course of your investigation at Mr. Elliston's farm, do you remember anything of significance about the seventh step on the stairway?

A. On the seventh step, actually on the wall of the seventh step, Sergeant Rickwartz indicates to me some spots that he thought that possibly could be blood at that time, because of the discoloration of it and such, and the length of the time from when this whole offense occurred. He informed me that he was going to swab this sample, and this was in conjunction with a few other swabbings of areas of that stairway, as well.

Q. And do you have those swabbings here today?

A. Yes, I do.

Q. Are they part of what you brought up? Are they --

A. I believe they're the ones that you -- yes, I

do.

Q. Okay. Explain to the jury briefly -- I don't want to belabor the obvious, but sometimes we use terms and assume they mean the same thing to other folks and they may not. Would you explain what you mean by swabbing?

A. What we do is when we have a suspected stain, and if it's a small amount and we don't want to test it with a chemical or presumptive test, we take a cotton swab and wet it with a saline solution with distilled water, and in a circular motion, swab up that stain as concentrated on one portion of the swab, as much as possible.

Then we set it in a -- we place it in a little box that is made to allow air to air dry the specimen. And this is what we've referred to as a swabbing.

MR. FARREN: And may I approach again, Your Honor?

THE COURT: Yes.

Q. By Mr. Farren) I'm showing you what has been marked as State's Exhibit 197 and State's Exhibit 198. Do you recognize this to be some of the drops that you have mentioned on the stairway at Mr. Elliston's farm?

A. Actually State's Exhibit 197 is a photograph of a drop, a stain that is on the -- on the third step

above from the floor, that Sergeant Rickwartz so designated. And then of course, State's Exhibit 198 would be the close-up photograph with a ruler that he took of that stain.

Q. And so the third step and you believe the seventh step, there were some of these --

A. There was another -- but there was a smaller stain, yes. And it was actually on the wall.

Q. On the wall above the seventh --

A. Or next to the seventh step. On the east wall.

Q. And these photos accurately depict the way it appeared at that time?

A. Yes.

Q. While I'm at it, because Lord knows, we don't have enough photographs in evidence already, State's Exhibits 199, 200, 201, 202, 193, and 195, do you recognize all of these to be various locations at the Elliston farm?

A. Yes. And most of our downstairs area may be a photograph by Sergeant Rickwartz or Corporal Rodden.

Q. And those downstairs photos, these are things that -- like additional duct tape?

A. A bucket with tape in it.

Q. Tupperware kind of holder with some rope --

A. Yeah, that was taken upstairs.
Q. So number --
A. State's Exhibit --
Q. 200 is actually upstairs. The Tupperware and rope is upstairs -- 199 --
A. That would be downstairs.
Q. Okay. 201?
A. 201 is also upstairs.
Q. Okay. 202, is that a --
A. That would be a close-up of the rope.
Q. The rope? Okay. And then 193?
A. I don't -- Corporal Rickwartz photographed it.
Q. You're not sure on that?
A. I'm not sure on that.
Q. Okay. And then 195?
A. Yes.
Q. Again, this is --
A. The -- near the stairwell, off to the side of it.
Q. State's -- all of these photos, other than 193 we'll leave for Sergeant Rickwartz. 195, 199, 202, 201, 200, 197 and 198, do all of those photos accurately depict the scene as it appeared at that time?
A. Yes, sir.
MR. FARREN: Offer those photos into

evidence.

THE COURT: Re-read those numbers consecutively, if you would.

MR. FARREN: Yes, sir.

THE COURT: If you can.

MR. FARREN: Yes, sir. We're offering 195, 197, 198, 199, 200, 201, and 202.

THE COURT: All right. Any objection?

MS. MCELROY: No objection, Your Honor.

THE COURT: State's 195, 197, 198, 199. 200, 201 and 202 are admitted.

Q. By Mr. Farren) I think we were talking a few moments ago about whether you had the swabbing with you. Do you believe it's --

A. I have -- the swabbing is -- I -- my 61, which would be a swabbing from the east wall of the second step, I do not have the swabbing of suspected blood on the third step.

Q. But do you have it on the seventh step?

A. I do have it on the seventh step.

Q. And do you know if that was later submitted to the lab?

A. Yes, it was.

MR. FARREN: Can he step down to retrieve that, Your Honor?

THE COURT: Yes.

Q. By Mr. Farren) And once this had been obtained, the method you have already described for the jury, and it was preserved in the method that you have described, what happened to this exhibit next?

A. State's Exhibit -- I mean, I'm sorry. Yeah, State's Exhibit 24, my item 61, was submitted to the Department Of Public Safety Crime Lab in Lubbock, and they would have it compared to the known DNA of the victim.

Q. And so the item you're holding, we've marked as State's Exhibit 24. Is that correct?

A. Yes.

Q. And this?

A. That swab goes inside that envelope --

Q. So 24, in total then, is this white envelope with various writing on it. And inside is a smaller white envelope or container. And inside that is a like a Q-tip?

A. Yeah.

Q. And that is what you used to swab the area and collect the fluid or whatever dried there?

A. Yes, sir.

Q. And then I -- would you agree I'm placing the smaller paper container into the white envelope that is

marked State's Exhibit 24 at this time?

A. Yes, sir.

Q. And you opened that today here in the courtroom?

A. That's right.

Q. Once you had obtained State's Exhibit 24, it either remained in your custody or in some secure location until you forwarded it to the lab?

A. Yes, sir.

Q. Once it arrived at the lab, again, you're familiar with their procedure. And it's either in their possession, or maintained in a secured location?

A. They have a protocol of the person who receives it, documents when it's received. And then they have a secured area where it's locked up. And then until it's assigned to a person that would analyze it or test it, whatever, it's their responsibility to check that out. And then when they finish analyzing it, it gets locked back up and then comes back to us.

Q. And so State's Exhibit 18, which was the carpet you identified earlier, we had already gotten it to the lab. And now State's Exhibit 24, a stain that was swabbed at the farm, your testimony is he's taken that to the lab?

A. Yes, sir.

Q. So those two items we know went to the lab because you and other investigators believed this might be the blood of Dustin Pool?

A. That is correct.

Q. And why did you send it to the lab? What did you want the lab to do with these two items once they received them?

A. My request was to, first of all, I asked them if it could determine whether it was blood, and if so, if it was blood, to do a DNA profile on it, if possible, if there was sufficient amount to do so. And if so, would they compare that DNA from that specimen to the known DNA of Dustin Pool.

Q. Now, the known DNA of Dustin Pool was a bit of a problem, wasn't it?

A. Yes, sir, it was.

Q. Because you didn't know where Dustin Pool was at the time that you collected this evidence. Right?

A. Yes, sir.

Q. Once you -- once -- and I want to leap ahead a little bit ahead in time. We will come back and fill in the details later. But eventually, were you present at the exhumation of the body of Dustin Pool?

A. Yes, sir, I was.

Q. And so now we have two samples of suspected

blood that has been forwarded to the lab. And now you have the body of Dustin Pool. And so your hope, I assume, is that you can obtain some sort of known DNA from Mr. Pool and have them do this comparison?

A. Yes, sir, that is correct.

Q. But is it that simple?

A. No, sir, it's not.

Q. What was the problem?

A. The problem with the DNA for Mr. Pool was his body was decomposed to a point where DNA deteriorated. It's -- the area such as blood was not possible -- or, you know, if it is -- if he does have blood, it's deteriorated, decomposed, through the process of decomposition. Or it's possible his hair -- and of course again, it's degraded, not possible for DNA. Then the other part is probably the pulp from the teeth of the mandible.

Q. Let's talk about the mandible a moment. Is the mandible often a pretty good source in these situations? Does the substance within the mandible that may have DNA, does it often remain intact or usable for a longer period of time?

A. The bone of the mandible would be, but more importantly the pulp from underneath the teeth, it's the most prominent area. But of course, you would try to do

the bone because that is a larger piece of evidence and such that you would extract DNA.

MR. FARREN: May I approach the witness, Your Honor?

THE COURT: Yes, sir.

Q. By Mr. Farren) At this time I'm showing you what has been admitted as State's Exhibit 99. Now, you attended the autopsy of Mr. Pool. Is that correct?

A. Yes, sir.

Q. And do you recognize what is depicted in this photograph?

A. Yes, sir, I do.

Q. You have mentioned the mandible and it being a promising source of DNA for -- a known DNA for testing. Would you agree that the lower portion of the jaw and the teeth involved in this photograph were in that area there. Is that correct?

A. Yes, sir.

Q. And do you know if the mandible, in fact, was collected at the autopsy and forwarded to the DPS lab?

A. Yes, sir, I do.

Q. And did you personally take that mandible to the DPS lab?

A. Yes, sir, I did.

Q. And again, once it was in your custody and

control, was it ever out of your control or in a secure location?

A. Not out of a secured location, no.

Q. Okay. So -- and once you took it to the DPS lab, the same procedures were followed there that you described in reference to the other exhibits that were sent there?

A. Yes, sir.

Q. Have you -- did you bring --

MR. FARREN: May I approach, Your Honor?

THE COURT: Yes, sir.

Q. By Mr. Farren) I'm showing you what is marked as State's Exhibit No. 253. Do you recognize this document and your connection to the document?

A. Yes, I do.

Q. Okay. And what is this?

A. This is a Texas Department of Crime Safety Laboratory Submission form, in which -- when I take the -- when I took the mandible there, I would sign in, describe it, and of course it's dated when I -- when they receive it. And of course, we already had a lab number because I had already submitted some previous items so the lab number was written on it. This shows that I turned --

Q. So this is a record of -- where you signed

this item of evidence in to the DPS lab?

A. That is correct.

Q. Okay. Did you bring that exhibit with you today?

A. Yes, sir.

MR. FARREN: May he retrieve that, Your Honor?

THE COURT: Yes, sir.

Q. By Mr. Farren) And while you're doing that, Sergeant Burgess, is the handwriting on here where you submitted, this is your handwriting?

A. Yes, sir.

Q. Okay.

MR. FARREN: We would offer State's 253 into evidence, Your Honor.

MS. MCELROY: We have no objection.

THE COURT: State's 253 is admitted.

Q. By Mr. Farren) I'm showing you what we've marked as State's Exhibit No. 246. Do you recognize State's 246?

A. Yes, I do.

Q. And what do you recognize it to be?

A. This is a -- the mandible that was removed from Dustin Pool by Dr. Natarajan, and which I picked up from the medical examiner's office and transported to

the DPS.

Q. Now, the mandible itself is in a plastic bag that is part of State's Exhibit No. 246?

A. Yes, sir.

Q. And then in addition, there is a --

A. A brown bag --

Q. -- paper sack with some writing. What role does that play?

A. This was the bag, the brown paper bag is a bag that I placed the plastic bag containing the mandible in and transported it to the DPS lab.

Q. And then in an abundance of caution, we've taken the mandible, which is already in one plastic bag and put it in a second plastic bag. Is part of that the aroma problem we talked about?

A. Yes, helps cut down on the smell.

MR. FARREN: Offer State's Exhibit 246 into evidence, Your Honor.

MS. MCELROY: I have no objection, Your Honor.

THE COURT: State's Exhibit 246 is admitted.

Q. By Mr. Farren) Now, I want to go back to the farm. When you were at the farm, did you learn from Mr. Elliston or other investigators about any sort of a

metal box, a green metal box that was involved in this -- in the homicide of Dustin Pool?

A. Yes, sir, we did.

Q. What did you learn about this box?

A. On one of our return trips, Mr. Elliston --

Q. And let me stop you a second. You indicated that you actually went to Mr. Elliston's farm twice. Is that correct?

A. Twice, well, three times.

Q. Well, do you know whether subsequent trips to the farm were after Mr. Elliston had given his second statement and begun to cooperate with the police?

A. Yes.

Q. Okay. So when he gave the first statement -- well, when he gave the second and subsequent statement, he provided additional information that led to the need to go back to the farm and gather additional information?

A. That is correct, yes.

Q. And at some point, you learned about this green metal box. What did you learn about it?

A. We learned that -- from Mr. Elliston that he told me that they had placed Dustin Pool in a refrigerator box, and that pieces of it, it was torn up and separated. They first took us over to the dumpster

by his residence and showed us some plywood.

Q. Let me interrupt you first. Just so that we all understand, he had indicated this box had been used to transport Mr. Pool, but subsequently he had tried to tear it up and destroy it, get rid of it?

A. Yeah, Mr. Elliston indicated that that's what they did. They -- he and others, they got rid of a lot of the stuff that wouldn't leave any of the evidence.

Q. All right.

A. He took us to a dumpster by his property where there was some plywood, particle board that had some -- what we thought might possibly be blood or whatever, we gathered that. And then he pointed us to a back portion of his property by the fence line, gathered some junk and where there had been a burn area where he said they had burned some stuff. And this was the green metal portion of the box that he said that was used to transport Dustin Pool. The wood was inside the metal box.

Q. So in essence, this old refrigerator had been lined with some kind of plywood inside by Mr. Elliston?

A. Yes, that is correct.

Q. Did you bring any of those items with you today?

A. I brought the metal.

MR. FARREN: May he step down?
THE COURT: Yes.
Q. By Mr. Farren) This is in several pieces. Is that correct?
A. Yes, it is.
Q. And based on the grimace on your face as you handle this, it's fairly heavy?
A. It's awfully heavy.
Q. And would you agree with me that the various pieces of metal involved here are marked as State's Exhibits 31 through 38?
A. Yes.
Q. And these are all items that you recognize as items that you collected at the scene after you learned this information from Mr. Elliston?
A. Yes.
MR. FARREN: At this time, we would offer State's Exhibits 31 through 38 into evidence, Your Honor.
MS. MCELROY: I'm sorry. I have no objection.
THE COURT: State's 31 through 38 are admitted.
Q. By Mr. Farren) Now, you mentioned some plywood that was involved that Mr. Elliston indicated

was originally part of this box?

A. Yes.

MR. FARREN: May I approach the witness, Your Honor?

THE COURT: Yes.

Q. By Mr. Farren) I'm showing you what has been marked as State's Exhibit No. 235. Do you recognize what is depicted in this photograph?

A. Yes. This is a photograph taken of one of the pieces of plywood that we had gathered at Mr. Elliston's, having the item number that I placed on it. And having some spots or stains that we thought might be blood circled, indicated on the board that would eventually later be removed.

Q. And does this photo accurately depict the piece of plywood you described?

A. Yes.

MR. FARREN: Offer State's Exhibit 235 into evidence.

MS. MCELROY: I have no objection.

THE COURT: State's 235 is admitted.

Q. By Mr. Farren) The photograph is now being displayed to the jury. Again, I don't know how well it shows up from their perspective, but there is a -- would you agree that with my pen, I'm pointing to a couple of

spots. One has a square drawn around it, and one has a circle drawn around it?

A. And then there's one off to the right corner.

Q. Here, as well?

A. Yes.

Q. Are those the spots you made reference to a little bit earlier?

A. Yes.

Q. Do you -- were you able to conduct presumptive tests on those spots?

A. We decided not to do that, because they were such large stains. And we thought the DNA was so important we didn't want to jeopardize any DNA by doing a presumptive test. We thought we would leave it in the hands of the people at the lab.

Q. Okay. All right. In addition to State's Exhibit -- in addition to State's Exhibit 18, the carpet you have already identified, do you know if any other pieces of carpet or padding were submitted to the lab from Tori Patrick's apartment?

A. Yes, sir.

Q. Did you bring that item with you?

A. Let's see. The only --

Q. It's your --

A. Twenty-four.

Q. It's a Special Crimes unit number 11?
A. Yes.
Q. And is it part of the items you brought up today?
A. Yes.
MR. FARREN: May he step down, Your Honor?
THE COURT: Yes.
Q. By Mr. Farren) Now, for the record, you've retrieved from the collection of items you brought up what has been marked as State's Exhibit 16. Is that correct?
A. Yes, sir, it is.
Q. And were you involved in the investigation of the crime scene when this item was collected as evidence?
A. Yes, I was.
Q. And once that item was collected, was it either -- once you had it, was it in your control or in some secure location until you took it to the lab?
A. Yes, sir.
Q. And then once it's at the lab, then the same procedure was used?
A. Yes, that's correct.
Q. And why did you submit State's Exhibit 16 to

the lab?

A. This is one of the areas that we -- when we had done luminol, they gave us a positive result of the indication of blood. So it was cut out and submitted.

Q. Now, on State's Exhibit 16 and the other items that you have taken to the lab, just so the jury will understand. The reason you -- you're able to recognize and identify those is because of the writing and so forth that's on this plastic container. Right?

A. Yes. The items that we collect will have the person who initially collected it, its initials or badge number or both. And then, of course, me being the designated lead in the crime scene investigation, it will have my initials and badge number upon them as well.

Q. So once an item is collected at a crime scene the practice is to make some kind of writing or mark on there that will identify the person that collected it. And then anybody that handles it after that will also write some either on the item itself or the container it's in?

A. If it is possible to write something on there. Sometimes it's not. So we either attach a tag or we make it known to the individual.

Q. Later when we're in front of a jury, then

you're able to go back and from the writing that is on the container or the item itself, you can tell us who collected it, who handled it after that, and got it out to the lab?

A. That's correct.

MR. FARREN: Your Honor, we, of course, anticipate additional testimony to State's Exhibit 16, to which he just testified, and State's Exhibit 24. For convenience sake, we would like to offer them into evidence at this time. He has identified them as objects collected at the scene. And we certainly anticipate additional evidence being offered about these items later. 16 is the additional piece of carpet from Tori Patrick's apartment, and 24 is the swabbing from the stairwell of Mr. Elliston's farm.

MS. MCELROY: There is no objection.

THE COURT: State's 16 and 24 are admitted.

Q. By Mr. Farren) Now, you've already indicated to the jury that you were present during the autopsy of Mr. Pool. Is that correct?

A. Yes, sir.

Q. When you were at the autopsy, did you observe Dr. Natarajan and his assistants remove a sock from Dustin Pool's mouth and throat?

A. Yes, sir.
Q. And had you -- did you bring that item with you today?
A. Yes, sir, I did.
Q. And in addition to the sock, did you -- now, a few moments ago, I just -- I want to go over this so the jury will understand the distinction between these two problems. If, in fact, the person upon whom the autopsy was being performed was Dustin Pool, then the mandible it was hoped would provide the DNA to compare to the samples from Tori Patrick's apartment and the farm?
A. Yes, sir.
Q. The next problem, then, would be how do we prove that that person, in fact, is Dustin Pool?
A. Yes, sir.
Q. How did you go about doing that?
A. I took his fingerprints at the autopsy. And after the autopsy, when I travelled back from Lubbock, I obtained a fingerprint card having Mr. Pool's fingerprints.
Q. Now, he had been arrested in the past. Is that correct?
A. Yes, that is correct.
Q. Is that where you were able to obtain known prints?

A. Yes, sir.

Q. And so you -- now, you had indicated to the jury earlier that while he had been encased in cement, he was -- there was decomposition problems with the blood and that sort of thing?

A. Yes.

Q. How then were you able to lift rolled inked impressions from him?

A. Fortunately, Mr. Pool was buried, which is a good way to preserve a body. The least favorable is up on the surface and in between being in the water. So he's preserved in the cool -- even though it's a damp place. So he had some skin slippage, where the skin becomes very loose, elastic. And it's -- we can either remove the skin off the fingers, or we can at least dry it enough sufficiently to make the ink adhere to the ridges of the fingers. And we were able to do that.

Q. Would you share with the jury briefly a summary of any training, education, and experience you have in the area of fingerprint collection and fingerprint identification?

A. Beginning in the mid 80s, I believe it was '85 when I first was being transferred to the ID division of the Amarillo Police Department, where I was trained somewhat on the fingerprint patterns and such,

eventually going to a two-week long school at DPS in Austin, where it's an intense study of fingerprints and the studying of fingerprints and comparing of fingerprints. A couple of years after that, I attended an advanced fingerprint school, and then advanced latent prints fingerprints school, and then a palm print school and an advanced finger -- chemical development of fingerprints from the FBI.

Q. And have you ever testified as an expert in this area in courtrooms in the State of Texas?

A. Yes, sir, I have.

Q. On one occasion or many occasions?

A. Many occasions.

Q. What is a ridge, in reference to a fingerprint?

A. On your fingers and on the bottom of the feet, as well, you have ridges that -- what we call friction ridges, which are placed there for you to be able to grab hold of things and stuff. But the ridges are made up of skin, raised skin. It has -- there's valleys, and in these ridges, there are sweat pores which you secrete a fluid from your body that helps assist in leaving a print. 98.5 percent of it's water. The rest of it's fats, amino acids and salts.

Q. So if I were to drive out here to a cotton

field outside Amarillo, Lubbock or someplace where they have plowed the field, and I have raised areas of soil, and then in between I have little dips or valleys between those, on a fingerprint would that raised area be the equivalent of a ridge?

A. Yes, that is a great analogy.

Q. And then in between these raised areas or little valleys, what are those called on a fingerprint?

A. We just call them valleys and ridges, and the upper surface or whatever and...

Q. Now, these ridges that are on our hands that you've indicated we secrete oils and sweat through, because they are raised higher than the valleys, if we -- if I were to touch this photograph, for instance, is it possible that I will unwittingly, unknowingly leave the pattern of those ridges and valleys on this photograph because I have left the pattern where the oil has adhered or the moisture has adhered to the ridge, and in between there is a blank spot because the valley is lower and it didn't touch the photograph?

A. That is correct.

Q. These ridges that are on our hands and palms and fingers and feet, is there anything unique about them to each individual?

A. Yes. The ridges form what we call minutiae,

and minutiae is a French word meaning small detail. The ridges will form things such as bifurcations, like a fork, where they'll create small ridges. They go a little way and stop, and maybe pick up somewhere else. They may create a shorter ridge, they may create an island, or they may just be a little dot. And what we do, we use those minutiae points to help us to make an identification from an unknown print to a known print.

Q. So each person has unique patterns of deltas and swirls and patterns of ridges on their hands. Are they -- are these patterns, these deltas, swirls, broken ridges, are they unique to each individual?

A. Yes, sir, they are.

Q. And so if you took a set of my prints -- by the way, what is a rolled inked impression?

A. A rolled inked impression is referred to as also a known inked impression. That is where we know who the individual is. We ink it with printer's ink, and we take the impression. It's usually -- it's what we refer to as those we get from the correction facility. That is a rolled inked impression.

Q. So when an individual gets booked into a jail or a prison, something of that nature, they take his hands, and each finger, they roll it in ink, and those ridges we've talked about, the ink adheres to it, to

those ridges.

A. And it leaves a pattern of a finger --

Q. When we put it on the paper, it leaves a pattern of those ridges, because again, the valleys don't make contact with the paper, because they're lower than the ridges. And so this pattern is preserved in ink on a piece of paper?

A. That is correct.

Q. And it's this inked impression that you talked about earlier that you collected that you were able to determine was the known impression of Dustin Pool?

A. Yes, sir.

Q. Because he had been booked into jail?

A. Yes, sir.

Q. Now, a latent print, of course, that's different. That is what I would leave if I touched the photograph and left behind those oils and things?

A. That is correct.

Q. Once you had -- how did you go about getting Mr. Pool's -- or the person on whom the autopsy was performed, you mentioned you could either actually remove the skin itself or roll the impressions there. Which method did you use?

A. I rolled the impressions.

Q. So his were well enough preserved that you

could actually roll his inked impressions at the autopsy?

A. Yes.

Q. Once you had obtained the rolled inked impressions and you got known samples of his fingerprints, did you make a comparison?

A. Yes, sir, I did.

Q. And were you able to reach a conclusion about whether the inked impressions you took at the autopsy, in fact, matched the known inked impressions of Dustin Pool?

A. Yes, sir, I did.

Q. What was your conclusion?

A. The conclusion was the known inked impressions I had matched the inked impression I took of the body at autopsy is that of being Dustin Pool.

Q. And so as an expert in the field, can you say that the prints that you lifted at the autopsy are the prints of Dustin Pool to the exclusion of every other human now living or ever having lived?

A. Yes, sir, I can.

Q. So we now know that the man the autopsy was performed on was Dustin Pool. The next question, of course, would be will that mandible contain sufficient DNA to be tested and compared to your suspected samples

from the apartment and the farm?

A. That is correct.

Q. Have you -- did you bring with you today any of the inked impressions about which you spoke?

A. Yes, sir.

MR. FARREN: May he retrieve at a break?

THE COURT: Yeah, let's take a break. Take a 15-minute break. If y'all will be back in the jury room.

(Recess.)

THE COURT: Thank you, ladies and gentlemen. Everyone be seated. Mr. Farren.

MR. FARREN: Thank you, Your Honor. May I approach the witness, Your Honor?

THE COURT: Yes.

Q. By Mr. Farren) I'm showing you again State's Exhibit 193. We talked about it earlier. Upon further reflection, do you recognize where that -- what is depicted there?

A. Yes, sir, I do.

Q. And this is some decking near the foot of the stairs. Is that correct?

A. At Mike Elliston's place, yes.

Q. And there is a -- well, first of all, does it accurately reflect the way it appeared at that time?

A. Yes.
Q. In fact, you guys have laid a measuring device down to sort of help give perspective to the spot?
A. That's correct, yes, sir.
MR. FARREN: Offer State's 193 into evidence, Your Honor.
MS. MCELROY: No objection, Your Honor.
Q. By Mr. Farren) The jury is now looking at the photograph on the screen. And there's sort of a smudged area.
A. Just above it, inside the "L" shape, yes.
Q. Did you and your associates conduct a presumptive test there, as well?
A. Yes, sir.
Q. That turned out to be negative. Is that correct?
A. That's correct.
Q. Okay. Did you bring with -- by the way --
MR. FARREN: Just a second, Your Honor.
Q. By Mr. Farren) By the way, during the course of your investigation, did you learn about a pair of pliers that might have been used in some way in the crime that you were investigating?
A. Yes, sir, we did.
Q. Did you collect a set of pliers that at least

match the description that you were given at Mr. Elliston's farm?
A. Actually, Mr. Elliston brought them to us at Special Crimes office.
Q. So Mr. Elliston brought them to you and identified these as the pliers that he had made reference to?
A. Yes, sir.
Q. And do you have those with you today?
A. Yes.
Q. Could you retrieve those, please? Sorry.
MR. FARREN: May I approach the witness, Your Honor?
THE COURT: Yes.
Q. By Mr. Farren) Now, this has been marked as State's 65. Is that correct?
A. Yes, sir.
Q. As you've indicated earlier, the exhibit itself is in a brown paper wrapping and a brown paper sack. And these items have writing on it that helps you tell who collected and who held it and so forth?
A. That's correct, yes.
Q. Okay. If you would open the item up. And in fact, are these the pliers to which you made reference?
A. Yes, they are.

Q. And did you -- because they were described as having a role in the crime, did you in fact submit these pliers to the DPS lab for testing, as well?

A. Yes, sir, I did.

MR. FARREN: Your Honor, we anticipate additional testimony later, and concerning State's Exhibit 65, but they have been identified as an item collected in reference to his investigation. We would offer it into evidence at this time.

MS. MCELROY: We have no objection.

THE COURT: State's 65 is admitted.

Q. By Mr. Farren) And you submitted -- once they were in your custody, did they remain in your custody or in a secure location until they were submitted to the lab?

A. That is correct.

Q. And of course, once they arrived at the lab, the same procedure is followed that you described earlier?

A. Yes.

Q. Now, in addition to Tori Patrick's apartment and Mr. Elliston's farm, were you ever at Craig Kimberlin's house or connected to any of the investigations there?

A. Yes, sir, I was.

Q. And did you collect items that you believe to be evidence at that location?

A. Yes, sir, we did.

Q. Did you bring those items with you?

A. Yes, sir.

Q. If you would retrieve those.

A. (Witness complies).

MR. FARREN: May I approach, Your Honor?

THE COURT: Let me ask you, are these the shovels that are already in evidence in the photograph?

MR. FARREN: That is correct, Your Honor.

THE COURT: Is there any reason to have the shovels themselves in evidence?

MR. FARREN: Other than to confirm that the photographs that we've admitted are the same as the shovels, Your Honor. But it's not absolutely necessary.

THE COURT: Are you going to have any objections to the shovels?

MS. MCELROY: No, Your Honor. I don't have an objection. I mean, I think that we could probably stipulate that we believe those shovels are accurately depicted in the photographs.

THE COURT: That would be all right. Let's just do it that way.

MR. FARREN: All right, sir.

THE COURT: Just set them back over there and you can point at them and say yeah, those are the same shovels.

MR. FARREN: Over the years, Your Honor, I've developed a tendency to be overly cautious and not leave anything out, just in case.

THE COURT: Oh, yeah? This is my 13th trial with you. I've seen that.

MR. FARREN: I've had some unpleasant experiences on appeal that made me do that.

THE COURT: Well, I understand.

Q. By Mr. Farren) In addition to the other items we've talked about, did you also attend -- I think you've indicated you were at the exhumation of the body of Dustin Pool?

A. Yes, sir, I was.

Q. I'm showing you what I have marked as State's Exhibit 157, 158, 159, 161, 163, 164, 165, 166, 167, 168, 169, 170, 171, 172, 173, and finally, 175. Would you view those photographs and tell me whether you recognize what is depicted there?

A. The State's exhibits that you have mentioned are photographs of the crime -- of the area where Dustin Pool's body was exhumed. And --

Q. And do these exhibits accurately reflect the

way the scene appeared at that time?

A. Except -- State's Exhibit 157 is a photograph where an abandoned car was located. Even though I was not present when it was removed, I had previously been to that area there and knew that car was there. And that car had been removed so they could have access to the --

Q. So in State's 157, you recognized that the car is no longer there. But you've also seen where the car was -- you have also observed the scene when the car was removed?

A. That's correct, yes.

MR. FARREN: Offer State's 157, 158, 159, 161, 163, 164, 165, 166, 167, 168, 169, 170, 171, 172, 173, and 175 into evidence, Your Honor.

MS. MCELROY: We have no objection.

THE COURT: They're admitted.

Q. By Mr. Farren) The jury has already observed a number of photographs of the scene, the above-ground area, and so forth. I want to talk to you mostly about the process of getting the body out of the concrete. In State's Exhibit 165, what is depicted here?

A. State's Exhibit 165 is a photograph of Sergeant Rickwartz removing some sludge and some water and stuff that was above the concrete area where we

recovered Dustin Pool.

Q. So at this -- at the time this photo was made, Sergeant Rickwartz was actually standing on top of the concrete that had been poured into the bottom of the pit and trying to get water and debris off of the top of that concrete?

A. That is correct, yes.

Q. State's 166?

A. This is a photograph of liquid sludge that Sergeant Rickwartz removed, scooped out.

Q. In State's 167, there is a very small --

A. Yes, piece of blue tarp.

Q. A little small blue area right there. What is that?

A. That is the person -- that is the tarp, a piece of the tarp that was wrapped around the body of Pool.

Q. And I noticed in the picture there are some -- what appear to be large sledge hammers and other devices. And was this being used to chisel away at the concrete?

A. Yes.

Q. State's Exhibit 168, the tarp now appears more visible. Is that correct?

A. More visible, and you could see a portion of

duct tape on there.

Q. State's Exhibit 169?

A. Again, more of the of the tarp being exposed, which contained a portion of the body of Mr. Pool.

Q. State's 170?

A. There is where Sergeant Rickwartz and I really removed a lot of the concrete where we're about to -- just prior to being able to make some final removals of some parts and secure the body to have it hoisted up.

Q. I'm going to skip a couple of photographs. 172?

A. It's a -- it's just another view of a previous photograph with -- where we finally removed all the obstacles in preparation to hoist the body out of the pit.

Q. And finally, State's Exhibit 173?

A. 173 is myself and Sergeant Rickwartz, after we've gotten the body up out of the hole and placed on a gurney to have it lifted up out of the --

Q. You're aware that there were other photographs made later on that same red stretcher or gurney up on the surface with the body on the gurney?

A. Yes, sir.

Q. And finally, State's Exhibit 175?

A. State's Exhibit 175 is after the body has been

removed, I continued digging underneath the body and showing that there is dirt underneath there, and which I located another item in the pit.

Q. What item did you locate?

A. A piece of a knife, the hunting knife. Actually it probably was only about a six-inch blade or four-inch blade, that I recovered down. And it was underneath the dirt, underneath the surface of the body.

Q. And were you ever able to determine if the knife was connected in any way to the homicide or just happened to be there?

A. No. As far as we know, it just happened to be there.

Q. If -- do you know if you continued to remove the dirt, eventually would you have reached a concrete bottom to this pit, or do you know?

A. I don't -- I don't know.

Q. You don't know. That's fine. You just know that you dug down and --

A. There was dirt, and I was digging in dirt.

MR. FARREN: May I approach the witness again, Your Honor?

THE COURT: Yes, sir.

Q. By Mr. Farren) I'm showing you State's Exhibit No. 272 and 273. What do you recognize those

items to be?

A. These are sketches that were done by Corporal Rickwartz of the place where we recovered the body.

Q. And, in fact, are you aware that the State has taken those two exhibits and we have expanded them. And they have been used by -- for demonstrative purposes in front of the jury, marked as State's Exhibit 245 and State's Exhibit No. 244.

A. Yes.

Q. Did you and the other investigators -- was this actually the original drawings that were used to make these blown-up demonstrative pieces of evidence?

A. Yes.

Q. And these items accurately depict -- it may not be to scale, but they show the proper relationship to the chambers and the walls and things of that nature?

A. That's correct.

MR. FARREN: Offer State's Exhibits 272 and 273 into evidence, Your Honor.

MS. MCELROY: We have no objection.

THE COURT: State 272 and 273 are admitted.

Q. By Mr. Farren) Okay. I want to show you State's 271, and if you'll look to your left, do you recognize what is -- what you're holding in your hand,

the drawing?
A. Oh, yes. It's a bird's eye view of the apartment of -- Tori Patrick's apartment.
Q. And would you agree that State's 271 is a smaller version. In fact, it was used to make this blow-up exhibit, 242, which has been used for demonstrative purposes?
A. Yes, sir.
Q. And that again may not be to scale, but it is an accurate drawing as far as the relationship of the walls of the --
A. This is the stairway.
Q. Oh, I'm sorry. I've confused you.
A. This is the hallway.
Q. I stand corrected. I misled you, Sergeant. State's 243. I said 242. Look again. Would you agree that this is the same drawing as State's 242, not --
A. Yes, sir.
Q. And this is Mr. Elliston's garage and shop area where you conducted the search. Is that correct?
A. Yes.
Q. All right. And this is simply the smaller version that was used to make the blow-up of State's 243. Is that correct?
A. That is correct.

MR. FARREN: Offer 271 into evidence, Your Honor.

MS. MCELROY: No objection.

THE COURT: That's the Elliston garage?

MR. FARREN: Yes, Your Honor.

THE COURT: It's admitted.

Q. By Mr. Farren) Showing you what has been marked as State's Exhibit 206. Do you recognize what is depicted in that photograph?

A. Yes, sir. It's a photograph that I took of a garden hoe that I took from Kimberlin's place.

Q. And does it accurately reflect the way it appeared at that time?

A. Yes.

MR. FARREN: Offer State's 206 into evidence, Your Honor.

MS. MCELROY: No objection.

THE COURT: 206 is admitted.

Q. By Mr. Farren) Why did you take a photograph of this? And did you eventually collect this item?

A. Yes, the -- I collected the item and photographed it at the lab, and it's mainly because of the residue that was on the blade of the tool.

Q. And did you believe that to be concrete?

A. Yes, I did.

Q. Did you bring -- when you were at the scene of the exhumation of the body, did you and those assisting you discover a concrete sack there?
A. Yeah, Sergeant Rickwartz, a corporal at that time, had found a concrete sack down inside one of the boots of the building and he turned it over to me at the scene.
Q. And that was collected and preserved?
A. Yes.
Q. And do you have that with you?
A. Yes.
Q. And we have marked this as State's Exhibit 22. Is that correct?
A. Yeah, 22.
Q. This was collected at the scene of the exhumation of the body. Is that correct?
A. Yes, by Sergeant Rickwartz.
Q. Now, obviously you believe cement or Sackrete was involved in the events that took place there.
A. Yeah, we had reports that he was buried under concrete, that that was mixed up at the scene.
Q. Now, do you know that this particular sack was part of that, or was collected because it may have been and there is no way to know for sure?
A. We don't know for sure whether it was actually

part of the burying of Mr. Pool. It was collected because our information was that concrete was bought and was used to cover the body and because it was there in the boot, the hole where he was at.

MR. FARREN: Offer State's 22 into evidence, Your Honor.

MS. MCELROY: No objection.

THE COURT: State's 22 is admitted.

Q. By Mr. Farren) Are you familiar with what we call a blood or DNA search warrant, a warrant to collect fluid specimens or blood from a suspect?

A. Yes, sir.

Q. In this particular case did you, in fact, obtain search warrants for blood from various suspects in this case in order to do the opposite of a rush to judgment? In other words, you guys tried to --

A. To make a comparison to whose DNA was left at certain areas.

Q. And that was done and attempts were made to compare to lots of folks, and not just one person?

A. Yes, sir.

Q. You were talking about fingerprints earlier. Do you have those inked impressions with you?

A. Yes, sir, I do.

MR. FARREN: May I approach, Your Honor?

THE COURT: Yes, sir.

Q. By Mr. Farren) Now, the exhibit as a whole has been marked as State's Exhibit 39. Is that correct?

A. Yes, sir.

Q. It's sort of a manila covered envelope, again with writing on it that helps you identify who collected it, who handled it and so forth?

A. That's correct.

Q. Inside the envelope there are some documents with these inked impressions. Is that correct?

A. Yes, inside the envelope are two letter-sized white pieces of paper, containing inked palm prints that I took from the victim, Pool, at the autopsy. There is also a clear plastic bag that contains a fingerprint strip of inked impressions that I took of the victim at the autopsy.

Also enclosed is a Randall County print card and palm print card of Dustin Pool when he was incarcerated. And these came from their files. And then there is also Amarillo Police Department fingerprints and palm print cards that I obtained from the APD files to make -- and I used those inked impressions from the Randall County jail and APD to compare to the inked impressions that I obtained at the autopsy of Dustin Pool to make the identification.

Q. And just to help illustrate the problem we talked about earlier about the tarp and the tape and all the things we have downstairs, in fact, just the inked impressions, is there a bit of an odor even from these?

A. Yes, there is.

Q. So the jury will know if they open this envelope up, it's -- again, you -- based on your expertise in the field and the comparisons that you made, the known -- the inked impressions from the autopsy match the known impressions of Dustin Pool to the exclusion of every other human on the planet?

A. Yes, sir.

MR. FARREN: Offer State's Exhibit 39.

MS. MCELROY: No objection.

THE COURT: It's admitted.

Q. By Mr. Farren) I'm showing you State's Exhibit No. 237 and 238. Do you recognize what is depicted in these photographs?

A. State's Exhibit No. 238 is a photograph of a -- of the victim's shirt that was obtained at the autopsy. And then State's Exhibit No. 237 is a photograph of the sock that was removed from the mouth of the victim.

Q. Now, was the victim wearing the shirt at the autopsy, or it was just part of what was gathered at the

exhumation scene?
A. It was just part of what was gathered. It was actually enclosed inside the tarp with it.
Q. And 237 and 238 accurately reflect the way they appeared at that time?
A. Yes.
MR. FARREN: Offer 237 and 238 into evidence.
MS. MCELROY: No objection.
THE COURT: They'll be admitted.
Q. By Mr. Farren) Did you bring the actual sock with you today, sir?
A. Yes, I did.
Q. It has been marked as State's Exhibit 53. Is that correct?
A. That's correct.
Q. And this is the sock that you retrieved when you were at the autopsy of Dustin Pool?
A. That's correct.
MR. FARREN: Offer State's 53 into evidence, Your Honor.
MS. MCELROY: No objection.
MR. FARREN: State's 53 is admitted.
Q. By Mr. Farren) Now, real briefly, Sergeant, I want to visit with you about latent prints in more

detail. We've talked about those a few moments ago. And the illustration was, if I touch a photograph the oil and fluids from my hand on the raised or ridged areas will leave this pattern?

A. Yes, sir, not all the time.

Q. And that was my next question. If we watch CSI, we know that -- you know, we just leave a trail of prints behind us everywhere we go. Is that accurate?

A. No, sir.

Q. In fact, in what percentage of cases you have been involved in, in 25 or 30 years of experience, are there even usable prints at all involved in a crime?

A. Most of the majority of the latent prints that we obtain in a crime scene are unidentifiable or not usable because they don't have sufficient minutiae points, or there are overlays of other impressions which confuse the correct pattern of a fingerprint.

A lot of times, fingerprints are, due to the surface in which someone touches something, is difficult to process. A rough edge, such as like the -- the texture of your steering wheel or the dash of your car is difficult. It's preferable that fingerprints should be lifted on a nice smooth surface, such as glass or tile or something. But even then, you run into a problem of whether the fingerprints have been exposed to

heat, moisture or dust for a certain amount of time. That fingerprint -- you cannot obtain fingerprints after a certain time, or sometimes you still may be able to obtain a fingerprint. There are documented cases in which a fingerprint has been obtained from a beer bottle that was in the river bed for several days. But that is a very highly, improbable --

Q. Would you agree also there are times when there will be an armed robbery, and ten witnesses know the man placed his hand on the counter, and yet no prints?

A. That happens many times because of the type surfaces that Toot 'n Totums use. The other thing is that persons, whether they're secreters or non-secreters, 80 percent of the population are secreters, which they're more likely to leave a fingerprint as a non-secreter. It doesn't mean that a non-secreter won't leave a print. It's just that the circumstances of the metabolism at the time that the person is leaving a print --

Q. So first of all, the first problem with prints is that a person may or may not be a secreter, or may or may not have just dried their hands or something of that nature. And even though they touch a surface, a surface that is promising, they still may not leave a print?

A. That is correct. There is a lot of variables that are -- that affect the length of time a fingerprint will remain on the surface.

Q. The second problem would be the surface itself, whether it's the kind of surface that is a promising area where you might find a print. If it's rough or if it had a lot of dust or things of that nature, there are many reasons why it may not be the kind of area where you expect to find a print?

A. That is correct.

Q. So the person themselves, the area, the time that has passed, the weather conditions, and in addition to that, if I put my hand on the picture like we've talked about earlier, and I move a finger a little bit while it's in contact, what does that do to the print?

A. That could smudge the print. In other words, run the ridges together where you can't use it. It's just what we refer to as a smudge.

Q. And so with the overlays and the smudges and some people are secreters and some are not on some surfaces and so forth, there's just a lot of times when there is just not going to be any prints at all, and other times where if there are, they won't be usable?

A. Yes, that is correct.

Q. When you were involved in this investigation

-- oh, by the way, would another impact on either prints or DNA be whether or not the individual wears gloves?

A. Yes.

Q. Were you able to conduct any -- were you involved in any efforts to lift any prints for any of the cleaning supplies at Tori Patrick's apartment?

A. We have obtained some cleaning supplies at Tori Patrick's apartment. Sergeant Crandell processed those items, and prints were compared to persons involved in this case. We were only able to identify two people involved in this case with their prints on a couple of the cleaning items. And one person that as far as we know, had nothing to do with this case.

Q. So is it accurate to say that you were able to identify the prints of Guinn Garcia and Tori Patrick?

A. That's correct.

Q. And another person, I think Ron Brown, who Tori Patrick had been in a relationship with prior to this?

A. I didn't know that.

Q. Okay. But anyway, a Ron Brown. Now, is it correct that there may be other prints, but these were the only readable prints? These were the only usable prints?

A. These were the only ones we were able to make

an identification --

Q. So there may be smidges, smears --

A. Or we don't have the prints of people that left them.

Q. Were you able to determine whether there were any prints on any of the shovels we've talked about?

A. There was one latent print, or there was a latent print that we obtained from the shovels that we identified to Craig Kimberlin.

Q. Craig Kimberlin. Okay. And again, if there was testimony that Destry Keeling, Frank Chacon, Craig Kimberlin all handled these items --

A. They would adhere to those items --

Q. But it doesn't surprise you that you were not able to find the prints of Craig Kimberlin, even though supposedly all these men handled these items?

A. That is correct.

Q. Now, it's my understanding that some effort was made to determine whether there were any usable prints on any of the duct tape. Is that correct?

A. Yes, sir.

Q. Was that successful? Were you able to find anything?

A. I found three possible areas on the duct tape that indicated some ridges or whatever. And they were

found to be -- after further exam, closer examination after developing them they were not -- of no use, lack of detail.

Q. So again, they may be prints, but they're just not prints that you can work with?

A. They're not sufficient. They're not usable.

Q. You're aware of efforts that were made to locate the black Navigator, or dark colored Navigator that was used in this crime. Is that correct?

A. That is correct.

Q. There was even trips to Topeka, Kansas, I think and --

A. Myself and Mr. Jennings went.

Q. Now, by the time you and Ron Jennings went to Topeka, Kansas, how much time had passed from the crime until you made this trip, if you recall? If the records indicate October 30th of 2003, do you think that is about right?

A. That would be right.

Q. Okay. So many months had passed from the time of the crime until after extensive efforts, you guys finally located what you think was the Navigator?

A. We don't know for sure if that was the actual Navigator or not, because the vehicle was sold without proper documentation being made.

Q. So was part of the problem that this purchase and selling process that Mr. Bledsoe was involved in, was sort of -- it wasn't through regular channels --

A. It wasn't followed according to legal methods.

Q. No titles were actually exchanged or things of that nature?

A. That's correct.

Q. So you didn't have an actual VIN number or anything like that?

A. We had nothing like that, yes, sir.

Q. If in fact the Navigator you finally located was the Navigator and then many months had passed to clean anything out of there, assuming wrapping Mr. Pool in the tarp and so forth had resulted in -- was not totally successful in preventing anything from being left behind --

A. In fact, the owner of the vehicle at the time when they went to Kansas said that he had cleaned it several times since he had it. Of course, at that time we saw it, it didn't look clean. There was kids' toys and spilled drinks and food stuff and everything.

Q. At any rate, the Navigator that you located and examined, you were unable to collect any evidence of any substance --

A. Well, I vacuumed and swept, and I collected

some possible stains and I submitted those. But they all came back negative.

Q. Now, from a forensic standpoint, would you agree this -- at least parts of this case presented some real challenges?

A. Yes, sir.

Q. A lot of different locations?

A. Yes, sir.

Q. A passage of time from the crime until the actual discovery of the body and the -- a lot of the evidence degraded?

A. And not only that, the people who lived at those locations, their DNA is supposed to be there.

Q. Right. So if you find Mr. Elliston's prints at his farm, for instance, that doesn't tell you anything because he lives there?

A. That is correct.

Q. If you find his hair or DNA there, it doesn't tell you anything because he lives there?

A. That is correct.

Q. Are you aware that Mr. -- that -- do you know Officer Rodden with the Amarillo Police Department?

A. Yes, sir.

Q. Who is Officer Rodden?

A. Officer Rodden, at the time of this

investigation, was actually a deputy for Potter County assigned to our unit at Special Crimes as a crime scene investigator.

Q. And are you aware that he videotaped -- he conducted a videotaped survey of the area at the grain silo, and also Elliston's farm?

A. Yes, sir, he did.

Q. So in addition to the still photographs, we have videotapes that depict the way it looks and so forth?

A. That's correct.

Q. Have you had an opportunity to view the videotapes?

A. Yes, sir.

Q. And do those videotapes accurately reflect the way those two locations appeared at that time?

A. Yes, sir.

Q. Do you know if those -- this videotaping process or the result, was it actually transferred then to CDs?

A. Yes. What the procedure is for our unit is that we use a digital camera that is a small digital tape. We take that tape and we -- as soon as we videotape, we take it to our computer. We download it onto our server, and which only the people at Special

Crimes have access to.

And then when we get prepared -- ready for trial or present a case, we copy that video on to a CD or DVD for the Prosecution or attorneys or whatever, whoever may need it.

MR. FARREN: Pass the witness.

CROSS EXAMINATION

BY MS. MCELROY:

Q. Sergeant Burgess, I want to start out at Ms. Patrick's apartment with you.

MS. MCELROY: May I approach the witness, Your Honor?

THE COURT: Yes.

Q. By Ms. McElroy) I'd like to show you what I've marked as Defendant's Exhibit 29.

THE COURT: I'm sorry. I can't hear you.

MS. MCELROY: Defendant's 29, Your Honor.

Q. By Ms. McElroy) Defendant's 30, Defendant's 31, Defendant's 32, Defendant's 33, and ask you if they fairly and accurately represent Tori Patrick's apartment on the day that you all went in to search?

A. When I looked at it, yes.

MS. MCELROY: We would ask then that these be admitted, Your Honor.

MR. FARREN: We have no objection, Your

Honor.

THE COURT: D-29 through 33 are admitted.

Q. By Ms. McElroy) Sergeant Burgess, can you tell us what this is a picture of?

A. Defendant's 29 is a photograph of the fireplace of Tori Patrick's apartment, showing the cigarette butts. And the bottom of the fireplace.

Q. Now, did you collect those cigarette butts?

A. I didn't. Sergeant Crandell did.

Q. And you prepare an evidence log, do you not?

A. Yes, ma'am.

Q. Would you look and see if those were submitted?

A. Submitted?

Q. Well, if they were gathered. Let me put it that way.

A. Yes.

Q. Okay. How many cigarette butts were there?

A. Eighty-nine.

Q. Okay. Do you know whether any of these were sent in to be examined?

A. No, I didn't submit the cigarette butts from the fireplace.

Q. Okay. But if there had been a positive match then you probably would be aware of that?

A. If they had been submitted, yes.
Q. Okay. I'm going to show you what has been admitted as Defendant's 30, 31 and 32. Can you tell the jury what you're looking at?
A. These are photographs taken by Sergeant Crandell of the cabinets in Tori Patrick's apartment showing the cleaning supplies.
Q. Okay. Is that what y'all then took the prints of?
A. Yes, ma'am.
Q. Okay. And is this also in Miss Patrick's apartment?
A. Yes, it is.
Q. Okay. Thank you.
MS. MCELROY: May I publish, Your Honor?
THE COURT: Yes.
Q. By Ms. McElroy) Sergeant Burgess, as part of your job, whether you're at one location or another, people bring you evidence and then you write it down in an evidence log?
A. Yes, ma'am.
Q. Okay. That way everything is kept track of, is -- what has been gathered?
A. Yes, ma'am.
Q. In this case, would you agree with me that

there is a 15-page evidence log?
A. Yes, ma'am.
Q. So from each scene, whether it was from Tori Patrick's or the farm or the grain elevator or the Navigator, there is a place and a location where you've listed it and given it a number?
A. Yes, ma'am.
Q. At some point in time, y'all had gathered up like 12 latent card prints. Is that right?
A. When I -- yes, ma'am.
Q. And that is in your evidence log?
A. Yes, ma'am.
Q. You talk about the tape. Right?
A. Yes, ma'am.
Q. Now, you had tried, did you not, personally to try to lift the prints from the tape?
A. Yes, ma'am.
Q. Did you then send it to the FBI?
A. Yes, ma'am.
Q. Were the -- were there any results from the FBI?
A. Results said they were of no value.
Q. Okay. But you tested the shovels and they were -- you were able to lift prints from the shovels?
A. Yes, ma'am.

Q. Now, in reference to some of the evidence that you gathered, you gathered some physical evidence from several people, including known head hair samples, pubic hair samples, oral swabs, digital photographs of individuals?
A. Yes, ma'am.
Q. And did this encompass the -- majorly the Defendant and Co-defendants involved in this case?
A. Yes, ma'am.
Q. So you had all of these known head and hair samples to do comparison for DNA purposes?
A. Yes, ma'am.
Q. Now, I believe Tori Patrick gave y'all -- or you talked about the swabbing from the table. Is that right?
A. Yes, ma'am.
Q. Did she also give you some toy fish?
A. Yes, ma'am.
Q. Was that of any evidentiary value that you know of?
A. None.
Q. Let's talk about in the investigation of this case. Did you accompany Mark Brown on 6/23 of 2003 to interview Destry Keeling?
A. Yes, ma'am. I believe that would be one of

the times, yes.

Q. Okay.

A. Would that be at his house or jail? Let me look. I'll tell you.

Q. It says, I believe if you'll refer to page 110.

A. Are you talking about the time we went to the trailer house?

Q. No. It says here on the morning --

MS. MCELROY: May I approach the witness, Your Honor?

THE COURT: Yes.

MS. MCELROY: Thank you.

Q. By Ms. McElroy) Did that help refresh your recollection a little bit?

A. Yes, ma'am.

Q. Okay. You and Mr. Brown went and spoke with Destry Keeling. Is that right?

A. Yes.

Q. And that was the morning of 6/23 of 2003?

A. Yes, ma'am.

Q. In fact, you noted the time. Do you remember the time?

A. Is that my report right there?

Q. If I were to tell you it was 9:30 A.M., would

you agree?

A. Yes.

Q. Okay. At some point in time after Mr. Keeling gave you a statement, do you know whether or not you then contacted the Randall County District Attorney?

A. No, I don't remember.

Q. If your report says that you did --

A. If it says I did, I did then, yes, ma'am.

Q. Okay.

A. We talked so many times I just can't remember. I'm still trying to find the page.

Q. And I understand, 111.

A. 111. Okay.

Q. Okay.

A. You're 111 is not matched with my 111. I'm sorry.

Q. Okay.

MS. MCELROY: May I approach?

THE COURT: Yes.

THE WITNESS: Yeah, because I don't have anything about Keeling on my page 111.

Q. By Ms. McElroy) Okay. Did -- you at some point in time talked to Mr. Keeling. Now, you returned, it says, and did you speak at some point in time with the Randall County District Attorney?

A. Yes, we did.

Q. Okay. And after you spoke with the district attorney after having Mr. Keeling's statement then reviewed, what happened then?

A. This is the time when we got the six --

THE REPORTER: I didn't hear you.

THE WITNESS: This is the time in which we were able to obtain the six capital murder warrants.

Q. By Ms. McElroy) Okay. And can you tell me who those warrants were issued for?

A. They were issued for Craig Kimberlin, Frank Chacon, Josh Stocker, Josh Bledsoe, Tori Patrick and Mike Elliston.

Q. Okay. Now, after you went and you had these warrants issued, can you tell me where you went then?

A. At 9:30 P.M., Sergeant Brown and I travelled to Carson County to arrest Mike Elliston.

Q. So you arrested Mr. Elliston on the capital murder warrant. Is that right?

A. Yes.

Q. Do you also remember whether or not you told Mr. Elliston at that time that you had arrested Mr. Kimberlin?

A. I know I didn't. Sergeant Brown might have.

Q. Do you remember putting in your report that

you and Sergeant Brown went to Carson County --

A. To interview Mr. Elliston, yes.

Q. Right. But that was at 9:30 that night?

A. Yes, and I believe I typed up his statement.

Q. Based on what Mr. Keeling had told you, did you then ask him if he wanted then to maybe get something off of his chest also?

A. Sergeant Brown did, yes, I remember.

Q. And at that point in time, he decided that he would give you a statement. Is that right?

A. That is correct.

Q. Now, I believe that you said that you had searched Mr. Elliston's place. Is that right?

A. Yes, ma'am.

Q. At the first time you did this, was this with a search warrant?

A. I believe we had a search warrant. And I'm trying to remember, we had a search warrant at one time. We didn't activate the warrant, because he gave us a consent to search, but we had obtained one, yes.

Q. Would this be accurate to say that you arrested him on 6/23 on capital murder charges, and then you had a search warrant for 6/24, and then he consented to the search?

A. That's correct, yes.

Q. Okay. At the point in time that you did this search, did you or did he ever talk to you about that -- that hidden doorway thing where you saw -- where you showed the jury the chair was?

A. Yeah, one of those times he did, yes, sir.

Q. But he didn't do it on the first time, did he?

A. No.

Q. So y'all had to make another trip out there later?

A. That's correct, yes.

MS. MCELROY: May I approach the witness, Your Honor?

THE COURT: Yes.

Q. By Ms. McElroy) I show you what's been marked as Defendant's No. 23, and ask you if you recognize that to be sort of the scenery around Michael Elliston's place?

A. Yes.

Q. And does that fairly and accurately depict the area at that time?

A. Yes.

MS. MCELROY: We'd ask that Defendant's No. 23 be admitted.

MR. FARREN: No objection, Your Honor.

THE COURT: Admitted.

Q. By Ms. McElroy) So Mr. Elliston, in response to y'all's investigation, he didn't show you the room that he had the chair in until later on?
A. As a matter of fact, I don't think he ever mentioned it, no. He just told us there was a chair. The first time he told us that everything was taken and discarded, that the carpet was pulled up, the rubber mats on the floor were pulled up and all discarded, that they all worked -- they put some effort into cleaning up the place and removing anything that would attach to Dustin Pool or themselves.
Q. So essentially, he indicated to you that he didn't have any evidence?
A. Yes.
Q. Okay. Did he talk to you -- at the first time you went out there, did he have anything to say to you about this box deal?
A. No.
Q. Okay. Was it the second or the third time you went out there that you found the box stuff?
A. Third time, I believe it was.
Q. Okay. Sergeant Burgess, if you know, what county is the River Falls apartment in?
A. Potter County.
Q. What county is the farm located in?

A. Carson County.

Q. And the elevator?

A. Randall County.

Q. So we have a multitude of different jurisdictions?

A. Yes, ma'am.

Q. All right.

MS. MCELROY: Approach the witness, Your Honor?

THE COURT: Yes, ma'am.

Q. By Ms. McElroy) I'm going to show you what's been marked as Defendant's 25, 26, 27 and 28. And I'm going to ask if you recognize these photographs. You attended the autopsy, did you not?

A. Yes, ma'am.

Q. Did those photos fairly and accurately represent the scene as you saw it on that day?

A. Yes, ma'am, it sure does.

MS. MCELROY: We'd ask that Defendant's 25, 26, 27 and 28 be admitted into evidence.

MR. FARREN: No objection.

THE COURT: 25 through 28 are admitted.

MS. MCELROY: Thank you, Your Honor. May I publish?

THE COURT: What's your purpose?

MS. McELROY: To show them what I admitted, because I don't have the handy dandy screen.

THE COURT: Okay.

Q. By Ms. McElroy) Are all of these photographs basically taken at the autopsy?

A. Yes, ma'am.

MS. MCELROY: May I approach the witness, Your Honor?

THE COURT: Yes.

Q. By Ms. McElroy) These have already been admitted as State's 225 and 226.

A. Yes, ma'am.

Q. Can you tell the jury what these are?

A. Yes. State's Exhibit 225 is a photograph of the waste paper basket inside the kitchen at Tori Patrick's apartment. And State's Exhibit No. 226 is a photograph of two pieces of paper, one of them being a document that Sergeant Crandell found inside the wallet, which he retrieved from the waste paper basket in Ms. Patrick's kitchen.

Q. All right. Thank you. Sergeant Burgess, do you know, was there any kind of cleaner found in the waste basket?

A. No, I don't know that. Sergeant Crandell did that, and I don't believe there was.

Q. So you didn't book into evidence any kind of cleaner that was obtained out of the trash can?

A. No.

Q. Okay. Now, on one of the examinations, I believe it was from the FBI, they actually lifted a print from the tape, did they not?

A. No, what -- the way the process is, is that the tape had to be processed two different ways, because one for the sticky side, one for the non-sticky side. And what I did was, I super glued and developed on these pieces of tape what are believed to be ridges. And what I did, I submitted a lift that I made and submitted the actual tape with the ridges to allow them to do whatever they wanted to do with them.

So as far as them making lifts, I don't -- I don't know. I am sure that they probably examined the actual ridges on the tape and photographed them. I wouldn't believe they would make a lift, because it would be on the sticky side of the tape, and they would have a mess.

Q. Well, either way you want to go at it, did they -- were they able to identify any of the prints?

A. No, their report stated that the latents were of no value. In other words, not sufficient detail, initial points to make an identification for comparison.

MS. MCELROY: May I approach the witness, Your Honor?

THE COURT: Yes.

Q. By Ms. McElroy) Sergeant Burgess, I'm going to show you this, if you would read it over to yourself.

A. (Witness complies.)

Q. When it says, though, that the latents were obtained from the duct tape, can you explain what that means?

A. Okay. That really means the latents were developed on the latent print tape, and they were cut and removed -- that portion of tape was cut from the main portion of the tape. So that would have been the -- what you would think a latent print card. But it wasn't. It was just a piece of tape containing the ridge that was removed from the large print, and that is referred to as a latent, because it's put on a print card. But it's not an actual dusting and lifting of the print.

Q. But there again, you submitted what you considered to be at least one usable print to them?

A. That is correct, yes.

Q. Okay. But upon their examination, it didn't match any of the individuals we have been talking about?

A. The print was of no value for comparison.

They could not even begin to compare with anybody because it was of no value, not of sufficient detail for making a comparison.

Q. Well, if it was of no value, why did you submit it?

A. Because I contacted the FBI lab, and because they're so advanced with technology and stuff, I figured they might have some -- they would have maybe some technology or some means of maybe enhancing or developing this to a point where it might be usable.

In other words, we have limited capabilities. The FBI, some limited, so we just took a chance that they did. And of course, they didn't.

Q. You also submitted swabbings, did you not, from various items?

A. Yes, ma'am.

Q. Did you submit swabbings from the shovels?

A. Yes, ma'am.

Q. And that was located in Mr. Kimberlin's --

A. Yes, ma'am.

Q. Did you submit swabbings from the farmer's place?

A. Yes, ma'am.

Q. From the garage stairway?

A. Yes, ma'am.

Q. From the stairway step?
A. Yes, ma'am.
Q. Did you submit 11 cigarette butts from a coffee can from Michael Elliston's place?
A. Do you have an autopsy item number?
Q. 67, top of page two.
A. Yes, ma'am, I did.
Q. All right. You also submitted swabbings from the metal chair? In fact, there is three separate swabbings?
A. Yes, ma'am.
Q. Then you also sent in known saliva and blood samples from Mr. Hale, Ms. Garcia, Joshua Stocker, Joshua Bledsoe, Stephen Craig Kimberlin, Frank Chacon, Michael Stocker, Michael Elliston, Destry Keeling and Tori Patrick?
A. Yes, ma'am.
Q. You sent in also these pliers, is that correct?
A. Yes, ma'am.
Q. And you also sent in the mandible and maxilla from Dustin Pool?
A. Yes, ma'am.
Q. All right. Other than what you got on your report, did you send anything else in since your last

submission?

A. No, ma'am. My last submission was a latent print submission.

Q. Okay.

MS. MCELROY: Pass the witness, Your Honor.

REDIRECT EXAMINATION

BY MR. FARREN:

Q. Real briefly, Sergeant Burgess, do you recall accompanying Sergeant Brown, Mark Brown, I think, and Sergeant Kevin Dockery over to the federal courthouse in May of 2003 and talking with Omar Mendoza?

A. Yes, sir.

Q. And were you present during a conversation with Mr. Mendoza about a discussion he had with Josh Stocker?

A. Yes, sir, I was.

Q. At the end of that meeting with Mr. Mendoza, did you, in fact, type up an affidavit that he read and signed?

A. Yes, sir.

MR. FARREN: May I approach, Your Honor?

THE COURT: Yes, sir.

Q. By Mr. Farren) I'm showing you a series of photographs, and we're not going to offer them at this

time. But do you recognize --

(Interruption in the proceedings.)

THE COURT: That's interesting. Be glad you're on the jury. If you were out there it would be real trouble.

(Laughter.)

THE COURT: But I don't do anything to my partners.

Okay. Go ahead.

Q. By Mr. Farren) I realize you may not have taken the photograph, but does this appear to be a photograph of the pair of channel lock pliers we talked about earlier?

A. Yes, sir.

Q. And this photograph, would you agree appears to be a photograph of the mandible that has been introduced into evidence?

A. Yes.

Q. Another series of photographs of the mandible and the teeth.

A. Teeth and so forth. That's correct.

Q. And then would you agree this photograph appears to be carpet padding that was submitted in State's Exhibit 16 and 18?

A. Yes.

Q. And I think the pliers we talked about, State's Exhibit 65. Is that correct?
A. Yes.
Q. And the mandible, State's Exhibit 246?
A. Yes.
Q. And then the cigarette butts?
A. Yes. From Elliston's garage -- a photograph --
Q. These are the ones from Elliston's garage?
A. I took the photographs, yes.
Q. Yeah.
THE COURT: Mr. Farren, I'm going to call a break here for about ten minutes.
MR. FARREN: Yes, sir.
THE COURT: I want this evidence taken out of the courtroom. The smell is bothering some of the jury.
MR. FARREN: Yes, Your Honor.
THE COURT: Put it somewhere, either in another corner, in the back of this courtroom or somewhere.
MR. FARREN: Yes, sir.
(Recess.)
(All sides, Defendant present.)
(Jury seated.)

THE COURT: All right. Everyone be seated.

MR. FARREN: Your Honor, for the record, the evidence that we removed, any evidence that might have an odor, we have placed it in the trash can in my office and the door is secure.

THE COURT: Oh, it is? I thought it was over there on Brad's desk. I'm sorry. I thought you were telling me that the odorous evidence was over there --

MR. FARREN: I just wanted the court reporter to know where her evidence is, in a secured area --

THE COURT: Yeah, she really wanted to know.

MR. FARREN: Well, she's responsible for it, so I imagine she does, Your Honor.

THE COURT: Okay.

Q. By Mr. Farren) Sergeant Burgess, you were asked a couple of questions about hair and things of that nature. How much time do you think you've spent trying to collect hair, fiber or anything of that nature at the various crime scenes you visited?

A. Well, how much time?

Q. Yeah. Is it a couple of minutes or --

A. Oh, processing a crime scene takes time and of course, getting from the individuals that we -- it took time.

Q. So hours and hours at the crime scenes gathering various kinds of evidence, including the hair, fiber and that sort of thing?

A. That's correct.

Q. And then as you said, from various people that might be a match to any of this stuff?

A. That's correct.

Q. And then you submitted -- any possibilities, you submitted all of that to the lab for analysis. Is that correct?

A. I didn't submit all of it. I was selective of what would most likely reveal --

Q. And that's what I meant. Things that you felt like were a possibility, you submitted on the hopes that it might work out?

A. Yes.

MR. FARREN: Pass the witness.

RECROSS EXAMINATION

BY MS. MCELROY:

Q. Sergeant Burgess, you said during that -- at the crime scene where you've got the grain elevator, and you're trying to get to the body part?

A. Yes.
Q. That you had to remove, I think, trash and debris and stuff like that?
A. Sergeant Rickwartz, and Corporal Redden -- or now Officer Redden did that. I was not present at that time. But they took photographs and videotaped the -- what they had to remove, yes.
Q. Did you also then have to remove like some soil and water out of there before you could get to the concrete?
A. I believe that yes, they did.
Q. Was -- do you know how deep that was?
A. From Corporal Rickwartz, I think it was about -- if I recall correctly, about four inches of liquid sludge and stuff running through. I remember he told me that he took a hammer handle or something like that or a shovel handle and stuck it on the side, and it wasn't very deep.
Q. So approximately four inches?
A. Yeah, about four inches.
Q. And you brought those up in buckets?
A. Yes, they did.
Q. Okay. Thank you.
MS. MCELROY: I have no further questions of this witness.

MR. FARREN: We have no other questions of this witness, Your Honor.

THE COURT: You may step down, Sergeant, thank you.

MR. FOWLER: Your Honor, we call John Bundy.

THE COURT: Come up here. Raise your right hand.

(Witness sworn.)

THE COURT: Thank you. Sit right there.

JOHN BUNDY,

Having been first duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. FOWLER:

Q. Would you state your name, please.
A. My name is John Bundy.
Q. Sir, where do you work?
A. I work for the Texas Department Of Public Safety Crime Lab.
Q. Where is that located?
A. In Lubbock, Texas.
Q. And what is your official title there?
A. Criminalist.
Q. Okay. And what do you do as a criminalist?
A. I am what is called a trace examiner. I do

different fields of study such as hair, fibers, shoe prints, tire treads, automotive paint and a few lesser disciplines.

Q. Can you tell us about your expertise and your training and your credentials in these areas?

A. Yes. I received a degree in chemistry and a second degree in biology at Lubbock Christian University in Texas Tech. I then went to Austin where I trained with the Texas DPS, and specifically, what I did for a little over a year. Then I was transferred to Lubbock, where I've been working ever since. During my training we did everything from extensive reading to training at the FBI academy and other places where we were sent, as well as working on the actual equipment and doing a series of proficiencies to show that we were proficient in each discipline.

Q. The examination you were asked to do in the Dustin Pool case, was that to compare hair and fibers?

A. Yes, it was.

Q. Okay. Have you testified before as an expert in the courts of this state regarding hair and fiber analysis?

A. Yes, I have.

Q. On one time or many occasions?

A. One time on fiber, and multiple occasions for

hair.

Q. Can you tell us your process just in general for comparing hair and fiber?

A. Specifically with hair comparisons, we'll do a visual exam first, just to say, this hair, you know, is visually similar. You know, if it's a completely different color, there is no need to continue comparison.

If they look visually similar, the questioned hair and the known sample that we have of the individual, we'll mount them on slides and go to what is called a comparison microscope, magnifying them anywhere to up to 400 times. While doing that, we look at the different characteristics and features found in human hair, and we compare every one of those together looking for similarities and differences to base our conclusions on.

For fiber, for instance, beginning similar process. We're looking under a stereoscope, which is essentially high powered binoculars for differences and similarities. If we find differences at this point, you know, we don't continue the exam. If we do, we mount them, we examine them on what's called a polarized light microscope, looking at the different optical features found within each of those fibers. If they're similar

at that point, we run what's called infrared spectroscopy on them to determine if they're the exact same type of fiber, whether it be nylon or polyester or olefin Dacron. If they're the same fiber type, we'll do a cross section to see if they're the same basic shape, whether it be round. Some are the shape of a dog bone or trilevel, or diamond shaped. If they're the same cross section shape, we continue even further on to what's called the MSP, or microspectrophotometer, which categorizes colors within fibers. And you can even tell the difference in dye lots between you know, the same fiber type, so it's very discerning as far as color goes.

If it's still similar in color shape, size, fiber type, and optical properties, we can at that point determine if this fiber is similar to the representative sample.

Q. Now, the items that you examine, are they submitted to you by a local police department?

A. Usually, yes.

Q. Okay. And in this case, was the Dustin Pool case assigned a laboratory number for L5L57238?

A. Yes, it was.

Q. Okay. And was Sergeant Jim Burgess of the Special Crimes unit, would he be the one who would

submit these items to your laboratory?

A. I believe he was in this case, yes, sir.

Q. And typically, he would submit them by Federal Express. He would Fed Ex them down to Lubbock?

A. Among other possibilities. I believe that's how he submitted it in this particular case, yes, sir.

Q. What analysis were you requested to do in this case?

A. Specifically in this case, I was requested to examine the submitted evidence for possible presence of the victim's head hair or fibers from the victim's clothing.

MR. FARREN: Your Honor, may I approach the witness?

THE COURT: Yes.

Q. By Mr. Fowler) Mr. Bundy, did you prepare a report in connection with your analysis in this case?

A. Yes, I did.

Q. I'm showing you what I've marked as State's 274. Is that a copy of your report?

A. Yes, it is.

Q. And does it have your proposed analysis and then your findings that you conducted in regards to this case?

A. Yes, sir, it does.

MR. FOWLER: Your Honor, upon tendering to opposing counsel, we would offer what I've marked as 274.

MR. WATKINS: No objection.

THE COURT: State's 274 is admitted.

MR. FOWLER: Your Honor, with your permission, I have 12 copies for the jurors, if we could publish to the jurors and they could follow along.

THE COURT: That would be fine.

Q. By Mr. Fowler) Okay. Mr. Bundy, look on the first page of your report. Does that show what Sergeant Burgess has submitted to your laboratory?

A. Yes, it does.

Q. And in reference, you were asked to see if there was any of the victim's hair from some of these items that he submitted to you. Is that right?

A. That is correct.

Q. Okay. And did you perform an analysis as requested?

A. Yes, I did.

Q. And what was your conclusion?

A. My conclusion was that among some of the items the hair was recovered from, some of those hairs were visually dissimilar to the victim's submitted head hairs. Nine of the hairs that were visually similar

were mounted but determined to exhibit microscopic characteristics that are dissimilar to the victim's submitted hair samples.

Q. And so would a layman's way of saying that be that you did not find any of the victim's hairs in these items that Sergeant Burgess submitted to you?

A. That's correct.

Q. Okay. And on -- continuing on the first page, it looks like he submitted some potential samples from shovels and hoes, and it looks like a swivel chair. Is that correct?

A. Yes, sir.

Q. And it looks like he also submitted some samples, possible samples from a suspect's residence. And I'm guessing that is Tori Patrick's residence. Is that also right?

A. That is correct.

Q. And then on the second page it shows that he submitted possible samples from the suspect's automobile. And I 'am guessing that is the Navigator that Sergeant Burgess went to. Is that also correct?

A. Yes, sir.

Q. Does that surprise -- did your findings that you could not find the victim's hair in these potential samples, does that surprise you at all?

131

A. Not necessarily.

Q. Does it surprise you -- well, let me do a hypothetical. If hypothetically, a victim's DNA was found at a location but yet you did not find any of the victim's hair at that location, would that surprise you?

A. Not necessarily.

Q. Okay. Why would that not surprise you?

A. Multiple reasons. One, you know there are going to be times when human head or body hair, you know may not be shed at all. Even if a violent struggle occurs, it doesn't necessarily mean hair will be shed.

And the second and more important reason is when we do a hair comparison, we're using a known standard that came from that victim. There is so much variation with the human head that if it's an insufficient sample, it could actually be a hair from the individual. But we cannot connect the two together because of an insufficient sample. The characteristics just won't line up.

Q. So does it happen frequently that a victim's DNA may be found at a location but yet their hair may not be found?

A. I'm not aware of any particular statistics, but I'm aware of it happening on occasion, yes.

MR. FOWLER: Your Honor, I pass the

witness.

MR. WATKINS: I have no questions.

THE COURT: Let me see the lawyers up here a minute.

(Discussion off the record.)

THE COURT: You may step down, Mr. Bundy. Thank you. And is he excused to go back to Lubbock?

MR. FARREN: He is indeed, Your Honor.

THE COURT: Thank you.

MR. WATKINS: We wouldn't object either.

THE COURT: Call your next witness.

MR. FARREN: State calls Tyler Hale, Your Honor.

(Witness sworn.)

TYLER HALE,

Having been first duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. FARREN:

Q. Would you state your name for the jury, please, sir.

A. Tyler Hale.

Q. How are you employed?

A. A & S Electric.

Q. And you have lived in the Amarillo area most of your life?

A. Yes, sir.
Q. Do you know a man named Craig Kimberlin?
A. Yes, sir.
Q. How do you know Craig Kimberlin?
A. I was a friend of his and a partner, I guess you would say for a couple of years.
Q. A business partner -- what now?
A. I did dealings with him.
Q. Okay. All right. You have agreed to testify in this case. And you have promised to come here and tell the truth. Is that correct?
A. Yes, sir.
Q. And we have entered an agreement with you. And just so we can get that out of the way, would you go ahead and explain to the jury what our agreement is.
A. That I just cooperate with y'all. And that is about it.
Q. But if you tell the truth, you believe that it will help you?
A. Yes, sir.
Q. Because you have charges pending, don't you?
A. Yes, sir.
Q. And if you don't tell the truth, it will hurt?
A. Yes, sir.
Q. And I don't remember if we signed a written

agreement with you or not, a use immunity agreement. But we've talked to you about use immunity. Do you remember that?

A. Yes, sir.

Q. And use immunity, is it your understanding means that what we say, we really don't use it against you. It's not a pass on any criminal activities you have been involved in. It just means that you can safely say whatever you want to say, but you know it won't be used against you?

A. Yes, sir.

Q. Okay. How did you first -- how did you first come into contact with Craig Kimberlin?

A. My roommate, named Jeter (phonetic) French. It was through his wife's brother.

Q. So you met him through his brother-in-law?

A. Yes, sir.

Q. Okay. And isn't it true, sir, that at times you obtained methamphetamine from Mr. Kimberlin?

A. Yes, sir.

Q. Okay. And in fact, what charges do you have pending now?

A. Tampering with physical evidence.

Q. Okay. And in -- in this particular case, the evidence that was involved was in -- was Mr. Pool's body

in the back of the Navigator that was parked in your garage overnight. Right?
A. Yes, sir.
Q. But did you obtain methamphetamine from Mr. Kimberlin at times?
A. Yes, sir.
Q. How long had you known Craig Kimberlin?
A. About two -- a year and a half to two years.
Q. And did you have a social relationship with Craig and Jessica Kimberlin, or just mostly business?
A. Mostly business.
Q. Okay. Did you ever obtain -- the methamphetamine you obtained from him, was that just for your use or did you sell it? Or was it just for your use?
A. Sell it.
Q. Okay. And you also know Jessica Kimberlin?
A. Excuse me?
Q. You also know Jessica Kimberlin?
A. Yes, sir.
Q. Do you know Josh Stocker?
A. Yes, sir.
Q. Do you see him here in the courtroom?
A. Yes, sir.
Q. There is a man in kind of a bright blue shirt

with a red and blue tie, no coat. Is that Joshua Bledsoe (sic)?

A. Yes, sir (sic).

Q. Joshua Stocker. Is that correct?

A. Yes, sir.

MR. FARREN: May the record reflect he has identified the Defendant?

THE COURT: The record will so reflect.

Q. By Mr. Farren) How did you meet Mr. Stocker?

A. Through Craig.

Q. Okay. And I want to direct your attention to back around March 9th, 10th and 11th of 2003. Do you remember getting a call from Craig Kimberlin of some time, about that time?

A. Yes, sir.

Q. What was the call about?

A. Seeing if I was going to be at home, and to make sure no one was there. He was going to bring --

Q. He was going to bring something to your home?

A. Yes, sir.

Q. Did he tell you what?

A. No, sir.

Q. He did not. How long -- how much time passed between the call, wanting to know if he could bring this item to your home and his arrival, if you know,

approximately?

A. Approximately about three to four hours.

Q. So it wasn't just a matter of minutes, there was a passage of time?

A. No, sir.

Q. When he arrived at your home, was he alone or was he with other people?

A. He was with other people.

Q. Who was he with?

A. Josh Bledsoe, Destry Keeling and --

Q. Okay. Do you know -- do you know Frank Chacon?

A. Yes, that is the other person.

Q. And you've mentioned Destry Keeling and Josh Bledsoe?

A. Yes.

Q. How were they traveling? Were they in one vehicle or more than one vehicle?

A. Josh Bledsoe and Destry Keeling was in the Expedition. And Chacon and Craig was in his pickup.

Q. Is that a red Dodge pickup?

A. I believe so, yes.

Q. Now, you mentioned an Expedition. Do you know if it was an Expedition or a Navigator, or do you know for sure?

A. I don't know for sure.

Q. But it was a vehicle like that?

A. Yes, sir.

Q. Okay. And when they arrived, what happened next?

A. I opened the garage door from my back door and --

Q. Now, how did you know to do that? Had he told you this was an item they wanted to put in your garage?

A. They came in first.

Q. Okay. Before you opened the door, they came in?

A. Yes, sir.

Q. Did all of them come in?

A. Yes, sir.

Q. Did all of them talk to you or just Craig?

A. Just Craig.

Q. Okay. What did he tell you?

A. He told me that they had some problems, some stuff happened, and they needed to put -- store a car in my garage.

Q. Did he ever tell you why he wanted to put this car in your garage?

A. No, sir.

Q. And you've already indicated he was concerned

about who was going to be at your home and whether there was going to be other people around and that sort of thing?

A. Yes, sir.

Q. Did he tell you why he was worried about that?

A. No, sir, he just did not want no one there.

Q. Okay. Was there more conversation with Mr. Kimberlin at that time? I mean, did you ever have any suspicions about what the situation was?

A. I kind of figured what the situation was, to a certain extent.

Q. Okay. Did he talk to you while he was there about Dustin Pool? At that time or some later time?

A. Later time, he did.

Q. Okay. So at this point, he wasn't talking about Mr. Pool?

A. No, sir.

Q. Well, you indicated that you kind of suspected. Why did you suspect?

A. The past or the days before, the week before, he was -- he kept telling me problems that they were having with Dustin Pool, and certain things like that.

Q. And so based on those earlier conversations about problems with Mr. Pool, you thought it was possible that that is why he wanted to put this

Navigator in your garage?
A. Yes, sir.
Q. Did you think there was someone in the Navigator?
A. Yes, sir.
Q. Did you think they were alive or dead?
A. Alive.
Q. You thought they might be alive. So you suspected they had kidnapped Mr. Pool, but you didn't --
A. Yes, sir.
Q. How long do you think they stayed and visited?
A. Say 45 minutes to an hour.
Q. And while they were there was the Navigator just parked outside or had you already put it in the garage, or do you remember?
A. I don't remember for sure which came first.
Q. Okay. At some point, was the Navigator placed in the garage?
A. Yes, sir.
Q. And how did you open the garage door?
A. I had a touch key pad to my back door, to my house, and I opened it that way.
Q. Now, that is a gray kind of wood frame house. Do you still live there?
A. No, sir.

Q. Okay. What was the address of that house, if you remember?
A. 4305 South Jackson.
Q. And how -- are you familiar with the United Grocery Store at 46th and Washington?
A. Yes, sir.
Q. How far from that grocery store was your house located?
A. Two blocks.
Q. Okay. And was this garage directly connected to your house or was it --
A. No, sir. It was a detached garage.
Q. I'm showing you what has been admitted as State's Exhibit No. 267. Can you see it up on the screen there?
A. Yes, sir.
Q. And is this the house where you used to live?
A. Yes, sir.
Q. And then State's Exhibit No. 266, is this the garage about which you spoke a moment ago?
A. Yes, sir.
Q. And the door that we see to the left of the picture, is this the garage door you opened, and the vehicle went in through that door?
A. Yes, sir.

Q. The -- the mechanism that opened the door, the button, is this located somewhere in your house?

A. Yes, it was located by the back door of the house.

Q. Now, I'm showing you State's Exhibit No. 268. Well, I understand how weathermen have problems with their -- is this the view of the back door to where the mechanism was located?

A. Yes, sir.

Q. Okay. I'm going to quit now. I'm getting dizzy. At any rate, even if you don't remember exactly what -- when it happened, the garage door was open, the Navigator was put inside, and you had a visit with them, maybe as long as 45 minutes. You're just not sure of all the sequence of events?

A. Yes, sir.

Q. Now, did they indicate or did anyone indicate to you how long you were going to have this vehicle parked in your garage?

A. Not exactly how long. He just said a day or so, or a couple of days.

Q. And so after -- at the end of this discussion did they leave?

A. Yes, sir.

Q. When do you think you saw Mr. Kimberlin again?

A. Maybe...
Q. Do you think it was at least a day?
A. Yes, at least a day.
Q. And do you think it may have been even more, but at least a day?
A. Yes, sir.
Q. Okay. At any rate, the next time you saw Mr. Kimberlin, was it at your house again?
A. Yes, sir.
Q. Was he alone or were others with him?
A. Frank Chacon and --
Q. Destry?
A. Destry Keeling.
Q. So Mr. Bledsoe, when they came the first time there was Kimberlin, Chacon, Keeling and Bledsoe?
A. Yes.
Q. When they came the next time, it was the same three, but not Mr. Bledsoe?
A. Yes, sir.
Q. When they arrived the second time, did you get a call or anything letting you know they were coming?
A. Yes, sir.
Q. Okay. On this particular occasion, was the call a long time before they came, or fairly closely related in time?

A. Closely related.

Q. Okay. When they arrived this time, did Mr. Kimberlin and everyone come in? Did anyone come into the house?

A. Mr. Kimberlin did, and asked to use my water.

Q. He asked to use your water. Now, what do you mean by that?

A. My water hose outside.

Q. And could you see what was going on outside?

A. No, sir.

Q. Okay. Did he indicate why he wanted to use your water hose?

A. No, sir.

Q. Did you ever learn why he used your water hose?

A. I just kind of figured.

Q. What did you figure?

A. That they were using it to do -- I mean...

Q. Did you think that their radiator was overheating?

A. No, sir, I figured it had to do something with what was in my garage.

Q. Now, if you thought Mr. Pool was alive when you were given -- were you concerned? I mean, he's been out there in that garage at least a day, maybe longer.

What did you think?
A. Then I started thinking it.
Q. By the time he stayed there that long, you thought maybe it was more than just a kidnapping?
A. Yes, sir.
Q. So you never actually saw what they were doing with the water hose?
A. They were filling up a trash can.
Q. Okay. How do you know that?
A. It's just what Craig said.
Q. So Craig told you they were filling up this trash can with water?
A. Yes, sir.
Q. But he didn't tell you why?
A. No, sir.
Q. How long were -- were they there the second time?
A. Probably 30 minutes.
Q. And when they left, did Mr. Kimberlin or anyone else tell you where they were going or what they were going to do?
A. No, sir.
Q. Okay. When they left, do you know what vehicle they were in when they arrived the second time?
A. I believe it was Craig's red Dodge pickup.

Q. When they left the second time, who -- when they left the second time, did they take the Navigator with them?

A. Yes.

Q. Do you know who drove the Navigator?

A. I believe it was Destry Keeling.

Q. Okay. Now, did you see them drive away?

A. All I saw was when I opened the garage door from my back door, and they pulled out.

Q. All right. So you saw the Navigator or the -- this vehicle exit your garage. Did you ever see the red Dodge pickup?

A. Yes. It was parked in my driveway.

Q. And did you see this trash can in the Dodge pickup?

A. No, sir.

Q. You didn't notice it? Okay. Do you know if it was in there or loaded later, or do you know?

A. I was -- they loaded it in something. I mean, I figured it was the pickup.

Q. Okay. At any rate, when they came back the second time and retrieved the Navigator, did both vehicles then leave?

A. Yes, sir.

Q. What time of the day or night do you think it

was when they brought the Navigator over the first time?
A. Midnight, 1:00, maybe.
Q. Okay. And when they came back the second time, was it daylight or dark?
A. It was early morning, 4:00, 5:00 in the morning.
Q. Okay. So you -- it would have been dark?
A. Yes.
Q. And after that, do you know what happened to the Navigator or anything?
A. No, sir.
Q. You don't know what happened after that? Now, did you continue to have contact with Mr. Kimberlin after that?
A. I believe I didn't speak to him for maybe four -- four days to a week.
Q. Okay. So you think about a week later is the next time you saw him?
A. Yes, sir.
Q. When you saw him then, where did you see him?
A. He stopped by the house.
Q. Okay. Did you have a discussion about the Navigator or any of that when he came by your house?
A. All we had a discussion about was that he was out looking for furniture right -- a couple of blocks

down from my house.

Q. What's a couple of blocks from your house where you can get furniture?

A. Warehouse Solutions.

Q. Warehouse Solutions?

A. Yes.

Q. Did he say why he was at Warehouse Solutions buying furniture?

A. Buying furniture for -- I don't know the girl's name.

Q. Did he --

A. For the person's apartment where something happened.

Q. Okay. Did he mention the name of the girl and you just don't remember it now?

A. Yes.

MR. FARREN: May I approach the witness, Your Honor?

THE COURT: I'm going to break everybody for lunch. Ladies and gentlemen, why don't we take a lunch break until about 1:35.

(Jury excused for noon recess.)

(Proceedings held.)

THE COURT: You don't have to use this. That is not -- so if it's in my courtroom, I order that

everyone can use it. So if you decide you want to use it, you'll be allowed to.

MS. MCELROY: Thank you, Your Honor.

MR. FARREN: We certainly have no objection.

THE COURT: Well, objection or not, if it's in my courtroom, both sides have to have access to it. We will be in recess until 1:35.

(Noon recess.)

(All sides, Defendant present.)

(Jury seated. Open court.)

THE COURT: Thank you, ladies and gentlemen. Everyone be seated. Mr. Farren.

MR. FARREN: Thank you, Your Honor.

Q. By Mr. Farren) Now, Mr. Hale, you and I have visited on more than one occasion in preparation for the trial. Is that correct?

A. Yes, sir.

Q. And at that time, you had a chance to review a statement that you gave to Sergeant Mark Brown at the police department?

A. Yes, sir.

Q. But you haven't looked at that statement in a while until today?

A. Yes, sir.

Q. During the lunch recess, you and I got a chance to talk about part of it. Correct?
A. Yes, sir.
Q. I want to take you back to the events at your garage. You have testified that you had contact with Craig Kimberlin, Frank Chacon, Josh Bledsoe, and Destry Keeling whenever they first brought the vehicle over?
A. Yes, sir.
Q. And when they came back the second time, Bledsoe wasn't with them?
A. Yes, sir.
Q. And that's when they retrieved the Navigator. Correct?
A. Yes, sir.
Q. Now, do you remember anything further about the water and the events that occurred after reviewing your statement?
A. Yes, sir.
Q. Okay. You and Mr. Kimberlin were inside your house. Is that correct?
A. Yes, sir.
Q. And who asked you about using the water?
A. Mr. Kimberlin.
Q. Okay. And you told him he could. And then do you recall what Mr. Keeling and Mr. Chacon did?

A. They went out back and started filling up the --
Q. This trash can?
A. Yes, sir.
Q. And while they were doing that, did Mr. Kimberlin talk to you about what was going on?
A. Yes, sir.
Q. Okay. Do you remember -- do you remember him telling anything about Bledsoe offering some money to solve a problem?
A. Yes, sir.
Q. What did he tell you about that?
A. They were at a shop, and a bunch of guys were around, and Josh Bledsoe had popped off and said, I'll give anybody $10,000.00 to take care of Dustin Pool.
Q. Now, you were already aware of an event, some kind of a kidnapping event involving a guy named Ray, a Hispanic guy. Right?
A. Yes, sir.
Q. And your conversation with Mr. Kimberlin was some time after that event occurred. Right?
A. Yes.
Q. And so when -- do you know -- did you know if there was any connection between this Ray and Mr. Pool, or did you know?

A. Yes.

Q. You did know that? Okay. When Mr. Kimberlin told you about Bledsoe popping off about this $10,000.00, did he indicate that Mr. Stocker responded in any way?

A. No, sir.

MR. FARREN: May I approach the witness, Your Honor?

THE COURT: Yes.

Q. By Mr. Farren) If you would look at -- don't read it out loud. Read to yourself. And maybe the way I worded the question was misleading, but looking at your statement, does that refresh your memory?

A. Yes, sir.

Q. Okay. What did Mr. Stocker do when Mr. Bledsoe made this offer? At least, what did Mr. Kimberlin claim he --

A. I was told by Craig that he took it on his own to just go do -- take care of Dustin, and he had some legal problems.

Q. He owed money?

A. Yes.

Q. And so this was a way to get the money?

A. Yes, sir.

Q. Did he tell you about Stocker going to some

girl's apartment?

A. Yes, sir.

Q. And do you remember -- if you remember, tell us what you remember about what happened while he was at this girl's apartment.

A. I was told by Craig that Josh Stocker hid out in a room. And this girl talked Dustin Pool into coming over, and then when Dustin got in the house, Josh Stocker hit him with a fireplace poker.

Q. Okay. And by the way, the statement that you and I are looking at --

MR. FARREN: May I approach, Your Honor?

THE COURT: Yes, sir.

Q. By Mr. Farren) This is the statement that you gave back in October of 2003. Correct?

A. Yes, sir.

Q. Okay. Earlier, you and I talked about an agreement that we had, that if you would tell the truth, I would take it into consideration. And that if you lie why, obviously, that's not going to help you?

A. Yes, sir.

Q. And we agreed we wouldn't use anything you say against you?

A. Yes, sir.

Q. Now, would you agree that you and I met for

the first time a few months ago?
A. Yes, sir.
Q. So that was long after you had given this statement?
A. Yes, sir.
Q. So when you gave the statement, you had no agreement?
A. No, sir.
Q. Now, did Kimberlin indicate did Stocker know what to do once he had hit Pool and he had him?
A. No, sir.
Q. So what did Stocker do, according to Kimberlin?
A. Kimberlin told me that he had called Craig, Kimberlin, and asked him for help.
Q. And how did Mr. Kimberlin help? Did he go over there?
A. He went over there.
Q. Did Mr. Kimberlin tell you anything about the farmer getting involved, or somebody called the farmer?
A. Yes, I was told by Craig that he called the farmer and asked him to, I guess bring something to get -- or to take Dustin somewhere or...
Q. And once -- did you know who the farmer was?
A. Yes, I did.

Q. Okay. Did you then?
A. Yes, sir.
Q. Okay. Had you ever been to the farm?
A. No, sir.
Q. How did you know who the farmer was?
A. From Craig.
Q. Did Mr. Kimberlin talk to you about whether or not when the farmer got there with whatever it was that -- whether Pool was able to walk and get in this box or not?
A. I was told by Craig that he suggested to Dustin to walk out of there, or they would get him out of there as a way -- or I mean, either walk, or we'll get you out.
Q. Now, was it your understanding at that time that Mr. Kimberlin and Mr. Stocker were there with Mr. Pool and the farmer?
A. Yes.
Q. Did you know if anyone else was there?
A. I believe Frank Chacon was.
Q. Okay. Do you remember that you don't mention Frank Chacon in your statement? Are you remembering that now, or you didn't put it in the statement or what?
A. I remember that now.
Q. Okay. So you think he said Mr. Chacon was

there. And do you remember him telling anything about the color of the box, and why that was important?

A. The -- it was --

Q. Would it refresh your memory to look at your statement?

A. Yes, sir.

MR. FARREN: May I approach, Your Honor?

THE COURT: Uh-huh.

Q. Okay. Does that refresh your memory?

A. Yes, sir.

Q. Okay. What -- and again, by saying color, I may have thrown you. Was there a discussion about color or something like that?

A. The box was made to look like a farmer's truck.

Q. So it matched the farmer's truck?

A. Yes.

Q. Did you know what color the farmer's truck was?

A. No, sir.

Q. Or the box?

A. No, sir.

Q. Okay. And once the farmer came with the box, do you know what happened or did Craig tell you what happened to Mr. Pool after that?

A. They carried the box up to the apartment. And that's when he offered him to walk or -- you'll get out my way, and they put him in the freezer.

Q. Once they had him in this refrigerator, freezer or whatever it was, what happened next, if you remember?

A. They had just carried him down the stairs and put him in the back of the farmer's truck.

Q. Do you remember in your statement mentioning something about Kimberlin saying that at some point, Bledsoe was bragging about putting a shovel in the anus or the rectum of Mr. Pool?

A. Yes.

Q. Did that happen after they got to the farm, according to your understanding?

A. Yes.

Q. Okay. Now, do you recall in your statement the first time you mentioned Mr. Chacon is after they got to the farm?

A. Yes.

Q. Okay. Do you think that is accurate? Or your statement a minute ago that he was at the apartment is accurate or are you sure?

A. I'm not for sure.

Q. Okay. All right. But are you sure that Mr.

Chacon was involved at some point?

A. Yes.

Q. Okay. Did they ever -- did Mr. Kimberlin ever talk to you about Pool being taped up in some way?

A. Yes.

Q. What did he indicate to you about him being taped up?

A. That he was taped up, and they taped his head up. And Frank Chacon had cut a breathing hole through the tape. And I was told that Josh Stocker said he don't need to breathe, and just taped his head up.

Q. So according to what you remember that Mr. Kimberlin told you --

A. Yes.

Q. -- Chacon provided the breathing. And Stocker said he didn't need to breathe and taped up the breathing hole?

A. Yes, sir.

Q. Do you remember if Mr. Kimberlin told you anything about when they moved, did he indicate that they ever moved him away from the farm or he left the farm?

A. They went to a lake house.

Q. Okay. But before they got to the lake house, did he tell you anything about moving him down the

stairs?

A. Yes, they drug him down some stairs.

Q. Do you remember who drug him down the stairs?

A. I believe it was Josh Stocker.

Q. Okay.

MR. FARREN: May I approach the witness?

THE COURT: Yes.

Q. By Mr. Farren) Lot of Joshes here. I understand. Does that at least refresh your memory to what you put in your statement?

A. Yes, sir.

Q. Okay. Who do you believe Kimberlin said drug him down the stairs?

A. Josh Bledsoe.

Q. Josh Bledsoe. Did he tell you anything about what happened as they were going down the stairs?

A. His head kept repeatedly hitting the stairs over and over.

Q. And did Kimberlin tell you what they -- when they thought he died, was it when they moved him down the stairs?

A. That's when Craig believed that he was dead.

Q. Now, you mentioned going to a lake a minute ago. And did you say a lake house?

A. Yes, sir.

Q. What -- do you know where Mr. Kimberlin claimed this lake house was?
A. I believe it was Lake Greenbelt.
Q. Again, would it refresh your memory to look at your statement?
A. Yes.
Q. In your statement, you indicate what lake?
A. Lake Meredith.
Q. Okay. But at any rate, a lake house, and in the statement you indicated it was Lake Meredith?
A. Yes.
Q. Now, did he indicate things went okay at the lake house, or did problems arise?
A. Craig had told me that there -- they had some problems and that they left the lake house, and Josh Stocker had bailed on him.
Q. So Josh Stocker had bailed on them. Did you know what he meant by that?
A. I guess leave them high and dry, I guess you would say.
Q. At any rate he bailed on them. Did he -- were you offered any money in return for letting him keep this vehicle in your garage?
A. Yes, sir.
Q. Did you actually get paid money or did you get

money taken off the books?

A. Money was taken off the books.

Q. Where -- did you understand if you were actually -- you were offered to be paid money. Right?

A. Yes, sir.

Q. And so was it your idea not to do that? In other words, did you decide would you just take money off the books?

A. He gave me an option. Craig did. Craig gave me an option.

Q. So he chose to have money taken off the books?

A. Yes, sir.

Q. And this was money you owed for drugs?

A. Yes, sir.

Q. Did he indicate where this money was coming from that he was offering?

A. He said that he owed Josh Bledsoe money, so he would pay the money to everybody and then take it out of Josh Bledsoe's money.

Q. And you've already mentioned Warehouse Solutions, and that he was getting furniture for this girl?

A. Yes, sir.

Q. Was it your understanding this was the same girl where the events had occurred at her apartment with

Mr. Stocker?

A. Yes, sir.

Q. Okay. Now, we've introduced a number of phone records, including some that I think involved your number, or a number you were using. Do you remember the phone number 336-2420?

A. Yes, sir.

Q. And whose number was that, or is that?

A. I believe that was my girlfriend at the time.

Q. And that's Kristen Province (phonetic). Right?

A. Yes, sir.

Q. And were you using her phone?

A. No, sir, I had my own.

Q. Okay. Did you ever get calls on her phone when you were with her, and things of that nature?

A. No, sir.

Q. Okay. Do you remember him talking about Mr. Bledsoe wanting to know if Mr. Pool made it after they had disposed of the body?

A. Yes, sir.

Q. Did he ever tell you where they had put the body?

A. No, sir.

Q. Now, about a week after those events, Mr.

Kimberlin and this group came to your house the first time. Then they came a second time, and you had a discussion where he told you some of the events you related to the jury. And when did you see Mr. Kimberlin again the next time? Do you remember going to his house?

A. Yes.

Q. Do you remember some further discussion at Mr. Kimberlin's house about the events that had taken place involving Mr. Pool? If you recall?

A. I don't understand your question.

Q. When you went to see -- do you remember going to see Mr. Kimberlin about a week after these events?

A. Yes, sir.

Q. Do you remember having a discussion with Jessica and -- or at least Jessica was there, I think you indicated. Did he talk to you about Jessica having helped out somehow?

A. Yes, sir.

Q. What did he say?

A. She had went and bought the concrete for them.

Q. Okay. And do you know if that is true, or that is just what he told you?

A. That's what I was told.

Q. Do you remember anything about their dog,

Java?
A. Yes.
Q. What about the dog?
A. I was told that there was a comment made that when they came back from getting rid of the body, that Java was smelling on them. And Jessica had said, he smells dead people.
Q. And do you remember a third time you were with Mr. Kimberlin when he talked about these events? Not necessarily to you, but maybe to another person?
A. Yes, sir.
Q. Do you know who this other person was, if you know?
A. I --
Q. Do you know anybody named Spoon, or Chad Spanel?
A. Chad Spanel.
Q. Did you know him by "Spoon", or just Chad Spanel?
A. I knew him by Chad Spanel.
Q. Had you ever met Chad Spanel before?
A. No, sir.
Q. Were you introduced to him at that time, or did you just learn who he was later?
A. I learned who he was at that time. I really

wasn't introduced to him, but I just --

Q. So you really weren't part of the conversation. You were there for business reasons?

A. Yes, sir.

Q. You were going to buy some more narcotics?

A. Yes, sir.

Q. Do you know why Mr. Spanel was there?

A. No, sir.

Q. Okay. But were you able to hear the conversation that he had with Mr. Spanel?

A. Yes, sir.

Q. And was there anything really different about what he was saying to him compared to what you had already heard on one or two other occasions?

A. No, sir.

Q. Did that surprise you, when you heard him talking about this?

A. No, sir.

Q. Okay. Now eventually, you were contacted by Sergeant Brown of the police department. Is that correct?

A. Yes, sir.

Q. Okay. And you finally agreed to give this statement, this October 22nd statement. Is that correct?

A. Yes. Yes, sir.

Q. Okay. Do you remember when you first came into contact with Sergeant Brown?

A. He called -- he had called me on my cell phone. I don't know actually what date it was, and asked me to come in to talk to him.

Q. Well, let me back up and ask it this way: Do you remember when Craig got arrested on some drug charges?

A. Yes, sir.

Q. When he got out of jail, did he call you?

A. Yes, sir.

Q. Okay. Why did he call you? What did he want?

A. He asked me to come by and talk to him.

Q. And is that one of the occasions he talked to you about what had happened with Pool?

A. He pretty much talked to me then, to tell me what to tell -- he told me that Mark Brown was going to be calling.

Q. So he -- Kimberlin told you Brown was going to contact you before Brown ever did?

A. Yes, sir.

Q. Okay. And why did he want you to know that?

A. He told me what to tell Officer Brown.

Q. And what were you supposed to tell Officer

Brown?

A. That it was Craig's padlock on the garage door, and that he had the only key to it.

Q. Was that true?

A. No, sir.

Q. Did you know why he wanted you to tell the police that?

A. I believe he was trying to protect me.

Q. So you think he thought that might keep you from getting dragged into this if they didn't think it was your padlock, maybe you knew nothing about it?

A. Yes, sir.

Q. Was there any other part of the story you were supposed to tell?

A. Not that I remember, sir.

Q. Okay. Do you remember him saying that you were supposed to say that you didn't know anything about what went on in your garage?

A. Yes, sir.

Q. Okay. And that you were supposed to tell the police that you just thought this was a vehicle that was getting repoed (sic)?

A. Yes, sir.

Q. Did he mention to you that he had given the police a statement?

A. Yes, sir.

Q. And did he tell you he left some parts out of the statement?

A. Yes, sir.

Q. What did he leave out?

A. The farmer's part.

Q. Okay. He left out the parts that happened out at the farm?

A. Yes, sir.

Q. So was it your understanding he told them about getting rid of the body, but he didn't tell them about what happened at the farm?

A. Yes, sir.

MR. FARREN: Pass the witness.

CROSS EXAMINATION

BY MS. MCELROY:

Q. Mr. Hale, other than what Craig had told you about what happened, you didn't have any recollection of any of these things independently?

A. No, sir (sic). I mean, ma'am. I'm sorry.

Q. That's okay. So all of these things that you have relayed is what Craig has told you?

A. Yes, ma'am.

Q. Do you think that there is a problem with what Craig told you at one time, and then what Craig has told

you at another time? Have they blended together?

A. I don't --

Q. Well, let me back up. That was a bad question. Is it possible -- because you weren't a witness here --

A. Yes, sir (sic), I mean, ma'am, I'm sorry.

Q. That's okay.

THE COURT: Just call her "sir".

(Laughter.)

Q. By Ms. McElroy) Is it possible between one time of him telling you what happened and then another time telling you what happened, that you've kind of confused or blended what has been told to you?

A. That could be possible, yes.

Q. Okay. You said that they left the Navigator there about a day and a half. Is that what you testified to?

A. Yes.

Q. Okay. During that day and a half, you never went out to go see what was in the Navigator?

A. No, ma'am.

Q. And none of these guys ever told you, don't go out to see what's in the Navigator?

A. I believe Craig had told me not to go out there.

Q. So you knew that you didn't want to know?
A. Yes, ma'am.
Q. Okay. I think you testified that Destry and Bledsoe drove up. Was Destry driving when they initially came with Pool?
A. I don't recall, ma'am.
Q. Okay. Did Destry and Bledsoe come in the house with Craig and Frank?
A. I don't recall.
MS. MCELROY: May I approach the witness, Your Honor?
THE COURT: Yes, ma'am.
Q. By Ms. McElroy) Okay. Start reading about there.
A. (Witness complies.)
Q. Does that help?
A. Yes, ma'am.
Q. Okay. Can you tell me who was driving?
A. Destry Keeling.
Q. Okay. So Destry and Josh are parking the Navigator inside your garage?
A. Yes, ma'am.
Q. Okay. Now, did they come inside the house?
A. No, ma'am.
Q. Did you testify that just Mr. Kimberlin came

in to talk to you?

A. Kimberlin and Frank Chacon.

Q. Okay. I believe that you said they had stayed about 20 minutes. Is that what I understood?

A. Twenty to 30 minutes, yes.

Q. Okay. During the time that Frank and Craig are in there talking to you, what is Destry and Bledsoe doing?

A. I don't know.

Q. But they're not in the house?

A. No, ma'am.

Q. Okay. Did you assume they were waiting out in the other vehicle?

A. Yes, ma'am.

Q. Okay. They're not wandering around in the yard or something?

A. Not that I know of.

Q. Okay. Do you remember what kind of time this was?

A. What kind of time the --

Q. Yeah, when they got to your house.

A. I believe it was 12:00, 1:00 A.M., 2:00 A.M., or --

Q. Okay. Is it closer to 12:00 or closer to 2:00?

A. (No verbal response.)

THE COURT: Mr. Hale, if you're not sure, that is what you need to say.

THE WITNESS: I'm not sure.

Q. By Ms. McElroy) Okay. That's fair. I believe that you said that you got money wiped off of your books. Is that right?

A. Yes, ma'am.

Q. Did you say $2,500.00 got wiped off of your books?

A. Yes, ma'am.

Q. Do your -- do you remember at all how much you owed Kimberlin?

A. Before he wiped off anything, I believe I owed about $5,600.00.

Q. Okay. You saw -- I mean, you were getting your dope from Kimberlin. Right?

A. Yes, ma'am.

Q. How often would you see him?

A. Once or twice a week.

Q. How much dope do you think you were getting from him on an average?

A. About a quarter pound.

Q. He made a statement -- I think you testified that Craig told you that Jessica had helped out and

bought the concrete?
A. Yes, ma'am.
Q. Do you remember what kind of words he used? Did he say that Jessica -- that he was "down with it" that she was "down with it"?
A. That -- yes.
Q. Did he tell you that, you know, more than one time or in the presence of other people? Or was this part of the party line, or did you think this was what happened?
A. They told me -- he told me once that she was down.
Q. Okay. You said that he called you up later after he got out of jail. Right?
A. Yes, ma'am.
Q. And then he told you the story that you were supposed to tell?
A. Yes, ma'am.
Q. Did he say anything about Jessica buying the concrete then or --
A. No, ma'am.
Q. Okay. Do you know whether or not Mr. Kimberlin had gone around and told other people similar party lines to tell people?
A. No, ma'am.

MS. MCELROY: Pass the witness.

REDIRECT EXAMINATION

BY MR. FARREN:

Q. Back to the phone records real quickly, when you lived in this house near the United Grocery Store that we looked at the photos a few minutes ago --

A. Yes, sir.

Q. -- did Ms. Province (phonetic) live there with you?

A. Yes.

Q. Okay. And did you have a cell phone?

A. Yes.

Q. Did she have a cell phone?

A. Yes.

Q. Did you have a land line in the house?

A. No, sir.

Q. Okay. So you guys just each had your own cell phones?

A. Yes, sir.

Q. Okay.

MR. FARREN: Pass the witness.

MS. MCELROY: No further questions, Your Honor.

THE COURT: You can step down, Mr. Hale. Thank you.

Call your next witness.

MR. FARREN: State calls Angela Rodriguez, Your Honor.

May we approach, Your Honor?

(At bench, Court, Counsel.)

(Discussion off the record.)

(Open court.)

THE COURT: As I understand it, you're going to call Miss Rodriguez, who is a DPS lab technician?

MR. FARREN: That is correct, Your Honor.

THE COURT: And come up here, Miss Rodriguez. How are you?

(Witness sworn.)

THE COURT: Thank you, ma'am. Sit right there. And as I understand it, rather that bring the actual objects, which are offensive to everybody in the courtroom because of their odor, we're going to -- but yet which are in packages which reflect the chain of custody numbers, the Defense is going to agree that the State, in each of these items, can offer the pictures of the items as if it was the item itself in the chain of custody envelope.

MR. WATKINS: Your Honor, we understood that was going to be true for the mandible. Was there

another one that you wanted -- I may have misunderstood.

MR. FARREN: I think the mandible, and the only other item like that, Your Honor, is the prints taken from Mr. Pool. Those are the two primary sources of odor. And I think only the mandible would be involved in her testimony. So only photographs --

THE COURT: So the only item that is going -- that this agreement reaches is the mandible itself with this witness?

MR. FARREN: I believe that is correct.

THE COURT: Is that right, Mr. Watkins?

MR. WATKINS: That's my understanding.

THE COURT: All right. You may proceed.

ANGELA RODRIGUEZ,

Having been first duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. FARREN:

Q. Would you state your name for the jury, please.

A. Yes, sir. Good afternoon. My name is Angela Rodriguez.

Q. And how are you employed?

A. I am currently employed by the Texas Department Of Public Safety Crime Lab, and I'm stationed in the Lubbock field laboratory, where I do DNA

analysis.

Q. And how long have you been with the Lubbock lab?

A. Approximately two and a half years.

Q. And were you with the Department of Public Safety in a similar capacity before that?

A. No, I was not.

Q. All right. Have you received any special training or education that enables you to perform in this capacity?

A. Yes, I certainly have.

Q. Would you share with the jury a summary of that training and education, please?

A. Certainly. I hold a Bachelor of Science Degree from Angelo State University in the field of medical technology. My minor field of study were both chemistry and biology. And in addition, I'm board certified by the American Society of Clinical Pathologists as a med tech or medical technologist. And since being employed by the DPS about two and a half years ago, I have received extensive on-the-job training in both forensic serology and forensic DNA analysis.

Q. And what is serology and forensic serology?

A. Okay. Serology, in general, is the study of body fluids and the interactions that they undergo.

Forensic serology is the application of that science to law.

Q. Okay. And have you testified as an expert in the fields of -- about which you have been speaking on previous occasions in courtrooms in the State of Texas?

A. Yes, sir, I have.

Q. On one occasion or more than one occasion?

A. More than one occasion.

Q. All right. Do --

MR. FARREN: May I approach the witness, Your Honor?

THE COURT: Yes.

Q. By Mr. Farren) At this time, I'm showing you what has been marked as State's Exhibit No. 275. I ask if you recognize this document?

A. Yes, sir, I do. It appears to be a copy of a lab report I issued on February 12th, 2004.

Q. And when you say you issued it, you created it or it was created at your direction and includes information and explanations that you wanted included in the report?

A. That's correct.

Q. Okay. Is this a record that is made at or near the time of the events recorded there in?

A. Yes, it is.

Q. And it's kept in the regular course of business?

A. Yes, sir, it is.

Q. And you're a custodian of those records?

A. Yes, sir.

MR. FARREN: Offer State's 275.

THE COURT: State's 275 is admitted. Let me see it.

MR. FARREN: Oh, I'm sorry.

THE COURT: Are you going to do a dozen of them to the jury?

MR. FARREN: Your Honor, at this time we would ask the Court for permission to publish to the jury copies of the report so they may follow along with Miss Rodriguez' testimony. We understand that the copies are not in evidence and we will be retrieving it from the jury later.

MR. WATKINS: No objection.

THE COURT: Permission granted.

Q. By Mr. Farren) The particular lab report about which we had been speaking, does it have a laboratory case number?

A. Yes, it does.

Q. And what is that number?

A. That case number is L5L57238.

Q. And your report indicates a number of suspects in connection with the submission of this evidence to you. Is that correct?
A. That is correct.
Q. And one of the suspects that's named is Joshua David Stocker. Is that correct?
A. Yes, sir.
Q. And this was submitted to you by Jim Burgess of the Special Crimes Homicide Unit of the Amarillo Police Department?
A. Actually, there were several different submissions. Some were received via Federal Express, and some were received by Jim -- from Jim Burgess, yes, sir.
Q. I understand. The ones that came by Federal Express, do you know if Mr. Burgess is the one who saw to it that --
A. Allow me to -- just one moment, please.
Q. Okay.
A. Yes, sir, even though submissions did originate from Mr. Burgess.
Q. Part of the -- part of the submissions that are mentioned in your report are a brown carpet swatch and some carpet padding. Do you recall that?
A. Yes, sir, I do.

MR. FARREN: May I approach, Your Honor?
THE COURT: Yes, sir.
Q. By Mr. Farren) I'm showing you what is marked as State's Exhibit 18, and I'd ask if you recognize the items contained in this clear plastic envelope?
A. Yes, sir, I do. I can recognize them by our independent laboratory case number and my own initials.
Q. Okay. And would you agree that State's Exhibit 29 is a photograph of some of the same items about which you have just made mention?
A. Yes, that is correct.
Q. Okay. And does this photograph accurately depict what it purports to be?
A. Yes, sir, it does.
MR. FARREN: Offer State's Exhibit 29 into evidence, Your Honor.
MR. WATKINS: No objection.
THE COURT: State's 29 is received. And is that the picture that will substitute for the original of the item itself?
MR. FARREN: No, we have that, Your Honor.
THE COURT: Oh, that's another --
MR. FARREN: Only the mandible.
THE COURT: Sorry.

Q. By Mr. Farren) On this photograph, have certain notations been made by you or other members of the laboratory in Lubbock to indicate events that occurred in testing these items?

A. Yes, sir. All of the markings on this photograph were markings made by me to report analysis which I performed.

Q. And in reference -- do you need to keep this to be able to explain what these notations mean, or do you have records?

A. I have records of that in my folder. Thank you.

Q. When you received this State's Exhibit 18, did -- what were you asked to do? What were you supposed to do in the way of testing this item?

A. I was asked to determine the presence of blood on that carpet and carpet padding, and compare it to a known standard from the victim and known standards from suspects.

Q. And that is the reason for the listing of the possible suspects in the submission. Is that correct?

A. That is correct.

Q. To make a long story short, were you able to make any -- did you find any indications of any similarities between the blood -- first of all, were you

able to determine that it was human blood or blood?
A. Presumptive tests did indicate that blood was present on this item. I did not, however, do a test to see if it was human blood, because that is a procedure that is done later on in DNA testing.
Q. So at this time, you're trying to decide is it blood? Is it human blood?
A. At this point, I'm only trying to decide is it blood.
Q. And I think I neglected to show you State's Exhibit 16. Would you agree that that is the actual carpet, and the other is the padding?
A. Yes, sir, that is correct.
Q. And again, you're able to determine that because of certain notations that are on the exhibit?
A. Right. I have our independent case number, our item number, and my initials.
Q. Okay. And what -- how do you go about determining if there is blood on these items?
A. The main way to go about determining the presence of blood is to look for a color change. Of course, when I look at an item I -- visually I look for stains resembling blood. If I see a stain that resembles blood, I do what's called a presumptive test known as phenolphthalein, in which you swab a portion of

that suspected stain onto the swab and add reagent.

If hemoglobin is present, hemoglobin being a constituent of blood, you will see a bright pink color change, and that will indicate a positive test.

Q. Okay. And what were the results of -- did you reach any conclusions or opinions based on the test you performed on State's Exhibit 16 and 18?

A. Yes. Presumptive tests did indicate the presence of blood on both the carpet and the orange carpet padding.

Q. Once you had determined, made that determination, did you do any further testing of those items?

A. No, I did not.

Q. What did you do with the items?

A. I selected those stains that tested positive and I cut those out and froze those. At the time when I screened this case, I was not fully trained in DNA analysis. My role in this case at that time was simply to screen the case. And by screening, I mean stain identification and stain selection. So I froze those stains until such time that another DNA analyst retrieved them from the freezer and did the DNA analysis.

Q. Subsequent to that event, you received

additional training and have additional experience in the area of DNA testing?

A. Yes, sir. I'm fully trained at this time.

Q. But at that time, you basically passed the portions of the exhibits that you believed were blood onto another technician?

A. That is correct.

Q. And who was that?

A. That was Kathy McCord, who is my supervisor.

Q. Okay. And were you asked to make a similar analysis of other items in this case?

A. Yes, sir.

Q. I'm showing you what has been admitted as State's Exhibit 65. And can you look at the container State's Exhibit 65 was in, whichever portion of the writing you need to examine, and tell us if you recognize the exhibit?

A. Yes, I sure will. I recognize this exhibit because again, I see our independent case number, the item number and my initials. And according to my records, this is a pair of adjustable pliers retrieved from a vehicle.

Q. And again, this is an item received from Jim Burgess of the Special Crimes Unit?

A. Yes, sir.

Q. State's Exhibit -- I'm showing you what's been marked now as State's Exhibit No. 259. Do you recognize this photograph?

A. Yes. These are photographs which I took of the pliers when I was screening them for blood.

Q. And does this photograph accurately reflect the way the pliers appeared at that time?

A. Yes, sir.

MR. FARREN: Offer State's Exhibit 259 into evidence.

MR. WATKINS: No objection.

THE COURT: State's 259 is admitted.

Q. By Mr. Farren) And again, there are a number of notations on the photograph. Can you tell us how those came to be there?

A. Yes, I made all of these notations myself. And these indicate stains that I tested, ones that were positive for the presumptive presence of blood and ones that were negative. And they're also areas which I collected.

Q. Now, is only blood -- is that the only way that DNA may be found somewhere, or can DNA be present even if blood is not present?

A. DNA can be present even if blood is absent. DNA is the -- basically the blueprints of life. And

it's present in almost every cell in our body. So just mere contact with an object can deposit DNA, even if blood itself is not deposited.

Q. But in this particular case, your role was to determine if you saw what you believed to be, and your tests indicated were blood?

A. Yes.

Q. And the photograph of 259, and the actual exhibit, State's 65 --

MR. FARREN: I haven't offered this. Have I offered this?

(Pause in the proceedings.)

Q. By Mr. Farren) In State's Exhibit -- the photograph, 259, is the actual pliers themselves. Did you find what you believe and your tests indicated were blood on the pliers?

A. Yes, sir, I did.

Q. Now, once you had made that determination concerning the pliers, what did you do then?

A. I took a swabbing from the handle of the pliers where there were some blood stains detected, and I also took a swabbing from -- I guess the usage end of the pliers, the teeth end. There were several very small stains in that area. And so rather than collect them individually, I swabbed the head of the pliers in

their entirety.
Q. In your report -- what number are the pliers in your report?
A. Number 214.
Q. For clarification, your report indicates -- and by the way, your report indicates one of the suspects is a Michael Elliston. Right? Michael Wayne Elliston on the front page?
A. Yes, sir.
Q. And in 214, the pliers, you indicate from suspect's vehicle?
A. Yes, sir.
Q. Okay. Now, if there were testimony earlier from Sergeant Burgess that Mr. Elliston voluntarily brought these to the police station and you wanted to record some source, or he wanted to record some source from which the police got this from, his vehicle would be accurate?
A. Yes.
Q. Unless he walked all the way from his farm 22 miles?
A. Correct.
Q. Okay. Now, State's Exhibit -- State's Exhibit 24, I want to ask if you recognize this exhibit and if so, how?

A. Yes, I do. Once again, I see our laboratory case number and item number and my initials. And according to my records, this is a swabbing from the garage stairway from 380 County Road 307 in Carson County.

Q. And if there were testimony earlier that that was the address of Mr. Elliston's farm, then that is what that would have been to, that address?

A. Yes, sir.

Q. Okay. And were you able to conduct any tests in reference to State's Exhibit 24 as to whether or not blood was present?

A. Let me refer to my notes, please.

Q. Okay.

A. Yes, I did conduct a test for blood, and this was positive as well.

Q. And State's Exhibit 65, the pliers, the swabbings from the stairway of Mr. Elliston's farm, the carpet and carpet sample from Tori Patrick's apartment, which is State's Exhibit 16 and 18, you -- did you follow the same process as to all four of those exhibits, they were then either forwarded to Ms. McCord, or you stored them in a place where she came and retrieved them?

A. Yes, that is correct.

MR. FARREN: May I approach the witness, Your Honor?

THE COURT: Yes, sir.

Q. By Mr. Farren) I want to show you what's been marked as State's Exhibits 25, 26, 27 and 28, and ask if you recognize what is depicted in these photographs?

A. Yes, sir, I do. This appears to be -- by the item number, this appears to be item number one and two from submission five. It's the mandible bone of the victim and the maxilla bone of the victim, along with two teeth that I extracted from the maxilla.

Q. So in this particular case, you weren't testing for the presence of blood, necessarily. You were trying to help prepare for the DNA analysis?

A. That is correct. The reason why these bones were submitted is that we needed a victim standard to compare other blood stains to. That is the whole idea behind DNA analysis. You're comparing unknowns to knowns. And in this case, we had no other sample from the victim, Mr. Pool, that was suitable for DNA analysis, so that is why I extracted these two teeth.

Q. So if there were testimony during the trial from Sergeant Burgess that in fact he lifted latent -- or excuse me, rolled inked impressions from the body of a person who was autopsied, and that this mandible was

removed from that same body, and by comparing those fingerprints he was able to determine that the man that was autopsied was, in fact, Dustin Pool, in other words, the prints confirmed that, then this mandible coming from that same body gave you a known source of DNA?

A. That is correct, yes.

Q. Once you had performed your part of the testing of the mandible in State's Exhibit 25 through 28, what did you do with it after that?

A. After removing two teeth from the upper bone, the maxilla, and three tissue fragments from the mandible, I froze those just like I froze all the other samples, and then those pieces of evidence were repackaged and returned to the Amarillo Police Department.

Q. So you saved there at the lab certain portions of the mandible for further testing by Ms. McCord?

A. Yes.

Q. And then forwarded the remainder back to the Special Crimes Unit?

A. Yes, sir.

MR. FARREN: Oh, offer State's Exhibits 25 through 28, the photographs she made reference to.

MR. WATKINS: No objection.

THE COURT: Okay. I'm going to admit

State 25, 26, 27 and 28. As I understand it, this witness and the other lab witnesses will be able to testify as to the chain of custody of these items from these pictures, just as if they were the originals of the envelope with the jaw bone in it itself.

MR. WATKINS: Yes, Your Honor, we're not challenging chain of custody on the mandible or the maxilla.

THE COURT: All right. Thank you.

Q. By Mr. Farren) Are you familiar with the terms, contamination, cross-contamination in reference to lab activity, particularly serology and blood and that sort of thing?

A. Yes, sir, I am.

Q. What is contamination?

A. Contamination is a four-letter word in our laboratory. Contamination is when -- in the world of DNA is when one person's DNA is introduced into another sample where it should not be. And we take many, many precautions to avoid that.

For example, I mentioned before that the whole idea of DNA analysis is to compare knowns and unknowns. So when I'm looking at knowns and unknowns, I have to do that at either a different time or in a different space to avoid cross contamination. My gloves are changed

very frequently between items. Our work surfaces are cleaned between items.

Q. So when you're handling specimens and pieces of exhibits, if you put some of those in a metal tray, let's say, and then later you're going to look at some other specimens, would you just chunk them back in the same tray without washing it or getting a new tray?

A. No.

Q. Why not?

A. Because DNA from one item could potentially be deposited on that tray.

Q. Do you believe as a scientist that that same principle could apply in other fields? That if you're trying to analyze a piece of evidence, whether you're going to use DNA or hair comparison or even entomology, things of that nature, that it is important to avoid contamination and cross-contamination when you're looking at these items?

A. I can only speak from my field of serology and DNA analysis, but I would assume that it would be just as important.

Q. It would be pretty strange to just be chunking various items into a tray and not -- making sure you didn't somehow mix them together.

A. That is correct. Although I'm not an expert

in those other fields --

Q. I understand.

A. -- I would agree.

MR. FARREN: Pass the witness.

CROSS EXAMINATION

BY MR. WATKINS:

Q. Ms. Rodriguez. Is that correct?

A. Yes, that is correct.

Q. Okay. My name is Mike Watkins. It's nice to meet you.

A. It's nice to meet you, too.

Q. Now, testing for presence of blood, there was also one other stain that you tested that was presumptive of blood from the stairway on County Road, 380 County Road 307. Is that correct? Other than what you have testified to. Let me refer you to stain 64.

A. Okay. One moment, please.

Q. That would be from submission two, if that helps you.

A. Yes, it does. Thank you. Yes, you are correct. That stain was also positive.

Q. Okay. But you didn't do any DNA analysis because you weren't trained at that time. Someone else did it?

A. That's correct. But that stain, however, was

frozen along with all others for testing.

Q. Okay. All right. Good. Now, there is a whole lot of items listed on page four of the first paragraph, that there were no blood stains on. Is that correct?

A. Yes, that is correct.

Q. Okay. And that includes the carpet padding, the coffee table swabs, the shovel swabs, the chair swabs, the green carpet cuttings, wood pieces, and vehicle swabs?

A. Yes.

Q. Okay. Now, those wood pieces, 86-A through E, 87-A through E -- I'm sorry. A through C. 88-A through F and 89-A through K, where does it indicate that those are from?

A. Let me check. I show that those were recovered from 380 County Road 307 in Carson County. I have no more specific details than that, as to where they were recovered.

Q. Okay. Let me ask this: The numbers that are assigned here, I noticed that they don't start necessarily with one and go in order. They kind of jump around. I just mentioned 86, 87, 88 and 89, but the next one under that is 151. Where do these numbers come from?

A. These numbers were assigned by investigators who collected the evidence. Those numbers were not changed when they were received from the laboratory.

Q. Okay. So the Amarillo Police Department investigators, specifically probably Mr. Burgess --

A. Well, whoever collected this evidence would have -- yes, would have assigned those numbers.

Q. Okay. And then there is a series of things that were not analyzed. Is that because you -- I think you said that you look for blood first, and if you didn't see anything that looked like it, you didn't analyze it.

A. No, that is not exactly correct. Anything that I examined, even just visually for the presence of blood, I would have listed prior in the letter, under the sentence that says, no visible blood stains were detected on these items.

Q. Okay.

A. Those items in the next paragraph where I say they were not analyzed at all, those were items that I neither looked at nor did a presumptive test on.

Q. They were just in the submission so you had to address them?

A. Yes.

Q. Okay.

MR. WATKINS: Pass the witness.

MR. FARREN: We have no other questions of this witness, Your Honor.

THE COURT: You may step down, Ms. Rodriguez. Thank you.

THE WITNESS: Thank you. May I please be excused to return to Lubbock?

THE COURT: Any objections?

MR. WATKINS: I have no objection.

MR. FARREN: State has no objections.

THE COURT: You are excused. Thank you very much.

MR. FARREN: Ms. McCord.

(Witness sworn.)

KATHY MCCORD,

Having been first duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. FARREN:

Q. Would you state your name for the jury, please?

A. Kathy McCord.

Q. How are you employed?

A. I am employed as a serology DNA section supervisor in the Lubbock DPS crime laboratory.

Q. And how long have you been with the Lubbock

crime laboratory?

A. I've been the section supervisor for three years. I've been in the Lubbock lab since 1989, and I've been with the crime laboratory system and other laboratories since 1981.

Q. So you have been with various labs with the Department Of Public Safety for 24 years?

A. Yes.

Q. And have you received any special training or education that enables you to perform in this capacity?

A. Yes, I have. I received a Bachelor of Science Degree in Chemistry right here from -- well, when I went it was with West Texas State University. Additionally, I received a Master of Science also in chemistry, also from WT here in Canyon.

I was first employed by DPS immediately after college, my first I guess and only real job, you could say. I received about eight months of training in the Austin headquarters laboratory. I then was assigned to the Amarillo laboratory for two and a half years.

I then worked in the Austin laboratory for five additional years before I transferred back to Lubbock or to Lubbock in 1989. And since I've been in Lubbock -- since 1989, I have performed serology. And then when we implemented the DNA case work, in the

Lubbock laboratory. And every year I do try to attend some kind of school, workshop, seminar, something to increase my knowledge.

Q. Have you ever testified as an expert in this field and the other fields you -- about which you have spoken in courtrooms in the State of Texas?

A. Yes, sir.

Q. Have you testified one time as an expert or many times?

A. Many times.

MR. FARREN: May I approach the witness, Your Honor?

THE COURT: Yes, sir.

Q. By Mr. Farren) I'm showing you what is marked as State's Exhibit 276, and ask if you recognize this document, and if so, how?

A. Yes. I recognize it. This is the report that I generated for my DNA testing on this particular case.

Q. And this was kept in your regular course of business there at the lab?

A. Yes, it is.

Q. Made by you or a person with personal knowledge of the information?

A. Yes.

Q. Kept or made at or near the time of the events

recorded therein?

A. Yes.

Q. And you were a custodian of those records?

A. Yes, sir.

MR. FARREN: Offer State's 276 into evidence, Your Honor.

MR. WATKINS: No objection.

THE COURT: State's 276 is admitted.

MR. FARREN: Your Honor, we have prepared -- I say we. Jeremy did all the work. He has prepared copies of the lab reports for the Court and for the jury for demonstrative purposes only. May I give these to the jury temporarily so they can follow along?

MR. WATKINS: No objection.

THE COURT: Yes, you may.

Q. By Mr. Farren) Are you familiar with case number L5L57238, as a lab number assigned or that you have assigned to this case in your lab?

A. Yes, that was our Lubbock laboratory number relating to the events on this case.

MR. FARREN: May I approach, Your Honor?

THE COURT: Yes, sir.

Q. By Mr. Farren) I'm showing you what has been admitted as State's Exhibit No. 259, and will represent to you without going through the noisy process of

unwrapping the packaging of State's Exhibit 65, that the pair of pliers depicted in 259 is the -- is the same pair of pliers that is in State's 65. And if you need to examine --

A. I did not examine any of the actual items of evidence. Angela Rodriguez, I think, who previously testified, examined the actual items. She recovered any stains. She gave those stains to me for DNA analysis.

Q. And do you know if -- Ms. Rodriguez has testified that she swabbed this exhibit that is depicted in 259, preserved that, and it was forwarded to you for testing. Do your records indicate that you received that swabbing and that you were able to conduct tests on it?

A. Yes, my records indicate that those swabbings were taken from those pliers.

Q. Okay. Once you had -- once you had these swabbings from these pliers -- and I want to use these as an example to explain the process that we're going to talk about in the other items as well, once you received them, what were you -- what was your assignment? What was it that they -- the submitting authorities wanted you to do with this item?

A. Perform DNA testing on any stains or any swabbings from the pliers, and then compare to the known

reference samples that I obtained from -- would you like me to list all the individuals?

Q. Yes, if you would.

A. From suspect Hale, Garcia, J. Stocker, Bledsoe, Kimberlin, Chacon, M. Stocker, Elliston, Keeling, Patrick, and additionally, from the victim identified as Dustin Pool.

Q. Now, the jury has already heard testimony that fingerprints were lifted at the autopsy of an individual, and that those rolled inked fingerprint impressions were compared to known inked impressions, and it was determined that the person upon whom the autopsy was performed was Dustin Pool.

They have further heard testimony that a mandible was removed at autopsy from that same individual identified as Dustin Pool, and forwarded to your laboratory. Do your records indicate that you have this mandible?

A. Yes, our records indicate that we had the mandible and additionally the maxilla from Mr. Pool.

MR. FARREN: Okay. May I approach, Your Honor?

THE COURT: Yes.

Q. By Mr. Farren) I'm showing you what has been admitted as State's Exhibits 25 through 28. And I will

tell you that these are photographs of the actual exhibit which has been admitted, but is not in the courtroom because of the odor problem.

A. Yes.

Q. And do you recognize these photographs to be -- at least appear to be the -- based on the appearance and the notations here, of the mandible that was used in your analysis?

A. Yes, and I recall seeing that in the laboratory itself.

Q. Okay. Now, Miss Rodriguez has explained to the jury that she collected certain -- she pulled some of the teeth, and actually collected some tissue samples that still adhere to this mandible, and preserved those and forwarded it to you for you to use in your testimony?

A. Yes.

Q. All right. Now, so you now have in your possession a known sample or a source of known sample, and you have an unknown sample. You've indicated to the jury that the process upon which you're about to embark in laymen's terms is called DNA or DNA analysis. What is DNA?

A. Well, DNA is the genetic material found in almost every cell in your body that tells you basically

everything about your body, from the color of your eyes to the shape of your ears to certain genetic predispositions for diseases. The reason it's important forensically is that the areas of DNA that we look at are found in different forms in the population, of course, with the exception of identical twins which come from the same eggs. Those would have identical DNA profiles. So what -- the DNA that we look at, though, is found in different forms in the population. Population studies have been performed to say how often this form is found versus this other form. And we look at about 15 different areas on the DNA and do our testing on those areas, and then we can come up with inclusions, exclusions off of evidence profiles or stains, evidence materials, and compare those to known individuals and say whether or not that individual is included or excluded as either being the source of that DNA or a contributor to the DNA, if the DNA might be from a mixture.

You know, these are biological samples. Sometimes they're not always from just a single individual. Sometimes you have mixtures between more than one individual. And so we're just trying to draw some kind of conclusion whether the known people that we get samples from included, excluded, and then we can try

to assign some sort of population statistics to tell you how important maybe that match is.

Q. What sort of -- what is the process, or can you give the jury a summary of the process you use to learn about the DNA in the profile you have mentioned in a given sample? How do you go about doing that?

A. In a given sample, oftentimes we get DNA deposited, or a blood stain. Obviously, the most common source of DNA is going to be blood stains. It could be on a swab. Maybe the officer already swabbed a blood drip at a scene. It could be -- we could get clothing items. And on those types of items if we can, we simply just simply cut out the stains, just cut it right out from the clothing. We'll take a portion of that. And what we do is add some chemicals to it to try to actually purify the DNA and separate it out from whatever it was deposited upon.

So that is the extraction process. You're purifying the DNA. You're concentrating the DNA. The next step is to actually quantitate the DNA and say now, I've isolated some DNA from this sample, how much DNA do I have? We try to determine how much is present. We then go through the process of -- we do DNA testing. The specific type of DNA testing we do is called PCR, polymerase chain reaction.

And very basically, it starts with a very few copies of DNA. And it replicates itself into where you have literally billions of copies of DNA. So you could start with not enough DNA to do testing on. Once you have amplified it or replicated it, you then have a more than sufficient amount of DNA for your testing. So we extract it, purify it. And we quantitate it to see how much is there. We then basically amplify it to make enough copies for testing. And then we analyze it with an instrument to basically -- and the end result is to give us the DNA profile that we could then use to compare back to known samples for inclusion and exclusion purposes.

Q. Once you completed this process, how was this recorded? How do you -- if you wanted to write it down or you were going to show us an actual result of this, what would it look like?

A. It looks like a lot of numbers, is what it really looks like. Like I said, we're looking at about 15 areas of DNA. We're also looking at sex types, so if it's a DNA sample from one individual, we can determine whether it is from a male or from a female.

Q. And -- oh, go ahead.

A. I was just going to say also remember that you inherit half of your DNA from your mother, half from

your father. So the areas of DNA that we look at, they're found in different forms. These different forms are identified by numbers. So what normally you do, is you have the DNA location or address of that specific area of DNA, and then it's usually a two-number result after that.

So we've got that spread across the page for each sample, each location at 15 areas, and then the results at each location.

Q. The mandible that was submitted to the lab that Miss Rodriguez tested first and then passed on portions of that to you, were you able to perform DNA analysis of any portion of that which Ms. Rodriguez preserved and passed on to you?

A. It was a piece of tissue that was removed from the mandible. And yes, I performed DNA testing on it but I got no results. The sample, as the district attorney mentioned earlier, had a very bad odor. That indicates a lot of degradation, deterioration of the sample. I was not really surprised that I got no results, so at that point, I had to move on to something further. And the next sample to be tested from the victim was a tooth from the maxilla.

Q. Okay. And Ms. Rodriguez had helped prepare and preserve this tooth. Is that correct?

A. Yes.

Q. And did you conduct a -- were you able to conduct a DNA analysis of a portion of this tooth?

A. Yes.

Q. And were you able to, in fact, determine the DNA structure or pattern of -- from this tooth?

A. I was able to determine the DNA profile from that tooth in all but one particular area. So I had more than enough useful information.

Q. So you had enough information to proceed with your job?

A. Yes.

Q. And so you now had from the tooth of the mandible of Dustin Pool a DNA -- I keep wanting to say pattern. It is a DNA profile?

A. It was a tooth from the maxilla, yes.

Q. From the maxilla. And it was a DNA profile. Is that correct?

A. Yes.

Q. Now, once you had this DNA profile, could you then proceed to the unknown samples that had been submitted to you by Sergeant Burgess and the Special Crimes Unit, and determine whether those samples came from the same individual, or had the same profile as the profile you had found in this tooth?

A. Yes.

Q. And were you able to do that with the pair of pliers?

A. Yes.

Q. And were you able to reach any conclusions about whether the DNA on the pliers was consistent with, or the same DNA as in the known sample of the tooth?

A. To a certain extent.

Q. Okay. If you would explain to the jury.

A. All right. Let me speak first, and if you're following in my letter, it's at the bottom of page three of four, second from the bottom paragraph. The DNA profile from the pliers, speaking now specifically to stain one, recovered from the pliers, it is consistent with a mixture -- by saying that, I'm saying more than one individual contributed to that profile. It was not a single source profile.

My conclusions would be that victim Pool cannot be excluded as a contributor to the DNA on this stain one on the pliers. And then I list the loci, which it cannot be -- I can read those if you would like me to, into the record.

Q. Just the statistical results probably would be better, if you would.

A. All right.

Q. If you would?

A. When you see on the second line where it says loci and then D21S11, those are simply the different locations on the DNA that we test for. Those are just the way they're designated or identified. That's all those mean.

Q. What -- statistically, what are the chances that at least part of the DNA on the pliers came from Mr. Pool? Or am I stating that properly?

A. Well, I cannot exclude him as being a contributor at those particular areas of DNA. And the probability of selecting an unrelated person at random who also could be a contributor to the DNA at those particular loci that I tested at, approximately one in 1.702 million for Caucasians, one in 15.82 million for blacks, and one in 5.47 million for Hispanics.

Q. And so another -- would it be proper to state this in this way: You would expect that profile to appear in Caucasians about once in 1.702 million?

A. It -- taking into consideration it's a mixture profile, you're basically saying what portion of the population could be a contributor to that.

Q. And so about every 1.7 million, you would see that profile, or close to that --

A. You would probably find someone who could

contribute to that profile, yes.

Q. Now, there is -- this is not absolutely conclusive, because there is many millions of people just in this country. Is that correct?

A. Absolutely. And because this was a mixture profile, and obviously numerous people were contributing to this mixture.

Q. Were there any other individuals, the known samples you had that you also could not eliminate as possible contributors to this mixture?

A. Yes, I could not eliminate suspect Bledsoe as a contributor to the DNA. There again, at those specific loci, and then again the probability of selecting unrelated persons at random who could be a contributor to that stain one at those loci is approximately one in 240,600 for Caucasians, one in 3,943,000 for blacks, and one in 888,100 for Hispanics.

Again, the last sentence says, additional minor contributors were present in the mixture profile. However, no further conclusions will be drawn. There were a number of minor contributors to it, and it was simply going to be impossible to include or exclude any further individuals from that. These were the two main contributors to that particular mixture profile.

Q. So to the extent the statistics you include

here reflected, you cannot eliminate either Pool or Bledsoe, but those numbers are far less than the total population of even the state or the country?

A. Yes.

Q. Now, another example would be number one, or the first one on your list from the carpet -- from the stain in the carpet.

MR. FARREN: May I approach?

THE COURT: Yes.

Q. By Mr. Farren) I'm showing you what's been marked as State's Exhibit 17 and 18. I'd ask if you recognize those two exhibits, or can you tell me whether or not you were given a portion of them by Ms. Rodriguez?

A. I have a laboratory case number on them, although I did not personally examine these exhibits.

Q. But your records indicate that a portion of those was preserved or preserved by Ms. Rodriguez and forwarded to you?

A. Yes.

Q. In both cases?

A. Yes.

Q. I assume you followed a similar procedure that you described to the jury in reference to the pliers and what you describe in general before that?

A. Yes. I used the same identical procedure for these.

Q. And were you able to reach a conclusion, any sort of a statistical, mathematical conclusion like you did with the pliers?

A. Yes. Mr. Pool cannot be excluded as a contributor of those stains, and the probability of selecting an unrelated person at random who could be the source of their DNA profile, approximately one in 15.13 quintillion for Caucasians, one in 18.37 quintillion for blacks, and one in 55.31 quintillion for Hispanics.

Q. So you cannot exclude Mr. Pool as a contributor of the DNA in the carpet padding?

A. No.

Q. And the chances of finding this profile is one in 15.13 three quintillion for Caucasians?

A. That is simply the probability of how often this profile would be found in the population.

Q. So you cannot exclude Pool, and you would expect this to pop up one time in 15.13 quintillion for Caucasians?

A. Yes, not very often.

Q. So if we can't exclude Mr. Pool and we're in the quintillions, then it either has to be Mr. Pool or a Martian?

THE COURT: Hold up.

MR. FARREN: Yes, sir.

THE COURT: Ms. McCord, what's a quintillion? I'm sorry.

THE WITNESS: That's perfectly alright. And let me just count it out for you and the jury. It starts with hundreds, thousands, millions, billions, trillions, quadrillions, then quintillions.

THE COURT: Thank you.

THE WITNESS: So I won't even go into how many zeros. It's an extremely rare profile, and it wouldn't be found very often. And the only reason I couldn't say Mr. Pool was a source of that because as I told you previously on the tooth, there was one area of DNA that I could not get to work. And based on our procedures and protocol, all areas have to work, and all areas have to match. And then we can say that they're the source of that sample.

For comparison purposes, the approximate world population, which is found in the letter on the last page is 6.3 billion. So --

Q. By Mr. Farren) So this is many times the population of the planet?

A. Yes.

Q. And you cannot exclude Mr. Pool?

A. Oh, no.

Q. In reference to the -- is that your conclusion in reference to the padding or the carpet itself? Well, let me ask you this: Is the conclusion to both the carpet and the padding the same?

A. The carpet padding, actually it had a mixture. So Mr. Pool could not be excluded as a major component in that mixture. The statistics are the same. They're identical for those two samples, because we consider through our procedures that if you're a major component that you can use the same statistics as for if it's a single source profile.

So basically, the results were identical. I just, at one particular area of DNA that I tested, I got an indication of a very minor contributor from someone else, but not enough to actually include or exclude anyone else from that particular profile.

Q. I want to jump down to the swabbing from the stairway. And I'm showing you what has been marked and admitted as State's Exhibit 24. Ms. Rodriguez and Mr. Burgess have testified that this was collected out at Mr. Elliston's farm and the stairway, submitted to your lab. Miss Rodriguez then did further testing and preserved a portion of that for you to conduct testing on?

A. Yes.

Q. Okay. This is -- this is from the stairway of the -- I think this is here on the next page.

A. No, this one -- this is 61. This would be 64.

Q. Okay. At any rate, the swabbing from the stairway that was submitted, did you reach a conclusion statistically on that?

A. The swabbing from the stairway, 64, yes, I did. Consistent with the DNA profile from suspect Elliston, cannot exclude him as a contributor on the stain, and the probability of selecting an unrelated person at random who would be the source of that DNA profile, approximately one in 1.362 sextillion. So we even go up from quintillion to sextillion one more step, for Caucasians, one in 158.2 quintillion for blacks, and one in 4.805 sextillion for Hispanics.

Again, to a reasonable degree of scientific certainty, Elliston is the source of the DNA on the stairway swabbing, including identical twins. This was a single source sample. They matched in every area. Therefore, based on the statistics, we can call him the source of that sample.

Q. And again, the other comparison, State's 61, this was the one you started to talk about previously, that DNA obtained from the stain on a carpet swabbing

for the stairway from the farm, is that part of your record, as well?

A. Yes, and that was again, the same as the stain on the carpet, consistent with the DNA profile for Mr. Pool.

Q. So in each of the items, the pliers, there was a mixture. And you couldn't exclude him in a statistical way up to I think, 1.7 million or something. But when we get to the stairway at the farm and the carpet at Tori Patrick's house, we're in sextillions and quintillions, far beyond the population of the planet?

A. Yes.

Q. And you cannot exclude Mr. Pool as being the contributor in those locations?

A. No.

Q. Now, when you and others at the lab are testing items that are submitted, does the time lapse from the crime until evidence is recovered, especially in the area of serology and blood and that sort of thing, is that an important factor? Does that create problems if there is a long time lapse?

A. It can.

Q. Okay. And if there is degradation of the victim's body and the blood and so forth, that is absolutely a problem, isn't it?

A. Absolutely, it's a problem.

Q. And I don't know if -- if you had -- I don't know if you testify in the field, but you work with others in the lab who work in hair and fiber and that sort of thing. Is that correct?

A. Yes.

Q. The jury has heard testimony earlier from Mr. Bundy that it is not uncommon and certainly not unheard of that we're able, by DNA, to determine a person was present at a location, and yet we don't find either hair nor fiber that we can tie to that individual, do you think that would be unusual or would that not surprise you?

A. It's certainly possible.

Q. Okay.

MR. FARREN: Pass the witness.

CROSS EXAMINATION

BY MR. WATKINS:

Q. Hi, Ms. McCord. My name is Mike Watkins. I don't believe we've met, have we?

A. Not to my recollection.

Q. I don't think we have. Nice to meet you.

A. Nice to meet you.

Q. I have a couple of questions. Back to the pliers, which is submission for item 214, and let's talk

about stain 1.
A. Okay.
Q. Okay. Now Ms. Rodriguez testified that she swabbed the entire top, I think, of those pliers. Do your records indicate what she swabbed?
A. I would have to look at her records.
Q. Okay. So if she said she swabbed them all together, would that kind of explain why there might be a mixture there?
A. Oh, absolutely. Anything that -- common use items, anything anyone touches, even if they don't leave blood, they can still leave tracings of DNA on it. Door knobs, pliers, any type of item like that is very common to get mixtures on those types of items.
Q. Okay. Now, so if there was some blood there, and then at some point that wasn't presumptive for blood but there was DNA when she swabbed them, would those two have kind of mixed over?
A. Yes.
Q. Okay. So are you able to tell from your testing if the blood that was presumptive positive was any particular person's?
A. No.
Q. You can just tell that there is a mixture?
A. I can just tell from the swabs she gave me

there was a mixture.

Q. Okay. And then on stain two on the same pliers, Mr. Farren, I don't believe discussed that, but that stain two came consistent with Pool, and Elliston. Is that correct? Or was that just Elliston?

A. I believe it was just Mr. Elliston.

Q. Okay. And that would be pretty common for someone carrying the pliers into the police department to have left some DNA as they carried them?

A. Well, certainly whoever handled it last would probably have left a portion of their DNA on it, yes.

Q. Okay. And I think you said there was some additional minor contributors, but you couldn't figure out who they were?

A. Yes, there was a number of minor contributors, but it was impossible to include or exclude any additional individuals.

Q. Okay. Let's talk about the items. There were swabbings from a chair. This is on page four of four, the next to the last paragraph. It's submission two, items 84-E through F.

A. Yes.

Q. And did that come back inconclusive?

A. Yes.

Q. Okay. And then you did tests for DNA on a

certain number of cigarettes. I think it was 11, if I'm not mistaken? I've got this report turned around so bad I can't find it.

A. Yes, it was 11 cigarette butts.

Q. Okay. And you're on page three of four, just slightly below the middle of the paragraph. Is that correct?

A. Yes.

Q. Okay. And those are consistent with a female contributor, and none of the people listed as suspects or Pool. Is that correct?

A. That's correct. They do not match any of the known reference samples that I had, but they were all from the same female contributor.

Q. And when you say "same", you mean the same woman smoked all 11 cigarettes?

A. The profiles were identical.

Q. Or the same person left DNA on those 11 cigarettes?

A. Yes.

Q. We're kind of assuming --

THE COURT: Let's move ahead.

MR. WATKINS: Pass the witness.

REDIRECT EXAMINATION

BY MR. FARREN:

Q. Very briefly. The known samples you have from females were Guinn Garcia and Tori Patrick. Is that correct?

A. Yes.

Q. Neither of them contributed the DNA to the cigarettes. Is that correct?

A. I did not match either of them.

MR. FARREN: Pass the witness.

MR. WATKINS: No further questions.

THE COURT: You may step down, Ms. McCord.

THE WITNESS: May I be excused, Your Honor?

THE COURT: Any objection?

MR. WATKINS: No objection.

MR. FARREN: We have no objection.

THE COURT: You are excused, Ms. McCord. Thank you. We're going to take a break, ladies and gentlemen. About 15 minutes.

(Recess.)

(All sides, Defendant present.)

(Open court, jury seated.)

THE COURT: Everyone be seated.

223

All right, ma'am. Will you raise your right hand.

(Witness sworn.)

THE COURT: Please say your name for the record.

THE WITNESS: Kelly Grayless.

KELLY GRAYLESS,

Having been first duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. FOWLER:

Q. Kelly, how do you spell your last name?
A. G-r-a-y-l-e-s-s.
Q. You might have to sit on the edge of that chair. And how old are you?
A. I'm 25.
Q. And at one point, you were Josh Bledsoe's significant other?
A. Yes.
Q. Were y'all common-law married, living together, how would you describe your relationship?
A. Common-law married. We lived together about four or five years.
Q. Do you remember the approximate years you lived together, from which year to which year?
A. From October 1st, 1998 until he went to jail

April 2nd, 2003.
Q. Now, where are you currently residing?
A. In Enid, Oklahoma.
Q. And I want to take you back to that time period where you lived with Josh around 2003. Did you know he was a drug dealer?
A. Yes, I did.
Q. Okay. Was there any point in time where you actually helped him with his business?
A. Helped him?
Q. You would help him keep track of things?
A. Sometimes, yes.
Q. Okay. And what types of things would you help him keep track of?
A. Okay. I tried to help keep track of things, but it kind of became a problem. So I more or less let him handle most.
Q. What types of things did you try to keep track of?
A. Money, people that owed him. Yeah, I tried real hard for a while to -- you know, so he wouldn't fall behind.
Q. About how long did you try to help him out?
A. Probably for about a year and a half.
Q. So you kind of acted like a reminder to him

about certain people, certain debts, certain deals?
A. Right. Until it became -- yeah, a fight between us.
Q. Okay. And at some point, did you decide I don't want to have anything to do with the drug dealing?
A. Absolutely.
Q. Do you remember about what month and year you decided to distance yourself from that?
A. Probably when we moved into Marrs Street. I don't remember. I think it was in January of 2001.
Q. Okay.
A. January 2001.
Q. And what about Josh's business did you find frustrating?
A. Huge debts from other people to Josh, Josh to other people. Mostly the debts, and the fact that he was just kind of there to make friends and not a business.
Q. How would you describe Josh Bledsoe's personality?
A. Very honest. Very loyal, very trustworthy man. He is an all around good guy.
Q. Would you say he was introverted or extroverted?
A. Extroverted.

Q. Do you feel like he was easily manipulated?
A. Very much so, yeah. I would -- I don't want to use the term "slow", but very easygoing, very -- wasn't concerned with too much, other than just having a lot of friends.
Q. Okay. When you say the debts, and debts in Josh's business frustrated you, what in particular about the debts?
A. Josh wasn't concerned about who owed him money or -- he did have lots of stress about the money that he owed, but never carried it -- never cared enough to, you know, not get ugly. But to collect or to -- he just cared about having friends and helping people.
Q. So he was worried about who he had to pay?
A. Yeah.
Q. But he wasn't necessarily worried about who had to pay him?
A. Absolutely not.
Q. Was there anyone in particular who owed him a large amount of money?
A. Yes.
Q. Who was that?
A. Craig Kimberlin.
Q. Do you know approximately how much he owed Josh before Josh went to jail in 2003?

227

A. I'm going to say approximately $150,000.00.

Q. Why did Josh Bledsoe never try to collect on that from Craig Kimberlin?

A. My personal belief is that he was -- we never ran into too many people ever that Josh was afraid of and I don't know how -- I don't know how to say it. He did. He expressed fear of Craig, or at least intimidation of Craig. And I didn't really notice that until the end there, when he just wouldn't ask for the money. He just, you know, kept helping him and I didn't understand it, but...

Q. Okay. What was your and Josh's lifestyle like when he was in the business?

A. Josh was stressed out often. We had money, we paid our bills. But he was constantly helping other people, you know, giving this person money, giving this person money. It wasn't -- we didn't live extravagantly. We did have money. We paid our bills.

Q. Now, you said you lived on North Marrs Street in Amarillo, Texas?

A. Yes, sir.

Q. What kind of neighborhood is that? How would you characterize it?

A. I don't even know if I'd put it -- middle class probably, just kind of making it, just --

Q. Okay. Now, Josh did tell us he did buy new cars or nice cars every now and then?
A. Yeah.
Q. Do y'all have a child together?
A. Yes, we do.
Q. How old is your child?
A. Aubrey is three years old.
Q. Do you remember an incident at Joe's Crab Shack with Dustin Pool and Josh Bledsoe back in the early months of 2003?
A. Yeah.
Q. Were you present?
A. Yes.
Q. Can you tell us what first caught your attention, or when did you first notice that incident?
A. We were walking out. I believe David Garcia was with us. I had my daughter in her carrier, and my son, he was about seven at the time. I just remember saying there is Dustin Pool. There is Dustin Pool. And I was like okay. Come on, kids, come on. And at some point, they were standing face to face. I was in my own vehicle and David and Josh were in their own vehicle. So we didn't leave together. But I was heading towards the car. And I heard Dustin say -- they were confronting each other -- next time I'll make sure it's

your bitch.

Q. Is this happening in the parking lot?

A. No, they're standing -- right before you walk up the steps. You know, that cement area right there.

Q. Kind of on the sidewalk area?

A. Yeah.

Q. And was anybody else with Dustin Pool?

A. Not at the time. But Josh later told me that he had went in and gotten his friend that was working there, or Ray, I think...

Q. After you heard those comments, what did you do?

A. I took the kids and left.

Q. Did you leave Josh there?

A. Yes, I did.

Q. So you and him came in separate vehicles?

A. Yes, we did.

Q. Did that incident worry Josh?

A. By that time, Josh and I, you know, I sort of stayed to myself. I mean, that's hard to explain. But I stayed out of his business, stayed to myself and just kind of let him do what we was going to do, rather than fight with him.

Q. In the early months of 2003, had you gotten a job?

A. Yes.
Q. Where were you working?
A. Corporate Systems.
Q. And what did you do for them?
A. I was an insurance teleclaims operator. I handled in-bound calls for -- for -- well, several different companies. Somebody would get hurt. They would call, and I would take their claim over the phone.
Q. Do you remember eating at a restaurant one day on March the 10th, 2003, where Josh Bledsoe got a phone call?
A. Yeah.
Q. Do you remember which restaurant it was?
A. No. You know, we -- Josh, he loved to eat -- we ate out probably every day. I don't remember exactly which restaurant it was.
Q. Which were your favorite restaurants to go to?
A. Joe's Crab Shack and probably Logan's.
Q. Okay. And they're both right next door to each other?
A. Yes, sir.
Q. And do you remember approximately what time of day it was when he received this phone call?
A. It was early evening. I don't know, maybe 8:00 or 9:00. I don't remember honestly, time-wise.

Q. And do you know who was calling Josh?
A. I didn't know them then.
Q. But you found out later?
A. Yeah.
Q. Who do you find out later placed the call to Josh?
MR. WATKINS: I'm going to object to hearsay.
THE COURT: Sustained.
Q. By Mr. Fowler) When did you find out later who called Josh?
A. I believe -- well, I know Josh told me he was going to Craig's, but that wasn't until later at the house.
Q. Okay. So after you get home from eating and he had received this call, Josh Bledsoe tells you he is going to Craig's?
A. Yeah, he told me he is going to go to Craig's. But I didn't really want him to. It was Sunday, getting kind of late. But he went ahead and kind of acted like you know, he really wanted to go, so I just said hurry.
Q. And by Craig, you mean Craig Kimberlin?
A. Yes, sir.
Q. After he went there, when was the next time you saw Josh Bledsoe?

A. The next morning.

Q. Do you remember approximately what time the next morning you saw him?

A. I never looked at a clock, but probably between 5:00 and 6:00 in the morning.

Q. Was it unusual that Josh Bledsoe would be gone for the night?

A. Absolutely, Josh -- as the what, five years I was with him, he never stayed gone all night. Never, never, ever, ever. So I was very worried.

Q. Before he left did he tell you where he was going?

A. Said he was going to Craig's.

Q. During the time period from when you -- when he left your house to when he came back, did you try calling him?

A. Yeah. I tried -- he was probably gone four hours, and it was getting late, you know, 2:00 or 3:00 in the morning. And like I said, it wasn't like Josh at all because he didn't drink. Didn't use drugs, just an all-around good guy. So I started calling him and he answered finally. But I believe I called him quite a few times. I remember calling him quite a few times before he did answer. And, yeah, he answered and said hello. And he said -- he didn't say anything else. I

said, what are you doing? Where are you at? What's going on? He said hold on so I said okay. He said they're not going to let me leave, and then hung up the phone.

Q. Did he tell you where he was?

A. He didn't tell me anything, nothing. So I proceeded to find Craig Kimberlin's number in one of his old phones, because I knew he was with Craig. I thought well, if I can find Craig, find out where he is. So I found Craig's number and I tried Craig and nobody answered.

Q. Were you concerned?

A. Very concerned, but I didn't know what to be concerned about, you know, what he was doing.

Q. Sure. You said he came home about 5:00 or 6:00 the next morning. Do you know how he got home?

A. I assume they dropped him off.

Q. When he came home was he driving his Lincoln Navigator?

A. I didn't know until I went to go get breakfast. I was leaving to go get some burritos, and I walked outside and the truck wasn't there. And I went back in and I said, where is your car? Where's -- he didn't answer me.

Q. So Josh had come home the next morning but his

Navigator was not there?

A. Right, exactly.

Q. What was his demeanor like when he got home?

A. It was -- I didn't know what to believe, was he cheating on me? Was he out with -- you know? He was crying when he came in. Because I finally fell asleep waiting for him in the bedroom. And when he came home, I guess he came straight in the bedroom. And that's when I woke up, and he was a complete mess. Yeah. Crying, just completely withdrawn. And I was so angry because I didn't know where he was or what he had been doing, or if he was just putting on a show for me because he had been out all night, because I'd never been through it with Josh.

So I went back to the back den, and I sat back down there. And he came back there about an hour later, not to comfort me, not to comfort me at all. He just laid down on the couch and started making some phone calls.

Q. Did he ever tell you at that time what was bothering him?

A. No, he didn't. And I was so angry I didn't know if I wanted to believe anything he would have told me.

Q. You said he started making some phone calls.

Do you know who he was trying to call?

A. No.

Q. Do you know what he was saying on the phone calls?

A. Yeah. When he was calling, whoever it was he called he called him several times. And I would come in. But then he would say the same thing, is he okay? Have they checked on him? Is he okay? That probably -- I can't remember how many phone calls he made like that. He was just a nervous wreck asking, is he okay? Have you checked on him?

Q. And did he ever get an answer that settled him down --

A. Never.

Q. -- after he made these phone calls?

A. Never, huh-uh.

Q. Did he ever tell you after he made the phone calls what was bothering him?

A. No.

Q. Now, did he tell you where his Navigator was?

A. No, I believe it was Destry. And I believe Destry dropped the keys off a couple of days later.

Q. From when he came home, how long was he in this, I guess, depression, state of depression, would you say?

A. I don't believe that he came out of it. I mean, he stopped eating. He just cried all day in the room. He was very withdrawn. And whatever it was, he didn't speak to me about it. And I wasn't pushing him to, by any means.

Q. And depression, is that a fair characterization of Josh?

A. Absolutely not.

Q. Okay. And then you said a couple of days later that the Navigator came back to your house. Do you know who dropped it off?

A. I think it was Destry. I'm not sure if anybody was with him.

Q. Did you actually see Destry drive up in the Navigator?

A. No.

Q. Why did you think it was Destry?

A. You know what? I don't know. I believe Josh had something to sort, things with Destry. I don't really know why I thought it was Destry.

Q. After the Navigator came back to your residence, did Josh ever meet with Josh Stocker?

A. Yeah. I think it's probably the only time I've ever seen Stocker. Him and Destry came to the house. Well, you know, he needed money, or that is the

story I got when they left. I didn't ever sit in there in the living room with them. I know he needed money, he said, do I have to worry about you too, something to that nature? And Josh ended up giving them money so that I guess Josh Stocker could evade arrest. I don't know what he was going to do.

Q. Let me stop you there. You said you had never met Josh Stocker before he came to your house?

A. I hadn't. I didn't, and I wasn't normally introduced to him when he did come to my house.

Q. The person that came to your house, do you see him here in the courtroom?

A. I don't know if that is him or not. It's been two years.

Q. Sure. That is fine. And you said he was with Destry?

A. Right, that -- yes.

Q. And then -- now, you weren't actually in the meeting with your Josh, Josh Stocker and Destry, were you?

A. No, sir.

Q. But after the meeting, your Josh had said --

A. He had told me what was going on, I think. I think that -- I'm -- yeah, he gave him some money to get out of town.

Q. Okay.
A. Eight hundred dollars, I think.
Q. After this, was Josh still in the state of depression and withdrawn?
A. Oh, yeah.
Q. And did he remain that way up until he got arrested?
A. Uh-huh, oh, yeah.
Q. And do you remember when he was arrested?
A. Yes, I do.
Q. When was that?
A. The first time was April 2nd, 2003, and the second time was Father's Day, 2003.
Q. Did he ever tell you anything about the events of that evening where he left and was out all night?
A. No, huh-uh.
Q. And did anybody else ever tell you about the events that evening?
A. Yeah. Destry and his wife, Denise, came to my house. Like I said, I don't remember the exact date. But it was, you know, three or four months after, in July. I know it was July. And that was the first time I ever got the entire story on what happened. I mean, I knew it was something bad, but I didn't know what. And I didn't ask. I didn't ask anybody, just because you

know, you hear a lot of things here and there --

MR. WATKINS: Objection, non-responsive.

THE COURT: Overruled.

Q. By Mr. Fowler) Now, you said that your Josh told you after this meeting with Josh Stocker and Destry Keeling that they had confronted him and said, do we have to worry about you, too?

A. Yes, yeah. That is -- yeah, Josh was a little shook up about what had just happened in our living room. Like I say, I stayed away from -- I stayed in the back room, whatever was happening. And they were -- but see, he had went to the police station and talked with Mark Brown. And Mark Brown had said, you know, we think your life is in danger. And Josh came home with that and sort of, you know, can you believe that they think my life is in danger? And I thought wow, okay --

Q. Let me stop you there.

A. Okay.

Q. Do you know Michael Stocker?

A. No.

Q. Did you ever have any contact with Michael Stocker after these events?

A. Never.

Q. Do you know if he ever visited with your Josh about these events?

A. Okay. There was just once, I think there was a phone call. I don't know -- okay. So Josh gives him -- them the $800.00 and they leave. Well, it wasn't shortly after that, Joshua Stocker was picked up in Canyon at his brother's house for whatever. And Michael Stocker called Josh and said, you set him up or was threatening him that he had said where he was. So it kind of shook Josh up. That is why I remember that.

Q. So your Josh got a call from Michael Stocker thinking your Josh was a snitch?

A. Exactly, yeah, exactly.

Q. Now, ma'am, are you on probation?

A. Yes.

Q. Okay. What are you on probation for?

A. Driving while license suspended.

Q. What county is that out of?

A. Potter County.

Q. How much longer, or how long are you on probation?

A. I get off in September.

Q. Okay. And that didn't have anything to do with you testifying today?

A. Absolutely not.

MR. FOWLER: Your Honor, I pass the witness.

CROSS EXAMINATION

BY MR. WATKINS:

Q. Hi, Ms. Grayless. My name is Mike Watkins. I don't believe we've met, have we?
A. No.
Q. Good afternoon.
A. Good afternoon.
Q. Okay. You were aware that your Josh was dealing drugs?
A. Yes, I was.
Q. Specifically methamphetamine?
A. Yes, I was.
Q. And you for a little while helped him with the books. So you were aware that he was dealing a lot of drugs?
A. Yes, I was.
Q. Okay. Now, did you use methamphetamine?
A. Sometimes.
Q. Okay. But you got out of the business early in 2001. Is that correct?
A. I stayed out of Josh's business.
Q. Stayed out of his business?
A. Right.
Q. Okay. Were you still using in 2001 up until Josh got arrested, let's say?

A. Not consistently.

Q. But some?

A. Some.

Q. Okay. Now, Josh was dealing directly with an Old Mexico connection. Is that correct?

A. Yes.

Q. Okay. And these are pretty tough people, if I'm not mistaken?

A. Yeah.

Q. These are people who want to get paid?

A. Right.

Q. Okay. Are you saying that he owed them a bunch of money and he wasn't paying them?

A. Yes.

Q. And Kimberlin owed Joshua $150,000.00 before Josh went to jail?

A. Approximately.

Q. Give or take a little bit?

A. Right.

Q. Okay. So your Josh was in this business just to make friends?

A. Well, of course he was supporting his family. But yeah, believe it or not.

Q. Yeah, now your Josh didn't use. Right?

A. Absolutely not.

Q. Okay. So you said it wasn't really a business to him, it was to make friends, help him make friends?
A. Yes, that is the way he used it, yeah.
Q. And he did this for five years? Six years?
A. No.
Q. How long was he doing this?
A. From about -- probably from '99, 1999 until 2003, about four years.
Q. About four years?
A. Yeah.
Q. And before that, he was just dealing weed. Right?
A. Before that, he was an electrician.
Q. Okay. So if he had testified he was dealing weed before --
A. He probably was.
Q. Okay.
A. But he was also working.
Q. Okay. But you weren't aware of -- apparently that he had been dealing marijuana prior to methamphetamine?
A. Not much. It wasn't supporting us, no. His job was supporting us.
Q. Was that just for personal use, to support each other's personal use?

A. Was what?
Q. The marijuana.
A. Was it to support my use of marijuana?
Q. And his.
A. He doesn't use marijuana.
Q. He never used marijuana?
A. He never used any drugs or alcohol.
Q. Okay. So all of his drug dealing was profitable?
A. Exactly.
Q. Now, you said that y'all weren't making a lot of money. You lived modest. That mostly he gave his money to friends?
A. Helped a lot of people out, yeah. And never badgered the ones that did owe money for the money that we probably would have made for profit.
Q. Okay. So he didn't keep a lot of cash around?
A. I am not going -- at certain times, you know, he would have money, I --
Q. Okay. So if he testified that it wasn't unusual for him to have $50,000.00 cash with him?
A. That is probably true.
Q. And you don't consider that a lot of cash?
A. Yeah, I do.
Q. Okay. Now, when Destry came back and dropped

off the Navigator, you said no one came in the house. Is that correct?

A. Okay. No, because I was in the other room. I don't think so. I think they stood at the door and handed Josh the keys, because I was in the kitchen and the living room. I couldn't see the door, but it was a pretty quick deal. I mean, just handed him the keys, and gone.

Q. Did Josh leave?

A. No, Josh didn't leave.

Q. Okay.

MR. WATKINS: Pass the witness.

MR. FOWLER: No further questions.

THE COURT: You may step down, Ms. Grayless. Thank you.

MR. FOWLER: Your Honor, we'd call Glenda Denise Keeling.

THE COURT: Ms. Keeling, would you raise your right hand.

(Witness sworn.)

GLENDA KEELING,

Having been first duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. FOWLER:

Q. Would you state your full name, please.

A. Glenda Denise Keeling.
Q. Ma'am, what city do you live in?
A. Plainview.
Q. Okay. Do you work?
A. Yes.
Q. What type of work do you do?
A. I'm a cashier at a --
Q. Ma'am, you're going to need to speak up, maybe sit on the edge of that chair and lean into that microphone. You said you're a cashier?
A. Yes.
Q. Now, you are you married to Destry Keeling currently?
A. No, I'm divorced.
Q. Okay. When did you get married to Destry Keeling, and when did you become divorced?
A. Let's see. In '89, and we were divorced in April of this year.
Q. Okay. Do you and Destry have any children together?
A. Yes, we do.
Q. Okay. What are their ages?
A. Thirteen and ten and a half.
Q. Sons or daughters?
A. Daughters.

Q. Ma'am, I want to take you back to some events that occurred around March 10th, March 11th, 2003. Do you remember taking a trip with Destry to Fritch?
A. Yes.
Q. Do you remember, what was the purpose of going to Fritch?
A. Yes.
Q. What were you told why you were going out there?
A. That Josh and Josh were needing to get away from Amarillo, and to kind of hide out, I guess you would say, and they needed a place to go.
Q. Okay. And when you say Josh and Josh, are you meaning Josh Bledsoe and Josh Stocker?
A. Yes.
Q. About what time of day do you remember leaving Amarillo for Fritch?
A. It was at night. I know it was pretty late at night.
Q. Now, how did you get to Fritch? Whose vehicle?
A. Her name was Donna Ryder (phonetic).
Q. So you borrowed a vehicle from her?
A. Yes, sir.
Q. Was she a neighbor? A relative, friend of

yours?
A. A neighbor.
Q. Did anyone call you or Destry to ask you to go to Fritch?
A. Yes.
Q. Okay. Who called you?
A. Craig.
Q. Okay. When you say Craig, you mean Craig Kimberlin?
A. Yes, sir.
Q. And what was at Fritch?
A. My grandmother has a lake house there, and that is all.
Q. Okay. And was the lake house to be used to help hide out Josh and Josh?
A. Yeah.
Q. Okay. That is what you were told?
A. Yes.
Q. Okay. This Jeep Cherokee that you borrowed from Donna, was this a new, fancy souped Jeep Cherokee?
A. No.
Q. What condition would you say it was in at that time?
A. Pretty junky.
Q. Was it an older model?

A. Yes.

Q. Had Destry -- had he just had a problem in his life before y'all went to Fritch?

A. Yes.

Q. Okay. What problem did he have just before you went to Fritch?

A. Well, he had a -- a viral infection in the blood. And they did a spinal tap. And they didn't plug it up. So I had to take him back to the hospital for them to put a plug in the spinal tap.

Q. Now, was this viral infection, was this drug related or drug usage related?

A. Yes.

Q. Okay. Before he got the call had he just gotten out of the hospital or had he been out of the hospital for days or weeks?

A. To go get the thing inside of his back, or from the hospital.

Q. To go to Fritch.

A. Okay. Well, he was in the hospital before. He got out. He was having headaches and I took him back to the hospital that day. So he had been out, but then returned for the plug in his back.

Q. Okay. And how long did -- if you remember, did he stay at that hospital that day?

A. That day? A couple of hours.
Q. Okay. Did he ask you before you embarked on this trip to Fritch if he could use your lake house?
A. He asked me if it was okay that they used it.
Q. What was your reaction?
A. Not a good one, at first. I wouldn't -- I wasn't real happy about it.
Q. Did you feel it was appropriate for Destry to be taking this trip after he had had these medical problems?
A. No, that is what I was unhappy about.
Q. You eventually made the trip. Right?
A. Yes.
Q. And why did you -- did you ever become okay with going to Fritch? Or was there anything -- you said this has to happen before you can go to Fritch?
A. I don't know what you mean.
Q. Well, did you insist on going with Destry?
A. No. I am the only one that knows where the lake house was. That is the only reason.
Q. Had he been to this lake house before?
A. Yes. Years before.
Q. Is it -- how easy is it to find it, if you've only been there once or twice?
A. It's impossible.

Q. And now it -- it's not in the town of Fritch. It's more near the Lake Meredith. Is that right?

A. Right.

Q. And do you remember how long it took you to get up to Fritch?

A. No.

Q. Okay. Did you make any stops on the way?

A. No.

Q. When you got to Fritch where did you stop at?

A. Alsup's.

Q. Okay. What was there at the Alsup's?

A. Josh and Josh.

Q. Okay. So you saw Josh Bledsoe and Josh Stocker there at the Alsup's?

A. Actually, I just seen the Navigator. I mean, I knew it was them, but I didn't actually see until later.

Q. Before you made this trip, did you know whose Navigator it was?

A. Yes.

Q. Okay. Whose Navigator did you believe it to be?

A. Josh Bledsoe.

Q. Okay. And were they already there at the Alsup's when you and Destry arrived?

A. Yes.
Q. Okay. Was there any conversation or any meeting between the four of you?
A. I didn't get out. I stayed in the vehicle.
Q. Did Destry get out of the vehicle?
A. Yes.
Q. And where did he go towards?
A. The Navigator.
Q. And since you were in the car, you didn't hear any conversations, did you?
A. No.
Q. And did he come back to your Jeep Cherokee?
A. Yes.
Q. And then what happened?
A. He said okay. Let's go to the lake house.
Q. And did you have any problems finding the lake house?
A. Yes.
Q. Okay. Do you remember about how long you spent trying to find the lake house?
A. Maybe close to an hour.
Q. And now this was at night. Is that correct?
A. Yes.
Q. Is it well lit out there?
A. No.

Q. And did you have directions or what? I guess what was the problem in trying to find the lake house?
A. Well, at night, it's hard to find. And it had been a while since I had been out there.
Q. Okay. You eventually found the lake house?
A. Yes.
Q. And what happened when you got there?
A. Well, I stayed in there for just a moment. He got out and talked, I believe, to Josh Stocker. Then he come back to the Jeep and asked me where the key was. And I said, well, she usually keeps it in a certain place by the door, but they remodeled and added a porch on. So I had to go look for it. And I couldn't find it.
Q. So you got out of the Jeep and went to try to look for this hide-a-key, I guess?
A. Yeah.
Q. And you never found it?
A. Huh-uh.
Q. How long did you try to -- spend trying to find this key?
A. Not a long time. Maybe 20 minutes, 30 minutes, at the most.
Q. And when you got out of your Jeep, had you seen Josh Bledsoe and Josh Stocker at this point?

A. Yes.
Q. Okay. They had gotten out of their Navigator?
A. Yes.
Q. Okay. You couldn't find the key. Is that right?
A. Right.
Q. And then what happened? What did you do?
A. I went and sat back in the Jeep, and I believe they were having a conversation. And then I believe Josh Stocker got on the phone. And I'm not --
Q. Do you know who he called?
A. Yes.
Q. Who?
A. Craig.
Q. Craig Kimberlin?
A. Yes.
Q. After he made this phone call with Craig, what did you or the other group members do?
A. Well, we sat there for a minute. And then we decided we would ride around a little bit and figure out what they were going to do. Or while he was still on the phone actually. And then Craig had mentioned to Josh Stocker to break the window and that he would replace it. And so not too long after that we went back to the lake house and got out, and tried to find a way

in without breaking the window. And I remember Josh Bledsoe, I walked back to the back with him while Destry and Josh Stocker went around the other side. And he got a metal rod or something and wrapped his shirt around it to try to break the window.

Q. Let me stop you there. Who got the metal rod and wrapped the shirt around it?

A. Josh Bledsoe.

Q. And how did you feel about the plan to break into your grandmother's lake house?

A. Not good. Not good at all. I didn't like it.

Q. Somebody in the group, and maybe Craig through Bledsoe or Stocker had offered to pay you back if they were successful?

A. Right.

Q. Did Joshua Bledsoe try to break out a window?

A. Yes.

Q. And what happened?

A. It didn't break, and it was really loud.

Q. Did he try one time or more than one time?

A. A couple of times, not a whole lot because it was loud and dogs were barking.

Q. And so he tries to break the window. He is unsuccessful, then what happens?

A. Then we all go back to the Jeep. And I

believe Josh was on the phone with Craig again. And we're just sitting there talking, and all of a sudden, Josh Bledsoe gets up, freaks out, gets in the Navigator and leaves.

Q. Do you know why he freaked out? Did you know why at the time?

A. I -- okay. That's what I was going to say. I didn't know at the time, no, not at the time.

Q. Did you get the feeling that Destry and Josh and Josh were trying to shield you, or really didn't want to involve you in their conversations?

A. Yeah.

Q. Okay. And now Josh Stocker, had you known him before this trip up to the lake house?

A. I had met him a couple of times, yeah.

Q. Do you see him here in the courtroom today?

A. Yes.

Q. Can you point him out for us?

A. Right there (pointing.).

Q. And he is wearing a dark blue shirt with a red tie?

A. Yes.

MR. FOWLER: Your Honor, I'd ask the record to reflect she has identified the Defendant.

THE COURT: The record will so reflect.

Q. By Mr. Fowler) After Bledsoe takes off, did he just kind of slowly leave the lake house, or did he just peel out?
A. Oh, he peeled out. He was gone quick.
Q. What was your and Destry and Josh Stocker's reaction to this?
A. One at a time or --
Q. Sure. Let's start with you. What was your reaction to it?
A. I was wondering why. You know, I was like what is going on, just -- trying to keep my nose out of it because I felt uncomfortable at that point anyway.
Q. What was Destry's reaction to this?
A. Pretty much the same. Why did he do that? Why did he just take off?
Q. And what was Josh Stocker's reaction to this?
A. He was like, he is stupid. He kept saying how stupid he was for just taking off like that.
Q. So Josh Stocker was saying Josh Bledsoe was acting stupid?
A. Yeah.
Q. Okay.
A. Pretty much.
Q. How was he saying that? When he was saying, he is stupid, how was he saying that?

A. What do you mean? Profanity? What do you mean?
Q. No, no. Was he laughing, was he saying it in a calm voice?
A. Laughing.
Q. He was laughing when he said that?
A. (Witness nods head up and down.)
Q. What else did Josh Stocker say?
A. A lot of things. Specifically?
Q. Yes.
A. He started talking about it, about what had happened.
Q. And what did he say?
A. That now what should we do with DP, you know. And the situation, and a lot of things.
Q. Okay. Do you remember what else he said, besides, you know, what should we do with DP?
A. Like on the way back?
Q. Now, just right then, right when Bledsoe takes off.
A. Yeah.
Q. What else did Josh Stocker say?
A. He told Destry, he said, well, I guess he is going to get pinned. It's going to be pinned on him now because he is the stupid SOB that took off in the

Navigator.

Q. Okay. Stupid SOB? Is that what you --

A. Yeah.

Q. Okay. And so after Bledsoe peels out, the Defendant makes these comments, what do you and Destry and Stocker decide to do?

A. To go back to Amarillo.

Q. Okay.

A. Well, actually, Craig wanted us to look for him. We looked for him for just a little while and then drove back that way.

Q. When you say look for him, look for Bledsoe?

A. Yes.

Q. And so the three of you got back into the Jeep, and did you drive around trying to look for Bledsoe?

A. Not really tried to drive around. We just drove back through Fritch, and looked around to see if we could find him.

Q. Did you ever find Josh Bledsoe?

A. No.

Q. And then did you make your way to Amarillo?

A. Yeah.

Q. In the car ride home to Amarillo, did you and Josh and Destry have a conversation?

A. There was conversation. I wasn't a part of it.

Q. Okay.

A. I didn't want to be a part of it.

Q. But did you hear the conversation?

A. Yes.

Q. And I take it the conversation then must have been between Destry and Stocker?

A. Yes.

Q. And what was said?

A. Well, Josh was telling Destry what had happened, that he was -- that Dustin Pool was squealing like a pig and he had to shut him up.

Q. Okay. So you heard Josh Stocker tell Destry that Dustin Pool was squealing like a pig, and he had to shut him up?

A. He referred to him as DP because he didn't say his name, but yeah.

Q. So he said DP was squealing like a pig. Is that correct?

A. Yes.

Q. And we had to shut him up?

A. Shut him up.

Q. Now, up until Bledsoe peeled out and Stocker said, you know, what are we going to do with DP, had you

ever heard about this Dustin Pool before then?

A. I don't remember hearing about him, no, I don't. I remember some things that he had said about him, but nothing about, you know...

Q. Well, when you heard the initials that night, DP, did you know it was Dustin Pool they were talking about?

A. No, not that night.

Q. Okay. When Stocker said DP wouldn't shut up, he was squealing like a pig, how was he saying that? What was his demeanor when he was saying that?

MS. MCELROY: Your Honor, I think that calls for speculation.

MR. FOWLER: Judge, I believe she can testify to his demeanor when the Defendant said nothing.

THE COURT: Yeah, I'll allow it. Overruled.

THE WITNESS: The demeanor, it was scary. He acted like he was possessed. It scared me bad.

Q. By Mr. Fowler) And at this time when he made these comments, I mean, had you put two and two together, and realized potential homicide with Dustin Pool?

A. Yes, well with DP.

Q. With DP?

A. Yeah.

Q. And so did you make any stops on the way from Fritch to Amarillo?

A. Yes.

Q. Okay. Where did you stop at?

A. Wal-Mart.

Q. Do you remember which Wal-Mart?

A. The one on I-40 and Grand.

Q. Okay. And whose suggestions or idea was it to stop there?

A. Josh.

Q. Josh Stocker?

A. Yes.

Q. Did he tell you what he needed from Wal-Mart?

A. Yes.

Q. What did he need?

A. Well, some pants, a shirt, some socks, and a phone charger.

Q. Had had you noticed anything about his clothes before you got to the Wal-Mart?

A. No.

Q. Okay. Who went in to the Wal-Mart?

A. I did.

Q. And did anybody give you money?

A. Yes.

Q. Who gave you money?
A. Josh.
Q. Did he tell where you the money he was giving you had come from?
A. No.
Q. And did you go into the Wal-Mart by yourself?
A. I believe so.
Q. Okay. And what did you purchase?
A. A pair of jeans, a T-shirt, some socks and a phone charger.
Q. And then you made your way back to the Jeep Cherokee in the parking lot?
A. Yes.
Q. Did you give these items to the Defendant?
A. Yes.
Q. What was his reactions?
A. I got the wrong kind of pants.
Q. What was wrong about the pair of pants you had gotten him?
A. I don't know. I guess they were the wrong style or -- I'm not for sure.
Q. I mean, did he react angrily when you gave him the wrong pair of pants?
A. Kind of. Not angry, but kind of dissatisfied.
Q. And did you go in and buy another pair of

pants, or was any action taken after that?
A. No.
Q. Now, you said you bought a phone charger, and that was also for Josh Stocker?
A. Yes.
Q. Did you notice any difficulties he was having with his cell phone that evening?
A. Yes.
Q. What difficulties did you notice?
A. I believe the battery had gone down. It kept cutting out.
Q. So was he having problems making phone calls and maintaining the cell phone call for, you know, more than a couple of minutes at a time?
A. Yes.
Q. After the Wal-Mart trip, did you go anywhere else?
A. Yes.
Q. Where did you go after the Wal-Mart --
A. To his trailer. His and --
THE REPORTER: I didn't hear you.
THE WITNESS: His and Brook's trailer.
Q. By Mr. Fowler) Brook Vangergriff?
A. Yes.
Q. And I believe she was at the time Josh

Stocker's significant other?
A. Yes.
Q. Did you know her before this evening?
A. I believe so. I believe we had met a couple of times.
Q. Do you remember approximately what area of town the trailer was located at?
A. Lake Tanglewood.
Q. And when you got to the trailer did you -- did all three of you get out of the Jeep?
A. Yes.
Q. And go inside the trailer?
A. Yes.
Q. And did the Defendant have a conversation with Brook?
A. Yes.
Q. What was Brook's reaction when Josh Stocker arrived home?
A. She was mad.
Q. Did she say why she was mad?
A. Because he had been gone for a while, and he wouldn't answer her calls.
Q. Any other reason why she was upset at Josh Stocker?
A. Not that I can remember.

Q. After going to the trailer then did you go anywhere else?
A. To where we lived, where Destry and I lived.
Q. And was the Defendant still with you after you had went to his trailer?
A. Yes.
Q. And so did they drop you off at your residence?
A. Yes.
Q. Why did they drop you off?
A. Because I had my kids. I had to go wake them up for school and get them to school that morning.
Q. And so by this time, can you estimate what time of day it was when you got back to your residence?
A. Probably about 6:30 or 7:00 in the morning.
Q. Okay. Was there a particular time you had to get the kids to the bus stop or in school?
A. Yes, I believe the bus stop came about 7:15.
Q. Okay. And did you arrive home in time to get the kids to the bus stop?
A. Barely. They were already getting ready.
Q. And then did you know where Destry and the Defendant went after they dropped you off at your residence?
A. Do I know now, or did I know then?

Q. Did you know then?

A. No -- well, there was one thing that they were going to do, and that was take him to his vehicle.

Q. Did you know where his vehicle was at the time?

A. No, I -- no, I didn't know where it was.

Q. Okay. Did the Defendant and Brook ever come to your residence after these events and ask to live with you?

A. Not to live with us, just to stay a little bit.

Q. Do you remember the time frame when they came and made this request of you? Was it, you know, the day after this trip? Or was it weeks or months after?

A. Probably weeks.

Q. Okay. Did they say why they needed to stay with you?

A. Because Josh was hiding.

MR. FOWLER: Your Honor, I pass the witness.

CROSS EXAMINATION

BY MS. MCELROY:

Q. Hi, Ms. Keeling. My name is C.J. McElroy. I just have a few questions. Were you called that night -- were you told that a couple of buddies wanted to go

fishing?

A. No.

Q. Okay. So they called pretty late at night. Is it after midnight when you get this call?

A. I am thinking maybe around midnight. It could have been around midnight. It was pretty late.

Q. Well, did you get the feeling that there must be some kind of urgency about this to be asked to do this so late at night?

A. Of course.

Q. You didn't have a feeling that somebody was, you know, just going to hang out at the lake house?

A. Well, knowing their present situation and what they, you know, the drugs and everything, that is -- that was my assumption, they were maybe wanting somewhere to hide out because of a drug thing. That was my assumption. That is all I could go by, because he wouldn't tell me.

Q. You and Destry were married for quite a bit of time before this happened?

A. Yes, ma'am.

Q. And you would, of course, have known that Destry had a drug habit?

A. Yes.

Q. Did you do dope?

A. Yes.
Q. Were you both doing dope that night?
A. No.
Q. Destry had -- had he suffered recently an overdose?
A. No. It was a viral infection or something within the blood, because of using dope.
Q. Okay. So he had gotten like a staph infection because he was shooting intravenous dope? Is that what you're telling me?
A. Yes, I'm not sure it was a staph infection. I know it was an infection in the blood.
Q. Okay. And he had just gotten out of the hospital to have a spinal tap patch done?
A. Well, he had been out of the hospital. And then I had to take him back to the hospital that day because he was having headaches, and so they put a plug in his back.
Q. All right. So you drive the Jeep out there. Is that right?
A. Yes, ma'am.
Q. And how long does it take you to get out there?
A. Probably 45 minutes, 45 minutes.
Q. Okay. Did you make any stops before you took

off?

A. No.

Q. All right. Now, it's just you and Destry. Right?

A. Yes.

Q. Okay. So you were out there, and I think you testified that they were already at the Alsup's waiting on you?

A. Yes.

Q. And you go then directly to try to find the lake house. How long does that take you?

A. A while.

Q. All right. When you say a while, is it over an hour or --

A. No, probably around an hour. 45 minutes to an hour.

Q. Now, you're out there. You're not asking Destry any questions like what is the deal with this deal? Why are we going out in the middle of the wilderness? It is 1:30 in the morning, I'm tired. I want to go home.

A. No.

Q. Okay.

A. I don't -- I learned not to ask those kind of questions.

Q. Would you say that that was deliberate ignorance?

A. Pretty much.

Q. Okay. Then you say that you get down there -- now, Destry gets out of the vehicle and you stay in the Jeep?

A. Uh-huh.

Q. How -- when you drive up to the lake house, is Mr. Bledsoe's Navigator pulled straight in or is it backed in, or how is that arranged?

A. He backed it in.

Q. Okay. So the back end was closest to the garage door?

A. There is not a garage door.

Q. Okay. Well, would it be --

A. The end of the trailer.

Q. Yes. Now, do you know whether or not Destry and Josh ever opened the back end, or did you see any of that?

A. No, I didn't see.

Q. At some point in time, they get back in. They say, we need you to find the key?

A. Right.

Q. All right. Well, how long did you look for the key?

A. About 20 minutes, because I knew that if it wasn't there, then it's not there at all.

Q. Was there any sort of discussion about calling somebody, let's go get the key?

A. Yeah, they had asked me if I could call my grandmother and get a key, and --

Q. And this is probably?

A. Very late.

Q. 3:00 in the morning?

A. Probably.

Q. Didn't think it was a good idea to call Grandma?

A. Huh-uh.

Q. Okay. You guys then decide to all get back in the Jeep and have a pow wow?

A. Right.

Q. Because we can't find the key?

A. Right.

Q. And we don't think calling Grandma is a good idea?

A. Right.

Q. All right. Now, did Josh use his phone or did Destry have a phone? Or did you have a phone?

A. Josh used his. I believe Destry left his at the house. He didn't take his.

Q. Was it Josh Stocker's phone or Josh Bledsoe's phone?

A. I don't know whose phone. I don't know if it was his or Bledsoe's. I'm not sure.

Q. Okay. So then you basically -- Craig's idea is to go break the window?

A. Yes.

Q. All right. And that doesn't work?

A. Right.

Q. Okay. But you're helping him trying to -- who finds this metal rod?

A. It had to have been Bledsoe, because when I came around, he had already found it and picked it up.

Q. During the time this is going on, are they having conversations with one another?

A. Not that I know of.

Q. So everybody is just silently walking around?

A. Well, trying to figure out, you know, things about, do you think we can get in here? Do you think we could get in there?

Q. Okay. That doesn't work out. Do you go -- does everybody return back to the Jeep?

A. Yes.

Q. And then do you have more conversations?

A. Yes.

Q. All right. In your presence, is there any other conversation other than just what is going on with the key?

A. No. Not -- well, calling Craig and asking him what should we do? That is the conversation that I heard, that I mean -- that was over the phone. I didn't hear the other end, I mean...

Q. But around about this time, you're getting the idea of why you're here?

A. Not the full idea, no.

Q. Okay. You said that you went and tried to find Bledsoe, but you couldn't find him?

A. Right.

Q. And then you go back over and then you go to the Wal-Mart?

A. Uh-huh.

Q. When you saw Josh, you said you didn't notice anything about his clothing?

A. Huh-uh.

Q. So it would be fair to say that he wasn't covered from head to toe in blood?

A. I didn't see it. I wasn't particularly looking for anything like that either.

Q. Destry had testified that he was called at some point in time by Stephen Kimberlin and basically

told what story he needed to tell. Did you also get the same kind of party line? Did you get the, this is what you need to tell everybody?

A. I was present.

Q. Okay. So you assumed that was to apply to you, too?

A. Pretty much, yes.

MS. MCELROY: Pass the witness.

REDIRECT EXAMINATION

BY MR. FOWLER:

Q. Ma'am, you said you were present when Craig Kimberlin told Destry what to say?

A. Yes.

Q. Where was that at?

A. At his home.

Q. And do you know if -- was anyone else around?

A. Jessica.

Q. And anybody else?

A. No. Just us four.

Q. Did the Defendant change clothes in the car, in the Jeep?

A. I believe so.

Q. Do you know what happened to the clothes he was wearing?

A. No.

Q. Okay. Did you find it odd that he was needing a change of clothes at 4:00 or 5:00 or 6:00 in the morning?
A. Well, by that point, I already knew what was going on.
Q. Okay.
A. Because of the conversation that he was having with Destry.
Q. And you don't know what happened to the clothes he was wearing before you got to the Wal-Mart?
A. What do you mean? Do you mean after?
Q. Yes.
A. Oh, no. I don't know what he did with them.
MR. FOWLER: Your Honor, I pass the witness.
MS. MCELROY: Nothing further.
THE COURT: You may step down, ma'am.
MR. FARREN: Your Honor, we rest.
THE COURT: All right, ladies and gentlemen. I'm going to let you go early. So y'all are discharged until 8:30 in the morning.
(Evening recess.)

THE STATE OF TEXAS )
COUNTY OF RANDALL )

I, Robyn Womack, Deputy Official Court Reporter in and for the 47th District Court of Randall County, State of Texas, do hereby certify that the above and foregoing contains a true and correct transcription of all portions of evidence and other proceedings requested in writing by counsel for the parties to be included in this volume of the Reporter's Record, in the above-styled and numbered cause, all of which occurred in open court or in chambers and were reported by me.

I further certify that this Reporter's Record of the proceedings truly and correctly reflects the exhibits, if any, admitted by the respective parties.

WITNESS MY OFFICIAL HAND this the 18th day of October, 2005.

Robyn Womack

ROBYN WOMACK, CSR 4470
Expires: 12/31/2006
Certified Reporter
5603 Foxcroft Dr.
Amarillo, Texas 79109
(806) 236-3312