07-05-0284-CR

FILED
OCT 18 2005
SEVENTH COURT OF APPEALS
PEGGY CULP, CLERK

# REPORTER'S RECORD

VOLUME 14 OF 22 VOLUMES

TRIAL COURT CAUSE NO. 15,307-A

| | | |
|---|---|---|
| THE STATE OF TEXAS | ) | IN THE DISTRICT COURT |
| V. | ) | RANDALL COUNTY, TEXAS |
| JOSHUA DAVID STOCKER | ) | 47TH JUDICIAL DISTRICT |

*********************

GUILT/INNOCENCE PROCEEDINGS

*********************

On the 20th day of July, 2005, the following proceedings came on to be heard in the above-entitled and numbered cause before the Honorable Hal Miner presiding, held in Randall County, Texas:

Proceedings reported by Stenographic Method.

**A P P E A R A N C E S**

ATTORNEYS FOR THE STATE:
NAME: Mr. James Farren & Mr. Jeremy Fowler
Randall County District Attorney's office
SBOT NO:
ADDRESS: Randall County Courthouse
16th Street and 5th Avenue
Canyon, Texas 79015
PHONE: (806) 468-5570

ATTORNEYS FOR THE DEFENDANT:
NAME: Ms. C. J. McElroy & Mr. Mike Watkins
Attorneys at Law
SBOT:
ADDRESS: 801 S. Fillmore Street
Amarillo, Texas 79101
PHONE: (806) 371-0555

VOLUME 14
CHRONOLOGICAL INDEX

JULY 20TH, 2005


PAGE

DEFENSE'S ORAL EVIDENCE:
APPEARANCES . . . . . . . . . . . . . . 2
CASE CALLED . . . . . . . . . . . . . . 6

WITNESSES:
DR. ROBERT BUX:
DIRECT EXAMINATION BY MR. WATKINS. . . . . . . 9
CROSS EXAMINATION BY MR. FARREN . . . . . . 27
REDIRECT EXAMINATION BY MR. WATKINS . . . . . . 58
RECROSS EXAMINATION BY MR. FARREN. . . . . . . 65

DR. NEAL HASKELL:
DIRECT EXAMINATION BY MS. MCELROY. . . . . . . 75
VIDEO PLAYED . . . . . . . . . . . . . 80
DIRECT EXAMINATION CONT. BY MS. MCELROY . . . 81
CROSS EXAMINATION BY MR. FARREN . . . . . . 129
REDIRECT EXAMINATION BY MS. MCELROY . . . . . 158
RECROSS EXAMINATION BY MR. FARREN. . . . . . . 161
DEFENSE RESTS . . . . . . . . . . . . . 162

STATE'S REBUTTAL EVIDENCE:
JAMES BURGESS (RECALLED):
DIRECT EXAMINATION BY MR. FARREN . . . . . . . 166
CROSS EXAMINATION BY MS. MCELROY . . . . . . . 173
REDIRECT EXAMINATION BY MR. FARREN . . . . . . 177

STANLEY RICKWARTZ:
DIRECT EXAMINATION BY MR. FARREN . . . . . . . 179
STATE RESTS . . . . . . . . . . . . . . 184
JURORS EXCUSED FOR EVENING RECESS. . . . . . . 184

CHARGE CONFERENCE . . . . . . . . . . . 185

EVENING RECESS . . . . . . . . . . . . 194
REPORTER'S CERTIFICATE . . . . . . . . . 195

ALPHABETICAL INDEX -- JULY 20TH, 2005


| WITNESSES | DX | CX | RDX | RCX | FRDX |
|---|---|---|---|---|---|
| BURGESS, JAMES | 166 | 173 | 177 | | |
| BUX, DR. ROBERT | 9 | 27 | 58 | 65 | |
| HASKELL, DR. NEAL | 75,81 | 129 | 158 | 161 | |
| RICKWARTZ, STANLEY | 179 | | | | |

INDEX OF EXHIBITS -- JULY 20TH, 2005

(NONE SUBMITTED.)

PROCEEDINGS

July 20th, 2005

(All sides, Defendant present, open
(Court:

THE COURT: Thank you all. Bailiff, how many do we have?

MR. FARREN: Your Honor, I'm going to have one housekeeping matter.

THE COURT: Oh, okay. Everyone be seated.

MR. FARREN: Your Honor, to clarify the record, there was some testimony yesterday about both the mandible and the maxillary bone --

THE COURT: Yes.

MR. FARREN: -- and out of an abundance of caution, I would ask the Court to announce on the record, and if the Defense has any objection, that not only do the photographs, but the actual State's Exhibit No. 246 include both the mandible and the maxillary bone, because I don't want problems on appeal arguing about whether just the mandible was entered.

THE COURT: Yes, sir. My understanding -- and this is my belief in the case, both the pictures of the envelope with the chain of custody information on it, and the actual item itself, the envelope with the

mandible and the other jaw part were also introduced into evidence, and were available, because of their odiferous nature, they were not brought into the courtroom and everyone here agreed that the pictures would suffice just as if the actual body part itself in the original sack was in here.

MR. FARREN: And to clarify, Your Honor, that is what we would like the record to show, that both jaw bones --

THE COURT: They're both in evidence.

MR. FARREN: -- were in that Exhibit 246.

THE COURT: Sure. They're both there.

MS. McELROY: That was my understanding.

THE COURT: And they're evidence. And they were simply available. This is a far better procedure, and we just introduced the pictures, and the chain of custody witnesses testified from the pictures entered by agreement. But as you say, both the pictures and the body parts themselves in the sack were introduced and admitted in evidence.

MR. FARREN: That is correct, Your Honor.

MS. MCELROY: Your Honor, I just have one more thing.

THE COURT: Okay.

MS. MCELROY: We have a couple of experts

today, and I just want to let the Court know, because they will be sitting in here.

THE COURT: That will be fine. They're not under the rule.

(Jury seated.)

THE COURT: Thank you. All rise, please. Well, good morning. Everyone be seated. I hope y'all didn't have so much to eat back there at breakfast that you didn't invite anybody else to, that you're not going to get sleepy in court.

All right. Ms. McElroy, are you ready to begin the Defense's case?

MS. MCELROY: Yes, we are, Your Honor.

THE COURT: All right. I believe you all made an opening statement already.

MS. MCELROY: We have, Your Honor.

THE COURT: All right. Are you ready to call your first witness?

MS. MCELROY: Yes, Your Honor. We're going to call to the stand Dr. Robert Bux, and Mr. Watkins is going to direct --

THE COURT: Bux? How do you spell that name?

MS. MCELROY: B-u-x.

THE COURT: Oh, okay. How are you?

THE WITNESS: I'm fine, sir.

THE COURT: Raise your right hand.

(Witness sworn.)

THE COURT: Go ahead.

DR. ROBERT BUX,

Having been first duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. WATKINS:

Q. Good morning, Dr. Bux.

A. Good morning.

Q. How are you this morning?

A. I'm fine, thank you.

Q. A couple of quick questions, a little bit about yourself. Your name is Dr. Robert Bux. Correct?

A. Correct.

Q. And for the court reporter, would you spell your last name?

A. B-u-x.

Q. Okay. And how are you currently employed?

A. I'm currently employed as Associate Coroner Medical Examiner for El Paso County, Colorado, which includes Colorado Springs.

Q. Okay. And is the coroner's office, is that kind of like a medical examiner's office?

A. Yes, it performs exactly the same functions.

Q. Okay. And do you have training -- are you a doctor, an M.D.?

A. Yes, I am.

Q. Okay. Would you share with the jury a summary of your training and experience that enables you to perform in your capacity?

A. Yes, sir --

MR. FARREN: Your Honor, if I may, we will stipulate that he is an expert in forensic pathology, if that will help save time.

MR. WATKINS: Your Honor, I think his testimony will be brief on this. And we will get through it pretty quick, just to establish who he is.

THE COURT: So you'd like to go ahead and go into his qualifications in front of the jury?

MR. WATKINS: Real briefly.

THE COURT: Do it briefly.

MR. WATKINS: Okay. Thank you, Judge.

A. I attended the Universidad Autonoma de Guadalajara Medical School, and graduated in 1974 receiving an M.D. degree. I then took a one-year rotating American Medical Association approved internship. And on completion of my internship in 1975, returned to the Republic of Mexico and performed a one-year social service.

Upon completion of my one-year social service, in 1976, I entered active duty with the United States Army, and was assigned as a general medical officer and brigade surgeon to the 7th Infantry Division at Fort Ord, California.

In July of 1978, I began a four-year residency in anatomical and clinical pathology at Brooke Army Medical Center at Fort Sam Houston, Texas. In June of 1982, I became board certified in anatomical and clinical pathology, assigned first assistant chief, then chief, Department of Pathology, United States Army Hospital, Fort Carson, Colorado.

In August of 1984, I left active duty and became a medical examiner for Bexar County in San Antonio, Texas. From August of 1984 through August of 1985, I completed a one-year approved fellowship in forensic pathology. In May of 1985, I became board certified in forensic pathology, and I have active licenses to practice medicine in the states of Colorado, New Mexico and Texas.

Q. In your experience in the Army and in Bexar County and in your current position, have you had an opportunity to testify as an expert in courts?

A. Yes, I have.

Q. Are those both state courts of Texas and other

states?

A. Yes, as well as federal and military courts.

Q. Okay. As part of your job in this case, have you reviewed an autopsy examination report?

A. Yes, I have.

Q. Okay. Is that the autopsy examination report that was submitted by Dr. Natarajan?

A. Yes, on a Dustin Shawn Pool.

Q. Okay. And what day was that autopsy report -- does it show that it was performed?

A. It shows that it was performed on June 16 at uh -- 2003, beginning at about 9:15 A.M.

Q. Okay. And in your review of this report, did you also review some other items?

A. Yes, sir, I did.

Q. Like what?

A. I reviewed the police investigation summary. I reviewed multiple statements of individuals that had been interviewed by law enforcement officials. I reviewed the autopsy report and I reviewed hundreds of photographs.

Q. Okay. With your review of this evidence and your review of the autopsy report, were there some anomalies that raised questions in your mind?

A. Yes, there were.

Q. Okay. In this autopsy report, did it ever identify the size and weight of the body?

A. No.

Q. And is that strange?

A. That is unusual. The custom would be to record the height and weight.

Q. Okay. What about -- did you have any concerns over the report and what it discussed regarding the ribs?

A. Yes, sir.

Q. And what is your concern there?

A. I think the rib fractures are clearly postmortem, or occurred after death.

MR. WATKINS: May I approach the witness?

THE COURT: Yes.

Q. By Mr. Watkins) I'm showing you what has been previously marked as State's Exhibit 147 and 116. Have you reviewed those pictures?

A. Yes.

Q. And what do they show?

A. They show four comminuted rib fractures. And comminuted means that there are multiple breaks, and you can actually see that the ribs appear to have moved and poked in towards the chest cavity inside.

Q. I'm going to put these on the screen over here

so that everyone can see while we discuss them. Dr. Bux, would it be easier to describe what caused you concern if you came over here and pointed at these?

A. Yes, I think it would, if that's okay. Thank you.

Q. And here is a pen that you can point with.

A. Okay. You can see the fractures. Here is one rib. Here is another one, and here is another one and here is another one. And they're on the left side of the chest cavity, so they're in this area here. What is important to remember is that when you break bones, inside the rim of the bone -- and we've all seen this when we looked at chicken bones and beef bones. You have the white rim around the outside of the bone that is really hard, and then inside you have the marrow cavity. Okay? And the marrow cavity is essentially where red and white blood cells are manufactured, and there are lots of small blood vessels in there.

As a result of that, when you snap a bone you get significant hemorrhage around the bone from the fracture, and there is none here.

Second of all, it's important to remember that ribs -- and again, we've all had this, those of us who like short ribs like me, if you look at short ribs, there is a covering called the periosteum over the bone,

and you can see that a lot of times on the ribs or on the chicken bones that you eat, or beef. It doesn't matter, whatever animal has it.

And that has blood vessels, as well. So when that is ruptured, like occurs when those ribs stick through, you're going to have bleeding. And third, there are bands of muscles between each rib, and those are called the intercostal muscles. And when you have rib fractures, you get bleeding into the intercostal muscle. And this photograph is not showing you bleeding. So it either occurred when the person had no blood pressure or when he was dead.

Q. Now, Dr. Bux, the other day we looked at -- the other day, Dr. Natarajan took us through a series of photos where he had incised what he believed to be contusions, and identified some as contusions and some as not contusions.

A. Correct.

Q. Would that same coloration be present if this were a pre-death injury?

A. Correct. Yes, it would.

Q. Okay. I'm going to put another picture --

MR. WATKINS: Approach the witness?

THE COURT: Yes.

Q. By Mr. Watkins) I'm showing you what has

previously been entered as State's Exhibit 160. Have you seen this photograph, as well?

A. Yes, I have.

Q. Okay. And what do you understand this section of the photograph -- and I'm pointing to about the middle of the section -- to be in this photograph?

A. My understanding is that that is in the silo where the body was encased in concrete. And that that is an area of concrete and a board on the side of that -- I don't know what to call it, except other than a hole.

Q. Okay. Do you understand that from the testimony there is discussion that the body was lifted and set up on this, and then eventually dropped over the side?

A. Yes.

Q. Is this retaining wall, so to speak, do you have an opinion on whether or not it would be a possible cause of those broken ribs?

A. Sure, it could be a possible cause. Anything that is blunt that the body falls against, whether it strikes it or is struck by something blunt is a way to cause that kind of injury.

Q. Okay. The next inconsistency, do you remember reading about and seeing photographs of a sock?

A. Yes.
Q. Okay. And did anything about that sock raise an anomaly or an inconsistency in your mind?
A. Yes.
Q. And what was that?
A. That was the presence of larvae on a sock that was in a sealed cavity.
Q. And why is that unusual? Why is that an anomaly?
A. Well, when insects lay eggs in a cadaver, they lay it on exposed body surfaces. They particularly like around openings, particularly the mouth and nose area. And the nose and the mouth and the chin were all sealed by multiple layers of duct tape, so there is no way that the insects can get on that material when it's already sealed.
And of course, insects are not going to lay eggs on somebody who is alive. They're attracted by smells of a decomposing body, so that is what attracts them.
Q. Okay. In our discussions of this when that issue was raised, what did you suggest the next step in investigation should be?
A. I suggested that you get an entomological consult from a forensic entomologist to determine what

kinds of insects were there, and when and how they could have been deposited by whatever species or species laid the eggs.

Q. Okay. And let me back up just a little bit. In your review of the photographs, did you see a photograph with the sock still in the mouth before it had been removed by the medical examiner?

A. Yes.

Q. And what was -- what did you see in that picture?

A. I saw some larvae.

Q. Okay. And was the sock just barely there or was it --

A. No, it was -- according to the autopsy report and looking at the photographs, looking at the size and having seen people that have had socks stuffed in their mouth before, and according to the testimony of Dr. Natarajan, that sock was stuffed all the way in and a significant part of it was in the back of the throat which would obviously obstruct an airway if somebody was alive.

Q. Now, what -- scientifically, where did the sock extend to?

A. It extended into what's called the posterior pharynx, which is the area behind the tongue up to the

roof of the mouth, going down to the opening of the epiglottis and the beginning portion of the trachea.

Q. Okay. So it -- that is way back there?

A. Absolutely. That's where your tonsils are, back in there and down.

Q. Okay. Let me show you --

MR. WATKINS: May I approach again?

THE COURT: Yes.

Q. By Mr. Watkins) Show you State's Exhibit No. 237, which has already been admitted. Do you recognize that photograph?

A. Yes. This is the sock that was inserted in the mouth. You can see the discoloration and staining from purge, which is a decomposition product. When a body decomposes, one of the things that happens is a cavity accumulates fluids. And in addition to that, or more importantly, the lungs exude fluid. And that fluid gets into the air tubes, comes up the trachea, which is your wind pipe, eventually comes into your mouth and nose, and eventually that liquid will purge out, will come out. It's usually a dark red brown color. It's foul smelling, and it will continue as the body decomposes.

Q. Okay. Talking about purge, why would someone put a sock in a dead person's mouth?

A. To prevent that purge from coming up.

Q. Is it likely that a sock would prevent that?

A. It will initially, but once it gets saturated by itself, then the purged fluid is going to come up through that, and you're going to have the same process going where it's going to come out of the mouth.

Q. Is purged fluid something that is voluminous?

A. You can get ounces of it over time. It certainly smells. So, you know, I'm unaware of if I've ever seen a volume written, but certainly I've seen ounces that have come out and been at a scene when a body is discovered that's decomposing.

Q. Is purge something that occurs immediately in the decompositional process, or is it later down the road?

A. It takes -- it takes hours to days to start to develop, depending on when the body starts to decompose. There is a period of time early on in the postmortem state when the body gets rigid and goes into what we call rigor mortis. And then when the body starts to come out of that, typically you see purge when either the rigor mortis is waning or afterwards. If it's an extremely hot environment, then the purge can come on quicker, because I've seen bodies that are decomposing within six hours, but they have been in the hot south

Texas sun. But typically, you would see it after the body comes out of rigor mortis.

Q. Okay. The -- this particular body was also duct taped. I believe it was described as a cocoon around the head. Does that give you any concern about these -- the sock and these bugs?

A. Well, yes, that would prevent the insects from laying on the sock. And it's interesting that the only place that I saw the larvae on the photographs was on the sock.

Q. Okay. In your years of experience as a medical examiner, is this evidence, this entomological evidence something that you would have collected?

A. Yes, or cause to be collected, one of the two.

Q. Whenever you say cause to be collected, what do you mean by that?

A. Somebody else may have collected it, or it may have been collected under my -- you know, under my direction.

Q. Additionally, is it your understanding that this body was wrapped in a tarp?

A. Yes, as well as plastic.

Q. As well as a thin plastic?

A. Yes.

Q. Okay. What about the burial? Do you

understand how -- what kind of conditions it was buried under?

A. It was dried -- it was buried in the bottom of this pit in the silo, and concrete was poured over the body, is my understanding.

Q. Okay. Does that give you some concern on how those bugs got there?

A. Well, those are great barriers to prevent them from coming in, depending on what the -- you know, what type they are. Again, what was unusual was that it just was found in the mouth. I didn't see anything else anywhere else.

Q. Okay. If you had heard and there has been testimony that there was approximately four inches of sludge on top of the concrete, meaning water and mud and other items, would that act as an additional barrier?

A. I would think so.

Q. Okay. Now, you've collected entomological evidence before. Is that correct?

A. Yes.

Q. When you collect evidence, do you take special precautions with rubber gloves?

A. I am usually gowned and have gloves on, but not specifically because of the insects.

Q. Okay. When you select -- when you are

collecting insects from one part of the body and you go to collect them from another, do you change gloves?

A. When I'm doing what?

Q. When you're collecting insects from one part of the body and you go to a different section, do you change gloves?

A. That wasn't the way I was taught. But you would have to ask an entomologist that. I don't see why you would.

Q. Okay. Are you familiar with use of entomological samples for DNA type issues?

A. No.

Q. Okay. What are entomological samples primarily used for?

A. They're used for establishing a postmortem interval from the time when somebody died until the time the body is discovered. You want to find out when it's likely that that person died, because then that ties down a time frame, and then gets back to people who have alibis or don't have alibis for that period of time.

Q. And have -- has entomological evidence helped in some of your investigations?

A. It can. Not always, but it certainly can pinpoint a time of death. It also -- although I've never had this happen, but it also can tell you

sometimes if a body has been moved from one area to another, based on the presence or absence of different kinds of insects.

Q. All right. I want to change subjects for just a little bit. We've discussed briefly on the ribs about the bruises that Dr. Natarajan notated in his autopsy report?

A. Yes.

Q. How many bruises did he notate?

A. I believe there's eight or nine that I was able to confirm by incising, which is what he was taught.

Q. Okay. Whenever you reviewed the photographs did you see large areas running down the back side of the body that were dark black or brown?

A. Yes.

Q. Okay. Based on the report and based on your review of the photographs, did those areas show to be bruising?

A. No.

Q. What caused that black stuff?

A. That is due to breakdown of postmortem that occurs because of the blood as it breaks down. You have lividity, which occurs when somebody dies. And what happens is, when your blood quits pumping it's still in

the blood vessels. But as time goes on, gravity takes over with liquid, and so it will seep down and it typically seeps on the sides and the back or the front of the body, depending on whether the body is face up or face down. Whatever area is touching the surface, that pressure will keep lividity from building up in that area.

Q. Okay. Did you notice a lot of this dark coloration, lividity in this -- in the autopsy photos of this body?

A. Yes, can see it, particularly I saw some photos on the left side that show that.

Q. And is this sometimes confused for a contusion or bruising, especially by people who don't know about autopsies?

A. Sure. And that is why you cut into it, to see if there is a change.

Q. Okay. Now, you testified earlier that you have testified in lots of state courts and even federal and military courts. Correct?

A. Correct.

Q. All right. In this case, you were hired by the Defense team. Is that correct?

A. Correct.

Q. And you're actually being paid to come here

today and to testify?
A. Certainly.
Q. Does that payment influence or bias your opinions today?
A. No.
Q. As a matter of fact, do you most often testify for Defense attorneys or for the State?
A. Almost always for the State.
Q. Okay. You work for the State, essentially. Is that correct?
A. Well, I have only worked for counties, but indirectly, I suppose.
Q. Okay.
A. Usually you're in a state court, or what's a district.
Q. County governments, but part of a state?
A. Correct.
Q. Okay. And right now it's the State of Colorado?
A. Correct.
Q. And you're kind of hoping to get back to Colorado tonight, aren't you?
A. That would be nice. I'd like to cool off.
Q. Is it a little cooler there than it is here?
A. Not much, but at night it certainly is.

MR. WATKINS: Pass the witness.

CROSS EXAMINATION

BY MR. FARREN:

Q. Doctor, my name is James Farren. I'm the District Attorney here in Randall County, and I have a few questions. If at any time you don't understand the question because I -- especially an area of medical terms, I may easily misuse a term. If that is the case, you let me know and I'll try to clarify the question.

A. I'll do my best.

Q. Yes, sir, I will, too.

A. We should be fine then.

Q. We'll make a great team, Doc, I'm sure. I found it interesting that you indicated that you usually testify for the State. Would it surprise you that -- you're aware that one of the things that changed in Texas in our law a while back is that we now are allowed to learn at least the identity of Defense experts prior to trial, if we file a motion?

A. Yes.

Q. Would it surprise you that when I pulled you up on the internet, the only reports I could find making reference to you were where you testified for the Defense?

A. I can't help it if the Prosecution in over 450

cases hasn't put something in a computer.
Q. Maybe the Defense likes your testimony more than the Prosecution. Is that possible?
A. I wouldn't think so.
Q. Okay. All right. You indicated that you reviewed the statements of a number of witnesses. Could you give me the names of those people?
A. Sure. Let me read them off to you, because I -- I can't remember who is who.
Q. Okay.
A. Kelly Sue Grayless, David Anthony Cochet?
Q. That is correct.
A. Daniel Armando Contreras, Christopher Len Eason. Judy Ruth Elliston.
Q. Which Elliston, sir?
A. Judy Ruth.
Q. Judy Elliston. Okay.
A. Miguel Rodolfo Gonzales. Glenda Denise Keeling, Jessica Jean Kimberlin --
MR. WATKINS: Your Honor, may we stop him for just a moment and approach?
THE COURT: Sure.
(At the bench, Court, Counsel.)
MR. WATKINS: Your Honor, one of the witnesses, more than one of the witnesses, but one in

particular that he reviewed, was of a witness whose testimony you have excluded under 401.

THE COURT: That's fine.

MS. MCELROY: I think --

THE COURT: Are you objecting to him eliciting that name? Wouldn't it be more appropriate if you objected if he elicited the information?

MR. WATKINS: I agree that we were premature --

THE COURT: Then wait until then.

(Open court.)

THE COURT: Go ahead.

THE WITNESS: Jeremy Dean Patrick. Joshua Craig Bledsoe, Francisco R. Chacon, Michael Wayne Elliston, Guinn Cordell Garcia, Tyler Shawn Hale. A statement by Destry Shannon Keeling, Stephen Craig Kimberlin, Tori Patrick. I believe that's it.

Q. By Mr. Farren) And when you reviewed the statement of Daniel Contreras, what information in that statement did you find helpful in reaching your conclusions?

A. What I found --

MR. WATKINS: Your Honor, we object based on the confrontation clause under U.S. v. Crawford. Mr. Contreras has not come in and testified, and thus we

would not be able to cross examine him.

MR. FARREN: They have provided this information to him, and he has relied on it to reach conclusions, Your Honor. Surely we're allowed to find out what there is in there that helped him reach these conclusions.

THE COURT: I agree. Overruled.

THE WITNESS: There is nothing specific. I think what is important is that the various witnesses offer a variety of observations and stories that happen. And what I think is important is to correlate that with what you find at autopsy, and what science tells you. And that is how I used those statements.

Q. By Mr. Farren) What was there in -- what was there in Mr. Contreras's statement that you found different from other witnesses' statements? You indicated that there were these differences.

A. Yeah, there is differences. I mean, some of them say the same things. Others vary on one item or another or several items --

Q. Yes, sir. My question is, what is there in Mr. Contreras's statement that you found different from the other witnesses that you read?

A. I don't know. I would have to go back and compare each one. That wasn't the purpose of why I

reviewed them.

Q. Well, what was the purpose?

A. The purpose was to see what the story was. If there was a consistent story, and there was not a consistent story. There were differences --

Q. How was it inconsistent, sir?

A. Then I would have to go and compare each of them. I didn't spend the time to do that. There were just things that were noted in them that were different from one to another.

Q. Well, sir, wouldn't you agree with me that Mr. Contreras names the same people as being involved?

A. Sure.

Q. The same fireplace poker?

A. Sure.

Q. The same attempt to lure the man to an apartment and a girl was paid money?

A. Yes.

Q. That he was struck in the head with a fireplace poker?

A. Yes.

Q. That eventually, bad things happened out at a farm?

A. Yes.

Q. That they were dragging him down some steps

and his head was banging, and things of that nature?
A. Yes.
Q. And that Mr. Stocker and Mr. Bledsoe reacted adversely when they realized he was dead?
A. Yes.
Q. And so in Mr. Contreras's statement, you heard that he died out at the farm?
A. Yes.
Q. In Mr. Miguel Gonzales' statement, what there helped you reach your conclusion?
A. Again, the same thing from looking from one to the other, and what they saw or didn't see.
Q. Well, sir, would you agree with me that Miguel Gonzales claims that again, this man was hit in the head with a fireplace poker out at the farm, and that a girl was used to lure him there. That they taped up his nose and mouth, and didn't leave room for him to breathe, and that's when he died out at the farm?
A. Yes, and that is -- and I don't believe that is exactly how things happened, so that is what I'm saying is --
Q. So this statement helped you reach the conclusion that he didn't die at the farm?
A. No. It helped me reach a conclusion that he didn't die because he was taped.

Q. Stephen Craig Kimberlin's statement, what in that statement helped you reach your conclusion?

A. (Pause.)

Q. You would agree that Mr. Kimberlin claims when he got to the farm, the man's face was completely covered up with duct tape down toward the bottom of page one?

THE COURT: Did you want -- he was looking to answer a question, I thought. Did you want to withdraw that question and then --

MR. FARREN: Oh, I'm sorry. I apologize.

THE COURT: You had asked him, and he was looking --

MR. FARREN: I withdraw the --

THE COURT: He was looking.

MR. FARREN: Okay. I'll withdraw the last question and wait until he responds. I apologize.

THE WITNESS: What is the question? Which question am I supposed to answer?

Q. By Mr. Farren) I thought you had responded to the last question about Mr. Contreras and Mr. Gonzales.

A. Correct.

THE COURT: Let me put this out. He asked you what in Steve Craig Kimberlin's statement led you to your conclusion. And I believe you were looking

at Kimberlin's, I think. And we were waiting for that.

MR. FARREN: Yes, sir.

THE COURT: I believe that is right.

MR. FARREN: Yes, sir.

THE WITNESS: Well, I think a couple of things. One is there is a reference that a shovel had been shoved up Dustin Pool's butt, and there is no evidence to support that at autopsy. That is --

Q. By Mr. Farren) Excuse me. Help me understand. On your direct, I don't believe you made reference to any of that. You were talking about a sock and the mouth and tape and so forth. How did this statement help you reach those conclusions?

A. Well, what it helps me is that this statement cannot be believed because there are factual errors in it that are just not borne out by the -- by what is found on the body. You know, physical evidence should be collaborated by witness statements. When it's not, then you have a problem. And the problem is in the witness statement.

Q. So if a witness makes a three-page statement and you believe there is one factual error, then the entire statement is discarded?

A. No, I don't think you discard it, but I think that you have to look at it with a very jaundiced eye.

Q. When you read Mr. Kimberlin's statement, did you note that he merely claimed to have heard about this and that he didn't claim to have witnessed it?

A. Right. But it's still in the statement and that --

Q. So is it your conclusion that Mr. Kimberlin's statement that he heard this is a false statement?

A. No, I -- well, yeah.

Q. Okay. So it's your position that someone else at the farm couldn't have claimed to have done this. Mr. Kimberlin heard it and reported it in his statement. What is there that led you to conclude he was lying when he said he heard that claim made?

A. I'm not saying he's lying. I'm saying the statement is false, wherever it came from.

Q. Okay. So his statement that he heard someone brag that they did this is false. Is that what you're saying?

A. Yes.

Q. How do you know that, sir?

A. How do I know that? Because there is no evidence of trauma on the anus or inside the anus of the deceased.

Q. And so that would show us that whoever made the brag did not tell the truth, but it wouldn't tell us

that Mr. Kimberlin didn't tell the truth, because if he heard the brag and reported that he did, that could be perfectly true, even though there isn't trauma. Isn't that right, sir?

A. True.

Q. So that part of the statement is not necessarily untrue?

A. Well, that statement is untrue. Whether Mr. Kimberlin reported it correctly or not, I can't evaluate that. All I can tell you is that that is not true and borne out --

Q. You -- as a scientist, you do not believe that anything was inserted into the anus of the deceased prior to death?

A. That is correct.

Q. But that doesn't mean Mr. Kimberlin didn't hear someone else claim to have done that, making a false claim?

A. Right. That is what I've said.

Q. So his statement would be true?

A. His statement is -- his statement is true. What is reported is false.

Q. What he reported to have heard someone claim is true, but the claim apparently was false?

A. Correct.

Q. Okay. So, so far we haven't found anything in Mr. Kimberlin's statement that we -- that you have scientific evidence that indicates is a false claim?

A. Well, yes, we just went over it.

Q. No, sir. You're indicating that the person who made the brag is not telling the truth.

A. Right.

Q. But that doesn't tell us Mr. Kimberlin is not telling the truth.

A. No, but that statement is part of Mr. Kimberlin's statement, and that part is false.

Q. Yes, sir. But see, he hadn't performed an autopsy on Mr. Pool. All he knew was what was being told him.

A. I understand that.

Q. So that part of his statement may well be true, but he heard this claim not realizing it was a lie.

A. That is true. That's what I've said.

Q. And so when we get to the part where he says his face is covered with tape, there is not something else in the statement that we can conclude was untrue and cast dispersion or doubt on his claim of seeing the face taped up.

A. That is true.

Q. Now, when he says that Mr. Pool was dragged down the stairs by his feet, again, did that help you reach any of the conclusions you testified about?

A. I think it offers an explanation and may explain the skull fracture. Other than that, no.

Q. Okay. Now, you indicated that it is your scientific opinion that the ribs were broken postmortem. Is that correct?

A. Correct.

Q. And so I would assume that you -- and there are photographs that I think you were present either when they were -- there was testimony about this or I assume you reviewed them. Would you agree that Dr. Natarajan testified that there was bruising on the outside of Mr. Pool's body, which he believed were consistent or correlated to the rib breaks?

A. Yes. And I don't believe that -- I don't think they're correlated. Those are --

Q. Okay. So do you think those are bruises on the outside of the body at that point?

A. It doesn't describe that as bruises. That -- the bruises that he talks about I believe are on the front part of the chest. It wasn't real clear in his testimony. He talks about mid chest, and I didn't catch -- it didn't seem to me that he was talking about the

lateral part of the chest. If he was, that's okay because he could still have a soft tissue injury from an injury that didn't produce the rib fractures. But the rib fractures do not have blood around them --

Q. That was not any question. And we'll get to that in a moment. My question is, did you see evidence of bruising on the outside of his body anywhere in the area where these ribs are broken?

A. Not that I saw on the photographs that I saw, no.

Q. And so your conclusion is those are not bruises?

A. Well, it doesn't matter whether they're bruising or not.

Q. My question is, your conclusion is those are not bruises?

A. From what I have, yes, that is correct.

Q. Okay. Is it your understanding that Dr. Natarajan believed that they are bruises?

A. Yes, but they're not described as --

Q. Is it your belief that Dr. Natarajan believes they're not bruises?

A. That's what -- I'm sorry?

Q. Is it your belief that Dr. Natarajan did believe they were bruises?

A. He talks about that --
Q. Is it your belief that Dr. Natarajan believed they were bruises?
A. He talks about that --
Q. Is it your belief that Dr. Natarajan believed they were bruises --
MR. WATKINS: Objection. I believe he is badgering the witness, Your Honor.
MR. FARREN: I'm asking him --
MR. WATKINS: And it's asked and answered.
MR. FARREN: It has not been asked and answered, Your Honor.
THE COURT: The second objection is overruled. The first one is sustained. Let him answer.
THE WITNESS: I believe that Dr. Natarajan testified that he thought that there were bruises overlying the rib fractures. That does not mean that they go with the rib fractures. And the photographs and the rest of his autopsy report show that they do not.
Q. By Mr. Farren) So -- and again, I'm trying to understand what you're telling us. Do you -- it is your understanding that Dr. Natarajan testified that those are bruises -- and I'm not sure of the medical term to

use but -- on the inside of the body we have pictures of broken ribs. On the outside of the body, we have discoloration on the opposite side of the wall. Is it your belief that Dr. Natarajan testified that that is bruising on the other side of the wall from the broken ribs?

A. That is the impression I got from his testimony.

Q. And you disagree that that is not bruising?

A. Yes, for the reasons that I've previously stated.

Q. Okay. I just wanted --

A. No. What I'm saying is, I don't know whether that is bruising or not. It's not described as bruising in the autopsy report. The issue is whether those rib fractures are antemortem or postmortem. For them to be antemortem, you have to have blood around that fracture. You should see it from the inside and you --

MR. FARREN: Objection, Your Honor. This is non-responsive. I didn't ask anything about that.

THE COURT: Overruled. Go ahead and finish your answer.

THE WITNESS: And there should be blood on the left chest cavity. The left chest cavity and the right chest cavity are separated. So the coloration of

the fluid that is found in both chest cavities would be different if the -- if there had been bleeding prior to death. And they're described as the same and it's the same amount. And there is no bleeding around the fractures. So those fractures are postmortem. Whether they're soft tissue bruising or not --

MR. FARREN: This is just an ongoing narrative that he wants to share with us. This has nothing to do with the question I asked, Your Honor. I object.

THE COURT: I believe the jury has heard enough. Thank you.

THE WITNESS: All right.

Q. By Mr. Farren) You've indicated that you -- you're not sure whether Dr. Natarajan testified that these were bruises or not. I am simply trying to find out for sure, do you not believe they were bruises?

A. I can't answer that question because I didn't see any incised portions of that.

Q. Sir, do you have a belief one way or another?

A. My belief is based on the evidence that I'm presented, and I don't have the evidence to answer the question.

Q. So then you cannot tell the jury that those are not bruises on the opposite side of the wall from

the rib fracture?

A. My opinion is that they're not, based on the fact that it is so -- it comes from the armpit all the way down to the hip. And I think that that is artifact from decomposition. The way to prove it was to incise those wounds, and I did not see any photographs where that was done.

Q. So it is your opinion that they are not bruises?

A. Based on the information that I have, yes.

Q. Okay. Now, the amount of time Mr. Pool was encased in concrete, the temperature, the passage of time, the conditions in which he was kept, all of that has an impact on the ability of science to examine his remains and reach conclusions. Would you agree, sir?

A. Oh, absolutely. Decomposed bodies are very difficult.

Q. And the longer the passage of time, the more it impacts the ability of science to tell us?

A. Not only the ability to tell you, but also certain things that would be present will disappear with time and decomposition.

Q. And are you aware that, for instance, when cement or Sakrete, when the chemical reaction that causes it to set up, when that occurs it generates a

great deal of heat?

A. Sure. As far as I know, all concrete does that. That is why it solidifies.

Q. Now, you mentioned that if blood pressure is low, that if the blood pressure were low at the time the ribs were broken, that could affect some of what you have testified about, as far as reaching your conclusions about them being postmortem breaks.

A. If he's in extremis and in shock and has either an extremely low blood pressure or more likely no blood pressure, then the answer to that is yes.

Q. Thank you --

A. But --

Q. Thank you --

A. -- but that also even applies more to the --

THE COURT: That's enough. Just answer his question.

THE WITNESS: Okay.

Q. By Mr. Farren) Now, was it your testimony earlier when you were shown a photograph of the wall, that the wall or part of the wall that you looked at in the photograph could have caused the rib fractures?

A. Sure, if somebody is dropped on that, that can cause those fractures. Or if you fell into that, you could have rib fractures, sure.

Q. Okay. If the testimony during the trial was that he was lifted up and put up on top of the wall, and then later pushed off of the wall, is it your belief this could have caused that -- those massive rib fractures?

A. When he impacted, sure.

Q. Okay. Doctor, what causes shock?

A. A variety of mechanisms.

Q. If -- this is my partner here. If I were to beat on Jeremy here with my hands and feet and various instruments over a ten to fifteen-hour period, could he go into shock?

A. Depends on what kind of damage you did.

Q. Could he go into shock?

A. It's possible, if the injuries are severe enough.

Q. Just possible?

A. Sure.

Q. You don't think it's likely that having been beat on for 15 hours he would go into shock?

A. Can't say whether it would or wouldn't. It may or may not. There is no way you can get to medical certainty whether it would or not --

Q. I'm not asking for certainty, sir. I'm asking isn't it more than just possible that he would into

shock?
A. No, because the other word is probable, which means it's more likely than not, and I can't make that statement.
Q. Well, is it less likely than not?
A. Yes, it's less likely than not. The problem is I can't tell whether it's less likely that he has an injury or less likely that he goes into shock or less likely that he doesn't. There is no way to tell, based on what you've just given me.
Q. So if a person is beaten and tortured for up to 15 hours, you think it's less likely that they would go into shock?
A. I didn't say that. I said that I can't tell based on that information. He may or may not. It's possible he could. It's possible he didn't. I don't know which it is.
MR. FARREN: May I have just a moment, Your Honor? May I approach the witness, Your Honor?
THE COURT: Yes, sir.
Q. By Mr. Farren) I'm showing you what is marked as State's Exhibit No. 259. And I'd like for you to assume with me that there is testimony that blood ended up on these pliers from out at the farm where Mr. Pool was beaten, that there are splatters of blood on there

and they DNAed the blood, and some of it, the blood comes back to Mr. Pool --

MR. WATKINS: I'm going to object. I don't believe the testimony said that the blood came back to Mr. Pool. I believe the testimony said there was DNA, and there was blood and it was a mixture --

MR. FARREN: There's DNA -- no, the testimony was it was tested for blood first, then passed onto the DNA expert, who testified to the mathematical opinions about whether this is Mr. Pool.

THE COURT: Hold up. What was your objection again?

MR. WATKINS: That it was a mischaracterization of the testimony that was elicited specifically through Ms. McCord.

THE COURT: In what way?

MR. WATKINS: Ms. McCord said that the DNA that was on the channel locks, stain one in particular, which I believe he was asking about, was a mixture. Ms. Rodriguez had previously offered that there was blood present, and that at some point the entire top part had been swabbed together, mixing any DNA that was not blood, as well as any blood.

THE COURT: All that is true. But how is what he said a mischaracterization of that?

MR. WATKINS: He said that the blood was tied through DNA -- on the channel locks was tied through DNA to Mr. Pool. It was not.

THE COURT: I believe that's what it says. Overruled. Go ahead, Mr. Farren.

Q. By Mr. Farren) I want you to assume that this item was screened at the DPS lab for blood, and that there is statistical evidence that this DNA was Mr. Pool's DNA. Okay?

A. Okay.

Q. Now, once blood is exposed, is it possible for a fly to land on the blood and lay an egg?

A. I defer to an entomologist.

Q. Well, sir, you were indicating your opinion about flies and larvae laying eggs earlier.

A. Right.

Q. Well, I'm asking you to share with me your opinion on this.

A. I don't -- I don't think that blood by itself -- well, sure, it could, because there is proteins in the blood, and if the proteins break down and there's enough of an odor, then potentially I suppose a fly could choose to lay an egg there, but you would be better off to ask an entomologist.

Q. Yes, sir. And I'm sure I'm going to have an

opportunity to do that a little bit later. When do those proteins begin to break down once the blood is exposed to the air?

A. I don't think it's when it's exposed to the air. I think it's when it starts to decompose, is when you'll start to get a break down.

Q. Okay. When does that occur?

A. Hours to days afterwards.

Q. So blood doesn't start to decompose until days afterwards?

A. No, it's -- it could be hours or days, depending on what kind of environment it's in, sure.

Q. Okay. So it could be within hours?

A. Sure.

Q. Okay. Now, if there were blood -- and I want you to assume there was testimony that these pliers were knocked off a table, and as Mr. Pool was rolling around and so forth, he actually rolled over these things and somebody else, Mr. Bledsoe picked them up. Okay?

A. Okay.

Q. And you would agree with me that that would explain how blood got on the pliers?

A. It may.

Q. Well, it's a possibility, isn't it?

A. Sure.

Q. I want you to assume with me, or I want to ask you a hypothetical. What if a sock were there, and blood got on the sock?
A. Same thing would apply.
Q. You can't tell the jury where this sock was prior to being inserted in Mr. Pool's mouth, can you, sir?
A. No.
Q. You can't tell the jury how many fly eggs were laid on the sock prior to being inserted into Mr. Pool's mouth?
A. You would have to ask an entomologist that.
Q. You can't tell the jury whether the sock was laying anywhere near Mr. Pool during the 15 hours that he was beaten?
A. I don't know.
Q. You can't tell Mr. -- you can't tell this jury whether the sock was even -- may have been used to help clean up blood?
A. Don't know.
Q. You do agree that at some point the sock ended up in the throat of Mr. Pool?
A. True.
Q. Now, did you -- do you recall Dr. Natarajan's testimony that when a sock is inserted into a person's

mouth that is alive, the tendency would be to work further and further into the throat?

A. Yes.

Q. Do you disagree with that?

A. No, of course not.

Q. When you saw the sock, I believe you testified -- or I'm sorry, when you saw photographs and have read the other evidence, it's your conclusion that this sock is way back in the throat?

A. Part of it is, sure.

Q. Okay. And that would be consistent with what Dr. Natarajan said could happen if it's inserted into the mouth of a live person?

A. It doesn't matter whether you're alive or dead.

Q. Excuse me, sir. My question is, is that consistent with what Dr. Natarajan testified would happen if you placed the sock in the mouth of a live person?

A. Yes.

Q. Thank you. By the way, I want to ask you this hypothetical: If a person has a sock inserted into their mouth and throat, and they're taped to the extent that you saw Mr. Pool, his head and so forth, if that were to happen, how long would they live? How long

would they be able to breathe, in your opinion?

A. Well, they're not going to be able to breathe. They'll be conscious for about a minute and a half once the air is completely cut off where they can't breathe, and they'll die within minutes.

Q. Do you have a medical opinion about if a person has a sock stuffed into their throat, their whole head is taped like Mr. Pool's head was, and if someone were trying to carry them and if they began to flail around, might that be when they're trying to breathe?

A. They'll have a minute and a half, so that's the only time that that would happen.

Q. If they're still alive and they do die in this minute and a half, at the end of the minute and a half --

A. Well, they wouldn't die. They'll be unconscious.

Q. I'm sorry. They would lose consciousness. When they would lose consciousness, do you think their head would slump over if they were sitting up?

A. Yes, the entire body will slump.

Q. Now, you indicated that you believed that -- or that the sock could have been placed in this person's mouth to prevent purge, which if I -- and correct me if I'm wrong, but I understood you to say it's sort of like

regurgitation almost, only it's a -- I understand it's something happening after death. But in laymen's terms, that is what it sounds like. Is that appropriate or not?

A. That is not how I would phrase it. I could see how somebody might think that that is what it is, but it's due to accumulation of fluids in the airways and it comes up because more and more accumulates, and so it's forced up the throat into the oral cavity and out the mouth and out the nose.

Q. Now, it isn't your opinion that someone taped up Dustin Pool's head until the tape was this thick, and then somehow worked the sock underneath that tape to prevent purge, is it?

A. No.

Q. So is your testimony that they not only put a sock in his mouth, but they were so worried about this purge that they taped his head so that the tape was that thick?

A. I don't know what they were worried about. But that is what happened, is that they put the sock in, and then they completely sealed the cavities.

Q. Having read these folks' statement, do you think they know a lot about purge?

A. No.

Q. So what would be the purpose of taping up his head after he is dead, if they're just trying to prevent purge?
A. I don't know that that is just what they were trying -- I don't know what they were trying to prevent. That is not addressed in this statement.
Q. On the other hand, if they put the sock in his mouth while he was alive, as Dr. Natarajan suggested, and then taped up his whole head, it's pretty obvious what they're trying to accomplish, isn't it?
A. Sure, if that -- if that is what indeed happened. But you have to look at the science.
Q. Yes. When decomposition -- oh, by the way, Doctor, when does rigor mortis begin -- rigor mortis begins -- scientifically speaking, rigor mortis begins almost immediately after death. Right?
A. To some slight degree, yes. It's usually evident between zero and two hours after death. It will become evident typically in the jaw, and then later the neck and then the extremities. It's usually fully developed if somebody is just completely rigid at about ten to 12 hours. And it starts to go away at about 24 hours typically, and will be gone by 36 hours.
If the environment is hot, rigor mortis comes on quicker and it leaves earlier. If the environment is

cold, it comes on slower, lasts longer before it goes away. If the person is exercising, exerting themselves or has a fever, it comes on quicker than somebody who is not doing these things.

Q. I want you to assume with me that Mr. Pool's body was stiff, so stiff that the folks at the silo had to work to stuff him down in it. Would you agree with me that then it's likely he had been dead ten to 12 hours by that time, maybe as many as 24 hours or more?

A. That is one explanation. But you would have to have somebody to really look at the body and make sure that we're talking about rigor mortis, and not to some degree because of all the trappings that are around the body.

Q. So it's your opinion that a polyurethane tarp would make him stiff?

A. It may give some type of relative firmness to that, and that is you know, again, assuming that we can believe what the statements say.

Q. Before I asked about the rigor mortis, I started another question, and again I apologize. I get worked up and I can't sometimes keep up with my own thoughts. So bear with me. A little earlier, I was going to ask you about when decomposition begins, when the body begins to decompose, is there a shrinkage? In

other words, as the fluids dissipate and so forth, is this body smaller in size?

A. It depends on the case. It may, and at the time interval, most bodies with time, if there is a lot of putrefaction where there is -- where there is a lot of bacterial proliferation, those bacteria will make gas so the body will actually expand and get bloated.

If the conditions are drier and cooler, like in this case, then that is not going to happen and may not be very evident. There is a little bit of gas formation that you can see in this guy's penis, but in terms of the rest of the body, it didn't seem to be very much because it wasn't noted. And when you look at the body, it doesn't look like -- at least the photographs don't look like he's bloated. So with time, then, that body will shrink.

Q. Okay. And so if Dr. Natarajan was able to get his fingers up under this tape on the head, that might explain why there was enough space to do that because of the change?

A. Sure.

Q. Okay. If he could get his fingers under there, do you think it's possible, just possible, that a fly could get under there?

A. I suppose in the realm of remote

possibilities, that it might be possible for it to get up under there. I don't know how it would get behind a sock.

Q. But it's possible?

A. I don't think that part is possible, no.

Q. So you -- flies just -- that sock barrier is just too great for the fly to overcome?

A. You would have to ask an entomologist that question.

Q. Doctor, at the conclusion of your testimony earlier, you were asked about being paid. How much have you been paid?

A. Nothing so far. I haven't submitted a bill.

Q. Well, assuming that the State of Texas and Randall County honors their obligation to you, which I suspect they will, how much do you anticipate being paid?

A. Somewhat over $3,000.00.

Q. And how much does that work out to an hour?

A. For review, it works out to $250.00 an hour. For a full day in court like travel to and from, it's $1,600.00 a day.

Q. $1,600.00 a day?

A. Yes, sir.

MR. FARREN: Pass the witness.

REDIRECT EXAMINATION

BY MR. WATKINS:

Q. A couple of quick questions. You were asked about the -- certain individual statements. Do you remember that?

A. Yes.

Q. Okay. Do you adapt -- when you're doing an autopsy, do you adapt your research and your investigation to the statements, or vice versa?

A. Run that by me again. I don't think I understand.

Q. What controls your investigation of the evidence at autopsy? Statements or what you see?

A. What I see, tempered with what the known information is surrounding the death. You have to -- you have to know circumstances around the death. To give you a real simple example, you can have somebody that has a gunshot wound, and if you don't know if the gun is defective and if the information is right, then you could have a gun accidentally discharge, particularly if it fell, and strike a person. So that would be an accidental death.

On the other hand, if you knew the person wrote out a suicide note and had all kinds of problems, both mental and maybe financial, and love life and all

of that, then that might make it a suicide.

On the other hand, if you had -- you know, if he is captured on videotape at the 7/11, and he is a clerk and somebody is on videotape shooting him, then you would call that a homicide. So you've got to have the circumstances. But as you work through a case and as you're doing the autopsy, you have to -- what the autopsy starts to tell you as you start going through layer by layer, that -- then your conclusions and your working hypotheses are going to change.

Q. Okay. You were asked about the shovel handle being inserted in the anus of Mr. Pool. Now, that -- what you read in the autopsy is not inconsistent with Dr. Natarajan's opinion, is it?

A. No, I think we agree it could happen.

Q. It's inconsistent with some of the statements?

A. Absolutely.

Q. Okay. You were also talked to -- a lot of time about the bruises on the outside of the chest in relationship to the break on the inside of the chest of the ribs?

A. Yes.

Q. Okay. Does it -- does it matter to your opinion if those bruises -- if those are bruises or not?

A. No, it doesn't change the ribs.

Q. Okay. Additionally, you were asked about blood pressure, low blood pressure or no blood pressure, stop -- slowing down the flow of blood. Is that correct?

A. Right.

Q. Okay. Does blood pressure -- does it make a difference if it's a bone versus subcutaneous tissue?

A. Yes.

Q. What difference does it make?

A. You're going to have much less blood flow to subcutaneous tissue than compared to the bone.

Q. Okay. So at low blood pressure, will you still have blood flow?

A. You'll have blood flow, but it's pretty much restricted to the central organs.

Q. Okay. You were asked about shock. Do individuals vary?

A. Sure.

Q. Okay. What might put me into shock might not put Mr. Farren into shock?

A. Absolutely.

Q. You were asked about rigor mortis. Is rigor mortis -- and you testified about the different temperatures or fever conditions of the body change when rigor mortis sets in, when it goes away, those kinds of

issues?
A. Yes, it does.
Q. Is that why a medical examiner has a cooler to keep bodies?
A. Yes.
Q. Okay. You also talked about the trappings around the body could have made it seem more stiff. And you were asked about a -- a tarp, in particular?
A. Yes.
Q. Okay. Were there other trappings around the body?
A. Yes.
Q. What kind of other trappings were there?
A. There was duct tape. There was small thin plastic that I don't think would have had any impact. And my understanding, it was wrapped fairly tightly.
Q. Okay. Did these -- the nature of these trappings -- and I understand you have looked at all the photographs from head to toe on this body. Is that correct?
A. Yes.
Q. Did the nature of these trappings indicate any purpose in these trappings being there?
A. No. I think they were used to -- obviously to completely wrap the body. Beyond that, whether it was

to prevent spillage of contents or blood dripping or whatever, I don't know.

Q. Okay. When you move a dead body in your laboratory, if you just pick up one foot and one arm and start to pull it, what happens?

A. You injure your back and they don't move.

Q. Okay. Does the other arm and the other leg move?

A. No. They're not going to move because you have to get them to slide. And the only way you can really get them to slide is if you have something that is either moist, or say is wet, or if you have something that is slippery on the outside of the body.

Q. Okay. Several pictures that have been introduced have an outer casing supplied by the police department to move this body. And I think we've referred to it with Dr. Natarajan as a body bag?

A. Yes.

Q. Why do we put a body in a body bag for transport?

A. Well, two reasons: I think probably the overriding reason is -- in a decomposed body is to help contain smell. In fact, if you don't -- if you're not worried about smell or body fluids staining the transport carrier, you can just as easily transport it

in a sheet, which is what most offices do. But a body bag works just fine.

Q. Okay. Why would some offices use just a sheet? Is it to keep the parts all together?

A. Well, it's -- that is part of it. But more importantly, it's to prevent extraneous evidence from being put on a body. So it's a way to protect the body so that you have no -- that you don't pick up any extraneous items during transport and prior to the autopsy. That is the number one reason. And the reason why some offices use sheets as opposed to body bags, is body bags are expensive and sheets are cheap, and you can recycle them. A good body bag will cost $50.00 to $75.00 or more.

Q. Okay. You were asked about Dr. Natarajan's ability to put his fingers under the tape?

A. Yes.

Q. And I believe there were some photographs of that, as well?

A. Yes.

Q. And it's described in the autopsy?

A. Yes.

Q. Prior to his putting the fingers up under the tape, does it describe him cutting the tape from where it's continuous to the body? And actually, I've

referred you to the autopsy. Let me re-refer you to his testimony.

A. Yes, I believe he said that he cut the -- that he cut it before he could, you know, before he put his fingers up to -- and that was a way to get it off.

Q. Okay. And do you remember in his testimony and in the report it saying anything about the slimy nature of the -- that area of the body?

A. Yes, it was.

Q. And did that make it more difficult or more easy to remove the cocoon of tape?

A. Well, I think it would indirectly make it easier, but you have impediments, particularly the jaw. And so if you have tape that is down here, there is no way you're going to be able to lift that without cutting it.

Q. Now, Mr. Farren had you testify that you're earning $1,600.00 a day for being here?

A. Yes, sir.

Q. Would you rather be back home at your regular job?

A. Yes and no. It's nice to get out occasionally. But to me, the thing is, you know, what the physical evidence shows you.

Q. Okay.

MR. WATKINS: Pass the witness.

RECROSS EXAMINATION

BY MR. FARREN:

Q. Well, I mean, if you don't agree to do this for $1,600.00, you wouldn't be here. You would be back home?

A. That is true.

Q. Okay. You have talked about this larvae on the sock, and you saw this in a photograph?

A. Yes.

Q. Do we have the photograph that he looked at?

(Short pause.)

Q. By Mr. Farren) Doctor, you talked about the body bag earlier. This is -- I mean, this is a body bag. Correct?

A. Sure. The same kind we used to use.

Q. Okay. And when the body is in a body bag like that, there's not much chance of any flies or anything getting on the body. Right?

A. It would be zero.

Q. But when the body is down in a hole like that where it's been encased in concrete for three months, would you agree that as they open that concrete up, the odor would waft up that cavern. There would be a lot of odor, wouldn't there?

A. Sure, there may be.
Q. And it would attract a lot of flies, wouldn't it?
A. It may.
Q. So you're just not sure that it would attract flies?
A. No, you would have to ask an entomologist.
Q. Okay. So just based on your experience, you don't think you can tell us whether that odor would attract flies?
A. I think given time, and if people were not moving around the body, then the answer is yeah, probably. It would depend on what the lighting conditions were and it would depend on the temperatures.
Q. So the flies like light?
A. Some of them do, some of them don't. You would have to ask an entomologist.
Q. Well, I'm just -- you indicated the light had an effect. I just wondered how, why?
A. Some flies like it where it's shady. Some flies like it when it's -- when it's in bright light. It's temperature dependent, it's wind dependent. But specifically, you would have to ask an entomologist.
Q. And you would agree with me that in State's Exhibit 174, as the body is above ground and I guess has

been rolled off of this gurney, it's not in a body bag there, is it?
A. No. It's just wrapped in the tarp and the plastic and the duct tape.
Q. And if a fly wants to get on Mr. Pool there, he certainly has plenty of opportunities?
A. You would have to ask an entomologist, giving the people around it and depending on what the temperature was, depending on what the species were that you found.
Q. So you're just not sure whether a fly could get on him?
A. You would have to ask an entomologist, depending on what kind of fly.
Q. In State's Exhibit 97, is this the photograph that you looked at where you saw the larvae?
A. I don't believe so. I would have to -- if you could bring it to me, because you lose it when it gets projected.
Q. Okay.
A. I think these are larvae down here, and I would be concerned about this.
Q. Okay.
A. And this, I can't tell on this photograph.
Q. Okay. So State's Exhibit 97, just so the jury

knows what we're talking about, in this particular photograph, you're not comfortable saying whether you can see anything there one way or another.

A. Correct.

Q. Okay. But in State's Exhibit 237, and I'm going to put the same photograph up for the jury to look at, State's Exhibit No. 237 is the exhibit that you looked at, and you have concluded that there is larvae?

A. Well, I'm not sure. I'm saying that I think there is larvae on this one. I looked at several photographs of the sock, and there was one that was better, and I thought showed a -- a number of larvae.

Q. Okay. Now, in State's Exhibit 97, is the larvae -- or what you believe may be larvae, is that back in this part of the sock or back at the front?

A. No, I think part of it's towards the front and part of it's around the heel area.

Q. Okay. So here in this area?

A. Correct.

Q. Okay. Now, would you agree with me in State's 97, the toe of the sock and the front part you're talking about is what is coming out of the mouth first and the heel there?

A. I can't see that for sure.

Q. You can't -- you don't believe this is the

heel and this is the toe of the sock?

A. I just can't tell. I'd have to look again at the picture.

Q. Well, if that is the case, then the larvae you're talking about would be on the part of the sock that was closer to the front of the mouth and not on the part of the sock that was closer to the back?

A. That I identified, yes. It doesn't mean that there aren't larvae other places. You would have to ask an entomologist whose looked at it.

Q. Well, I agree. So that when you share that with the jury, that would just be total speculation on your part. Correct?

A. What would be?

Q. That there may be other larvae. You have no idea if there were other larvae?

A. No, I just saw what looked to me like larvae.

Q. And so when you share with the jury there may be others, that is just total speculation on your part?

A. Well, right, because other surfaces of the sock may not have been photographed that would reveal that.

Q. The sock that we looked at in 237, do you know where this sock was after it was removed from Mr. Pool's mouth?

A. No.

Q. Do you know how many flies landed on the sock after it was removed from Mr. Pool's mouth?

A. I would assume none, but --

Q. Why would you assume none?

A. Because morgues typically don't have flies flying around them. Pathologists don't like flies as a group.

Q. I understand that. So it's your testimony that it's impossible for a fly to be in a morgue?

A. No, I didn't say it was impossible. I said it was very unlikely.

Q. So you can't tell this jury that flies didn't land on the sock after it was removed from Mr. Pool's mouth?

A. I would be very surprised if there was a substantial number of flies in that morgue. That would not be in keeping with what forensic pathologists do, in that -- and I don't know anybody that likes flies.

Q. So you can't tell this jury whether a fly landed on the sock after it was removed from Mr. Pool's mouth?

A. No, but I don't --

Q. Yes, sir --

A. -- again, in terms of morgues --

Q. Thank you. That answered my question. Thank you. After the sock left the morgue, you can't tell the jury how many flies landed on the sock after that, can you, sir?

A. No, but evidence is treated a certain way, and it should have been bagged --

Q. Excuse me, sir. My question --

A. And if it was bagged then the answer is none --

Q. Yeah, if --

A. If the police did what they should have done.

Q. Okay. So your complaint is with the method of preserving the evidence if a fly landed on it?

A. Yes.

Q. Because you don't know where the sock was kept after it was -- after it left the morgue, do you, sir?

A. No, it should have been stored as evidence.

Q. I understand you have an opinion about where it should have, but you don't know, do you, sir?

A. No, I am making the assumption that the police did what they should have done. Now are you telling me they didn't?

Q. I'm asking you if it's possible for a fly to land on this sock after it leaves the morgue, and the way this works is, I ask you questions and then you

answer, if we could.
A. Okay. And what is your question?
Q. The question is, you cannot tell this jury whether a fly landed on the sock after it left the morgue?
A. By direct observation, no.
Q. Are you aware that Defense counsel and the State visited the Special Crimes Unit where these items of evidence were kept on more than one occasion, and physically looked at and examined the physical evidence?
A. No.
Q. Okay. If it were possible -- let me back up and ask it this way: If the larvae were on the sock as it's being removed from the mouth of Mr. Pool, is it possible that the larvae would be dislocated from the sock -- and I assume this is dead larvae at this point?
A. I don't know. You would have to ask an entomologist.
Q. So you can't give us your opinion as to whether dead larvae could get knocked off the sock?
A. Well, I suppose that's possible if they're dead.
Q. Have you visited with Dr. Haskell, who is going to testify for the Defense?
A. Only briefly.

Q. You didn't ask him whether the larvae could get knocked off the sock?
A. No.
MR. FARREN: Pass the witness. I'm sorry, if I may, Your Honor. I have one last question.
THE COURT: We're going to take a break here.
MR. FARREN: Yes, sir.
(Recess.)
(Jury seated.)
THE COURT: Everybody have a seat, please.
MR. FARREN: I have one quick question.
THE COURT: Sure. Thank you, ladies and gentlemen. Everybody be seated. Go ahead, Mr. Farren.
Q. By Mr. Farren) One last question, Doctor, and I promise it's the last or the jury is liable to come over the rail and put a sock in my mouth.
A. I don't think they would. If that's more than one question, that's fine.
Q. You -- I want you to assume the following facts, and if they're inaccurate, tell me. That you visited with the Defense counsel prior to your testimony today?
A. Yes.

Q. And you had shared with them the things you have shared with the jury?

A. Absolutely.

Q. So when they questioned Dr. Natarajan, they could have asked Dr. Natarajan about these issues, had they wanted to?

A. Certainly they had the opportunity on some of them. Some of them have come up since his testimony.

Q. Okay. So at least on I assume the larvae and that kind of thing, and these -- and whether the ribs were postmortem those issues were things you had already talked to them about?

A. I talked to them about the ribs before, but we don't know what Dr. Natarajan was going to testify at trial.

Q. I understand, but had they wanted to ask him about it, they could have?

A. I assume so.

Q. Sure.

MR. FARREN: Pass the witness.

MR. WATKINS: No further questions of this witness.

THE COURT: You may step down.

THE WITNESS: Thank you, Judge.

THE COURT: Thank you. May this witness

be excused?

MR. FARREN: We have no objection.

MR. WATKINS: We have no objection. He is probably going to be around because his ride back to the airport is not here.

THE COURT: Well, okay. But he's excused. Is that right? You're excused, sir. Thank you.

Call your next witness.

MS. MCELROY: Your Honor, we would call Dr. Haskell to the stand.

THE COURT: H-e-s --

MS. MCELROY: H-a-s-k-e-l-l, Your Honor. Thank you, Your Honor.

(Witness sworn.)

<u>DR. NEAL HASKELL,</u>

Having been first duly sworn, testified as follows:

<u>DIRECT EXAMINATION</u>

<u>BY MS. MCELROY:</u>

Q. Will you state your full name for the record?

A. Neal Haskell. N-e-a-l, H-a-s-k-e-l-l.

Q. How are you presently employed?

A. I'm employed as a professor of forensic science and biology at Saint Joseph's College in Rensselaer, Indiana. I'm also a private international

forensic entomology consultant.

Q. Can you tell us what kind of training you have had in order to hold your position?

MR. FARREN: Your Honor, again, in an effort to save time, we would stipulate that he is an expert in the field of entomology and forensic entomology.

MS. MCELROY: Your Honor, I just have a few questions. I'm not going to go into the 31-page --

THE COURT: That will be fine. Keep it as brief as you can.

Q. By Ms. McElroy) Can you just give us basically the high points of your education and training?

A. Sure. I received a Bachelor of Science Degree in Entomology from Purdue University in 1969. I then studied later in life forensic entomology with a master's degree completion. And as far as we know, the first masters completed with a specific study of forensic entomology at Purdue University in 1989. And then I completed my Ph.D., again in forensic entomology with specific study of the areas that we would need to know, things in forensic entomology in 1993.

Some of the areas I studied in were pathology, forensic pathology. I had an opportunity to spend a

year at the Indiana University Medical Center Morgue, where I assisted the forensic pathologist in dissections and learning about the technical aspects from the pathological side. I certainly don't want to be a forensic pathologist. That's why we have doctors like Dr. Bux and others. But I wanted to be able to understand when I had an autopsy report, that at least I might know the terminology and understand at least maybe even less than that, where to look up those terms that I might not know. And I studied a lot of bioetiology and climatology, because with the insects, they're cold-blood creatures, and the growth and development is driven by environmental factors such as primarily the temperature, and locations, geographic locations, and those environmental things that drive their development. So this is some of the areas that I studied, and over the masters and Ph.D., and as I said, these are the first, as far as we know in the world, first curriculum directed degrees in advanced degrees in forensic entomology.

Q. Now, Doctor, have you been certified as an expert in the State of Texas?

A. Yes, I have.

Q. Have you been certified and testified as an expert in other states?

A. Yes, many other states.

Q. Has that been on one or numerous occasions?

A. Numerous occasions. I believe I'm qualified now in 26 states as an expert witness, and then both states and federal courts. I had three different federal court venues that I worked on. And then I'm also the chief forensic entomology consultant for Ontario, Canada. So I've testified in both regional and provincial courts in Canada.

Q. Doctor, is there a special board certification for entomology?

A. Yes, we have a couple of different certifications there. One is through the Entomological Society of America, where we can attain by taking a test and having so many years of experience a certification known as a board certified entomologist. Then we have another forensic board, which goes deeper into the qualifications with regards to the study of insects that go to dead things. And that is the American Board of Forensic Entomology, of which I'm a diplomate.

Q. Doctor, you were obviously contacted by us in order to testify today?

A. That is correct.

Q. And as part of that, did we get together and prepare a power point presentation?

A. Yes, we did.

Q. In order to explain what we're going to talk about, do you think that that would be helpful in your explanation to this jury?

A. It certainly would. It's one of the ways, one of the venues I use to train coroners, medical examiners and law enforcement agents and students around the world.

MS. MCELROY: With the Court's permission, we would ask to start the power point --

MR. FARREN: Your Honor, we have not seen this power point. We have no idea what is in there. We have no way to know whether to object or not. I have no idea what is in it.

THE COURT: All right. The jury will be excused for a minute while we go into it.

(Jury excused, proceedings held.)

THE COURT: If it's by way of demonstration -- everyone be seated. If it's by way of demonstration, then, you know, it's not going to be much there to object to. I don't know what's on it either. And so --

MS. MCELROY: Do you want us to display it for you?

THE COURT: You're going to have to do

the whole thing, it looks to me like.

MS. MCELROY: Okay.

THE COURT: It should have been done before now, it wasn't done before now and it should have been. And that is a mistake. But we're going to do it right now. I'm going to leave the courtroom and you're going to do it with him, and he is going to go through the whole power point, and we're going to excuse this jury for about -- how long is it?

MS. MCELROY: I don't know. Probably 25 minutes, maybe.

THE COURT: That will be fine. Somebody come get me when we're done. Is there anything else that we need to get out of the presence of the jury? Do you have anything else you're going to do?

MS. MCELROY: We have nothing.

THE COURT: Okay. Thank you.

(Judge exits courtroom, jury out.)

(Power point video played, no sound.)

(Defendant present, open court jury out).

THE COURT: Thank you, all. Everyone be seated. Do we have any objections to the power point presentation?

MR. FARREN: We have no objection to the introducing of the power point being used for

demonstrative purposes, Your Honor.

THE COURT: All right. Bring the jury in.

(Jury seated.)

THE COURT: Thank you all. Everyone be seated. All right, Ms. McElroy, you may begin.

MS. McELROY: Thank you, Your Honor.

DIRECT EXAMINATION (CONT.)

BY MS. MCELROY:

Q. Dr. Haskell, you prepared this power point today. And is this the image of you up here on the screen?

A. In my younger days, yes.

Q. And you presently teach at Saint Joseph's College?

A. That is correct.

Q. What is entomology, Doctor?

A. Entomology primarily is the study of insects, and it's a very, very large group of organisms on the face of the earth, and they interact with humans and so that's why we study them.

Q. When you talk about them being organisms, is there a percentage or basis of how much insects make up of the percentage of organisms on earth?

A. Yes. Of all of the described known organisms

on the face of the earth, which means all the bacteria, all the viruses, and all the trees and all the animals and all the birds and sea things, the insects comprise about 40 percent of the total number of the different kinds, which is enormous.

Q. Okay. How are insects classified or categorized, Doctor?

A. They're broken down into -- so that we can keep track of who is who and the players, they're broken down into first major groups, and then we move down into smaller and smaller groups that have same likenesses. And with regards to the larger groups, we call them orders. When I refer to groups or smaller groups, I'm talking about families that have a number of kinds or species within each family. It's not just one kind. If I say flesh flies, for instance, that is a family and it has many different species under that umbrella of the different kinds.

And then when we talk about colonization, colonization doesn't mean a fly coming down and landing and walking around and looking at things. Colonization refers specifically to that mother fly coming down, checking things out, and then depositing eggs or larvae on the food source. And then we have what are known as the beetles. And that is a Coleoptera. Again, that's a

larger group. That is an order.

Q. Okay. Doctor, are some types of bugs drawn to particular food sources?

A. Absolutely. Since there are so many different kinds, almost a million different kinds described, and all of them needing to eat, and since their biomass is tremendous, their weight, total weight as insects are tremendous, they need to eat things to live. And what a strategy would be, if you're in a population where you have millions and millions of individuals, and if you can pick a food resource that most of you won't like, and I like it, my chance of survival is greater. So the insects have developed niches, food niches where they have less competition for it.

For instance, human body lice, they will only go to humans and feed on our blood, very, very specific parasites. Other insects are more general feeders. And so they may have -- their strategy is that they can feed on a number of different things such as some of the insects you find on your roses and so forth, or in your gardens.

And then we have still other groups that will focus on these different areas of food, and it could be plants, it could be rotting things, it can be houses. Termites, of course, have chosen wood products. And so

we have these food niches. And the bottom line is if you can find a food resource where you have less competition, you have a greater chance to survive.

Q. All right. Doctor, are there some types of insects that are attracted to carrion, or dead things?

A. Absolutely. And we have -- Ricky Raccoon out here, he was probably killed by the drunk going home Friday night. And here he is Saturday morning with the heat temperatures up high enough so that the insects can be flying, and they're colonizing and they're doing a good job right there. He's bloated up. He's in a bloat stage of decomposition. And there are certain very specific insects, and insect groups. Remember, groups being the family that go to this type of food.

Q. Okay. What insects, Doctor, specifically feed on decomposing carrion? Are there just certain ones?

A. With regards to the major groups, the order, the flies. That is Diptera, but the flies will comprise a number of different families or groups. We have the blow flies, the flesh flies, coffin flies, muscid flies. Muscid flies are the relatives of the house fly. We have sepsid flies which are -- sepsid flies, we have skipper flies, which are uh -- they have the jumping maggots. And then we have soldier flies, to name just a few of the groups that we find. We also have beetles.

And the beetles are coming in, can feed directly on the decomposing animal carrion. That is the soft tissues of vertebrate animals. They can be cold-blooded, they can be warm-blooded animals. But these insects feed specifically on their decomposing remains. And it's the soft tissues they feed upon.

Q. Is the order of the bugs helpful in forensic investigation or how they progress or come to the -- to whatever -- the body or carrion?

A. Right. The sequence with which the insects come in, now, they're pretty smart. If all the insects who like dead things came in right off the bat after you're immediately dead, then you've got that competition problem again. Right? So what the insects have done is evolved over the millenia, is to divide carrion food resource into different stages. Now, if any of you had the opportunity to watch something dead decompose, of course you see it dead -- it looks fresh along the road. And here in Texas, things go pretty quick if it's in the summer time, when we have the heat. And the heat, the temperatures drive that.

And then it progresses through different stages of decomposition. And each one of those different stages of decomposition will attract different groups, different families of insects that contain

different species that will come in, in a nice progression as regards to the progression of the decomposition.

Q. Okay. Does the order of that progression help to set a time?

A. Absolutely. It's called insect succession.

Q. Okay. How long, Doctor, has forensic entomology been around?

A. The first documented case of the use of entomology in a murder investigation was from 13th century China, where a local peasant had been murdered by one of the other local peasants with a hand sickle. And what the magistrate did, there were several suspects, of course. What the magistrate did was call in all of these peasants to town, the village center. And he had each one of the suspects lay their hand sickles down on the ground and then stand back.

Well, it was a nice warm day. One of those handle sickles began to attract flies that are of forensic importance. And so almost immediately they knew who the murderer was.

Q. Can you tell us who would be responsible for a more modern approach to forensic entomology?

A. Documentation goes back to France in the 1880s -- or 1890s where J.P. Megnin recognized -- he had a

paper called the -- basically, the Insects of the Corpse. And he had recognized that -- this very obvious thing as decomposition progresses into the different stages, that different insects came with those different progressing stages.

Q. Okay. So his research was important because different stages are recognized. Is that right?

A. Yes. We have -- in his scheme, he had, I think five stages, a fresh, bloat, decay, dry, and remains. There can be -- there can be probably more fillings in between, and maybe it is not as discrete as what he was showing, but it was important to note that he recognized that there was this progression of decomposition.

And in addition to this progression, there were different groups of insects that utilized the different biochemical make-up of the decomposition as it progressed. The biochemistry changes as it goes down the decomposition path. And so with regard to that, then, we have the different insects coming at different times. And we can tell -- that is one of the ways we can tell the extent of the postmortem intervals, based on the different insects in succession when we pick a specific time and place on a decomposed body. Does it have species A, B, C and D? Or does it have E, F, G and

H, or does it have I, J, K and L, and whatever?

Q. Let me just ask you a couple of questions here, because we're going to go into a segment where you talk about the insect succession on human corpses.

A. Right.

Q. Now, you have studied -- and I believe that you have done studies at the body farm and the other times. Can you explain to the jury what the body farm is and what the purpose of it is?

A. The body farm is a unique research facility at the University of Tennessee, Knoxville, which as far as we know is the only facility in the United States capable of getting donated freshly dead humans. And in studying the decomposition and the changes on a daily, weekly and monthly and yearly basis of those changes of the decomposition. And Dr. Bass (phonetic), who is the founder of the body farm, gave me the opportunity several years ago on a number of occasions to come down. We had the big question. Obviously, in most states it's impossible to get humans to study. And so we need to know what is happening in Texas. We need to know what is happening in Indiana. We need to know what is happening in Canada. And so we use pigs, for the most part.

Well, what we found was that there was -- and

what I had seen, based on my case work versus the research that I was doing, it didn't appear to be any problems. But we needed to do a definitive study to show that the insects that come to the pigs as the experimental model would be the same insects that come to humans and in the same sequence. You know, we didn't want them jumping one of these stages, one of these serial waves.

Q. Well, why would that be important, Doctor?

A. Because if we're basing our conclusions and knowledge on the research that we're doing in the different states, we want to make sure that the animal model that we're using to replicate humans is going to replicate the humans to the degree that it's necessary for the conclusions that we draw. And we were able to show -- we did a -- my son and I did a major study in 1989. We spent about two months at the body farm every day from 7:00 in the morning until about 10:00 at night, collecting numerous times during the day. And I was able to repeat that research in 1998. And that was the second part -- part of the first study and the second study was funded -- the first major funding by the justice department, National Institute of Justice for a about a total of a $320,000.00 grant, or $220,000.00 grant for that to make those two different summer

studies that we did. And we are publishing the data now. And it would be very clear that the insects that come to humans would be the same insects that the pigs attract in the same sequence. So we validated the use of the pigs in our decompositional studies and the succession studies that we've done around the world literally.

Q. There are some pictures that are in here, and it will show you -- and there will be dead bodies along the way. Now, this is part of the research that was done at the body farm. Is that right?

A. That is correct.

Q. And these bodies are donated?

A. Yes. As a matter of fact, I donated myself to the body farm. And my mom has donated her body to the body farm. So I picked out my tree there, as a matter of fact.

Q. But this is for scientific purposes?

A. Absolutely. And it couldn't be any better. I can contribute to science long after I'm dead, and not just my publications, but directly.

Q. All right. Now, we've talked about the succession on human corpses. Is this the first stage?

A. That is a fresh -- and that's not a human. That is a pig.

Q. Right.

A. And that is a study back in 1986 that I did in Indiana. And now these photographs are only 24 hours apart, 24-hour intervals. This is in the summer in July. We're in the woods. We're covered, and we're getting light rains over the period. So there is some factors going on here that really enhances the speed at which decomposition takes place. This pig had been dead -- that pig had been dead about ten minutes, and already the blow flies were coming to it. I had a couple of blow flies on the picture up by the head. They were coming to it, the mother blow flies trying to figure out is this going to be a good place to put the next generation.

Then we go into the bloat stage. And as you can see that we have -- as Dr. Bux talked this morning, we have the bacteria in our intestines generating gases because they're causing decomposition internally. And those gases are building, and some of them can reach the outside through the mouth and the nose. Others go through the rectal area, and so others just build up and eventually blow up to the point where they actually pop.

Q. Well, what is the significance of that as it -- as the bloating and the gases are released?

A. Well, that is -- the gases being released is

the attracting factor to bring the flies in to the food source.

Q. Now, is a different kind of insect going to be attracted to say, gases from an early death as opposed to 36 hours, or does it change in -- the way the insects can smell it?

A. Actually, there are some very quick changes in -- the first guys in are the blow flies. Now, remember, we've got several different species of blow flies that will come in. The blow flies are easy to recognize because they're the really colorful metallic green and blue flies that you'll see around your garbage can and so forth, or out on Rover that got hit by the gas man as he's driving down the road. You'll see that over time -- well, even within the blow fly group, we have some blow flies that come very, very early. As I said within seconds to minutes after death.

And then we have blow flies that will tag on later and come later in the -- somewhere around 72 hours or more. It kind of switches, and then we see a greater build-up of different species or different kinds of blow flies that would come later. And then as decomposition progresses into days and weeks and months, we see even different insects, as we've talked about this partitioning of the food resource where every bit of

that food resource is going to be used up. And it's not going to be interfered with by overly -- competition for that particular segment of the decomposition stage.

Q. All right. I believe the next stage is putrefication (sic)?

A. Putrefaction.

Q. Sorry.

A. Yeah, putrefaction.

Q. Putrefaction. And what are we looking at here, Doctor?

A. Well, that is the pig that was dead -- we're at 72 hours. We are at 72 hours in the woods. And this same pig that was at the bloat at 24 hours earlier, it is now completely engulfed or inundated by third stage blow fly maggots. And it's fascinating to sit and watch this, because you can actually see the soft tissues disappear from the corpse, from the food resource. They are -- it's basically -- just -- well, the next slide, we had -- that was a 50-pound pig when we started. Within 96 hours -- this is at 96 hours, it's down to 18 pounds. They can be very, very dynamic in this process. And the -- Mother Nature does a very good job of getting rid of our dead things. If we didn't have the blow flies and all of these other insects that help in decomposition, we would have stuff piled so high that we

couldn't even get through it.

Q. Is there an area where the insects are drawn to more strongly than other areas of the body?

A. Obviously, the nose, mouth, and eyes. And that is because the odors that attract the flies in are being purged or discharged in gaseous plumes that disseminate. And we can have a dead pig laying here that you and I can't even smell yet, and a blow fly, a mother blow fly can track it from other over a mile and a half away on these very, very, obviously low concentrations of odors. But they track in, and that's why they're going directly to the nose, mouth and eyes.

The nose, mouth and eyes also hold -- we have moisture in them on the freshly dead. We have places where the mother fly can stick her eggs back up for some protection against the predatory animals that would come in or could come in and feed. And then we have the mucus membranes available once these new hatchling maggots come out, or larvae. Larvae maggots, the same thing. A maggot is just a descriptive word for a particular type of larvae. As you all know what a caterpillar is, that is a type of larvae that has a head and legs, and then funky legs at the back. A maggot is a particular type of larvae that has no head, has no legs and tapers usually like a carrot from the butt end

to the front end.

Q. Doctor, why do we need forensic entomologists?

A. Well, when we have a death scene, there are many, many questions that need to be answered. Some of the main questions are, who is the dead guy? What is the cause and the manner? Where did the death occur? When did the death occur? And who are the suspects, among other things? Of course, there can be a hundred questions. But forensic entomology in the past hundred years or so has -- if we could back that up, Mike. You're too quick -- we have a number four, when death occurred. Primarily most of my cases are dealing with time of death, because time of death to me is so important to show who would have been there at that particular time, and who has an alibi. So it can be very important.

Sometimes we can do a where death occurred, based on where we would expect to find certain species of insects. And we have -- we have western species, we have eastern species. We have northern species we have southern species. Another thing we can do is help the forensic pathologist to determine and the -- the anthropologist to determine where we might have areas of trauma so that we can work out the -- we don't; the pathologists do the cause and manner of death. And we

can even do victim. We have techniques now where we can take the maggots and extract human DNA and tell who the maggots have been chewing on.

I just got back from a case in North Dakota where we had a scene (sic) that was placed in a trunk -- a murder victim was placed in a trunk of a car. He is buried in North Dakota and we never did find him yet. But we had maggots in the trunk of the car. Had those maggots been collected properly, we had a good chance to recover the DNA from that individual. And so if a group of maggots have human DNA in them and it's your DNA, you probably aren't doing too well.

Q. All right, Doc. How reliable are insects in helping establish time intervals?

A. They're actually the most reliable means of any of the means available with regard to estimating the time intervals of death.

Q. And that would be based on your opinion or other people's research?

A. Well, it's my opinion, but also other people's research. We had a study from Europe that actually did a statistical testing of a number of different ways, pathological ways such as rigor mortis and ligor mortis, and other aspects of that. And the entomology came to be the most precise and the most accurate of those

different means.

Q. All right. The next chart, I believe -- this is a time line.

MS. MCELROY: Your Honor, might the witness step down so that he can point to the screen? This is kind of complicated.

THE COURT: You bet.

Q. By Ms. McElroy) Dr. Haskell -- if you would stand up --

THE COURT: Come on down to the screen over here.

THE WITNESS: Thank you, Your Honor. This may look a little confusing to begin with, but it's fairly -- fairly apparent up here, the red part into the black is death. The green part is the insect association with the death. And so if we have death here, we have the decay process starting out here. And it's going out for -- it could be days, it could be weeks, months, it could be centuries. And what we have here in the early stages we've come down and we find -- we can find what insects are present or absent at that time. And then that would indicate a track along this line here. And then we could back track for the estimation, PMI, we have a range that we would give. And then we can lock in, and death would be within that

range someplace. And so we're not pinpointing the time. We have a range that would -- that a body that has been out maybe ten or 15 days. We have the potential to be plus or minus 12 hours, although usually my range is wider so that we can take into consideration the variability of biological happenings, so that we have what's called a competence interval, expanding the competence interval so that we can be very sure that the death had occurred in that period someplace.

Out of the more advanced postmortem interval decomposition, we look at different assemblages of insects that are present. And again, if we have species D, E, F, and G, and we've done research in the area to determine what insects we have as the progression of decomposition goes, then we can back track and say it can be between 35 and 60 days, for instance. So that is the way this whole process works.

As I said or as Mike has indicated, this might be a little complicated, but in reality, I think it depicts a very definite and definitive way that decomposition progresses, and also a definitive way with which the insects interact with that so that we can tell what's going on, whether it's early, mid-late, or extended.

THE COURT: Thank you, sir.

Q. By Ms. McElroy) All right, Doctor. Basically, what that chart explains is that there is a time succession based on what kind of insect you are?

A. That is correct.

Q. And that helps you then decide where in the death process or where along abouts we are in the death process. Is that right?

A. Yes.

Q. All right. Let's talk about the types of bugs that you're going to see.

A. Well, we kind of talked about them briefly with their common names. Now, this is the same -- more or less the same list I have up here with the scientific names. And again we have the flies, which are the Diptera, and the beetles, which are the Coleoptera. And I certainly like to use names that all of us can understand, so common names will work for me if it works for you.

The different names, Calliphoridae, those are our blow flies. Sarcophagidae, those are the flesh flies. Piophilidae, those are the skippers, and Phorids, coffin flies. Sphaerocerids, the Spaerocerids, and on and on. So we have a number of players here. Now, these players, some of them would be in early. Some them would be middle, some of them would be late,

and some would be way out.

Q. Okay. Then the next group, are these insects that would come at a later time?

A. Not -- well, some of the beetles would. We have the Trojans, which are skin beetles. We have Clerids, which are clown beetles. Those are all found later in the decomposition process. When the --

MR. FARREN: Your Honor, at this time, unless we're going to have testimony later that some beetles or some clown beetles or something play a role in this case, I'm going to object. This is interesting but it's really -- I don't see the relevance unless he is going to testify that clown beetles played a role in this case.

MS. McELROY: Your Honor, we'll be happy to move along.

THE COURT: I'm going to overrule the objection, but I'm going to count on you to move it quickly.

MS. MCELROY: Yes, Your Honor.

Q. By Ms. McElroy) All right. Let's talk about the early flies, Doctor, and what's important for us to know about that.

A. This is where you're going to find the blow flies, the Calliphorids. And those are the ones -- I

had the dead pig, and there was a blow fly on it already looking for a place to lay its eggs. So if you have accessibility, those insects will come very, very quickly in the progression of decomposition. But they won't last the whole time. They will only last for a short period of time when that piece of food is attractive to them, and only them. And then it progresses for the others.

Flesh flies, they come in early, but maybe a little bit delayed from the blow flies. We have the later colonies when we have that putrefaction, when things are really goopy and yucky.

Q. Let's talk about putrefaction. I mean, that is noted by mainly the smell?

A. That's -- the putrefaction is actually the bacteria breakdown of the soft tissues of the animals. And we have a lot of things going on there. We have some chemicals called uh -- one is called putrescine, another is called cadaverine that will be present during this time. We have fermentation of the tissues, the muscle and the fats all giving off different smells and different chemical cues to the insects that are coming in. And we have a number here uh -- we have the coffin flies. We have the house fly relatives, which are the house fly, dump fly, stable fly, false stable fly. We

have the skippers and we have the fruit flies that all come in when we have different fermentation taking place, different biochemical going places, as opposed to the early stages of decomposition.

Q. All right. Now, Doctor, you have here a general fly life cycle. Can you tell me how is this relevant in the way you analyze different species of bugs?

A. Well, based on a particular species, we can -- which we find say, the third stage maggot, that great big one there. And kind of in the center to the left, and we know the species, we can -- and we know how -- from experimental data, we know how long it takes to get to that under certain temperature conditions. We can start there and backtrack of an estimate of when that egg was laid. Now, I'll have a range of time for that, but it may span a 12 or 24-hour period or so forth.

We can -- and this life cycle is good for most of the higher flies, higher flies meaning flies such as the house flies, the blow flies, the flesh flies, the muscid flies that we look at in the later stages of decomposition.

Q. All right. I thought we had talked about earlier that there are different kinds of blow flies. Which of these flies are the ones that come early on?

A. The blow flies, the green will be in first. The black blow fly will delay, and the blues are going to be found during cooler times of the year. When we have the warmer times of the year, we have the greens, then we have the black blow fly.

Here in Texas, it gets so hot that the black blow fly drops out in the hottest part of the summer, and we have another fly that takes over or in combination with it.

Q. All right.

A. And here are some of the blow fly species that we would encounter again, the green bottle fly on the left and the green bottle fly in the center, and the black blow fly on the right.

Q. All right. Now, this is specifically -- well, let me back up just a minute. Doctor, you traveled to Amarillo at an earlier time, did you not?

A. That's correct.

Q. And when you did that, did you go to the Special Crimes Unit?

A. Yes, I did.

Q. And at that point in time, did you collect different samples of bugs from different pieces and items of evidence?

A. I certainly did.

Q. And that was in regarding the Dustin Pool case?

A. That's correct.

Q. Now, you took those samples, and what did you do with them?

A. Well, first of all, I did the collections into vials of either alcohol or dry, and then I took them back to my laboratory where I microscopically identified the different groups and species that we found, and then compiled the list of the species and groups or species that we could get the species level from the different samples.

Q. Okay. Now, listed above here, it says insects from the remains. Then it says sample one. The next number next to that, does that refer to the evidence log number or the evidence piece that you --

A. That is the evidence log number. I put a sample number to it so it's easier to track in my laboratory. But it's referring to that particular piece of evidence, 56, and that is recovered from the scene. I believe from the pit. And that sample, I found only one fly larva. Diptera means a fly, and it's a house fly relative. Mucina is the genus, that could not determine the species. But it's probably -- most likely Mucina stabulans, the false stable fly. But we have one

larvae from that particular piece of evidence.

Second, we have -- from the pit again, we have a really nice array of really --

Q. Let me just interrupt you briefly here. When you say from the pit, was this from tarps that was wrapped around the body?

A. I believe these are collections -- my understanding was that these were collections taken from the pit itself, from the soil in the pit. That was my understanding. And in that, we see a nice -- as I started to say, we see a nice array of a number of different groups of flies. We have the muscids. We have the fruit flies. We have the coffin flies, we have the Sphaerocerids which don't have a common name. We have a beetle there, the Staphylinid beetle, a small beetle that is found in accordance with decomposing remains. And then we have Scatopsidae, an insect and a fly that comes -- a small fly that would come to decomposing things.

Q. Okay. In reference to what you found, was that different than what you had expected to find?

A. Absolutely.

Q. Why?

A. Because in my opinion, if we were going to find any insects at all, they would have to be the early

colonizers. They would have to be deposited before this body was wrapped, before it was taped, before it was wrapped in the plastic, before it was wrapped in the tarp, before it was buried and put under concrete, because those -- every one of those is a barrier. And you add them all up, and it's a tremendous barrier, plus the water on top of it. So if you have colonization with all of the insects, that colonization would have to be before wrappings took place. And if the wrappings occurred shortly after or during his death, then the colonization would have to be prior to his death, prior to his wrappings, but death would have taken place. And so I would have expected the blow flies to be present, and primarily only the blow flies to be present, because nothing can get to that body in that condition in that location under those conditions.

Q. Okay. Now, this, I believe, represents the results of what you did find in this case?

A. These are some of the flies that we found in our case that had had a number of the false stable flies, the Mucina stabulans. We had Ophyra, which is a house fly relative called the dump fly, and then we have only a little piece of an adult, and then one partial larvae of the blow flies, which again, it was completely inconsistent with what I had expected to find, given

what I had read with regards to the way the case supposedly had gone.

Q. Now, you also had another sample here that was collected?

A. Right. We have a number of samples here.

Q. And what did you find in this selection?

A. Okay. From the plastic sheet, from the plastic sheet, we have a part of a blow fly, Phormia Regina, the black blow fly. We have the dump fly, and we're talking about -- we see uneclosed puparium. Puparium is the cocoon stage of the life cycle. And we call it a puparium because it's formed differently. It doesn't have fibers spun around it. It's -- the actual cocoon is the third stage, larval stage that hardens and contracts. So we call it a puparium. But uneclosed means it's not hatched out. And we have a hatched out puparium from the house fly, Musca domestica. We have an eclosed puparium from another specimen of Mucina, probably Mucina stabulans. So we've got three different ones there, and then we have some other uneclosed puparia that was damaged probably from one of the smaller Diptera that are present. So we have a number of groups and species present in combination on this decomposing remains.

Q. What does that mean?

A. That -- well, this means that these aren't the first guys that come in. These come in much later in the decompositional process. When we have -- we're probably past bloated and into the putrefaction stage when these start to come in and then finish out as they go into the dry stage. So they're colonizing later after this body has decomposed.

Q. All right.

A. We had one blow fly larvae, and that was from the -- there was a -- as we opened up the plastic sheet and examined the plastic sheet, and when we folded it back up and I got ready to do my next specimen, there was a specimen -- a larval specimen laying there on the table. And most likely it came from the sheet as we had opened it up. Sometimes they fall off. Lot of times they'll adhere tightly. And with regards to the sample from the sock here --

Q. Now, back up, Doctor. What sock are we talking about here?

A. Okay. We're talking about what I was given as the sock from the mouth.

Q. Okay. When you saw or when you were at Special Crimes, you were brought the sock, had it been previously in evidence?

A. Yes.

Q. Was it wrapped in any way?

A. To my recollection, it was enclosed in a plastic sandwich bag with a Ziplock bag or something along that order. So it was enclosed, and then to -- also to my recollection, I believe they told me that it had been in a freezer.

Q. And it was your understanding from reading the autopsy and viewing the pictures that this sock came from Mr. Pool's mouth?

A. That is correct.

Q. Was it also your understanding that the sock had been shoved into the posterior pharynx of Mr. Pool?

A. That is correct. That was the description that was given.

Q. All right. Did you take any samples off of the sock?

A. Yes, I did.

Q. And are these the results?

A. That is correct.

Q. What do these results tell us, Doctor?

A. Okay. We have -- again, we have some additional -- we have an additional fly, Fannia scalaris, which is a house fly relative. And then as we still -- we have two eclosed puparium, Mucina stabulans. We have an uneclosed Mucina, probably stabulans, but we

couldn't say for sure. I have parts of puparia of Diptera, which are flies. They have fly parts, eclosed puparia of Ophyra, the dump fly. And then I have eclosed puparium, again, Fannia, most likely Fannia scalaris. And then parts -- small parts, about two millimeters in size of beetles. We couldn't tell what. We know they were beetles. We couldn't tell what they were.

So we have again, an array of different -- major different groups, all of them coming later in the decompositional process.

Q. When you say later in the decompositional process, give me an idea of what that means to you.

A. At warmer temperatures it can be several days, a week or later, at cooler temperatures that extends the time. And so it could be -- instead of days, it could be weeks if the body was in a place where it was much cooler for a period of time.

Q. Okay. Again, this wasn't the type of insect or the -- I don't think I'm saying this right. It wasn't the species that you were looking for?

A. It wasn't the group that I would have expected. It wasn't the group or the family that I would have expected had somebody been freshly dead and freshly colonized and then buried.

Q. All right. This last sample, number eight, now, what did you find here, Doctor?

A. That is tape around the head. And we have some parts of the puparia, the cocoon stage. And then we have an eclosed puparium, again, the dump fly, and that was from -- recovered from the tape.

Now, there were a number of specimens on this evidence, many of them were so fragile that -- and they were stuck to the tape. And I had a -- it was impossible to recover all of the puparia that were there because you touch them with forceps, and then it would break. So I was able to successfully recover a couple of those.

Q. All right. What are some of the factors that affect insect colonization?

A. Obviously, temperature is a critical factor to have temperatures high enough so the insects are out and flying. And that is an important factor. Would we have temperatures high enough for the larvae, say, the early colonizers, the blow flies and so forth?

Q. In order to put the data on this piece of -- that we're looking at, what did you do to back that up? I mean, where did you go to get this information from?

A. It was the national weather service station here. The data was recovered from the Amarillo station

right here in Amarillo. I guess we're not in Amarillo. We're down the road. But back at the weather station by the airport.

Q. This next picture -- I'm sorry. This next picture that we're seeing, is this from the grain elevator pit?

A. Yes, that is what I was told, yes.

Q. Okay. Why is this picture important or relevant to this case?

A. What it is showing is that we have a deep pit with barriers on the sides. And in this photograph, we see that there is stuff on top of the concrete that is on top of the wrappings on top of the buried body. And so this is depicting a -- to me, this is a major barrier in accessibility of the remains by any of those fly groups.

Q. All right. Doctor, why is this picture important to you -- and this is in reference to our case, Dustin Pool's case. Is that right?

A. Yeah, I believe that is the one that is showing that the sock is in the mouth before it was removed from the mouth. And it is -- it's way in there.

Q. Okay. This next picture, why is this next picture important, Doctor?

A. Because this is the sock -- I'm not 100

percent sure that the orientation is directly indicating the way it's being pulled out, whether it's been pulled out and then laid to show the length of the sock, with regards to the way it was put in because there was ribbings -- there were ribbings -- as you looked at the one in detail, there were ribbings you could see and it looks like the top part of the sock instead of the toe and the heel.

I have one of the puparia that -- recovered, actually circled on that slide at the autopsy. There are other puparia -- the puparia is a cocoon stage of the flies, and there are additional puparia on there as the evidence analysis suggested and listed.

Q. All right. Well, Doctor, why is it important that we found a bug on that sock?

A. We didn't just find a bug. We found developing life stages of insects that come later in the decomposition process. And what is extremely significant about it is that they were at the back. They would -- they were on the sock, and so they had to be at the back of the pharynx, back of the throat. And with that sock in there with these tapings and so forth, it would be impossible for those insects to get there. And so -- impossible to get there with the sock being in the way first.

Q. Well, you have the sock, right? And then there is multiple layers of tape. That is also a barrier --

A. Oh, absolutely.

Q. Then you have -- he was also wrapped in a thin sheet. Is that right?

A. That is correct.

Q. And then he was also wrapped in a tarp?

A. That is correct.

Q. What is the next barrier?

A. Okay. We have the soil from the burial. And then we have another burial of the concrete. And then we have yet another barrier, the sludge over the concrete. All of those making -- any of those individually could be a barrier. And some of them could be major barriers, or inhibitor barriers for the colonization.

Q. Is it important to you that there are several different barriers -- does that increase in your mind the -- or lessen the probability of some kind of later colonization?

A. I think the fact that we have all of these barriers completely excludes later colonization, anything getting down to that while it's in that position.

Q. Now, Doctor -- and maybe this is -- maybe you've already answered this, but are these the type of flies that -- I mean, are they going to come and lay an egg in my mouth if I'm still alive?

A. Absolutely not. The blow flies -- and even these -- this whole group that I showed you or these groups that I mentioned here in this evidence, these are all flies consistent with much later decomposition. As I said, at 70 or 80 degrees, we're talking about a few days to a week, maybe more. At cooler temperatures, it could be extended. But we're talking about that body taking major changes biochemically where these are attracted to it. You could take a fresh body. Some of the adults -- some of the adults of the species may be there, but they're not laying eggs. And they don't start laying eggs until the biochemistry is right for them to have their offspring be able to live off of that particular type of food resource.

Q. So then the logical conclusion, Doctor, would that be from your research and your expertise that there wasn't any barrier for those flies to then lay eggs?

A. Well, the barrier that was here -- I mean, they could not have had a barrier for them to lay, particularly in -- lay eggs, particularly in the different, the quantity of -- or the diversity of the

groups that we have here. We have five or six different genera and --

Q. When you say genera, what does that mean?

A. That means different kinds. We have a genus specie, or four or five, four different kinds or five different kinds, all consistent with that later decomposition process.

Q. What is important about this picture, Doctor?

A. It's showing the circles are certainly a number -- two or three or four sites of where we have clusters of puparia and or -- I think even maggots crawling around there. And it's under the tape. And again, they don't do that. They can't -- these are barriers. This had to be coming in before those barriers were in place.

Q. All right. So let me understand. You believe that whatever flies or insects that came had to have come without having the tape on there at all, and then the tape placed over them?

A. Without having the sock in the mouth and without having the tape there, yes, absolutely.

Q. Let -- what's important, Doctor, about how you collect insect evidence? Can you tell us how that works and what are the rules about that?

A. Well, we need to be able to -- for an

entomologist, we need to be able to have the characteristics on those specimens in a condition that we can recognize them and then sort out. We call it a taxonomic key. In other words, an identification roadmap on how you get to different insect groups and species. And so those characteristics have to be well enough preserved and maintained so that we can make those definitive assessments.

And you notice some of those I couldn't get to a specific group or species. It was a major group like Coleoptera of the beetles. That was because the characteristics weren't identifiable enough to take it that far. Others, we had the characteristics present so we could successfully take them to those different groups.

Q. All right. Let's go to the next part here. There is a couple of different methods that you can collect. Is that right?

A. We use different methods to collect the insects, and when we have bodies that are out in the open where we have adult flying insects, obviously, the insect net is one way to recover -- trap and recover those, because they're very fast flying, for the most part. And they can fly off and not be around.

The others -- another means is to hand

collect. And this is where we would specifically pick off of the remains, or in close proximity using forceps, vials, and specifically going for those that are obvious and seen, and recognized as insect specimens. So we collect those.

Basically, those are my tools for collecting insect specimens. A vial of preservative fluid and forceps. Also, the entomologist, I was taught 40 years ago that this was one of the best set of forceps an entomologist has, as long as the insects don't sting you. So the index and thumb are just great.

Q. All right. Doctor, the next slide here, what is that telling us about?

A. Well, how forensic entomology works. As you have already seen with the example of the pigs, decomposition can happen very quickly. This remains is a remains of a case in Pennsylvania. This body has been dead six days. So things can happen very quickly if the conditions are correct.

And one -- our major indicator group are the blow files, Calliphoridae, the blow flies. And again, to refresh, these are the brightly colored green and blue metallic flies that we find. Those are the first guys in. They're the most dynamic on the remains. And we have some premises with forensic entomology. Time of

death estimations are scientifically based upon the fact that under satisfactory conditions, insect colonization of a dead animal will occur within a matter of minutes of death. By knowing rates at which the insects grow, an interval of time can be estimated between the oldest life stage on the remains and the starting time of that insect colonization. It's specific, it's accurate, it's precise if we have the information to go with it.

Q. Well, would it be accurate to say, Doctor, that you have the benefit of a source or insects that are following an instinct. So they're under a law of nature, and their variance is limited in how they react?

A. Absolutely. Now, that doesn't mean a blow fly couldn't come in on day one and extend -- a mother blow fly coming in and laying the eggs on day one and maybe extend to day four, five or six. They'll have a range. But beyond that, in my research all over, all over north America, we see that there is a point where the blow flies cease and then these other flies will start -- they will start to come in when the blow flies are fading out, because that biochemistry of that food resource is changing. We have the expectation of blow fly colonization. Favorable temperatures and the remains is outside, facial wounds exposed, the insects will be coming in a matters of minutes to hours, laying

eggs within minutes to hours. And that's the blow flies.

Q. Okay. These are the exclusions of the early blow flies coming in?

A. Right. We can have exclusions. Now, the blow flies don't fly at night. So they shut down, they go to bed about sunset. They get up after sunrise, in combination with the temperature being high enough to support their flight and activity. And that is the next -- that's the next exclusion, below 50 degrees Farenheit. With certain exceptions, we don't have the blow flies flying. So it has to be above 50 degrees. The warmer it is, the more able the flies are to get around and fly. 90 to 100 degrees, and you're out in possibly shaded -- they are really cooking. Literally hundreds of them can come in, by the thousands of them to big carcasses.

And then we have physical barriers that will exclude the colonizations. You put a body in a freezer, it certainly excludes -- plastic bags, a good wrapping of plastic bags. I just finished a case from Cleveland, where we did extensive plastic bag experiments with pigs, and excluded. And then we have barriers. Delays, we have cool temperatures between above 50 and through about 65. Enclosures, torn plastic bags under brush

piles and the like. Shallow burials where it may have eroded away, or some of the flies can lay eggs on the surface and the larvae burrow down. But that is very short distances, just a few inches of that. And then fire ants can carry off eggs and larvae at times.

Q. All right. You say here that you've studied a different variety of factors. What are we talking about here?

A. All of those factors that we're talking about, the delays, the exclusions and the favorable times, and these are the studies we have done, of course at the body farm. Back in the -- in '89 with humans, we did a number of studies in the '90s. And then as late as last March, 2004, my team was training the FBI at the body farm. We had the ERT team members coming in from all over the country, and we were training them at the body farm also. We do a lot of training nationwide and internationally.

Q. What is this telling us about?

A. Again, just noting that we have a heavy infestation of third-stage maggots. And it's -- that's that case in Pennsylvania at six days. The head skeletonized, we're seeing the flies go to the nose, mouth, and eyes, because the head is clearly -- here is the rest of the body. We've turned the body over and

you can see soft tissues on the body. And so we have -- the blow fly is going to the face first. And that is where they're going.

Now, here is what is known as a maggot mass. This is one of my body farm research subjects. And that's all maggots right in there. That is a whole big mass of maggots, just like we saw on the tape. And again, you can see that they start at the head area, primarily.

And then we have another term, which once the maggots have completed, once the third stage maggots have gotten enough energy in, they go into what's known as migration. They crawl away from the food source. They're headed for a place where they can be protected. They're burrowed down into the soil, or into -- in a house, they'll go to the edge of the room and stop where there is carpeting. And I measured maggot mass migration out to over 100 yards from the originating carpet sometimes. So they can go a long ways.

Q. So when they get done eating --

A. Yeah.

Q. -- then they drop off of the source?

A. They crawl away. They crawl off the source, yes.

Q. Now, you talked about puparia. And this is an

example of the uneclosed and the eclosed puparia.
A. Uneclosed is the guy that is not opened up, and the eclosed means they hatched out, and you can see several that are eclosed there, hatched out. And I'm out of pictures.
Q. Okay. Doctor, in preparation for your testimony today, you came to Amarillo, and did we visit a variety of different scenes?
A. Yes, we did.
Q. Did we go to the River Falls -- we didn't go inside, but we went to where the River Falls Apartments are. Is that right?
A. That is correct. We saw them from the outside.
MS. MCELROY: May I approach the witness, Your Honor?
THE COURT: Yes.
Q. By Ms. McElroy) I'll show you what has been marked as State's Exhibit 213. This is the River Falls Apartment.
A. Uh-huh.
Q. Now, we didn't go in the apartment, but that is just an indication. This is State's Exhibit 222. That is inside Miss Patrick's apartment. Again, we didn't go inside.

A. Right.

Q. Now, we also visited -- this is State's Exhibit No. 267. Do you remember going by this home?

A. I think we went by the front and we went down the alley by the back, if I recall.

Q. Okay. And do you remember seeing this detached garage?

A. Yes, I did. And that's what's inside, and we didn't go inside.

Q. Now, we also went to 380, County Road 307, didn't we?

A. That is correct.

Q. And is this basically sort of the scenery about --

A. The general environmental habitat that we would see at that location.

Q. Now, we also went to the grain elevator, did we not, Doctor?

A. That's right.

MR. FARREN: Just for clarification, the last photo, could -- did he have an identification on which was the last photo?

MS. MCELROY: Oh, I'm sorry. Defendant's 23.

MR. FARREN: Okay. Thank you.

Q. By Ms. McElroy) And again, at the farm the actual building had burned down by the time we had visited it?

A. At the elevator, yes.

Q. Were you concerned about the building?

A. Not so much at that point. Again, I wanted to see the environment where the -- where the flies and the insects would be coming from.

Q. So you were concerned to just kind of get a general feel of the locale of where the body had been taken from different progressions so that you could understand better to make your analysis?

A. That is correct.

Q. Okay. Were there any other factors that you considered or found to be important here?

A. Well, of course, the temperatures that we considered. And the -- obviously, the insects, the specimens that I had an opportunity to recover and identify.

MS. MCELROY: We pass the witness, Your Honor.

THE REPORTER: I need just a few minutes.

THE COURT: Oh, okay. Ladies and gentlemen, why don't y'all take a lunch recess. Ladies and gentlemen, why don't y'all be back at 1:20.

(Jury excused, proceedings held.)

MR. FARREN: Your Honor, at this time we would ask the Court to review your ruling on the --

THE REPORTER: Mr. Farren, your back is to me.

MR. FARREN: We believe they have now made the sock issue a really critical part of this case. And we believe Mr. Roy's testimony now becomes even more relevant and more essential than it was before, in spite of the other evidence that has been offered. It now takes on a completely different character. We would ask the Court to reconsider your ruling concerning Mr. Roy, and the evidence that he would present.

MS. MCELROY: May I respond, Your Honor?

THE COURT: I wish you would.

MS. MCELROY: I don't see that the Roy incident is in any respect relevant to the testimony that we have had today. But if we were saying -- and the experts are saying that the sock couldn't have been in his mouth, based upon the bug evidence that is found behind the sock, our supposition and the reason they're here to testify is that Dustin Pool didn't die by suffocation, which is an element they have alleged in the indictment. That is the testimony, the scientific testimony that we're presenting to this Court, because

they're bound under the indictment to prove that beyond a reasonable doubt. It's our supposition that they have not done that, based on our experts' testimony, and whether or not there was some other person -- who I think there is at least a good argument that Michael Marquez was responsible. I mean, it really doesn't matter.

I mean, I guess what I'm saying is, I am not seeing how that is relevant, because our whole point of bringing the experts is to say there wasn't a sock in his mouth and he didn't die of suffocation.

MR. FARREN: The way that it's relevant, Your Honor, is that it shows that at least on one occasion Mr. Stocker participated in an almost identical event, and they didn't put the sock in Mr. Jeremy Roy's mouth after he was dead, they put it in his mouth and taped up his head while he was alive. And that's exactly what happened in this case. And we believe that helps the jury make a decision. We believe they have kicked the door off the hinges with this evidence.

THE COURT: Well, let me make a point here. I'm going to think about this over lunch, but I'm -- the basis of my ruling about the Jeremy Roy kidnapping was a 403 balancing test, not its relevance under 404(b). It never was. As I told you then when I

made the ruling, I never really decided whether the -- the signature or the identity issue were identical or not. I never felt I had to make that --

MR. FARREN: I see.

THE COURT: -- it was simply a balancing test. And as I told you then, your evidence on the case in chief of the elements of the indicted offense was compelling enough and so powerful enough that it lowered by a long shot the probative of this Roy kidnapping.

Let me consider it over lunch. But I don't think I'm going to let that in. Is there anything else?

MR. FARREN: No, Your Honor.

THE COURT: Okay. We'll be in recess until 1:20.

(Noon recess.)

(All sides, Defendant present.)

(Jury out.)

THE COURT: Thank you all. Everyone be seated. At this time, I'm not going to allow the Jeremy Roy testimony. I'm not convinced that -- I agree with your characterization, Mr. Farren, that they opened the door and increased the relevance of that extraneous offense. I agree with that. I don't agree with the degree that you characterized it about kicking the hinges off the door. And I'm still not going to

jeopardize this case on appeal by letting in something I have doubts about like that. So I just wanted to let y'all know at this point. I am willing at any time to revisit that issue, if you think the circumstances and the context has changed.

MR. FARREN: Yes, Your Honor.

THE COURT: Do we have anything else?

MR. FARREN: No, sir.

THE COURT: Can I bring the jury in?

MR. FARREN: Yes, Your Honor.

(Jury seated.)

THE BAILIFF: All rise.

THE COURT: Y'all be seated. All right. It's your cross.

MR. FARREN: Thank you, Your Honor.

CROSS EXAMINATION

BY MR. FARREN:

Q. Dr. Haskell, I have a copy of your book, Entomology and Death. You recognize this as being your book. Correct?

A. Well, it's not solely my book. I was an editor and a contributor. We had a number of forensic entomologists contribute to that.

Q. Entomology and Death, a Procedural Guide. Well, do you have reservations about not wanting to take

credit for the book or --

A. Well, I like to give my colleagues equal time, if that's due.

Q. But there is nothing in the book that you don't stand by that wouldn't -- you feel like is accurate and is an accurate guide to folks who want to learn about entomology and death?

A. That is a good characterization.

Q. Okay.

MR. FARREN: May I approach the witness, Your Honor?

THE COURT: Yes.

Q. By Mr. Farren) Would you agree with me, Doctor, that on page 37 of your book you state that insects can be a valuable tool in investigations of homicide, suicide, and untimely death and other violent crimes. Accurate forensic determinations are possible. However, only when representative specimens are recognized, properly collected, preserved and forwarded in a timely manner to a qualified forensic entomologist for analysis. Is that a true statement?

A. I think Dr. Lord with the FBI wrote that, and I would certainly agree.

THE REPORTER: What was that name?

THE WITNESS: Dr. Lord, L-o-r-d.

Q. By Mr. Farren) So in this particular case, would you agree that the specimens were recognized, properly collected, preserved and forwarded in a timely manner?

A. I certainly recognize them. I certainly collected them, and I certainly took them to my laboratory, so I -- maybe the issue of timely manner may be at issue, but the rest of it, I think was certainly followed.

Q. So you think timely manner may be an issue?

A. Well, if we're talking about timely, I have done cases -- I had a case out in West -- or western New Mexico, the four corners area, where I was evaluating the skeletal remains that had insect specimens on them. And I was able to make some determinations on that. It turned out that it was the -- four skeletons in this grave were killed about 750 A.D., so we were still able to take even ancient material and make some analysis from it.

Q. So we could put a parenthetical here that timely manner parentheses, within a few hundred years?

A. Maybe within a three or four millenium. My oldest case is 4,000 --

Q. So timely then means nothing?

A. Timely means when we're talking about -- when

we're talking about a case, it -- if it has to do with living maggots and so forth, we're trying to make identifications. And whether it's today or whether it was two years ago or a year ago or 100 years ago, if we could -- if we have the specimens to work with, we can certainly make the identifications if they're there.

Now, when we're talking about maggots and identifying the species, we may want to raise some of those to adults. In other cases, it's not necessary because we can make those species identifications.

So the fact that I was able to make identifications in this, although you notice I didn't talk about time of death --

MR. FARREN: Excuse me. I object. This is non-responsive.

THE COURT: I agree, Doctor.

THE WITNESS: Sorry, Your Honor.

THE COURT: That's okay. But try to answer his questions in as short of an answer if you can. Thank you, sir.

Q. By Mr. Farren) So when you say that these need to be collected in a timely manner, then it really didn't mean anything. It could be years.

A. Well, it depends on what the specimens are developing to, and what the condition is.

Q. Okay.

MR. FARREN: May I approach again, Your Honor?

THE COURT: Yes, sir.

Q. By Mr. Farren) You would agree with me that chapter five of your book addresses the collection of entomological evidence at the death scene?

A. That is correct.

Q. And chapter six of your book involves collection techniques at the autopsy?

A. That is correct.

Q. Where is the chapter on collecting it two years later?

A. Well, we're getting ready to do a new edition, and probably we want to add that but --

Q. So it's been inaccurate up until now?

A. Absolutely not. The collections can be at scenes much later. They can be at evidence rooms. I've looked -- we've looked at a lot of evidence after the fact, and certainly can draw conclusions based on what specimens are there. The whole idea is to get these specimens in a condition that they're identifiable. And in this case, they were.

Q. Earlier, Dr. Bux shared with us how much he was paid. How much are you being paid?

A. I'm being paid $400.00 an hour for court time, $200.00 an hour for case work-up time.

Q. And you're not concerned that you have left out a whole chapter of your book up until now?

A. No.

Q. Okay. Now, you indicated that you had learned of some temperatures in May that you believed were helpful in making evaluations, temperatures in May here in the Amarillo area?

A. No.

Q. You did not get temperatures in May of 2003?

A. I have some temperatures from May of 2003.

Q. Maybe I'm confused, Doctor. I asked did you collect some information about temperatures in May?

A. I have some, yes. But I didn't -- I believe I showed March and not May.

Q. I'm sorry. In March?

A. That is correct.

Q. Okay. You didn't get any in May though?

A. I have the May data and it's listed on my data sheet, yes. But what I was showing here was the initial temperatures for if the flies would be out flying or sometimes it could be cold here. So they might not be flying.

Q. So did you collect some temperatures from May?

A. Yes.
Q. Did you get the temperatures for June?
A. Yes.
Q. Okay.
A. And April.
Q. And in June -- did you check the temperatures in Fritch, Texas in May -- in March?
A. No, I believe I had the data from Amarillo.
Q. So not from Fritch?
A. To my knowledge, no.
Q. Do you have the temperatures from Panhandle, Texas?
A. I -- as I stated, Amarillo, the station here at Amarillo.
Q. And you don't have the temperatures for any of those other months for Fritch or Panhandle, is that --
A. No, I don't.
Q. Now -- and do you have the temperature in March of 2003 inside Tyler Hale's garage in the back of the Navigator?
A. No, sir, I don't. Upon point, those temperatures should have been taken by the law enforcement. That is what we would do if we were doing that.
Q. I understand your complaints. I agree --

A. I'm not complaining. It's just a comment.

Q. That would go back to the fact that your area of expertise only works when it's properly collected, preserved and forwarded in a timely manner?

A. That's correct.

Q. If not, then it loses a lot of its value. Right?

A. We -- I did not attempt a postmortem interval based on this.

Q. Right. Yes, sir. Now, how long -- well, let me ask you this first. You've talked about some -- I guess it's larvae. And correct me if I'm using the wrong terms. What did you see on the sock? What did you collect from the sock?

A. Puparium. The cocoon stage, as we went over the cocoon stage of the life cycle, and it's called the puparium. And that is what I observed in the photographs. That's what I observed when I collected from the sock.

Q. And when you -- and I confess my ignorance. But is that -- what stage of decomposition would you expect to see that particular larvae?

A. Well, it would be -- if -- it's not larvae. It's puparia.

Q. I'm sorry. Puparia.

A. The puparia would be the continuation of the growth and development from the insects that come in in that stage of decomposition. So it would be the stage of decomposition plus a period of time at the temperatures that we might -- it would have been nice to have temperatures at the bottom of the grave because that way we could have calculated that difference.
Q. So would you expect that -- to see those a day into decomposition?
A. Weeks.
Q. Weeks?
A. Days and weeks into the decomposition stage at those temperatures.
Q. Days and weeks into decomposition?
A. Yes.
Q. So it -- it is -- it would be your theory, then, that Mr. Pool was killed, and weeks later someone stuffed a sock in his mouth and taped up his head?
A. That could be days later at temperatures in the 70s or 80s. If it was lower than that, it could be potentially weeks later. But it could be -- I believe I said earlier on direct, it could be somewhere around five, six, seven days, as a minimum at 70 degrees or so. And -- but if it's cooler, it could be longer because decomposition hasn't progressed.

Q. So it's your theory, then, that Mr. Pool was killed and decomposed for a week, and then somebody stuffed a sock in his mouth and taped up his head?
A. That would be consistent with Dr. Bux's testimony in regards to the purge and decomposition.
Q. Well, is it consistent with your testimony? That's what you believe, he was killed and a week later, he decomposed somewhere and then somebody wrapped up his head with tape after they put a sock in his mouth?
A. That's correct.
MR. FARREN: May I approach the witness, Your Honor?
THE COURT: Yes.
Q. By Mr. Farren) In State's Exhibit 94 -- and I'm going to put it up on the screen. What are those little critters right there?
A. Those are larvae.
Q. And are they alive?
A. Looks like they're alive there, yes.
Q. Oh, a moment ago, you and I were talking about these little folks right here (pointing).
A. No, we weren't.
Q. Well, that is what --
A. Oh, you mean up here when we were sitting up here?

Q. Yes, sir.

A. Oh, yes, sir.

Q. And you believe, and they certainly look like it to me, but I'm not an expert, to be little critters that are alive, not dead?

A. I never said the puparia were dead. The puparia were continuing to try to develop to a point, in my estimation. And we have younger stages that would have been either slower developers or they were even deposited at a slightly later time.

Q. Okay. Again, I'm going to try to listen carefully, Doctor, but I'm confused. This is a photo at the autopsy. You understand?

A. That is correct.

Q. And this is -- this autopsy is in June, three months after Mr. Pool died?

A. That is correct.

Q. Okay. So are we saying that these are the larvae that you found on the sock, or are these on later larvae?

A. Those don't appear to be on the sock, although they're in the oral area, oral cavity mouth area, and could be consistent with the clutch that was deposited that resulted in the puparia that were on the sock in the back of the throat.

Q. Well, are these puparia?
A. No, they're larvae.
Q. Okay.
A. Larvae. Those are maggots. The puparia are the cocoon. They're --
Q. So how much later do the larvae appear after the puparia?
A. It's the other way around. The larvae are -- we have an egg, a first stage maggot, a second stage maggot, and a third stage maggot, a migrating maggot, which a migrating maggot is done feeding and he wants to leave because he wants to form the puparia so that he can make the metamorphosis or the change in form. That's what metamorphosis means, to form the adult fly.
Q. So what we're seeing here is something that would have been around the mouth cavity prior to the puparia?
A. They would have been later than the puparia. The puparia are the oldest. The puparia are older than larvae. So who is there first? Well, the guys that were laid as eggs that form the puparia. And there were a whole bunch of puparia on the tape outside the mouth, too, which is consistent. And they had a few -- there are fast growers and there are slow growers. And these would have been from the same batch and they're slow

growers.

Q. Okay.

A. But it's hard to tell what species we have because we couldn't make a positive identification at this point.

Q. Okay. But what you picked off the sock is something that would develop before or after what we're seeing in the photo?

A. There -- the ones off the sock are older than what these larvae are.

Q. Well, then, how does the -- what you took off the sock help us know anything, because they obviously develop later from these critters here?

A. No, no, no. The puparia on the sock came before these guys. Or these guys are slower growers. What I -- in my opinion, what happened was there were larvae or eggs or some of these guys around the mouth area when the sock went down into the mouth and into the throat. Some of them were wiped in, and these evidently weren't.

Q. Well, I understand your theory, sir. I am trying to understand how you got there. If these -- if what we're seeing in the photo is something that occurs at an earlier stage, how would you conclude that what you picked off the sock didn't develop at some time

after the autopsy?

A. Because they were in the photograph at the autopsy. They're on the photographs, on the autopsy photographs of the sock.

Q. So from the photograph of the sock at the autopsy, you can tell for sure what they are, but here you can't tell?

A. No, I picked the specimens off the sock that were seen in the autopsy photographs and identified those. That is what we did.

Q. So you -- so you know that those that you picked off are exactly the same ones you saw in the photograph?

A. I think a couple can maybe be identified as that, but there were certainly a number of --

Q. Excuse me, sir --

THE WITNESS: I would like to explain this, Your Honor.

Q. By Mr. Farren) How would you know -- they're not wearing little name tags, are they?

A. Well, sort of they are, yeah.

Q. So you know that those exact same little critters that you saw in a picture made two years ago are the same ones you picked off the sock two years later?

A. They're in the same relative locations on the sock. Puparia don't move. They lock in there -- they sit there and they do their thing until the fly hatches out. And in this case, they stick them in the freezer and the fly can't hatch out. We had one that was ready to hatch out, fly was ready to hatch out that knocked out the end of the puparia where they hatched out. And it was trying to get out but it couldn't get out.

Q. Where did these guys go?

A. I don't know.

Q. So we just -- we don't know -- they just escaped?

A. I don't know. Might still be on the tissues.

Q. Could they -- could they be on the table where you dropped some other items while you were examining things at the Special Crimes Unit?

A. Well, I think that what we had on the table was probably a result that dropped off of the tarp and this appears to be on the body and not the tarp, a plastic sheet.

Q. Dr. Haskell, of course you weren't there when the body was exhumed. Is that correct?

A. That is correct.

Q. Can you tell us how long -- I want you to assume this is a picture of the body as they're

chiseling it out of the concrete in the bottom of that pit. Can you tell us how long they were down there chiseling that body out?

THE COURT: Does this have a number?

MR. FARREN: I'm sorry. I apologize, Your Honor. This is number -- State's 172.

Q. By Mr. Farren) Can you tell us how long they were down there chiseling him out?

A. We probably could if we went to the record of the crime scene assessment, or they -- processing a crime scene, we normally log the times and dates and so forth.

Q. Can you tell the jury how long they were down there chiseling the body out?

A. If I saw the crime scene information, I probably could.

Q. Can you tell the jury how long they were down there chiseling the body out?

A. If we had the crime scene information, we could.

Q. So you can't? The answer would be no, you don't know how long --

A. Well, we could if we refer to the information.

Q. On the -- when you testified earlier, did you know at that time how long he was in the bottom of this

pit in this concrete as they were chiseling him out?
A. No.
Q. Okay. Could have been hours?
A. It should have been hours, if they were properly processing the scene. It would be. That's proper exhumation techniques for archaeology.
Q. And would you agree with me that the top of the tarp and the head area is open, at least as they're putting him on this gurney, this area here?
A. Well, it could be. I can't tell from the photograph here. But it doesn't show that it is. If it is, then it is.
Q. I want you to assume with me that others have testified the tarp was open at the head area.
A. All right.
Q. Now, after he has been buried in concrete for three months and they bust that concrete open, you would agree with me that the aroma, the odor would be tremendous?
A. It would be pretty tough, even for professionals in that.
Q. In fact, just the mandible and the maxillary bone, I believe is the correct pronunciation, in a plastic bag and another plastic bag in this room, even today created a tremendous odor. Would that surprise

you?

A. No, not at all.

Q. Do you think a lot of flies would be attracted to that, sir?

A. They could be. But they would be flies, again, that are attracted to the odors of older decomposition, at least three months, yes.

Q. Kind of like the puparia?

A. The what?

Q. The pronunciation that you used earlier. The later stage flies.

A. No, it doesn't work that way. We would have adult flies coming in. Right? But the mother fly flies in to these odors. She is going to try to access this because this is a heck of a food resource, isn't it, because of the odors coming in?

Q. Yes, sir.

A. Okay. Now, mother fly has to lay eggs. Those eggs have to develop through the first stage maggot through the second stage maggot, through the third stage maggot, through the migrating maggot or post-feeding larvae. And then they form the puparia. And some of the puparia that we found were nearly hatched out.

Q. Okay, sir. You would agree that here at the top of the silo, the tarp is opened, and -- at the top

near the head, and various flies and insects would have access to the body of Mr. Pool and what is exposed?

A. That is exactly right.

Q. And so if these flies laid there --

THE COURT: On that last exhibit, I hate to keep bugging you, but the record will look better if we -- they can read what's there.

MR. FARREN: I apologize. You're right, Your Honor. The three exhibits, the first one is 172, the second was 173, and the third was 174.

THE COURT: All right. Thank you.

Q. By Mr. Farren) Now, once the eggs are laid, this progression begins. Correct?

A. That is correct.

Q. And if -- this progression continues for days, you said?

A. Yes. It depends on the temperature at 70, 80 degrees, for instance, most of these -- the house fly and house fly relatives would take about two weeks to form the puparia.

Q. Okay. I'm trying to get it narrowed down because I'm hearing months and weeks and days. Can we -- is there any way to get it any more narrow than that?

A. I think we're doing pretty good there.

Q. Okay, sir. So it could be days, it could be

weeks, it could be months?
A. For what?
Q. The puparia.
A. To form the puparia?
Q. Yes.
A. I said about 12, 14 days, 15 days, possibly, to get the puparia. And the thing is, we have the photographs from the autopsy within what -- the autopsy was the next day. And so we have photographs that show puparia, and so it can't be from any colonization after the pit is opened, or after the body is exposed, the head is exposed on the gurney.
Q. Prior to his death, you don't know where the sock was. Right?
A. No.
Q. And prior to his death, you don't know what flies laid what eggs on the sock?
A. Well, we can -- we would know that -- we don't have any blow flies, so if the sock is freshly -- freshly covered with blood, which blood is not an attracter for flies too much, anyway. There have been cases where that has been, but there would have to be a lot of blood on the tissue or on the material, the cotton or whatever, before the flies will come in. They're probably coming in -- the blow flies are

probably coming in to the uh -- research has shown the albumen in the blood itself, and not the blood -- not the plasma, not the -- not that.

Q. It doesn't have to be blood on the sock, does it? I mean it could be other things that would cause flies to lay eggs on the sock?

A. That is a possibility.

Q. I want you to assume with me that the man who lived there wasn't the tidiest individual. And what if -- what if I have worn the same pair of socks for a couple of weeks, would some of my tissue end up shedding off on those socks?

A. I don't know. Depends on how wet or how dry your feet were for one thing, I would think.

Q. Well, if some of my tissue did shed onto the socks and it began to decompose, that would be attractive to a fly --

A. I don't think there would be enough tissue there to attract, because again, it was skin. It's epithelial tissues, and would not be -- not be consistent with these guys that come in to really yucky stuff.

Q. Well, if the skin begins to decompose, it's not yucky. Is that your testimony?

A. Well, it depends on the quantities. We slough

skin -- you've got skin all over. Everybody has got skin in their beds. And there is -- skin sloughs off. That's why the epithelial tissue keeps re-generating all the time.

Q. Yes, sir.

A. And the outside of it -- again, cockroaches like to eat it, but we haven't seen any cockroaches here.

Q. Yes, sir. I understand. But do flies lay eggs on decomposing tissue?

A. On decomposing tissue, sure.

Q. Okay. Thank you. Now, how many -- how many of these little critters did you find on the sock?

A. There were a number of them. We had four different kinds, four different groups, mostly the house fly relatives, and probably seven or eight, we could go through that and count the numbers total to arrive at that. I don't recall that right off the top of my head, but somewhere around eight or ten maybe.

Q. Eight or ten of the little critters?

A. Specimens, yes. And that wasn't all of them because they were very fragile, and they were stuck to the sock. And trying to pull them off was not working successfully on all of them. And so there were more than that on the sock.

Q. Isn't it true, sir, that when the flies lay their little colonies of eggs, that there is 150, 300, 400 of these eggs laid --

A. That's if the blow flies, if they have the time to do it. If Mother flies in there and she gets three eggs laid, and a big old hornet comes along and wants to eat her, she is taking off. It disturbs her. And that's blow flies. So the house flies and these others, somewhere around in there if they have an opportunity to put their full -- open their -- empty their full ovaries, somewhere around 100, 150, yeah. And that is if mother fly has an opportunity to be there and do the thing.

Now, there is a number of specimens in these photographs from the autopsy that we were able to identify --

Q. My question is, how many of the little critters did you take off the sock?

A. I was able to successfully extract about eight or ten or twelve, and there were more on the sock --

Q. Was it eight or ten or twelve?

A. That is a range inside -- can be ranges.

Q. Well, did you count them?

A. Well, I can count them.

Q. Well, would you for us?

A. Put the video up and we'll count them.
Q. The video?
A. Or the CD. My power point presentation has them listed there.
Q. We wouldn't have to go through the whole thing again, would we?
A. Well, probably not.
Q. Okay. Just curious.
A. We could go to that one page.
THE COURT: Do you want the point -- power point put up?
MR. FARREN: No, Your Honor, I'm not requesting that.
THE COURT: All right. Let me know if you do.
Q. By Mr. Farren) So in other words, the only record you have that would refresh your memory and how many you got off the sock is the power point?
A. Well, I have in here an identification sheet, too.
Q. Okay. Sir, if you could -- do you not have a report we can review?
A. No. I have -- I was not asked to do a report. I count nine and parts.
Q. And if --

A. Those are the ones I was successfully able to extract off the sock.

Q. And is it of interest to you or not that you didn't find three or 400?

A. No, because I was under the assumption that the flies would not have had the time to deposit that many. And there could have been -- you know, I didn't get a chance to see anything but the photographs, and we found quite a few in the photographs.

Q. Well --

A. I was -- that is consistent with something that has been stuck away, exposed and then stuck away.

Q. If this man had been decomposing for ten or 12 days --

A. I believe I said as short as seven, but it could be 15.

Q. Okay. Seven days --

A. And he had to be excluded from the earlier rules --

Q. Excuse me, sir. If he been disposing (sic) seven days, seven, twelve, why would there not be plenty of time for the flies to just lay eggs to their hearts' content? I mean, he is decomposing for seven to twelve days.

A. Right. Because he was in a location where

they couldn't get to him. And that is the early flies, the blows flies. They should have been there. They were excluded.

Q. How do you know that?

A. Because they're not there.

Q. Well, okay. Where was he when they laid these eggs?

A. I have no idea.

Q. Just somewhere decomposing for seven to twelve days, and you know a fly couldn't get to him?

A. The blow flies were not on him, other than that one larvae. And that could have come in the later part of the end of their preference for the food source. And, what I -- my scenario is that he had to be someplace where he is decomposing, that he was excluded from fly colonization. And then he was exposed for a period of time, a short period of time when these older -- when these specimens that come into the older stages of decomposition occurred, and then the sock was placed in his mouth, he was taped up, or because of the purge, because of the floppiness of the body --

THE COURT: That is good, Doctor.

THE WITNESS: Okay. Sorry.

THE COURT: That is plenty.

Q. By Mr. Farren) Now, did you review some

statements from witnesses in preparation for your testimony?

A. I looked through them.

Q. Well, why would you look at them unless you were going to read them?

A. No, sir, I read them.

Q. Okay. So you did review them?

A. Okay. Well, I reviewed --

Q. What are the names of some of the witness statements you reviewed?

A. I really don't know, because I didn't use this for my evaluation. What I used for my determinations were the insects, the temperatures, the photographs.

Q. Then why did you read the report, the statements?

A. Because I wanted to see what they had to say.

Q. Well, did you learn enough from the statements to realize that there may have been as much as two and a half days pass from the time these folks say he was beaten and died, until he ended up in the bottom of that pit?

A. I believe two and a half to three days, correct.

Q. Okay. All right. And just so I understand, it's -- the jury has heard testimony over several days

from folks who claim that this man was beaten over several hours, had a sock stuffed in his mouth and then his head was taped up. That is one theory. Your theory is that he was dead for seven to twelve days, then had a sock stuffed in his throat and his head was taped up. Is that an accurate description of the two competing theories?

A. Well, he was dead for a period of time. It could be five days, seven days, twelve days, twenty days depending on temperatures. He had passed into the putrefaction stage when these flies came in. That is -- that's the only way it can work.

Q. Okay. I am just -- is it five days? Seven days? Twelve days?

A. I gave a range, but somewhere around seven days or more. It could be as short as five days if it's 95 degrees where he is being held.

Q. Are you using confidence intervals when you're giving us those statistical results?

A. I'm not giving statistical results at this point because I -- what I'm giving you is an evaluation of when these flies are found. These flies are found -- these flies are found when the body is in this stage of decomposition. They are not found and laying eggs when the body is fresh.

Q. Would you agree with me, sir, that your theory then is that once he is in this concrete, that no new colonization is likely to be taking place because they can't get to him?

A. That is absolutely correct.

Q. Okay. If we know -- if we know that he was alive on the 9th, March 9th, then he -- according to your theory, he wouldn't have been in the concrete until as many as 12 days later?

A. It could be 12, could be seven. Could be five if it's warm enough. If you got him out in the box and he is sitting out in the sun, that box gets pretty hot.

Q. If he were in the concrete by the early morning hours of the 12th, and we know he was alive on the 9th, then something is wrong, isn't it? Because three days won't work --

A. No, no, because we -- we're missing the blow flies.

Q. So if he were alive on the 9th, he could not possibly have been in the pit by the 12th?

A. That is correct.

Q. Okay. Could you show me in this book where it explains what you just told us?

A. I don't know whether it's in the book. This is a guide -- this book was written as a guide for law

enforcement officers for collections at crime scenes. It wasn't a dissertation on analysis of the entomological evidence. We did not put that in there because we were afraid people would misinterpret that, too.

Q. Then it wouldn't surprise you if I've read your book from cover to cover and it's not in there?

A. No. We purposely did not put it in there, Dr. Katz (phonetic) and I.

Q. So when you wrote your book, Entomology and Death, you intentionally left that part out?

A. The analysis out, yes.

MR. FARREN: Pass (sic) the book -- pass the witness and the book, if they want it.

MS. MCELROY: Just one second, Your Honor.

THE COURT: Yes, ma'am.

REDIRECT EXAMINATION

BY MS. MCELROY:

Q. Doctor, I am going to show you an exhibit that we've used earlier. Maybe it would better if I went this way. I believe you were provided with a copy of this, were you not?

A. Yes, I believe I was.

Q. And if you could --

THE COURT: Ms. McElroy, move those other exhibits, and set that bottom down on that chair and then you can hold it against the wall where everybody can see it. Thank you.

MS. MCELROY: All right.

Q. By Ms. McElroy) Is it your understanding that this indictment alleges that in the course of committing and attempting to commit kidnapping of Dustin Pool, intentionally commit the murder by intentionally causing the death of an individual, and then the causation, by suffocating Dustin Pool by putting a sock into the throat of Dustin Pool and covering, and covering Dustin Pool's mouth with tape?

A. That is in the indictment, yes.

Q. And that is your understanding of what our client stands charged with?

A. Yes, it is.

Q. All right. In your expert opinion, Doctor, due to the fact that the types of bugs that you found and the location in which you found them, do you believe in your scientific basis that that occurred?

A. No.

Q. Why?

A. Because the insects could not get to the back of the throat through the sock through the tape in the

manner that they were found at the autopsy and photographed at autopsy, and then recovered two years later when I went to the crime scene -- or went to the lab and recovered those specimens.

Q. Now, Doctor, I think Mr. Farren said something to you about the possibility of a fly laying eggs on stinky socks. I mean, is this a realistic happening here, based on wearing socks?

A. Usually not. Of course, I will have to admit that there have been -- I have had a victim, a client that had actual decomposing feet with his socks on. He hadn't taken his socks off in three months. So I mean it can happen. But there is nothing to indicate it here.

Q. In what you have seen in the evidence that you have reviewed, especially in respect to the age of the insects that you found, whether or not an insect laid an egg on him when they exhumed him, is that relevant in any way?

A. Not in this case, because we have the photographs from the autopsy, which show the puparia on the sock, and a large group of them on the -- on the inside of the tape close to the head, or face and mouth. Had this been the first time, the two-year intervals when I had gone in and collected, I might agree with Mr.

Farren. Where we don't have that interval which shows we already had them at this age, at this time, we know the age and we know the time.

Q. Doctor, would you agree with me that you collected what you could, and would you agree with me that it would be better to collect what you could rather than nothing at all?

A. Absolutely.

MS. MCELROY: Pass the witness.

RECROSS EXAMINATION

BY MR. FARREN:

Q. Very briefly, Doctor. I want to show you what has been admitted as State's Exhibit 175. This is -- can you see the picture from there? I want you to assume this is what was under Mr. Pool after they chiseled him out of the concrete.

A. That's with the concrete removed?

Q. Yes, sir. That is after -- the concrete is gone and he is gone.

A. Right.

Q. If there were -- can flies get to him underneath?

A. No.

Q. No. Okay.

MR. FARREN: Pass the witness.

MS. MCELROY: We have no further questions, Your Honor.

THE COURT: You may step down, Doctor, thank you.

THE WITNESS: Thank you, Your Honor.

MS. MCELROY: Your Honor, may this witness be released?

MR. FARREN: We have no objection.

THE COURT: Okay. You're excused, sir. Thank you.

MS. MCELROY: At this time, Your Honor, we would rest.

THE COURT: Okay. Ladies and gentlemen, let's take about a 15-minute break right here. Thank you. Be back in that jury room at 2:25. Thank you for coming.

(Jury excused, proceedings held.)

THE WITNESS: Thank you.

THE COURT: Do you have any rebuttal witnesses you're going to call?

MR. FARREN: I believe we're going to, if I could have a few minutes to visit with them.

THE COURT: Sure. Why don't we take 15 minutes and you tell me. If you need until tomorrow to get them here --

MR. FARREN: Oh, no, they're here. We believe the last question to the doctor when she specifically went into the indictment and talked about the sock and throat again, opens the door to Jeremy Roy, Your Honor.

MS. McELROY: Your Honor, we would reassert our 403 objection.

THE COURT: I don't think that question changed the degree of the relevance of the extraneous offense of kidnapping. I'm still going to keep it out at this time. We will be on break for 15 minutes. Mr. Farren, you've got --

MR. FARREN: Two rebuttal witnesses this afternoon. Given the Court's patience and kindness, we believe we can have Dr. Natarajan or a pathologist from the Lubbock Medical Examiner's office here by tomorrow morning. Now, I don't want to mislead the Court. I don't have their word on that yet, so if I don't produce it's not because I'm trying to mislead you. I just --

THE COURT: All right. Here is what will happen. You put your two rebuttals on and then everybody rests again, unless you have something else. And everybody rests. I'm going to send the jury home, tell them to come back in the morning, and then we will take a look at it. And if have you a witness in the

morning you can reopen and put it on. If not, you can go ahead and close.

MR. FARREN: Yes, sir.

THE COURT: But I will tell you one thing. I want that witness at 8:30.

MR. FARREN: Oh, yeah, I understand.

THE COURT: Okay. Everybody understand what we're going to do?

MS. MCELROY: No.

THE COURT: Oh, you don't?

MS. MCELROY: No, I don't. I mean, are we going to do the charge stuff tonight so that if they rest --

THE COURT: Yeah. I think we need to do that. We'll get nine tenths through the charge. The charge may change depending on if he puts on a rebuttal witness in the morning or not. I can't imagine it changing, but it might. And then we'll redo it then, and then we will charge in the morning and then we will argue.

MS. MCELROY: Okay.

THE COURT: How does that sound?

MS. MCELROY: That's fine.

THE COURT: Okay. Please bring the jury in.

(Jury seated.)

THE COURT: Thank you all. Everyone be seated. All right. Let me tell you all where we're at and what we're going to do next. Now we're starting what is called the rebuttal stage of a trial. It's a third stage. It's called for, and sometimes it's there, and sometimes it isn't. And the State is going to put on some witnesses. I may let you go a little early today, and there is some good chance you'll get the case tomorrow. And it may be over tomorrow. I will promise you it will be over by Friday.

So I just wanted y'all to know what your time table looks like, so it won't run to next week.

All right. Mr. Farren, call your next witness.

MR. FARREN: State calls Sergeant Burgess.

THE COURT: Sergeant, just take a seat. You're still under oath.

THE WITNESS: All right. Thank you.

(Witness previously sworn.)

JAMES A. BURGESS (Recalled),

Having been previously sworn, testified as follows:

DIRECT EXAMINATION

BY MR. FARREN:

Q. Would you state your name for the jury, please?

A. James A. Burgess.

Q. You're the same James Burgess that testified earlier in this trial?

A. Yes, sir.

Q. All right. And at that time you indicated you have been a police officer how long?

A. Oh, 25 years.

Q. How long have you been with the Special Crimes Unit?

A. Around 15, going on 15.

Q. In those 15 years, Sergeant Burgess, how many times have you responded -- have you been involved in investigations of cases with dead bodies? Hundreds?

A. Over 200.

Q. And have you ever encountered individuals who have been dead as much as 12 days?

A. Oh, yes, sir.

Q. Based on your training and experience which you shared with us earlier and what you said now, do you have an opinion -- let me back up and ask it this way: You saw Mr. Pool and helped chisel him out of the

concrete?
A. Yes, sir.
Q. And of course, you have had sufficient training and experience to know that being in the concrete or covered with concrete would retard his decomposition once the concrete covered him?
A. Yes, sir.
Q. Okay. But prior to being covered with concrete, he would decompose in the same way any other person would?
A. There is some variables, but yes.
Q. Right. If he is in a freezer somewhere, then he is not going to go decompose very much?
A. That is correct.
Q. If he is laying on the -- in a tin bed in the middle of the summer, he's going to decompose more quickly?
A. Yes, sir.
Q. But keeping those variables in mind, you saw Mr. Pool's body once he was out of the concrete, out of the tarp?
A. Yes, sir.
Q. Having encountered individuals who have been dead and decomposing for as much as 12 days, do you have any opinion about whether Mr. Pool had decomposed for as

much as 12 days before he was covered with concrete?

MR. MCELROY: Your Honor, I'd object. I believe that this is outside the scope of this witness's expertise. He is not a medical pathologist.

MR. FARREN: Crime scene technician with hundreds of hours of training.

THE COURT: I will overrule that objection. You may answer.

THE WITNESS: Can you repeat the question?

Q. By Mr. Farren) Do you believe, based on your view of Mr. Pool, that he had been decomposing for as much as 12 days before he was covered with concrete?

A. No, sir.

Q. Why not?

A. Just from my experience only from bodies that I believe that he was pretty well preserved, and that there was a lack of skin slippage. There was no uh -- the later stages of decomposition were just skeletonization, for as long as he has been dead. That the ground does -- when you bury someone, that in our training and education, it does preserve the body when you bury somebody. If you wanted a body to rapidly decompose, you leave it laying out on top of the surface outside or in between those two kinds of areas being

dumped in the water, would be -- a body would decompose slower than it would if it was on top of the ground, but faster than one that was put in the ground.

Q. Did you notice -- did you notice any difference based on your training and experience in the stage of decomposition of some portion of his body, compared to other portions of his body?

A. Yes.

Q. Okay. I want to ask you to look at State's Exhibit 175. Do you recognize that photograph?

A. Yes, sir.

Q. And in -- and that's a photograph of what?

A. The pit after the body was removed.

Q. So after all the concrete is chiseled, after he is out of the concrete and you've chiseled all the concrete that was poured over him, that is what was under him?

A. Yes, sir.

Q. Were his feet completely encased in concrete, just his feet part?

A. I believe it was. From -- from when I got there at the scene, they had exposed some of the blue tarp. There wasn't very much of an area that they had chiseled away. So it was kind of -- and the body was covered with cement, and then chiseled -- kind of like

pulling off a pop top, pulling off a layer of pop tops.
Q. Was his head perfectly flat, or was part of his body down in the dirt underneath and part of it completely in concrete?
A. His head was in the dirt.
Q. And the part of his body that was in the dirt, do you believe it had decomposed more than the part of his body that was in -- covered in concrete?
A. If you looked from his feet and his head, yes.
Q. And did his feet look like the feet of a person who had been laying around rotting for 12 days?
A. No, sir.
Q. I want to show you State's Exhibit 102. Do you recognize what is depicted in that photograph?
A. Yes, sir.
Q. And that is a tattoo on Mr. Pool. Is that correct?
A. Yes, sir, it is.
Q. Had he been decomposing for 12 days, do you think you would be able to --
A. If he was decomposing above surface, not in the ground, that -- I would expect in my opinion and my experience, that would be -- the colors wouldn't be as bright. The skin would be more shriveled up. You would had kind of the slippage, apparent stuff on it. Of

course, like I said, for 12 days, it was 12 days above the ground or --

Q. Right. I understand.

MR. FARREN: May I approach, Your Honor?

THE COURT: Yes.

Q. By Mr. Farren) Would you agree that Dr. Natarajan indicates that there was moderate decompositional change to the body?

A. Yes.

Q. When you have encountered folks who have been decomposing for 12 days, would you view that as moderate decomposition?

A. Again, if it was on the surface, not in the ground, that -- I would expect more than just that moderate -- even though at the time of the year that he was pronounced dead, which is early spring, I would expect more decomposition if he was dead for more than 12 days. And again, not buried.

Q. Oh, yeah, and when you were down there working around the body, what was the temperature down in that hole?

A. It was hot.

Q. And did maybe a fly or two come by and visit you?

A. Yeah -- yes. In fact, Sergeant Rickwartz was

there prior to me, and he realized how hot it was and everything, and someone came up with the idea to bring the fire department to put some hoses, some ducts in there to blow in air in there for us to be able to get cooled off.

Q. Before you started blowing air in there, do you think there were just a few flies or a lot of flies?

A. Honestly, Sergeant Rickwartz would have to answer that, because when I got there they were putting in the ducts.

Q. Okay. How long does it take to -- from the time you arrived, even though they had partially extracted him, how long did it take to chisel him out of the ground?

A. I was in -- when I got there, I immediately took over and it was one and a half hours after I started chiseling.

Q. Then it took some time to get him from the bottom of the pit up to the surface?

A. That's correct.

Q. How much time, approximately?

A. By the time I got the gurney -- probably about time I got the gurney down there, probably about 15 or 20 minutes.

Q. And once he was above ground, you had to wait

for a transport vehicle. Correct?

A. Yes, sir.

Q. How long do you think that took?

A. That was probably about 30 minutes, 30 -- could have been as much as 40 minutes. It was less than an hour.

Q. Okay. So would it be fair to estimate that from the time you were -- you arrived and were chiseling on the body until the transport vehicle arrived, two and a half hours, maybe more?

A. Oh, more, yes.

Q. More?

MR. FARREN: Pass the witness.

CROSS EXAMINATION

BY MS. MCELROY:

Q. Sergeant Burgess, can you tell me specifically what training in pathology you've received?

A. The only -- the only training I've had is attending the autopsies of the bodies that I've been assigned to. The closest other thing is forensic anthropology school.

Q. And how long did that last?

A. Ten days.

Q. Ten days. Do you have any other formal education? Do you have a masters or are you a doctor?

A. I have a master's degree.
Q. And what is that in?
A. Sociology.
Q. So you have had ten days' worth of training. Any other specific training regarding pathology?
A. No, ma'am, just --
Q. I think you testified that you didn't see any skin slippage and you would have expected to. Was that your testimony?
A. I didn't see as much skin slippage as I wanted to, as I expected to.
MS. MCELROY: May I approach the witness?
THE COURT: Yes.
Q. By Ms. McElroy) I'm going to show you what has already been admitted as State's Exhibits 104, 105, and 106, and ask you if you can identify these, please.
A. Yes, these are the hands of the victim.
Q. Okay. Would you agree with me, Sergeant Burgess, that that skin has fallen off of the hands, and especially around --
A. Yes, we do have evidence of skin slippage, yes.
Q. I think you testified earlier with Mr. Farren that, in fact, there was so much slippage that you took the skin itself and made inked fingerprints?

A. No. If I remember correctly that I have attended autopsies where we could take the skin off the hand because there is such skin slippage, but I didn't have to do that in this case because it wasn't to an advanced stage of slippage where sometimes you can just pull the skin right off, the first layer of --

Q. But Sergeant Burgess, would you agree with me that this skin has come off of the fingers?

A. Yes, ma'am.

MS. MCELROY: May I approach the witness?

THE COURT: Yes.

Q. By Ms. McElroy) Let me show you what has been marked as State's Exhibit 89, and ask you, Sergeant, isn't that an example of skin slippage here all over his leg and at the bottom of his abdomen?

A. Over this part of the leg? No.

Q. See the rough parts here?

A. The skin slippage, yes.

Q. Would you agree --

A. Because it gathers up before it starts tearing, so that's ...

Q. Let me show you what's been marked as State's Exhibit 90, and ask you here on the back of this leg, isn't that an example of the gathered skin that is referred to as skin slippage?

A. It could be.
Q. It could be?
A. Yes.
Q. Let me show you what's been admitted as State's Exhibit 88, and ask you, Sergeant Burgess, if that is not a hunk of skin on the bottom of that foot.
A. On the side of the foot, yes, it is.
Q. And let me show you what was admitted as State's Exhibit 103, and ask you if that is not a piece of skin falling off the hand?
A. Yes, it is.
Q. I think you talked about some variables?
A. Yes, ma'am.
Q. If a body, say, had been stored in a cool building for five days, would that be consistent with what you had seen?
MR. FARREN: Well, I'm going to object. This is a question based on facts not in evidence. There is no evidence of a body stored in a building for five days. She can ask the hypothetical which would assume facts, but the hypothetical has to be based on facts in evidence, Your Honor.
MS. MCELROY: Your Honor, I believe that Mr. Farren posed the same sort of hypothetical to Sergeant Burgess earlier and received an answer, based

on a body being out for 12 days in the open.

THE COURT: That is true. Overruled. You can answer.

THE WITNESS: Repeat the question one more time, please.

Q. By Ms. McElroy) Would it change your opinion if we were to submit a different variable, and you have a body that was exposed for a five-day period, but kept in a cool, enclosed environment?

A. That would slow the decomposition down somewhat as the body gases and stuff build up, yes, again --

Q. So your answer is yes?

A. Well, yes.

MS. MCELROY: Pass the witness.

REDIRECT EXAMINATION

BY MR. FARREN:

Q. Well, even in a cool building after five days, isn't he going to bloat up like a balloon?

A. It -- depending on the temperature, if it's in the wintertime and cold, he will eventually bloat. It will just take a lot -- long time. And again, there's variables of what temperature we're talking about. Are we talking about 32 degrees, 30, 40 degrees. The point I think that both of you are wanting me to get is that

in my opinion, the skip slippage is not as drastic as I would expect if the body was left found -- was dead for 12 days before it was -- I would expect a lot more skin slippage to be present.

Q. Because the cement retarded decomposition, but it didn't stop it, did it?

A. That's correct.

Q. So there is still three months of decomposition?

A. Yes.

Q. It's just been slowed down?

A. That is correct.

Q. But even after three months, is it correct that it's your opinion that this is not as much decomposition as you would expect in a body exposed for five to 12 days?

A. That would be correct.

Q. Now, in addition to that, the tattoo photo, State's Exhibit 102, has been on the screen. I'm now putting 120 on the screen. Do you recognize what is depicted there?

A. No.

Q. Okay. Let me bring you the photo. I think you'll be able to tell better. That's the top --

A. Top of the skull, yeah.

Q. Top and back of the skull. Correct?
A. Yes.
Q. Now, do you -- do you believe the difference in that, in 120, and this in 102 is because this part of the body in 120 was down in the dirt, 102 is in the concrete?
A. That is a possible explanation, yes.
MR. FARREN: Pass the witness.
MS. MCELROY: We have no questions of the witness.
THE COURT: You may step down.
THE WITNESS: Thank you, sir.
MR. FARREN: State calls Sergeant Rickwartz.
THE COURT: You're a sergeant now?
THE WITNESS: Yes, sir.
THE COURT: Congratulations. Raise your right hand.
(Witness sworn.)

STANLEY RICKWARTZ,

having been first duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. FARREN:

Q. Before I forget, Sergeant Rickwartz, are you aware that Dr. Natarajan has left the state and may or

may not be able to come back and testify, or did you know?

A. I did not know that.

Q. Okay. You have been at times assigned to the Special Crimes Unit, homicide unit on the police department. Is that correct?

A. Yes, sir.

Q. Now, are you actually there now?

A. No, sir.

Q. Okay. How many bodies have you -- how many homicide cases have you been involved in which you have seen the bodies of the individuals that had been killed?

A. In the eight years plus I was in there, probably a safe estimate would be between 85 and 100.

Q. Okay. And in some of those cases, you folks arrive at the scene fairly soon after the homicide. Is that correct?

A. Yes, sir.

Q. And in some cases, some time passes before you're at the place where the body is?

A. Yes.

Q. Have you ever encountered bodies where the death occurred five to 12 days before you arrived?

MS. McELROY: Your Honor, I'm going to object, if he is going to try to use Sergeant Rickwartz

in the same capacity, and basically asking questions that should be tendered to an expert, we object because this person does not have expert knowledge, is not a forensic pathologist. And their opinions have little relevance.

THE COURT: I overrule your objection and I'll explain to you why. He is going to testify as to his observation based on his experiencing 85 or 100 bodies. If he delves past that, then you re-object and you will be correct. But his observations, based on his experience and seeing 85 to 100 decomposing bodies, is under that exception for ordinary opinions.

MS. MCELROY: Thank you, Your Honor.

THE COURT: All right.

Q. By Mr. Farren) You would have viewed the body of Dustin Pool?

A. I viewed a portion of the body.

Q. Okay. And that portion of the body that you -- first of all, you helped chisel him out of the concrete?

A. Yes, sir.

Q. And how long do you think it took total to get him out of the bottom of that pit?

A. We started about 9:00 in the morning, and it was probably around 3:00 or 4:00 in the afternoon before

we actually got him out.

Q. Were there any flies down there?

A. Yes, there were flies all over.

Q. The decomposition --

MR. FARREN: First of all, may I approach the witness, Your Honor?

THE COURT: Yes.

Q. By Mr. Farren) Now, are you aware that Dr. Natarajan describes in the autopsy that the palms, skin has decomposed and slipped, and the fingernails readily fall off, but he describes the body areas as moderate decomposition?

A. Yes.

Q. Is that unusual that the palms and the fingernails would be in that condition compared to the body itself?

MS. MCELROY: Your Honor, I'm going to object. I don't believe that is within this witness's --

THE COURT: Lay a little predicate.

MR. FARREN: Yes, sir. I'll rephrase.

Q. By Mr. Farren) Have you witnessed in those 85 to 100 cases, the palms and fingernails of other individuals who have died and begun to decompose?

A. Yes.

Q. In those cases, have you observed bodies where the palms and nails may be more decomposed than other parts of the body? Or can you say?

A. I can't say.

Q. Okay. That's fine. Well, let me ask you this: Do you recall whether the body and the bottom of the pit was -- was it level or was it -- at a different angle than level, in your opinion?

A. It was at an incline.

Q. Incline. And which part of the body was lower?

A. The head.

Q. The head. When you chiseled the body out of the concrete, were the feet completely encased in concrete but the head was not?

A. Yes, that is correct.

Q. Okay. And so the head was actually down in the dirt?

A. Yes, sir.

Q. Did you notice whether the -- do you know whether the head was more decomposed than the feet, if you know?

A. Yes, it was.

Q. In those 85 to 100 cases in which you have been involved, whether individuals have been decomposing

five days, a week, 12 days, did you see decomposition to a greater degree in those cases than you did in the case of Mr. Pool?

A. Yes.

MR. FARREN: Pass the witness.

MS. MCELROY: We have no questions.

THE COURT: Sergeant, you may step down. Thank you.

Any other witnesses, Mr. Farren?

MR. FARREN: We have no other witnesses at this time, Your Honor. We rest at this time.

THE COURT: All right. Ladies and gentlemen, I'm going to excuse you for the evening. Remember what I've told you about talking about the case. If y'all would be here ready to go at 8:30 tomorrow, I'd appreciate it. Thank y'all. We would like a little notice if you're bringing food.

(Jury excused for evening.)

THE COURT: We'll take a ten-minute break. Okay.

MR. FARREN: I was just going to tell the Court that Wes has a draft of the charge.

THE COURT: We'll meet back in here at 3:00. And if you distribute everybody a copy and then we'll read it and meet back in here at 3:30 and talk

about it. How is that?

MR. FARREN: We will be more than ready to do it, Your Honor. With the Court's -- I assume the Court has no objection to Wes Clayton attending the charging conference, since he is the one that is going to --

THE COURT: Why would I?

MR. FARREN: Well, he hasn't been involved in the trial until now, sir.

(Recess.)

THE COURT: Did everybody have a chance to go over this version one of the charge? Has the State had a chance to go over it?

MR. FARREN: We have, Your Honor.

THE COURT: I have a couple of thoughts. I think it cleans it up to move paragraphs five and six into paragraphs 16 so that all the kidnapping definitions and stuff are in one spot.

MS. MCELROY: Your Honor, I think we're going to ask that 16 be taken out.

THE COURT: Well, okay. On what grounds?

MS. MCELROY: Well, Your Honor, we didn't ask for a lesser included on this, and he stands charged by indictment of capital murder.

THE COURT: So you're not asking for any

lesser included?

MS. MCELROY: That is correct, Your Honor. So we would ask that 15, 16 and 17 be eliminated from the charge.

THE COURT: Well, all right. State have any objection to that?

MR. FARREN: Let me think about it a second, Your Honor. Of course, we can request a lesser, as well.

THE COURT: You know, this is an informal conference right now. We don't have either side closed yet, and things are subject to change. Now I'm just trying to understand where everybody is headed with this charge, is all I'm trying to do.

MR. FARREN: Well, at this point we would ask that it be left in. We might agree to take it out later, but at this point we can ask for a lesser included, the State --

THE COURT: Yes, you can. I agree with that.

MR. CLAYTON: Judge, the reason five and six are where they are is that kidnapping is part of capital murder in the situation --

THE COURT: All right. Then maybe it ought to be before 12, which is the capital murder --

I'm just trying to make it read logically to him, that's all. I don't really have a big --

MR. CLAYTON: You know, in paragraph number one, Judge, it says -- it defines capital murder and it says, commits murder in the course of committing or attempting to commit kidnapping. And then the next thing we define is kidnapping is a part of capital murder, and that's why it was where it was.

THE COURT: Well, all right. Then do you need the definition of murder right after the definition of abduct?

MR. CLAYTON: Well, it doesn't come into play, Judge. It doesn't come into play until the -- until after they decided -- you know, it doesn't come into play until the lesser included, the murder part.

THE COURT: Okay. All right. I give up. You win. I'm just trying to make it read logically, but that's probably a forlorn hope with respect to the charges to juries.

What is the Defense's position about any additional charges?

MS. McELROY: Your Honor, I think that we would probably be asking for accomplice as a matter of fact, as opposed to law on Jessica in addition to this. We would ask for instructions on Jessica Kimberlin,

Destry Keeling, and there might be a third one that we would ask that at least we have an instruction as to witnesses, accomplices in fact for the jury to determine whether or not --

THE COURT: Do you have a wording on such a charge yet?

MS. MCELROY: Yes, Your Honor.

THE COURT: Well, just come tomorrow prepared to give it to me. Okay? Why don't you type it out for me so if we decide to put it in, we can.

MS. MCELROY: Yes, sir.

MR. FARREN: We would just suggest there is absolutely no evidence that they're parties to the charge of capital murder, Your Honor, that there is testimony about them involved when they're getting ready to dispose of the body. But there was no testimony they were involved other than that -- there is no evidence.

MS. MCELROY: Well, we disagree with that position. I mean, there was testimony put before the Court that Jessica Kimberlin was at the planning meeting or the conspiracy meeting, that Destry Keeling was at the planning meeting and the conspiracy. And they put a conspiracy charge in here, and the law of parties charge in here. And I think that it raises to a level at least the jury should get to decide whether they believe

they're an accomplice in fact.

MR. FARREN: There is no evidence that Jessica Kimberlin attended the meeting. She said she was at Stumpy's --

THE REPORTER: I can't hear. There was what?

MR. FARREN: There was no evidence she attended the meeting. She was at Stumpy's when it happened, but there is no evidence she attended the meeting.

THE COURT: Jessica Kimberlin, Destry Keeling and who is the third one?

MS. McELROY: Your Honor, it's not coming to me right now.

THE COURT: What about your co-counsel? Is it coming to him?

MR. WATKINS: Well, we're working on it, Your Honor. We had just finished reading this when you walked in.

THE COURT: All right. I'm not pressing you. This is an informal conference to try to get some idea of where we're headed.

MS. McELROY: Well, I was kind of confused about -- okay. We've got Michael Elliston as an accomplice at law. Guinn Garcia, Tori Patrick, and

Josh Bledsoe. Is that what you have, James?

MR. FARREN: I'm sorry?

MS. MCELROY: Is that what your understanding is, as accomplices in the law?

MR. FARREN: Accomplices by law?

MS. McELROY: Yeah, Bledsoe, Kimberlin, Tori, Guinn, Elliston.

MR. FARREN: Right. Kimberlin, Chacon, Tori, Guinn, Elliston.

MR. CLAYTON: Judge, I'm sorry. We've got four people in here as accomplices as a matter of law.

THE COURT: I read it. They were there.

MR. CLAYTON: Not Chacon. Elliston, Guinn Garcia, Tori Patrick, and Joshua Bledsoe.

THE COURT: Why wouldn't Chacon be one?

MS. MCELROY: He didn't testify.

THE COURT: I see, okay.

MR. FARREN: Neither did Kimberlin.

MS. MCELROY: I think that we would also ask that Tyler Hale, Your Honor, be -- we'd get an instruction --

THE COURT: Why are you entitled to an accomplice in fact on Keeling and Hale when they weren't involved until after the indicted offense was over?

MS. McELROY: Okay. On Keeling and Kimberlin, our position is that they were involved, and they were co-conspirators, Your Honor.

THE COURT: They were at the meeting?

MS. McELROY: Yes, they were at the meeting. I don't think --

(Pause).

MS. McELROY: Okay. I don't think Tyler Hale was at the meeting, but I believe Keeling -- yeah, I believe Jason Hickson was also at the meeting. And he was also present with all the statements about whatever contract money was being thrown around. We would ask that we might at least pose to the jury an instruction as an accomplice as a matter of fact.

MR. FARREN: Yeah, I agree Jason Hickson, I hadn't thought about it, but he did attend the meeting, Your Honor. I think he was at the meeting.

THE COURT: Jessica --

MR. FARREN: She was just there.

THE COURT: I'll think about it, and we will visit about it some more after everybody closes.

MS. MCELROY: Oh, and Brook Vandergriff was also at this meeting, Your Honor, the Stumpy's meeting.

MR. FOWLER: I think she testified she

drove the Defendant there, is what I --

(Pause.)

THE COURT: Okay. So you're going to want those accomplices in fact, and you do not want the lesser included of either murder or kidnapping?

MS. MCELROY: That is right, Your Honor.

THE COURT: And Mr. Farren, at this time you're holding to that you may want the kidnapping?

MR. FARREN: Yeah, I don't know yet, Your Honor. We hadn't anticipated that they wouldn't want the lesser included.

THE COURT: So you just don't want it thrown out of the sack yet? Is that what the deal is?

MR. FARREN: Not quite. Not quite.

THE COURT: Is there any evidence of it?

MR. FARREN: Of the kidnapping?

THE COURT: Well, are you -- are you entitled to one if there is -- doesn't there have to be some evidence they're not guilty of the murder?

MR. FARREN: No, sir.

THE COURT: Evidence only of the kidnapping?

MR. FARREN: Yes, sir. Because the jury could conclude there is evidence of the murder, but it's not sufficient. But there is sufficient as to

kidnapping.

THE COURT: All right. Well, we'll reconvene on this after everybody closes. Is there anything else to bring up? Okay. Do you know anything about whether you're going to have your witnesses tomorrow yet?

MR. FARREN: May we please have just a second? We had offered State's Exhibit 2, the statement of Jessica Kimberlin as a prior consistent statement. We believe she was on impeachment purposes --

THE COURT: That was last week --

MR. FARREN: Yes, sir. We believe she was impeached on cross examination, and that she gave this statement at a time prior to the time the Defense suggested she had a reason or motive to fabricate the lie, in other words, before she entered the deal with us.

THE COURT: Believe it or not, I actually took that home and looked at it, and I'm going to have to do it again. I'll let you know in the morning.

MR. FARREN: Look at it again?

THE COURT: Yes. And read it in light of those two rules of evidence.

MR. FARREN: Yes, sir.

THE COURT: And I'll let you know in the

morning. Anything further? Do you know anything about your witness in the morning?

MR. FARREN: Jim Burgess is on the phone as we speak, working on it.

THE COURT: Then we will be back here at 8:30.

(Evening recess.)

THE STATE OF TEXAS )
COUNTY OF RANDALL )

I, Robyn Womack, Deputy Official Court Reporter in and for the 47th District Court of Randall County, State of Texas, do hereby certify that the above and foregoing contains a true and correct transcription of all portions of evidence and other proceedings requested in writing by counsel for the parties to be included in this volume of the Reporter's Record, in the above-styled and numbered cause, all of which occurred in open court or in chambers and were reported by me.

I further certify that this Reporter's Record of the proceedings truly and correctly reflects the exhibits, if any, admitted by the respective parties.

WITNESS MY OFFICIAL HAND this the 18th day of October, 2005.

ROBYN WOMACK, CSR 4470
Expires: 12/31/2006
Certified Reporter
5603 Foxcroft Dr.
Amarillo, Texas 79109
(806) 236-3312