07-05-0284-CR

FILED
SEP 19 2005
SEVENTH COURT OF APPEALS
PEGGY CULP, CLERK

REPORTER'S RECORD

VOLUME 16 OF 21 VOLUMES

TRIAL COURT CAUSE NO. 15307-A

| | | |
|---|---|---|
| STATE OF TEXAS, | ) | IN THE DISTRICT COURT OF |
| PLAINTIFF | ) | |
| VS. | ) | RANDALL COUNTY, TEXAS |
| | ) | |
| JOSHUA DAVID STOCKER, | ) | 47TH JUDICIAL DISTRICT |
| DEFENDANT | ) | |

*************************************************

STATEMENT OF FACTS

*************************************************

On the 21st day of July, 2005, the following proceedings came on to be heard in the above-titled and numbered cause before the Honorable Hal Miner, Judge presiding, held in Canyon, Randall County, Texas:

Proceedings reported by Machine Shorthand

APPEARANCES:

Mr. James A. Farren
Randall County District Attorney
SBOT NO. 06839400
501 16th Avenue, 3rd Floor
Amarillo, Texas 79015
Phone: (806) 468-5570
ATTORNEY FOR THE STATE

Mr. Jeremy Fowler
Randall County Assistant D.A.
SBOT NO.24010033
501 16th Avenue, 3rd Floor
Amarillo, Texas 79015
Phone: (806) 468-5570
ATTORNEY FOR THE STATE

Ms. C. J. McElroy
Law Office of C.J. McElroy
SBOT NO. 13581995
801 S. Fillmore, Suite 210
Amarillo, Texas 79101
Phone: (806) 371-0555
ATTORNEY FOR THE DEFENDANT

Mr. Mike Watkins
Woodburn, Watkins & Jackson
SBOT NO. 00797631
500 S. Taylor, Suite 510, LB 264
Amarillo, Texas 79101
Phone: (806) 374-9584
ATTORNEY FOR THE DEFENDANT

# C H R O N O L O G I C A L   I N D E X

VOLUME ___

(STATEMENT OF FACTS)


| | Direct | Cross | Page | Vol. |
|---|---|---|---|---|
| JULY 21, 2005 | | | | |
| APPEARANCES . . . . . . . . . . . . . . . | | | 2 | |
| STATE'S WITNESSES | | | | |
| JEREMY CHAD ROY | | | | |
| By Mr. Fowler | 10 | | | |
| By Mr. Watkins | | 15 | | |
| STATE REST AND CLOSE . . . . . . . . . . . | | | 18 | |
| DEFENSE REST AND CLOSE . . . . . . . . . . | | | 18 | |
| INSTRUCTIONS TO THE JURY . . . . . . . . . | | | 19 | |
| STATE'S JURY ARGUMENT MR. FOWLER . . . . . | | | 33 | |
| DEFENDANT'S JURY ARGUMENT BY MS. MCELROY . | | | 59 | |
| STATE'S FINAL ARGUMENT BY MR. FARREN . . . | | | 83 | |
| VERDICT OF THE JURY. . . . . . . . . . . . | | | 94 | |
| SENTENCE OF THE COURT. . . . . . . . . . . | | | 96 | |
| FINAL RECESS . . . . . . . . . . . . . . . | | | 98 | |
| REPORTER'S CERTIFICATE . . . . . . . . . . | | | 99 | |

ALPHABETICAL WITNESS INDEX

| | Direct | Cross | Vol. |
|---|---|---|---|
| JEREMY CHAD ROY | 10 | 15 | |

EXHIBIT INDEX

(NO EXHIBITS MARKED OR ADMITTED IN THIS VOLUME)

(Open court, Defendant present, no jury.

THE COURT: I've reviewed the pretrial testimony we took of Mr. Roy. I have reviewed the cases. I've read the statement, and I'm going to allow a limited introduction of the second kidnapping. And I mean limited. I don't want the entire transaction.

MR. FARREN: Yes, sir.

THE COURT: I will allow you to go into and demonstrate the identical, or similar, elements, and the immediate time and area before and immediately upon the end of day. That's where we're going to go. Do you understand that?

MR. FARREN: Yes, sir, I do, Your Honor. And I don't think we put into the record that the Court is now responding to a request that we have made to be allowed to reopen and do that.

THE COURT: Right. I didn't say that.

MR. FARREN: I didn't want the record to appear the Court has just done this, and respond to it. We have made such a request and --

THE COURT: That's right. I should have said that. This is pursuant to a verbal request made of me after close, and I'm going to allow the State to reopen for that extremely limited and quick examination.

MS. MCELROY: Just for the record, Your

Honor. The Defense would except under 401.4(b) and 403.

THE COURT: Thank you. Is this going to change the charge in any way?

MR. FARREN: There is an extraneous offense.

THE COURT: There's already an extraneous charge in there.

MS. MCELROY: Right.

MR. FARREN: That should cover it.

THE COURT: That being the case, then I'm going to allow this one witness to direct and cross until you all are finished; and then we're going to excuse the jury for a very brief time. You'll have one last shot at the charge, and bring them right back in, charge them, and do the argument the way we said before. Everybody agree with that?

MR. FARREN: Yes, sir.

MS. MCELROY: Your Honor, are you going to advise the jury that they are going to hear this testimony for a limited purpose before they hear it?

THE COURT: Are you asking me to give them a limiting charge?

MS. MCELROY: Yes, a limiting instruction that it can only be considered for a limited purpose, as I believe Mr. Farren's statement, it was for intent.

MR. FARREN: We are offering it under the issue of intent, Your Honor.

THE COURT: Okay. Why don't --

MR. FARREN: And lack of accident or mistake.

THE COURT: I'll grant that, Ms. McElroy, but I want you to tell me on the record what you want the limiting instructions to say.

MS. MCELROY: Your Honor, we would like the Court to advise the jury that they can only consider the testimony of Jeremy Roy for a very limited purpose, that limited purpose is for intent; that it's not to be considered for the case in chief or as any evidence of the case in chief.

MR. FARREN: We would ask that it be expanded to cover intent, lack of accident or mistake, Your Honor. We also think it goes to Rebuttal Defensive Theory, Your Honor.

THE COURT: I think I'll confuse them with that. Intent --

MR. FARREN: Lack of accident or mistake.

THE COURT: Lack of accident.

MS. MCELROY: Your Honor, we would contest that, because I don't think that there's any

inference that there's -- implied that it was a mistake.

MR. FARREN: There was testimony that --

MS. MCELROY: From your witnesses.

MR. FARREN: Well, I'm sure that we can accept that first one.

MS. MCELROY: I don't think that it's right that the State raises it and then wants to dam the dike up by saying, oh, well, my own witnesses that I elicited testimony from have raised that it was a mistake, so now --

THE COURT: I'm going to submit it just the way you asked me to.

MR. FARREN: Okay.

THE COURT: Anything else?

MR. FARREN: No, Your Honor.

THE COURT: All right. All rise. Why don't you bring the jury in. Is Mr. Roy here?

MR. FARREN: He is indeed, Your Honor.

THE COURT: Bring him in.

(Jury seated.

THE COURT: Thank you all. Everyone be seated. I want to apologize to you for the delay. We've been busy, but it has delayed us, and I apologize for that. Here's what's going to happen next. I'm going to allow the State to reopen with one witness,

very quickly, and I'm going to read you now a limiting instruction on that witness.

The witness is Mr. Jeremy Roy, and you are only to consider his testimony for a limited purpose, for intent only, not for any evidence of the case in chief. Everybody understand that? Okay.

Mr. Roy, come forward, please. Will you raise your right hand.

(Witness was sworn in.

THE COURT: Thank you, sir. Sit right there.

(Witness takes the stand.

MR. FARREN: Thank you, Your Honor.

JEREMY CHAD ROY,

having been first duly sworn, testified as follows:

D I R E C T   E X A M I N A T I O N

BY MR. FARREN:

Q. Would you state your name for the jury, please, sir?

A. Jeremy Chad Roy.

Q. Mr. Roy, are you employed here in the Amarillo area?

A. Yes, sir.

Q. And you're living here now?

A. Yes, sir.

Q. Were you living here in -- around Thanksgiving of 2002?
A. Yes, sir.
Q. On that occasion, were you kidnapped, sir?
A. Yes, sir, I was.
Q. Would you describe for the jury -- well, let me -- to keep it limited, let me ask it this way. Was one person or more than one person involved in the kidnapping?
A. More than one person.
Q. There were two people initially?
A. Initially, yes, sir.
Q. Who were the two people?
A. Joshua Stocker and Mike.
Q. A guy you knew as Mike?
A. Yes, sir.
Q. Did you know his last name then?
A. Not then.
Q. Okay. So Joshua Stocker and Mike. Do you see Joshua Stocker in the courtroom at this time?
A. Yes, sir, I do.
Q. Would you point him out to the jury?
A. (Indicates) At the end of the table.
Q. Okay. There's a man with an off-green shirt, or aqua shirt, and a blue tie, no coat. Is that the

person to whom you are referring?
A. Yes, sir.
Q. May the record reflect he's identified the Defendant, Your Honor.
THE COURT: The record will so reflect.
Q. (BY MR. FARREN) When Josh Stocker and Mike kidnapped you, did they have weapons?
A. Both of them were armed.
Q. Both of them were armed with firearms?
A. Yes, sir.
Q. Were you taken to another location at that time?
A. Yes, sir.
Q. Was a box involved?
A. Yes, sir.
Q. Were you duct taped?
A. Absolutely.
Q. At some point, was a sock placed in your mouth?
A. Yes, sir.
Q. Did Josh Stocker place the sock in your mouth, sir?
A. Yes, sir.
Q. And then taped you?
A. Yes, sir.

Q. Were you interrogated, questioned? Were you asked questions by these people? Were they wanting to get information from you?
A. Yes, sir.
Q. Were part of these questions suggesting that you had been a snitch, or an informant?
A. Yes, sir.
Q. When you were taped, what parts of your body were taped?
A. My ankles, my knees. My hands were taped behind my back. I had a sock stuffed in my mouth that was duct taped, and I had a towel wrapped around my eyes and duct taped on.
Q. So the sock was in your mouth, and then portions of your face were duct taped?
A. Yes, sir.
Q. When you were duct taped with the sock in your mouth, did it affect your breathing?
A. Absolutely.
Q. Were you able in some way to communicate to these people that you were having problems breathing?
A. Yes, sir.
Q. When you did that, what happened?
A. The sock was removed.
Q. And did you explain to them then what the

problem was?
A. Yes, sir.
Q. What kind of sock was it? Do you recall?
A. Just gym socks.
Q. Some sort of white gym socks?
A. In a roll.
Q. What else were you -- when you were first kidnapped, what were you wearing?
A. Well, I mean, I was wearing shorts.
Q. Did you have a shirt?
A. Yeah, I had a shirt on.
Q. After the kidnapping was in progress, did they remove any of your clothing?
A. They removed everything but my underwear.
Q. Okay. So, at one point then, you were duct taped in various places wearing only your underwear, with a sock in your mouth?
A. Yes, sir.
Q. When they moved you, did -- eventually, did they put you in a vehicle to move you to another location?
A. Yes, sir.
Q. Do you know what a dollie, a furniture dollie, or something like that is?
A. Yes, sir.

Q. Do you know if one of those was involved?
A. Yes, sir.
Q. And then you were put in a box?
A. Yes, sir.
Q. And this was around Thanksgiving of 2002?
A. It was two days before Thanksgiving, 2002.
MR. FARREN: Pass the witness.

C R O S S - E X A M I N A T I O N

BY MR. WATSON:

Q. Good afternoon, Mr. Roy. You and I have met. Is that correct?
A. Yes, sir.
Q. As a matter of fact, you came to my office one day, and we talked about some of this stuff.
A. Yes, sir.
Q. Do you remember telling me that day that it was -- well, hold on. Let me back up. You said you didn't know Mike's last name at that time. You do know who Mike is today?
A. Right.
Q. And who is that?
A. Well, I can't recall his last name.
Q. If I suggested Michael Marquez --
A. Yes, sir, that's it.
Q. That's the name?

A. Yes, sir.

Q. Okay. Do you remember, at my office that evening, telling me that it was Michael Marquez who had put the sock in your mouth?

A. Michael Marquez put the sock in my mouth the second time. When I was placed in the box the first time, Josh duct taped me and put the sock in my mouth.

Q. Did you tell me that that night?

A. Yes, sir.

Q. Do you remember making a statement on July 24th, 2003?

A. Yes.

Q. Okay. Where were you when you made that statement?

A. I was in the Montford Prison in Lubbock, Texas.

Q. Okay. What were you in prison for?

A. Credit card abuse.

Q. Okay. One count?

A. Yes, sir.

Q. And did you have any other charges?

A. I had two previous felony convictions, one for credit card abuse and one for forgery.

MR. WATSON: One moment, please.

THE COURT: Yes, sir.

the sock was taken out of your mouth?

A. Yes, sir.

Q. Okay. Let's talk about this duct tape around your head. You said that there was a towel or a pillow case?

A. There was a towel.

Q. A towel?

A. A small hand towel folded, placed over my eyes, and duct tape was wrapped around it to keep it secure.

Q. And this was a pair of gym socks rolled up?

A. Yes, sir. It was a pair of white socks, wadded up.

Q. Well, was it wadded or rolled?

A. Well, I mean, you know, how you fold socks when you get them out of the dryer.

Q. Okay. Kind of folded into themselves?

A. Yes, sir.

Q. Okay. I'm not sure if we covered this or not. Who took the sock out of your mouth?

A. Josh.

MR. WATSON: Okay. Pass the witness.

MR. FARREN: No other questions of this witness, Your Honor.

THE COURT: You may step down, Mr. Roy.

Thank you. State close?

MR. FARREN: We rest and close, Your Honor.

THE COURT: Defense rest and close?

MS. MCELROY: Yes, Your Honor, we do.

THE COURT: Anybody have any objection to this charge, other than the ones you have already made?

MR. FARREN: The State has no objection or requested additions, Your Honor.

MS. MCELROY: I think this charge is fine.

THE COURT: I intend to begin reading it to the jury, and if there's any objection --

MS. MCELROY: No objection.

THE COURT: All right. Ladies and Gentlemen, this is what took so long. It's a little longer than my usual charge. It is the charge of the law, and I told you earlier that I would be giving you this at the end of the trial. It's something we cannot prepare until the case is over, because it would be changing every minute. It is tailored to this trial, and who testified, and who didn't get to, and all those kinds of things. So, that's what took so long is we had to hammer it out, and it's quite complicated.

You will be getting this to take with you

back in the jury room, so try to listen as best you can. But I'm fixing to read you ten or twelve pages here, and it's going to be hard for you to follow the whole thing. But you'll have this back with you to refer to once you elect a foreman or a forewoman.

Members of the Jury, the Defendant, Joshua Stocker, stands charged by indictment with the offense of capital murder, alleged to have been committed in Randall County, Texas, on or about the 9th day of March, 2003. To this charge, the defendant has pled not guilty. You are instructed that the law applicable to this case is as follows.

One, a person commits the offense of capital murder if the person intentionally causes the death of an individual, and the person intentionally commits the murder in the course of committing or attempting to commit kidnapping.

Number two, attempt means to commit an act with specific intent to commit an act, an offense, where the act committed amounts to more than mere preparation, but fails to affect the commission of the offense intended. Individual means a human being that is born and is alive.

Three, a person acts intentionally or with intent, with respect to the result of his conduct,

when it is his conscious objective or desire to cause the result. A person acts knowingly or with knowledge, with respect to a result of his conduct, when he is aware that his conduct is reasonably certain to cause the result.

Number four, a person is criminally responsible if the result would not have occurred but for his conduct.

Number five, a person commits the offense of kidnapping if he intentionally or knowingly abducts another person.

Number six, abduct means to restrain a person with intent to prevent his liberation by, A, secreting or holding him in a place where he is not likely to be found, or, B, using or threatening to use deadly force. Restrain means to restrict a person's movements without consent, so as to interfere substantially with his liberty by moving him from one place to another, or by confining him. Restraint is without consent if it is accomplished by force, intimidation or deception.

Number seven, our law provides that a defendant may testify in his own behalf if he elects to do so. This, however, is a privilege accorded to the defendant, and in the event he elects not to testify,

that fact cannot be taken as a circumstance against him. In this case, the Defendant has elected not to testify, and you are instructed that you cannot and must not consider, discuss, allude to, comment on or refer to that fact throughout your deliberations, or to take it into consideration for any purpose whatsoever.

Number eight, you are instructed that the phrase on or about an indictment, means any time prior to the presentment of the indictment that is within the applicable statute of limitations period. There is no statute of limitations period for the offense of capital murder.

Number nine, you are charged -- you are further charged, as the law in this case, that the venue for the trial of the offense of capital murder is in the county where the dead body of the victim is found. The burden of proof is on the State to prove venue by a preponderance of evidence. It's the only element that has preponderance of evidence. The term preponderance of evidence means the greater weight of credible evidence. Now, therefore, even if you find from the evidence, beyond a reasonable doubt, that the Defendant did commit the offense of capital murder as alleged in the indictment, but you find by a preponderance that the State failed to prove venue, you will acquit the

Defendant, and say by your verdict not guilty.

Number ten, a conviction cannot be had upon the testimony of an accomplice unless you, the jury, first believe that the accomplice's evidence is true, and that it shows the Defendant is guilty of the offense charged against him, and even then you cannot convict unless the accomplice's testimony is corroborated by other evidence tending to connect the Defendant with the offense charged, and the corroboration is not sufficient if it merely shows the commission of the offense, but it must tend to connect the Defendant with the commission.

You are further instructed that accomplice witnesses cannot corroborate each other, but such corroborative evidence, if any, must be from some source other than an accomplice witness. You are further instructed that mere presence of the accused in the company of an accomplice witness shortly before or after the time of the offense, if any, is not in itself sufficient corroboration of the accomplice witness testimony.

You are charged that Michael Elliston was an accomplice, if any offense was committed; and you are instructed that you cannot find the Defendant guilty upon the testimony of Michael Elliston, unless you first

believe that testimony of the said Michael Elliston is true, and that it shows the Defendant is guilty as charged in the indictment. But even then, you cannot convict the Defendant, Joshua Stocker, unless you further believe that there is other evidence in this case, outside the evidence of Michael Elliston, or any other accomplice witness, tending to connect the Defendant with the commission of the offense charged in the indictment, and then, from all the evidence, you must believe beyond a reasonable doubt the Defendant is guilty.

You are charged that Guinn Garcia was an accomplice, if any offense was committed, and you are instructed that you cannot find the Defendant guilty upon the testimony of Guinn Garcia, unless you first believe that the testimony of Guinn Garcia is true and shows the Defendant is guilty as charged in the indictment. Even then, you cannot convict the Defendant, Joshua Stocker, unless you further believe that there is other evidence in this case, outside the evidence of Guinn Garcia, tending to connect the Defendant with the offense charged in the indictment.

You are further charged that Tori Patrick was an accomplice, if any offense was committed, and you are instructed that you cannot find the Defendant guilty

on the testimony of Tori Patrick, unless you first believe that the testimony of the said Tori Patrick was true, and that it showed the Defendant is guilty as charged in the indictment. And even then, you cannot convict Joshua Stocker unless you further believe that other evidence in the case, outside of Tori Patrick's evidence, tends to connect the Defendant with the offense charged in the indictment.

You are charged that Joshua Bledsoe was an accomplice, if any offense was committed, and you are instructed you cannot find the Defendant guilty upon the testimony of Joshua Bledsoe, unless you first believe that the testimony of the said Joshua Bledsoe is true, and that it shows the Defendant is guilty as charged in the indictment. And even then, you cannot convict the Defendant unless you further believe that there is other evidence in the case that tends to connect him with the offense charged in the indictment.

Number eleven, an accomplice, as the word is used here, means anyone connected with the crime charged as a party to the offense. A person is criminally responsible as a party to an offense if the offense is committed by his own conduct, by the conduct of another for which he is criminally responsible, or both. A person is criminally responsible for an offense

committed by the conduct of another if, acting with intent to promote the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense. Mere presence alone will not constitute one a party to an offense.

You are further instructed that mere presence of the accused in the company of an accomplice witness, shortly before or after the time of the offense, is not by itself sufficient corroboration of the accomplice witness testimony. You are further instructed again that accomplice witnesses cannot corroborate each other. A conviction cannot be had upon the testimony of an accomplice unless the jury first believed that the accomplice evidence is true, and that it shows the Defendant is guilty of the offense charged against him. And even then, you cannot convict unless you find other evidence from other sources that that tends to connect the Defendant to the charged offense.

The first names I read you, you are instructed as a matter of law that they are accomplices. These next accomplice witnesses are accomplices in fact, and the charge is a little different. Try to listen carefully.

If you find from the evidence that the witness Destry Keeling was an accomplice, or you have

reasonable doubt thereof, as that term has been defined to you in subsequent instructions in this charge, then you are instructed that if you find beyond a reasonable doubt that an offense was committed, you cannot find Joshua Stocker guilty upon the testimony of Destry Keeling, unless you first believe that the testimony of Destry Keeling is true, and that it shows the Defendant is guilty as charged in the indictment; and even then you cannot convict the Defendant unless there is other evidence that said Destry Keeling, or any other accomplice witness, tending to connect the Defendant to the indictment charged.

Jason Hickson. If you further find from the evidence that the witness Jason Wayne Hickson was an accomplice, or if you have a reasonable doubt thereof, as that term has been defined to you in subsequent instructions in this charge, then you are instructed that you, if you find beyond a reasonable doubt that the offense was committed, you can't find that the Defendant is guilty upon the testimony of Jason Wayne Hickson, unless you first believe that the testimony of Jason Wayne Hickson is true, and that it shows the Defendant is guilty as charged in the indictment; and even then you cannot convict the Defendant unless you further believe there is other evidence tending to connect the

Defendant to the offense.

Number 12, you are further instructed that if there is any evidence before you as to any acts or statements of any person alleged to be a coconspirator with the Defendant, you cannot consider any such acts or statements against the Defendant, unless you first believe from the evidence beyond a reasonable doubt, that at the time any such acts or statements were made or done, there existed a conspiracy between such person or persons and the Defendant to commit the offense alleged in the indictment, or any lesser included offense of kidnapping; and further, that such acts or statements, if any, were made during the course of and in furtherance of the conspiracy, if any. And unless you so believe from the evidence beyond a reasonable doubt, you will disregard any such acts or statements made by any such person or persons as evidence against the Defendant.

Number 13, now bearing in mind all those foregoing instructions, if you unanimously believe from the evidence beyond a reasonable doubt that the Defendant, Joshua Stocker, on or about the 9th day of March, 2003, in the County of Randall and State of Texas, as alleged in the indictment, did then and there, in the course of committing or attempting to commit the

kidnapping of Dustin Pool, intentionally commit murder by intentionally causing the death of an individual, to-wit, Dustin Pool, by suffocating Dustin Pool by putting a sock into the throat of Dustin Pool and covering Dustin Pool's mouth with tape, you will find the Defendant guilty of the offense of capital murder, and so say by your verdict. But if you do not so believe, or if you have a reasonable doubt thereof, you will next consider whether the Defendant is guilty of capital murder as a party to that offense.

Number 14, a person is criminally responsible as a party to an offense if the offense is committed by his own conduct, by the conduct of another for which he is criminally responsible, or by both. Each party to an offense may be charged with the commission of the offense. A person is criminally responsible for an offense committed by the conduct of another if, acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense. Mere presence alone will not make a party -- a person a party to an offense.

Fifteen, bearing in mind the foregoing instructions, if you unanimously believe from the evidence beyond a reasonable doubt, that on or about the

9th day of March, 2003, in the County of Randall and State of Texas, Joshua Bledsoe, or Craig Kimberlin, or Frank Chacon did then and there, in the course of committing or attempting to commit the kidnapping of Dustin Pool, intentionally commit murder by intentionally causing the death of an individual, to-wit, Dustin Pool, by suffocating Dustin Pool by putting a sock into the throat of Dustin Pool and covering Dustin Pool's mouth with tape, and if you further unanimously believe from the evidence beyond a reasonable doubt, that on said date in said county, the Defendant, Joshua Stocker, is a party, as that the term has hereinbefore been defined, acting with intent to promote or assist the commission of the offense, solicited, encouraged, directed, aided or attempted to aid the said Joshua Bledsoe or Craig Kimberlin or Frank Chacon in the foregoing action, you will find the said Joshua Stocker guilty of the offense of capital murder as charged in the indictment, and so say by your verdict. But if you do not so believe, or if you have a reasonable doubt thereof, you will acquit the Defendant, and say by your verdict not guilty.

Number 16, the Defendant is on trial solely for the charge contained in the indictment. In reference to evidence, if any, that the Defendant has

previously participated in other crimes, wrongs or acts, other than that which is charged in the indictment in this case, you are instructed that you cannot consider such other crimes, wrongs or acts, if any, for any purpose, unless you find and believe beyond a reasonable doubt, that the Defendant participated in or committed such other crimes, wrongs or acts, if any. And even then, you may only consider the same for the purpose of determining motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident, if it does, and no other purpose.

Aren't you glad you're going to get to take these back in that jury room with you? I'll be glad to let you have them.

Seventeen, the only function of the jury under this charge is to determine the guilt, if any, of the Defendant, or the innocence of the Defendant, according to the directions and instructions contained herein.

Number 18, you are instructed that a grand jury indictment is no evidence of guilt. It is the means whereby a Defendant is brought to trial in a felony prosecution. It is not evidence, nor can it be considered by you in passing upon the innocence or guilt of this Defendant.

Nineteen, in all criminal cases the burden of proof is on the State and never shifts to the Defendant. The Defendant is presumed to be innocent until his guilt is established by legal evidence beyond a reasonable doubt. And in case you have a reasonable doubt as to the Defendant's guilt, after considering all the evidence before you, and these instructions, you will acquit the Defendant and say by your verdict not guilty. All persons are presumed to be innocent, and no person may be convicted of an offense unless each element of the offense is proved beyond a reasonable doubt.

The fact that a person has been arrested, confined or indicted for, or otherwise charged with, the offense, gives rise to no inference of guilt at his trial. The law does not require a defendant to prove his innocence or produce any evidence at all. The presumption of innocence alone is sufficient to acquit the Defendant unless you the jury are satisfied beyond a reasonable doubt, after a careful and impartial consideration of all the evidence. The prosecution has the burden of proving the Defendant guilty, and it must do so by proving each and every element of the offense charged beyond a reasonable doubt; and if it fails to do so, you must acquit the Defendant. It is not required

that the prosecution prove guilt beyond all possible doubt. It is required that the prosecution's proof exclude reasonable doubt concerning the Defendant's guilt. In the event you have a reasonable doubt, you will acquit him, and say by your verdict not guilty.

Twenty, you are the exclusive judges of the facts proved, of the credibility of witnesses, and the weight to be given their testimony, but you are bound to receive the law from the Court, which is here given to you in these written instructions, and you must be governed thereby.

Number 21, during your deliberations in this case, you must not consider, discuss, or relate any matters not in evidence before you. You should not consider or mention any personal knowledge or information you may have about any fact or person connected with this case, which is not shown by the evidence.

Twenty-two, after you have retired to the jury room, you should select one of your members as your presiding juror. It is the presiding juror's duty to preside at your deliberations, and to vote with you in arriving at a unanimous verdict. Your verdict must be unanimous, and when you have unanimously agreed upon a verdict, the presiding juror will certify to your

verdict by signing the same as presiding juror.

Twenty-three, after you have retired to the jury room, no one has any authority to communicate with you except the officer who has you in charge. You may communicate with this Court in writing through my bailiff, Mr. Parker. Do not attempt to talk to Mr. Parker, or any attorneys, or anyone else concerning any question you might have.

Twenty-four, after you have arrived at your verdict, you may use one of the verdict forms attached hereto by having your presiding juror sign his or her name to the particular form that conforms to your verdict; but in no event shall your foreman or forewoman sign more than one such verdict. And on the last page, there are the two verdict forms, not guilty and guilty.

All right. Mr. Farren, are you ready? I'm sorry. Mr. Fowler.

MR. FOWLER: Yes.

THE COURT: You may proceed.

MR. FOWLER: May it please the Court.

THE COURT: Mr. Fowler.

MR. FOWLER: Counsel for the Defense.

MS. MCELROY: Mr. Fowler.

MR. FOWLER: Ladies and Gentlemen of the Jury. I want to give you an overview of how the

procedure is going to work today, and tell you a little bit about what I would like to visit with you about. I'm going to be speaking with you for about 25 minutes, and then Counsel for the Defendant will have their opportunity to visit with you; and then, since the burden of proof rests with the State of Texas, Mr. Farren will perform the final closing argument.

Some of the things I would like -- I'm going to visit with you about the jury charge. As the Judge told you, it's very complicated, it's very lengthy, and it's written by lawyers; and sometimes it's a little difficult to understand. So I'm going to visit with you, the first part of my remarks, about the Jury Charge.

Second, I'm going to talk to you a little bit about some of the evidence that you heard, some of the time lines, some of the motives, some of the corroborating evidence I want to visit with you about. And third, I want to visit with you about what the Defense stated in their opening statement, and to examine some of the case that they have put on.

But before I begin, I want to state the obvious, and that's thank you. Thank you for your time. Thank you for your service. You have all have made tremendous sacrifices with your families, with your

work, with your children, with your friends, and we certainly appreciate it. No matter what we say today, no matter what we do, we have taken two weeks of your time, and we can never replace that, and so certainly, thank you. And on behalf of the District Attorney's office and the citizens of Randall County, thank you for your service.

The Jury Charge contains many, or controls many, of the decisions that you will make, and let me start off with some of the easy things that are in here.

The Judge tells you you have to elect a foreman. Your verdict has to be unanimous. You are not to concern yourself with punishment in this case. The only issue is the guilt or innocence of the Defendant. Don't consider things that are not in evidence. But what the Jury Charge also, it does not say, it does not say to check your common sense at the jury room door. You are allowed to take with you your common sense into the jury room. Your 12 life experiences, collectively, you can use in helping make a decision here.

One of the things that may be difficult to understand is the venue of this case. Why is the Defendant being prosecuted in Randall County? Well, as you all have learned and figured out, this case is a

multi-county case, multi-jurisdictions. If you recall from Tori Patrick's testimony, and when she first visited with Dustin Pool on the phone, he was coming from the strip club, the Clubhouse Cabaret located there on the E-way. He was coming home to his residence. Sergeant Brown told you that that strip club is in Randall County, Texas, and he told you that Dustin Pool's residence is in Randall County, Texas. Tori Patrick's apartment at the River Falls apartment complex is in Potter County, Texas.

Dustin Pool was then transported to Mike Elliston's farm in Carson County, and then up to the lake house, the Fritch, Lake Meredith area, Hutchinson County, and then back through Potter County into the United at 46th and Washington in Randall County, and again, to Tyler Hale's house in Randall County, and to the grain elevator, where he was eventually buried, in Randall County. Both Sergeant Burgess and Sergeant Brown told you that the location where the body was found is in Randall County, Texas.

So, the Judge sets out the law of this case is where the body was found. That's Randall County. The dates on the indictment, the indictment states March 9th, 2003. There are three key words right before that, though, and the Judge tells you what they

mean. It's says on or about March 9th, 2003. In situations where it's very difficult to prove exactly when somebody was killed, that on or about language is used, basically, to give the prosecution a little leeway about the death, the date of the death, of the individual.

And the Judge tells you, basically, on or about means as long as the murder takes place before the presentment of the indictment and before the statute of limitations has run; and he also tells you there's no statute of limitations in this case. So the question is whether or not Dustin Pool was murdered before the date in the indictment. And Mark Brown told you when the warrants were issued, which was in June of '03. So don't get hung up on the dates in the indictment.

There's an instruction there about extraneous offenses, and that's another -- that's a legal term that fancy lawyers say, other things the Defendant may have done wrong. And before you can consider them, before you can consider that evidence, you have to believe beyond a reasonable doubt that the Defendant participated in some way, some way, shape or form in that extraneous offense.

For example, the Ray Placensio kidnapping. If you don't believe Destry Keeling and

Brook Vandergriff and Josh Bledsoe and Chris Eason, if you don't believe all those people, that it didn't happen, and that that offense was not proved beyond a reasonable doubt, then the Judge instructs you, do not consider something like that. He has an instruction in there about coconspirator statements. You have heard a lot of testimony from individuals which would be called hearsay, that is, what somebody has told them. The Judge says you can consider that hearsay testimony, but you first have to believe that there was some kind of conspiracy, some kind of agreement, a plan to commit a crime between whoever was saying the hearsay and the Defendant.

An example would be when Mike Elliston testified that Craig Kimberlin called him and said, hey, do you have a box big enough that a person can fit in, or a box big enough for a grandfather clock. What Kimberlin tells Elliston is hearsay, but it's also a coconspirator statement that's committed during the course of this conspiracy, this agreement; and so, you can consider hearsay like that.

Beyond a reasonable doubt, the Judge gives you some instructions as to what that means. If you remember, Ms. McElroy touched on that in her jury selection. She had that chart with the stairsteps, and

on each step it said not guilty, not guilty, not guilty. And you used to get a definition of what beyond a reasonable doubt is, but it was decided to take that away; and so basically, use your common sense, beyond a reasonable doubt. It's not beyond all doubt, or beyond a shadow of a doubt; it's beyond a reasonable doubt. And when I first heard a defense attorney try to explain it, I was, like, how could anyone be convicted beyond a reasonable doubt. It's such a high standard, so unattainable.

Well, you just use your common sense, just think about some of the people who have testified before you. Destry Keeling was convicted of passing counterfeit money beyond a reasonable doubt. Other people were convicted, and they told you about their convictions, all occurring beyond a reasonable doubt. So it's not an unattainable -- this high lofty, unattainable standard. Use your common sense beyond a reasonable doubt.

The Judge also told you what's called a parties charge. And you may remember Mr. Farren's phrase, if you're in for a penny, you're in for a pound. I think we've heard that about a handful of times in the last couple of weeks. Again, basically, that means you can be held responsible for the acts of somebody else if

you act with intent to assist them, you solicit, you encourage, you direct, you aid, or you attempt to aid that person in committing a crime.

So basically, there are two ways the Defendant can be found guilty. You have two options you can find him guilty of capital murder. If you believe he did exactly what is alleged in the indictment, you can find him guilty of capital murder. If you don't believe that, you next consider this parties charge. If somebody else did it, like Kimberlin, Chacon, Bledsoe, and you believe Mr. Stocker, acting with intent to assist them, with intent to promote the crime that they committed, you are permitted to convict him of capital murder based on a parties charge. And again, that's if you're in for a penny, you're in for a pound.

The Judge -- many of the paragraphs in the Jury Charge, the Judge spends talking about what's called the accomplice witness instruction. And again, you may remember from Ms. McElroy's jury questioning, she had the blow-up of the accomplice witness -- the actual law where it says that. And basically, what the Judge does, he sets out accomplices who are, by law, these witnesses are accomplices. Mike Elliston, Guinn Garcia, Tori Patrick, and Josh Bledsoe, they are all accomplices. And there are some that are called

accomplices in fact. That is, that you are to determine if they are in fact accomplices. Jason Hickson and Destry Keeling. And those two are for you to decide if they are accomplices. Why does it all matter? Why do we care who's an accomplice and who's not? Because the law that Ms. McElroy showed you is, there must be some evidence tending to connect the Defendant with the commission of the crime, beyond what an accomplice says. So, if you just had an accomplice testify in a trial, and that's all the jury heard, you would have to return a verdict of not guilty. There has to be some other evidence in -- that has been presented to the jury, that tends to connect the Defendant with the commission of the crime.

And I want to visit with you about some of the evidence that I'd like to talk to you about. And before -- and as we delve into the facts, if your 12 collective memories does not jive with whay I'm saying, you go with your 12 collective memories, because your 12 collective memories are much more powerful than just mine or Mr. Farren's or Counsel's. So if I said something like, Tori said this, and you're like, man, I didn't hear that, you all go with your 12 collective memories.

Some of the things that the jury -- that

in jury questioning that, when Ms. McElroy asked you, what types of things, evidence -- what other types of evidence do you want to hear besides accomplices that would help shore up the prosecution's case, physical evidence, fingerprints, DNA, weapons, a dead body, motive, other witnesses who are involved, time lines, bystanders, and then of course, confessions. Let me start, if I may, with motive in this case. You all have heard lots of evidence about the problems between Dustin Pool's group and Craig Kimberlin and Josh Bledsoe's group. You have heard many, many, many incidents between the two groups, which we believe helps establish a motive, a framework with which you can consider this case.

If you remember from Bill Redden, the drug officer, he told you that Kimberlin's house was busted in November of 2002. That really rocked Kimberlin's world. He wanted to know who had snitched him out. And if you remember, Josh Bledsoe and Guinn Garcia told you about this scheme that Dustin Pool had to dress up as SWAT or Task Force people, and go raid Josh Bledsoe's house. You heard them talk about it. You heard Bledsoe mention that Pool, Ray and Bobby Ocanas did a mock drive-by at his residence, which really concerned him. You heard about the collection

problems with Josh Bledsoe's godfather, Greg Seago, and the problems that that caused.

And Pool took humbrage at the fact that they were actually threatening Greg Seago's son, who was in prison, and Josh Bledsoe was upset with that. And after that came to light, there was a meeting between Pool and Bledsoe and Kimberlin where that was discussed. And if you recall from Josh Bledsoe's testimony, he, quote, wanted to have the issue squashed. You heard about Miguel Gonzales, a member of the Kimberlin and Bledsoe group, his wife was chased around the mall in Amarillo. You heard about another meeting at Pool's house, and additional efforts to try to, quote, squash these problems.

There were the problems with Chad Spanel, Josh Stocker's main customer. Dustin Pool was trying to take him over to his group and start selling to him. And naturally, the Defendant and Craig Kimberlin and Josh Bledsoe did not like that. You heard about a meeting between Stocker and Pool that just happened one on one, and that didn't go too well, because Pool pulled a gun on the Defendant. Also, remember Kelly Grayless's car was run off the road. Josh Bledsoe had lent it to Ted Dibiase's son to test drive, and it got ran off the road, mistakenly thinking that Bledsoe's family would be

in there. You heard from Kelly Grayless and Josh Bledsoe about the problems at Joe's Crab Shack on February -- in the early month of February, 2003, and the actual confrontation there in the parking lot.

You also heard about Placensio, Pool's right-hand man, his answer to Frank Chacon and some of the enforcers that Kimberlin had. You heard about him asking around for information where Craig Kimberlin lived. If you remember from Josh Bledsoe's testimony, he told you about this stripper who was trying to set up Frank Chacon, and kept inviting Frank Chacon over, and they thought in was some kind of set-up attempt. You heard about this harebrained idea from Guinn Garcia that the Texas Syndicate, this prison gang with which Placensio was organized with, he wanted everybody who sold drugs in Amarillo to pay a tax. Naturally, Craig Kimberlin, Stocker, and Bledsoe did not react favorably to that plan.

You heard about the Ray Placensio kidnapping, which was approximately three to four weeks before the kidnapping and murder of Dustin Pool, on February 12th, 2003, how he was beaten, how he was tortured, how he was interrogated. And you heard about that. And you heard about why he was interrogated, because it was to get to Pool. It was to send a message

to him. It was a shot across Pool's bow. You'd better quit making all these threats. You'd better cut out your stuff; and you heard about that. And you heard after the Placensio kidnapping. Dustin Pool kept on and on.

You remember from Guinn Garcia, she told you that Josh Stocker, the Defendant, was cut off from Craig Kimberlin. He had been causing too many problems. He was too deep in debt. He owed Craig Kimberlin too much money. You also heard that testimony from Jessica Kimberlin, Chris Eason, and Joshua Bledsoe. And then you heard testimony from Jason Hickson, where Pool would call up people and say, I'm going to snitch you out; and that seemed to be one of his main threats, is he would use this, I'm going to snitch you out, to try to get them to do what he wanted them to do.

You heard from Brandon Cotton. He was the fellow who stole the guns to protect the children. He told you how, before Dustin Pool was kidnapped, he heard the Defendant and Pool on the phone arguing, either about drugs or a girl. He also told you that the Defendant came to him weeks before Pool was kidnapped, and said, hey, I need you to round up Dustin Pool. And so that's just a brief history of the motives in this case which we have heard about; and that helps put this

killing in a framework for you.

In jury questioning, someone said, well, to help corroborate what accomplices say, what about confessions. I mean, did the Defendant confess to anybody? Well, yes, to many people. You remember Brandon Cotton, which we spoke about earlier? He told you that the Defendant came and said, hey, I need you to round up Pool. You remember at the Comfort Inn when Tori Patrick was visiting with the Defendant, after he had made it back from this aborted attempt at Lake Meredith, and she said Stocker was laughing. You remember Guinn Garcia also at the Comfort Inn, and she said Stocker was laughing. And she probably had the same reaction that you all had when you heard Mr. Farren give his opening statements. She didn't believe Josh Stocker's confession, because it was such a harebrained story, so crazy. How could anyone believe that story?

She told you how the Defendant stated that Bledsoe was driving around with Pool's body in the back of his Navigator. You heard from Chris Eason that the Defendant confessed to him a couple of days later, and was bragging about how he had committed this murder. And you remember Guinn Garcia's reaction from Chris Eason, when she had probably realized, hey, it's true. She was almost throwing up. You remember Omar Mendoza,

the Mr. State-Your-Name-I-Take-The-Fifth. Do you remember him? His statement at the time was read into the record by Mr. Farren that he gave, and the Defendant confessed to him while they were in the Randall County jail.

Glenda Denise Keeling, who helped drive them up to Fritch, and then back to Fritch, and the conversation there in the car on the way back. What is it the Defendant says? When Bledsoe takes off, when he peels out of the lake house, she said Stocker was laughing. That stupid SOB, it's now on him. And then in the car ride back, the conversation that Glenda Keeling heard. She said Stocker said, he was squealing like a pig, so we had to shut him up. And she also said that Stocker was, quote, acting possessed.

Do you remember Brook Vandergriff, the Defendant's girlfriend, the Defendant's significant other, at the time? She made 24 phone calls, according to the phone records that are in evidence, on March 10th, to Josh Stocker. And when Mr. Farren asked her, did that sound about right, she said no, it probably should be a lot more than that. And if you remember what she said, when the Defendant came home, he said -- and this is interesting, and use your common sense. He said he had been to Tori Patrick's apartment to warn

Dustin Pool what was going to happen; and then he also said to her, the Dustin Pool problem had been resolved.

Well, how on you earth would he know to go to Tori Patrick's apartment? How on you earth had he known the Pool situation was resolved? Now, Ladies and Gentlemen, when you use your common sense, and when you come home and talk to your significant other, are you going to say, hey, honey, hi, how are you, how was your day; oh, good, I just murdered Dustin Pool? Are you going to say that to your significant other? No. What you're going to do is you're going to shade it, and you're going to say, the Dustin Pool problem is resolved. So we would ask that you view that as a tacit confession from the Defendant to his girlfriend.

Now, it was made in the Defense's opening statements that there were two types of people who would testify in this case. There were the police people, the lab people, the ID people, and then there was this other group of people who all had a reason to come here and testify to you. And the Defense asked you to listen carefully to what reasons they had to come to you. Now, Mr. Farren talked to you in jury selection about reaching understandings with the defendants, other codefendants. Some of you expressed an indication that, say, man, I prefer you not do it, but we understand why

it has to be done. You have seen how long this trial, and how complex, it's been, just a week and a half for one defendant.

Can you imagine if we were -- imagine if we had the task of trying all 11 defendants. And so, it is a necessity in our criminal justice system to work out understandings with other codefendants. In many of -- and this hasn't been hidden from you. This has been all transparent, for you to see what kind of deals, if any, these people have reached. Mr. Farren is your District Attorney. He's been elected many times, and the buck stops with him. So understand that these agreements, these understandings, are a necessity in our system. And most of these people, their agreement is, they don't have an agreement. They have agreed to cooperate, and their cooperation and truthful testimony will be taken into consideration, but they don't know exactly what's going to happen to them.

Now, if you remember, Jessica Kimberlin, the wife of Craig Kimberlin, I think the reason why she was here cooperating can be summed up with two words, her son. She was prepared to take 24 years in prison, two 12-year sentences stacked, and she decided, hey, I'm not being a good mom by doing that, I mean -- so I'll submit to you, the reason she was here testifying was

not because she wanted to work out a deal, but it was because of her son.

You remember Destry Keeling. He had already pled on his sentence of tampering with the evidence. He's in federal prison. He's already come and taken care of this charge. He could have said, when he took the stand, he could have been like Omar; state your name, I take the Fifth. There's nothing holding over his head, and so look at his testimony carefully. Now Tori Patrick and Michael Elliston, of course, they didn't have any criminal history whatsoever, and now -- and why -- and you might say, okay, well, I understand it's necessary that you have to work agreements out with some of these defendants, but why so many.

Well, this is not like a robbery of Toot N Totum. This was a complex case involving many different locations; and in order to know what happened at each location, with a different set of characters in each location, you're going to have to reach understandings with many of the characters at each location. That's why we had to know what happened in Tyler Hale's garage; how long was the body there at Tyler Hale's. Well, we would never know, we would have never gotten the truth, unless an agreement would have been reached with Tyler Hale.

And don't think for a minute that it's easy for these people to come in here and testify in front of a packed courtroom about some of these events. Do you think Jessica Kimberlin is going to enjoy testifying when her husband is sitting in that chair? Do you think Josh Bledsoe has a little bit of worry about what's going to happen to him when he goes back to federal prison, because he'll be labeled as a snitch. So it's not easy just to come here and testify, so keep that in mind. And also keep in mind, these people whose agreements haven't been finalized, Tori, Guinn, Tyler, Bledsoe, Elliston, they will have a reckoning. They will be forced to account for what they did, but that time is not yet. And I'm sure after this trial, you will hold your District Attorney to that.

Physical evidence. Many of the witnesses testified about physical evidence. Low and behold, what documentation, what wallet was found at Tori Patrick's apartment in the trash can? This wallet, attached with these papers. A travel permit from the Community Supervision and Corrections Department. Whose name is on it? Josh Stocker. Some kind of handwritten agreement to transfer a car. Whose name is on it? Josh Stocker. So this piece of evidence helps corroborate what Tori Patrick has told you, that she knew the

Defendant, that he would come over to her apartment and hang out there.

Dustin Pool's wallet, found at Circuit City. And if you remember, the story of Dustin Pool's wallet was this. After spending the night at the Comfort Inn, Tori Patrick went back to her apartment, wanting to check things out; and when she did, she discovered his wallet still there in her apartment. She freaks out, grabs the wallet, goes back to the Comfort Inn. There she gives it to the Defendant. And, if you remember, Guinn Garcia also told you that Tori gave the wallet to the Defendant. And where was it found? Where was his wallet found? With a driver's license, Sprint PCS cards, Hastings card, where was it found? At Circuit City. And who was at Circuit City?

THE COURT: Mr. Fowler, five more minutes.

MR. FOWLER: Yes, sir. Thank you.

And who was at Circuit City? The Defendant. You remember from the receipt that's been introduced into evidence, on March 11th he was buying stereo equipment. Now, the Defense would have you suggest, oh, Pool left his wallet there while he was living -- he was shopping there, obviously he left it there. He left his wallet, his driver's license, and

some of these other cards, he just left it there, never went to pick it up. Of course, they don't dispute the fact that he did buy a stereo. Also, Destry Keeling told you about the burial of the body, and some of the evidence -- some of the preparation and the material that he had to get to bury the body.

He talked about this Sakcrete or Quikcrete. Low and behold, what kind of bag was found at the grain silo? Sakcrete, Quikcrete, introduced again into evidence. Also introduced into evidence was that coal miner's headlight that he talked about that was purchased. Again, corroborating Destry Keeling. Michael Elliston told you about this green metal box that Dustin Pool was transported in. And again, the pieces of the box that had been welded and cut up and disfigured, an obvious attempt to hide what the actual coin of that metal was, was introduced into evidence, helps corroborate Mike Elliston.

And again, if you want to look at Mike Elliston and really examine what he said under oath, you can look at his statement that was made in 2003, that has been introduced into evidence. And I think when you examine that statement, and you use your 12 collective memories about what he said, you will find that his statement from two years ago corroborates what he told

you. If you want to look at the time line in this case, the time line really hasn't been challenged other than what we heard yesterday. You saw the Motel Six receipt that's in evidence, 4:49 on the 10th. The La Quinta receipt, 6:27; and then the Comfort Inn receipt, 11:36 p.m., all helping corroborate Tori and Guinn about this paranoia, and leaving from hotel to hotel to hotel.

The Circuit City receipt, again, is in evidence. The Warehouse Solutions receipt, when Tori received two new green couches to help replace the ones that were covered in blood and had been cleaned up, again in evidence from March the 17th. And also remember Dustin Pool's wallet. There is no money in that evidence. And if you remember, did anyone else notice the trail of major purchases that the Defendant made? You heard it was a habit of Dustin Pool to carry large sums of money. And that makes sense; he was in the drug business. And again, you heard how Stocker was out of work.

You can see from the bill at Motel Six and La Quinta, how Michael Stocker, the Defendant's brother, paid cash at Motel Six, cash at La Quinta. Josh Stocker gave Denise Keeling cash to go into Wal-Mart and buy a new set of clothes. Josh Stocker gave Tori Patrick cash for a deposit on the new

apartment complex. Josh Stocker paid cash for a steam vaccuum cleaner at Wal-Mart that they tried to clean up Tori's apartment with. Josh Stocker paid cash for the receipt at Circuit City, and Josh Stocker gave Guinn cash to pay for the Allen's Carpet cleaning.

You look at some of the key times in here. Tori Patrick told you that Josh Stocker came back at about 8:30 there in the morning on the 11th. She said it was about mid-morning, just guessing, 8:30. Guinn Garcia said it was a little later, said it was about mid afternoon. You remember Denise Keeling's statement. She had to get home by 7:15 to get the kids at the bus stop; and again, the kids just made it. So by Keeling and Stocker getting to Amarillo at 7:15, that corroborates Tori's statements that Stocker came to the Comfort Inn at around 8:30.

Some of the issues that were brought up, you want to be confident in your police, that they have done a good job, that the investigation has left no stone unturned. You heard about Mark Brown in his tireless pursuit of this case for almost over a year, the many statements he took, the many scenes he went to. You heard about Bill Redden and his parallel investigation on the drug side, and how they corroborated and shared information to eventually crack

this case. And Jim Burgess and Mike Crandel and Stan Rickwartz, the CSI guys, as we know them, helped collect the evidence which helped firm up some of the stories and some of the testimony you have heard today.

You even heard about testing that didn't work, that didn't yield anything. John Bundy, the hair and fiber guy, from DPS in Lubbock, testified that -- really, not to much. But the point of that testimony was to show you the police went through every single step they could think of to help this case. They sent the duct tape off to the FBI, and that was inconclusive. So you should feel confident about the police investigation. There are similar situations -- don't you want to know about similar situations that maybe the Defendant was involved in? The Ray Placensio kidnapping, the brutal beating, the duct tape, the held against his will, they taped up his whole mouth, but they left air holes in that duct tape for his nose, and he eventually survived that.

You've just heard today about Jeremy Roy, which Mr. Farren will talk to you a little bit more. You heard that Stocker, that Josh Stocker, the Defendant, was warned that putting a sock and covering his mouth with duct tape was not good, and he wasn't going to last; and Stocker got the message and took the

sock out.

THE COURT: Mr. Fowler?

MR. FOWLER: Yes, sir?

THE COURT: Did you want to leave him 30 minutes?

MR. FOWLER: Yes, sir. I'm almost done, Judge.

THE COURT: All right. Go ahead.

MR. FOWLER: You also heard from Mark Brown about the phone records, the huge stack of phone records, all consistent with the story, with the testimony that you have received from the State witnesses. Again, calls from Josh Stocker to Michael Stocker on the morning of the 10th at 2:43 a.m. You remember Tori Patrick saying Ray Placensio called Dustin Pool while she was in her apartment, again borne out by the phone records, at 3:45. Again, more calls from Michael to Josh at 4:00 and 5:00 in the morning. Calls from Kimberlin to Elliston, Elliston back to Kimberlin, Kimberlin to Bledsoe, and four calls on March the 10th from the Defendant to the La Quinta Inn. Again, the phone records helped bear out, helped corroborate, the testimony.

Mr. Farren is going to talk to you about the bulk of their experts, Dr. Haskell and Dr. Bucks,

that we heard from yesterday. Just a few things for you to consider. This was not disclosed in opening statement, and I'm sure we'll probably hear a reason why it wasn't. We'll also hear a reason why they did not ask Dr. Nataragan some of these important questions. Also, you know that they are paid, paid significant sums of money. No reports from these people introduced into evidence, nothing in writing saying this is my conclusion. And that's why we put reports by experts in evidence, and give to you, so you can follow along. None of that was done today.

So Ladies and Gentlemen, when you go back into that jury room, and you start the hard work of deliberations on this case, and you look at all the evidence, and you use your common sense, all the evidence points to, and conclusively proves, that that man sitting right there took a human life.

THE COURT: Thank you, Mr. Fowler. Ladies and Gentlemen, we're going to take a break here for ten minutes. Now, more than ever, remember what I told you. Thank you.

(Recess.

(Open court, Defendant present, no jury.

THE COURT: You want to bring the jury in for me, Bruce? I don't know where my bailiff is.

(Jury seated.

THE COURT: Be seated. Ms. McElroy, are you ready?

MS. MCELROY: Yes. May it please the Court.

THE COURT: Ms. McElroy.

MS. MCELROY: Counsel.

MR. FARREN: Counsel.

MS. MCELROY: I know these last several days have been really hard. I know that y'all had to listen to a lot of testimony. Some of the pictures haven't been pleasant to see, and some of the testimony, I'm sure, hasn't been pleasant to hear. But I think that we need to go over briefly some scenarios. First, let's talk about the case within the case. At times, I know that you sat here and wondered, as I am sure just like I did, whether or not we were in the wrong trial.

Now, there was much ado about the drug cartels, the drug conspiracy, the distribution of methamphetamine, the 28-count federal indictments, the wiretaps, the confidential informants, the money, and there was lots of money. Now, we know all this is in the context of this outer perimeter, but that's not why y'all are here. That's not what put you in these seats as jurors. The indictment sitting up over here, the

State of Texas v. Joshua David Stocker, is indicted because they say, that in the course of committing kidnapping, that he was killed by suffocation by placing a sock in his mouth and putting tape over it.

We talked in the beginning about the burden of proof, and how the burden of proof starts with the State, and never shifts to the Defendant. Their burden of proof, just like we talked about in the voir dire, is beyond a reasonable doubt. We also talked about that that burden of beyond a reasonable doubt applies to every one of the allegations, whether it's the date, whether it's the fact that it's in Randall County, whether it's the fact that it's on or about March 9th. And more appropriately and succinctly, is whether or not the State can prove to you beyond a reasonable doubt that Dustin Pool died by suffocation, by having placed a sock in the mouth and throat of Dustin Pool and covering Dustin Pool's mouth with that tape.

We'll get back to Dr. Haskell and Dr. Bucks's testimony later, but let's talk about some of these other scenarios. Let's talk, for instance, about the wallet scenario. First of all, the Prosecution wants you to believe that these people that so carefully and conspiratorily planned this all -- you have Tori

Patrick calling up, Dustin, come on over. Dustin shows up. Whatever struggle ensues, Dustin's gone. Now, behind that deal, here goes Guinn with Tori. There they go. Michael Stocker drops her off, goes in and pays for her room there. Then she and Guinn go on an adventure and tour of the different hotels in Amarillo. Well, they are pretty upset.

Now, all about this wallet. Tori, who's really very concerned about her carpet, comes back to her apartment and is most displeased, because right here, you know, things are a mess, things have been left in a mess. And you're right, she finds this wallet. And if you will remember, she also testified that in the middle of this deal, this supposed kidnapping going on, that Josh is trading wallets out.

Now, folks, in the middle of your kidnapping, are you going to be, like, hold on, I think I'll get myself out -- I'll trade this stuff out. You heard Efran Ramos's testimony. Efran Ramos is an independent outsider, sort of an anomaly, somebody who didn't get an immunity agreement, didn't get their probation dismissed, didn't get it put off for months, didn't get promised a deal, have their time cut to 1244 reduction, or promised to have their federal time cut by ten to 15 years if they would give a statement or help

out.

Efran Ramos is a coach. He happened to work at the Circuit City at the time. And he came in here, and he told you that this wallet, he found in the shop. Now, the reason that this is important is because he told you that the reason he remembered this is because he remembered Dustin. He identified Dustin. He picked out the photograph. He said, yeah, that's the guy that was there. And why did he remember? Because Dustin wanted him to cut him a deal. He wanted him to give him the employee discount. He asked him, well, you know, I don't know, I'll pay you whatever you make here. He remembers that conversation, and he remembers Dustin being there.

Now, let's talk about the Circuit City receipt. There are two dates on this receipt, one of which is -- one of which is the date supposedly that the equipment was bought. And under cross-examination, when he was asked, there's a separate date on here that says release date. It says the 14th. So, you know, I don't know that it was necessarily installed like Guinn said so. Another thing that's kind of contradictory, we talked about this stereo system, right, and how she had to wait around for two hours because this entire system had to be installed, but yet she testified the day

before Josh had come over and bought Tori's stereo from her. Now, folks, I mean, how many stereos do we really need here?

Let's talk a little bit about the Ray Placensio. Ray Placensio. Well, you know, we didn't hear from him, because poor Ray, he stands charged right now with murder. Okay. His beating was so brutal, so horrible, so vile, that 12 days after he's supposedly kidnapped and beaten, 12 days later he's stabbing Jesse Preciado 87 times. Yeah. Didn't seem to put him out of commission for long. Destry Keeling says that there's a fight held, and that he allows Ray and Miguel Gonzales to have this mano-a-mano fight. But then later there's other testimony that it's not Miguel; it's Josh and somebody else.

Tori. Let's talk about Tori. Well, you guys saw Tori. You know, she supposedly is a little helper with Guinn. Tori said that she only started doing meth two days after she had been clean for three years. She also said a couple of other things that I thought were kind of off. She said that as Dustin was in the room, that he had this cell phone in his hand the entire time. Well, Ladies and Gentlemen, she also told you she was in the bathroom, sitting, with the door cracked. Now, unless methamphetamine enables you to

hear extraordinarily and see through walls, I would suggest that she is either mistaken or she is lying.

Now, in reference to Ms. Tori again -- I will say this in her defense. She did say that when you're doing methamphetamine, time gets all kinds of messed up, and I expect that's probably so. What we do know, is that Guinn, who came to talk to you, still has a case -- still has a case, probation, revocation, been pending, nothing done about it. These all documents are all in evidence, and I expect that you'll go through them. I expect you might read over them, but it doesn't matter. The probation officer says, this person needs to be revoked. She doesn't want to be on probation. She won't complete treatment. She denies use of illegal drugs. She tests positive for methamphetamine.

But it doesn't matter, Ladies and Gentlemen, because, you know, Ms. Guinn Garcia, she's got it worked out. Things are all worked out. In for a penny, Ladies and Gentlemen, in for a pound. Really? Is that how it worked? Destry Keeling on the in-for-a-penny, in-for-a-pound scenario. Destry Keeling, he's at the meeting at Stumpy's. He's -- I mean, he's basically the guy that gets Ray because, you know, we have that little problem with, you know, shooting him in the foot, you know. We've got issues here. So everybody else has

to go off to the hospital. Right? And that only leaves Destry.

There wouldn't be a Ray incident if there wasn't Destry. He's the one that brought him in. He's the one who took him over to Bledsoe's shop, and that's how that all went down. Without Destry, there isn't a Ray incident. Now, the next time we hear, we hear he gets a call. It's after midnight. He says, honey, I've got these two buddies. I think he said that he told her that they were wanting to go fishing. Well, you know, I know that I'd be jumping up about midnight to see that my husband's buddies got into the lake house so they could go fishing. That makes sense.

Denise, however, is much more understanding than I. And so she goes and says, we can use Grandma's cottage; that's what we'll do. And so they run up there, and they wait at the Allsup's. And then they go on this little tour, and they finally find the house. And we get out of the car, and you know what, my gosh, we've driven all the way out here, and now we don't have the key. Oh well, don't worry, Grandma always hides one. Well, that didn't work out so well either. So this well-oiled, well-planned organized cartel machine, they are out there with poles trying to break the window of the lake house so they can get in.

Well, that didn't work so well either. And 'round about that time Mr. Bledsoe says, I've had it, I've just totally had it; and he takes off. Well, Destry -- and there's a bit of confusion here, because Tyler Hale's statement to you, as he testified, was that when they brought the Navigator in the first time that Destry was there at his home, that Destry and Bledsoe didn't go inside, but they were there. Destry didn't say that. He didn't mention it.

Now, we do know for a fact that Destry was the one who came and got the Navigator out, and they had the little meeting. And this is after they have all the meetings at Kimberlin's and decided where they wanted to bury it, and how they want to do it; and we're going to vote, do we want to put it in the boat, do we want to put it there. No, I know, let's do the grain silo idea. And so they do that, and he helps, and he plans it, and he goes along with it, and he helps do the concrete, and he smooths the floor out, and he carries all this different stuff away.

Meanwhile, Jessica Kimberlin is ready and listening to the scanner, ready to help, ready to call in case there's an alert. All these people are involved in this that came. These people are all together in their little adventure. Now, some are less culpable

than others, obviously. But, you know, to say that there wasn't a motivation with these people. There's not somebody who is -- I mean, okay, maybe the carpet cleaning guy that came in and said, okay, I cleaned the carpet and here's, like, this was the receipt. Okay. That's unmotivated. Nobody needs to do that. He wasn't getting a cut.

But most of these other people, if you look at the motivation and bias, if you take into account the different number of people, whether it was Guinn Garcia, or Destry Keeling, or Tori Patrick, or any of these other people, they've all got some serious motivations, folks. Mr. Farren said, you know, all we have -- we have no deal, we have no deal. All I've asked them to do is to tell the truth; that's our deal. You tell the truth, and we'll take that into consideration.

Well, folks, let me ask you this. Who gets to determine what the truth is? Huh? You or me? A judge? I would submit to you no. It would be the District Attorney. Now, you're under that kind of gun. You've got felonies hanging over your head. You've got other stuff. Where is your motivation? Are you going to come up with what you think the DA would like to hear? Do you think there might be a little pressure to

do that? Maybe if you were facing 24 years in prison, or whatever, you might have a little reason to pause there. These folks all participated. We heard, from Kelly Grayless, Josh Bledsoe's common-law wife. Right? And we heard from her, and she talked to us, and she said, well, initially she was all up and ready to do these books, and she kept track of the business, but then she didn't want to know from -- any more of that.

Now, I guess that's what you call plausible deniability, you know, if I don't consciously know about it, then I can't be held accountable. But Ms. Grayless was involved. She knew what her husband did. I find it interesting, though, that Josh Bledsoe isn't involved in the drug business for profit. And you will remember, he's not an addict, he doesn't do methamphetamine. It's not because he has a habit. He's not compelled. This is a business. Except for the fact that Ms. Grayless said, he did it because he just needed friends; he just liked to have friends. Well, that's an interesting twist on why you go into the dope business.

We heard the testimony about -- from Josh, that -- Mr. Bledsoe, that he told us that -- originally, how did you get involved in it? Well, I paid a man $10,000 for an introduction. And what were you doing? How did you get the $10,000? Well, I was

working at Patrick Electric. And he's got $10,000? Oh, well, I was dealing weed before then. Yeah. Okay? So we've graduated up. All the time, still, he's the guy who supposedly has the clear head? He's not a meth addict? He's -- according to his common law, he's a good guy. He's a good guy. He's making $300,000 a week. He's a good guy. Okay.

Let's talk about (takes a drink) -- let's talk a little bit about the clean up. We know that there's been a lot to-do, and a lot made, out of this wallet scenario. But let's also back up and look at the rest of the facts that surround that. These are folks, I submit, that you've heard in the testimony. These are folks that went to great lengths to try to clean this place up. These are folks that went to the lengths of cutting a piece of carpet out, and replacing it, and hot gluing it in, but only after, of course, buying all kinds of cleaning materials, going through all of Tori's old cleaning materials, going out to buy new cleaning materials, throwing those away, getting rid of those, going out and buying one of the hand-held steam vacs, or whatever you can put together and do.

When that didn't work, they went and called professional carpet people. And when that didn't work, they went to the point of actually throwing

couches out, replacing carpet, doing all these things. They went to, I would say, a lot of trouble. Goodness. You know, after emptying trash cans, and cleaning stuff up, and going through cleaning stuff, gosh, you know, I'd want to throw my wallet in the trash can. That's what I'd do. That should put them off, shouldn't it? Folks, I would submit that it's a reasonable inference from the facts, that at some point in time Mr. Kimberlin, who had a key to Tori Patrick's apartment, decided that he wasn't going to go down for that, and maybe he could help somebody along.

Well, you know, Josh is expendable; he's not the $300,000 guy. Okay? He's not the drug connection. He's just -- he's just a schmo. He's easy to get rid of. Why not? Why not stick it on somebody? Why not let them take the rap for it? We also know, according to Destry, that he brings Josh back. They try to get in the car. Well, he doesn't have his keys. Hum. Wonder who had his keys? Why doesn't he have his keys? Some of these things just don't fit. Some of these things don't make sense. I would submit to you, a bunch of it doesn't make sense. But you know what, folks, that's not my job. That's not my job.

And, you know, it's really not your job either. Your job isn't to try to connect the dots, or

fill in the blanks, or try to figure out who done it. What you have to do is try to decide that each one of these elements, each one of these different phrases here on this board, in this indictment, are they proof to you beyond a reasonable doubt? Now, in Jeremy's statement, I think there was an inference made that somehow the Prosecution had been rooky-do'd and surprised. Well, that's not the case. We're required to relay to the State who our expert witnesses are, and that was done before trial. This wasn't a surprise. Now, perhaps the testimony might have been a surprise, but the fact that we had the experts was not a surprise.

In the course of our investigation, in the course of our preparation for trial, you heard Dr. Bucks's testimony, that we spoke with him. It was at that point in time that you heard his testimony, that when he was reviewing the different autopsy photos, that included the sock, we were really perplexed about how we got bugs on the sock. And the fact is, is that if you understand the way insects work, and what they are drawn to, you can't get insects down in your throat if you have a sock down your throat and tape over your face. They can't get down there. And they can't lay their eggs, and they can't do what they need to do.

And you heard Dr. Bucks -- Dr. Haskell

tell you that. And we also talked -- and you know, there's been a lot of confusion that's tried to be thrown in there. Well, when you were down in the pit excavating the body, weren't there a lot of flies down there? You know what, folks, the autopsy is the next day. Do you think they laid the eggs and hatched them and had larvae all in one day? That's not the life cycle. It takes an amount of time for those eggs to process and grow and change in stages from pupae and from the ova position, from the ova position to the egg, to the larvae, and then finally the puparium. This didn't happen from the time that they excavated the body until the next morning at 9:15 when they were performing an autopsy on him. The type of bugs that Dr. Haskell found, we talked about that. He talked about that there was an order in nature. Okay? That there is a scientifically proven order; that they have done studies; they have done research. You saw the different pictures from the body farm. That's what they do. They do all this different research, so they can quantify and be able to help people know what's going on here.

He told us that there are certain bugs, that the first ones that would be there would be the blood flies; and that -- I think he also told you that that's what he exactly expected to find. But when he

came to Amarillo and got the samples, and took them back to his laboratory, and got the microscope out and looked, that's not what we ended up with. What we ended up with were flies that come to a much later time. I realize that Dr. Haskell says that these bugs come to somebody who's decomposing, that it could start as early as five days; it could be seven, eight days.

But whenever they got there, the fact is, they could get there. There wasn't a sock in his mouth. There wasn't tape over his face, and he didn't suffocate. I don't know how Dustin Pool died. I don't know that. I couldn't tell you. I've spent two years on this case, and you see the volume of material that we have. I can't tell you right now, because I don't know. But I didn't ask the State of Texas to bring an indictment. I don't have the full resources of the State, and have all these different DPS, lab people, and investigators, and police officers to go and collect all this evidence and do all this investigation.

They brought the charges, and it's their burden to prove that to you. That burden never shifts to the Defendant. We tried very hard to make our presentation of the evidence as succinct and as relevant as possible. We did that. We brought you the evidence. We brought you the testimony. And as a result of that,

you know -- we are going to look at the charge for a minute. Just a second.

How much more time?

THE COURT: Thirty-five minutes.

MS. MCELROY: Okay. So I'm doing pretty good.

THE COURT: I should have lied.

MS. MCELROY: I beg your pardon?

THE COURT: Nothing. I said, I should have lied.

MS. MCELROY: They are all going, shut her up.

I know. I know. Y'all are getting tired of this. You know, God love you, in this charge. This is really a complex charge, and I apologize. It's not easy to understand. But, you know, when the law -- we talked about accomplices. Right? We talked about that the law sets out and makes a presumption that you can't be convicted on testimony of accomplice witnesses. Okay? And the reason for that, because you know people are going to come with biases. You know people are going to come with motivations.

See, the law is not going to let you convict somebody based on accomplice witness testimony. They are going to say, whoa, you know, you need

sufficient corroboration to connect that person to the crime. Now, I can't tell you what sufficient corroboration is. Y'all have to determine what sufficient corroboration is. But I would suggest that it's got to be something, and it can't be another accomplice. I think this is really important, because we've got so many coconspirators, and co-players, and co-drug dealers; and everybody's got a deal, and that's basically what the State brings you. There wasn't a single piece of physical evidence that connects Joshua David Stocker to this deal, not a single piece of DNA, not a single bloodstain, not a fingerprint, nothing. Zero.

In reference to the extraneous offenses, I believe that Mr. Farren will have a lot to say to you about Jeremy Roy; and that's fine. The question isn't whether or not, on an occasion, that Josh helped to kidnap this guy, and there was a sock in his mouth. It doesn't have anything to do with intent, because the physical evidence, the scientific, the reliable, the credible evidence, doesn't tell you that. It doesn't matter. It doesn't matter, because there wasn't a sock in his mouth. He didn't die of suffocation. I don't know why he died. But I'll tell you this, after listening to all these different folks, and after

listening to Dr. Haskell's testimony, well, you know, it's up to y'all. It's up to y'all. Y'all decide the credibility of the witnesses.

But Dr. Haskell, whether or not he's paid as an expert, I mean, this man, he doesn't need this money. Okay? This isn't something that's going to, okay, well, let me see, will I be paid really well if I lie really good? This guy has a national reputation. I don't think he's going to put his reputation and his business and his integrity on the line for a criminal case, for somebody who he doesn't even know. The bugs have an order. The bugs have a cycle. The bugs don't vary, and don't lie, and they don't get deals, and they don't get immunity. The bugs don't have pending cases.

A couple of things when we talk about the bugs, and we talk about -- Dr. Haskell said they are drawn to a putrefaction period. We talked about the different cycles that bodies go from, from fresh, to bloat, to putrefaction, to drying, to skeleton. Right? These flies, these types of bugs, are drawn to the smell. Remember when Frank Chacon and Craig -- Steve and Craig Kimberlin go back, and they have just buried this body, and Jessica is teasing them about the dog, Java, going, he smells dead people. Well, you know what? You know, when we had the evidence in the

courtroom, do you remember what the evidence smelled like? It's a different smell than you normally have. It's not one that you mistake. Well, you know, if it was a fresh body, it wouldn't be smelling like that.

Now, earlier, in some of the other testimony that was elicited by the State, there was much to-do about Dr. Haskell's collection of the evidence, and whether or not his DNA might have gotten on the bugs. Well, you know what, folks? We don't really care if Dr. Haskell's DNA is on there, because we didn't have it tested for DNA. You know, you can look at a bug under a microscope and you can tell what it is. We didn't do DNA testing. We don't care if he touched the bugs or not. We were interested in the genus and the species, because that tells us, because the order of the bugs, what's going on. Whether he picked them up with the little forceps and tweezers and put them in the jar, or he put them here, the fact is is he got it off of the evidence. He got it out of the Special Crimes Unit. And since nobody else had bothered to even notice this, he looked at them. He took them back. Not only was he qualified in entomology, but forensic entomology.

And this whole blah, blah, blah, about changing your gloves after touching the specimen, she's a DNA person, a blood person, and they are concerned

about cross-contamination of samples. And that's an issue that I would tell you was related particularly in that field. But when you're talking about identifying what bugs are, that's really just not an issue. And I would submit, I hope y'all don't go bouncing down bunny trails like that.

Let's talk about Mr. Elliston. Shall we? In the opening, Mr. Farren told you that he was a little Barney Fife kind of guy, who just sat and wrung his hands. Well, I would go for the wringing his hands; but then I'd like to direct your attention to the fact that when Sergeant Burgess got on the stand, he talked about visiting with him. He talked about visiting with him, I believe, on June 23rd, of that morning. No, not that morning. Sorry. They were busy -- that's right. They were busy visiting with Destry Keeling. He and Mark Brown get a statement from Destry Keeling.

As a result of getting that statement, they go to the District Attorney's office, and they are issued capital murder arrest warrants. One of those warrants was for Michael Elliston. Mark Brown and Sergeant Burgess go back, and they have another discussion with Mr. Elliston. Oh, by the way, according to Sergeant Burgess, Mark Brown's comment is, do you have anything else you would like to get off your chest.

Well, at that point, Ladies and Gentlemen, since he lied in his first statement, you know, the one -- the party line deal where Kimberlin goes around and goes, all right, now this is what I want you to tell, and okay, you're Tyler Hale, you tell them that it was your padlock, or my padlock, and so that will help you, and whoever that we want to, you know, fix up.

Now, you'll notice that my client wasn't one of the ones that they helped out with the stories. Nobody much came around and told anything that Kimberlin had to say that was going to exclude my client, or in any way help my client out. That wasn't what was going on. But since we've got all these different party lines going on, Elliston gets the whole thing. And, you know what? He's good for that. He's good. Oh, this is the way it is. Because you know what? He's just the hapless victim, the poor little weak guy who's being imposed on by these big boys.

Well, then we have the second statement. And the Prosecution says to you, why would he change his statement; because in his first statement he's guilty of nothing, and in his second statement he's guilty of capital murder. Well, I would say that he probably didn't do it without provocation. He probably didn't know that Destry Keeling was going to spill the beans.

He probably didn't know that that was all going -- because Destry, he had been going along, too, up until that time. Up until that moment when he says, okay, Sergeant Brown, sit down, I'm going to tell you the real deal. All right?

But then they go get these capital murder warrants. I don't think Mr. Elliston was thinking, oh, yea, the jig is up, better tell what I can do. Mr. Elliston is going to cut a deal wherever Mr. Elliston feels like he's got his best deal coming. He hung in there with Kimberlin until he figured the jig is up; but then, you know, we can always make a different deal with a different fellow.

Jason Wayne Hickson. I don't know. I mean, y'all saw him. I think the most interesting thing is that, nobody threatens me like that. And that's probably so. This was Josh Bledsoe's protector. This is the guy who's at the meeting, and this is the guy who shows up at Stumpy's, you know. And let's talk about that for a minute. Let's go back to the meeting at Stumpy's just for a minute. There's some inconsistencies here.

We've got this whole story line that this is supposedly some big contract to kill, and we have this different testimony. The only problem with some of

this testimony is that, you heard Josh Bledsoe. He sat up there on the witness stand, and he told you, I didn't -- that wasn't what I was talking about; I don't know how people misunderstood that. I was telling you about the cartel guys. They told me that they could have somebody do it for $10,000. In fact, they said they'd have somebody do it for free, because all this mess with Dustin Pool is causing me all this big loss of business.

Well, did it occur to y'all? It occurred to me. You've got somebody telling you you're going to do it for free, but, oh, no, let's let the keystone cops do this. I know, we can all get together in a van and then I can, like, you know, shoot off the Uzi and shoot somebody through the foot. I mean, that doesn't make any sense. There's been all this talk about how this was a big deal, that Josh owed a bunch of money to Kimberlin, and he was trying to get right with him.

But you know what, folks? I mean, they talk about this deal, but all the time in the drug business, people front the drugs. They get paid on the back end. There was testimony that Bledsoe paid up his debt, paid up $8,000 worth of debt. There's testimony all over the board. I mean, they've got everything in here, from Bledsoe paid somebody -- the girl $7,000, and we've got all these different money items that are

supposed to have gone to Tori. I would submit to you that I heard so many different figures -- you know, maybe Ms. Kimberlin needs to keep the books, because lots of figures don't add up here.

I'm going to sit down and be quiet here. I appreciate your concentration. I appreciate your attention and detail. I ask you to go through and look at some of this stuff over again, to give it some consideration, because your decision will literally affect my client for the rest of his life.

I need to talk to you a little bit about the rule of law. Our system, our nation, our country, has chosen to live under the rule of law. We have a constitution that outlines how we do business, and how things work, and the rules that we play by. In my opinion, the State has failed to meet its burden in an element of the indictment, and I believe that it is your duty and your obligation to find my client not guilty. That's going to be hard, but I submit to you that it's the obligation that you have.

Y'all all played by the rules. Every one of you got a summons in the mail, and you came up here, and you filled out your jury questionnaire, and you have put up with being run in and out of the room, and waiting, and all kinds of inconveniences. And y'all

have played by the rules. Well, the rules say that the Prosecution has the burden of proof, to prove each and every element beyond a reasonable doubt. That didn't happen. I would submit to you that my client is not guilty, and we would ask you to acquit him. We'd ask you to do your job by law. Thank you.

THE COURT: Thank you, Ms. McElroy. Mr. Farren?

MR. FARREN: Your Honor. Counsel.

THE COURT: You want a break? All right. I'm sorry. How about ten minutes? Remember what I told you.

(Recess.

(Open court, Defendant present, no jury.

THE COURT: Thank you all. Everyone be seated. Bring them all in.

(Jury seated.

THE COURT: Mr. Farren, are you ready?

MR. FARREN: Ready, Your Honor.

A few years ago, David Copperfield made an entire elephant disappear on live television. Do you remember that? That's an amazing feat. An entire elephant disappeared on live television. Do you know how he did it? Because I don't. I do not know how David Copperfield did that. And I would suggest to you

that the Defense's argument would be, if you can't explain how he made that elephant disappear, then beyond a reasonable doubt, you believe the elephant really did disappear. Do you think David Copperfield really did make a live elephant actually disappear on television? No, you don't, because you have an entire life of experiences, of other kinds of evidence, that tell you that's impossible, and you know it didn't really happen.

But if you can't explain how he made that elephant disappear, according to the Defense, that's a reasonable doubt, and you believe the elephant really did disappear. The point is, that's not a reasonable doubt, folks. That's simply some information you have that you can choose to believe or not believe. And I think all of us would agree, we don't believe that he made that elephant disappear, because we have so much other evidence that tells us that's impossible. Making a rabbit magically appear in a hat, I don't know how they do it; but I know that rabbit doesn't just, out of thin air, appear in that hat, because of my life experiences, and all the other evidence I have to draw on.

Same thing when they saw the lady in half, et cetera. That's what we have in this case. You have all the avalanche of evidence that Jeremy

summarized for you before, all of which overwhelmingly points to the guilt of the Defendant. I think even the Defense agrees, except for the bug evidence, and we're going to talk about that in a minute. Except for the bug evidence, it is overwhelming. That's why she said to you a minute ago, she wants you to return a not guilty verdict, and it's not going to be easy.

Well, why wouldn't it be easy? If there's all these holes in the evidence, and there's all these problems, and really we didn't present any evidence, it shouldn't be hard at all. But even she agrees, it's going to be hard for you to do what she wants you to do; and that's because all of that evidence you heard, all of that evidence that fits together, all that evidence that tends to connect and make sense, all of the receipts, all of the telephone calls, all of the non-codefendant witnesses that testified, all the people who said he admitted to them his participation in the death of Dustin Pool. Especially, especially, a codefendant, Michael Elliston. I suggest you start there.

Now, she did her best to suggest to you that Mr. Elliston somehow has a motive to tell this story. When he gave this statement, he had no deal with anyone. He didn't cut any deals with anybody. It was

months later when he agreed to a deal. There are rules of evidence which make hearsay admissible. Ordinarily, hearsay is not admissible. One of the ways it becomes admissible is if it's an admission against penal interest. That means, I'm admitting I did some crime. Evidence that would not otherwise be admissible becomes admissible if, in telling whatever I'm telling, I also admit I committed a crime.

The theory is, folks don't ordinarily lie to implicate themselves in a crime. They might lie to implicate somebody else, but not themselves. When we get a search warrant, one of the most powerful pieces of evidence we can offer to a judge to help get the warrant is, that the guy who says he went in the house and saw the dope admits he used the dope, or he uses dope, or he's a dope user. That's an admission against penal interest, and that lends credibility to him and makes it more likely the judge will give us the warrant.

Michael Elliston didn't just make a statement against penal interest. He implicated himself in a capital murder. He could have faced the death penalty. Who lies to put themselves in that position? And that's just part of the evidence you heard. Again, Jeremy did a wonderful job of summarizing for you all of that evidence. And I want you to think of all that

evidence, in parallel with all the evidence you have in your life, that elephants don't just disappear. The Defendant's attorneys want you to believe this. See, all their eggs are really in one basket. They know the rest of the case is really strong. But if you'll just believe that elephant disappeared, then just maybe a murderer can walk out of this courtroom. It's a parlor trick, folks.

The bug evidence is a magician's trick. I spent half the night trying to figure it out, and I finally figured it out. I had some help, some entomologists and so forth, but I finally understood what they were telling me; and I'm going to share with you how the trick worked. Now, I don't know how Mr. Copperfield made the elephant disappear. When you leave here, you're still not going to know that. And I don't know how they make the rabbit appear in the hat. I'm going to tell you how those bugs got there.

Some of the other evidence, before we talk about that specifically, that tells you that this is -- it's like the elephant. I saw it, but that just doesn't make sense. They want you to believe this man lay around rotting for up to 12 days. And I don't know where he was. I don't know why they -- I don't -- I don't want to be too sarcastic here, but you just -- I

can't help thinking of the scenario. As the Defendants are standing around 12 days later, you know, we've got to do something with this body. What are we going to do? We've got to figure out something to do with this thing. I know, we'll stuff a sock in his throat. But that's not all. We'll tape up his head with tape a quarter-inch to a half-inch thick over and over and over and over. And while we're at it, let's go ahead and tape his shoulders and his hands.

Now, this tape is a different color than the silver duct tape he was taped with when he was being tortured. This is the tape they taped his head with. In fact, the Defense made a point in some of the cross-examination, that the tape is continuous. Now, if you believe that you've got a person here who's been dead 5 days, 12 days, why would you tape up his head and his hands? Did that elephant really disappear? Did those bugs get there the way they suggest? No. And the tape is part of the reason you know that. They didn't think this guy, who had been dead for 12 days, was going to jump up and run away. But the Defendant's attorneys want you to believe that, if you can't explain how the bugs got there, then you have to believe their version of the story. You have to believe the elephant really did disappear.

Now, reason tells you that their suggestion doesn't make sense. And I bet if we knew how the elephant disappeared, our response would be, oh, that's so simple, it's so obvious. But we don't know what that trick is. If we knew how they make that rabbit appear in the hat, I suspect we'd say, gosh, it's right in front of me, and I didn't realize it. Well, that's kind of like the bugs, folks. I finally realized the question is not, how did the bugs get there, although we have to answer it. The question is not so much what is there; it's what's not there.

We've got some of the little eggshells, and that's what was left, partially broken open, and they didn't hatch out. Just like a chicken egg. If I break it open, it isn't going to hatch out. But some of them did. Some of them were just the husk. Now, the cycle she talked to you about, what happens? The bug lays the egg, the egg becomes larva, maggot, eat, eat, eat. Then he moves away from the food source, cocoons up, and what comes out of the cocoon? Flies. Where are the flies? There are no flies. There are no flies. Nobody found any flies. Nobody talked about any flies. Their entomologist didn't find any flies. Where are the flies? Well, maybe they escaped; they got out. Well, that won't work, because their whole theory is flies

couldn't get in.

Well, if they can't get in, they can't get out. Where are the flies? It's a parlor trick. And once you do away with the parlor trick, that avalanche of evidence makes him guilty of murder. Now, how did they get there? Well, as I understood more and more about it, and as I talked to the entomologist, I realized, one of the key things is that there were so few of them. Flies lay hundreds, three, four hundred eggs. He picked off nine, or counted nine, on the sock, and a few more on the tape. You can look at the picture. I forgot to pull it. At the autopsy, the sock is sticking out of the mouth and wrapped around, and as they pull the sock out, the ones he picked out are on the front of the sock, not at the back. And when they put that tape on the face, those little eggshells were already there. That's why there's no flies.

You see, you saw Michael Elliston's place. You saw the trash pit he lived in. Now, I don't know what they were feeding on, a dead rat, an old Subway sandwich. I don't know. But when it reached that stage of decomposition where the kind of fly that Haskell talked about lays some eggs on it, it reached the larvae stage, moved away, after it got through eating, pupaed up on the sock. Not a few, hundreds,

unless this is just some strange, abnormal situation. And when they picked it up, or he rolled over it, or who knows what, and stuffed it in his mouth, most of them are knocked off, because they are real fragile. He told you, you've got to be really careful, they crumble. That's why there's only nine, not hundreds, because those eggs had already hatched, and those flies had already flown away before that sock ever went in his mouth.

It's a parlor trick. It's an elephant that disappeared. Only all the evidence of your life tells you, that elephant didn't really disappear, and all of that evidence tells you that something's wrong here. It's a parlor trick. Folks, you have the right and the duty to collectively consider all the evidence, and you have the right also to your individual honor, courage and faith in your own beliefs. If you believe that man is guilty of murder, a horrendous, horrible murder, then you stick by your verdict. Thank you.

THE COURT: Thank you, Mr. Farren. All right. Ladies and Gentlemen, I'm going to release you from the pledge not to talk to each other. You can go back and deliberate in the jury room, and go over the charge, and do what I told you. Thank you. We'll wait to hear from you. If you want any of the exhibits, let

us know. We'll be in recess until we get a verdict or a question.

(Jury leaves to deliberate at 3:05 p.m.

THE COURT: We'll be in recess until we get a verdict or a question.

(Recess.

(Open court, Defendant present, no jury.

THE COURT: I've received our first note from the jury, and I'm going to read it into the record. It's 3:15. They've been out ten minutes. May we please have the list of characters on the poster board? Ms. Denise Conder, who evidently is the forewoman.

MS. MCELROY: Your Honor?

THE COURT: Yes?

MS. MCELROY: We would have an objection to including the list of characters, because it's not in evidence.

THE COURT: What?

MS. MCELROY: It wasn't admitted into evidence.

THE COURT: No, it wasn't in evidence. I don't think I can give it to them unless everyone agrees.

MR. FARREN: There -- I guess the only way they would be able to get it would be to certify a

disagreement about what was heard during the trial, and ask that each name they'd heard be read back to them.

MS. MCELROY: That could take a while.

THE COURT: Yeah. But I'm not going to tell them that.

MS. MCELROY: Thank God.

THE COURT: I'm going to fashion an appropriate reply.

MR. FARREN: Are you opposed to advising them that the list itself is not in evidence, and it can't be given to them?

MS. MCELROY: That's fine with me.

MR. FARREN: I'd like to explain to them why they can't have it.

MS. MCELROY: I think, because the DA doesn't want them to have it, is an excellent answer.

MR. FARREN: Will that slide under the door? It's too wide.

THE COURT: Off the record.

(Off the record discussion.

THE COURT: Okay. I propose this answer. In fact, I'm going to give this answer. It's not a proposal. I cannot give you that because that item was a demonstrative aid, and not an exhibit admitted into evidence.

MS. MCELROY: We have no objection.

MR. FARREN: We have no objection, Your Honor.

THE COURT: All right. Stay handy. We'll be in recess.

(Recess at 3:18 p.m.

(Open court, Defendant present, no jury.

THE COURT: Thank you all. Everyone be seated for a second. I have a message from the jury that they have a verdict. And I'm going to receive this verdict, whichever way it goes. And I have ordered the Sheriff's deputies and my bailiff to seal the courtroom until the jury leaves the building. So, you just need to know that. If you don't want to be a part of that, then leave the courtroom now. All right. All rise. Bring the jury in.

(Jury seated.

THE COURT: Thank you, Ladies and Gentlemen. Everyone be seated. Ms. Conder, are you the forewoman?

THE FOREWOMAN: Yes.

THE COURT: Well, good for you. Does your jury have a verdict?

THE FOREWOMAN: Yes, sir, we do.

THE COURT: Is this verdict unanimous?

THE FOREWOMAN: Yes, sir, it is.

THE COURT: All right. Would the Defendant please rise. We, the jury, find the Defendant, Joshua Stocker, guilty of the offense of capital murder as alleged in the indictment. Is this the verdict of each and every one of you?

THE FOREWOMAN: Yes, it is.

THE COURT: Do any of you dissent from this?

THE FOREWOMAN: No, sir.

THE COURT: All right. Well, I'm going to receive this verdict, and with that, I'm about to discharge you from your duties. Y'all have been the best jury I've ever had. And I know you think I say that to every jury, but I don't. You have just been magnificent. I want to compliment you. I'm proud of you, and I hope you're proud of your service. I know it was hard. I know it's probably one of the hardest things you ever did. But you can see now just how well our system works, and I hope you take comfort in that. And I hope you take some admiration from it.

And with that, I want to tell you one other thing. You are free to talk to anybody you want to, or not, as you wish. If you have any questions in the future, call me, and I'll be glad to talk to you

about them. I'm in the book, so just get ahold of me.

There will be a lot of the lawyers that want to talk to you. You're free to talk to them, or not. I have made arrangements for Mr. Parker and another bailiff to escort you to the parking lot now and retain everyone on this floor until you're gone. So if y'all want to go, you're free to go now, and I thank you all. All rise.

(Jury leaves the courtroom.

THE COURT: Everyone be seated. Mr. Stocker, please rise.

(Defendant stands.

THE COURT: The jury has found you guilty of the charged offense in the indictment of capital murder. There is only one sentence for that, and that is life in prison. Section 12.31 of the Penal Code, and Article 37.071 both prescribe that, and that is the sentence I'm required to sentence you to. So, pursuant to those two statutes, I sentence you to serve a term imprisonment of life in prison in the Texas Department of Criminal Justice Institution Division, and at this time I remand you to the custody of the Randall County Sheriff to begin that sentence. Good luck to you, sir. Have a seat. All right.

(Off the record discussion.

THE COURT: Mr. Stocker, you have a right to appeal, and you also, because this was a capital murder, I believe you have a right to a separate lawyer and a separate proceeding at the simultaneous time as your appeal, to a writ of habeas corpus proceeding. The appeal is automatic, and if you can't afford a lawyer, I'm sure we can appoint someone. I'm required to do that by law. I believe the appeal is directly to the Court of Criminal Appeals. Is that also the case in the non-death penalty?

MR. FOWLER: No, Your Honor.

MR. FARREN: I believe that's only in --

THE COURT: Only in the death penalty? Okay. Well, whatever. But these two lawyers will help you file the first and second part of that, and then we will find you a good appellate lawyer. And also, if I'm required to, a habeas corpus lawyer. But I need somebody to advise me whether I need to do that in this non-death penalty case. I don't know whether I'm required to or not, but y'all look at it and let me know.

MR. FARREN: Also, we would advise, for the record, we have inquired of the victim's mother, and she does not want to make a statement.

THE COURT: All right. We will remain

here until we're told that the jurors have left the parking lot.

THE BAILIFF: Five minutes.

THE COURT: All right. You've got them gone? All right. Everyone is released.

(Final recess.

*****************************************************

THE STATE OF TEXAS

COUNTY OF RANDALL

I, Rebecca Gulde, Deputy Official Court Reporter in and for the 47th District Court of Randall County, State of Texas, do hereby certify that the above and foregoing contains a true and correct transcription of all portions of evidence and other proceedings requested in writing by counsel for the parties to be included in this volume of the Reporter's Record, in the above-styled and numbered cause, all of which occurred in open court or in chambers and were reported by me.

I further certify that this Reporter's Record of the proceedings truly and correctly reflects the exhibits, if any, admitted by the respective parties.

WITNESS MY OFFICIAL HAND this the 19th day of September, 2005.

REBECCA GULDE, Texas CSR 1750
Expiration Date: 12/31/07
4103 W. 49th Avenue
Amarillo, Texas 79109
(806) 355-8181