REPORTER'S RECORD
VOLUME 3 OF 6 VOLUMES
NO. WR-88,099-01
CAUSE NO. W-15,307-A-1

RECEIVED
COURT OF CRIMINAL APPEALS
1/16/2019
DEANA WILLIAMSON, CLERK

| | | |
|---|---|---|
| EX PARTE | ) | IN THE DISTRICT COURT |
| | ) | |
| | ) | |
| | ) | RANDALL COUNTY, TEXAS |
| | ) | |
| | ) | |
| JOSHUA DAVID STOCKER | ) | 47TH JUDICIAL DISTRICT |

*************************************************************

WRIT HEARING

*************************************************************

On the 30th day of October, 2018, the following proceedings came on to be heard in the above-entitled and numbered cause before the Honorable David Gleason, Judge presiding by assignment, held in Canyon, Randall County, Texas;

Proceedings reported by Stenographic Method.

A P P E A R A N C E S

FOR THE APPLICANT:
SBOT NO. 24010492
Mr. James Edd Wooldridge
Attorney at Law
600 South Tyler Street
Suite 1704
Amarillo, Texas 79101
(806) 418-8575

FOR THE STATE OF TEXAS:
SBOT NO. 00787925
Mr. Robert Allen Love, II
SBOT NO. 02505850
Mr. Charles David Blount
SBOT NO. 04300500
Mr. Warren L. Clark
Randall County Assistant District Attorneys
2309 Russell Long Boulevard, Suite 120
Canyon, Texas 79015
(806) 468-5570

CHRONOLOGICAL INDEX


| October 30, 2018 | Pg | Vol |
|---|---|---|
| Appearances | 2 | 3 |
| Case Called | 7 | 3 |
| Motions | 8 | 3 |

APPLICANT'S

| ORAL EVIDENCE | DX | CX | RDX | RCX | VOL |
|---|---|---|---|---|---|
| Charles Blount | 15 | 18 | | | 3 |
| Bobbie Bruhn | 21 | 26 | 35 | | 3 |
| James Farren | 43 | 66 | 120 | 136 | 3 |
| | | | 138 | 140 | 3 |
| Jeremy Fowler | 143 | 148 | 158 | | 3 |
| Guin Garcia | 165 | 169 | 173 | | 3 |

| | Pg | Vol |
|---|---|---|
| Proceedings Concluded | 175 | 3 |
| Reporter's Certificate | 176 | 3 |

ALPHABETICAL INDEX


| WITNESS | DX | CX | RDX | RCX | VD | VOL |
|---|---|---|---|---|---|---|
| Charles Blount | 15 | 18 | | | | 3 |
| Bobbie Bruhn | 21 | 26 | 35 | | | 3 |
| James Farren | 43 | 66 | 120 | 136 | | 3 |
| | | | 138 | 140 | | 3 |
| Jeremy Fowler | 143 | 148 | 158 | | | 3 |
| Guin Garcia | 165 | 169 | 173 | | | 3 |

EXHIBIT INDEX

APPLICANT'S

| NO. | DESCRIPTION | OFFERED | ADMITTED | VOL |
|---|---|---|---|---|
| 1 | Brooke Vandergriff's Proffer Agreement | 17 | 17 | 3 |
| 2 | Bobbie Bruhn's Affidavit | 40 | 40 | 3 |
| 3 | Craig Kimberlin's Use Immunity Agreement | 128 | 128 | 3 |
| 4 | Letter to C.J. McElroy | 128 | 128 | 3 |
| 5 | Bledsoe's Plea Agreement | 128 | 128 | 3 |
| 6 | James Farren's Affidavit | 128 | 129 | 3 |
| 7 | James Farren's Amended Affidavit | 128 | 129 | 3 |
| 8 | Letter to Tori Patrick With Enclosure | 132 | 132 | 3 |
| 9 | Excerpt Proceedings | 147 | 148 | 3 |

STATE'S

| NO. | DESCRIPTION | OFFERED | ADMITTED | VOL |
|---|---|---|---|---|
| 1A | Disc-Josh Stocker Trial | 13 | 13 | 3 |
| 1B | Thumb Drive-Stocker Trial | 13 | 13 | 3 |
| 2 | Patrick's Unsigned Use Immunity Agreement | 28 | 29 | 3 |
| 3 | Supplemental Report | 31 | 34 | 3 |
| 5 | Brooke Vandergriff's Proffer Agreement | 72 | 72 | 3 |

EXHIBIT INDEX (Continued)


| STATE'S NO. | DESCRIPTION | OFFERED | ADMITTED | VOL |
|---|---|---|---|---|
| 6 | Guin Garcia's Use Immunity Agreement | 72 | 72 | 3 |
| 7 | Excerpt Proceedings | 69 | 69 | 3 |
| 8 | Bledsoe's Plea Agreement | 72 | 72 | 3 |
| 9 | Excerpt Proceedings | 74 | 74 | 3 |
| 10 | Excerpt Proceedings | 83 | 83 | 3 |
| 11 | Excerpt Proceedings | 88 | 88 | 3 |
| 12 | Excerpt Proceedings | 90 | 90 | 3 |
| 13 | Excerpt Proceedings | 94 | 94 | 3 |
| 14 | Excerpt Proceedings | 98 | 98 | 3 |
| 15 | Excerpt Proceedings | 101 | 101 | 3 |
| 16 | Excerpt Proceedings | 102 | 102 | 3 |
| 17 | Motion to Increase Bail | 112 | 112 | 3 |
| 18 | Docket Sheet | 114 | 114 | 3 |
| 19 | Motion - Bond Conditions | 115 | 115 | 3 |
| 20 | Letter to Jeff Robnett | 116 | 116 | 3 |
| 21 | Fax to Jeff Robnett | 117 | 118 | 3 |
| 22 | Patrick's Signed Use Immunity Agreement | 158 | 158 | 3 |
| 23 | Complaint | 172 | 172 | 3 |

P R O C E E D I N G S

October 30, 2018

(Open court, Applicant and Counsel present)

09:22AM THE BAILIFF: All rise.

09:22AM THE COURT: Good morning. You-all may be
09:22AM seated.

09:23AM Well, this will be Cause Number
09:23AM W-15,307-A-1 in the 47th District Court in and for
09:23AM Randall County, Texas, on the Amended Application for
09:24AM Writ of Habeas Corpus, I believe.

09:24AM MR. WOOLDRIDGE: Judge, I don't believe
09:24AM the application was amended, but there were additions
09:24AM and replies.

09:24AM THE COURT: Okay. Just on the
09:24AM Application for Writ of Habeas Corpus?

09:24AM MR. WOOLDRIDGE: Yes.

09:24AM THE COURT: What says the Applicant?

09:24AM MR. WOOLDRIDGE: The Applicant is ready.

09:24AM THE COURT: Okay. And are you,
09:24AM Mr. Stocker?

09:24AM THE APPLICANT: Yes -- yes, sir.

09:24AM THE COURT: Mr. Stocker, this application
09:24AM was filed on your behalf by Mr. Wooldridge. You didn't
09:24AM actually sign it, but he indicates to me that he is

operating with your consent as a pro bono attorney.

Do you understand what that means?

THE APPLICANT: Yes, sir.

THE COURT: And is that with your consent?

THE APPLICANT: Yes, sir.

THE COURT: Okay. Very well. You may be seated.

What says the State?

MR. BLOUNT: The State's ready, Your Honor, but we do have a couple of matters we probably need to address right away.

THE COURT: Very well.

THE REPORTER: Can you turn on your mic, please.

MR. BLOUNT: Oh.

First of all, as I recall at our preliminary meeting with the Court over a month ago, the issue of -- of whether or not the -- the DA's office would be recused from representing the State in this writ hearing was -- was brought up and the Court denied that.

THE COURT: That's correct.

MR. BLOUNT: Subsequently, last week the Applicant caused a subpoena to issue and be served on

Warren Clark, and then yesterday at 4:00, I was served with a subpoena. I -- I can't imagine what material testimony I could give, but I -- I assume there's going to be a motion -- a Motion to -- for the Rule to be Invoked and I guess we need to know whether I'm going to be here or not.

MR. WOOLDRIDGE: Judge, the Motion to Invoke the Rule was filed last night and it was accepted this morning, so it should be available somewhere to you and a proposed order.

And we move to invoke the rule.

THE COURT: Well, the attorneys representing the State, the State being a party, are exempt from the rule. The rule of witnesses is -- will apply to all other witnesses.

What else?

MR. BLOUNT: I move to Quash the Subpoena for me, Your Honor. I -- I -- I have no material evidence to -- material testimony to the facts or anything concerning this -- the merits or the facts concerning this writ hearing.

THE COURT: Mr. Wooldridge?

MR. WOOLDRIDGE: He is a material witness.

THE COURT: In what respect?

MR. WOOLDRIDGE: Why do I have to do that before I put him on the stand? Do you want to let them know what all my defensive strategy is?

THE COURT: This is a Motion to Quash his Subpoena.

MR. WOOLDRIDGE: He is a material witness.

THE COURT: In what respect?

MR. WOOLDRIDGE: Can we put him on the stand now? I'll call him first.

THE COURT: No, I need to know whether or not to quash his subpoena.

MR. WOOLDRIDGE: He is the attorney who signed the proffer agreement with one of the witnesses who testified at Mr. Stocker's trial.

THE COURT: Very well.

The Motion to Quash is denied.

MR. BLOUNT: We also move to Quash the Subpoena issued for Warren Clark.

THE COURT: On what ground?

MR. BLOUNT: On what ground are we moving to quash it? Because he has no material testimony to give concerning the matters that are raised in this writ, Your Honor. We believe that the only thing that he is going to be called upon to testify is his -- what

09:28AM he was -- what he brought before the Court during our preliminary hearing, and that was that he met with the parents of Josh Stocker early on and then that did not result in any representation.

THE COURT: Okay. Response?

MR. WOOLDRIDGE: Mr. Clark committed some misconduct relating to a Codefendant. He is going to be called as a witness to testify about his actions in that regard, and a pattern of misconduct and malicious prosecution on the part of the State.

THE COURT: Mr. Clark will remain under subpoena.

Next from the State, are you ready?

MR. BLOUNT: He is exempt from the rule, Your Honor?

THE COURT: He is exempt from the rule.

MR. BLOUNT: Your Honor, we have prepared for the benefit of the Court the reporter's -- the transcripts of the Stocker trial so that if the Court would like to have easy access to it, we have it on a thumb drive or on a CD disc. You can have them both. It's just to help -- to help you out.

THE COURT: Thank you.

MR. LOVE: Do they need to be marked?

MR. BLOUNT: Oh. We do want it

introduced as an exhibit so that's just part of the record.

Any objections, Mr. Wooldridge?

MR. WOOLDRIDGE: What does it -- what does it contain again?

MR. BLOUNT: The reporter's record from the Stocker trial.

MR. WOOLDRIDGE: Be it all 22 volumes or so?

MR. BLOUNT: All of them.

MR. WOOLDRIDGE: Okay.

MR. LOVE: All 22 volumes, yes.

THE COURT: Any objection?

MR. WOOLDRIDGE: Without having seen it, as long as it's the record and not -- does not deviate in some material means from the records, then I wouldn't have a problem with it, as long as it's the record.

MR. BLOUNT: I represent that it is the record.

THE COURT: Certified?

MR. BLOUNT: Yes, sir.

THE COURT: Okay.

MR. LOVE: And State's Exhibit 1A is the CD disc and State's Exhibit 1B is the thumb drive with the exact same --

THE COURT: The same -- the same information.

MR. BLOUNT: We invite Counsel to review it before you --

MR. LOVE: We offer State's Exhibit 1A and 1B.

THE COURT: No objection?

MR. WOOLDRIDGE: No objection.

THE COURT: They are admitted.

MR. WOOLDRIDGE: Judge, may I have just a moment with the reporter?

THE COURT: Yes, sir.

(Pausing)

THE COURT: It seems unnecessary for me to inquire, since Mr. Wooldridge is -- is donating his time and services to you, Mr. Stocker, but the Court of Criminal Appeals wants to know whether or not you are indigent, that is without funds available with which to employ counsel for this purpose?

THE APPLICANT: Yes, sir, I am.

THE COURT: You are?

THE APPLICANT: Yeah.

THE COURT: You so swear?

THE APPLICANT: Say it again.

THE COURT: You swear so?

09:35AM THE APPLICANT: Yeah, I'm indigent.

09:35AM THE COURT: You swear that?

09:35AM THE APPLICANT: Yes, sir.

09:35AM THE COURT: Okay. Good.

09:35AM I thought it was an unnecessary inquiry, 09:35AM but there we are.

09:35AM Are you ready to proceed?

09:35AM MR. WOOLDRIDGE: I am.

09:35AM THE COURT: The Applicant may proceed.

09:35AM MR. WOOLDRIDGE: First off, there are 09:36AM several witnesses in the building who should be under 09:36AM the rule. I would like to have them sworn. That would 09:36AM be Bobbie Ledbetter, James Farren, Jeremy Fowler and 09:36AM Warren Clark and Bill Redden, as far as I know, that are 09:36AM here.

09:36AM THE COURT: Are they all available?

09:36AM MR. LOVE: I believe so. I -- I can get 09:36AM them.

09:36AM (Pausing)

09:36AM (Witnesses enter the courtroom)

09:39AM THE COURT: Any and all of those 09:39AM witnesses who are present, would you please stand and be 09:39AM sworn. Each of you who are to be witnesses in this 09:39AM cause, please stand and be sworn.

09:39AM (Witnesses sworn)

THE WITNESSES: I do.

THE COURT: All right. The rule of witnesses has been invoked and will apply to all except for the attorneys actually involved in representing the State in this case.

Do each of you understand that rule?

THE WITNESSES: Yes, sir.

THE COURT: All right. If you will remain outside the courtroom then until you are called.

Mr. Wooldridge.

MR. WOOLDRIDGE: Charles David Blount.

THE COURT: David Blount.

(Witness sworn)

MR. BLOUNT: I do, Your Honor.

THE COURT: Thank you.

Mr. Wooldridge.

CHARLES DAVID BLOUNT,

having been first duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. WOOLDRIDGE:

Q. Mr. Blount, will you please state your full name.

A. Charles David Blount.

Q. How are you employed?

A. I'm an assistant district attorney with the

Randall County Criminal District Attorney's office.
Q. How long have you been so employed?
A. Since January the 1st of 1995. So roughly 23, almost 24 years.
Q. So in 2003 then, you were employed in the same capacity?
A. I was.
Q. Okay. Do you recall meeting with any of the witnesses who were set -- set to testify or give any kind of information in this matter involving Mr. Stocker in the Dustin Pool murder?
A. I -- I don't have any independent recollection of that.
Now, in preparation for this writ hearing, I read the Amarillo Police incident reports and I believe Mark Brown's supplement indicates that I met with, I think, maybe Brooke Vandergriff.
MR. WOOLDRIDGE: May I approach?
THE COURT: You may.
Q. (BY MR. WOOLDRIDGE) Mr. Blount, I'm going to show you what I have marked as Defendant's Exhibit 1.
Do you have any recollection of that document?
A. I don't have any independent recollection, but it is my handwriting in the portion where the blank is

filled in to be taken into consideration and then my signature is there.

Now, that was 13, 14 years ago. I don't specifically remember it, but I'm sure I did because that is my handwriting and signature.

Q. Okay. Do you recall then even though -- just given your answer, do you recall a date when this document was executed?

A. Does it not have the date on there?

Q. No, sir, it does not.

A. I don't specifically remember, but it would have been sometime after March 9th of 2003. It could have been April, May, June, July. I mean, the -- the police incident report, Sergeant Brown's supplement may have the date in there. If I could see that, it might refresh my memory.

Q. But you don't dispute that you were a party to this agreement with Ms. Vandergriff?

A. I don't -- as an agent of our office, no, I don't dispute that whatsoever.

MR. WOOLDRIDGE: Your Honor, at this time I would offer into evidence Defendant's Exhibit 1.

MR. LOVE: No objection.

THE COURT: Exhibit 1 is admitted.

MR. WOOLDRIDGE: Pass the witness.

CROSS-EXAMINATION

BY MR. LOVE:

Q. If the police report indicates that occurred on December 11th of 2003, that you met with Greg Phifer, Brooke Vandergriff and Mark Brown in your office, does that -- would that be the accurate time?

A. As -- I have no reason to dispute that from the police reports. Again, I don't independently recall -- recall that.

I was -- I didn't try any of these cases. I had some involvement early on, but like I said, it's been many years. I don't specifically remember, but I don't dispute that date.

Q. And there are a couple of other places in there that refer to you as doing certain things. I think you may have met with Walt Weaver and Tyler Hale at some point, according to the police report.

A. Sure.

Q. And that a case may have been presented to you on Tyler Hale at one point, according to the police report?

A. (Moving head up and down.)

Q. And then I think that was about it in your involvement. After those events occurred, did you have any involvement in preparing for any of the trials?

09:44AM A. I don't think so. I -- I don't remember. I don't remember getting any of the cases ready for trial.

09:45AM I think at one time there was some talk about I might have been assigned one of the trials, but you know, that changed because at the time I -- I had some other murder trials that I was handling. And I think at one point I -- I talked to James Farren about, you know, I need to give something up, and I think the Pool cases were one -- one of the things I gave up because I just -- I was swamped.

09:45AM Q. At the time you were assigned to the 251st District Court. Is that correct?

09:45AM A. Actually I don't think I was. I think this was just before -- at the time I was what was referred to as trial chief, if you remember that designation in our office. It was -- Wes Clayton was still first assistant and I was kind of in a semi-supervisory role over the -- the court attorneys.

09:46AM And then I think in 2000 -- late 2004 or early 2005, I was then assigned to the 251st, but I was kind of floating at one -- at one time.

09:46AM Q. You were -- as you mentioned, you were involved in the -- the -- the other murders that were pending in the trial courts?

09:46AM A. Right.

09:46AM Q. As well as this one, the little bit that's mentioned in the police report?
09:46AM A. Yes.
09:46AM Q. But you never participated in Josh Stocker's trial in July of 2005?
09:46AM A. No.
09:46AM Q. And Frank Chacon's trial in December of 2006?
09:46AM A. No.
09:46AM Q. Or Josh -- Michael Stocker in February of 2009?
09:46AM A. No. In fact, those three trials, I don't even know that I went -- ever even went into the courtroom to watch. I mean, my only recollection of the Josh Stocker trial was seeing C.J. McElroy and Mike Watkins periodically outside during breaks. I don't even think I went -- even went in the courtroom.
09:47AM Q. And what we've discussed here in the courtroom is -- is the extent of your involvement as you can remember it anywhere from ten to 15 years later?
09:47AM A. That's right.
09:47AM MR. LOVE: I have no other questions, Your Honor.
09:47AM MR. WOOLDRIDGE: No other questions.
09:47AM THE COURT: You may step down, Mr. Blount.

09:47AM THE WITNESS: Thank you.

09:47AM THE COURT: Next witness?

09:47AM MR. WOOLDRIDGE: Bobbie Ledbetter Bruhn.

09:48AM MR. LOVE: Is there a way that we can get the next witness or -- so we don't have a long break in between. One gets off the stand and waiting for the next one to come up?

09:48AM THE COURT: That's up to the Applicant.

09:48AM MR. WOOLDRIDGE: Mr. Farren will be next.

09:48AM MR. LOVE: Mr. Farren. Thank you.

09:49AM THE COURT: That does remind me though, if any of you have one of these kind of things, please put it on vibrate or silent. Inevitably mine goes off.

09:50AM (Witness enters the courtroom)

09:50AM THE COURT: Good morning.

09:50AM THE WITNESS: Good morning, Judge.

09:50AM THE COURT: Have a seat up here, please.

09:50AM THE WITNESS: Yes, sir.

09:50AM (Witness takes the witness stand)

09:50AM THE COURT: Mr. Wooldridge.

09:50AM BOBBIE BRUHN,

09:50AM having been first duly sworn, testified as follows:

09:50AM DIRECT EXAMINATION

09:50AM BY MR. WOOLDRIDGE:

09:50AM Q. Please state your name.

09:50AM A. Bobbie Bruhn.
09:50AM Q. Was your name formerly Bobbie Ledbetter?
09:50AM A. Yes, sir.
09:50AM Q. Are you the same Bobbie Ledbetter who appeared as a witness in the -- Mr. Stocker's trial in 2005?
09:50AM A. Yes, sir.
09:50AM Q. Do you remember your testimony from that event?
09:50AM A. It's been a long time, but...
09:50AM Q. Have you had a chance to review it?
09:50AM A. Some, yes.
09:50AM Q. Did you have a chance to review it a couple of years ago with Ms. Patrick?
09:50AM A. A couple of years ago with Ms. Patrick?
09:50AM Q. Yes.
09:50AM A. I believe so.
09:50AM Q. Yeah, you filed an affidavit, didn't you?
09:50AM A. Yes, sir.
09:50AM Q. Now, way back when this began, you prepared and were a signatory to a use immunity agreement with Tori Patrick. Is that correct?
09:51AM A. Yes, sir.
09:51AM Q. Do you remember that now?
09:51AM A. I do. I remember parts of it actually.
09:51AM Q. In 2005, you said that a document didn't

09:51AM exist, didn't you?
09:51AM A. I said I could not find the document.
09:51AM Q. You said it had not been created. Is that
09:51AM correct?
09:51AM A. I said I could not find it and being unable to
09:51AM find it, I felt like there was a chance that it was gone
09:51AM over, but it hadn't been signed, I believe is what I
09:51AM said.
09:51AM Q. You testified you didn't have an independent
09:51AM memory of filling out the use immunity agreement?
09:51AM A. No, sir, I do not.
09:52AM Q. What parts of it do you remember now?
09:52AM A. I remember discussing a use immunity
09:52AM agreement. I remember going through the motions of
09:52AM talking about that with Ms. Patrick and Ms. Watson and
09:52AM Mr. Farren. I don't remember her specifically signing
09:52AM it and I don't remember filing it.
09:52AM Q. You didn't remember yourself signing it?
09:52AM A. No, sir.
09:52AM Q. How much time did you spend with Ms. Patrick
09:52AM that day?
09:52AM A. The major part of the day.
09:52AM Q. And you wouldn't remember something as
09:52AM significant as a use immunity agreement?
09:52AM A. I remember -- like I said, I remember going

through one. I don't remember everyone specifically signing it.

Q. Well, you created a document, a memo, where you said everybody signed it, didn't you?

A. Yes, sir.

Q. But when it came time for trial, you couldn't remember?

A. I had not reviewed or done anything to prepare for that and didn't have that report available to me at that time.

Q. How long have you been working in law enforcement?

A. Since '95.

Q. And what's your history in law enforcement?

A. I started out as an intern at the Randall County Sheriff's office. I then moved as a civilian lab technician. I worked crime scene from -- pretty much from '97 until 2002, and then I came to work for the district attorney's office in 2002.

Q. When you gave that testimony, was that testimony all of your own accord?

A. Yes, sir.

Q. Nobody asked you to say anything?

A. Absolutely not.

Q. You just did that all of your own?

A. No, sir -- well, yes, sir.
Q. And what role did you have in the recovery of the use immunity agreement that did not exist at the time of Mr. Stocker's trial?
A. I had no role in that recovery.
Q. When was the next time you remember ever seeing it?
A. I did not see it until it was presented to our office by a Codefendant in the Dustin Pool murders.
Q. When you created that use immunity agreement who did you give it to?
A. I don't remember.
Q. Did you give it to anybody?
A. I don't -- I don't have an independent memory of taking that specific agreement to anyone or doing anything with it.
Q. Well, would you agree that for someone to create such an important document and then lose it would be derelict?
A. Sure.
Q. Are you admitting responsibility for losing the document?
A. I was a part of that. I -- it could have been me. I -- I don't remember. I don't know. Sometimes I handle legal documents, sometimes I don't.

09:55AM Q. Do you have any idea where the document came from when it resurfaced?
09:55AM A. I -- I don't know who had it in their case. I know it was in a case file with a Codefendant, but I don't remember which one.
09:55AM MR. WOOLDRIDGE: Pass the witness.
09:55AM CROSS-EXAMINATION
09:55AM BY MR. LOVE:
09:55AM Q. When you testified in the Josh Stocker trial, was there a copy -- a signed copy of it available at that time?
09:55AM A. Of the immunity agreement?
09:55AM Q. Between Tori Patrick and the district attorney's office?
09:55AM A. To me?
09:55AM Q. Did you have one available to you?
09:55AM A. No, sir, I did not.
09:55AM Q. You testified in the middle of Tori Patrick's testimony. Is that correct?
09:55AM A. I believe that's correct.
09:55AM Q. Okay. And then they ended.
09:56AM Were you involved in any sort of search for a signed copy of Tori Patrick's use immunity agreement?
09:56AM A. Yes, sir, I was.

Q. After the -- at the end of the day?
A. I believe that's correct.
Q. Are you aware that there was a blank copy of Tori Patrick's use immunity agreement that was found?
A. Yes.
MR. LOVE: May I approach the witness, Your Honor? I'm sorry.
THE COURT: Go ahead.
Q. (BY MR. LOVE) I'm going to show you what has been marked for identification State's Exhibit Number 2. Do you recognize -- take a minute, review it and do you recognize that?
A. Yes, sir.
Q. Is this the document that you told Mr. Wooldridge you remembered reviewing with Tori Patrick, her attorney and Mr. Farren on June 28th of 2003?
A. Yes, sir.
Q. Is this the document that you were -- that you do not remember whether anybody signed this document?
A. That's correct.
Q. And this was proffered during the middle of the Josh Stocker trial -- or are you familiar with that?
A. I -- I don't know if it was proffered as evidence or not. I know a blank -- an unsigned one was

09:57AM found.

09:57AM Q. But you don't know what happened to it after that?

09:57AM A. But I don't know what was done with it, no, sir.

09:58AM MR. LOVE: I would offer State's Exhibit Number 2 into evidence.

09:58AM And just for the record, Your Honor, that is the exact copy of State's Exhibit 261 in the original trial back in July of 2005. And I don't know if the Court has the file available. Well, I know you don't have the exhibits available because I know there is like five boxes of them in the clerk's office, but that's where this exhibit came from.

09:58AM THE COURT: And it's referenced in the record.

09:58AM Any objection, Mr. Wooldridge?

09:58AM MR. WOOLDRIDGE: There's no objection.

09:58AM I was going to reference that, I believe, we've made mention of this particular document previously as well as part of our allegation that the Court was aware of these issues, at least as of the time of the end of the trial when the Court created its Court exhibit file, which was sealed and that document was contained therein.

THE COURT: Thank you. With no objection, this is received.

MR. LOVE: I would object to it being -- the -- calling it sealed. It was not sealed. It was just made a Court's exhibit and not to be used during -- in front of the jury, is the way it was -- and that's the way it was documented in the clerk's file.

THE COURT: I wasn't there, but I suspect so.

MR. LOVE: Other than that, no objection.

THE COURT: It was -- it was sealed -- not to be used before the jury?

MR. LOVE: Not before the jury.

THE COURT: Okay.

MR. LOVE: And was it admitted, State's Exhibit 2?

THE COURT: It is admitted.

MR. WOOLDRIDGE: Let me clarify for the Court. When I say it was sealed, the envelope that contained the Court's exhibits was sealed, not -- not declared sealed, but the envelope was sealed and unopened.

THE COURT: Very good. Thank you.

Q. (BY MR. LOVE) So State's Exhibit 2, you weren't present in the courtroom when that was proffered

to the Court the next day after you testified in the Joshua Stocker trial?

A. No, sir, I don't believe so.

Q. You referenced -- in your direct testimony with Mr. Wooldridge, you referenced a -- a supplement that you prepared. Is that correct?

A. Yes, sir.

Q. And I'm going to show you what is marked as State's Exhibit Number 3 for identification.

MR. LOVE: May I approach the witness again, Your Honor?

THE COURT: You may.

Q. (BY MR. LOVE) I'm going to show you State's Exhibit 3. And I want you to take a look at that and read through it. Do you recognize that document?

A. Yes, sir, I do.

Q. And what is that document? Just describe it without reading it all.

A. It's -- it's like a supplemental report that I probably did to submit to APD, noting the events that had happened on June 28th.

Q. Is there what appears to be an APD IR number at the top of that document?

A. Yes.

Q. And what is the number that is at the top of

that document?

A. IR Number 03-23750.

Q. And are you familiar with the Amarillo Police report, 125-page document, for the investigation of the Dustin Pool homicide?

A. I've seen it before, yes.

Q. Okay. And what number is on that?

A. 2003-00023750.

Q. Is that the same number that's atop of State's Exhibit Number 3?

A. Yes.

Q. And I showed you for identification State's Exhibit 4, which is the APD -- the complete 125 page APD report.

A. Okay.

MR. LOVE: I would offer State's Exhibit 3 into evidence.

And just for the record, Your Honor, it was originally identified in the Josh Stocker trial as Defense Exhibit 3. At some point during the trial, it became Court's Exhibit 3, and that's written up at the top.

MR. WOOLDRIDGE: And, Your Honor, I would reference this over to what was filed with the Application for Writ of Habeas Corpus in the memorandum

brief supporting, which was our Appendix I. It's the same document.

THE COURT: Appendix I?

MR. WOOLDRIDGE: Yes. Except ours is a smaller -- a smaller copy.

THE COURT: Okay.

MR. LOVE: Your Appendix I, did it have the -- the Court exhibits?

MR. WOOLDRIDGE: No.

MR. LOVE: Okay. And that's what I thought I remembered was, the version that's in his writ is a blank copy. It does not reference that this was in the Court's record in July of 2005, as originally Defense Exhibit 3, and then was modified during this little out-of-the-presence-of-the-jury hearing with Ms. Ledbetter that -- or Ms. Ledbetter then, Ms. Bruhn now testifying at that time.

THE COURT: Okay. And this is her supplemental report?

MR. LOVE: Supplemental report to IR 03-23750.

THE COURT: Exhibit 3 here?

MR. LOVE: It is also State's Exhibit 3 in this case, in this hearing.

THE COURT: Okay. All right.

MR. LOVE: Sorry.
MR. WOOLDRIDGE: Okay. That Court's 3, where did that come from?
MR. LOVE: That was on the exhibit that's in the clerk's office. I got this copy directly from the clerk's copy of the exhibits.
MR. WOOLDRIDGE: Can we take a moment to go get that, Judge?
THE COURT: Sure.
MR. WOOLDRIDGE: When I went through it, the disc was not in there.
MR. LOVE: It was in the same folder that you said was sealed.
THE COURT: All right. How long will you need, James?
MR. WOOLDRIDGE: Five minutes.
THE COURT: Make it ten. We'll be in recess ten minutes.
THE WITNESS: May I step down?
THE COURT: You may temporarily. Don't discuss the case.
THE WITNESS: I won't go far. No, sir.
(Recess)
(Open court, Applicant and Counsel present)

10:14AM THE BAILIFF: All rise.

10:14AM THE COURT: Thank you. You may again be seated.

10:14AM Mr. Wooldridge.

10:14AM MR. WOOLDRIDGE: Let me retract my earlier statement. That -- that document was one of the ones that was in that -- that sealed file.

10:14AM THE COURT: It was? Okay.

10:14AM So Exhibit 3 is admitted. Where is the blank one that was admitted?

10:15AM MR. LOVE: It's right here, Your Honor.

10:15AM THE COURT: Okay. All right.

10:15AM MR. LOVE: At the end of her testimony, can I provide those to you?

10:15AM THE COURT: Sure.

10:15AM MR. LOVE: I think I'm close.

10:15AM Q. (BY MR. LOVE) And just -- it's been a while since -- and I can't remember if I asked, but that is the supplement that you prepared, that later ended -- ended up in State's Exhibit 4 for identification as a supplement to the Amarillo Police Department report?

10:15AM A. Yes, sir.

10:15AM Q. And let me show you -- I'm going to show you page 105 -- 101 and 102 in State's Exhibit 4 for identification. And I do want you to do one thing for

me. I want you to take State's Exhibit 3 and compare that to the supplement that is found in APD report 03-23750 and make sure that it's identical to what State's Exhibit 3 is, please.

A. Yes, sir, it is the same.

Q. Okay.

MR. LOVE: Your Honor, I have no further questions.

THE COURT: Mr. Wooldridge.

REDIRECT EXAMINATION

BY MR. WOOLDRIDGE:

Q. Now, Ms. Ledbetter -- or Ms. Bruhn after you -- how do you pronounce your last name again?

A. Bruhn.

Q. Bruhn.

After you gave this testimony in Mr. Stocker's trial, what further involvement did you have in any of the trials with Mr. Stocker or Codefendants?

A. I probably transported witnesses, if needed, or helped out on the periphery.

Q. Did you give any further testimony?

A. I did.

Q. In what capacity?

A. I believe I was called as a witness in a

hearing with Mr. Kimberlin.
Q. Would that have been in December of 2005?
A. Yes, sir.
Q. What was the gist of your testimony at that time?
A. I was called to explain, I guess, where the use immunity agreement had been found and substantiated the supplemental report that I had submitted to APD.
Q. So by December of 2005, five months after this trial, this document had resurfaced?
A. I believe so, yes, sir.
Q. And you gave testimony at that time about it?
A. Yes, sir, I did.
Q. And your testimony in Stocker's trial was sworn?
A. Yes, sir.
Q. And at any point did you ever give further sworn testimony retracting the statements that you made in Mr. Stocker's trial?
A. Not retracting it, no, sir.
Q. I'm going to show you what I have marked as Defendant's Exhibit 2.
A. Okay.
Q. Do you recognize what this document is? And you can take a minute.

A. That is not my affidavit. Wait, wait, wait, wait.

MR. LOVE: I can't hear the witness.

A. I misread. Yeah, I was looking down here (indicating).

Okay. What was your question?

Q. (BY MR. WOOLDRIDGE) Is this, in fact, the affidavit that you filed in the State's response in a case entitled State v. Tori Patrick -- Tori Brooke Patrick in Cause Number 18,834-A in this court?

A. I believe it is.

Q. Okay. Now, you filed this shortly after the allegations were made in Ms. Patrick's case, did you not?

A. It was filed, yes, by our office.

Q. And if I represent to you that we made that document available in Ms. Patrick's case on February 23rd, 2016, would that sound right to you?

A. I'm not sure of the timeline, but...

Q. Pretty close? And this was filed in response?

A. Yes, sir.

Q. Okay. So you created this document during a long session with Ms. Patrick that lasted for hours June 28th of 2003?

A. I believe so, yes, sir.

10:23AM Q. And then in July 2005, you didn't remember any of that?
10:23AM A. I remember parts of that.
10:23AM Q. But you didn't remember signing it? Didn't remember that the document existed?
10:23AM A. I knew a document existed, but not the signed -- I couldn't find the signed one so I couldn't say that it was actually signed.
10:23AM Q. Well, would you agree with me we can refer to the reporter's record in that regard for the testimony that you gave?
10:23AM A. I'm sorry?
10:24AM Q. Would you agree with me that we can refer to the reporter's record for the details of the testimony that you gave in 2005?
10:24AM A. Sure.
10:24AM Q. We have no reason to doubt the accuracy of the reporter's record?
10:24AM A. No.
10:24AM Q. It says what it says?
10:24AM A. Sure.
10:24AM Q. And then by December of 2005, you did remember something about this document?
10:24AM A. After it surfaced and I saw the supplemental report and we put all the pieces together to find it,

yes.

Q. And you had created that supplemental report?

A. Yes, sir, I had.

Q. And the same supplemental report that you were presented with in Mr. Stocker's trial?

A. Yes, sir.

Q. And then --

MR. LOVE: I'm going -- I'm going to object, Your Honor. She was not presented with that report, I don't believe. It was Ms. Patrick who was presented with that report by Mr. Watkins. When it became Court's Exhibit 3, it was in presentation to Ms. Patrick, not to Ms. Bruhn. And the record will --

MR. WOOLDRIDGE: I will refer to the record on that. It says what it says.

THE COURT: We'll refer to the record.

Q. (BY MR. WOOLDRIDGE) And this was a five-page document you created in 2016?

A. Yes, sir. The affidavit.

Q. And, essentially, again you -- is this basically the same document you also filed in this matter?

A. I believe so, yes, sir.

Q. And so in 2016, 13 years after the event, you remember in great detail according to what you put in

this affidavit. Correct?

A. After finding documents to support it, yes.

Q. But in 2005, you didn't in the crucial point in Mr. Stocker's trial?

A. No, sir.

MR. WOOLDRIDGE: Pass the witness. I actually -- wait a minute, before I do that -- if I didn't, I offer Defendant's Exhibit 2 into evidence.

MR. LOVE: No objection, Your Honor.

THE COURT: Applicant's Exhibit 2 is admitted.

MR. WOOLDRIDGE: Pass the witness.

THE COURT: Anything further, Mr. Love?

MR. LOVE: No, Your Honor. No further questions.

THE COURT: Ms. Bruhn, your last name now is spelled B-R-U-H-N?

THE WITNESS: Yes, sir.

THE COURT: Okay. I knew you as Ledbetter.

THE WITNESS: Yes, sir.

THE COURT: Thank you. You may step down.

THE WITNESS: Thank you, sir.

MR. LOVE: Your Honor, in case we need

10:26AM her when we get around to our case, can we keep her
10:27AM under the rule and available?

10:27AM THE COURT: Please remain under the rule.

10:27AM THE WITNESS: Yes, sir.

10:27AM THE COURT: Thank you.

10:27AM (Witness exits the courtroom)

10:27AM THE COURT: I don't want to get ahead of
10:27AM anybody, but there was a signed use immunity agreement
10:27AM that has surfaced somewhere?

10:27AM MR. LOVE: Yes, sir.

10:27AM THE COURT: Are you about to present
10:27AM that?

10:27AM MR. WOOLDRIDGE: Your Honor, I think we
10:27AM could take judicial notice -- actually, I would ask the
10:27AM Court to take judicial notice of the file and its
10:27AM contents, included therein in our application at, I
10:27AM believe, Appendix H --

10:27AM THE COURT: Okay.

10:27AM MR. WOOLDRIDGE: -- is the signed use
10:27AM immunity agreement. Yeah, Appendix H.

10:27AM THE COURT: Notice is taken.

10:27AM Next witness?

10:27AM MR. WOOLDRIDGE: Judge, could we take a
10:28AM short break?

10:28AM THE COURT: Yes, we may. All right.

15 minutes, you think?

MR. WOOLDRIDGE: That will be fine.

THE COURT: All right. A 15-minute break. We will be in recess 15 minutes.

(Recess)

(Open court, Applicant and Counsel present)

THE COURT: For the record -- for the record, this Court does not permit cameras or recording devices of any kind in the courtroom. And that -- the use of any such item in the courtroom will be dealt with as if it were contempt. The device will be confiscated and gone from there. So if any of you have any -- I guess that would include in this day and age, taking photographs with your phone or any other portable device. That is prohibited.

Everybody understand?

MR. LOVE: Yes, sir.

THE COURT: All right.

Mr. Wooldridge?

MR. WOOLDRIDGE: Call James Farren.

(Witness enters the courtroom)

THE WITNESS: Do you want me to go ahead and take the seat, Your Honor?

THE COURT: Please do.

(Witness takes the witness stand)

JAMES A. FARREN

having been first duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. WOOLDRIDGE:

Q. State your full name, please.
A. James A. Farren.
Q. What does the A stand for?
A. Aubrey.
Q. Mr. Farren, how are you employed?
A. I am the Criminal District Attorney for Randall County, Texas.
Q. And how long have you been the criminal district attorney?
A. In December it will be 24 years.
Q. Now, you as the -- the district attorney, you supervise what goes on in your office. Correct?
A. I'm the criminal district attorney, and, yes, I do supervise what goes on in my office.
Q. You are responsible for all of that?
A. Well, I supervise everyone in my office, yes.
Q. Okay. And you were the lead attorney prosecuting all the cases coming out of the Dustin Pool murder. Is that correct?
A. Correct.

Q. And you were present and aware of all the motions that were filed in the matter?
A. Well, I was aware of the motions. I don't know that I was present when they were all filed.
Q. And -- well, then would you be aware -- or would you have been aware of the Motion to Produce Exculpatory and Mitigating Evidence filed in the matter by the Defense attorneys for Mr. Stocker?
A. Sure. Yes.
Q. And you were aware that the Judge ordered that motion granted?
A. Yes.
Q. Did your office ever provide the use immunity agreement signed by Tori Patrick to the Defense?
A. Apparently not. I thought we had, but apparently we had not. By the time we reached that point in the trial where it became an issue, it became obvious that apparently we had not.
Q. Now, you were the sponsoring attorney for Ms. Ledbetter's testimony. Correct?
A. For Bobbie Ledbetter?
Q. Yes.
A. Yes.
Q. Okay. And you knew what she was going to say before she said it?

A. Well, I had reviewed her testimony with her. But, no, I didn't know what she was going to say.

Q. Well, when you reviewed her testimony, did she indicate to you that she didn't remember that document existing?

A. I don't remember any specific conversation with her about her not remembering the document existed, no.

Q. Well, did you discuss with her whether the document existed?

A. I don't recall any specific discussion about that. I know that -- I recall vaguely that we couldn't find a copy in our file.

Q. Well, you were a signatory to the use immunity agreement, were you not?

A. I don't recall that either. I may have been. I was not there when the discussion with Ms. Patrick took place and when the -- I don't believe I was there when she signed it. Now, I may have signed it later.

Q. You didn't remember discussing the use immunity agreement with Ms. Patrick?

A. I didn't understand your question.

Q. You don't remember discussing the use immunity agreement with Ms. Patrick and explaining it to her?

A. I remember explaining how a use immunity

agreement worked prior to her visiting with Ms. Ledbetter for several hours, yes

MR. WOOLDRIDGE: May I approach, Your Honor?

THE COURT: You may.

Q. (BY MR. WOOLDRIDGE) Mr. Farren, I'm going to show you a document presently labeled Defendant's Exhibit 3 with the yellow label, previously labeled Exhibit Defense 15.

Do you recognize what this document is?

A. Yes.

Q. Okay. What is that document?

A. It's a use immunity agreement.

Q. Okay. And is this the use immunity agreement we're talking about with Ms. Patrick -- I'm sorry, with -- with --

A. No, this is Craig Kimberlin.

Q. Did you ever provide that use immunity agreement to the Defense?

A. In the Stocker case?

Q. Yes.

A. I don't recall. I thought we -- I remember providing a number of different use immunity agreement -- copies of use immunity agreements to the Defense in the Stocker trial, but I don't recall specifically

whether that one was tendered to them or not, since Mr. Kimberlin wasn't a witness in that case.

Q. Well, if you signed a use immunity agreement with them, did that not indicate that you were contemplating using him as a witness?

A. No.

Q. Well, if you are not going to use him as a witness, why would you bother giving him a use immunity agreement?

A. Because he is going to be reluctant to visit with us unless he has guarantees that -- that information won't be used against him as long as he abides by the rules.

Q. Well, that use immunity agreement specifically contemplates his testimony at trial, does it not?

A. No.

Q. I'll bring it back to you in a second.

I'm going to show you what has been labeled as -- in the petition -- or the application filed by Mr. Stocker, Appendix H. Do you recognize what this document is?

A. Yes, I do.

Q. Okay. What is this document?

A. That's a copy of the use immunity agreement entered into with Tori Patrick.

10:56AM Q. Okay. And are you a -- is that your signature on it?
10:56AM A. It is indeed.
10:56AM Q. So you are a signatory to this agreement?
10:56AM A. I -- I said awhile ago I was. I just don't know if I signed it while she was at the sheriff's office or whether I signed it later.
10:56AM Q. Do you have memory problems?
10:56AM A. I didn't understand your question, sir.
10:57AM Q. Do you have memory problems?
10:57AM MR. BLOUNT: I object as being argumentive, Judge.
10:57AM THE COURT: Overruled.
10:57AM A. Define memory problems.
10:57AM Q. (BY MR. WOOLDRIDGE) It's a pretty straightforward question, Mr. Farren. Do you have problems with your memory?
10:57AM A. What kind of problems do you mean, sir?
10:57AM Q. Are you forgetful of things that you participated in and you just can't remember them?
10:57AM A. Sometimes.
10:57AM Q. Something as important as a use immunity agreement?
10:57AM A. Sometimes.
10:57AM Q. How long have you had memory problems like

10:57AM that?
10:57AM A. All my life.
10:57AM Q. At what point subsequent to the trial or subsequent to Ms. Ledbetter's testimony that this document didn't exist did you -- did the document resurface?
10:57AM A. I don't know. By the time we tried Frank Chacon, someone had found a copy of it. To this day, I don't know who nor where, and I don't know what happened to the original.
10:58AM Q. Do you remember about when it resurfaced?
10:58AM A. No, sir, I do not.
10:58AM Q. Do you have any recollection of your response when somebody found this document?
10:58AM A. I -- no.
10:58AM Q. Okay. When you subsequently encountered this document for the first time after Mr. Stocker's trial, what was your response?
10:58AM A. I just said I don't recall my response.
10:58AM Q. Okay. You didn't think, oh, crap, we gave false testimony at Mr. Stocker's trial?
10:58AM A. No. We -- we may have given -- well, define what you mean by false testimony. If you mean inaccurate, yes. If you mean that we intentionally provided false information, no, we did not.

10:58AM Q. Well, when you discovered it, did you stop and think, you know what, this doesn't jive with that testimony we gave, maybe we should bring it to somebody's attention?
10:58AM A. No.
10:58AM Q. Now, were you present at the time that Mr. Fowler was examining Ms. Patrick in Mr. Stocker's trial?
10:59AM A. In Mr. Stocker's trial, yes.
10:59AM Q. Did it not concern you that when -- that he elicited testimony from her, that there was no use immunity agreement or agreement of any type?
10:59AM A. That wasn't her testimony.
10:59AM Q. Do we have any cause that you know of to doubt the reporter's record in that regard?
10:59AM A. No.
10:59AM Q. Okay. So we can trust the reporter's record from Ms. Patrick's testimony?
10:59AM A. Yes.
10:59AM Q. Do we have any cause to doubt that the use immunity agreement bearing your signature and Ms. Patrick's signature dated June 28th, 2003, is a true and accurate document?
11:00AM A. Is a true and accurate document?
11:00AM Q. Yep.

11:00AM A. I don't understand your question.
11:00AM Q. Did you enter into that agreement with her?
11:00AM A. Yes.
11:00AM Q. And the document accurately reflects the agreement into which you entered?
11:00AM A. Yes.
11:00AM Q. I'm going to show you, Mr. Farren, a document I just labeled as Defendant's Exhibit 4. Do you recognize what this document is?
11:01AM A. I do.
11:01AM Q. What is that document?
11:01AM A. This is a copy of a letter sent to C.J. McElroy on July 19th, 2004.
11:01AM Q. In that document does it reflect that Tori Patrick, in fact, had an agreement to testify -- or that she would only be -- or that she would plead to aggravated kidnapping?
11:01AM A. It says that she would be allowed to plead to aggravated kidnapping, yes.
11:01AM Q. And this is dated July 19th, 2004?
11:01AM A. Yes.
11:01AM Q. Almost exactly a year before her testimony in Mr. Stocker's trial?
11:01AM A. Well, it was sometime before his trial. I don't remember the exact date his trial started, but it

was sometime before his trial.

Q. Well, this trial ran from like July 10th through July 21st. Does that sound right?

A. Again, I don't recall the exact dates, but the letter was written several months before the trial, yes.

MR. LOVE: What number did you call that, James?

MR. WOOLDRIDGE: 4.

MR. LOVE: Didn't you call a previous document Number 4?

MR. WOOLDRIDGE: No, it was 3.

MR. LOVE: Okay. My bad.

Q. (BY MR. WOOLDRIDGE) Mr. Farren, I'm now going to show you what has been attached to Mr. Stocker's Application for Writ of Habeas Corpus as Appendix N.

Do you recognize what this document is?

A. Yes.

Q. And what is this document?

A. This is a copy of a letter sent to Jeff Robnett on July 19th, 2004.

Q. And that's a letter authored and signed by you?

A. Yes.

Q. And in this document do you not reflect that Ms. Patrick and her former attorney Jami Watson,

provided for the dismissal of a pending capital murder charge to be replaced with a charge of aggravated kidnapping, and that Patrick agreed to plead guilty to aggravated kidnapping in return for her testimony?

A. Yes.

Q. And this is dated July 19th, 2004, as well?

A. Correct.

Q. So this reflects that even prior to July 19th, prior to Mr. Robnett's appearance as Ms. Patrick's attorney when she had Ms. Watson as her attorney, you had already entered into an agreement to allow her to plead to aggravated kidnapping?

A. We had negotiated for a plea. Correct.

Q. That's a little bit more substantial than a use immunity agreement, is it not?

A. Well, it's a different kind of an agreement. I don't know how you measure substantial, but it's a different kind of agreement, yes, very different.

Q. Okay. So then there were two agreements with Ms. Patrick?

A. Well, by the time we went to trial, there was one agreement.

Q. Had one agreement been rescinded?

A. Yes.

Q. Which agreement?

11:04AM A. The agreement that she would be allowed to plead to aggravated kidnapping had been rescinded.
11:04AM Q. When was that rescinded?
11:04AM A. I don't recall the date.
11:04AM Q. Did you ever send Mr. Robnett a letter of rescinding that agreement?
11:04AM A. I don't recall whether I sent a letter or whether I talked to him verbally, but it was rescinded. Both he and Ms. Patrick were made aware of that.
11:04AM Q. How were they made aware?
11:04AM A. Again, I don't know whether a letter was sent or whether it was verbal, but they were made aware that she no longer had an offer on the table.
11:05AM Q. Who made them aware?
11:05AM A. Me.
11:05AM Q. Do you recall the date you made them aware?
11:05AM A. No.
11:05AM Q. Do you recall the circumstances under which you made them aware?
11:05AM A. I recall the circumstances being we were preparing for trial and I decided that based on everything I knew at that point, I was going to rescind the offer.
11:05AM Q. Why were you going to rescind the offer?
11:05AM A. A number of reasons.

Q. Can --

A. Number one, she was vacillating in some of her testimony, primarily concerning her culpability. I felt like her position that she was just this innocent dupe at the hands of Stocker and Kimberlin was not going to be believed by the jury. I felt like it was going to affect her credibility. I felt like her role was much greater than what I once believed it was.

And I felt like if we had any kind of agreement with her to plead to something other than what Stocker was on trial for, that we would be seen as endorsing her story, and I thought it would affect our credibility, and so I withdrew the offer from her. I withdrew offers from Guin Garcia and Michael Elliston.

Q. What agreement did Guin Garcia have?

A. I think it was -- it was similar to plead to kidnapping or aggravated kidnapping instead of facing capital murder.

Q. Did you file any document recording the recension of any of those agreements?

A. Again, I don't -- I don't remember whether a letter was sent or whether a verbal conversation took place, but the offers were rescinded.

The Defendants knew that. Those three Defendants were well aware of that and so were their

attorneys.

Q. When you rescinded Ms. Patrick's agreement, did you bring her in with her attorney and talk with them both at the same time?

A. Very unlikely, because Robnett was sort of an absentee attorney. He didn't -- he didn't come up very much. I talked to him from time to time, but it's very unlikely that he and Ms. Patrick were present at the same time when I rescinded the offer, no.

Q. Did you bring Ms. Patrick to your office to do that? Did you give her a call?

A. I don't recall. I just know she was well aware of that -- that the plea agreement was gone. She understood that the use immunity agreement was still in effect.

Q. Is there -- would there be a reason why you would record an offer for an agreement with a document, but yet not record the recension?

A. No. Sometimes I -- sometimes I talk to attorneys verbally. Sometimes I sent letters.

Q. Now, Mr. Farren, I'm going to show you again Defendant's 3. Referring to this document again, there's a label on the bottom of it preexisting which labeled it as Defense Exhibit 15.

What were the circumstances under which

11:08AM that document was offered, do you remember?
11:08AM A. I do not.
11:08AM Q. If it's a Defense exhibit, obviously it's not yours?
11:08AM A. Correct. And it indicates it was a Defense Exhibit 15.
11:08AM Q. And this is in relation to Mr. Kimberlin?
11:08AM A. Correct.
11:08AM Q. And except for the names, the use immunity agreement is pretty much identical to the one that Ms. Patrick and Ms. Garcia had. Is that correct?
11:09AM A. It's similar. I think there are probably some differences because his situation was different than hers.
11:09AM Q. Well, you participated in some pretrials of Mr. Kimberlin in December of 2005, did you not?
11:09AM A. Yes.
11:09AM Q. Do you recall this document being offered by the Defense in -- in those pretrials?
11:09AM A. I do not recall it. If you -- if -- very well may have been offered during those proceedings, but I don't have an independent memory of that.
11:09AM Q. Okay. Do you remember Tori Patrick's use immunity agreement being offered during those proceedings as well?

A. I don't have an independent memory of it, no.
Q. Now, those documents -- Ms. Patrick's unsigned use immunity agreement and Guin Garcia's actual signed use immunity agreement, they were contained in some -- in a file marked Court exhibits in the clerk's record.
Have you seen those?
A. Are you asking me if there's a clerk's record with those in them?
Q. Included with the clerk's record, the reporter's record, there was an envelope marked Court exhibits containing those agreements.
Would you agree with me -- have you ever seen those?
A. In which proceedings, sir? In Mr. Kimberlin's or --
Q. No. In Mr. Stocker's.
A. In Mr. Stocker's?
Q. Yeah.
MR. BLOUNT: Can we -- can we specify which one? There were two Stocker trials. We are talking about Joshua Stocker?
MR. WOOLDRIDGE: Josh Stocker.
MR. BLOUNT: Okay.
A. I -- I don't know. I don't think I've seen them. I mean, not as marked in an envelope in the way

you are indicating them. I don't remember seeing that, no.

Q. (BY MR. WOOLDRIDGE) Do you recall bringing up those documents and labeling -- labeling them as State's exhibits and offering them to the Court at some point after testimony was concluded?

A. In the Stocker trial?

Q. Yes, in Joshua Stocker's trial.

A. I don't have a memory of that, no.

Q. Now, in this trial you also conducted the examination of Joshua Bledsoe. Is that correct?

A. Correct.

Q. Do you remember much about Mr. Bledsoe's testimony?

A. Yes.

Q. Do you remember any discussion about what type of plea agreement he had?

A. Yes.

Q. What was his agreement?

A. I think his agreement was to plead to 20 on a murder charge, and I don't remember if there was a fine or not. But I believe the -- the agreement was that he would plead to 20 on a murder charge.

Q. Did anybody elicit that testimony during Mr. Stocker's trial?

11:12AM A. Yeah. It was discussed in front of the jury. I don't remember whether we brought it up on direct or whether Kelly did on cross.
11:12AM Q. No, no, no. Mr. -- with Josh Stocker.
11:12AM A. Oh, with Josh -- with Josh Stocker -- Bledsoe's testimony in Stocker's trial?
11:12AM Q. Yes. Did he -- did he have an agreement?
11:12AM A. Yes.
11:12AM Q. And what was that agreement?
11:12AM A. I think it was to plead to 20 for murder.
11:12AM Q. Okay.
11:12AM A. Eventually he had that agreement. Now, whether he already had it in Stocker, I don't know. I know he did by Chacon.
11:12AM Q. Well, you didn't bring out the testimony that that's what his agreement was during Mr. Joshua Stocker's trial, did you?
11:12AM A. As I said, sir, I don't recall.
11:12AM Q. Did you ever offer a copy of Mr. Bledsoe's plea agreement to the Defense?
11:12AM A. I don't know that there was a written plea agreement. There was just an agreement.
11:12AM Q. Okay.
11:12AM A. And eventually he entered a plea.
11:12AM Q. Mr. Farren, I'm going to show you what has

11:13AM been marked Defendant's Exhibit 5.
11:13AM Do you recognize what this document is?
11:13AM A. Yes.
11:13AM Q. And what is this document?
11:13AM A. This is titled a plea agreement.
11:13AM Q. State of Texas versus Joshua Craig Bledsoe?
11:13AM A. Yes.
11:13AM Q. And this agreement is signed by you?
11:13AM A. Yes.
11:13AM Q. Dated August 8th, 2003?
11:14AM A. Yes.
11:14AM Q. And also signed by Mr. Bledsoe?
11:14AM A. Yes.
11:14AM Q. And also signed by his attorney Laura Hamilton?
11:14AM A. Yes.
11:14AM Q. Did you ever provide that document to the Defense?
11:14AM A. I don't --
11:14AM THE COURT: Excuse me.
11:14AM Q. I don't have an independent --
11:14AM In which case?
11:14AM MR. WOOLDRIDGE: Joshua Stocker.
11:14AM THE COURT: Okay.
11:14AM Go ahead and answer if you can.

A. I don't recall whether it was provided to the Defense or not. I -- I don't have an independent memory of that, no.

Q. (BY MR. WOOLDRIDGE) Would it have been your office that prepared this document?

A. I assume so, yes.

Q. Okay. And you're pretty careful when you prepare these documents to make sure they say what you want them to say. Correct?

A. I try to, yes, sir.

Q. Now, this document reflects that the agreement is that you will not bring any additional charges against the Defendant, that being Joshua Bledsoe, based upon the known conduct underlying and related to the Defendant's plea of guilty. And if he gives truthful and accurate information about the death of Dustin Pool to the State, information will not be used against him in any prosecution.

Does that sound right?

A. If that's what the document says, yes. I -- I recognize -- my signature is on there, and I wouldn't have signed it unless I was aware of what was in the document and -- and didn't object to it.

Q. And that you will dismiss after sentencing any remaining charges in the pending indictment or

11:15AM information?

11:15AM A. Again, if that's what the document says, then

11:15AM it's accurate.

11:15AM Q. And -- and that you will proceed on the lesser

11:15AM included offense of murder?

11:15AM A. Yes.

11:15AM Q. And recommend a $25,000 bond?

11:15AM A. Again, I don't remember specifically that

11:15AM being part of the agreement, but if that's in the

11:16AM document, then it's accurate.

11:16AM Q. Now, this document was not entered into

11:16AM evidence in Joshua Stocker's trial, was it?

11:16AM A. I don't recall.

11:16AM Q. It's labeled as State's Exhibit 264, but if

11:16AM the clerk's record never reflects that that was either

11:16AM offered or admitted, we can fairly assume it wasn't ever

11:16AM admitted into evidence?

11:16AM A. Again, I don't have an independent memory of

11:16AM it, and I have no reason to doubt the clerk's record.

11:16AM Q. Now, the indictment against Mr. Joshua Stocker

11:16AM alleged that he suffocated Dustin Pool by putting a sock

11:16AM in his throat. Is that correct? That was the way you

11:16AM wanted the indictment to read?

11:16AM A. The indictment against --

11:16AM Q. Yes.

A. -- Josh Stocker?
Q. Uh-huh. Yes.
A. Again, I don't remember how the indictment specifically read. There would have been a number of different ways we could have -- have alleged the manner of death, the cause of death.
Q. Well, the one -- we can take the indictment for its face value. If it's suffocation by sock, then that's -- that was the charge you operated off of?
A. Correct.
Q. Okay. What was the reason why you changed the indictments against Frank Chacon and Michael Stocker to read either suffocation or by blunt force trauma?
MR. BLOUNT: Judge, I'm going to object to the relevance of --
THE COURT: Sustained --
MR. BLOUNT: -- of this hearing.
Q. (BY MR. WOOLDRIDGE) Now, during this trial with Michael -- or with Joshua Stocker, you had this big board with cast of characters thing going on. Do you remember that?
A. Yes.
Q. Okay. And where did you get all of the information for that?
A. From the investigation.

11:18AM Q. Did you get a lot of that from Tori Patrick and Guin Garcia?

11:18AM A. We got it from a number of different sources, including Tori Patrick and Guin Garcia.

11:18AM Q. How many times did you meet with Tori Patrick in order to establish all of that information and review her testimony?

11:18AM A. Oh, I don't -- I didn't meet with Tori very many times. Now, the investigators did. Mark Brown and other investigators spent time with -- with her, but I met with her a couple of times, maybe three.

11:18AM Q. Does your office keep any record of when you meet with witnesses? Do you make any notations in files, anything like that, that you met with them on this particular day?

11:18AM A. No.

11:18AM Q. So there's no record?

11:18AM A. Not to my knowledge.

11:18AM Q. Did you discuss Ms. Ledbetter's testimony before she gave it regarding the existence of Ms. Patrick's use immunity agreement?

11:19AM A. Today or in the Stocker trial?

11:19AM Q. During the Stocker trial.

11:19AM A. I -- I don't recall. I don't have a personal memory of having gone over it with her. I would assume

at some point we talked about it, but I don't remember specifically visiting with her, no.

MR. WOOLDRIDGE: Pass the witness.

CROSS-EXAMINATION

BY MR. BLOUNT:

Q. Mr. Farren, first of all, you are aware that the -- the writ that's been filed in this case and that's pending before this Court talks about two different use immunity agreements. Number one, the Tori Patrick use immunity agreement, and number two the Guin Garcia use immunity agreement. Okay?

A. Correct.

Q. All right. Let's start with the Guin Garcia use immunity agreement. One of the things -- you are aware that one of the things the Court of Criminal Appeals has remanded this case back to the trial court to develop facts concerning whether or not the Guin -- it was a Brady violation for the State to fail to disclose to the Defense during the Josh Stocker trial the signed Guin Garcia use immunity agreement. You are aware of that -- that -- that remand order from the Court of Criminal Appeals?

A. Yes.

Q. Okay. Was the Guin Garcia signed use immunity agreement provided to the Court and to Defense counsel

during the Joshua Stocker trial?

A. Yes.

Q. And was a blank copy of the Tori Patrick's use immunity agreement provided to the Defense and was the Court made aware of it during the Joshua Stocker trial?

A. Yes. If by blank you mean --

Q. Unsigned.

A. -- a printed copy, but it wasn't signed by anybody.

Q. Right. And you -- you have been shown the unsigned printed copy and you've seen the signed copy. Correct?

A. Correct.

Q. They are exactly the same, except one is unsigned and one is signed?

A. Correct.

Q. So you know that one was prepared around the time or during the time that Tori Patrick was giving a statement on June the 28th of 2003?

A. Correct.

Q. And so it was discussed?

A. Yes.

Q. And she had use immunity -- she had a use immunity agreement?

A. She did have a use immunity agreement.

Q. What -- what -- what exactly was the use immunity agreement? What -- what -- what benefit did it confer to her?

A. It allowed her to proffer to us the information she claimed to be accurate so that we could evaluate it and decide what kind of offer to make to her.

Q. Okay.

A. And she could do that without fear that information would be used against her, as long as she told the truth and told us everything.

Q. So, in other words, she -- the -- the benefit that she was conveyed was, whatever you tell us won't be used to prosecute you?

A. Correct. With the -- with the provisions that -- the safeguards that she had to be truthful and complete.

MR. BLOUNT: What exhibit would I be on Ms. -- Dina.

THE REPORTER: 5. I think 4 was talked about, but it wasn't offered.

MR. BLOUNT: May I approach the witness?

THE COURT: Certainly.

Q. (BY MR. BLOUNT) Mr. Farren, I'm going to show you what I have marked as State's Exhibit Number 7.

Would you review those documents, please.

A. Yes, sir.

Q. Do you recognize that to be a -- an excerpt of the reporter's record, Volume 11 of 22, in the trial of the -- Joshua David Stocker?

A. Yes.

Q. And that begins on -- the testimony that's within this exhibit begins on page 7 and continues to page 12.

A. Yes.

MR. BLOUNT: Judge, do you -- do you have it on your -- are you allowed --

THE COURT: I don't have it.

MR. BLOUNT: You can't find it. Okay.

Let me -- I'm going to let you have that. Well, I move to admit that portion, that excerpt, this exhibit.

MR. WOOLDRIDGE: No objection.

THE COURT: It is admitted.

MR. BLOUNT: Sorry, Judge. I should have made one extra copy.

THE COURT: You can have this one back. I'm finished with it, as long as the record has the original.

Thank you.

11:27AM Q. (BY MR. BLOUNT) Mr. Farren, would you go to page 7.
11:27AM A. Yes.
11:27AM Q. Does it -- does page 7 indicate that during the Stocker trial there were proceedings held outside the presence of the jury in which you found the blank copy -- or the unsigned copy of the Tori Patrick use immunity agreement?
11:28AM A. Yes.
11:28AM Q. Did you mark it as an exhibit, that being Number 261?
11:28AM A. Yes.
11:28AM Q. And did you provide it to the Court and to Defense counsel?
11:28AM A. Yes.
11:28AM Q. Did you mark State's Exhibit 263, being -- and I'm referring now to page 8.
11:28AM A. Right.
11:28AM Q. -- State's Exhibit Number 263, an immunity agreement with Guin Garcia?
11:28AM A. Yes. But the Defense indicated they already had 263.
11:28AM Q. Correct. So they had the Guin Garcia signed use immunity agreement?
11:28AM A. According to Mr. Watkins, yes, sir.

11:29AM And I might add, they had Ms. Ledbetter's incident report, which indicated there was also an agreement with Tori Patrick, and they did have that report.

11:29AM MR. WOOLDRIDGE: Objection, nonresponsive.

11:29AM THE COURT: Overruled.

11:29AM Q. (BY MR. BLOUNT) Did you also provide a copy of the Brooke Vandergriff proffer agreement?

11:29AM A. Yes.

11:30AM MR. BLOUNT: Approach the witness again, Your Honor?

11:30AM THE COURT: You may.

11:30AM Q. (BY MR. BLOUNT) State's Exhibit Number 5 for purposes of this hearing, which was labeled 262, is that the Brooke Vandergriff proffer agreement that you provided to Counsel and Court during the trial?

11:30AM A. Yes.

11:30AM Q. State's Exhibit Number 6, which is labeled 263, is that the Guin Garcia signed use immunity agreement you provided to the Court and Counsel during the Josh Stocker trial?

11:30AM A. Yes.

11:30AM Q. State's Number 8, which is labeled Number 264, is that the Josh Bledsoe plea agreement that you

provided to Counsel and the Court during the Josh Stocker trial?

A. Yes.

MR. BLOUNT: I offer State's Exhibits 5, 6 and 8.

MR. LOVE: At the same time, Your Honor, could we substitute a certified copy of State's Exhibit 2? It's a color copy, as well. It's much easier to read.

THE COURT: You may.

MR. LOVE: Thank you.

THE COURT: Thank you.

MR. WOOLDRIDGE: No objection.

THE COURT: It's substituted.

No objection to these?

MR. WOOLDRIDGE: No objection.

THE COURT: 5, 6 and 8 are all admitted.

Q. (BY MR. BLOUNT) In fact, did you -- when you disclosed the unsigned agreement -- this was -- it was marked as an exhibit. Were you prepared to allow the Defense to offer it in front of the jury?

A. Yes. And I -- I was surprised when Mr. Watkins indicated he didn't wanted it offered in front of the jury.

Q. And to your knowledge, it never was?

11:32AM A. I don't recall it ever being introduced. No.
11:33AM MR. BLOUNT: May I approach the witness, Your Honor?
11:33AM THE COURT: You may.
11:34AM Q. (BY MR. BLOUNT) I'm going to show you what I have marked as State's Exhibit Number 9. Would you review that document, please.
11:34AM A. Okay.
11:34AM Q. Do you recognize that to be an excerpt of the testimony of Tori Patrick during the Josh Stocker trial?
11:35AM A. Yes.
11:35AM Q. Referring to page 217, Volume 10 of 22, does it indicate that Mr. Watkins asked Ms. Patrick, "I asked you about a use of immunity -- or about an immunity agreement earlier. Do you remember that?"
11:35AM What did she answer?
11:35AM A. She answered, "Yes, sir."
11:35AM Q. "And you don't remember signing anything. Correct?"
11:35AM Her answer?
11:35AM A. "Yes, sir."
11:35AM Q. "Do you remember talking with the DA's office about them not using your testimony against you?"
11:35AM Her answer?
11:35AM A. She said, "Yeah. We've -- we've talked about

it."

Q. And she was asked, "And that's the general understanding, is that whatever you tell them won't be used against you."

What was her answer?

A. Her answer was, "Yes".

Q. And you -- isn't that the functional equivalent of a use immunity agreement?

A. Yes. She has described the agreement she had with us.

MR. BLOUNT: Offer State's Exhibit 9.

MR. WOOLDRIDGE: No objection.

THE COURT: Exhibit 9 is admitted.

Q. (BY MR. BLOUNT) Mr. Farren, what was the -- things have changed, wouldn't you agree, since 2005 and today in regards to files and how files are maintained in the DA's office?

A. In our office, yes, sir, they've changed considerably.

Q. Okay. And things have changed in regards to discovery?

A. Yes.

Q. In 2005, when the Josh Stocker trial was conducted, were files maintained in a different -- how were they maintained at that time?

A. Every -- everything was -- every paper instrument was a hard copy. And in the Stocker case there were boxes of documents and papers and all of them were in hard copy and it was cumbersome to keep up with and keep organized.

Q. And what was your -- what was the discovery policy during that period of time?

A. I believe at that point we still had an open-file policy. We would allow the Defense to review our entire file, other than work product, and there was a copy machine available and they could copy whatever they wanted out of the file. I believe that was still the policy at that time.

Q. Now, you were aware that Bobbie Bruhn, Bobbie Ledbetter at the time, made a supplemental report concerning her time spent at the -- at the jail interviewing and taking a statement from Tori Patrick on June 28th of 2003?

A. Yes.

Q. Did you instruct her to -- to destroy that supplement?

A. No.

Q. To hide it?

A. No.

Q. You -- you know that it contained references

to Tori Patrick signing the use immunity agreement?
A. I understand that's what it indicated, yes.
Q. And that you signed it?
A. Yes.
Q. Are you aware that -- that her supplement was apparently sent to the Amarillo Police Department and included within their official supplemental reports concerning the Dustin Pool homicide?
A. Yes.
Q. Now, all of that's provided -- was provided as discovery?
A. Yes, it was -- all of that became part of our file, which was made available to the Defense to review and copy as they saw fit.
Q. If it was your intent to hide the signed use immunity agreement with Tori Patrick, would you agree with me that you did a poor job?
A. Yes.
Q. In fact, during the -- that's how it all came out during the trial, wasn't it, that Mr. Watkins had Ms. Ledbetter's supplemental report referring to a signed agreement?
A. Correct. Mr. Watkins, as he explained to the Court, was aware -- there should be a document entitled a use immunity agreement somewhere in the file he got

from us, and he couldn't find it. And so we began to look through our file.

Q. You were shown or asked about Defense Exhibit Number 4, which you identified as a letter that you sent in 2004 to C.J. McElroy, reflecting that Tori Patrick would be allowed to plead to aggravated kidnapping?

A. Yes.

Q. You identified that earlier in your testimony?

A. Yes.

Q. So in 2004, you attempted or did cause a letter to be sent to the Defense counsel, the lead counsel for Josh Stocker, informing her about this -- this perspective agreement?

A. Yes.

Q. Again, if you were attempting to hide that fact, do you agree with me you did a pretty poor job?

A. Yes.

Q. You also sent a similar letter the same -- at the same time to Tori Patrick's lawyer, Jeff Robnett?

A. Correct.

Q. Now, you've indicated that between that time when you sent this letter to Robnett and to C.J. McElroy, things changed?

A. Yes.

Q. There was this -- vacillations?

A. Yes.
Q. And eventually you informed Counsel that the deal had been -- that there was no deal?
A. Right.
Q. You're aware, aren't you, the affidavit that Tori Patrick has signed that was included in the Josh Stocker writ?
A. Yes.
Q. You've read it?
A. I have.
Q. You are aware that she makes some specific allegations of misconduct on your part?
A. Yes.
Q. Among which are that you didn't like Jeff Robnett and informed her to fire Jeff Robnett, get rid of him?
A. I'm aware that that's her accusation, yes.
Q. Do you agree with that accusation?
A. No.
Q. The -- the -- the relationship, if you want to call it that, between you and Robnett was difficult because of the distance?
A. Well, it was -- it made it more difficult to communicate with him. It actually -- I mean, there were a lot of defendants and a lot of attorneys, so one less

-- if one of those attorneys is going to be sort of long distance and not in my hair all the time, that's fine with me.

Q. Okay. Are you aware that Ms. Patrick has stated in her writ affidavit that you instructed her to omit from her testimony that -- that Dustin Pool was a snitch?

A. I'm aware that that's what she claims, yes.

Q. You -- you laugh at that. Can you tell me why you find that amusing?

A. Well, part of our primary theory of the case was that Craig Kimberlin and his crew believed that Pool was a snitch, and that was part of the motive to act against Pool. That's part of what led to his kidnapping and death, the very fact they believed that he was a snitch and that he was the source of information that led to a raid on Kimberlin's house, I think, in November of the previous year.

So it would -- it would be -- it would make no sense for -- for me to instruct Tori not to talk about him being a snitch. I would want the jury to know that she and others believed he was a snitch.

Q. I'll show you what I have marked as State's Exhibit Number 10. Would you examine the exhibit, please.

11:45AM A. Yes. Okay.

11:46AM Q. Does this appear to be excerpts of the testimony of Jessica Kimberlin, Volume 9 of 22, in the trial of Joshua David Stocker?

11:47AM A. Yes.

11:47AM Q. Now, Jessica Kimberlin, I believe, was actually the State's first witness in that trial. Do you recall that?

11:47AM A. I -- I don't have an independent --

11:47AM Q. It's okay if you don't.

11:47AM But however on page 50, I would like to direct your attention.

11:47AM A. Okay.

11:47AM Q. Page 50 of exhibit -- was Jessica asked whether her husband, Mr. Kimberlin, had any opinions about who had narked on him.

11:47AM Now, this was in regards to the fact that Kimberlin's house had been the subject of a search warrant?

11:47AM A. Correct.

11:47AM Q. Okay. And -- and so she was asked whether her husband had any opinions about who had narked on him, wasn't she?

11:47AM A. Yes.

11:47AM Q. And what was her response?

11:47AM A. That, yes, she and Mr. Kimberlin had discussed that.
11:47AM Q. And -- and -- and she was asked, "Who do you think narked on him"?
11:47AM A. And she said "Dustin Pool".
11:47AM Q. "So he believed Dustin Pool had somehow given information to law enforcement authorities that led to this raid on his home?"
11:48AM Her answer was?
11:48AM A. "Yes." Her answer was "Yes".
11:48AM Q. Okay. So this was information elicited by the State?
11:48AM A. Correct. By me.
11:48AM Q. And then on page 59, near the bottom, was she asked, "Do you -- in addition to Mr. Kimberlin, do you remember anyone else talking about Mr. Pool being a nark or having to do with snitching people off?"
11:48AM And her answer was what?
11:48AM A. She believed Josh Bledsoe also believed that Pool was a snitch.
11:48AM Q. Page 121, near the bottom.
11:48AM A. Yes.
11:48AM Q. The question by you to Ms. Kimberlin, "Do you know if Mr. Kimberlin ever believed that -- you've mentioned that he thought that Mr. Pool had narked or

snitched on him, and Bledsoe also said something about that. Do you remember any discussions or any names of anyone else that they thought might have snitched them, snitched on them or narked on them?"

And she answered, "Yes, sir". Right?

A. Yes.

Q. And then that's a discussion about Keith Simpson?

A. Yes, correct.

Q. And then on page 123, did you ask her, "In addition to Mr. Pool and Mr. Simpson, do you know, was there any other people suspected of being a nark or a snitch. If you know?"

And her answer was?

A. "No." She answered "No".

She didn't know of anyone else.

Q. And then on the next page finally in regards to Ms. Kimberlin, did you ask her, "Okay. Did -- did Mr. Kimberlin or anyone else in the group ever have any discussions in your presence or with you about Mr. Pool's father being somehow connected with the DEA?"

Her answer was what?

A. "Yes."

Q. And did you ask her, "Is that part of the reason that they thought he might be a snitch?"

Her answer?
A. She said, "Yes".
That is part of the reason they thought he was a snitch.
MR. BLOUNT: Offer State's Exhibit 10.
MR. WOOLDRIDGE: No objection.
MR. BLOUNT: There was no objection, Judge.
THE COURT: No objection. 10 is admitted.
Q. (BY MR. BLOUNT) I'm showing you what I have marked as State's Exhibit Number 11 and ask if you recognize that -- or -- or examine it first and then let me know.
A. Okay.
Q. Does the exhibit appear to be excerpts of the direct examination by you of Josh Bledsoe during the trial of Josh Stocker?
A. Yes.
Q. Volume 12 of 22?
A. Yes.
Q. On page 60 toward the bottom did you ask Mr. Bledsoe, "And how did Mr. Kimberlin feel about that? What did he think was going on?"
And you were referring to the raid on his

house?

A. Correct.

Q. And he answered, "About the raid?" And you said, "Yeah."

What was his answer?

A. He -- that he thought the police figured -- that that's how he thought the police figured out to raid him, did he think somebody had snitched him off, and he replied he thought Dustin Pool told on him.

Q. Did you ask him if he thought anybody else did or just Dustin as far as you, Bledsoe, know?

A. Yeah.

Q. And his answer was what?

A. He said, "Dustin, as far as I know."

Referring to Dustin Pool.

Q. Did you ask him how -- "And how did he feel about that?" Referring to Mr. Kimberlin. "Was he happy that Dustin had snitched or narked on him?"

And your -- his answer was what?

A. He talked -- he said Kimberlin was talking pretty bad about it, like Dustin was the one who was responsible for it.

Q. Okay. On page 116 towards the bottom. Now, this part of the testimony is about once they had Pool at the farm -- Elliston's farm.

A. Correct.
Q. And they had him in the chair upstairs?
A. Correct.
Q. Did you ask Josh Bledsoe was he just sitting in the chair. And his answer was what?
A. He indicated he had -- he had been stripped of his clothing and that they were checking him for a wire.
Q. Okay. And -- and then he was asked -- was he taped -- why was he taped and -- and what with, I guess.
A. Right.
Q. And his answer was what?
A. Again, he says he was naked. They told me they were looking for a wire because they thought he was a snitch.
Q. And then did you ask him about whether he had ever heard of Pool's father being involved in the DEA or Pool being involved with the DEA?
And his answer was what?
A. He said, "I heard that his dad worked for the DEA."
Q. And on page 119 towards the top, did you ask him, "Now, after Mr. Chacon had explored the Jessa situation" -- now Jessa was some other girl that they supposedly were upset with Pool about that they interrogated him.

A. Well, she was -- in context this is during the Stumpy's meeting, Pool was supposedly over at Jaguars and Jessa was somehow involved with Pool at Jaguars.

Q. Okay. So you asked Bledsoe, after Chacon had talked to him about -- talked to Pool about Jessa, did Kimberlin talk to him about being a snitch?

A. And -- and he answered, "Being a snitch" before I could even finish the question.

Q. Okay. And then -- then his answer was -- or you asked him, "Being a snitch, about the raid on his house in November."

Was that --

A. And he said -- he said, "Yes, sir".

Q. Okay. So, again, Mr. Farren, the idea -- the belief by Kimberlin and Bledsoe and others that -- that were associated with them, Frank Chacon or Josh Stocker or any of those, that they may have thought Dustin Pool was a snitch fell right in with your presentation of this case?

A. Yes. It was an intricate part of our theory of the case as to the motive for kidnapping Pool and doing bad things to him.

Q. And so if Tori Patrick had indicated to you that she had some knowledge that Dustin Pool was a snitch, that would have been helpful to your case?

11:56AM A. Oh, absolutely.
11:57AM Q. Ms. Patrick in her writ affidavit specifically accuses you of instructing her to testify falsely concerning her belief that Josh Stocker was merely going to confront Dustin Pool at her apartment and take it outside.
11:57AM Do you remember that?
11:57AM A. Right. Yes, I remember.
11:57AM Q. Okay. Now, before going any further with that, let me ask you this: You are aware that prior to her trial testimony in Josh Stocker -- I'm talking about Tori Patrick.
11:57AM A. Right.
11:57AM Q. She had given an affidavit to Mark Brown with the Amarillo Police Department?
11:57AM A. Correct.
11:57AM Q. She had given a detailed nine-page affidavit on June 28th of 2003, at the Randall County Jail where at this same -- at the same time this use immunity agreement was generated?
11:58AM A. Correct.
11:58AM Q. And then approximately a year after that she met with you, with her lawyer, Jeff Robnett, and gave a two-page-clarifying affidavit?
11:58AM A. Correct.

Q. Are you aware of whether or not in any of those statements that Tori Patrick gave, she mentioned that she had knowledge that Dustin Pool was a snitch?

A. No, I don't. I don't recall her ever saying that.

Q. All right. In regards to her assertion that you told her to testify falsely, that Josh Stocker was supposed to confront Dustin Pool if she got him over to her apartment and was going to take it outside, did you instruct her to testify falsely in that regard?

A. No.

MR. BLOUNT: I want to offer State's Exhibit Number 11. I forget to do that. That was the previous one, Bledsoe's excerpt.

MR. WOOLDRIDGE: No objection.

THE COURT: 11 is admitted.

Q. (BY MR. BLOUNT) Mr. Farren, I'm going to show you what I have marked as State's Exhibit 12. If you will review that, please.

I'm sorry. I didn't give you 11, did I?

THE COURT: No.

MR. BLOUNT: Right there.

THE COURT: Okay. Thank you.

Q. (BY MR. BLOUNT) Does that appear to be an excerpt of the testimony of Tori Patrick in Volume 10 of

22 in the trial of Joshua David Stocker?
A. Yes.
Q. This will be on page 190 -- actually, this is the cross-examination by Mr. Watkins.
A. Correct.
Q. Okay. And on page 190 was Ms. Patrick asked, "Now, you also said that you didn't have any idea that any fight was going to go on in your apartment"?
And her answer was what?
A. "They weren't supposed to -- they weren't supposed to fight in my apartment."
Q. And then she was asked, "So why would you need to go hide"?
And here she's -- he's asking about her going to the bathroom because she was told to go in the bathroom at -- by Josh Stocker --
A. Correct.
Q. -- once they confronted Pool. Right?
A. Correct.
Q. "So why would you need to go hide?"
And her answer was what?
A. Well, she said -- it's just what -- "Because they were going to -- what Josh was saying he was going to go get him in a choke hold, to get him out of my apartment."

Q. And that she was supposed to be in the bathroom until they got -- until they got him out?

A. Right. This is -- this is part of the vacillation that went on.

And by the -- by the time of trial I -- I can't tell the witness what to say, but I had -- I believe she knew more about what was going to happen than she was willing to admit, but I can't dictate to her what she is going to testify to.

Q. But nevertheless, in regards to her specific allegations in the writ affidavit that you told her to lie about this and that she testified that that was what was supposed to happen?

A. Right. Correct.

MR. BLOUNT: Offer State's Exhibit 12.

MR. WOOLDRIDGE: No objection.

THE COURT: Admitted.

We'll take a lunch recess at this time. Please keep in mind all previous instructions, Mr. Farren.

THE WITNESS: Yes, sir.

THE COURT: We'll resume at 1:30.

MR. WOOLDRIDGE: 1:30.

MR. LOVE: Your Honor, may Dave, James and I approach?

THE COURT: Sure.

THE REPORTER: Do you want a record?

MR. LOVE: No, it doesn't need to be.

THE COURT: We will be in recess until 1:30.

(Open court, Applicant and Counsel present)

THE BAILIFF: All rise.

THE COURT: Thank you. You may again be seated.

Everybody ready?

MR. BLOUNT: Ready.

THE COURT: You may resume.

MR. BLOUNT: Thank you.

Q. (BY MR. BLOUNT) Mr. Farren, I've handed you what I have marked as State's Exhibit 13. Would you review that document and let me know when you've had a chance to look at it.

A. Okay.

Q. Tori Patrick in her writ affidavit has accused or asserted that you told her to testify falsely in regards to her -- that -- that Josh Stocker wanted her to get Dustin Pool to her apartment so that he could be confronted and that they were supposed to go out in the yard and fight.

Are you aware of that accusation in her writ affidavit?
A. I'm aware that that's her version at this point.
Q. Okay. You -- you assert however that you did not instruct her to testify falsely about that?
A. That is correct. I did not instruct her to testify falsely about that or anything else.
Q. Now, State's Exhibit Number 13 appears to be a -- an excerpt of the testimony -- the direct examination or testimony of Tori Patrick in Volume 10 of 22, page 105, in the Joshua Stocker trial.
A. Correct. Correct.
Q. Now, on page 105, was she asked -- and this is on direct examination by the State. Was she asked -- or did she say, "I didn't want to get involved at first with anything -- anybody getting hurt." And then was she asked, "And did they say what would happen to Dustin Pool if you were successful in getting him to your apartment"?
What was her answer to that question?
A. She said, no, that all -- all she was told was that Josh wanted to fight him. That they had been trying to get Dustin to come out of his house and -- come out and meet him. They tried several times, but

01:44PM Dustin wouldn't -- wouldn't come out, wouldn't meet him.
01:44PM Q. And what did she say at the end of that answer, "That they wouldn't do --"
01:44PM A. Oh, they said -- she said, "That they -- that they wouldn't do it in my apartment".
01:44PM Q. So she alleges that you were -- you instructed her to testify falsely, but she testified to that?
01:44PM A. Correct.
01:44PM Q. Now, on July the 28th -- I'm sorry -- June 28th, 2003, she gave the detailed nine-page statement to Bobbie Ledbetter at the Randall County Jail?
01:45PM A. Correct.
01:45PM Q. And she was represented by Jami Watson at that time?
01:45PM A. Yes.
01:45PM Q. And Jami Watson, as far as you know, was present with Tori Patrick throughout the process of taking that affidavit?
01:45PM A. Correct.
01:45PM Q. Do you recall in that statement that she gave, that she said that Stocker told her that he would not fight in her apartment, that they would do it elsewhere and not mess up her place?
01:46PM A. Yes.

Q. She came in approximately a year later with her new attorney, Jeff Robnett, and gave a short two-page clarifying statement to Bobbie Ledbetter?

A. Correct.

Q. In fact, Jeff Robnett, her attorney, witnessed that two-page statement?

A. Correct.

Q. In that statement do you recall that she said they were supposed to fight, but not in my apartment. I thought that Josh just wanted to kick Dustin's ass for calling and harassing him?

A. Correct. I mean, correct, that's what she said in the statement.

Q. Okay.

MR. BLOUNT: Move to introduce State's Exhibit 13.

MR. WOOLDRIDGE: No objection.

THE COURT: Admitted.

Q. (BY MR. BLOUNT) Now, would you look at what I have marked as State's Exhibit 14.

A. I have.

Q. Does that appear to be an excerpt, the testimony of Tori Patrick, on direct examination, again, in the trial of Joshua Stocker?

A. Yes.

01:47PM Q. On page 147 was she asked, "Can you describe or show with your fingers what the tip or the end of the fireplace poker looked like?"
01:47PM Was she asked that question?
01:47PM A. Yes, she was asked about that. Correct.
01:47PM Q. And did she -- how did she answer?
01:47PM A. She said, "It was hard to tell. It was black."
01:47PM Q. Okay. Now, she has accused you in her writ affidavit of telling her to testify falsely about the fireplace poker, in that it had no damage and no blood on it?
01:48PM A. Correct. That's what she claims that I told her to say.
01:48PM Q. Okay. Is -- was there anything about that question that I just asked you about that -- that prompts her to -- to answer about damage or blood?
01:48PM A. No.
01:48PM Q. Okay. Then she was asked -- I mean, or -- or the questioner, which was Jeremy Fowler, I believe, isn't that right?
01:48PM A. Correct.
01:48PM Q. After she said, "It was hard to tell. It was black." Jeremy said, "Okay".
01:48PM And then Ms. Patrick offered what?

A. She -- she volunteered then that when -- "I mean, when -- when we wiped it off there was a little bit of blood on the --"

And that's where it ends.

Q. And that's where Jeremy interrupted her apparently?

A. Correct.

Q. So was that testimony elicited from her?

A. She volunteered it. It was in response to the statement, okay.

Q. Okay. And once she began to say something about wiping up -- there was a little bit of blood on it, Jeremy interrupted and said, "Okay. And can you show for the jury with your fingers. Was it crooked, was it straight, how was it"?

And her answer was?

A. She describes it as being -- kind of goes straight and then you -- it's just like a fireplace poker goes off.

Q. And then he asked her, "So it has a little crook?"

A. And she says, "Uh-huh" -- "Yeah, uh-huh."

Q. Okay. So she -- she accuses you of -- of telling her not to testify about the blood, but she is the one who volunteered it?

01:49PM A. Correct.
01:49PM Q. Jeremy never asked her about that?
01:49PM A. Well, and -- of course, we don't know what she's making -- correct, he didn't. Her response not only is volunteered, but she talks about wiping it off. Now, I don't know what they are wiping, but she does mention blood.
01:50PM Q. You were present through the three trials?
01:50PM A. Correct.
01:50PM Q. Joshua Stocker, his brother Michael Stocker and Chacon?
01:50PM A. Correct.
01:50PM Q. Do you recall her ever testifying at all at any point about any damage to the fireplace poker?
01:50PM A. No.
01:50PM Q. Or that either it had damage or didn't have damage?
01:50PM A. No.
01:50PM Q. Was she ever asked about that?
01:50PM A. No.
01:50PM Q. You're familiar with fireplace pokers?
01:50PM A. Yes.
01:50PM Q. And you know that the evidence in this case suggested that certainly the State's -- the State asserted that Joshua Stocker hit Dustin Pool in the head

with a fireplace poker?

A. Correct.

Q. Based on your -- your experience and your lifetime with fireplace pokers, would it surprise you that a fireplace poker that struck somebody in the head had no damage?

A. No, I would imagine it probably wouldn't have damage.

Q. Okay.

MR. BLOUNT: I offer State's Exhibit 14. Did I give you a copy? I'm sorry. Excuse me. I meant to.

MR. WOOLDRIDGE: No objection.

THE COURT: 14 is admitted.

Q. (BY MR. BLOUNT) I would like to direct your attention to what I've marked as State's Exhibit 15.

A. Yes.

Q. Tori Patrick accused you in a writ affidavit that she was supposed to testify falsely or omit information that her last call to Dustin Pool went unanswered except for voicemail. And in my last voicemail for Dustin Pool, I instructed him not to come over as I had developed a bad feeling.

Are you familiar with that accusation?

A. I'm familiar with -- yes, that that's what she

01:52PM claims in her affidavit.
01:52PM Q. And your answer to that is you did not --
01:52PM A. No.
01:52PM Q. -- instruct her --
01:52PM A. No.
01:52PM Q. -- any -- in any such way?
01:52PM A. No.
01:52PM Q. In fact, sir, in State's Exhibit 15, have you had a chance to review that?
01:52PM A. Yes, I have.
01:52PM Q. Does that appear to be an excerpt of the direct examination of Tori Patrick at page 90 -- I'm sorry -- at page 112, 113 and 114 of Volume 10 of the State of Texas versus Joshua Stocker?
01:52PM A. Yes.
01:52PM Q. In referring to page 112 about midway through the page -- this is on direct examination by Mr. Fowler, did she indicate, "And I told him at one point not to come over, but he came any way?"
01:53PM A. That's correct. That's what the transcript reflects.
01:53PM Q. And that was -- she was referring to Dustin Pool?
01:53PM A. Correct. About six lines earlier the context is Dustin Pool.

01:53PM Q. And then the next page, 113 towards the middle, the question by Mr. Fowler was, "And so you were having reservations about getting him over to your apartment at this first phone call that he called you back"?

01:53PM And the Court apparently noted that she might have been confused about the question and asked her, "Do you understand the question?" And she said really -- "Not really, no."

01:53PM And so Mr. Fowler rephrased it.

01:53PM A. Right.

01:53PM Q. Okay. And this indicates that her earlier answer was now presumed that -- and so you were having reservations about getting him over to your apartment.

01:54PM A. Correct.

01:54PM Q. Right?

01:54PM A. Yes.

01:54PM Q. And on page 114 at the top does Mr. Fowler ask her, "And then did he call back." And did she -- what did she indicate?

01:54PM A. She says, "No, I tried to call him back."

01:54PM Q. And he asked her, "Why did you try to call him back?"

01:54PM And her answer?

01:54PM A. Tell him not to -- to tell him not to come

01:54PM over. He said he was coming anyway. I tried again to
01:54PM call him, but he wouldn't answer the phone.
01:54PM Q. And did Mr. Fowler ask her, "And why were you
01:54PM trying to tell him not to come over"?
01:54PM Her answer?
01:54PM A. And she -- she said, "Because -- I don't know.
01:54PM I started just -- it was late already and I don't know.
01:54PM I started having doubts."
01:54PM Q. So she testified -- she testified in the trial
01:54PM to these facts that she's accusing you of -- that you've
01:55PM told her to omit these facts?
01:55PM A. Correct.
01:55PM MR. BLOUNT: We offer State's Exhibit 15.
01:55PM MR. WOOLDRIDGE: No objection.
01:55PM THE COURT: It is admitted.
01:55PM Q. (BY MR. BLOUNT) Referring to what I have
01:55PM marked as State's Exhibit 16, have you had a chance to
01:55PM review that?
01:55PM A. Yes, I have.
01:55PM Q. Does that appear to be a transcript or an
01:55PM excerpt from Volume 9 of 22, the trial of Joshua Stocker
01:56PM at page 275?
01:56PM A. Correct.
01:56PM Q. Now, this is the testimony on direct
01:56PM examination by you of -- of Mark Brown the lead

investigator from this homicide.
A. That is correct.
Q. And at page 275 at the top, does it indicate that -- that -- during this course of her calling Pool and Pool -- that Pool called her back?
A. Right.
Q. And when he did what did Mr. Brown say that he had learned about that?
A. In that context that he -- Brown indicated that he learned from her that he -- that he, Pool, did call back -- called her back. Saw her number on his caller ID, called her back and said he was coming over. She said she told Dustin, don't come over. It's getting late. I'm getting ready to go to bed, and he said, I'm coming over anyway. She said don't do that. And she says the next thing she knew, he was buzzing to get in -- in the apartment complex.
Q. So, once again, she was allowed to testify to those facts and Mark Brown testified to those facts?
A. Correct.
MR. BLOUNT: Offer State's Exhibit 16.
MR. WOOLDRIDGE: No objection.
THE COURT: 16 is admitted.
Q. (BY MR. BLOUNT) Further, Tori Patrick has accused you of coercing her into testifying falsely or

omitting information that Dustin Pool -- she knew Dustin Pool carried a gun, that when he was confronted by the Stockers in her apartment, that he pulled the gun and it was taken away from him.
Are you familiar with that accusation?
A. I'm -- I'm aware that that's her claim in her affidavit, I think --
Q. And you do deny --
A. -- concerning Mr. Stocker.
Q. Okay. And you do deny that?
A. Oh, no. I never -- yeah, I absolutely deny it.
Q. To your knowledge, did she ever testify about Dustin Pool having a gun?
A. No.
Q. In any of the three trials?
A. No.
Q. At her plea hearing?
A. No.
Q. You are familiar with the -- an affidavit given by a lady named Jennifer Vest?
A. Yes.
Q. Jennifer Vest was a -- supposedly a co-worker of Ms. --
A. Co-worker and friend.

Q. -- Patrick?

And that she had supposedly learned information from Tori Patrick before she had ever even encountered Mark Brown, much less you?

A. Correct. She was one of the -- she was one of the people that was a source that led to Tori.

Q. And in Ms. Vest's affidavit that you had as part of your file --

A. Right.

Q. -- did -- did Ms. Vest indicate that Tori Patrick ever mentioned anything about a gun?

A. No.

Q. You are aware that Ms. Patrick's ex-husband, Jeremy Patrick, had given an affidavit about a conversation he had with Tori Patrick before she ever talked to Mark Brown?

A. Correct.

Q. Much less yourself?

A. Correct.

Q. And he gave an affidavit about that conversation that was part of your file?

A. Correct.

Q. Did Jeremy Patrick indicate that Tori Patrick ever said anything about Dustin Pool having a gun?

A. No. No, he did not indicate she ever

mentioned a gun -- not that Dustin Pool had.

Q. In the affidavit she gave Mark Brown, which was given long before she gave you and Bobbie Ledbetter the nine-page affidavit at the jail, did she indicate -- did she mention a gun?

A. No.

Q. In the nine-page affidavit that she gave over the course of five hours or more at the Randall County Jail, did she mention a gun?

A. No.

Q. Now, she was represented by counsel --

A. Correct.

Q. -- at that time?

A. Correct.

Q. A year later in the two-page clarifying affidavit with Robnett -- her attorney, Robnett, present and witnessing the statement, did she mention a gun?

A. No.

Q. During the trial of Joshua Stocker this idea that -- that Pool had a gun and pulled it did come up through Jessica Kimberlin, didn't it?

A. Correct.

Q. Now, Jessica Kimberlin, the wife of Craig Kimberlin, had given an affidavit in which she indicated that she had heard that Dustin Pool had a gun?

02:00PM A. Right. It was -- it was a hearsay -- her information was based on hearsay, but she did talk about Pool having a gun.
02:00PM Q. And that Stocker supposedly hit Pool because -- after he pulled the gun?
02:01PM A. Well, hit him in the process of pulling the gun. I don't know exactly what happened first. It was -- her statement was not detailed about that. But that, yeah, he had a gun and Stocker hit him apparently because of the gun.
02:01PM Q. Now, correct me if I'm wrong, but your -- your theory of this case in part was that Joshua Stocker and Michael Stocker who had -- Michael Stocker had a shotgun?
02:01PM A. Correct.
02:01PM Q. Joshua Stocker had a fireplace poker?
02:01PM A. Correct.
02:01PM Q. And that they confronted Dustin Pool in the hallway of Tori Patrick's apartment after she had lured Pool over?
02:01PM A. Correct.
02:01PM Q. And that had come towards Pool brandishing this fireplace poker and a shotgun?
02:01PM A. Correct.
02:01PM Q. Would it have changed your position in the

case in your prosecution of these cases, if you had learned that Dustin Pool did have a gun and pulled it?
A. No.
Q. Why not?
A. Well, I mean, he is being confronted with two potentially deadly weapons. If -- if he had a gun, he would certainly be justified in trying to use the gun to protect himself. Whether he had a gun or not, I -- I -- I don't know. I -- the evidence is pretty thin. But if he did have a gun, it wouldn't have changed anything.
Q. And so you had no reason to coerce Tori Patrick into admitting that information, if she had such information?
A. Correct. I -- I -- if -- whatever -- if the truth was he had a gun, that was fine.
Q. One of the last accusations that she made against you, Mr. Farren, is that when you first -- well, when you met with her in July of 2004, at the DA's office when she was accompanied by Jeff Robnett --
A. Correct.
Q. -- that you informed her in a secret meeting to get rid of Robnett because you didn't like him?
A. I'm aware that that's her claim, yes.
Q. And you deny that?
A. I deny that.

Q. Did she get rid of Robnett?
A. Several years later when she was ready to enter a plea to a lesser charge, she announced to the Court that she was terminating her relationship with him, but that was years later.
Q. And you're -- you're aware that her -- she -- she says she negotiated her deals by herself, she had no more communication with Robnett, that she was just -- she was without a lawyer?
A. I -- I understand that's her claim, yes.
Q. Okay. And you are aware of an affidavit that Robnett has given which seems to kind of back up her story?
A. I'm aware of his affidavit, yes.
Q. But you contest that affidavit?
A. Yes. Yes.
Q. One thing that -- let me ask you about this, was -- Robnett asserts that he -- he didn't have any more communication with you after that meeting in July of 2004 at your office, and he didn't know anything more until after she had pled?
A. Right. I mean -- I know that's what he claims. I had communications with him -- we had one or two meetings with Tori prior to the Stocker trial, and I have no independent memory whether we talked to him on

02:04PM every occasion or whether he told us it was okay to go ahead and talk to her at that point, but he was aware we were meeting with her.

02:04PM Q. Well, you're aware of his claim that he didn't know nothing until after she had pled?

02:05PM A. I -- I understand that's his claim. It seems like a very strange position for an attorney -- a defense attorney to take, but I understand that's his claim.

02:05PM Q. All right. And she pled in 2007?

02:05PM A. Yes.

02:05PM Q. Did you become aware in October of 2005, just a couple, three short months after the Joshua Stocker trial, that Tori was arrested on some new charges in Potter County?

02:05PM A. Correct.

02:05PM Q. And was incarcerated?

02:05PM A. Correct.

02:05PM Q. And your office -- our office -- you directed, I believe, maybe Jennifer Cates to file a Motion to Revoke or Increase her Bond on the Murder Charge?

02:05PM A. Correct.

02:05PM Q. And so eventually in November -- on November the 18th -- well, earlier than that, but Judge Miner set that matter for a bond hearing to be conducted on

November the 18th of 2005.
You are aware of that?
A. Correct.
Q. Do you know whether some testimony was taken at the hearing?
A. I -- I believe her father and maybe her -- her mother testified, and I think some probation officer either testified or provided an affidavit. I don't have a clear memory of exactly who testified, but I know there was some witnesses that testified.
MR. BLOUNT: May I approach the witness?
THE COURT: You may.
Q. (BY MR. BLOUNT) I'm going to show you what I have marked --
MR. BLOUNT: These have been admitted, and I'll go ahead and give them to the Court.
THE COURT: Thank you.
Q. (BY MR. BLOUNT) I'll show you what I have marked as State's Exhibit 17. I'm also going to hand you 18.
A. Okay.
Q. If you will review those and then once you've had an opportunity, I've got some questions for you.
A. Okay. All right.
Q. All right. In regards to State's Exhibit 17,

02:09PM what is that?
02:09PM A. It a copy of an Amended Motion to Revoke and Increase Bail, State of Texas versus Tori Patrick.
02:10PM Q. And this is the same -- I mean, this is the case number for the murder charge --
02:10PM A. Correct.
02:10PM Q. -- capital murder?
02:10PM And it was being filed in part because she had been accused of these new crimes in Potter County?
02:10PM A. Yeah, several charges of forgery and possessing identifying information -- fraudulent possession of identifying information.
02:10PM Q. And was this motion -- does it indicate at the bottom that it was -- is there a file-mark stamp Jo Carter?
02:10PM A. Yes.
02:10PM Q. So it was filed?
02:10PM A. Yes.
02:10PM Q. And then do you see a certificate of service? I believe it would be the fifth page of the document.
02:11PM A. Yes. Yes, I see the certificate.
02:11PM Q. Okay. And -- and it's signed by someone named Jennifer M. Cates.
02:11PM Do you know who that person is?

02:11PM A. Yes. She is an attorney -- currently a municipal judge -- but she was a prosecutor in my office at the time.

02:11PM Q. Okay. Did she do some work, at least on the periphery of these cases?

02:11PM A. Correct.

02:11PM Q. Does she indicate in her certificate of service who she served notice of this -- or a copy of this Motion to Increase Bond?

02:11PM A. Yes. Jeff Robnett, and gives his address in Midland, Texas, having been provided a copy of the amended motion.

02:11PM Q. On what day?

02:11PM A. November 3rd, 2005.

02:11PM MR. BLOUNT: Offer State's Exhibit 17.

02:11PM MR. WOOLDRIDGE: No objection.

02:11PM THE COURT: 17 is admitted.

02:11PM Q. (BY MR. BLOUNT) Now, State's Exhibit 18 --

02:12PM A. Yes.

02:12PM Q. -- what does that appear to be?

02:12PM A. It's a copy of a criminal docket, the State of Texas versus Tori Brooke Patrick, and it indicates attorneys that were representing the State and Tori Patrick.

02:12PM Q. And who was representing Tori -- well, let me

02:12PM ask you this. It indicates that there was a hearing?
02:12PM A. Yes.
02:12PM Q. And what date?
02:12PM A. 11-18 of '05. November 18th of '05.
02:12PM Q. And this was on the bond?
02:12PM A. Correct. On our Motion to Revoke or Increase the Bond.
02:12PM Q. And who was representing Tori Patrick?
02:12PM A. Jeffery Robnett.
02:12PM Q. Now, you don't -- do you have any independent recall as we sit here today, 13 years later, to being in the courtroom talking to Jeff Robnett?
02:12PM A. I -- I don't remember specifically Robnett being here. I have a vague memory of -- of the hearing. I remember being in the courtroom. I remember Tori and her parents being here, but I can't say that I specifically remember Mr. Robnett, no.
02:13PM Q. You had many court appearances with Judge Miner --
02:13PM A. Yes.
02:13PM Q. -- during his tenure on the bench?
02:13PM A. Yes.
02:13PM Q. Can you fathom Mr. -- Judge Miner conducting such a hearing without her attorney being present, unless some deal was worked out?

A. No.

MR. BLOUNT: Approach the witness, Your Honor?

THE COURT: Yes, sir.

MR. BLOUNT: I'm sorry. Did I offer 17 and 18?

THE REPORTER: Not 18.

MR. BLOUNT: Not 18?

MR. LOVE: No, you did not.

MR. BLOUNT: 17 was admitted?

THE COURT: 17 was, yes.

MR. LOVE: Yes.

MR. BLOUNT: And 18 I offer, the docket sheet. No objection?

MR. WOOLDRIDGE: No objection.

THE COURT: 18 is admitted.

Q. (BY MR. BLOUNT) And I'm going to show you what I have marked as State's Exhibit 19. Do you want to just give me the sticky.

A. Sure.

Q. And then 20 and 21.

A. Okay.

Q. In regards to State's Exhibit Number 19, although it's entitled State's Motion to Raise or Set Special Bond Conditions, actually this is more in the

form of a 404(b), et cetera, notice, isn't it?

A. Correct.

Q. In what case?

A. The State of Texas versus Tori Patrick, Cause Number 15,310-A, the 47th District Court.

Q. Which is the murder case?

A. Correct.

Q. And who -- who signed off on this notice?

A. Jennifer Cates.

Q. And does it have a certificate of service?

A. It does. It indicates that the Defendant or her attorney of record was served by fax of a foregoing Notice pursuant to Rule 404(b), 609(f) and 37.07 on October 25th, 2005.

Q. At that time who was the attorney?

A. Jeff Robnett.

MR. BLOUNT: Offer State's Exhibit Number 19.

THE COURT: Any objection?

MR. WOOLDRIDGE: I'm sorry?

THE COURT: Do you have any objection?

MR. WOOLDRIDGE: No objection to 19.

THE COURT: 19 is admitted.

Thank you.

MR. BLOUNT: You're welcome.

02:19PM Q. (BY MR. BLOUNT) In regards to State's -- proposed Exhibit 20 --

02:19PM A. Yes.

02:19PM Q. -- do you recognize the document?

02:19PM A. I do.

02:19PM Q. Is it on your letterhead?

02:19PM A. It is.

02:19PM Q. And what is it?

02:19PM A. It's a letter to Jeff Robnett concerning Tori Patrick and the murder charge. It involves -- Mr. Farren authorized -- Jeremy Fowler signed the document and it -- indicating that I've authorized him, Jeremy Fowler, to extend the following offer to your client in return for a plea of guilty to the lesser included offense of aggravated kidnapping, 10 deferred, $2,000 fine, court costs, community service, standard conditions.

02:20PM Q. When was this dated?

02:20PM A. It's dated March 9th, 2007.

02:20PM Q. Which was before Tori Patrick pled?

02:20PM A. Correct.

02:20PM MR. BLOUNT: Offer State's Exhibit 20.

02:20PM MR. WOOLDRIDGE: No objection.

02:20PM THE COURT: Admitted.

02:20PM Q. (BY MR. BLOUNT) State's Exhibit 21 --

A. Yes.
Q. -- what does that appear to be?
A. Again, this is a letter dated March 9, 2007, to Mr. Jeff Robnett, State of Texas versus Tori Patrick, Cause Number 15,310-A.
Q. Let me stop you, Mr. Farren.
A. Yes, sir.
Q. Does it -- does it appear to be the same as State's Exhibit Number 20, except 20 was likely mailed and this one was faxed?
A. I believe that's correct. I believe one was a faxed copy and one was a mailed copy.
Q. How about the one that's in your hand, 21, is that a --
A. It indicates a via facsimile and it gives a phone number.
Q. Okay.
A. Signed by Jeremy Fowler.
Q. Faxed to the Offices of Jeff Robnett.
A. It appears to be the -- correct, yes.
Q. Before the Tori Patrick plea?
A. Yeah, March 9th, 2007.
MR. BLOUNT: Offer State's Exhibit Number 21.
MR. WOOLDRIDGE: No objection.

02:21PM THE COURT: Admitted.
02:22PM Q. (BY MR. BLOUNT) One quick question, Mr. Farren, is that in State's Exhibits 20 and 21, Mr. Fowler, on your behalf, extended these offers to Jeff Robnett -- or an offer to Jeff Robnett of 10 years deferred probation on aggravated kidnapping?
02:22PM A. Correct.
02:22PM Q. She pled to kidnapping?
02:22PM A. Correct.
02:22PM Q. How do you explain that?
02:22PM A. Well, at some point we changed our mind and let her plead to kidnapping rather than agg kidnapping.
02:22PM We -- we changed our position lots of times on lots of defendants during this several years of trials.
02:23PM Q. And since that was his client, do you believe that was likely conveyed to Mr. Robnett?
02:23PM A. Oh, absolutely.
02:23PM Q. And so there were communications --
02:23PM A. Correct.
02:23PM Q. -- between you and your office, our office, with Mr. Robnett between the July, 2004, meeting in your office and the time that Tori Patrick pled?
02:23PM A. Yes.
02:23PM Q. I want to go back and -- just briefly on the

issue of the use immunity agreement, Tori Patrick's --

A. Yes.

Q. -- use immunity agreement. Were you disappointed or -- or happy or somewhere in the middle about not being able to lay your hands on the signed use immunity agreement?

A. Oh, I would have loved to have found a copy. I -- the use immunity agreement, if I had the actual written document to present to the Court, would have confirmed my position that it was only a use immunity agreement and it had nothing -- it made no reference to any specific plea agreement of any kind, and it would have been great to have the actual document to show to the Court and Defense counsel.

Q. And then a -- a search was made for the document and the unsigned agreement was found on Ms. Farren's computer at the jail?

A. Correct. It -- her computer at -- she had two offices; one at the S.O. and one here, and it was found on the computer at the S.O., which is where Ms. Ledbetter, Bruhn now, was meeting with Tori Patrick and -- and gathering the information that went into her lengthy statement.

Q. And, in your mind, did that provide some relief in finding the -- finding the unsigned one

because at least it showed that there was no plea bargain agreement within the -- within the body of the document?

A. Right. The -- the unsigned version that was in -- the unsigned document which was in her computer confirmed what I was saying, but it would obviously have been nice to have the actual signed document.

Q. Okay.

MR. BLOUNT: Pass the witness.

THE COURT: Mr. Wooldridge.

REDIRECT EXAMINATION

BY MR. WOOLDRIDGE:

Q. Now, Mr. Farren, you said you would have loved to have the actual signed use immunity agreement with Tori Patrick for the reasons you stated?

A. I'm sorry. I didn't hear the last part of the question.

Q. For the reasons you stated.

A. I said -- for the reasons I said, yes, sir.

Q. Okay. You would have loved to have had that for Guin Garcia too, wouldn't you?

A. The -- the actual document?

Q. Uh-huh.

A. We did have.

Q. Okay. Is there a reason why you did not

introduce that as evidence if you would have loved to have had that and shown it to a jury and shown that there, in fact, was no agreement other than the use immunity agreement?

A. Guin Garcia wasn't the one on trial.

Q. Well, neither was Tori Patrick, was she?

A. Well, it was provided to -- to Defense counsel. I --

Q. That's not my question.

If you would -- you said you would have loved to have had that to show that there was nothing else for her to testify for?

A. In reference to an actual plea agreement, correct.

Q. So the one for Guin Garcia, the same thing would be true. Correct?

A. Correct.

Q. Why didn't you introduce Ms. Garcia's?

A. We -- we didn't introduce it. We provided it to the Court and Defense counsel, so the Court knew at that point that there was no plea agreement in Guin Garcia's use immunity agreement. It certainly implied -- implied that there wasn't one in Tori Patrick's either.

My concern was to convince the Court --

02:27PM this was a hearing out of the presence of the jury. My concern was to convince the Court that Mr. Watkins' theory was incorrect, that there wasn't any reference to a specific plea agreement in the document.

02:27PM Q. They both testified identically that they didn't have any agreement, other than they were just going to tell the truth.

02:28PM A. They didn't have a plea agreement, yes, sir.

02:28PM Q. Well, they -- but they did have a use immunity agreement?

02:28PM A. Correct.

02:28PM Q. But they denied that?

02:28PM A. I -- I don't remember Guin Garcia denying she had a use immunity agreement.

02:28PM Q. And then Brooke -- Brooke -- Brooke Vandergriff, nobody even raised the issue of whether or not she had a use immunity agreement, did she -- did they?

02:28PM A. I don't recall.

02:28PM Q. You didn't raise it?

02:28PM A. I don't recall.

02:28PM Q. Now, Mr. Farren, you don't seem to have recollection problems when the State's attorneys are asking you questions. Is this not some kind of intermittent thing?

MR. BLOUNT: Your Honor, that's just argumentative.

THE COURT: Sustained.

MR. WOOLDRIDGE: I would like to know if he has some kind of condition.

THE COURT: Ask him.

Q. (BY MR. WOOLDRIDGE) Do you have some kind of condition?

A. If I understand your question, it's the same one you asked earlier about do I have memory problems, and I wouldn't describe them as memory problems. I would describe it as a normal human memory.

Q. Is there a reason why you have problems remembering questions I ask you or the facts relating to the questions that I asked you.

A. I -- I answered several of Mr. Blount's questions by telling him, I didn't recall just as I'm answering some of yours I don't recall.

Q. Now, as far as State's 17 goes, you say you don't have any independent recollection of Mr. Robnett actually being here?

A. I can't even remember what Mr. Robnett looks like at this point. I remember the hearing. I remember Tori being present because she was very upset and her presents were upset, so I -- I remember that. But I

02:29PM can't say that I actually remember Robnett because I -- I don't even remember what he looks like.
02:29PM Q. Do you remember what the outcome of that hearing was?
02:29PM A. I do not.
02:30PM Q. Did Judge Miner deny the bond increase?
02:30PM A. Sir, I just answered I don't remember.
02:30PM Q. Well, if -- if I prompt you and suggest to you that maybe Judge Miner denied the bond increase, does that help?
02:30PM A. Does it change my memory, no.
02:30PM Q. Now, on the certificate of service, it states that Ms. Cates mailed this to what is purported to be Mr. Robnett's address in Midland. Is that correct?
02:30PM A. Again, I -- I've seen the documents. I remember sending notice -- or I remember Jennifer indicating we had sent notice. Exactly how she went about that, I don't have an independent memory.
02:30PM Q. Well, she said she --
02:30PM A. When I look at the documents, I see what they say, but I don't have an independent memory.
02:30PM Q. Okay. And if it says that she mailed it, then that means she mailed it?
02:30PM A. If -- if Jennifer says she mailed it, she mailed it.

Q. And it doesn't say certified mail.
A. I don't recall whether it says that or not.
MR. WOOLDRIDGE: May I approach?
THE COURT: You may.
Q. (BY MR. WOOLDRIDGE) If you could review that.
A. Sure.
Yes, it says by mailing said copy.
Q. Okay. And if you mail it, you don't get a return like you do if you send it certified mail, do you?
A. Correct.
Q. So we don't know if it ever got there, do we?
A. I have no knowledge of whether it got there or not. I know she mailed it if she said she did.
Q. Well, that's only half the equation, isn't it?
A. Well, are you asking me why I think he got it?
Q. Well, I'm asking you if you know that he got it?
A. I know Judge Miner didn't hold a hearing on a capital murder bond without having her attorney present.
Q. That's not the question that I asked you, Mr. Farren. Do you know that he got it?
A. Well, I know that he -- I know Judge Miner didn't hold a hearing on a capital murder bond without her attorney, so somehow he knew to be here.

02:32PM Q. Again, Mr. Farren, do you know that he got it?
02:32PM A. I know he knew to be here. I don't know whether he got that letter, no.
02:32PM Q. Well, if he didn't get the letter, how would he know to be here?
02:32PM A. You know, I bet it's probably because he got the letter.
02:32PM Q. But you don't remember him being here?
02:32PM A. I don't specifically remember what he looks like.
02:32PM Q. Mr. Farren, I'm going to show you what has been marked as Defendant's Exhibit 6. Can you take a look at that and see if you remember that?
02:33PM A. I do.
02:33PM Q. Okay. And that's a -- is that, in fact, the affidavit you swore out on April 1st of 2016 in response to Tori Patrick's First Response to the Revocation and her Writ of Habeas Corpus?
02:33PM A. It is a copy of my affidavit, yes, sir.
02:33PM Q. Is that true and correct?
02:33PM A. It is true and correct. It's incomplete, but it's true and correct.
02:33PM Q. Okay. Now, I'm going to show you what has been marked as Defendant's Exhibit 7. Do you recognize what that is?

02:33PM A. Yes, sir.
02:33PM Q. And what is that?
02:33PM A. That is a -- a copy of the amended affidavit, which I created after I signed the first affidavit --
02:34PM Q. Okay.
02:34PM A. -- in reference to the same issues.
02:34PM Q. Okay. Now, in this first affidavit you basically -- you didn't mention anything about any other agreements, just the use immunity agreement. You just addressed that. Is that correct?
02:34PM A. I think that's correct.
02:34PM Q. Okay. But then in this document you changed that and said, well, actually she did have sort of a half agreement. We didn't have an agreement as to years or whatever, but she did have an agreement to plead out to aggravated kidnapping?
02:34PM A. Well, I don't think that's what the amended affidavit says, but if that's what you say --
02:34PM Q. Well, I think there's a highlighted portion there. What does that say?
02:34PM A. The only promise she had from our office was that if she told the truth under oath, it would inure to her benefit.
02:34PM Q. Okay. But we now know from other documents that you actually had a different agreement than that,

don't we?

A. At what time?

Q. As of at any time prior to Mr. Stocker's trial.

A. At -- at one point she did, yes. That was later rescinded.

MR. WOOLDRIDGE: Your Honor, I would offer into evidence what has been marked -- first, let me go back and offer into evidence Defendant's 3, 4 and 5.

MR. BLOUNT: Let me just make sure. I don't remember what they were.

(Viewing documents)

MR. BLOUNT: No objection to Defendant's 3, no objection to Defendant's 4, and no objection to Defendant's 5.

THE COURT: Defendant's 3, 4 and 5 are admitted.

MR. WOOLDRIDGE: And I would offer Defendant's Exhibits 6 and 7.

MR. BLOUNT: Are these the ones that were just identified?

MR. WOOLDRIDGE: Yes.

MR. BLOUNT: No objection to 6. No objection to 7.

THE COURT: They are both admitted.

Thank you, sir.

Q. (BY MR. WOOLDRIDGE) Mr. Farren, similarly with Mr. Fowler's communication to Mr. Robnett, do you have any knowledge beyond the fact that there was some communication between your offices?

A. I don't understand the question.

Q. Do you know if Mr. Robnett was ever actually privy to any of those communications or was it just someone in his office? Do we have any idea if it ever got to him?

A. I know we -- we attempted to keep him informed. Whether he got the information that was mailed to him, I can't say for sure he got that, no.

Q. And you don't recall again specifically talking to Mr. Robnett about that. You just seen some documents that say there was some communication between your offices?

A. Talking to Mr. Robnett about what?

Q. About Ms. Patrick's plea agreement.

A. I -- I don't specifically remember when I had conversations with Robnett. I don't specifically remember the details. I do remember having conversations with him and I do know we sent communications to him.

02:37PM Q. And the final agreement between you and Ms. Patrick where she pleads only to kidnapping, instead of aggravated kidnapping, you didn't broker that deal with Mr. Robnett, did you?
02:37PM A. I -- I don't recall. I think you may have been her attorney by then.
02:37PM Q. Well, that was my next question. Did you and I have any plea negotiations with regard to Ms. Patrick?
02:37PM A. I don't recall. I assume we did, but I don't have an independent memory of it, no, sir.
02:37PM Q. Was there any document where you sent me an offer on Ms. Patrick?
02:37PM A. I -- I don't know.
02:37PM Q. In fact, I was her attorney for less than 24 hours before we entered that plea, wasn't I?
02:38PM A. If you say so.
02:38PM Q. Now, Mr. Farren, I'm now going to show you what has been marked as Defendant's Exhibit 8. Do you recognize this?
02:38PM A. I -- yes, I mean, I recognize they're documents from my office. I don't have an independent memory of those specific events, but I recognize them and don't dispute they're documents from our office.
02:38PM Q. Well, with reference to the second page of this, this is, in fact, the offer -- the offer that's

already been entered on a different page --
A. Correct.
Q. -- or on a different exhibit from the State where Mr. Fowler is communicating the offer to Mr. Robnett?
A. Correct.
Q. Okay. And the first page of this, what would you describe that as?
A. That's a confirmation communication to Ms. Patrick, making sure she knows about a copy of the plea bargain letter that was sent to Mr. Robnett.
Q. So you were communicating directly with Ms. Patrick?
A. Oh, yeah. From time to time, yes.
Q. This didn't go through her attorney?
A. The -- the plea it makes reference to went to her attorney.
Q. But this communication did not go through her attorney, does it?
A. Not to my knowledge, no.
Q. And there's no courtesy copy to Mr. Robnett that we're sending this document directly to your client?
A. Not to my knowledge, no.
MR. WOOLDRIDGE: Your Honor, at this time

I would offer Defendant's Exhibit 8.

MR. BLOUNT: No objection.

THE COURT: Defendant's 8 is admitted.

Thank you.

Q. (BY MR. WOOLDRIDGE) Now, Mr. Farren, if you were to admit to any of these allegations of witness tampering or supporting aggravated perjury, you'd essentially be confessing to third degrees or higher felonies, would you not?

A. No, I would be lying.

Q. Well, I'm not asking you as a factual matter, Mr. Farren. I'm asking you as a hypothetical.

A. Hypothetically?

Q. Yes.

A. Hypothetically, if I admitted to those things, I would be admitting to committing crimes.

Q. Exactly.

A. Therefore, I would be lying.

Q. Now, there was also a person that testified in this trial named Tyler Shawn Hale, was there not?

A. Correct.

Q. What was Mr. Hale charged with?

A. Originally?

Q. Yes.

A. I -- I don't -- I don't remember. He was a

lesser player in this case. He -- he was part of Kimberlin's cartel and he let them park Bledsoe's Navigator in his garage overnight after the failed attempt to dispose of the body at Lake Meredith, and that was basically his only role.

So I would assume we offered him some lesser charge than Stocker and Kimberlin and others faced, but I don't recall specifically what he was charged with. Probably tampering with evidence.

Q. A felony?

A. Yes.

Q. And who was Mr. Hale's attorney?

A. I don't recall.

Q. Okay. Mr. Hale testified at Joshua Stocker's trial. Correct?

A. Correct.

Q. Okay. He testified at length as a matter of fact?

A. I -- I remember he testified. I don't know -- I'm not sure what at length means, but I do remember he testified.

Q. Well, you're the one that sponsored his testimony?

A. Yes.

Q. And he, in fact, testified that he had some

02:42PM kind of -- maybe like a use immunity agreement, but
02:42PM there was no written agreement?
02:42PM A. I don't recall. I'm sure he did have an
02:42PM agreement with us that we -- a common practice for my
02:42PM office and for me is if -- if a defendant or potential
02:42PM defendant wants to visit with us, we will facilitate
02:42PM that by making it -- possible for them to proffer their
02:43PM testimony without fear that it would be used against
02:43PM them. So I'm sure we made some sort of an agreement --
02:43PM use immunity agreement with him as well.
02:43PM Q. What ultimately was the result of Mr. Hale on
02:43PM his case?
02:43PM A. I think his case was eventually dismissed.
02:43PM Q. Do you recall the circumstances of why his
02:43PM case was dismissed?
02:43PM A. Probably because he had such a minor role in
02:43PM the case and he held up -- he agreed to testify
02:43PM truthfully. I believe he did. And probably because he
02:43PM was cooperative and had such a minor role in this thing,
02:43PM that's probably why. I -- I can't say I know for sure
02:43PM his case was dismissed, but I think it was.
02:43PM Q. Well, if I tell you a record -- the record in
02:43PM his case reflects that it was dismissed, that would be
02:43PM accurate?
02:43PM A. That -- yes, that -- that would not surprise

02:43PM me. I think that's what happened.
02:43PM Q. And who was Tyler Shawn Hale to you?
02:44PM A. Who was -- was Hale's what?
02:44PM Q. Who was Tyler Shawn Hale to you?
02:44PM A. I'm still not hearing the end of the question.
02:44PM Q. Just a person in the case, just another
02:44PM witness?
02:44PM A. He was a -- he played a minor role in the
02:44PM events of -- he played a minor role in disposing of
02:44PM Pool's body after he was dead.
02:44PM Q. Who is Samuel Joseph Hale?
02:44PM A. I have no idea.
02:44PM Q. Do you have a brother?
02:44PM A. Do I have a brother?
02:44PM Q. Uh-huh.
02:44PM A. Yes.
02:44PM Q. Is his name Ken Hale -- or -- I mean, Ken
02:44PM Farren?
02:44PM A. Yes.
02:44PM Q. Who is his daughter?
02:44PM A. Jennifer.
02:44PM Q. Who is she married to?
02:44PM A. Sam Hale.
02:44PM Q. So Samuel -- so Tyler Shawn Hale is your
02:44PM niece's brother-in-law?

A. If he is, it's a surprise to me.

MR. WOOLDRIDGE: Pass the witness.

RECROSS-EXAMINATION

BY MR. BLOUNT:

Q. I think I just want to cover one last area with you, James. And back on -- Mr. Wooldridge was asking you about questions and you -- and you were talking about needing to convince the Court that there was no plea agreement.

A. Correct.

Q. Okay. Weren't you -- weren't you trying to convince Judge Miner that there was no Brady violation and concerns -- as it concerns this use immunity agreement with Tori Patrick?

A. Correct. That was my -- that was my primary concern because that was what Mr. Watkins was -- that was the context that he brought this up in, that -- that under Brady, they didn't have this document. So I was trying to persuade Judge Miner that if -- if they didn't have it, then it was either inadvertent or -- or it didn't exist.

Q. And Judge Miner heard -- conducted a hearing outside the presence of the jury. Correct?

A. Correct.

Q. In fact, you didn't call Bobbie Ledbetter as a

02:46PM witness. It was Judge Miner who required her to come to the courtroom and give testimony --

A. Correct.

Q. -- on this issue of whether there was a signed use immunity agreement.

Do you remember that?

A. Correct. Yes.

Q. Okay. And he heard that evidence -- he questioned Bobbie Ledbetter, he allowed you to further question her, Mike Watkins to question her?

A. Correct.

Q. He -- he was going to have Jami Watson testify as well, wasn't he?

A. Correct.

Q. And Watson was not available at that time. She was on vacation.

A. That's -- that's correct.

Q. Did you tell Judge Miner that she would be back before the end of the trial?

A. I did.

Q. And was she available in -- in the event that Judge Miner wanted to hear further testimony from her on this issue?

A. As far as I know. She indicated -- she indicated to me she would be back. I have no reason to

02:47PM believe that she didn't return before the end of the trial.

02:47PM Q. Okay. After hearing from Ledbetter and from the State and from the Defense, did Judge Miner make a ruling?

02:47PM A. Yes. He -- he concluded there had been no Brady violation and that the document must be lost in the bowels of the DA's office, to quote Judge Miner.

02:47PM Q. In -- in fact, his statement on the record indicates that he believed there was a possibility that there was a signed agreement?

02:47PM A. Correct.

02:47PM Q. But -- and still found no Brady violation?

02:47PM A. Correct.

02:47PM MR. BLOUNT: Pass the witness.

02:47PM FURTHER DIRECT EXAMINATION

02:47PM BY MR. WOOLDRIDGE:

02:47PM Q. To review, the only use immunity agreement that you actually provided to the Defense prior to the beginning of Joshua Stocker's trial was Guin Garcia's?

02:47PM A. No. We presented a use immunity agreement in reference to several people, certainly Tori Patrick. We just didn't present the actual document.

02:47PM Q. So you didn't give the actual documents, other than Guin Garcia's to the Defense?

A. I'm sorry, sir. I'm not -- I can't hear you.
Q. So you didn't give any of those use immunity agreements, except Guin Garcia -- Garcia's to the Defense prior to trial?
A. Well, they claim they didn't have them and so I'm assuming we didn't. I -- I don't know whether we gave them to them and they lost them in their massive documents or whether we misplaced them, but they didn't have them at the time of trial.
Q. And Guin Garcia and Tori Patrick both testified they didn't have those agreements with you?
A. No, that is not what they testified to.
Q. That's -- well, the record can reflect what it -- what it --
A. The record reflects they said we understand what we say can't be used against us, yes.
Q. We'll let the record speak for itself in that regard.
But they testified that they didn't have agreements?
A. No, they did not testify -- they testified they didn't have plea agreements.
Q. They testified they didn't have a use immunity agreement as well --
A. No.

02:49PM Q. -- didn't they?
02:49PM A. No, they did not.
02:49PM Q. Okay. And Joshua Bledsoe testified he didn't have an agreement?
02:49PM A. I -- I'm unaware of that if he did.
02:49PM Q. And even after some of the documents were disclosed to the Court and to Defense, nobody went back and bothered to correct the jury's impression that these people -- as to how they had testified previously?
02:49PM A. Judge Miner even asked Mr. Watkins -- Mr. Watkins specifically told Miner he didn't want this presented to the jury, unless he decided to do so later.
02:49PM Q. And you said that you were surprised by that?
02:49PM A. Yeah.
02:49PM Q. Why were you surprised by that?
02:49PM A. Because Mr. Watkins wanted that document and he wanted to be able to use it in front of the jury. Now, he had at least a version of it and now he announces he doesn't want to use it in front of the jury.
02:50PM MR. WOOLDRIDGE: Pass the witness.

FURTHER CROSS-EXAMINATION

02:50PM BY MR. BLOUNT:
02:50PM Q. Even if Josh Bledsoe had said in his testimony that he didn't have some agreement, you -- you -- he did

02:50PM have an agreement?
02:50PM A. Yes.
02:50PM Q. That agreement was turned over to the Defense and they could have questioned him about that had they chosen to?
02:50PM A. Oh, the agreement was certainly given to the Defense. Now, I don't remember Josh Stocker saying he didn't have an agreement. Maybe -- I haven't reviewed his testimony --
02:50PM Q. Well, there were two --
02:50PM A. But, yes, the Defense did get --
02:50PM Q. Okay.
02:50PM A. They were made aware of his agreement.
02:50PM Q. Okay. There were two Joshes, so I want to clear the record up.
02:50PM You said Josh Stocker.
02:50PM A. I'm sorry. I meant Josh Bledsoe.
02:50PM Q. Okay. So even if Bledsoe had indicated some way that he didn't have an agreement, the Defense had his agreement when he testified and could have questioned him about that, if they had chosen to do so?
02:50PM A. Yes, sir.
02:51PM MR. BLOUNT: Pass the witness.
02:51PM THE COURT: Mr. Wooldridge, anything else?

02:51PM MR. WOOLDRIDGE: If you will give me just
02:51PM a second, Judge. I'll revisit it at a later point,
02:52PM Judge.
02:52PM No further questions.
02:52PM THE COURT: Thank you.
02:52PM You may step down, Mr. Farren.
02:52PM THE WITNESS: Thank you, Your Honor.
02:52PM (Witness exits the courtroom)
02:52PM THE COURT: At this point, we will take a
02:52PM 25-minute recess.
02:52PM MR. WOOLDRIDGE: I'm sorry, Judge. Did
02:52PM you say five or 25?
02:52PM THE COURT: 25.
02:52PM MR. LOVE: So 3:15?
03:23PM THE COURT: Yes.
03:23PM MR. LOVE: Thank you, Your Honor.
03:23PM (Recess)
03:23PM (Open court, Applicant and Counsel
03:23PM present)
03:23PM THE COURT: All right. Back on the
03:23PM record.
03:23PM Mr. Wooldridge, you may present your next
03:23PM witness.
03:23PM MR. WOOLDRIDGE: Jeremy Fowler.
03:24PM (Witness enters the courtroom)

03:24PM THE COURT: Good afternoon, Judge. How are you?

03:24PM THE WITNESS: Good afternoon, Judge.

03:24PM THE COURT: Hi.

03:24PM (Witness sworn)

03:24PM THE WITNESS: I do.

03:24PM THE COURT: Have a seat.

(Witness takes the witness stand)

THE COURT: Mr. Wooldridge.

JEREMY ROBERT FOWLER,

having been first duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. WOOLDRIDGE:

03:24PM Q. Please state your full name.

03:24PM A. Jeremy Robert Fowler.

03:24PM Q. Were you previously employed with the Randall
03:25PM County Criminal District Attorney's office?

03:25PM A. Yes, sir.

03:25PM Q. What was the period of your employment there?

03:25PM A. I believe it was 2004 to 2010.

03:25PM Q. Now, in your capacity -- capacity as an
03:25PM assistant district attorney there, were you the
03:25PM participant referred to in the reporter's record as
03:25PM Mr. Fowler?

03:25PM A. Yes, sir.

Q. And you participated in all three trials of Joshua Stocker, Frank Chacon and Michael Stocker?
A. Yes, sir.
Q. And those prosecutions were essentially you and Mr. Farren as a team?
A. I believe Ms. Hathaway helped on the Frank Chacon trial, so it was three attorneys on that case, and I believe it was just Mr. Farren and myself on Michael Stocker.
Q. And you conducted the examinations of -- some cross-examinations as referenced in the reporter's record?
A. Correct.
Q. And have you had a chance to review those records?
A. I've reviewed pieces of the records.
Q. Would you assert that there's any reason not to believe that those records are accurate?
A. They seem accurate to my recollection.
Q. And as far as the arguments and statements that you made, those -- those were yours?
A. Yes, sir.
Q. And you sponsored Ms. Patrick's testimony?
A. Yes, I was the one that did her direct examination.

03:26PM Q. And you were not aware of any agreements that she should have been saying existed when they didn't?
03:26PM A. I was aware that there was a report that she had signed a use immunity agreement when she gave her typed statement to Ms. Ledbetter.
03:26PM Q. Okay. And in Michael Jeffery Stocker's trial, which was Cause Number 17,289-A, that occurred in February of 2009, you provided the closing argument in that, did you not?
03:27PM A. Yes, sir.
03:27PM Q. And was your closing argument accurate and truthful as far as you know?
03:27PM A. Yes.
03:27PM MR. WOOLDRIDGE: May I approach?
03:27PM THE COURT: You may.
03:27PM MR. BLOUNT: Which -- which trial are you referring to?
03:27PM MR. WOOLDRIDGE: To Michael.
03:27PM Q. (BY MR. WOOLDRIDGE) Mr. Fowler, I'm going to show you what has been marked Defendant's Exhibit 9.
03:27PM A. Okay.
03:27PM Q. And you understand that this is not a full record, this is just an excerpt?
03:27PM A. Okay.
03:27PM Q. And this actually is two different ones. If I

03:27PM represent to you that the first two pages are direct examination of Mark Brown by Mr. Farren, is that what -- what the record -- or this document shows?

03:27PM A. Yes.

03:27PM Q. And if we then switch back to page 9, it starts with your closing argument, does it not?

03:28PM A. Yes, sir.

03:28PM Q. Okay. If we then move to page 16 of this, starting at the second full paragraph, could you read that paragraph and the following two.

03:28PM A. (Witness complies.) Okay.

03:29PM Q. And you were sincere in that argument?

03:29PM A. Yes.

03:29PM Q. Could you read those three paragraphs into the record, please.

03:29PM A. Starting on page 16, the second full paragraph.

03:29PM "At Tori Patrick's apartment, if you remember Kimberlin and Elliston essentially arrived after Tori went and Michael had already been there. So they really don't know firsthand what exactly happened in Tori's apartment. So it was essential to enter into agreements with Tori and Guin to figure out what had happened in her apartment."

03:29PM The next paragraph. "Now, you may not

like entering into plea agreements with people. You may think it's unseemly. You may think it's distasteful, but Mr. Farren talked about it in jury selection. It's one of the necessary situations we have to do in our business. None of the agreements that Tori or Guin or Bledsoe or Keeling have entered into have been hidden, swept under the rug from you, this is all out in the open. They were known to Josh Stocker's lawyer. They were known to Frank Chacon's lawyers. This has all been out in the open. And even if you have a problem with it, the buck stops right there at Mr. Farren. He is your District Attorney, you've elected him four different times. That's why he's elected to make those hard calls about who should get a plea agreement and who shouldn't."

Q. Thank you.

MR. WOOLDRIDGE: At this time, I would offer into evidence what has been marked as Defendant's Exhibit Number 9.

MR. BLOUNT: No -- no objection.

THE COURT: This is Defendant's Exhibit 9?

MR. WOOLDRIDGE: And, Judge, I'm going to hang onto Exhibit 9 for just a little bit --

THE COURT: Okay.

MR. WOOLDRIDGE: Or actually, no, I do have a copy. Never mind.

Tender to the Court.

THE COURT: Okay. No objection. 9 is admitted.

I don't mind if you want to hang onto it.

MR. WOOLDRIDGE: No, I forgot I had a copy. Thank you.

Pass the witness.

CROSS-EXAMINATION

BY MR. BLOUNT:

Q. Just to be clear, you were quoting from your final argument in the Michael Stocker trial. Isn't that -- that's where that came from?

A. Correct.

Q. Now, let's distinguish between Michael Stocker and Josh Stocker. Each were tried, but on -- on much separate dates. Right?

A. Correct.

Q. Okay. Josh Stocker was tried in 2005?

A. Correct.

Q. And during the course of the Joshua Stocker trial, this issue of trying to find a signed use immunity agreement entered into with Tori Patrick, that's -- that blew up?

03:33PM A. Correct.
03:33PM Q. Okay. And then that case was over with and then Frank Chacon was tried at a later date, I believe, in 2007, if I -- if I remember correctly. 2006?
03:33PM Co-counsel tells me December of 2006. Do you have any reason to dispute that?
03:33PM A. No, I don't.
03:33PM Q. You know that it was tried after Joshua Stocker?
03:33PM A. Correct.
03:33PM Q. And Michael Stocker was tried in 2009?
03:34PM MR. LOVE: February of '09.
03:34PM A. That sounds about right. Yes.
03:34PM Q. (BY MR. BLOUNT) Sounds about right.
03:34PM Okay. So -- so that final argument that you've been quoting, was one that you made approximately four years after the Joshua Stocker trial?
03:34PM A. Correct.
03:34PM Q. Okay. By the time that y'all -- you and Mr. Farren were prosecuting the trial of Michael Stocker, Tori Patrick had by then pled?
03:34PM A. Correct.
03:34PM Q. She had already gone to court, represented by Mr. Wooldridge, and entered a plea to kidnapping and been placed on probation?

03:34PM A. That's correct.
03:34PM Q. Okay. And that's -- that's the deal that you were referencing in regards to Tori in your final argument?
03:34PM A. Yes. Yes.
03:34PM Q. Jeremy -- Judge Fowler, I'm sorry. You -- it appears since you participated in all three trials -- and you did, didn't you?
03:35PM A. Correct.
03:35PM Q. Okay. Probably more than any other assistant in Mr. Farren's office participated more in those prosecutions than anybody else?
03:35PM A. Correct.
03:35PM Q. Did you meet with Tori Patrick on a couple of occasions?
03:35PM A. Yes, sir.
03:35PM Q. Now, you conducted direct examination of her in the Joshua Stocker trial?
03:35PM A. Yes.
03:35PM Q. And I believe in the Michael Stocker trial?
03:35PM A. I -- I don't recall.
03:35PM Q. Okay. But you do recall meeting with her on one or more occasions?
03:35PM A. Yes, sir.
03:35PM Q. Would -- would Mr. Farren have been present at

03:35PM those meetings as well?
03:35PM A. Yes.
03:35PM Q. Did Mr. Farren coerce Tori Patrick in any way?
03:35PM A. No.
03:36PM Q. Were any deals cut that you recall?
03:36PM A. No.
03:36PM Q. Did he try and twist her arm into testifying falsely about any matters?
03:36PM A. No.
03:36PM Q. Did you coerce her?
03:36PM A. No.
03:36PM Q. Did you threaten her?
03:36PM A. No.
03:36PM Q. Now, at the time of the Joshua Stocker trial, during that trial no one could lay their -- apparently no one could lay their hands on a signed use immunity agreement in regards to Tori Patrick?
03:36PM A. Correct.
03:36PM Q. Okay.
03:36PM A. Until Mr. Watkins brought that up during trial, it had never crossed my mind to verify what was in the offense report actually existed, that one piece of paper.
03:36PM Q. Okay. Okay. Now, that raises another issue I wanted to deal with -- ask you about. You knew from the

03:37PM offense reports that Bobbie Ledbetter had made a supplemental that ended up being part of the APD reports?
03:37PM A. Yes.
03:37PM Q. And that in that report -- well, it was essentially the same -- the exact same as her typed up supplemental report that Mike Watkins had?
03:37PM A. Yes.
03:37PM Q. And you knew by virtue of that, that according to Bobbie Ledbetter, there was a signed agreement?
03:37PM A. Yes.
03:37PM Q. The Defense in the Stocker -- Josh Stocker trial knew exactly what you knew?
03:37PM A. Yes.
03:37PM MR. WOOLDRIDGE: Objection; speculation.
03:37PM THE COURT: Sustained.
03:37PM Q. (BY MR. BLOUNT) Well, they had that material available to them, didn't they?
03:37PM A. Correct.
03:37PM Q. Okay. Because at that time there was an open-file policy?
03:37PM A. Yes, that's right.
03:37PM Q. And they were provided the police reports, the ones that you just referenced and you read?
03:37PM A. Yes.

03:37PM Q. Okay. And indeed during the trial, Mike Watkins had Bobbie Ledbetter's typed-up supplement, didn't he?
03:38PM A. Yes.
03:38PM Q. After the Joshua Stocker trial, was a signed use immunity agreement ultimately found?
03:38PM A. Yes, sir.
03:38PM Q. And did you give someone a copy of it?
03:38PM A. I believe my recollection is that I found the signed use immunity agreement either several months after Mr. Stocker's trial or even up to a year after his trial in preparation for the other cases.
03:38PM Q. Now, when you say "other cases," Kimberlin was going to go to trial, wasn't he?
03:38PM A. Correct. He was the next defendant scheduled.
03:38PM Q. And, in fact, there were -- I believe there were subpoenas issued for that trial for January of 2006?
03:38PM A. Yes.
03:38PM Q. Does that sound about?
03:38PM A. That sounds about right.
03:38PM Q. But you believe before the Kimberlin trial -- in preparation for that next trial, that the agreement was found?
03:39PM A. Yes, sir.

Q. And what, if anything, did you do with the agreement?

A. When I located the agreement, at the next opportunity I had to see Mr. Watkins face to face, I told him that the use immunity agreement signed by Tori Patrick had been located.

Q. And did he react?

A. He -- it -- it was a very casual conversation almost as if in passing, and I believe he indicated something along the lines of, I figured it existed or I always knew it existed somewhere, and that was it.

Q. Okay. But you informed him that it had been located?

A. Yes, sir.

Q. And you believe that was before the scheduled date for the Kimberlin trial?

A. Correct.

Q. Do you recall prior to Tori Patrick pleading -- well, strike that. Let me ask you a different question.

Did you become aware that after the Joshua Stocker trial, Tori Patrick was arrested on some new charges in Potter County and put into jail?

A. Yes, sir.

Q. That was in the fall or -- or October -- late

October, November of 2005. Did you become aware that -- that our office, the DA's office, your office at the time, filed to increase or revoke her bond on a murder charge?

A. I -- I don't remember that.

Q. Do you remember any kind of bond hearing in regards to that matter?

A. I do not.

Q. Okay. Do you recall in 2007, sending a fax and/or a -- by mail a letter to Jeff Robnett conveying Mr. Farren's offer of deferred probation on kidnapping -- aggravated kidnapping actually?

A. I do, yes.

Q. Okay. And -- and did you cause that letter to be typed up and transmitted?

A. Yes, sir.

Q. By mail and by fax?

A. Yes.

Q. And did you also send a letter to Tori Patrick to inform her or -- or include a copy of it for her?

A. I do not remember.

Q. I'm going to show you Defense Exhibit -- well, Number 3 first. Does that appear to be the signed use immunity agreement that you ultimately located after the Joshua Stocker trial?

03:42PM A. This is of Craig Kimberlin's use immunity agreement.

03:42PM Q. Oh, I'm sorry. I'm looking for the wrong one. I found the wrong one. Well, I'll locate that in a second.

03:42PM But let me then show you Defendant's Exhibit 8.

MR. LOVE: Do you have Defense Exhibit 3?

THE COURT: Defense Exhibit what?

MR. LOVE: 3.

THE COURT: Defense Exhibit 3?

MR. LOVE: No?

THE COURT: I think he's got it.

MR. LOVE: James, do you have Defense Exhibit 3 on your desk?

MR. WOOLDRIDGE: I was just getting ready to interject. We did tender that as a separate exhibit. I referred to it as --

THE REPORTER: Are we on the record?

THE COURT: Yes.

THE REPORTER: Because I can't hear what they're saying.

MR. BLOUNT: Do you have a copy of it anywhere?

MR. WOOLDRIDGE: I referred to it as --

MR. BLOUNT: I've got it.
MR. WOOLDRIDGE: -- Appendix H, this one right here.
MR. LOVE: Okay. So you didn't put it in directly? You just referred to it as Appendix H to your writ?
MR. WOOLDRIDGE: Right. If you want to use this, that's fine.
MR. LOVE: We'll -- we'll make a copy and --
Q. (BY MR. BLOUNT) Judge Fowler, the exhibit I've handed you, is that 8?
A. Defendant's Exhibit 8.
Q. Okay. Do you recognize those documents?
A. Yes, I do.
Q. Okay. And at the first document is a letter you sent to Tori Patrick?
A. Correct.
Q. Informing her or -- or sending her a copy of the plea-bargain offer?
A. Yes.
Q. Okay. And then the second document is a faxed letter you sent to Robnett?
A. Correct.
Q. Okay. Why did you send a letter to Tori

Patrick?

A. I -- I -- I don't know. Up until today that -- the letter to Ms. Patrick, I don't -- I don't recall and I don't -- sitting here, I don't know why I would cause that to be sent to her.

Q. I'm showing you what I -- I am showing you what I have marked as State's Exhibit Number 22. Does that appear to be the signed use immunity agreement of Tori Patrick that you found and then gave or -- or informed Mr. Watkins existed?

A. Yes.

MR. BLOUNT: I offer State's Exhibit Number 22.

MR. WOOLDRIDGE: No objection.

THE COURT: Admitted.

MR. BLOUNT: Pass the witness.

THE COURT: Mr. Wooldridge?

REDIRECT EXAMINATION

BY MR. WOOLDRIDGE:

Q. Now, Mr. Fowler, the nature of the evidence as it related to both Michael and Joshua Stocker, at least at the inception of this event in Tori Patrick's apartment was basically the same, was it not?

A. I'm -- I'm sorry. You're confusing me.

Q. The nature of the evidence as it relates to

both Josh Stocker and Michael Stocker, at least as far as the inception of the event in Tori Patrick's apartment was essentially the same?

A. Yes, I would agree with that. Yes.

Q. Okay. Now, when this document resurfaced what -- what do you recall about the circumstances as to how you were able to find this document?

A. So in preparation for the Kimberlin trial, at that time our office had, as I recall, a separate file for Josh Stocker and a separate file for Craig Kimberlin. And so as we were preparing for the Craig Kimberlin trial, looking through it is when I found it, and then I made the decision we needed to combine all the files into one so that there was just one master Dustin Pool file instead of a file for each Codefendant.

Q. Do you recall how far in advance of Mr. Kimberlin's hearing on December 17th that you discovered the document?

A. I -- I do not.

Q. Okay. And you say you thought this was in whose file?

A. Mr. Kimberlin's file.

Q. A week? Two weeks? A month?

A. I -- I don't know, and if I may clarify. I don't know if any of the lawyers ever -- any of the

03:48PM Codefendants' attorneys ever expressed to me that they didn't have that. So I don't know if I disclosed that to the Codefendants' attorneys or not. I just know I did make a note of it, that I needed to tell Mike in person that we had found that document.

03:48PM Q. Did you discover this while you were in your office? Somewhere in the courtroom?

03:48PM A. It would have been in the district attorney's office.

03:48PM Q. Okay. And when you discovered it, do you remember what your immediate reaction was thereafter?

03:49PM A. Finally, you know, it was a loose end for Mr. Stocker's trial. If Tori Patrick was going to testify again in the further trials, you know that needed to be cleared up. It -- it was just an unresolved question that Mr. Watkins and Ms. McElroy had brought up. And so, you know, when -- when it came to light, I was like, oh, you know, there it is.

03:49PM Q. Well, what was the first thing you did? Did you go see Mr. Farren or somebody and say, hey, look what I found?

03:49PM A. I -- I don't recall. I mean, I did inform him at some point that that document had been found.

03:49PM Q. Did you have any discussion as to, you know, this is actually kind of serious. We said this didn't

exist and it does and this guy just got convicted? Any discussions like that?

A. I don't recall the specific nature of the discussions around that document.

Q. Well, by that point Van Williams would have been Mr. Stocker's appellate attorney.

Did you notify him?

A. I do not believe I did.

Q. Did you go back to the Court and say, Judge, you know that thing we had going on back in July, that was all wrong?

A. Well -- I mean, Judge Miner would have been made aware of it because it surfaced obviously in Mr. Chacon's trial, but whether I specifically went to him ex parte and told him about it, I would doubt that.

Q. Was there any discussion within -- within your office as to what should be done now that the document had surfaced?

A. I don't -- I don't recall.

Q. And as far as you know, the document was just languishing in Mr. Kimberlin's file?

A. Correct.

Q. And you don't recall whether or not you contacted anybody to have them send this document to you or anything like that?

A. I'm sorry?
Q. You don't recall or do you recall whether or not you contacted anybody to have them send you a copy of this use immunity agreement?
A. No. I found the document on my own, sir.
Q. Okay. Did you have any discussions with any investigators? Did they say anything about they found it and put it in Mr. Kimberlin's file?
A. No.
Q. What is your estimation of the effect on Joshua Stocker's trial and ultimate -- ultimate outcome with the absence of this agreement?
MR. BLOUNT: Object to that question, Your Honor. It calls for his speculation.
THE COURT: I'll overrule the objection.
You may answer.
A. Assuming Mr. Watkins and Ms. McElroy had the document to use in trial, I still believe that Mr. Stocker would have been convicted.
And if I may clarify that a little bit. Mr. Stocker's main defense was that the State's timeline was inaccurate. And he buttressed that argument by calling a forensic entomologist, Dr. Haskell. And based on what Dr. Haskell discovered concerning larva and bugs and insects found in Mr. Pool's body, Dr. Haskell

03:52PM concluded that the time of death was much different than what the State theorized. And -- and so in a certain way, the Defense wanted Ms. Patrick to testify and to lock in her timeline according to her written statement.

Q. So the absence of an agreement -- document proving an agreement that shows somebody might have an insensitive to testify a certain way, you don't think would have any effect on that person's credibility or the ultimate outcome of a trial?

A. No, for sure. It -- it would affect her credibility. However, she was not given transactional immunity. She was just given limited use immunity for proffered the statement that she gave to Ms. Ledbetter.

Q. So were you privy to discussions with Mr. Farren then about what Ms. Patrick's actual offers were?

A. I was never aware of any fixed plea-bargain offer until Mr. Farren authorized me to write that letter you've -- you've referenced.

Q. Okay. So are you testifying that the only agreement you ever knew about with Ms. Patrick was the use immunity agreement up until the time she actually pled?

A. Correct, yes.

Q. And you never discussed it with Mr. Farren?

A. He -- he made it specifically clear that we could not discuss any fixed plea bargains, any type of plea bargain with her or with her attorney prior to her testifying.

Q. Why was that?

A. Mr. Farren believed, as he explained to me, that if a witness testifies without a fixed plea bargain, that her -- the witness's credibility is somehow enhanced by that.

MR. WOOLDRIDGE: Pass the witness.

MR. BLOUNT: No questions.

THE COURT: Thank you. Judge, you may step down.

May the witness be excused?

MR. WOOLDRIDGE: No objection.

THE COURT: All right. Good luck.

(Witness exits the courtroom)

THE COURT: Next witness?

MR. WOOLDRIDGE: Guin Garcia.

(Witness enters the courtroom)

THE COURT: Good afternoon.

THE WITNESS: Good afternoon.

THE COURT: Are you Guin Garcia?

THE WITNESS: Yes, sir.

THE COURT: Are you handcuffed?

THE WITNESS: Yes, sir.

THE COURT: Okay.

(Witness sworn)

THE WITNESS: Yes, sir.

THE COURT: All right. If you would, have a seat over here on the witness chair. And if you would also listen to the questions that are asked of you and then give direct answers. Okay?

THE WITNESS: Yes, sir.

THE COURT: Thank you.

(Witness takes the witness stand)

THE COURT: Mr. Wooldridge.

GUIN CORDELL GARCIA,

having been first duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. WOOLDRIDGE:

Q. Will you please state your full name.

A. Guin Cordell Garcia.

Q. And, Ms. Garcia, are you the Guin Garcia that was one of the Codefendants in this matter involving Dustin Pool and Joshua Stocker?

A. Yes, sir.

Q. What were you charged with originally?

A. Tampering with evidence.

Q. You were never charged with anything else?

04:01PM A. Kidnapping.
04:01PM Q. And did you have both of those charges pending simultaneously?
04:01PM A. I can't remember.
04:01PM Q. Okay. What happened on the tampering charge?
04:01PM A. I bonded out on it and then a few days -- the next day or a few days later I got a kidnapping charge.
04:01PM Q. Well, ultimately, on the tampering charge did you plead out, receive a sentence, anything like that?
04:02PM A. On the tampering?
04:02PM Q. Yes.
04:02PM A. No.
04:02PM Q. Was that case dismissed?
04:02PM A. Yes, sir.
04:02PM Q. And what happened on the kidnapping case?
04:02PM A. I got 10 years.
04:02PM Q. Was it originally kidnapping or was it originally aggravated kidnapping?
04:02PM A. I believe it was -- I believe it was aggravated.
04:02PM Q. And ultimately at some point you did reach a plea agreement?
04:02PM A. Yes.
04:02PM Q. When did you plead out on the kidnapping charge -- or the lesser included of kidnapping?

04:02PM A. I can't remember that date.
04:02PM Q. Have you had some trouble with the law?
04:02PM A. Since then?
04:02PM Q. Uh-huh.
04:02PM A. Yes.
04:02PM Q. You've been in trouble a few times?
04:02PM A. Yes. Two charges.
04:02PM Q. Yeah.
04:02PM Now, you don't recall the date that you plead out. Do you recall even the year?
04:02PM A. 2006.
04:03PM Q. Prior to or after Frank Chacon's trial?
04:03PM A. I don't remember that.
04:03PM Q. Okay. Now, they put you on 10 deferred probation. Is that correct?
04:03PM A. For the kidnapping?
04:03PM Q. Yes.
04:03PM A. No. I was already on deferred probation when that happened. I got 10 years prison.
04:03PM Q. They just gave you a straight ten-year sentence?
04:03PM A. Yes, sir.
04:03PM Q. You never went on probation?
04:03PM A. For the kidnapping, no.
04:03PM Q. Right. Okay.

Did you -- have you completed that sentence?

A. Yes.

Q. And they appear to have you in jail clothing and they are bringing you out of the jail, so what's the charge that you are on now?

A. Delivery.

Q. And how much of a sentence did you get on that?

A. 20 years.

Q. Now, referring back to your testimony at Mr. Stocker's trial, has anybody ever asked you to review your testimony in that regard?

A. To review it?

Q. Yes.

A. Yes, I've reviewed it.

Q. And does that -- the record look right as far as what your testimony was?

A. Yes, sir.

Q. And you have no reason to contest the accuracy of that record?

A. No, sir.

Q. And in that you said that you didn't have an agreement when you were asked by Mr. Fowler?

A. I was real confused over all of that.

Q. At the time --
A. I --
Q. -- did you remember having signed a use immunity agreement?
A. Yes, sir.
Q. And what was the source of your confusion?
A. Well, I thought it was so I wouldn't have any more charges.
Q. Do you remember much about it?
A. Like what -- I'm confused -- I'm confused what you mean.
Q. Well, I spoke with you back in the jail, I don't know, a couple of hours ago. Do you recall indicating to me at the time that it was all just kind of a blur to you and you don't really remember any of this?
A. I remember signing the agreement. I -- I thought it was so I wouldn't have any more charges brought against me.
Q. Okay.

MR. WOOLDRIDGE: Pass the witness.

CROSS-EXAMINATION

BY MR. CLARK:

Q. Ms. Garcia, you -- you reviewed your testimony in the Josh -- Joshua Stocker trial?

04:05PM A. Yes, sir.
04:06PM Q. All right. And you've read that in its entirety.
04:06PM A. Yes, sir.
04:06PM Q. Correct?
04:06PM Can you recall whether you were ever asked by either Defense lawyer whether or not you had actually signed a use immunity agreement?
04:06PM Do you understand the question?
04:06PM A. Not really.
04:06PM Q. Well --
04:06PM A. That whole --
04:06PM Q. Did you ever read in the transcription of your testimony that you were ever asked about signing a use immunity agreement?
04:06PM A. Yes.
04:06PM Q. Yeah. We -- we do know that you told the Court and the jury that you were there to tell the truth --
04:06PM A. Yes.
04:06PM Q. -- and whatever the punishment was going to be in your case, let the chips fall where they may. Correct?
04:06PM A. Absolutely.
04:06PM Q. And that's what you told the jury?

A. Yes, sir.
Q. And that was the truth?
A. Yes, sir.
MR. CLARK: May I approach the witness, Your Honor?
THE COURT: Yes, sir.
MR. LOVE: Do you want to mark it, Warren?
Q. (BY MR. CLARK) Ms. Garcia, I want to hand you what has been marked as State's Exhibit Number 23, and you may or may not have ever seen that.
A. Yes.
Q. Let me ask you -- it looks like it's a document that is charging you with kidnapping.
A. Yes, sir.
Q. Correct?
Not aggravated kidnapping. Right?
A. Yes, sir.
Q. Right. Okay.
And that's -- that's eventually what you pled to was kidnapping.
A. Right.
Q. And 10 years. Correct?
A. Yes, sir. Yes, sir.
Q. And this was after the Joshua Stocker trial.

Correct?

A. Yes, sir.

Q. After you testified --

A. Yes, sir.

Q. -- in that case?

Did you testify in the Frank Chacon trial? You didn't, did you?

A. No.

Q. You testified in the Michael --

A. They brought me down here, but I didn't testify.

Q. Right. You were called and then you testified in the Michael Stocker trial. Do you remember that?

A. Yes.

Q. Okay. By that -- by that time you had already pled to the 10 years on the kidnapping, to the best of your knowledge?

A. Yes, sir.

Q. Okay.

MR. CLARK: Your Honor, at this time we would tender State's Exhibit 23, which is a copy of a complaint filed against Guin Cordell Garcia, charging her with kidnapping, dated March 30th of 2003.

MR. WOOLDRIDGE: No objection.

THE COURT: It is admitted.

04:10PM Q. (BY MR. CLARK) Briefly, Ms. Garcia, the writ application in this case has alleged that you were encouraged to make false representations about the existence of this agreement that you made. The only agreement that you had was that you would testify and tell the truth?

04:11PM A. My lawyer told me to get up and tell the truth.

04:11PM Q. That's it?

04:11PM A. Just -- yes.

04:11PM Q. And that's what you did?

04:11PM A. Yes, sir.

04:11PM Q. Were you ever encouraged by James Farren or anyone else prosecuting the case to testify and make false representations about the existence of this agreement that you had reached?

04:11PM A. No.

04:11PM MR. CLARK: I'll pass the witness.

04:11PM REDIRECT EXAMINATION

04:11PM BY MR. WOOLDRIDGE:

04:11PM Q. Up until the time that you pled out on the kidnapping charge and took your 10 years, did you ever have any agreement with Mr. Farren at any time other than the use immunity agreement?

04:12PM A. No.

MR. WOOLDRIDGE: Pass the witness.

MR. CLARK: No further questions, Your Honor.

THE COURT: Ms. Garcia, where are you presently housed?

THE WITNESS: In Randall County.

THE COURT: Okay. Thank you.

THE WITNESS: Yes.

THE COURT: You may step down.

MR. WOOLDRIDGE: Can we approach?

MR. BLOUNT: Judge -- yeah, she is in TDC, I believe, if you were asking what TDC unit.

THE COURT: Yes.

MR. BLOUNT: She probably misunderstood what you were asking.

THE COURT: Okay.

THE WITNESS: Lockhart.

THE COURT: Lockhart Unit?

THE WITNESS: Yes, sir.

THE COURT: Okay. Thank you. Good luck.

THE WITNESS: Thank you.

(Witness exits the courtroom)

MR. LOVE: Can we approach?

THE COURT: Do you want this on the record or off?

04:12PM MR. LOVE: Off.

04:12PM THE COURT: Off the record. Okay.

04:12PM (Off-the-record discussion between Court
04:12PM and Counsel)

04:13PM (Open court)

04:13PM THE COURT: Then back on the record. The
04:13PM Court will be in recess until 9:00 a.m. in the morning.

(Proceedings Adjourned)

REPORTER'S CERTIFICATE

THE STATE OF TEXAS )
COUNTY OF RANDALL )

I, Dina Wall, Official Court Reporter in and for the 47th District Court of Randall County, State of Texas, do hereby certify that the above and foregoing contains a true and correct transcription of all portions of evidence and other proceedings requested in writing by counsel for the parties to be included in this volume of the Reporter's Record, in the above-styled and numbered cause, all of which occurred in open court or in chambers and were reported by me.

I further certify that this Reporter's Record of the proceedings truly and correctly reflects the exhibits, if any, admitted by the respective parties.

WITNESS MY OFFICIAL HAND this the 8th day of January, 2019.

*Dina Wall*
______________________________
Dina Wall, Texas CSR 4784
Expiration Date: 12-31-2020
47th District Official Court Reporter
Randall County, Texas
Canyon, Texas 79015
(806) 468-5557