REPORTER'S RECORD
VOLUME 4 OF 6 VOLUMES
NO. WR-88,099-01
CAUSE NO. W-15,307-A-1

RECEIVED
COURT OF CRIMINAL APPEALS
1/16/2019
DEANA WILLIAMSON, CLERK

| | | |
|---|---|---|
| EX PARTE | ) | IN THE DISTRICT COURT |
| | ) | |
| | ) | |
| | ) | RANDALL COUNTY, TEXAS |
| | ) | |
| | ) | |
| JOSHUA DAVID STOCKER | ) | 47TH JUDICIAL DISTRICT |

*****************************************************************

WRIT HEARING

*****************************************************************

On the 31st day of October, 2018, the following proceedings came on to be heard in the above-entitled and numbered cause before the Honorable David Gleason, Judge presiding by assignment, held in Canyon, Randall County, Texas;

Proceedings reported by Stenographic Method.

# A P P E A R A N C E S

FOR THE APPLICANT:

SBOT NO. 24010492
Mr. James Edd Wooldridge
Attorney at Law
600 South Tyler Street
Suite 1704
Amarillo, Texas 79101
(806) 418-8575

FOR THE STATE OF TEXAS:

SBOT NO. 00787925
Mr. Robert Allen Love, II
SBOT NO. 02505850
Mr. Charles David Blount
SBOT NO. 04300500
Mr. Warren L. Clark
Randall County Assistant District Attorneys
2309 Russell Long Boulevard, Suite 120
Canyon, Texas 79015
(806) 468-5570

# CHRONOLOGICAL INDEX


| October 31, 2018 | | | | | | Pg | Vol |
|---|---|---|---|---|---|---|---|
| Appearances.................................. | | | | | | 2 | 4 |
| Case Called.................................. | | | | | | 6 | 4 |

APPLICANT'S

| ORAL EVIDENCE | DX | CX | RDX | RCX | VD | VOL |
|---|---|---|---|---|---|---|
| Jennifer Cates | 11 | 20 | | | | 4 |
| Jami Watson | 25 | 31 | 36 | 38 | | 4 |
| | | | 39 | | | 4 |
| Debra Keeler | 41 | 46 | 48 | 51 | | 4 |
| | | | 55 | | | 4 |
| Tori Patrick | 58 | | | | | 4 |
| C.J. McElroy | 69 | 82 | 110 | 111 | | 4 |
| | | | | 117 | | 4 |
| | | | 118 | 119 | | 4 |
| Mike Watkins | 121 | 135 | 164 | 168 | | 4 |
| | | | 168 | | | 4 |
| Tori Patrick (Cont'd) | 171 | 198 | | | | 4 |

| | | |
|---|---|---|
| Proceedings Concluded.......................... | 225 | 4 |
| Reporter's Certificate......................... | 226 | 4 |

ALPHABETICAL INDEX


| WITNESS | DX | CX | RDX | RCX | VD | VOL |
|---|---|---|---|---|---|---|
| Jennifer Cates | 11 | 20 | | | | 4 |
| Debra Keeler | 41 | 46 | 48 | 51 | | 4 |
| | | | 55 | | | 4 |
| C.J. McElroy | 69 | 82 | 110 | 111 | | 4 |
| | | | | 117 | | 4 |
| | | | 118 | 119 | | 4 |
| Tori Patrick | 58 | | | | | 4 |
| Tori Patrick (Cont'd) | 171 | 198 | | | | 4 |
| Mike Watkins | 121 | 135 | 164 | 168 | | 4 |
| | | | 168 | | | 4 |
| Jami Watson | 25 | 31 | 36 | 38 | | 4 |
| | | | 39 | | | 4 |

EXHIBIT INDEX

APPLICANT'S

| NO. | DESCRIPTION | OFFERED | ADMITTED | VOL |
|---|---|---|---|---|
| 10 | T. Patrick's Bond Hearing | 8 | 8 | 4 |
| 11 | T. Patrick's Jail Calls | 19 | 19 | 4 |
| 12 | J. Wooldridge's Letter | 184 | 184 | 4 |
| 13 | J. Wooldridge's Letter | 184 | 184 | 4 |
| 14 | T. Patrick's Jail Records | 196 | 196 | 4 |
| 15 | Photograph | 197 | 198 | 4 |

STATE'S

| NO. | DESCRIPTION | OFFERED | ADMITTED | VOL |
|---|---|---|---|---|
| 24 | Thumb Drive (Phone Calls) | 24 | 24 | 4 |
| 25 | T. Patrick's signed Use Immunity Agreement | 34 | 34 | 4 |
| 26 | Excerpt Proceedings | 144 | 145 | 4 |
| 27 | Excerpt Proceedings | 144 | 145 | 4 |
| 28 | T. Patrick's Supporting Affidavit | 215 | 215 | 4 |
| 29 | T. Patrick's Supporting Affidavit | 215 | 215 | 4 |
| 30 | T. Patrick's Statement | 215 | 215 | 4 |
| 31 | T. Patrick's Statement | 215 | 215 | 4 |
| 32 | T. Patrick's Statement | 215 | 215 | 4 |
| 33 | T. Patrick's Plea Hearing | 215 | 215 | 4 |

P R O C E E D I N G S

October 31, 2018.

(Open court, Applicant and Counsel present)

THE COURT: Let the record reflect all the persons necessary right now are present.

Mr. Love.

MR. LOVE: Your Honor, there's a couple of matters we need to clarify occurred during Mr. Farren's testimony.

One of them is regarding a Motion to Revoke Bond or Increase Bond hearing that occurred on November 18th of 2005, involving the State of Texas versus Tori Brooke Patrick, Cause Number 15,310-A. There was some questioning about that and there was a statement in response, I believe, to one of Mr. Wooldridge's questions that Mr. Farren responded that he would be surprised if Judge Miner held a hearing without Ms. Patrick's attorney present.

I, after the -- his examination was concluded by both sides, I approached Ms. Wall, the court reporter, and asked is that something that we could get. She indicated to me that as the testimony was going on she had some recollection that she might have already prepared that testimony or the transcript

from that hearing.

She looked here at the office, was not able to find the transcript on her computer here. I asked her if there would be any other place that it could be found, and she said maybe on her computers that she has at home for -- that she has used in the past. And I asked her if she would look.

She then -- I gave her my e-mail address so that she could send it to us if she found out. She did, in fact, find it. I've marked it as State's Exhibit 23, and I would like to offer it into evidence at this time.

I know Mr. Wooldridge has a -- has a copy of it.

THE REPORTER: It should be 24.

MR. WOOLDRIDGE: Well, Judge, I don't think it's appropriate for the State to be doing that right now because it's not their witness and it's not their case. It's still ours.

I've got it as Defendant's 10. I will offer that.

THE COURT: Either one is fine with me.

MR. LOVE: It doesn't matter to me whether it's 10 -- State's Exhibit 10 or 23.

THE REPORTER: You already have a 23.

MR. LOVE: I'm sorry?

THE REPORTER: Robert, you already have a 23.

MR. LOVE: Oh. Well, then I won't offer it.

09:22AM I'll let Mr. Wooldridge offer it as Defense Exhibit 10. We have no objection.

09:22AM THE COURT: Are you offering Defendant's Exhibit 10?

09:22AM MR. WOOLDRIDGE: I am offering Defendant's Exhibit 10.

09:22AM THE COURT: No objection. It is received and admitted.

09:22AM MR. LOVE: That, in fact, Mr. Robnett was not present. Ms. Patrick does in fact inform the Court that her attorney Mr. Robnett is not there, that he is aware of the hearing that is taking place, but he is in Lubbock, I believe is what she tells the Court upon questioning, that he has a -- some sort -- other matter going on in Lubbock and was not able to be there.

09:23AM I checked the file from that case. I didn't find a Motion for Continuance -- a written Motion for Continuance filed by any party with regard to this hearing. Just -- I was just curious as to -- that there is nothing in the file that would indicate a Motion for

Continuance was filed.

There were -- witnesses testified. Ms. Keeler -- Mr. and Ms. Keeler, the mother and father, of Tori Patrick, they both did testify. There was no decision made by the Court and it was just left open.

And there was -- the only other thing I noted was Mr. Farren talked about the plea agreement that existed between Ms. Patrick and the DA's office on the -- November 18th of 2005.

The second matter, Mr. Wooldridge inquired of Mr. Farren about a relationship with a Sam Hale and that Sam Hale may be related to Tyler Hale, who was one of the Codefendants in this case. Because of the -- because of the potential allegations that could have been raised by Mr. Wooldridge's questions, I felt we were duty-bound to look into it, and we did.

Mr. Farren stated that Kenneth Farren is his brother. He does have a daughter named Jennifer. Her daughter did marry someone named Sam Hale. And we inquired as to any relatives of Sam Hale. We learned that Sam Hale has two brothers, Seth and Steven Hale.

We then inquired -- we were able to learn that from Jennifer Hale, Sam Hale's wife and Kenneth Farren's daughter and Mr. Farren's niece, that she is not aware of any relatives in their family by the name

of Tyler, the Hale side of the family.

We just felt like the implications from that, giving a deal to someone that may be a relative, however slight by in-law -- by marriage or blood, we felt like we had to look into that. We satisfied our -- ourselves. There is no relationship between Sam Hale that is married to Jennifer Hale, previously Jennifer Farren, and Tyler Hale.

THE COURT: Thank you for the clarification.

Mr. Wooldridge, you may present your next witness.

MR. WOOLDRIDGE: I would call Jennifer Cates.

(Witness enters the courtroom)

THE COURT: Good morning, Judge. How are you?

THE WITNESS: Good morning.

THE COURT: Would you raise your right hand.

(Witness sworn)

THE WITNESS: I do.

THE COURT: Please have a seat.

(Witness takes the witness stand)

THE COURT: Mr. Wooldridge.

09:26AM JENNIFER CATES,
09:26AM having been first duly sworn, testified as follows:
09:26AM DIRECT EXAMINATION
09:26AM BY MR. WOOLDRIDGE:
09:26AM Q. Please state your full name.
09:26AM A. Jennifer Cates.
09:26AM Q. Formerly Jennifer Casey?
09:26AM A. Yes.
09:26AM Q. Formerly Jennifer Cubby?
09:27AM A. Yes.
09:27AM Q. Now Jennifer Cates?
09:27AM A. Yes.
09:27AM Q. In 2000 and -- in the period between 2003 and 09:27AM 2005, where were you employed?
09:27AM A. The Randall County District Attorney's office.
09:27AM Q. What was the full period of your tenure here?
09:27AM A. You know, maybe '99 to 2006.
09:27AM Q. And you were in that capacity as an assistant 09:27AM district attorney?
09:27AM A. I was.
09:27AM Q. Did you have any participation in any of the 09:27AM cases involving the Dustin Pool murder?
09:27AM A. I did.
09:27AM Q. What was your role?
09:27AM A. I assisted anything that they needed as they

were prepping for trial. I was specifically assigned to the Kimberlin case, but if they needed anything while they were getting ready on the others, I would help.

Q. So you were handling Mr. Kimberlin's case?

A. Most specifically. But I would do whatever they needed.

Q. And what was the -- the story line on Mr. Kimberlin's case?

A. Well, it's -- it's been awhile, but he was head of the rival faction and supposedly he is the one that set up the -- the hit.

Q. Well, now, what I mean is they -- they filed those charges sometime in June 2003?

A. Okay.

Q. And Mr. Kimberlin's case was resolved when?

A. Maybe 2006. I'm not sure. It's been awhile.

Q. Were you involved and present at his plea?

A. Yes, I was.

Q. And did he plead in December 2005?

A. I don't have anything to argue that. I'm sure that's true.

Q. Okay. Did you have any role in the plea negotiations with Mr. Kimberlin?

A. The negotiations, I was present. I didn't make any of the deciding factors, but -- and then I -- I

was there during the plea. I questioned him.

Q. Okay. Now, it appears that there was a pretrial hearing on Mr. Kimberlin in December of 2005, shortly before his plea where some pretrial matters were -- were handled. Do you recall that? Were you part of that?

A. I don't remember.

Q. Do you recall ever finding -- finding in Mr. Kimberlin's file a use immunity agreement to which Tori Patrick was a signatory?

A. I -- I don't remember seeing that, no.

Q. If Mr. Fowler -- Jeremy Fowler indicates that he found that use immunity agreement in that file, would you have been aware of it being in the file then or should have been aware of it being in the file all that time?

A. You know, I have no -- I have no reason to argue with Mr. Fowler at all.

Q. Okay. Would you have been the person in custody of the file? Would you have kept that -- because back then we had paper files. Would you have kept that in your office?

A. No.

Q. Where would it have been?

A. Well, you know, that file could have been

anywhere. It could have been in Mr. Farren's office. There was very -- there were investigators working on the file. It was -- it was a big file, so parts of it could have been anywhere in the office.

Q. Do you recall any discussions about Tori Patrick's use immunity agreement?

A. I -- I was not involved in Ms. Patrick's case very much at all. So, no, I don't.

Q. Well, use immunity agreements for all the different people who might be witnesses or defendants or whatever, it's kind of important to know whose got those and who doesn't, wouldn't you say?

A. That's true. I just don't remember Ms. Patrick specifically.

Q. Okay. Do you ever recall any discussions about anybody's use immunity agreements?

A. Well, I remember that we -- of course, that we talked about them and that witnesses would come in, but specifically, I don't remember details.

Q. And you knew Mr. Kimberlin had one?

A. I'm sorry. I -- I can't even answer that.

Q. Okay.

MR. WOOLDRIDGE: May I approach?

THE COURT: You may.

Q. (BY MR. WOOLDRIDGE) Mr. Josh Stocker has filed

an Application for Writ of Habeas Corpus in this matter. And attached to that is a memorandum brief in support of the writ and attached to that memorandum brief at Appendix O is this document right here.

Do you recognize what this is?

A. I do.

Q. And what is that?

A. That's the sticky note in my handwriting.

Q. Okay. And this sticky note in handwriting, according to this also appeared to have been attached to a note from Bobbie Ledbetter with Tori Patrick's address on it?

A. I -- I -- I don't know that one. I know my handwriting.

Q. Okay. Well, do you have an explanation for why it would have been attached to Ms. Ledbetter's note with --

MR. BLOUNT: Objection --

Q. (BY MR. WOOLDRIDGE) -- Ms. Patrick's address?

MR. BLOUNT: Objection, Your Honor. She just testified she doesn't know anything about the other note.

THE COURT: Sustained.

Q. (BY MR. WOOLDRIDGE) In the note you say you are listening to Tori's calls and you think she honestly

believes you're not listening to her, and it might be better to let her think that.

Why would you opine that?

A. Because she was being very honest. She was in the Potter County Jail and she was just talking like no one was listening.

Q. Well, you understand this note was found in Mr. Stocker's file?

A. Okay.

Q. And it's attached to a note that has Tori's address where she ceased living there at least a year before Mr. Stocker's trial?

MR. BLOUNT: Judge, I'm going to object. That's assuming some facts that have not been presented in this writ hearing.

THE COURT: Sustained.

Q. (BY MR. WOOLDRIDGE) So you say you were just listening to jail calls from Potter County?

A. That's correct.

Q. Never listened to any other calls?

A. No.

Q. Never had any other calls available?

A. Well, I listened to Randall County Jail calls too throughout the case.

Q. I'm sorry?

A. I also listened -- if anybody was in Randall County, I would listen to their jail calls also.
Q. Now, did you prepare notes relating to those phone calls?
A. Yes, I did.
Q. Now, you've been out of the DA's office for some time. Is that correct?
A. That's correct.
Q. So you would not have participated in any of the recent discovery processing regarding this case?
A. That's correct.
Q. If I represent to you that I received this in discovery from the district attorney's office and it appears to be a copy of your notes as it pertains to those phone calls, would you agree with that -- or agree that those are your notes?
A. I would. What I would do is I would write handwritten notes and usually those were difficult to read so I -- that was usually my practice to retype them.
Q. Okay. If I can get you to refer to page 2 of this. And apparently sometime during call number 9 there, the highlighted part, what have you noted there?
A. "Farren has already screwed me. He's jerking me around bad. Farren told me that I can't get

psychological help until after the trial because it would hurt me as a witness."

Q. Okay. And would that then be a call from October 9, 2005?

A. According to my notes, yes.

Q. Okay. And it looks like she was talking to her father?

A. That's what I wrote, yes.

Q. Okay. And also during that call, what -- this highlighted part right here, what did she say there?

A. "Farren said that all of that stuff is out the window (probation deal)." Tori.

Q. And now these are kind of like summation notes. When you say probation deal, she didn't say parentheses, probation deal?

A. No.

Q. What was she referring to?

A. Well, I thought she was referring to probation, so I would have put that down.

Q. Okay.

A. I mean, they weren't verbatim.

Q. Yeah, these are just your interpretations?

A. Right.

Q. And on November 4th right here -- I've not highlighted this, but what is she saying right there?

A. "Have Judy tell Farren, I will be willing to do house arrest if they make the bond cheaper."
Q. Okay. Now, do you recall what the date of the bond hearing was for Ms. Patrick?
A. No, I don't recall that.
Q. It would have been shortly after this. It would have been after that bond hearing she got out of jail, wouldn't she?
A. I don't remember.
MR. WOOLDRIDGE: Your Honor, I would offer into evidence.
THE REPORTER: What's the number on that?
MR. BLOUNT: 11.
MR. WOOLDRIDGE: We would offer Defendant's Exhibit 11.
MR. BLOUNT: No objection.
THE COURT: Admitted.
Q. (BY MR. WOOLDRIDGE) Do you recall any further discussion about what kind of psychological help she was trying to get?
A. On -- on the tape itself?
Q. Yeah.
A. No.
Q. Did anything stick out in your mind that you remember from that what she was trying to get?

A. Well, just from the jail phone calls in general, she discussed Managed Care, but, you know, that's all that really sticks out, that and her attitude.

MR. WOOLDRIDGE: I'll pass the witness.

CROSS-EXAMINATION

BY MR. BLOUNT:

Q. Judge Cates, so your testimony is, is that in your preparations or in your participation in the prosecution of Craig Kimberlin, as well as perhaps some of the other Codefendants, that you become aware that Tori Patrick had been incarcerated in late 2005?

A. That's correct.

Q. In the Potter County Jail?

A. Yes.

Q. She had acquired or picked up new felony charges in Potter County?

A. Yes.

Q. And either on your own or through someone else's direction in the office, you acquired the jail calls that she had made or participated in from the Potter County Sheriff's department?

A. That's correct.

Q. And you listened to a number of those calls made while she was there?

A. Yes.
Q. And these are the notes that you've been referring to. When you listened to them, you would make some notes?
A. That's right.
Q. Okay. Now, they're not verbatim?
A. No.
Q. They're a summary?
A. Yes.
Q. And when you say you believe -- and if you were to say you believe they're accurate today -- we're talking about phone calls you listened to, what, 13 years ago?
A. That's correct.
Q. Okay. And on direct examination you -- you were asked specific questions about finding or seeing use immunity agreements or specifics about some of these -- or the Kimberlin file.
Have you -- you haven't looked at any of that in 15 years or --
A. No.
Q. -- well, not 15 years, but 13 years?
A. I haven't looked at any of that.
Q. When you were subpoenaed were you under the impression that your testimony was going to be in

regards to these phone calls?

A. That's correct.

Q. You weren't aware you were going to be asked any detailed questions about anything else?

A. No.

Q. You didn't go review any files?

A. I did not.

Q. Are you aware that -- that Tori Patrick, as well as Josh Stocker, has filed or filed writs?

A. I was not aware of that until recently.

Q. Okay. So you were aware of the Joshua Stocker writ?

A. Yes.

Q. And you are aware that there's been allegations that the DA's office during that timeframe wiretapped Tori Patrick?

A. Yes.

Q. And your sticky note was attached as some kind of evidence of that?

A. That's correct.

Q. Okay. Did you listen to any wiretapped phone calls?

A. No.

Q. Do you have any knowledge that any such practice occurred?

09:40AM A. No.
09:40AM Q. Have you ever seen any notes about any -- anything concerning Tori Patrick being wiretapped?
09:40AM A. No.
MR. BLOUNT: What would my next number be, Dina?
THE REPORTER: 24.
MR. BLOUNT: I'm sorry?
THE REPORTER: 24.
09:41AM MR. BLOUNT: May I approach the witness, Judge.
09:41AM THE COURT: Surely.
09:41AM Q. (BY MR. BLOUNT) I am showing you what I have marked as State's Exhibit Number 24 and ask if you recognize it?
09:41AM A. I do.
09:41AM Q. What is it?
09:41AM A. It's some phone calls from the Potter County Jail that I was given by the DA's office.
09:41AM Q. Now, this is -- well, actually 24 is a thumb drive --
09:41AM A. Right.
09:41AM Q. -- or a disc -- a memory disc.
09:41AM And have you looked at the contents of the disc?

A. I have listened to it, yes.
Q. Are those the phone calls you reviewed back in 2004/2005 that you've been talking about?
A. Those are some of them. I can't say if they were all of them.
Q. Okay. But the ones you listened to, those are the ones?
A. Yes.
Q. Have they changed in any significant way since then as far as you know?
A. As far as I know, no.
MR. BLOUNT: Offer State's Exhibit 24.
MR. WOOLDRIDGE: No objection.
THE COURT: There is no objection?
MR. WOOLDRIDGE: No objection.
THE COURT: 24 is admitted.
MR. BLOUNT: Pass the witness.
MR. WOOLDRIDGE: Nothing further for this witness.
THE COURT: Thank you, Judge. You may step down.
THE WITNESS: All right.
THE COURT: And may return to service.
THE WITNESS: Thank you.
THE COURT: Thank you.

(Witness exits the courtroom)

MR. WOOLDRIDGE: Jami Watson.

(Witness enters the courtroom)

THE COURT: Good morning. If you will raise your right hand.

(Witness sworn)

THE WITNESS: I do.

JAMI KAYE WATSON,

having been first duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. WOOLDRIDGE:

Q. Will you state your full name.
A. Jami Kaye Watson.
Q. And, Ms. Watson, how are you employed?
A. I'm an attorney with the Texas Department of Family & Protective Services.
Q. How long have you been in that capacity?
A. Six-and-a-half years.
Q. Prior to that what did you do?
A. I worked for the Randall County DA's office as their CPS attorney.
Q. From what period?
A. 2004 to 2012.
Q. When did you take the job in 2004?
A. I'm sorry?

Q. When did you take the job in 2004?
A. It was in April.
Q. What were you doing prior to that?
A. I was a private practice attorney.
Q. In your capacity as a private practice attorney, did you represent at some point a lady named Tori Brooke Patrick?
A. Yes, on a couple of occasions.
Q. How did you come to represent Ms. Patrick?
A. She hired me to do a divorce for her, and I don't -- I'm sorry. I don't remember the year. And then she hired me to represent her on a criminal case.
Q. Do you recall when she hired you on the criminal case?
A. I want to say in 2003, but I'm not certain.
Q. Okay. What do you remember about that case?
A. It was a capital murder case involving Dustin Pool.
Q. Did you participate in any negotiations with the Randall County Criminal District Attorney's office regarding Ms. Patrick?
A. Yes.
Q. What do you remember about those negotiations?
A. After Tori was incarcerated, we met at the jail with representatives of the DA's office and she

gave a statement.

Q. And do you recall who those representatives were?

A. Bobbie Ledbetter and Gil Farren, and James Farren was there for just short periods of time.

Q. So she gave most of that statement to Ms. Ledbetter. Is that correct?

A. Yes.

Q. Were you present during all of that?

A. Yes.

Q. And did you also participate in signing a use immunity agreement with Ms. Patrick?

A. Yes.

Q. And who all -- well, five signatures are there, so I guess you all signed it out at the jail?

A. Yes.

Q. Did Ms. Patrick have any other agreements with the Randall County Criminal District Attorney's office?

A. No.

Q. That you participated in?

A. No.

Q. Okay. If Mr. Farren says he sent a letter to a subsequent attorney saying that he had entered an agreement with you and Ms. Patrick, that she would plead to a lesser charge and other terms of that deal, does

that not ring a bell or did that not exist?

A. We discussed that, but it was contingent on Tori complying with the use immunity agreement and testifying. So it did not come to fruition before I got off the case.

Q. So there was no written agreement to that effect?

A. No.

Q. It was just this is what we're going to do if we're satisfied?

A. Yes.

Q. Okay. Now, in a previous -- actually with Ms. Patrick's case previously a couple of years ago, you were subpoenaed to come testify at that time and bring with you any files relating to that matter.

When you and I talked at that time, did you indicate your file with Ms. Patrick no longer existed?

A. Yes.

Q. Do you recall when you destroyed that file -- or first, did you destroy the file?

A. Yes.

Q. What was the manner of destruction?

A. They were taken to a shredder.

Q. And do you recall when you did that?

A. I don't.
Q. Now, you are aware of the Texas Disciplinary Rules of Professional Procedure, are you not?
A. Yes, sir.
Q. Do you recall what those rules mandate as far as time for us to maintain files?
A. Seven years. And I kept them at least ten. It was after the ten years that I destroyed all my files, but I can't tell you what date that that happened.
Q. Now, you withdrew from her case ultimately, did you not, before resolution?
A. Yes, sir.
Q. Do you recall when you withdrew?
A. I believe April or May of 2004.
Q. And if we look in the records and it says May, would that -- can we trust the record on that?
A. Absolutely.
Q. Okay. So you were still Tori's attorney for about a month after you took the job with the DA's office?
A. Yes.
Q. Now, were you contacted by the Randall County Criminal District Attorney's office at some point regarding contents of that file?

A. Yes.
Q. And what was the nature of that contact?
A. When one of the criminal defendants -- and I don't remember who -- was on trial, they contacted me about documents that could be in the file. But at that point I checked the file and I didn't have the documents that they wanted or needed, and so...
Q. Do you know where they would have gone?
A. No.
Q. Do you -- now, that document in question was actually Ms. Patrick's use immunity agreement, the one that you had signed?
A. Yes, I believe so.
Q. You didn't have that anymore?
A. No.
Q. Do you have an explanation for why you would not have had that at that point?
A. I don't. I checked her file. I checked the files around her file. I checked the four drawers in the filing cabinet, and I was not able to locate it.
Q. I mean, that's a pretty important document to maintain for your client, is it not?
A. Yes, sir.
Q. And it disappeared?
A. Yes, sir.

Q. Did you destroy it?
A. Not to my knowledge.
Q. Did you have any assistants who may have destroyed it, secretaries, anything like that?
A. Not to my knowledge.
Q. Where did you maintain those files?
A. In file boxes. Some in the attic at my home and some in our little -- our storage building in the garage -- in the driveway.
Q. Now, they seemed to indicate during that trial that you were unavailable because you were on vacation.
Where were you vacationing?
A. Las Vegas with my husband.
Q. How long were you there, if you remember?
A. Approximately a week.
Q. Understanding it was 2005, do you remember dates?
A. I don't.
Q. Do you know if you got back before the trial was over?
A. I don't.
MR. WOOLDRIDGE: Pass the witness.

CROSS-EXAMINATION

BY MR. LOVE:
Q. I've just got one topic that I want to talk to

you about, Ms. Watson. If you don't understand the questions I'm asking, please ask me to repeat them or restate them because I sometimes go quick at the mouth.

THE REPORTER: Turn on your mic, please.

MR. LOVE: Oh.

THE REPORTER: Thank you.

Q. (BY MR. LOVE) I want to talk to you about -- and Mr. Wooldridge didn't get into an exact date with you -- but it was June 28th of 2003, where there was a meeting at the Randall County Jail and you talked about a meeting at the Randall County Jail, about taking a statement from Ms. Patrick?

A. Yes.

Q. Okay. There's been some other testimony in this hearing that that meeting lasted hours, perhaps six, seven, eight hours on that day that -- I think you identified yourself, Ms. Patrick, Bobbie Ledbetter, now Bruhn, Gil Farren and James Farren?

A. Yes.

Q. Are those the only people that were there, that -- that you recall?

A. That's all I remember.

Q. Okay. And as Mr. Wooldridge said, all five of those names appear on Ms. Patrick's use immunity agreement.

Is that State's Exhibit -- or Defense Exhibit -- do you remember which one that is, James?

MR. WOOLDRIDGE: Attachment H -- Appendix H to our writ application.

MR. LOVE: Okay. You didn't put it in, did you, as one of your...

Q. (BY MR. LOVE) But as far as you know, that's the only five people that were there?

A. Yes, sir.

Q. And in Mr. Wooldridge's direct examination he mentioned -- or you mentioned that Mr. Farren left?

A. Yes, sir.

Q. Did Ms. Farren stay?

A. I believe that she did for the majority of the time.

MR. LOVE: May I approach the witness?

THE COURT: Surely.

Q. (BY MR. LOVE) I'm going to show you what has been marked as State's Exhibit 25 for identification. Read through that, and I've got a couple of questions for you.

A. Okay.

Q. Do you recognize that document?

A. Yes, sir.

Q. Do you recognize that that is the use immunity

agreement of Tori Patrick?
A. Yes.
Q. And your signature is on there, as well as the other four people, that we mentioned earlier?
A. Yes, sir.
MR. LOVE: Offer State's Exhibit 25 into evidence.
MR. WOOLDRIDGE: No objection.
THE COURT: No objection. It's admitted.
Q. (BY MR. LOVE) I'll let you have that.
A. Okay.
Q. Is there anything but a use immunity agreement as you understand it in that document?
A. No, sir.
Q. Is there any sort of set plea agreement in that document?
A. No, sir.
Q. That day did Mr. Farren or anybody else with the DA's office coerce Ms. Patrick into signing that?
A. No, sir.
Q. Did anyone from the DA's office threaten her to encourage her to sign that document?
A. No, sir.
Q. Use of any other sort of duress of any sort by any member of the DA's office to get Ms. Patrick to sign

09:56AM that document?
09:56AM A. No, sir.
09:56AM Q. If that kind of thing would have happened, you as her attorney -- would you have stepped in?
09:56AM A. Absolutely.
09:56AM Q. Okay. During the course of -- you said that there was a statement that was taken from her, and I think there's evidence in the record that it was approximately nine pages?
09:56AM A. Yes.
09:56AM Q. Did anybody during the course of taking that statement threaten, coerce or use any sort of duress to get Ms. Patrick to complete that statement?
09:56AM A. No, sir.
09:56AM Q. If anybody had done that during the course of those several hours, would you have stepped in?
09:57AM A. Absolutely.
09:57AM Q. Were you present from the beginning to the end?
09:57AM A. Yes.
09:57AM Q. Were there times -- if you remember, were there times where you asked DA office personnel to step out so that you could confer with Ms. Patrick?
09:57AM A. Yes.
09:57AM Q. And you didn't leave before -- did you leave

09:57AM at the same time the DA's personnel left that evening?
09:57AM A. I believe I stayed a little later and visited with Tori. I can't tell you how long that took.
09:57AM Q. But you stayed longer?
09:57AM A. Yes.
09:57AM Q. So nobody else talked to her after you left in your presence?
09:57AM A. Not in my presence, no.
09:57AM Q. And when you were asked to look in your files for a copy of the use immunity agreement during the trial -- you said you didn't remember which one -- did you -- you said you looked in other files that were near it?
09:58AM A. Yes, in case it had been misfiled accidently.
09:58AM Q. And you were unable to locate it in Tori Patrick's file or any other file that you had near that file?
09:58AM A. Correct.
09:58AM MR. LOVE: I'll pass the witness.

09:58AM REDIRECT EXAMINATION

09:58AM BY MR. WOOLDRIDGE:
09:58AM Q. Now, Ms. Watson, do you -- what do you remember about the contact from the Randall County Criminal District Attorney's office asked you about the existence of that document? And I understand it's been

09:59AM a long time ago. But as best you can remember how it came in and what went on, what do you remember from that?

09:59AM A. I just remember that they couldn't find one. They asked if I had one. And so I checked my files, and I did not.

09:59AM Q. Okay.

09:59AM A. I couldn't find it.

09:59AM Q. Do you recall who called you from the district attorney's office?

09:59AM A. No.

09:59AM Q. Male? Female?

09:59AM A. I don't.

09:59AM Q. Do you recall where you were when you got the call?

09:59AM A. No, sir.

09:59AM Q. Now, if you were on vacation, you should have gotten that call out in Las Vegas?

09:59AM A. I think I checked the files before I went to Vegas. I'm not sure. It's been so long ago. But I -- I don't know. Or if they called me in Vegas, I checked them when I got home. I don't remember exactly.

09:59AM Q. Do -- do you recall any length of time in

10:00AM between the time you got the request to see if you had that document and the time you actually got to check for

it?

A. I don't know.

Q. Did you check yourself or did you have somebody else check?

A. I checked myself.

MR. WOOLDRIDGE: Pass the witness.

RECROSS-EXAMINATION

BY MR. LOVE:

Q. Do you remember when you received a call -- and I know you said you don't remember who -- did it seem that the person, whoever it was, was desperate to find that -- that use immunity agreement?

A. I don't -- I couldn't say.

Q. Or really wanted to?

A. I knew that they wanted to, but I couldn't say how they sounded.

Q. Okay.

MR. LOVE: I have -- I have no other questions.

THE COURT: Anything else, Mr. Wooldridge?

MR. WOOLDRIDGE: If you could give me just a minute, Judge.

THE COURT: Okay.

(Pausing)

FURTHER DIRECT EXAMINATION

BY MR. WOOLDRIDGE:

Q. Do you recall if you were actually in Las Vegas or if whether they -- or if they had actually approached you about that document before trial?

A. I don't remember for sure.

Q. Do you recall if you came back from Las Vegas while the trial was still going on?

A. I don't remember if it was still going.

Q. Did anybody approach you and ask you anything about -- we may need you to come say something?

A. I don't remember.

MR. WOOLDRIDGE: Pass the witness.

MR. LOVE: No other questions.

THE COURT: You may step down.

THE WITNESS: Okay.

MR. LOVE: Your Honor, Ms. Watson has another CPS -- jury or bench?

THE WITNESS: I have a bench trial tomorrow that I'm preparing for.

MR. LOVE: Can she be released?

MR. WOOLDRIDGE: We have no objection.

THE COURT: Excellent. You may return to service.

THE WITNESS: Thank you.

10:03AM THE COURT: Thank you.
10:03AM (Witness exits the courtroom)
10:04AM MR. WOOLDRIDGE: May I go see if my witness is here?
10:04AM THE COURT: Who would it be?
10:04AM MR. WOOLDRIDGE: I'm sorry?
10:04AM THE COURT: Who would be your next one?
10:04AM MR. WOOLDRIDGE: Debbie Keeler.
10:04AM THE COURT: You may check and see.
10:05AM (Pausing)
10:05AM MR. WOOLDRIDGE: We'll move onto Tori Patrick.
10:05AM THE COURT: Will she be rather lengthy?
10:05AM MR. WOOLDRIDGE: I'm sorry?
10:05AM THE COURT: She will be. Let's take a 20-minute break.
10:05AM Is she back here?
10:05AM THE BAILIFF: Yes.
10:05AM THE COURT: We'll take a 20-minute break and then we'll take up Tori Patrick.
10:05AM (Recess)
10:05AM (Open court, Applicant and Counsel present)
10:43AM THE BAILIFF: All rise.
10:43AM THE COURT: Thank you for your patience.

You may be seated.

Mr. Wooldridge.

THE COURT: Debbie Keeler, and she needs to be sworn.

(Witness enters the courtroom)

THE COURT: All right. Good morning.

Ms. Keeler, would you raise your right hand.

(Witness sworn)

THE WITNESS: Yes.

THE COURT: Please be seated.

Mr. Wooldridge.

DEBRA KEELER,

having been first duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. WOOLDRIDGE:

Q. Ms. Keeler, will you please state your full name.

A. It's Debra Keeler.

Q. And do you know a Tori Patrick?

A. Yes.

Q. What is your relationship to Tori Patrick?

A. That's my daughter.

Q. Now, have you been involved pretty much continuously throughout -- with Tori throughout her --

10:44AM her travails with the law in this case?
10:44AM A. Yes, sir.
10:44AM Q. So you were pretty much apprised of what was going on the entire time?
10:44AM A. Yes, sir.
10:44AM Q. At some point did -- when -- after Tori had been charged in this case, was there a meeting with you and your husband and Mr. Farren?
10:45AM A. Yes, sir.
10:45AM Q. Can you describe what that was.
10:45AM A. That was when her attorney -- she lived in Midland at that time and her attorney was from Midland, and they flew up here, and we picked them up at the airport at Tradewind and brought them to Canyon because he was supposed to meet with Farren that day.
10:45AM Q. Okay. And is that attorney Jeffrey Robnett?
10:45AM A. Yes, that's correct.
10:45AM Q. And you -- you accompanied them?
10:45AM A. Yes. We brought them down here.
10:45AM Q. And was that at the old --
10:45AM A. It was. It was on the square.
10:45AM Q. Right. When you got there what -- what transpired?
10:45AM A. Well, he and Tori went, I don't know, to another room or -- I really don't know what they did.

Tom and I sat in the waiting room. And then a little bit later -- I don't know if it was Mr. Farren himself or somebody else -- told us that he wanted us to come to his office.

Q. And when you say "us", you are referring to?

A. My husband and I.

Q. Okay. And you went to his office?

A. Yes, sir.

Q. Who else was present?

A. His -- his -- Mr. Farren's wife was in there too.

Q. Gil Farren?

A. Yes, his late wife.

Q. Anybody else?

A. No.

Q. What was the nature of the conversation?

A. The nature of the conversation was that he was just going to talk to us about what had transpired and -- with the case. And I do remember that on the wall he had a -- he had a big dry erase board and it had cast of characters and it had all of these names. And I do remember thinking, I've not heard of any of those names except for like two. And so -- but he told us -- he didn't go through everybody. He just told us that, you know, what he felt like had happened and that -- that it

wasn't a cartel, but was --

MR. BLOUNT: Excuse me, Judge. I'm going to object to the hearsay.

THE COURT: Sustained.

Q. (BY MR. WOOLDRIDGE) Did Mr. Farren tell you anything about Tori's situation?

A. Yes.

MR. BLOUNT: Object to the hearsay, Your Honor.

THE COURT: Sustained.

MR. WOOLDRIDGE: That's not hearsay. I asked if he told her. I didn't ask what he told her.

THE COURT: All right. I'll -- I'll withdraw my ruling on that one.

Q. (BY MR. WOOLDRIDGE) Did Mr. Farren indicate that there was an agreement?

MR. BLOUNT: Objection to hearsay, Judge.

THE COURT: Sustained.

MR. WOOLDRIDGE: Judge, it's relevant hearsay because this goes to the issue of whether or not an offer was made, what the offers were. And Mr. Farren has testified about that, and if he's made prior statements to Ms. Keeler about what the offer was and what he was doing with Ms. Patrick, then it's relevant.

THE COURT: To impeach prior testimony is

what you're saying?

MR. WOOLDRIDGE: Yes, sir.

THE COURT: All right. I'll allow it.

Go ahead.

Q. (BY MR. WOOLDRIDGE) What did Mr. Farren indicate was Tori's situation?

A. He just said that he had to charge her with something because -- for her safety with all these other people.

Q. He indicated those other people were dangerous?

A. Yes, sir.

Q. And he didn't want them thinking Tori was some kind of a snitch?

A. Yes, sir.

Q. And did he -- what did he mention about what was going to happen with her ultimately?

A. He just said that she would be charged with kidnapping and that then she would be on probation for ten years.

Q. And that would have been July 19th, 2005 -- or I'm sorry -- 2004?

A. Probably. I don't remember --

Q. Does that sound right?

A. -- the date.

It was probably around there.

Q. Okay. If other records indicate that's when that meeting took place, you are not going to disagree?

A. No.

Q. Now, also during this period did you have some kind of strange issues going on with your telephone?

A. Yes. It was doing a lot of clicking, and I felt like that it was being tapped.

Q. You knew -- you are not an expert on wiretapping and that kind of thing?

A. No.

Q. But you've heard some things about what you are supposed to look for if somebody's in your phone?

A. Correct.

Q. And did it sound to you like that's what was going on?

A. Yes.

MR. WOOLDRIDGE: Pass the witness.

THE COURT: Cross-examination?

CROSS-EXAMINATION

BY MR. BLOUNT:

Q. Ms. -- Ms. -- I'm sorry -- is it Keeler?

A. It is.

Q. Ms. Keeler, you were not present through any other meetings with Mr. Farren?

A. No, sir.

Q. That -- the one you've testified to, the one from July the 19th of 2004, when you brought Mr. Robnett to Farren to the meeting, that's the only time you met -- or that Mr. Farren discussed with you anything concerning Tori?

A. Yes, that's correct.

Q. So if any kind of deals -- this deal that you're talking about, if Mr. Farren had rescinded it, he wouldn't have called you to tell you that, would he?

A. I wouldn't think so.

Q. You wouldn't think so, would you?

You don't have no idea about any of that?

A. No.

Q. Okay. Is your husband here today?

A. No, he is not.

Q. Where is he?

A. He -- well, he was working.

Q. Where does he work?

A. He mows lawns. He's a retired firefighter.

Q. Where do you live?

A. 8600 Olympia in Amarillo.

Q. Will he be home later?

A. Probably.

Q. You would expect him to be?

A. Yes.
Q. What do you think he will be doing tomorrow?
A. Mowing.
Q. Were you aware of a telephone call that your daughter had with your husband while she was in the Potter County Jail?
A. I do remember that he talked to her, but I don't know what the -- what the conversation was, no.
Q. Okay.
MR. BLOUNT: I pass the witness.

REDIRECT EXAMINATION

BY MR. WOOLDRIDGE:
Q. Now, you know your daughter pretty well. Right?
A. Well, I think so.
Q. At any time after y'all had that meeting with Mr. Farren, but before Joshua Stocker's trial, did Tori ever come in and just -- well, first off, she is fairly outspoken, is she not?
A. Very.
Q. Yeah. Can't shut up?
A. Correct.
Q. Did she ever come in mad as hell that Farren's rescinded her agreement or anything like that? Ever mention anything like that?

MR. BLOUNT: Objection to hearsay, Your Honor.

THE COURT: Sustained.

Q. (BY MR. WOOLDRIDGE) Now, Tori ultimately was facing a revocation and she came and hired me. You are aware of that?

A. Yes.

Q. I think you assisted in hiring me?

A. Yes.

Q. And after those proceedings began in February of 2016, did you notice a change in activity around your house?

A. Yes.

Q. Can you describe what that was.

A. Well, it was a lot of different vehicles going by. A lot.

MR. BLOUNT: Objection, Your Honor, to the relevance of this testimony for the purposes of this writ hearing.

THE COURT: Overruled.

A. And then there was -- late at night, probably about 3:00 in the morning we had noticed, not every night, but several times a night there would be a man walking by. And at first I thought maybe he was walking to work or something, but one of the times I got in my

vehicle to see where he went, and he just goes around the block and then gets in a vehicle and leaves. So I thought that was kind of weird, but...

Q. (BY MR. WOOLDRIDGE) Now, you live at 8600 Olympia?

A. Yes.

Q. That's a fairly quiet neighborhood, is it not?

A. Yes.

Q. Fairly well-to-do neighborhood or --

A. Well, not --

Q. -- upper, middle class maybe?

A. Well, probably not. Used to be, but I don't think it is anymore.

Q. And you are aware of what is normal for the neighborhood?

A. Correct.

Q. And that changed after we started this?

A. Correct.

Q. And at some point did Tori move out?

A. Correct.

Q. Do you recall when that was?

A. December of '17.

Q. And I think sometime in the early fall or late summer, do you remember we actually made demands to the Randall County Sheriff and the Amarillo Police

Department Chief of Police to tell their people to back off because we knew what they were doing?

A. Correct.

Q. Now, after Tori moved out in -- December 2017, did that activity around your house cease?

A. Yes.

MR. WOOLDRIDGE: Pass the witness.

RECROSS-EXAMINATION

BY MR. BLOUNT:

Q. While Tori was in jail in Potter County in 2005, do you recall talking to her on the phone on several occasions?

A. I don't remember. I'm sure I probably did.

Q. Okay. In regards to Jeff -- Jeff Robnett -- well, let me ask you this.

Are you aware that your daughter has alleged in a -- in a sworn affidavit that James Farren told her to fire Jeff Robnett at this July -- July 19th, 2004, hearing -- meeting?

A. Yes, I am aware of that.

Q. You are aware of that?

A. Yes.

Q. Do you agree with that?

A. Yes.

Q. Did she fire him?

A. Well, she -- I don't think she ever sent a letter. They told her that -- that they would -- that they would contact them, was my understanding. That Randall County was going to contact him.

Q. Randall County who, ma'am?

A. I don't know. I don't --

Q. Okay.

A. I really don't know the particulars on that.

Q. Well, do you remember on November the 7th of 2005, having a conversation with your daughter while she was in jail and her telling you that she's not getting out. And you -- you said, well, I don't guess. I don't know what else to do. And she said, well -- I mean, call Jeff, because I can't call him from here and tell him. He needs to do something, that they're not setting a bond.

Do you remember her telling you that?

A. I don't remember her telling me that because I didn't call him.

Q. Well -- and you responded to her by saying, I hate to call Jeff. And then she said it has to do with a case he's already representing me on. If it weren't for the Randall County charge, I wouldn't be going through this right now. You need to call him and tell him they won't set a bond and he needs to do something.

I've already got a bond set on the forgeries. This has to do with a case he is representing me on.

You don't remember any of that?

A. I don't.

Q. Do you remember showing up at the bond hearing and testifying?

A. I'm sure I probably did.

Q. Do you remember your daughter telling Judge Miner that she had -- that Jeff Robnett had been notified of the hearing?

A. Yes, I do remember that.

Q. Okay. So you agree Jeff Robnett was notified of the hearing?

A. It was my understanding he was.

Q. He thought he -- I thought your daughter was supposed to be -- be firing him, not having anything --

A. Well, if she --

Q. -- more to do with him?

A. -- did, I didn't -- I wasn't aware. I didn't do it.

Q. Okay. Do you agree -- you see the inconsistency?

A. I see the inconsistency, but it doesn't mean that she did it.

Q. Okay. All right. As far as some kind of deal

that you've talked about that Mr. Farren made on July the 19th or told you about, do you remember talking to your daughter at the Randall County -- or while she was in the Potter County Jail on December the 6th, 2005, where you -- you talked to her about a custody case that Vaavia Edwards was going to handle for you?

A. Yes.

Q. Okay. And that was because Tori was trying to get y'all custody of Caden, wasn't she?

A. We were trying to get custody of Caden because his dad kept trying to kidnap -- he kidnapped him once.

Q. And because Tori was looking at going to prison?

A. It didn't have anything to do with that.

Q. Well, do you remember your daughter telling you during this conversation on December the 6th, that Vaavia has looked into the -- that case, talking about the murder case, a little bit. And said, I don't see any way you won't do some time. And your daughter says, yeah, I don't either. So I will probably do some time, but -- which I've known.

You don't remember that?

A. I do remember that. I --

Q. So she did tell you that?

A. She did tell me that.

Q. Okay. So she knew for some time that she was probably going to do time?

A. (Moving head up and down.)

Q. Even though she had a deal for probation?

A. Well -- correct.

Q. Okay. Thank you.

MR. BLOUNT: Pass the witness.

FURTHER DIRECT EXAMINATION

BY MR. WOOLDRIDGE:

Q. Now, Ms. Keeler, what Mr. Blount left out of that conversation in court --

MR. BLOUNT: Your -- Your -- Judge, I'm going to object to the sidebar comment about what I did or didn't do.

THE COURT: Sustained.

Q. (BY MR. WOOLDRIDGE) Well, we'll just read it. Do you recall hearing this at the -- at Tori's bond hearing when the Court asked, "Who is your lawyer?" Tori says, "Jeff Robnett." The Court says, "I don't know Mr. Robnett. Well, when did you get notice of this hearing?" The Defendant, Tori, "I was -- when did I get -- last week." The Court, "Last week. So you had a little notice of it?" The Defendant, "Uh-huh. And I've told him." Referring to her lawyer.

Do you recall that conversation?

A. Sort of. I remember --
Q. So according to Tori, Tori was the one that notified Mr. Robnett?
A. Okay. I did not know if she did or not.
Q. Did you ever notify Mr. Robnett?
A. No, I did not.
Q. Did you ever talk to Mr. Robnett?
A. Just when we picked him up from the airport and brought him here.
Q. How many times did she ask if you talked to Mr. Robnett?
A. Well, I guess just that one time, because I don't even remember that one.
Q. How many times does she ask you to talk to me?
A. Oh, a bunch.
MR. WOOLDRIDGE: Pass the witness.
MR. BLOUNT: No further questions.
THE COURT: Thank you, Ms. Keeler. You may step down.
THE WITNESS: Thank you.
MR. BLOUNT: I would like her subject to recall, Judge.
THE COURT: Okay. You will need to remain under the rule, Ms. Keeler.
MR. BLOUNT: Ma'am.

THE COURT: You will just need to remain under the rule outside.

THE WITNESS: Okay. Thank you.

MR. WOOLDRIDGE: Could she be free to leave?

THE COURT: She's subject to recall.

MR. WOOLDRIDGE: I mean, I understand.

THE COURT: Okay.

MR. LOVE: Do you have a number for her that --

MR. WOOLDRIDGE: Yes.

MR. LOVE: -- we can get her back here if we need her?

MR. WOOLDRIDGE: Yes.

THE COURT: Okay. Good. Thank you.

(Witness exits the courtroom)

MR. WOOLDRIDGE: And can I step outside and see if the next witness is here?

THE COURT: Yes, sir.

(Pausing)

MR. WOOLDRIDGE: May we approach, Judge? May we approach, Judge?

THE COURT: Come on up.

THE REPORTER: Do you want a record?

MR. WOOLDRIDGE: No.

(Off-the-record discussion between Counsel and the Court)

(Open court)

MR. WOOLDRIDGE: I'm going to -- we'll call Tori Patrick.

(Witness enters the courtroom)

THE COURT: Good morning.

THE WITNESS: Good morning.

THE COURT: Are you Tori Patrick?

THE WITNESS: Yes, sir.

THE COURT: You are being called as a witness.

(Witness sworn)

THE WITNESS: Yes, sir.

THE COURT: Okay. If you would please have a seat right over here.

(Witness takes the witness stand)

THE COURT: Mr. Wooldridge.

TORI BROOKE PATRICK,

having been first duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. WOOLDRIDGE:

Q. Please state your full name.
A. Tori Brooke Patrick.
Q. Is Patrick your married name? Maiden name?

A. It's a married name. My maiden name is Keeler.

Q. You are the same Tori Patrick that was charged as a Codefendant in the Joshua Stocker -- in the -- regarding the murder of Dustin Pool?

A. Yes, sir.

Q. What were you originally charged with?

A. Capital murder.

Q. Were you subsequently charged with a different crime?

A. Kidnapping.

Q. Kidnapping or aggravated kidnapping?

A. I think aggravated kidnapping at first and then the agg was dropped.

Q. What happened on the capital murder charge?

A. It was dismissed in '07, when they filed the kidnapping.

Q. Okay. Was there an agreement to dismiss the capital murder charge before '07?

A. Yes, in '04.

Q. What were the circumstances under which that agreement was brokered?

A. What do you mean?

Q. What were the circumstances under which that agreement came to be?

A. That agreement came to be whenever Farren discussed that with me without my attorney present.
Q. Did you say without your attorney present?
A. Right.
Q. Did you also have discussions with Mr. Farren when your attorney was present?
A. One time.
Q. Do you recall what time that was?
A. July 22nd, '04, when we flew down here on a plane.
Q. When you had the discussion with Mr. Farren with your attorney present, what was the agreement that y'all reached?
A. I don't know because he talked to my attorney in a room and they had me in a different room with Bobbie Ledbetter.
Q. Did your attorney convey an agreement to you after that?
A. He -- yes. He told me that they were just going to dismiss the capital charge, and there was no mention of anything else.
Q. When -- or how far after that did you have the discussion with Mr. Farren where he gave you a different agreement?
A. Not long after that. Probably within the next

week or two maybe.
Q. Now -- I mean, we've had discussions at nauseam on this subject, have we not?
A. Yes, we have.
Q. Now, how soon after you and Mr. Robnett left Mr. Farren's office did he contact you?
A. It was real soon. I don't remember exactly. I mean, I don't --
Q. Was it the same day?
A. Not the same day.
Q. The next day?
A. Possibly.
Q. How did he contact you?
A. I think by phone.
Q. Did he do it himself or did he have Ron Jannings do it?
A. Ron Jannings came, I believe, and told me to come down and talk to him.
Q. Okay. Was that normal for Ron Jannings to come and do that?
A. It's normal --
MR. BLOUNT: Excuse me, Judge. I'm going to object to whether -- she has no personal knowledge of -- I'll tell you what, I'll withdraw the objection.
Sorry. Withdraw.

THE COURT: Thank you.
A. It's -- it's normal that Ron Jannings would either contact me by phone or come to my house, yes, and tell me to come talk to Farren. Yes.
Q. (BY MR. WOOLDRIDGE) How many times did that happen?
A. A handful.
Q. Now, I think at your trial -- well, I don't think.
According to the record at Mr. Joshua Stocker's trial, you testified you'd only met with Farren two or three times, was that true?
A. No.
Q. Why did you testify that way?
A. Because I was told not to -- I mean, I -- because we discussed testimony before I ever testified.
Q. Who is "we"?
A. Farren and Ledbetter and Fowler and their -- his crew.
Q. And yourself?
A. And myself.
Q. Your testimony now would be you met with Mr. Farren how many times?
A. A dozen. I mean, it's a lot of times. I was down here a lot. It seemed like a lot.

I used to come here on -- on weekends to see my son from Midland, and it seemed like every weekend I came to see my son, I also talked to the DA's office.

Q. Now, you're fairly well involved in the street scene in Amarillo, Texas, are you not?

A. Uh-huh.

Q. So you know who a lot of people are?

A. Uh-huh.

Q. Did you provide a lot of information to Mr. Farren about who all his cast of characters were and what the relationships were to each other?

A. No.

Q. Now --

A. I didn't know that information actually.

Q. Well, I was first appointed to you in 2007. Is that correct?

A. Uh-huh.

Q. In order to facilitate your plea so that you would have a lawyer?

A. Right.

Q. And I think I was your attorney for less than 24 hours before you entered your plea?

A. Correct.

Q. And you and I met that morning before you

entered your plea --
A. Uh-huh.
Q. -- and we sat down and talked?
A. Briefly, yeah.
Q. And did I -- I had like nine pages of discovery that I had been given?
A. Yeah, and you -- we -- we didn't even get five minutes to discuss anything.
Q. What did I advise you at the time about what to --
A. Not to plea.
Q. And why did I do that -- or what did I tell you your -- the reasoning was on why you should not plea?
A. Because you said they didn't have anything. They had no case against me.
Q. Okay. But you insisted on entering the plea, didn't you?
A. Yes, sir.
Q. You, in fact, relayed to me that you had brokered that deal with Farren?
A. Yes.
Q. Was Mr. Robnett involved in that at all?
A. No.
Q. Now, it appears that there were some

communications in March of -- of 2007 --
A. Uh-huh.
Q. -- where apparently they're trying to talk to Mr. Robnett. You've seen those communications.
Did you ever talk to Mr. Robnett during that period?
A. No, he thought he was done.
Q. Okay. Well, how would you know that he thought he was done if you didn't talk to him?
A. Well, I mean, I -- I guess I didn't -- I am assuming because he had told me before, whenever he was here on a plane and talked to Farren, that they were just supposed to dismiss the capital charges. There was not supposed to be -- he was -- he was never notified of anything else. So to his knowledge -- I mean, that's what I'm...
Q. Okay. So you don't know if he thought he was done or not really? You just --
A. No, but I'm just...
Q. And the product of your state of mind at that time, was that because you talked to Mr. Robnett or -- let me ask it a different way.
Do you recall the last time you talked to Mr. Robnett?
A. Yes. And he said that they were supposed to

11:13AM dismiss that capital charge.
11:13AM Q. Do you recall when that was?
11:13AM A. Yeah, it was in July of '04. And he said just -- that I was supposed to testify in Joshua's trial and they were going to dismiss that one and that was the end of that. I mean, that was the end of it. It wasn't supposed to be nothing further.
11:14AM Q. Okay. It also appears that you had a bond hearing in November 2005. Do you recall that?
11:14AM A. Yep.
11:14AM Q. Were you sober at the time?
11:14AM A. Yeah, I had been in jail for a while.
11:14AM Q. And at that hearing if it says that you relayed to the Court that you had notified Mr. Robnett of -- of that hearing, do you recall talking to him at that time?
11:14AM A. No, I didn't talk to them. I asked my parents to relay that -- that I had a bond hearing.
11:14AM Q. Well, if your mother says she didn't actually relay it to Mr. Robnett, then you would have been wrong?
11:14AM A. What do you mean?
11:14AM Q. You wouldn't have known that Mr. Robnett -- or Mr. Robnett would not have known if your mother didn't contact him?
11:14AM A. Right.

Q. Okay.

A. That's correct.

I had asked her to contact him. I'm in jail. I mean, I can't --

Q. Okay. So you were working on the assumption that your mother had contacted him?

A. Right. I know she -- I thought she had tried to. He has three different offices in different cities for one.

MR. WOOLDRIDGE: May we approach?

THE COURT: Surely.

(At the bench, on the record)

MR. WOOLDRIDGE: I'm informed by the bailiff that Ms. McElroy is here.

THE COURT: I saw her come in. And to follow the rule, I told them to have her stay outside.

MR. WOOLDRIDGE: How would you feel about interrupting Ms. Patrick's testimony as a courtesy to Ms. McElroy because --

THE COURT: I think that would be beneficial.

Do you?

MR. BLOUNT: That's fine.

THE COURT: Any problem with that?

MR. WOOLDRIDGE: No.

MR. BLOUNT: No. I will...

THE COURT: Okay.

(Open court)

THE COURT: Ms. Patrick, I'm sorry to interrupt your testimony, but there's another witness who has arrived --

THE WITNESS: Sure.

THE COURT: -- that your lawyer -- that your former lawyer wants to call as a witness first.

THE WITNESS: All right.

THE COURT: So if you will go back with the bailiff.

(Witness exits the courtroom)

MR. WOOLDRIDGE: Call Cristy Jo McElroy.

(Witness enters the courtroom)

THE COURT: Good morning.

THE WITNESS: Good morning. How are you?

THE COURT: Better and better.

If you're ready for this, raise your right hand.

(Witness sworn)

THE WITNESS: I do.

THE COURT: Thank you.

(Witness takes the witness stand)

THE COURT: Mr. Wooldridge.

CRISTY JO MCELROY,

having been first duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. WOOLDRIDGE:

Q. Will you please state your full name.
A. My full name is Cristy Jo McElroy.
Q. And you go by C.J.?
A. I do.
Q. And how are you employed?
A. I'm currently employed as an assistant federal public defender with the Federal Public Defender's office for the Northern District of Texas.
Q. Prior to that how were you employed?
A. I was a private attorney with my own practice.
Q. When did you take the federal public defender job?
A. Approximately a year ago.
Q. And prior to that, what was your -- how long was the period of time that you were a private practitioner?
A. 26 years.
Q. In the course of your private practice, did you at some point represent a Joshua David Stocker?
A. Yes, sir.
Q. Do you see him here today?

A. Yes, sir.
Q. And that's your guy?
A. Yes, sir.
Q. What was the issue on which you represented Mr. Stocker?
A. Mr. Stocker was charged with capital murder pending in Randall County.
Q. Do you recall how soon after he was arrested on the charge that you were appointed as his attorney?
A. No, I don't know the exact dates. I know that initially he was represented by Mr. Isern. That case was dismissed and then the case was filed as a capital murder case.
Q. And that was David Isern?
A. Yes, sir.
Q. And you -- were you the lead attorney on that?
A. I was.
Q. And did you have a second chair?
A. Yes, sir.
Q. Who was that?
A. Michael Watkins.
Q. So you two collaborated on the defense for Mr. Stocker?
A. Yes, sir.
Q. And as part of your collaboration, did you

11:22AM both make sure that you -- y'all had complete files; whatever Mr. Watkins had, you had, whatever you had, he had?

A. It was my practice throughout the many trials that we had done together, as lead attorney, if I received any information, that was immediately copied and then transferred to Mr. Watkins.

Q. Okay. Would there have been then, to your knowledge, anything in either of your files that the other one did not have?

A. No, other than personal notes.

Q. All right. Do you recall about when you came on the case for Mr. Stocker?

A. It would have been 2003.

Q. Do you recall if it was April, May, June?

A. No, I'm sorry. I don't.

Q. And did you represent Mr. Stocker throughout -- to the completion of his trial?

A. Yes, sir.

Q. During the trial there was some issue about a use immunity agreement for a couple of the witnesses. Do you recall that incident?

A. I do.

Q. Okay. When the issue came up -- well, do you remember how it came up?

A. My recollection is that we were questioning -- I believe Mr. Watkins was questioning Ms. Patrick. We asked specifically about an agreement that she had with the State.
Q. What did you know about the agreement prior to her testimony?
A. We had been told by other counsel that this agreement existed.
Q. Do you recall who the other counsel was that told you?
A. I don't remember at this point, no.
Q. But you had some information?
A. Yes. We had information from a credible source. It was another attorney involved in this rather large case, and we were told that this immunity agreement existed, so...
Q. Okay. Did you also have a memo from Ms. Ledbetter indicating that this agreement should have existed?
A. I don't recall that portion, but I -- I -- there was indications that we felt were good grounds in order to put forth questions to the witness about that.
Q. Okay. And Ms. Patrick denied that there was an agreement?
A. She did.

Q. Similarly with Guin Garcia, did she also deny that there was an agreement?

A. Yes, sir.

Q. As part of your discovery, had any use immunity agreements or any other type of plea agreements or proffers or anything been tendered to you as part of the discovery?

A. No, sir.

Q. During the course of the trial did you learn that those agreements, in fact, did exist?

A. During the course of the trial?

Q. Yes.

A. No. I don't believe other than, you know, maybe they tendered, you know, Mr. Bledsoe's agreement -- his plea agreement, but I don't remember being tendered any of the use immunity agreements. In fact, we didn't know those existed until fairly recently.

Q. It appears from the record that the issue on whether or not Ms. Patrick's -- or Ms. Patrick's testimony occurred on the 14th day of July. Now -- and -- and let me interrupt myself.

Have you had a chance to review any of the reporter's records or files or anything else before --

A. No, sir, I have not.

Q. -- coming in?

So you're coming in cold about something from 13 years ago?

A. Yes.

Q. And additionally as well, at -- at some point did I submit to you an authorization and demand on behalf of Joshua Stocker to provide to the new attorney, myself, any files that you had on him?

A. I don't recall that. I know that you asked me about it, but I don't recall the demand portion.

Q. Well, I think your answer was, you didn't have your file anymore?

A. That is the answer.

Q. Okay. Why do you not have the file anymore?

A. Well, as a process of trying to move things around, a 13- or 14-year-old file that would have encompassed probably 14 banker boxes worth, there were things that had to be eliminated, and those were one of the things that got eliminated.

Q. Okay. Well, as a licensed attorney in the State of Texas, you are familiar with the Texas Disciplinary Rules of Professional Procedure?

A. I am.

Q. And you understand how long you have to keep a file?

A. I don't believe that there's an exact date that's been mandated.

Q. Well, if I represented to you that depending on what the -- the case may be, it may be somewhere between seven and ten years?

A. Yes, sir, that's my understanding in generality terms.

Q. And you kept it as long as you were supposed to?

A. Yes, sir.

Q. And then you destroyed the file?

A. Yes, sir.

Q. So you have nothing to which you can refer?

A. No, sir, I do not.

Q. And nobody bothered to bring you the 22 volumes and have you review those --

A. No, sir.

Q. -- of the reporter's record?

Now, it appears again that the issue with Ms. Patrick and Ms. Garcia was on the 14th day of July. If I were to inform you that the record reflects that on -- the first proceedings on the 15th day of July, is that the State came up with some of those documents, partials, but not all of them, not Tori Patrick's signed use immunity agreement, and they proffered them to you,

does that ring a bell?

A. Not specifically. I mean, what -- what stands clear in my mind is that we had not ever had produced for us signed agreements that indicated to us that either Tori Patrick or Guin Garcia had signed and formalized those agreements prior to trial.

Q. And had you had a copy of a plea agreement with Josh Bledsoe?

A. At some point in time probably during trial.

Q. But not before?

A. It wasn't produced before.

Q. And they dumped you -- these on you in the middle of trial?

A. That would be my recollection, yes.

Q. And when you cross-examined Mr. Bledsoe, do you remember asking him about any agreement he had?

A. Yes.

Q. And if you misstated what the agreement was, was -- can you give a reason why that would have been?

A. Probably because we didn't have enough time to go through the materials prior to having his testimony introduced or -- or a misassumption on my part that that was the original agreement.

Q. Now, do you remember this was like an 11-day trial?

A. It was.
Q. And getting prepared for an 11-day trial is quite a task.
A. Yes, sir.
Q. Would you agree?
And then sitting through a trial for 11 days -- or 11 days total -- I guess you didn't do anything on the weekends, but for 11 days it's -- it's pretty burdensome?
A. This case was particularly difficult from the standpoint of there were many parties involved. I think at the beginning there may have been as many as 12 different parties that were identified that we had information on, and those were the people that were charged. That didn't encompass all of the witnesses, the testimony.
There were three different scenes to this particular case. Everything about this case was difficult. The -- the body was in poor shape by the time it was recovered. All of the forensics were particularly murky. This was a very involved, complex case.
Q. Now, if the record doesn't reflect that you ever entered any of those documents that were dumped on you in the middle of trial, would there be an

explanation why?

A. I don't -- other than, you know, feeling like this hadn't been properly explored -- essentially, my particular feeling about how this went down was, we attempted to examine the witness about this use immunity agreement.

It was represented by the witness that this didn't exist. My recollection of that is that Mr. Farren objected to this as being a -- a trick or a ploy, that it was inappropriate. That was done in front of the jury.

Then further examination went on. He represented essentially that there hadn't been any deals made with these people.

Further than that then, he called witnesses to substantiate his position that this had never occurred, and that we shouldn't be allowed to go further in our examination for this because it was an unfounded basis. That we had nothing other than supposition to basically predicate our -- our stance that this was an agreement made before trial where somebody was being given a benefit that we weren't made aware of.

Q. Did you find out that there were actually a lot of agreements?

A. Yes. Subsequent, yes.
Q. And you never got Mr. Kimberlin's use immunity agreement before trial?
A. No, sir.
Q. What would be the reason why in presenting a witness to a jury, you would not want them to know about agreements to their benefit?
A. There is no reason why.
Q. Well, I mean, not -- if you are on the Defense side. But if you are on the other side, what would be the rationale?
A. Well, the supposition behind not wanting the witness to appear to be biased or appear to be swayed, obviously before a jury, you know, I am assuming that the prosecution would want to submit to a jury a witness that they say is coming forward just to give their truthful testimony rather than it being induced because of a bargain or benefit that they would stand.
A bias, obviously, that could be explored by the Defense and used to explain why a person might change their truth to better fit the prosecution's line of reasoning.
Q. Now, during Mr. Stocker's trial after, Ms. Patrick and Ms. Garcia's testimony, that their agreements didn't exist, did anybody ever correct that,

as far as presenting to the jury?
A. No.
Q. So the jury was left with a -- a false impression that they didn't have agreements, when they did?
A. Yes. And beyond that, they were left with the impression, I think more damaging than that supposition was, Mr. Farren's explanation that somehow the Defense was making bogus claims based on nothing. And undermined our credibility as attorneys, with the supposition that we were pulling a fast one in order to try to discredit these witnesses, that we had no basis, in fact, to make these assertions.
Q. In your assessment of that trial and its outcome, do you believe that as a result of that Mr. Stocker received a fair trial?
A. No, I do not.
Q. Do you think the outcome could have been drastically altered had the proper testimony been presented to Mr. Stocker's jury?
A. I believe that a jury is entitled to hear the truth. I believe that the jury is entitled to be confronted with all of the information, including those things that might taint a person's testimony. To allow them with a good basis and fact to judge a credibility

of a witness, they would have to know what factors or influences might be pulling at that person.

For that reason, I believe that his trial testimony is undermined and due to that I believe that his trial was unfair.

Q. Now, would you -- the fact that -- as we read the record, the denials of the existence of the use immunity agreements by both Ms. Patrick and Ms. Garcia are almost verbatim. Would that cause you any concern?

A. It was my supposition from the beginning, and what caused me concern about these particular witnesses, much like you would paint a picture, you draw in the general objects. You start out positioning the big parts of the pictures and you place them there. That's what Ms. Patrick and Guin Garcia did for the government's case or the prosecution's case. They painted and framed the reference where all the big pieces would then be filled in.

The fact that both of these women -- given the fact that both of them were active drug users, had been drug users for a lengthy period of time prior to this event and the fact that Guin Garcia had involved herself in -- in many other nefarious activities, including planning of a different murder, these things caused me great consternation because I didn't believe

that either one of these people were truthful about anything.

MR. WOOLDRIDGE: Pass the witness.

CROSS-EXAMINATION

BY MR. LOVE:

Q. Good morning.

A. Good morning.

Q. How are you, Ms. McElroy?

A. I'm well. And you, Mr. Love?

Q. I'm doing well.

I haven't seen you since you went to work at the public defender's office -- Federal Public Defender's office. I hope things are going well with you there.

I want to talk to you something -- about the very end of your testimony. You were talking about you didn't believe either Guin or Tori were truthful.

A. That's correct.

Q. Okay. And you understand that the jury charge in this case named both of those as accomplices. Correct?

A. Yes.

Q. Okay. And under our law, accomplices, if they are testifying against a -- a codefendant, their testimony has to be corroborated or the jury can't take

it into consideration.
A. That is the law.
Q. And I'm guessing you -- you were not in the jury deliberations, just as the State was not in the jury deliberations. Correct?
A. No, they never let me go in.
Q. So you don't know whether that's what the jury decided, they didn't believe Garcia and Patrick either?
A. No, sir, I have no indication about that.
Q. Okay. So -- yet they found Mr. Stocker guilty with the other evidence or it could have been that way hypothetically?
A. That would call for some speculation on my part, but, yes.
Q. Yes. I mean, it's hypothetical. I'm not saying that either one of us know what went on in the jury.
I think Mr. Wooldridge asked you a number of questions about what you have reviewed before you came and took the stand in here today?
A. (Moving head up and down.)
Q. You haven't reviewed any of the trial transcript or the testimony or anything along those lines. You said your file is gone, so I am assuming you haven't reviewed your file?

A. That's correct.

Q. Okay. Do you remember how long ago you destroyed the file?

A. I don't know. It -- I really -- I mean, it could have been four years ago. It could have been five years ago.

Q. And from that time forward, clearly you haven't reviewed the file?

A. No, sir. I have really been a busy girl.

Q. From '05, after the trial until whenever that time is you destroyed it, how many times did you review the file -- after Josh Stocker's trial, how many times did you review the file after that?

A. Zero.

Q. Okay. So the last time you reviewed the file would have been in the -- in the midst of trial in July of 2005?

A. I may have gone over it as I closed the file, just from a standpoint of the way I like to categorize things, so it may have been in August or September when I was closing the file that I may have adjusted things the way I preferred it. But that would probably have been the last time that I actually laid eyes on or reviewed any of the material.

Q. And it would have been in the 30 to 60 days

following the trial?
A. Yes, sir.
Q. Because you still have some responsibilities following it. If the conviction was on -- the date of judgment was July 21st of 2005, you still have 30 days to file Motions for New Trial, notices of appeal and things like that, and those are responsibilities that you and Mr. Watkins would have had --
A. Yes, sir.
Q. -- at least initially until appellate counsel was appointed?
A. Yes, sir.
Q. So you closed it sometime in that 30 to 60 days and then have never looked at it afterwards?
A. That's correct.
Q. Now, one of the things you testified to on direct is that you don't -- the only thing you remember that may have been tendered to you in the middle of trial was Joshua Bledsoe's plea agreement?
A. That's the only thing that I can recall.
MR. LOVE: And may I approach the witness, Your Honor?
THE COURT: You may.
Q. (BY MR. LOVE) I am going to show you State's Exhibit Number 8, and that was -- it's State's Exhibit

Number 8 at the bottom for this hearing. It was 262 at the trial.

Is that what you are referring to?

A. I'm going to say probably.

Q. Okay. And if the record reflects this is what was tendered in the middle of trial --

A. Then I don't have any other way to say anything different. I just have no independent recollection of it at this point.

Q. But your recollection is that this was the only thing you remember, correct, being tendered in the midst -- the midst of trial?

A. No, there were other things tendered in the midst of trial. I just couldn't tell you exactly what they were.

Q. Okay. But I think you said that you clearly -- that you had never seen any of the use immunity agreements until after trial, you said until recently?

A. Yes, the signed agreements. Yes, sir.

Q. Okay.

MR. LOVE: May I approach again, Your Honor?

THE COURT: You may.

Q. (BY MR. LOVE) I'm showing you what has been marked as State's Exhibit 2 for this hearing. It was

State's Exhibit 261 in the trial of Mr. Stocker.

A. Uh-huh.

Q. Do you recognize that?

A. I recognize this.

Q. And it's clearly unsigned --

A. Yes.

Q. -- by any of the signature lines?

A. Yes, sir.

Q. Okay. Do you remember if that was something that you received during the midst of trial?

A. I don't -- I don't recollect. All I -- what I do recollect, Mr. Love, is that when we asked about it, it was indicated that none of this occurred. So I think that it would have, in my mind, been a nonentity since it wasn't signed, and the indication was it was not agreed to.

Q. Okay. And then there was some other witnesses that were called during the course of trial. There was a Brooke Vandergriff --

A. Yes, sir.

Q. -- who I think identified herself as the common-law wife of your client, Mr. Stocker. Is that correct?

A. I remember it was a girlfriend.

Q. Okay. But in the record if she identified

herself as the common-law wife, you're not --
A. I don't have an argument about that.
Q. Okay. And then there was also -- Garcia testified?
A. Yes, sir.
Q. And you said earlier on your direct testimony that you believed that you never -- you hadn't seen any other use -- signed use immunity agreements until very recently?
A. Yes.
Q. Okay. So if the record reflects that the signed use immunity agreements of Brooke Vandergriff and Ms. Garcia were given in the midst of trial, you wouldn't argue with that if that's what the record reflects? And I'm showing you State's Exhibit 5 and 6 for this hearing, that were 262 and 263 for the Josh Stocker trial.
A. I don't recall -- I don't recall these two documents, Mr. Love.
Q. Okay.
A. I -- I don't recall them.
Q. You don't recall them?
A. No.
Q. But you are not going to dispute that those documents were tendered to the Court and kept out of the

jury's purview, but were made Court exhibits at some point, if that's what the record reflects?

A. If that's what the record reflects, then, no, but I don't have it -- I guess -- my answer is that I don't have an independent recollection about this, other than they may have been tendered at some point in time.

Q. Okay. Your -- your recollection?

A. Right. And they -- what I do know is they weren't tendered before trial.

Q. So you don't recall the statement made by your Co-Counsel regarding Ms. Garcia's use immunity agreement that y'all already had this?

A. I don't recall that.

Q. Okay. So if the record reflects that Mr. Watkins said that on the record, you just don't have a recollection of it?

A. I don't have a recollection. My -- I don't recall that portion, no.

Q. Okay. And you said that you learned from some source that you considered credible --

A. Uh-huh.

Q. -- that Ms. Patrick had a use immunity agreement prior to trial?

A. Uh-huh.

Q. And you said you don't remember who that

credible source was --

A. It was one of the other attorneys that were on the myriad of other nine defendants in --

Q. I'm going to show you what is marked as State's Exhibit 3. It was Court's 3 and -- it started as Defendant's 3 and ended up as Court's 3 by the end of the Josh Stocker trial.

Can you take a look at that and just -- just read it for me if -- to yourself, not out loud.

A. Yes, sir.

Q. Okay. Do you have any independent recollection of what's reflected in State's 3 that has been admitted?

A. I -- I -- I've -- I believe that I have read over that, but I couldn't -- it would have been years, Mr. Love.

Q. It would have been -- I'm sorry?

A. It would have been years.

Q. Years ago?

A. If -- if I saw that, it would have been years ago.

Q. Before the trial even?

A. That, I don't recall.

Q. Well, if -- if -- if -- as the record reflects, Mike Watkins showed this to Tori Patrick when

she was on the stand --
A. Uh-huh.
Q. -- in the cross-examination.
A. Uh-huh.
Q. And as I mentioned at the beginning, it started out as Defendant's Exhibit 3. That would indicate that you -- the Defense team was in possession of this information?
A. Yes, sir.
Q. And you're saying that it -- it could have been?
A. Yes.
Q. Okay.
A. I just -- I don't have the certainty to say, yes, absolutely because of the years that have passed.
Q. I totally understand. I mean -- and I'm not holding you on your memory. All of this was 13 to 15 years ago when you started your representation.
A. Yes.
Q. Typically at that time the -- the policy in our office was that defense attorneys would come to our office and review the file, and there was a copy machine out in front of the office to make copies.
Do you remember that policy at the Randall County Criminal DA's office?

A. I don't believe that that was what was happening with this case.

Q. Well -- and you are right. I'm going to get to that in a minute.

The general policy was that defense attorneys would come, we would hand them a thin file, maybe that thick, and then you would go and make copies of whatever documents you wanted?

A. Yes, that was the standard procedure for most cases, yes.

Q. In this case, because of the volume of it --

A. And it was huge.

Q. -- different procedures were used?

A. Uh-huh.

Q. In fact, I think on one occasion or -- or what was done for all defendants, was that our file was sent to Kinkos or some other copy firm and copies were made and distributed to the defense teams, because as you mentioned, this was a huge case --

A. Yeah.

Q. -- multiple Codefendants?

A. Yes.

Q. I'm going to show you the police report from the investigation in this case, and I'm going to turn to page 101. This is State's Exhibit 4 for identification.

It has not been admitted. And I want you to take a look at the highlighted portion on page 101, and tell me if you recognize the information that's contained in that one supplement?

A. As far as I'm aware, Mr. Love, I think we would have obviously gotten a copy of that and reviewed it, which was the -- more concerning about when it references the use immunity agreement than the indication that there wasn't a use immunity agreement.

Q. Now -- and if -- if you've read through it, it's identical to State's Exhibit 3, the -- the language that's in there. If you need to hold it next to it and look.

A. I think it's very similar in tone, yes.

Q. Okay. And it's -- who's the person the -- that's doing that supplement?

A. It appears to be Bobbie Ledbetter.

Q. And you know her as an investigator in the DA's office?

A. Yes, sir.

Q. Okay. So there is indication in documents -- and, again, no one said we had that in the police report, only with this document, State's Exhibit 3. Mike Watkins indicated that he had this document. But it's the same information that's contained in the

document that Mr. Watkins presented in the court.

Again, you are going to have to accept my guarantee that this document was used by Mr. Watkins with Tori Patrick.

A. Yes. But it indicates to me that that would have never made it in front of the jury, only in front of the Court.

Q. You're -- you are exactly right. You are exactly right. Police reports generally don't --

A. Yes.

Q. -- go in front of juries in trials.

A. Right.

Q. But the --

A. And that exhibit itself would have never made it to the jury either.

Q. You are correct. I'm not saying -- I'm not suggesting that it was.

A. Yeah.

Q. It ended up being Court's 3, indicating that it was not a -- an exhibit that went to the jury.

But the fact that you had this, indicates that you had knowledge of this information or at least Mr. Watkins did?

A. Yes.

Q. Okay.

11:52AM A. Uh-huh.
11:52AM Q. And then the blank one was an indication that what was in this -- this State's Exhibit 3, this was something that was at least referenced in there, the blank Tori Patrick use immunity agreement?
11:52AM A. Yes. I -- I am assuming though that the reference would have been to the signed one, which we -- we didn't get.
11:52AM Q. I'm going to show you State's Exhibit 3, which was Defense Exhibit 3 and Court's 3 in the Stocker trial -- no, I'm sorry. I'm looking for the blank one. State's Exhibit 2 and State's Exhibit 261 in the Josh Stocker trial.
11:53AM A. Uh-huh.
11:53AM Q. Does that appear to be the same document, except for there's letterhead at the top of State's Exhibit 25 and the signatures are present?
11:53AM Here is it.
11:53AM A. Thank you.
11:53AM Q. Do those appear to be the same documents, except one is signed and one is not signed?
11:53AM A. Yeah, other than the -- the distinction being different with the letterhead and of course the signature is kind of key, then they are the same document.

Q. And just identifying State's Exhibit 4 for identification, the police report, you said this is a -- this would be something that you -- your defense team would have available to you?

A. Yes.

Q. Okay. And if I remember your direct testimony, you were pretty certain that you had never seen the Guin Garcia use immunity agreement until sometime recently?

A. That's my recollection, that we either did not get that signed agreement until trial or it came to us at -- or I would have seen it after trial, but I don't recall it being tendered to us before trial.

Q. Before trial?

A. I don't recall that part, no.

Q. And you talked about using these during the -- the trial. You would agree that if State's Exhibits 261, 262 or -- it was State's Exhibit 261 and 263 -- 62, 63 and 64, that -- that appear to be tendered during the Josh Stocker trial, these are not voluminous records that would require a lot of reading and not being able to go through.

You would agree with that. Right?

A. The record themselves, I would agree with you.

Q. Okay. So if they were tendered in the middle

of a trial, they would be available to you as the Court had them at that point?

A. Yes, sir. I -- I think the -- the difference is when you have the opportunity to prepare and you have forewarning, then you have a greater opportunity to also prepare your cross-examination of those folks and to endeavor to talk with them with a more informed view of what else was dismissed or not filed.

Q. Okay. What do you -- what do you believe a use immunity -- what's your definition of a use immunity agreement?

A. My understanding of the -- of the use immunity agreement, is that Ms. Patrick would be asked to give her truthful testimony and then would be exempt from prosecution for further crimes that she might admit that she had participated in or committed, absent the agreement of the State.

Q. And -- and that the State or the government whoever is doing the prosecution --

A. Yes.

Q. -- could not use what she testifies to in the courtroom or any statements that she's given in conjunction with the use immunity agreement, the State or the government could not use that against that witness --

A. For further prosecution, yes.
Q. -- in trial?
Of them, not of the -- where they're testifying, but of them in a separate criminal prosecution. Correct?
A. Yes, that's the entire basis, as I understand it, of the benefit of the agreement.
Q. And then in those situations when you cross-examine a witness that has a use immunity agreement, you're the Defense attorney, you are going to ask do you have a use immunity agreement. And the witness should respond, yes, the State -- the government said they will not use what I testified to in trial against me in my prosecution. Right?
A. I -- I -- I suppose that would be a response that could be elicited.
Q. Okay. And if the witness then said, yes, that's my understanding. They're not going to use my testimony and my statement against me, that would be showing the jury that they -- they've inured some benefit from that use immunity agreement?
A. Yes.
Q. Do you -- you -- you said that you remembered something about Mr. Farren, that it was some -- he was accusing y'all of some trick or ploy in front of the

jury in the use immunity agreements and y'all's questions about that.

Do you remember that part of your testimony with Mr. Wooldridge?

A. My recollection, Mr. Love, is that when we tried to explore this with Ms. Patrick, Mr. Farren objected strenuously and made remarks that basically indicated to the jury that we were doing this without a bases in fact. In that this was a Defense ploy and left that impression with the jury. And that is my recollection of how those events transpired.

Q. If the record reflects that all discussions about this use immunity agreement took place off the record without the presence of the jury, then that would be your -- your memory would be inaccurate, is that --

A. What I recall is his objection to our questioning, which was in front of the jury, before the jury was excused.

Q. So you don't remember Mr. Watkins asking the Court to approach the bench that first brought this to -- to the attention of the Court?

A. I remember there being discussions at the bench, yes.

Q. Okay. But you don't remember Mike Watkins being the first one to raise this issue before the

Court --

A. I don't --

Q. -- outside the presence of the jury?

A. I do not. I don't recall that portion, no.

Q. Okay. So when you said that that left a false impression with the jury in your opinion, Mr. Farren saying that y'all were going out of bounds or doing something unseemly --

A. Uh-huh.

Q. -- that left a false impression with the jury is what I wrote down.

A. My recollection of how this went down was there were sidebar comments that were being made as the jury was being processed in and out that I was concerned that the jurors would probably overhear. Mr. Farren was quite hot about this and he was upset and speaking loudly. So whether he was actually directing his commentary to the jury, I was more concerned that they would overhear some of the commentary about it. And then certainly throughout the trial and in his final remarks, he relied heavily and emphasized the testimony of both Ms. Patrick and Ms. Garcia.

Q. Okay. So clearly you don't have a clear recollection -- if the record reflects something totally different than what you have just described, you don't

have a clear recollection of it?
A. Well, let me put it to you this way.
Q. Okay.
A. My recollection is certainly a recollection from some years back.
Q. Right. And we talked about that.
A. And my recollection would have been in real time. And so the bits and pieces that I recall may not be things that are reflected on -- on the reporter's record, because they were happening in time. And while a reporter's record -- a reporter's record is going to take down the witness's testimony or what was directed in court, it doesn't always pick up sidebar comments or things that are implied; tone of voice, whether or not a person is, you know, upset or angry. A flat record doesn't always reflect the emotional impact that can occur in the courtroom.
Q. Okay. And I -- I would agree with you there. But if it was Mike Watkins who started the discussion with approaching the bench before anything was ever said in front of the jury, that's clearly not what you're recollecting? You are recollecting Mr. Farren going off and then that stopping the proceedings?
A. My recollection is -- no. My recollection is that we had these discussions, and at this point in time

that Mr. Farren was quite upset and angry about this. And that he objected, that he did not want to have any further discussions about it, that he didn't believe that this had occurred, that this -- this had transpired and was vocal about that.

Q. Okay. And then you clearly don't recollect the next morning's conversation when Mr. Farren came forward to the Court with those four documents that I showed you, State's Exhibit 2, 5, 6 and 8?

A. Were all of those exhibits -- those would not have been Ms. Patrick's signed use agreement. Is that right?

Q. No. But there were other use immunity agreements that you said you didn't get until after trial.

A. I -- I don't recall that portion. My primary memory is that to -- to the very end of the time, Mr. Farren's position was that Ms. Patrick had never signed any kind of use immunity agreement, and that was the focus of our argument for the greatest part here.

Q. Okay. And you don't remember Mr. Farren bringing it to the Court's attention the next morning, because that would differ than your opinion that he's angry about it, he doesn't want any more talk about it?

A. Well, I'm not sure I understand your question,

Mr. Love. And so are you saying, do I recall if Mr. Farren presented Ms. Patrick's signed use agreement? Is that --

Q. No, I --

A. -- what your question is?

Q. I showed you 261, 262, 263 and 264. That's the exhibits I'm talking about, and those numbers are from your trial, the Josh Stocker trial, not the ones here.

The ones here for this hearing are 2, 5, 6 and 8.

A. Well, therein lies my confusion because I don't know which ones you are talking about.

MR. LOVE: May I approach, Your Honor, again?

THE COURT: You may.

MR. LOVE: I'm sorry.

Q. (BY MR. LOVE) I'll just leave these with you.

A. Okay. Thanks. I appreciate it.

Q. That would be easier.

261 at your trial was the blank one for Tori Patrick. Correct?

A. Yes.

Q. 262 was the signed one by Brooke Vandergriff, correct --

A. Yes.
Q. -- with Greg Phifer as her attorney?
A. Yes.
Q. Okay. 263 was the signed one by Guin Garcia?
A. Yes.
Q. And 264 was the plea agreement with Josh Bledsoe. Correct?
A. Yes.
Q. Okay. So those -- and -- and I'm telling you that the record reflects that in Volume 11 before -- and I think that was on July 17th of 2005, that the day started with Mr. Farren tendering all four of those to the Court.
Do you -- do you recall that?
A. I don't have an independent recollection, but I'm not disputing if that's what the record says.
Q. Okay. That would be different than what the -- the Mr. Farren you've portrayed as opposing any more discussion about this and there's not anything out there. Right?
A. I -- I don't believe -- or maybe I wasn't clear, but my recollection is about the discussions regarding Ms. Patrick, and I would stand by my statement that in regards to asserting whether or not Ms. Patrick ever signed the use immunity agreement, Mr. Farren

remained adamant that that had not occurred.

Back that up by putting Ms. Ledbetter on that concurred that that had not occurred as well. And so the focus of the program or the focus of my memory was an emphasis on the fact that Ms. Patrick had not signed that use immunity agreement.

Q. So -- so you don't remember that Judge Miner was the one that required Bobbie Ledbetter to testify?

A. I don't recall that, no.

Q. Okay. You -- you guided the direct -- or the cross-examination of Guin Garcia and Josh Bledsoe. Is that correct from the trial?

A. Yes.

Q. Okay. Do you remember that?

A. No.

Q. Okay. If the record reflects that you were the one who cross-examined Guin Garcia and Josh Bledsoe, you'll -- you'll accept that as accurate?

A. Yes.

Q. Okay. Do you recall that at no time during either of their examinations; cross, recross -- because it went back and forth for a while on both of those witnesses, you didn't offer State's Exhibit 6 or State's Exhibit 8 to the jury, if that's what the record reflects?

A. If that's what the record reflects, then that's what happened.

Q. Okay. If we were to provide you with the record of Tori Patrick's testimony, would you -- could you review that over the lunch break?

A. Could I? Yes.

Q. And I'm asking, will you?

A. Should the -- should the Court ask me to do that, I would be happy to.

MR. LOVE: Your Honor, would the Court ask to her do that? I have some additional questions. Because I think a lot of our discussion is from her lack of memory of what went on. I think it would help in gathering that information.

THE COURT: Well, Ms. McElroy has voluntarily chosen to appear here from her job as assistant public defender in the federal system.

THE WITNESS: Yes, Your Honor.

THE COURT: Do you have other duties that would cause you not to be able to be here this afternoon?

THE WITNESS: I have no court hearings, Your Honor. I do have a good deal of work.

THE COURT: Okay. Do you volunteer to return this afternoon?

THE WITNESS: Your Honor, my discussions with my direct supervisor was that I was going to be -- I would be returned to the office by 1:30.

THE COURT: Okay.

THE WITNESS: That was the agreement by which I was --

THE COURT: All right. How long will it take you to produce that testimony for her to review?

MR. LOVE: It's approximately 126 pages of transcript.

THE COURT: The entire testimony of Tori Patrick?

MR. LOVE: Yes. Yes, Your Honor.

THE COURT: How long will that take you to review?

THE WITNESS: Probably the entire hour.

THE COURT: Then it will leave you no time for lunch.

THE WITNESS: That's correct, Your Honor.

THE COURT: When's the next time you could return?

THE WITNESS: Today is Wednesday. Okay. We have court hearings on Friday and I have other scheduled matters tomorrow afternoon. I could return in the morning if I could check my schedule.

THE COURT: Okay. We're going to take a brief recess while she checks her schedule. If you have a copy of that transcribed testimony that she could take with her to review, it would be beneficial.

Meanwhile, it's a brief timeout.

(Recess)

THE COURT: Counsel, could I see you-all up here for just a moment.

THE REPORTER: Judge, do you want this on the record?

THE COURT: Not yet.

(Off-the-record discussion between Court and Counsel)

(Open court)

THE COURT: We'll go back on the record now.

Thanks, C.J.

Q. (BY MR. LOVE) The use immunity agreement on Guin Garcia, that was State's Exhibit 6, I think, that's up there. It was 263 on the red sticker.

A. Yes, sir.

Q. Do you have it?

If the record reflects that Mr. Watkins indicated to the Court in an out-of-the-presence-of-the-jury hearing that y'all had already had that, you're not

going to dispute that, that you -- that you the Defense team had that or at least Mr. Watkins did?

A. No, sir.

Q. Okay.

A. If that was the representation, no.

Q. And when you cross-examined Ms. Garcia, if the record reflects that you didn't offer that or use that against Ms. Garcia in cross-examination, you are not going to argue with that either?

A. That would be the record, no.

Q. Okay.

MR. LOVE: I have no other questions.

THE COURT: Then we'll take a lunch break. Back at 1:30?

MR. LOVE: Well, I think he had a short redirect, and that way we could get her out of here and don't even have to come back.

THE COURT: Oh, she wouldn't even have to come back?

THE WITNESS: Right.

MR. LOVE: Well, if he didn't get his redirect, I'm fine with that too.

THE COURT: Okay. Go with your redirect, Mr. Wooldridge. We'll try to accommodate the witness.

THE WITNESS: Thank you, Your Honor.

REDIRECT EXAMINATION

BY MR. WOOLDRIDGE:

Q. After Ms. Garcia's testimony that she did not -- that no use immunity agreement or other agreement existed with her, was she ever called back to the stand to your knowledge?

A. Not that I recall.

Q. And her use immunity agreement signed was presented by Mr. Farren the next morning and she did not come back for testimony?

A. Not that I recall, Mr. Wooldridge.

Q. Now, you also testified at a pretrial hearing on Mr. Kimberlin in December. Do you remember that? December 2005?

A. I'm sorry. Ask the question again, please.

Q. In December of 2005, do you recall testifying at that pretrial hearing for Stephen Craig Kimberlin?

A. No, not really. No.

Q. You don't recall testifying about media proceedings and how you thought it would affect -- it affected your client and how it would affect Mr. Kimberlin's chances for a fair trial? It was a change of venue issue?

A. Oh, okay. In -- in -- in that regard, yes, I recall that particular discussion.

Q. Okay. Did anybody inform you that at that hearing Tori Patrick's use immunity agreement signed was entered as evidence?

A. No, sir.

MR. WOOLDRIDGE: Pass the witness.

RECROSS-EXAMINATION

BY MR. LOVE:

Q. Mr. Wooldridge asked you -- this is very quick. I'll be done.

Mr. Wooldridge asked you about Guin Garcia's testimony and not calling her back. Do you remember that just a minute ago?

A. The question? Yes.

Q. Yes. And he said -- and then y'all never called her back. Y'all were provided with the use immunity agreement. If the record reflects totally different than what he said, that it was the day after Tori Patrick's testimony, not Guin Garcia's, that all of those exhibits were presented to the Court, that would mean you still had them available for Guin Garcia's testimony, who came much later in trial. Right? And Mr. Bledsoe later in trial?

A. Mr. -- Mr. Love, I don't have an independent recollection of the order of the witnesses or how that came to be. So the only thing I could rely on would be

the record, which as we've discussed before, I haven't reviewed. So I can't dispute if that's the question.

Q. If the record reflects that Tori Patrick was the first person to testify of those four --

A. Yes.

Q. -- on the second full day of trial, the testimony?

A. Yes, sir.

Q. And then Guin Garcia testified on the third full day of trial. Brooke Vandergriff testified on the third full day of trial -- fourth full day of trial, and then, I think, Bledsoe was either the fifth or the sixth day, you -- you would have had those available for those cross-examinations if you received them after Tori Patrick's testimony. Correct?

A. If that was the sequence of events, then that's the logic answer, yes.

Q. Okay.

MR. LOVE: No other questions.

MR. WOOLDRIDGE: No further questions.

THE COURT: I have to ask. I'm sorry. As trial counsel --

THE WITNESS: Yes, Your Honor.

THE COURT: -- and your general practice back then before trial was to file Motions for

Discovery, which would include motions to reveal the deal --

THE WITNESS: Yes, sir.

THE COURT: -- or any other agreements made with witnesses?

THE WITNESS: Yes, specifically Brady. Yes.

THE COURT: Did you file such a motion?

THE WITNESS: Yes, those motions were filed pretrial.

THE COURT: All right. And you -- and you didn't receive any of these things until -- except for possibly the Bledsoe plea agreement -- none of the use immunity agreements until midtrial?

THE WITNESS: That's correct.

THE COURT: Okay. And you and Mike apparently chose not to use -- not to cross-examine further about those things. Correct?

THE WITNESS: Yes, sir.

THE COURT: Okay. But had you had these documents prior to beginning trial, you would have had more time to perform strategy or what?

THE WITNESS: I think there would have been a -- a better opportunity to have better prepared for that. Obviously, when you have those thrown in the

midst of a pretty complex trial, you are at a disadvantage. So anytime you have more time to prepare, you are in a better position to -- to deal with those witnesses, Your Honor.

THE COURT: All right. And if, as you say, Mr. Farren vociferously denied the existence of any of these things before the jury --

THE WITNESS: Yes. I mean, that's my recollection --

THE COURT: Okay.

THE WITNESS: -- is that the objection -- it might have been -- the other portion of the program is -- my recollection of the way the courtroom was structured that we were trying this case in, is we were sitting across from each other at the very same table --

THE COURT: Right.

THE WITNESS: -- not very far from the jury box. And so it wouldn't have been difficult for the jurors to overhear things that were said that would not have been made on the record, Your Honor.

THE COURT: This was in the Criminal Justice Center then on 4th and --

THE WITNESS: No, I think --

THE COURT: -- or was it in this building?

THE WITNESS: All I can remember is that we were at one single table. Instead of having two different -- different places to sit, we were at a single table, and they were seated on the side closest to the jury box.

THE COURT: A long table?

THE WITNESS: Yes, a long table.

THE COURT: Right.

THE WITNESS: And so that put us in very close proximity then for the jurors to have overheard things.

THE COURT: Okay.

Had you been able to review these documents prior to trial and present what was denied, would the result of the trial been different?

THE WITNESS: I believe -- Your Honor, I think that -- I think importantly, you know, when you are not allowed to explore an area fully, when you are not allowed to bring out the bias of witnesses -- and like I said, I believe that Guin Garcia and I believe that Tori Patrick, you know, basically sketched the -- the picture that was then subsequently filled in by other witnesses. They set the stage.

By not being fully able to cross-examine those witnesses, it impaired our ability to obviously

give the -- the jurors an indication of -- of what was going on in the background. And the intensity with which these folks were making deals and in many cases were heavily involved in criminal activity and were basically skating from being punished, while my client was facing capital murder, in those -- in that context, I think it would be important for a jury to be able to have -- have all of those facts available to them.

THE COURT: Thank you.

Other questions for her?

MR. LOVE: May I -- I hate correcting courts, but --

THE COURT: Thank you.

MR. LOVE: Can I -- can I suggest a -- a -- something different than what you said? You said none of it had been turned over except perhaps Josh Bledsoe. I think what the record reflects is that Guin Garcia's signed use agreement, according to Mike Watkins, they already had, if that makes sense.

THE COURT: Okay.

MR. LOVE: It's not that one.

THE COURT: Thank you.

MR. LOVE: Okay.

THE COURT: Okay.

MR. LOVE: And then there is one other

question I had for --

THE COURT: One other question.

FURTHER CROSS-EXAMINATION

BY MR. LOVE:

Q. If -- Brooke Vandergriff was one of the use immunity agreements that you received -- that was received in the middle of trial, do you remember electing not to cross-examine Ms. Vandergriff at all?

A. I remember there were a good many factors that went into that decision.

Q. Okay. So that was a -- that was a considered decision on your part?

A. That was a considered decision for a myriad of other tactical reasons that might not be directly related to this.

Q. But you're aware that you did not cross-examine Ms. Vandergriff at all?

A. I believe that there were some strategy in that decision.

Q. And I understand. But you do recollect that aspect of the trial?

A. Yes.

Q. Okay. That there were no cross-examining questions for Ms. Vandergriff, which is State's Exhibit 5, I believe, in this hearing.

MR. LOVE: I have no other questions, Your Honor.

THE COURT: Thank you.

Mr. Wooldridge.

FURTHER DIRECT EXAMINATION

BY MR. WOOLDRIDGE:

Q. Ms. McElroy, would you agree with me that Tori Patrick and Guin Garcia's testimony as to Josh -- Joshua Stocker's initial involvement in this and the -- the testimony about him trying to use this to settle up a $10,000 debt or something like that, that theirs was the damning testimony against your client in that regard?

A. Yes.

Q. And if you had had a better opportunity to prepare knowingly that they, in fact, had biases instilled through their agreements and for their untruthfulness, do you think that would have altered a jury's opinion of your client and then the outcome of the trial?

A. Well, I think it certainly would have made an impact on whether or not they believed these witnesses. Since I believe that they were important witnesses, the logical conclusion is, is that it could have well impacted the result of the trial.

Q. And the result of the trial may have been

different?

A. Yes.

MR. WOOLDRIDGE: Pass the witness.

FURTHER CROSS-EXAMINATION

BY MR. LOVE:

Q. The source of the $10,000 was not -- the only people that testified about that were not Guin Garcia and Tori Patrick. Correct? There were a number of witnesses that testified about that fact?

A. I don't recall the other witnesses' testimony in that regard. I remember it primarily being purported to be the basis of the action by both of those women.

Q. Okay.

MR. LOVE: No other questions.

MR. WOOLDRIDGE: Nothing further.

THE COURT: All right. Are you through with Ms. McElroy then?

MR. WOOLDRIDGE: We ask that she be released.

MR. LOVE: No objection.

MR. WOOLDRIDGE: Even though she's actually not under subpoena.

THE COURT: Thanks -- thanks for coming.

THE WITNESS: Thank you, Judge.

THE COURT: You are excused. Thank you.

(Witness exits the courtroom)
THE COURT: Now, lunch break.
MR. WOOLDRIDGE: Judge, may we have at least until 1:45 --
THE COURT: That suits me.
MR. WOOLDRIDGE: -- or later?
THE COURT: 2?
MR. WOOLDRIDGE: 2 will be fine.
THE COURT: All right. We'll recess until 2.
Thank you, Gentlemen and Ladies.
(Recess)
(Open court, Applicant and Counsel present)
THE COURT: Thanks. You -- you may be seated.
Are you ready for Tori Patrick again?
MR. WOOLDRIDGE: We will call Mike Watkins, Your Honor. He's here.
THE COURT: Mike Watkins. Okay.
MR. LOVE: John Michael Watkins.
THE COURT: One and the same.
(Witness enters the courtroom)
THE WITNESS: I assume you want me up here?

THE COURT: I do, Mike, right up here.

(Witness sworn)

THE WITNESS: I do.

(Witness takes the witness stand)

THE COURT: Mr. Wooldridge.

JOHN MICHAEL WATKINS,

having been first duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. WOOLDRIDGE:

Q. Would you please state your full name.

A. John Michael Watkins.

Q. How are you employed, Mr. Watkins?

A. I'm self-employed.

Q. As?

A. An attorney.

Q. How long have you been operating in that capacity?

A. I think it's 22 years.

Q. It becomes a blur after a while, does it not?

A. Fortunately, yes.

Q. How long have -- throughout the 22 or so years have you spent it all in the capacity of private practice?

A. Yes.

Q. In that capacity at some point did you have an

opportunity to represent Joshua David Stocker?
A. I did.
Q. And do you recognize Joshua David Stocker?
A. He looks quite a bit different, but I do recognize him.
Q. And he is the guy that you represented?
A. Yes.
Q. And on what kind of charge?
A. It was a capital murder charge.
Q. Were you the only attorney representing him?
A. No. There was me and C.J. He also had an -- an attorney, David Isern, on a separate charge.
Q. Okay.
A. And there may have been other attorneys on other charges, but those are the three that I distinctly remember.
Q. Did Mr. Isern ever -- and referring to David Isern -- did he ever represent Mr. Stocker on this case? Was it just you and C.J.?
A. I think we were -- C.J. and I were the only two who were ever appointed. I think David tried to help him on this case before it was indicted or before the complaint was filed, but I don't know that he -- David was ever appointed.
Q. Okay.

A. But after I was appointed, David was not on the case, although he tried to be helpful.

Q. When you say he tried to be helpful, in what way?

A. There were some questions regarding the federal case and how it was going to affect this case and vice versa, and David tried to provide that kind of information for us.

Q. Now, in the course of representing Mr. Stocker, are there -- or any criminal defendant, are there not certain procedures that you have to follow in order to be able to prepare for a case for trial?

A. Absolutely.

Q. And part of that would be like the discovery issues.

A. Right.

Q. And did y'all -- you and C.J., file the appropriate discovery issues in this case?

A. We filed Pretrial Motions for Discovery and asked for discovery and had many conversations about discovery.

Q. If the record shows that those motions were -- apparently were addressed and an order entered at least two months before trial, does that sound right?

A. If the record shows that, I would have no

reason to challenge that.

Q. Do you recall about when in the process of getting prepared for this case that you actually got discovery, the bulk of it?

A. Discovery -- I don't remember when in the process we got discovery. I remember discovery just kind of rolled in continuously throughout the case, but I don't remember when the bulk of discovery came.

Q. But orders were entered, I think, in May of 2005?

A. That may be true. I -- I don't remember the date. I remember it was on a Saturday we had the hearing and we held it in Potter County, but --

Q. And the trial was in July of 2005?

A. That's -- I read a transcript -- bits of a transcript earlier and -- and that's what it said, yes.

Q. And were you and C.J. appointed pretty early on after he would have been charged in the matter?

A. We were appointed back in 2003. I remember that because it was right after I got out of the hospital, which was right after I bought my house.

Q. Now, as part of the discovery, did you ever receive a use immunity agreement signed by Tori Patrick, James Farren, Gil Farren and Jami Watson?

A. As part of the discovery, I don't -- I don't

believe I ever received that use immunity agreement. As part of what I reviewed today, we talked about it in trial and later I believe I saw or received that use immunity agreement after the trial was over.

Q. Do you recall how much longer?

A. I don't. I -- but I do remember -- I remember that I got it at some point and said, uh-huh, it does -- it does exist, even though no one could ever find it.

Q. Did you receive it at a point subsequent to the trial when your duties to Mr. Stocker would have expired, at least as far as trial preparation and defense and that sort of thing?

A. Oh, absolutely. Someone else had been appointed on the appeal and the writ and all those other things, and those may have even run. I don't -- I don't remember in particular what the status at that point was.

Q. Now, do you recall receiving as part of discovery a use immunity agreement? Well, let me back up first.

Do you recall -- or did you receive as part of discovery an unsigned use immunity agreement for Tori Patrick?

A. As part of discovery, I don't believe we ever did.

02:17PM Q. And do you -- and did you receive a use immunity agreement signed by Guin Garcia?
02:17PM A. Not as part of discovery. Based on what I read earlier today, one was entered during trial.
02:17PM Q. Okay. As -- as part of this, I presented you with an authorization and demand from Mr. Stocker to provide your file in this matter.
02:17PM Do you recall that?
02:17PM A. I do.
02:17PM Q. And you did give up a file?
02:17PM A. I did.
02:17PM Q. You had scanned everything that you had --
02:17PM A. Yes.
02:17PM Q. -- pretty much, and it was an electronic file?
02:17PM A. That's correct.
02:17PM Q. And have you had a chance to review that file?
02:18PM A. I have had a chance, but I have not reviewed that file.
02:18PM Q. So at this point you're not the best authority on what's in this file?
02:18PM A. I -- I -- whatever I happen to remember -- no one asked me in particular to review the file.
02:18PM Q. If the trial testimony reflects that the morning following Tori Patrick's testimony that she did not have a use immunity agreement, that the Randall

County Criminal District Attorney's office produced an unsigned use immunity agreement for Tori Patrick and a signed use immunity agreement for Guin Garcia and a signed use immunity agreement for Brooke Vandergriff and a plea agreement for Josh Bledsoe, and the testimony at the time was that you said that you had Guin Garcia's, would you rely on that testimony? Would that have been accurate?

A. If I said that we had it, then obviously we had it.

Q. Okay. But you didn't have the other three?

A. And we wouldn't have had the other three.

Q. Now, how -- how -- how complex would you say this case was and -- and the severity of your preparations that you had to have for it?

A. I would say to date, it's still -- it's still the most complex case I've handled, including multi-party litigations, huge divorce -- multi-million dollar divorces, anything -- this is the most complex case I've ever handled.

Q. Now, is witness credibility always an issue in any trial?

A. Yes, especially when a jury is involved.

Q. Would the existence of use immunity agreements or other agreements beyond the use immunity agreement

for any codefendant in a -- in a case, would that be something that would be quite substantial in its effect on a jury?

A. I would hope it would be substantial in effect of -- to a jury. It's certainly something that if I were a jury member, I would take into account.

Q. And if you have the opportunity to show that somebody has a bias or an incentive to testify in a certain manner, you certainly would want to put that in front of a jury, wouldn't you?

A. I certainly try to.

Q. And that's not the sort of thing that you just -- they drop a document on you and you are ready to go, is it?

A. Well, I like -- I like to have some time to prepare and -- and know what -- know what I'm going to do with it. You know, I walk into trial with an idea of how I'm going to handle each -- each potential witness. It's one reason you ask for a witness list.

Q. The document review pretty much has to come before the trial?

A. Yes. You need to know what -- what you have ahead of trial. That's why you ask for these documents to be produced ahead of trial.

Q. Because once trial begins, you have to -- to

focus on what's coming out of that witness stand, do you not?

A. That's right. I even ask my clients not to talk to me during trial, instead write -- write notes, so that I can read them and not try and listen to two people at one time.

Q. Now, these got -- these documents were dropped on you in the middle of trial. Correct?

A. They were provided one morning. Mr. Farren -- according to what I read this morning -- and quite honestly, I don't have an independent recollection other than what was refreshed this morning or this afternoon. They were provided in mass all at one time and said here's what we have. And they were given numbers and they were Courts exhibits. They weren't even -- they were produced not as documents for the jury.

Q. What was the role of Tori Patrick and Guin Garcia as far as the testimony went against Mr. Stocker?

A. As far as the testimony went, it had to do with they -- they were testifying that he was the guy who put the whole thing together, and they lured Pool over and then the -- the attack happened, and from there on I think they went to a hotel or something.

Q. Now, there was a lot of testimony in here about preliminary events that occurred between people

and whatever and all kinds of things that they were doing to each other. But as far as the actual issue of when this event got started, when they wanted -- lured Dustin Pool over for their kidnapping, that was -- really just came down to three people, didn't it; Tori, Guin and Mr. Stocker?

A. From what I remember, I think so.

Q. So as -- as far as establishing the damming testimony against Mr. Stocker at the inception, it was Guin and Tori?

A. Yeah, Guin and Tori -- they were the two that -- that started the -- the process. Yes.

Q. So the need for those to represent as credible witnesses was pretty great for the State, wouldn't you say?

A. I think --

MR. LOVE: Object; calls for speculation.

THE COURT: Overruled. You may state your opinion.

A. I think the State wanted each of their witnesses, but especially Tori and even Guin, to come off as very credible, yes.

Q. (BY MR. WOOLDRIDGE) And do you recall at trial, Tori denied the existence of any agreement?

A. I -- I do recall that, yes.

Q. And you started to cross-examine her about that?
A. I did.
Q. Because you had some information that she may have -- that there was a use immunity agreement?
A. Right. There was an incident -- information in an incident report.
Q. At any -- at any point during the trial did either side correct the impression given to the jury that she had no agreement?
A. I don't know that I have enough recollection of the entire trial to answer that question.
Q. Well, you never got her use immunity agreement until after trial?
A. I don't remember having it until after trial.
Q. And you don't remember the State introducing her use immunity agreement at some point after she had denied it?
A. Other than that unsigned one that was introduced not to the jury, but to the Court.
Q. But that was to the Court, not the jury?
A. That's correct.
Q. So with the jury it was unrectified?
A. That's right.
Q. But it wasn't just Ms. Patrick, there were

people out -- turns out had these agreements?

A. Many people, yes.

Q. And you were unable to prepare preliminary to trial in that regard?

A. In regard to who had use immunity agreements, yes.

Q. What was the defensive theory of the case as you recall?

A. Our defensive theory developed based around some bugs that were found on the sock -- on a sock that had been found in Pool's mouth.

We got the money to hire an entomologist, and basically it became that there was no kidnapping. That any death that happened, happened right there in Potter County and that the moving of the body was not a kidnapping, but was moving of a dead body around.

And the entomologist, we felt like, had proven that, the -- Mr. Pool passed away in Potter County after that initial blow.

Q. And when you say the initial blow, are you referring to basal skull fracture?

A. The basal skull fracture.

Q. The side of his head was cracked open?

A. I don't remember which side it was, but one -- it basically was a huge basal fracture of his skull,

which I think the autopsy said was sufficient to cause death.

Q. Well, you recall -- do you recall much about the autopsy? Have you had a chance to review the autopsy?

A. I did not review the autopsy. I do remember things like the basal skull fracture and that there were allegations that they had done things to this man's testicles and -- to cause him pain at another location in Carson County. And that didn't withhold -- that didn't hold up at all. And that they had used a shovel in his anus, and that didn't hold up at all. I remember things like that.

If you have specific questions, I can tell you if I remember it.

Q. Your concern though -- or your theory was not that he died by suffocation?

A. I -- I don't believe -- and our theory -- our defensive theory was that is not how he died. Yes. And that the transportation of him from Potter County, that apartment, he was dead then. There was no kidnapping from Potter County.

Q. There was the theory also that the sock in the mouth was basically there to stop the gases from coming out of the body as they are hauling him around, that's

why they had tape over his face so nothing could escape and it stunk?

A. It stunk and someone said he made a noise -- in one of the incident reports or in one of the statements, I think, someone said he made a noise. I think, it was coming down a staircase or something. And one of the experts -- I think it was our medical examiner said that was probably gas, you know, where he was decomposing, escaping from him. They called it a death rumble or death rattle or something like that.

Q. What would be your estimation as to the damaging effect against Mr. Stocker from the -- withholding of the evidence and the late disclosure and the ultimate never -- having never disclosed certain agreements with witnesses?

A. I -- I think it could be very damaging. I -- I would have really liked to have had it to cross-examine them with, each of those people that testified with that information.

Q. If you -- if -- you think if you had that information that the outcome of the trial would have been different?

A. I like to think it -- it should have been, yes.

Q. Okay.

MR. WOOLDRIDGE: Pass the witness.

CROSS-EXAMINATION

BY MR. LOVE:

Q. You and Ms. McElroy placed a lot of reliance on the entomologist in this case, is that correct, on your defensive theory?

A. On our defensive theory, yes.

Q. Okay. It was vert important for your defensive theory that the entomologist -- and I can't remember his name.

A. I don't remember it off the top of my head.

Q. Was it Bucks?

MR. BLOUNT: Haskell.

MR. LOVE: Haskell.

A. Haskell, yes.

Q. (BY MR. LOVE) Haskell. That his testimony be seen as determinative on death -- time of death. Correct?

A. Yes.

Q. Because you wanted --

MR. WOOLDRIDGE: Your Honor, I'm sorry to interrupt. If I may, could I step out for about 30 seconds to make arrangements with a witness? I don't want to talk on the phone in here.

THE COURT: You may.

MR. WOOLDRIDGE: Okay. I'll be right back.

(Mr. Wooldridge exits the courtroom)

(Pausing)

(Mr. Wooldridge enters the courtroom)

MR. LOVE: May I continue, Your Honor?

THE COURT: You may proceed.

Q. (BY MR. LOVE) The -- and -- and I think you said it. You -- with the entomologist, Dr. Haskell, you were trying to prove that there was no kidnapping and that whatever offense had occurred, it had stopped in Potter County. Is that correct?

A. Yes.

Q. Okay. Now, may have been tampering with evidence or something like that after the fact, because I think you made reference to the body traveling to other places.

A. That's correct.

Q. But the -- the offense that resulted in the death of Dustin Pool was done before even leaving the apartment?

A. That -- that was -- based on the entomology, that's what our defensive strategy was.

Q. And that was your strategy?

And why -- why was it important to -- to

show there was no kidnapping?

A. Oh, because that would take the capital part of this away.

Q. Right. And -- and that is a reasonable strategy in cases, that many attorneys take, especially in capital cases, you would agree?

A. I don't know what many attorneys would do. We felt like it was reasonable to try and change the -- the nature of the original charge.

Q. One of the major attacks on capital murder cases is if you can take away the aggravated factor, the burglary of a habitation, the kidnapping, the child under six, the -- the -- the fact that they were a public servant; a police officer or a fire -- a fire -- a fireman, if you can take away that aggravating factor, it has the impact that you've just described. Correct?

A. That's right.

Q. It drops it down to a murder?

A. That's correct.

Q. With much more favorable punishment range?

A. That's right.

Q. A -- much more favorable parole eligibility aspects.

So the main focus in this case was to take away that no kidnapping -- or to take away the

aggravated kidnapping aspect?

A. Well, that wasn't the main -- that wasn't the only main focus. That -- that was a huge focus, but there were other issues we were also trying to -- it's not a single focus in that case.

Q. Absolutely. And it's not a single focus from the prosecution as well. There's a number of things that have to be proved on both sides of it. But that was a main focus in your trial, the -- the taking away the no kidnapping?

A. That's right.

Q. Or taking away the kidnapping. I'm sorry.

And that main focus was not dependent on witnesses or anything. That was really dependent on cause of death as determined by the pathologist. Right?

A. Yes and no, because the -- the witnesses that I have been asked about also had testimony about him being transported out and what they did and -- and things like that.

Q. Whatever -- whatever -- however Dustin Pool ended up with the basal fracture, that it's clearly in the autopsy said it's capable of causing his death. Right?

A. Right.

Q. No matter who did it or how it happened, it

happened there in that apartment was your theory. Right?

A. That was our theory.

Q. And that was determinative to take away an aspect of the case -- the State's case, the aggravated kidnapping aspect. Correct?

A. That -- say that again because I'm not sure I followed you.

Q. And that was a bad question. I'll start it over.

No matter what you were doing, you -- you -- a main focus was to get this away from capital murder down to murder. Correct?

A. Correct.

Q. Okay. And to do that you had to rely on the pathologist, Dr. Sridhar Natarajan, his conclusion that the basal fracture was capable of causing death. Correct?

A. Correct.

Q. Okay. Because your argument was that suffocation did not apply? Even though there was tape all over him and a sock in his mouth, suffocation -- he was dead in Tori Patrick's apartment?

A. Correct.

Q. Okay. And that was not dependent upon

witnesses. Right? That was dependent upon Sridhar Natarajan and whatever cross-examination you were able to do with him. Right?

A. I -- I don't -- I don't think you can say it was dependent or not dependent upon witnesses because the witnesses also testified that they -- he was put in a box and he was transported down the stairs and things like that.

Q. But that came from other witnesses. Right?

A. I think --

Q. Because Guin and Tori weren't there when that aspect of the case was going on?

A. Well -- but they -- okay. They talked about cleaning it up and him moaning and him talking and -- and things like that.

Q. They talked about cleaning it up, but after Dustin Pool had been removed from that apartment. Correct? There was that day they came over after he had been removed. I think there was testimony from a number of witnesses that a number of people went over the next day, that there was testimony about a carpet cleaning company coming out and doing something in the next two or three days after?

A. Okay. It's -- it's been a long time.

Q. I know.

02:37PM A. You pointed out it's been 15 years since --
02:37PM Q. I completely understand. I completely understand.
02:37PM But if that's what the record reflects, you wouldn't dispute that? If the testimony about them coming back and cleaning was after Dustin Pool was removed from the apartment, if that's what the record reflects, you wouldn't dispute that.
02:37PM A. I won't dispute that that's -- if that's what it shows that they testified to then.
02:37PM Q. And not just Tori and -- Tori Patrick and Guin Garcia, but other witnesses as well; the carpet cleaning company?
02:38PM A. Yes.
02:38PM Q. And after the verdict, is it -- is it fair to say when the verdict came back guilty of capital murder, that you and Ms. McElroy were severely disappointed in the verdict that was returned?
02:38PM A. I would say we were disappointed. I think we expected the verdict. So to say we were severely disappointed, I don't -- I don't think that's a fair assessment.
02:38PM Q. But you had some belief that you would get the lesser included of murder?
02:38PM A. We had -- we had hope, and we -- it's what we

wanted for our client, but we had a -- to be honest, we know Randall County juries.

Q. Okay. But you had a strong belief in Dr. Haskell, your entomologist, was going to be able to show from a physical standpoint -- from a scientific standpoint that Dustin Pool was dead at a different time than what other people had opined about his time of death?

A. We had some science and it was some of the only science in the whole case.

Q. There was -- there was DNA about stuff in certain places in Tori Patrick's apartment and, I think, even out at the farm, Michael Elliston's place. But you're right, there was not a whole lot of science, but the autopsy -- but other than that. So you had placed great reliance on that being a -- not an ace up your sleeve, but a very strong part of your case that -- from a scientific standpoint knowing Randall County juries, that that might be something that they would jump on?

A. That -- that is something that we hoped that would be helpful to a jury and that they would find credible.

Q. Because it was science?

A. Because it was science.

And quite honestly CSI was at its

highlight. Our judge even made a statement about he wanted to make the CSI comment.

Q. The CSI what?

A. The comment in voir dire in this case.

Q. Okay. So 2005 was a -- was -- I mean, there ended up being like four or five different CSIs, but it was the beginning and their march to prominence?

A. That's right.

Q. Okay. I asked you to review certain aspects or certain parts of the transcript before your testimony today because we ran into an issue on it this morning that I wanted to avoid.

MR. LOVE: May I approach the witness, Your Honor?

THE COURT: You may do so.

Q. (BY MR. LOVE) I'm going to give you -- I'm going to give you what is marked as -- for identification State's Exhibit 26 and 27. They are both excerpt proceedings of this trial, Volume 10, pages 207 through 220 is State's Exhibit 26. State's Exhibit 27 is excerpt proceedings, page 7 through 12. And I know I gave you 7 through 17, which is Efram --

A. Ramos.

Q. -- Ramos' testimony that had nothing to do with this, and I'm sorry I made you read that at the

break.

I took that off for the exhibit.

A. Okay.

Q. And do you recognize this as a part of the record from the testimony after you read it this morning -- or at the lunch break?

A. I do.

Q. Okay. And you don't dispute the accuracy of this part of the proceeding as it -- as far as it goes, the pages that are represented?

A. I haven't looked at each page, but it appears to be what I read at the break.

Q. Okay.

MR. LOVE: And I -- I would offer State's Exhibit 26 and 27 into evidence.

MR. WOOLDRIDGE: Well, I don't guess I have an objection, but is 27 redundant? Did I already enter that?

MR. LOVE: I -- I don't think we have. I don't think -- this is the proceedings on July 15th starting out the day. It had nothing to do with testimony. None of this -- well --

MR. WOOLDRIDGE: You didn't enter this with Mr. Farren yesterday?

MR. LOVE: Do what?

02:43PM MR. WOOLDRIDGE: You didn't enter this with Mr. Farren yesterday?
02:43PM MR. LOVE: I didn't. And I don't remember Mr. Blount doing that.
02:43PM MR. WOOLDRIDGE: Okay. No objection.
02:43PM MR. LOVE: If it's redundant, can we remove one of them after the fact?
02:43PM THE COURT: 26 and 27 are both admitted.
02:43PM Q. (BY MR. LOVE) 26 is a portion of the testimony -- a break in the testimony of Tori Patrick.
02:43PM Did you recognize it as that?
02:43PM A. Yes.
02:43PM Q. Okay. Tell me at least according to the record, and if you could turn to page 207, lines 24 and 25, how did it come, based on the record, that a break was taken? Who did that?
02:44PM A. I asked to approach the bench.
02:44PM Q. Okay. And there's nothing -- Mr. Farren asking about approaching a bench or anything Mr. Farren saying at that point -- at that point?
02:44PM A. At this point, I've asked to approach the bench. And whenever I start talking, the Judge says, we need to take the jury out because apparently it's a bigger issue than what -- in that small courtroom basically the jury could hear most of what was said at

the bench.

Q. And, essentially, is --

MR. LOVE: Could I have the State's Exhibits, please.

(Court hands Mr. Love exhibits)

MR. LOVE: Thank you.

Q. (BY MR. LOVE) And you make reference in -- on page 208 at the top to a memo. Correct?

A. Yes.

Q. Okay. Can you take a look at State's Exhibit 3, which actually in the Josh Stocker trial started as Defense Exhibit 3 and became Court's Exhibit 3 at the end of this.

Do you remember that?

A. I don't remember that, but I recognize my handwriting as Defense 3.

Q. Okay. So that started as Defense 3 and then subsequently if we get to it at the end of this little soliloquy between the attorneys and the Court.

Do you recognize what State's Exhibit 3 is?

A. Yes.

Q. What is that?

A. It's the memo that's referenced in this record, and I believe it's the one by Bobbie --

Q. Bobbie Ledbetter?

A. Yes, Bobbie Ledbetter.

Q. Okay. She is Bobbie Bruhn now. She has been remarried.

A. Right. Regarding this use immunity agreement.

Q. Okay. And you had that going into trial. Correct? I mean, because you are the one that brings it up, you are the one that marks it as Defense 3. You had that going into trial. Correct?

A. Apparently so, yes.

Q. So you've got some questions because you don't have a signed use immunity agreement regarding Tori Patrick. Is that accurate?

A. Yes.

Q. And that's what you are bringing up to the Court at this point?

A. Yes.

Q. And then during this -- based on your review of it at the lunch break -- there's a lot of discussion about how the -- looking for the signed use immunity agreement. Correct? Mr. Farren does a long statement about why -- what they've done to try to find it by going to Jami Watson, who was her attorney at the time of the use immunity agreement, but now worked at -- at the time of the trial worked in the DA's office.

Correct?

A. That's correct.

Q. And then you get to a point where the Court asks Mr. Farren, can you get Bobbie Ledbetter in here and testify?

A. Correct.

Q. Then the Court questions her to begin with and then you question her?

A. Correct.

Q. And then Mr. Farren was able to ask a couple of questions at the end?

A. Correct.

Q. Okay. So -- and most of it was about where is this use immunity agreement and there's discussions about not remembering whether it was signed or not, and whether a signed use immunity agreement even existed. Is that fair?

A. Yes.

Q. All of that is outside the presence of the jury?

A. It is.

Q. Okay. So there's no unfair implication being presented to the jury about this by either Mr. Farren, by you, the Court, because the jury has already left the courtroom?

A. Well, I don't -- I don't know what you mean by unfair implication, but --

Q. Something --

A. -- the jury is not hearing that there is or isn't one.

Q. Correct. That's -- that's -- that's the point I'm trying to make at that point.

A. That's correct.

Q. Do you remember -- when you went up and asked to approach the bench, what was your demeanor like? Were you angry?

A. I don't have any independent recollection.

Q. Do you have any independent recollection of anybody in the courtroom being angry at that time?

A. If it was close to 3:00, the Judge was probably mad at me at that point. Everyday he got mad at me for something.

Q. And I'll tell you, Mr. Watkins, as late in the day as this is -- appears to be, it might have been 3:00.

No, but I'm talking about you, Mr. Farren, Ms. McElroy, Mr. Fowler, do you remember anybody being upset and angry about what was going on, that you've gone to the bench and said, I think there's a Brady violation?

A. I remember -- I don't know that you would call it angry. I remember that Mr. Farren was -- was put out that I would challenge him, you know, how dare I challenge him on a Brady violation.

Q. Outside the presence of the jury?

A. Right.

Q. Okay.

A. But, I mean, that's -- that's James. That's how he acts.

Q. Okay. So at the end of this, it's concluded that we're not sure that there's ever a signed copy and you move onto continue questioning Ms. Patrick. Is that correct?

A. Right. From my read of this, the Judge determines on his own, sua sponte, so to speak, that there's been no Brady violation and tells us to move on.

Q. Okay. Right or wrong, that's what the Judge concluded?

A. That's right.

Q. Okay. So you go on and you have just a couple more pages of questions for Ms. Patrick. Is that correct?

A. Based on the record, yes.

Q. Okay. Let me ask you this, when we use the term -- as lawyers when we use the term use immunity

agreement, what does that mean to you?
A. Well, I call it useless immunity agreement because it's based on your decision of -- of what it -- how to interpret it --
Q. Okay.
A. -- as the DA or the soon-to-be-elected DA.
Q. Okay. Let's look at the theoretic definition of a use immunity agreement. What does it provide for, from your understanding?
A. That -- that their information that they provide cannot be used against them in -- in their -- the prosecution of their own case.
Q. Okay. So the witness who has signed the use immunity agreement, whatever they say in the courtroom or in this case -- I think there was a nine-page statement that was provided. Is that correct?
A. I think -- I think there were three or four multiple --
Q. Yeah, there were --
A. -- multiple, multiple page statements.
Q. There was a number of statements. There was a follow -- a couple of followups after the initial one with Ms. Watson on June 28th of 2005 -- 2003. You -- you remember that?
A. Right.

Q. That that witness, in this case, Tori Patrick, nothing she said in those statements or nothing she said in that testimony could be used against her in a -- in a future prosecution?

A. That's my understanding of a use -- use immunity. I almost called it the wrong name.

Q. Use immunity agreement?

A. Yes.

Q. Okay. I want you to look at page 217, line 23, and I'll let you -- can you read out loud your question there and then I'll answer for Ms. Patrick.

A. Okay. 217. And what line?

Q. 23.

A. 23. "Do you remember talking with the DA's office about them not using your testimony against you?"

Q. And Ms. Patrick's response was, "Yeah, we've -- we've talked about it."

And then on page 218, line 1, what was your next question?

A. "Okay. And that's the general understanding, is that whatever you tell them won't be used against you."

Q. And her response was, "Yes".

Okay. Isn't that the essence of a use immunity agreement?

A. Yes.
Q. Okay. Okay. State's 27, this is Volume 11, which is the next day after Tori Patrick has testified, and pages 7 through 12. Do -- you have those in front of you. Correct?
A. Yes. Yes.
Q. Who -- what goes on there in that very beginning?
A. Basically, Mr. Farren comes in and makes a record of presenting the use immunity agreements, including one that's not been signed and offering them up -- offering this Brady material up in the middle of trial.
Q. In the middle of trial.
This is on July 15th at the top of page 7, it says proceedings beginning July 15th. Correct?
A. Right.
Q. Okay. And I think, if I'm not mistaken, the trial began on July 14th?
A. I don't remember independently what day though.
Q. Okay. I think -- and where I'm getting that from -- it may have been earlier than that now that I say that.
A. If Volume 10 was on July 14th, I would think

it started before then.

Q. That's what I was about to say. And -- and that was not the first day of testimony. Dr. Natarajan testified the day before that. So it was probably on the 12th is when the trial started.

A. Yeah, I -- I don't remember. It's a lot of years ago.

Q. I -- I have the advantage that I've read this more recently than you -- than you experienced it.

So on page 7, line 15 of State's Exhibit 27, Mr. Farren said, "We did find in Mrs. Farren's computer at the sheriff's office a record of an immunity agreement that was typed that has her name on it. Of course, it is not signed."

And then he said -- in line 23, after the Court says something -- "I just marked it as State's Exhibit 261."

Would you agree that's what the record reflects?

A. I agree that's what the record reflects.

Q. And then on page 8 on line 1, it's -- it's Mr. Farren saying, "I'm providing a copy of that to Defense counsel, Your Honor."

Do you see that?

A. Yes.

Q. And that's what it says?
A. That's what it says.
Q. So you wouldn't disagree that he is providing you a copy -- that in addition to what's written here, he is also handing you or Mr. Fowler is handing you or Ms. McElroy a copy of 261?
A. That's correct.
Q. Okay. And then it says on line 6 -- I've just -- or line 4, "But I just want the record to reflect that we do have a signed immunity agreement with Brooke -- Brooke Vandergriff. I have marked it as 262, and I would like to offer it. I have given a copy to the Defense."
So what it sounds like is he's given 261 to the Court and given you a copy of it at the same time.
Is that a fair interpretation of what's going on?
A. That's what it sounds like.
Q. Okay. And then we get to 263 -- State's Exhibit 263 is an immunity agreement with Guin Garcia. Correct?
A. 263? Yeah.
Q. On line 8. I apologize, Mr. Watkins.
Line 8, "State's Exhibit 263 is an

immunity agreement with Guin Garcia. And I'm giving them a copy."

A. Yes.

Q. Okay. And then I want to jump down to line 18 on page 8 where it's Mr. Watkins responding, and can you read that for us.

A. "Your Honor, actually, we had 263. We've had it, but we haven't had Ms. Vandergriff's until today."

Q. Okay. So that's an indication that prior to that you probably -- you've already indicated you didn't have 261, which was Tori Patrick's. Correct?

A. Correct.

Q. And 262, you don't make any notation of whether you had it or you didn't have it, but you clearly point out that you had 263 before Mr. Farren gave you a copy of it?

A. That's correct.

Q. And do you know where you got that?

A. Got what?

Q. The -- 263 -- your copy of 263? Did that come in discovery?

A. As I sit here today, I don't know where I got it from.

Q. But the Defense team had that before at least this moment in time?

A. I wouldn't have said it if I hadn't had it.
Q. Okay. And then also the last thing, line 24 through 25 and then onto the next pages lines 1 through 3 is Mr. Farren, "And then we have a plea agreement that I have labeled as 264, with Josh Bledsoe. It is signed but, of course, it has not been executed. In other words, no official court action has been taken in reference to that."
Correct?
A. That's what it says, yes.
Q. Okay. Then at the bottom of that page 9, line 25, "The Court: Okay. I want -- I want 262, three and four kept in the same category with Court's No. 3" -- which is what you've got up in front of you. I handed you the supplement from Bobbie Ledbetter.
A. Yes.
Q. That was Court's Number 3.
A. Okay. And --
Q. "-- In the same category with Court's No. 3, and I don't want them given to the jury, yet, unless somebody offers them for that purpose."
Correct?
A. Okay. You are reading and I lost where you were reading.
Q. (BY MR. LOVE) I apologize.

A. Just tell me what line number and I can --

Q. I started on page 9, line 25.

A. All right. All right. I see that.

Q. Okay. Where it says, "Okay. I want -- I want 262 -- "

And then we go over to page 10, lines 1, 2 and 3 --

A. I got it.

Q. -- 3 and 4. Okay.

And in the Court's statement there, they don't refer to Exhibit 261, correct, just two, three and four -- 262, 263 and 264?

A. Yes.

Q. So on line 7 of page 10, you step in and you say what:

A. "On 261, we would ask that it not be published to the jury unless someone offers it and goes through all the process."

Q. Is it a fair interpretation that because the Court had mentioned 262, 263 and 264, you as the Defense attorney wanted to make sure that 261 was in the same group as those three?

A. Yes.

Q. Okay. Mike, I -- and I apologize. Mr. Watkins.

A. I don't mind if you call me Mike.
Q. Well, we're in the courtroom and I need to be appropriate. I apologize.
Mr. Watkins, I've been through the entire record and I've been through everything around these two excerpts that we have.
Was there ever a time that you and Ms. McElroy discussed when your -- your -- I think Mr. Wooldridge phrased it, when you got this all dropped on you, was there ever a consideration by you or Ms. McElroy, that you would ask for a continuance to review the documents or go through them?
A. I don't remember there being a discussion one way or the other on that.
Q. Okay.
A. I just don't remember at this point.
Q. Did you think about asking for a short break so that you could take in the information that Mr. Farren has just brought in that morning on July 15th?
A. I -- I don't remember -- I don't remember that.
I can tell you that based on reading this transcript, whenever I'm adding in about -- that we didn't have Ms. Vandergriff's, and if you read that, you

can tell I'm -- I'm having to jump in and interrupt the conversation -- the flow of conversation between the Judge and Mr. Farren --

Q. Okay.

A. -- to get my -- myself be heard at that point.

Q. Okay.

A. The -- and as you pointed out, the Judge was -- was short-tempered and he would -- he didn't want to hear a lot from us. He --

Q. Actually you pointed out at 3:00 he was short-tempered?

A. Yes, everyday. He -- it was a -- if you -- if you look at this, even when Ms. McElroy answers on page 10 -- Exhibit 27, page 10, line 25, she stammers a bit, because we're given -- all this stuff is given to us and we're expected to have an instant answer based on all of this evidence that's been dumped on us, that we suspected existed, but we've never been able to find out anything, and so she stammers about it at that point.

Now, did we have an opportunity to sit and ask for a -- a continuance, I don't remember asking for that. Based on reading this, I can tell that we were -- we were under the gun and -- and trying.

Q. And based on the record -- I'm not trying to trip you up or anything. I'm just wondering if there

were any conversations outside between the two of you, that you recall, about continuances or a break to review the evidence?

A. I -- I don't recall any either way.

Q. All right. And I want to show you State's Exhibit 261 -- well, ours are -- for this hearing it's State's Exhibit 2, 5, 6 and 8, and these are all admitted into evidence. But I'll represent to you that these are the four exhibits that were offered on the morning of July 15th in Volume 11, what we've just been talking about.

Would you agree that those are the four numbers that are being referred to in the excerpts?

A. I would agree that those are the numbers, yes.

Q. Okay. And 261, 262, and 263 are one-page documents. Do you agree with that?

A. Yes.

Q. And 264 is -- well, it's three pages, but pretty much just two based on what's on the last page?

A. Two pages and the signature page.

Q. Basically. You would agree with that. Right?

A. Yes.

Q. Okay. And six pages total?

A. Yes.

Q. And 261, 262, and 263 are use immunity

agreements; one blank one with Tori Patrick unsigned, 262 is Brooke Vandergriff, and 263 is Guin Garcia's. Correct?

A. I don't remember which ones were which order, but if that's what -- what they show, then, yes.

Q. Okay. And they were just the one page -- basically a -- half a page of the -- of the -- the content of the use immunity agreement?

A. That's correct.

Q. Which you and I have already talked about is, you can't use what they say against them?

A. Correct.

Q. Did you at any point -- if I -- if I represent to you that Ms. Patrick of those four people -- witnesses, including Josh Bledsoe regarding the plea agreement that was up there in State's Exhibit Number 8, Ms. Patrick was the first of those four to testify in the trial, and Guin testified the day after. Actually, Volume 11, July 15th, that she testified that day, and then Brooke Vandergriff and Josh Bledsoe all testified after that.

You are not going to dispute that that's what the record reflects?

A. If that's what the record reflects, I'm -- I won't dispute that.

Q. At any point during -- and I'm really not trying to be sarcastic or anything, but it didn't -- it doesn't take a lot to actually take an exhibit sticker and place it on a document, does it?
A. No, it doesn't take a lot to make that simple, physical action.
Q. And then to take that document to the witness, whether it's Brooke Vandergriff, whether it's Guin Garcia or -- or Josh Bledsoe and take it up to them and ask them if they recognize that?
A. No.
Q. And then you could offer that exhibit -- subject to whatever objections that may be made, you could offer that exhibit?
A. Yes.
Q. And with Guin Garcia you stated in the record that y'all already had that use immunity agreement. You don't remember 13 years later from what source, but you had that use immunity agreement?
A. That's what I stated in the record, yes.
Q. With Brooke Vandergriff, if I stated to you that -- because it wasn't one of your witnesses. Of those four, only Tori Patrick was one of your witnesses.
Brooke Vandergriff -- there was a decision made by the Defense team or something to not

ask any questions of Ms. Vandergriff when she testified on direct examination for the State during the trial.

Do you recall that?

A. You told me that that was in the record. I don't recall a decision being made to or not to cross-examine.

Q. So you don't have any specific recollection of that?

A. I don't.

Q. Okay. But if the record reflects there was none, you are not disputing that?

A. I obviously wouldn't -- wouldn't refute the record.

MR. LOVE: I'll pass the witness, Your Honor.

REDIRECT EXAMINATION

BY MR. WOOLDRIDGE:

Q. Do you have any inclination for why the documents would not have been used subsequent to their discovery in the middle of trial?

A. Off the top of my head, I do not, other than the fact that our preparation was two years in the making. And getting something a couple of days into trial or however many days it was into trial, that working -- that changing our entire preparation, you

know, it -- that's something that you don't always do on the fly, so -- as easily as Mr. Love walked me through it. It's not as easily done as placing a sticker on it. You have to change up your entire questioning at times.

If you didn't know something existed, but you suspected it and all of the sudden there it is, your mode of questioning is probably going to change. And there was a lot going on. This was very complex litigation with lots of subtexts and -- and complex theories and such as that.

I -- I can't say precisely, but that -- you know, that kind of explains a general term of why something thrown on you in the middle of trial would be a problem.

In civil investigation, you have a 30-day window. Everything has to be given to you 30 days before trial starts. That's not the case in -- in criminal law. And we've even since this case finished have Michael Morton law, where things -- you know, we now have discovery rules where we didn't back then.

Q. Is it pretty easy to get tripped up in any particular trial, but especially in a complex one -- trial?

A. It's very easy to get tripped up.

Q. Okay. Asking the question as another

attorney, have you ever had a perfect trial where you didn't screw something up?

A. I would like to think all my trials were perfect, but I doubt anyone ever has.

Q. Well, after any particular trial, do you not always sit around drinking beer or something with somebody and talking about I should have done this or I should have said that or --

A. I can always --

Q. -- I should have objected to something and I missed it?

A. I can always find a mistake, especially if I write an appeal on the record afterward.

Q. Now, back to that useless immunity agreement, you've seen the ones prepared in this particular case?

A. Yes.

Q. And have you dealt with other use immunity agreements?

A. I've dealt with them out of several counties in the Panhandle.

Q. Are those use immunity agreements -- who ultimately is the arbitrator of truth when the -- for what they are asking for in the agreement?

A. The DA or the DA's office. Generally -- I say it's the elected DA, but...

Q. And have you ever seen one that actually defined what truth is -- is going to be qualified as?

A. The agreement?

Q. Yes.

A. I've -- no, I've never seen one that says we identify the truth.

Q. They -- they say -- those agreements all say, this is all conditioned upon you telling the truth?

A. I believe every one I've ever said -- I've ever seen says at least something to that extent.

Q. But the only person that gets to ultimately be satisfied with whether or not you tell the truth is the prosecutor that's making that agreement with you?

A. Yes. And whenever I've had a client sign one with Mr. Farren, I've even pointed that out to them in front of Mr. Farren.

Q. And in the event that your prosecutor is dissatisfied that the truth has been told, they get to revoke this at -- at any time?

A. (Moving head up and down.)

Q. And -- and since none of these use immunity agreements qualify or -- or -- or provide a result for the defendant, other than, well, we'll take this into consideration, as a defendant you've pretty much got to say what they want you to say, don't you?

A. I would agree with that.
Q. And it doesn't take a very high IQ to figure that out, does it?
A. I would hope not.
Q. Well, everybody seems to figure it out, so...
MR. WOOLDRIDGE: Pass the witness.

RECROSS-EXAMINATION

BY MR. LOVE:
Q. In all of the limitations that Mr. Wooldridge went over it with you, about getting it at the last second and about it changing your -- your -- because you've already done your pretrial prep and getting evidence in the middle of trial, all of that -- that doesn't apply to Guin Garcia's use immunity agreement, correct, because you already had that?
A. Right, we had it.
MR. LOVE: No other questions, Your Honor.

FURTHER DIRECT EXAMINATION

BY MR. WOOLDRIDGE:
Q. Guin Garcia was not the person in the apartment at the inception of this event, was she?
A. I don't remember whether --
MR. LOVE: I'm going to object. That misstates the evidence in the transcript. There is

03:14PM evidence that she was there at the inception of this --

03:14PM MR. WOOLDRIDGE: Let me -- let me withdraw that --

03:14PM MR. LOVE: Okay.

03:14PM MR. WOOLDRIDGE: -- and state it again.

03:14PM Q. (BY MR. WOOLDRIDGE) Guin Garcia was not in the apartment at the inception of the event when Dustin Pool arrived and it was just Stockers and Patrick, was she, or do you remember?

03:14PM A. From what I remember, I think she showed up later, but I -- I don't remember exactly.

03:14PM Q. So the only other person to really point a finger at Stocker, from the events originating in the apartment, was Tori Patrick?

03:15PM A. Tori was a -- was a big witness for the State.

03:15PM Q. And hers is the use immunity agreement that the jury never got?

03:15PM A. That's correct.

03:15PM MR. WOOLDRIDGE: Pass the witness.

03:15PM MR. LOVE: No other questions, Your Honor.

03:15PM MR. WOOLDRIDGE: Nothing further.

03:15PM (Pausing)

03:15PM MR. LOVE: No other questions from the State, Your Honor.

MR. WOOLDRIDGE: May this witness be excused?

THE COURT: Yes, sir.

You may step down and be excused.

THE WITNESS: Thank you.

(Witness exits the courtroom)

THE COURT: Next witness?

MR. WOOLDRIDGE: May I step outside and see who I've got?

THE COURT: Certainly.

(Mr. Wooldridge exits the courtroom)

(Mr. Wooldridge enters the courtroom)

MR. WOOLDRIDGE: May we approach?

THE COURT: Surely. Do you need a record?

MR. WOOLDRIDGE: No.

(Off-the-record discussion between the Court and Counsel)

(Open court)

THE COURT: Take 20.

(Recess)

(Open court, Applicant and Counsel present)

MR. WOOLDRIDGE: Would it be possible to inquire of the court reporter what my last question to

Ms. Patrick was?

THE REPORTER: It will take me a while to --

THE COURT: It will take a while. The last thing I remember she talked a dozen times to Farren about Robnett.

MR. WOOLDRIDGE: Okay. That will be good enough.

TORI BROOK PATRICK,

having been previously duly sworn, testified as follows:

DIRECT EXAMINATION (Continued)

BY MR. WOOLDRIDGE:

03:47PM Q. Now, you made allegations that Mr. Farren structured your testimony.

03:47PM A. Uh-huh.

03:48PM Q. In what ways did he do that?

03:48PM A. Well, they asked me questions on the stand and then like some of it's not just yes-or-no questions. Whenever I go to answer, they cut me off to shape testimony for one. That's one way. And then another way is whenever like I'm on -- the hearing at Frank Chacon's hearing, whenever he -- he had talked to me before that hearing and whenever he said that he was going to bring up that immunity agreement on Josh or whatever from Stocker's trial, I said I don't know the

law or whatever. So I don't know what the difference was in a use immunity at that point and a plea agreement or whatever. And he said, yeah, that's what he wanted me to say, is that I didn't know the law. He said, I'll come back and save you from that, which is what he did in Frank's trial.

Q. Well, now in Joshua Stocker's trial, you just flatly denied you had a use agreement --

A. Correct, because I was told to.

Q. By who?

A. Farren and his office.

Q. Well, how many -- specifically, who else in his office?

A. Ledbetter, Fowler. The only -- those are the only ones I ever worked with. I didn't ever -- they didn't ever have nobody else talk to me, except for Jannings, and that's it of those -- that office.

Q. Did they have anything else that they told you they didn't want to go into for any reason?

A. I'm trying to think. I don't think so.

MR. BLOUNT: I'm sorry. What was the answer, ma'am?

THE WITNESS: I said, I don't know. I don't think so.

MR. BLOUNT: Okay. Thank you.

THE WITNESS: I'm trying to think. It's been 15 years.
MR. BLOUNT: Thank you.
Q. (BY MR. WOOLDRIDGE) What was the issue with the Saran Wrap?
A. I asked at one point why there was Saran Wrap in my house, and Farren --
Q. Well, just -- first, just describe the Saran Wrap in your house.
A. There was little pieces of Saran Wrap on the floor at one point.
Q. Like how many?
A. I don't know.
Q. A lot? A few? All over the house? One spot?
A. Not all over the house. Like in one room like in just an area and not a lot -- not a lot.
Q. Okay. And you discussed that with Mr. Farren?
A. At one point I asked him what that was about.
Q. And what did he tell you?
A. He said that they -- that they -- I don't know who "they" is, had wrapped Dustin's face up with Saran Wrap and that Chacon had poked holes in his nose so he could breathe.
Q. Why did he tell you he didn't want to go into that?

03:50PM A. I don't know. Ask him.
03:50PM Q. Now, you've given testimony in Stocker's trial, Chacon's trial and Michael Stocker's trial.
03:50PM A. Uh-huh.
03:50PM Q. And you've also sworn out a couple of affidavits regarding to -- your interaction with Mr. Farren. Would you deny that there's going to be discrepancies between all of that?
03:50PM A. No.
03:50PM Q. You admit you did not testify truthfully throughout Joshua Stocker's trial?
03:50PM A. Yes, sir.
03:50PM Q. And you've tried to rectify that by telling the truth now --
03:51PM A. Yes, sir.
03:51PM Q. -- as best you remember?
03:51PM A. Yes, sir.
It wouldn't have taken so long, except for I never had discovery in my case ever until 14 years later.
03:51PM Q. Well, when I was first appointed to you, did I not tell you that I had gotten like nine pages or something?
03:51PM A. You didn't have anything. You had very little.

Q. Well, if you say by "anything" as far as the discovery of police incident reports and all of that sort of stuff, yeah. Did I relate to you that what I had from you was your statement and your use immunity agreement basically and that was the discovery provided to us?

A. Yes. But --

Q. And on the basis of your statement I was telling you not to -- not to plead?

A. Yes. But I wanted to plea because Farren kept reminding me of that use immunity agreement, that I would go to court with no fair trial, no -- that I had waived all my rights in that use immunity agreement and I had no lawyer, so I didn't want to take that risk in a county with a 96 percent conviction rate. No thank you.

Q. Now, was there also some threat made against your children?

A. Yeah, where CPS was going to take them, yes.

Q. Who made that threat?

A. I think Farren.

Q. And what exactly was the threat?

A. I don't remember exactly word for word. Just that CPS would be involved and I would never see my son. That they would take him, they would take custody of my son, the State would.

03:52PM Q. What type of incentive did that provide you to do what Mr. Farren wanted?
03:52PM A. What do you mean? What do you mean? What are you asking me?
03:52PM Q. Well, did that make you tow --
03:52PM A. Well, that and among --
03:52PM Q. -- the line?
03:52PM A. -- other things like the use immunity agreement where he told me that, you know, that I waived all my rights. And that -- and, you know, yeah, both.
03:52PM Q. Now, when you say you didn't have a lawyer, you stopped talking about this being subsequent to the time that you and Mr. Robnett had met with Mr. Farren?
03:53PM A. I signed the use immunity agreement when Jami Watson was still representing me, but shortly thereafter she wasn't representing me anymore because she went to work for their office.
03:53PM And then whenever me and Farren had worked together on a deal or whatever, then, yeah, that's when all that was said, and at that point I didn't have a lawyer. It was almost like Farren was my lawyer is what it felt like.
03:53PM I mean, I used to call up to the DA's office and find out about court hearing dates and times because no one --

MR. BLOUNT: Excuse me. Excuse me. I'm going to object to nonresponsive.
THE COURT: Sustained.
Q. (BY MR. WOOLDRIDGE) What was your purpose of calling up to the DA's office?
A. To ask when we had court and stuff like that. I had no attorney otherwise to find out.
Q. Now, was there some issue about who told you to go to Dallas?
A. Yeah, Mark Brown and Laura Hamilton.
Q. Now, is that the testimony you gave at trial?
A. I don't remember. And Craig Kimberlin did too. All three of them had told me.
Q. Well, at trial you mentioned Craig Kimberlin, did you not?
A. Yes.
Q. Did you mention Mark Brown though?
A. I think I did, but they struck it from the record, I believe. Like they wouldn't let me talk about Laura Hamilton at all.
Q. What did you want to say about Laura Hamilton?
A. I was trying to talk about the Dallas -- how she had wanted me to go to Dallas, and then that she had said to do that, and then it got me in trouble later on and they wouldn't let me mention her name.

Q. What was the purpose in going to Dallas?
A. I don't know. I had family there. Mark Brown just told me I should go there because I would be safe there, to get away from here. That they didn't know if my safety was at risk.
Craig Kimberlin's purpose for me to go to Dallas was to get me out of the way, so -- they were worried about --
Q. Why was he trying to get you out of the way --
MR. BLOUNT: Excuse me; calls for speculation.
Q. (BY MR. WOOLDRIDGE) -- if you know?
THE COURT: Overruled. Go ahead.
Q. (BY MR. WOOLDRIDGE) If you know?
A. Yeah. He told me. The reason that he wanted me to go to Dallas is because he didn't want nobody talking to the cops.
Q. After you went on probation you had some -- some trouble, ultimately resulted in the district attorney's office filing a Motion to Revoke your Probation.
A. Uh-huh.
Q. Now at the time that they moved to revoke your probation, you came and hired me?
A. Yes, sir.

Q. And we filed a variety of motions on those and I think the beginning part of that when we responded was in -- February 23rd, 2016 --
A. Uh-huh.
Q. -- at your initial revocation hearing?
A. Yes, sir.
Q. Subsequent to that time when we came forward with these allegations against Mr. Farren -- and I guess we should back up.
There was an affidavit attached to your response -- your initial response that made these allegations against Mr. Farren?
A. Correct.
Q. So as of February 23rd, 2016, they knew?
A. Uh-huh.
Q. Subsequent to that, were you being -- have you been subjected to any type of retaliatory or --
A. Yeah.
Q. -- harassment --
A. Yes.
Q. -- from the parties involved in this?
A. Yes, sir.
Q. Can you describe what you've been subjected to?
A. Well, my car is pretty much totalled.

Q. Because?
A. I've been run off the road three times by police officers.
Q. Have you recognized some of those police officers?
A. Yes, sir.
Q. Which ones?
A. One was Toby Hudson. I went to high school with him and he's a SWAT member.
Q. And who else?
A. I've also -- Austin McGee has been involved in some things. He lives across the street from my house -- my parents' house at the time. He is an officer. And then the one --
Q. What type of actions was he involved in?
A. He is at the very least making his house available for other people -- other cops and stuff to use. Like he put -- everybody has those lamps on the street. My parents' street, they have those lamps in the front yard. They have like orange little -- low orange lights, like they're not very bright. He put this blue purplish light that -- I don't know what kind of light it is. But I had night vision cameras, and it took out my night vision where they wouldn't worked.
Q. And it remained aimed at your night vision

03:57PM cameras?
03:57PM A. Yeah. And then he put a camera on his porch that remained aimed at my front porch.
03:57PM Q. Did you have any type of interruption service in your -- in your cameras?
03:57PM A. Oh, yeah. All the time.
03:57PM Q. What was that?
03:57PM A. They hacked my Wi-Fi where it would shut my cameras down and they would freeze up, stuff like that. They would freeze and something would happen and then they didn't record it because it just froze-frame.
03:57PM Q. Did you have a couple of incidents with the DPS helicopter?
03:57PM A. Yeah, shinning in my -- a light in my front yard for hours on end, yeah --
03:58PM Q. And what time of --
03:58PM A. -- blocking access to my driveway.
03:58PM Q. What time of day would that be?
03:58PM A. Four in the morning.
03:58PM Q. And all of a sudden, you've got a DPS helicopter over your house?
03:58PM A. Yeah, I videoed that.
03:58PM Q. And I think at some point we did have photographs of that?
03:58PM A. Well, I've got video, yes.

Q. What was the deal with being run off the road?

A. I was -- I was going to my friend's dad's house where I was staying at and he -- they were messing with him at first on the highway. And then I was following him. So I got up close to him and a Charger going -- I don't know how fast -- he was going -- I know it was over 80 miles an hour at one point. He got on the highway and then he -- I could see that he was an officer. He had that spotlight thing on that car and then his window was down at one point.

But he got in front of me and then just slams on his brakes where I can't even -- I mean, I can't even stop my car fast enough before I went down that embankment.

Q. Did you have repeated incidents with the Chargers?

A. Yeah, three incidents with the Chargers. Like one --

Q. Black Chargers? White --

A. -- damaged my car --

THE REPORTER: I'm sorry. I can't take both of you.

THE WITNESS: Sorry.

Q. (BY MR. WOOLDRIDGE) Black Chargers? White Chargers?

A. Both.
Q. At some point did we send a demand letter to both the Randall County Sheriff --
A. We did.
Q. -- and the Amarillo Police Department Chief of Police Ed Drain telling them to back off?
A. We did. And that was ignored.
MR. WOOLDRIDGE: Am I on 12?
THE REPORTER: Yes.
MR. WOOLDRIDGE: May I approach?
THE COURT: You may.
Q. (BY MR. WOOLDRIDGE) Ms. Patrick, I'm going to show you what has been marked Defendant's Exhibit 12 and 13. Do you recognize what these are?
A. Yes.
Q. Are these, in fact, copies of the demands letters that we sent?
A. Yes.
Q. Absent the photographs we attached --
A. Yeah.
Q. -- of some of the police officers that we had identified?
A. Uh-huh.
Q. And are the facts as related in these particular documents, which were published --

A. Right.

Q. -- do you stand by those being true and accurate?

A. Yes, I do.

(Mr. Blount Viewing documents)

MR. BLOUNT: No objection.

THE COURT: They are both admitted.

MR. LOVE: Well, there was one question we had. I didn't see photographs on there.

MR. WOOLDRIDGE: She just testified these were absent the photographs.

MR. LOVE: Oh, okay. That's what I was asking.

Q. (BY MR. WOOLDRIDGE) Following the publication of those letters in the local news media, did they back off for a little bit?

A. Very, very -- a little bit.

Q. Okay. Were there also some incidents involving Bill Redden?

A. Uh-huh. Yes, sir.

Q. Could you describe that.

A. Yep. When I was staying with Thad Gutierrez (phonetic), his -- there was a white Crown Vic parked in the alley like in the daytime. And Thad and me lived next door to a lawyer.

04:02PM Q. Maxwell Peck?

04:02PM A. Yes, sir. And Maxwell has cameras in his yard. And we noticed that who gets out of the car is what looks like -- I mean, it's obvious. It's weird. But he is in a Pizza Hut uniform, but -- I have two friends that work at Pizza Hut and that's not even their uniforms anymore. But he is carrying an uninsulated pizza box and he proceeds to go into the gate of Max Peck's backyard.

04:02PM Q. Did you recognize that as Bill Redden?

04:02PM A. Yes, sir.

04:02PM Q. How long have you known Bill Redden?

04:02PM A. It's not that I know him. It's just I've seen him around Guin and them in the past. And he's got -- he -- he is easily recognizable.

04:03PM Q. Well, you've had -- had some trouble -- well, first off, are you a self-professed drug addict?

04:03PM A. Yes, sir.

04:03PM Q. So you've had issues with drugs for a long time?

04:03PM A. Uh-huh. Yes, sir.

04:03PM Q. Have you ever been around Bill Redden working in, I guess, any of his capacities as a narcotics officer where he was actually doing drugs?

04:03PM A. Yes, sir.

Q. Could you describe some of those incidents?
A. I can describe an incident where he shot up in his neck.
Q. Okay. Have you described that before as you had to take the needle from him and do it?
A. No.
Q. No?
What was he shooting up in his neck?
A. Meth.
Q. How many times were you ever around him where you saw something like that?
A. He used to come to Guin's house when he was going by the name of Dave and he would get dope and he would do dope in the house on several occasions.
He would smoke some, but he was a banger mostly.
Q. And you knew a lot about Bill Redden from other contacts from within organizations or whatever --
A. Yeah. Yeah.
Q. Now, at the time of this Dustin Pool thing, were you -- was there an organization that you were associated with?
A. I mean, just -- like what are you asking me?
Q. A cartel?
A. I didn't know who was who really. I kind of

like -- we were associated with Teddy and Eddie Phengsengkham, we were associated with Dustin, we were associated with Craig's people and we were associated with Omar's people as well.
Q. And you were aware of the Phengsengkham's descriptions of their interactions --
A. Yes, I know quite a bit about that.
Q. And did you deal with Denise and Danny Contreras?
A. I had dealt with Denise on occasion.
Q. What were your dealings with them?
A. All I did with Denise was buy a car, me and Guin had got a car from her.
Q. A what?
A. A car.
Q. Okay.
A. A vehicle.
Q. What do you mean?
A. Like we had bought a Firebird at one point from her. She owns a car lot, like more than one.
Q. Now, we also had an opportunity to review some transcripts of federal wiretaps that pertained to Mr. Stocker --
A. Uh-huh.
Q. -- represented as being -- presented to

Mr. Watkins from David Isern and to me from Mr. Watkins.

A. Uh-huh.

Q. And you had a chance to review those?

A. Yes, sir.

Q. In there it references a hit from --

MR. BLOUNT: Excuse me. I'm going to object to that as hearsay, Your Honor.

THE COURT: Sustained.

Q. (BY MR. WOOLDRIDGE) Well, the document was -- has been entered as being attached to our application for Writ of Habeas Corpus.

MR. BLOUNT: It doesn't mean it's not hearsay, Judge.

THE COURT: Correct.

MR. WOOLDRIDGE: And you took judicial notice of it.

MR. BLOUNT: I don't recall the Judge taking judicial notice of that.

MR. WOOLDRIDGE: I asked for judicial notice of the file, including our Writ of Application at the beginning of these proceedings.

THE COURT: Notice was taken.

MR. WOOLDRIDGE: I'm sorry?

THE COURT: Notice was taken.

Q. (BY MR. WOOLDRIDGE) If a hit had been ordered

from La Pinta, would you have known who it was?
A. No.
MR. BLOUNT: Excuse me?
Q. Do you know who Jimmy Ocanas is?
A. Yes.
Oh, a hit from La Pinta? I heard it was Bobby Ocanas at the time, but I don't know.
Q. Bobby Ocanas?
A. Uh-huh. They're brothers. I know Jimmy though better.
Q. Now, you had a litany of attorneys in this matter, did you not?
A. I had a what?
Q. A litany of attorneys.
A. Uh-huh.
Q. A lot of them?
A. Yes.
Q. Who was your first attorney on this?
A. My first attorney appointed was Joe Dawson.
Q. Who was your first attorney?
A. That I hired or that was appointed?
Q. Yeah, your -- whichever one was first.
A. Joe Dawson.
Q. You had Joe Dawson before you hired Ms. Watson?

A. Yes.
Q. Okay. And then --
A. Oh, no. Maybe not. No, I had Jami Watson first. You're right, and then Joe Dawson.
Q. And then who did you have after Joe Dawson?
A. They appointed, I think, Don Schofield.
Q. How long was Mr. Dawson on your case?
A. One day.
Q. And you got him because of what reason?
A. They gave me him because Jami Watson was hired by the DA's office when she was representing me.
Q. And how long was Mr. Dawson your attorney?
A. For one day, because it was a conflict of interest, because Tim Pirtle, his partner, represented Chacon.
Q. Represented who?
A. Frank Chacon.
Q. Frank Chacon.
A. Oh, yeah. And then they did appoint Qlo Crum after that briefly.
Q. Was there -- how long was Qlo your attorney?
A. Two weeks, but he -- but we -- neither one of us had -- I don't know why it wasn't realized or whatever, he was the victim's attorney for a long time.
Q. Dustin Pool?

A. Right. So they didn't let me keep him either.
Q. And then who replaced him?
A. Don Schofield.
Q. And how long was Don your attorney?
A. Not long at all.
Q. Why do you say it like that?
A. Because I didn't want to use him. I ended up hiring Jeff Robnett.
Oh, yeah, and the very first one before Jami was Laura Hamilton originally. I didn't choose to hire her, but she was hired apparently for me and Guin.
Q. And then you ultimately wound up with Mr. Robnett?
A. Ultimately, yes.
Q. And at what point would you say the relationship with Mr. Robnett terminated and not formally terminated, but where you just stopped dealing with him?
A. After we -- after me and him flew here to talk to the DA's office from Midland.
Q. And I think we addressed this earlier, but I'll address it again just in case. In the bond hearing where you state that Mr. Robnett has been informed, you're relying on the assumption --
A. Oh --

Q. -- that your parents had contacted him?
A. Well, I had asked my mom to call him. I didn't remember that. That's what I was trying to tell you. I do remember that. And it should be on the jail -- they record every recording -- every phone call in jail is recorded, so you should be able to get that.
But in '05, I was on the phone. I remember my dad yelling at me. And I asked him again if he had got ahold of Robnett. And he said, Tori, we have already left messages or whatever. He hasn't called back. So I don't know what more you want.
But then at one point on the phone my dad said that he or Vaavia had talked to him. My dad said if we have to use Robnett, we're going to have to pay him. And my dad said I'm not going to pay him any more money. I don't have it. So do you trust Vaavia to just deal with it? She is appointed to me on that case. So I let Vaavia do it.
But they -- ultimately, I didn't ever have a bond. They just put a hold on me is what they did.
Q. Back to the harassment issue, have you also been -- had issues with drones?
A. Yes.
Q. Can you describe that?

A. Yeah, those are interesting. They -- there's been drones around the house. I've lived that when I stayed out in the country with Nana. The old lady --

Q. And you say at some point, you almost got your hands on one?

A. Yeah. Yeah, there was one flying above us. And the only reason it took off is because I pulled my phone out to record it.

Q. Do you know of any reason why anybody would be harassing you other than your allegations against the Randall County --

A. No, I've never --

Q. -- Criminal District Attorney?

A. -- had any problems like that before this.

Q. And was any of this going on beforehand?

A. No, I had bought a fairly new car and -- no.

Q. And subsequent to the allegations, has it been more or less continuous?

A. Yeah, it's continuous -- been continuous. My car is now in the shop. The core support is shoved back a foot and a half from being run into a wall at 70 miles an hour.

Q. Have you also been subjected to some raids?

A. Yes.

Q. Could you describe that?

A. Yeah. Last June -- I think it was June 29th, me and Christopher Boyd were raided and Corbin Hill. They had -- we had -- I asked for a warrant. They did not provide one. They told me they didn't have to give me one. They threw three flash bang grenades into a motel room, in which I was -- I just got back into the room. So when the door -- they kicked the door and threw those in. So, yeah, it hurt.

Q. Did they destroy any of your property?

A. All of my property was destroyed.

Q. Including a computer?

A. Yep. A laptop, my make-up, everything.

Q. On that laptop did you have information relating to these issues?

A. Yes.

Q. Photographs, surveillance, that sort of stuff?

A. Uh-huh. I have a backup though for most of it so it was okay, but they have destroyed that computer. I have not been able to buy another one since.

Those officers had no warrant. They had no badges on with their names or anything.

Q. Did you ask for a warrant?

A. I asked for one. Several times I was told to shut up.

Q. I'm going to show you now what has been marked

as Defendant's Exhibit 14. Do you recognize what this is?

A. Yes.

Q. What is this?

A. It's my jail records. Right?

Q. And what is page 2?

A. It's when they lowered the bond.

Q. Okay. Now, does this appear to be an accurate copy of the times -- or an accurate record of the times that you have been in jail?

A. Yes.

Q. Okay. The top entry there, is that the time that you were arrested on the -- the capital murder charge and the time you spent in jail where you executed the use immunity agreement with Mr. Farren?

A. Yes. I was -- I spent four days. I was arrested the 24th.

Q. Okay. So this -- this record is correct?

A. Or -- yes.

Q. Okay. How many jail calls -- or how many phone calls did you make or did you receive while you were in jail --

A. One.

Q. -- on those four days?

A. One.

Q. And what was that call?
A. I called my dad after arraignment to let him know that my bond was set at one million, because he told me to call and let him know what the bond was, so I did that.
Q. You had no other calls?
A. They -- I was on -- I was on ad seg, administrative segregation.
MR. WOOLDRIDGE: We would offer into evidence Defendant's Exhibit 14.
THE COURT: Did you say ad seg?
THE WITNESS: Yes, sir. Administration seg.
THE COURT: Okay.
THE WITNESS: I wasn't allowed out of my cell, but for 15 minutes for a shower.
Q. (BY MR. WOOLDRIDGE) Are you dangerous?
A. Apparently. I'm on maximum now, so apparently so, despite that I've had no infractions.
MR. BLOUNT: No objection.
THE COURT: Is this Exhibit 14?
MR. WOOLDRIDGE: Yes, sir.
THE COURT: Okay. It's admitted.
Thank you.
Q. (BY MR. WOOLDRIDGE) Ms. Patrick, I'm now going

to show you what has been labeled Defendant's Exhibit 15.

A. Uh-huh.

Q. Do you recognize what that is?

A. Your law office.

Q. Well, is it my hall office or is it just --

A. It's the outside. It's the entrance and -- and the camera that's outside the door.

Q. Okay. Now, you worked for me for a period. Is that correct?

A. Yes, sir.

Q. So you are familiar with my office?

A. Yeah, very.

Q. And is it located at 1704 South Tyler -- or I'm sorry -- 600 South Tyler Street?

A. I was going to say -- yes, 600 South Tyler Street. Yes.

Q. Suite 1704?

A. Yes, sir.

Q. And this accurately depicts what it's intended to show?

A. Yes.

MR. WOOLDRIDGE: We would offer into evidence what has been marked Defendant's Exhibit 15.

MR. BLOUNT: No objection.

THE COURT: Admitted.

Q. (BY MR. WOOLDRIDGE) So did you with regard to your use immunity agreement document in Joshua Stocker's trial, did you come up with the idea to testify falsely about that all on your own?

A. No, sir.

Q. How many times did you rehearse your testimony with Mr. Farren?

A. Several.

Q. And Mr. Fowler?

A. Several. They were always in the room together usually.

Q. And, in fact, did this all begin with the -- the relevance of this misconduct because you brought a notebook to me that had been given to you by the Randall County Criminal District Attorney and his wife, which was kind of like a scrapbook of your testimony in all of these trials?

A. Yes, sir. When he gave me that, he said that any time I ever felt like I was going to get in trouble, maybe I should open that up and it would be a reminder.

MR. WOOLDRIDGE: Pass the witness.

CROSS-EXAMINATION

BY MR. BLOUNT:

Q. Ms. Patrick, first, I want to talk to you

04:16PM about the time -- let's see if we can get the timing of some events.

Do you know a person named Jennifer Vest?

A. Yes, when I worked at the hospital.

Q. You worked with her at Northwest Texas at one time?

A. Briefly, yeah.

Q. Well, it was around the time of the Pool homicide?

A. Right. That's why I said briefly, because I didn't keep that job much longer after that.

Q. Do you remember talking to her about what had happened at your apartment?

A. Briefly, we had a conversation.

Q. Okay. And that would have been long before -- or it would have been before you ever talked to Mark Brown?

A. Right.

Q. And a good while before you talked to Bobbie Ledbetter?

A. Right.

Q. And your ex-husband is named Jeremy Patrick?

A. Uh-huh.

Q. And you talked to him about what happened at your apartment?

A. Not really, I didn't. I talked to him not -- not in -- what he says I told him is not -- no.
Q. Okay. You had -- did you have a conversation?
A. I had a conversation, yes.
Q. With Jeremy?
A. Yes. But not to the extent that he said.
Q. Okay. Well, just listen to my question. Okay?
A. Okay.
Q. And -- first of all, sometimes we're going to have multiple names, the same people --
A. Yep.
Q. So we've already mentioned Jeremy Fowler and now we're talking about Jeremy Patrick. So let's be clear on which Jeremy we're talking about.
A. Okay.
Q. You did have a conversation with Jeremy Patrick about what happened at your apartment. Now, you may -- you may believe or say that -- that you didn't tell him as much as he thinks you told him, but you did have a conversation about it?
A. Briefly, yes.
Q. So you did have one with him?
A. Yes.
Q. Okay. And that was before you talked to Mark

Brown?

A. Yes.

Q. And certainly long before you talked to Bobbie Ledbetter and James Farren?

A. Yes.

Q. And then you talked to Mark Brown --

A. Uh-huh.

Q. -- the homicide investigator in the Pool cases, and you gave him a statement?

A. Yeah.

Q. I think it was maybe two pages?

A. Yeah.

Q. And that was before you ever met James Farren?

A. Correct.

Q. And then you ended up in jail in Randall County around June 28th of 2003, and you had a lawyer representing you, Jami Watson. Correct?

A. Correct.

Q. And James -- that's the first time you met James Farren, is he met with you and Jami Watson and Bobbie Ledbetter --

A. Correct.

Q. -- in the Randall County Jail?

A. And Gil Farren.

Q. Okay. Gil Farren was around as well?

A. Yeah.
Q. And this use immunity agreement was discussed. James Farren agreed to grant you use immunity. Right?
A. Right.
Q. And a -- a use immunity agreement was typed up and everybody signed it?
A. Correct.
Q. And did you get a copy of it?
A. Yes.
Q. Did your lawyer get a copy of it, as far as you know?
A. As far as I know.
Q. Now, earlier testimony during this hearing has indicated that James Farren wasn't there all that long, talked to you about the use immunity and then y'all signed it. He left and then you and Bobbie Ledbetter and your lawyer Jami Watson worked for several hours on getting your --
A. Correct.
Q. -- statement done?
A. Correct.
Q. All right. Was -- did James Farren exert any coercion on you that day to get a statement?
A. No.
Q. Was that statement truthful?

A. Yes.

Q. Okay. Then a little over a year later, by now you're in Midland and you hire Jeff Robnett?

A. Uh-huh.

Q. And you talked about flying up here, and Robnett met with you and Mr. Farren at his office?

A. Uh-huh.

Q. Talked to y'all and then you gave another statement -- a two-page statement kind of expanding on some things?

A. They had asked for that, yeah.

Q. "They" meaning?

A. I'm sorry. The DA's office; Ledbetter and Farren had asked for that information.

Q. And did Mr. Farren or Mr. Fowler exert any coercion on you to get that statement?

A. Not that day, because my lawyer was with me. And my lawyer came out of the room and told me to answer that -- to answer that question. That's where that statement came from -- the -- the addition to that statement.

Q. Okay. So up to that -- up and through that statement, no one had -- no one had applied any coercion on you to get your statement?

A. That's because up --

Q. Ma'am, I'm just asking a simple question.
A. But it's not just a simple answer. That's the problem.
Q. Well, had Mr. Farren, Mr. Fowler or Ms. Ledbetter exerted any coercion on you to obtain your statement?
A. I had an attorney, so, no.
Q. So the answer is, no, you -- they did not?
A. Not whenever I had an attorney they didn't.
Q. And that's up through the two-page version in July of 2004, when Robnett was there with you?
A. Right.
Q. Okay. Now, was -- was that statement you gave at that time with Robnett present -- in fact, he witnessed the statement?
A. Right.
Q. Was that statement truthful as well?
A. Yes.
Q. Okay. Now, you testified during the trial of Joshua Stocker in July of 2005. Correct?
A. Correct.
Q. Yes. And then you testified in the Frank Chacon trial in September of 2006?
A. Correct.
Q. You testified at your plea hearing March of

2007?

A. Correct.

Q. And then you had already pled and were on probation when you testified in the Michael Stocker trial in February of 2009?

A. Correct.

Q. In October of 2011, you went back to court on allegations that you violated your probation?

A. True.

Q. And you ended up going to SAFPF?

A. Uh-huh.

Q. I guess the major infractions alleged were drug use?

A. There was one infraction alleged.

Q. Well -- okay.

A. Not --

Q. You have had a drug problem for a long time.

A. That's never been disputed.

Q. That's never been disputed.

And so the Judge ordered you to go to SAFPF?

A. Correct.

Q. In fact, I believe that was by agreement, wasn't it?

A. Correct.

Q. The State and your attorney, Mr. Wooldridge, you through him agreed to recommend to Judge Miner that you go to SAFPF?

A. Judge Schaap.

Q. Was it Judge Schaap? Okay.

A. It was.

Q. Okay. You went to SAFPF and then --

MR. WOOLDRIDGE: I'll object. That's actually a misstatement. What we agreed to is to send her to CRCT. But with the charges that she had, they wouldn't accept her, so they wound up sending her to SAFPF.

MR. BLOUNT: Okay. All right. Thank you.

Q. (BY MR. BLOUNT) Is that your recollection, Ms. Patrick?

A. Yes, sir.

Q. Okay. All right. But the State was recommending something short of revocation to prison?

A. At that time, yeah.

Q. At that time.

A. But it was -- yeah.

Q. At that time?

A. Uh-huh.

Q. So you ended up going to SAFPF, you came back

and you were still on probation, I guess, in 2012, 2013, 2014, 2015. Correct?
A. Uh-huh.
Q. Okay. And then in early 2000 -- or late 2015, a second Motion to -- to Revoke -- or Proceed to Revoke your Probation was filed by the DA's office --
A. Not until January 2016 was it filed.
Q. Okay. January 2016.
A. Yes. From December of 2015 allegation though, yes.
Q. Okay. And then after that motion was filed in early 2016 --
A. Uh-huh.
Q. -- and you're aware that at that time the probation department was recommending revocation?
A. Correct.
Q. And you found out that the State was going to take the same position, try and revoke you to prison?
A. They offered two years.
Q. So you knew that everybody -- the probation department and the State --
A. Correct.
Q. -- were seeking to revoke your probation --
A. Correct.
Q. -- and send you to prison. Correct?

A. Yeah.
Q. And that's when you filed your writ affidavit, isn't it?
A. Yes. I -- I guess. I don't know when we filed the writ. My lawyer is right there though.
Q. Well, do you know when you signed the affidavit?
A. Well, I mean, not exactly. What date did I sign it? No, I don't. I signed a lot of motions that year.
Q. Does February of 2016 sound about right?
A. Yep.
Q. So that's the first time you aired out these allegations?
A. Right.
Q. 11 years after the Stocker trial?
A. That's how long it took you guys to give me discovery in my case.
Q. Well, it's also -- apparently the same time that we all sought to send you to prison too?
A. Well, I guess so.
Q. Okay. Now, you were represented -- you've already testified in regards to your murder trial -- or murder case, which ended up being kidnapping, you had Joe Dawson -- you really didn't have him. I mean, for a

day. You didn't even meet him, did you?
A. No. I talked to him on the phone for like five minutes.
Q. But you had Jami Watson. You had her -- at least something of a relationship with her --
A. Uh-huh.
Q. -- before she went to the DA's office and withdrew?
A. Right.
Q. Jeff Robnett, you hired him?
A. Uh-huh.
Q. Okay. You had Vaavia Edwards on your Potter County cases in 2005?
A. Court-appointed, yes.
Q. And -- and she tried to help you on, you know, looking into the murder case as well and maybe some custody issues, didn't she?
A. I don't know about the murder case so much. I don't know. I was in jail. I don't know what she did with all that. I do know she did -- she did help eventually with the custody issues later on.
Q. Well, didn't she offer to go down to the DA's office in Randall County and -- and see about the status of your case?
A. Right. But I never heard anything back from

her on that, so I don't know.
Q. Okay. But she offered to do that?
A. I think so.
Q. Okay. And then after -- after you were put on probation, did you go to work for Cathy Dodson?
A. I went to work for April Palmer.
Q. Did you ever work for Dodson?
A. No.
Q. Did you work for April Palmer?
A. Yes, but they were in the same office.
Q. Oh, I see. Okay.
But you worked for April Palmer?
A. Yes, sir.
Q. For how long?
A. Three -- a little over three years.
Q. And she is a lawyer?
A. Yeah.
Q. Okay. You had a relationship with Stephen Palmer?
A. Uh-huh.
Q. An intimate relationship?
A. Uh-huh.
Q. For a year or so? Do you remember that?
A. Longer than that.
Q. Longer than that?

A. Two-and-a-half years.
Q. And Stephen Palmer is a lawyer with the 7th Court of Appeals, isn't he?
A. Right. Yes, sir.
Q. Did you ever talk to any of these folks about these horrible things that James Farren --
A. Yes.
Q. Who did you talk to about it?
A. April Palmer.
Q. April Palmer?
A. Yes, sir. And Stephen, they both --
Q. You talked to Stephen Palmer as well --
A. Yeah.
Q. -- about these oppressive things that Mr. Farren was doing to you?
A. Yes. April Palmer could -- yeah, she -- she should be here.
Q. She should be here?
A. She should.
Q. Okay. And Stephen Palmer?
A. April, we worked together. I talked to April about everything. April knew everything about me that there is to know probably. She was the one I was closest to.
Q. Okay.

A. And, yeah, she could testify to everything.

MR. WOOLDRIDGE: Note in advance that if the State wants to call either of the Palmers, we're not going to object to any hearsay.

THE COURT: Thank you.

That's a waiver of objection on the record.

MR. BLOUNT: I'm sorry, Judge? What -- what was that?

THE COURT: That's a waiver of objection on the record.

MR. BLOUNT: I see. Well, I appreciate that.

Q. (BY MR. BLOUNT) All right. Now, would you agree with me Ms. -- Ms. Patrick, that the writ affidavit that you signed and that was presented with your writ in 2016, is essentially the same as the writ affidavit that you signed, that has been attached to and used in -- in this writ, Joshua Stocker's writ?

A. I believe so. I would have to see both of them probably. Is that -- I don't know what's attached to Josh Stocker's writ, I mean, off the top of my head. There was a lot of things attached to his writ.

Q. Okay.

MR. BLOUNT: Approach the witness, Your

Honor?

THE COURT: Yes, please.

MR. BLOUNT: Is this Number 28?

THE REPORTER: Yes.

MR. WOOLDRIDGE: Judge, while he is doing that, I'm going to step out real quick and see if Mr. Pirtle is here.

THE COURT: Okay.

(Mr. Wooldridge exits the courtroom)

(Pausing)

(Mr. Wooldridge enters the courtroom)

THE COURT: Has he arrived?

MR. WOOLDRIDGE: No, sir.

THE COURT: We're probably not going to get to him today.

MR. WOOLDRIDGE: If he gets here, it's only going to take like five minutes.

THE COURT: Better hurry.

Q. (BY MR. BLOUNT) Ms. Patrick, I'm going to show you what I have marked as State's Exhibits 28 and 29.

A. Okay.

Q. Would you review those --

A. Yes, sir.

Q. -- and let me know, once you've had a chance

to look at them.
A. Okay. So what is your question?
Q. Hold on. Just a second. Do you recognize those exhibits?
A. Yeah, I do.
Q. What are they?
A. They are my affidavits.
Q. Do they appear to be true and correct copies of the two affidavits?
A. Yes. Yes.
Q. I'm going to show you State's Exhibit Number 30.
A. Yeah, I already know what this is. Here, you can have this back.
Q. Is that your statement --
A. Yup.
Q. -- that you gave --
A. Yes, to Mark Brown.
Q. -- to Mark Brown?
A. Correct.
Q. 31?
A. Yep, I know what that is too. You can --
Q. What is it?
A. It's a statement I gave to Ledbetter.
Q. Number 32?

A. The same. That's a supplement I gave to Ledbetter.

Q. The July -- well, at the meeting with Robnett?

A. Correct.

Q. State's 33?

A. That's my plea hearing in '07.

MR. LOVE: Is that 33, Dave?

MR. BLOUNT: Yes.

I offer State's Exhibits 28, 29, 30, 31, 32 and 33.

THE COURT: Are there four of these exhibits?

MR. BLOUNT: I'm sorry?

THE COURT: 28, 29, 30 and 33?

MR. BLOUNT: 28, 29, 30, 31, 32 and 33.

THE COURT: 31, 32 and 33. Okay. Thank you.

MR. WOOLDRIDGE: No objection.

THE COURT: They're all admitted.

Q. (BY MR. BLOUNT) Ms. Patrick --

A. Uh-huh.

Q. -- would you agree with me that your State's Exhibit 28 and 29, your two writ affidavits, are substantially the same?

A. I'll agree with you.

Q. And you knew when you prepared your affidavit, particularly the one that was attached to your writ, that you were making very serious allegations --
A. Uh-huh.
Q. -- against Mr. Farren?
A. Yes, sir.
Q. And you had had a long time to consider it?
A. Uh-huh. Finding a lawyer to represent something like that is almost impossible.
Q. Well, the oppression began, according to you --
A. Yeah, a long time ago.
Q. -- in 2004?
A. Correct.
Q. And you're preparing and submitting this affidavit 12 years later?
A. I understand that, and --
Q. And so you had a long time to consider your allegations?
A. To find an attorney to represent something like that is almost an impossibility. And on top of that, I didn't ever have discovery in my case to get half of what I needed to do that --
Q. Well, I --
A. -- until 14 years later. Again, it's not --

04:40PM Q. I appreciate all of that. But you would agree with me that you had 12 years --
04:40PM A. Yeah, I --
04:40PM Q. -- to consider your allegations?
04:40PM A. -- would agree with you. I had 12 years to do it. I guess so, but whatever.
04:41PM Q. Okay. And so we can -- we can expect that these writ affidavits were a thorough account of your grievance against Mr. Farren?
04:41PM A. Uh-huh. I mean, yeah.
04:41PM Q. I mean, did you leave something out?
04:41PM A. I mean, is there not -- I mean, I left a lot out. I mean, it would take a month to say everything I wanted to say really.
04:41PM Q. Okay.
04:41PM A. I mean, it's -- it's a summary.
04:41PM Q. This is a summary?
04:41PM A. That's a summary. I mean, it's not that detailed. I mean, I can go into a lot more detail than that.
04:41PM Q. You didn't think that it was important to be detailed when your life --
04:41PM A. Well --
04:41PM Q. -- was -- when your freedom was on the line?
04:41PM A. No, it's because I didn't have discovery like

04:41PM I have now. Like maybe -- now I have over a thousand pages of stuff that's ridiculous that they've done that I didn't have then. So that kind of changes things.

04:41PM Q. Okay.

04:42PM A. Once again, it's not just a yes-or-no question.

04:42PM Q. All right. State's Exhibit -- you have indicated that State's Exhibit 31, the nine-page affidavit that you gave to Bobbie Ledbetter is true?

04:42PM A. Yes, sir.

04:42PM Q. Okay. Number 32, the one you gave a year later is true?

04:42PM A. It's a supplement, yes, sir.

04:42PM Q. Did you -- did you tell any lies at the -- at your plea hearing?

04:42PM A. No, sir.

04:42PM Q. In your -- in your statement, Number 31, the statement to Bobbie Ledbetter, June the 28th of 2003, that you say is true --

04:43PM A. Uh-huh.

04:43PM Q. -- you indicated that Dustin -- that Josh Stocker was bragging about drug prices and quantities, and then the subject came up about Dustin Pool. And he talked to Guin about how she knew Dustin and asked you if you knew him, and you told him, yeah, through Guin.

04:43PM And then Stocker started telling you about his ongoing conflict with Dustin Pool.
04:43PM All that is true?
04:43PM A. Yes, sir.
04:43PM Q. He said that he wanted to kick Pool's ass and asked me if I would call him up and try and get him over to my place?
04:43PM A. Yes, sir.
04:44PM Q. Stocker said he would never fight in my -- he would not fight in my apartment?
04:44PM A. Correct.
04:44PM Q. They would do it elsewhere and not mess up my place?
04:44PM A. They were supposed to go outside and fight.
04:44PM Q. I tried to call Dustin, got his voicemail. Guin left?
04:44PM A. Uh-huh.
04:44PM Q. This is all at your apartment. Right?
04:44PM A. Yeah.
04:44PM Q. Guin left, I tried calling Dustin again and got no answer. Excuse me. Then Stocker tried to call Pool's cell phone at least once. He told me that if Pool answered, he was going to throw the phone to you, but Pool never answered?
04:44PM A. Right.

Q. Stocker called his brother Michael and told him to come over to your place because he needed help with something. Michael showed up and Josh let him in.
All that's true?
A. Yes.
Q. Josh did a line of crank, we were still sitting around and Dustin called your home phone?
A. Correct.
Q. And you -- by then you changed your mind about having him come over?
A. Well, yeah, it was late. Uh-huh. He called like much later.
Q. It was getting late and I was going to go to bed, but Stocker insisted -- in fact, you told -- according to your testimony, you told him -- or your statement, you told Pool don't come over?
A. Right.
Q. And he said I'm coming anyway?
A. Right.
I mean, that's not disputed. I've already said that that's true. I don't know where you're going with this.
Q. Indulge me, please.
A. Okay.
Q. Dustin Pool showed up, knocked on your door.

04:45PM You opened it for him?
04:46PM A. Yeah, I did that. Yes.
04:46PM Q. He came in?
04:46PM A. (Moving head up and down.)
04:46PM Q. And Michael and Josh were out of sight?
04:46PM A. Right.
04:46PM Q. You and Dustin Pool talked for a little bit?
04:46PM A. Kind of. He was on the phone.
04:46PM Q. He began to act leery?
04:46PM A. Uh-huh.
04:46PM Q. Checking things out, started walking around your apartment?
04:46PM A. Right.
04:46PM Q. Began to go to the hallway, and that's when Josh Stocker and his brother Michael confronted him in the hallway?
04:46PM A. In the living room actually, but they came from the hallway. Yeah.
04:46PM Q. In the living room, but they came from the hall?
04:46PM A. Right.
04:46PM Q. Michael had a shotgun?
04:46PM A. Correct.
04:46PM Q. Josh had a fireplace poker in his hand?
04:46PM A. Correct.

Q. Josh Stocker told you to come here. You walked around Dustin, and Josh pushed you in your back towards the bathroom?
A. Right.
Q. You went in the bathroom, the door was cracked you could hear Dustin yelling?
A. I heard him try to yell once, yes.
Q. Yell for help?
A. Right.
Q. You heard someone get hit?
A. Heard it, yep.
Q. You opened the door and motioned Josh to come over, and you asked him who got hit?
A. Uh-huh.
Q. Josh told you that he hit Dustin because he wouldn't shut up. I asked him what he hit Dustin with --
A. And he said his fist. Correct.
Q. And you said okay. You could hear Dustin whining about his head and you covered your ears so you couldn't hear him. You were crying and scared. Then you opened the door more to look and you could see Dustin lying on the white comforter between the coffee table and the couch. You could see blood on the white comforter. Josh was sitting on the coffee table in

front of Dustin lying --
A. Dustin wasn't lying. He was sitting on the white comforter between --
Q. Okay. I could see Dustin's face and I could not understand what was being side.
A. I was too far away to hear what they were --
Q. I'm sorry, ma'am?
A. I was too far from him to hear what he was talking about. But they were talking. I don't know what was being said.
All that's correct.
Q. Okay. Now, not long after that, Josh Stocker wanted you to leave and go with his brother to a Motel 6. Isn't that right?
A. Correct.
Q. When you left Dustin was still alive?
A. Yes.
Q. But he was bleeding from the head and there was a lot of blood?
A. There was blood. He wasn't still bleeding -- -- when I left, he had a towel on his head to -- but the bleeding had stopped by that point. I mean, it wasn't like running all over the place. He was holding a towel and he was talking. He was alive, yes.
Q. Well, there was enough blood that a couple of

days later when you went back, y'all had to go get a carpet cleaner and try and get --
A. It didn't look the same when I went back. The apartment didn't look like that when I left.
Q. Okay. There was more blood --
A. Yes.
Q. -- when you went back?
A. Yes. And didn't look the same.
Q. You said in your statement that when you got back a day or two later, it smelled like bleach, blood all over the bathroom sink --
A. Right.
Q. -- the couch was in the floor?
A. Right.
Q. Now, you also found Dustin Pool's wallet, his phone and his license there in your apartment?
A. Yes.
Q. And you took the wallet -- you took those items and -- and left. And the next time you saw Josh Stocker you gave them to him, didn't you?
A. I asked him why they were at my apartment, yes, sir.
Q. Okay.
THE COURT: Are you at a stopping place, Mr. Blount?

04:51PM MR. BLOUNT: I'm sorry, sir?

04:51PM THE COURT: Are you at a stopping place?

04:51PM MR. BLOUNT: Sure.

04:51PM THE COURT: We'll recess until morning.

04:51PM MR. WOOLDRIDGE: Is that going to be 04:51PM 9:00, Judge?

04:51PM THE COURT: Ish.

04:51PM MR. WOOLDRIDGE: Your Honor?

04:51PM THE COURT: Sir?

04:51PM MR. WOOLDRIDGE: Mr. Pirtle is here and 04:51PM it won't take five minutes.

04:51PM THE COURT: We're gone.

(Proceedings Adjourned)

REPORTER'S CERTIFICATE

THE STATE OF TEXAS )
COUNTY OF RANDALL )

I, Dina Wall, Official Court Reporter in and for the 47th District Court of Randall County, State of Texas, do hereby certify that the above and foregoing contains a true and correct transcription of all portions of evidence and other proceedings requested in writing by counsel for the parties to be included in this volume of the Reporter's Record, in the above-styled and numbered cause, all of which occurred in open court or in chambers and were reported by me.

I further certify that this Reporter's Record of the proceedings truly and correctly reflects the exhibits, if any, admitted by the respective parties.

WITNESS MY OFFICIAL HAND this the 8th day of January, 2019.

Dina Wall
Dina Wall, Texas CSR 4784
Expiration Date: 12-31-2018
47th District Official Court Reporter
Randall County, Texas
Canyon, Texas 79015
(806) 468-5557