REPORTER'S RECORD
VOLUME 5 OF 6 VOLUMES
NO. WR-88,099-01
CAUSE NO. W-15,307-A-1

RECEIVED
COURT OF CRIMINAL APPEALS
1/16/2019
DEANA WILLIAMSON, CLERK

| | | |
|---|---|---|
| EX PARTE | ) | IN THE DISTRICT COURT |
| | ) | |
| | ) | |
| | ) | RANDALL COUNTY, TEXAS |
| | ) | |
| | ) | |
| JOSHUA DAVID STOCKER | ) | 47TH JUDICIAL DISTRICT |

*******************************************************

WRIT HEARING

*******************************************************

On the 1st day of November, 2018, the following proceedings came on to be heard in the above-entitled and numbered cause before the Honorable David Gleason, Judge presiding by assignment, held in Canyon, Randall County, Texas;

Proceedings reported by Stenographic Method.

A P P E A R A N C E S

FOR THE APPLICANT:
SBOT NO. 24010492
Mr. James Edd Wooldridge
Attorney at Law
600 South Tyler Street
Suite 1704
Amarillo, Texas 79101
(806) 418-8575

FOR THE STATE OF TEXAS:
SBOT NO. 00787925
Mr. Robert Allen Love, II
SBOT NO. 02505850
Mr. Charles David Blount
SBOT NO. 04300500
Mr. Warren L. Clark
Randall County Assistant District Attorneys
2309 Russell Long Boulevard, Suite 120
Canyon, Texas 79015
(806) 468-5570

CHRONOLOGICAL INDEX


| November 1, 2018 | Pg | Vol |
|---|---|---|
| Appearances | 2 | 5 |
| Case Called | 6 | 5 |

APPLICANT'S

| ORAL EVIDENCE | DX | CX | RDX | RCX | VD | VOL |
|---|---|---|---|---|---|---|
| Tori Patrick (Cont'd) | | 7 | 73 | | | 5 |
| Tim Pirtle | 101 | 106 | | | | 5 |
| Tori Patrick (Cont'd) | | | 107 | 112 | | 5 |
| | | | 118 | | | 5 |
| Michael Mogelinski | 128 | 130 | 135 | | | 5 |
| Warren Clark | 136 | 143 | 144 | | | 5 |

| | Pg | Vol |
|---|---|---|
| Applicant Rests | 147 | 5 |

| STATE'S ORAL EVIDENCE | DX | CX | RDX | RCX | VD | VOL |
|---|---|---|---|---|---|---|
| Jennifer Seay | 148 | 157 | | | | 5 |
| Jeremy Patrick | 158 | 167 | | | | 5 |

| | Pg | Vol |
|---|---|---|
| State Rests | 172 | 5 |
| Applicant Closes | 172 | 5 |
| State Closes | 172 | 5 |
| Applicant's Closing Argument by Mr. Wooldridge | 173 | 5 |
| State's Closing Argument by Mr. Blount | 175 | 5 |
| State's Closing Argument by Mr. Clark | 176 | 5 |
| Proceedings Concluded | 197 | 5 |
| Reporter's Certificate | 198 | 5 |

ALPHABETICAL INDEX



| WITNESS | DX | CX | RDX | RCX | VD | VOL |
|---|---|---|---|---|---|---|
| Warren Clark | 136 | 143 | 144 | | | 5 |
| Michael Mogelinski | 128 | 130 | 135 | | | 5 |
| Jeremy Patrick | 158 | 167 | | | | 5 |
| Tori Patrick (Cont'd) | | 7 | 73 | | | 5 |
| Tori Patrick (Cont'd) | | | 107 | 112 | | 5 |
| | | | 118 | | | 5 |
| Tim Pirtle | 101 | 106 | | | | 5 |
| Jennifer Seay | 148 | 157 | | | | 5 |

EXHIBIT INDEX

APPLICANT'S

| NO. | DESCRIPTION | OFFERED | ADMITTED | VOL |
|---|---|---|---|---|
| 16 | Letter from J. Wooldridge | 83 | 84 | 5 |
| 17 | Thumb Drive-Video Clips | 111 | 111 | 5 |
| 18 | Photograph | 119 | 119 | 5 |
| 19 | Photograph | 119 | 119 | 5 |
| 20 | Letter from COA | 140 | 140 | 5 |
| 21 | Letter-RC DA's Office | 142 | 142 | 5 |
| 22 | Letter-from J. Wooldridge | 143 | 143 | 5 |

STATE'S

| NO. | DESCRIPTION | OFFERED | ADMITTED | VOL |
|---|---|---|---|---|
| 34 | Order | 198 | 198 | 5 |
| 35 | Letter-Spriggs Law Firm | 40 | 40 | 5 |
| 36 | Excerpt Proceedings | 50 | 50 | 5 |
| 37 | PC Criminal History Req. | 73 | 73 | 5 |
| 38 | J. Vest Statement | 156 | 156 | 5 |
| 39 | J. Patrick Statement | 167 | 167 | 5 |

P R O C E E D I N G S

November 1, 2018

(Open court, Applicant and Counsel Present)

09:48AM THE BAILIFF: All rise.

09:48AM THE COURT: Be seated.

09:48AM THE BAILIFF: I'll go get her.

09:48AM (Pausing)

09:48AM (Witness enters courtroom)

09:48AM THE COURT: Thank you. Good morning all.

09:50AM MR. BLOUNT: Good morning, Judge.

09:50AM MR. LOVE: Good morning.

09:50AM MR. WOOLDRIDGE: Good morning.

09:50AM THE COURT: Why are you rised?

09:50AM MR. WOOLDRIDGE: We would like to make a request to the Court to allow Mr. Stocker, while he's sitting at the table here, to have his handcuffs removed.

09:50AM THE COURT: Any problem, Brad?

09:50AM THE BAILIFF: No, sir.

09:50AM THE COURT: Do it.

09:51AM (Applicant's handcuffs were removed)

09:51AM THE COURT: All right.

09:51AM Mr. Blount, you may resume.

09:51AM MR. BLOUNT: Thank you, sir.

09:51AM CROSS-EXAMINATION OF TORI PATRICK (Continued)

09:51AM BY MR. BLOUNT:

09:51AM Q. Ms. Patrick, I just want to recap a couple of things we discussed yesterday before the break. We talked -- I visited with you about the statements that you had given. Before you ever met James Farren, you had talked to Jennifer Vest about what happened in your apartment, you talked to Jeremy Patrick, your ex-husband, about it. You -- you sat down with Mark Brown and gave him a one-page affidavit, and then later -- you first met James Farren at the jail. Y'all talked about the use immunity agreement, and then you spent some time with Bobbie Ledbetter and your attorney, Ms. Watson, this detailed nine-page affidavit.

09:52AM Is that --

09:52AM A. That's correct.

09:52AM Q. Okay. And you said that what you -- what you put in the affidavit -- the nine-page-detailed affidavit is the truth?

09:52AM A. That's correct.

09:52AM Q. Okay. And then I also asked you about your guilty plea hearing, I think in 2007, after the Chacon trial, and you told the Court the truth during your guilty plea hearing.

09:52AM A. Uh-huh.

09:52AM Q. Right? Is that --
09:52AM A. Yeah -- yeah, that's correct.
09:52AM Q. Okay. Now, in your statement given to Mark Brown, before you ever met James Farren, you told Mark Brown in this statement or put in this statement that you gave to Mark Brown that when you walked out of the -- the bathroom, Dustin Pool was bleeding from a cut on his upper forehead and you could see that the cut didn't come from a fist.
09:53AM Do you remember telling Mark Brown that?
09:53AM A. Yes, sir.
09:53AM Q. And that you knew that Josh hit Dustin with something. Right?
09:53AM A. I just knew that he was hit with something.
09:53AM Q. You knew he was hit with something?
09:53AM A. (Moving head up and down.)
09:53AM Q. And then in the statement to Mark Brown, you looked around your apartment when you went back a day or two -- a day and a half, two days later and you could not find your fireplace poker?
09:53AM A. Right.
09:53AM Q. Now, throughout all of this -- all the statements that you had given before meeting James Farren, the ones you gave after meeting James Farren and your trial testimony, you've never claimed that you saw

09:54AM -- actually saw Josh Stocker swing and hit Dustin Pool?
09:54AM A. Right. I never seen him do that.
09:54AM Q. Okay. But you -- you -- you did say consistently that you -- before you went into the bathroom that he had a fireplace poker when he and Michael came out of the hall?
09:54AM A. He had one in his hand, but --
09:54AM Q. Okay. He had one in his hand.
09:54AM And then you confronted him about who hit Dustin Pool and he claimed that he did.
09:54AM A. With his fist.
09:54AM Q. Right. And you didn't believe that?
09:54AM A. No, but Dustin was still coherent after that too. I mean --
09:54AM Q. Well, he was claiming to be dizzy. Right?
09:54AM A. Yeah, at one point.
09:54AM Q. Okay. Okay.
09:54AM A. Correct.
09:54AM Q. Okay. And you were also consistent throughout your statements and in your trial testimony that you and Michael -- and/or Michael Stocker took the fireplace (sic) out of your apartment. Correct?
09:55AM A. Correct, but --
09:55AM Q. Ma'am --
09:55AM A. Okay.

09:55AM Q. -- just try and stick with my question, ma'am.
09:55AM A. All right.
09:55AM Q. I know you want to explain these things.
09:55AM A. Because everything is just like a real simple yes or no. That's the problem.
09:55AM Q. Well, it is right now. And -- and Mr. Wooldridge called you as a witness --
09:55AM A. Okay.
09:55AM Q. -- and believe me he is going to get his chance to come back and ask you further questions, okay, if y'all feel like something else needs to be added. You are going to get that chance. Okay.
09:55AM A. Okay.
09:55AM Q. We'll switch gears for just a second and go back to your -- to your writ affidavits, the one that you prepared for your writ and the one that was prepared and you signed for Mr. Stocker's writ was -- yesterday you testified are essentially the same.
09:56AM A. Uh-huh.
09:56AM Q. And they each contained allegations that James Farren told you to lie or omit certain -- certain evidence.
09:56AM A. Correct.
09:56AM Q. Okay. And I want to talk to you about some of that. Okay?

09:56AM A. Okay.
09:56AM Q. Now, in your writ affidavit one of the things that you claim that James Farren told you to lie about, was that -- that -- that Dustin Pool was brought over -- lured to your apartment because Josh Stocker was going to fight him and it was going to happen outside.
09:57AM A. Right.
09:57AM Q. Right?
09:57AM And James Farren wanted you to lie about that?
09:58AM A. No, he just didn't want -- he didn't want to address that so much.
09:58AM Q. He didn't want to address that?
09:58AM A. He said it wasn't important.
09:58AM Q. Okay. So he didn't want you talking about it?
09:58AM A. Right.
09:58AM Q. And that's what -- in your writ affidavit with these serious allegations --
09:58AM A. Uh-huh.
09:58AM Q. -- that -- that James Farren coerced you into testifying. Basically, perjure -- perjure -- perjury?
09:58AM A. Well, yeah, not talking about a use immunity agreement and stuff, yeah.
09:58AM Q. Well. I'm talking about other things right

now. Okay?
A. Okay.
Q. And when you say that he coerced you into not talking about this --
A. Correct.
Q. -- aspect of Pool was supposed to come over and they were going to fight and they were going to take it outside --
A. Yeah.
Q. -- that -- your testimony that he told you not to talk about that, is that just -- are you being just as truthful about that as you are that he told you not to mention the use immunity agreement?
A. Yes, sir.
Q. Okay. And so did you -- did you omit that testimony?
A. It never got brought up. He -- it -- it was never --
Q. Never got brought up?
A. Whenever I tried to mention it, I was cut off kind of like y'all do right now.
Q. And, again, your testimony about this -- this aspect of him not -- him not wanting you to testify about that is just as truthful --
A. Yes, sir.

Q. -- as you are -- are about your allegations that he told you not to mention the use immunity agreement?
A. Yes, sir.
MR. BLOUNT: May I approach the witness?
THE COURT: Surely.
Q. (BY MR. BLOUNT) I'm going to show you what has been introduced into evidence as State's Exhibit Number 13.
A. Yes.
Q. And identified as transcript -- an excerpt of your testimony from the Joshua Stocker trial.
Would you review that, please. It's not very long.
A. Yeah, I'm already done reviewing it.
Q. All right. You see over to the left there's a column of numbers 1, 2, 3, 4, 5, 6, 7?
A. Yes, sir.
Q. On line 6 you were asked a question.
A. Right.
Q. "And did they say what would happen to Dustin Pool if you were successful in getting him to your apartment."
Right?
A. Right.

10:01AM Q. What was your answer?
10:01AM A. "No" --
10:01AM Do you want me to read the whole thing?
10:01AM Q. Yes, ma'am.
10:01AM A. It says, "No. All I was told is that Josh wanted to fight him. That he couldn't get -- ever get Dustin to come out of his house to meet him. They tried numerous times, but Dustin wouldn't meet him. Then they wouldn't -- that they wouldn't do it in my apartment."
10:01AM Q. Would you agree with me that -- that you testified about the very issue --
10:01AM A. No, I wouldn't. Because it doesn't say that they would fight outside, does it? It doesn't even mention that part.
10:01AM Q. When you said they wouldn't do it in my apartment, that's not --
10:01AM A. Well, that doesn't -- that's not very specific though, is it, as to what -- they would do what? I mean, there's a lot of things you can talk about. Somebody would kidnap somebody out of my apartment? No, that's not what I said. I said they were supposed to fight outside. That's not very specific, is it? Not really. So, no, my answer is no.
10:02AM Q. Ms. Patrick --
10:03AM MR. BLOUNT: May I approach again, Judge?

THE COURT: You may.

Q. (BY MR. BLOUNT) I'm showing you what has been introduced as State's Exhibit 12, as another portion of your testimony from the Joshua Stocker trial.

Now, on page -- on the third page of that document, State's Exhibit 12, line 5, you were asked, "Now, you also said that you didn't have any idea that any fight was going to go on in your apartment?."

A. Right.

Q. What was your answer?

A. "They weren't supposed to -- they weren't supposed to fight in my apartment."

Q. And so -- then you were asked, well, why did you need to go hide. And they were referring to the bathroom. Right?

A. Uh-huh.

Q. And your answer was?

A. I don't know. I mean, that was just what -- because they were going to -- what Joshua was saying he was going to go get him in a choke hold to get him out of my apartment. Because everything happened like right then and there, fast.

Q. Okay. So, again, you were allowed to testify about this -- this -- this idea that they were supposed to be taking this outside, that it was just going to be

10:04AM a fight?
10:04AM A. No. Because if you read the question on line 5, it says, "Now, you also said that you didn't have any idea that any fight was going to go on in your apartment?" Because I didn't. Right?
10:05AM But it never allowed me to say that there was a plan or whatever. They were supposed to just meet outside. It acts like it just all popped off, which it did just pop off like that. But it -- what I'm telling you is, the plan was they were supposed to just go outside from the jump, from the very beginning, and this doesn't indicate that.
10:05AM Q. Well, when you -- when you --
10:05AM A. It leaves it to question.
10:05AM Q. Excuse me, ma'am.
10:05AM When you testified on line 11 that what -- Josh was saying is he was going to get him in a choke hold to get him out of my apartment?
10:05AM A. That was after it had already popped off. That's what I'm saying. So you're not -- it's not making sense what you are trying to say.
10:05AM Q. Another allegation that you made against Mr. Farren was that he -- he instructed you not to testify or omit that your last call to Dustin Pool went unanswered and that my last voicemail for him instructed

him not to come over as you had developed a bad feeling?
A. Correct.
Q. All right. And your -- your allegations of -- concerning that are just as truthful as your allegations that he told you not to mention or deny that you had a use immunity agreement?
A. True. Because in -- okay. True.
Q. I'm going to hand you what's been marked as State's Exhibit 15, introduced into evidence in this trial as a transcript, a portion of your testimony from Dustin -- from the Joshua Stocker trial.
On page 112, line 17 --
A. Uh-huh.
Q. -- did you testify during the trial that you told him at one point not to come over, but he came anyway?
A. Right.
Q. Page 113, line 9, were you asked, "And so you were having reservations about getting him over to your apartment at this first phone call that he called you back?"
A. Uh-huh.
Q. And you -- the Court indicated -- well, questioned whether you understood. And you said, no, not really.

But if go to page 114, line 2 --

A. Uh-huh.

Q. -- you indicated that you tried to call him back. Why were you -- "Why did you try and call him back?"

And your answer was what?

A. "To tell him not to come over, and he said he was coming anyway" --

THE REPORTER: Okay. Okay. You are going to have to slow down.

THE WITNESS: Okay.

A. "To tell him not to come over, and he said he was coming anyway. I tried again to call him and he wouldn't answer the phone."

Q. And why were you trying to tell him not to come over?

A. "Because -- I don't know. I started just -- it was late already, and I don't know, I started having doubts."

Q. Okay. Well, ma'am, you -- you were told by Mr. Farren to lie about all of that, but that's what you testified to?

A. But I'm telling you that like what I was talking about is, I left him a voicemail at one point to not come over, whenever I did call back and his

voicemail picked up. And that voicemail is the one deleted.

On the discovery that I have, there is two calls from me, not three. So there's that issue.

Q. Well, maybe -- maybe I'm confused. Can you -- can you tell me what the significance of the difference is?

A. Yeah. The significance of the difference -- I mean, I don't know that it's that big of a deal --

THE REPORTER: Okay. You're going to have to slow down. I can't take it.

A. Okay. I don't know what the significance or whatever is. I'm not a lawyer. But at the same time what I'm telling you is, I left a voicemail at one point for him not to come over.

Whenever we got discovery after 14 years of this case, I'm looking at my discovery for the first time ever, and I realize the call that -- the third call that I made telling him not to come over, is the one that is not there in discovery. It's missing conveniently. But the other two calls are there. You can hear my voice on the tape.

You are looking at me confused, but go back to the discovery. I mean, it's in your office somewhere. You've had it this whole time.

Q. Okay. You -- you did -- were allowed to convey to the jury this idea that you tried to call Dustin Pool and tell him, don't come over?

A. I don't know that I was allowed to. I got it in --

Q. Well, you did.

A. -- kind of just like I do --

Q. You were asked about it and you answered.

A. Yeah.

MR. WOOLDRIDGE: Objection, argumentative.

THE COURT: Overruled.

Q. (BY MR. BLOUNT) You -- you -- you allege in your writ affidavits that James Farren coerced you into -- into saying that -- or omitting -- I'm sorry -- omitting that in addition to Craig Kimberlin, Laura Hamilton and Mark Brown also suggested that you go to Dallas. Right?

A. Farren was told by Miner we couldn't talk about her.

Q. I'm sorry?

A. James Farren was told by Judge Miner we couldn't mention Laura's name. That's what he told me.

Q. All right. Judge Miner told James Farren that you couldn't talk --

A. That's what Farren told me.
Q. That's what Farren told you?
A. Yeah. Farren actually tried to get her name in and they -- he wouldn't allow it.
Q. Whose name?
A. Laura Hamilton.
Q. Laura Hamilton.
A. We couldn't -- they struck it from the recording.
Q. All right. Well, if James Farren tried to get it in and Judge Miner struck it, how is it that you accuse James Farren of trying to get you to perjure yourself?
A. Because he told me -- he's the one that told me not to mention her name, even though she's a factor in that -- in my case. Like she was my first lawyer, and she did tell me to go to Dallas. And he said we can't talk about it. I didn't get to hear that from the Judge. I heard it from Farren.
Q. Okay. Well, then, let's -- let's talk about -- you find that significant because you believe Farren wanted the jury to believe that it was only Craig Kimberlin who wanted you to go to Dallas?
A. Reword -- reword -- what?
Q. Okay. You -- you believe that James Farren

was trying to get you to omit that information because he wanted to make it seem as though it was only Craig Kimberlin who wanted you to go out of town to Dallas?

A. Right.

Q. Okay. You did have Laura Hamilton -- well, she was never your lawyer, was you?

A. She was.

Q. Okay. She was your lawyer. And did you hire her?

A. I did not.

Q. You did not. Who -- who did?

A. I'm not sure. I was told Bledsoe, but I don't know that for sure. Guin Garcia told me it was Josh Bledsoe. I don't know. But yet Craig Kimberlin knew -- the day I fired her, Kimberlin knew within seconds that I fired her. So, obviously -- I mean, he knew every little thing that was going on. So I'm wondering if he didn't hire her, because why would she tell him everything about --

Q. Okay.

A. It's -- it's a -- I don't know the answer to that question.

Q. Well, you believed that she was telling you to go out of town at the behest of -- of either Bledsoe or Kimberlin?

A. Correct.

Q. Okay. The -- the -- the folks that were trying to hiding the death of Dustin Pool and their participation in it?

A. Who's that?

Q. Well, Kimberlin and Bledsoe.

A. Possibly.

Q. Well, Kimberlin had already talked to you about what -- what you should tell the police. Right?

A. Right. But then Mark Brown was telling me my life was in danger. But if --

Q. Did you have reason to believe that that was not true?

A. I mean -- well, if -- if the most dangerous person -- I mean, y'all took him to trial for capital, Josh, Michael, and Frank. Y'all have them in y'all's custody at one point and still telling me I'm in danger. Well, they're in your custody, why am I in danger at that point then, unless there's somebody else involved?

Because at one point, they were all three locked up when I moved to Midland even and I was told that -- that my life was in danger. So it's very confusing to me.

Q. Okay. You -- you also allege that James Farren wanted you to -- I'm not sure -- I'm not sure I'm

reading it right. But this bit about the blood on the poker and damage to the poker.

Are you familiar with your allegation in that regard from your writ affidavits?

A. Yeah. I'm trying to remember my writ -- all my writ affidavits. There's a lot of appendices attached. I don't remember verbiage word for word, but...

Q. Well, I'm talking about your writ affidavit, the one that accuses James Farren --

A. Yeah, I know which one you are talking about.

Q. Okay. Well, what did you -- what did you have to say in regards to the -- to the blood on the poker and the damage to the poker?

A. I mean, I said I wiped it -- I wiped it down.

Q. Well, but --

A. And we took it with us. Even though they -- trial testimony later on in -- the jury and out to the media, it was said that he was beat all night with a fireplace poker, which is an impossibility. If me and Michael took it out of the apartment and my involvement was 40 minutes, then how he was beat all night with it, I don't even know. But it was told to the media and it was told to the jury, so there's that issue.

I read numerous articles that -- that

said he was beat with that poker all night, even though me and Michael had taken it out of the apartment. So that's kind of confusing to me.

Q. Well, what did James Farren coerce you into saying or not saying about the fireplace poker?

A. Because I don't remember there being blood on it to begin with whenever I first --

Q. That's not my question.

A. Okay. Then I don't know what you are asking me.

Q. Well, it's your writ affidavit and it's your allegations.

What did you allege James Farren coerced you into lying about or omitting about the fireplace poker?

A. I don't know how to answer that question. I don't.

MR. BLOUNT: Do you have the writ affidavit?

(Pausing)

Q. (BY MR. BLOUNT) Ma'am, I'm looking at your writ affidavit, State's Exhibit Number 28, that was attached to your writ.

A. I get that.

Q. I testified as instructed by James Farren and

10:16AM Jeremy Fowler. Specifically, I was instructed to testify that neither the -- the -- the agreement or the use immunity --

10:16AM A. Uh-huh.

10:16AM Q. I was also instructed to say falsely --

10:16AM I'm sorry. I'm at the wrong page then. One second, please. This is what I'm looking for. Okay. All right.

10:16AM I'm sorry. The writ -- writ affidavit that you had provided for this particular writ, the Stocker writ. Okay. In it you say, I was also instructed to omit certain information such as, I was instructed by Detective Mark Brown and Attorney Laura Hamilton to leave Amarillo for Dallas for your safety so that it was -- appeared my departure for Dallas was purely at the behest of Craig Kimberlin?

10:17AM A. Uh-huh.

10:17AM Q. You talk about Joshua -- that Joshua Stocker wanted you to get Dustin Pool to your apartment so he could be confronted. They were supposed to go out in the yard and fight. And you talk about the last call to Dustin Pool, the gun.

10:17AM A. Uh-huh.

10:17AM Q. That Dustin Pool was a snitch?

10:17AM A. Uh-huh.

10:17AM Q. Or that the fireplace poker I took out of the apartment alleged to have been used to strike Dustin Pool, had no blood or damage.

10:18AM A. Right.

10:18AM Q. Okay. So are you telling this Court that James Farren -- well, what -- how did James Farren coerce you into saying anything or not saying anything about the fireplace poker?

10:18AM A. Because I kept saying I wiped it down like for fingerprints and stuff. Like I wiped it off so my prints wouldn't be on it or whatever, because I didn't know what he was hit with. I didn't see him get hit.

10:18AM And then whenever Fowler kept pressing me, him and Farren, about there was blood on the poker. There was blood on the poker. And I said there wasn't blood, they kept pressing me about there was blood on the poker.

10:18AM Q. So you --

10:18AM A. And I have no attorney at that point, mind you, not technically. I mean, I'm in Farren's office by myself, no attorney, with all of them. Meaning, Gil Farren, James Fowler, Fowler and Ledbetter and no lawyer.

10:18AM Q. Okay.

10:18AM A. I'm 24. It's my first time to even be

10:18AM arrested ever in my life. That's pretty intimidating.
10:19AM Q. So you are saying that James Farren and Jeremy Fowler coerced you into saying that the fireplace poker had blood on it?
10:19AM A. Correct.
10:19AM Q. And -- and when did you testify about that?
10:19AM A. I don't know when I testified about that. It's in the transcript somewhere. This has been 15 years ago or so.
10:19AM Q. Well, you would agree with me that the statement that you gave to Mark Brown, long before you met Farren, doesn't mention any blood on the fireplace poker?
10:19AM A. The statement I gave to Mark Brown was a lie that Craig Kimberlin told me to say. He had a conversation with me and Guin, and we -- we did a statement, according to what he told us to write. And I -- I have testified to that exactly -- about that statement being a lie. Yes. It's in a transcript somewhere. The statement to Mark Brown is a lie.
10:20AM Q. So you were coerced by James Farren and by Jeremy -- and/or Fowler to testify that the blood -- that there was blood on the fireplace poker. Is that what you are saying?
10:21AM A. Correct.

10:21AM MR. BLOUNT: Approach the witness?
10:21AM THE COURT: You may.
10:21AM Q. (BY MR. BLOUNT) I'm going to hand you what's been introduced into evidence as State's Exhibit 14, as a part of your testimony of the Josh Stocker trial.
10:21AM A. Okay.
10:21AM Q. On page 147, line 7.
10:21AM A. Uh-huh.
10:21AM Q. Jeremy Fowler asked you, "Can you kind of describe or show with your fingers what the tip or the end of the fireplace poker looked like?"
10:22AM And what was your answer?
10:22AM A. "It's hard to tell. It was black."
10:22AM Q. And he said, "Okay".
10:22AM A. Uh-huh.
10:22AM Q. And then what did you say? That -- I mean, that's not even a question, but then you went onto add what?
10:22AM A. Right. But this is all in trial. Right?
10:22AM Q. This is --
10:22AM A. I'm talking about -- we had already gone over this trial before in his office -- in their office.
10:22AM Q. I understand.
10:22AM A. That's what I'm telling you.
10:22AM Q. Okay.

A. So I'm doing what I'm told to do at this point. You understand that. Right?

Q. You were told by Farren and Fowler that they wanted you to testify that there was blood on the poker?

A. Yes. Correct.

Q. Did they solicit that testimony from you at trial?

A. Obviously.

Q. Ma'am -- no, ma'am, it's not obvious.

MR. WOOLDRIDGE: Objection, argumentative.

A. I mean, it is on line 12. I said, I mean, when we wiped it off, there was a little bit of blood. Right?

Q. But were you asked to describe that?

A. Not in trial, but we already talked about this in their office where I was told what to testify to. If I didn't, then I was going to have to go to trial on a -- on a capital charge with no attorney, because he reminded me of all of my rights I waived in my use immunity agreement as we talked about yesterday. So it's the same answer.

Q. Your -- your answer during the trial?

A. Was that it had a little blood on it.

Q. Okay. And as soon as you mentioned there was

10:23AM a little bit of blood on the -- you were cut off, weren't you?
10:23AM A. Uh-huh. Yeah.
10:23AM Q. By Mr. Fowler. He cut you off?
10:23AM A. He does that a lot.
10:23AM Q. Well, he did it here -- he cut you off from talking about any blood on the poker. And said, "Okay. And can you show for the jury with your fingers. Was it crooked, was it straight, how was it?"
10:24AM A. Right.
10:24AM Q. Now, Fowler and Farren had met with you --
10:24AM A. Uh-huh.
10:24AM Q. 20 times --
10:24AM A. Yep.
10:24AM Q. -- before your testimony so that you could get this right. And one of the things they wanted you to get was there's blood on this poker?
10:24AM A. Right.
10:24AM Q. But when you brought it up, Fowler just cut you off and goes onto something else?
10:24AM A. I agree with you. That's a question for Fowler.
10:24AM Q. You were told by Farren and Fowler, don't mention he's a snitch, don't do that. Right?
10:24AM A. They just didn't want to bring it out in

court. I don't know why.

Q. They didn't want to bring it out in court because it didn't what -- it didn't fit with their script?

A. No, Farren said they didn't want to bring it out because they weren't going to talk about -- bad about the victim.

Q. They weren't going to --

A. He said that there was no reason to talk bad about the victim. They weren't going to bash the victim is what he said.

Q. Now, you wanted to talk about that? You wanted to talk about him being a snitch?

A. I don't remember what the context of our conversation was that that was important at that time.

Q. It was important?

A. I don't remember what the context of the conversation at that time -- what was it, 15 years ago?

Q. Well, ma'am, your memory is pretty clear about some --

A. Well, it is. It's a pretty traumatic event. A murder is a pretty traumatic event.

Q. At any rate, in your -- in your statements or what you told Jennifer Vest or Jeremy Patrick or Mark Brown or in your nine-page-detailed affidavit given at

the jail in 2003 --
A. Uh-huh.
Q. -- did you say anything about him being a snitch?
A. No. I don't remember what we were talking about that would have been important at that point to mention that he was a snitch. I don't remember what was asked of me.
Q. Well, let's talk about the nine-page-detailed affidavit you gave at the jail --
A. Okay.
Q. -- that you've testified already was not coerced out of you, that it's the truth.
A. Right.
Q. Right?
A. Okay.
Q. Did you mention in that statement that he's a snitch?
A. No.
Q. Okay. And you say that -- nevertheless, James Farren wanted to make sure that you didn't talk about him being a snitch when you testified at the Josh Stocker trial?
A. Because that statement that was given was me and Bobbie typing it out. Remember that? All day --

10:26AM Farren wasn't there all day, he didn't hang out all day long, but as time went on --

10:26AM MR. BLOUNT: Objection to nonresponsive, Your Honor.

10:26AM THE COURT: It is. Sustained.

10:26AM Q. (BY MR. BLOUNT) My question, ma'am, is, James Farren and Jeremy Fowler told you, don't talk about him being a snitch in trial?

10:26AM A. Correct.

10:26AM Q. Because that didn't fit in with their agenda?

10:27AM A. I guess not. I mean, you will have to ask them that question. I don't know what their agenda was.

10:27AM Q. Okay. Have you -- now, you -- you keep talking about you've finally gotten discovery in your case.

10:27AM A. Uh-huh.

10:27AM Q. You worked for Mr. Wooldridge for a while. Right?

10:27AM A. Uh-huh. Yeah. And that's when I got discovery.

10:27AM Q. You helped him prepare your writ -- your writ. Right?

10:27AM A. Right.

10:27AM Q. Have you ever looked over the transcripts of the Joshua Stocker trial?

10:27AM A. I've looked over everything that I'm allowed to look at.
10:27AM Q. Which you were allowed to look at the trial transcript?
10:27AM A. Correct. Some of it, yes. What I've got -- what we've gotten.
10:27AM Q. Well, have you gotten the trial transcript --
10:27AM A. Yes, I've --
10:27AM Q. -- from the Joshua --
10:27AM A. -- looked at it.
10:27AM Q. Including the Josh Bledsoe testimony?
10:27AM A. No, I haven't seen Bledsoe's testimony.
10:27AM Q. Well, let me ask you this. Based on what you've alleged in regards to Mr. Farren and -- and Mr. -- and now Judge Fowler concerning this idea that they didn't want you to testify that he was a snitch, would it surprise you at all that testimony was solicited from Josh Bledsoe that Dustin Pool was thought to be a snitch? Jessica Kimberlin, that he thought to be a snitch? That through Jessica Kimberlin, her husband, Craig, thought he was a snitch? Jason Hickson thought he was a snitch?
10:28AM A. I am just telling you what I was told was that we weren't going to talk bad about the victim. That's all I know.

Q. I understand that.
A. I can't answer for why they testified to that and it was allowed -- you would have to ask your office. I don't know.
Q. But -- okay. But if you were told -- strong-armed into not testifying about him being a snitch, wouldn't it kind of surprise you that -- that that testimony was put in by the State through these other witnesses during the trial?
A. Honestly in this case nothing surprises me.
Q. That's your answer?
A. That's my answer.
Q. All right. By the way, your -- you had your writ hearing. Correct?
A. My writ hearing?
Q. Yes. Your writ was presented to the --
A. No, not really it wasn't. We presented it and he kind of threw it to the side and I got sentenced.
THE WITNESS: Is that not what happened, Mr. Wooldridge?
Q. (BY MR. BLOUNT) I'm -- I'm asking you, ma'am.
A. Well, I don't really know the answer to that. My lawyer is right there.
I don't remember having an actual hearing about my writ, no, I don't.

Q. Were you present when it was -- when it was presented?
A. I was present when my lawyer gave it to the Court, yes.
Q. Were you present in front of Judge Ed Self --
A. Yeah, and he stood me up and sentenced me like directly afterwards, yes.
Q. Did he have your writ?
A. Yes.
Q. Did he rule on your writ?
A. He didn't read it, but he ruled on it, yes.
MR. BLOUNT: What number would the next one be?
THE REPORTER: 34.
MR. BLOUNT: 34.
Q. (BY MR. BLOUNT) Now, I'm -- I'm going to show you what I've marked as State's Exhibit Number 34. Have you ever seen this document?
A. Yeah, I have.
Q. You have seen it?
A. I have.
Q. Isn't that the order Judge Self entered in regards to your writ?
A. Yes, that's not -- I'm not disputing that fact.

Q. Okay. All right. And --
A. But I'm just saying we didn't have a hearing about it. We didn't get to argue anything or present any evidence at all.
Q. Okay. His order is one -- one sentence.
A. Denied.
Q. Well, it's more than that.
A. As frivolous. But he didn't ever read it, so that's kind of...
MR. BLOUNT: Offer State's Exhibit 34.
THE WITNESS: Like I said, nothing surprises me in this case.
MR. WOOLDRIDGE: No objection.
THE COURT: 34 is admitted.
Q. (BY MR. BLOUNT) Were you tendered as a witness at that writ hearing?
A. Not that I'm aware of. I don't remember having a hearing over it, I'm telling you. I came in and he pretty much sentenced me. That's pretty much it. I don't --
Q. So you were not subjected to cross-examination?
A. No, I never moved from the defendant's table, as I recall.
Q. In regards to these allegations that you've

made concerning Mr. Farren and Mr. Fowler, have you -- you expected to make millions of dollars off of this, didn't you?

A. No, I don't care about that.

Q. Really?

A. No, I don't. I wouldn't of -- if you're -- my whole deal is it's what you can live with. Y'all used me to put somebody away for 100 years on something that y'all don't even have evidence on, because I didn't ever have my discovery. That's just the facts of it.

If we need to redo trial, then whatever. It's needs to be redone or whatever. But something needs to happen, because it needs to be fixed. It's not right.

I mean, this is not the only life we live, you know. Like I said, it's what you can live with.

MR. BLOUNT: What was that one?

MR. LOVE: 34. So 35 is next.

THE WITNESS: I would have dropped suit if they ever agreed to let Josh go, but that's never been offered.

MR. BLOUNT: Approach the witness?

THE COURT: You may.

Q. (BY MR. BLOUNT) I show you what I have marked

as State's Exhibit 35. Do you recognize that document?
A. Yeah, I do. I know what that is.
Q. Did it demand $37 million from the Randall County --
A. That's not because I asked for that. That's what my lawyer that -- they did this letter --
Q. On your behalf?
A. It did. But I would have settled for nothing if I would have just got it right with Josh's case.
MR. BLOUNT: Submit Number 35.
THE WITNESS: And it was on both of our behaves.
MR. WOOLDRIDGE: No objection.
THE COURT: Number 35 is admitted.
Q. (BY MR. BLOUNT) Did you ever talk to Josh Stocker about houses in Breckenridge, Colorado?
A. Oh, we talked about Breckenridge. That was his favorite place. He likes Colorado. That was just a conversation we had.
Q. Sodena?
A. Yeah. I don't understand the relevance of any of it, but whatever. It was just conversational. Something to talk about, instead of talking about being in jail where he's been for the last 15 years.
Q. Wasn't it -- isn't it a fact, ma'am, that you

10:33AM talked to him about what y'all were going to do with the money you were going --

10:33AM A. We talked about leaving the state, yeah, we did talk about that.

10:33AM Q. -- with the money that y'all were going to make from all of these lawsuits?

10:34AM A. I don't know that it was -- okay. Well, I don't know.

10:34AM Q. Excuse me?

10:34AM A. I don't know that it was a conversation like you are saying it is, but, you know, it doesn't matter. Whatever y'all say is always what it is, so it doesn't matter. I don't even know why you asked me. It's going to be whatever you want it to be anyways.

10:34AM Q. Did you have conversations with Josh Stocker about buying a million dollar house in Breckenridge?

10:34AM A. Not a million dollar house. We had conversations buying houses and getting out of Texas, yeah, we did have conversations about that, numerous conversations about leaving the state.

10:34AM Q. With the money that you were going to make off of your lawsuits?

10:34AM A. I just said if it went that way after that letter was done, I was going to leave Texas. Yes, I did say that. Still plan to leave Texas no matter what

happens. It's a joke.

Q. I'm going to talk to you for a minute about -- you already indicated that you told the truth to Judge Miner during your plea hearing. Right?

A. Yes.

Q. Ma'am, do you need a break? I mean, are you -- are you worn out?

A. No, my head just hurts.

Q. Okay. But do you remember Judge Miner during your plea hearing asking you, "Now, have you had plenty of time to go over the facts surrounding the information with Mr. Wooldridge"?

A. Okay. Yeah, then I lied at my plea hearing because, no, I didn't get time. I got five minutes with my lawyer. But if I would have said that, I already know what comes next, so what am I supposed to do? I mean, I really did get five minutes with my lawyer. That was it. And he had no discovery, like nine pages. Yeah, he did advise me not to plea, but I didn't listen because --

Q. We'll get to that in just a second.

A. Oh, okay. Please do.

Q. But let me ask my question one more time.

A. Okay.

Q. Did Judge Miner ask you, "Now, have you had

plenty of time to go over the facts surrounding the information with Mr. Wooldridge"?

A. Yes, he did.

Q. And your answer was what?

A. I don't have that in front of me.

Q. You don't recall it?

A. Well, I mean, I don't know what -- are you asking me verbatim? My answer was, yes, I did, I guess. But if you're asking me verbatim, I don't remember what I said specifically.

Q. Are you being as truthful with this Judge as you was to Judge Miner?

A. Yes, I'm being truthful.

Q. Well, you weren't -- just now you said that you did lie.

A. But I'm saying, I didn't get time with my attorney. But if I would have said that, I just know it would have just been a problem.

Q. Well, but you told Judge Miner that you'd had plenty of time to go over it with --

A. Because Farren is standing right there, and me and Farren had already worked this deal without any attorney.

Q. Okay.

A. So I'm not going to sit there and say that or

I'll lose my -- probably lose my deal that me and him worked out.

Q. Did Judge Miner ask you, "And have the -- the two of you been able to explore all possible defenses that you have --

A. Yes.

Q. -- to this information"?

A. Yes.

Q. And your answer was what?

A. "Yes."

Q. Do you remember Judge Miner asking Mr. Wooldridge, are you satisfied that, you, Ms. Patrick, are entering the plea knowingly and voluntarily?

A. Yes.

Q. And he said yes, he was?

A. Yes.

Q. Judge Miner asked you, and with all of the lawyers you've had, other than Mr. Dawson, have you had an opportunity to visit with them and talk with them about the facts surrounding your charge of capital murder and the current charge of kidnapping?

A. Yes.

Q. And you told him yes?

A. Yes.

10:38AM Q. And today you are saying that's a lie?
10:38AM A. Yes.
10:38AM Q. So you did lie to Judge Miner?
10:38AM A. I did, yeah.
10:38AM Q. And then he asked you, and you understand if you want to wait -- do you want to wait and talk to Mr. Robnett, when he becomes available? We would be willing to do that.
10:38AM Do you remember him telling you that?
10:38AM A. Yeah, I do.
10:38AM Q. And you said, yeah, I understand that?
10:38AM A. Yup.
10:38AM Q. So your -- this is your choice --
10:38AM A. Right.
10:38AM Q. -- to go ahead with Mr. Wooldridge as your attorney on this case?
10:38AM Your answer was what?
10:38AM A. "Yes."
10:38AM Q. Did Mr. Farren ask you some questions during that plea hearing?
10:38AM A. Yes, I believe he did.
10:38AM Q. Do you remember him asking you, and from the beginning you've known that our intent was that if you cooperated, eventually we would offer you a plea bargain, a chance to plead, and that your cooperation

would help you. That you would be better off working with us and helping us bring these people to justice, than you would be if you didn't cooperate with us?

And your answer was what?

A. Yes.

And that was from the beginning he said that. Right? Yeah.

Q. And then he asked you, "But we never made you any direct promises as to what the final plea offer would be. Is that right"?

And your answer was what?

A. It was yes. But --

Q. And -- I'm sorry, ma'am.

A. Okay.

Q. You've answered --

A. Sorry.

Q. -- my question. Okay?

A. Okay.

Q. Thank you.

A. You're welcome.

Q. Question by Mr. Farren, "And only after the trial of Mr. Chacon, did -- were you informed that we were going to offer you 10 years deferred on kidnapping"?

Your answer was what?

A. Probably it was yes.
Q. And Mr. Wooldridge was allowed to ask you some questions and he asked you whether -- or he said he had reviewed some documents on this and explained to you there were some options available to you, and you said yes?
A. Uh-huh.
Q. Do you remember that?
A. Yes.
Q. And he told you that he would be willing to pursue those options with you. And you said, yes, sir, I --
A. Yeah.
Q. Okay.
A. Yes.
Q. But you had essentially worked out this deal and you wanted the Court to approve the deal and move on. Isn't that right?
A. Yes.
Q. Yesterday I asked you about talking to your ex-husband, Jeremy Patrick?
A. Uh-huh.
Q. And I think your testimony was something about you didn't tell him all or what happened or not as much about what happened or something. I don't remember.

What was your answer?
A. Well, I talked to him because I needed to see if he could take my son for a little bit.
Q. Okay. But you told him about what happened?
A. Briefly.
Q. But you told him the truth about what happened?
A. No.
Q. No?
A. Well, he says that there was couches or something at my old apartment and the new couches were never at my old apartment, stuff like that. I don't know where he -- that's not -- I mean, that can be proven. So, I mean, there was a lot of lies he told. I don't really know.
Because the Warehouse Solutions thing showed they were delivered to my other apartment. Jeremy Patrick testified --
MR. BLOUNT: Object to nonresponsive, Your Honor.
THE COURT: Sustained.
Q. (BY MR. BLOUNT) Ms. Patrick --
A. Uh-huh.
Q. -- I -- Ms. Patrick, I'm going to hand you what I have marked as State's Exhibit Number 36. Take a

moment, if you -- if you need to. I'll represent to you that that is an -- is your testimony from the Michael Stocker trial.

A. Okay. What do you want me to --

Q. Just look through that and verify in your mind if that's what it is.

A. Well, it's kind of hard with my hands handcuffed to look through all of this.

Q. I can't do anything about that. That's up to the Court.

A. Well, I can't -- I'm -- I can't --

Q. You can't do it?

A. I don't have no movement hardly at all, so here.

MR. BLOUNT: I ask if the bailiff could help her, maybe.

A. It's kind of frustrating.

(Witness's handcuffs were removed)

A. Okay.

Q. You've had a chance -- does that appear to be the transcript of your testimony in the Michael Stocker trial?

A. Yes.

Q. I'm going to refer you to page 56.

THE REPORTER: Dave, turn on your mic,

please.

Q. (BY MR. BLOUNT) Refer you to page 56.

A. Okay.

Q. Were you asked about what you told Jeremy Patrick.

A. Okay.

Q. Line 8. Where you were asked, "What did you tell Jeremy Patrick"?

A. Right.

Q. Your answer was what?

A. "I told Jeremy Patrick the truth about what happened that night."

That's correct.

Q. Thank you, Ms. Patrick.

MR. BLOUNT: I offer State's Exhibit 36.

THE COURT: Mr. Blount, this is the Michael Stocker case?

MR. BLOUNT: Yes, sir.

MR. WOOLDRIDGE: No objection.

THE COURT: It is admitted.

Q. (BY MR. BLOUNT) Ms. Patrick, another one of the allegations you levied in your writ against James Farren and -- and/or Jeremy Fowler was that you were supposed to lie or omit information concerning you knew Dustin Pool carried a gun and pulled it out when

confronted by the Stockers and it was taken away from him. Is that right?

A. Dustin carried -- always carried a gun, yes, especially during that time. They --

Q. Well, did you see him with a gun?

A. He had a gun on him that night, yes.

Q. That night?

A. Uh-huh.

Q. Did you see him pull it out?

A. He sat it down on the table at one point, not pull it on someone though.

Q. I'm sorry?

A. I didn't see him pull it on someone. He set it on a table.

Q. Okay. All right. So --

A. When he sat down.

Q. Okay. Because after he got there -- when you let him in the apartment, while the Stockers were hiding, he sat -- first sat down on a couch?

A. Uh-huh.

Q. And you sat down, love seat or couch, one of the two --

A. On the couch. He was on the love seat.

Q. Y'all visited for a brief time?

A. He was on the phone, but, yeah.

Q. And then he had a phone call, he got up and started walking around the kitchen maybe?

A. Uh-huh.

Q. Okay. So you are saying before he got up and walked towards the kitchen, he had already pulled his gun out and put it on your coffee table?

A. When he sat down, he pulled it out and set it on the table, I guess, to sit down. When he stood up, it went back up into his waistband.

Q. Okay. So when he stood up and began -- and went towards the kitchen, he had picked it back up?

A. Uh-huh.

Q. And put it in his waistband?

A. Right. Where he kept it or whatever.

Q. Now, when you --

A. Most people don't leave their gun laying around.

THE COURT: I'm sorry. You're mumbling. If you would speak up a little louder, I would appreciate it.

THE WITNESS: I'm sorry. I said that most people don't leave their gun just laying around. If they walk off, they usually take it with them.

Q. (BY MR. BLOUNT) Well, regardless of what most people do, your testimony here today is, is that when he

10:50AM stood up and walked towards the kitchen, he had picked it back up --
10:50AM A. Right.
10:50AM Q. -- and put it in his waistband?
10:50AM A. Right.
10:50AM Q. Okay. Now, when he walked towards the hallway --
10:50AM A. Uh-huh.
10:50AM Q. -- back towards where the bathroom is and the bedrooms, I assume, were back there as well?
10:51AM A. Right.
10:51AM Q. Because this hallway led to the bathroom and bedroom?
10:51AM A. Yes.
10:51AM Q. And there was a hall closet as well?
10:51AM A. The hall closet -- there's not a hall closet. The closet for -- is in the living room by the kitchen.
10:51AM Q. All right. Okay. Well, so when he began to walk down the hall -- or towards the hall --
10:51AM A. Towards the hall.
10:51AM Q. -- that's when the Stockers came out?
10:51AM A. They blocked him from the hallway, yes.
10:51AM Q. And Michael had the shotgun and Josh had the fireplace poker?
10:51AM A. Correct.

10:51AM Q. Okay. And you were behind Dustin Pool?
10:51AM A. Uh-huh.
10:51AM Q. Did you see him pull a gun?
10:51AM A. I was behind him so I didn't see.
10:51AM Q. You didn't -- okay. But even though you were standing behind him --
10:51AM A. It happened very fast though when I was in the bathroom, I guess.
10:51AM Q. So your --
10:51AM A. I just got out of the way.
10:51AM Q. So your testimony is you did not see him pull a gun?
10:51AM A. Not on anybody, no.
10:51AM Q. Well, did you see him pull the gun out in the hallway as he was approaching the hallway?
10:51AM A. I didn't -- I couldn't see.
10:52AM Q. I understand. So then your answer is you didn't --
10:52AM A. Then I -- then, no, I didn't because I'm standing behind him.
10:52AM Q. Thank you.
10:52AM And then you were motioned by Josh or told by Josh to come towards him, and then he puts his hand in the small of your back and pushed you towards the bathroom?

A. Right, just to get me out of the way.
Q. All right. And as you're passing Dustin Pool, did you see a -- see the gun at all?
A. No, I didn't turn and look. I was just wanting out of the situation, so, no.
Q. I understand you didn't turn and look. So your answer is no?
A. Then my answer is no.
Q. You did not see it?
A. No.
Q. Okay. And then you went into the bathroom, the door was ajar, you sat on the rim of the bathtub and you heard some -- some things, but --
A. I heard them arguing.
Q. I'm sorry?
A. I heard like them arguing and scuffing like -- yeah.
Q. But you weren't able to see at that point?
A. They were off to my right too far.
Q. And then you heard someone get hit?
A. Yes.
Q. Okay. Then you -- then you went to the door and called Josh to come?
A. Uh-huh.
Q. Okay. And were you able to see Dustin Pool at

that point?
A. Not quite yet.
Q. When you were able to see Dustin Pool, did you see the gun?
A. No.
Q. Okay. All right. And in your statement to Mark Brown, the first one that you gave, you mentioned nothing about a gun?
A. That statement was -- was told by Craig for us to say, so I didn't --
MR. BLOUNT: Judge, that's non -- I'm going to object. Nonresponsible -- nonresponsive to my -- my question.
THE COURT: Sustained.
Q. (BY MR. BLOUNT) Ma'am, that means that -- please answer my question.
A. Well, answer the -- ask the question differently then.
Q. No, ma'am. I'm going to ask my question --
A. Well --
Q. -- the way I want to ask it, and I ask that you answer it.
A. Okay.
Q. Okay. All right. In your statement to Mark Brown, you did not mention anything about Dustin Pool

having a gun?

A. No.

Q. When you were arrested and at the Randall County Jail and represented by Jami Watson and deciding to cooperate so that it would help you, you spent hours and you signed a nine-page affidavit. Right?

A. Yes.

Q. Did you mention anywhere in that affidavit that Dustin Pool had a gun?

A. I don't remember. I know it's not in the typed version, but I mentioned it at one point and I was asked the same thing you are asking and -- because I -- no.

Q. Well, your -- your nine-page statement --

A. No. The answer is no.

Q. The answer is, no, you never mentioned it in your statement?

A. Not in a written statement, no -- or typed statement, whatever. We talked about it though.

Q. All right. So it is not in your written statement.

When you gave a two-page statement a year later with Jeff Robnett present, did you mention a gun?

A. Nope, not in the written statement.

Q. And, of course, you didn't say anything about

that at the -- during your testimony at the Josh Stocker trial, the Frank Chacon trial or the Michael Stocker trial?

A. It wasn't asked about.

Q. But you have decided that that is significant because that somehow means that Josh Stocker acted in self-defense?

A. I didn't say that.

Q. Well, I'm asking you. Why is it significant?

A. I don't know.

Q. You don't know?

A. I didn't type my writ statement. I signed it. That's what I said -- that's what I told my lawyer.

Q. I'm sorry. What did you tell your lawyer?

A. My writ statement --

Q. Yes.

A. -- that you are talking about, I didn't type it myself.

Q. But you signed it?

A. I did sign it, but I didn't type it. So I don't know what the relevance of whatever it is.

Q. And you swore --

A. That's not a question you need to ask me.

Q. And you swore to it?

A. Yes. But I couldn't tell you the relevance of

10:57AM it. I'm not a lawyer.

10:57AM Q. After the -- after your testimony in the Josh
10:57AM Stocker trial and after that trial was over with, you
10:57AM were arrested in October of 2005 in Potter County. Is
10:58AM that accurate?

10:58AM A. That's accurate.

10:58AM Q. And you remained in jail at least until
10:58AM November the 8th of 2005?

10:58AM A. Yes.

10:58AM Q. You had a bond hearing before Judge Miner down
10:58AM here in -- or in -- on the -- on your murder case?

10:58AM A. Correct.

10:58AM Q. Were you released on bond? Were you on bond
10:58AM when you went to that hearing?

10:58AM A. I was -- they transferred me to a rehab
10:58AM facility, Managed Care in Lubbock, from jail -- directly
10:58AM from jail.

10:58AM Q. All right. Well, when you -- when you had the
10:58AM hearing in front of Judge Miner, were you in custody?

10:58AM A. I don't remember. I think he let me out for
10:58AM -- he tried to let me out for the holiday, but I got
10:58AM repicked up, if I'm not mistaken. I wasn't out for
10:58AM days, I don't think. I got rearrested.

10:59AM Q. And you are aware that -- that you -- you made
10:59AM a number of jail -- or phone calls from the Potter

10:59AM County Jail --

10:59AM A. Yes.

10:59AM Q. -- during your incarceration?

10:59AM A. Yes.

10:59AM Q. And those calls were recorded?

10:59AM A. Yeah.

11:00AM THE COURT: Do you need some time, 11:00AM Mr. Blount?

11:00AM MR. BLOUNT: I'm sorry?

11:00AM THE COURT: Do you need some time.

11:00AM MR. BLOUNT: Judge, a 10-minute break 11:00AM would be good at this point. I'm getting very close to 11:00AM the end if that helps.

11:00AM THE COURT: A 10-minute break. Thank 11:16AM you.

11:16AM (Recess)

11:16AM (Open court, Applicant and Counsel 11:16AM Present)

11:16AM THE COURT: Thank you. You may be 11:16AM seated.

11:16AM Mr. Blount, you may resume.

11:16AM MR. BLOUNT: Thank you, Judge.

11:16AM Q. (BY MR. BLOUNT) Ms. Patrick --

11:16AM A. Yes, sir.

11:16AM Q. -- you were in the Potter County Jail October

the 27th of 2005?
A. Yes.
Q. And -- and you had a conversation with your father, a telephone conversation, that was recorded?
A. Uh-huh.
Q. And do you remember him talking to you about -- that he had talked to Jeff Robnett, and Robnett was willing to represent you on your new cases; the forgery and the -- I guess the fraudulent use or possession of identifying information?
A. Correct.
Q. But that he would want more money?
A. Yep.
Q. Do you remember your dad -- well -- well, do you remember telling your dad that if you -- that if he and your mother didn't bail you out, that you were probably going to sit there for years?
A. Yeah, I'm sure I said that.
Q. Okay. And your dad said, well, until Farren and them are through with you?
A. Right.
Q. And then told him that's why you wanted to see your son before you -- before you went --
A. Right.
Q. Because once you go before Farren, it's over

and you wanted to see Caden before then?
A. Right.
Q. Do you remember your dad saying to you, well, we'll see. It may not be over. Jeff was going to get you probation, but he told you -- and you said, no, he wasn't, Dad. And your dad said, what? And you said, he said that stuff was out the window a long time ago. Farren said that. Farren said that doesn't matter, none of that stuff -- he didn't sign nothing and Jeff has never shown me anything.
A. Right.
Q. So any deal you thought you might have had been revoked --
A. Because of that arrest.
Q. -- a long time before?
Well, you hadn't been in jail but a couple --
A. I went to jail and I went back to jail. There was two -- there was two arrests there in that. Yes, there is.
In October I got arrested for fraudulent possession of identifying information and forgery in '05, in October. I was released before the holiday and rearrested for the same thing because I failed a UA. And the Judge was going to let me out for the holiday

11:19AM and I did not make it, and he rearrested me. There are two separate arrests.

11:19AM Q. Nevertheless, you made the statement to your father that --

11:19AM A. Correct.

11:19AM Q. -- Farren had told you a long time before, any deal is gone?

11:19AM A. Correct.

11:19AM Q. You did make that statement?

11:19AM A. Okay. Correct.

11:19AM Q. Now, Vaavia Edwards represented you on the forgery and the other Potter County case?

11:19AM A. Yeah. She was court-appointed.

11:19AM Q. And she was going to help y'all on a custody matter, you and -- you and your folks --

11:20AM A. Uh-huh.

11:20AM Q. -- in the event that you went to prison?

11:20AM A. Correct.

11:20AM Q. And she went and looked at the murder case or -- or found out some information about it?

11:20AM A. I guess.

11:20AM Q. Well, do you remember talking to your mom on December the 6th of 2005, while you were in jail, talking about the custody case and Vaavia was going to handle it?

11:20AM A. Vaguely. I mean, yes.
11:20AM Q. Do you remember telling your mom, Vaavia has looked into it a little bit -- into that case. And she said, I don't see any way you don't do some time?
11:20AM A. Vaguely, I remember it. It was 13 years ago.
11:20AM Q. And you said, well -- you said, yeah, I don't either. So I probably will do some time, but -- which I've known?
11:20AM A. Right.
11:20AM Q. Do you remember talking to your -- your mom while you were in jail, November 2nd, 2005, and your mom telling you that your dad had talked to Jeff Robnett and the information concerning the check case was sent to him -- talking about the forgery, what you were in jail for -- and he wants to know if you want to hire him. And your dad told him that you have a court-appointed attorney.
11:21AM Do you remember a conversation along those lines?
11:21AM A. Yeah, vaguely.
11:21AM Q. Okay. And then you told her, your mom, that she, Vaavia, is better than Robnett, because you haven't seen him do nothing?
11:21AM A. Correct.
11:21AM Q. Okay. That Vaavia is going to call Jeff and

see what the deal was. And your dad telling you, Vaavia is not going to plead you on the original case. That's Jeff's job?

A. Correct.

Q. And you said, I know.

A. (Moving head up and down).

Q. From -- from around the time that your writ was filed around -- somewhere around April 2016?

A. That sounds about right.

Q. About right?

Continuing for the next year or so, September of 2018 -- the next two years, you engaged in hundreds of phone calls with Josh Stocker.

A. That's probably true.

Q. Well, it is true, isn't it?

A. Okay. Yes.

Q. Okay. And you've talked here yesterday primarily about drones flying over your house, about Dodge Chargers --

A. Uh-huh.

Q. -- running you off the road, all this harassment --

A. Uh-huh.

Q. -- and these conspiracies, and Farren is behind all of it, isn't he?

11:23AM A. I wouldn't call it a conspiracy.
11:23AM Q. You wouldn't call it a conspiracy?
11:23AM A. No, it's not a conspiracy. Isn't that like a theory? I mean, I'm telling you that's fact.
11:23AM Q. Oh, no, no. When I say a conspiracy, I mean a group of --
11:23AM A. Okay.
11:23AM Q. Like Farren is pulling the strings.
11:23AM A. Okay.
11:23AM Q. You agree --
11:23AM A. Yeah. Yeah, I agree with you.
11:23AM Q. Okay. And you believe others are involved in these conspiracies against you, don't you?
11:23AM A. True.
11:23AM Q. Who else?
11:23AM A. APD for one.
11:23AM Q. How about Four Price?
11:23AM A. I think it's a possibility. We've talked about that, yeah. I think it goes all the way down. I think there's corruption all the way down to the -- yeah.
11:24AM Q. You've made the allegation --
11:24AM A. I have.
11:24AM Q. -- that Four Price conspired and took a payoff -- a hundred million dollars with Farren to --

A. I didn't --
Q. -- bury Cason (phonetic)?
A. I didn't say no hundred million dollars.
Q. I'm sorry?
A. I didn't say a hundred million dollars or whatever you are talking about.
I said it's corrupt all the way down to the state senate. It is. I've made that comment before.
Q. Your investigator, Bruce Tiffin, tried to kidnap your lawyer. You had to fire him?
Have you ever made that statement?
A. I don't know -- he was fired, yes.
Q. Because he tried to kidnap somebody?
A. There was a situation that was weird, yes.
Q. He tried to kidnap somebody? Bruce Tiffin, the former bailiff for Judge Anderson?
A. There was a weird situation, yes. There was a weird situation.
Q. Did -- did you tell Josh Stocker that Bruce Tiffin shook down a rookie near your house who told him that he had been paid $11,000. That Farren had issued a shoot-to-kill order on you. And if you were caught outside of your house smoking a cigarette and felt threatened, they could just go ahead and shoot you?

A. Tiffin had mentioned that -- yes, Tiffin mentioned something to that effect to me, yes, about a standoff and everything. Yes.

Q. Did you tell Josh Stocker you are going to go after --

A. I'm sure I did.

Q. -- that you are going to go after cops and Farren individually? You are going to sue the cops individually, because that will keep them from buying a house and you -- it will make their lives miserable?

A. I'm sure I did, because it was my life that was miserable when they were blocking my driveway and all of the stuff they were pulling at my parents' house.

Q. Did you tell Josh Stocker that Hal Miner was corrupt and that --

A. Yep.

Q. You did?

A. I did.

Q. And you told -- told him that Hal Miner over -- overdosed -- died of a cocaine overdose in New York City?

A. That's what I heard.

Q. Well, that's what you told him?

A. That's what I told him.

Q. And you told him the rumor was, Bill Redden

11:26AM was in New York City at the same time?

11:26AM A. That's what I heard. That's what I told him.

11:26AM Q. You heard that from a reputable, credible source?

11:26AM A. I didn't say that. I said I heard that.

11:26AM Q. Okay. In 2011, were you on life support for taking cocaine and gun powder?

11:26AM A. I was in the hospital, yes.

11:26AM Q. From taking cocaine and gun powder?

11:26AM A. Yes, sir. I tried to kill myself that year.

11:26AM Q. In a phone call that you conducted with Josh Stocker on June the 17th of 2016 -- and it's the same conversation in which you told him that in 2011, you were on life support for taking cocaine and gun powder --

11:27AM A. I had like tubes in me, yeah.

11:27AM Q. Okay. At -- at the 8 minute and 41 second mark, do you recall telling Josh Stocker -- well, he questioned you about -- let me see if I get this right.

11:27AM Because you and Guin -- y'all had this use immunity agreement at trial and Farren said you didn't have the agreement, that's what's going to get him out of prison. And you said, well, both of us said it. That's what I'm telling you. I'm sorry from the beginning, because I didn't know that -- I didn't even

know what that meant.

A. Correct.

Q. You didn't know what that meant when they were asking you about a use immunity agreement?

A. Correct. That was the --

Q. Okay. That answers that -- that answers my question.

A. Okay.

MR. WOOLDRIDGE: Objection to sidebar.

THE COURT: Overruled.

MR. BLOUNT: Well, Judge, I don't know how to stop her.

THE COURT: Overruled.

MR. BLOUNT: I mean -- okay.

Q. (BY MR. BLOUNT) Did you tell Josh Stocker on another occasion that the medical examiner in this case took a payoff?

A. Correct.

Q. And as recently as 2016, in phone calls with Josh Stocker, you know what you saw, which was he had a fireplace poker, and then you saw blood on the wall?

A. Yes.

Q. And you knew that wasn't caused by a glove?

A. Yes.

Q. You also told Josh Stocker in a phone call

that after -- when you went back to your apartment, eventually you found one of his shirts and that it had a lot of blood on it.

Do you remember that?

A. I don't remember that, but...

Q. In a phone call --

A. I think I said I found a shirt, yeah. I found a shirt at one point. I don't know that I knew whose it was for sure, but I didn't know who was at my apartment since it was different when I went back.

Q. In a phone call on June the 18th, 2016 --

A. Uh-huh.

Q. -- a recorded phone call, at the 1743 mark, do you remember telling him, Josh Stocker, the only thing I do know when you -- when you came back -- because I ended up with one of your shirts later. I didn't even know that I had that, but you had blood on you, quite a bit. And that's the only thing. And he says, well -- and then you say, but I mean, you are beating on him. If you beat him up, then that makes sense, which I'm positive you done that. But that's different. That's an assault case versus a murder case?

Do you remember that?

A. I'm sure I did. I mean, I don't remember. It was two years ago, but I'm sure -- I mean, yes. I don't

11:30AM know how to answer that question. Yes.
11:30AM Q. Okay. Oh, by the way, do you know where six bodies are buried on Gordon Cummings Road?
11:30AM A. No. I've heard some rumors about --
11:30AM Q. Have you ever made that statement that you know where six bodies are buried?
11:30AM A. I've made a statement about I've been -- I know some information about some stuff that I've been told that's weird.
11:30AM Q. Did you ever pass that onto law enforcement?
11:30AM A. No.
11:30AM Q. Okay. And do you -- do you know whether or not Sherry Mondragon was wrapped in an Oriental rug that that --
11:31AM A. I just know what the news has talked about.
11:31AM Q. Okay.
11:31AM A. And then whatever I was told by that same person about the other incident, which is not a credible source.
11:31AM MR. BLOUNT: Pass the witness.
11:31AM A. Okay.
11:31AM THE COURT: Don't -- don't mumble, please.
11:31AM THE WITNESS: All right.
11:31AM MR. BLOUNT: Pass the witness.

THE COURT: I need to instruct you again.

MR. BLOUNT: Oh, I'm sorry.

THE COURT: I haven't instructed you yet, but listen to the question that's asked and then make a direct answer and don't try to explain it or anything like that.

THE WITNESS: Okay.

THE COURT: Okay. Thank you.

MR. BLOUNT: Offer State's Exhibit 37, from the Sheriff's Department of Potter County indicating the times that she was incarcerated in Potter County on those charges.

THE COURT: Any objection, Mr. Wooldridge?

MR. WOOLDRIDGE: No objection.

THE COURT: It's admitted.

MR. BLOUNT: Pass the witness.

THE COURT: You may redirect.

REDIRECT EXAMINATION

BY MR. WOOLDRIDGE:

Q. Where on Dustin Pool's head was the wound initially inflicted?

A. On the left side of the head.

Q. Not on the right side?

A. Not on the right side.

11:32AM Q. And if you could demonstrate, you said that when Dustin Pool was on your couch holding a towel to his head, how was he positioned?
11:32AM A. He was sitting up between the couch and the table.
11:32AM Q. Was he sitting straight up or leaning one way or the other?
11:33AM A. He was sitting up.
11:33AM Q. And the blood was going which way down his head?
11:33AM A. Well, he had a towel. I mean...
11:33AM Q. Okay. Well, before he put the towel on it, which way had it been going?
11:33AM A. It was just like -- down this way, down his left side.
11:33AM Q. Now, when Dustin Pool first got to your apartment, did he call anybody in front of you?
11:33AM A. Yes.
11:33AM Q. Who did he call?
11:33AM A. Ray Plasencio.
11:33AM Q. And what did he tell Ray Plasencio?
11:33AM A. He gave him his location, where he was, in case anything happened.
11:33AM Q. Okay. And when you say he gave his location, what did he say?

11:33AM A. He said, I'm at Tori Patrick's apartment, G373 at River Falls. And that's exactly what --
11:33AM Q. And did he add anything to that?
11:33AM A. Huh-uh. I don't think so.
11:33AM Q. So the person who's been described as Dustin Pool's lead henchman, knew where he was?
11:33AM A. Correct.
11:33AM Q. In some phone calls about which Jennifer Cates made some notes, there's a call in there where you're saying that Farren won't let you get psychiatric treatment or psychological treatment -- psych treatment, because it will look bad if you testify later at trial.
11:34AM Do you recall that?
11:34AM A. Yes.
11:34AM Q. What kind of psych treatment were you seeking?
11:34AM A. Depression.
11:34AM Q. And would you recall any specifics about the treatment you were seeking or was it just generally you needed some help?
11:34AM A. Generally, I just needed some help.
11:34AM Q. Okay. And when did you talk to Farren about that?
11:34AM A. One of the times in his office. Like one of the times right before I was arrested on that.
11:34AM Q. So you were asking for that before you got

arrested?
A. Yes.
Q. Okay. How far previously to -- to your arrest and your statement on that phone call had you been asking Mr. Farren for help?
A. Probably about a couple of months.
There's another call in there to my granddad. I remember my granddad addressing that issue with me, and I told my grandfather on the phone calls too.
Q. Okay. So a couple of months then. October would put you back into August?
A. Uh-huh.
Q. So right after Mr. Stocker's trial you started seeking help?
A. Maybe before that. I think it was before that then. It was during -- because he said he couldn't because I still -- I was a witness in that case. So it had to be during Josh's case whenever I asked him. He said it would have to wait.
Q. Did you ever get any help?
A. No, not from them, I didn't -- or not because of them, I mean.
Q. Now, as far as Jeremy Patrick's self-serving statements, he said that he saw some couches at your

11:35AM apartment there where the incident happened. Is that correct?

11:35AM A. He said that, but it's not true.

11:35AM Q. Okay. And how would you demonstrate that that's not true?

11:35AM A. The Warehouse Solutions' receipt shows that the couches were delivered to my new apartment at Candlewyck Plaza. Jeremy had never been over there. The couches were not delivered to the apartment at River Falls, so he couldn't have seen them at River Falls.

11:35AM Q. Now, you mentioned that you've been able -- able to review some of the discovery in this matter?

11:36AM A. Yes.

11:36AM Q. And have you reviewed the incident report where Mark Brown says that there were three calls from you on Dustin Pool's answering machine?

11:36AM A. I don't know if it was Brown. It was Sergeant Sanford and I'm trying to think of the other one. There was two officers that said that, yes, that there were three calls.

11:36AM Q. Three calls?

11:36AM A. Yes.

11:36AM Q. And you also listened to the download prepared by Bill Redden --

11:36AM A. Uh-huh.

Q. -- where he is playing those messages on the machine, but then recording them again?
A. Correct.
Q. And there are only two calls on there?
A. Correct.
Q. And there's not the call on there where you say don't come over?
A. Right. And the other officer's name is Kennedy. I'm sorry. Kennedy and Sanford.
Q. And did I explain anything to you about the significance of -- of you abandoning the effort if you were involved in some conspiracy?
A. What do you mean?
Q. That if you abandoned the effort, then they would lose the kidnapping on you?
A. When -- when would you have -- I -- I don't understand what you are asking me.
Q. A couple of years ago -- actually even going back to the original plea when we met out there in that room did I tell you --
A. Oh, yeah, you told me not to plea.
Q. Yeah.
A. Right.
Q. And because -- from your own statement you abandoned the effort before Dustin Pool -- before the

11:37AM crime could ever come to fruition whether it be assault or kidnapping or whatever?

11:37AM A. Right.

11:37AM Q. And about the issue of Dustin being a snitch, they raised the issue that -- that -- from previous testimony regarding Kimberlin thinking he was a snitch and he was snitching against the group that was involved in that. What was your relationship with Dustin Pool prior to this incident?

11:38AM A. At first he was Guin's drug dealer. I met him through that. But he had tried to like holler at me, talk to me, you know what I mean? Like trying to get me to come hang out with him by myself, stuff like that. But I didn't want to hang out with him because there was an incident when I was drunk one time and I got a ride home from him.

11:38AM Q. And what happened on that?

11:38AM A. I ended up fighting him off of me. Like I was drunk and I walked all the way home with no shoes or nothing.

11:38AM Q. Why were you having to fight him off of you?

11:38AM A. Because he was trying to have sex with me. I didn't want to have sex with him. I was drunk. I just wanted to go home. And that was at Security Systems that that happened. I had seen him at Burberry's.

11:38AM Q. And you had some conversations with him?
11:38AM A. Which occasion?
11:38AM Q. A lot of conversations?
11:38AM A. Yeah.
11:38AM Q. A few conversations?
11:38AM A. Yeah, I had a lot of conversations with him in my lifetime.
11:39AM Q. What did he say to you about his expectation for his life expectancy?
11:39AM A. That he didn't think he would make it to see 30 years old.
11:39AM Q. And why did he say that?
11:39AM A. Because he had a lot of enemies. He said some higher-ups were after him.
11:39AM Q. And they were after him because of why?
11:39AM A. He didn't say. He just said he owed them a lot of money.
11:39AM Q. And was he talking about Kimberlin? Bledsoe?
11:39AM A. No.
11:39AM Q. Who was he talking about?
11:39AM A. He said that they are from another country, and I didn't know who they were.
11:39AM Q. As far as the poker -- actually, as far as basically all the statements that Mr. Blount has examined you -- or cross-examined you about regarding

11:39AM whether or not they were true, you've come forward with new affidavits, have you not?
11:39AM A. Yes.
11:39AM Q. And in those affidavits you say statements that you made previously were untrue?
11:40AM A. True.
11:40AM Q. Okay. So if there's a variation now between what you say in your new affidavit and your old one, there -- there shouldn't be a problem with that, should there?
11:40AM A. Correct.
11:40AM Q. Because you are saying those statements weren't true?
11:40AM A. Right.
11:40AM Q. Specifically in regard to your plea, you've mentioned before you know what is going to happen if you go in there and give different answers?
11:40AM A. Right.
11:40AM Q. All right. So you have to say you kidnapped somebody, even if you didn't?
11:40AM A. Right.
11:40AM Q. So when you told Judge Miner you were guilty of kidnapping, you lied to him?
11:40AM A. Right.
11:40AM Q. But you had to tell that lie to get what you

wanted?
A. Yeah.
MR. WOOLDRIDGE: May I approach?
THE COURT: You may.
Q. (BY MR. WOOLDRIDGE) Ms. Patrick, I'm going to show you what I have marked as Defendant's Exhibit 16. Could you look at that.
A. Yep.
Q. Do you -- do recognize what those are?
A. I do.
Q. What are they?
A. They are letters of termination.
Q. Letters of termination from who directed to who?
A. Okay. The first one -- let's see. This is to you from Josh Stocker, and it's xc'd to Ronald and Levi Spriggs, and then to Mr. Spriggs from Josh Stocker. To -- I mean -- sorry. To Levi Spriggs from Josh Stocker. To Ronald Spriggs from Josh Stocker. And from Tori Patrick to Ron Spriggs.
Q. Okay. Now, these are the ones that are in Mr. Stocker's file. I'll represent that to you.
Did you also send a similar letter from you to me?
A. I did.

Q. Okay. And these letters terminate any attorney/client relationship in regards to a civil rights action that may arise --
A. Correct.
Q. -- out of this case.
Is that correct?
A. Correct.
Q. So have you hired anybody else to represent you?
A. No, sir.
Q. Have you and Mr. Stocker hired anybody else to represent you?
A. No.
Q. So at some point there is no pending action in that regard?
A. Correct.
Q. And any monetary return for damages inflicted by the State in this case, that's just a vague possibility at this point?
A. Right. We don't have a case on that.
MR. WOOLDRIDGE: Your Honor, I would offer into evidence Defendant's Exhibit 16.
THE WITNESS: Those were sent certified mail.
MR. BLOUNT: No objection.

THE COURT: What number is it?
MR. WOOLDRIDGE: 16.
THE COURT: It's admitted.
Thank you.
Q. (BY MR. WOOLDRIDGE) You've had a lot of conversations with me about this case, have you not?
A. Yes, sir.
Q. And you repeatedly harp on the fact that James Farren debriefed you. What is the significance of that to you?
A. Because there's times like -- even though it's been a long time, there's times like where it's hard -- even during that time where -- I even told Fowler one time that he -- to slow down and reword questions and stuff because it's hard to differentiate fact and what they've told me. I've been in their, whatever you call it, so many times. Like I've been in their office and gone through so much with them, that there's times that I have to really think about what is fact or what they told me.
Q. Okay.
A. It's messed with my head a lot. Like they --
Q. And your statements to Brown, statements to Ledbetter, those were -- those were repeated lies, were they not?

11:44AM A. What do you mean?
11:44AM Q. Well, you've said that the statement to Brown was a lie?
11:44AM A. Right. That one was.
11:44AM Q. Okay. And if you repeat those lies, whether you are repeating lies told by -- you were told to tell by Kimberlin or Farren or whoever, they're lies?
11:44AM A. Right.
11:44AM Q. Now, the reporter's record in this matter is not a lie, is it?
11:44AM A. No.
11:44AM Q. So if the reporter's record reflects that you never testified truthfully about a use immunity agreement, then you never testified truthfully about that?
11:45AM A. That's correct.
11:45AM Q. You have no argument with that?
11:45AM A. Huh-uh.
11:45AM Q. And if it shows that nobody ever came back and corrected your testimony in front of Mr. Stocker's jury, they got the testimony from you that you didn't have that agreement?
11:45AM A. Correct.
11:45AM Q. And do you have an explanation as to why you and Guin Garcia gave verbatim answers on -- whenever you

were asked about whether or not you had any agreement?

A. Because we were told by --

MR. BLOUNT: Excuse me, ma'am. Judge, I object.

THE COURT: Sustained.

MR. WOOLDRIDGE: On what basis?

THE COURT: Sir, I don't need to explain my ruling. You need to explain your question and examine your question when you are asking her to determine what's in Ms. Garcia's mind.

Do you understand that?

MR. WOOLDRIDGE: Yes, sir.

If Mr. Blount wants to make an objection --

THE COURT: It's sustained.

MR. WOOLDRIDGE: -- he needs to state the basis. If he doesn't state the basis, how can I respond?

THE COURT: His objection is sustained.

MR. WOOLDRIDGE: Oh, I understand that, Judge. But if he doesn't say what the basis of the objection is, how --

THE COURT: Don't argue with the Court, Mr. Wooldridge, or you are going to find yourself in trouble.

11:46AM Do you understand?
11:46AM MR. WOOLDRIDGE: Note our objection.
11:46AM THE COURT: So noted.
11:46AM Rephrase your question if you want to ask it.
11:46AM Q. (BY MR. WOOLDRIDGE) What is your understanding of what -- well, I'll ask it this way.
11:46AM Were you and Guin Garcia present at the same time anytime that Mr. Farren told you how to structure those responses?
11:46AM A. No.
11:46AM Q. Did you discuss it with Guin Garcia?
11:46AM A. Yes.
11:46AM Q. Did she admit that she had been told the same thing?
11:46AM A. At one point, yes.
11:46AM Q. Now, at the time of your plea in 2007, were you still under a charge of capital murder?
11:47AM A. Yes.
11:47AM Q. Was your charge of capital murder, in fact, not dismissed until the day after you entered the plea on kidnapping?
11:47AM A. Right.
11:47AM Q. So that was still over your head?
11:47AM A. Yes.

11:47AM Q. At the time that I asked you at that plea whether or not -- or -- or asserted that you had worked out this deal with Mr. Farren --
11:47AM A. Yes.
11:47AM Q. -- I was not part of it. You had worked it out?
11:47AM A. Yes.
11:47AM Q. They didn't bother to come back and try to correct that and say, no, we actually worked this out with your attorney, did they?
11:47AM A. No.
11:47AM Q. They acquiesced to that?
11:47AM A. Yes.
11:47AM Q. Regarding the statement that all those plea deals or whatever that you had were out the window, if that was in October or November of 2005, then those deals preexisted?
11:47AM A. Correct.
11:47AM Q. Were those deals offered to you after the Joshua Stocker trial?
11:47AM A. No.
11:47AM Q. When were they offered?
11:48AM A. Before Stocker's trial.
11:48AM Q. And when did Mr. Farren tell you that they're out the window?

A. Around -- it was after the shooting at Wal-mart involving Mannie Saldonia, because I got questioned over that. And apparently Guin Garcia had told the officers or whatever that I knew the shooter, and I didn't. And whenever I told them I didn't know him, I got pulled in for that, and it was right before I got my arrest on the forgery.

Q. And do you know when that was?

A. Like July or June. I don't know. In the summer sometime. It was in the summertime. Because whenever I got questioned, I was wearing shorts.

Q. Was it before or after the Stocker trial?

A. It was like during it. It was like at the same time that was going on. There is an article about that shooting, but I don't know the date.

Q. Okay. So prior to the Stocker trial, had Mr. Farren ever brought you in and said, you know what, Tori, you are vacillating too much and we are pulling your deal?

A. Yes, there was a time when he did.

Q. When did he do that?

A. I don't know. It was in '05, during -- it was before Stocker's trial. I think like maybe -- I don't know. I need the article date. I could tell you specifics, but I don't have the article in front of me.

11:49AM Q. What did he say?
11:49AM A. He said -- he asked me about that shooting at Wal-Mart, and I told him I didn't know anything about it. He said, well, that's not what Guin says. And I told him, well, then go ask Guin, because I don't know. And he said, well, we'll just -- we probably won't do a deal then if that's what you're gonna -- if this is the kind of stuff you are going to do. He said, there's -- you know, you've got people at your house and this and that that are no -- like people of disreputable character around your home, including Mannie Saldonia, and Mannie was the victim in that shooting.
11:49AM Q. What agreement did he say he was pulling?
11:49AM A. My ten-year agreement. My ten-year probation deal.
11:49AM Q. Okay.
11:49AM A. The one that I'm supposed to not know about until after Stocker -- or after Chacon's trial. But yet in the jail tapes, I'm talking about it.
11:49AM MR. BLOUNT: Objection, nonresponsive, Your Honor.
11:49AM THE COURT: Sustained.
11:49AM Q. (BY MR. WOOLDRIDGE) Okay. Let's -- let's review. You had a use immunity agreement?
11:49AM A. I did.

11:49AM Q. Okay. Was that -- did James Farren ever come to you and say, I'm pulling your use immunity agreement?
11:50AM A. Yeah, he talked about that.
11:50AM Q. When?
11:50AM A. I don't know when it is. The article -- I don't know. Again, whenever that shooting was. I don't know. It was whenever he -- that happened that he called me and told me that.
11:50AM Q. Okay. At some point did he tell you, okay, we're going to offer this agreement again?
11:50AM A. He didn't tell me like that.
11:50AM Q. How did he tell you?
11:50AM A. I don't remember. He just -- it was just back on the table after he wasn't mad anymore about --
11:50AM Q. Well, how long did --
11:50AM A. -- the shooting at Wal-Mart.
11:50AM Q. -- it take him not to be mad?
11:50AM A. I don't know. I mean, I don't know.
11:50AM Q. A week? Two weeks?
11:50AM MR. BLOUNT: Your Honor, she is --
11:50AM Q. (BY MR. WOOLDRIDGE) A month?
11:50AM MR. BLOUNT: Excuse me.
11:50AM A. I don't know.
11:50AM MR. BLOUNT: She's answered that question. It's been asked and answered.

11:50AM A. Maybe like a couple of weeks. I don't know.
11:50AM MR. BLOUNT: Excuse me, ma'am.
11:50AM THE COURT: I'll sustain the objection.
11:50AM MR. BLOUNT: Thank you.
11:50AM A. I don't know.
11:50AM Q. (BY MR. WOOLDRIDGE) In the intervening period, Ms. Patrick, since you said you didn't have it come back to you --
11:50AM A. Do what now?
11:50AM Q. Did you -- did you just say it was a couple of weeks?
11:50AM MR. BLOUNT: Your Honor --
11:50AM A. I said it was probably at least a couple of weeks. Because I didn't -- there was a period we didn't talk for a while.
11:51AM MR. BLOUNT: Excuse me. That's nonresponsive to any question.
11:51AM THE COURT: Sustained.
11:51AM Q. (BY MR. WOOLDRIDGE) So then did he reinstate those offers before the Stocker trial?
11:51AM A. Yes.
11:51AM Q. Do you recall how long before the trial?
11:51AM A. I don't recall.
11:51AM Q. Now, there's been some documents bandied about and wherein Mr. Stocker -- or sorry. I mean, Mr. Farren

11:51AM sends letters to Mr. Robnett and also to Ms. McElroy, indicating that you have a deal to plead to a lesser aggravated kidnapping, but it doesn't -- excuse me -- it doesn't specify a term of years, just that you are going to plead to aggravated kidnapping?

11:51AM A. Correct.

11:51AM Q. So if Mr. Farren admits that agreement was there, did he ever come and say to you that agreement has been pulled?

11:51AM A. Yes.

11:51AM Q. And it was at -- all at the same time?

11:52AM A. Yes.

11:52AM Q. And then when he came back and said -- a couple of weeks later when he wasn't mad anymore, did he reinstate all of those agreements or just some of them?

11:52AM A. He reinstated -- I mean, they were all just still there.

11:52AM Q. Okay. Now, ultimately, what did you plead out to on this?

11:52AM A. Kidnapping, deferred probation for ten years.

11:52AM Q. And if the agreement brokered through Mr. Robnett was alleged to be the dismissal of the capital murder charge, did that not ultimately occur just as proffered?

11:52AM A. No, it didn't. Because he was supposed to

dismiss the capital charge and that was the end of it. And instead he charged me -- I had to plead to this kidnapping, which they had talked and it wasn't supposed to be that way.

Q. Well -- but ultimately they did just dismiss the capital murder?

A. Right, but I wasn't supposed to plead to the kidnapping.

Q. Well, if he records in his document that he is offering you aggravated kidnapping, then you got something better than aggravated kidnapping?

A. Right, but I did that on my own with no lawyer.

Q. So at the time you testified at Mr. Stocker's trial, which agreements did you believe you were under and were active at that time?

A. The use immunity agreement and a ten-year-probation deal for deferred.

Q. And did you ever testify truthfully about that at Mr. Stocker's trial?

A. Nope.

Q. And even if you managed to slip some testimony in that was the truth, as you understood it, does that change anything about the fact that Mr. Farren and Mr. Fowler attempted to coerce and structure your

11:54AM testimony in a different way?
11:54AM A. No.
11:54AM Q. Now, you've also testified about some -- some of the harassment retaliation where there was some issue with some wiretaps since you started this in 2016?
11:54AM A. Yes.
11:54AM Q. What was that?
11:54AM A. Like my phone just freezes up in the middle of calls. It sounds like you are in a cave. You can hear other conversations. It cuts off. It does all kinds of stuff.
11:54AM Q. Has there been some activity that would indicate to you that somebody had been listening to you on your phone?
11:54AM A. Oh, yeah. Like whenever I get away from them, like if they're following me or whatever, and I escape observation, if I'm talking to somebody about where I'm going, they will just conveniently show up. It's sort of like they knew where I was going at all times.
11:54AM Q. Let me ask you about an incident that occurred shortly after we had the hearing with -- in front of Judge Self on May 31st.
11:55AM If I represent to you that May 31st, 2016, was a Tuesday, does that sound right?
11:55AM A. Yes.

11:55AM Q. That Friday evening was there an event that happened that you recall?

11:55AM A. There was lots of events that happened. I -- there was an event where there were several cars around my house on the day I had court on the morning where I --

11:55AM Q. Well, let me ask it this way. You had a friend that you've mentioned, Thad?

11:55AM A. Oh, yeah. Uh-huh.

11:55AM Q. And what was his last name?

11:55AM A. Gutierrez.

11:55AM Q. Thad Gutierrez.

11:55AM And he was staying up on Polk Street. Is that correct?

11:55AM A. Yeah, he had a loft, uh-huh.

11:55AM Q. Yeah. Adjacent to the property owned by Maxwell Peck?

11:55AM A. Yes, sir.

11:55AM Q. And you were spending some time up there with him?

11:55AM A. I was living there at one point.

11:55AM Q. And you and I had discussed the issues that were going on, as far as the harassment?

11:55AM A. Yes.

11:55AM Q. And by that point, you and I were looking out

for each other, that we knew these people were around?

A. Yes.

Q. And it was my habit -- I would come back -- I would drive passed Polk Street just to see if I saw anybody around.

MR. BLOUNT: Objection to leading the witness, Your Honor.

THE COURT: Sustained.

Q. (BY MR. WOOLDRIDGE) Did I send you a message one night, I guess, to the effect that -- I sent you the message, hey, late night at Fats (phonetic), because you were still open?

MR. BLOUNT: Objection to leading the witness, Your Honor.

MR. WOOLDRIDGE: It's a yes-or-no question.

THE COURT: Sustained. Don't suggest the answer.

Q. (BY MR. WOOLDRIDGE) Yes or no, Ms. Patrick, do you recall a message from me?

A. Yes.

Q. And as a result of that did you go off?

A. Probably.

Q. Do you recall sending me a message about you just wanted your bond pulled?

MR. BLOUNT: Your Honor, again, I'm going to object to leading the witness.

MR. WOOLDRIDGE: It's a yes-or-no question, Your Honor.

A. That's --

MR. WOOLDRIDGE: It doesn't suggest an answer. She can answer yes or no.

THE COURT: I'll -- I'll overrule this objection.

A. Yes.

Q. (BY MR. WOOLDRIDGE) Shortly thereafter, what happened?

A. I don't remember.

Q. Do you know who Michael Baca is?

A. Yes.

Q. Who is he?

A. He was a security guard at the building where our office was and he's a volunteer for the Randall County Fire Department.

Q. And what was your involvement with him?

A. None, except for he would -- he got to where he -- he is weird. He would walk me to my car and stuff like that when I didn't want him to. He was asking me lots of questions about stuff.

Q. Like what kind of stuff?

11:57AM A. Like my case.
11:57AM Q. And did you know this guy previously?
11:57AM A. No.
11:57AM Q. And all of a sudden, a security guard is all over you?
11:57AM A. Yep.
11:57AM Q. Wants to know about your case?
11:57AM A. Yep.
11:57AM Q. Do you recall viewing a video in which Mr. Baca --
11:58AM MR. BLOUNT: Your Honor, I'm going to --
11:58AM Q. -- was involved?
11:58AM MR. BLOUNT: -- object to the relevance of this.
11:58AM THE COURT: I'm sorry?
11:58AM MR. BLOUNT: I'm going to object to the relevance of this line of questioning with some security guard.
11:58AM THE COURT: I -- it's hard for me to see it. But if there's any relevance to it, I'll permit him to ask it.
11:58AM Q. (BY MR. WOOLDRIDGE) Do you -- do you recall reviewing with me a videotape of Mr. Baca burglarizing my office?
11:58AM A. I do.

MR. WOOLDRIDGE: Your Honor, if we could take a moment to make sure we've got the technology right.

THE COURT: Okay. Let's take a 10-minute break for that. Okay. See if you can get that arranged.

(Recess)

(Open court, Applicant and Counsel Present)

MR. WOOLDRIDGE: Can we interrupt the testimony of Ms. Patrick and put on Mr. Pirtle? It will take five minutes.

THE COURT: Any objection?

MR. BLOUNT: No objection.

THE COURT: You may do so.

MR. WOOLDRIDGE: We would call Tim Pirtle.

(Witness enters the courtroom)

THE COURT: Good afternoon.

THE WITNESS: Good afternoon, Judge.

(Witness sworn)

THE WITNESS: Yes, sir.

THE COURT: Please be seated.

(Witness takes the witness stand)

THE COURT: Mr. Wooldridge.

TIM PIRTLE,

having been first duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. WOOLDRIDGE:

Q. Mr. Pirtle, will you please state your full name.

A. Tim Pirtle.

Q. And are you employed, Mr. Pirtle?

A. I'm a lawyer.

Q. How long have you been doing that? Don't say too long.

A. Since 1990.

Q. What has been the focus of your practice?

A. Criminal defense, family law and a little civil.

Q. At one point did you have an opportunity to represent anybody involved in the Dustin Pool case?

A. Frank Chacon.

Q. And how long did you represent him?

A. Oh, I don't recall the exact dates, but I didn't finish the representation. I believe there was a conflict and Mr. Kelly took over the representation.

Q. Now, were you at some point in a partnership in a law practice?

A. Yes.

12:11PM Q. What was that practice or what was that firm?
12:11PM A. What time period? I've been in three or four.
12:11PM Q. Around the time of this -- the inception of this event, 2003 to 2005?
12:11PM A. I would have been partners with Joe Dawson and Gene Storrs.
12:11PM Q. And what was Joe Dawson's practice?
12:11PM A. Criminal defense.
12:11PM Q. Okay. At some point did there arise that there was an issue of a conflict that he couldn't represent somebody because you already -- already represented Mr. Chacon?
12:11PM A. I don't remember the exact reason. I think it was a witness that became apparent.
12:11PM Q. If -- if -- if I told you it was Tori Patrick, would that sound right?
12:11PM A. No.
12:11PM Q. No. If the record reflects that Mr. Dawson was appointed to her for a matter of days, does that bring back any recollection?
12:11PM A. None. We kept all that separate.
12:11PM Q. Okay. Well, that would have been my next question. As far as the structure of your office went, did y'all have access to each other's files?
12:12PM A. No.

Q. Did you have anybody in the office besides you and Mr. Dawson and Mr. Storrs?
A. At that time, I don't remember. The only two other people it could have been would have been C.J. McElroy or Harry Ingram, but I don't remember the times that they were there. They rented some office space, but they weren't in the partnership.
Q. Was -- was Kathy Garrison ever around there?
A. She didn't have an office.
Q. She didn't have an office?
A. Nope.
Q. Did she work with you and Mr. Dawson?
A. She has, yes.
Q. When she works with you, does she have -- did she have access to files?
A. Only if we provided it. I mean, I don't know. I can't speak for Joe Dawson, but if Cathy came to me and said, you know, can I look at your file or whatever, then -- if she was hired on the case, sure, she -- I would share my file with her.
Q. Okay. So do you recall what your fax number was for that law firm?
A. Yes.
Q. And what was it?
A. (806) 374-2620.

Q. And do you, in fact -- well -- well, that firm -- you eventually broke up, did you not?
A. Yes.
Q. And Mr. Dawson is deceased?
A. Correct.
Q. And he's been deceased since when?
A. December 24th, 2009.
Q. As part of the dissolution of the firm, did you wind up with that number?
A. Yes.
Q. So it's still your fax number today?
A. Correct.
MR. WOOLDRIDGE: May I approach?
THE COURT: You may.
Q. (BY MR. WOOLDRIDGE) Mr. Pirtle, I'm going to show you what has been marked and previously exhibited as State's Exhibit 22.
A. Okay.
Q. Do you -- across the top up here, do you recognize what that is?
A. The letterhead from the district attorney?
Q. No, no, above that.
A. Oh, the fax?
Q. Yes.
A. Yes, that would be my fax number -- or our fax

number back in the day.

Q. Indicating that on December 13th of 2005, that that fax came from your number?

A. From or to. I can't -- I can't tell if it was faxed from or to.

Q. Okay. And the law office up there -- it seems to me that some of this got cut off across the top?

A. Oh, I don't have any idea.

Q. Okay. Did you have any kind of -- whenever your fax sent something out, did it -- did it have a blurb on it that said from the Law Offices of Storrs, Pirtle & Dawson or anything like that?

A. I -- I don't think so, but I don't really remember.

Q. Okay. So that may have been something internal to whoever received it?

A. I would -- I can't answer that. I don't really know the answer to that.

Q. Okay. But that is your fax number?

A. Yes.

Q. Okay. And -- well, you wouldn't be able to verify a time and date stamp. We would just have to take that as face value?

A. Whatever it says is all I can...

MR. WOOLDRIDGE: Pass the witness.

CROSS-EXAMINATION

BY MR. LOVE:

Q. Were you representing Frank Chacon on this date that's denoted in the -- State's Exhibit 22 --

A. I don't know -

Q. -- 12-17 of '05?

A. I don't know the answer to that, Mr. Love. I would have to look.

Q. But you know at some point you had a conflict and the case was handed over to Bill Kelly?

A. Yes, sir.

MR. LOVE: No other questions.

MR. WOOLDRIDGE: No other questions. We would ask that Mr. Pirtle be excused.

MR. LOVE: No objection.

THE COURT: Bye.

THE WITNESS: Bye.

THE COURT: Thank you.

(Witness exits the courtroom)

THE COURT: Is this document offered?

MR. LOVE: It's already in.

MR. WOOLDRIDGE: It's in.

THE COURT: It's in. Okay.

MR. LOVE: I just wanted to put it there so it doesn't get lost.

MR. WOOLDRIDGE: Recall Tori Patrick.
(Witness enters the courtroom)
THE COURT: Mr. Wooldridge.

REDIRECT EXAMINATION OF TORI PATRICK (Continued)

Q. (BY MR. WOOLDRIDGE) Ms. Patrick, I have here Defendant's Exhibit 17, which is a flash drive containing seven approximate 10-second-in-duration videos; IMG 76, 77, 78, 79, and 239, 240 and 241?
Have you had a chance to review these?
A. Yes.
Q. Do they fairly and accurately depict what they are intended to depict?
A. Yes.
Q. Okay. And you understand what the contents of these are?
A. Yes.
Q. I'm going to play for you --
MR. WOOLDRIDGE: I guess at this time, I would offer Defendant's Exhibit 17.
MR. BLOUNT: Your Honor, we haven't -- we haven't seen it. I don't know what it is. I can't make an intelligent decision about whether to object or not.
THE COURT: I'll reserve whether I accept it into evidence until after it's been displayed.
MR. WOOLDRIDGE: Permission to display

it.

THE COURT: You may do that.

(Video played)

Q. (BY MR. WOOLDRIDGE) Do you recognize the person in that video?

A. Yes.

Q. Who is that?

A. That is Michael Baca.

Q. And do you recognize the location?

A. That's your office.

Q. And where in my office is that?

A. In the foyer, I believe. Yeah, the foyer. Right by the front door.

Q. And with regards to 77, do you recognize that as being a different angle, the same video?

A. Michael Baca, yeah, and it's the foyer to your office.

MR. LOVE: James, what was the first number?

MR. WOOLDRIDGE: 76 -- 0076.

MR. LOVE: 76.

Q. (BY MR. WOOLDRIDGE) And do you recognize what is depicted here?

A. Your office and that's Michael Baca.

Q. And do you recognize what the little white

12:18PM object in his hand is?
12:18PM A. It's hard to see because there's a glare on the screen from my angle from the light, but I -- I can't see it. The -- the glare is really bad.
12:18PM Q. Well, it's okay if you don't recognize it. You can say you don't recognize it.
12:19PM A. Well, I can't see it. There's a glare on the screen really.
12:19PM MR. LOVE: What was the number on that one, Mr. Wooldridge?
12:19PM MR. WOOLDRIDGE: 78.
12:19PM A. That's better. Thank you.
12:19PM Q. (BY MR. WOOLDRIDGE) Did you see the beginning of that?
12:19PM A. Was that a light -- a laser pointer?
12:19PM Q. Do you recognize what the white object is?
12:19PM A. No. No, I do not.
12:19PM MR. LOVE: This is 79?
12:19PM MR. WOOLDRIDGE: This is 79, yes. Sorry.
12:19PM Q. (BY MR. WOOLDRIDGE) Do you know or recognize an officer with the Amarillo Police Department named Michael Mogelinski?
12:19PM A. Yes.
12:19PM Q. Do you recognize or know of an officer from the Amarillo Police Department named Jace Strate?

A. Yes.
Q. I'm now going to show you IMG 0239, and I'm going to ask you if you recognize --
MR. LOVE: 0239?
MR. WOOLDRIDGE: Yes, sir.
A. Yeah. Mogelinski is in the black shirt and Jace Strate is in the blue.
(Video played)
A. Your volume is down.
Q. That's as loud as it gets.
I am now going to show you IMG 0240.
A. The same two.
(Video played)
Q. When he mentions a Class four, do you know what he is talking about?
A. Locks, door locks.
Q. I'm now going to show you IMG 0241. Do you recognize this?
(Video played)
A. Jace Strate, yes. Talking about solid core doors.
Q. Now, you're familiar with the door at my office?
A. Yes.
Q. Does it have a mail slot in it?

12:21PM A. Yes, it does.

12:21PM Q. Would you have to reach through the mail slot in order to be able to determine if it's a solid core door?

12:21PM A. Yes, you would.

12:21PM MR. WOOLDRIDGE: Judge, reoffer State's Exhibit -- or Defendant's Exhibit 17.

12:21PM MR. BLOUNT: Object on relevance, Judge.

12:21PM MR. WOOLDRIDGE: Your Honor, we've made allegations of harassment and retaliation, and this is video graphic proof of the Amarillo Police Department coming by to burglarize my office. And they did, in fact, burglarize my office. The video reflects not only the burglary of a building when he crosses the threshold of my mail slot. It also reflects the conspiracy to do so because they're standing there discussing breaking into my office.

12:21PM THE COURT: I'll overrule the objection. The exhibit is admitted.

12:22PM For clarification, during this time, was Ms. Patrick in your employ?

12:22PM MR. WOOLDRIDGE: Yes, she was.

12:22PM THE COURT: Okay. Thank you.

12:22PM Q. (BY MR. WOOLDRIDGE) Ms. Patrick, let me go back and ask you, do you recall the date that was

because I -- if the -- the video -- you've reviewed these videos several times, have you not?

A. Yes, I have.

Q. And if the video reflects that it was August 10th of 2017. Is that correct?

A. That sounds about right.

MR. LOVE: August 10th of 2017?

MR. WOOLDRIDGE: Yes.

MR. LOVE: Thank you.

Q. (BY MR. WOOLDRIDGE) And that would be as to -- as it pertains to the videos of Mogelinski and Strate?

A. Right. Correct.

Q. And the video as it pertains to Mr. Baca in September of 2016. Is that correct?

A. That's correct.

MR. WOOLDRIDGE: Pass the witness.

THE COURT: Any questions?

MR. BLOUNT: Just briefly, Judge.

RECROSS-EXAMINATION

BY MR. BLOUNT:

Q. I want to make sure I understand you on your testimony just a few -- right before we took that break. Mr. Wooldridge was asking you about your guilty plea hearing and whether you had to tell a lie to the Judge in order to get what you wanted, and you said yes?

A. Yeah.
Q. In your mind when you want something and you need to get it through lying, then that's what you do?
A. I disagree with that.
Q. Well, you lied to Judge Miner to get what you wanted, which was probation. Right?
A. A deal I made with no attorney, so...
Q. Again --
A. I'm not -- I don't have an answer for that.
Q. Well, you lied -- okay. You -- you -- you said you had to tell that lie to get what you wanted?
A. I did. That's just how it works in this county.
Q. When you filed your writ affidavit --
A. Uh-huh.
Q. -- you wanted something?
A. What's that?
Q. Well, you wanted to avoid going to prison, didn't you?
A. I don't care about going to prison. That's never been the issue. You act like that's hard to do or something. It's not. That's never been the issue.
Q. Okay. So you've never cared one way or the other?
A. Not really.

Q. Not really.
Michael Baca is, what, a security guard?
A. I think so. That's what he's supposed to do, but he -- he was -- he walked me to my car and stuff. That's not what he was supposed to do.
Q. Well, I understand. But who did he work for?
A. I don't know. I guess the Chase building.
Q. That's where this -- that's where the office is?
A. Yeah, on the 17th floor. James' office is 1704.
Q. Okay. So he wasn't working for the Amarillo Police Department as far as you know?
A. No, not as far as I know. He was a security guard.
Q. So the harassment in part is coming from the -- the owners of the Chase building?
A. I don't know. I can't -- I mean, you would have to ask them. I'm not -- I can't speak for them.
Q. Well, the relevance of the -- of the -- Michael Baca, was -- the office being burglarized by Michael Baca because --
A. Clearly --
Q. -- of some kind of harassment of you and Mr. Wooldridge --

A. Well, I mean, he is not burglarizing all the offices down the hallway.
Q. Okay. But you've alleged that this harassment is all tied back to Mr. Farren?
A. I mean -- and the timing is convenient. I wasn't ever harassed like this in any other job I've ever had. The minute I have a case against him and here we are with this harassment crap. So, yeah, I have tied it back to Farren. You are right.
Q. So Michael Baca burglarized or broke -- stop you right there. He wasn't supposed to be in the office, is that the burglary?
A. Well, it's not that he can't be in the office, I guess. I don't really know what his -- I don't know what his job is. I don't know as a security guard what he is allowed to do.
Q. Okay.
A. But it's not that he can't be in the office probably. But to be behind James' desk and all that, no, he's not supposed to be doing all that mess. Opening --
Q. Okay. I didn't see him go through any drawers or anything like that, did you?
A. No, it's just weird. He --
Q. Okay. I mean --

A. No.
Q. -- I understand it's weird.
A. No.
Q. But I didn't see him pick up anything or take anything.
A. He had something in his hand. I just don't know what it was.
Q. Well, you don't know what it was --
A. Right.
Q. -- and you don't know whether he had it when he walked in?
A. Right.
Q. But this is evidence of James Farren's harassment --
A. Yeah.
Q. -- because Michael Baca is somehow connected with James Farren?
A. Well, he is connected to Randall County. He -- he also worked for their fire department.
Q. He worked for who?
A. Randall County Fire Department as a volunteer as well.
Q. He was a volunteer with the Randall County Fire Department?
A. Yes, sir.

12:27PM Q. And that's how James Farren was able to --
12:27PM A. All I'm saying is any other job I've ever had, I've never had this problem until my case started and then I have all of these problems. It's just kind of coincidence.
12:28PM Q. And that's why every time you see a Dodge Charger on the road, it's somehow connected to James Farren and --
12:28PM A. Is the Dodge Charger running me off the road when I see it or --
12:28PM Q. Well --
12:28PM A. -- is it just driving beside me?
12:28PM Q. Okay. So --
12:28PM A. There's a difference.
12:28PM Q. So every act of bad driving that you see is somehow connected to James Farren?
12:28PM A. If it has an A-pillar on the -- an A-pillar spotlight and they are in uniform, more than likely, yep.
12:28PM MR. BLOUNT: Pass the witness.
12:28PM THE COURT: Did you pass the witness?
12:28PM MR. BLOUNT: I did. Sorry for mumbling.
12:28PM THE COURT: Any other redirect?
12:28PM MR. WOOLDRIDGE: My last was 17?
12:28PM THE COURT: It was.

12:28PM MR. WOOLDRIDGE: May I approach?
12:28PM THE COURT: You may.
12:28PM FURTHER DIRECT EXAMINATION
12:28PM BY MR. WOOLDRIDGE:
12:29PM Q. Ms. Patrick, I'm going to show you what's marked -- been marked as Defendant's Exhibit 18 --
12:29PM A. Uh-huh.
12:29PM Q. -- and 19. Do you recognize what these are?
12:29PM A. Mogelinski.
12:29PM Q. Well, first do you recognize the photographs fairly and accurately depict what they intended to depict?
12:29PM A. Yes.
12:29PM Q. And as far as Defendant's 18 -- excuse me -- Defendant's Exhibit 18, what is that?
12:29PM A. That is your law office.
12:29PM Q. Does it appear to be a still from the video we just watched?
12:29PM A. Yes.
12:29PM Q. Okay. And Defendant's Exhibit 19, do you recognize what that is?
12:29PM A. That's Hooter's.
12:29PM Q. And you said it was Mr. Mogelinski?
12:29PM A. That is Mogelinski.
12:29PM Q. Okay. And how -- and how did you come to

review that?

A. Through you. Because you were up there at the same time.

Q. And I took the picture?

A. Yes.

MR. WOOLDRIDGE: Your Honor, at this time I would offer into evidence Defendant's Exhibit 18 and 19.

THE COURT: No objection?

MR. BLOUNT: No objection to 18. I'm sorry. This is showing -- where is this area?

MR. WOOLDRIDGE: That is at the bar at Hooter's. His back is to the entrance.

MR. BLOUNT: Okay. Supposedly -- supposedly -- no objection to 18.

In regards to 19, I object to the relevance. I'm being told it's a photograph of an Amarillo police officer at the Hooter's bar. I -- I -- I object to the relevance as far as this hearing is concerned.

THE COURT: If -- if it's designed to show a photograph of Mogelinski for the purpose of showing it's Mogelinski, I'll admit it.

18 and 19 are both admitted.

MR. WOOLDRIDGE: Pass the witness.

12:31PM MR. BLOUNT: No more questions.
12:31PM THE COURT: Ms. Patrick, you may step down. Thank you.
12:32PM (Witness exits the courtroom)
12:32PM THE COURT: Are you ready for lunch?
12:32PM MR. WOOLDRIDGE: Yes, sir.
12:32PM MR. LOVE: Your Honor, can we take care of a couple of housekeeping issues before we leave --
12:32PM THE COURT: Yes, sir.
12:32PM MR. LOVE: -- because it depends on what we want to do after lunch.
12:32PM THE COURT: Okay.
12:32PM MR. LOVE: Mr. Wooldridge, you subpoenaed Mike Mogelinski?
12:32PM MR. WOOLDRIDGE: I did.
12:32PM MR. LOVE: Did you release him from his subpoena?
12:32PM MR. WOOLDRIDGE: I told him yesterday afternoon that he was cut loose. I just texted him last night and said that we would need him back here, I think, at 10:30 this morning.
12:32PM MR. LOVE: Okay. I haven't seen him, but we want him back for our case. We want to rely on his subpoena until -- that's allowed under the Code of Criminal Procedure.

THE COURT: You may rely on that subpoena.

MR. LOVE: Also, before we started today, Mr. Wooldridge graciously gave me a head's up on an issue. He had indicated -- he gave me a chance to retract -- and I appreciate him -- the way he handled it -- to retract my statement yesterday about Mr. Farren, Jennifer and Sam Hale and Tyler Shawn Hale, who was the -- who was a Codefendant on this back in '03.

THE COURT: Yes, sir.

MR. LOVE: He indicated to me that he had had some indication -- and he showed me on his phone -- I'm assuming it was from a -- some sort of search that he had done.

MR. WOOLDRIDGE: That was on Instant Checkmate.

MR. LOVE: Okay. I didn't see what -- what site it was.

That there was something where he had searched Tyler Shawn Hale and a possible relative came up for Samuel Hale and Jennifer Hale. Am I -- I don't remember exactly what it said. Is that correct?

MR. WOOLDRIDGE: Stephen Andrew Hale, I believe, is the person and there's a couple of other

12:33PM Hales that cross-reference between Jennifer Hale and Sam Hale. They have Stephen Andrew and another Hale on there that then cross-reference over to Tyler Hale as being a close relative.

MR. LOVE: Okay.

MR. WOOLDRIDGE: The way Instant Checkmate pulls up, it will say possible relatives and it will show like the six closest ones.

MR. LOVE: Okay.

MR. WOOLDRIDGE: And they are referencing between each other.

THE COURT: All right.

MR. WOOLDRIDGE: And it's the same Tyler Hale, because it also shows Tyler Hale's criminal charge for tampering with a witness in this case that was ultimately dismissed and it shows Jennifer Hale as being related to Ken Farren.

MR. LOVE: And -- and -- so I want to go back and -- everything that I said yesterday, I'm not retracting. That is all accurate.

Now, I do have some additional information. I -- I noted to the Court yesterday that the only brothers that -- because I think during his cross-examination or his examination of Mr. Farren he indicated that Tyler Hale and Samuel Hale, who is

married to Jennifer Hale, who is Ken Farren's daughter, that they were brothers.

I came in and announced that, no, they were not brothers. The only brothers that Samuel Hale has is a Stephen Hale and a Seth Hale.

So I had an investigator do some searches for me. We have some -- access to some data storage stuff that does the same thing that he is describing. And what we were able to determine -- the connection between Stephen Andrew and Tyler -- Stephen Andrew Hale and Tyler Shawn Hale is Stephen, who is the younger brother of Samuel Hale, used to be a roommate with Tyler Shawn Hale at 1515 Stubbs in Amarillo. And that therefore the connection is made at that point.

There's no other connection. I have recordings of -- of interviews with Jennifer Hale and Samuel Hale. Both of them say they don't know Tyler Hale personally. He is not a family member. That Samuel Hale said that my brother was friends with him years and years ago when they lived on Stubbs. But other than that, there is no family relationship. And I don't retract anything I said yesterday as a -- as a result of that.

THE COURT: Thank you for that.

MR. WOOLDRIDGE: And in view of that,

Your Honor, I would ask that at the conclusion of these hearings, that we be given some time to develop that on our own.

THE COURT: Okay.

MR. LOVE: I mean, for the purposes of -- I mean, I don't --

MR. WOOLDRIDGE: Well -- I mean, we don't have to conclude the issue today.

THE COURT: These -- these statements made by Mr. Love aren't evidence anyway, but --

MR. WOOLDRIDGE: I understand.

THE COURT: -- but they are informative. Let's put it that way. All right.

MR. LOVE: Thank you, Your Honor.

And that was all I had for the break.

THE COURT: Okay. Anything else from you?

MR. WOOLDRIDGE: Nothing at this time.

THE COURT: Okay. You've got more witnesses to come?

MR. WOOLDRIDGE: Two or three or maybe just one.

THE COURT: Okay. All right. Let's take lunch until 2:00 or 2:15. Let's say 2:15, if that's all right.

(Recess)

(Open court, Applicant and Counsel Present)

THE BAILIFF: All rise.

THE COURT: Thank you very much. All ready to resume?

MR. BLOUNT: The State is ready.

THE COURT: Ready?

MR. WOOLDRIDGE: Defense is ready or Applicant is ready.

THE COURT: Okay. You may call your next witness.

MR. WOOLDRIDGE: Jace Strate.

THE BAILIFF: He disappeared, I guess. He's not around.

MR. WOOLDRIDGE: Your Honor, I will announce to the Court Mr. Strate was served by subpoena on Tuesday the 29th of October. Her -- my server -- process server, Terry Lopez and his assistant -- his first name is Struter. Let the record reflect that subpoena was returned. Mr. Strate did not contact me per the instructions on the subpoena and I've had no contact with him, but he is under subpoena.

THE COURT: Okay. Do you know if he is on duty?

MR. WOOLDRIDGE: I don't know if he is on duty, but I know he was served.

THE COURT: Okay. Well, first we'll make an attempt to contact him through the police department. Is it the Amarillo Police Department?

MR. WOOLDRIDGE: Uh-huh.

THE COURT: Brad, would you have Amanda contact Chief Drain --

THE BAILIFF: Amanda is not in the office.

THE COURT: Oh. Amanda is not in the office. Would you see if Carly will do that for us then.

THE BAILIFF: Okay.

THE COURT: Is the other -- is the other officer under subpoena as well?

MR. WOOLDRIDGE: He is.

THE COURT: He is here?

MR. WOOLDRIDGE: I do not know. I've not seen him today.

THE COURT: Okay. And was he likewise served by a process server?

MR. WOOLDRIDGE: He was.

THE COURT: No contact?

MR. WOOLDRIDGE: He did contact me

02:31PM Tuesday night. I gave him instructions. A person claiming to be Michael Mogelinski showed up yesterday, and it was not Michael Mogelinski because I've had dealings with Michael Mogelinski before. I told him to go away.

02:31PM I texted back to Mr. -- the actual Mogelinski last night and informed him he was supposed to be here by 10:30 this morning and I have not seen him.

02:31PM THE COURT: Okay.

02:31PM MR. LOVE: He is here.

02:31PM THE COURT: He is here. Okay. Then it's just Strate that we need to get the Chief involved with.

02:32PM MR. LOVE: Do you want us to use any of our contacts?

02:32PM THE COURT: If you can, yes. It will -- it will avoid an unpleasant scene.

02:32PM MR. LOVE: Okay.

02:32PM THE COURT: Well, since Mr. -- Mr. Strate is not present, who will be your next witness?

02:32PM MR. WOOLDRIDGE: Michael Mogelinski.

02:33PM THE COURT: He is on the way?

02:33PM MR. LOVE: He is in the building. He is on the way.

02:33PM THE COURT: Okay.

02:35PM (Witness enters the courtroom)
02:35PM THE COURT: Good afternoon.
02:35PM THE WITNESS: How are you, sir?
02:35PM THE COURT: I am well.
02:35PM (Witness sworn)
02:35PM THE WITNESS: Yes, I do.
02:35PM THE COURT: Please be seated.
(Witness takes the witness stand)

MICHAEL VAN MOGELINSKI,

having been first duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. WOOLDRIDGE:

02:35PM Q. State your full name, please.
02:35PM A. Michael Van Mogelinski.
02:35PM Q. How old are you?
02:35PM A. I'm 43.
02:35PM Q. When were you born?
02:35PM A. Where?
02:35PM Q. When?
02:35PM A. 12-30 of 1974.

THE REPORTER: Is your mic on?

MR. WOOLDRIDGE: Yes, it is.

THE REPORTER: Can I get you to spell your last name for me.

THE WITNESS: It's M-O-G-E-L-I-N-S-K-I.

THE REPORTER: Thank you.

Q. (BY MR. WOOLDRIDGE) Are you employed at the Amarillo Police Department?

A. Yes, I am.

Q. How long have you been there?

A. 19 years.

MR. WOOLDRIDGE: May I approach, Your Honor?

THE COURT: You may.

Q. (BY MR. WOOLDRIDGE) How many trials have you and I ever been in together?

A. None that I know of.

Q. You don't ever remember being cross-examined by me?

A. Not that I remember.

Q. Have you ever been involved -- have you ever been involved in a case involving any relatives of John McCain the Senator?

A. I -- if I have, I don't know.

Q. Does the name sound familiar?

A. John McCain?

Q. Uh-huh.

A. His name sounds familiar.

Q. Kenneth McCain?

A. Not that I know of.

Q. Do you recognize who this person is right here (indicating)?

A. Yes, I do.

Q. Who is that?

A. That's Bryan Jackson.

Q. Bryan Jackson.

And where would we find him at?

A. Right this second, I'm not sure.

Q. Do you know what division or what part of the Amarillo Police Department he serves in?

A. I believe he works in the patrol division.

Q. Patrol division.

MR. WOOLDRIDGE: Pass the witness.

THE COURT: Did you say pass the witness?

MR. WOOLDRIDGE: Pass the witness.

MR. LOVE: May I approach?

THE COURT: You may.

CROSS-EXAMINATION

BY MR. LOVE:

Q. Did he show you this photo --

A. Yes, he did.

Q. -- Defense Exhibit 18?

A. Yes.

Q. Okay. Do you recognize -- who -- who did he point to? I couldn't see who he pointed to.

02:37PM A. He pointed to the one in the long sleeve black Polo.
02:37PM Q. The dark shirt?
02:37PM A. Yes.
02:37PM Q. And that's Bryan Jackson?
02:37PM A. Yes, it is.
02:37PM Q. Do you recognize the other officer that's standing there next to Officer Jackson?
02:37PM A. Yes, I do.
02:37PM Q. Who is that?
02:37PM A. Sy Slover.
02:38PM Q. Okay. Is he employed at the Amarillo Police Department today?
02:38PM A. Yes.
02:38PM Q. Okay. What -- what -- what role do you perform for the Amarillo Police Department?
02:38PM A. I'm a member of our SWAT team.
02:38PM Q. Are either of these people a member of the SWAT team?
02:38PM A. Yes, one of them is.
02:38PM Q. Who?
02:38PM A. Sy Slover.
02:38PM Q. A SWAT team is -- Bryan Jackson, does he do things in conjunction with the SWAT team or SWAT team activities?

A. He works in conjunction with us due to his role as -- I believe he is titled a negotiator, and we work together with them during critical incidents.
Q. Are there times where the SWAT team and negotiators will go and look at buildings where hostage situations or crisis situations could -- could occur?
A. Yes.
Q. Why?
A. It's for us to be able to solve the problem or rescue a hostage, we have to know how to get to the hostage. Plenty of times buildings -- everywhere we go, we will look at the makeup of the doors, the makeup of windows and things like that to see how we could get in if we could get in -- in an emergency.
Q. So if -- if these are still shots from a video in which some -- some of the discussion on the video was very low, but it was talking about the lock -- the type of lock that was on the door --
A. Uh-huh.
Q. -- and talking about the consistency of the door itself as a solid core or a hollow core door, why would two officers standing outside of an office need to know those kind of things?
MR. WOOLDRIDGE: Objection, calls for speculation.

THE COURT: Overruled.

Q. (BY MR. LOVE) It was overruled. You can answer. I'm sorry.

A. Oh. We would -- at any given point, we would look at it, we would discuss the type, make-up of the door because there are numerous different ways for us to attack a door to try and defeat the locking mechanism to gain entry quickly.

Q. So if they're talking outside of the door and that's what they are talking about, the consistency of the door and the lock, that would not be unusual for -- for work that you do?

A. No, it would not.

Q. Have you done something like this?

A. Yes, I have.

Q. When?

A. Recently I did at the new Xcel building downtown on Buchanan. Did a -- an extensive survey of that site to figure out how to defeat locks and get into it.

Q. Do you -- do you know whether the Xcel building has surveillance video in the hallways?

A. Yes, they did.

Q. Okay. Would you have shown up similarly like Officer Slover and Officer Jackson standing in front of

02:40PM doors on some of the video in the Xcel building?

02:41PM A. Yes.

02:41PM Q. Did you analyze the doors as I've described these two officers were doing in that situation?

02:41PM A. Yes, I did.

02:41PM Q. Now, if there was a mail slot in the door, this one right here with Officer Jackson and Slover, is -- is there any way you can determine the consistency or the type of door it is by sticking your hand in the mail slot to determine that?

02:41PM A. You might be able to tell different things if -- it would -- it depends on the door. You would -- you might be able to tell something -- the make-up of the door; if it's solid, if it's not, if it's just veneer on the outside, if it's metal, if it's wood, if there's anything behind it that could be like Chicago block or something like that that could barricade the door, that would be something to slow us down.

02:42PM Q. Okay. And there was a second -- I'm going to show you --

02:42PM MR. LOVE: May I approach the witness?

02:42PM THE COURT: Surely. Go ahead.

02:42PM Q. (BY MR. LOVE) I'm going to show you Defendant's Exhibit 19. Do you recognize the person who is depicted in State's (sic) Exhibit 19?

02:42PM A. I -- I don't.
02:42PM Q. Is that you?
02:42PM A. No.
02:42PM Q. Are you sure?
02:42PM A. Yes.
02:42PM Q. Okay.
02:42PM MR. LOVE: I'll pass the witness.
02:42PM REDIRECT EXAMINATION
02:42PM BY MR. WOOLDRIDGE:
02:42PM Q. How do you spell Sy Slover?
02:42PM A. Sy is S-Y. Slover is S-L-O-V-E-R.
02:42PM Q. Just S-Y?
02:42PM A. Yes, sir.
02:42PM Q. When you do these inspections through buildings like that, do you ever have to seek the permission of the building first before you start going through there and doing that sort of thing? You just do it on your own?
02:43PM A. Not if it's public access.
02:43PM Q. Have you ever participated in a fire inspection of any of these buildings?
02:43PM A. No.
02:43PM MR. WOOLDRIDGE: Pass the witness.
02:43PM MR. LOVE: No other questions.
02:43PM THE COURT: Thank you. You may step

down.

May the witness be excused?

MR. WOOLDRIDGE: Yes.

THE COURT: Thank you.

THE WITNESS: Thank you, sir.

(Witness exits the courtroom)

THE COURT: You may call your next witness.

MR. WOOLDRIDGE: Warren L. Clark.

THE COURT: You have already been sworn, haven't you?

MR. CLARK: I have not been -- yes, I have. I have been sworn.

THE COURT: Okay. Thank you.

(Witness takes the witness stand)

THE COURT: Go ahead.

WARREN L. CLARK

having been first duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. WOOLDRIDGE:

Q. Please state your full name.

A. Warren L. Clark.

Q. What does the L stand for?

A. Who do I work for?

Q. No. What does the L stand for?

A. Oh. Lee.

You need to speak up a little bit, Mr. Wooldridge. I'm a little hard of hearing.

Q. Mr. Clark, what is your role and employment at present?

A. I work for the Randall County Criminal District Attorney's office.

Q. How long have you done that?

A. Oh, eight-and-a-half years.

Q. So in 2016, would you agree with me in February -- actually February 23rd when we filed the allegations in Ms. Patrick's case, have you been pretty much the attorney either supervising or overseeing or assisting with the -- these issues that we've been raising through Ms. Patrick and Mr. Stocker?

A. Well, I have handled her Article 11.072 writ response and also handled her direct appeal representing the State.

Q. Okay. And one of those proceedings we had on that was May 31st of 2016, wasn't it?

A. Yes.

Q. And that was the actual -- when we actually got around to the writ hearing and revocation?

A. Yes.

Q. And you were present at that?

02:45PM A. I was.
02:45PM Q. And who else was assisting you in that meeting -- or hearing?
02:45PM A. As far as the 11.072?
02:45PM Q. Yes.
02:45PM A. No one else.
02:45PM Q. Who all was over at the table?
02:45PM A. I think Mr. Love was there with me.
02:45PM Q. And was Ms. Wiggins participating?
02:45PM A. Yes, Courtney Wiggins.
02:45PM Q. Okay. And you were, I guess, actually the lead voice throughout most of that for the State?
02:45PM A. Yes.
02:45PM Q. Okay. Now, subsequent to that, we filed an appeal on that and were you the attorney handling the appeal for the State?
02:45PM A. Yes.
02:45PM Q. And was anyone assisting you on that appeal?
02:45PM A. No.
02:45PM Q. Ms. Wright didn't participate?
02:45PM A. No.
02:45PM Q. What exactly is your role within the district attorney's office?
02:45PM A. I'm the appellate chief.
02:45PM Q. The appellate --

A. I dole out the -- who works on what appeals and supervise Kristy to an extent. She doesn't need -- need much supervision, but that's part of my job.

Q. As part of that appeal, we reached a point where the 7th Court of Appeals sent us a -- a letter commanding us to provide additional briefing to the Court on the issue of whether or not there was a written notice of appeal and what the implications would be. Is that correct?

A. No. They sent us a request to respond to the question of whether or not you would be permitted to supplement the clerk's record with evidence derived from the 11.072 proceeding.

They wanted to know, number one, whether or not there -- it was relevant. And, number two, whether or not they had jurisdiction to consider those materials.

MR. WOOLDRIDGE: May I approach?

THE COURT: You may.

Q. (BY MR. WOOLDRIDGE) Mr. Clark --

MR. WOOLDRIDGE: Was my last 18 or 19?

MR. LOVE: 19.

THE REPORTER: This will be 20.

Q. (BY MR. WOOLDRIDGE) Mr. Clark, I'm going to show you what I have labeled as Defendant's Exhibit 20.

02:47PM Do you recognize what that is?
02:47PM A. Yes.
02:47PM Q. And what is that?
02:47PM A. That is a letter from the Court of Appeals
02:47PM dated February 16th, 2017, inquiring us to brief the
02:47PM issue as to whether or not an oral notice of appeal
02:48PM arising from an 11.072 writ is sufficient to confer
02:48PM jurisdiction on the Court of Appeals.
02:48PM Q. Well, they are directing us to provide
02:48PM additional briefing, are they not?
02:48PM A. Yes.
02:48PM Q. Okay.
02:48PM MR. WOOLDRIDGE: Your Honor, at this time
02:48PM I would offer into evidence what has been marked as
02:48PM Defendant's Exhibit 20.
02:48PM MR. BLOUNT: No objection.
02:48PM THE COURT: Admitted.
02:48PM MR. BLOUNT: No objection.
02:48PM THE COURT: Thank you, sir.
02:48PM Q. (BY MR. WOOLDRIDGE) Now, Mr. Clark, I'm going
02:48PM to show you what has been marked as Defendant's Exhibit
02:48PM Number 21. Do you recognize what this is?
02:48PM A. Oh, I know what it is.
02:48PM Q. And what is it?
02:48PM A. That's my response to the Court of Appeals.

02:48PM Q. This is your letter, brief and response?
02:48PM A. Yes.
02:48PM Q. And this is a three-page document?
02:48PM A. Yes.
02:48PM Q. And the last paragraph in response to a question posed by the Court of Appeals, can you read what your response is there. It will be the last paragraph.
02:48PM A. You want me just to read the last paragraph and not in response to the question?
02:49PM Q. Well, you can read the question too if you want.
02:49PM A. "Has Appellant ever filed a written notice of appeal expressly mentioning that she desired to appeal the trial court's denial of her Article 11.072 writ of habeas corpus." Answer, "No. The only extant written notice of appeal is the one located at C.R., which stands for clerk's record, 281, which references the Judgment of Conviction herein rendered against her." Judgment of Conviction is Italicized.
02:49PM Q. You can stop there.
02:49PM A. You don't want me to read the rest of it?
02:49PM Q. Well, if you want to, go ahead.
02:49PM A. "Appellant's oral notice of appeal preceding the hearing on the State's Amended Motion to Revoke

02:49PM failed to satisfy the relevant appellate rules or
02:49PM trigger this Count's jurisdiction."
02:49PM Q. Thank you.
02:49PM MR. WOOLDRIDGE: Your Honor, at this time
02:49PM I would offer into evidence, Defendant's Exhibit 21.
02:50PM MR. BLOUNT: No objection.
02:50PM THE COURT: Admitted.
02:50PM Q. (BY MR. WOOLDRIDGE) Mr. Clark, I'm now going
02:51PM to show you what has been labeled Defendant's Exhibit
02:51PM Number 22.
02:51PM A. Oh, I recognize that.
02:51PM Q. And what is this?
02:51PM A. That's your response.
02:51PM Q. Okay. In my response I reference the
02:51PM reporter's record from that hearing and under Roman
02:51PM Numeral III, the third full paragraph. Have you had a
02:51PM chance to review that anytime lately?
02:51PM A. Oh, I've read it.
02:51PM Q. Okay. Do you have any question as to whether
02:51PM this accurately matches the reporter's record for that
02:51PM particular segment?
02:51PM A. About what? Well, that's what it says, yes.
02:51PM Q. Correct. And you don't disagree that the
02:51PM reporter's record was accurate and true?
02:51PM A. Well, the reporter's record shows that you

02:51PM made an oral -- you uttered an oral notice of appeal.
02:52PM Q. Well, Mr. Clark, I just asked you if it was
02:52PM accurate and true?
02:52PM A. Yeah, I guess so. Yeah.
02:52PM MR. WOOLDRIDGE: Your Honor, I would
02:52PM offer into evidence --
02:52PM A. Yeah.
02:52PM MR. WOOLDRIDGE: -- Defendant's
02:52PM Exhibit 22.
02:52PM THE COURT: No objection?
02:52PM MR. BLOUNT: No objection.
02:52PM THE COURT: 22 is admitted.
02:52PM MR. WOOLDRIDGE: Pass the witness.
02:52PM CROSS-EXAMINATION
02:52PM BY MR. BLOUNT:
02:52PM Q. So as I understand it, and I'm not a writ
02:52PM lawyer or appellate lawyer, but as I understand it, the
02:52PM issue came down to Wooldridge -- Mr. Wooldridge orally
02:52PM announced that he wanted to appeal at the hearing, the
02:52PM writ -- the writ hearing, revocation hearing held in
02:52PM front of Judge Self?
02:52PM A. That's correct.
02:52PM Q. He orally announced he wanted to appeal?
02:52PM A. Yes. What happened was Judge Self orally
02:52PM determined that the writ was frivolous. And I

02:52PM approached the bench with an order that would recite
02:52PM that the writ was frivolous. At that point,
02:52PM Mr. Wooldridge came up to the bench and said we're
02:53PM appealing, which is fine.
02:53PM But it's fundamental law, Mr. Blount,
02:53PM that a -- any notice of appeal from a proceeding, which
02:53PM is appealable -- an order which is appealable must be in
02:53PM writing. It doesn't matter if it's written on tissue
02:53PM paper or a matchbook cover or a piece of regular paper,
02:53PM it must be in writing. And any competent lawyer should
02:53PM know that.
02:53PM Q. And so that was the question that the Court of
02:53PM Appeals was inquiring about, was whether that oral
02:53PM announcement was sufficient?
02:53PM A. That's correct.
02:53PM Q. Okay. And that's what y'all responded to the
02:53PM Court of Appeals about?
02:53PM A. That's what I did.
02:53PM MR. BLOUNT: Pass the witness.
02:53PM REDIRECT EXAMINATION
02:53PM BY MR. WOOLDRIDGE:
02:53PM Q. Mr. Clark, do you remember me handing a
02:53PM written notice of appeal to Judge Self?
02:53PM A. Yes. You handed him a notice of appeal, which
02:53PM specifically stated that you were appealing from Tori

Patrick's conviction of --
Q. Do you remember me --
A. No, let me finish. -- her conviction for kidnapping.
Q. Do you remember me handing him a different notice of appeal?
A. No, you did not.
Q. Okay. Even though the record reflects in two different places that I'm handing a written notice of appeal to Judge Self?
A. It doesn't matter what it reflects, you never tendered a written notice of appeal, James. You just can't accept it.
Q. How far away were you standing from me when I handed it to Judge Self?
A. I was right next to you. You handed him one notice of appeal. That's all.
Q. Warren, why would the reporter's record reflect that I did that twice?
A. It doesn't reflect that, James.
Q. So you are disputing the record?
A. You've been saying this for months.
Q. Are you disputing the --
MR. BLOUNT: Your Honor, I'm going to interject here. This is getting us nowhere. They have

02:54PM a disagreement and --

02:54PM THE CLARK: The issue is resolved.

02:54PM MR. BLOUNT: And it's on Tori Patrick's
02:54PM case. It's on her -- it's -- it's -- it's irrelevant at
02:55PM this point.

02:55PM MR. WOOLDRIDGE: It's relevant to the
02:55PM continuing pattern of misconduct on the part of the
02:55PM Randall County Criminal District Attorney's office.

02:55PM MR. BLOUNT: He's answered -- he has
02:55PM answered the question.

02:55PM THE COURT: I'll sustain the objection.

02:55PM MR. WOOLDRIDGE: Pass the witness.

02:55PM MR. BLOUNT: No further questions.

02:55PM THE COURT: You may step down.

02:55PM MR. CLARK: Thank you, sir.

02:55PM MR. LOVE: Your Honor, I have some
02:55PM additional information about Officer Strate, Jace
02:55PM Strate.

02:55PM Officer Jace Strate was out sick on
02:55PM Tuesday and Wednesday. He was not personally served
02:55PM with it. It appears from the information I've been
02:55PM given, that a secretary at the police department was
02:55PM served with it.

02:55PM He comes in at 3:00, so he has not even
02:55PM been in today to see that the subpoena was served on a

-- a secretary. We believe that serving a secretary of someone is not sufficient service, is not valid service.

Having said that, Officer Strate is on his way here.

MR. WOOLDRIDGE: We can recall that subpoena, because if the other police officer has testified that that's a different personality, there's no need to bring Mr. Strate here now. We can address that issue at some other point.

THE COURT: Okay. So you withdraw the subpoena?

MR. WOOLDRIDGE: Yes, sir.

THE COURT: All right. Would you notify Officer Strate that he is not needed. Unless the State wants to call him. You don't need to call Strate, do you?

MR. LOVE: We're not going to call Officer Strate, no, sir.

THE COURT: Please notify him that the subpoena has been withdrawn.

Next witness?

MR. WOOLDRIDGE: Defense rests -- or I'm sorry -- Applicant rests.

THE COURT: Applicant rests.

The State?

MR. BLOUNT: We're ready.

Jennifer Vest.

(Witness enters the courtroom)

THE COURT: Good afternoon.

THE WITNESS: Hi.

THE COURT: What's your name?

THE WITNESS: Jennifer Seay.

THE COURT: Would you raise your right hand.

(Witness sworn)

THE WITNESS: I do.

THE COURT: Be seated over here on the witness stand, please.

(Witness takes the witness stand)

THE COURT: And if you would, spell your last name for the reporter.

THE WITNESS: S-E-A-Y.

MR. BLOUNT: May I proceed, Your Honor?

THE COURT: You may.

JENNIFER SEAY,

having been first duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. BLOUNT:

Q. Ms. Seay, I called you Jennifer Vest. Is that your former maiden name?

A. Yes.
Q. Okay. So at one time it was V-E-S-T?
A. Yes, sir.
Q. And you are married now and your married name is Seay, S-E-A-Y?
A. Correct.
Q. Okay. Ms. Seay, do you know a person named Tori Brooke Patrick?
A. Yes.
Q. And how do you know Tori Patrick?
A. I worked with her a long time ago and was a friend of hers for a short time. We worked at Northwest Texas Hospital together.
Q. In March of 2003, would you have been -- is that the timeframe where you were working with her?
A. Correct.
Q. And around the end of March, specifically March the 27th of 2003, did you talk with an Amarillo police officer named Mark Brown about some events regarding Tori Patrick?
A. Yes, sir.
Q. Did you ultimately give a signed affidavit to Mark Brown with the Amarillo Police Department about this episode?
A. Yes, sir.

03:02PM Q. Did that involve a conversation that you had had with Tori Patrick two or three weeks earlier on March the 11th or 12th of 2003?
03:02PM A. Yes, sir.
03:02PM Q. And on March the 11th or 12th of 2003, what -- how -- how did your contact with Tori -- how did it begin? How did it come about on that particular day? The -- the -- and I'm talking about the conversation which led to you talking with Mark Brown.
03:02PM A. The day that I talked to Mark Brown?
03:02PM Q. No. The day that Tori Patrick talked to you around March the 11th or 12th of 2003.
03:02PM A. That day began, she called me on the phone and was just hysterical. I asked her if she was okay. What was going on. She told me she could not tell me anything over the phone, proceeded to hang up the phone at that time --
03:03PM Q. Okay.
03:03PM A. -- and then showed up at my house.
03:03PM Q. Okay. Now, ma'am, that's a long time ago, you agree with me?
03:03PM A. Yes, sir.
03:03PM Q. Have -- have you had an opportunity to review the -- the affidavit that you signed back then from Mark Brown?

03:03PM A. Yes, sir, that was sent to me.
03:03PM Q. Do you know when by any chance?
03:03PM A. It is on my phone.
03:03PM Q. It's on your phone?
03:03PM A. Yes, sir.
03:03PM Q. In fact, did -- did Ms. Patrick -- do you remember telling Sergeant Brown that, in fact, Ms. Patrick said that she had done something horrible?
03:03PM A. Yes.
03:03PM Q. And after she -- you said that she showed up at your house?
03:03PM A. Yes, sir.
03:03PM Q. And when she came to your house, how was she acting?
03:03PM A. Pretty hysterical.
03:04PM Q. Did you get her calmed down and ask her what was going on?
03:04PM A. Yes.
03:04PM Q. And what did she tell you?
03:04PM A. She proceeded to tell me that she had lured somebody to her apartment.
03:04PM Q. And did she name this person?
03:04PM A. Yes. Dustin Pool.
03:04PM Q. Okay. And did she indicate that some other folks had come to her apartment and told -- and told her

that they wanted to kill Dustin Pool?
A. Yes. She spoke of two men that were at her apartment.
Q. And do you recall the names of these people that she told you were at her apartment?
A. The names she gave me were Joshua Stocker and Josh Bledsoe.
Q. Okay. And did they -- did she tell you why they wanted to harm Dustin Pool?
A. She had mentioned to me that there was some sort of hit out on Dustin and that it was just -- involved -- to do with -- with methamphetamines.
Q. Okay. And as a result of them discussing this matter, did she agree to do something for them?
A. Yes. Her part of that was just to lure Dustin over to her apartment.
Q. And did she tell you how she went about doing that?
A. She didn't go into a lot of detail. I believe she had just told me that she called him and just asked him to come over to her apartment.
Q. Okay. And did she indicate whether he ever agreed or -- or not or whether he -- she ever got ahold of him? Well, that's a bad question. Let me -- let me withdraw that and ask it a different way.

Did she indicate whether or not he ever agreed to come over? And, ma'am, I know it's been a long time. If you get to a point where you are not recalling, just tell me you don't recall.

A. That's okay. We did not have an exact conversation about the phone call. She just spoke of -- that Dustin Pool was at her apartment.

Q. Okay. All right. And did she talk about what happened when he got there -- the first thing that happened? What was the first -- when he got there, what happened first?

A. She stated that they were sitting on her couch, her and Dustin, talking.

Q. Okay.

A. That she got up to go to the bathroom and that she heard him screaming.

Q. Okay. Did -- did she indicate where these other -- you talked -- she talked to you about Josh Stocker being there and another guy she named as Josh Bledsoe -- Joshua Bledsoe. Did she indicate where they were when Dustin Pool was sitting on the couch?

A. She stated they were in the hallway of -- inside her apartment.

Q. Okay. And she indicated to you the next thing she knew, Dustin Pool was screaming?

03:07PM A. Yes, sir.
03:07PM Q. Did -- did she indicate where she was when this was going on?
03:07PM A. From what I can recall, she was in the bathroom from what she had stated.
03:07PM Q. Okay. And then what -- and then what did she tell you happened?
03:07PM A. That she came out of the bathroom and told them that they needed to shut him up.
03:07PM Q. And next?
03:07PM A. That he was struck with a fireplace utensil.
03:07PM Q. Did she -- what, if anything, did she say about blood?
03:08PM A. That there was a lot on the couch and the carpet.
03:08PM Q. What, if anything, did she say about Guin Garcia?
03:08PM A. The only thing that I can recall from her statement to me was that she was there at some point.
03:08PM Q. Did she -- what, if anything, did she indicate to you eventually happened with Dustin Pool?
03:08PM A. That he was taken from her apartment.
03:08PM Q. And did she tell you -- what, if anything, did she tell you about how he was removed from her apartment?

03:08PM A. I believe what she stated to me at that time was in some sort of moving box and placed in a vehicle.
03:08PM Q. Okay. Did -- what, if anything, did she say about a later conversation she had with Josh Stocker?
03:09PM A. I believe in reference to phone calls that were made of what to do with the body. I apologize. I've -- it's been a couple of days since I looked at the statement.
03:09PM Q. Okay. Would it help -- help refresh your memory about that if I let -- let you review your statement?
03:09PM A. Uh-huh.
03:10PM Q. I don't want you to read it out loud.
03:10PM A. Okay.
03:10PM Q. Just review it to yourself.
03:10PM (Witness reviews statement)
03:10PM A. That there was --
03:11PM Q. Well, first of all --
03:11PM A. Uh-huh.
03:11PM Q. -- let me ask whether that helped refresh your memory?
03:11PM A. Yes, sir.
03:11PM Q. Okay. Now, my -- the question, I think, was did she later -- did she tell you she later learned some information from Josh Stocker?

A. Yes.

Q. And what was that?

A. That after Dustin was placed in the vehicle, that he was driven for a ways and then ended up being beat to death. And then a phone call was made to Craig Kimberlin to find out what to do with the body.

Q. And -- and did she indicate whether or not she herself knew where the body ended up?

A. Yes. Not exactly. Craig Kimberlin had just told her that it ended up at a farmhouse buried under concrete.

Q. I'm handing you what has been marked as State's Exhibit Number 38. Would you take a look at that and tell me if you recognize that document?

A. Yes.

Q. Is that a true copy of the affidavit you gave Mark Brown in March of 2003?

A. Yes, sir.

MR. BLOUNT: May I have it back. Offer State's Exhibit 38.

MR. WOOLDRIDGE: No objection.

THE COURT: All right. It is admitted, Counsel

MR. BLOUNT: Pass the witness.

CROSS-EXAMINATION

BY MR. WOOLDRIDGE:

Q. Did you testify at any of the trials of the people involved in this?

A. I believe -- I believe it was Tori's. It's been so long ago, I can't remember exactly, and it was very quickly.

Q. Was it essentially the same thing that you testified to here?

A. Yes.

MR. WOOLDRIDGE: Pass the witness.

MR. BLOUNT: No further questions.

THE COURT: Thank you, Ms. Seay. You may step down.

And may she be excused?

MR. WOOLDRIDGE: No objection.

(Witness exits the courtroom)

MR. BLOUNT: Jeremy Patrick.

MR. LOVE: And while we're waiting for Mr. Patrick, we had asked that Bobbie Bruhn be held under her subpoena. Her son is running in the State cross country meet tomorrow and we're not going to use her. Can we have her released so that she can go to her son's state championship cross country?

MR. WOOLDRIDGE: No objection.

THE COURT: No objection. She is therefore released.

MR. LOVE: Thank you.

(Witness enters the courtroom)

THE COURT: Good afternoon.

THE WITNESS: Good afternoon.

THE COURT: Are you Jeremy Patrick?

THE WITNESS: Yes, sir.

THE COURT: Would you raise your right hand, please.

(Witness sworn)

THE WITNESS: Yes, sir.

THE COURT: Be seated over here, please, sir.

(Witness takes the witness stand)

THE COURT: The State may question.

JEREMY DEAN PATRICK,

having been first duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. BLOUNT:

Q. Is -- is your full name Jeremy Dean Patrick?

A. Yes.

Q. And, Mr. Patrick, do you know a Tori Patrick?

A. Yes.

Q. How do you know Tori?

03:17PM A. I was married to her probably 15, 20 years ago.
03:18PM Q. And y'all ended up getting divorced?
03:18PM A. Yeah.
03:18PM Q. Before March of 2003, y'all were divorced?
03:18PM A. Yes.
03:18PM Q. Do y'all have a child together?
03:18PM A. Yes.
03:18PM Q. And what's that child's name?
03:18PM A. Caden.
03:18PM Q. Are you -- you don't live in Amarillo anymore?
03:18PM A. No.
03:18PM Q. Where are you living, the city? I don't want the address.
03:18PM A. Angel Fire.
03:18PM Q. You live in Angel Fire?
03:18PM A. Yeah. I'm working in Dallas, but I live in Angel Fire.
03:18PM Q. I see. Okay.
03:18PM And you agreed to come here and testify for -- you know, we called you -- wanted to call you as a witness?
03:18PM A. Yes.
03:18PM Q. We appreciate you being here, sir.
03:18PM I'm going to ask you some questions about

03:18PM an affidavit that you gave a long time ago. And if you
03:18PM get to a point where you're having difficulty recalling
03:18PM what you said, please just let me know and we'll -- you
03:19PM don't have a copy of the affidavit with you, do you?
03:19PM A. No. I do in the truck, not with me.
03:19PM Q. You reviewed it?
03:19PM A. Yeah, I've -- I've -- I've looked it over.
03:19PM Q. But if you need to refresh your memory with
03:19PM it, I've got a copy.
03:19PM A. Okay.
03:19PM Q. You just let me know.
03:19PM A. Okay.
03:19PM Q. I don't want you guessing.
03:19PM A. Right.
03:19PM Q. Okay. Did you meet with a -- a police officer
03:19PM named Mark Brown around March the 25th of 2003, and give
03:19PM him a sworn affidavit?
03:19PM A. Yes, I believe I met with him twice.
03:19PM Q. But on March the 25th of 2003, did you give
03:19PM him the affidavit, a written signed affidavit?
03:19PM A. Yes.
03:19PM Q. And was that -- was that concerning a
03:19PM conversation that you had had with your ex-wife, Tori
03:19PM Patrick?
03:19PM A. Yes.

03:19PM Q. How did that conversation come about?
03:19PM A. With Tori?
03:19PM Q. Yeah -- and, first of all, you -- you were talking to Mark Brown on March the 25th. Were you telling him about a conversation you had had earlier with Tori?
03:20PM MR. WOOLDRIDGE: Objection, compound question.
03:20PM Q. (BY MR. BLOUNT) Well, let me ask you this.
03:20PM THE COURT: Sustained.
03:20PM MR. BLOUNT: I will withdraw it and ask it a different way.
03:20PM Q. (BY MR. BLOUNT) About when was this conversation with Tori Patrick?
03:20PM A. The first time she talked to me was before the incident happened. She said they were offering her money to do this.
03:20PM Tori -- we just blew it off. If anybody knows Tori, you just kind of blow off whatever she says. She just talks a lot. And then afterwards -- it was a day or two maybe after it happened, she called me over there, you know, crying. I walked in and she explained, you know, she went ahead and did it.
03:20PM Q. Okay. And where did this conversation occur?
03:20PM A. I want to say -- it's a three to four-story

apartment complex. Belpree Apartments, I believe. It's over off of I-40 and Bell. Third floor, I think, if I remember correctly.

Q. Okay. And so this second conversation where she called you and said she needed to talk to you, but you didn't want -- she didn't want to do it on the phone, did she?

A. No.

Q. And so did you -- and why was it she didn't want to do it on the phone?

A. She was worried that the police or -- were listening in or she -- she just gets real paranoid.

Q. Wiretaps and phone bugs --

A. Yeah.

Q. -- and things of that nature?

A. Yeah. Yes.

Q. Was her -- what was her demeanor? When I say demeanor, do you know what I mean? How was she acting when she called you?

A. Really paranoid. I couldn't tell if she was just high or not, but she was just real paranoid, and I really didn't believe her when I walked in. I mean, when she was telling me about it, I did notice that she got new couches.

Q. And did you ask her about the new couches?

A. Yeah. And she said that's what she needs to talk to me about, and that's when she started explaining.
Q. Well, before she started explaining, did she do something else?
A. Turned the TV up real loud and we went into one of the bedrooms. I can't remember which one. I want to say it was Caden's bedroom.
Q. And did you take that as a -- more part of the paranoia?
A. I thought she was just high. She -- she comes up with scenarios when she's high.
Q. Okay. All right. Once -- once she turned the TV up and y'all went back to the back bedroom what, if anything, did she tell you about Dustin Pool?
A. She said she went ahead and did it, and she called -- you know, she had him over to the house. Somebody was in the closet. There was two people there. He stuck her -- or assaulted him with a fireplace poker. After all that -- you know, she heard him scream, please don't kill me.
After that she -- there was other people there to help -- help get the body out of there.
Q. Okay. Now, did she name one of the two people that was there when Dustin Pool got to her apartment?

A. She said Josh Stocker.
Q. And she didn't name the other person -- or if she did, you didn't recall the name?
A. She's had so many conversations with it -- about it. I don't remember if she told me Michael Stocker then or if it was, you know, before or after. I can't honestly give you an honest answer with that.
Q. Okay.
A. The person she said assaulted him was Josh Stocker.
Q. Okay. And I'm sorry if you've already -- I don't -- I don't recall you testifying about this. But did she indicate what was it that she heard, if anything, when Josh Stocker and the other person confronted Dustin Pool in her apartment?
A. She heard him plead for his life, please don't kill me.
Q. Did she tell you -- what, if anything, did she tell you what happened after Josh Stocker was hit? I mean -- I'm sorry -- after Dustin Pool was hit?
A. She said they carried a big box. It might have been a refrigerator -- at first she said a wooden box. Might have been a refrigerator to carry him out. And then she -- or she left. And when she came back, you know, there was some items still left. They -- they

were -- tried to clean it up.
Q. Did she indicate who helped her try and clean it up?
A. Guin helped her clean it up and then she called Josh Stocker back over there because he -- they left Dustin's wallet and cell phone there.
Q. Did she indicate whether she was happy or unhappy about --
A. She seemed -- she seemed scared maybe after the fact. She's -- she's --
Q. Okay.
A. It's -- it's hard to read because, you know, it's just a lot of emotion going on. She is kind of a -- just hard for me to read.
Q. Well, did she -- did you indicate that she told you that she griped Josh Stocker out about leaving Pool's stuff at her apartment because he was supposed to get rid of it?
A. Yes, she was mad about it. Like he was almost setting her up.
Q. According to her, what was Josh Stocker supposed to do with the cell phone?
A. He -- they were supposed to drive around to different locations and call other numbers so that there would be other -- you know, a trail going a different

direction.

Q. Well, she was -- she was concerned about something in regards --

A. Yeah, about -- about -- about her being the last phone call. You know, because she called him to -- for him to come over there.

Q. She didn't want hers to be the last number?

A. Right.

Q. What -- what, if anything, did she say about these people and an attorney?

A. She said they offered to give her money for an attorney if she -- if she needed it. She was in their group -- group now. She just -- she felt like she was a part of them. Like they were going to take care of her on it.

Q. What, if anything, did she tell you what happened with Dustin Pool after he was taken away from the apartment?

A. One time she said they started burying him like in a basement. She did say they drove several hours. And from there she -- I mean, she -- all the stories she kept talking -- she just talks and talks and talks. It's like the worst person in the world to do a crime with.

So like, I mean, I've heard a bunch of

03:27PM different stories from her, but she -- they just all -- you know, after -- after that, her story kind of changed a little bit, but 100 percent she knew ahead of time and right after that's -- she's never changed it.

03:27PM MR. WOOLDRIDGE: Objection, nonresponsive.

03:27PM THE COURT: Sustained.

03:27PM Q. (BY MR. BLOUNT) Okay. But the story as you -- from her, as you knew it, on March the 25th is what you put in your statement?

03:27PM A. Yes.

03:27PM Q. I'm going to show you what I have marked as State's Exhibit Number 39. Would you look at that for me, please.

03:27PM A. Yes, that's it.

03:27PM Q. Do you recognize it as your statement?

03:27PM A. Yes.

03:27PM MR. BLOUNT: May I have it back, please. Offer State's 39.

03:27PM MR. WOOLDRIDGE: No objection.

03:27PM THE COURT: Admitted.

03:27PM MR. BLOUNT: Pass the witness.

03:27PM CROSS-EXAMINATION

03:27PM BY MR. WOOLDRIDGE:

03:27PM Q. Now, Mr. Patrick, if we can be clear. You

03:28PM said you went over a couple of days after this had
03:28PM happened and that's when she was telling you?
03:28PM A. Well, I wasn't -- I wasn't for sure if it was
03:28PM a day or a couple of days, it's been 15 years.
03:28PM When I got there she had enough time to
03:28PM already have new couches in the apartment, and that's
03:28PM what she wanted to talk about.
03:28PM Q. And that was the apartment where -- and I
03:28PM think you said Belpree. I've never heard that title
03:28PM before. Are you talking about the ones where this
03:28PM happened at River Falls?
03:28PM A. River Falls, yes, sir.
03:28PM Q. Okay. So at River Falls you said she had new
03:28PM couches there?
03:28PM A. Yes.
03:28PM Q. Now, you've testified in other matters
03:28PM involving Ms. Patrick, have you not?
03:28PM A. I've testified on -- yeah -- yes.
03:28PM Q. Quite a few times actually because you've had
03:28PM some child support, child custody issues, the two of
03:29PM you?
03:29PM A. I went to court against her one other time
03:29PM on -- yes, on -- well, as far as testifying against her,
03:29PM one other time.
03:29PM Q. Now, you testified in Michael Stocker's trial

03:29PM too, did you not?
03:29PM A. Yes.
03:29PM Q. And in that trial you essentially said that -- well, you were saying whatever you needed to say because it's going to help you out in your child support case -- or child custody case?
03:29PM A. No. I said I was trying to get on record and -- and be as vague as possible because I didn't want to be strung out through this -- a bunch of subpoenas, but everything I did say was the truth.
03:29PM Q. Have you had a chance to review that record?
03:29PM A. Yes.
03:29PM Q. When did you review it?
03:29PM A. I looked at it again yesterday.
03:29PM Q. And that reporter's record as it pertains to your testimony is true and correct?
03:29PM A. Yes.
03:29PM Q. And what you said in there is true and correct?
03:29PM A. Yes.
03:29PM Q. Now, how many times have you been arrested?
03:29PM A. Oh, several times.
03:29PM Q. Are you up in the high twenties?
03:29PM A. No.
03:30PM Q. Like 27, something like that?

03:30PM A. No.
03:30PM Q. How many times, do you know?
03:30PM A. I started doing time when I was --
03:30PM MR. BLOUNT: Well, Judge, I'm going to object. It's not proper impeachment about how many times you've been arrested. If he wants to ask about felony convictions, that's fine. We understand that.
03:30PM THE COURT: Sustained.
03:30PM Q. (BY MR. WOOLDRIDGE) How many convictions have you had?
03:30PM A. The last felony --
03:30PM MR. BLOUNT: Well, that's not a proper question either, Judge. It's a felony or a misdemeanor crime of moral turpitude or theft.
03:30PM THE COURT: Sustained.
03:30PM Q. (BY MR. WOOLDRIDGE) How many felony or misdemeanor crimes of moral turpitude have you been convicted of?
03:30PM A. I've been convicted -- my last felony was in 1998 to be convicted.
03:30PM Q. What was your relationship with Omar Mendoza?
03:30PM A. I knew him. I knew of him.
03:30PM Q. Did you do --
03:30PM A. Everybody --
03:30PM Q. -- business with him?

I'm sorry. Say it again.

A. Everybody back in the '90's knew Omar Mendoza.

Q. Why was that?

A. He just sold cocaine and speed.

Q. And you did business with him?

A. No. I -- I knew him, but I never did business with him.

Q. Did you know this Miguel she was talking about in the statement that you gave?

A. I asked her at the time if it was Miguel, I want to say Gonzales that we knew, and she said it wasn't that Miguel.

Q. If there are receipts showing that the two couches in question were never delivered to the apartment at River Falls, can you explain how you saw the green couches there?

MR. BLOUNT: Judge, that's just asking him to speculate.

THE COURT: Sustained.

MR. WOOLDRIDGE: Pass the witness.

MR. BLOUNT: No further questions.

THE COURT: Thank you. You may step down, Mr. Patrick.

MR. BLOUNT: We admitted 38, but I didn't give it to you, Judge.

03:32PM THE COURT: Thank you.

03:32PM (Witness exits the courtroom)

03:32PM MR. BLOUNT: The State rests.

03:32PM THE COURT: The State rests.

03:32PM Applicant?

03:32PM MR. WOOLDRIDGE: We close.

03:32PM MR. BLOUNT: Close.

03:32PM THE COURT: Close.

03:32PM MR. WOOLDRIDGE: For the purposes of this 03:32PM hearing, Judge, because of the issues that have 03:32PM developed, I would ask the Court to continue the matter 03:32PM for at least a couple of weeks in order to be able to 03:33PM develop further evidence that's arisen from the 03:33PM testimony here. And if it turns out that that doesn't 03:33PM come to fruition, I'm certainly -- I can certainly -- we 03:33PM can certainly revisit with the Court and say we're done.

03:33PM THE COURT: Well, do you wish to make 03:33PM oral closing arguments or do you wish to just leave it 03:33PM with me as it is?

03:33PM MR. BLOUNT: The State wishes to.

03:33PM MR. WOOLDRIDGE: Yeah, Judge, if I may.

03:33PM THE COURT: All right. What I propose 03:33PM then is that we hear your oral closing arguments, and 03:33PM I'll take the matter under advisement for a period of 03:33PM time. If -- if you have other evidence to present, I'll

need to know it real quick.

MR. WOOLDRIDGE: I understand.

THE COURT: And after I hear your arguments, I will take the matter under advisement and probably invite you guys to each submit a proposed set of findings and conclusions, not saying that I will adopt either one. Understood?

MR. LOVE: Yes, sir.

THE COURT: Closing argument then, Mr. Wooldridge.

MR. WOOLDRIDGE: Yes, Your Honor.

APPLICANT'S CLOSING ARGUMENT

BY MR. WOOLDRIDGE: At the conclusion of all the matters involved in this, what we still have at the end of the day is, we had a trial with Josh Stocker. Witnesses testified, particularly Tori Patrick, that there was no use immunity agreement. Other witnesses testified there were no agreements, bolstering the credibility of those witnesses. Particularly Tori Patrick again, because she is the person in the apartment at the beginning that establishes the State's case and points the finger at Josh Stocker.

She testified she did not have a use immunity agreement. She, in fact, had several agreements at various levels; some formal written

agreements, some not. None of those were entered, including the formal written agreement for the use agreement.

Nobody ever corrected that with the jury. The State never came back and said, you know what, actually there is something that gives Ms. Patrick incentive to testify in a certain way and gives her a bias to testify in a certain way.

Even if the Defense had been presented with that, which they weren't, Brady -- nobody's ever -- still ever presented it. For the documents that were presented, it may have affected some of the credibility of some of the other witnesses. For whatever reason, those attorneys came in here and did not offer an explanation for why any reasonable, competent attorney would have performed otherwise. And even they say, you know, we don't have an explanation.

So the issue is with Josh Stocker's trial, that jury was left with a false impression, and it was a material false impression as to the credibility of the witnesses whether they should be believed and how the story unfolded.

Additionally, with the other testimony that comes in and -- and I'm kind of surprised actually. These -- these back up a lot of the things that Tori

03:36PM said that had her testimony altered.

03:36PM Josh Stocker did not get a fair trial.
03:36PM Josh Stocker deserves a new trial wherein he could be
03:36PM tried fairly.

03:36PM THE COURT: State's closing?

03:36PM MR. BLOUNT: Judge, we're going to split
03:36PM this up if the -- if the Court will indulge us.

03:36PM STATE'S CLOSING ARGUMENT

03:36PM BY MR. BLOUNT: I am going to address one
03:36PM thing and then I'm going to let Mr. Clark, more
03:36PM particularly, address the writ hearing. But I want to
03:37PM point out where in the transcript you can find evidence,
03:37PM aside from Tori Patrick's testimony or even Guin
03:37PM Garcia's testimony, that implicates Josh Stocker in the
03:37PM murder.

03:37PM In other words, even if you disregard
03:37PM Tori's testimony or Guin's testimony, there was evidence
03:37PM to establish his guilt of capital murder. And as an
03:37PM demonstrative aid, I'll give to the Court my outline of
03:37PM the witnesses and where you can find that testimony.

03:37PM Jill Paulson, Dustin Pool's mother, and
03:37PM at Volume 9, page 17, she indicated that she had last
03:37PM talked to Dustin on March the 9th around 3 p.m. The
03:38PM following Thursday she had Sprint give her the last
03:38PM number Dustin calls -- called, and it was Tori

Patrick's. She also accessed his voice messages and one was from Tori.

Jessica Kimberlin, the wife of Craig Kimberlin, testified that she was present on or about March the 9th of 2003, when Craig received a call from Stocker. After Craig told her that he, Stocker, had gone to some girl's apartment at River Falls and waited for Pool and that he had -- that he had Pool. And she was asked, "What did Mr. Kimberlin do then?" Answer, "He got a bag together with some duct tape and rope and then he left to go over there."

Judge, I've -- I've put this in outline form. Instead of me just standing up here and reading it to you, I'll let you have it for your purposes. If it doesn't help you, throw it away. And I'll -- I'll stop and let Mr. Clark pick it up.

THE COURT: Okay. Mr. Clark.

STATE'S CLOSING ARGUMENT

BY MR. CLARK: Your Honor, Mr. Blount brought the camera back for you to give you an overview of -- just to simply show that our position is very simple in this matter. You can simply remove Tori Patrick's testimony completely. Erase it from the entire record, erase it from all of these volumes right here, throw it in Lake Meredith and what you have is a

03:39PM mountain of evidence from accomplice/nonaccomplice witnesses as well as physical evidence, which clearly supports the jury's reasoned verdict.

Now, Mr. Wooldridge has stood up to say that he just didn't get a fair shot all because of a single piece of paper, that is the use immunity agreement that was not produced. And we want the Court to be aware that ultimately when you determine the proposed findings and conclusions, this is one of the determinations that you have to make as to the weight and significance of all of the evidence, taking away Tori Patrick's testimony.

What I want to do for the next few minutes, if you will indulge me, is to bring the camera in close so that I can address these four issues that you now have before you.

The first one, of course, is -- asked about the failure to provide Brady material. Now, I'm going to state right now that it is established, and I will not contest or dispute the fact that the written use immunity agreement was not timely provided to the Defense. I don't think there's any dispute about it. The equivalent of that was certainly there and the Defense was permitted to fully cross-examine her about her understanding. And that was, she was testifying

under a grant of use immunity. So that was there for the jury. So as for the absence of a written use immunity agreement, that answer would be, yes, it was not produced.

I do believe that as far as Guin Garcia's concern, Your Honor, that is a fact issue that has been demonstratively established that the use immunity agreement was provided timely. The Defense acknowledged its receipt and I note that they elected -- they elected not to even bring it up when they cross-examined Guin Garcia. The significance of that, I'll discuss in just a minute.

It brings us to the materiality analysis. It's not enough to simply say that something wasn't produced. We now have to consider the materiality of that. I will discuss that along with the criticality analysis in just a moment.

Then you get to the second subseries of questions, and that is did Tori Patrick and Guin Garcia give false testimony. In other words, did they produce false evidence? Now, remember, Your Honor, that everything in Tori Patrick's three statements and her plea testimony and her testimony before the jury in the Joshua Stocker trial is true. She has told us everything in that was true. The TDC phone

03:43PM conversations that we talked to Ms. Patrick about, they provide further corroboration of that.

She says that she was told to testify falsely about a use immunity agreement. But as I've pointed out, we now know on that cross she orally confirmed the very same thing, that she was testifying under the use immunity agreement. We also know now as a result of Ms. Patrick's concessions that she didn't have a deal. That what James Farren said was true and she corroborated that. She confirmed that. Corroborated further by the Potter County phone call that she conceded was accurate and that she did tell her mother that.

I -- in addition to answer -- trying to answer these questions, Your Honor, we have to examine Tori's affidavit, and specifically the affidavit that she provided Mr. Wooldridge when he filed this particular writ. Not her writ, but this instant writ. For example, on the issue of Robnett and James Farren's -- according to Ms. Patrick -- insistence that she run him off and that he deal with her solely. You have the Robnett affidavit before you as part of the writ.

We believe that the Court records, the Potter County phone communications, the documents substantiating that and the communications between the

district attorney's office and Mr. Robnett's office clearly establish that he remained her lawyer throughout, all the way up to 2007, when she entered the plea to kidnapping.

And I want to point out something that wasn't discussed, but it's obvious from the record, Robnett never moved to withdraw. He never removed himself from this case.

Now, I pointed all of this out in my response to Mr. Stocker's writ application. I pointed this out when I responded to Ms. Patrick's writ application. And, if anything, I feel and I submit to you that for the reasons I have put forth, that affidavit is not worthy of belief. It simply is not worthy. It's not worthy because it's directly rebutted by the evidence that we have presented to you. And I note that this Court got the same treatment that Ms. Patrick received from Mr. Robnett. He didn't show up. He wasn't called. I would have loved to have cross-examined him.

The part of the affidavit in which she alleges James Farren urged her to -- and I'm quoting from memory -- get onboard or else you will be prosecuted for capital murder. Your Honor, I think a fair question is why would Tori Patrick have to get

onboard to avoid capital murder prosecution according to James Farren's directives when she had already negotiated the terms of her own surrender when she went to Ms. Vest and Mr. Patrick, her ex-husband, to confess and tell them everything a full four months before she ever had any contact with James Farren? It doesn't make sense, Your Honor.

This is how you should interpret these kind of inane allegations. It's as if whoever thought this up, had not taken the time to read the entire record. They only knew bits and pieces, whoever it was.

And, of course, finally the events of 2007, you have the record before you. Robnett asked for the offer, we give it -- the office gives it to him and the resulting plea deal. It's consistent with lawyers doing things for the minimum.

MR. WOOLDRIDGE: Objection, trying to strike over the shoulders of Counsel.

MR. CLARK: Ms. Patrick --

THE COURT: Sustained.

MR. CLARK: Ms. Patrick alleges that we coerced her to lie about her use immunity agreement and this issue of probation. I want you to consider the phone calls between Ms. Patrick and her mother.

Now, why would Jeremy Fowler -- why would

03:48PM he bring up the issue of the use immunity agreement if everybody was onboard not to bring it up? And when Tori Patrick denies the existence of any deals, what does Jeremy Fowler do? He plows ahead and asks her, irrespective of that, about her understanding of the agreement between her and the district attorney's office. Very simple. Testify truthfully, the ultimate essence of a use immunity agreement.

Now, I don't think that Jeremy Fowler is that obtuse or deficient. She alleges that she met with James Farren and/or Jeremy Fowler for 20 to 30 times. I will let the Court decide who it wishes to believe and what is plausible when it comes to that allegation.

As to this information that she was instructed not to mention or talk about leaving for Dallas at the insistence of Craig Kimberlin, the manner of her confrontation in the apartment with Dustin Pool, her desire to see it carried outside, her calls to Dustin Pool, that Dustin Pool carried a gun or did not carry a gun, that he was a snitch, that the fireplace poker was not bloody or damaged or maybe it was bloody or damaged. I could never get a handle on that one.

None of this makes sense, Your Honor, if you read the entire record, if you look at her statements that she has already provided, not even

03:50PM counting the ones to Patrick and to Vest, not even counting those. They simply don't make sense, because the same evidence was elicited through multiple witnesses or Tori herself when she talked freely and openly about these things, without prompting by the State as to blood evidence. That was a volunteered statement.

03:50PM If we were acting according to a script, according to the Applicant's writ application, certainly no one was doing a very good job. Almost intentionally, it looks like, if you accept the premise that they are trying to promote.

03:51PM Again, Your Honor, it's all very strange, as if somebody wrote up these affidavits and didn't know the entire record.

03:51PM MR. WOOLDRIDGE: Again, striking over the shoulders of Counsel.

03:51PM THE COURT: Sustained.

03:51PM MR. CLARK: Consider this, Your Honor. Tori Patrick had the same opportunity to offer the same evidence in this very same courtroom, and she elected not to. We know what happened. We know what happened. Judge Self stated on the record, he read the application, he read our response and he made a decision. He found it frivolous. I think that's

significant. I think and hope that that informs you when you consider whether Tori Patrick provided false evidence at trial.

And finally as to drones, helicopters, black Chargers and getting run off the road. I am reminded of a truism and this truism triggers my baloney-detection factor in my mind. Extraordinary claims require extraordinary evidence, and we have none.

Now, Your Honor, this brings me to really the crucial part of this and how do you approach this. Let's assume you find false evidence, let's assume you find a Brady violation. There are two approaches to this, and I don't want to get real wonky with you at this point because this will be something I will be addressing to the Court in our proposed written findings of facts and conclusions of law.

But you have two tests to apply. One is to the Brady materiality test, and that calls for the Court to make the determination of whether or not the outcome would have been the same absent Tori Patrick's testimony. That's the Brady test. And I think Mr. Blount and his comments address that and we invite you to read his notes, to think about that test on that level.

The false evidence test is a little bit

03:53PM different, Your Honor, and this is the more -- the more
03:53PM stringent of the two analyses, and what I mean by that
03:53PM is this. Error is more readily found when you apply the
03:53PM test applicable to the false evidence. It is -- it
03:53PM calls for an examination of whether the false evidence
03:54PM contributed to the verdict. Did it contribute to the
03:54PM verdict? In other words, is there a reasonable
03:54PM likelihood that it contributed to an erroneous verdict.

03:54PM Now, in this regard, I too have prepared
03:54PM an aid for you, and what this aid is, is simply a
03:54PM collection of various -- the testimony provided various
03:54PM witnesses and a recordation of the physical evidence in
03:54PM the case which corroborates all the key elements of Tori
03:54PM Patrick's affidavits and her testimony at trial.

03:54PM And what I would like to do is, is
03:54PM provide this to you. I'll provide a copy to opposing
03:55PM Counsel. Your Honor, you can take this. You don't have
03:55PM to look at it. You can file it away, but we would ask
03:55PM you to -- to use this as a guide when we submit our
03:55PM findings and conclusions.

03:55PM To give you a flavor of what I'm talking
03:55PM about, if you could open up to the table of contents,
03:55PM there's a Tab A and it outlines the testimony that was
03:55PM provided by Detective Brown. And Detective Brown told
03:55PM the jury -- and by the way, Your Honor, all of this

evidence -- all of the evidence contained in this collection was admitted without objection.

He told the jury that Tori told him about the plan to lure Dustin Pool to her apartment. She tells Brown why she participated in the plan to lure Pool to the apartment. He described motel records, which corroborated her and Guin Garcia's movements on the night of March 9th and 10th. His testimony concerned the cell phone records, which tracked all of the actors in this strategy as it stretched out over two days.

You could go to Tab B and consider the testimony of Destry Keeling. He told the jury how the rouse was developed by Josh Stocker, Guin Garcia and Tori Patrick, how to nab Pool, and how Stocker beat Pool with a fireplace poker and enlisted Kimberlin's assistance. And then you have Jessica Kimberlin under Tab C. And, of course, she provided an avalanche of evidence about her husband's -- Craig Kimberlin's involvement in this. How he described how he moved Pool out of the apartment in a big box, that he told Tori Patrick to leave town and travel to Dallas, Texas; gave her money, bought her new furniture, and how Josh Stocker struck Dustin Pool with a fireplace poker.

In other words, you have various other

03:57PM witnesses, Your Honor. Chris Eason, Brooke Vandergriff, Tyler Hale, Omar Mendoza. Of course, Sergeant Crandell testified to the discovery of Stocker's wallet in Patrick's apartment, corroborating Tori Patrick's testimony that she removed the wallet and took it to her apartment. And, of course, Kathy McCord, the DPS chemist and analyst who could not exclude Dustin Pool as the donor of the DNA mix.

Now, Your Honor, finally, Robert Love -- Mr. Love was questioning C.J. McElroy and he asked her a question at the time that I didn't know -- realize the significance of until I thought about it that night. He asked her, did she ever consider that when you -- when you look at how the jury was charged in this case and we know that Guin Garcia and Tori Patrick were accomplices as a matter of law, the jury could not even consider their testimony unless it was sufficiently corroborated. She agreed with that. And he invited her to entertain the possibility that they could have disbelieved everything that she said completely and thrown it out and nevertheless relied on the mountain of evidence in the record to reach their verdict, and she agreed that was certainly possible.

She also got -- Mr. Love also had her and Mike Watkins concede that their trial strategy was a

03:59PM novel and valiant, yet failed effort to persuade the jury to come back with a murder conviction. That's the bottom line.

03:59PM THE COURT: Capital.

03:59PM MR. CLARK: Yes, from capital down to murder with the obvious benefits on the punishment end of it. And it's consistent -- that is consistent with the way they tried this case, Your Honor. And this is the bottom line. They didn't care about the use immunity agreement. They didn't care about that. They didn't care about deals. They didn't concern themselves with whether or not a particular witness had or had not reached an agreement, had or did not have a use immunity agreement. They didn't care. They focused on one thing, kicking that thing down to murder with their entomologist testimony and they were convinced they had it.

04:00PM Now, I know what it's like to lose. I do. I've been there. You know for -- you know for a fact it's tough, but you move on. Some lawyers do. Some lawyers don't. And when you consider the testimony of Ms. McElroy, I want you to consider one thing. What she really told this Court was that when you consider all of the evidence, all of the evidence contained in the go-by that Mr. Blount has presented you, all of the

evidence that we hope you will review in this booklet, she is stating that the failure of her part to have a single sheet of paper which said Tori Patrick has use immunity agreement undermined the integrity of the jury's verdict.

Now, she is entitled to her opinion, but she is not entitled to ignore the record whatsoever. I understand her motivations. I understand her opinion. I don't think it's a very strong opinion and I'm saying that it was only natural that when she learned of the existence of this missing use immunity agreement, that was reason enough for her to reach the conclusion that she did.

We -- there's no excuse -- there's no excuse for failing to have that written use immunity agreement. I think Judge Miner termed it -- kind of summed it up best and it turns out that he was prescient when he stated after that short hearing that they had, well, if it exists, it's lost somewhere in the bowels of the DA's office, and that's what happened.

Did it have an outcome -- did it have an effect on the outcome of this trial? Did it affect the integrity of the verdict? We submit the answer is a resounding no, and we will be prepared to submit proposed findings and conclusions to that effect.

Thank you.

THE COURT: Thank you.

MR. CLARK: Any questions, Your Honor?

THE COURT: No questions -- well, I do, I suppose a couple. It's not just what you have addressed so far or -- or what Mr. Wooldridge has addressed so far, but --

MR. CLARK: Your Honor, could you come a little closer the to mic for me.

THE COURT: I'm not sure it's on. There.

MR. CLARK: Yes, sir.

THE COURT: It's not just what you have addressed or what Mr. Blount has addressed nor what Mr. Wooldridge has raised so far, but in the last three days we've had a number of things bandied about here in the courtroom, including several ethical considerations, including Mr. Farren's denial of the existence of this piece of paper to start with, and then -- then finding the blank one and then going on.

Including Mr. Robnett's affidavit, which you are aware of, including the alleged meetings between Mr. Farren and sometimes Gil and sometimes Bobbie and sometimes Jannings and sometimes somebody else in his office without her lawyer present. When a -- when a person is represented by counsel, I know -- I know you

04:04PM need to prepare your witnesses and you need to talk to your witnesses and do all that sort of stuff, everybody does that. But if they're represented by counsel, you need to either have counsel's permission to do that or some other reason to get it done without counsel.

Whether that ethical -- whether that rises to an ethical violation or not is a question that's running around here. Mr. Robnett's affidavit clearly says he didn't give anybody permission to do that, so who knows.

MR. LOVE: And -- and Mr. Farren's testimony clearly says that at some point he got permission to meet with Ms. Patrick because of the distance issues.

THE COURT: I -- I -- I recognize that too, but there's a conflict there. Which one -- which one is right? Which one is wrong?

Ms. Patrick's testimony, too, was when she was coming up to have her visits with her kids, she would stop into her lawyer's office -- Mr. Farren's office and have a conversation. I don't know if that's true or not. It's just -- it's there running around. And I don't know exactly how to address my request that you each --

MR. CLARK: You want me to address that,

Your Honor?

THE COURT: Well, you don't have to now, but somehow in your proposed findings and stuff --

MR. LOVE: Okay.

MR. CLARK: I think I know what you're asking.

THE COURT: I mean -- I mean, it seems to me that there could be a conglomeration of things that build up to a level that gets to be out of hand.

MR. CLARK: Okay. All right. I think I am --

THE COURT: I'm not sure we're there, but I -- but I haven't -- I haven't made a decision in here yet, but I have a lot of things to think about. And that's why I would like to see what your proposed findings and conclusions are and what Mr. Wooldridge's are.

I kind of have an idea of where I'm -- part of mine is going, but I don't know about the final outcome.

There's four questions that the Court wants answered. And I noticed on your -- the cover of your little notebook, you used the word critical in -- in quotation marks. That's what the Court used in their letter back here, was critical in quotation marks.

MR. CLARK: And I don't know why they used that particular term, but --

THE COURT: Well, they didn't say essential, they didn't say important, they didn't say -- words have meaning as you know, some tweets these days. You know, there are some words that do have meaning.

Anyway, if you would address those issues as well as the ones that are raised by the actual writ application, I would appreciate it.

MR. CLARK: Yes, sir.

THE COURT: If you have something further to address now, you may.

MR. WOOLDRIDGE: No, Your Honor. I think I will just provide that in the proposed findings of facts and conclusions of law.

THE COURT: Okay. If you need to have a further evidentiary hearing, I need to know as soon as possible.

MR. WOOLDRIDGE: I will --

THE COURT: My time -- my time is kind of limited. I've got to be in Lubbock for a couple of days. I've got to be in Potter County for seven or eight days. I've got to be in Florida for one, so -- doing crazy things.

MR. WOOLDRIDGE: To that end, Your Honor,

04:08PM I would ask that the court reporter prepare the record from these hearings.

04:08PM THE COURT: All right. She is -- she is instructed, Madam Reporter, to do a supplemental reporter's record to be filed at least by the due date of January --

04:08PM MR. CLARK: It's January 9th.

04:08PM THE COURT: -- 9th, I think it is. Yeah. I would like to do it before then.

04:08PM On -- in terms of your proposed findings and conclusions that you want to submit to me, I would like those within the next week or two -- a couple of weeks maybe. Can you do that?

04:09PM MR. LOVE: One of -- one of the issues that I think we will both decide will run across is having a clear recollection of exactly what the factual allegations were --

04:09PM THE COURT: Yes.

04:09PM MR. LOVE: -- without having a copy of the record. Is there a way that -- I know they've told us the 9th, but I don't know how long it's going to take Ms. Wall to prepare the record. But once we know that, is there a way that we can request the Court of Criminal Appeals and maybe ask for an extension because of that issue?

THE COURT: I have --

MR. WOOLDRIDGE: Your Honor --

THE COURT: -- sought the one and only extension, I think, they are willing to grant. So I might -- I might purview that if I'm running into difficulties, but --

MR. WOOLDRIDGE: Your Honor --

THE REPORTER: Are we still on the record?

THE COURT: We can go off for just a minute.

(Off-the-record discussion between the Court, Counsel and Reporter)

(Open court)

THE COURT: Back on the record then. The reporter indicates it will take her probably early December at the earliest to get the transcription done -- the reporter's record. And I am -- am scattered out through the month of December in various places. So I don't know how we're going to accomplish my finalization of my findings and conclusions, if I don't have more time to work on it.

So as soon as you can get those done, get them in is all I can say.

MR. WOOLDRIDGE: And, Your Honor, I -- I

don't recall the Court of Criminal Appeals giving us any of the usual hateful blurbs about you don't get any more extensions period.

I think it -- another extension would be in order, and I've also got the issue that I've got a federal trial set to begin the first week in January. That, of course, takes precedence over state matters and it's going to put me in a bind --

THE COURT: Balderdash. Okay.

(Laughter)

MR. WOOLDRIDGE: -- because I'm going to get crutched in there in -- in December and January trying to do two major things at once.

THE COURT: Okay.

MR. WOOLDRIDGE: I would -- I would ask the Court to seek an extension, perhaps maybe of just 30 days to the end of January or early February, and that's going to greatly assist, I think, all of us.

THE COURT: I'm going to -- I'm going to wait until we see how the month of November develops. If -- if by the end of November we're still not in shape to do this stuff, I'm going to ask them, but whether they will grant it or not is another question.

MR. LOVE: Thank you, Your Honor.

THE COURT: I appreciate the -- the

04:12PM orderly manner in which y'all have presented what was
04:12PM presented and it is all going to be under consideration.

04:13PM MR. WOOLDRIDGE: Thank you, Your Honor.

04:13PM THE COURT: Thank you very much.

(Proceedings Concluded)

REPORTER'S CERTIFICATE

THE STATE OF TEXAS )
COUNTY OF RANDALL )

I, Dina Wall, Official Court Reporter in and for the 47th District Court of Randall County, State of Texas, do hereby certify that the above and foregoing contains a true and correct transcription of all portions of evidence and other proceedings requested in writing by counsel for the parties to be included in this volume of the Reporter's Record, in the above-styled and numbered cause, all of which occurred in open court or in chambers and were reported by me.

I further certify that this Reporter's Record of the proceedings truly and correctly reflects the exhibits, if any, admitted by the respective parties.

WITNESS MY OFFICIAL HAND this the 8th day of January, 2019.

Dina Wall ____________________________
Dina Wall, Texas CSR 4784
Expiration Date: 12-31-2018
47th District Official Court Reporter
Randall County, Texas
Canyon, Texas 79015
(806) 468-5557