**ELECTRONIC RECORD**

**EX PARTE**

**Application for Writ of Habeas Corpus**
**47th District Court**
**Randall County, Texas**

RECEIVED
COURT OF CRIMINAL APPEALS
2/20/2018
DEANA WILLIAMSON, CLERK

**TRIAL COURT WRIT NO. W-15307-A-1**

**CLERK'S SUMMARY SHEET**

**APPLICANT'S NAME:** **JOSHUA DAVID STOCKER**

**OFFENSE:** **CAPITAL MURDER**

**CAUSE NUMBER:** **15307A**

**PLEA:** **NOT GUILTY**

**SENTENCE:** **LIFE YEARS TDCJ** **DATE: 7/21/2005**

**TRIAL DATE:** **7/21/2005**

**JUDGE PRESIDING AT TRIAL:** **HONORABLE HAL MINER**

**APPEAL NUMBER:** **07-05-00284-CR**

**CITATION TO OPINION:** _____ S.W. 3d

**HEARING HELD:** ______ YES _____ NO

**FINDINGS & CONCLUSIONS FILED:** _____ YES _____ NO

**RECOMMENDATION:** _____ GRANT _____ DENY _____ NONE

**JUDGE'S NAME: HONORABLE DAN SCHAAP**

**NAME OF COUNSEL IF APPLICANT IS REPRESENTED: JAMES WOOLDRIDGE**

**CAPTION**

THE STATE OF TEXAS

COUNTY OF RANDALL

At a regular term of the 47th District Court begun and holden within and for the County of Randall, and State of Texas, before the HONORABLE DAN SCHAAP thereof presiding, which term began 1/2/18, the following cause came on for hearing, to-wit:

| | |
|---|---|
| **EX PARTE:** | **)( WRIT OF** |
| **JOSHUA DAVID STOCKER** | |
| **VS.** | **)( HABEAS** |
| **THE STATE OF TEXAS** | **)( CORPUS** |
| **CAUSE NO. W-15307-A-1** | |

DAN SCHAAP
PRESIDING JUDGE
47th District Court
RANDALL COUNTY, TEXAS

**NO. W-15307-A-1**

**THE STATE OF TEXAS VS JOSHUA DAVID STOCKER**

**In the 47th District Court**
**In and For**
**Randall County, Texas**

I N D E X


| | | Page |
|---|---|---|
| 1. | Application for a Writ of Habeas Corpus Seeking Relief from Final Felony Conviction under Code of Criminal Procedure, Article 11.07 Filed January 16, 2018 | 4 |
| 2. | Notice to Randall County District Attorney, James Farren Hand Delivered January 16, 2018 | 20 |
| 3. | Memorandum of Law in Support of Habeas Corpus Relief…Filed January 17, 2018 | 21 |
| 4. | State's Answer to Application for a Writ of Habeas Corpus…Filed February 1, 2018 | 168 |
| 5. | Reply to State's Answer to Application for Writ of Habeas Corpus… Filed February 19, 2018 | 240 |
| 6. | State's Sur-Reply to Applicant's Response to State's Answer to Writ of Habeas Corpus… Filed February 20, 2018 | 314 |
| 7. | First Amended Reply to State's Answer to Application for Writ of Habeas Corpus… Filed February 20, 2018 | 332 |
| 8. | Indictment…Filed August 6, 2003 | 406 |
| 9. | Trial Court's Certification of Defendant's Right of Appeal…Filed July 26, 2005 | 407 |
| 10. | Charge of the Court…Filed July 25, 2005 | 408 |
| 11. | Judgment on Jury Verdict of Guilty Punishment Fixed by Court or Jury… Filed July 26, 2005 | 421 |
| 12. | Docket Sheet | 424 |
| 13. | Clerk's Certificate | 430 |

**Case No. W-15,307-A-1**
(The Clerk of the convicting court will fill this line in.)

**IN THE COURT OF CRIMINAL APPEALS OF TEXAS**

**APPLICATION FOR A WRIT OF HABEAS CORPUS
SEEKING RELIEF FROM FINAL FELONY CONVICTION
UNDER CODE OF CRIMINAL PROCEDURE, ARTICLE 11.07**

**NAME:** **JOSHUA DAVID STOCKER**

**DATE OF BIRTH:** **28 April 1978**

**PLACE OF CONFINEMENT:** **Bill Clements Unit, 9601 Spur 591, Amarillo, Texas 79107**

**TDCJ-CID NUMBER:** **01811349** **SID NUMBER:** **05513232**

(1) **This application concerns** (check all that apply)**:**

**X** **a conviction**

**a sentence**

**time credit**

**parole**

**mandatory supervision**

**out-of-time appeal or petition for discretionary review**

(2) **What district court entered the judgment of the conviction you want relief from?** (Include the court number and county.)

**47TH Judicial District - Randall County**

(3) **What was the case number in the trial court?**

**15,307-A**

(4) **What was the name of the trial judge?**

Bruce Hal Miner



. FILED .
1/16/2018 3:28 PM
Jo Carter, District Clerk
Randall County, Texas
___AB______Deputy

(5) **Were you represented by counsel? If yes, provide the attorney's name:**

**Cristy Jo McElroy, SBN 13581995; John Michael Watkins, SBN 00797631**

(6) **What was the date that the judgment was entered?**

**21 July 2005**

(7) **For what offense were you convicted and what was the sentence?**

**Capital Murder, Life**

(8) **If you were sentenced on more than one count of an indictment in the same court at the same time, what counts were you convicted of and what was the sentence in each count?**

(9) **What was the plea you entered?** (Check one.)

**guilty-open plea** **guilty-plea bargain**
**X not guilty** ***nolo contendere*/no contest**

**If you entered different pleas to counts in a multi-count indictment, please explain:**

(10) **What kind of trial did you have?**

**no jury** **X jury for guilt and punishment**
**jury for guilt, judge for punishment**

(11) Did you testify at trial? If yes, at what phase of the trial did you testify?

No

(12) Did you appeal from the judgment of conviction?

X yes no

If you did appeal, answer the following questions:

(A) What court of appeals did you appeal to? 7TH Court of Appeals

(B) What was the case number? 07-05-00284-CR

(C) Were you represented by counsel on appeal? If yes, provide the attorney's name:

L. Van Williamson, SBN 21624550

(D) What was the decision and the date of the decision? Affirmed, 16 May 2007

(13) Did you file a petition for discretionary review in the Court of Criminal Appeals?

X yes no

If you did file a petition for discretionary review, answer the following questions:

(A) What was the case number? PD-0968-07

(B) What was the decision and the date of the decision?

Refused, 12 September 2007, 10 October 2007

(14) Have you previously filed an application for a writ of habeas corpus under Article 11.07 of the Texas Code of Criminal Procedure challenging *this conviction*?

yes X no

If you answered yes, answer the following questions:

(A) What was the Court of Criminal Appeals' writ number? ____________

(B) What was the decision and the date of the decision? ______________

(C) Please identify the reason that the current claims were not presented and could not have been presented on your previous application.

______________________________________________

______________________________________________

______________________________________________

______________________________________________

(15) Do you currently have any petition or appeal pending in any other state or federal court?

yes X no

If you answered yes, please provide the name of the court and the case number:

______________________________________________

(16) If you are presenting a claim for time credit, have you exhausted your administrative remedies by presenting your claim to the time credit resolution system of the Texas Department of Criminal Justice? (This requirement applies to any final felony conviction, including state jail felonies)

yes no

If you answered yes, answer the following questions:

(A) What date did you present the claim? ______________

**(B) Did you receive a decision and, if yes, what was the date of the decision?**

______________________________________________

**If you answered no, please explain why you have not submitted your claim:**

______________________________________________

______________________________________________

______________________________________________

______________________________________________

______________________________________________

**(17) Beginning on page 6, state *concisely* every legal ground for your claim that you are being unlawfully restrained, and then briefly summarize the facts supporting each ground. You must present each ground on the form application and a brief summary of the facts. *If your grounds and brief summary of the facts have not been presented on the form application, the Court will not consider your grounds.***
**If you have more than four grounds, use pages 14 and 15 of the form, which you may copy as many times as needed to give you a separate page for each ground, with each ground numbered in sequence. The recitation of the facts supporting each ground must be no longer than the two pages provided for the ground in the form.**

**You may include with the form a memorandum of law if you want to present legal authorities, but the Court will *not* consider grounds for relief set out in a memorandum of law that were not raised on the form. The citations and argument must be in a memorandum that complies with Texas Rule of Appellate Procedure 73 and does not exceed 15,000 words if computer-generated or 50 pages if not. If you are challenging the validity of your conviction, please include a summary of the facts pertaining to your offense and trial in your memorandum.**

**GROUND ONE:**

**Applicant was denied Due Process and the right of Confrontation by failure to disclose evidence favorable to Applicant, to wit, Use Immunity Agreements made with multiple co-defendants; tampered with the co-defendants; and suborned Aggravated Perjury to conceal the undisclosed favorable evidence and witness tampering.**

**FACTS SUPPORTING GROUND ONE:**

Two co-defendant's in Applicant's murder trial were granted Use Immunity Agreements two years before trial. One co-defendant was the only witness to events transpiring at the inception of the kidnapping and murder and was vital to the State's case. The agreements were never dis-closed. Further, the witnesses were instructed to lie about the agreements and the prosecutor sponsored his investigator to lie about the existence of the agreements to bolster the testimony of the co-defendants through Aggravated Perjury.

**GROUND TWO:**

**Applicant was denied Due Process by the use of illegal and undisclosed wiretaps to surveil Applicant's co-defendants to build evidence against Applicant.**

**FACTS SUPPORTING GROUND TWO:**

In the process of reviewing the State's file regarding a co-defendant, evidence was uncovered that the State had been wiretapping the co-defendant and never made the required disclosures.

**GROUND THREE:**

**Applicant was denied Due Process and the right of Confrontation by failure to disclose evidence favorable to Applicant, to wit, Use Immunity Agreement made with co-defendant Stephen Craig Kimberlin, and an undisclosed agreement with the same co-defendant that conferred a secret early release from prison in exchange for something unknown but to the** State and Stephen Craig Kimberlin.

**FACTS SUPPORTING GROUND THREE:**

A co-defendant in Applicant's murder trial was granted a Use Immunity Agreement two years before trial. The co-defendant was the ring-leader and incriminated Applicant as the most culpable party in return for undisclosed benefits. The agreements were never disclosed. Evi- .dence has come to light showing the co-defendant was granted a secret early release from prison apparently in return for whatever undisclosed benefit he provided to the State.

**GROUND FOUR:**

**Applicant was denied Due Process, a fair trial, and an impartial jury by false evidence, new evidence against which has surfaced casting doubt on the entirety of the State's case.**

**FACTS SUPPORTING GROUND FOUR:**

The State's case portrayed the matter as a dispute between local, low level, rival cartels. New evidence has surfaced in the form of testimony from the murder victim's business partner that casts doubt on the entire story, instead suggesting the story was a cover to conceal the true nature of the law enforcement corruption that caused the series of events, stemming from the dissolution of the Panhandle Regional Narcotics Task Force subsequent to the Tulia fiasco, and that the victim was murdered as a result of a hit ordered out of "La Pinta," the prison in retaliation for snitching directed by the narcotics task force as they were being forced to dissolve.

**GROUND:**

**FACTS SUPPORTING GROUND:**

**WHEREFORE, APPLICANT PRAYS THAT THE COURT GRANT APPLICANT RELIEF TO WHICH HE MAY BE ENTITLED IN THIS PROCEEDING.**

## VERIFICATION

This application must be verified or it will be dismissed for non-compliance. For verification purposes, an applicant is a person filing the application on his or her own behalf. A petitioner is a person filing the application on behalf of an applicant, for example, an applicant=s attorney. An inmate is a person who is in custody.

The inmate applicant must sign either the Oath Before a Notary Public before a notary public or the Inmate's Declaration without a notary public. If the inmate is represented by a licensed attorney, the attorney may sign the Oath Before a Notary Public as petitioner and then complete Petitioner's Information. A non-inmate applicant must sign the Oath Before a Notary Public before a notary public unless he is represented by a licensed attorney, in which case the attorney may sign the verification as petitioner.

A non-inmate non-attorney petitioner must sign the Oath Before a Notary Public before a notary public and must also complete Petitioner's Information. An inmate petitioner must sign either the Oath Before a Notary Public before a notary public or the Inmate's Declaration without a notary public and must also complete the appropriate Petitioner's Information.

**OATH BEFORE A NOTARY PUBLIC**

STATE OF TEXAS

COUNTY OF POTTER

JAMES EDD WOOLDRIDGE, being duly sworn, under oath says: I am the applicant / petitioner (circle one) in this action and know the contents of the above application for a writ of habeas corpus and, according to my belief, the facts stated in the application are true.

Signature of Applicant / Petitioner (circle one)

SUBSCRIBED AND SWORN TO BEFORE ME THIS 16TH DAY OF JANUARY, 2018.

Lisa Draper Baker

Signature of Notary Public

LISA DRAPER BAKER
Notary Public, State of Texas
Comm. Expires 07-12-2020
Notary ID 1818527

## PETITIONER=S INFORMATION

Petitioner=s printed name: JAMES EDD WOOLDRIDGE

State bar number, if applicable: 24010492

Address: 600 S. Tyler Street, Suite 1704

LB 12051

Amarillo, Texas 79101

Telephone: (806) 418 8575

Fax: (806) 418 8576

## INMATE=S DECLARATION

I, ________________________________, am the applicant / petitioner (circle one) and being presently incarcerated in ________________________________, declare under penalty of perjury that, according to my belief, the facts stated in the above application are true and correct.

Signed on ____________________, 20_____.

________________________________________
Signature of Applicant / Petitioner (circle one)

**PETITIONER=S INFORMATION**

Petitioner=s printed name: ______________________________

Address: __________________________________________

__________________________________________

__________________________________________

Telephone: ________________________________________

Fax: ______________________________________________

Signed on __________________, 20_____.

____________________________________
Signature of Petitioner

***JO CARTER***
**District Clerk - Randall County**
**2309 Russell Long Blvd. Ste. 110**
**Canyon, Texas 79015**
**(806) 468-5600**
**Fax No. (806) 468-5604**
**districtclerk@randallcounty.orgd**
**January 16, 2018**

James Farren, District Attorney
Randall County Justice Center
2309 Russell Long Blvd., Suite 120
Canyon, Texas 79015

RE: JOSHUA DAVID STOCKER
W-15307-A-1

Dear Mr. Farren,

Enclosed please find a copy of the **Application for Post Conviction Writ of Habeas Corpus** in the above styled and numbered cause, received by this office, today. Your office has 15 days to file an answer to the Writ.

Yours truly,
Jo Carter
District Clerk

By [signature], Deputy

DISTRICT COURT OF RANDALL COUNTY, TEXAS

JC/ab

enc.
cc: HONORABLE DAN SCHAAP
JOSHUA DAVID STOCKER

I hereby acknowledge receipt of a copy of the above-captioned **Application for Post Conviction Writ of Habeas Corpus**, filed pursuant to Article 11.07 of the Texas Criminal Procedure. Therefore, I waive service by certified mail as provided therein.

I understand that I have 15 days in which to file an answer.

James Farren
District Attorney

By [signature]
Assistant Criminal District Attorney

# MEMORANDUM OF LAW
# IN SUPPORT OF
# HABEAS CORPUS RELIEF

## GROUNDS OF HABEAS CORPUS RELIEF

**APPLICANT'S ISSUE #1: APPLICANT was denied Due Process, the right of Confrontation, and a fair trial by the State's failure to disclose evidence favorable to the accused, to wit: that co-defendants Tori Brooke Patrick and Guin Garcia had been granted Use Immunity Agreements, had been instructed to testify falsely about said agreements, and the State's sponsor of same before Appellant's Jury, thus suborning aggravated perjury to secure a conviction against Appellant., contrary to the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution, and Article I, Sections 10 and 19 of the Texas Constitution**

**APPLICANT'S ISSUE #2: APPLICANT was denied Due Process and a fair trial by and through the State's use of illegal and inadvertantly revealed wiretaps.**

**APPLICANT'S ISSUE #3: APPLICANT was denied Due Process, the right of Confrontation, and a fair trial by the State's failure to disclose evidence favorable to the accused, to wit: that co-defendant Stephen Craig Kimberlin had been granted a Use Immunity Agreement, and apparently had been. some type of highly favorable agreement for secret early release from prison, in exchange for who knows what, contrary to the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution, and Article I, Sections 10 and 19 of the Texas Constitution.**

**APPLICANT'S ISSUE #4: APPLICANT was denied Due Process and a fair trial before an impartial jury by and through false evidence material to the State's case, in that new evidence has surfaced, unavailable at the time of his trial, that would tend to exonerate, and which casts doubt on the entirety of the State's concocted story against him, in violation of the Sixth and Fourteenth Amendments to the United States Constitution and Article I, Section 10 of the Texas Constitution.**

FILED
January 17, 2018 11:35 AM
JO CARTER DISTRICT CLERK
RANDALL COUNTY, TEXAS
by AB______________Deputy

**RECITATION OF FACTS**

Applicant Joshua David Stocker was charged by way of indictment with the offense of Capital Murder, alleged to have been committed on March 3RD, 2003 in Cause Number 15,307-A in the 47TH Judicial District Court in and for Randall County, Texas, styled the State of Texas v. Joshua David Stocker. The victim alleged in said offense was Dustin Pool. Applicant was appointed counsel for his representation in that matter, said counsel initially being C.J. McElroy and Mike Watkins. Trial by jury was had from July 11TH to July 21ST, 2005. Applicant was found guilty and sentenced to confinement for Life in the Texas Department of Criminal Justice, Institutional Division.

Applicant subsequently filed an appeal in the Court of Appeals for the Seventh District of Texas at Amarillo, such appeal having been numbered as 07-05-00285-CR and for which Applicant received appointed counsel L. Van Williamson. The appeal was denied on May 16TH, 2007. Applicant thereupon petitioned the Court of Criminal Appeals for discretionary review in PD-0968-07, with said petition being refused on September 12TH, 2007. Applicant has not previously applied for a writ of habeas corpus in this matter.

**APPLICANT'S ISSUE #1: APPLICANT was denied Due Process, the right of Confrontation, and a fair trial by the State's failure to disclose evidence favorable to the accused, to wit: that co-defendants Tori Brooke Patrick and Guin Garcia had been granted Use Immunity Agreements, had been instructed to testify falsely about said agreements, and the State's sponsor of same before Appellant's Jury, thus suborning aggravated perjury to secure a conviction against Appellant., contrary to the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution, and Article I, Sections 10 and 19 of the Texas Constitution.**

## STANDARD OF REVIEW

## DUE PROCESS

No person . . . shall be deprived of life, liberty, or property without due process of law. U.S. CONST. amend. V. The Fifth Amendment of the United States Constitution applies to the individual states by virtue of the Fourteenth Amendment, which commands that no state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws. U.S. CONST. amend. XIV. The Texas Court of Criminal Appeals has long been aware of its duty to protect rights of the accused and of binding effect of concepts of due process announced by the Supreme Court of the United States. *Charles v. State*, 424 S.W.2d 909, 913 (Tex.Crim.App.1968), certiorari denied 88 S.Ct. 2319, 392 U.S. 940, 20 L.Ed.2d 1401.

Additionally, Texas provides its own constitutional due process safeguards. No citizen of this State shall be deprived of life, liberty, property, privileges or immunities, or in any manner disfranchised, except by the due course of the law of the land. TEX. CONST. art. I, § 19. This is further codified in the Texas Code of Criminal Procedure. No citizen of this State shall be deprived of life, liberty, property, privileges or immunities, or in any manner disfranchised, except by the due course of the law of the land. TEX.CODE CRIM. PROC. ANN. art. 1.04. A fair trial by a fair tribunal is a basic requirement of due process. *In re Murchison*, 349 U.S. 133, 136, 75 S.Ct. 623, 625, 99 L.Ed. 942 (1955); *United States v. Brown*, 539 F.2d 467, 469 (5th Cir.1976).

If the appellate record in a criminal case reveals constitutional error that is subject to harmless error review, the court of appeals must reverse a judgment of conviction or punishment unless the court determines beyond a reasonable doubt that the error did not contribute to the conviction or punishment. TEX. R. APP. P. 44.2 (a).

## *BRADY* & CONRONTATION

A defendant has a constitutional right to have the government disclose evidence in its possession which is material and exculpatory. *Brady v. Maryland,* 373 U.S. 83, 87, 83 S.Ct. 1194 (1963). Impeachment evidence also falls within the *Brady* rule. *United States v. Bagley,* 473 U.S. 667, 676, 105 S.Ct. 3375 (1985); *Harm v. State,* 183 S.W.3d 403, 408 (Tex.Crim.App. 2006). The State's duty under *Brady* requires disclosure of favorable evidence known only to the police. *Harm,* at 406. The obligation to disclose evidence favorable to a defendant is automatic for the government, and failure to disclose such information is not excused merely because the prosecutor claims he did not have actual

knowledge of such favorable evidence. *California v. Trombetta*, 467 U.S. 479, 485 (1984); *United States v. Auten*, 632 F. 2d 478, 481-482 (5th Cir. 1980).

To demonstrate reversible error for violation of *Brady* rights, a defendant must show (1) the State failed to disclose evidence, regardless of the prosecutor's good or bad faith; (2) the withheld evidence is favorable to the defendant; and (3) the withheld evidence is material, that is, there is a reasonable probability that had the evidence been disclosed, the outcome of the trial would have been different. *Harm,* at 406. See also *Strickler v. Green*, 527 U.S. 263, 281-282 (1999). As to the third element, materiality, (1) it does not require demonstration by a preponderance of the evidence that disclosure of the suppressed evidence would have resulted in acquittal; (2) it is not a sufficiency-of-the-evidence test; and (3) once materiality is established, the harmless error analysis has no application; and (4) it must be assessed collectively, not item by item. *Kyles v. Whitley*, 514 U.S. 419, 434-436 (1995).

Brady exists to protect the due-process rights of defendants. As the Supreme Court explained in *Trombetta*, 467 U.S. at 485, "[U]nder the Due Process Clause..., criminal prosecutions must comport with prevailing notions of fundamental fairness. We have long interpreted this standard of fairness to require that criminal defendants be afforded a meaningful opportunity to present a complete defense. To safeguard that right..., [a] defendant has a constitutionally protected privilege to request and obtain from the prosecution evidence that is either material to the guilt of the defendant or relevant to the punishment to be imposed. Even in the absence of a specific request, the prosecution has a constitutional duty to turn over exculpatory evidence that would raise a reasonable doubt about the defendant's guilt.

A conviction must be reversed upon "[a] showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Youngblood v. West Virginia*, 547 US 867, 870, 126 S. Ct. 2188, 165 L. Ed.2d 269 (2006), quoting *Kyles*, 514 U.S. at 435. Dismissal of the case with prejudice is warranted where a defendant suffers demonstrable prejudice, or the substantial threat thereof, and where the taint cannot be identified and neutralized by other means. In other words, dismissal with prejudice is appropriate in rare cases where it is the only means of adequately protecting an individual's rights and society's interest in checking abuse of the State's power. *State v. Frye*, 897 S.W.2d 324, 330 (Tex.Crim.App. 1995); *Phillips v. State*, 650 S.W.2d 396, 399-403 (Tex.Crim.App. 1983). In *Frye*, the prosecutor's act of interviewing the defendant in violation of his Sixth Amendment right to counsel, which revealed the defense's theory of the case, demonstrated a substantial threat of prejudice arising from the State's misconduct that could not be neutralized by other means. *Frye*, at 326-330. The Court of Criminal Appeals held that dismissal with prejudice was the appropriate remedy. *Id.*; see also *United States v. Morrison*, 449 US 361, 364, 101 S. Ct. 665, 66 L. Ed. 2d 564 (1981) (Dismissal is an appropriate remedy where the State's misconduct of a constitutional dimension leads to permanent, rather than transitory prejudice, which cannot be purged to assure that a defendant can effectively defend himself and that he will not be unfairly convicted); see also *State v. Terrazas*, 962 S.W.2d 38, 41 (Tex.Crim.App. 1998) (When a Sixth Amendment violation has occurred, the trial court must identify and then neutralize the taint by tailoring relief appropriate in the circumstances to assure the defendant the effective assistance of counsel and a fair trial, but a dismissal may be proper if the defendant suffers demon-

strable prejudice, or a substantial threat thereof, and where the trial court is unable to identify and neutralize the taint by other means.).

Upon motion of the defendant showing good cause therefor and upon notice to the other parties, the court in which an action is pending shall order the State before or during trial of a criminal action therein pending or on trial to produce and permit the inspection and copying or photographing by or on behalf of the defendant of any designated documents, papers, written statement of the defendant, (except written statements of witnesses and except the work product of counsel in the case and their investigators and their notes or report), books, accounts, letters, photographs, objects or tangible things not privileged, which constitute or contain evidence material to any matter involved in the action and which are in the possession, custody or control of the State or any of its agencies. TEX. CODE CRIM. PROC. ANN. art. 39.14(a). Pursuant to Article 39.14, Applicant filed on April 6TH, 2005, his Motion For Discovery seeking "30. (A)ny promises whether implied or expressed, or any aid, assistance, reward, compensation, or benefit conferred or to be conferred upon any witness, which said witness or witnesses would or might receive if said witness testified on behalf of the State, or any implied or expressed promise of aid or assistance or of possible benefit made by the State, by or through any attorney or law enforcement agency, to any attorney or member of the family or to any other person with whom said witness may have been associated or through whom said witness may have learned of said promise." and also on the same date his Motion To Produce Exclupatory and Mitigating Evidence seeking "any exculpatory and/or mitigating evidence and/or facts within the possession, custody or con-

trol of the District Attorney or any of his agents," or within the knowledge of, the state or any of its agencies. C.R. 1:40,53. The trial court granted said motions. C.R. 1:47,55.

In all criminal prosecutions the accused shall be confronted by the witnesses against him. U.S. CONST. amend. VI. TEX. CONST. art. I, § 10. The Constitution guarantees a fair trial through the Due Process Clauses, but it defines the basic elements of a fair trial largely through the several provisions of the Sixth Amendment. *California v. Trombetta*, 467 U.S. 479, 485, 104 S.Ct. 2528 (1984); cf. *Strickland v. Washington*, 466 U.S. 668, 684-685, 104 S.Ct. 2052, 2063, 80 L.Ed.2d 674 (1984). The United States Constitution guarantees criminal defendants "a meaningful opportunity to present a complete defense," whether rooted directly in the Due Process Clause of the Fourteenth Amendment, or in the Compulsory Process or Confrontation clauses of the Sixth Amendment. *Washington v. Texas*, 388 U.S. 14, 23, 87 S.Ct. 1920 (1967); *Davis v. Alaska*, 415 U.S. 308, 94 S.Ct. 1105 (1974). An essential component of procedural fairness is an opportunity to be heard. *In re Oliver*, 333 U.S. 257, 273, 68 S.Ct. 499 (1948); *Grannis v. Ordean*, 234 U.S. 385, 394, 34 S.Ct. 779 (1914).

## SUBORNATION OF AGGRAVATED PERJURY

A person commits an offense if, with intent to deceive and with knowledge of the statement's meaning she makes a false statement under oath or swears to the truth of a false statement previously made and the statement is required or authorized by law to be made under oath. TEX. PENAL CODE ANN. § 37.02(a)(1). A person commits an offense if she commits perjury as defined in Section 37.02, and the false statement: is made during or in connection with an official proceeding; and is material. TEX. PENAL CODE

ANN. § 37.03(a). An offense under Section 37.03 is a felony of the third degree. TEX. PENAL CODE ANN. § 37.03(b). A statement is material, regardless of the admissibility of the statement under the rules of evidence, if it could have affected the course or outcome of the official proceeding. TEX. PENAL CODE ANN. § 37.04(a). It is no defense to prosecution under Section 37.03 (Aggravated Perjury) that the declarant mistakenly believed the statement to be immaterial. TEX. PENAL CODE ANN. § 37.04(b). Whether a statement is material in a given factual situation is a question of law. TEX. PENAL CODE ANN. § 37.04(c). It is a defense to prosecution under Section 37.03 (Aggravated Perjury) that the actress retracted her false statement before completion of the testimony at the official proceeding; and before it became manifest that the falsity of the statement would be exposed. TEX. PENAL CODE ANN. § 37.05. An information or indictment for perjury under Section 37.02 or aggravated perjury under Section 37.03 that alleges that the declarant has made statements under oath, both of which cannot be true, need not allege which statement is false. At the trial the prosecution need not prove which statement is false. TEX. PENAL CODE ANN. § 37.06.

While the State may "prosecute with earnestness and vigor" it still must "refrain from improper methods calculated to produce a wrongful conviction. . . ." *United States v. Young*, 470 U.S. 1, 7 (1985) (quotation omitted). "It is well settled that the State is not permitted to present false evidence or allow the presentation of false evidence to go uncorrected." *Moody v. Johnson*, 139 F.3d 477, 484 (5th Cir. 1998). "To establish a due process violation based on the government's use of false or misleading testimony, a petitioner must show (1) that the witness's testimony was actually false, (2) that the testimony was material, and (3) that the prosecution knew the witness's testimony was

false." *Fuller v. Johnson*, 114 F.3d 491, 496 (5th Cir. 1997). A charge of perjury is a serious accusation that must be clearly supported by the evidence. *Haywood v. State*, 507 S.W.2d 756, 760 (Tex.Crim.App. 1974). While it is clear that the State may not obtain a conviction through the knowing use of perjured testimony, Appellant bears the burden of showing that the testimony used by the State was in fact perjured. *Losada v. State*, 721 S.W.2d 305, 311 (Tex.Crim.App. 1986).

The false-evidence materiality standard "is considered less demanding on a defendant than either the `reasonable probability' or *Brecht* harmless-error standards." *Barrientes v. Johnson*, 221 F.3d 741, 756 (5th Cir. 2000). False evidence is "material" if there is "any reasonable likelihood [that the false evidence could] have affected the judgment of the jury." *Giglio v. United States*, 405 US 150, 154, 92 S. Ct. 763, 31 L. Ed. 2d 104 (1972) (quoting *Napue v. Illinois*, 360 U.S. 264, 269 (1959)). The Supreme Court has explained that this materiality standard "is equivalent to the *Chapman* [*v. California*, 386 U.S. 18 (1967)] harmless-error standard." *United States v. Bagley*, 473 U.S. 667, 679 n.9 (1985); see also *United States v. Barham*, 595 F.2d 231, 242 (5th Cir. 1979) ("[The false-evidence materiality standard] is the brother, if not a twin, of the standard (`harmless beyond a reasonable doubt') for determining whether constitutional error can be held harmless."). Error is not harmless unless it "did not contribute to the verdict obtained." *Chapman*, 386 U.S. at 24.

"(P)erjured testimony, on any matter which was actually presented to and considered by the trial court in rendering the judgment assailed," is intrinsic fraud. *King Ranch, Inc. v. Chapman*, 118 S.W.3d 742, 751 (Tex. 2003).

## APPLICATION

The conduct of the Randall County Criminal District Attorney, James Farren, and his deputies, specifically the acts of Tampering With A Witness (by and through and against Tori Brooke Patrick and Guin Garcia) and Aggravated Perjury in the course of the prosecution of Joshua Stocker, and the co-defendants involved, resulted in the intentional deprivation of Due Process, the Right of Confrontation, and renders the verdict and sentence of Applicant constitutionally untrustworthy, entitling Joshua David Stocker to vacation of said judgment and sentence. Material evidence was withheld. Not only did the State withhold material *Brady/Bagley* impeachment evidence, the State knew of the evidence because the evidence, i.e., the Use Immunity Agreements, were created by the State and the agreement was used to induce the witnesses to rehearse testimony in anticipation of trial. Moreover, the State presented false testimony that there was no such evidence and further created and coached and intentionally suborned the false testimony specifically for the purpose of denying said evidence to Applicant's jury. At trial, on direct question, the prosecution vehemently denied that there was a Use an Immunity Agreement with the only witness (Patrick) to provide testimony pertaining to the initiation of the alleged kidnaping and murder. Moreover, prosecutors elicited testimony known to be false that there was no agreement. Yet the agreement was dated two years prior to trial and bears the signature of, among others, the Randall County *Criminal* District Attorney himself. Not only did the Randall County *Criminal* District Attorney personally contribute to creation of the witness agreement, Bobbie Ledbetter, an investigator for his office, witnessed the agreement and, in fact, typed it. The Ran-

dall County *Criminal* District Attorney then sponsored the investigator and suborned her false testimony denying the existence of said agreement.

The State attorneys, including the Randall County *Criminal* District Attorney's deputy Jeremy Fowler, identically made false representations about the existence of the witness agreement of Guin Garcia, encouraged the witness to make false representations about the existence of the agreement, failed to notify the court of the witnesses' false testimony, failed to notify opposing counsel of the witnesses' false testimony, failed to notify the court of the investigator's false testimony, failed to notify opposing counsel of the investigator's false testimony, continued to give false and perjured testimony regarding the agreement after Applicant was convicted and sentenced, and failed to notify Applicant of the *Brady* material in the years following the trial.

Further, the Court was complicit in the denial of Applicant's rights in this matter as evidenced by the inclusion of "Court Exhibits" indicating that, no later than the conclusion of Applicant's trial, the court was aware that perjured testimony had been presented and yet did nothing other than secrete the evidence within the Clerk's File, and even though having been again presented with the Use Immunity Agreements of Tori Brooke Patrick during a subsequent proceeding involving Stephen Craig Kimberlin in December, 2005, a mere five months later.

In support, see *Appendix A*, Court's Exhibits (brown folder included with the Reporter's Record, State of Texas v. Joshua Stocker, Cause No. 15,307-A In The 47TH District Court for Randall County, Texas) - State's Exhibit 263; *Appendix B* – Co-Defendant's Supporting Affidavit; *Appendix C* - Attorney's Supporting Affidavit (filed in 15,310-A In

The 47TH District Court for Randall County, Texas); *Appendices D-G* – Reporter's Record Excerpts from Volume 10, State of Texas v. Joshua Stocker, Cause No. 15,307-A In The 47TH District Court for Randall County, Texas; *Appendix H* – Use Immunity Agreement (Patrick); *Appendix I* – Ledbetter Memo; *Appendix J* – Register of Actions-Case No. 18,834-A In The 47TH District Court For Randall County, State of Texas v. Tori Brooke Patrick; *Appendix K* - Reporter's Record Excerpt from Volume 11, State of Texas v. Joshua Stocker, Cause No. 15,307-A In The 47TH District Court for Randall County, Texas; *Appendix L*- Garcia Use Immunity Agreement; and *Appendix M*, Patrick Use Immunity Agreement as Defense Exhibit 14, State of Texas v. Stephen Craig Kimberlin, Cause No. 17,288-A In The 47TH District Court for Randall County, Texas, hereto attached and incorporated.

Per the affidavits of James A. Farren and Bobbie Ledbetter Bruhn, co-defendant Tori Brooke Patrick's claims are validated. Specifically, and in denial of testimony elicited in the trial of Joshua Stocker, Farren admits in his amended affidavit that, in addition to the Use Immunity Agreement, there also existed another agreement not contained in the Use Immunity Agreement, i.e., "the only promise she had from our office was that if she told the truth under oath it would inure to her benefit." Further, even that statement is false in that there previously existed an agreement that Petitioner would receive deferred adjudication on Aggravated Kidnapping and the Capital Murder charge would be dismissed, without discussion of a term of years. *See Appendix N* - Letter from James Farren to Jeffrey Robnett dated July 19, 2004, hereto attached and incorporated.

Because of the egregiousness of the violations in this case, it is not enough to merely "identify and then neutralize the taint." The conviction should be reversed and rendered and the State's case dismissed with prejudice.

Appellant's Issue Number One should be sustained and his conviction reversed, an order of acquittal entered, or otherwise be granted a new trial.

**APPLICANT'S ISSUE #2: APPLICANT was denied Due Process and a fair trial by and through the State's use of illegal and inadvertantly revealed wiretaps.**

## STANDARD OF REVIEW

## FIFTH AMENDMENT & ARTICLE I, § 19

No person . . . shall be deprived of life, liberty, or property without due process of law. U.S. CONST. amend. V. The Fifth Amendment of the United States Constitution applies to the individual states by virtue of the Fourteenth Amendment, which commands that no state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws. U.S. CONST. amend. XIV. The Texas Court of Criminal Appeals has long been aware of its duty to protect rights of the accused and of binding effect of concepts of due process announced by the Supreme Court of the United States. *Charles v. State*, 424 S.W.2d 909, 913 (Tex.Crim.App.1968), certiorari denied 88 S.Ct. 2319, 392 U.S. 940, 20 L.Ed.2d 1401.

Additionally, Texas provides its own constitutional due process safeguards. No citizen of this State shall be deprived of life, liberty, property, privileges or immunities, or in any manner disfranchised, except by the due course of the law of the land. TEX. CONST. art. I, § 19. This is further codified in the Texas Code of Criminal Procedure. No citizen of this State shall be deprived of life, liberty, property, privileges or immunities, or in any manner disfranchised, except by the due course of the law of the land. TEX.CODE CRIM. PROC. ANN. art. 1.04.

The Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged. *In re Winship* 397 U.S. 358, 364, 90 S.Ct. 1068, 1073, 25 L.Ed.2d 368 (1970); *Lowry v. State*, 692 S.W.2d 86, 87 (Tex.Crim.App.1985).

If the appellate record in a criminal case reveals constitutional error that is subject to harmless error review, the court of appeals must reverse a judgment of conviction or punishment unless the court determines beyond a reasonable doubt that the error did not contribute to the conviction or punishment. TEX. R. APP. P. 44.2 (a).

**TEXAS CODE OF CRIMINAL PROCEDURE ARTICLE 18.20**

Within a reasonable time but not later than 90 days after the date an application for an order is denied or after the date an order or the last extension, if any, expires, the judge who granted or denied the application shall cause to be served on the persons named in the order or the application and any other parties to intercepted communications, if any, an inventory, which must include notice: (1) of the entry of the order or the application; (2) of the date of the entry and the period of authorized interception or the date of denial of the application; and (3) that during the authorized period wire, oral, or electronic communications were or were not intercepted. TEX.CODE CRIM. PROC. ANN. art. 18.20 § 13(a).

**Reports Concerning Intercepted Wire, Oral, Or Electronic Communications**

Within 30 days after the date an order or the last extension, if any, expires or after the denial of an order, the issuing or denying judge shall report to the Administrative Office of the United States Courts: (1) the fact that an order or extension was applied

for; (2) the kind of order or extension applied for; (3) the fact that the order or extension was granted as applied for, was modified, or was denied; (4) the period of interceptions authorized by the order and the number and duration of any extensions of the order; (5) the offense specified in the order or application or extension; (6) the identity of the officer making the request and the prosecutor; and (7) the nature of the facilities from which or the place where communications were to be intercepted. TEX.CODE CRIM. PROC. ANN. art. 18.20 § 15(a).

In January of each year each prosecutor shall report to the Administrative Office of the United States Courts the following information for the preceding calendar year: (1) the information required by Subsection (a) of this section with respect to each application for an order or extension made; (2) a general description of the interceptions made under each order or extension, including the approximate nature and frequency of incriminating communications intercepted, the approximate nature and frequency of other communications intercepted, the approximate number of persons whose communications were intercepted, and the approximate nature, amount, and cost of the manpower and other resources used in the interceptions; (3) the number of arrests resulting from interceptions made under each order or extension and the offenses for which arrests were made; (4) the number of trials resulting from interceptions; (5) the number of motions to suppress made with respect to interceptions and the number granted or denied; (6) the number of convictions resulting from interceptions, the offenses for which the convictions were obtained, and a general assessment of the importance of the interceptions; and (7) the information required by Subdivisions (2) through (6) of this

subsection with respect to orders or extensions obtained. TEX.CODE CRIM. PROC. ANN. art. 18.20 § 15(b).

**Unlawful Interception, Use, Or Disclosure Of Wire, Oral, Or Electronic Communications**

Per Section 16.02, "computer trespasser," "covert entry," "communication common carrier," "contents," "electronic communication," "electronic, mechanical, or other device," "immediate life-threatening situation," "intercept," "investigative or law enforcement officer," "member of a law enforcement unit specially trained to respond to and deal with life-threatening situations," "oral communication," "protected computer," "readily accessible to the general public," and "wire communication" have the meanings given those terms in Article 18.20, Code of Criminal Procedure. TEX. PEN. CODE ANN. § 16.02(a).

A person commits an offense if the person intentionally intercepts, endeavors to intercept, or procures another person to intercept or endeavor to intercept a wire, oral, or electronic communication. TEX. PEN. CODE ANN. § 16.02(b)(1).

A person commits an offense if the person intentionally discloses or endeavors to disclose to another person the contents of a wire, oral, or electronic communication if the person knows or has reason to know the information was obtained through the interception of a wire, oral, or electronic communication in violation of this subsection. TEX. PEN. CODE ANN. § 16.02(b)(2).

A person commits an offense if the person intentionally uses or endeavors to use the contents of a wire, oral, or electronic communication if the person knows or is reckless about whether the information was obtained through the interception of a wire, oral, or electronic communication in violation of this subsection. TEX. PEN. CODE ANN. § 16.02(b)(3).

A person commits an offense if the person knowingly or intentionally effects a covert entry for the purpose of intercepting wire, oral, or electronic communications without court order or authorization. TEX. PEN. CODE ANN. § 16.02(b)(4).

A person commits an offense if the person intentionally uses, endeavors to use, or procures any other person to use or endeavor to use any electronic, mechanical, or other device to intercept any oral communication when the device: (A) is affixed to, or otherwise transmits a signal through a wire, cable, or other connection used in wire communications; or (B) transmits communications by radio or interferes with the transmission of communications by radio. TEX. PEN. CODE ANN. § 16.02(b)(5).

Any offense under Section 16.02(b) is a felony of the second degree. TEX. PEN. CODE ANN. § 16.02(f).

**APPLICATION**

Co-Defendant Tori Brooke Patrick complained by way of her Petition For Writ Of Habeas Corpus in Cause Number 15,310-A that evidence had been retrieved from the State's file demonstrating that information to the detriment of Tori Brooke Patrick and

her co-defendant's was obtained via illegally wiretapped conversations of Tori Brooke Patrick in preparation for the prosecution of Joshua David Stocker, Tori Brooke Patrick, and their co-defendants. *See Appendix O*. No disclosure per Texas Code of Criminal Procedure Article 18.20, § 15(a) & (b) was ever provided to Appellant, was ever made of record as required, nor was ever submitted in this matter by the State. *See Clerk's Records for State v. Stocker & State v. Patrick*. The non-existent disclosure can only be reasonably presumed to not exist nor ever to have existed because the interception of the co-defendant's communications was flatly and flagrantly illegal, further reinforced by the content and tone of the note revealing that the State was listening to Appellant's conversations in furtherance of prosecuting Applicant and his co-defendants. Inasmuch as the State's conduct also constituted several varieties of criminal action per Penal Code Section 16.02, no doubt the State's agents had a very personal interest in not disclosing their illicit monitoring of Applicant's co-defendant. Further, there can be absolutely no assurance that whatever undisclosed information received by the State was used to the detriment and harm of Applicant in the prosecution against him.

Applicant's Issue Number Two should be sustained and his sentence reversed and vacated, and otherwise a new trial ordered.

**APPLICANT'S ISSUE #3: APPLICANT was denied Due Process, the right of Confrontation, and a fair trial by the State's failure to disclose evidence favorable to the accused, to wit: that co-defendant Stephen Craig Kimberlin had been granted a Use Immunity Agreement, and apparently had been. some type of highly favorable agreement for secret early release from prison, in exchange for who knows what, contrary to the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution, and Article I, Sections 10 and 19 of the Texas Constitution.**

## STANDARD OF REVIEW

## DUE PROCESS

No person . . . shall be deprived of life, liberty, or property without due process of law. U.S. CONST. amend. V. The Fifth Amendment of the United States Constitution applies to the individual states by virtue of the Fourteenth Amendment, which commands that no state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws. U.S. CONST. amend. XIV. The Texas Court of Criminal Appeals has long been aware of its duty to protect rights of the accused and of binding effect of concepts of due process announced by the Supreme Court of the United States. *Charles v. State*, 424 S.W.2d 909, 913 (Tex.Crim.App.1968), certiorari denied 88 S.Ct. 2319, 392 U.S. 940, 20 L.Ed.2d 1401.

Additionally, Texas provides its own constitutional due process safeguards. No citizen of this State shall be deprived of life, liberty, property, privileges or immunities,

or in any manner disfranchised, except by the due course of the law of the land. TEX. CONST. art. I, § 19. This is further codified in the Texas Code of Criminal Procedure. No citizen of this State shall be deprived of life, liberty, property, privileges or immunities, or in any manner disfranchised, except by the due course of the law of the land. TEX.CODE CRIM. PROC. ANN. art. 1.04. A fair trial by a fair tribunal is a basic requirement of due process. *In re Murchison*, 349 U.S. 133, 136, 75 S.Ct. 623, 625, 99 L.Ed. 942 (1955); *United States v. Brown*, 539 F.2d 467, 469 (5th Cir.1976).

If the appellate record in a criminal case reveals constitutional error that is subject to harmless error review, the court of appeals must reverse a judgment of conviction or punishment unless the court determines beyond a reasonable doubt that the error did not contribute to the conviction or punishment. TEX. R. APP. P. 44.2 (a).

## ***BRADY* & CONRONTATION**

A defendant has a constitutional right to have the government disclose evidence in its possession which is material and exculpatory. *Brady v. Maryland,* 373 U.S. 83, 87, 83 S.Ct. 1194 (1963). Impeachment evidence also falls within the *Brady* rule. *United States v. Bagley,* 473 U.S. 667, 676, 105 S.Ct. 3375 (1985); *Harm v. State,* 183 S.W.3d 403, 408 (Tex.Crim.App. 2006). The State's duty under *Brady* requires disclosure of favorable evidence known only to the police. *Harm,* at 406. The obligation to disclose evidence favorable to a defendant is automatic for the government, and failure to disclose such information is not excused merely because the prosecutor claims he did not have actual knowledge of such favorable evidence. *California v. Trombetta*, 467 U.S. 479, 485 (1984); *United States v. Auten*, 632 F. 2d 478, 481-482 (5th Cir. 1980).

To demonstrate reversible error for violation of *Brady* rights, a defendant must show (1) the State failed to disclose evidence, regardless of the prosecutor's good or bad faith; (2) the withheld evidence is favorable to the defendant; and (3) the withheld evidence is material, that is, there is a reasonable probability that had the evidence been disclosed, the outcome of the trial would have been different. *Harm,* at 406. See also *Strickler v. Green*, 527 U.S. 263, 281-282 (1999). As to the third element, materiality, (1) it does not require demonstration by a preponderance of the evidence that disclosure of the suppressed evidence would have resulted in acquittal; (2) it is not a sufficiency-of-the-evidence test; and (3) once materiality is established, the harmless error analysis has no application; and (4) it must be assessed collectively, not item by item. *Kyles v. Whitley*, 514 U.S. 419, 434-436 (1995).

Brady exists to protect the due-process rights of defendants. As the Supreme Court explained in *Trombetta*, 467 U.S. at 485, "[U]nder the Due Process Clause..., criminal prosecutions must comport with prevailing notions of fundamental fairness. We have long interpreted this standard of fairness to require that criminal defendants be afforded a meaningful opportunity to present a complete defense. To safeguard that right..., [a] defendant has a constitutionally protected privilege to request and obtain from the prosecution evidence that is either material to the guilt of the defendant or relevant to the punishment to be imposed. Even in the absence of a specific request, the prosecution has a constitutional duty to turn over exculpatory evidence that would raise a reasonable doubt about the defendant's guilt.

A conviction must be reversed upon "[a] showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to under-

mine confidence in the verdict." *Youngblood v. West Virginia*, 547 US 867, 870, 126 S. Ct. 2188, 165 L. Ed.2d 269 (2006), quoting *Kyles*, 514 U.S. at 435. Dismissal of the case with prejudice is warranted where a defendant suffers demonstrable prejudice, or the substantial threat thereof, and where the taint cannot be identified and neutralized by other means. In other words, dismissal with prejudice is appropriate in rare cases where it is the only means of adequately protecting an individual's rights and society's interest in checking abuse of the State's power. *State v. Frye*, 897 S.W.2d 324, 330 (Tex.Crim.App. 1995); *Phillips v. State*, 650 S.W.2d 396, 399-403 (Tex.Crim.App. 1983). In *Frye*, the prosecutor's act of interviewing the defendant in violation of his Sixth Amendment right to counsel, which revealed the defense's theory of the case, demonstrated a substantial threat of prejudice arising from the State's misconduct that could not be neutralized by other means. *Frye*, at 326-330. The Court of Criminal Appeals held that dismissal with prejudice was the appropriate remedy. *Id.*; see also *United States v. Morrison*, 449 US 361, 364, 101 S. Ct. 665, 66 L. Ed. 2d 564 (1981) (Dismissal is an appropriate remedy where the State's misconduct of a constitutional dimension leads to permanent, rather than transitory prejudice, which cannot be purged to assure that a defendant can effectively defend himself and that he will not be unfairly convicted); see also *State v. Terrazas*, 962 S.W.2d 38, 41 (Tex.Crim.App. 1998) (When a Sixth Amendment violation has occurred, the trial court must identify and then neutralize the taint by tailoring relief appropriate in the circumstances to assure the defendant the effective assistance of counsel and a fair trial, but a dismissal may be proper if the defendant suffers demonstrable prejudice, or a substantial threat thereof, and where the trial court is unable to identify and neutralize the taint by other means.).

Upon motion of the defendant showing good cause therefor and upon notice to the other parties, the court in which an action is pending shall order the State before or during trial of a criminal action therein pending or on trial to produce and permit the inspection and copying or photographing by or on behalf of the defendant of any designated documents, papers, written statement of the defendant, (except written statements of witnesses and except the work product of counsel in the case and their investigators and their notes or report), books, accounts, letters, photographs, objects or tangible things not privileged, which constitute or contain evidence material to any matter involved in the action and which are in the possession, custody or control of the State or any of its agencies. TEX. CODE CRIM. PROC. ANN. art. 39.14(a). Pursuant to Article 39.14, Applicant filed on April 6TH, 2005, his Motion For Discovery seeking "30. (A)ny promises whether implied or expressed, or any aid, assistance, reward, compensation, or benefit conferred or to be conferred upon any witness, which said witness or witnesses would or might receive if said witness testified on behalf of the State, or any implied or expressed promise of aid or assistance or of possible benefit made by the State, by or through any attorney or law enforcement agency, to any attorney or member of the family or to any other person with whom said witness may have been associated or through whom said witness may have learned of said promise." and also on the same date his Motion To Produce Exclupatory and Mitigating Evidence seeking "any exculpatory and/or mitigating evidence and/or facts within the possession, custody or control of the District Attorney or any of his agents," or within the knowledge of, the state or any of its agencies. C.R. 1:40,53. The trial court granted said motions. C.R. 1:47,55.

In all criminal prosecutions the accused shall be confronted by the witnesses against him. U.S. CONST. amend. VI. TEX. CONST. art. I, § 10. The Constitution guarantees a fair trial through the Due Process Clauses, but it defines the basic elements of a fair trial largely through the several provisions of the Sixth Amendment. *California v. Trombetta*, 467 U.S. 479, 485, 104 S.Ct. 2528 (1984); cf. *Strickland v. Washington*, 466 U.S. 668, 684-685, 104 S.Ct. 2052, 2063, 80 L.Ed.2d 674 (1984). The United States Constitution guarantees criminal defendants "a meaningful opportunity to present a complete defense," whether rooted directly in the Due Process Clause of the Fourteenth Amendment, or in the Compulsory Process or Confrontation clauses of the Sixth Amendment. *Washington v. Texas*, 388 U.S. 14, 23, 87 S.Ct. 1920 (1967); *Davis v. Alaska*, 415 U.S. 308, 94 S.Ct. 1105 (1974). An essential component of procedural fairness is an opportunity to be heard. *In re Oliver*, 333 U.S. 257, 273, 68 S.Ct. 499 (1948); *Grannis v. Ordean*, 234 U.S. 385, 394, 34 S.Ct. 779 (1914).

## APPLICATION

Undisclosed at any point in this matter has been the substance of whatever agreement Stephen Craig Kimberlin brokered with the Randall County *Criminal* District Attorney, and details remain secret to this day. However, even though TDCJ clearly reflects that Kimberlin remains incarcerated, the Facebook posts showing an aged Kimberlin with his son Codi from 2015 against a Central American backdrop clearly reflects that either Kimberlin was in fact released shortly after his strange Motion For Conference Call in 2012, or Kimberlin's son has found Kimberlin's doppelgänger to substitute.

In any event, Kimberlin's Use Immunity Agreement was concealed, as were Patrick's and Guin's as previously complained.

In support, see *Appendix P*, Register of Actions, State of Texas v. Stephen Craig Kimberlin, Cause No. 15,308-A In The 47TH District Court for Randall County, Texas; *Appendix Q* – Register of Actions, State of Texas v. Stephen Craig Kimberlin, Cause No. 17,288-A In The 47TH District Court for Randall County, Texas; *Appendix R* - Offender Information for Stephen Craig Kimberlin as reflected by the Texas Department of Criminal Justice; *Appendix S* - Booking photograph of Stephen Craig Kimberlin; *Appendix T* - Screenshot of the Facebook Page for Stephen Craig Kimberlin; *Appendix U* - Screenshot of the Facebook page of Codi Kimberlin; *Appendix V* - Screenshot of the Facebook page of Jessica Kimberlin; *Appendix W* - Pro Se Motion For Conference Call filed July 27TH, 2012, Cause No. 17,275-A, State of Texas v. Stephen Craig Kimberlin, hereto attached and incorporated.

Applicant's Issue Number Three should be sustained and his conviction reversed, an order of acquittal entered, or otherwise be granted a new trial.

**APPLICANT'S ISSUE #4: APPLICANT was denied Due Process and a fair trial before an impartial jury by and through false evidence material to the State's case, in that new evidence has surfaced, unavailable at the time of his trial, that would tend to exonerate, and which casts doubt on the entirety of the State's concocted story against him, in violation of the Sixth and Fourteenth Amendments to the United States Constitution and Article I, Section 10 of the Texas Constitution.**

## STANDARD OF REVIEW

### FIFTH AMENDMENT & ARTICLE I, § 19

No person . . . shall be deprived of life, liberty, or property without due process of law. U.S. CONST. amend. V. The Fifth Amendment of the United States Constitution applies to the individual states by virtue of the Fourteenth Amendment, which commands that no state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws. U.S. CONST. amend. XIV. The Texas Court of Criminal Appeals has long been aware of its duty to protect rights of the accused and of binding effect of concepts of due process announced by the Supreme Court of the United States. *Charles v. State*, 424 S.W.2d 909, 913 (Tex.Crim.App.1968), certiorari denied 88 S.Ct. 2319, 392 U.S. 940, 20 L.Ed.2d 1401.

Additionally, Texas provides its own constitutional due process safeguards. No citizen of this State shall be deprived of life, liberty, property, privileges or immunities, or in any manner disfranchised, except by the due course of the law of the land. TEX. CONST. art. I, § 19. This is further codified in the Texas Code of Criminal Procedure.

No citizen of this State shall be deprived of life, liberty, property, privileges or immunities, or in any manner disfranchised, except by the due course of the law of the land. TEX.CODE CRIM. PROC. ANN. art. 1.04.

The Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged. *In re Winship* 397 U.S. 358, 364, 90 S.Ct. 1068, 1073, 25 L.Ed.2d 368 (1970); *Lowry v. State*, 692 S.W.2d 86, 87 (Tex.Crim.App.1985).

If the appellate record in a criminal case reveals constitutional error that is subject to harmless error review, the court of appeals must reverse a judgment of conviction or punishment unless the court determines beyond a reasonable doubt that the error did not contribute to the conviction or punishment. TEX. R. APP. P. 44.2 (a).

The Due Process Clause of the Fourteenth Amendment can be violated when the State uses false testimony to obtain a conviction, regardless of whether it does so knowingly or unknowingly. Accordingly, to constitute a due process violation, the testimony used by the State must have been false, and it must have been material to the defendant's conviction, meaning "there is a reasonable likelihood that the false testimony could have affected the judgment of the jury." *United States v. Agurs*, 427 U.S. 97, 103-04, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976); *Ex parte Ghahremani*, 332 S.W.3d 470, 478 (Tex.Crim.App.2011).

It is sufficient that the testimony was "false." *Napue v. Illinois*, 360 U.S. 264, 269, 79 S.Ct. 1173 (1959). There is no need to show that the witness committed perjury, although whether the testimony is perjury or was knowingly used may impact the applicable standard of materiality. *Ghahremani*, 332 S.W.3d at 478. Testimony that is ‘un-

true' is one of many ways jurists define false testimony [and the] Supreme Court has indicated that `improper suggestions, insinuations and, especially, assertions of personal knowledge' constitute false testimony." *Ex parte Chavez*, No. AP-76291, 2010 WL 4638619, at *7 (Tex.Crim.App. Nov. 17, 2010) (not designated for publication) (quoting *Berger v. United States*, 295 U.S. 78, 88, 55 S.Ct. 629, 79 L.Ed. 1314 (1935).

The case against Applicant would require a thorough review of the record in this matter, but the summation is that the victim, Dustin Pool, was murdered as a result of competition between local, low level cartels.

Evidence has now surfaced in the form of the Affidavit of Jeremy Marc Green, Dustin Pool's business partner, that casts serious doubt on the entire storyline of the State and which suggests that the victim was murdered as a result of a hit ordered out of "La Pinta," the prison, as reflected in wiretaps provided in a series of federal cases arising from information provided by Dustin Pool, in retaliation for Pool's role as an agent of law enforcement conducting narcotics deals for police profit and leveraging drug dealers into position to do the same as part of a police racketeering scheme. *See Appendix X* - Affidavit of Jeremy Marc Green; *Appendix Y* - wiretap excerpt, . Accordingly, Applicant makes demand for new trial to assert his innocence of the charge for which he was convicted and to destroy the charade concealing the true nature of the matter.

Applicant's Issue Number Four should be sustained and his conviction reversed and that he be granted a new trial.

## PRAYER

Applicant prays this honorable Court of Criminal Appeals sustain the Applicant's Issues and reverse his sentence and enter an order of acquittal, and otherwise to remand this cause to the trial court and order that Applicant be granted a new trial.

Respectfully submitted,

JAMES E. WOOLDRIDGE
S.B.T. No. 24010492
600 S. Tyler Street, Suite 1704
LB 12051
Amarillo, Texas 79101
TEL: (806) 418 8575
FAX: (806) 418 8576
Attorney for Applicant,
Joshua David Stocker

## CERTIFICATE OF COMPLIANCE

I, JAMES E. WOOLDRIDGE, hereby certify that pursuant to TEX.R.APP.P. 9.4, this Brief In Support Of Application For Writ Of Habeas Corpus contains 8,444 words. In making this certificate of compliance, I am relying on the word count provided by the software used to prepare the document.

JAMES E. WOOLDRIDGE

# APPENDIX A

07

15307A - Randall 47th

state v stocker -

Courts Exhibits - Refered

to in Court Reporters' Record

FILED
Jo Carter
District Clerk
Randall County, Texas

JUL 22 2005

STATE'S EXHIBIT 263

## USE IMMUNITY AGREEMENT

By my signature below I, Guin Garcia acknowledge and affirm that I have entered into a use immunity agreement with the Randall County Criminal District Attorney's Office. I understand that I have both a 5th and 6th Amendment right under the United States Constitution to have an attorney present to advise me during any interrogation by law enforcement authorities. I understand this agreement provides that if I give truthful, accurate, and complete information about The Dustin Pool Homicide Investigation to Sgt. Mark Brown that said information will not be used against me in any prosecution. I also understand that if I provide information that is not truthful, accurate, and complete that this agreement is void and that the promised immunity if forfeited.

Date: 9-8-03

x [signature]
Declarant

[signature]
Randall County Criminal District Attorney's Office

Mark K. Brown
Witness

Witness

# APPENDIX B

**NO. W-15,307-A-1**

| | | |
|---|---|---|
| **EX PARTE** | § | **IN THE DISTRICT COURT** |
| | § | |
| | § | **47TH JUDICIAL DISTRICT** |
| | § | |
| **JOSHUA DAVID STOCKER** | § | **RANDALL COUNTY, TEXAS** |

**CO-DEFENDANT'S SUPPORTING AFFIDAVIT**

**TO THE HONORABLE JUDGE OF SAID COURT:**

Tori Brooke Patrick appeared in person before me today and stated under oath:

"My name is Tori Brooke Patrick. My date of birth is February 21ST, 1979. I am thirty-eight years of age, and I am fully competent to make this affidavit. The facts stated in this affidavit are within my personal knowledge and are true and correct.

I am the person named as the accused in the indictment charging Kidnapping, a Third Degree Felony, against Tori Brooke Patrick in Cause No. 18,834-A in the 47TH Judicial District Court in and for Randall County, Texas, and in the indictment, now dismissed, charging Capital Murder in Cause No. 15,310-A in the 47TH Judicial District Court in and for Randall County, Texas. The facts giving rise to the charges against me in both aforesaid matters were the same as giving rise to the charge against co-defendant Joshua David Stocker in the present matter.

On the original charge of Capital Murder in Cause No. 15,310-A, I was arrested June 24TH, 2003. I was subsequently released on bond on June 28TH, 2003. I changed residence by a move to Midland, Texas on July 3D, 2003. I remained a resident of Midland until sometime around January, 2005. At no point during or after the investigation and trial of my co-defendants was I ever notified that I had been the subject of any wiretapping operation. I was only notified that I had been the subject of wiretaps after the inadvertent discovery of a note wherein it was revealed that Farren and crew had been listening to me but that Jeremy Fowler opined that I honestly did not believe they were listening to me. The note was a post-it "sticky" and

accompanied another note with investigator Bobbie Ledbetter's heading whereupon I had given my second address in Midland, and would have been dated , well after I had left the confines of the Randall County Jail. During that period I was a cooperating witness in the preparatory lead-up to Joshua Stocker's Capital Murder trial.

During the time I was in Midland I made frequent return trips to Canyon and Amarillo in order for the Randall County *Criminal* District Attorney, James Farren, in conspiracy with his Assistant District Attorney, Jeremy Fowler, to structure my testimony in accordance with their desires as to how it should be seen most favorably for the storyline with which they intended to run. During the period of my incarceration in June, 2003, I was in fact informed by James Farren upon our first meeting that if I did not get on board with his storyline, that I would be prosecuted for Capital Murder and further that his office had a 96 percent conviction rate.

Immediately prior to the dismissal of the Capital Murder charge, I entered into a plea agreement on the Kidnapping charge wherein I received Deferred Adjudication for a period of ten (10) years. The Complaint and Information charging Kidnapping was filed, and Attorney James E. Wooldridge appointed for my defense, the day previous, March 29TH, 2007. The plea agreement into which I entered had been brokered between myself and the Randall County Criminal District Attorney, James Farren, over two and a half years previously, shortly after I gave a statement on July , 2004 regarding matters in the Dustin Pool murder cases. No attorney on my behalf participated in the agreement even though, at the time of brokerage and the following two and a half years, I was represented continuously by Mr. Robnett; the agreement was purely between myself and James Farren. The agreement, as of July, 2004, was that in return for testimony structured to James Farren's satisfaction, I would receive ten (10) years deferred adjudication probation on a charge of Kidnapping, a third degree felony. If I did not cooperate or my testimony was not to James Farren's satisfaction, Mr. Farren would prosecute me for Capital Murder, that I would not get defense counsel, a jury trial, nor a bench trial because I had waived such by signing the Use Immunity Agreement.

The agreement was brokered shortly after the meeting wherein I provided the statement dated July 22ND, 2004. Mr. Robnett was present at that meeting. However, immediately

afterwards, James Farren contacted me and arranged for to come to his office, whereupon he told me to get rid of my attorney, Mr. Robnett, because he did not like him and I would get a much better deal from Farren without Mr. Robnett. The agreement as aforementioned was then brokered without counsel on my behalf, by myself.

Subsequently I provided testimony in the trials of Joshua Stocker, Frank Chacon, and Michael Stocker. I testified as instructed by James Farren and Jeremy Fowler. Specifically, I was instructed to testify that neither the actual agreement (as to 10 years deferred on Kidnapping) nor the Use Immunity Agreement entered into on June 28TH, 2003 existed. I was also instructed to say falsely that an agreement to testify existed between myself, James Farren, and my attorney. Prior to the Joshua Stocker trial, my testimony in such regard was rehearsed in James Farren's office by James Farren and Jeremy Fowler approximately 20 to 30 times to provide such testimony exactly as James Farren wanted it delivered according to his 'script.' I was also instructed to omit certain information, such as that I was instructed by Detective Mark Brown and attorney Laura Hamilton to leave Amarillo for Dallas for my safety, so that it appeared my departure for Dallas was purely at the behest of Craig Kimberlin; that Joshua Stocker wanted me to get Dustin Pool to my apartment so that he could be confronted and that they were supposed to go out in the yard and fight; that my last call to Dustin Pool went unanswered except for voicemail, and that in my last voicemail for Dustin Pool I instructed him to NOT come over, as I had developed a bad feeling; and that I knew Dustin Pool carried a gun, which was never officially recovered, and that upon discovering Joshua and Michael Stocker in my apartment that Dustin Pool attempted to pull the gun and it was taken away from him; and that Dustin Pool was a snitch and carried a phone issued to him by the police, also never officially recovered; or that the fireplace poker I took out of the apartment, alleged to have been used to strike Dustin Pool, had no blood or damage. I was also instructed by James Farren and Jeremy Fowler to testify falsely during the trial (2007) of co-defendant Frank Chacon that I had not understood the question as to the Use Immunity Agreement in previous testimony, and to testify identically during the trial (February, 2009) of co-defendant Michael Stocker.

During the Joshua Stocker trial, Joshua Stocker's attorney, Mike Watkins, raised the issue

about the Use Immunity Agreement, whereupon James Farren informed the court that the agreements did not exist and suborned perjured testimony from Bobbi Ledbetter that the agreements did not exist. Shortly thereafter, I questioned James Farren in his office about the possible consequences if the Use Immunity Agreement were to be discovered. James Farren assured me that would never happen as "Gil (Farren) and Bobbi took care of it."

Even though Mr. Robnett remained my attorney until the Capital Murder charge was dismissed, I ceased to have any interaction with him as a direct result of James Farren directing me to "get rid of him" following the July 22ND, 2004 meeting. I did so, and complied with James Farren's directions as result of fear and duress induced by his threats to prosecute me for Capital Murder if I did not. As I now understand that the facts of this case would support neither Capital Murder or Kidnapping against me, I should never have been placed in the position of having to choose between the lesser of two evils. I was in such position because of the coercion inflicted by James Farren. Had he not threatened and persuaded me to abandon counsel, I would not have entered the plea agreement recorded in this matter. While said agreement does in fact contain my signature in the relevant places, at the time I signed I did so involuntarily as my state of mind in so doing was predicated upon fear for the rest of my life resulting from James Farren's deliberate misrepresentation to me that the testimonial facts and legal defenses available to me would have exonerated me from legal liability, and his measured steps to separate me from counsel who would have advised me appropriately such that I would never have entered into the agreement, and certainly would never have testified falsely as James Farren coerced me to do."

Tori Brooke Patrick

SUBSCRIBED AND SWORN under oath before me on this, the 5TH day of January, 2018.

LINDA J. WHIPPLE
NOTARY PUBLIC
STATE OF TEXAS
ID# 4839722
EXPIRES 3-10-2020

Notary Public, State of Texas

# APPENDIX C

NO. 18,834-A

| | | |
|---|---|---|
| **STATE OF TEXAS** | § | **IN THE DISTRICT COURT** |
| | § | |
| **V.** | § | **47TH JUDICIAL DISTRICT** |
| | § | |
| **TORI BROOKE PATRICK** | § | **RANDALL COUNTY** |

**ATTORNEY'S SUPPORTING AFFIDAVIT**

**TO THE HONORABLE JUDGE OF SAID COURT:**

Jeffrey Todd Robnett appeared in person before me today and stated under oath:

"My name is Jeffrey Todd Robnett. I am fifty-four years of age, and I am fully competent to make this affidavit. The facts stated in this affidavit are within my personal knowledge and are true and correct to the best of my recollection.

I am an attorney licensed to practice in the State of Texas, State Bar Number 17118450. I am a graduate of Texas Tech University School of Law and have been licensed since May 5TH, 1989. My primary practice location is Midland , Texas and my contact information is as follows:

Law Offices of Jeff Robnett
PO Box 1583
Midland, TX 79702-1583
432 682 6140

I am the attorney who last represented Tori Brooke Patrick in Cause No. 15,310-A in the 47TH Judicial District Court in and for Randall County, Texas, in which she was charged with Capital Murder relating to the homicide of Dustin Pool. I substituted into the matter July 15TH, 2004, replacing Don Schofield, and remained as counsel of record until the charge was dismissed on March 30TH, 2007.

Shortly after I was retained by Ms. Patrick, I flew with her from Midland to Amarillo, on July 22ND, 2004, via a personal aircraft and met with the Randall County Criminal District Attorney, James Farren at his office. During the course of the meeting, I discussed resolution of Ms. Patrick's case with James Farren. I do not believe Ms. Patrick was present during the discussion. The oral agreement between Farren and myself was to have been that, in return for Ms. Patrick's cooperation in the prosecution of the co-defendant's, the Capital Murder charge against her would be dismissed. Immediately subsequent, Ms. Patrick executed a sworn statement that clarified earlier statements she had given before my involvement, as requested by James Farren.

That essentially concluded my involvement in her case. I do not recall having received any further communication on the matter from James Farren or his office, and heard nothing more about it until I learned, well after the dismissal date, that the case had actually been dismissed. I was never informed that my client, Ms. Patrick, was needed for further interview or involvement in developing details of the case, and subsequent to the July 22ND, 2004 meeting, permission to speak with Ms. Patrick was never sought from me by any person from the Randall County Criminal District Attorney's Office. I was further completely unaware that Ms. Patrick had been subpoenaed for testimony in any trials, or that she was in fact testifying in the trials of co-defendants on matters that related to her own charge without me being present to assist and advise her. I was also completely unaware that she entered into a plea deal with James Farren wherein she pled to the offense of Kidnapping in return for dismissal of the Capital Murder charge on which I represented her. I was, in fact, completely unaware that Ms. Patrick entered such a deal until I was informed by her current counsel, James E. Wooldridge, when he contacted me earlier this year. I was in no way involved in the agreement Ms. Patrick ultimately entered, and did not at any time give James Farren permission to speak with my client, or broker any deal, without my involvement."

[signature]

Jeffrey Todd Robnett

SUBSCRIBED AND SWORN under oath before me on this, the 19 TH day of May, 2016.

[signature]

Notary Public, State of Texas

DEE PRINTZ
Notary Public, State of Texas
My Commission Expires
March 27, 2019

# APPENDIX D

TRIAL Stocker

0 14 THE COURT: That seems likely. You may step down, Detective. Thank you.

40:07

0:40:09 THE WITNESS: Thank you, Judge.

0:40:22 MR. FOWLER: Your Honor, we call Tori Patrick.

0:40:24

0:40:45 THE COURT: Ms. Patrick, would you raise your right hand.

0:40:47

0:40:48 (Witness sworn.)

0:40:55 THE COURT: All right. It will be all right, just sit right down there.

0:40:57

0:41:02 MR. FARREN: May I approach, Your Honor? We're are going to need these.

0:41:09

0: 1 THE COURT: All right. Thank you.

TORI PATRICK,

having been first duly sworn, testified as follows:

DIRECT EXAMINATION

0:41:18 BY MR. FOWLER

0:41:18 Q. Would you please state your full name.

0:41:25 A. Tori Brook Keeler (phonetic) Patrick.

0:41:28 Q. Ma'am, how old are you?

0:41:29 A. Twenty-six.

0:41:30 Q. Where do you work?

0:41:31 A. At Tejas Broadcast.

0:41:34 Q. What -- are you married?

0: 5 A. Divorced.

# APPENDIX E

MR. FOWLER: I pass the witness, Your Hono

CROSS EXAMINATION

BY MR. WATKINS:

Q. Hi, Ms. Patrick. My name is Mike Watkins.

A. Hi.

Q. How are you today? A little nervous?

A. Yes.

Q. Okay. I have some questions, based on your testimony and your statements. Let's start out: Mr. Fowler started out with you talking about what agreement you have for your testimony today.

A. I don't have an agreement for any testimony.

Q. Okay. Now, do you remember a day back in June 2003, when you were in jail and you were represented by Jamie Watson, when Mr. Farren and Ms. Ledbetter came out and talked to you?

A. Yes.

Q. Okay. And on that day did you sign an immunity agreement with Mr. Farren?

A. No. I never have seen an immunity agreement.

Q. You've never seen one?

A. No. I've never been given anything like that.

Q. Okay. In talking with the DA, did they agree to recommend a reduction of your bond for your testimony?

A. They --

3:43:14 Q. Wasn't your bond originally set at --
3:43:07 A. Right. I don't know why it was. I mean, I don't -- I don't know the reasons why.
3:43:11 Q. Just out of nowhere --
3:43:13 A. Well, I don't know anything about the law. I've never been in trouble. You know? I don't know.
Q. Okay. All right.
3:43:20 A. I knew what I was charged with. I didn't feel like --
3:43:23 Q. Let me -- let me slow you down, and let's ask questions and answers, so we don't lose the court reporter or the jury. Okay?
3:43:30 Your original bond was pretty high. Is that correct?
3:43:32 A. Yes, sir.
3:43:33 Q. What was it?
3:43:33 A. $1,000,000.00.
3:43:35 Q. And you're currently out on bond right now?
A. Yes, sir.
3:43:38 Q. How much?
3:43:40 A. I think $10,000.00.
3:43:41 Q. $10,000.00? That's quite a difference, isn't it?
3:43:46 A. Yes, sir.
3:43:47 Q. And you've been out on bond for how long?
3:43:53 A. About a year and a half. I don't know.

3:44:05 Q. Okay. And during your first couple of statements you were represented by an attorney, Jamie Watson. Is that correct?
3:44:08 A. Yes, sir.
3:44:09 Q. Now, she's not your attorney any longer?
3:44:11 A. No, sir.
3:44:12 Q. She actually works for the Randall County DA's office now?
3:44:15 A. Yes, sir.
3:44:16 Q. Okay. Who's your attorney now?
3:44:18 A. Jeff Robinette (phonetic).
3:44:20 Q. Okay. And is he here today?
3:44:22 A. He doesn't live in town.
3:44:24 Q. Okay. So he's not in the courtroom?
3:44:26 A. No, sir.
3:44:30 Q. Okay. Now, you say that there's not an agreement, but you understand that you still stand charged with capital murder?
3:44:36 A. Yes, sir.
3:44:36 Q. And that there's been some discussion about if you give truthful testimony that that will be taken into consideration when your case is taken care of?
3:44:48 A. Yes, sir.
3:44:49 Q. Okay. Just no one's ever mentioned an exact time?

A. No, sir.

Q. Okay. Now, you're not hoping for a life sentence, are you?

A. No, sir.

Q. You're kind of hoping for probation, or a lesser sentence, or something like that, aren't you?

A. Well, whatever one would hope for over prison.

Q. Okay. Or maybe that goes away?

A. Well, yeah, I wish that, but. . .

Q. Okay. But you just don't know?

A. Right.

Q. Now, has -- your case, it's pending at what we call complaint. Is that correct?

A. What does that mean?

Q. Well, has it -- has it ever been indicted?

A. No.

Q. You don't -- you know those terms?

A. Not really.

Q. Okay. That's fine. All right. You said that you second met Josh Stocker. You knew him as a kid, when y'all were all kids. Right?

A. Yes.

Q. And the second time you run into him is whenever you want to sell a stereo?

A. Yes.

Q. Do you have any children?
A. One.
Q. How old is your child?
A. Four years old.
Q. And that's a son?
A. Yes.
Q. And what's your son's name?
A. Kadden Dean Patrick (phonetic).
Q. Ms. Patrick, do you understand that you are charged with capital murder --
A. Yes, sir.
Q. -- as a result of this case?
A. Yes, sir.
Q. And you and your attorney have reached an agreement with Mr. Farren in our office, for you to testify in this case. Is that right?
A. Yes, sir.
Q. What is your understanding of the agreement that you have with Mr. Farren, and our office?
A. That I'm -- I don't understand what you mean.
Q. Well, what -- what is your understanding of the agreement that has been reached between you and your attorney, and Mr. Farren and our office? What is your deal, or do you have a deal?
A. I don't have anything promised from y'all. All

2 know is that if I testify it may be a little bit better.
2:47 I'm testifying anyway, because I can't sleep with this on my mind.
0:42:49
0:42:50 Q. Okay. Tori, and if you could, maybe speak a little bit closer to the microphone. You have a soft voice there.
0:42:51
0:42:55
0:42:56 A. I'm sorry.
0:42:57 Q. So as a -- part of the agreement you've reached is that there really is no agreement --
0:43:00
0:43:02 A. I have no agreement whatsoever.
0:43:04 Q. Okay.
0:43:04 A. I have nothing.
7 Q. And as a part of the agreement, you have to tell the truth. Is that correct?
3:11
0:43:12 A. Well, yes, sir.
0:43:13 Q. And do you know Josh Stocker?
A. Yes, sir.
0:43:28 Q. Do you see him here in this courtroom?
0:43:31 A. Yes, sir.
0:43:31 Q. Can you point him out for us?
0:43:33 A. (Witness pointing).
0:43:34 Q. Can you describe an article of clothing he's wearing?
0:43:38
0:43:38 A. Yes. He's wearing a blue tie.
2 Q. Is he also wearing a --

# APPENDIX F

THE COURT: Yeah. Come on up.

(At the bench, before the Court only:)

MR. WATKINS: Your Honor, I -- the State is required to provide Brady material to us. There is a memo or a part of an incident report in what the State has provided to us, indicating that there is use of an immunity agreement signed by Mr. Farren, and Ms. Patrick. It never has been provided to us. At this point, we're kind of left with a situation of calling Ms. Ledbetter, who made the memo --

MR. FARREN: Can I see that?

THE COURT: May have to. Let's -- let's take the jury out and let's look into it.

(In open court:)

THE COURT: Ladies and gentlemen, we're going to take a break here. If y'all would be back in the jury room at a quarter until 3:00. Thank you.

(Jury retired from the courtroom.)

THE COURT: Well, I for one, could use about a ten-minute break here. Uh -- let's be back in here, and Markus, if you'd keep the Defendant here, and keep this witness on the witness stand, let's be back here at 2:40.

(Both sides, the Defendant present, in open (court:

THE COURT: Be seated. Let me see that,

please. Let me read it first.

MR. FARREN: Yes, sir.

THE COURT: And, in fact, with the Court's permission, I'd like to put Ms. Ledbetter on the stand, outside of the presence of the jury. I think we can clear this up.

Okay. Let me look at it.

(Pause.)

THE COURT: Okay.

MR. FARREN: For the record, Your Honor, this issue has come up during our preparation for this trial. We believe there was discussion about an immunity agreement with Ms. Watson, when she represented her at that time. We believe Bobby Ledbetter knew that there was this discussion, and had assumed that an agreement had been drawn up and signed.

I do not recall ever actually drafting the agreement and having it signed. I believe this witness is testifying truthfully when she says there was no agreement signed. I think she will respond to questions, do you remember talking about such an agreement, but we don't believe the agreement actually exists anywhere in writing to produce. We can't find it, her attorney can't find it. The only other possible trace on it is on Ms. Farren's computer at that Sheriff's Department, because that's

4:36:07 where Ms. Ledbetter met with her. Ms. Farren is currently
4:36:13 checking to see that if in her files there's a copy, but an unsigned one.

4:36:14 We think that's what occurred, and we have
4:36:18 no problem with Defense counsel asking her about that. We
4:36:21 don't mind putting Ms. Ledbetter on the stand, out of the
4:36:24 presence of the jury to clarify that.

4:36:26 THE COURT: I would like to do that. Would
4:36:27 you produce Ms. Ledbetter. And would you step down for a
4:36:31 minute.

4:36:32 MS. McELROY: Can we enter it into the
4:36:33 Court's --

4:36:34 THE COURT: Raise your right hand.

4:36:40 (Witness sworn.)

4:36:40 THE COURT: Sit right there, Ms. Ledbetter.

4:36:43 THE BAILIFF: Do you want Ms. Patrick in
4:36:45 here, Judge?

4:36:45 THE COURT: That will be just fine. Just --
4:36:46 because we're not going to take very long.

4:36:49 You let me do it.

4:36:51 MR. FARREN: Yes, sir.

BOBBIE LEDBETTER,

having been first duly sworn, testified as follows:

4:36:52 DIRECT EXAMINATION

4:36:52 THE COURT: Ms. Ledbetter, have you seen

4·  ·4 this document that I am going to term as Court's 3?

,6:57 THE WITNESS: I glanced over it, but I didn't get to read it.

4:37:01 THE COURT: Okay. Why don't you read it.

4:37:12 Is this something she prepared for just notes or something --

(Off-the-record discussion with the Court (and Mr. Farren.)

4:37:37 THE WITNESS: Okay.

4:37:37 THE COURT: So you've read it?

4:37:38 THE WITNESS: Yes, sir.

4:37:39 THE COURT: Is that a note that you prepared for yourself or for internal use?

/:44 THE WITNESS: Yes, sir.

4:37:45 THE COURT: All right. It makes reference to a written or a signed use of immunity agreement.

4:37:55 THE WITNESS: Yes, sir.

4:37:57 THE COURT: To your knowledge, is there in existence anywhere a signed use of immunity agreement by Tori Patrick?

4:38:03 THE WITNESS: Not to my knowledge.

4:38:05 THE COURT: Pass the witness to Mr. Watkins first, I guess. Do you have some questions for her?

4:38:10 MR. WATKINS: Your Honor, I don't have any questions of Ms. Ledbetter, with that testimony --

THE COURT: Okay.

MR. WATKINS: -- I don't, no.

THE COURT: I'm building a record here. Anybody else you want to talk to her from the DA's office about this purported use of immunity agreement?

MR. WATKINS: Let me ask her a couple of questions.

CROSS EXAMINATION

BY MR. WATKINS:

Q. Ms. Ledbetter, is this an incident report that you typed up and submitted?

A. I don't -- I don't call them incident reports. I mean, I do supplements sometimes or I'll make notes of interviews, or things that I'm present for.

Q. Okay. Do you see the -- at the top it says, (reading) IR number 0323750?

A. Yes, sir.

Q. Is that the -- does "IR" stand for incident report?

A. Yes, it does.

Q. And does that refer to the Special Crimes or the Amarillo Police Department incident report number that deals with the death of Dustin Pool?

A. I don't know that for certain now, but by seeing it on top of that report, I would -- I would assume so. I

will double check.

Q. If I show you the incident report that's been provided to us, would -- would that help you --

MR. FARREN: Here you go, Mike.

A. Yes, it would help me.

MR. WATKINS: I'll bring it all back to you just like this.

Q. (BY MR. WATKINS) This is from your employer, Mr. Farren, the incident report in this case. Does this appear to a supplement to this incident report?

A. Yes, sir.

Q. Do you prepare these kind of incident reports to identify them, to remind you what happened during your part of the investigation of a case?

A. Yes, sometimes I do.

Q. And when you prepare them, do you try to be as accurate and truthful as you can be?

A. Yes, sir, I do.

Q. Okay. And does this one, in fact, say that Ms. Patrick agreed that she wanted to speak with Mr. Farren and she signed the use immunity agreement?

A. Yes, it does.

Q. Okay. Do you know if there is a use immunity agreement anywhere?

A. I have not been able to locate one, no, sir.

4 '3 Q. Do you remember speaking --
0:27 THE COURT: No -- no more sugar.
4:40:31 Q. (BY MR. WATKINS) Do you remember speaking with Ms. Patrick on June 28th of 2003?
4:40:38 A. Yes, sir, I do.
4:40:40 Q. Okay. And you met at the sheriff's office in jail --
4:40:43 A. Yes, sir.
4:40:43 Q. -- with her and with her attorney?
4:40:46 A. Yes, sir.
4:40:47 Q. You have independent memory of those -- of that visit or is it this incident report?
1 A. No, I remember being there that day.
:53 Q. Okay. Do you have independent memory of not filling out the use of immunity agreement and having even sign?
4:41:01 A. I don't. I remember discussing that. I don't remember anything actually being signed but we discussed that whichever one that was willing to talk to us.
4:41:13 Q. Okay. You don't remember one way or the other?
4:41:16 A. I don't -- I know -- I remember talking about it because I remember leaving the room, so that Ms. Patrick could visit with her attorney out of my and Mr. Farren's presence.
5 Q. Okay.

4 8 MR. WATKINS: Pass the witness.

11:30 MR. FARREN: Just a couple of quick

4:41:32 questions, Your Honor.

CROSS EXAMINATION

BY MR. FARREN:

4:41:33 Q. When you drafted this document in which we've
4:41:38 made reference, and I -- I think perhaps we should mark it
4:41:42 at least for some sort of exhibit outside -- outside of
4:41:45 the trial record for appellate purposes -- but when you
4:41:49 drafted this, because of a practice that we often exercise
4:41:55 where we do use a documented use immunity, did you assume
4:42:00 that one -- because we'd talked about it, that one had
4: 3 been signed?

2:03 A. That -- that could very well be.

4:42:06 Q. But you don't -- you don't remember specifically
4:42:10 seeing her sign such a document?

4:42:11 A. No, I -- I don't.

4:42:12 Q. And you -- you know that Ms. Watson, her attorney
4:42:16 at the time, has searched her files and cannot find such a
document?

4:42:19 A. Yes, sir. I've talked to Ms. Watson.

4:42:21 Q. And you know that we cannot locate such a
4:42:24 document anywhere in our office?

4:42:25 A. Yes, sir, I know that, too.

4: 8 MR. FARREN: That's all I have.

THE COURT: All right. You can step down, Ms. Ledbetter. Leave Court's 3 right there.

MR. FARREN: I didn't realize you'd already marked it.

THE COURT: Yes, sir. For the same reason you wanted it marked, some way to identify it. It will be here for the people to use.

MR. WATKINS: Okay. And it's going into the records --

THE COURT: Right. I asked Ms. Watson be brought in. I want to ask her --

MR. FARREN: She's on vacation, Your Honor.

THE COURT: Oh, she is?

MR. FARREN: Yeah. Now, we can try to get her --

THE COURT: She's not here?

MR. FARREN: No, but I think --

THE COURT: That's pretty handy. And I'm sure her answers are going to be the same, and I -- at such time you can conveniently have her come -- don't cut any vacation short. Don't do any of that.

MR. FARREN: She will return before this trial is over.

THE COURT: Okay. Then we'll just -- we'll just continue this little -- this little record. But I'm

4 3 satisfied there's not any kind of Brady violations here

.3:17 Can we continue with this witness?

4:43:20 MR. WATKINS: Certainly. Certainly.

4:43:21 THE COURT: All right. Bring this jury back

4:43:23 in.

4:43:52 (Jury seated.)

4:43:53 THE COURT: Thank you, ladies and gentlemen.

4:43:55 Everyone be seated.

4:43:56 MR. WATKINS: Is it still my witness?

4:43:58 THE COURT: Yes, it is your witness. I

4:44:00 think you were about finished though.

4:44:03 MR. WATKINS: I think I am.

(Witness Tori Patrick resumes stand.)

RECROSS EXAMINATION (CONTINUED)

BY MR. WATKINS:

4:44:04 Q. Ms. Patrick, a couple of more quick questions. I

4:44:07 promise. I asked you about a use of immunity -- or about

4:44:11 an immunity agreement earlier. Do you remember that?

4:44:13 A. Yes, sir.

4:44:14 Q. And you don't remember signing anything.

Correct?

4:44:16 A. Yes, sir.

4:44:17 Q. Do you remember talking with the DA's office

4:44:19 about them not using your testimony against you?

4: 2 A. Yeah. We've -- we've talked about it.

4:44:28 Q. Okay. And that's the general understanding, is that whatever you tell them won't be used against you?
4:44:31 A. Yes.
4:44:32 Q. Okay. How many times have you talked with the DA's office all together?
4:44:38 A. Maybe -- maybe just three times.
4:44:46 Q. Okay. Now, there's the statement on June -- or July 22nd. Correct?
4:44:53 A. Yes, sir.
4:44:54 Q. Okay. And the statement on July 3rd?
4:44:59 A. Do what now?
4:45:00 Q. Said you gave a statement to Investigator Ledbetter, to Bobbie Ledbetter --
A. Yes.
4:45:04 Q. -- on July 3rd. Is that correct?
4:45:06 A. Yes. Yes.
4:45:07 Q. Okay. And then you gave one to Ms. Ledbetter -- Ms. Ledbetter on June 28th?
4:45:22 A. June 28th is when I was in jail. Yes, that was that statement. I'm not aware of July 3rd. Is it not the same thing?
4:45:32 Q. Well, the June 28th --
4:45:33 A. I don't understand.
4:45:39 Q. -- 28th appears to be --
MR. FOWLER: Judge, if I may interrupt

Mr. Watkins. I think they're the same statement. That

THE WITNESS: There was like --

MR. FOWLER: -- that later statement didn't have the waiver of rights on it, and when Ms. Ledbetter noticed that it didn't have the waiver, she prepared a new one and put the waiver back on.

THE COURT: Verbatim, the same?

MR. FOWLER: Yes.

Q. (BY MR. WATKINS) Okay. So on July 3rd, you signed -- you resigned a statement?

A. The same one from the 28th.

Q. The same one from the 28th?

A. Yes.

Q. Okay. But that was another -- you had contact with the DA's office on July 3rd and June 28th?

A. Yes. Just to sign the same statement, yes.

Q. Okay. And then you had contact with Mark Brown back on 3/26?

A. Yes.

Q. March 26th?

A. Yes.

Q. Okay. Did you have contact with the DA's office in preparing for trial? As they were preparing their case and putting their witnesses together, did you come in and talk to them?

4 5 A. Briefly. I talked to Farren for maybe three minutes.
6:49
4:46:49 Q. Okay.
4:46:50 A. Seriously.
4:46:50 Q. Did you talk to anyone else?
4:46:52 A. No.
4:46:52 Q. Okay. Ever talk to anyone on the phone?
4:46:55 A. I've called to see if -- what about court time and stuff. Other than that, no.
4:46:58
4:47:00 MR. WATKINS: Pass the witness.
4:47:02 MR. FOWLER: No further questions, Judge.
4:47:04 THE COURT: You may step down, ma'am. Thank you. Call your next witness.
4 5
:09 MR. FARREN: State calls Michael Elliston, Your Honor.
4:47:12
4:47:31 THE COURT: Okay. Come around here, Mr. Elliston. Raise your right hand, please.
4:47:47
4:47:48 (Witness sworn.)
4:47:54 THE COURT: Thank you, sir. Sit right there.

Go head.

MICHAEL WAYNE ELLISTON,

having been first duly sworn, testified as follows:

DIRECT EXAMINATION

4: 6 BY MR. FARREN:

# APPENDIX G

meeting --

MR. KELLY: Objection; nonresponsive.

A. Because the other ones were just --

Q. (By Mr. Farren) Did you get to talk to anyone else -- did you have to talk to someone else first before you were allowed to talk to Mr. Kimberlin?

A. When I was --

Q. Just -- just yes or no.

A. Yes.

Q. Okay. Thank you. Now, you indicated a moment ago, this was the last meeting. What do you mean by the last meeting?

A. Well, I mean, we had a few meetings at Wal-Mart. I don't know when -- when exactly every meeting was. But I know the last one happened after I got back from Dallas at Slim's Pool Hall.

Q. Okay. Did Mr. Kimberlin ever visit with you about what you were to do if the police talked to you?

A. Yeah. I mean, he visited with me. He didn't want me to talk to the police about anything. He had got me an attorney at one point.

Q. Okay. So he didn't want you to talk to the police and he provided you with an attorney?

A. Yes.

Q. Okay. And did you -- did you follow those

instructions at first?

A. At first.

Q. Okay. Eventually, did that change?

A. Yes. That -- that attorney was not someone I wanted.

Q. All right. So eventually you talked with the police?

A. Eventually. It was, like, way down the line.

Q. Did you give a statement to the police?

A. Yes.

Q. Did you tell them the truth at first?

A. No.

Q. What did you tell them at first?

A. Are you referring to the meeting with Mark Brown or after that?

Q. Uh-huh. Yes, ma'am.

A. Some made-up story. I don't even remember what I said now. It's been a long time. But it was a made-up story between me, and Josh, and Guin, that Craig wanted us to use.

Q. Okay. Later, did you talk with Mark Brown again?

A. I just talked to him once.

Q. Okay.

A. I think I just talked to him once.

Q. Did you ever tell Mark Brown the truth?
A. No.
Q. Okay. Did you eventually tell the truth?
A. Yes.
Q. To whom?
A. To you.
Q. Well --
A. Well --
Q. -- to me or to an investigator in my office?
A. An investigator in your office.
Q. Do you know a lady named Bobbie Ledbetter?
A. Yes.
Q. All right. And you visited Ms. Ledbetter?
A. Yes.
Q. And provided a written statement?
A. Yes.
Q. And did you tell the truth in that statement?
A. Yes.
Q. Just briefly, Ms. Patrick, did you -- did you sign a Use Immunity Agreement?
A. Yes, I did.
Q. Okay. Do you recall testifying in the Josh Stocker trial?
A. Yes, I do.
Q. Okay. Do you remember being asked about a Use

Immunity Agreement in that trial?
A. They asked me, apparently, about that, but I thought they had asked about something altogether different.
Q. You denied signing a Use Immunity Agreement in that trial, didn't you?
A. Yes.
Q. What did you think they were talking about?
A. I thought they were talking about, like, a set deal, like --
Q. A plea agreement?
A. That they -- yes, because they never said Use Immunity Agreement that I could --
Q. So you thought they were asking about a plea agreement?
A. Yes.
Q. And when you said, no, you -- you weren't talking about the Use Immunity Agreement?
A. No.
Q. Okay.
MR. FARREN: Pass the witness.

CROSS-EXAMINATION

BY MR. KELLY:
Q. Ms. Patrick, I'm Bill Kelly, and I represent Frank. While we're on the Use Immunity Agreement, were

you charged in this case?

A. Yes, sir.

Q. With what?

A. Capital murder.

Q. And I believe that you were charged by complaint, but you haven't been indicted yet; is that right?

A. That's true.

Q. So that's still hanging over your head?

A. Yes, sir.

Q. This Use Immunity Agreement that you signed, I think that not only at the last trial you didn't understand it, but everybody in the trial denied it; isn't that correct? Mr. Farren's office. Do you remember that?

A. Yes.

MR. FARREN: Well, I am going to object to him asking her to speculate about what other people understood.

THE COURT: Sustained.

MR. KELLY: I think that came out in the testimony.

MR. FARREN: I am going to object to sidebar comments, Your Honor.

THE COURT: Sustained. Mr. Kelly, please

# APPENDIX H

LAW OFFICES
JAMES A. FARREN
CRIMINAL DISTRICT ATTORNEY
RANDALL COUNTY, TEXAS

Randall County Courthouse
501 16th Street
Canyon, Texas 79015

Ph: (806) 468-5570
Fax: (806) 468-5566

## USE IMMUNITY AGREEMENT

By my signature below I, Tori Brooke Patrick, acknowledge and affirm that I have entered into a use immunity agreement with the Randall County Criminal District Attorney's Office. I understand that I have both a 5th Amendment right and a 6th Amendment right under the United States Constitution to have an attorney present to advise me during any interrogation by law enforcement authorities. I hereby confirm that I initiated this meeting and discussion and I have chosen to waive the aforementioned 5th and 6th Amendment rights. I understand that this agreement provides that if I give truthful and accurate information about the death of Dustin Pool to Bobbi Ledbetter of the Randall County Criminal District Attorney's Office that information will not be used against me in any prosecution. I also understand that if I provide information that is not truthful or accurate that this agreement is void and that the promised immunity is forfeited.

Date: June 28, 2003

Tori Brooke Patrick
Tori Brooke Patrick

James A. Farren
James A. Farren
Criminal District Attorney
Randall County, Texas

Bobbie Ledbetter
Witness – Bobbie Ledbetter

Gil Farren
Witness – Gil Farren

Jami K. Watson
Jami K. Watson

# APPENDIX I

IR # 03-23750

On June 28, 2003 I accompanied Randall County District Attorney James A. Farren to the Randall County Sheriff's Office and Jail to meet with Randall County inmate Tori Patrick. [redacted] The meeting started at approximately 10:00 a.m. and began with Mr. Farren explaining a Use Immunity Agreement to Ms. Patrick. After consulting with her attorney, Ms. Patrick agreed that she wanted to speak with Mr. Farren and she signed the use immunity agreement. Ms. Patrick gave Mr. Farren a detailed account of what happened in an incident involving the kidnapping and eventual murder of Dustin Pool and agreed to signing a written statement concerning the incident. We began the type written statement at 1:17 p.m. The Miranda warning was attached to the top of each page of the statement. Ms. Patrick conveyed the incident to me and I typed as she spoke. Ms. Watson was present the entire time. At times, Ms. Watson would request to speak with her client and I would step out of the room. The statement was completed and signed at approximately 6:45 p.m. While reviewing the statement I encountered typographical errors and I contacted Ms. Watson to see if Ms. Patrick would agree to meet again to go over the revisions and sign a new corrected statement. Ms. Watson and Ms. Patrick agreed and the corrected statement was reviewed and signed at the Randall County District Attorney's Office on July 3, 2003 at approximately 11 a.m. The original statement was given to Sgt. Mark Brown at the Amarillo Police Department on the afternoon of July 3.

No copy of Use Immunity Agreement.

$10,000 Bond Judy

Threaten CPS action if you didn't help?

Bobby Ledbetter

# APPENDIX J

Skip to Main Content Logout My Account Search Menu New Criminal Search Refine Search Back Location All Courts Help

# REGISTER OF ACTIONS
## CASE NO. 18834A

**STATE OF TEXAS Vs. TORI BROOKE PATRICK** § § § § §

Case Type: **Adult Felony**
Date Filed: **03/29/2007**
Location: **47th District Court**

### RELATED CASE INFORMATION

**Related Cases**
18834A (Other)

### PARTY INFORMATION

| | | | Attorneys |
|---|---|---|---|
| **Defendant** | PATRICK, TORI BROOKE<br>Amarillo, TX 79110<br>SID: TX07123894<br>Other Agency Numbers<br>RCSO Other-see notes | Female White<br>DOB: 02/21/1979<br>5' 5", 98 lbs | |
| **State** | **STATE OF TEXAS**<br>CANYON, TX 79015 | Other | **JAMES A. FARREN**<br>806-468-5570(W) |

### CHARGE INFORMATION

| Charges: PATRICK, TORI BROOKE | Statute | Level | Date |
|---|---|---|---|
| 1. KIDNAPPING | 20.03(a) PC | Third Degree Felony | 03/09/2003 |

### EVENTS & ORDERS OF THE COURT

**DISPOSITIONS**

04/02/2007 **Disposition** (Judicial Officer: Miner, Hal)
1. KIDNAPPING
Deferred

04/02/2007 **Plea** (Judicial Officer: Miner, Hal)
1. KIDNAPPING
Guilty

04/02/2007 **Sentence** (Judicial Officer: Miner, Hal)
1. KIDNAPPING
CSCD 10 Years , 0 Months , 0 Days with Community Service of 0 Hours

**OTHER EVENTS AND HEARINGS**

03/29/2007 **Complaint Filed** (Judicial Officer: Miner, Hal )
*Event Code: CPF*
03/29/2007 **Information (OCA)**
03/30/2007 **DOCKET SHEET** (Judicial Officer: Miner, Hal )
*Event Code: DSH*
03/30/2007 **Trial Court's Certification of Defendant's Right to Appeal** (Judicial Officer: Miner, Hal )
*Event Code: TCC*
03/30/2007 **DEFENDANT'S WAIVER OF APPEAL AFTER SENTENCE** (Judicial Officer: Miner, Hal )
*Event Code: DWAP*
03/30/2007 **Affidavit by Attorney for Plaintiff for Posting** (Judicial Officer: Miner, Hal )
*Event Code: AAP*
03/30/2007 **FELONY PLEA MEMORANDUM** (Judicial Officer: Miner, Hal )
*Event Code: FPM*
03/30/2007 **Order To Pay Attorney Fee** (Judicial Officer: Miner, Hal )
*Event Code: OPAF Memo: $400.00/JAMES WOOLDRIDGE*
04/05/2007 **Order Deferring Adjudication & Placing on Community Supervis** (Judicial Officer: Miner, Hal )
*Event Code: DEF Memo: 10 YRS; $2000.00 FINE VOL: I;S*
Vol./Book I;S

| | |
|---|---|
| 05/13/2009 | **Motion**<br>*Event Code: MOT Memo: FOR PERMISSION TO TRAVEL* |
| 01/25/2016 | **MOTION TO PROCEED - UNADJUDICATED PROBATION - (OCA)** |
| 01/25/2016 | **PROPOSED ORDER** |
| 01/25/2016 | **REPORT PROBATION VIOLATION** |
| 01/25/2016 | **NOTICE OF COMPLIANCE WITH C.C.P. ART. 39.14** |
| 01/25/2016 | **ORDER TO ISSUE ALIAS CAPIAS** |
| 01/25/2016 | **ISS CAPIAS/PRECEPT** |
| 01/29/2016 | **Bond**<br>*BUDGET BAIL BONDS $10,000* |
| 02/09/2016 | **FIL CAPIAS/PREC**<br>*SERVED $50* |

## Financial Information

| | | | | |
|---|---|---|---|---|
| | **Defendant** PATRICK, TORI BROOKE | | | |
| | Total Financial Assessment | | | 2,873.00 |
| | Total Payments and Credits | | | 2,873.00 |
| | **Balance Due as of 02/17/2016** | | | **0.00** |
| 03/30/2007 | Transaction Assessment | | | 2,223.00 |
| 04/26/2007 | Payment | Receipt # 30986 | PATRICK, TORI BROOKE | (150.00) |
| 05/25/2007 | Payment | Receipt # 31366 | PATRICK, TORI BROOKE | (150.00) |
| 06/21/2007 | Payment | Receipt # 31712 | PATRICK, TORI BROOKE | (150.00) |
| 07/24/2007 | Payment | Receipt # 32139 | PATRICK, TORI BROOKE | (150.00) |
| 08/21/2007 | Payment | Receipt # 32542 | PATRICK, TORI BROOKE | (150.00) |
| 09/21/2007 | Payment | Receipt # 32959 | PATRICK, TORI BROOKE | (150.00) |
| 10/23/2007 | Payment | Receipt # 33364 | PATRICK, TORI BROOKE | (150.00) |
| 11/21/2007 | Payment | Receipt # 33720 | PATRICK, TORI BROOKE | (150.00) |
| 12/21/2007 | Payment | Receipt # 34098 | PATRICK, TORI BROOKE | (150.00) |
| 01/22/2008 | Payment | Receipt # 34453 | PATRICK, TORI BROOKE | (150.00) |
| 02/27/2008 | Payment | Receipt # 34893 | PATRICK, TORI BROOKE | (150.00) |
| 03/20/2008 | Payment | Receipt # 35165 | PATRICK, TORI BROOKE | (573.00) |
| 10/14/2011 | Transaction Assessment | | | 50.00 |
| 10/18/2011 | Transaction Assessment | | | 600.00 |
| 07/23/2012 | Payment | Receipt # 76659 | PATRICK, TORI BROOKE | (200.00) |
| 10/03/2012 | Payment | Receipt # 79286 | PATRICK, TORI BROOKE | (100.00) |
| 11/02/2012 | Payment | Receipt # 80477 | PATRICK, TORI BROOKE | (120.00) |
| 11/30/2012 | Payment | Receipt # 81637 | PATRICK, TORI BROOKE | (120.00) |
| 12/27/2012 | Payment | Receipt # 2012-148752 | PATRICK, TORI BROOKE | (110.00) |

# APPENDIX K

# REPORTER'S RECORD

VOLUME 11 OF 22 VOLUMES

TRIAL COURT CAUSE NO. 15,307-A

| | | |
|---|---|---|
| THE STATE OF TEXAS | ) | IN THE DISTRICT COURT |
| | ) | |
| | ) | |
| VS. | ) | POTTER COUNTY, TEXAS |
| | ) | |
| | ) | |
| JOSHUA DAVID STOCKER | ) | 47TH JUDICIAL DISTRICT |

*********************

STATEMENT OF FACTS

*********************

COPY

On the 15th day of July, 2005, the following proceedings came on to be heard in the above-entitled and numbered cause before the Honorable Hal Miner, presiding, held in Potter County, Texas:

Proceedings reported by Stenographic Method.

FILED
20.10.2005 13:32
JO CARTER, DISTRICT CLERK
RANDALL COUNTY, TEXAS
DEPUTY

that.

MS. McELROY: Yes, sir.

THE COURT: Objection overruled.

Q. (BY MR. FOWLER) Ms. Garcia, you may answer the question.

A. He was upset.

Q. Now, after these events unfolded, was Josh Stocker hard to get ahold of?

A. Yes.

Q. Would you try calling his cell phone?

A. Yes.

Q. Would you get any responses?

A. No.

Q. Approximately for how long was the Defendant hard to get ahold of after these events?

A. I talked to him one time after all of that happened, and never talked to him again.

Q. Now, ma'am, I believe you gave a statement to Mark Brown of the police department in September of 2003?

A. Yes, sir.

Q. And Mark Brown, in fact, told us that you, too, were hard to get ahold of right after these events. Is that correct?

A. Probably, yes.

10:36AM Q. And now -- and to let the jury know a little bit about your background, you -- at the time this happened, you were on felony probation for drug offenses. Is that right?
10:36AM A. Yes, I was.
10:36AM Q. And your probation was pending out of Judge Board's court, I believe. Is that right?
10:36AM A. Yes.
10:36AM Q. And you hired an attorney for that. Right?
10:36AM A. Yes, sir.
10:36AM Q. And you have been charged with aggravated kidnapping and tampering with evidence. Is that right?
10:36AM A. Yes, sir.
10:36AM Q. And you have an attorney for those charges, as well?
10:36AM A. Yes, sir.
10:36AM Q. What is the understanding of any agreement that you have worked out with Mr. Farren and our office?
10:37AM A. I don't have an agreement. Any punishment I get is going to be based on me telling the truth and my knowledge, and even my guilty part in what happened.
10:37AM Q. And what happens if you don't tell the truth?
10:37AM A. I don't know. I'm sure I will go to prison for a long time.
10:37AM Q. And when I asked you when you first took the

10:37AM stand where you were staying, and you told us you were at the Randall County Jail?

10:37AM A. Yes, sir.

10:37AM Q. Can you tell us why you're at the Randall County Jail?

10:37AM A. Failure to report uh -- the way I'm supposed to, the times I'm supposed to.

10:37AM Q. So you have been all of this time reporting to a probation officer. Is that right?

10:37AM A. Yes, sir.

10:38AM Q. And you had some problems with your probation. Right?

10:38AM A. Yes.

10:38AM Q. And, in fact, I believe you also had a dirty drug test?

10:38AM A. Yes.

10:38AM Q. And you were supposed do go to out-patient rehab and you didn't go. Right?

10:38AM A. I went.

10:38AM Q. Okay.

10:38AM A. I -- the last day I did not go. I was sick. Yes, I did not go.

10:38AM Q. And so the bond that you were let out on was increased, and this new charge was filed, and you ended up in the Randall County Jail because you weren't

10:38AM behoving, basically?

10:38AM A. Right. Yes.

10:38AM MR. FOWLER: Your Honor, may I approach the witness?

10:38AM THE COURT: Yes.

10:38AM Q. (BY MR. FOWLER) I want to show you what has been admitted into evidence as State's 69. Is that the Dustin Pool that you knew?

10:38AM A. Yes.

10:39AM MR. FOWLER: Your Honor, I pass the witness.

THE COURT: Ms. McElroy.

CROSS EXAMINATION

BY MS. McELROY:

10:39AM Q. Ms. Garcia, I believe that you testified -- well, first let me back up and ask you this: Is Daniel Jaquez (phonetic) your cell phone -- or did you ever use a cell phone by this person?

10:39AM A. Daniel who?

10:39AM Q. Jaquez.

10:39AM A. Not that I'm aware of.

10:39AM Q. Were you ever -- did you have a cell phone?

10:39AM A. When?

10:39AM Q. During this period of time, March of 2003.

10:39AM A. Yes.

Q. What phone number was that?
A. I don't know. It was -- I don't know the phone number, but it was under Tori's name.
Q. I'm sorry.
A. It was under Tori's name.
Q. It was under Tori's name? Do you remember who provided the service?
A. Sprint, I believe.
Q. Did you ever use or have the cell phone number with the number 336-5072?
A. No, I don't believe so.
Q. Did you ever use anyone else's cell phone?
A. Not that I can remember.
Q. Did you ever use Chad Spanel or Morgan Sprool's phone?
A. Oh, Morgan got one in his name whenever Tori had it turned off.
Q. Okay. Do you remember what that number was?
A. It was a long time ago. I don't.
Q. Okay. All right. Do you have any memory of using a phone with the numbers 584-9000?
A. No.
Q. That was Morgan's phone. Do you remember using that phone?
A. I don't remember the numbers. He had one and

he had another one --

Q. There were two phones?

A. Yes.

Q. Okay. And was it a frequent occurrence for y'all to kind of trade phones around?

A. No.

Q. Well, didn't you just tell me that you would use other people's phones?

A. No, I used his -- that phone. He got it for me in the name -- whenever Tori had mine turned off, the one that was in her name.

Q. Okay. But you didn't run around with a cell phone in your name, Guinn Garcia?

A. No.

Q. Okay. So you would use someone else's cell phone?

A. Yes, I did.

Q. Okay. Ms. Garcia, you testified earlier that you had a live-in relationship with Ray Placensio?

A. Yes.

Q. Do you remember how long you had been with him?

A. Probably -- like I said earlier, I was with him probably half a year before he went to prison, and then when he got out, probably a year, year and a half.

10:42AM Q. Okay. And do you remember giving testimony in a court case entitled, the State of Texas versus Ricky Gallegos?

10:42AM A. Yes, I do.

10:42AM Q. Do you remember testifying for the State in that matter?

10:42AM A. Yes.

10:42AM Q. Can you tell me, briefly, why you were testifying for the State then?

10:42AM A. Uh -- I pretty much just told them what I knew. There was a meeting held at my house. And --

10:42AM Q. Well, you were involved with Ray. Correct?

10:42AM A. Yeah.

10:42AM Q. Okay. And Ray was a member of the Texas Syndicate. Is that right?

10:42AM A. I believe so.

10:43AM Q. Okay. And during that time, he was holding meetings?

10:43AM A. Yes.

10:43AM Q. Okay. And at one of those meetings, can you tell me, do you know who Bobby O'Connis is?

10:43AM A. I was not allowed to be there present during the meetings.

10:43AM Q. I understand. Do you know who Bobby O'Connis is?

A. Yes, I do.
Q. Do you know Mr. Valdez (phonetic)?
A. I met him, yes.
Q. Do you know Lupe Rodriguez (phonetic)?
A. Yes, I do.
Q. So you knew all of these people?
A. Yes.
Q. Can you tell me if you know how many people were charged in this particular case?
A. I don't know.
Q. Did you know Ricky Ricardo Gallegos (phonetic)?
A. Yes.
Q. How did you know him?

MR. FARREN: Your Honor, if I may -- and this is not an objection or anything. I realize it's his (sic) witness. I was wondering if we can all stipulate that Mr. Gallegos was a co-defendant in the Pracioto murder with Mr. Placensio, so that the jury has some context of what this is all about.

MS. McELROY: That's fine, Your Honor.

MR. FARREN: So these are from the transcript of the Gallegos murder trial, who is the co-defendant to Placensio in the Pracioto murder.

THE COURT: All right. Mr. Farren, since

10:44AM we've raised it, let's clear it up for the jury a little bit. Go into a little more detail.

10:44AM MR. FARREN: And we'll provide a written summary to the Court, so we can both sign it.

10:44AM THE COURT: All right. Okay. That's good.

10:44AM MR. FARREN: It is my understanding that these questions are from the transcript of the Ricky Gallegos trial, and that Ricky Gallegos is a co-defendant or was a co-defendant to Mr. Ray Placensio. Both of them, and I think some others charged in the homicide of Pracioto in Potter County in Amarillo.

10:44AM THE COURT: All right. I hope that clears it up for them. I worry about them getting bits and pieces of this and not understanding the context.

MR. FARREN: Yes, Your Honor.

10:44AM THE COURT: You and I know, because a part of it is in my court up there. Anyway -- all right.

10:45AM Q. (BY MS. McELROY) You testified, did you not?

10:45AM A. Yes, I did.

10:45AM Q. In this event? And you testified in Mr. Gallegos' trial. Do you anticipate testifying against Ray Placensio?

10:45AM A. Probably.