10:45AM Q. His trial hasn't been yet held. Is that correct?
10:45AM A. I'm -- not to the best of my knowledge.
10:45AM Q. Well, you haven't been called to court or anything?
10:45AM A. No.
10:45AM Q. Was Ray the head of the "TS" at that time?
10:45AM A. No, not to the best of my knowledge. It was -- they were trying to decide who was going to be the head. As far as I knew, it was Bobby and a guy named K.O. before that.
10:45AM Q. Okay. Now, did the Texas Syndicate, they were dealing drugs?
10:46AM A. Yeah.
10:46AM Q. Okay. And so you were working for them?
10:46AM A. No.
10:46AM Q. No. Where were you getting your drugs from?
10:46AM A. Dustin Pool.
10:46AM Q. Okay. So it's your testimony that the Texas Syndicate was taking over Dustin Pool's drugs?
10:46AM A. No. Dustin asked them to kind of come in and help him, as far as having someone to back him, like collecting and stuff like that.
10:46AM Q. Okay. But I think your testimony earlier on direct was that the "TS" were wanting people to pay tax

in order to sell dope?
A. Yeah, Ray always said that.
Q. Right. Well, Dustin Pool was an independent drug dealer at that time, was he not?
A. Yes.
Q. All right. So would it be logical that then they would expect him to pay that tax, also?
A. Well, when they --
MR. FOWLER: Your Honor, I'd object to speculation.
THE COURT: Sustained.
Q. (BY MS. McELROY) For your testimony, were you given any immunity agreement in Potter County?
A. (Witness shakes head side to side.)
Q. You -- did you have any sort of -- did you have any sort of deal with the Prosecutor in Potter County in order to have your testimony?
A. (Witness shakes head side to side.)
Q. I'm sorry?
A. A deal? No.
Q. You were just a bystander?
A. A bystander?
Q. Yes. You -- you weren't charged in this offense?
A. No.

10:47AM Q. Okay. So you were subpoenaed to testify about it. Right?
10:47AM A. Yes.
10:47AM Q. Do you know when this murder took place?
10:47AM A. Specific dates, no, I don't.
10:48AM Q. Well, if I were to tell you that it was February 24th, would that sound about right?
10:48AM A. I don't know a specific date. I mean, I don't --
10:48AM Q. All right. I'm going to ask you if Ray (sic) -- February 27th of 2003 sounds accurate to you?
10:48AM A. I don't know.
10:48AM Q. Okay. Do you know whether or not Mr. Pracioto (sic), in concert with these other people, ended up murdering Jesse Pracioto?
10:48AM A. You mean Placensio? Or Pracioto?
10:48AM Q. Yes. I'm sorry. Did Ray Placensio, and Bobby O'Connis, and Mr. Valdez, and Ricky Ricardo Gallegos, and Vincente Flores, did they go in on February 27th and stab Jesse Pracioto to death?
10:49AM A. I do not know.
10:49AM Q. And you testified at this trial?
10:49AM A. I testified to him telling me that he showed his heart when I asked him about it.
10:49AM Q. Okay. And that was the sole purpose of your

# APPENDIX L

# USE IMMUNITY AGREEMENT

By my signature below I, Guin Garcia acknowledge and affirm that I have entered into a use immunity agreement with the Randall County Criminal District Attorney's Office. I understand that I have both a 5th and 6th Amendment right under the United States Constitution to have an attorney present to advise me during any interrogation by law enforcement authorities. I understand this agreement provides that if I give truthful, accurate, and complete information about The Dustin Pool Homicide Investigation to Sgt. Mark Brown that said information will not be used against me in any prosecution. I also understand that if I provide information that is not truthful, accurate, and complete that this agreement is void and that the promised immunity if forfeited.

Date: 9-8-03

x [signature]
Declarant

[signature: James A. Farren]
Randall County Criminal District Attorney's Office

[signature: Mark K. Brown]
Witness

Witness

# APPENDIX M

JAMES A. FARREN
CRIMINAL DISTRICT ATTORNEY
RANDALL COUNTY, TEXAS

Randall County Courthouse
501 16th Street
Canyon, Texas 79015

Ph: (806) 468-5570
Fax: (806) 468-5566

# USE IMMUNITY AGREEMENT

By my signature below I, Tori Brooke Patrick, acknowledge and affirm that I have entered into a use immunity agreement with the Randall County Criminal District Attorney's Office. I understand that I have both a 5th Amendment right and a 6th Amendment right under the United States Constitution to have an attorney present to advise me during any interrogation by law enforcement authorities. I hereby confirm that I initiated this meeting and discussion and I have chosen to waive the aforementioned 5th and 6th Amendment rights. I understand that this agreement provides that if I give truthful and accurate information about the death of Dustin Pool to Bobbi Ledbetter of the Randall County Criminal District Attorney's Office that information will not be used against me in any prosecution. I also understand that if I provide information that is not truthful or accurate that this agreement is void and that the promised immunity is forfeited.

Date: June 28, 2003

Tori Brooke Patrick
Tori Brooke Patrick

James A. Farren
James A. Farren
Criminal District Attorney
Randall County, Texas

Bobbie Ledbetter
Witness – Bobbie Ledbetter

Gil Farren
Witness – Gil Farren

Jami K. Watson
JAmi K. Watson

DEPOSITION EXHIBIT
Defense 14
PENGAD 800-631-6989

# APPENDIX N

JAMES A. FARREN
CRIMINAL DISTRICT ATTORNEY
RANDALL COUNTY, TEXAS

Randall County Courthouse
501 16th Street
Canyon, Texas 79015

Ph: (806) 468-5570
Fax: (806) 468-5566

July 19, 2004

Jeff Robnett
Attorney at Law
P.O. Box 1583
Midland, Texas 79702

Re: Tori Patrick

Dear Mr. Robnett:

I write in response to our recent conversation concerning Tori Patrick. We have entered an agreement with Patrick and her former attorney Jamie Watson that provided for dismissal of the pending capital murder charge to be replaced with a charge of aggravated kidnaping. Patrick agreed to plead guilty to aggravated kidnaping and to testify truthfully at the trial of any other defendant charged with any crime in connection with the death of Dustin Pool. We have never specified a sentence and the State would prefer to avoid delineating a specific sentence until the trials of the other defendants have been completed.

We do have some concerns about the completeness of Patrick's earlier written statement and would like to meet with her in the near future to clear up some ambiguities. We look forward to meeting with you and your client in the near future. Please contact me if I can provide further information.

James A. Farren
James A. Farren
Criminal District Attorney
Randall County, Texas

# APPENDIX O

1341/2

* I don't know if you want
to use anything from the
phone calls. Tori honestly
believes we aren't listening
to her -- might be better to
let her think that.

~~2215~~ 110

Jori Patrick

2317 N. County R

Midland

79706

432-686-9168

-GM- Acutel

# APPENDIX P

# Register of Actions
## Case No. 15308A

The State of Texas vs STEPHEN CRAIG KIMBERLIN § § § § § §

Case Type: **Adult Felony**
Date Filed: **08/06/2003**
Location: **47th District Court**

## Party Information

**Defendant** KIMBERLIN, STEPHEN CRAIG
SID: TX04093855
Other Agency Numbers
0000000000 Other-see notes, APD 03-73750 Other-see notes, APD IR #03-58841 Other-see notes

Male White
DOB: 06/27/1968
6' 1", 225 lbs

**Attorneys**
**PAUL HERRMANN**
*Retained*
806-342-4242(W)

SELDEN B. HALE
*Retained*
806-372-5711(W)

**State** STATE OF TEXAS
CANYON, TX 79015

Other

**JAMES A. FARREN**
806-468-5570(W)

## Charge Information

| Charges: KIMBERLIN, STEPHEN CRAIG | Statute | Level | Date |
|---|---|---|---|
| 1. CAPITAL MURDER OF A PEACE OFFICER OR FIREMAN | 19.03 (a)(1) | Capital Felony | 03/09/2003 |

## Events & Orders of the Court

### DISPOSITIONS

08/01/2005 **Disposition** (Judicial Officer: Miner, Hal)
1. CAPITAL MURDER OF A PEACE OFFICER OR FIREMAN
Dismissed

### OTHER EVENTS AND HEARINGS

06/23/2003 **Complaint Filed** (Judicial Officer: Miner, Hal )
*Event Code: CPF Memo: CAPITAL MURDER 19.03 VOL: I;S*
Vol./Book I;S

06/23/2003 **ISS WARRANT** (Judicial Officer: Miner, Hal )
*Event Code: IW VOL: I;S*
Vol./Book I;S

06/25/2003 **MAGISTRATE'S WARNING** (Judicial Officer: Miner, Hal )
*Event Code: MW*

06/26/2003 **FIL WARRANT** (Judicial Officer: Miner, Hal )
*Event Code: FW Memo: 6-23-2003 VOL: I;S*
Vol./Book I;S

08/06/2003 **Indictment - (OCA)** (Judicial Officer: Miner, Hal )
*Event Code: IND*

08/06/2003 **ISS CAPIAS/PRECEPT** (Judicial Officer: Miner, Hal )
*Event Code: IC*

08/12/2003 **MAGISTRATE'S WARNING** (Judicial Officer: Miner, Hal )
*Event Code: MW*

08/14/2003 **MAGISTRATE'S WARNING** (Judicial Officer: Miner, Hal )
*Event Code: MW VOL: I;S*
Vol./Book I;S

08/18/2003 **FIL CAPIAS/PREC** (Judicial Officer: Miner, Hal )
*Event Code: FC Memo: 8-8-03 VOL: I;S*
Vol./Book I;S

08/18/2003 **Defendant's Pre-Trial Motion** (Judicial Officer: Miner, Hal )
*Event Code: DPTM Memo: DEF'S REQ/EVIDENCE; DEF'S MOT REQUEST NOT OF PROSEC INTENT TO USE CERT COPIES; MOT/DISCLOSURE OF IMPEACHING INFO; MOT/LIMIT JURY ARGUMENT OF STATE; MOT/PRODUCTION & INSPECTN OF EVIDENCE/EXCULP EVID; MOT/PROD OF INFO CONCERN STATE'S WITNESSES; DEF'S MOT IN LIMINE #1; DEF'S MOT IN LIMINE #2; MOT/LIMINE REGARDING APP FOR PROB; MOT/DISCOVERY OF EXPERTS; MOT/DISCOVOF PRIOR JURY SERV; MOT/DISCOVERY, PRODUCTION & INSP OF EVIDENCE; MOT/REQ STATE TO REVEAL ANY AGREEMENT W/ANY WITNESS. VOL: I;S*

| | |
|---|---|
| | Vol./Book I;S |
| 09/03/2003 | **COURT APPT ATTY**<br>*Event Code: CAP Memo: HERRMANN/S.HALE VOL: I;S*<br>Vol./Book I;S |
| 10/02/2003 | **Motion**<br>*Event Code: MOT Memo: APPT OF INVESTIGATOR; SEALED VOL: I;S*<br>Vol./Book I;S |
| 10/02/2003 | **ORDER**<br>*Event Code: ORD Memo: APPT OF INVESTIGATOR; SEALED VOL: I;S*<br>Vol./Book I;S |
| 10/28/2003 | **SEARCH WARRANT** (Judicial Officer: Miner, Hal )<br>*Event Code: SW* |
| 05/05/2004 | **Order To Pay Attorney Fee** (Judicial Officer: Miner, Hal )<br>*Event Code: OPAF Memo: INVESTIGA--$574.50 - PAT CHAMBERS VOL: I;S*<br>Vol./Book I;S |
| 06/15/2004 | **Order To Pay Attorney Fee** (Judicial Officer: Miner, Hal )<br>*Event Code: OPAF Memo: S.HALE $2890.00 VOL: I;S*<br>Vol./Book I;S |
| 07/15/2004 | **Order To Pay Attorney Fee** (Judicial Officer: Miner, Hal )<br>*Event Code: OPAF Memo: INVSTG; STEINHILPER $6725.00 VOL: I;S*<br>Vol./Book I;S |
| 08/27/2004 | **Notice** (Judicial Officer: Miner, Hal )<br>*Event Code: N Memo: NOTICE OF DEATH PENALTY INTENT VOL: I;S*<br>Vol./Book I;S |
| 01/31/2005 | **Order To Pay Attorney Fee** (Judicial Officer: Miner, Hal )<br>*Event Code: OPAF Memo: $2525.00/SELDEN HALE* |
| 03/18/2005 | **Defendant's Pre-Trial Motion** (Judicial Officer: Miner, Hal )<br>*Event Code: DPTM Memo: MOT ELECT JURY TO ASSESS PUNISHMENT* |
| 03/22/2005 | **Defendant's Pre-Trial Motion** (Judicial Officer: Miner, Hal )<br>*Event Code: DPTM Memo: 4 MOTIONS* |
| 03/23/2005 | **Defendant's Pre-Trial Motion** (Judicial Officer: Miner, Hal )<br>*Event Code: DPTM Memo: ORD ON DEF MOT APPT MITIGATION SPEC.; SEALED BY ORDER* |
| 03/28/2005 | **STATE APPLICATION** (Judicial Officer: Miner, Hal )<br>*Event Code: SA Memo: SEE IMAGING* |
| 03/29/2005 | **Defendant's Pre-Trial Motion** (Judicial Officer: Miner, Hal )<br>*Event Code: DPTM Memo: INDIVIDUAL VOIR DIRE & MOT TO DISCOVER* |
| 03/29/2005 | **ORDER OR NOTICE OF HEARING** (Judicial Officer: Miner, Hal )<br>*Event Code: OH Memo: 4-14-05* |
| 03/30/2005 | **Defendant's Pre-Trial Motion** (Judicial Officer: Miner, Hal )<br>*Event Code: DPTM Memo: MOT/LIST EXHIBITS & MOT/DISCOVERY OF IMMUNITY TO POTENTIAL WITNESSES* |
| 03/30/2005 | **Subpoena Served** (Judicial Officer: Miner, Hal )<br>*Event Code: SUBPS Memo: SEE IMAGING* |
| 04/01/2005 | **Subpoena Returned Unserved** (Judicial Officer: Miner, Hal )<br>*Event Code: SUBPU Memo: CONTINUED* |
| 04/04/2005 | **STATE APPLICATION** (Judicial Officer: Miner, Hal )<br>*Event Code: SA Memo: NO. 15308A, 15307A, 15305A* |
| 04/06/2005 | **Motion**<br>*Event Code: MOT Memo: WRIT H/CORPUS AD PROSEQUENDUM* |
| 04/06/2005 | **ORDER**<br>*Event Code: ORD Memo: WRIT H/CORPUS AD PROSEQUENDUM* |
| 04/14/2005 | **STATE'S MOTIONS** (Judicial Officer: Miner, Hal )<br>*Event Code: SM Memo: DISCOVERY OF DEF. EXPERTS* |
| 04/18/2005 | **STATE APPLICATION** (Judicial Officer: Miner, Hal )<br>*Event Code: SA Memo: SEE IMAGE* |
| 04/22/2005 | **MEMO TO THE JUDGE-JUV** (Judicial Officer: Miner, Hal )<br>*Event Code: MEMO Memo: FROM SELDEN HALE - MEDICAL STATEMENT* |
| 05/05/2005 | **ORDER OR NOTICE OF HEARING** (Judicial Officer: Miner, Hal )<br>*Event Code: OH Memo: 8-8-05* |
| 05/10/2005 | **STATE APPLICATION** (Judicial Officer: Miner, Hal )<br>*Event Code: SA Memo: ERFAIN RAMOS, WARD GREGORY, ERIN FOSTER* |
| 05/11/2005 | **Subpoena Served** (Judicial Officer: Miner, Hal )<br>*Event Code: SUBPS Memo: RONNIE POPE & JERROD HAWBAKER* |
| 05/12/2005 | **ORDER**<br>*Event Code: ORD Memo: ASSIGNMENT; JUDGE GLEASON* |
| 05/12/2005 | **FILED** (Judicial Officer: Miner, Hal )<br>*Event Code: F Memo: ASSIGNMENT OF JUDGE DAVID GLEASON* |
| 05/13/2005 | **Defendant's Pre-Trial Motion** (Judicial Officer: Miner, Hal )<br>*Event Code: DPTM Memo: MOT/PRODUCTION OF JURY QUESTIONNAIRES; MOT/DISCLOSURE OF EVIDENCE OR PRIOR CONVICTIONS; MOT/CONCERNING EXTRANEOUS ACTS; WRITTEN ORJECTIONS; & MOT/RECESS* |
| 05/13/2005 | **STATE APPLICATION** (Judicial Officer: Miner, Hal )<br>*Event Code: SA Memo: SEE IMAGING* |
| 05/24/2005 | **Subpoena Served** (Judicial Officer: Miner, Hal )<br>*Event Code: SUBPS Memo: WAREHOUSE SOL.* |
| 05/25/2005 | **NOTICE/AFFIDAVIT BUSINESS RECORD** (Judicial Officer: Miner, Hal )<br>*Event Code: NABR Memo: J.PRESNALL; S.JONES; T.BLEVINS; B.FOSTER; CHRIS JONSE* |

| | |
|---|---|
| 06/03/2005 | **LETTER** (Judicial Officer: Miner, Hal )<br>*Event Code: LETTER Memo: TO ATTYS FROM JUDGE GLEASON - OFFICE CONFERENCE - 6/14/05 @ 10:00 IN CANYON* |
| 06/08/2005 | **Defendant's Pre-Trial Motion** (Judicial Officer: Miner, Hal )<br>*Event Code: DPTM Memo: MOT/DISCLOSUREOF ALL EVIDENCE FAVORABLE TO THE DEF. UNDER BRADY V. MARYLAND* |
| 06/15/2005 | **Defendant's Pre-Trial Motion** (Judicial Officer: Miner, Hal )<br>*Event Code: DPTM Memo: MOT/EXCULPATORY EVIDENCE & MOT/DISCOVERY* |
| 06/15/2005 | **STATE APPLICATION** (Judicial Officer: Miner, Hal )<br>*Event Code: SA Memo: JEFF STOCKE* |
| 06/23/2005 | **NOTICE/AFFIDAVIT BUSINESS RECORD** (Judicial Officer: Miner, Hal )<br>*Event Code: NABR Memo: QUALITY INN* |
| 06/27/2005 | **Subpoena Served** (Judicial Officer: Miner, Hal )<br>*Event Code: SUBPS Memo: JERROD HAWBAKER* |
| 06/29/2005 | **STATE APPLICATION** (Judicial Officer: Miner, Hal )<br>*Event Code: SA Memo: OFF. RODEN, APD* |
| 07/12/2005 | **Subpoena Served** (Judicial Officer: Miner, Hal )<br>*Event Code: SUBPS Memo: OFF RODEN* |
| 07/15/2005 | **STATE APPLICATION** (Judicial Officer: Miner, Hal )<br>*Event Code: SA Memo: DAVID COCHET* |
| 07/15/2005 | **STATE APPLICATION** (Judicial Officer: Miner, Hal )<br>*Event Code: SA Memo: SEE IMAGING* |
| 07/20/2005 | **Subpoena Served** (Judicial Officer: Miner, Hal )<br>*Event Code: SUBPS Memo: BRANDON COTTON* |
| 08/02/2005 | **DOCKET SHEET** (Judicial Officer: Miner, Hal )<br>*Event Code: DSH* |
| 08/02/2005 | **MOTION & ORDER TO DISMISS** (Judicial Officer: Miner, Hal )<br>*Event Code: MODISM Memo: REINDICTED AS 17288A* |
| 08/17/2005 | **ORDER OR NOTICE OF HEARING** (Judicial Officer: Miner, Hal )<br>*Event Code: OH Memo: JURY TRIAL 1-9-06* |
| 01/03/2006 | **DEFENSE APPLICATION FOR SUBPOENA** (Judicial Officer: Miner, Hal )<br>*Event Code: DAS Memo: CUSTODIAN OF RECORDS - RANDALL CO DETENTION CENTER & CUSTODIAN OF RECORDS - CAL FARLEY'S BOY'S RANCH* |
| 01/10/2006 | **Subpoena Served** (Judicial Officer: Miner, Hal )<br>*Event Code: SUBPS Memo: SEE IMAGING* |

# APPENDIX Q

# Register of Actions

## Case No. 17288A

**The State of Texas vs STEPHEN CRAIG KIMBERLIN**

§
§
§
§
§

Case Type: **Adult Felony**
Date Filed: **07/27/2005**
Location: **47th District Court**

### Party Information

| | | | |
|---|---|---|---|
| **Defendant** | KIMBERLIN, STEPHEN CRAIG<br>SID: TX04093855<br>Other Agency Numbers<br>0000000000 Other-see notes, APD 03-73750 Other-see notes, APD IR #03-58841 Other-see notes | Male White<br>DOB: 06/27/1968<br>6' 1", 225 lbs | **Attorneys**<br>**PAUL HERRMANN**<br>*Court Appointed*<br>806-342-4242(W)<br><br>SELDEN B. HALE<br>*Retained*<br>806-372-5711(W) |
| **State** | **STATE OF TEXAS**<br>CANYON, TX 79015 | Other | **JAMES A. FARREN**<br>806-468-5570(W) |

### Charge Information

| Charges: KIMBERLIN, STEPHEN CRAIG | Statute | Level | Date |
|---|---|---|---|
| 1. MURDER | 19.02(b)(1) | First Degree Felony | 03/09/2003 |

### Events & Orders of the Court

**DISPOSITIONS**

01/05/2006 **Disposition** (Judicial Officer: Miner, Hal)
1. MURDER
Convicted

01/05/2006 **Plea** (Judicial Officer: Miner, Hal)
1. MURDER
Guilty

01/05/2006 **Adult Sentence - Local Jail - (OCA)** (Judicial Officer: Miner, Hal)
1. MURDER
Confinement to Commence 01/05/2006
45 Years , Texas Department of Corrections, Texas Department of Criminal Justice

**OTHER EVENTS AND HEARINGS**

07/27/2005 **Indictment - (OCA)** (Judicial Officer: Miner, Hal )
*Event Code: IND*

07/27/2005 **ISS CAPIAS/PRECEPT** (Judicial Officer: Miner, Hal )
*Event Code: IC*

08/03/2005 **FIL CAPIAS/PREC** (Judicial Officer: Miner, Hal )
*Event Code: FC*

08/08/2005 **STATE APPLICATION** (Judicial Officer: Miner, Hal )
*Event Code: SA Memo: SEE IMAGE*

08/15/2005 **STATE APPLICATION** (Judicial Officer: Miner, Hal )
*Event Code: SA Memo: BRANDON COTTON*

08/17/2005 **Subpoena Served** (Judicial Officer: Miner, Hal )
*Event Code: SUBPS Memo: BRANDON COTTON*

08/25/2005 **Subpoena Served** (Judicial Officer: Miner, Hal )
*Event Code: SUBPS Memo: BONNIE POPE*

08/29/2005 **STATE APPLICATION** (Judicial Officer: Miner, Hal )
*Event Code: SA Memo: PAUL MAES*

09/07/2005 **STATE APPLICATION** (Judicial Officer: Miner, Hal )
*Event Code: SA Memo: SHANNON BURNEY*

09/16/2005 **STATE APPLICATION** (Judicial Officer: Miner, Hal )
*Event Code: SA Memo: MYER, SPANEL*

| | |
|---|---|
| 09/21/2005 | **Subpoena Served** (Judicial Officer: Miner, Hal )<br>*Event Code: SUBPS Memo: GUIN GARCIA & RONNIE POPE* |
| 09/27/2005 | **STATE APPLICATION** (Judicial Officer: Miner, Hal )<br>*Event Code: SA Memo: CHRIS EASON* |
| 09/28/2005 | **STATE APPLICATION** (Judicial Officer: Miner, Hal )<br>*Event Code: SA Memo: JAMIE KELLERMAN* |
| 09/28/2005 | **STATE APPLICATION** (Judicial Officer: Miner, Hal )<br>*Event Code: SA Memo: TORI PATRICK* |
| 10/05/2005 | **STATE APPLICATION** (Judicial Officer: Miner, Hal )<br>*Event Code: SA Memo: KRISTI BRESHEARS & MIKE CRANDELL* |
| 10/10/2005 | **Defendant's Pre-Trial Motion** (Judicial Officer: Miner, Hal )<br>*Event Code: DPTM Memo: MOT/LIMINE TO EXCLUDE PSYCHIATRIC OR PSYCHOLOGICAL TESTIMONY* |
| 10/13/2005 | **STATE APPLICATION** (Judicial Officer: Miner, Hal )<br>*Event Code: SA Memo: LOWES HOME IMPROVEMENT CUSTODIAN OF RECORDS* |
| 10/19/2005 | **Subpoena Served** (Judicial Officer: Miner, Hal )<br>*Event Code: SUBPS Memo: JEFF RODDEN* |
| 10/19/2005 | **MEMO TO THE JUDGE-JUV** (Judicial Officer: Miner, Hal )<br>*Event Code: MEMO Memo: FROM S HALE CONCERNING DEF. TRIAL TRANSCRIPT* |
| 10/19/2005 | **ORDER OR NOTICE OF HEARING** (Judicial Officer: Miner, Hal )<br>*Event Code: OH Memo: 11/7/05, 12/12/05, 12/13/05* |
| 10/19/2005 | **LETTER** (Judicial Officer: Miner, Hal )<br>*Event Code: LETTER Memo: FROM JUGDE MINER TO COUNSEL* |
| 10/19/2005 | **MEMO TO THE JUDGE-JUV** (Judicial Officer: Miner, Hal )<br>*Event Code: MEMO Memo: FROM S.HALE* |
| 10/24/2005 | **STATE APPLICATION** (Judicial Officer: Miner, Hal )<br>*Event Code: SA Memo: CURTIS SINCLAIR, CINCLAIR COMMUNICATIONS CUSTODIAN OF RECORDS* |
| 10/24/2005 | **STATE APPLICATION** (Judicial Officer: Miner, Hal )<br>*Event Code: SA Memo: CUSTODIAN OF RECORDS, SW BELL TELEPHONE* |
| 10/24/2005 | **STATE APPLICATION** (Judicial Officer: Miner, Hal )<br>*Event Code: SA Memo: MELANIE HALL, SPRINT PCS, SUBPOENA COMPLIANCE* |
| 10/24/2005 | **STATE APPLICATION** (Judicial Officer: Miner, Hal )<br>*Event Code: SA Memo: DAN METSLER, CINGULAR WIRELESS* |
| 10/28/2005 | **STATE APPLICATION** (Judicial Officer: Miner, Hal )<br>*Event Code: SA Memo: DAN MATSLER, MELANIE HALL, CUST WESTERN WIRELESS,* |
| 11/01/2005 | **Defendant's Pre-Trial Motion** (Judicial Officer: Miner, Hal )<br>*Event Code: DPTM Memo: MOT/APPOINTMENT OF AN INVESTIGATOR* |
| 11/01/2005 | **ORDER**<br>*Event Code: ORD Memo: GRANTING APPOINTMENT OF INVESTIGATOR* |
| 11/07/2005 | **MEMO TO THE JUDGE-JUV** (Judicial Officer: Miner, Hal )<br>*Event Code: MEMO Memo: FROM SELDEN HALE - NO LONGER NEED HEARING 11-7-05* |
| 11/14/2005 | **Motion**<br>*Event Code: MOT Memo: DEF. MOT TO TRANSFER FILED MOTIONS* |
| 11/14/2005 | **Subpoena Served** (Judicial Officer: Miner, Hal )<br>*Event Code: SUBPS Memo: SEE IMAGING* |
| 11/14/2005 | **ORDER**<br>*Event Code: ORD Memo: GRANTING MOTION TO TRANSFER DEF. PRE TRIAL MOTIONS* |
| 11/15/2005 | **Order To Pay Attorney Fee** (Judicial Officer: Miner, Hal )<br>*Event Code: OPAF Memo: HALE; $7086.00* |
| 11/22/2005 | **Motion**<br>*Event Code: MOT Memo: MOT WRIT H/C TESTIFICANDUM; TOMMY TUCKER, JOSHUA STOCKER, MIGHUEL GONZALES, DESTRY KEELING, JOSHUA CRAIG BLEDSOE* |
| 11/22/2005 | **ORDER**<br>*Event Code: ORD Memo: WRIT H/C AD TESTIFICANDUM; TUCKER, STOCKER, GONZALES, KEELING, BLEDSOE* |
| 11/22/2005 | **APPLICATION FOR WRIT OF HABEAS CORPUS**<br>*Event Code: WRIT Memo: WRIT H/C AD TESTIFICANDUM; TUCKER, STOCKER, GONZALES, KEELING, BLEDSOE* |
| 11/30/2005 | **Defendant's Pre-Trial Motion** (Judicial Officer: Miner, Hal )<br>*Event Code: DPTM Memo: MOT/RECUSE DA* |
| 11/30/2005 | **APPLICATION FOR WRIT OF HABEAS CORPUS**<br>*Event Code: WRIT Memo: AD TESTIFICANDUM; JOSHUA BLEDSOE* |
| 12/01/2005 | **Defendant's Pre-Trial Motion** (Judicial Officer: Miner, Hal )<br>*Event Code: DPTM Memo: MOT/CHANGE OF VENUE* |
| 12/01/2005 | **STATE APPLICATION** (Judicial Officer: Miner, Hal )<br>*Event Code: SA Memo: TIM ATCHLEY* |
| 12/01/2005 | **Defendant's Pre-Trial Motion** (Judicial Officer: Miner, Hal )<br>*Event Code: DPTM Memo: MOT/SUPPRESS EVIDENCE; MOT/DISMISS; MOT/SUPPRESS; MOT/DISCOVERY* |
| 12/02/2005 | **STATE'S MOTIONS** (Judicial Officer: Miner, Hal )<br>*Event Code: SM Memo: TRIAL BRIEF IN SUPPORT OF ADMISSION OF MARITAL COMMUNICATIONS, TRIAL BRIEF IN SUPPORT OF ADMISSION OF COCONSPIRATION STATEMENTS, TRAIL BRIEF IN SUPPORT OF VENUE, MOT/DISCOVER DEF. EXPERTS, MOT/LIMINE - COMMITMENT QUESTIONS, MOT/LIMINE - PRETRAIL NEGOTIATIONS, MOT/LIMINE-HEARSAY, MOT/LIMINE-UNFILED CHARGES, TRIAL BRIEF IN SUPPORT OF ADMISION OF EXTRANEOUS OFFENSES* |
| 12/02/2005 | **Notice** (Judicial Officer: Miner, Hal )<br>*Event Code: N Memo: EXPERT WITNESSES FOR THE STATE* |
| 12/02/2005 | **TEXAS RULES OF CRIMINAL EVIDENCE** (Judicial Officer: Miner, Hal )<br>*Event Code: TRE Memo: STATE - RULE 404(b) & 609(f)* |
| 12/02/2005 | **DEFENSE APPLICATION FOR SUBPOENA** (Judicial Officer: Miner, Hal ) |

| | |
|---|---|
| | *Event Code: DAS Memo: NYLYNN NICHOLS, DUSTY GREEN, KARI KING, BARRY KING* |
| 12/02/2005 | **LETTER** (Judicial Officer: Miner, Hal )<br>*Event Code: LETTER Memo: FROM DA TO SELDEN HALE - REQ/NAME & ADDRESSES OF EXPERTS* |
| 12/02/2005 | **LETTER** (Judicial Officer: Miner, Hal )<br>*Event Code: LETTER Memo: FROM DA TO PAUL HERRMANN - REQ NAME & ADDRESS OF EXPERTS* |
| 12/05/2005 | **Motion**<br>*Event Code: MOT Memo: TO UNSEAL RECORDS IN 15307-A* |
| 12/05/2005 | **Motion**<br>*Event Code: MOT Memo: REQUIRE DISCLOSURE OF ALL INFORMERS RELIED UPON AND FOR PRODUCTION OF SAID INFORMERS IN OPEN COURT* |
| 12/06/2005 | **FILED** (Judicial Officer: Miner, Hal )<br>*Event Code: F Memo: AFFIDAVIT'S OF REDDEN, BROWN, JAKLEWICZ* |
| 12/06/2005 | **STATE'S MOTIONS** (Judicial Officer: Miner, Hal )<br>*Event Code: SM Memo: REPLY TO DEFENDANT'S MOTION TO CHANGE VENUE* |
| 12/06/2005 | **Subpoena Served** (Judicial Officer: Miner, Hal )<br>*Event Code: SUBPS Memo: KING, KING, MILLER,GREEN* |
| 12/06/2005 | **STATE'S MOTIONS** (Judicial Officer: Miner, Hal )<br>*Event Code: SM Memo: TO RECUSE COUNSEL FOR DEFENDANT* |
| 12/07/2005 | **STATE'S MOTIONS** (Judicial Officer: Miner, Hal )<br>*Event Code: SM Memo: TRANSFER FILED MOTIONS* |
| 12/12/2005 | **RANDALL CO SO TRANSPORT - CRI**<br>*Event Code: TRANSPORT Memo: MIGUEL GONZALES - $260.94* |
| 12/12/2005 | **RANDALL CO SO TRANSPORT - CRI**<br>*Event Code: TRANSPORT Memo: JOSHUA STOCKER - $1504.48* |
| 12/13/2005 | **STATE APPLICATION** (Judicial Officer: Miner, Hal )<br>*Event Code: SA Memo: PALLARD, KATHY JONES* |
| 12/13/2005 | **Subpoena Served** (Judicial Officer: Miner, Hal )<br>*Event Code: SUBPS Memo: SEE IMAGING* |
| 12/13/2005 | **Defendant's Pre-Trial Motion** (Judicial Officer: Miner, Hal )<br>*Event Code: DPTM Memo: MOT/REQ/DISCLOSURE/INFORMERS* |
| 12/13/2005 | **Subpoena Served** (Judicial Officer: Miner, Hal )<br>*Event Code: SUBPS Memo: PAM POLLARD, KATHY JONES, SGT BROWN, LT TRUPE, B REDDEN, J WATSON, B LEDBETTER* |
| 12/14/2005 | **Notice** (Judicial Officer: Miner, Hal )<br>*Event Code: N Memo: TO S HALE FROM DA'S OFFICE WITH LISTING OF EVIDENCE* |
| 12/14/2005 | **Notice** (Judicial Officer: Miner, Hal )<br>*Event Code: N Memo: TO P HERRMANN FROM DA'S OFFICE - LIST OF EVIDNECE* |
| 12/14/2005 | **RANDALL CO SO TRANSPORT - CRI**<br>*Event Code: TRANSPORT Memo: 237.44* |
| 12/15/2005 | **LETTER** (Judicial Officer: Miner, Hal )<br>*Event Code: LETTER Memo: TO ATTYS FROM JUDGE MINER - HEARING IN AMARILLON 12-17-05* |
| 12/16/2005 | **DEFENSE APPLICATION FOR SUBPOENA** (Judicial Officer: Miner, Hal )<br>*Event Code: DAS Memo: BILL REDDEN* |
| 12/16/2005 | **Defendant's Pre-Trial Motion** (Judicial Officer: Miner, Hal )<br>*Event Code: DPTM Memo: MOT/"GAG" ORDER* |
| 12/16/2005 | **Trial Document** (Judicial Officer: Miner, Hal )<br>*Event Code: TRIAL Memo: STATES TRIAL BRIEF* |
| 12/20/2005 | **RANDALL CO SO TRANSPORT - CRI**<br>*Event Code: TRANSPORT Memo: BLEDSOE $669.23* |
| 12/20/2005 | **NOTICE/AFFIDAVIT BUSINESS RECORD** (Judicial Officer: Miner, Hal )<br>*Event Code: NABR Memo: STATES; CINGULAR WIRELESS, SINCLAIR COMM, MOTEL 6, LA QUINTA INN, QUALITY INN, WAREHOUSE SOLUTIONS, CIRCUIT CITY, SW BELL TEL, WESTERN WIRELESS, SPRINT PCS* |
| 12/21/2005 | **Notice** (Judicial Officer: Miner, Hal )<br>*Event Code: N Memo: EXPERT WITNESSES FOR THE DEFENDANT* |
| 12/21/2005 | **DEPUTY REPORTER STATEMENT** (Judicial Officer: Miner, Hal )<br>*Event Code: DRS* |
| 12/21/2005 | **PRE-TRIAL ORDERS** (Judicial Officer: Miner, Hal )<br>*Event Code: PTO* |
| 12/21/2005 | **STATE APPLICATION** (Judicial Officer: Miner, Hal )<br>*Event Code: SA Memo: KATHY JONES, CPS* |
| 12/22/2005 | **Notice** (Judicial Officer: Miner, Hal )<br>*Event Code: N Memo: AMENDED NOTICE OF EXPERT WITNESS/DEFENDANT* |
| 12/29/2005 | **Subpoena Served** (Judicial Officer: Miner, Hal )<br>*Event Code: SUBPS Memo: KATHY JONES* |
| 12/30/2005 | **DEFENSE APPLICATION FOR SUBPOENA** (Judicial Officer: Miner, Hal )<br>*Event Code: DAS Memo: VICKIE LAMBERSON, JAY EUBANKS* |
| 12/30/2005 | **Subpoena Served** (Judicial Officer: Miner, Hal )<br>*Event Code: SUBPS Memo: JAY EUBANKS, VICKIE LAMBERSON* |
| 01/04/2006 | **NOTICE/AFFIDAVIT BUSINESS RECORD** (Judicial Officer: Miner, Hal )<br>*Event Code: NABR Memo: PERSONNEL DIRECTOR RANDALL CO JUV PROB., REGISTRARS OFFICE WTAM* |
| 01/05/2006 | **DOCKET SHEET** (Judicial Officer: Miner, Hal )<br>*Event Code: DSH* |
| 01/05/2006 | **Trial Court's Certification of Defendant's Right to Appeal** (Judicial Officer: Miner, Hal )<br>*Event Code: TCC* |
| 01/05/2006 | **DEFENDANT'S WAIVER OF APPEAL AFTER SENTENCE** (Judicial Officer: Miner, Hal )<br>*Event Code: DWAP* |

| | |
|---|---|
| 01/05/2006 | **FELONY PLEA MEMORANDUM** (Judicial Officer: Miner, Hal )<br>*Event Code: FPM* |
| 01/05/2006 | **Judgment of Conviction** (Judicial Officer: Miner, Hal )<br>*Event Code: JCON Memo: 45 YRS TDC VOL: I;S*<br>Vol./Book I;S |
| 01/11/2006 | **ISSUED TDCJ-ID COMMITMENT** (Judicial Officer: Miner, Hal )<br>*Event Code: ITC* |
| 01/11/2006 | **RANDALL CO SO TRANSPORT - CRI**<br>*Event Code: TRANSPORT Memo: $394.80 - FLORENCE, CO* |
| 01/31/2006 | **Motion**<br>*Event Code: MOT Memo: DER. MOT/EXPERT ASSISTANCE IN INDIGENT CASE - $1338.33 - VINCE GONZALES* |
| 01/31/2006 | **ORDER**<br>*Event Code: ORD Memo: EX PARTE ORDER - PAYMENT OF FEE FOR MITIGATION SPECIALIST - $1338.33 FOR VINCE GONZALES - COPY TO AUDITOR* |
| 01/31/2006 | **Order To Pay Attorney Fee** (Judicial Officer: Miner, Hal )<br>*Event Code: OPAF Memo: $715.00/DAVID SIRMON - PRIVATE INESTIGATOR* |
| 01/31/2006 | **Order To Pay Attorney Fee** (Judicial Officer: Miner, Hal )<br>*Event Code: OPAF Memo: $17,172.00/SELDEN HALE* |
| 02/14/2006 | **RANDALL CO SO TRANSPORT - CRI**<br>*Event Code: TRANSPORT Memo: RCSO $751.06* |
| 05/17/2006 | **Order To Pay Attorney Fee** (Judicial Officer: Miner, Hal )<br>*Event Code: OPAF Memo: $26,533.00/PAUL HERRMANN* |
| 05/18/2006 | **Order To Pay Attorney Fee** (Judicial Officer: Miner, Hal )<br>*Event Code: OPAF Memo: $3300.00/SELDEN HALE* |
| 07/21/2006 | **Subpoena Served** (Judicial Officer: Miner, Hal )<br>*Event Code: SUBPS Memo: CUSTODIAN OF RECORDS, HOWES HOME IMPROVEMENT* |
| 09/18/2012 | **BILL OF COST - INMATE WITHDRAWAL** (Judicial Officer: Miner, Hal )<br>*Event Code: BCW* |
| 11/06/2012 | **ORDER WITHDRAW INMATE TRUST FUND** (Judicial Officer: Miner, Hal )<br>*Event Code: OWDIT* |

## Financial Information

**Defendant** KIMBERLIN, STEPHEN CRAIG

| | |
|---|---|
| Total Financial Assessment | 54,364.00 |
| Total Payments and Credits | 273.00 |
| **Balance Due as of 01/15/2018** | **54,091.00** |

| | | | | |
|---|---|---|---|---|
| 01/11/2006 | Transaction Assessment | | | 273.00 |
| 05/18/2006 | Transaction Assessment | | | 47,005.00 |
| 01/16/2013 | Payment | Receipt # 2013-149708 | KIMBERLIN, STEPHEN CRAIG | (72.11) |
| 01/23/2013 | Payment | Receipt # 2013-150745 | KIMBERLIN, STEPHEN CRAIG | (10.00) |
| 02/13/2013 | Payment | Receipt # 2013-152020 | KIMBERLIN, STEPHEN CRAIG | (5.00) |
| 03/14/2013 | Payment | Receipt # 2013-153824 | KIMBERLIN; STEPHEN; CRAIG | (10.00) |
| 06/19/2013 | Payment | Receipt # 2013-159291 | KIMBERLIN, STEPHEN CRAIG | (5.00) |
| 08/13/2013 | Payment | Receipt # 2013-162336 | KIMBERLIN, STEPHEN CRAIG | (10.00) |
| 12/18/2013 | Payment | Receipt # 2013-168919 | KIMBERLIN, STEPHEN CRAIG | (5.00) |
| 02/27/2014 | Payment | Receipt # 2014-172539 | KIMBERLIN, STEPHEN CRAIG | (10.00) |
| 03/25/2014 | Payment | Receipt # 2014-173934 | KIMBERLIN, STEPHEN CRAIG | (10.00) |
| 06/25/2014 | Payment | Receipt # 2014-179202 | KIMBERLIN, STEPHEN CRAIG | (10.00) |
| 08/18/2014 | Payment | Receipt # 2014-182115 | KIMBERLIN, STEPHEN CRAIG | (10.00) |
| 10/28/2014 | Payment | Receipt # 2014-185966 | KIMBERLIN, STEPHEN CRAIG | (4.20) |
| 12/10/2014 | Payment | Receipt # 2014-188549 | KIMBERLIN, STEPHEN CRAIG | (10.00) |
| 01/12/2015 | Payment | Receipt # 2015-189977 | KIMBERLIN, STEPHEN CRAIG | (10.00) |
| 04/28/2015 | Payment | Receipt # 2015-196574 | KIMBERLIN, STEPHEN CRAIG | (4.20) |
| 06/08/2015 | Payment | Receipt # 2015-199227 | KIMBERLIN, STEPHEN CRAIG | (10.00) |
| 07/08/2015 | Payment | Receipt # 2015-201316 | KIMBERLIN, STEPHEN CRAIG | (0.89) |
| 09/09/2015 | Payment | Receipt # 2015-205574 | KIMBERLIN, STEPHEN CRAIG | (10.00) |
| 10/15/2015 | Payment | Receipt # 2015-208142 | KIMBERLIN, STEPHEN CRAIG | (3.00) |
| 11/10/2015 | Payment | Receipt # 2015-209918 | KIMBERLIN, STEPHEN CRAIG | (1.19) |
| 01/18/2016 | Payment | Receipt # 2016-214412 | KIMBERLIN, STEPHEN CRAIG | (10.00) |
| 02/16/2016 | Payment | Receipt # 2016-216408 | KIMBERLIN, STEPHEN CRAIG | (1.00) |
| 04/12/2016 | Payment | Receipt # 2016-220790 | KIMBERLIN, STEPHEN CRAIG | (4.00) |
| 05/12/2016 | Payment | Receipt # 2016-223182 | KIMBERLIN, STEPHEN CRAIG | (0.39) |
| 08/11/2016 | Payment | Receipt # 2016-230044 | KIMBERLIN, STEPHEN CRAIG | (10.00) |
| 09/14/2016 | Payment | Receipt # 2016-232265 | KIMBERLIN, STEPHEN CRAIG | (4.00) |
| 10/17/2016 | Payment | Receipt # 2016-234504 | KIMBERLIN, STEPHEN CRAIG | (0.69) |
| 02/13/2017 | Payment | Receipt # 2017-242709 | KIMBERLIN, STEPHEN CRAIG | (10.00) |
| 07/20/2017 | Payment | Receipt # 2017-254301 | KIMBERLIN, STEPHEN CRAIG | (10.00) |
| 09/13/2017 | Payment | Receipt # 2017-258325 | KIMBERLIN, STEPHEN CRAIG | (2.50) |
| 01/10/2018 | Payment | Receipt # 2018-267013 | KIMBERLIN, STEPHEN CRAIG | (9.83) |

# APPENDIX R

Return to Search Results

# Offender Information Details

**SID Number:** 04093855

**TDCJ Number:** 01345531

**Name:** KIMBERLIN,STEPHEN CRAIG

**Race:** W

**Gender:** M

**DOB:** 1968-06-27

**Maximum Sentence Date:** 2048-06-22

**Current Facility:** ALFRED HUGHES

**Projected Release Date:** 2048-06-22

**Parole Eligibility Date:** 2025-12-22

**Offender Visitation Eligible:** YES

*Information provided is updated once daily during weekdays and multiple times per day on visitation days.* ***Because this information is subject to change, family members and friends are encouraged to call the unit prior to traveling for a visit.***

## SPECIAL INFORMATION FOR SCHEDULED RELEASE:

**Scheduled Release Date:**
Offender is not scheduled for release at this time.

**Scheduled Release Type:**
Will be determined when release date is scheduled.

**Scheduled Release Location:**
Will be determined when release date is scheduled.

Parole Review Information

## Offense History:

| Offense Date | Offense | Sentence Date | County | Case No. | Sentence (YY-MM-DD) |
|---|---|---|---|---|---|
| 2003-04-02 | DEL CONT SUB > 400 GRAMS | 2006-01-05 | RANDALL | 15,275-A | 20-00-00 |
| 2003-03-09 | MURDER | 2006-01-05 | RANDALL | 17,288-A | 45-00-00 |

Return to Search Results

---

*The Texas Department of Criminal Justice updates this information regularly to ensure that it is complete and accurate, however this information can change quickly. Therefore, the information on this site may not reflect the true current location, status, scheduled termination date, or other information regarding an offender.*

*For questions and comments, you may contact the Texas Department of Criminal Justice, at (936) 295-6371 or webadmin@tdcj.texas.gov. This information is made available to the public and law enforcement in the interest of public safety. Any unauthorized use of this information is forbidden and subject to criminal prosecution.*

---

New Offender Search

Texas Department of Criminal Justice | PO Box 99 | Huntsville, Texas 77342-0099 | (936) 295-6371

# APPENDIX S


RANDALL COUNTY
TEXAS
SHERIFF'S DEPARTMENT
TX1910000
24300
www.mugshots.com

# APPENDIX T

Email or Phone | Password | Log In
Forgot account?

## Craig Kimberlin is on Facebook.

To connect with Craig, sign up for Facebook today.

Log In

or

Sign Up



# Craig Kimberlin

Friends Photos Videos

## About Craig Kimberlin

No info to show

## Favorites

**Music**



B-Real of Cypress Hill

**Movies**




The Secret Life Of Pets

**Television**

cute

Animal Planet's Too

**Athletes**



## Photos



See More Photos

## Wrong Craig Kimberlin? Try Again

Craig Kimberlin Search

## Others Named Craig Kimberlin



Craig Kimberlin



Craig Kimberlin

Alana
Blanchard

**Other** Donald J. Trump, Dani Mathers, Jessica Ashley, Kristen Nicole, Beth Williams, Sean Hannity, Mercedes Brito, Carmen Electra, Jenna Jameson, Nikki Leigh, Josephine Skriver, Elizabeth Hurley, Pamela Anderson, Fabricio Zaia, Ali Rafiq and more


Craig Kimberlin


Melissa Craig
(Melissa Joann Kimberlin)

See more people named Craig Kimberlin

## Others With a Similar Name


Craig Davis


Rick Craig


Craig Alpert


Craig Ellis


Craig Rokuson



Craig Sole


Cathie Craig


Craig Weinrib

**CONTACT INFORMATION**

No contact info to show

Español Français (France) 中文(简体) العربية Português (Brasil) Italiano 한국어 Deutsch हिन्दी 日本語

Sign Up Log In Mobile Find Friends Pages Help

Messenger Facebook Lite People Places Games Locations Celebrities Marketplace Groups Recipes Momer
Instagram About Create Ad Create Page Developers Careers Privacy Cookies Ad Choices Terms




ook.com/photo.php?fbid=12399674460
.100009704498106.-2207520000.14785
ery Apple Disney TEAMS Parent Self Child Support - ESPN Protec
Craig Kimberlin's Photos
n Profile Pictures
Options Share


obe-News
capital murder charges |
com | Amarillo Globe-News
Visit page
Share
TAP TO
REMOVE

# APPENDIX U

Email or Phone
Password
Log In
Forgot account?

**Cody Kimberlin is on Facebook.**

To connect with Cody, sign up for Facebook today.

Log In

or

Sign Up



Cody Kimberlin

Friends Photos Videos

## About Cody Kimberlin

WORK

Cornerstone Church Wheeler

Maxey's Steakhouse
Host (event)

EDUCATION

Texas Tech University
Class of 2015 · Lubbock, Texas

Wheeler
Wheeler, Texas

CURRENT CITY AND HOMETOWN

Wheeler, Texas
Current city

## Photos



See More Photos

**Wrong Cody Kimberlin? Try Again**

Cody Kimberlin Search

**Others Named Cody Kimberlin**



**Amarillo, Texas**
Hometown

## Favorites

**Music**



Nicki Minaj

**Television**

Funker530 - Combat

**Games**

Ketchapp

**Athletes**



Ryan Sheckler

**Sports Teams**

Texas Rangers

**Sports**



Baseball

**Other**

Top Eleven Hack Free Tokens Cheats, Amazon.com, Free Xbox Live Gold Membership Codes, Certified Teens, Emo/Skater, Gatorade, Ohhh Shit √, Tag someone who, Diesel Babe, Dude Perfect, Top Vines, Eminem, HERB, Brennen Taylor, The Mind Unleashed and more


Cody Kimberlin


Cody Kimberlin


Cody Kimberlin


Cody Kimberlin


Cody Kimberlin


Cody Kimberlin


Cody Kimberlin

See more people named Cody Kimberlin

## Others With a Similar Name


Cody Gantz


Cody Below


Cody M White


Cody An Brian


Sanja Cody


Cody Tilford


Cody Miller


Cody Gill

CONTACT INFORMATION

# APPENDIX V

Email or Phone

Password

Log In

Forgot account?

**Jesica Kimberlin is on Facebook.**

To connect with Jesica, sign up for Facebook today.

Log In

or

Sign Up



Jesica Kimberlin

Friends Photos Videos

## About Jesica Kimberlin

EDUCATION



River Road
Class of 1998 · Amarillo, Texas

### Favorites

Music



DJ James Erik

Movies



VeggieTales

Television

### Photos









+145

See More Photos

### Others With a Similar Name



Kimberlin Martinez



Jesica Palavecino

Food Network

**Athletes**



Love Relationship

**Sports Teams**

Dallas Cowboys

**Other**

Entenmann's, Nations Lending, Sick Chirpse, LittleThings, Brian James NBC5, Re-Elect Judge Jerry Hefley, Lisa Leonard Designs, Stiles Hair Boutique, Wheeler Ink & Threads, Kristen Hampton WBTV Good News, City of Pampa Texas, 9Lilas, The Spice Gal, Gageby Store, The Works Auto Reconditioning and more


Vicky Kimberlin


Jesica Blub


Jesica Bautista Latuga


Jesica Montero

**CONTACT INFORMATION**

No contact info to show

# APPENDIX W

POSTED

CAUSE NO 015275A

| | | |
|---|---|---|
| STATE OF TEXAS | § | IN THE DISTRICT OF |
| | § | |
| VS. | § | RANDALL COUNTY, TEXAS |
| | § | |
| KIMBERLIN | § | 47th JUDICIAL DISTRICT |

## MOTION FOR CONFERENCE CALL

My name is Stephen Craig Kimberlin, Movant pro se. My Offender Number is 1345531. I am presently incarcerated in the Alfred D. Hughes Unit located in Coryell County, in Gatesville, Texas. I am unable to personally appear before the Court and give testimony in this cause and respectfully request the Court to issue an Order to conduct a conference call for the final hearing in this matter, so that I might give testimony. Movant does not wish to put the Court or Randall County to the expense or inconvenience of bench warranting and transporting him back to Randall County for this hearing; thus, a conference call would suffice.

In the alternative, Movant believe his sworn petition will adequately represent his tesimony.

## PRAYER

**WHEREFORE, PREMISES CONSIDERED** Movant prays that this Court will grant this motion and Order a conference call, or in the alternative, accept

FILED
2012 JUL 27 PM 1:57
JO CARTER, DISTRICT CLERK
RANDALL COUNTY, TEXAS
________ DEPUTY

COPY

Movant's sworn petition as his testimony.

Respectfully Submitted,

Stephen Craig Kimberlin
TDCJ-CID #1345531
Alfred D. Hughes Unit
Route 2 Box 4400
Gatesville, Texas 76597
**MOVANT PRO SE**

**UNSWORN DECLARATION**

I, Stephen Craig Kimberlin, TDCJ-CID #1345531, being presently incarcerated in the Alfred D. Hughes Unit, in Coryell County, Texas, declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

**EXECUTED** on this the 9th day of July, 2012.

Stephen Kimberlin
Stephen Craig Kimberlin
**MOVANT PRO SE**

CAUSE NO. 015275A

| | | |
|---|---|---|
| STATE OF TEXAS | § | IN THE DISTRICT OF |
| | § | |
| vs. | § | RANDALL COUNTY, TEXAS |
| | § | |
| KIMBERLIN | § | 47th JUDICIAL DISTRICT |

ORDER

**THE COURT,** having heard and considered Movant's "MOTION FOR FREE STATEMENT OF FACTS", the Court is of the opinion that the motion should be, and is hereby GRANTED/DENIED.

**BEING GRANTED,** the pertinent statement of facts from the "Hearing on Change of Venue" in the above - styled and numbered cause, along with the additionally requested court records, will be provided under the following conditions:

______________________________________________

______________________________________________

______________________________________________

______________________________________________

______________________________________________

Signed and **ORDERED** on this the ______ day of ___________, 2012.

______________________________
JUDGE PRESIDING

# APPENDIX X

NO. W-15,307-A-1

| | | |
|---|---|---|
| **EX PARTE** | § | **IN THE DISTRICT COURT** |
| | § | |
| | § | **47TH JUDICIAL DISTRICT** |
| | § | |
| **JOSHUA DAVID STOCKER** | § | **RANDALL COUNTY, TEXAS** |

**SUPPORTING AFFIDAVIT OF JEREMY MARC GREEN**

**TO THE HONORABLE JUDGE OF SAID COURT:**

Jeremy Marc Green appeared in person before me today and stated under oath:

"My name is Jeremy Marc Green. My date of birth is October 27TH, 1977. I am forty years of age, and I am fully competent to make this affidavit. The facts stated in this affidavit are within my personal knowledge and are true and correct.

I was introduced to Dustin Pool sometime around February, 2002 through an old high school friend, Jessica Vasquez, who was his wife at the time. I was a Branch Manager for ADT Home Security Services in Amarillo, Texas. Jessica asked if I could stop by their home at 5621 Quiet Circle, Amarillo, Texas to discuss a camera system for the outside of the home. At the appointment, I met Dustin Pool for the first time and he ordered a topnotch system for the time which cost around $3,000. I put in the order and then he went to the back room and he brought out cash and paid me. He said he got his money from an inheritance from his grandmother. I had never had a customer pay with cash like that before but I was happy to make the sale. Two days later, Dustin called to cancel the order and demanded his cash back. We canceled the order and he was issued a check back for a refund.

Two or three days after that, I got a call from Dustin asking me if I could come talk to him at his home on Quiet Circle. I showed up and he started telling me that he needed

to invest in a solid business and his wife, my friend, said that I would be a guy that he could trust as an honest businessman. Dustin asked me to look into what it would take to become a dealer for ADT as I already held a license with the Texas Private Security office. All it really took was cash, so I then made calls and started the process for the dealership. ADT required prospective dealers to have a certain amount of cash in the bank as they processed us through their due diligence department. Dustin supplied the deposit of around $20,000.00 cash, but stated he needed it back immediately. Through Attorney Steven Ivy, Dustin and I established a corporation named Security Systems Unlimited, Inc. There then was a stop in our approval process with the due diligence department with ADT due to something that came up under Dustin's name. I cannot recall so many years later exactly what the problem was. We then made the decision that I would have to be the President and CEO of the company and Dustin would only act as an officer. Dustin didn't like it but it was our only choice at the time in order to secure approval. Originally, Dustin was to be President and CEO and I was going to be the Vice President. ADT approved our dealership under my direction as the CEO per the altered structure. He later told me in a threatening way "(Y)ou know your name may be on everything but it's still all mine." By this point, I was starting to see Dustin's "alternative lifestyle" and his way of talking to others in a gangster type way. I was only a 23 year old kid and he really sounded kind of scary.

Our office was initially located at 4521 S. Western Street in Amarillo, Texas and opened with a red ribbon grand opening ceremony in May of 2002, replete with Commissioner Kevin Nap and the Amarillo Chamber of Commerce. ADT helped us set up our new dealership, and the ADT personnel at one point asked me what Dustin's deal as they seemed suspicious of his behaviors and actions. I said he inherited a lot of money and was really a silent partner. We hit the ground running and sold 28 contracts our first month for around $1,400 each. After we paid sales commissions, equipment cost and installation team we profited about $800 of that money, which was pretty good for the time. I kept the teams starting each week and sales kept coming in. I would pay Dustin on average around $1,000 per week.

I soon realized Dustin was more like an embarrassment when he would show up to the office often hammered on weed and alcohol, or out of it always with a bottle of Xanax pills in his pocket. New sales guy recruits usually quit the day after meeting him as he looked bad on drugs and was always acting mad about something, usually on the phone screaming at someone. I came to believe later that he was faking the calls to seem important as the screaming was a way to sound intense and intimidating. He would be either all over the place or a zombie that never left his home. He never came in or attempted to even know really what the company did. He slept all the time and you could never reach him when he was down. I soon realized he was a complete mess of a person but I was already in business with the guy and if I played my cards right, the company would continue successfully with him only being an officer and without him destroying our company. Or so I thought.

At some point during our second month in business, a guy named Adrian Gonzales (who I also knew from high school, although we never were really friends but knew each other's family) came to the company and said that it wasn't fair that I didn't understand what Dustin was involved in and that he knew that I had no Idea. Adrian then demanded that he and I both go to Dustin's house and wake him up and make him explain to me the situation. We went over there and had to beat on the door for almost 30 minutes and call continuously before finally his wife answered the door. We found Dustin in bed knocked out of it. Adrian then shocked him until he woke up. Once Dustin was coherent and awake, Adrian told him he must tell me of the situation. Dustin then proceeded to freak out, cussed out both of us and kicked us out saying he wasn't saying shit, and how dare we wake him up. Adrian then told me that all he could say was that Dustin was severely addicted to methamphetamine and was also selling it but wouldn't say any more, and then that Dustin needed to tell me. He then warned me to get away from Dustin. I explained about the company being incorporated and that neither of our personal issues could destroy the company. Adrian agreed that I was sucked into a bad deal and I needed to find an exit strategy.

One or two days later I got a call from Dustin telling me to go to his home on Quiet Circle so we could talk. Dustin then told me that he had been selling dope and was addicted to it and that's why he was acting so weird, but sold me on a story I believed to be just a hiccup in our situation, as I had never seen meth at that time. He said he was not selling it any longer and really needed more that $1,000 a week out of the company for pay each week and if it were not for him the company wouldn't exist. I, a scared young guy, just agreed to avoid confrontation. The problem was that we started having slower months four to five months in, not to mention attrition on accounts that didn't make payments and the company would get charged back the total paid for the contract, so then we were out the sales commissions, equipment, and installation cost, so it wasn't really the time for him to put the squeeze on the company. I did what I could with extra money to give to him, even while suffering myself by not paying myself some weeks, primarily out of fear of him. Ultimately, I explained and showed him our situation. We decided to rent and office up in the Herring Bank Building in downtown Amarillo on the 5th floor, as it was way cheaper than our original office. We also discussed our pay situation and his solution was for me to move into his home in his guest room and we could split bills until we got our sales back up, and we could then move on again. I agreed in a desperate attempt to save the company and our personal bills.

Once in his house, he had a lot of people that would come and visit and they would be in his game-room having meetings. All were gang/drug related or undercover cops. One night I walked in and Dustin, Ray Plascencio, and Ray's girlfriend Guin Garcia were smoking meth. I had never before seen it in my life. Dustin then put it in my face and told me to try it, as I had already been dabbling with weed and pills by now, so why not. When I then tried it for the first time I instantly was stung by its effects and I liked it. I felt zoned out but really good. They all were laughing at me and later told me it was ok, that it happens to each of us, and they then told me I smoked some of the purest meth around. I was instantly addicted to the drug. He then was more comfortable with it around me, and would bring in huge bags and cut it into bigger

bags, from one pound up to three pounds after dilution. Dustin explained that Shannon Burney had taught him how to cut the dope. Dustin told me that's how he got rich in first place; there was never really any inheritance. Also by this point, Dustin's wife, my old high school friend Jessica Vasquez, had left after our first month in business, as it was a short-lived marriage of only a couple of months.

One night after Dustin had been up tweaking for about a week with no sleep and started drinking alcohol and taking Xanax, he told me that people were out to get him for territorial issues in the dope game and he was worried people knew he was an informant for police. I was in shock. He also informed me that the house we lived in had wiretaps in the game room and kitchen areas and was a police traphouse. He explained that he had been pulled over in Plainview, Texas and was taken down by the DEA and the former Regional Narcotics Task Force the previous year, and that he was working for them, particularly Bill Redden, against different groups, in addition to making drug sales for the Task Force, from which he was allowed to keep ten percent of the proceeds. After he had been flipped, during a remodel of his house the police had installed wiretaps and cameras in the game room and kitchen to record transactions and that if I wanted anything done in private, not to do it in those rooms. I personally witnessed Dustin deliver controlled substances to police for their personal use and to deliver cash from drug sales to the police, as they would use Dustin to resell dope they had confiscated. One time in particular we were in a white Chevy Lumina that had our logo on it and just as we arrived at Western Bowl, Dustin received a call from some cops. We told them what vehicle to look for and they told us they had already identified our vehicle as they had been following us. We had a bag of dope in the car which Dustin took back to the cops and then returned to our vehicle without the dope and without cash.

Dustin stated to me that he would not let this affect me or the company and to keep on with business as usual. The only problem was that now I had an addiction to the drugs

and was also going down, and this crap scared the shit out of me as I was no gangster. I had to quickly learn the ways, though, like it or not. In fact, I had to begin assisting Dustin in delivering drugs to his clients, including a couple of trips to Plainview to deliver to an older female sheriff's deputy in deals that went down under a table in the Grandie's Restaurant that used to be located there off of I-27.

One night sometime around mid to late summer of 2002, we had a huge party at the house on Quiet Circle and Dustin invited all the people from different groups, almost as if it was staged. Now that I think of it, it was clearly staged to get all these people together while the cops could surveil the situation to make connections on groups. Dustin got called out by someone, with the guy saying he didn't care if it was Dustin's house he was going to take him out for his loud mouth. The party didn't last long but all connections connected I'm sure, with the cops recording everything. After this night is when Dustin told me he had to start selling again and for me to just run the company and keep it afloat and he would cover the house.

Dustin was a loudmouth but I believe he was like that while the cops were controlling his actions and listening to each call he made. I believe he was actually terrified and was used and controlled like a puppet. I believed through what I witnessed with my own eyes that his every move was controlled by drug officials, right down to the money that came through from Dustin, such as the $20,000 shown in the bank to get our dealership started only to be pulled right out so he could pay it back, to the drugs he would get to cut and redistribute to the public. Dustin was frequently in a rage and I believe the rage was fueled by the fact of the police' control over him and the danger they were exposing him to. One night while Dustin was up for a long time and drinking, he confessed he would receive drugs from drug officials and sell them under vehicle surveillance, and that his vehicles were rolling recording devices, and then give the cash back to the cops and they would allow him to hold onto a little of the cash so he could keep going. At one point I know his vehicles and his phones were confiscated by the cops. He complained that he was selling dope for them but they would only let

him keep scraps and he was getting only pennies He was used so he could establish the network of meth dealers and get them compromised so that they, like Dustin, and like another guy named Justin Bailey, could be leveraged into selling drugs for the police instead of themselves. He never would say names of cops other than Bill Redden. He mentioned him a lot, even amongst other groups of people I would meet. They called Redden the man of disguise because he was bald but would disguise himself as someone else with long hair. I even identified him on various occasions with either long hair, looking like a biker, or bald just running around town with his family; he has one of those faces you can't forget. Bill Redden would come to the house on Quiet Circle and would go to the backroom to transact with Dustin and would come out appearing to have just done dope. Dustin told me Redden was a banger, meaning he only shot it up and did not smoke it. Anyhow I continued to tried to continue to sell home security to anyone I could while still hiring guys each week that I could get excited to go out and sell friends and family and make my week easy.

I became very familiar with many of the people Dustin was dealing with. I knew that Craig Kimberlin and Dustin had done deals together but Dustin never indicated that there was a problem with Kimberlin. I never heard the name of Josh Stocker until after the case hit the news. I was aware of a problem with Josh Bledsoe after Dustin came home one night, scared and visibly shaking due to an incident at Stumpy's. Dustin stated that a bunch of cartel gangsters had hemmed him up at Stumpy's accusing him of being a snitch, and were about to beat the hell out of him and maybe kill him and Josh Bledsoe was one of the people about to attack him. The only thing that saved him was when Omar Mendoza, Big O, intervened and told everybody that "(W)e don't do this like this" and to trust him on it. Big O got everyone to back off of Dustin and kept them from doing what they were going to do in a public bar. Dustin was extremely shaken by the ordeal. Nevertheless, it was apparent in my conversations with Dustin that he was far more afraid of the cops, and violence from the cops, than the cartels, and it was because the cops were in a panic over the impending breakup of the Narcotics

Task Force and were closing up all their loose ends, eliminating people and groups who had worked for them.

One night about two weeks before Dustin was murdered I had a dream and I woke up crying and sweating as I had been up for days and had fell out. I dreamed that I could hear plumbing moving in the walls, and banging on the doors and windows. I run in to the living room and Dustin is piling up furniture against the door and I look out and see all these low riders and Hispanic people. I start to help him pile furniture up against the door as they try to get in. I then take his girlfriend at the time to the closet with her son and close the closet door. I then heard the door bash in and Dustin runs into the room and jumps on us in the closet saying "I'm not going to let them get you, J!" That's when I woke up crying, it felt so real. I then told Dustin of how real my dream was and he started laughing at me saying I was just fucked up.

A few days later, Dustin was acting crazy and hiding in the trees in the front yard at Quiet Circle with guns in hand and he was with Ray Plascencio saying that people were coming to get them. I hid in the house but watched as a car did pull up and two masked people got out of car, and then Dustin and Ray jumped out of the trees and started running at them, so they jumped in the car and hauled ass. Then Dustin and Ray jumped in Dustin's car and began chasing them. I had had enough of this shit, so I then left and went to my grandparents' house. I then made the decision I needed to leave Amarillo and get away from this madness that had ruined my life. A day later Dustin figured out I was done answering to him, or anyone else, and started demanding all cash from the bank from our company saying he needed it. I informed that I would not be giving over any cash, he informed me that I would never enjoy it. I took that as a threat on my life. I went to the bank and pulled out what cash we had left, not even $4,100, and headed to Colorado to live with a friend. Two weeks later he was dead. I do believe had I not left that he possibly would have murdered me as he was in a crazy state, and really doped up all the time, and with the I don't give a damn

attitude. He was threatening everyone I heard him come in contact with in his last few weeks of his life.

This is as factual as I can remember in my mind as a young man this was over 15 years ago, and I continue to pray that one day it will all come to and end and justice will be served to anyone connected in an unjust way in the set up of these people.

JEREMY MARC GREEN

SUBSCRIBED AND SWORN under oath before me on this, the 12TH day of January, 2018.

CHRISTOPHER J. MORGAN
Notary Public, State of Texas
Comm. Expires 03-01-2021
Notary ID 131025353

Notary Public, State of Texas

# APPENDIX Y

COPY

U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FILED
APR - 1 2003
CLERK, U.S. DISTRICT COURT
By ______ Deputy

CRIMINAL COMPLAINT
IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

UNITED STATES OF AMERICA

V.

NO. 2:03-MJ-26

EMILIO SANCHEZ-VEJAR, (1)
also known as Emilio Sanchez-Bejar, also known as Emilio Martinez,
RAMON SANCHEZ-VEJAR, (2)
JULIO CESAR JACOBO, (3)
ROBERTO GARCIA-MAYORQUIN, (4)
also known as La Loca
DENISE MICHELLE CONTRERAS, (5)
DANIEL ARMANDO CONTRERAS, (6)
also known as Danny Contreras
DAVID FUENTES, III, (7)
CARL SIMPSON, (8)
ANGELICA LUPE LUJAN, (9)
IANUEL D. LUJAN, (10)
FABIO (Last Name Unknown), (11)
NIEVES THERESA VELA, (12)
also known as La Huanga, also known as Theresa
CATARINO RODRIGUEZ, (13)
MIGUEL GONZALEZ, (14)
JOSHUA CRAIG BLEDSOE, (15)
DAVID GARCIA, (16)
CANDACE BAILEY, (17)
TODD ALEXANDER MOORE, (18)
JOE LEON, (19)
OMAR MENDOZA, (20)
ROBERT BOBBY CASTILLO, JR. (21)
also known as B.J. Castillo
MANUEL ISSAC ROMERO, (22)
also known as Isaac Romero
RICHARD BITELA, (23)
ERMELINDA HERNANDEZ, (24)
DANIEL ANTHONY CASTRO, (25)
also known as Danny Castro
HRIS CASTRO, (26)



04/08/2003 16:57 8063741053 SMITH WILSON DUNCAN PAGE 02

DENISE: HELLO?
DANIEL: WHAT'S UP?
DENISE: WHAT'S UP?
DANIEL: HEY, IS FABIAN AND THEM STILL HERE?
DENISE: UH-HUH.
DANIEL: ARE THEY STAYING AT YOUR HOUSE?
DENISE: UH-HUH.
DANIEL: OH. HAVE THEY SAID ANYTHING?
DENISE: HUH?
DANIEL: HAVE THEY SAID ANYTHING OR ACTED ANYWAY?
DENISE: UH-UH. WHY?
DANIEL: OKAY. OH, 'CAUSE, I GUESS DUSTIN POOL IS MISSING, HUH?
DENISE: HUH?
DANIEL: DUSTIN POOL IS MISSING.
DENISE: [GASPS]. SWEAR TO GOD.
DANIEL: FOR REAL.
DENISE: SINCE WHEN?
DANIEL: I DON'T KNOW, A WHILE ALREADY.
DENISE: WHO TOLD YOU THIS?
DANIEL: ALL KINDS OF PEOPLE. I ALREADY FOUND OUT.
DENISE: MIGUEL HASN'T... HASN'T TOLD ME NOTHING.
DANIEL: OH. AND AH... I GUESS HE WAS FUCKING WITH MONTERREY AND THEM, JAVIER.
DENISE: UH-HUH.
DANIEL: YEAH. DOES FABIAN KNOW THEM?
DENISE: WHAT?
DANIEL: DOES FABIAN KNOW THEM?
DENISE: MONTERREY?
DANIEL: YEAH.
DENISE: I DON'T KNOW, I DON'T THINK SO. FROM THAT... THAT CAR LOT?
DANIEL: YEAH.
DENISE: BUT WHAT WOULD THEY DO TO DUSTIN, WHY WOULD THEY TAKE HIM?
DANIEL: I DON'T KNOW. BECAUSE I... SOMEBODY TOLD ME THAT LIKE... SOMEBODY... HE HASN'T ANSWERED YET BUT AH... LIKE, THEY WANTED TO KNOW WHERE I LIVED N' SHIT, THAT THEY WERE LOOKING FOR ME.
DENISE: WHO WAS?
DANIEL: THAT'S WHAT I SAID. AND, I MEAN, I KNOW, FABIAN DOESN'T KNOW NOTHING AND HE DON'T KNOW NOBODY BESIDES THAT I KNOW. [U/I] WHY... THEY DON'T KNOW NOBODY THAT I KNOW. YOU KNOW WHAT I'M SAYING?
DENISE: WELL, I HAVEN'T TOLD NOBODY NOTHING AND... YOU KNOW...
DANIEL: I KNOW, THAT'S WHAT I'M SAYING, UM... [U/I] DON'T KNOW NOTHING, NOBODY THAT I KNOW. YOU KNOW WHAT I MEAN?
DENISE: YEAH. WHO TOLD YOU THAT THEY WERE LOOKING FOR YOU?
DANIEL: [U/I] CALLED ME AND TOLD ME THAT AH... THIS DUDE THAT HE KNOWS THAT... SOMEBODY THAT DUSTIN WAS TALKING TO. I GUESS...
[VOICES OVERLAP]
DENISE: WELL, WHAT WOULD THEY...
DANIEL: THE PEOPLE THAT...
DENISE: WELL, WHAT THEY HAVE TO DO TO... WITH IT?
DANIEL: THAT'S WHAT'S I'M SAYING.
DENISE: WHO WAS DUSTIN WORKING WITH? THOSE MONTERREY GUYS, YOU SAID?
DANIEL: YEAH, YEAH.
DENISE: I DON'T KNOW, I'M A HAVE TO INVESTIGATE THAT.
DANIEL: YEAH, INVESTIGATE THAT, LET ME KNOW.
DENISE: OKAY, BYE.
[END OF CALL]

Linesheet 04/03/2003 12:35:10

| | |
|---|---|
| Case: | MB-03-0007 |
| Target: | 433-3351 |
| Line Id: | 433-3351 |
| Session: | 840 |
| Date: | 03/30/2003 |
| Start Time: | 15:30:33 |
| Duration: | 00:03:11 |
| Direction: | Incoming |
| Monitored By: | br |
| Classification: | Pertinent |
| Complete: | Yes |
| In Digits: | 8053364660 |
| Clean Number: | 8053364660 |
| Participants: | CONTRERAS, DENISE |

**Comments** *Document contains no text*

**Synopsis**

IN: 336-4660
SUBS: JOE T. BALLIN

UM TELLS DENISE THAT HE JUST WOKE UP. DENISE IS GETTING DRESSED. UM TELLS DENISE THAT HE HAS THE CHIPS FOR HER. UM ASKS IF DENISE HAS ANY SAMPLES OF "PURE" LAYING AROUND. DENISE SAYS SHE CAN GET UM ONE AND WHEN SHE UM BRINGS HER THE CHIPS, SHE'LL GIVE IT TO HIM.

UM EXPLAINS THAT THIS GUY IS A LAWYER THAT BUYS POUNDS OF "PURE". UM STATES THAT THE LAWYER USED TO GET HIS STUFF FROM DUSTIN POOL. DENISE ASKS IF DUSTIN IS STILL MISSING AND UM SAYS YES.

DENISE SAYS THAT OMAR SAID THEY KILLED HIM. UM SAYS THEY DID. DENISE ASKS WHY AND UM SAYS DUSTIN HAD A HIT ON HIM. DENISE ASKS WHY AND UM SAYS HE DOESN'T KNOW BUT THAT HE HAD A HIT FROM THE "PINTA". DENISE ASKS WHY AND UM SAYS HE DOESN'T KNOW, HE JUST KNOWS HE HAD ONE. DENISE WONDERS WHERE THEY PUT HIS BODY AND UM SAYS NOBODY KNOWS.

DENISE ASKS IF UM REALLY THINKS THEY DID SOMETHING TO HIM AND UM SAYS YES. DENISE COMMENTS THAT DUSTIN WORKED GOOD SO WHY WOULD THEY DO IT. DENISE TELLS UM TO CALL HER BEFORE 18:00 BECAUSE DENISE WILL HAVE TO BE HOME AT 18:00. UM ACKNOWLEDGES.

Linesheet 04/03/2003 12:35:10

| | |
|---|---|
| **Case:** | MB-03-0007 |
| **Target:** | 433-3351 |
| **Line Id:** | 433-3351 |
| **Session:** | 842 |
| **Date:** | 03/30/2003 |
| **Start Time:** | 16:13:03 |
| **Duration:** | 00:10:19 |
| **Direction:** | Incoming |
| **Monitored By:** | br |
| **Classification:** | Pertinent |
| **Complete:** | Yes |
| **In Digits:** | 8062380156 |
| **Clean Number:** | 8062380156 |
| **Participants:** | CONTRERAS, DENISE |

**Comments** *Document contains no text*

No. W-15,307-A-1

| | | |
|---|---|---|
| EX PARTE | § | IN THE 47TH DISTRICT COURT |
| | § | |
| | § | IN AND FOR |
| JOSHUA DAVID STOCKER | § | |
| TDC # 01811349 | § | RANDALL COUNTY, TEXAS |

## *STATE'S ANSWER TO APPLICATION FOR WRIT OF HABEAS CORPUS*

COMES NOW, THE STATE OF TEXAS, by and through the Criminal District Attorney of Randall County and denies generally all allegations contained in the instant Application for Writ of Habeas Corpus.

### *I.*

### *Trial court and appellate proceedings*

On August 6, 2003, a Randall County Grand Jury indicted Applicant for the offense of capital murder. The State waived the death penalty and his jury trial was conducted from July 11-21, 2005. The jury found him guilty as charged. A life sentence was automatically assessed as required by law. Applicant appealed to the Seventh Court of Appeals where he challenged the sufficiency of evidence underlying his conviction. That Court held in an unpublished opinion on May 16, 2007 that the evidence was both legally and factually sufficient, affirming his conviction. His petition for discretionary review to the Court of Criminal Appeals was refused on October 10, 2007. Mandate issued on November 7, 2007.

FILED
2/1/2018 11:38 AM
Jo Carter, District Clerk
Randall County, Texas
___AB______Deputy

## *II.*

## *Applicant's post-conviction claims*

Applicant raises four grounds of relief. The first ground contends that Applicant was denied due process and a fair trial due to a course of conduct which the Randall County Criminal District Attorney engineered to Applicant's detriment. This course of conduct included a failure to disclose use immunity agreements which it entered into with two of Applicant's co-defendants, tampering with witnesses during and after his trial and the subordination of perjury in order to conceal earlier misconduct from the trial court (failing to disclose *Brady* material and witness tampering). Further, Applicant alleges that the D.A. carried out this scheme through three distinct acts: 1) by the failure to disclose the use immunity agreements, 2) compelling witnesses to lie about these use immunity agreements and 3) "sponsoring" false testimony from one of his criminal investigators in order to conceal his failure to disclose the use immunity agreements.

### *Standard of review*

In any habeas case, the applicant bears the burden of proving facts that would entitle him to relief and ensuring that a sufficient record is presented to show error requiring reversal. *Ex parte Chandler*, 182 S.W.3d 350, 353 n. 2 (Tex.Crim.App. 2005); *Ex parte Kimes*, 872 S.W.2d 700, 703 (Tex.Crim.App. 1993). An applicant

is required to plead *and* prove that any complained-of error did, in fact, contribute to his conviction. *Ex parte McPherson*, 32 S.W.3d 860, 861 (Tex.Crim.App. 2000); *Ex parte Maldonado*, 688 S.W.2d 114, 116 (Tex.Crim.App. 1985) Conclusory, broad, unsupported statements claiming denial of due process - standing alone without offers of proof - will not support relief and are insufficient to meet an applicant's burden of proof. *Id.* Even sworn allegations by a writ applicant, standing alone, are not sufficient proof to warrant any habeas relief. *Ex parte Evans*, 964 S.W.2d 643, 648 (Tex.Crim.App. 1998); *Ex parte Empey*, 757 S.W.2d 771, 775 (Tex.Crim.App. 1988). Delay in seeking habeas corpus relief may prejudice the credibility of the applicant's claim. *Kniatt v. State*, 206 S.W.3d 657, 664 (Tex.Crim.App. 2006).

Because Applicant is required to plead *and* prove that any complained-of constitutional error did, in fact, contribute to his conviction and punishment, he identifies and submits various kinds of "proofs" (denominated as "Appendix __" and attached to his Memorandum of Law accompanying his writ application) in support of his entitlement to relief. The State shall address this alleged "proof" to demonstrate that, individually and collectively, it is woefully inadequate to satisfy the Applicant's heavy burden required to warrant habeas relief.[1]

---

[1] In this vein, it is significant that the bulk of Applicant's tendered "proofs" in support of his application has already been considered by a neutral fact finder in a related writ proceeding and found to be "wholly frivolous." The State will discuss this related writ and its frivolity in

## ***III. Reply to Ground of Relief 1***

### ***Applicant's baseless allegations of prosecutorial misconduct are not grounded in fact because the "proofs" he tenders in support of those charges have already been considered and rejected***

*The claim*

Ground of relief 1 consists of a set of global allegations leveled against D.A. Farren and his staff. These allegations touch on claims of suppression of *Brady* evidence, witness tampering, witness coercion and subordination of perjury. To a large extent, Applicant bases this ground of relief on the affidavit of Tori Patrick, one of Applicant's co-defendants who testified on behalf of the State at his 2005 trial. This affidavit is an expanded version of one which she executed on February 22, 2016. It served as the primary form of proof to her own Art. 11.072 writ application which she filed in May of 2016 in a failed attempt to void her 2007 guilty plea to the lesser-included offense of kidnapping. Ms. Patrick accused the Randall County Criminal District Attorney of same acts and omissions in her writ that Applicant now raises in the instant one. (Exhibits 1 & 2) The State vigorously opposed Patrick's writ application. Having concluded that the writ was frivolous, the trial court denied relief by written order on May 31, 2016. (Exhibit 3) Patrick did not appeal the trial court's

---

conjunction with its analysis of the instant writ application, focusing on its similarities in content as well as authorship.

ruling.

***The Tori Patrick expanded affidavit is not worthy of belief***

As was accomplished with the Patrick Art. 11.072 writ application, the State submits and attaches to this answer the affidavits of James Farren, the Randall County Criminal District Attorney who was responsible for the prosecution of Applicant, and Bobbie Bruhn, an investigator with the Randall County Criminal District Attorney's Office. (Exhibits 4 & 5) They conclusively rebut all allegations of impropriety made by Tori Patrick or Applicant regarding his jury trial.[2]

***The Robnett affidavit is unsigned and even if it was in proper form, it is not worthy of belief***

The Robnett affidavit (Appendix C) is unsigned and therefore, constitutes no proof of anything. Even assuming for purposes of argument that it *should* be considered as proof that D.A. Farren "tampered" with Tori Patrick's anticipated testimony or somehow circumvented his attorney-client relationship with Patrick, documentary evidence demonstrates one of two things: either that the unsigned Robnett affidavit is false or that the attorney's memory of events is so impaired as to

---

[2]It is worth noting that both Patrick and her lawyer, who also serves as Applicant's writ lawyer, remained utterly silent regarding these explosive charges up until the time that the State elected to revoke Patrick's probation, the latter occurring after its repeated efforts to assist her in maintaining sobriety while on probation had come to naught. Only then did Patrick with the aid of attorney James Wooldridge plead, without proof, all of the spurious allegations regarding D.A. Farren's unethical or criminal conduct.

call into question the entirety of his recall of events.

In the affidavit, Robnett confirms exactly what James Farren states in his affidavit. They met in July of 2004 to discuss resolution of Patrick's case. Contingent and crucial to *any* agreement, according to Robnett, was her "cooperation in the prosecution" of all co-defendants. After this understanding was reached and subsequent to Patrick providing a follow-up written statement outlining her participation in the murder and kidnaping, Robnett claims he concluded his involvement in Applicant's case. While he does not deny having ever received "any further communications on the matter from James Farren" (note the careful insertion of his *inability to recall* any further communications), he goes on to claim that he never heard a word more about the case at all until well after Patrick's case had been dismissed. He further claims that he was never contacted by anyone from the D.A.'s Office concerning further interviews or Patrick's continuing involvement in the case after his July 2004 meeting with Farren. He asserts that no one from the Randall County Criminal District Attorney's Office ever obtained his permission to speak with Patrick after his July 2004 meeting with James Farren. He was even unaware that she had testified in the trials of the co-defendants or that she had entered into a plea agreement with the State on the charge of kidnaping. He claims he wasn't even aware of this until informed of such by James Wooldridge, attorney for Patrick at the

original plea hearing. Three key documents conclusively demonstrate either the falsity of these assertions or that Robnett's memory is fundamentally suspect.

First, attached is a true and correct copy of a phone message from Robnett to Criminal District Attorney Farren, dated March 6, 2007. Robnett requests that a plea offer be faxed to him at the number listed. (Exhibit 6) Farren documented on the reverse side an offer of "10 Defer. $2,000" on the charge of aggravated kidnaping. The March 6, 2007 date on the phone message is pivotal here because this communication took place well *after* the trials of both Stocker and Chacon. This is probative circumstantial evidence which corroborates Farren's affidavit: there was *no set* plea offer until and when Applicant satisfied her end of the agreement by providing truthful testimony during the trials of her co-defendants. *Only then* could Applicant seek to benefit from the immunity agreement and any future plea agreement requiring the State's dismissal of the capital murder charge.

Second, attached is a true and correct copy of correspondence, dated March 9, 2007, from Jeremy Fowler, Randall County Assistant Criminal District Attorney, confirming the March 6th phone call which Robnett made to Farren regarding Applicant's plea offer. (Exhibit 7) Note that the fax number shown on the face of the letter corresponds with the fax number provided by Robnett when he initiated the call to Farren three days earlier. This dispels Robnett's false assertion that he had no

contact with the prosecution after his 2004 meeting with Farren.

Third, a cursory review of Patrick's sworn statements and representations to the trial court at her plea hearing explain the circumstances behind Wooldridge's substitution as counsel for her at the plea hearing. In fact, Patrick confirmed to the trial court that she "fired" Robnett so that Wooldridge could stand in his stead at the hearing. (Exhibit 8, excerpt from Patrick's March 2007 plea hearing) Wooldridge himself attested to this representation as well as to his client's knowing and voluntary plea to the charge. (Exhibit 9, Patrick plea excerpt) Patrick confirmed that if she wanted to postpone the plea hearing so that she would have the benefit of Robnett's counsel, the Randall County Criminal District Attorney's Office would have acceded to this request and postponed the hearing. She also confirmed the chain of events which ultimately led to her plea bargain agreement with the State - her truthful testimony in the trials of Josh Stocker and Frank Chacon followed up with the aforementioned ten-year deferred adjudication probationary term on the charge of kidnaping. (Exhibit 10, Patrick plea excerpt)

Frankly, it is inconceivable that Robnett, having been retained on a charge of capital murder, would have walked away from Patrick's case after the July 2004 meeting, particularly after he himself confirmed that his client's continued cooperation was the *essential* element necessary for a beneficial plea agreement. His

protestations of ignorance are feigned, misguided or worse, the product of serious memory deficits. In any event, his affidavit (even if it were signed and sworn to), when contrasted with the existing documentation and the affidavits already on file, cannot be reconciled with the actual record in this case and therefore does not merit serious consideration. It is not worthy of belief.

***Guin Garcia testified truthfully at Applicant's trial***

Part of Applicant's complaints under Ground 1 include an allegation that D.A. Farren suppressed evidence of Garcia's use immunity agreement from Applicant and his lawyers and that Farren likewise threatened, cajoled or compelled Garcia to testify falsely about her not having reached a plea agreement with the State. However, none of the "proofs" attached to Applicant's writ application prove any of this.

For example, Applicant attaches a partial transcription of Garcia's testimony at Applicant's trial (Appendix K) which he suggests is evidence of Farren's misconduct. However, neither the excerpt or any of the other various "proofs" attached to Applicant's writ establish that Garcia's testimony - that she had no set plea agreement with a discrete sentence recommendation - was false; nor does anything else proffered by Applicant establish that this was false. Moreover, insofar as Applicant's allegation that Farren instructed Garcia to lie about the existence of the use immunity agreement which Garcia signed off on with the Randall County

Criminal District Attorney's Office, her trial testimony merely shows that when asked if she had entered into a use immunity agreement with the *Potter County District Attorney's Office*, she denied same.

Review of the record provided by Applicant logically leads to the conclusion that Garcia, in the absence of any direct proof which could contradict her sworn testimony in Applicant's trial, gave truthful testimony at Applicant's trial. Thus, the attachments tendered by Applicant (K & L) in support of the various accusations underlying the basis of Ground of Relief 1 do nothing more than establish the obvious: Garcia did not mislead the jury, was not instructed to testify falsely by D.A. Farren, was not tampered with by anyone associated with the Randall County Criminal District Attorney's Office and did not testify falsely about the existence of her use immunity agreement with the State.[3]

---

[3] In a multifarious pleading embedded in the text of his memorandum of law, Applicant also implicates the trial judge in a conspiracy to deny him due process of law. He alleges through rumor and speculation – and again, without proof – that the trial court took no action after Garcia perjured herself at Applicant's trial. Complicating this alleged malfeasance was the court's active participation in "secreting" this evidence within the clerk's record in addition to its stubborn refusal to address Garcia's continuing perjury leading up to Craig Kimberlin's trial in December, 2005. Yet Garcia was never called to testify at Kimberlin's trial because he pled to a murder count in return for a sentencing recommendation of 45 years confinement. So, this makes it understandable that Applicant relies solely on Garcia's testimony in Applicant's trial as his sole form of proof which he thinks proves that Farren tampered with Garcia's testimony. Yet the record itself shows that Garcia testified truthfully and Applicant hasn't shown otherwise.

### *Conclusion*

Ground of Relief 1 is devoid of admissible, viable, reliable proof. The totality of Applicant's complaints under Ground of Relief 1 constitute, in essence, naked accusations of prosecutorial misconduct attributable to just two: Patrick and Applicant's writ lawyer.[4] Neither provide any *reliable* proof that their complaints are grounded in reality. They certainly have failed to present this Court with any admissible, reliable proof that Randall County Criminal District Attorney James Farren engaged in a single act of prosecutorial misconduct. Applicant has failed to plead *and* prove a ground upon which relief can be granted. It should be denied for the reasons expressed above.

## ***IV. Reply to Ground of Relief 2***

### ***No denial of due process when Applicant cannot prove wiretapping***

*The claim*

In his second ground of relief, Applicant contends that he was denied due process by the State's "use of illegal and undisclosed wiretaps to surveil [sp] co-defendants to build evidence against Applicant." Applicant alleges that "[n]on-existent disclosure can only be reasonably *presumed* to not exist nor even to have

---

[4]Let us not forget that Patrick and writ lawyer Wooldridge are proverbially "joined at the hip." Wooldridge serves dual masters at present: Patrick on her direct appeal to the Eastland Court of Appeals and, of course, Applicant here on the instant writ.

existed because the interception of co-defendants' communications was flatly and flagrantly illegal, further reinforced by the content and tone of the note revealing that the State was listening to Appellant's conversations in furtherance of prosecuting Applicant and his co-defendants." (Applicant's Memorandum of Law, p. 20) (emphasis added) Applicant's "proof" consists of a handwritten note attesting to the fact that the staff at the Randall County Jail were monitoring Tori Patrick's outgoing calls while she was housed as a inmate at the jail. Her second "proof" consists of a handwritten note located among the trove of documents and pleadings which made up the State's files in Applicant's prosecution. The handwritten note reflects an address Tori Patrick used once she bonded out of Randall County Jail.

These exhibits fall woefully short of that type of proof which the law requires of any habeas applicant. Further, the affidavit of Jennifer Cates (Exhibit 11) addresses the meaning behind Applicant's Appendix O (handwritten notes detailing Randall County Jail's ongoing monitoring of Patrick's jailhouse phone calls). Further, basic understanding of law office administration and trial preparation explain the reason why the State would have contact information on Patrick.

*Discussion*

What is remarkable about Applicant's claim of unlawful electronic interception is his employment of a *presumption* in substitution of what the law clearly requires:

independent proof of just such a violation and resulting harm. This presumption morphs into a circular argument, namely that it should be presumed that there exists illegal wiretapping which explains why Applicant offers no proof: the State has taken all steps to conceal this illegal wiretapping and any evidence confirming such. In other words, the *absence* of any proof of wiretapping, which he is required to *produce* in order for the claim to be considered on its merits, *confirms* the State's acquisition and use of such. Applicant contends that Cates's note concerning jailhouse phone monitoring and the one showing Patrick's Midland, Texas address somehow prove the point.

It is and has been the regular policy of the Randall County Jail - indeed of all county jails statewide - that all outgoing inmate calls are monitored for all the right reasons. This is no secret since the inmate and recipients of phone calls are distinctly advised that each call may be monitored and recorded for security purposes. And this is exactly what happened while Patrick was incarcerated in the Randall County Jail. She made phone calls to third parties while incarcerated in the Randall County Jail. They were recorded, then reviewed and when she was informed of this, she refused to acknowledge the risk she assumed when she said things which she considered to be protected or privileged.

As to the existence of a note in the State's files which contained a Midland,

Texas address, this is merely evidence of careful documentation and record keeping concerning the whereabouts of an anticipated witness who the State anticipated calling in its case-in-chief in a number of upcoming homicide prosecutions. It is only to be expected that the Randall County Criminal District Attorney's Office would have information on where Patrick lived.

Here, there is a wholesale failure to proffer proof that the State engaged in *any* electronic interceptions during the investigation of Applicant's case. Applicant's conclusory and unsupported statements concerning these presumed wiretaps are insufficient to meet his heavy burden of proof.[5] Likewise, Patrick's sworn attestation that she was a victim of illegal electronic surveillance, either standing alone or in conjunction with the two handwritten notes described above, are not sufficient to warrant habeas relief. *Ex parte McPherson*, 32 S.W.3d at 861; *Ex parte Evans*, 964 S.W.2d at 648; *Ex parte Maldonado*, 688 S.W.2d at 116.

Ground of Relief 2 is devoid of merit and should be denied.

---

[5]The State will leave for another day to debate whether this ground or ground 3 could possibly have been filed in good faith.

## *V. Reply to Ground of Relief 3*

### *Applicant's due process claim that the State entered into "secret agreements" with Craig Kimberlin resulting in his premature release from prison is demonstrably false*

*The claim*

Applicant's due process claim is best summed up by quoting verbatim from his application:

> Undisclosed at any point in this matter has been the substance of *whatever* agreement Stephen Craig Kimberlin brokered with the Randall County [Criminal] District Attorney, and details *remain secret to this day*. However, even though TDCJ clearly reflects Kimberlin remains incarcerated, the Facebook posts showing an aged Kimberlin with his son Codi from 2015 against a Central American backdrop clearly reflects that either Kimberlin was in fact released shortly after his strange Motion For Conference Call in 2012, or Kimberlin's son has found Kimbelin's doppelganger to substitute.
>
> Memorandum of Law at p. 26.
> (emphasis added)

*The "proof" behind Farren's secret deals*

The reference to the Texas Department of Criminal Justice includes a print-out from the "Offender Search" link to the TDCJ website, identifying one Stephen Craig Kimberlin who is presently confined in the Hughes Unit. The documents provides a parole eligibility date of December 22, 2025 and an maximum sentence (expiration)

date of June 22, 2048. (Appendix R)[6] Applicant refers the reader to a series of undated screen shots lifted off of Facebook accounts of Craig, Cody and Jesica Kimberlin. (Appendixes T-W) Do the photographs really depict Stephen Kimberlin and son on a recent Central American get-a-way? How was Kimberlin's "strange" *pro se* Motion For Conference Call used to trigger whatever "secret agreement" reached between him and D.A. James Farren? Is TDC *really* implicated in this "secret agreement" by conniving to release Kimberlin well ahead of his scheduled parole date? No one knows, including Applicant and his writ lawyer.

*Reality*

What we *do* know is this: Craig Kimbelin is presently serving his 45-year sentence in a state prison and has been serving that sentence continuously since 2005. That is beyond any rational dispute. (Exhibit 12) This story more readily fits neatly in between the chapters of a crime potboiler at an airport gift shop. It is not fit to be considered a viable habeas ground of relief. Simply put, the risible proof proffered by Applicant utterly fails to establish the semblance of any constitutional claim upon which relief might be based.

---

[6]Applicant makes no attempt to explain why a presumption of regularity should not attach to this document.

*Conclusion*

Ground of relief 3 is not supported by fact, is frivolous and utterly lacking merit. Not only is it false; Applicant's fantastic claim is *spectacularly* false. It should be summarily denied.

## ***VI. - Reply to Ground of Relief 4***

***Applicant's theory of denial of fair trial based on newly discovered evidence fails because it is not newly discovered, is not exculpatory, is not true, is not reliable and consists of rumor, innuendo and inadmissible hearsay***

*The claim*

Here, Applicant contends that the State's theory of prosecution was false and that in truth and fact, based on the affidavit of Jeremy Green and an undated extract of a wiretap between two conspirators in an unrelated federal methamphetamine conspiracy prosecution, the decedent Dustin Pool was murdered by members of an prison drug gang. (Appendix X & Y) He further contends that this "new evidence" casts a pall over the integrity of the State's prosecution of Applicant, thus necessitating a new trial. Although Applicant claims to be innocent of the crime for which the jury convicted him, the relief he seeks is a new trial as opposed to a finding of innocence and exoneration. Regardless of the habeas theory of relief Applicant seeks, he is manifestly entitled to no relief whatsoever as will be discussed below.

*The law on "false evidence" and seeking relief based on "newly discovered evidence"*

In Texas, incarceration of an innocent person violates due process. *Ex parte Elizondo*, 947 S.W.2d 202, 209 (Tex.Crim.App. 1996). The Court of Criminal Appeals has categorized claims of "actual innocence" as either: (1) "a substantive claim in which applicant asserts his bare claim of innocence based solely on newly discovered evidence or (2) a procedural claim in which applicant's claim of innocence does not provide a basis for relief but is tied to a showing of a constitutional error at trial." *Ex parte Franklin*, 72 S.W.3d 671, 675 (Tex.Crim.App. 2002).

To be entitled to relief on a "bare claim of innocence," an applicant must present newly discovered evidence that constitutes affirmative evidence of the applicant's innocence. *Ex parte Franklin*, 72 S.W.3d at 678. To constitute "newly discovered evidence," the applicant must satisfy a four-prong test: (1) the newly discovered evidence was unknown or unavailable to the applicant at the time of trial; (2) the applicant's failure to discover or obtain the new evidence was not due to the applicant's lack of due diligence; (3) the new evidence is admissible and not merely cumulative, corroborative, collateral or impeaching and (4) the new evidence is probably true and will probably bring about a different result in a new trial. *See State v. Arizmendi*, 519 S.W.3d 143, 149 (Tex.Crim.App. 2017); *Carsner v. State*, 444

S.W.3d 1, 2-3 (Tex.Crim.App. 2014). Once the applicant provides such evidence, it is then appropriate to proceed with a determination of whether the applicant can prove by clear and convincing evidence that no reasonable juror would have convicted him in light of the newly discovered evidence. *Id.* This showing must overcome the presumption that the conviction is valid and it must unquestionably establish applicant's innocence. *Id.*

The State may not knowingly use false evidence or fail to correct false evidence by the State. *Napue v. Illinois*, 360 U.S. 264, 269 (1959). It is of no consequence that the falsehood bore only on the witness' credibility rather than directly on the defendant's guilt. *Id.* at 270. Likewise, perjured testimony will be found material unless the perjury did not contribute to the conviction or punishment beyond a reasonable doubt. *Ex parte Castellano*, 863 S.W.2d 476, 485 (Tex.Crim.App. 1993). However, mere discrepancies in the testimony of a witness do not make out a case for perjury. *Losada v. State*, 721 S.W.2d 305, 312 (Tex.Crim.App. 1986).

Cases finding a due process violation based on the actions of the prosecutor involve conduct that implicate a deliberate attempt to mislead or conduct sufficiently egregious that it infects a trial with unfairness. *Miller v. Pate*, 386 U.S. 1, 5-6 (1967). There is no due process violation when a prosecutor commits "ordinary trial error."

*Donnelly v. De Christoforo*, 416 U.S. 637, 647-48 (1974).

*Discussion*

Applicant does not make clear whether he seeks relief based on a claim of "bare actual innocence" or a new trial based on false evidence allegedly used by the prosecution. Even if Applicant is given the benefit of the doubt as to each theory of relief, he is entitled to none.

For starters, Applicant makes no attempt to establish that the substance of Green's knowledge of any of the facts surrounding Dustin Pool's homicide was unknown or unavailable to him prior to his trial in 2005. Likewise, Applicant makes no attempt to prove that any failure to discover or obtain Green's anticipated testimony was *not* due to his or his defense team's lack of due diligence. Failure on either prong is fatal to a claim that an applicant's "newly discovered evidence" should be considered on its merits. *See, e.g. Delamora v. State*, 128 S.W.3d 344, 355 (Tex.App. – Austin 2004, pet. ref'd.) (Noting no need for reviewing court to review additional prongs when applicant fails to explain that the discovery of the evidence was *not* due to lack of diligence by the defense team.); *and see Shafer v. State*, 82 S.W.3d 553, 556 (Tex.App. – San Antonio 2002, pet. ref'd.).

More to the point, the bulk of Green's affidavit is comprised of rank rumor, innuendo and casual hearsay statements attributable to Dustin Pool and other third

parties associated with methamphetamine distribution, thus rendering the affidavit and the totality of Green's evidence inadmissible. Shorn of any personal knowledge, Green believes that Dustin Pool was in the employ and control of law enforcement who secured his services as a snitch, the latter conduct which eventually led to his death at the hands of a rival drug ring. However, this version of facts does not cast doubt on the State's theory of prosecution. Rather, it merely presents an alternative version of the role Dustin Pool played in the difficulties he encountered at the hands of Applicant, Craig Kimberlin, Michael Stocker and Frank Chacon. It certainly does not constitute affirmative evidence that Applicant did *not* murder Dustin Pool.

Applicant's complicity in that death is an incontestible fact found by a Randall County Jury and upheld by the Amarillo Court of Appeals and this Court. All the Green affidavit does is promote a highly imaginative narrative suggesting that Pool's death was a Mexican cartel "hit." That does not render the prosecution's evidence "false." Moreover, Green's narrative is fully discredited by the affidavit of Bill Redden, attached hereto and incorporated herein as if set forth fully below. (Exhibit 13)

In sum, Green's affidavit does not satisfy any one of the four prongs attendant to the test for newly discovered evidence. Applicant has failed to establish that Green's existence was unknown or unobtainable prior to his trial or that his discovery

of Green was *not* due to a lack of due diligence. The affidavit is not admissible because it is based on inadmissible hearsay and rumor. Not only does the affidavit fail to constitute "affirmative evidence" of alleged "false" evidence or of Applicant's innocence, it fails even to impeach the State's case-in-chief. At most, it presents a collateral version of background events leading up to Dustin Pool's death. This is not "new evidence" which is probably true or which would necessarily cause a juror to return a finding of "not guilty." The Green affidavit fails on all four counts.[7]

Applicant's second "proof" in support of his "cartel hit" version consists of an extract from an intercepted phone conversation between "Daniel" and "Denise," (presumably a communication between conspirators in a criminal investigation) and a copy of a untitled, undated DEA file report. The conversation between the man and woman involves discussion of Dustin Pool's disappearance and "Daniel's" belief that Pool was working with "those Monterrey guys." Applicant makes no effort to flesh out the context of the intercepted phone conversation, identify the true identity of the parties to the call or describe the nature of the criminal investigation which gave rise to the recorded phone conversation. The DEA report is just as specious since the reader is left to guess at the identity of "UM" in the context of his conversation with

---

[7] Green's affidavit fails to show that he was available to testify at Applicant's trial and that he would have testified to the events and persons portrayed in the affidavit. Given Applicant's abject failure to satisfy any of the four prongs of the "newly discovered evidence" test, the State need not address this additional deficiency.

"Denise." Suffice to say that "Denise's" statement concerning an alleged "hit" on Dustin Pool from the "Pinta" constitutes double hearsay. Applicant makes no effort to identify who or what "Pinta" is as opposed to his suggestion that "Pinta" is or was a shadowy prison gang. The reader is left only to guess.

*Conclusion*

Riddled with yawning gaps, fundamentally plagued with an absence of proper identification of its speakers, questionable in its veracity, Applicant's two "proofs" miserably fail to establish that Green's contentions raise the issue of innocence or that the totality of evidence presented at Applicant's trial was false. Giving Applicant a generous benefit of the doubt, his evidence tepidly muddies the waters and certainly does no more than constitute suggestions that his "cartel hit" version is anything other than rumors and innuendo.

Ground of relief 4 has no merit and should be denied.

## ***VII. No necessity for hearing***

There is no necessity for an evidentiary or fact-finding hearing in this case because there is ample evidence in the record for the Court to rule on the relief sought.

WHEREFORE, PREMISES CONSIDERED, the State prays the Court deny the relief sought by Applicant without a hearing.

Respectfully submitted,

JAMES A. FARREN
Randall County Criminal D.A.

s/ James A Farren
James A. Farren
SBN 06839400
james.farren@randallcounty.com
Randall County Criminal D.A.

s/ Warren L. Clark
Warren L. Clark
SBN 04300500
clarkwl3@gmail.com
warren.clark@randallcounty.com
Appellate Chief
Assistant Criminal District Attorney

s/ Krisy Wright
Kristy Wright
SBN 00798601
kristy.wright@randallcounty.com
Assistant Criminal District Attorney

Randall County Criminal D.A.'s Office
Randall County Justice Center
2309 Russell Long Blvd., Ste. 120
Canyon, Texas 79015
806/468-5570

## *CERTIFICATE OF COMPLIANCE*

I hereby certify that a true and correct word count to the foregoing State's Answer to Applicant's Art. 11.07 Writ of Habeas Corpus is 5,449 words and that it was prepared with WordPerfect software in 14 point Times New Roman font.

s/ Warren L. Clark
Warren L. Clark

## *CERTIFICATE OF SERVICE*

I hereby certify that a true and correct copy of the foregoing State's Answer has been served on James Wooldridge, attorney for Applicant JOSHUA DAVID STOCKER on this the 1st day of February, 2018.

s/ Warren L. Clark
Warren L. Clark

# *EXHIBIT 1*

**NO. 18,834-A**

| | | |
|---|---|---|
| **STATE OF TEXTAS** | § | **IN THE DISTRICT COURT** |
| | § | |
| **V.** | § | **47TH JUDICIAL DISTRICT** |
| | § | |
| **TORI BROOKE PATRICK** | § | **RANDALL COUNTY, TEXAS** |

## PETITION FOR WRIT OF HABEAS CORPUS

COMES NOW JAMES E. WOOLDRIDGE, Attorney And Counselor At Law, Petitioner, pursuant to Article 11.072 of the Texas Code of Criminal Procedure, and makes known to the Court that TORI BROOKE PATRICK, Applicant, is illegally restrained in liberty solely under and by virtue of the Order Of Deferred Adjudication rendered against her on the 30TH day of March, 2007 in Cause No. 18,834-A In The 47TH Judicial District Court In And For Randall County, Texas acknowledging said Tori Brooke Patrick's plea of guilty to the offense of Kidnapping. Said Order is void and in violation of the Due Process Clauses of the Fifth and Fourteenth Amendments to the Constitution of the United States and Article 1, Section 19 of the Constitution of the State of Texas, and the right to the effective assistance of counsel embodied in the Sixth Amendment to the Constitution of the United States and Article 1, Section 10 of the Constitution of the State of Texas, and in support thereof, Petitioner would show the following:

I.

On the 30TH day of March, 2007 in Cause No. 18,834-A In The 47TH Judicial District Court In And For Randall County, Texas, an Order Of Deferred Adjudication was rendered against Tori Brooke Patrick acknowledging said Tori Brooke Patrick' plea of guilty to the offense

FILED
5/26/2016 9:31:49 PM
Jo Carter, District Clerk
Randall County, Texas
__AJ_______Deputy

of Kidnapping. Said plea was made of record concomitant with the Order of Deferred Adjudication entered the same day.

II.

Per the Order of Deferred Adjudication, Tori Brooke Patrick remains under disability by virtue of the plea complained of in this matter, specifically that she remains under the custody of the Potter-Randall Community Supervision and Corrections Department until March 29TH, 2017.

III.

Tori Brooke Patrick was represented in the proceedings in Cause No. 15,310-A, in which she was charged with Capital Murder relating to the demise of Dustin Pool, by Attorney Jami Watson from inception of the matter to May 19TH, 2004 by Attorney Joe Dawson from May 13TH, 2004 to MAY 14TH, 2004; by Attorney Don Schofield from May 14TH, 2004 to July 21ST, 2004; and by Attorney Jeffrey Robnett from July 19TH, 2004 until dismissal of the cause on March 29TH, 2007. See Register of Actions-Case No. 15310 In The 47TH District Court For Randall County, State of Texas v. Tori Brooke Patrick, attached and incorporated hereto as Appendix A.

IV.

Per the Affidavits of Tori Brooke Patrick and Attorney Jeffrey Robnett, the conduct of the Randall County Criminal District Attorney, James Farren, and his deputies, specifically the acts of Tampering With A Witness (by and through and against Tori Brooke Patrick) and Aggravated Perjury in the course of the prosecutions of Joshua Stocker, Tori Brooke Patrick, and the co-defendants involved, amounting to the infliction of coercion, duress, and the deprivation of effective counsel, renders the plea of Tori Brooke Patrick involuntary and thereby defective and

void, entitling Tori Brooke Patrick to vacate and withdraw said plea. In support, see Appendix B – Defendant's Supporting Affidavit; Appendix C - Attorney's Supporting Affidavit; Appendices D-G – Reporter's Record Excerpts from Volume 10, State of Texas v. Joshua Stocker, Cause No. 15,307-A In The 47TH District Court for Randall County, Texas; Appendix H – Use Immunity Agreement; Appendix I – Ledbetter Memo; Appendix J – Register of Actions-Case No. 18,834-A In The 47TH District Court For Randall County, State of Texas v. Tori Brooke Patrick; Appendices B-J hereto attached and incorporated.

V.

Per the affidavits of James A. Farren and Bobbie Ledbetter Bruhn, Petitioner's claims are validated. Specifically, and in denial of testimony elicited in the trial of Joshua Stocker, Farren admits in his amended affidavit that, in addition to the Use Immunity Agreement, there also existed another agreement not contained in the Use Immunity Agreement, i.e., "the only promise she had from our office was that if she told the truth under oath it would inure to her benefit." Further, even that statement is false in that there previously existed an agreement that Petitioner would receive deferred adjudication on Aggravated Kidnapping and the Capital Murder charge would be dismissed, without discussion of a term of years. See Appendix K - Letter from James Farren to Jeffrey Robnett dated July 19, 2004, hereto attached and incorporated.

VI.

The filing of the Affidavits attached to the State's Response To Defendant's Petition To Remove Randall County Criminal District Attorney and Affidavit - Amendment by James A. Farren constitutes criminal acts against the State of Texas and Tori Brooke Patrick, to wit, Aggravated Perjury and Official Oppression, such that the Randall County Criminal District

Attorney and his deputies are perpetuating the perpetration of fraud upon this court,, and continue to violate the rights of Tori Brooke Patrick in their personal interest, exactly as predicted by Ms. Patrick's counsel.

VII.

Further, the pattern of conduct committed through and against Tori Brooke Patrick and her co-defendants is demonstrated via the testimony elicited from co-defendant Guin Garcia as to the existence of any agreement with her, identically denied at the trial of Joshua Stocker, when compared with the Use Immunity Agreement executed between Guin Garcia and James Farren as of September , 2003. See Appendix L - Reporter's Record Excerpt from Volume 11, State of Texas v. Joshua Stocker, Cause No. 15,307-A In The 47TH District Court for Randall County, Texas, and Appendix M- Garcia Use Immunity Agreement, hereto attached and incorporated.

VIII.

Further, this court is complicit in the aforementioned violations of the rights of Tori Brooke Patrick and her co-defendants in that this court was made aware of at least the existence of the executed Use Immunity Agreement with Guin Garcia prior to the conclusion of proceedings, and took absolutely no remedial action. See Court's Exhibits (brown folder included with the Reporter's Record, State of Texas v. Joshua Stocker, Cause No. 15,307-A In The 47TH District Court for Randall County, Texas, currently held by the Randall County Criminal District Attorney) - State's Exhibit 263.

IX.

Further, evidence has been retrieved from the State's file demonstrating that information to the detriment of Tori Brooke Patrick and her co-defendant's was obtained via illegally

wiretapped conversations of Tori Brooke Patrick. See Appendices N-P, hereto attached and incorporated.

WHEREFORE, Petitioner prays that a Writ of Habeas Corpus be issued commanding James A. Farren, Criminal District Attorney In And For Randall County, Texas, to appear herein immediately and show cause, if any, why Applicant is restrained in liberty, and in absence of cause to vacate the plea entered in this cause.

Respectfully submitted,

JAMES E. WOOLDRIDGE
Attorney & Counselor at Law
600 S. Tyler Street, Suite 1704
LB 12051
Amarillo, Texas 79101
Tel: 806 418 8575
Fax: 806 418 8576
j.e.wooldridge@att.net

By:________________________________
JAMES E. WOOLDRIDGE
State Bar No. 24010492
Attorney for Tori Brooke Patrick

## CERTIFICATE OF SERVICE

This is to certify that on May 26TH, 2016, a true and correct copy of the above and foregoing document was served on the Randall County Criminal District Attorney's Office, 2309 Russell Long Boulevard, Room 120, Canyon, Texas 79015, by electronic transmission via ProDoc eFiling 2 to DAFELONY@suddenlinkmail.com.

________________________________
JAMES E. WOOLDRIDGE

# VERIFICATION

**STATE OF TEXAS** §
§
**COUNTY OF POTTER** §

ON THIS DAY personally appeared JAMES E. WOOLDRIDGE, who, after being placed under oath, stated the following:

"I, JAMES E. WOOLDRIDGE, having been duly sworn, upon oath state that the allegations of the above petition are true according to my belief."

Petitioner

SWORN TO AND SUBSCRIBED BEFORE ME by James E. Wooldridge on this 26TH day of May, 2016.

Janet Fergerson
Notary Public in and for the State of Texas

JANET FERGERSON
Notary Public
STATE OF TEXAS
My Comm. Exp. August 6, 2019

# *EXHIBIT 2*

**NO. 18,834-A**

| | | |
|---|---|---|
| **STATE OF TEXAS** | § | **IN THE DISTRICT COURT** |
| | § | |
| **V.** | § | **47TH JUDICIAL DISTRICT** |
| | § | |
| **TORI BROOKE PATRICK** | § | **RANDALL COUNTY** |

**PETITIONER'S SUPPORTING AFFIDAVIT**

**TO THE HONORABLE JUDGE OF SAID COURT:**

Tori Brooke Patrick appeared in person before me today and stated under oath:

"My name is Tori Brooke Patrick. My date of birth is February 21ST, 1979. I am thirty-seven years of age, and I am fully competent to make this affidavit. The facts stated in this affidavit are within my personal knowledge and are true and correct.

I am the person named as the accused in the indictment charging Kidnapping, a Third Degree Felony, against Tori Brooke Patrick in Cause No. 18,834-A in the 47TH Judicial District Court in and for Randall County, Texas, and in the indictment, now dismissed, charging Capital Murder in Cause No. 15,310-A in the 47TH Judicial District Court in and for Randall County, Texas. I am and was represented on the Kidnapping charge by attorney James E. Wooldridge of Amarillo, Texas. I was represented on the Capital Murder charge by attorney Jeffrey Robnett of Midland, Texas from the time of his substitution into the matter, July 15TH, 2004, until the charge was dismissed on March 30TH, 2007.

Immediately prior to the dismissal of the Capital Murder charge, I entered into a plea agreement on the Kidnapping charge wherein I received Deferred Adjudication for a period of ten (10) years. The Complaint and Information charging Kidnapping was filed, and Attorney James E. Wooldridge appointed for my defense, the day previous, March 29TH, 2007. The plea agreement into which I entered had been brokered between myself and the Randall County Criminal District Attorney, James Farren, over two and a half years previously, shortly after I

gave a statement on July , 2004 regarding matters in the Dustin Pool murder cases. No attorney on my behalf participated in the agreement even though, at the time of brokerage and the following two and a half years, I was represented continuously by Mr. Robnett; the agreement was purely between myself and James Farren. The agreement, as of July, 2004, was that in return for testimony structured to James Farren's satisfaction, I would receive ten (10) years deferred adjudication probation on a charge of Kidnapping, a third degree felony. If I did not cooperate or my testimony was not to James Farren's satisfaction, Mr. Farren would prosecute me for Capital Murder.

The agreement was brokered shortly after the meeting wherein I provided the statement dated July 22ND, 2004. Mr. Robnett was present at that meeting. However, immediately afterwards, James Farren contacted me and arranged for to come to his office, whereupon he told me to get rid of my attorney, Mr. Robnett, because he did not like him and I would get a much better deal from Farren without Mr. Robnett. The agreement as aforementioned was then brokered without counsel on my behalf.

Subsequently I provided testimony in the trials of Joshua Stocker, Frank Chacon, and Michael Stocker. I testified as instructed by James Farren and Jeremy Fowler. Specifically, I was instructed to testify that neither the actual agreement (as to 10 years deferred on Kidnapping) nor the Use Immunity Agreement entered into on June 28TH, 2003 existed. I was also instructed to say falsely that an agreement to testify existed between myself, James Farren, and my attorney. Prior to the Joshua Stocker trial, my testimony in such regard was rehearsed in James Farren's office by James Farren and Jeremy Fowler approximately 20 to 30 times to provide such testimony exactly as James Farren wanted it delivered according to his 'script.' I was also instructed to omit certain information, such as that I was instructed by Detective Mark Brown and attorney Laura Hamilton to leave Amarillo for Dallas for my safety, so that it appeared my departure for Dallas was purely at the behest of Craig Kimberlin. I was also instructed by James Farren to testify falsely during the Chacon trial that I had not understood the question as to the Use Immunity Agreement in previous testimony.

During the Joshua Stocker trial, Joshua Stocker's attorney, Mike Watkins, raised the issue

about the Use Immunity Agreement, whereupon James Farren informed the court that the agreements did not exist and suborned perjured testimony from Bobbi Ledbetter that the agreements did not exist. Shortly thereafter, I questioned James Farren in his office about the possible consequences if the Use Immunity Agreement were to be discovered. James Farren assured me that would never happen as "Gil (Farren) and Bobbi took care of it."

Even though Mr. Robnett remained my attorney until the Capital Murder charge was dismissed, I ceased to have any interaction with him as a direct result of James Farren directing me to "get rid of him" following the July 22ND, 2004 meeting. I did so, and complied with James Farren's directions as result of fear and duress induced by his threats to prosecute me for Capital Murder if I did not. As I now understand that the facts of this case would support neither Capital Murder or Kidnapping against me, I should never have been placed in the position of having to choose between the lesser of two evils. I was in such position because of the coercion inflicted by James Farren. Had he not threatened and persuaded me to abandon counsel, I would not have entered the plea agreement recorded in this matter. While said agreement does in fact contain my signature in the relevant places, at the time I signed I did so involuntarily as my state of mind in so doing was predicated upon fear for the rest of my life resulting from James Farren's deliberate misrepresentation to me that the testimonial facts and legal defenses available to me would have exonerated me from legal liability, and his measured steps to separate me from counsel who would have advised me appropriately such that I would never have entered into the agreement, and certainly would never have testified falsely as James Farren coerced me to do."

Tori Brooke Patrick

SUBSCRIBED AND SWORN under oath before me on this, the 22ND day of February, 2016.

SOPHIA A. CAMP
NOTARY PUBLIC,
STATE OF TEXAS
My Commission Expires 06-12-2019

Notary Public, State of Texas

# *EXHIBIT 3*

No. W-18,834-A-1

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE 47TH DISTRICT COURT |
| | § | |
| VS. | § | IN AND FOR |
| | § | |
| TORI BROOKE PATRICK | § | RANDALL COUNTY, TEXAS |

***ORDER***

Having reviewed and considered the pleadings and attachments in the above-styled and numbered cause, the Court has determined that Applicant is manifestly entitled to no relief and that this application be denied as frivolous.

SIGNED AND ENTERED this 31st day of ~~December~~ May, 2016.

JUDGE PRESIDING
By Assignment

FILED
2016 MAY 31 AM 11:07
JO CARTER, DISTRICT CLERK
RANDALL COUNTY, TEXAS
DEPUTY

# *EXHIBIT 4*

No. 15,307-A-1

| | | |
|---|---|---|
| | § | IN THE 47TH DISTRICT COURT |
| | § | |
| IN RE JOSHUA DAVID STOCKER | § | IN AND FOR |
| | § | |
| | § | RANDALL COUNTY, TEXAS |

***AFFIDAVIT***

COUNTY OF RANDALL X

STATE OF TEXAS X

BEFORE ME, a duly authorized Notary Public, personally appeared James A. Farren who, being by me duly sworn, does state the following:

"My name is James A. Farren and I am the duly elected Criminal District Attorney for Randall County, Texas. I have served in that capacity since 1995. I wish to respond to allegations made by Joshua Stocker in which he alleges that I and members of my staff intentionally misled the trial court by deliberately presenting false testimony about a use immunity agreement signed by Tori Patrick prior to her sworn testimony in three criminal trials. Presumably, he is also alleging that we intentionally hid the document in question from the trial court and the defense. Applicant also makes the additional allegation that Patrick was coerced into providing this false testimony about whether she reached a plea agreement prior to her testimony in his and Frank Chacon's trial. Finally, Applicant claims that I attempted to persuade Patrick to disassociate herself from Jeff Robnett, an attorney who represented her on a capital murder charge. The following affidavit, based on investigative files and my personal recollections, shall demonstrate that Applicant's claims are patently false.

In the latter part of 2002, detailed investigation established that two groups were responsible for the bulk of methamphetamine traffic in the Texas Panhandle. One group operated under the direction of Dustin Pool and the other was led by Craig Kimberlin. The tension between the competing drug rings began to intensify in November of 2002 when Kimberlin's home was raided by law enforcement authorities. Kimberlin and members of his drug distribution ring suspected that Pool

was the source behind the information used by law enforcement to mount the raid. Prior to the raid, threats had been exchanged by the two groups and some physical confrontations and kidnaping events had occurred.

In February of 2003, Kimberlin and his confederates held a meeting to formulate a solution to the "Pool problem." One member of the ring, Josh Bledsoe, implied that $10,000 would be put up and awarded to the person who could solve their "problem." After additional discussion and new threats from Pool, Guin Garcia, Josh Stocker and Tori Patrick formulated a scheme to kidnap Pool. The three believed that Pool had a romantic interest in Patrick and conspired to manipulate that interest to carry out the abduction.

In furtherance of this plan, Patrick called Pool and invited him to her apartment. By the time Pool arrived, Patrick, Josh Stocker and his brother Michael Stocker, were waiting in the apartment. The Stockers remained in hiding while Patrick entertained Pool. Eventually, the Stockers revealed themselves to Pool who was then assaulted and tied up. When Guin Garcia returned to the apartment, she and Patrick were escorted to a nearby hotel by Michael Stocker. Josh Stocker contacted Kimberlin and revealed Pool's capture. Pool was later moved to a farm house near Panhandle, Texas where he was beaten and tortured to death over a period of several hours by Josh Bledsoe, Josh Stocker, Frank Chacon and Craig Kimberlin. After a failed attempt to dispose of the body at Lake Meredith, Pool's remains were placed at the bottom of a grain silo under more than a ton of concrete near McCormick Road in Randall County, Texas.

Pool was reported missing on March 13, 2003 and the missing person inquiry morphed into a homicide investigation over a period of several months. Detective Mark Brown of the Special Crimes Unit with the Amarillo Police Department and APD narcotics officer Bill Redden eventually recovered Pool's body after Craig Kimberline revealed the location in an attempt to broker a plea agreement concerning drug charges he was facing. Destry Keeling, another member of the conspiracy, admitted to assisting in disposal of Pool's body. In the end, ten members of Kimberline's drug distribution ring were charged with crimes committed in connection with the abduction, murder and disposal of Dustin Pool. Four participants - Josh Bledsoe, Josh Stocker, Frank Chacon and Craig Kimberlin - were convicted of murder. Michael Stocker was convicted of aggravated kidnapping. Michael Elliston, Guin Garcia, Tori Patrick, Destry Keeling and Tyler Hale were eventually

charged with less serious crimes when they agreed to testify truthfully in the trials of the other defendants.

Tori Patrick has been represented by seven different lawyers between 2003 and the present. The Randall County District Clerk's records are a bit confusing and rendered incomplete since some of the attorneys involved in representing Patrick failed to file notice of their entry into the case or orders confirming their withdrawal. At any rate, the following list will assist the court in forming a time line of representation.

***Capital Murder, No. 15,310-A*** - filed June 23, 2003, dismissed March 30, 2007

- Laura Hamilton - March or April 2003 (withdrawal date unknown, no notice);
- Jamie Watson - June 17, 2004 to May 17, 2004;
- Joe Dawson - May 13, 2004 to date unknown (withdrawal date unknown due to lack of order permitting withdrawal);
- Don Schofield - May 14, 2003 to date unknown (withdrawal date unknown due to lack of order permitting withdrawal) and
- Jeff Robnett - July 21, 2004 to March 30, 2007 (terminated by Patrick in open court).

***Kidnaping, No. 18,834-A*** - filed March 29, 2007, pled March 30, 2007

- James Wooldridge - March 30, 2007 to date unknown (no order permitting withdrawal included in files);
- Viavia Edwards - May 13, 2009 to date unknown (no order permitting withdrawal included in files) and
- James Wooldridge - September 29, 2011 to present.

***Proceedings***

- Capital Murder filed June 23, 2003, dismissed March 30, 2007;
- Kidnaping filed March 29, 2007 with guilty plea on March 30, 2007;
- Ten years deferred adjudication granted on March 30, 2007;
- Motion to Proceed (revocation) filed September 13, 2011;
- Probation modified and Patrick sent to drug rehab (SAFPT) on October 14, 2011;
- Second Motion to Proceed filed January 25, 2016;
- Second Motion to Proceed granted, Patrick adjudicated guilty of

kidnapping and sentenced to four years confinement in prison;

- Patrick's appeal currently pending before the 11th Court of Appeals at Eastland, Texas (No. 11-17-00075-CR).

As the above time line demonstrates, Patrick was represented by several lawyers before Patrick retained Jeff Robnett of Midland, Texas. Therefore, some debriefings with Patrick occurred in the presence of other lawyers prior to Robnett's entry. Various negotiations concerning an agreement with Patrick did occur with one or more of the attorneys but there was no effort to negotiate directly with Patrick. No formalized final agreement was reached with Patrick through the attorneys because of Patrick's vacillations and inconsistencies in the information she provided and because of the several changes in representation. Nevertheless, Patrick's assertion that she met between 20 to 30 times with me in preparation for trial is false. It would have never been necessary to meet with any fact witness this many times when preparing the witness for trial. In fact, Patrick noted that she had met three times with me or Jeremy Fowler, the assistant criminal district attorney who assisted me in the Stocker trial. Her testimony at trial on this issue is accurate.

After he began his representation, Robnett was not always present when I and other members of the prosecution team met with Patrick but he was always notified of the meetings and granted permission to meet and consult with his client. By July of 2004, Patrick agreed to testify truthfully in the trials of the co-defendants and provided a written statement. Robnett was present for this event. Neither I nor any member of my staff encouraged Patrick to disassociate from Robnett. Nor did we ever encourage her to disassociate from or terminate any of the numerous lawyers who represented Patrick from time to time. Her allegations concerning such claims are utterly false.

Tori Patrick signed a Use Immunity Agreement, drafted June 28, 2003, to facilitate a proffer of information she was willing to provide. The agreement allowed her to proffer her story without fear of the information being used against her if no plea agreement was finalized. This was the only final formal agreement which she had entered into with my office by the time that Joshua Stocker and Frank Chacon were tried. The only promise she had from our office during those two trials was that if she told the truth under oath, it would inure to her benefit. By the time she testified in the trial of Michael Stocker, we were satisfied with the truthfulness of her testimony.

Eventually, Patrick testified at the trials of Josh Stocker (July of 2005), Frank Chacon (December of 2006) and Michael Stocker (February of 2009). Josh Stocker was represented at trial by Mike Watkins and C.J. McElroy. During the Stocker trial, defense counsel Watkins noticed a supplemental offense report in his copy of our file in which Bobbie Ledbetter (now Bobbie Bruhn), an investigator for our office, mentioned a use immunity agreement signed by Patrick. Watkins could not find a copy of the agreement in his files and made a *Brady* request to the trial court. His position was that if Patrick had been promised a specific sentence recommendation in the written agreement, then this sentencing recommendation would constitute *Brady* material to which he was entitled. In fact, the written agreement did not contain any promise of a specific sentencing recommendation. I knew it did not because my office has used these agreements in the past and none of them have ever contained wording which makes these kind of promises. My office has always used the same wording in the text of each and every use immunity agreement. Each use immunity agreement always requires the potential witness to tell the truth or else, the agreement is voided. The agreements never make reference to any specific sentencing recommendation.

When Watkins made his request, I initiated a search for the original Use Immunity Agreement; however, it could not be found. There was no attempt to hide or suppress this document from the defense because it would have been to the advantage of the prosecution to present the document to the trial court and defense. The document would have confirmed that no sentence recommendation was included in the agreement. Unfortunately, we could not find the original agreement nor a copy of it.

The documentation in the Dustin Pool case was huge. We were prepared to call as many as 164 witnesses. Dossiers, consisting of several pages, were prepared on each witness. We anticipated the introduction of 222 exhibits. The documentation concerning the chain of custody of many of the exhibits was voluminous. The case file for 10 potential defendants, 164 potential witnesses and 222 exhibits consisted of thousands of documents. I was disappointed that neither I nor my assistants or investigators could provide the trial court with the original or a copy of the agreement because it would have reinforced my position in the *Brady* discussions. However, with a case file as large as the Pool case, I realized that specific documents are sometimes misplaced.

Since I could not find the original or a copy of the Use Immunity Agreement, I finally concluded that the error we had made was not in losing the document but in never having created one. I visited with Ledbetter about her supplement. She and Jamie Watson (Patrick's attorney prior to time when the Josh Stocker trial began) originally seemed to believe that the document existed but I became convinced that we had intended to create the agreement but had simply failed to do so.

Watkins questioned Patrick about *an agreement*. As Patrick later clarified in the trial of Frank Chacon, she thought she was being asked about a specific plea agreement. Therefore, she denied having signed an "agreement." By the time the Chacon trial began, a copy of the missing Use Immunity Agreement had been discovered. The original was never found. I have no personal knowledge about how or where the copy was located. I realize now that the discovery confirmed Ledbetter's and Watson's attestations that a Use Immunity Agreement had been created and signed by Patrick. In other words, my belief that we had planned to enter into an immunity agreement with Patrick but had ultimately failed to do so proved incorrect. As to Patrick's suggestion that I instructed her to testify at the Chacon and Michael Stocker trials that she did not understand previous questions concerning the use immunity agreement at the Stocker trial, that is categorically false. Applicant's own offers of proof attached to his writ application merely show that she was asked about an *agreement* which she understood to be a plea bargain agreement. To this question, she answered truthfully.

Nevertheless, this conclusion bolsters my assertion that Patrick's allegations that we coached her to help cover up some scheme to hide the existence of the document are false and ridiculous. Logic and common sense dictate that production of the document during the Josh Stocker trial would have corroborated my statement to the trial court and the defense that Patrick had no specific plea agreement with my office. She was under the duty to testify truthfully or else suffer the loss of the benefits arising from the immunity agreement. Hiding it would make no sense whatsoever. I repeat: neither I, Gil Farren, Bobbie Ledbetter Bruhn nor any other member of my staff entered into any scheme to hide information from the trial court or Joshua Stocker's lawyers.

Patrick's claim that she was coerced into falsely denying under oath that she had a plea agreement with the prosecution is also obviously flawed. She testified in the trials of three co-defendants. In all three trials, her testimony was consistent with

the two statements she provided to Bobbie Ledbetter Bruhn. Her first two appearances on the witness stand occurred prior to her plea to kidnaping. The date of her third visit to the stand was well after her plea. Yet, her testimony was consistent in all three trials. In other words, she claims that this clandestine plea agreement "coerced" her to testify in the first two trials; yet she provided the same testimony in the third trial when she was longer in danger of losing her alleged secret plea deal.

When her testimony during her plea is added to the mix, she actually testified four times. Her plea testimony includes few of the details about the murder that she provided in the three trials. However, her plea testimony is consistent with her first two trial appearances because she denies having been made any promise of a specific plea offer. In the third trial, the plea was a *fait accompli*, so she obviously knew the benefit of her cooperation by then.

Perhaps the best evidence that Patrick's story is fantasy is revealed in her claim I pressured her to terminate Robnett as her lawyer. Her actions demonstrate that this claim is false. Consider her recent, counseled accusation against me: she was so responsive to my demands that it took *three* years for her to comply with my desire for Robnett's termination. She was "coerced" with a promise that she would receive a *better* plea offer if she terminated him. However, three years later, with Robnett still serving as her attorney of record, she was offered a dismissal of the pending capital murder charge and a sentence of 10 years deferred adjudication on a kidnaping charge, a third degree felony. What would a better plea deal look like? Neither she nor her current lawyer provide an answer.

From 2003 until 2016, not a single lawyer on Patrick's behalf, nor she, nor Applicant's lawyer, ever raised the issues she asserted in her 2016 writ application. Either they turned a blind eye to her plight, she never mentioned it to them or they are false and manufactured in a foolhardy attempt to void her guilty plea. Her current lawyer, who also is Applicant's current lawyer, served as her counsel on the 2011 motion to proceed when she was placed within the shadow of the penitentiary yet he failed to disclose my alleged wrongdoing. On the contrary, he waited until the final motion to revoke was filed before he raised the issues of witness tampering or undue influence.

I note that Applicant is the current beneficiary of Patrick's baseless charges,

liberally supplemented with newly-acquired "memories" of additional misconduct. Writ counsel, who has conveniently avoided explaining how he can represent Applicant and Patrick at the same time when their interests are so clearly in conflict, either ignored her additional revelations for his own purposes, knows that she never made them in the first place or that they are demonstrably false. The reader can decide but Applicant, Tori Patrick and the writ lawyer cannot have it both ways."

This concludes my affidavit.

James A. Farren

James A. Farren, Affiant

SUBSCRIBED AND SWORN TO BEFORE ME on this the 1st day of February, 2018.

FAITH WATSON
Notary Public, State of Texas
Notary ID #3603513
My Commission Expires 05-06-2020

Faith Watson

Notatry Public in and for
State of Texas

# *EXHIBIT 5*

No. 15,307-A-1

| | | |
|---|---|---|
| | § | IN THE 47TH DISTRICT COURT |
| | § | |
| IN RE JOSHUA DAVID STOCKER | § | IN AND FOR |
| | § | |
| | § | RANDALL COUNTY, TEXAS |

***AFFIDAVIT***

COUNTY OF RANDALL

STATE OF TEXAS

Before me, the undersigned authority, on this day personally appeared Bobbie Bruhn, who being by me duly sworn upon her oath, did state the following:

"My name is Bobbie Bruhn and I am currently employed as an criminal investigator with the Randall County Criminal D.A.'s Office and have worked in that capacity since October, 2002. That year, I worked on a series of homicide prosecutions against various defendants in which Tori Brooke Patrick gave testimony on behalf of the State of Texas. I have been provided a copy of Joshua Stocker's Art. 11.07 application for writ of habeas corpus. Applicant asserts that I committed perjury during his trial when I testified during a hearing outside the presence of the jury that a use immunity agreement, entered into between Defendant Patrick and the Randall County Criminal District Attorney's Office, did not exist. She also intimates that I somehow assisted in its destruction along with Gil Farren, James Farren's wife. I submit the following response to these allegations.

Prior to the Joshua Stocker trial, I and Randall County Criminal District Attorney James Farren met with Ms. Patrick and her lawyer, Jami Watson out at the Randall County Jail on June 28, 2003. Mr. Farren talked to Ms. Patrick and her lawyer in my presence about her knowledge of the Dustin Pool kidnapping and murder. He wanted to make sure that she could give truthful testimony on behalf of the State. In this regard, he also discussed the specifics of a use immunity agreement and what it would mean for Ms. Patrick as well as the State. He made clear that in the event of her cooperation, there would be no specific agreement on a punishment recommendation but rather, she would promise to give truthful testimony at later trials and that this testimony would not be used as evidence against her in any subsequent prosecution. After Mr. Farren completed his initial interview with Ms. Patrick, he departed the jail and left it up to me to flesh out Ms. Patrick's recollections about the offenses and memorialize them in a written, sworn statement.

My interview with Ms. Patrick was an exhausting ordeal. In fact, I spent just about the entire day there while I hammered out the details about her involvement in the Dustin Pool kidnapping and murder. This extended effort, made arduous because Ms. Patrick requested multiple, confidential conferences with her lawyer, was accomplished to insure that Ms. Patrick's statement was accurate and voluntary in all respects. I recall preparing a typed statement for Ms. Patrick's approval and

signature. I began the actual preparation of the statement around 1:17 p.m. Patrick signed the final typed statement around 6:45 p.m. later that evening. A corrected version of this typed statement was subsequently prepared for Patrick's signature on July 3, 2003 which she signed at 11:00 a.m. This written statement was then given to Detective Mark Brown of the Amarillo Police Department later that day.

During the Joshua Stocker trial, I was asked whether there existed a written use immunity agreement. In efforts to clear up any confusion, I remember looking through all of my personal notes pertaining to the Dustin Pool case as well as all of the files maintained in the office on the case for either an agreement or some documentation of one. I contacted Jami Watson to see if she might have perhaps retained a copy of the agreement in her files. Nevertheless, in spite of these efforts, no use immunity agreement could be found. I was then called to the stand during a hearing outside the presence of the jury in order to determine if, in fact, a use immunity agreement had been executed and what had happened to the document after its signature there at the Randall County Jail. In response to direct question from the trial judge, I testified that I did not believe that there existed a signed use of immunity agreement by Tori Patrick because I found no copy of an agreement or documentation that one was signed. I also testified that I did remember talking to both Patrick and her lawyer about a use immunity agreement but I simply did not have any

independent memory of her or anyone else signing the actual agreement. I simply did not remember seeing her sign such a document. This was truthful testimony. When shown a copy of my IR supplement, I had no reason to doubt the accuracy of my report or that, in fact, Ms. Patrick had indeed signed a use immunity agreement. I simply did not have a copy of that report in my records, documenting the agreement.

When I learned that a copy of the agreement had been found at the time of the Ray Chacon trial, I took a look at it. I have no reason to doubt that the copy attached to Stocker's writ application is not a true and correct copy of the agreement. I simply could not remember seeing her actually sign the agreement when questioned by the trial court and that is why I stated at the hearing during the Stocker trial that I didn't believe, based on my independent memory, that one actually existed. Since there had been discussion about the agreement with no independent recall on my part that it had been signed by either James Farren or Ms. Patrick, I simply assumed that it did not exist. However, when subsequently shown the supplemental IR report and the signed Use Immunity Agreement, I realize now that I was mistaken.

As to Ms. Patrick's suggestion that Gil Farren or I or the two of us in combination had somehow "taken care of the written agreement," this is a false accusation. Obviously, the document was mislaid or else, a copy would not have surfaced, along with my supplemental report to the file, during the Chacon trial in

2005. I certainly did not dispose of the agreement, destroy it or any copy or take any steps to prevent its eventual discovery."

FURTHER AFFIANT SAYETH NOT.

SIGNED this 1st day of February, 2018.

Bobbie Bruhn, Affiant

SUBSCRIBED AND SWORN TO BEFORE ME, on this the 1st day of February, 2018.

M'SHAUN LAMB
Notary Public, State of Texas
Notary ID #1052879-8
My Commission Expires 05-17-2020

Notary Public in and for
The State of Texas

# *EXHIBIT 6*

To James

Date 3-6-07 Time ☐AM ☐PM

**WHILE YOU WERE OUT**

M Jeff Robnette

of 432-682-6140 fax 684-7727

**Phone Numbers**

Office (Area Code / Number / Ext.)

Voicemail

FAX

Pager

Mobile

e-mail

☐ Telephoned
☐ Please call
☐ Returned your call
☐ Called to see you
☐ Wants to see you
☐ Will call again
☐ URGENT

**Message**

Wants plea offer for Tori faxed to him

AMPAD EFFICIENCY® Operator ML Reorder #23-000

0.00 Tx

Defer 01

AG KIDNAPPING

# *EXHIBIT 7*

JAMES A. FARREN
CRIMINAL DISTRICT ATTORNEY
RANDALL COUNTY, TEXAS

Randall County Justice Center
2309 Russell Long Blvd., Suite 120
Canyon, Texas 79015

Ph: (806) 468-5570
Fax: (806) 468-5566

March 9, 2007

Mr. Jeff Robinette
Attorney at Law

via facsimile to 432-684-7727

RE: State of Texas vs. Tori Patrick; Randall County Cause No. 15310-A

Dear Mr. Robinette:

Mr. Farren has authorized me to extend the following offer to your client in return for a plea of guilty to the lesser included offense of Aggravated Kidnapping:

10 years deferred probation
$2000 fine + court costs
community service waived while on probation in Potter County
standard conditions of probation

If this meets with your client's approval, kindly let us know and we can schedule a plea date.

Sincerely,

Jeremy Fowler
Assistant District Attorney

JF/

# *EXHIBIT 8*

which was a charge of capital murder. And in that -- in that case you have an attorney that you've hired. I don't know who it is, but I'm informed that you have an attorney.

Is that correct?

THE DEFENDANT: Yes, Your Honor.

THE COURT: Okay. I am going to have you get on the stand and tell me a little bit about that and we're going to go over your new lawyer. Okay?

THE DEFENDANT: Okay.

THE COURT: Raise your right hand.

(Defendant sworn)

THE DEFENDANT: Yes, sir.

THE COURT: Okay. Why don't you come on right up here. Thank you.

Now, let me ask you a question. What's your lawyer's name and where does he live?

THE DEFENDANT: Jeffrey Robnett and he lives in Midland, Texas.

THE COURT: Okay. And that's where he practices criminal law?

THE DEFENDANT: Yes, sir.

THE COURT: All right.

THE DEFENDANT: He has an office in Lubbock also.

THE COURT: Okay. And you are -- are desirous of -- of not employing and having Mr. Robnett as your lawyer in 15,310 anymore?

THE DEFENDANT: Correct.

THE COURT: Okay. And you've thought about that and so forth. Right?

THE DEFENDANT: Yes, sir.

THE COURT: Okay. Since the -- since the State is going to dismiss 15,310 today at the same time we do this plea, I don't think I need to cover anything else about the attorney in that case.

Now, in this case, which I've called today, which is 18,834, I've -- I've appointed you an attorney and -- James Wooldridge, who is an officer of this Court and -- have you had a chance to visit with him?

THE DEFENDANT: Yes, Your Honor, I have.

THE COURT: Okay. And you understand everything that is going on here?

THE DEFENDANT: Yes, sir.

THE COURT: Okay. And you've told him you wanted to fire Mr. Robnett in that other case and you -- and you consent to have him represent you in this case today?

THE DEFENDANT: Yes, Your Honor.

# *EXHIBIT 9*

08:57AM THE COURT: And by my signing it, I am certifying to an appellate court that you do, in fact, have no right of appeal.

08:57AM Do you understand that?

08:57AM THE DEFENDANT: Yes, Your Honor.

08:57AM THE COURT: Okay. And let me tell you what the effect of this document is. If after we finish this plea, you attempt ever to bring any kind of appeal in an appellate court, that appellate court will take this document and use it to summarily dismiss your appeal.

08:57AM Do you understand that?

08:57AM THE DEFENDANT: Yes, Your Honor.

08:57AM THE COURT: And knowing that, you still wish to plead guilty?

08:57AM THE DEFENDANT: Yes, sir.

08:57AM THE COURT: All right. Now, have you had plenty of time to go over the facts surrounding the information with Mr. Wooldridge?

08:57AM THE DEFENDANT: Yes, sir.

08:57AM THE COURT: Okay. And have the -- the two of you been able to explore all possible defenses that you have to this information?

08:57AM THE DEFENDANT: Yes, Your Honor.

08:57AM THE COURT: Okay. Mr. Wooldridge, are

you satisfied that -- that Ms. Patrick is entering this plea knowingly and voluntarily?

MR. WOOLDRIDGE: I am, Your Honor.

THE COURT: And do you have any reservations about her mental abilities?

MR. WOOLDRIDGE: I have none.

THE COURT: Thank you.

Ms. Patrick, when you plead guilty, you give up a lot of valuable constitutional and statutory rights. For instance, you have a constitutional right to a jury trial that no one can involuntarily take away from you, and you have a lot of statutory rights that the legislature has given you. You have the right to compel witnesses to testify favorably for you. You have the right to make Mr. Farren prove this case beyond a reasonable doubt, and you have a right to have this information taken to a grand jury to see if they will indict you.

Do you understand that?

THE DEFENDANT: Yes, Your Honor.

THE COURT: Do you give up all of those rights?

THE DEFENDANT: Yes, Your Honor.

THE COURT: Okay. Is this your signature on the plea papers between the word Defendant and the

# *EXHIBIT 10*

Q. And then finally today and this week, Mr. Wooldridge has been kind enough to assist you and, in fact, us in -- in completing a process that began back in 2003?

A. Yes, sir.

Q. And with all of those attorneys, you have -- other than Mr. Dawson, you've had an opportunity to visit with them and have talked with them about the facts surrounding your original charge of capital murder and the current charge of kidnapping. Is that correct?

A. Yes.

Q. And you understand that if you wanted to wait and you wanted to use Mr. Robnett and -- when he became available, we would be willing to do that?

A. Yes, sir.

Q. Okay. So this is your choice to go ahead with Mr. Wooldridge as your attorney on this case?

A. Yes, sir.

Q. Back in 2003, in March, do you recall making some phone calls from your apartment at the River Falls Apartments in Potter County in Amarillo, Texas, to a Mr. Dustin Pool?

A. Yes, sir.

Q. In fact, you and Guin Garcia and Josh Stocker were present and -- in various combinations assisted one

# *EXHIBIT 11*

No. W-15,307-A-1

| | |
|---|---|
| EX PARTE | IN THE 47th DISTRICT COURT |
| | IN AND FOR |
| JOSHUA DAVID STOCKER | RANDALL COUNTY, TEXAS |

**AFFIDAVIT OF JENNIFER CATES**

State of Texas
County of Potter

Before me, the undersigned authority, personally appeared Jennifer Cates, who, being by me duly sworn upon her oath, does depose and state the following:

My name is Jennifer Cates and I used to work as a prosecutor at the Randall County Criminal District Attorney's office. I worked at that office from approximately May 1999 until May 2006. While so employed, I helped some of my co-workers prepare for the trial of Joshua David Stocker.

On January 30, 2018, I was contacted by a member of the Randall County Criminal District Attorney's office about a wiretapping allegation raised in Cause No. W-15,307-A-1. I was asked to review a note attached as Appendix O to Mr. Stocker's writ application. This note was written by me and stated as follows: "I don't know if you want to use anything from the phone calls. Tori honestly believes we aren't listening to her—might be better to let her think that." While helping with the preparation of Joshua Stocker's trial, I listened to many jail phone calls from various co-defendants involved in the Dustin Pool murder. All of these phone calls were jail calls and did not involve wiretapping. Any suggestion that this note referred to wiretapped conversations is false.

Signed this 31st day of January, 2018.

Jennifer Cates

Jennifer Cates

Sworn to and Subscribed Before Me, the undersigned authority, on this the 31st day of January, 2018.

Victoria Medley

Notary Public in and for the State of Texas

VICTORIA MEDLEY
Notary Public, State of Texas
Notary ID #8478729
My Commission Expires 05-05-2019

# *EXHIBIT 12*

**BASIC INFORMATION RELATING TO OFFENDER (INMATE) OF TEXAS DEPARTMENT OF CRIMINAL JUSTICE**

Public Information Disclosure Sheet as stipulated by Section 552.029

Name: Kimberlin, Stephen Craig

Identification Number: 1345531

DOB: 06/27/1968

Race/Gender: W/M

**Controlling Offense:**

Charge: Murder

Sentenced: 01/05/2006

County/Court: Randall

Minimum Expiration of Sentence Date: 06/22/2048

Maximum Expiration of Sentence Date: 06/22/2048

Date received: 01/31/2006

Sentence began Date: 06/23/2003

Date Released: Currently in custody at the Hughes Unit

Date Discharged: Active

**Additional Sentences:**

Charge: Del. Cont. Subs. >400g

TDCJ: 1345531

County/Court: Randall

Sentenced: 01/05/2006

Minimum Expiration of Sentence Date: 03/08/2012

Maximum Expiration of Sentence Date: 10/20/2023

Date received: 01/31/2006

Sentence began Date: 10/20/2003

Date Released: Active

Date Discharged: Active

Texas Department of Criminal Justice

Bryan Collier
Executive Director

January 30, 2018

Kristy Wright
Randall County District Attorney's Office
2309 Russell Long Blvd.
Canyon, TX. 79015

**RE: Kimberlin, Stephen Craig** **TDCJ#: 1345531**

Pursuant to your request I am providing you the following basic information sheet of the incarceration dates for the above listed offender. Please feel free to keep copies of this document for your records. Also if our office can be of further assistance please do not hesitate in contacting us on our website www.tdcj.texas.gov or call us at 936-437-6509.

| Unit | Date |
|---|---|
| Middleton | 01/31/2006 |
| Rudd | 09/24/2008 |
| Hughes | 11/05/2008 |

Sincerely,

Angelia Alexander
Admin. Asst. III
Classification & Records

AMA/ama
cc: file

Our mission is to provide public safety, promote positive change in offender behavior, reintegrate offenders into society, and assist victims of crime.

P.O. Box 99
Huntsville, Texas 77342-0099
936-437-6509
www.tdcj.texas.gov

# *EXHIBIT 13*

No. W-15,307-A-1

| | |
|---|---|
| EX PARTE | IN THE 47th DISTRICT COURT |
| | IN AND FOR |
| JOSHUA DAVID STOCKER | RANDALL COUNTY, TEXAS |

**AFFIDAVIT OF BILL REDDEN**

State of Texas
County of Randall

Before me, the undersigned authority, personally appeared Bill Redden, who, being by me duly sworn upon his oath, does depose and state the following:

On January 25, 2018, I was given a copy of an affidavit sworn to by Jeremy Marc Green and attached to Cause No. W-15,307-A-1 as appendix X. After reading this affidavit, I wish to respond to several allegations made against me. From October 1980 until October 2011, I worked for the Amarillo Police Department. In 2003, I assisted the Drug Enforcement Agency with the investigation of large scale methamphetamine traffickers in Amarillo. I was very familiar with the traffickers at that time, which included Dustin Pool. Pool was not murdered as a result of a hit ordered out of "La Pinta". Pool and a local methamphetamine supplier, Stephen Craig Kimberlin, were feuding with each other and Kimberlin's organization was responsible for Pool's death. As for the allegation that Pool was selling drugs for me, this is untrue. I never had Pool sell or deliver any drugs. Also, I never frequented Pool's house located on Quiet Circle. The only time I have ever been to this residence was on May 31, 2002 in order to execute a search warrant. At such time I asked Pool if he wanted to cooperate in the investigation, but he refused. Moreover, any allegation that I used methamphetamine or that I was a "banger" is completely false. In brief, the allegations contained in Jeremy Green's affidavit pertaining to me are complete fabrications. It should be noted that I have never met Mr. Green or even heard of Mr. Green prior to reading his affidavit.

Signed this 30th day of January, 2018.

[signature]
Bill Redden

Sworn to and Subscribed Before Me, the undersigned authority, on this the 30th day of January, 2018.

DEITRA HILL
NOTARY PUBLIC,
STATE OF TEXAS
My Commission Expires 08-02-2018

[signature]
Notary Public in and for the State of Texas

## REPLY TO STATE'S ANSWER TO APPLICATION FOR WRIT OF HABEAS CORPUS

**While a reiteration of Applicant's claims are unnecessary, since the State's response is facially and substantively meritless, some points need to made in response to the State's continued dishonest and deceptive responses before these courts.**

**APPLICANT'S ISSUE #1:**

The State proffers absolutely no authority, because there is none, that similar facts raised by a co-defendant applied to a completely different issue can collaterally estop Applicant from using the now expanded facts to raise his own issues.

Attorney Robnett's Affidavit is clearly signed. *See Applicant's Brief, Appendix C.*

The State's attorney claims co-defendant Tori Patrick did not appeal the denial of her Petition for Writ of Habeas Corpus. Such claim is blatantly dishonest and indicative of yet more skullduggery on the part of James A. Farren, Warren L. Clark, and crew. Applicant would refer to, and request this court take judicial notice of, Cause Number 11-17-00075-CR in the Eleventh Court of Appeals, specifically the request for additional briefing originally at the behest of the Seventh Court of Appeals to address the fact that the written appeal from the denial of the writ, although clearly entered of record and filed in open court with the court and repeatedly demanded for inclusion in the record by Ms. Patrick, mysteriously never made it to the Clerk's Record filed in the matter. As Ms. Patrick's supplemental briefing has never been made available to the public

. FILED .
2/19/2018 9:15 PM
Jo Carter, District Clerk
Randall County, Texas
___ab______Deputy

through the appellate court websites even though the State's has, curiously enough, it is included here as *Appendix A*. The matter yet remains on appeal, despite the deliberate disingenuity of the State's agents.

## CONTINUED SUBORNATION OF AGGRAVATED PERJURY

A person commits an offense if, with intent to deceive and with knowledge of the statement's meaning she makes a false statement under oath or swears to the truth of a false statement previously made and the statement is required or authorized by law to be made under oath. TEX. PENAL CODE ANN. § 37.02(a)(1). A person commits an offense if she commits perjury as defined in Section 37.02, and the false statement: is made during or in connection with an official proceeding; and is material. TEX. PENAL CODE ANN. § 37.03(a). An offense under Section 37.03 is a felony of the third degree. TEX. PENAL CODE ANN. § 37.03(b). A statement is material, regardless of the admissibility of the statement under the rules of evidence, if it could have affected the course or outcome of the official proceeding. TEX. PENAL CODE ANN. § 37.04(a). It is no defense to prosecution under Section 37.03 (Aggravated Perjury) that the declarant mistakenly believed the statement to be immaterial. TEX. PENAL CODE ANN. § 37.04(b). Whether a statement is material in a given factual situation is a question of law. TEX. PENAL CODE ANN. § 37.04(c). It is a defense to prosecution under Section 37.03 (Aggravated Perjury) that the actress retracted her false statement before completion of the testimony at the official proceeding; and before it became manifest that the falsity of the statement would be exposed. TEX. PENAL CODE ANN. § 37.05. An information or indictment for perjury under Section 37.02 or aggravated perjury under Section 37.03 that alleges that

the declarant has made statements under oath, both of which cannot be true, need not allege which statement is false. At the trial the prosecution need not prove which statement is false. TEX. PENAL CODE ANN. § 37.06.

Applicant moves this court to contrast the proffered evidence so far entered with the Reporter's Records excerpts incorporated here as *Appendix B* (from Volume 3 , State of Texas v. Stephen Craig Kimberlin, Cause No. 17,288-A In The District Court, Randall County, Texas, 47TH Judicial District) & *Appendix C* (State of Texas v. Michael Jeffrey Stocker, Cause No. 17,289-A In The District Court, Randall County, Texas, 47TH Judicial District), taken before the same judge who created his "Court Exhibits." The latest sworn statements of Farren and Ledbetter (Bruhn) cannot be reconciled with either the testimony from the Stocker/Chacon/Stocker trials and certainly not with the Kimberlin pretrials, and constitutes yet another, and latest, instance of Aggravated Perjury for which the Statute of Limitations has not expired.

Further, the State's agents suggest at Page 10 of the State's Answer that Guin Garcia only denied a use immunity agreement with Potter County. A careful reading shows that response was when asked about a Potter County case involving Ray Plascencio and Guin Garcia on Page 98 of her excerpt, yet when we refer to Page 89 of the same excerpt, we see the following exchange:

Q.(By Fowler) What is the understanding of any agreement that you have worked out with Mr. Farren and our office?

A.(By Garcia) I don't have an agreement.

Perhaps the dishonesty and deception are compulsive, as it cannot be deemed intelligent or effective.

**APPLICANT'S ISSUE #2:**

Co-defendant Joshua David Stocker was incarcerated for a mere four days, from June 24TH to June 28TH, 2003. *See Appendix D*, Randall County Jail Records Search Results for Joshua David Stocker. During the period of her incarceration, she made one phone call, to her father, to discuss bond.

Insofar as the State's agents have suborned an affidavit from Jennifer Cates in an attempt to show the note referencing illegal wiretapping of a co-defendant doesn't mean what it clearly says, i.e., that Farren and Cates were actively listening (as in, not past tense) to Tori but that Tori honestly believed that they were not actively listening to her (as in, at present) and it might be good to let her keep thinking so, Applicant requests of this court the opportunity to factually resolve the now controverted and unresolved facts by issuing a subpoena for Jennifer Cates ordering her to appear and give testimony.

**APPLICANT'S ISSUE #3:**

Applicant requests of this court the opportunity to factually resolve the now controverted and unresolved facts by issuing a bench warrant for Stephen Craig Kimberlin ordering him to appear and give testimony

**APPLICANT'S ISSUE #4:**

Applicant requests of this court the opportunity to factually resolve the now controverted and unresolved facts by issuing a subpoena for William "Bill" "Dave" "Jim Brewer" Redden ordering him to appear and give testimony.

**DEFENDANT'S MOTION TO DISQUALIFY THE RANDALL COUNTY CRIMINAL DISTRICT ATTORNEY AND OFFICE, TO SPECIFICALLY DISQUALIFY WARREN L. CLARK, AND TO STRIKE THE STATE'S ANSWER**

COMES NOW JOSHUA DAVID STOCKER, Applicant/Movant, by counsel James E. Wooldridge, and pursuant to the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution, Article 1, Sections 3, 10, and 19 of the Texas Constitution, and other authority cited herein, moves this Court for an order disqualifying the Randall County Criminal District Attorney, James Farren, and the prosecuting attorneys of the Randall County Criminal District Attorney's Office, and especially Warren L. Clark. In making this motion, Joshua David Stocker relies upon her right to Due Process, her right to a fair trial, her right to counsel, her right to present a defense, her right to reliable sentencing determination, her right to equal protection, and other rights safeguarded by the Fifth, Sixth and Fourteenth Amendments to the United States Constitution, per authorities cited herein. In support thereof, this Defendant would show:

I.

Defendant moves to disqualify the Randall County Criminal District Attorney, James Farren, and any and all prosecutors from the Randall County Criminal District Attorney's Office from further representing the State of Texas in this cause, and specifically Warren L. Clark as an attorney who consulted with agents of Joshua David Stocker regarding representation in this matter to the point of having established an attorney-client relationship that would preclude Clark's subsequent representation of the State of Texas against Joshua David Stocker. *See Appendix E.*

II.

In criminal cases, the accused and the public are entitled to impartial prosecution based on statutory standards, the interests of justice and notions of fundamental fairness. A conflict for one attorney in the District Attorney's Office, particularly the elected district attorney, is a conflict for all attorneys in that office.

III.

There are conflicts that impinge upon the ability of the Randall County Criminal District Attorney's Office to objectively prosecute this case. Those conflicts also effectively preclude attorneys from that office from engaging in any objective evaluation of this case.

IV.

The Randall County Criminal District Attorney, James Farren, has committed official misconduct through the commission of the offense of Tampering With Witness, Aggravated Perjury, and Conspiracy. Other members of the Randall County Criminal District Attorney's Office in collusion with James Farren include, at a minimum, Jeremy Fowler, a former assistant district attorney, Jennifer Cates, a former assistant district attorney, and Bobbi Ledbetter, an investigator, per the evidence already submitted before this court.

V.

A person commits the offense of Tampering With Witness if, with intent to influence the witness, he offers, confers, or agrees to confer any benefit on a witness or prospective witness in an official proceeding, or he coerces a witness or a prospective witness in an official proceeding:

to testify falsely;

to withhold any testimony, information, document, or thing.

Tex. Penal Code § 36.05(a)(1) & (2).

VI.

If the official proceeding is part of the prosecution of a criminal case, an offense under Texas Penal Code 36.05 is the same category of offense as the most serious offense charged in that criminal case. Tex. Penal Code § 36.05(d).

VII.

Notwithstanding Subsection (d), if the most serious offense charged is a capital felony, an offense under this section is a felony of the first degree. Tex. Penal Code § 36.05(e).

VIII.

The offense charged in State of Texas v. Joshua Stocker, Cause No. 15,307-A in the 47TH District Court for Randall County, Texas, the subject prosecution of the criminal act committed by the Randall County Criminal District Attorney, James Farren, and his deputies, was Capital Murder.

IX.

Prior to September 1ST, 2011, the Witness Tampering statute carried only a three year statute of limitations but was modified in response to continued malfeasance on the part of prosecutors in this state. The last act of the continuing criminal episode of witness tampering occurred in the trial of Michael Jeffrey Stocker in February, 2009. As the modification of the statute of limitations occurred before the three years expiration of the former statute of luminations, the limitation was thereby extended to the current no limitation, such that James A. Farren, Jeremy Fowler, and Bobbie Ledbetter Bruhn remain subject to indictment on these matters, in addition to the charges of Aggravated Perjury having been committed in their attempt to defeat