the declarant has made statements under oath, both of which cannot be true, need not allege which statement is false. At the trial the prosecution need not prove which statement is false. TEX. PENAL CODE ANN. § 37.06.

Applicant moves this court to contrast the proffered evidence so far entered with the Reporter's Records excerpts incorporated here as *Appendix B* (from Volume 3 , State of Texas v. Stephen Craig Kimberlin, Cause No. 17,288-A In The District Court, Randall County, Texas, 47TH Judicial District) & *Appendix C* (State of Texas v. Michael Jeffrey Stocker, Cause No. 17,289-A In The District Court, Randall County, Texas, 47TH Judicial District), taken before the same judge who created his "Court Exhibits." The latest sworn statements of Farren and Ledbetter (Bruhn) cannot be reconciled with either the testimony from the Stocker/Chacon/Stocker trials and certainly not with the Kimberlin pretrials, and constitutes yet another, and latest, instance of Aggravated Perjury for which the Statute of Limitations has not expired.

Further, the State's agents suggest at Page 10 of the State's Answer that Guin Garcia only denied a use immunity agreement with Potter County. A careful reading shows that response was when asked about a Potter County case involving Ray Plascencio and Guin Garcia on Page 98 of her excerpt, yet when we refer to Page 89 of the same excerpt, we see the following exchange:

> Q.(By Fowler) What is the understanding of any agreement that you have worked out with Mr. Farren and our office?
>
> A.(By Garcia) I don't have an agreement.

Perhaps the dishonesty and deception are compulsive, as it cannot be deemed intelligent or effective.

**APPLICANT'S ISSUE #2:**

Co-defendant Tori Brooke Patrick was incarcerated for a mere four days, from June 24TH to June 28TH, 2003. *See Appendix D*, Randall County Jail Records Search Results for Tori Brooke Patrick. During the period of her incarceration, she made one phone call, to her father, to discuss bond.

Insofar as the State's agents have suborned an affidavit from Jennifer Cates in an attempt to show the note referencing illegal wiretapping of a co-defendant doesn't mean what it clearly says, i.e., that Farren and Cates were actively listening (as in, not past tense) to Tori but that Tori honestly believed that they were not actively listening to her (as in, at present) and it might be good to let her keep thinking so, Applicant requests of this court the opportunity to factually resolve the now controverted and unresolved facts by issuing a subpoena for Jennifer Cates ordering her to appear and give testimony.

**APPLICANT'S ISSUE #3:**

Applicant requests of this court the opportunity to factually resolve the now controverted and unresolved facts by issuing a bench warrant for Stephen Craig Kimberlin ordering him to appear and give testimony

**APPLICANT'S ISSUE #4:**

Applicant requests of this court the opportunity to factually resolve the now controverted and unresolved facts by issuing a subpoena for William "Bill" "Dave" "Jim Brewer" Redden ordering him to appear and give testimony.

**DEFENDANT'S MOTION TO DISQUALIFY THE RANDALL COUNTY CRIMINAL DISTRICT ATTORNEY AND OFFICE, TO SPECIFICALLY DISQUALIFY WARREN L. CLARK, AND TO STRIKE THE STATE'S ANSWER**

COMES NOW JOSHUA DAVID STOCKER, Applicant/Movant, by counsel James E. Wooldridge, and pursuant to the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution, Article 1, Sections 3, 10, and 19 of the Texas Constitution, and other authority cited herein, moves this Court for an order disqualifying the Randall County Criminal District Attorney, James Farren, and the prosecuting attorneys of the Randall County Criminal District Attorney's Office, and especially Warren L. Clark. In making this motion, Joshua David Stocker relies upon her right to Due Process, her right to a fair trial, her right to counsel, her right to present a defense, her right to reliable sentencing determination, her right to equal protection, and other rights safeguarded by the Fifth, Sixth and Fourteenth Amendments to the United States Constitution, per authorities cited herein. In support thereof, this Defendant would show:

I.

Defendant moves to disqualify the Randall County Criminal District Attorney, James Farren, and any and all prosecutors from the Randall County Criminal District Attorney's Office from further representing the State of Texas in this cause, and specifically Warren L. Clark as an attorney who consulted with agents of Joshua David Stocker regarding representation in this matter to the point of having established an attorney-client relationship that would preclude Clark's subsequent representation of the State of Texas against Joshua David Stocker. *See Appendix E.*

II.

In criminal cases, the accused and the public are entitled to impartial prosecution based on statutory standards, the interests of justice and notions of fundamental fairness. A conflict for one attorney in the District Attorney's Office, particularly the elected district attorney, is a conflict for all attorneys in that office.

III.

There are conflicts that impinge upon the ability of the Randall County Criminal District Attorney's Office to objectively prosecute this case. Those conflicts also effectively preclude attorneys from that office from engaging in any objective evaluation of this case.

IV.

The Randall County Criminal District Attorney, James Farren, has committed official misconduct through the commission of the offense of Tampering With Witness, Aggravated Perjury, and Conspiracy. Other members of the Randall County Criminal District Attorney's Office in collusion with James Farren include, at a minimum, Jeremy Fowler, a former assistant district attorney, Jennifer Cates, a former assistant district attorney, and Bobbi Ledbetter, an investigator, per the evidence already submitted before this court.

V.

A person commits the offense of Tampering With Witness if, with intent to influence the witness, he offers, confers, or agrees to confer any benefit on a witness or prospective witness in an official proceeding, or he coerces a witness or a prospective witness in an official proceeding:

to testify falsely;

to withhold any testimony, information, document, or thing.

Tex. Penal Code § 36.05(a)(1) & (2).

VI.

If the official proceeding is part of the prosecution of a criminal case, an offense under Texas Penal Code 36.05 is the same category of offense as the most serious offense charged in that criminal case. Tex. Penal Code § 36.05(d).

VII.

Notwithstanding Subsection (d), if the most serious offense charged is a capital felony, an offense under this section is a felony of the first degree. Tex. Penal Code § 36.05(e).

VIII.

The offense charged in State of Texas v. Joshua Stocker, Cause No. 15,307-A in the 47TH District Court for Randall County, Texas, the subject prosecution of the criminal act committed by the Randall County Criminal District Attorney, James Farren, and his deputies, was Capital Murder.

IX.

Prior to September 1ST, 2011, the Witness Tampering statute carried only a three year statute of limitations but was modified in response to continued malfeasance on the part of prosecutors in this state. The last act of the continuing criminal episode of witness tampering occurred in the trial of Michael Jeffrey Stocker in February, 2009. As the modification of the statute of limitations occurred before the three years expiration of the former statute of luminations, the limitation was thereby extended to the current no limitation, such that James A. Farren, Jeremy Fowler, and Bobbie Ledbetter Bruhn remain subject to indictment on these matters, in addition to the charges of Aggravated Perjury having been committed in their attempt to defeat

the accusations against them.

X.

Co-defendants in this instant matter, Tori Brooke Patrick and Guin Garcia, were persons with whom the Randall County Criminal District Attorney's Office tampered to testify falsely and to withhold testimony, information, a document, or thing, to wit, evidence of a Use Immunity Agreements executed between Tori Brooke Patrick, Guin Garcia, and the Randall County Criminal District Attorney, James A. Farren.

## ARGUMENT AND AUTHORITY

**The District Attorney's Office Should Be Disqualified Because The Prosecutors' Actual Bias And Conflict of Interest Violates Due Process.**

**Due Process Requires a Fair and Impartial Forum and Unbiased Decision-Makers.**

1. The essential guarantee of the due process clause is procedural fairness. U.S. Const. Amend's 5 & 14. No citizen of this State shall be deprived of life, liberty, property, privileges or immunities, or in any manner disfranchised, except by the due course of the law of the land. TEX.CODE CRIM. PROC. ANN. art. 1.04

2.Accordingly, judges and other decision makers must be neutral and detached. *In re Murchison*, 349 U.S. 133, 136 (1955); *Tumey v. Ohio*, 273 US. 510 (1927). This rule extends to prosecuting attorneys who must be free of corrupting conflicts of interest. A prosecuting attorney

may not prosecute a case where he is so biased against the accused that the accused is "denied . . . the possibility of a fair-minded exercise of the prosecutor's discretion." *Ganger v. Peyton*, 3798 F.2d 709, 712 (4TH Cir. 1967) (prosecutor's financial interest in civil litigation disqualified him from prosecuting related criminal case).

3. A prosecutor who is less concerned with justice and the fair administration of a trial than he is with his professional reputation or his own personal or financial interests in a case must disqualify himself. In *Tumey v. Ohio*, the United States Supreme Court outlawed a system whereby the mayor of a town served as judge in liquor possession cases in which the punishment was a fine. The money paid pursuant to the fine went into a fund from which the mayor could recover his costs for hearing the case. And in *Ward v. Village of Monroeville*, an Ohio statute authorizing mayors to sit in ordinance violation cases, the fines from which would go into the municipality's coffers, was held unconstitutional. "[T]he test is whether the mayor's situation is one 'which would offer a possible temptation to the average man as a judge to forget the burden of proof required to convict the defendant, or which might lead him not to hold the balance nice, clear and true between the state and the accused....' " *Ward v. Village of Monroeville*, 409 U.S. 57, 60 (1972) quoting, *Tumey*, supra, 273 U.S. at p. 532.

4. The American Bar Association's Code of Professional Responsibility addresses the special considerations applicable to a lawyer who is also a public official: "A lawyer who is a public officer, whether full or part-time, should not engage in activities in which his personal or professional interests are or foreseeably may be in conflict with his official duties." (ABA Code

of Prof. Responsibility, EC 8–8.) "[A]n attorney holding public office should avoid all conduct which might lead the layman to conclude that the attorney is utilizing his public position to further his professional success or personal interests." (ABA Committee on Prof. Ethics, opn. No. 192 (1939).

5. A prosecutor who is less concerned with justice and the fair administration of a trial than he is with his professional reputation or his own personal or financial interests in a case must disqualify himself. *See, e.g. Clancy v. Superior Court*, 705 P.2d 347, 39 Cal.3d 740, 746-47; *People v. Greer*, 561 P.2d 1164, 19 Cal.3d 255, 261 (1977); ABA Criminal Justice Standard 3-1.2 (c),(e)(prosecutor must seek justice, not merely to convict and he must be guided by ethical codes); ABA Criminal Justice Standard 3-1.2 (a),(f) (prosecutor must avoid professional conflicts of interest and may not permit his professional judgment to be influenced by personal, political or financial interests).

6. The fact that a criminal proceeding is supervised by a disinterested judge does not meliorate the conflict of interest created by a prosecutor with a personal interest in the case, because a prosecutor is quasi-judicial officer with an independent duty to seek justice. *Young v. Vuitton*, 81 U.S. 787, 807 (1987), citing ABA Model Code of Professional Responsibility Canon 7-13. The *Young* Court commented on the unique power held by public prosecutors in our legal system.

> "... the fact that the Judge makes the initial decision that a contempt prosecution should proceed not sufficient to quell concern that prosecution by an interested

party may be influenced by improper motives. A ***prosecutor*** exercises considerable discretion in matters such as the determination of which persons should be targets of investigation, what methods of investigation should be used, what information will be sought as evidence, which persons should be charged with what offenses, which persons should be utilized as witnesses, whether to enter into plea bargains and the terms on which they will be established, and whether any individuals should be granted immunity. These decisions, critical to the conduct of a prosecution, are all made outside the supervision of the court."

*Young*, 481 U.S. at 807.

7. It shall be the primary duty of all prosecuting attorneys, including any special prosecutors, not to convict, but to see that justice is done. They shall not suppress facts or secrete witnesses capable of establishing the innocence of the accused. TEX.CODE CRIM. PROC. ANN. art. 2.01. It is the duty of the trial court, the attorney representing the accused, the attorney representing the state and all peace officers to so conduct themselves as to insure a fair trial for both the state and the defendant, not impair the presumption of innocence, and at the same time afford the public the benefits of a free press. TEX.CODE CRIM. PROC. ANN. art. 2.03(b). District and county attorneys shall not be of counsel adversely to the State in any case, in any court. TEX.CODE CRIM. PROC. ANN. art. 2.08(b).

8. A judge of a court in which a district or county attorney represents the State shall declare

the district or county attorney disqualified for purposes of Article 2.07 on a showing that the attorney is the subject of a criminal investigation by a law enforcement agency if that investigation is based on credible evidence of criminal misconduct for an offense that is within the attorney's authority to prosecute. TEX.CODE CRIM. PROC. ANN. art. 2.08(b). See Tex. Code Crim. Proc. Art. 2.08; see also *In re Guerra*, 235 S.W.3d 392, 420-24 (Tex.App.--Corpus Christi 2007, orig. proc.) (holding that a trial court can disqualify a district attorney without notice and appoint an attorney *pro tem* when a grand jury seeks to investigate the district attorney for possible criminal activities). A trial court may not disqualify a district attorney or his staff on the basis of a conflict of interest that does not rise to the level of a due process violation. *State ex rel. Hill v. Pirtle*, 887 SW 2d 921, 927 (Tex.Crim.App.1994). Ergo, a court contrariwise may disqualify a district attorney or his staff on the basis of a conflict of interest that does rise to the level of a due process violation.

9. The conflict of interest in this case is particularly egregious because it was a criminal act and fraud perpetrated and perpetuated upon the court engineered and implemented by the Randall County Criminal District Attorney himself, and his agents. Once discovered, James Farren and his agents/co-conspirators have a manifest interest in using the power of the state to protect themselves against the state as an issue in self-preservation directly opposed to the mandates of article 2.01 of the Texas Code of Criminal Procedure.

10. These wrongful, voluntary actions by the District Attorney have also created a public perception of unfairness and bias that violate due process and undermine public confidence in

the courts and justice system.

## CONCLUSION

This court should grant an evidentiary hearing on the conflicts in this case and impose an appropriate remedy, including disqualification of the Randall County Criminal District Attorney, his Office, and any former employees thereof, and specifically Warren L. Clark as having previously represented the Applicant he now opposes, from prosecuting this case, and further to strike the State's response as opposed to the interests of the State of Texas and a criminal act therein against.

## PRAYER

Applicant prays this honorable Court of Criminal Appeals sustain the Applicant's Issues and reverse his sentence and enter an order of acquittal, and otherwise to remand this cause to the trial court and order that Applicant be granted a new trial.

Respectfully submitted,

JAMES E. WOOLDRIDGE
S.B.T. No. 24010492
600 S. Tyler Street, Suite 1704
LB 12051
Amarillo, Texas 79101
TEL: (806) 418 8575
FAX: (806) 418 8576
Attorney for Applicant,
Joshua David Stocker

## CERTIFICATE OF COMPLIANCE

I, JAMES E. WOOLDRIDGE, hereby certify that pursuant to TEX.R.APP.P. 9.4, this Reply To State's Answer To Application For Writ Of Habeas Corpus contains 3,387 words. In making this certificate of compliance, I am relying on the word count provided by the software used to prepare the document.

JAMES E. WOOLDRIDGE

## CERTIFICATE OF SERVICE

This is to certify that on February 20TH, 2018, a true and correct copy of the above and foregoing document was served on the Randall County Criminal District Attorney's Office, 2309 Russell Long Boulevard, Room 120, Canyon, Texas 79015, by electronic mail transmission to DAAPPEAL@randallcounty.com.

JAMES E. WOOLDRIDGE

# APPENDIX A

# JAMES E. WOOLDRIDGE
ATTORNEY & COUNSELOR AT LAW

CHASE TOWER
**600 S. Tyler Street, Suite 1704**
**LB 12051**
**Amarillo, Texas 79101**

TEL: **806 418 8575**
FAX: **806 418 8576**
j.e.wooldridge@att.net
WooldridgeLaw.net

The College of the State Bar of Texas
Professionalism Through Education
MEMBER of the College of the State Bar of Texas


24TH FEBRUARY, 2017

VIVIAN LONG, CLERK
Seventh Court of Appeals
Potter Couinty Courts Building
501 S. Fillmore Street
Amarillo, Texas 79101-2449

RE: 07-16-00215-CR, Tori Brooke Patrick v. State of Texas

Dear Ms. Long,

Please accept this as the letter brief to be filed on behalf of Appellant Tori Brooke Patrick per this court's instruction via letter of February 16TH, 2017.

I.

As to whether the district clerk's assignment of habeas and ordinary appellate matters under the same number would require a notice of appeal expressly encompassing the trial court's ruling on the application for habeas corpus, Appellant contends the question is moot. If separate notice is not required, then Appellant's complaints are properly before this court as part and parcel of the appeal. But even if separate notice is required, Appellant satisfied her requirement by actually filing a notice of appeal expressly encompassing the trial court's ruling on the application for habeas corpus. Said notice of appeal was presented to the court in writing immediately upon the court's ruling. R.R. 5:17.

II.

If an application for writ of habeas corpus is denied in whole or part, the applicant may appeal under Article 44.02 and Rule 31, Texas Rules of Appellate Procedure. TEX.CODE CRIM. PROC. ANN. art. 11.072 § 8. When written notice of appeal from a judgment or order in a habeas corpus or bail proceeding is filed, the trial court clerk must prepare and certify the clerk's record and, if the appellant requests, the court reporter must prepare and certify a reporter's record. The clerk must send the clerk's record and the court reporter must send the reporter's record to the appellate court within 15 days after the notice of appeal is filed. TEX. R. APP. P. 31.1. But even if oral notice is itself insufficient, if a bona fide effort is made to appeal, an appellant should be given a new opportunity to do so even though untimely.

*Linwood v. NCNB Texas*, 885 S.W.2D 102 (Tex.1994). Habeas is proper to compel an out-of-time appeal. *Nelson v. State*, 725 S.W.2d 784 (Tex.App.-San Antonio 1987, no writ). Failure of counsel to give notice of appeal though appellant desired appeal requires grant of out-of-time appeal. *Ex parte Axel*, 757 S.W.2d 369 (Tex.Crim.App.1988). A request for transcript amounts to notice of appeal. *Buchanan v. State*, 881 S.W.2d 376 (Tex.App.-Houston {1st Dist.] 1994), *rev'd on other grounds by* 911 S.W.2d 11 (Tex.Crim.App. 1995). Appellant's Request For Preparation Of Reporter's Record and Written Designation Specifying Matters For Inclusion In The Clerk's Record and request for supplementation of the clerk's record are a matter of record. C.R. 1:283, 286; C.S.R. 1:114. Thus, as Appellant has taken all steps necessary even assuming aground that no notice of appeal specific to the habeas matter was properly entered, Appellant is in the position that an out-of-time appeal would be mandated, even if necessary to file for habeas on top of habeas.

III.

Appellant, in fact, filed a written Notice Of Appeal specific to the denial of her Application For Writ Of Habeas Corpus. R.R. 5:17. Said notice of appeal was separate and apart from the notice subsequently filed, both oral and written, upon Appellant's conviction and sentencing. R.R. 5:54. The computer generated unsigned copy of the habeas notice is attached and incorporated hereto as a separate document, to demonstrate the language difference from the notice regarding the conviction recorded at C.R. 1:281.

That the written Notice Of Appeal was made of record in open court is made clear from the following excerpt from the Reporter's Record:

THE COURT: All right. Thank you, sir. All right. As the -- I think as stated before, the record will show I have considered all of the affidavits that were previously submitted in the other petitions and motions. I've also considered all of the affidavits and the records submitted on this petition together with the supplement. I don't see any need for an evidentiary hearing. I'm going to deny any relief on the Application for Writ of Habeas Corpus.
MR. WOOLDRIDGE: Your Honor, at this time, then we would provide Court with Notice of Appeal. May I approach?
THE COURT: Sure.
MR. CLARK: Your Honor, is counsel submitting you an Order of Dismissal denying --
THE COURT: No, this is Notice of Appeal.
MR. CLARK: Haven't even entered the order yet, have you?
THE COURT: I've -- I'm stating it verbally.
R.R. 5:16-17.

State's counsel, Warren L. Clark, from two feet away, was a direct witness to the submission of the habeas-specific notice of appeal, which he now states categorically as not existing in the State's response, in direct violation of the Texas Disciplinary Rules of Professional Conduct. A lawyer shall not bring or defend a proceeding, or assert or controvert an issue therein, unless the lawyer reasonably believes that there is a basis for doing so that is not frivolous. TEX.DISCIPLINARY.R.PROF.CONDUCT Rule 3.01. A lawyer shall not knowingly make a false statement of material fact or law to a tribunal. TEX.DISCIPLINARY.R.PROF.CONDUCT Rule 3.03(a)(1). A lawyer shall not knowingly fail to disclose a fact to a tribunal when disclosure is necessary to avoid assisting a criminal or fraudulent act. TEX.DISCIPLINARY.R.PROF.CONDUCT Rule 3.03(a)(2).

Appellant has previously demanded of the Randall County District Clerk that all matters relating to the habeas matter be included in the Supplemental Clerk's Record, apparently to no avail. As the Reporter's Record clearly reflects that the habeas-specific Notice Of Appeal was filed in open court, received by the court in open court, and that in response to the State's query was clearly identified by the court as a notice of appeal in response to the denial of the application for writ of habeas corpus, such document's existence cannot be questioned and it should fall to this court to make demand of the Randall County District Clerk to produce the subject government/court document or otherwise explain why this document no longer exists and at whose direction was it destroyed.

Thank you for your attention to these matters.

Sincerely,

/s/ JAMES E. WOOLDRIDGE
JAMES E. WOOLDRIDGE

CERTIFICATE OF SERVICE

I, JAMES E. WOOLDRIDGE, certify that a true and correct copy of the foregoing Brief For Appellant was delivered by electronic service, via email to the Randall County Criminal District Attorney's Office for Appellee the State of Texas, 2309 Russell Long Boulevard, Room 120, Canyon, Texas 79015, on the 24TH day of February, 2017, in accordance with TRAP 9.5.

/s/ JAMES E. WOOLDRIDGE
JAMES E. WOOLDRIDGE

# APPENDIX B

THE WITNESS: Yes, sir.

THE COURT: It sounds like they may need you again.

THE WITNESS: All right, sir.

THE COURT: I can't tell. Call your next witness.

MR. HALE: We call Ms. Ledbetter to the stand, please.

THE COURT: The Rule is still invoked, Mr. Redden. Thank you, sir.

(Witness was duly sworn.)

THE COURT: Have a seat. Mr. Herrmann, are you going to do the Direct? Her voice is weak and froggy, and her words, so would you go slow? Thank you.

BOBBIE LEDBETTER,

having been first duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. HALE:

Q. Would you state your full name, please?

A. Bobbie Ledbetter.

Q. What do you do? How are you employed?

A. I'm an investigator for the Randall County District Attorney's office.

Q. How long have you had that capacity?

A. I've been there since October of 2002.

THE COURT: Mr. Parker.

THE WITNESS: I'm sorry.

THE COURT: It's okay.

THE WITNESS: It's not as bad as it sounds.

THE COURT: Tell us if you need a break or need a pause, or speak as slow as you need to. Go ahead.

Q. (BY MR. HALE) Have you assisted the District Attorney's office on the Craig Kimberlin murder case?

A. Yes, sir, I have.

Q. Have you interviewed the witnesses in the case and been present when they were being interviewed?

A. A few of them, yes, sir.

Q. Are you familiar with the files of those witnesses held by the District Attorney's office?

A. Somewhat.

Q. I want to ask you a question. There are a number of witnesses. I would like to ask you some -- list you some of the names to assist you.

A. Okay.

Q. One of the witnesses probably will be -- or maybe will be Josh Bledsoe, Conner Hale, Jason Hixon, Esther Keeling, Brook Vandergrif, Jessica Kimberlin and Josh Stockard. Now, are you familiar of whether or not any of those witnesses have any sort of signed immunity agreements or unspoken immunity agreements with the

District Attorney's office of Randall County?

A. I don't know specifically which ones had signed these agreements. I wasn't involved in every interview with all of those people.

Q. Can you tell us of any that you do know today that have use immunity agreements with your office?

A. Of the ones that you mentioned?

Q. Yes.

A. I believe Jessica Kimberlin was one of them, of the ones you mentioned. And I'm not sure about the others.

Q. Well, Craig Kimberlin has an agreement, doesn't he?

A. Has a use immunity agreement?

Q. Yes.

A. I believe he did sign an agreement, yes.

Q. And also Tori Patrick. Is that correct?

A. Yes, I believe so.

MR. HALE: May I approach the witness, Your Honor?

THE COURT: Yes.

MR. HALE: Just mark this Movant's --

THE COURT: Well, you have made the warrant 10.

MR. HALE: It can be whatever.

THE COURT: It will be 14.

THE COURT REPORTER: It's 14.

THE COURT: What happened to 11 and 12?

MR. HERRMANN: They're right here.

THE COURT: All right. You can do it like that. I just was asking. I just hoped I hadn't missed anything.

Q. (BY MR. HALE) I want to ask you, ma'am, if that's a copy -- that is Exhibit 14. I'm going to ask you: Is that a true and accurate copy of an agreement that the Randall County District Attorney's office has with Ms. Tori Patrick?

A. Yes, it is.

Q. When was that immunity agreement signed?

A. June 28th of 2003.

Q. And who was present when it was signed?

A. Tori Brooke Patrick, James A. Farren, Bobbie Ledbetter, Gil Farren and Jami K. Watson.

Q. Now, is Ms. Watson a member of the District Attorney's office at this time?

A. Yes, she is.

Q. Do you know when she came to work at the District Attorney's office?

A. I believe it was April of '04.

Q. And were those parties actually in the room when

Ms. Patrick signed the affidavit?

A. I believe so.

Q. Because they witnessed it?

A. Yes, sir.

Q. Now, who is Gil Farren?

A. She is a victim witness coordinator for the Randall County Sheriff's office and the Randall County District Attorney.

Q. And she is the wife of the District Attorney?

A. Yes, sir.

Q. And she was present when the witness consummated the use immunity agreement?

A. Yes.

Q. Now, had you talked to Ms. Patrick before that June 28th?

A. No, sir, I had not.

Q. Who had talked to Ms. Patrick about the use immunity agreement that she signed?

A. I believe she spoke with her attorney at the time, and I believe Mark Brown, too, on Tori Patrick, and probably with James Farren through Mark Brown.

Q. Do you have a copy of your incident report supplement that you made on July 23rd?

A. No, not with me.

MR. HALE: May I approach the witness?

THE COURT: Yes.

MR. HALE: I introduce Defense 14.

MR. FARREN: No objection.

THE COURT: Defense 14 is admitted.

Q. (BY MR. HALE) Ms. Ledbetter, in the body of your report you say that during these discussions Ms. Patrick gave Mr. Farren a detailed account of what happened in an incident involving the kidnapping and eventual murder of Dustin Poole, and agreed to sign a written statement concerning the incident. Is that correct?

A. Yes, sir.

Q. Now, how long did this detailed statement that Ms. Patrick gave, about how long did that conversation last?

A. We were there all day. I'm not really sure how long we visited before I started actually typing her statement. I was there --

Q. Ma'am?

A. -- an hour maybe.

Q. Before Ms. Patrick -- where did these conversations occur?

A. They were in the investigative suites at the Randall County Sheriff's office.

Q. And Mr. Farren came to the jail along with his wife to discuss and consult these agreements and this

information. Correct?
A. At the Sheriff's office, yes.
Q. Now, do you know whether or not Ms. Watson, who was then the attorney, had talked to the District Attorney's office before this meeting?
A. I feel they probably did because she was instrumental in setting up the meeting with Ms. Patrick.
Q. And you don't know if Ms. Patrick had talked to Officer Brown before?
A. I do not know that, no, sir.
Q. Okay. Do you know how many times that Officer Brown went to her and talked with her?
A. I don't for certain. I believe it was twice.
Q. Now, when she started these discussions with your office, did she have any other Counsel?
A. Besides Ms. Watson?
Q. That's correct.
A. I don't believe so.
Q. Okay. Isn't it true that Laura Hamilton represented her at one time?
A. I did learn that later, yes.
Q. Okay. And do you know or are you familiar with why Ms. Hamilton withdrew and her second Counsel came and intervened in the case?
A. What I took from that meeting was there was a

conflict with one of the co-defendants, that whenever Ms. Patrick would start to talk about Ms. Hamilton, Ms. Watson would ask that I wouldn't write so she could talk to Ms. Patrick without conflict.

Q. Well, now, do you know when Ms. Hamilton got off the case?

A. No, I don't. I actually don't even know if she actually ever even represented Ms. Patrick in the beginning.

Q. Do you know whether or not there was a tape recording of this meeting made?

A. No, there was not.

Q. Did your office decide sometimes to record the conversations with these witnesses and sometimes not to record them?

A. No, sir. My office, the District Attorney's office, to my knowledge never records anything, video or audio.

Q. Well, isn't it true that the jail does videos there in those suites?

A. The jail doesn't. The investigators may record suspects or witnesses when they are interviewing. Those are members of the Sheriff's office and we wouldn't operate their equipment.

Q. Do you know whether or not any sort of recording

was made by you, by the District Attorney's office, by the Randall County jail, of that meeting and of those discussions of immunity for Ms. Tori Patrick?

MR. FARREN: Objection, asked and answered.

THE COURT: Overruled.

A. No.

Q. (BY MR. HALE) Have there been -- at the time that Ms. Patrick gave this statement to you in your office, since that time, have there been other additional criminal charges in either Potter or Randall County that have been filed on Ms. Tori Patrick?

A. I believe so.

Q. Are you aware of those?

A. I don't know specific. I mean, I don't remember specifically what --

Q. Tell us what you know about that?

A. I mean, Ms. Patrick would show up from time to time. I think she was picked up for forgery.

MR. FARREN: Your Honor, I'm going to object to the relevance of her -- her testimony as to her visit.

MR. HALE: I'm fixing to make a road.

THE COURT: Overruled.

Q. (BY MR. HALE) Has Ms. Patrick been told that her immunity agreement will enure to her benefit on the later

criminal charges?
A. I don't know the answer to that.
Q. Are you aware of whether the District Attorney, Mr. Farren, ever talked to the defendant Josh Stockard?
A. Yes, he did.
Q. And where did that occur?
A. At the investigators' suites in the Randall County Sheriff's office.
Q. Were you present?
A. Yes, sir, I was.
Q. When was that conversation?
A. I believe it was June 25th of 2003.
Q. Were you present when some of those conversations occurred?
A. There was one, one encounter, one conversation.
Q. When was that?
A. I believe it was June 25th, 2003.
Q. What do you recall from that conversation?
A. Mr. Farren and I had Gil bring Mr. Stockard out, and he -- I think Mr. Stockard said he wanted to talk with Mr. Farren. And when we got in there, Mr. Farren started explaining use of immunity agreement. Mr. Stockard wanted to know what was in it for him and what -- how he would benefit if he testified. And Mr. Farren told him that he couldn't make any promises or make any deals with him, or

he would not make any deals with him. And Mr. Stockard told us that he would rather get the needle than get life in prison.

Q. Did Mr. Farren tell him that he would seek -- when you made this comment about he would rather get the needle than face life imprisonment, Mr. Farren had earlier told him that he would seek the death penalty in the case, didn't he?

A. I think Mr. Farren explained what the punishment was for the case that Mr. Stockard had -- or the offense that Mr. Stockard had been arrested for, so he knew what the options were that were on the table.

Q. Were there other parties present when Mr. Farren conducted this interview with Mr. Stockard?

A. Yes. I believe at that time Mr. Isern was his attorney.

Q. And what date do you say that that occurred on?

A. I thought it was June 25th, but I could be wrong. I would have to look back on the report to be sure.

Q. At some point, isn't it true -- oh, excuse me. I will withdraw that. So would it be fair to say that thus far you have talked about a series of parties in this case that the District Attorney visited with and made -- had discussions of use immunity agreements in exchange for

testimony?

A. Yes.

Q. Josh Stockard was one of them. Tori Brooks -- Tori Patrick was one of them, and Craig Kimberlin was one of them?

A. I believe that's correct.

Q. Now, what about Jessica Kimberlin?

A. I believe she was.

Q. Do you recall when those conversations with Mr. District Attorney occurred and where?

A. I wasn't involved in the discussions about use immunity with Mr. Bledsoe, Mr. Kimberlin or Ms. Kimberlin, so I don't know when those conversations actually occurred.

Q. But you are aware that at least three or four so far that we have elicited from you, Mr. District Attorney participated in those pre-statement negotiations?

A. I don't think that Mr. Farren approached anyone that was going to speak with us and explained use immunity agreement before they ever gave a statement, if they had criminal charges pending or were involved in a case.

Q. Now, did -- I have some dates here I want to ask you, and if you don't know, you can tell us. But I believe that the incident report reflects that there were at least three meetings with the District Attorney and

Mr. Josh Stockard. April the 14th, '03, 24th of May, '03 -- or 21 May '03. And were there any other times that you remember when Mr. District Attorney met with Josh Stockard?

A. The only thing I know of personally of Mr. Stockard and Mr. Farren was the one I mentioned where I was present with David Isern at the jail on June 25th, 2003.

MR. HALE: Pass the witness.

CROSS-EXAMINATION

BY MR. FARREN:

Q. Ms. Ledbetter, I will try to be brief. I know your voice is weak. You were asked a few moments ago about other dealings with Josh Stockard and me, and you indicated you only know of one meeting with me?

A. That's correct.

Q. Do you know if he did, in fact, though, meet with a Potter County prosecutor on one or more occasions early in the investigation?

A. I don't know.

Q. Okay. Do you know an attorney named Pat Murphy who works for Potter County?

A. Yes, I do.

Q. But you don't know if Mr. Stockard met with Pat Murphy or not?

A. No, I don't.

Q. Okay. Do you know what the practice, in fact, firm practice of our office is as far as attorneys meeting with witnesses or potential witnesses? Do they ever do that alone?

A. No, sir.

Q. Is there always a non-attorney present?

A. Yes, sir. We usually have an investigator present.

Q. Why do we do that?

A. So that if we learn new potential information, or potential information for trial, it doesn't make the attorney a witness. The investigator could be a witness.

Q. So this policy always makes available someone else who could be called to the stand if necessary to testify about what happened or what was said?

A. Yes, sir.

Q. You were asked about, in your incident report, a detailed statement Ms. Patrick -- an oral statement Ms. Patrick gave when I was present. Do you recall that?

A. Yes, I do.

Q. And then you were asked questions about taking a statement from her, and you indicated that it took almost all day.

A. Yes, sir, it did.

Q. Was I present all day or just during this oral statement?

A. Just during the first portion of it.

Q. And how long was that statement compared to taking the written statement?

A. It was pretty short compared to actually typing up the statement.

Q. Would it be fair to say Ms. Patrick gave us a summary of what she could tell us after she was informed about the use immunity agreement, and then you took a long written statement from her?

A. Yes, sir, that's correct.

Q. You were asked about Ms. Hamilton, Laura Hamilton, representing Tori Patrick. Do you recall that?

A. Yes, sir.

Q. You don't know that she was ever actually officially an attorney for Ms. Patrick?

A. No, I do not.

Q. Okay. Do you know if Ms. Hamilton in fact represented or represents one or more other co-defendants in the case?

A. Yes, sir, she does.

Q. And do you know if representing Ms. Patrick and another defendant in the same case would be a conflict? I mean for Ms. Hamilton.

MR. HALE: Your Honor, I object to that. She's not qualified to make that statement. That's a legal conclusion and I object.

THE COURT: Sustained.

MR. FARREN: Pass the witness.

REDIRECT EXAMINATION

BY MR. HALE:

Q. I have only one question briefly. You testified under cross-examination by Mr. Farren that she told you all -- or in his words gave, I believe, a brief synopsis of what she could reveal. Do you have any notes of that brief synopsis?

A. No, sir, I don't.

Q. Are there any notes anywhere about that brief synopsis?

A. No, sir.

Q. But you do know that she was in the office being interrogated by you and/or Mr. Farren and/or other people for almost all afternoon -- I believe you said all day or all afternoon?

A. It was all day.

Q. Okay. Was Mr. Redden ever present?

A. No, sir.

Q. Was Mr. Brown ever present?

A. No, sir.

Q. So only people from the District Attorney's office?

A. And her attorney.

MR. HALE: Okay. Pass the witness.

RECROSS-EXAMINATION

BY MR. FARREN:

Q. I want to make sure you understood Mr. Hale's question.

MR. HALE: Your Honor, I think that if the witness didn't understand --

MR. FARREN: May I finish my question before he objects, Your Honor?

THE COURT: I think that is a good practice. Let him finish, don't answer, and then you make your objection, Mr. Hale. Go ahead and finish your question, or start it again.

Q. (BY MR. FARREN) Do you recall being asked by Mr. Hale about me being present and participating in the interrogation of Tori Patrick?

A. Yes.

Q. Did you understand the question in reference to the word interrogation?

A. Yes. I --

THE COURT: Hold up, Ms. Ledbetter. Did you have an objection, Counsel?

MR. HALE: Well, I think my objection wasn't -- I don't think there's an arguable way to phrase it, but he's trying to suggest to her what her answer is, and I object.

THE COURT: Well, that's what we call a leading question.

MR. HALE: That's correct but --

THE COURT: And it's your witness.

MR. HALE: Well, but she's an adverse witness and you have ruled that we can, I guess, use leading questions, at least during these deals. I no longer have an objection.

THE COURT: It speeds the process. The Court is aware that it may have been a leading question, but the Court is also aware that it does speed up the process. Any other questions, Mr. Farren?

MR. FARREN: Yes, Your Honor.

THE COURT: Okay.

Q. (BY MR. FARREN) Did you understand what he meant by the word interrogation?

A. Yes.

Q. Did I participate in an interrogation of Ms. Patrick?

A. No, sir. I was trying to say that. He cut me off.

Q. Okay. Did you in fact interrogate Ms. Patrick?
A. No, sir, I did not.
Q. Describe for the Court briefly this process you used after -- first of all, was I present during the written statement?
A. No, sir, you were not.
Q. Describe for the Court and the record the process you used in getting the information from Ms. Patrick?
A. Ms. Patrick started from the beginning of what she told in the brief version earlier, and would go slow so that I could type as she spoke and get details. We would go through like a paragraph or a few sentences and I would type it, and I would read it back to Ms. Patrick to make sure that it was accurate. And if it was accurate we would move on, and if it was inaccurate we would correct it and then reread it and continue.
Q. And again, to make sure the record is clear, was Ms. Watson, her attorney, present first when she met with all of us to decide if she wanted to enter a use immunity agreement?
A. Ms. Watson was present with Ms. Patrick the whole entire day.
Q. Okay. So she was present during the early meeting about use immunity and then present during the

time you created the written statement?

A. Yes, sir.

MR. FARREN: Pass the witness.

REDIRECT EXAMINATION

BY MR. HALE:

Q. Do you recall the date that Ms. Watson came to work at the District Attorney's office?

A. I just know it was April, 2004.

MR. HALE: No further questions.

MR. FARREN: Last question.

RECROSS-EXAMINATION

BY MR. FARREN:

Q. Was there ever any discussion during the meeting you have described about Ms. Watson coming to work for our office?

A. No.

MR. FARREN: Pass the witness.

MR. HALE: No further questions.

THE COURT: Good. You may step down, Ms. Ledbetter.

THE WITNESS: Thank you.

THE COURT: Rest your voice. We are going to take a break.

THE WITNESS: Judge, can I be released?

THE COURT: Fine with me. Mr. Hale, can

Ms. Ledbetter go home and rest her voice?

MR. HALE: Yes. We don't have any further questions, Your Honor.

THE COURT: Thanks for coming.

(Recess.)

THE COURT: Call your next witness, Mr. Hale.

MR. HALE: Your Honor, at this time the Defense plans to call the accused, Stephen Kimberlin, but we want the record to reflect we offer his testimony for the sole purpose of testifying to these motions that we have today, and don't intend to go into anything else.

THE COURT: All right. Will you stand and raise your hand, Mr. Kimberlin.

(Witness was duly sworn.)

THE COURT: Thank you, sir. Sit right up there.

STEPHEN CRAIG KIMBERLIN,

having been first duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. HALE:

Q. Would you state your full name, please?

A. It's Stephen Craig Kimberlin.

Q. And Mr. Kimberlin, how old a gentleman are you?

A. 37.

# APPENDIX C

# REPORTER'S RECORD

VOLUME 1 OF 1 VOLUMES

TRIAL COURT CAUSE NO. 17,289-A

| | | |
|---|---|---|
| THE STATE OF TEXAS | ) | IN THE DISTRICT COURT |
| | ) | |
| VS. | ) | RANDALL COUNTY, TEXAS |
| | ) | |
| MICHAEL JEFFREY STOCKER | ) | 47TH JUDICIAL DISTRICT |

COPY

*******************************************************

EXCERPT PROCEEDINGS

*******************************************************

On the 3rd and 10th days of February, 2009, the following excerpt proceedings came on to be heard in the above-entitled and numbered cause before the Honorable Hal Miner, Judge presiding, held in Canyon, Randall County, Texas;

Proceedings reported by Stenographic Method.

A P P E A R A N C E S

FOR THE STATE OF TEXAS:
SBOT NO. 06839400
Mr. James A. Farren
Randall County District Attorney
SBOT NO. 24010033
Mr. Jeremy Robert Fowler
Randall County Assistant District Attorney
2309 Russell Long Boulevard, Suite 120
Canyon, Texas 79015
(806) 468-5570

FOR THE DEFENDANT:
SBOT NO. 00790467
Mr. Kelly Clark
Attorney at Law
1601 Broadway
Lubbock, Texas 79401
(806) 765-9977

P R O C E E D I N G S

February 3, 2009

(Thereupon the following excerpt proceedings were had)

DIRECT EXAMINATION OF MARK BROWN

BY MR. FARREN:

Q. Okay. During this investigation you had visited with Jeremy Patrick, Tori Patrick, Josh Bledsoe. Did you also visit with Guin Garcia?

A. Yes, sir.

Q. Do you remember if around August 8th, you talked to Guin Garcia?

A. Yes, sir.

Q. Did you, in fact, take a statement from her?

A. Yes.

Q. Had you been able to talk with her prior to this?

A. No.

Q. Why?

A. She was avoiding me.

Q. But eventually you were able to make contact with her?

A. Yes.

Q. When you talked with Ms. Garcia on August 8th, was she under arrest, charged with anything at that

point?

A. Not at that point.

Q. Did she have any arrangement, agreement, deal with you of any kind?

A. None.

(Excerpt proceedings concluded)

February 3, 2009

(Thereupon, the following excerpt proceedings were had)

CROSS-EXAMINATION OF MARK BROWN

BY MR. CLARK:

Q. I'm going to show you a document and ask you if -- if you recognize that document?

A. A use immunity agreement.

Q. Who is it granted to?

A. Guin Garcia.

Q. And whose signatures are on it?

A. James Farren and mine and Guin Garcia, September 8th.

Q. And that doesn't appear to have been altered. There appears to be -- where it was punched for holes to be put in a notebook?

A. Yes, sir.

Q. Other than that, do you believe that to be a fair and accurate reproduction of the document that was executed?

A. Yes, sir.

Q. And that is an agreement not to use her statement against her. Is that correct?

A. Yes, sir.

MR. CLARK: Upon tendering to the

Prosecution, we would ask that Defendant's Exhibit 5 be entered. I put State's on that. I'm sorry. I need to get a different sticker.

MR. FARREN: I don't think there's any basis to introduce the agreement. We will -- we will stipulate to the jury that there was a use immunity agreement with Guin Garcia to give a statement, but there was no agreement of any other for a deal or anything. But I don't think there's any basis to introduce statements or a use immunity agreement.

MR. CLARK: Your Honor, I believe that Mr. Brown denied that any agreement had taken place prior to this, and I believe this is contrary to the testimony.

THE COURT: If you will call that Defendant's 5, I'll admit it, instead of State's 5.

MR. CLARK: Yes, Your Honor. I put the wrong sticker on that one.

THE COURT: Okay. Yeah.

MR. CLARK: Let the record reflect that I'm stacking those exhibit stickers.

THE COURT: Well, all right. As long as it's clear.

MR. CLARK: Yes, Your Honor.

THE COURT: All right. Thank you.

Q. (BY MR. CLARK) So, in fact, Ms. Garcia did have

some protections when she gave her statement. Is that correct?

A. Statement, yes.

Q. And that was from both yourself and Mr. Farren?

A. Correct.

Q. So the earlier testimony was misstated.

A. Yes.

Q. Is that correct?

A. Yes.

MR. CLARK: I'll pass the witness.

REDIRECT EXAMINATION

BY MR. FARREN:

Q. Okay. Sergeant Brown, for clarification, Tori Patrick and Craig Kimberlin signed use immunity agreements in the discussions you had with them and others had with them; was an effort to reach an agreement about a deal before we knew whether they were going to testify or not. That this was part of an negotiation on both Tori Patrick's part and Craig Kimberlin's part to reach a deal about a plea. Correct?

A. Yes.

Q. But with Guin Garcia, although there was a use immunity agreement, we had no arrangements for any kind of deal or -- or any kind of agreement to any sentence

or what she was going to be charged with or anything else?

A. No. This -- this was to get her to give us a statement.

Q. Okay. So while there may have been a -- and, again, what is a use immunity agreement? I want to make sure we understand.

A. It's -- they agree to tell the truth and omit nothing. And if they do that, none of what they say can be used against them.

Q. Is it correct or not, for the jury, based on your involvement in this investigation, that there's a distinction between what was going on with Tori and -- and Kimberlin compared to Guin and everybody else?

A. Oh, yeah.

Q. Okay.

(Excerpt proceedings concluded)

P R O C E E D I N G S

February 10, 2009

(Thereupon, the following excerpt proceedings were had)

MR. FOWLER: May it please the Court.

THE COURT: Mr. Fowler.

MR. FOWLER: Counsel.

MR. CLARK: Counsel.

STATE'S CLOSING ARGUMENT

BY MR. FOWLER: Ladies and Gentlemen of the Jury. I'm going to visit with you about three different areas today; the Court's Charge, what the Judge just read to you, and specifically Number 12, which is the most important paragraph in what he just read to you. The second thing I want to visit with you about, some of the facts that you have heard. And the third thing I want to visit with you is some of the issues the Defense has raised and talk about some of those.

But before we dive right into the charge and paragraph 12, I certainly want to express our thanks. We have taken a week and a half out of your lives, a week and a half from your families, your co-workers, your friends, and your service is greatly appreciated here in Randall County.

Now, admittedly, what the Judge just read

to you sounds very complex and I want to try to help you understand it. There are several things in there that are straightforward. Your verdict has to be unanimous. You have to elect a foreman. There are several other legal issues that can become quite confusing.

As the Judge indicated to you, there is a charge submitted to you for the offense of capital murder. That's what Michael Stocker is charged with, capital murder. If for some reason you find the evidence insufficient in some manner, the Judge tells you, you can consider the lesser included offenses of aggravated kidnapping. Either Michael Stocker is guilty of committing the aggravated kidnapping himself, what's called as a principal, or he may be guilty of committing aggravated kidnapping as a party. He helped somebody else commit the aggravated kidnapping. So there are two ways. If you find the evidence insufficient on capital murder, there are two ways he could be found guilty of aggravated kidnapping.

If for some reason you think the evidence is insufficient on aggravated kidnapping, the Judge tells you you have to consider the lesser offense of just straight kidnapping. And there are again, the same two ways he can be found guilty of just kidnapping; either actually doing the kidnapping himself as a

principal or either doing the kidnapping, helping somebody else as a party. So that's -- that's how the charge is structured about the actual charge that he is charged with.

Now, there is also what's called an accomplice witness instruction. The Judge tells you that three people as a matter of law were what's called accomplices; Tori, Guin and Josh Bledsoe. And these witnesses -- and this was discussed in jury selection. I know that seems like two or three weeks ago, but it was only last Monday.

Mr. Farren and both Mr. Clark talked to you about accomplice witnesses. That is, since they are charged with almost the same offense, there has to be some kind of verification of their testimony. You can't just convict based on Tori's testimony alone. There has to be some kind of outside corroboration that tends to connect the Defendant to the commission of the offense.

It doesn't say you have to corroborate -- if Tori says A, B, C and D, it doesn't say you have to corroborate A, B, C and D, because that would mean -- what's the point of putting Tori on to testify if you had to reprove every single thing she said. It just says you have to find some outside information that tends to connect Michael Stocker to the commission of

the crime.

Judge Miner also tells you that Destry Keeling is what's called an accomplice as a matter of fact. That means it's up to you to decide if he's an accomplice. If you remember Destry Keeling, he essentially met Josh Stocker and Josh Bledsoe at Lake Meredith when the body was already dead and you had that whole Lake Meredith fiasco, and then he buried the body.

If you believe Destry Keeling is an accomplice to the murder, the capital murder, then the same rules apply to his testimony. That is, you would also have to have some outside independent evidence that corroborates, that tends to connect Michael Stocker to the commission of the crime.

The Judge does not define beyond a reasonable doubt. And if you go back to jury selection, you will remember from last Monday, both Mr. Farren talked about reasonable doubt and Mr. Clark talked about beyond a reasonable doubt. The Judge doesn't define reasonable doubt. It is for you to use your common sense and experiences to define it.

If you remember Mr. Farren had the example of the commentator on the news talking to O.J.'s defense attorney. And O.J.'s defense attorney said, well, you didn't have an opinion going in, and after you've heard

the evidence and you believe he did it, then there has been a thought process in your mind to believe he did it and it has been proved to you beyond a reasonable doubt.

Now, on the other hand Mr. Clark says, well, you're all reasonable people. If you have a doubt, isn't that a reasonable doubt? Well, that's not quite. You may have a reasonable doubt about a lot of things in this case. What's an example? Tori says she received a half gallon jug of milk and diapers from Michael and Guin when they came to the Motel 6. Guin says they bought them at Wal-Mart. Michael says I wasn't even involved in getting any milk. You may have a reasonable doubt as to whether Tori really even received milk and diapers. But, again, that doesn't mean you should acquit the Defendant. You have to have a reasonable doubt as to one of the elements of the offense.

Paragraph Number 12 is the most important paragraph in this charge, and that's where the Judge says how somebody is criminally responsible for the conduct of another. He is criminally responsible for an offense if in the attempt to carry out a conspiracy to commit one felony, another felony is committed by one of the conspirators, all conspirators are guilty of the felony actually committed, though having no intent to

commit it if the offense was committed in furtherance of the unlawful purpose and was one that should have been anticipated as a result of carrying out the conspiracy. That can be summed up with Mr. Farren's phrase from jury selection. If you're in for a penny, you're in for a pound. That is what paragraph 12 tells you.

You remember we had all these complicated examples in jury selection about A, B and C, and D was doing something, and Mr. Farren and I were robbing the Toot'n Totum, and I was driving the getaway car. That is what that paragraph addresses right there. If you're in for a penny, you're in for a pound.

So those are some of the things that the Judge tells you in the charge. There's also paragraph 21 which deserves mention. The Judge tells you you are not to consider the idea of punishment. Your sole function is to determine the guilt or innocence of Michael Stocker.

There was talk in jury selection, well, if someone isn't as responsible, we'll try to even it out in punishment maybe. Maybe the getaway driver didn't really know somebody was going to be killed or shot. Do not let those thoughts creep into your mind. Your only function, as the Judge tells you in paragraph 21, is to figure out the guilt or innocence of Michael Stocker.

Now, in talking about the facts of the case, I want you-all to remember the reason why we have 12 of y'all is because 12 memories are much more powerful than one. If I say something or Mr. Clark or James says something about, well, Tori said this and you don't remember Tori saying that, you go with your 12 collective memories, because that's why we have 12 of you and not one of you.

To draw yourself out from the case, why this case is extremely complicated is essentially you have three crime scenes. Now, really the whole Panhandle of Texas is a crime scene, because the body was taken everywhere. But for simplicity sake, we put Tori's apartment, the farm, and the grain silo. And what's even more confusing than the three crime scenes are three different sets of people at each crime scene. And so that is why during the course of this investigation you learned that our office entered into negotiations and agreements with various defendants to figure out what happened at the grain silo.

Obviously, Dustin Pool is dead and we can't talk with him. And so it was necessary to make an arrangement with one of those three; Kimberlin, Chacon or Keeling. And if you remember, Kimberlin had his defense and told Mark Brown where the body was, but lied

about everything else. So his deal was revoked, and essentially left Destry Keeling, who had no other involvement in this to work out an arrangement.

You remember at the farm Stocker, Kimberlin, Elliston, Bledsoe and Chacon were all out at the farm. Now, Elliston never went upstairs. He never participated in the beating. So to figure out what was going to happen upstairs, what the truth was that happened upstairs at Elliston's house, it was necessary to enter into negotiations with Josh Bledsoe.

At Tori Patrick's apartment, if you remember Kimberlin and Elliston essentially arrived after Tori went and Michael had already been there. So they really don't know firsthand what exactly happened in Tori's apartment. So it was essential to enter into agreements with Tori and Guin to figure out what had happened in her apartment.

Now, you may not like entering into plea agreements with people. You may think it's unseemly. You may think it's distasteful, but Mr. Farren talked about it in jury selection. It's one of the necessary situations we have to do in our business. None of the agreements that Tori or Guin or Bledsoe or Keeling have entered into have been hidden, swept under the rug from you, this is all out in the open. They were known to

Josh Stocker's lawyer. They were known to Frank Chacon's lawyers. This has all been out in the open. And even if you have a problem with it, the buck stops right there at Mr. Farren. He is your District Attorney, you've elected him four different times. That's why he's elected to make those hard calls about who should get a plea agreement and who shouldn't.

So even though you may not like the fact that Tori ended up -- got probation, I would urge you to consider the reality of the situation that this investigation found itself in; three different crime scenes and three different sets of players at each crime scene.

Now, of the people who were at the apartment, Tori and Guin placed Michael Stocker in the apartment before Dustin Pool arrived; two eyewitnesses placed him there. The other one who could actually vouch for Michael Stocker, who was at the Randall County Jail we learned yesterday, but who didn't testify --

MR. CLARK: Objection, Your Honor. I believe this is an unconstitutional shift of the burden for the Defendant to prove something.

THE COURT: Sustained.

MR. FOWLER: The Defendant has the right to call any witnesses they want. Mr. Farren talked about

that in jury selection. Joshua Stocker was not called as a witness --

MR. CLARK: Your Honor, I again object to an unconstitutional shift of the burden.

THE COURT: Sustained.

MR. CLARK: Your Honor, may we approach?

THE COURT: Yes, sir.

(At the bench, on the record, outside the hearing of the jury)

MR. CLARK: Your Honor, at this time, we move for a mistrial. There's no way we can ever undo that. They have told the jury that he hasn't proven it, he hasn't called him. He repeated it twice to catch their attention --

THE COURT: He sure did.

MR. CLARK: -- and we move for a mistrial.

MR. FOWLER: Your Honor --

THE COURT: After I sustained the objection, you did it again. And you may disagree with me, but I sustained that objection.

MR. FOWLER: Yes, sir.

THE COURT: Do you understand me?

MR. FOWLER: Yes, sir.

THE COURT: You could have endangered this whole deal here. I'm going to deny your motion, but it

may be good. Everybody get back.

MR. CLARK: We would move to have --

THE REPORTER: I couldn't hear you, Kelly.

THE COURT: Say it again.

MR. CLARK: We would move to have the jury admonished, Your Honor.

THE COURT: Okay.

(Bench conference concluded)

THE COURT: Ladies and Gentlemen, you will disregard that statement about calling Josh Stocker as a witness.

MR. FOWLER: And so the two eyewitnesses that were there, Tori and Guin, have testified that Michael was there before Dustin Pool.

Now, Mr. Clark has spent a lot of time focusing on Tori's statements. Is Tori a person that strikes you as somebody that could keep a lie together for over six years? She can lie to an investigator from our office in her June statement, which is in evidence. And if you want to see it, send out a note saying, we want to see Tori's statement, send it back. Does she strike you as someone that could keep a lie together under cross-examination in Joshua Stocker's trial? Does she strike you as somebody that could keep the lie together in Frank Chacon's trial and keep the lie

together in this trial? Tori Patrick isn't that sophisticated. And the reason why her statement is consistent with what she told the investigator, what she told the jury in Joshua Stocker's trial, what she told the jury in Frank Chacon's trial is because it is the truth.

MR. CLARK: Your Honor, may we approach?

(At the bench, on the record, outside the hearing of the jury)

MR. CLARK: Your Honor, Counsel is personally vouching for the credibility of the witness. He has said she is telling the truth. It's not about whether -- inconsistency; it's his personal vouching.

MR. FARREN: He didn't say he personally believed she is telling the truth. He just says the evidence shows she is telling the truth. You can interpret it either way.

THE COURT: Hold on.

MR. CLARK: May I step back to my counsel table for just a moment, Your Honor?

THE COURT: What?

MR. CLARK: May I step back to my counsel table for just a moment?

THE COURT: Sure.

(Pause in proceedings)

MR. CLARK: Your Honor, here is the most current. It's the United States of America versus --

MR. FARREN: Well, I'm well aware of that case, Your Honor. He says -- he says, she's telling the truth. He didn't say I think she's telling the truth. The jury is allowed to interpret --

THE COURT: That's what he said. That's right.

MR. FARREN: Okay. One other point I would like to make, Your Honor. We understand your ruling and we understand your concern about the earlier event. I just want to remind the Court and I want the record to reflect, even though we understand it, it's your ruling and whatever you say is correct. There was unobjected to testimony from Michael Stocker during his testimony that he understood that Josh was out at the jail and he was --

THE COURT: There was testimony about that, and I'm not going to rehash this.

MR. FARREN: No. I just --

THE COURT: If you want to do this after the jury goes out, we'll spend all afternoon.

MR. FARREN: Yes, sir. I just wanted it in the record.

THE COURT: Then I'll overrule your

objection about the bolstering. Everybody step back. Thank you.

(Bench conference concluded)

MR. FOWLER: When Guin -- you remember Mark Brown couldn't find Guin. She never gave a bogus statement to Mark Brown. She gave one statement in September '03, and then again she tells a consistent story to this jury about Joshua Stocker. Does she strike you as someone that could keep the lie together for six years?

If you were to believe the Defendant's testimony yesterday that he merely showed up after Pool was incapacitated and he checked Tori into the Motel 6, you would have to conclude that everything -- almost essentially everything Guin said was a lie. Guin didn't have a vehicle. How did she show back up to Motel 6 if Michael was there? Remember Chris Eason testified they were her taxi service because she didn't have a vehicle. Who moved Dustin Pool's car?

You member Jessica Pool, the ex-wife, said, yeah, I lent him my green Monte Carlo because he was going to go fill it up with gas that day. And Jessica Pool testified that vehicle was recovered at the Tiffany Square Apartments. If you were to believe Michael's testimony, who moved that car?

And so I submit to you, Ladies and Gentlemen, that Michael Stocker's testimony yesterday just didn't add up. And it also didn't add up with regard to the Canyon kidnapping, which you can consider in this case. He has given three different versions of the events in Canyon, two to Lieutenant Dale Davis, which are in evidence and you can ask to see, and then the version he gave yesterday.

Also, recall that Josh Bledsoe said he had a conversation with the Defendant and the Defendant made admissions to him after it about being there and getting his brother's back. And on the -- when Bledsoe and Kimberlin and Chacon went out to the farm, Kimberlin tells them how this all went down in Tori's apartment, and how Michael was there to get his brother's back. And, in fact, Kimberlin tells Mark Brown, I had a conversation with Michael after all this happened and Michael admits he was getting his brother's back.

If you were to believe the Defendant's testimony yesterday, you would also have to conclude that Tori just made up this random statement to Jeremy Patrick, that she just inserted Michael and Josh into being there before Dustin was disabled. Why would she lie to Jeremy Patrick and say -- make up that Michael was there before Tori -- before Pool was disabled? You

then also remember that Josh Stocker told Destry Keeling, Michael was there in the apartment and helped me obtain Pool.

Now, the Defense has made much ado about the timeline in this case. Figuring out when Dustin Pool was assaulted has -- has always been something of a situation where you have to back into the time. The motel -- the Motel 6 receipt was 4:49 a.m. Okay. So we know the assault or abduction happened before then.

If you recall from Tori's testimony, Pool received a phone call from a man named Ray Plasencio, a guy that was kidnapped and beaten several weeks earlier. Pool's right-hand man. And Mark Brown on his phone chart that's introduced into evidence, has the phone call from Plasencio to Pool at 3:45 a.m. sometime between 3:45 a.m., when Pool got the call from Plasencio in Tori's apartment until 4:49 a.m., when they were checked into Motel 6, is the approximate time of when the assault on Pool happened.

Now, you look on Michael's phone records, the call from Josh came in at 2:42, and Mark Brown testified to that. That that phone call on -- and this is Michael's records even though it says Jeff Stocker. The call came -- incoming 2:42 is from Josh, and that's verified by looking at Josh's records.

Now, you remember Ashley, the Defendant's wife, testified that she -- or that he called her at 680-6713 at 11:49. So we know the Defendant was not with Ashley Stocker on 11:49. Now, she also claims the next call at 12:21 was her calling Michael. But all we have is her testimony, and we don't know where that comes from. It's from a land to a mobile. And it very easily could have been Tori Patrick's landline, Josh Stocker using it, calling Michael Stocker. Because if you remember from the testimony, the actual phone calls from Tori's landline to a cell phone -- they started at about 11:30 p.m. on the 9th. And so it would make sense -- it would fit for Josh to be calling Michael at 12:21, saying, hey, get up here. I need you.

But even if this was the very first call at 2:42 from Josh to Michael saying get out there, that gives him plenty of time to arrive in Amarillo before the Plasencio to Pool call at 3:35.

MR. FARREN: Jeremy, about three minutes.

MR. FOWLER: Thank you.

So, Ladies and Gentlemen, when you consider the evidence, take as much time as you need. When you look at the evidence and you look at the charge, Michael Stocker was in Tori's apartment before Pool was disabled. Two eyewitnesses have said that. You didn't

get to meet Jill Paulson, Dustin's mother, but Mark Brown introduced you to her, the lady in the back right corner. If anyone starts to feel sorry for Michael Stocker, I would ask them to --

MR. CLARK: Objection; Your Honor. This is an impermissible argument; pleading compassions and prejudices of the jury.

THE COURT: I'll overrule that objection.

MR. FOWLER: I would ask that you consider Ms. Paulson, the lady who lost her son, didn't know the whereabouts for three months. It was a gruesome and a horrendous crime.

Ladies and Gentlemen, after you consider the evidence, do the right thing, hold Michael accountable, tell him there are consequences to his actions. If you run with trouble, you're going to get in trouble. Find him guilty of capital murder. Thank you.

THE COURT: Thank you, Mr. Fowler.

(Excerpt proceedings concluded)

REPORTER'S CERTIFICATE

THE STATE OF TEXAS )
COUNTY OF RANDALL )

I, Dina Wall, Official Court Reporter in and for the 47th District Court of Randall County, State of Texas, do hereby certify that the above and foregoing contains a true and correct transcription of all portions of evidence and other proceedings requested in writing by counsel for the parties to be included in this volume of the Reporter's Record, in the above-styled and numbered cause, all of which occurred in open court or in chambers and were reported by me.

I further certify that this Reporter's Record of the proceedings truly and correctly reflects the exhibits, if any, admitted by the respective parties.

I further certify that the total cost for the preparation of this Reporter's Record is $135.00 and was paid by Mr. Jeff Stocker.

WITNESS MY OFFICIAL HAND this the 12th day of April, 2009.

Dina Wall, Texas CSR 4784
Expiration Date: 12-31-2010
Official Court Reporter
47th District Court
Randall County, Texas
Canyon, Texas 79015
(806) 468-5557

# APPENDIX D

# Jail Records Search Results



**Record Count:** 5
**Search By:** Defendant **Last Name:** patrick **First Name:** tori

| Booking Number | Defendant Name | Booked | Released | Arresting Agency | Charge(s) |
|---|---|---|---|---|---|
| 12720 | PATRICK, TORI BROC | 06/24/2003 | 06/28/2003 | Randall County Sherifi | CAPITAL MURDER |
| 60466 | PATRICK, TORI BROC | 09/16/2011 | 10/25/2011 | | MTP/KIDNAPPING |
| 1630648 | PATRICK, TORI BROC | 01/26/2016 | 01/26/2016 | | MTP/KIDNAPPING |
| 1633748 | PATRICK, TORI BROC | 05/31/2016 | 05/31/2016 | | MTP\KIDNAPPING |
| 1745646 | PATRICK, TORI BROC | 09/26/2017 | 09/26/2017 | Amarillo Police | AGGREGATED THEF |

# APPENDIX E